**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLOBAL GAMING PHILIPPINES, LLC, <br><br> *Plaintiff,* <br><br> vs. <br><br> ENRIQUE K. RAZON, JR.; BLOOMBERRY RESORTS AND HOTELS INC.; SURESTE PROPERTIES, INC.; COLLINGWOOD OIL & GAS HOLDINGS, LLC; COLLINGWOOD USA, INC.; COLLINGWOOD BROOKSHIRE USA, INC.; COLLINGWOOD APPALACHIAN MINERALS, LLC; ASIA ARROW LIMITED; RIZOLINA LLC; ENSARA LLC; NOZAR LLC; BOWERY BAY LLC; CAMPANILLA LLC; FESARA LLC; AND 11 ESSEX STREET REALTY LLC, <br><br> *Defendants.* | Civil Action No. _____ <br><br><br><br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## I.   INTRODUCTION

1.      Plaintiff Global Gaming Philippines, LLC ("Plaintiff" or "GGAM") brings this action as a creditor of defendants Bloomberry Resorts and Hotels Inc. ("BRHI") and Sureste Properties, Inc. ("Sureste"; together with BRHI, the "Debtor Defendants"), with a foreign arbitral award (the "Final Award") against the Debtor Defendants in the amount of approximately $296,562,709.02, exclusive of post-award interest.   GGAM now seeks to recognize the Final Award and enforce that liability within the United States against Enrique K. Razon, Jr. ("Razon") – who dominates and controls the Debtor Defendants as part of his global enterprise – and various alter ego instrumentalities used by Razon to conceal his U.S. assets and operations.

2.      Razon, a Philippine national with extensive ties to the United States, inherited his father's port management business.   Over time, Razon expanded that business to a global enterprise that now spans a variety of industries, including shipping, ports, energy, natural resources, and hospitality, and includes operations in numerous jurisdictions, including the United States.   Along the way, Razon leveraged his political and business relationships, influence in Philippine society, and international connections to establish himself as the second wealthiest businessperson in the Philippines.

3.      Razon accumulated his personal wealth through careful management of an enterprise of global companies over which he exerts complete domination and control.   Razon employs a cadre of loyal operatives who devised and constructed a personal enterprise to serve Razon's two primary objectives: (i) protect his personal wealth from creditors and other stakeholders, and (ii) retain his tight control over every portion of his enterprise.   To that end, Razon regularly appoints his trusted agents to management and other leadership positions across his enterprise, including the Debtor Defendants and the other entities discussed below, and uses those individuals to form, fund, and manage the entities at his instruction and for his personal gain.

4.      In 2011, Razon set out to develop a new branch of his enterprise: an ultra-luxury casino and resort in Manila.  As a key step in that effort, Razon came to the United States to solicit the assistance of GGAM, a world-class casino operator and gaming management company.  Razon convinced GGAM to provide substantial assistance to Razon through the Debtor Defendants – the entities under which Razon was developing and ultimately would operate the integrated casino and resort.  As a result of GGAM's guidance and support, the project – *Solaire Resort and Casino* ("*Solaire*") – opened to the public in March 2013 and was an overwhelming success.  In just a matter of months, the operation started turning a profit, and it continued to do so in each of the following seven years.  GGAM invested substantial resources, including tens of millions of dollars of its own money, relying on Razon's promise that GGAM would reap the rewards of that hard work over the remainder of the parties' ten-year contract.

5.      Razon, however, viewed the project's immediate success as an opportunity to squeeze out the U.S.-based GGAM, seize GGAM's legitimate economic rights for his own personal benefit, and hide behind Philippine borders and its local courts when GGAM sought to enforce those rights.  In September 2013, only six months after *Solaire* opened, Razon – per his design – caused the Debtor Defendants to unlawfully terminate the agreement with GGAM and ultimately withhold tens of millions of dollars in fees and other consideration owed to GGAM.  Pouring salt on GGAM's wound, Razon also leveraged his personal relationships in the Philippine stock market to unlawfully prevent GGAM from selling its equity interest in the project – an obstructive effort Razon continues to this day.

6.      After years of protracted arbitration proceedings – delayed in large part by the Debtor Defendants – a three-member arbitral tribunal seated in Singapore and acting under the UNCITRAL Rules issued a series of orders and awards confirming that Razon, acting through the

Debtor Defendants, engaged in actions that were unlawful, meritless, and caused GGAM to suffer damages in the approximate amount of $296,562,709.

7.      Despite expressly agreeing to arbitration in the Debtor Defendants' agreement with GGAM and then submitting to UNCITRAL arbitration, Razon has brazenly shirked the arbitral tribunal's authority, orders, and awards, even after those awards were affirmed by the High Court of Singapore and the Singapore Court of Appeal.  Instead, Razon's actions demonstrate his belief that he and his wealth are sufficiently protected from legal consequences by virtue of (i) his influence in the Philippines and its local courts and (ii) the corporate form of the various entities he and his operatives devised within his enterprise (including the Debtor Defendants).  Thus, instead of paying GGAM the damages awarded to it, Razon continues to take action to obstruct GGAM's efforts to recover the amounts owed and exercise its rights with respect to its equity interests in the project.

8.      Through extensive investigation, GGAM has since discovered the extent of Razon's personal enterprise and the degree to which Razon exercises domination and control over the entities thereof, including the Debtor Defendants.  As set forth below, Razon and his agents have formed a vast network of shell companies in the United States designed to conceal Razon's ownership of assets within this country's borders and, on information and belief, have diverted funds and other assets from the Philippine members of his enterprise, including the Debtor Defendants, to fund such U.S. entities for the sole personal benefit of Razon and his family.

9.      In short, Razon has used a team of trusted agents and the entities in his enterprise – including the Debtor Defendants – to cause significant damage to GGAM, while also capturing and protecting the profits derived from GGAM's efforts.

10.     GGAM now brings this action to establish Razon's alter ego relationship with the Debtor Defendants, to enforce GGAM's rights under the Final Award against the assets of Razon and his alter ego entities in the United States, to hold Razon separately liable for his conversion of GGAM's assets, and to prevent the inequitable result that would otherwise occur if Razon were permitted to continue to hide behind Philippine borders and the corporate form he has abused.

## II.     THE PARTIES

### A.     Global Gaming Philippines, LLC

11.     Plaintiff Global Gaming Philippines, LLC is a limited liability company organized under the laws of the State of Delaware, with its registered office located at 251 Little Falls Drive, Wilmington, Delaware 19808.  GGAM is an affiliate of Global Gaming Asset Management, LLC, a casino operator and gaming management company with extensive experience in developing and operating highly successful integrated casino resorts.  GGAM's three-member senior executive team possesses over 100 years of collective experience operating some of the largest and most sophisticated integrated casino resorts in the world, including the Las Vegas Sands, the Marina Bay Sands in Singapore, and the Venetian Las Vegas.

### B.     Enrique K. Razon, Jr.

12.     Defendant Enrique K. Razon, Jr. is a Philippine national who owns real property in New York (including a residence in Manhattan, where he routinely resides when not in the Philippines) and elsewhere in the United States, and owns and operates business interests in the United States through various shell entities and holding companies, as described below.  Razon dominates and controls each of the Debtor Defendants and the Alter Ego Entities (defined below) through his direct and indirect ownership of those entities, each of which, on information and belief, were formed at his direction and are operated for his benefit.  Specifically, at all relevant times the Debtor Defendants and Alter Ego Entities were operated by a group of loyal operatives,

including employees, officers, and directors of the Debtor Defendants and the Alter Ego Entities, who at all times were employed at the will of Razon, and acted under the direction and control, and for the benefit of Razon personally (such individuals, including those non-party employees, officers, and directors of the Debtor Defendants identified below, are referred to herein collectively as the "Razon Agents").

### C. The Debtor Defendants

13. Defendant Bloomberry Resorts and Hotels Inc. is a company organized under the laws of the Republic of the Philippines, with its headquarters located at The Executive Offices, Solaire Resort and Casino, 1 Asean Avenue, Entertainment City, Tambo, Parañaque City, Philippines. BRHI owns and operates the gaming elements of *Solaire* in Manila, and holds the gaming license issued by the Philippine Amusement and Gaming Corporation ("PAGCOR"), the Philippine gaming authority. BRHI is a wholly-owned subsidiary of defendant Sureste, which is owned and controlled by Razon through his other entities as set forth below.

14. Defendant Sureste Properties, Inc. is a company organized under the laws of the Republic of the Philippines, with its headquarters also located at The Executive Offices, Solaire Resort and Casino, 1 Asean Avenue, Entertainment City, Tambo, Parañaque City, Philippines. Sureste owns and operates the non-gaming elements of *Solaire*, including the real property, hotel, and restaurant operations. Sureste is owned by defendant BRHI (9.34%) and Bloomberry Resorts Corp. (90.66%), each of which are owned and controlled by Razon through his other entities as set forth below.

### D.    The Alter Ego Entities[1]

#### i.    The Energy Entities

15.    Defendant Collingwood Oil & Gas Holdings, LLC ("Collingwood Holdings") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Harris County, Texas.  On information and belief, Collingwood Holdings is a wholly-owned subsidiary of Collingwood Investment Company Limited ("Collingwood Cayman"), a Cayman Islands entity, which is in turn owned and controlled by Razon.  On information and belief, Collingwood Holdings was formed in late 2016 to serve as an intermediary parent company between Collingwood Cayman – Razon's offshore funding entity – and defendants Collingwood USA, Inc. and Collingwood Brookshire USA, Inc., which had acquired energy holdings in the United States.

16.    Defendant Collingwood USA, Inc. ("CUSA") is a corporation organized under the laws of the State of Delaware, with its principal place of business in Harris County, Texas.  CUSA is a wholly-owned subsidiary of defendant Collingwood Holdings.  Razon serves as the President of CUSA and, on information and belief, appointed Jose Eduardo Alarilla to serve as the director of CUSA.  Mr. Alarilla is a longtime associate of Razon and serves in leadership roles in a number of Razon's other entities, including Vice Chairman of non-party Bloomberry Resorts Corp. and President of defendant Sureste.

17.    Defendant Collingwood Brookshire USA, Inc. ("CBUSA") is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Harris County, Texas.  CBUSA is a wholly-owned subsidiary of defendant Collingwood Holdings.

---

[1] The defendant entities identified in this section are referred to in this Complaint collectively as the "Alter Ego Entities," and each individually as an "Alter Ego Entity."

Razon serves as the President of CBUSA and, on information and belief, appointed Jose Eduardo Alarilla to serve as the director of CBUSA.

18.     Defendant Collingwood Appalachian Minerals, LLC ("CAM"), formerly known as Mesa Appalachian, LLC, is a limited liability company formed under the laws of the State of Delaware, with its principal place of business located in Harris County, Texas.  CAM is a wholly-owned subsidiary of defendant CUSA.

19.     Defendants Collingwood Holdings, CUSA, CBUSA and CAM are referred to collectively in this Complaint as the "Energy Entities" and individually as an "Energy Entity."

20.     On information and belief, Razon dominates, controls and owns 100% or substantially all of each of the Energy Entities through a corporate structure depicted below:



### ii.    The Real Estate Entities

21.    Defendant Asia Arrow Limited ("Asia Arrow") is, on information and belief, a limited company formed under the laws of the British Virgin Islands, with its principal place of business located in New York, New York.  On information and belief, Asia Arrow is wholly owned and controlled, directly or indirectly, by Razon and was formed for the purpose of acquiring and holding Razon's beneficial ownership of his residence at The Plaza, located at the intersection of Fifth Avenue and Central Park South, at 768 Fifth Avenue, Penthouse 2001, New York, New York.

22.    Defendant Rizolina LLC ("Rizolina") is a limited liability company formed under the laws of the State of New York with its principal place of business located in New York, New York.  On information and belief, Rizolina is owned and controlled, directly or indirectly, by Razon, and was formed for the purpose of acquiring and holding Razon's beneficial ownership of the real property at 211 East 13th Street, Penthouse 1G, New York, New York.  On information and belief, Razon appointed Medel Payumo – Razon's longstanding agent in New York – to serve as the registered agent for Rizolina.

23.    Defendant Ensara LLC ("Ensara") is a limited liability company formed under the laws of the State of New York with its principal place of business located in New York, New York. On information and belief, Ensara is owned and controlled, directly or indirectly, by Razon, and was formed for the purpose of acquiring and holding Razon's beneficial ownership of the real property at 211 East 13th Street, #6A, New York, New York.  On information and belief, Razon appointed Medel Payumo – Razon's longstanding agent in New York – to serve as the registered agent for Ensara.

24.    Defendant Nozar LLC ("Nozar") is a limited liability company formed under the laws of the State of New York with its principal place of business located in New York, New York. On information and belief, Nozar is owned and controlled, directly or indirectly, by Razon, and

was formed for the purpose of acquiring and holding Razon's beneficial ownership of the real property at 100 Barclay Street, #28D, New York, New York.  On information and belief, Razon appointed Medel Payumo – Razon's longstanding agent in New York – to serve as the registered agent for Nozar.

25.      Defendant Bowery Bay LLC ("Bowery") is a limited liability company formed under the laws of the State of New York with its principal place of business located in New York, New York.  On information and belief, Bowery is owned and controlled, directly or indirectly, by Razon, and was formed for the purpose of acquiring and holding Razon's beneficial ownership of the real property at 21-30 44th Drive, Penthouse B, Long Island City, New York.  On information and belief, Razon appointed Medel Payumo – Razon's longstanding agent in New York – to serve as the registered agent for Bowery.

26.      Defendant Campanilla LLC ("Campanilla") is a limited liability company formed under the laws of the State of New York with its principal place of business located in New York, New York.  On information and belief, Campanilla is owned and controlled, directly or indirectly, by Razon, and was formed for the purpose of acquiring and holding Razon's beneficial ownership of the real property at 21-30 44th Drive, Penthouse J, Long Island City, New York.  On information and belief, Razon appointed Medel Payumo – Razon's longstanding agent in New York – to serve as the registered agent for Campanilla.

27.      Defendant Fesara LLC ("Fesara") is a limited liability company formed under the laws of the State of New York with its principal place of business located in New York, New York.  On information and belief, Fesara is owned and controlled, directly or indirectly, by Razon, and was formed for the purpose of acquiring and holding Razon's beneficial ownership of the real property at 44 Carmine Street, New York, New York.  On information and belief, Razon appointed

Medel Payumo – Razon's longstanding agent in New York – to serve as the registered agent for Fesara.

28.     Defendant 11 Essex Street Realty LLC ("Essex") is a limited liability company formed under the laws of the State of New York with its principal place of business located in New York, New York.  On information and belief, Essex is owned and controlled, directly or indirectly, by Razon, and was formed for the purpose of acquiring and holding Razon's beneficial ownership of the real property at 11 Essex Street, New York, New York.  On information and belief, Razon appointed Medel Payumo – Razon's longstanding agent in New York – to serve as the registered agent for Nozar.

29.     Defendants Asia Arrow, Rizolina, Ensara, Nozar, Bowery, Campanilla, Fesara, and Essex are referred to collectively in this Complaint as the "Real Estate Entities" and each individually as a "Real Estate Entity."

## III.    SUBJECT MATTER JURISDICTION AND VENUE

30.     The Court has jurisdiction over Plaintiff's claims under 9 U.S.C. § 203, 28 U.S.C. § 1331, and 28 U.S.C. § 1367.  Venue is proper in this district under 9 U.S.C. § 204 and 28 U.S.C. § 1391(b).

## IV.    FACTUAL BASIS FOR CLAIMS

### A.     Razon's Global Enterprise

#### i.     Background

31.     Razon sits atop an expansive and interconnected conglomerate of business entities, holding companies, and shell corporations spanning several sectors and industries, including port management, hospitality, energy, and other natural resources.  Through the operation of his enterprise, Razon has accumulated significant wealth and been identified as the second-wealthiest billionaire in the Philippines in 2021.

32.     Razon's global empire did not materialize overnight.  Razon's father, Enrique M. Razon, Sr. ("Razon Senior"), was one of the wealthiest and most successful businesspersons in the Philippines in his time, having rebuilt the family's port management business after World War II – a business Razon's grandfather founded in the early 1900s.

33.     Building on the success of his predecessors, Razon expanded the family business both in reach and breadth, seizing on the opportunities presented by the global economy of the past 30 years.  As his enterprise grew outside the Philippines, so did Razon's desire to be recognized and treated as a legitimate player on a global level.  To that end, he typically spends more than 200 days of the year traveling, pursuing business and personal wealth outside the Philippines.

34.     Over time, Razon looked to the United States for opportunities to continue building his family's wealth.  Razon developed a particular fondness for New York and, as set forth below, has invested tens of millions of dollars to acquire real estate in and around New York City, including a penthouse apartment at The Plaza in Manhattan, where he and his family principally reside when not in the Philippines.

35.     As Razon expanded his enterprise and sought to create a legacy of personal wealth for himself and his children, he consistently maintained complete domination and control over the operations of his enterprise, ensuring his business lines are each operated through convenient shell companies and conduits he controls, and as a "family business" for his benefit.  To ensure that control, as set forth more fully below, Razon enlists a close group of loyal personnel to "manage" day-to-day operations across his enterprise, in accordance with his direction and for his benefit. As Razon explained to the Wall Street Journal in 2014, the management of his businesses is "[n]ot democratic.  Things filter up to me and I make decisions right away.  Quickly.  Most often unilaterally."

11

36.     As described in more detail below, Razon built on the cornerstone company inherited from his father and expanded his reach into gaming and entertainment.  His foray into the lucrative, but highly complex and capital-intensive gaming industry created opportunities to transact with respected world-class partners from outside the Philippines, including GGAM.  In his attempt to step onto the world stage, however, Razon always maintained tight control over his enterprise and used that control to manipulate and maneuver assets between and among the entities he controls so that he could disregard the rule of law, divert assets away from entities that incurred significant international contractual or legal obligations, and frustrate his business partners' efforts to hold him responsible for his obligations.  As described below, he did exactly that to GGAM – carefully manipulating assets among his entities so that the Debtor Defendants, on paper, would only maintain assets in the Philippines, where Razon was comfortable the local courts would protect him, while he was free to use those assets and the fruits of his enterprise around the world, including in the United States.

### ii.    International Container Terminal Services, Inc.

37.     The cornerstone of Razon's enterprise is the company founded by his father— International Container Terminal Services, Inc. ("ICTSI").  Headquartered in Manila, ICTSI is one of the largest shipping, port and container terminal operators in the world.  Over time, ICTSI's operations have expanded to include more than 30 port terminals in 19 countries across the globe, including the United States.

38.     On information and belief, the bedrock of ICTSI was the now-defunct enterprise E. Razon, Inc. ("ERI").  Razon Senior formed ERI in 1962 for the purpose of bidding on the contract to manage Manila's South Harbor.  Razon Senior sought the assistance of Judge Juan de Borja to help prepare the bid and, in 1966, ERI won the bid to manage piers 3 and 5 of the South

Harbor.  In 1974, ERI was awarded the management contract for the entire South Harbor, and in 1976, Judge de Borja's family became minority shareholders of ERI through their holding company, Makiling Farms, Inc.

39.     Razon Senior, however, fell under close scrutiny after President Ferdinand Marcos was ousted from office in 1986.  With close ties to President Marcos, Razon Senior became a target of the reformist government's Presidential Commission on Good Government ("PCGG"), tasked with pursuing ill-gotten wealth that President Marcos and his cronies accumulated during the Marcos regime.  In July 1986, the Philippine government cancelled ERI's contract with the Philippine Ports Authority, noting claims that Razon Senior and his companies were complicit in the Marcos regime's corruption and illegal dealings.

40.     To escape the PCGG's scrutiny and reenter the port management industry, Razon Senior formed a consortium, joining ERI with other entities to bid on the Manila International Container Terminal in Manila's North Harbor.  After winning the bid, the consortium formed ICTSI to perform the contract, breathing new life into the Razon family's port management business and insulating that business from PCGG examination.

41.     Today, in addition to shipping and port management, and as set forth more fully below, the Razon enterprise includes investments in the United States and globally in gaming and hospitality, power, mining, and oil and gas exploration.  Razon is the Chairman and CEO of the Bloomberry entities (discussed below) and their gaming and hospitality assets throughout Asia. Razon is also the largest shareholder of Apex Mining Co., Inc., a Philippines-based mining company, and owns and controls MORE Electric and Power Corp., formerly known as Monte Oro Resources and Energy, Inc., which handles power distribution in the Philippines and has faced political backlash after its takeover of Panay Electric Co.'s distribution assets in Iloilo City.  Razon

also owns various shell companies through which he has invested hundreds of millions in acquiring mineral interests and oil and gas assets in the United States.

42.     Despite expanding ICTSI in the global market and capitalizing on other opportunities within the Philippines, Razon remained determined to demonstrate that his success was not simply a byproduct of circumstance or inheritance, but rather the fruits of personal ingenuity by an international player.  Thus, by the early 2000s, Razon set his sights on building a new branch of his global enterprise: gaming and hospitality.

### iii.     Razon's Gaming Business

43.     Razon's expansion into hospitality coincided with the emergence of gaming opportunities in the Philippines.  Specifically, in 2007, in an effort to benefit from Asia's emerging gaming market and develop the Philippines into a world-class tourism and gaming destination, the Philippine Government liberalized gaming by authorizing the issuance of four highly-sought-after provisional licenses for gaming development and operations within Entertainment City, a special economic zone in Metro Manila.

44.     Razon recognized the potential of Asia's gaming market and saw the opportunity to capitalize on an attractive gaming option in the Philippines.  In addition to a favorable gaming tax regime and regulatory environment, the Philippines offered certain operational advantages, including low labor costs and a comparatively young, English-speaking work force.

45.     Razon also sought to make a name for himself in a new industry on a global stage. By successfully entering the gaming industry, Razon could align himself with world-renowned gaming icons such as Sheldon Adelson and Steve Wynn.[2]  To that end, Razon developed a concept

---

[2] As set forth below, Razon would later purchase his penthouse in The Plaza from Steve Wynn.

for an integrated ultra-luxury casino and resort in Manila, which he envisioned would become the "Las Vegas of the Philippines."

46.     On April 8, 2009, Razon, through his wholly-owned entities defendants BRHI and Sureste, obtained the first provisional license to construct and operate *Solaire*, the first integrated casino and resort in the Philippines.

**B.     Razon Solicits GGAM in the United States**

47.     Preparing to develop *Solaire*, Razon recognized two realities: first, he would need to attract significant outside funds to ensure his first foray into the capital-intensive gaming industry was a success; and second, despite his background in shipping and port management, Razon lacked experience and expertise in the gaming and resort industries.  As a result, Razon set out to engage top-level consultants and operational executives with the relevant expertise and industry clout.

48.     With *Solaire*, Razon sought to duplicate the successful models used by Las Vegas's integrated casino resorts.  To design *Solaire*, Razon initially engaged Nevada-based Steelman Partners, LLP, the same company that designed JW Marriott (Las Vegas), The Plaza Hotel and Casino (Las Vegas), Harrah's Atlantic City (New Jersey), MGM Foxwoods (Connecticut), Sands Macau, and The Four Seasons Macau.  Razon also hired Philippines-based contractors Design Coordinates, Inc. and D.M. Consunji, Inc. to oversee *Solaire's* construction.

49.     Razon then sought out the interest and expertise of Global Gaming Asset Management, LLC ("Global Gaming") – a casino operator and gaming management company with significant experience in constructing, developing, and operating casino-resort properties in Las Vegas and around the world.  Specifically, Razon sought to harness Global Gaming's deep expertise with planning, technical, advisory, management, and operational services for *Solaire*, both before and after it commenced commercial operations.  Razon also sought to leverage Global

Gaming's vast network of connections and clout with potential institutional investors, with an eye toward raising necessary funds in the capital markets.

50.     Global Gaming is a global leader in developing world-class integrated casino-hotel resort properties.  Its management principals, William P. Weidner, Bradley H. Stone, and Garry W. Saunders, have been responsible for opening over 20 landmark integrated casino resorts across the United States and Asia, and all previously held top-level executive positions at prominent gaming companies, including Las Vegas Sands.  Combined, Global Gaming's three principals have over 100 years of hospitality, gaming, real estate, retail, and entertainment experience, and have helped to design, develop, and operate some of the world's largest, most innovative, and most recognizable integrated casino and resort properties, including the Venetian Las Vegas, The Palazzo, and Marina Bay Sands Singapore.

51.     In early 2011, with construction of *Solaire* already underway, Razon sought to hire an executive to oversee *Solaire's* day-to-day development and operations.  Razon retained U.S.-based executive search firm SpencerStuart, which recommended that Razon arrange an initial meeting with Global Gaming.

52.     In early 2011, Razon approached Global Gaming about collaborating on *Solaire*. Soon after, in March 2011, Razon traveled to Las Vegas to meet with Mr. Weidner and Mr. Saunders, two of Global Gaming's management principals, to discuss Global Gaming's potential role in the development and operation of *Solaire*.

53.     Razon recognized that Global Gaming's advice and managerial oversight of *Solaire* would allow him to establish a state-of-the-art operations infrastructure and achieve stellar operational efficiency.  Razon also recognized the importance of Global Gaming's industry relationships, as well as its extensive experience in designing operations infrastructure, and the

ability of its management principals to execute top-tier staffing, budgeting, strategic direction, monitoring, and oversight of all aspects of *Solaire's* operations.

54.     After their initial meeting, Global Gaming and Razon began to negotiate the terms of a business relationship with the primary goal of creating a world-class integrated casino and resort in the Philippines.  A component of the overall relationship between GGAM and Razon would be GGAM's provision of certain specific management services to *Solaire*.

55.     Ultimately, Global Gaming and Razon agreed on the structure of a collaboration under which GGAM would provide the requested services and resources in exchange for management fees and, importantly, would receive the right to participate in the upside equity value of *Solaire* resulting from GGAM's involvement.  In addition, and material to GGAM's agreement to work with Razon on *Solaire*, Razon granted GGAM the right to participate in the management of any other similar casino projects that Razon might pursue, whether under the same corporate structure or otherwise.

### C.     Razon Engages GGAM

56.     On or about September 9, 2011, GGAM executed a Management Services Agreement (the "MSA") with the Debtor Defendants, under which Razon would benefit from GGAM's management and technical services and its unparalleled experience in the casino industry.  Under the MSA, GGAM was to, among other things, provide management and technical services in the development and construction of *Solaire*, and manage and supervise the operation of *Solaire* once constructed for a period of ten years.[3]

57.     GGAM's counterparties under the MSA were the Debtor Defendants owned by Razon – BRHI, which held the provisional gaming license to operate *Solaire's* gaming operations

---

[3] The MSA had an initial term of five years, subject to automatic extension at GGAM's option for an additional five years.

in the Philippines, and Sureste, the parent company of BRHI, which would own the hotel and non-gaming components of *Solaire*.  Razon executed the MSA as the Chairman and CEO of both Debtor Defendants.

58.    While the Debtor Defendants were express parties to the MSA, it was understood by all parties, and reflected in the MSA and other agreements, that the Debtor Defendants were simply vehicles through which Razon was pursuing his personal gaming aspirations, and that GGAM was in fact providing services to and investing its resources alongside Razon.

59.    For instance, Clause 16.1 of the MSA granted GGAM the right to terminate its services under the MSA in the event Razon no longer owned and controlled the Debtor Defendants.[4]  Clause 18.3 of the MSA further provided that GGAM would have the option to purchase up to a 10% equity ownership in *Solaire* from Razon pursuant to a separate "Option Agreement" in recognition of the significant equity investment GGAM agreed to make under the MSA.  Finally, Clause 18.3 also provided that GGAM would have the right to "co-invest" in additional casino operations pursued by Razon – whether through the Debtor Defendants or otherwise.

### D.    Razon Restructures the Gaming Business

60.    The MSA established a relationship pursuant to which the parties fully expected that GGAM would make considerable investments in *Solaire* and its operations in the initial pre-launch phase of *Solaire*, and then would recover its investment and turn a considerable profit once *Solaire* was operational.  Months prior to the parties' execution of the MSA – although not yet

---

[4] Clause 16.1(c) of the MSA provided that if Razon continued to "own or control" the Debtor Defendants following an IPO or back-door listing of the Debtor Defendants, it would not constitute a "change of control."  As set forth below, the Debtor Defendants were back-door listed on the Philippine Stock Exchange through a new partner company, Razon's Bloomberry Resorts Corp., shortly after the MSA was executed, but Razon remained the overwhelming majority shareholder and maintained control of the Debtor Defendants.

obligated to do so – GGAM began providing the Debtor Defendants with input and assistance regarding the ongoing construction of *Solaire*, as well as its planned design and layout. Upon executing the MSA, GGAM faithfully fulfilled its obligations under the MSA. GGAM resolved substantial construction problems caused by Bloomberry's general contractor and construction manager. GGAM led the successful effort to rehabilitate the construction schedule and revamp the ineffective project management structure it found, and its advice and involvement substantially improved *Solaire's* design. On behalf of *Solaire*, GGAM leveraged its contacts to recruit a world-class management team, including a Chief Operating Officer, to ensure *Solaire's* successful opening and operations. Additionally, GGAM negotiated critical agreements for *Solaire*, including maintenance service agreements and management and procurement agreements. GGAM developed and implemented detailed and comprehensive business and marketing plans for *Solaire*, oversaw the development and implementation of operating policies and procedures, and developed robust customer databases with working lists of VIP customers and gaming junket operators[5] for *Solaire's* use.

61.     Meanwhile, Razon restructured his gaming operation to accomplish two objectives: raising needed capital from the public market and maintaining unfettered control of *Solaire* for his personal and family benefit.

62.     Specifically, Razon established Bloomberry Resorts Corp. ("BRC"), a Philippine corporation, to serve as the vehicle through which he would raise necessary outside capital through

---

[5] GGAM provided significant value by establishing *Solaire's* gaming junket operations. Junket operators provide a steady flow of high-dollar gamblers (typically through coordinated gaming tourism trips for foreign gamblers), and help establish a client casino as a target destination for gaming tourism. Gaming junkets often serve as the primary means for a casino to build relationships with "whales," high-stakes gamblers who might frequent the casino on a regular basis.

the public markets in the Philippines.  At the time, Razon owned all of the equity interests in Sureste through a shell holding company, Prime Metroline Transport Corp. ("Prime"),[6] and BRHI was a wholly-owned subsidiary of Sureste.

63.    To maintain control of *Solaire* and its value for his own benefit, Razon first ensured that he and his group of loyal personnel from ICTSI would remain in control of BRC following a public offering.  For instance, Razon appointed Estella Tuason-Occeña ("Occeña") – an executive officer at ICTSI, a Director and the Treasurer of Prime, and the Treasurer of both Sureste and BRHI – as the Chief Financial Officer and Treasurer of BRC.  Occeña has long served as Razon's "right hand" and has managed his financial dealings across his enterprise and his other personal finances.

64.    Razon appointed Christian Gonzalez – Razon's nephew, a Director of Prime and the Senior Vice President of ICTSI – as a Director of BRC, Sureste, and BRHI.

65.    Razon appointed Silverio "Benny" Tan – a Director and Corporate Secretary of Prime and ICTSI, and the Corporate Secretary of Apex Mining Co. – as the Corporate Secretary at BRC, Sureste, and BRHI.

66.    Razon also installed other common trusted directors and officers across "Bloomberry" entities, including Thomas Arasi as the President of BRC, Sureste and BRHI, and Donato Almeda and Jose Eduardo Alarilla ("Alarilla")[7] as Directors of BRC and BRHI.

---

[6] Prime Metroline Transport Corp. is the predecessor in interest to Prime Metroline Holdings, Inc. In or about January 2021, Prime Metroline Holdings, Inc. changed its name to Prime Strategic Holdings, Inc., which is the current shell entity through which Razon majority-owns and controls BRC and the Debtor Defendants.  The term "Prime" is used interchangeably herein to refer to those entities.

[7] Alarilla is also a Director of Razon's Apex Mining Co.  As set forth below, Alarilla serves as a nominee Director of Razon's U.S. shell companies through which Razon holds his mineral interests and oil and gas assets.

67.     Razon maintained ultimate management authority at each of BRC, Sureste, and BRHI, serving as the Chairman and Chief Executive Officer of BRC, and the Chairman of both Sureste and BRHI.

68.     Once this structure was established, Razon caused Prime to transfer its shares in Sureste to BRC in exchange for shares in the newly-formed BRC.[8]

### E.     GGAM Acquires its Equity Position and Participation Rights

69.     Having developed a corporate structure that would preserve his domination and control of the Debtor Defendants, Razon prepared BRC to "go public" through a backdoor listing and initial public offering ("IPO") on the Philippine Stock Exchange ("PSE").

70.     On or about March 9, 2012, BRC became publicly traded via a backdoor listing on the PSE, where it continues to trade today under the symbol BLOOM:PM.

71.     Shortly thereafter, and as contemplated in the MSA, GGAM and Razon finalized the terms of an agreement memorializing GGAM's right to purchase equity in the *Solaire* corporate structure from Razon.

72.     On April 16, 2012, GGAM entered into an Equity Option Agreement ("EOA") with newly-public BRC and Prime, pursuant to which Razon's holding company, Prime, granted GGAM an option to purchase 921,184,056 shares in BRC (the "Option Shares") at an agreed-upon strike price of 1.67 Philippine Pesos ("PHP") per share.

73.     As contemplated in the MSA, the EOA further provided GGAM the express right to co-invest with Razon on any competing casino projects Razon may pursue in the Philippines, whether using the Debtor Defendants, BRC or any other Razon-affiliated entity.  To that end, in

---

[8] To facilitate a backdoor listing on the Philippine Stock Exchange, Razon transferred his ownership interest of the Debtor Defendants to Prime, his personal holding company, on September 30, 2011.

connection with executing the EOA, BRC and Prime delivered to GGAM a countersigned Participation Agreement, which would become effective upon GGAM's exercise of its right to purchase the Option Shares.

74. Alarilla executed the EOA, at Razon's direction, on behalf of BRC and Prime. Clause 11.3 of the EOA requires any notices to Prime to be delivered to Razon, as Chairman and CEO of Prime, and to his lieutenant Occeña at her ICTSI office.

75. The Participation Agreement delivered under the EOA, among other things, memorializes GGAM's right of first refusal to manage any competing casino projects pursued by Razon in the Philippines, and GGAM's right to co-invest in any such Razon projects. The Participation Agreement further requires Razon (through Prime) to repurchase the Option Shares from GGAM at fair market value upon GGAM's demand if "the MSA terminates for any reason whatsoever (other than a willful breach of the MSA by [GGAM])."

76. Occeña executed the Participation Agreement, at Razon's direction, on behalf of BRC and Prime. Clause 9.2 of the Participation Agreement requires any notices to Prime to be delivered to Razon, as Chairman and CEO of Prime, and to his lieutenant Occeña at her ICTSI office.

77. Between April 16, 2012 and May 2, 2012, GGAM took part in and played a critical, active role in a highly-successful roadshow preceding the IPO of BRC. The equity offering closed on May 3, 2012, at PHP 7.50 per share, and raised more than $209 million.

78. By June 2012, largely as a result of the successful offering, Razon's estimated net worth more than doubled from an estimated $1.6 billion to an estimated $3.6 billion.

79.    On December 20, 2012, GGAM exercised its option under the EOA to purchase the Option Shares, paying approximately $37.43 million to Razon through his holding company, Prime.  That same day, GGAM executed and delivered the Participation Agreement.

80.    Razon continues to dominate and control the Debtor Defendants through his ownership of BRC.  As of the date of this Complaint, and as reflected in the chart below, Razon owns approximately two-thirds of the outstanding shares of BRC's common stock through his personal holding companies, Prime (53.83%), Razon & Co. Inc.[9] (2.04%), and Quasar Holdings, Inc. (8.35%):



**F.    Razon Terminates the MSA to Shield the Profits from GGAM**

81.    On March 16, 2013, following GGAM's investment of significant resources through the two-plus-year development stage and capital raise, *Solaire* held its grand opening.  As

---

[9] Razon & Co. Inc. was formerly known as Falcon Investco Holdings, Inc.

a result of GGAM's critical contributions to *Solaire's* construction, development, and operations, the property opened for commercial operation on time, on budget, and to rave reviews.

82.     Following the opening, as it had during the development and pre-opening phases, GGAM actively oversaw the progress of *Solaire's* operations, both on-site and through the management team it identified, recruited, and assembled.  From the successful opening onwards, *Solaire* performed consistent with Razon's overall expectations as stated to investors.

83.     *Solaire's* gaming revenue was significant from the start and increased monthly. Razon acknowledged *Solaire's* initial success at the annual BRC shareholder meeting on June 24, 2013, noting: "Since opening day, the [Bloomberry Group] immediately began generating revenues from *Solaire's* gaming, hotel and food and beverage, and this has been rising steadily even as I speak.  Gaming was and continues to be the biggest contributor to revenues, closely followed by hotel, food and beverages and other services."

84.     The highly successful launch of *Solaire* had dramatic personal implications for Razon, who established himself as more than the so-called "Ports King" of the Philippines, but as a gaming tycoon.  Razon began pursuing casino development opportunities in other jurisdictions, acquiring the JeJu Sun Casino in South Korea and, more recently, pursuing a potential integrated casino and resort project in Japan.

85.     Equally important, however, *Solaire's* profitability and Razon's control over the Bloomberry entities (BRC, Sureste, and BRHI) presented a substantial economic opportunity for Razon.  Razon knew that GGAM stood to receive (and Razon's entities would be required to pay) a substantial cut of the profitable operations of *Solaire* under the MSA for a period of at least ten years.  In addition, the Option Shares GGAM had rightfully purchased from Razon were now

extremely valuable, having appreciated materially since GGAM exercised the option, in large part due to GGAM's own efforts to launch *Solaire*.

86.     Razon also knew he could leverage his contacts and influence in the Philippines in any dispute with the U.S.-based GGAM, and attempt to hide behind the Philippine territorial boundaries and its local judicial system should the need arise.  Razon is a highly influential public figure in Philippine society, and his family has long been associated with various Philippine government regimes.

87.     In addition to the Razon family's prior association with the Marcos regime, Razon has a close personal relationship with the former President of the Philippines, Gloria Macapagal-Arroyo, and her husband, Jose Miguel Arroyo.  Razon also has ties to Rodrigo Duterte, the current President of the Philippines.

88.     Outside of politics, Razon is highly visible and influential in Philippine society. Razon is the chairman and financial backer (through his enterprise entities) of Pilipinas Golf Tournaments, Inc., which runs the Philippine Golf Tour.  Razon previously owned a basketball team in the now-defunct Philippine Basketball League and is a significant donor to De La Salle University's sports program.  Indeed, Razon donated PHP 50 million to the university in exchange for its construction of the Enrique M. Razon Sports Center, named after Razon's father.  Razon is also a member of the American Management Association, the U.S.-Philippines Society, and the World Economic Forum.  Among his close relationships with Philippine public figures, on information and belief, Razon has a personal relationship with Hans Sicat, the former president of the PSE, the national stock exchange of the Philippines.[10]

---

[10] The PSE is a private, for-profit corporation that is governed by its president and a board of directors, and lists its own shares on the exchange under the symbol PSE:PM.

89.     Armed with these tools, on July 12, 2013, Razon sent email correspondence to GGAM alleging purported grievances with GGAM's performance and threatening to cause the Debtor Defendants to terminate the MSA (as described below, an esteemed three-member arbitration panel later unanimously recognized that these purported grievances were baseless contrivances of Razon to set up his bad-faith termination of the MSA).  Although GGAM rightfully denied Razon's fabricated allegations, GGAM undertook efforts to address them; however, Razon refused to engage in good faith to resolve his purported concerns.  Rather, Razon's plan was already in motion, and he immediately acted as if the MSA was terminated.

90.     Meanwhile, on July 30, 2013, Razon announced that *Solaire* had begun to generate profit after only a few months of its operations.

91.     On September 12, 2013, Razon sent GGAM a formal Notice of Termination of the MSA, effective that night at midnight.  But for Razon's wrongful termination of the MSA, the initial term of the MSA would have ended March 16, 2018, subject to GGAM's option to extend it an additional five years.

### G.     The Arbitration

92.     On September 12, 2013, the same day that Razon sent the termination notice, GGAM submitted a Notice of Arbitration in accordance with Clause 19.2 of the MSA and Article 3 of the UNCITRAL Rules.

93.     Clause 19.2(b) of the MSA provides, among other things, that the "decision of the arbitration panel shall be final and binding on the Parties, without right of appeal," and that the "Parties agree in advance that if one Party initiates arbitration, the other Party shall be bound to participate, and the decision of the arbitration panel shall be binding upon both Parties and enforceable in all jurisdictions."

94.     In the arbitration, GGAM requested the arbitral tribunal find that the Debtor Defendants materially breached the MSA through the purported termination, and award GGAM damages for those breaches, including interest and costs.  Conscious of Razon's attempt to capture the value of the Option Shares for himself, GGAM also requested the arbitral tribunal determine that the Debtor Defendants and their affiliates have no valid claim for rescission or restitution of the Option Shares rightfully purchased by GGAM under the EOA, that GGAM did not breach the MSA, and that the Debtor Defendants and their officers and agents (including Razon) should be enjoined from further interfering with GGAM's rights with respect to the Option Shares, including the sale of those shares.

### i.     Razon Corruptly Uses His Influence to Further Damage GGAM during the Arbitration

95.     Following Razon's wrongful termination of the MSA and GGAM's commencement of arbitration, GGAM made plans to sell the publicly traded Option Shares.  On the date the MSA was terminated, BRC's shares were being traded on the public market between PHP 11.8 and PHP 12.3 per share – significantly higher than the option price paid by GGAM.

96.     On or about January 15, 2014, GGAM confirmed a block sale of the Option Shares to over 50 institutional investors for PHP 8.05 per share, with the sale scheduled to close on January 21, 2014.

97.     Razon was aware of GGAM's intended sale of the Option Shares, and understood that if the sale were consummated, he would lose substantial leverage over GGAM in the arbitration, and that GGAM would have captured some of the economic benefit bargained for under the MSA and EOA.[11]  Razon therefore leveraged his personal relationship and influence

---

[11] Razon knew, at all times, that GGAM was the legitimate owner of the Option Shares, despite his desire to re-acquire those shares.  In fact, on September 13, 2013, the day after Razon sent notice purportedly terminating the MSA, the Wall Street Journal quoted Razon on the implications

with the PSE, including its then-President, Hans Sicat, and on January 15, 2014, caused BRC's corporate secretary, Silverio "Benny" Tan, to send a vague, four-sentence letter to the PSE requesting that it take the dramatic action of suspending trading in *all* BRC shares for one week. Despite GGAM's written objection, and the brevity of Mr. Tan's correspondence, the PSE granted the request the next day, on January 16, 2014, and GGAM was prevented from executing its anticipated block sale of the Option Shares.

98.     The following day, on or about January 17, 2014, the Debtor Defendants and Razon (through Prime) filed a petition with the Philippine Regional Trial Court ("RTC") in Manila for writs and a temporary restraining order ("TRO") to prevent GGAM from selling the Option Shares once trading was no longer suspended.  On January 20, 2014, the RTC granted the TRO, and on February 27, 2014, issued writs of preliminary attachment and preliminary injunction restricting GGAM from disposing of, selling, or transferring the Option Shares.  Importantly, however, the RTC recognized that the parties' dispute was subject to an arbitration clause and expressly specified that the preliminary writs were subject to revocation by the arbitral tribunal once it was constituted.

99.     As a result of the preliminary writs issued by the RTC, Deutsche Bank (GGAM's share custodian) transferred the Option Shares to a restricted, non-trading account where they are still held today.  Deutsche Bank refuses to release the Option Shares to GGAM based on Razon's continued and wrongful opposition.

---

of termination on the Option Shares:  "'That's theirs.  They can do whatever they want' with the stake, Mr. Razon said. 'For the right price I might buy it.'"

ii.   **The Arbitral Tribunal Finds Razon's Actions to be Wrongful and Awards Substantial Damages to GGAM**

100.    The three-member arbitral tribunal was formed on March 28, 2014, with proceedings to be held in the Republic of Singapore and in Washington, D.C.

101.    Through a series of orders, culminating in the Final Award issued on September 27, 2019, the arbitral tribunal confirmed that the Debtor Defendants wrongfully terminated the MSA, GGAM is the rightful owner of the Option Shares, GGAM is entitled to sell the Option Shares, and the Debtor Defendants (who at all times acted under the direction of Razon) actively and unlawfully impeded GGAM's right to sell the Option Shares.

102.    Specifically, on December 9, 2014, following a hearing held at the request of the Debtor Defendants in Washington, D.C., the arbitral tribunal issued its Interim Measures ("IM") Order, in which the arbitral tribunal confirmed GGAM's right to sell the Option Shares, and expressly vacated and superseded the RTC's preliminary writs.  The IM Order further directed the parties to make the arbitral tribunal's order known to the Philippine courts and "to assure its implementation."  By its terms, the IM Order "directly binds" the parties to comply with that Order unless and until either party obtains a court decision setting it aside.  Despite this clear order superseding the RTC writs – which the RTC had expressly invited – Razon continues to this day to cause his entities to stand in the way of GGAM's sale of the Option Shares, including refusing to authorize Deutsche Bank to return those shares to GGAM's trading account despite clear, repeated directives from the arbitral tribunal.

103.    The arbitral tribunal conducted the arbitration on the merits of GGAM's claims and the Debtor Defendants' counterclaims in two phases: first on the parties' respective liability, followed by consideration of appropriate remedies.

104.    The arbitral tribunal conducted its merits hearing on liability in Singapore from October 15-24, 2015.   On September 20, 2016, the arbitral tribunal issued its initial award determining the respective liability of the parties (the "Liability Award"), finding the Debtor Defendants materially breached the MSA by terminating GGAM without cause.   The arbitral tribunal also expressly rejected the Debtor Defendants' purported defense that GGAM had materially breached the MSA.   The Debtor Defendants subsequently sought to set aside and resist enforcement of the Liability Award in the Singapore courts.   On January 3, 2020, the High Court of Singapore rejected all of the Debtor Defendants' challenges to the Liability Award.   *See Bloomberry Resorts and Hotels Inc. v. Global Gaming Philippines LLC*, [2020] SGHC 01 (Singapore High Court, Jan. 3, 2020).   The Debtor Defendants appealed the Singapore High Court's decision to the Singapore Court of Appeal, the highest court of Singapore, and on February 16, 2021, the Singapore Court of Appeal dismissed the Debtor Defendants' appeal, finding "no merit in the [Debtor Defendants'] submissions."   *See Bloomberry Resorts and Hotels Inc. v. Global Gaming Philippines LLC*, [2021] SGCA 9, ¶ 98 (Singapore Court of Appeal, Feb. 16, 2021).

105.    After finding the Debtor Defendants were liable to GGAM, the arbitral tribunal conducted its merits hearing on remedies in Washington, D.C. from May 28, 2018 – June 1, 2018. On September 27, 2019, the arbitral tribunal issued the Final Award, in which it found that the Debtor Defendants' actions in preventing GGAM's sale of the Option Shares "is tantamount to their '*de facto seizure*'" of GGAM's Option Shares.   The arbitral tribunal valued the shares based on the date of the IM Order – the date the arbitral tribunal made clear that GGAM had the right to dispose of the Option Shares – and applied a block sale discount, ultimately resulting in a share

valuation of PHP 11.04 per share, for a total value of PHP 10,169,871,978.24 (approximately $196,000,000 as of that date).

106.     The arbitral tribunal further ordered the Debtor Defendants to pay the value of the Option Shares as damages to GGAM in exchange for GGAM's transfer of those shares to the Debtor Defendants or their designee.  The Final Award provides that if the Debtor Defendants did not comply within 30 days of the Final Award, GGAM was permitted to sell the Option Shares on the open market, and the Debtor Defendants would be required to "take all steps necessary" to (i) withdraw the preliminary writs issued in the RTC, (ii) issue a joint press release regarding GGAM's ownership of the Option Shares, and (iii) instruct the PSE, Deutsche Bank, and the Philippine Depository & Trust Corporation regarding GGAM's rightful ownership of the Option Shares.  The arbitral tribunal further and specifically directed the Debtor Defendants to direct their agent – Razon's personal holding company, Prime, the majority shareholder of BRC – to cooperate in these efforts.

107.     Finally, the arbitral tribunal also jointly awarded GGAM and its affiliate, GGAM Netherlands B.V., the following damages under the MSA: $85.2 million for lost management fees, $391,224 for pre-termination fees and expenses, and $14,998,052 in costs and attorneys' fees incurred by GGAM in the arbitration.  In sum, the damages awarded by the arbitral tribunal in favor of GGAM totaled approximately $296,562,709 as of the date of the Final Award.

108.     Pursuant to the Final Award, the damages awarded by the arbitral tribunal in favor of GGAM bear post-award interest at the rate of 6% per annum, compounded annually beginning 30 days after the date of the Final Award and until payment.

109.     The Debtor Defendants then sought to set aside the Final Award in the Singapore courts, but on May 29, 2020, the High Court of Singapore dismissed the Debtor Defendants'

application.  *See Bloomberry Resorts and Hotels Inc. v. Global Gaming Philippines LLC*, [2020] SGHC 113 (Singapore High Court, May 29, 2020).[12]

### iii.   Razon Refuses to Comply with the Arbitral Tribunal's Orders

110.   Despite the arbitral tribunal's IM Order vacating and superseding the RTC's writs of preliminary injunction and preliminary attachment against GGAM's sale of the Option Shares, Razon caused the Debtor Defendants and Prime to annually renew the preliminary injunction and preliminary attachment bonds necessary to ostensibly maintain the RTC injunction.  Razon has also consistently opposed GGAM's efforts to reverse the RTC preliminary writs—even after the IM Order.

111.   And even after the arbitral tribunal issued the Liability Award, adjudicating that the Debtor Defendants – acting under Razon's direction and control – breached the MSA by terminating GGAM, Razon has caused BRC to actively thwart GGAM's lawful rights in those shares.

112.   For instance, Razon caused the Debtor Defendants to make a misleading disclosure to the PSE on November 14, 2016, after the Liability Award had issued, stating that the Debtor Defendants had terminated the MSA due to a material breach by GGAM – without disclosing the arbitral tribunal's findings to the contrary.  These false statements created market and public confusion regarding GGAM's rights to the Option Shares and further prevented GGAM from lawfully selling those shares.  When GGAM demanded the Debtor Defendants issue a press release correcting the false statements, Razon refused.

---

[12] The Debtor Defendants appealed the Singapore High Court's decision to the Singapore Court of Appeal, which appeal remains pending.

113.    Razon also caused the Debtor Defendants, in contravention of the arbitral tribunal's orders, to refuse to cooperate with GGAM's efforts to cause Deutsche Bank to unfreeze the Option Shares for purposes of trading.  At all times, Razon has been aware of Deutsche Bank's position that it requires the Debtor Defendants' express permission to unfreeze the Option Shares.  GGAM made express requests to the Debtor Defendants, including on October 10, 2016, March 17, 2017, and April 3, 2017, for such written consent consistent with the arbitral tribunal's orders.  In each instance, Razon caused the Debtor Defendants to refuse GGAM's requests.

114.    The Debtor Defendants, acting under Razon's direction and control, admitted they have withheld such consent, in violation of the arbitral tribunal's orders, as leverage in settlement negotiations with GGAM.  Since the conclusion of the arbitration, Razon has caused the Debtor Defendants and Prime to refuse to comply with the arbitral tribunal's express orders, much less pay the significant damages awarded in favor of GGAM.

### iv.    Razon Publicly Acknowledges He Will Attempt to Hide Behind Philippine Borders

115.    Throughout the arbitration process, Razon made clear that he and his companies (and his network of Razon Agents) will attempt to hide behind the Philippine borders and leverage his influence in the local courts to prevent enforcement of the arbitral tribunal's orders and awards.

116.    As early as December 2014, Razon directed certain Razon Agents to make statements to the press that the arbitral tribunal has no jurisdiction over the Philippine courts in relation to GGAM's frozen Option Shares.

117.    Beginning in September 2016, Razon (through the Bloomberry entities) falsely represented to the PSE that the Liability Award was only enforceable in a Philippine court.  Razon and those under his control have since repeated this incorrect assertion numerous times in BRC's annual and quarterly reports and Philippine SEC disclosures.  Most recently, in BRC's SEC

disclosure on June 1, 2020, BRC claimed that "the arbitration award is not self-executing and must be confirmed by a [Philippine] court for it to have the legal effect of a judgment." This statement is patently false.

### H.  Razon's Alter Ego Entities

#### i.  The Debtor Defendants

118.   At all relevant times, Razon dominated and controlled the Debtor Defendants as part of his larger enterprise of entities operated for his own personal benefit, and used those entities as his instrumentalities and alter egos to carry out his intent of damaging GGAM and realizing for himself the corresponding personal financial benefits of violating GGAM's legitimate legal rights.

119.   Razon intentionally structured the Debtor Defendants' corporate ownership and management so that he would at all times retain control over those entities and all of their material decisions and business dealings.

120.   Razon at all times retained (through his holding companies) no less than 63% ownership of the voting shares of BRC, the parent company of the Debtor Defendants. Razon further installed a close group of trusted operatives to manage the Debtor Defendants' day-to-day operations, each acting at Razon's instruction and his ultimate direction. These Razon Agents simultaneously held management or other leadership positions with other entities within the Razon family enterprise, including ICTSI, Prime, and other Alter Ego Entities, as set forth below. At all relevant times, the Razon Agents acted for Razon's ultimate benefit and at his direction, to the exclusion of the interests of other stakeholders, including GGAM.

121.   At all times, Razon dominated the Debtor Defendants' material financial decisions, including in their dealings with GGAM before and after the wrongful termination of the MSA. Razon also exercised control, for his personal benefit, over all primary decisions relating to

GGAM, the arbitration, the Debtor Defendants' conduct during the arbitration, and the Debtor Defendants' obstruction of GGAM's legal rights with respect to the Option Shares.

122.    On information and belief, Razon also commingled and used the Debtor Defendants' assets for his personal benefit, including to support his procurement of a portfolio of valuable investments in U.S. real estate and energy deposits.  For instance, Razon frequently uses BRHI's Gulfstream Jet to transport himself and his family on personal vacation travel and other trips, including to and from the United States, and for business purposes solely to benefit other entities in his enterprise.  Indeed, between Razon's initial meeting with GGAM in March 2011 and his termination of the MSA on September 12, 2013, BRHI's Gulfstream Jet made more than 80 flights to 15 different airports in 9 different U.S. states, and Razon uses BRHI's Gulstream Jet to transport himself and his family from the Philippines to the United States for personal travel.  In addition, while refusing to satisfy the significant debt owed to GGAM, on information and belief, Razon has invested significant funds from his Philippine entities, including, on information and belief, the Debtor Defendants, into various real estate and other investments in the United States, as set forth below, for Razon's personal benefit and not for the benefit of the Debtor Defendants' creditors, including GGAM.  In effect, Razon has disregarded the corporate separateness of the Debtor Defendants, instead treating and intending to treat the Debtor Defendants and their assets as his own.

123.    Razon understood and intended that in dealing with the Debtor Defendants, GGAM would rely (as it is entitled to) on the premise that the Debtor Defendants would operate as legitimate corporate entities, not mere instrumentalities of Razon, acting at the direction and for the sole benefit of Razon, to the unlawful detriment of legitimate third parties such as GGAM.

124.   Contrary to GGAM's presumption and reasonable belief, Razon used his domination and control of the Debtor Defendants to significantly and proximately harm GGAM by, among other things, intentionally causing the Debtor Defendants to unlawfully terminate the MSA for Razon's intended personal benefit, intentionally causing (and continuing to cause) the Debtor Defendants and their agent, Prime, to obstruct GGAM's efforts to exercise its lawful rights in and to the Option Shares, and causing (and continuing to cause) the Debtor Defendants to refuse to pay the amounts awarded to GGAM under the Final Award, while diverting funds from the Philippines to benefit Razon and his family personally.

### ii.   The Alter Ego Entities

125.   Razon's use of entities in his enterprise as instrumentalities to advance his personal financial objectives is not limited to the Debtor Defendants.  As set forth above, Razon's personal enterprise includes entities in many jurisdictions, including the United States.  On information and belief, Razon has used a network of intermediary shell companies and the same Razon Agents to divert hundreds of millions of dollars from the Philippines to fund significant investments in real estate, energy, and various other ventures in the United States, all for the purpose of creating legacy wealth for himself and his children.

### 1.   The Real Estate Entities

126.   Over the years, Razon has acquired significant real estate holdings in and around New York City using his trusted agent, Medel Payumo, and Mr. Payumo's company, Triumph Properties Corp., and various shell entities to disguise Razon as the true owner of the properties. These entities include the following defendants, which are each owned and controlled, directly or indirectly, by Razon:

   a.   Asia Arrow, which owns Razon's residence at The Plaza on Central Park South and Fifth Avenue.  Asia Arrow was formed in the British Virgin

Islands shortly before, and for the purpose of, acquiring the residence for Razon from fellow casino tycoon, Steve Wynn.   Razon and his family frequent this residence and spend family holidays (including Thanksgiving and Christmas) at the property.   Various permits related to the property list Razon as the actual owner, despite the use of the offshore Asia Arrow as a personal holding company.

b.     Rizolina, which owns a second penthouse property at 211 East 13th Street, Penthouse 1G in Manhattan.   Consistent with Razon's use of trusted operatives, and at Razon's instruction, Mr. Payumo serves as the registered agent for Rizolina in New York.   On information and belief, the name of this entity is derived from Razon's family member's names, including his name (Enrique *aka* "Ricky"), his son's nickname ("Enzo"), his spouse's name (Felicia *aka* "Lizzy"), and his daughter's name (Katrina).

c.     Ensara, which owns an apartment at 211 East 13th Street, #6A in Manhattan (the same building as the property owned by Rizolina).   At Razon's instruction, Mr. Payumo serves as the registered agent for Ensara in New York.   On information and belief, the name of this entity (Ensara) is derived from the first two letters of Razon's son's name, Enrique Santos Razon.

d.     Nozar, which owns an apartment at 100 Barclay Street, #28D in Manhattan. At Razon's instruction, Mr. Payumo serves as the registered agent for Nozar in New York.   On information and belief, the name of this entity (Nozar) is derived from spelling Razon in reverse.

e.  Bowery, which owns a penthouse apartment at 21-30 44th Drive, Penthouse B in Long Island City, New York.  At Razon's instruction, Mr. Payumo serves as the registered agent for Bowery in New York.  On information and belief, Razon's spouse, Felicia, is listed as the organizer of the entity.

f.  Campanilla, which owns a separate penthouse apartment in the same building as Bowery, at 21-30 44th Drive, Penthouse J in Long Island City, New York.  At Razon's instruction, Mr. Payumo serves as the registered agent for Campanilla in New York.  On information and belief, Razon's spouse is listed as the organizer of the entity.

g.  Fesara, which owns an apartment building at 44 Carmine Street in Manhattan.  At Razon's instruction, Mr. Payumo serves as the registered agent for Fesara in New York.  On information and belief, Fesara is derived from the first two letters of Razon's wife's name, <u>Fe</u>licia <u>Sa</u>ntos <u>Ra</u>zon.

h.  Essex, which owns an apartment building at 11 Essex Street in Manhattan. At Razon's instruction, Mr. Payumo serves as the registered agent for Essex in New York.  On information and belief, Razon's spouse executed the deed acquiring the property in the name of Essex, identifying herself as the manager of the entity.

127.  On information and belief, each of the Real Estate Entities is a personal holding company ultimately owned by Razon to serve no purpose other than to hold public title to the above-identified real property located in the State of New York.  Razon uses these shell entities for the purpose of concealing his ownership of such assets from his creditors, including GGAM,

and dominates and controls the operational, financial, and other decisions of each entity, including all decisions regarding the acquisition and disposition of their respective properties.

128.    On information and belief, Razon appointed trusted agents, including Mr. Payumo, to serve as the public-facing agents of these entities to further conceal his ultimate ownership and control of the Real Estate Entities.  On information and belief, each of the Real Estate Entities is and has been capitalized on an as-needed basis by Razon using funds from his personal accounts, family trusts, or from other entities within his personal enterprise, including other Alter Ego Entities.

129.    On information and belief, Razon used and commingled resources from the Philippine entities in his enterprise, including the Debtor Defendants, to support the acquisition, operation and oversight of assets held by the Real Estate Entities, including without limitation, utilizing personnel and property of the Debtor Defendants to oversee acquisition and maintenance of the portfolio of real property assets owned by the Real Estate Entities, and using the Debtor Defendants' assets (including BRHI's Gulfstream jet) to visit the properties, attend meetings regarding the properties, and transport Razon's family for purposes of residing at certain of the properties, including the residence owned by Asia Arrow.

### 2.    The Energy Companies

130.    In addition to building his legacy through New York real estate asset holdings, Razon has used a network of U.S. shell companies to invest in and acquire ownership of valuable mineral rights and oil and gas assets from Texas to the Appalachians, determined to exploit profit opportunities in the United States.

131.    During the same time period in which Razon caused approximately $300 million in damages to GGAM by breaching the MSA and effectively seizing GGAM's Option Shares,

Razon diverted more than $250 million of funds from his Philippine operations into U.S. energy holdings for his sole benefit.

132.    As set forth below, on information and belief, Razon repeatedly and consistently used and leveraged the Debtor Defendants' funds and resources, including the same Razon Agents who serve in management and other leadership capacities for the Debtor Defendants, to construct a complex new arm of his enterprise and to acquire these U.S. assets for his personal benefit.  And, as with the other entities in his enterprise, Razon at all times maintained and exercised his domination and control over all material aspects of the operations of the Energy Entities, including through the use of nominee directors and agents otherwise employed by the Debtor Defendants.

### a.    Razon Pursues and Acquires Energy Assets in the United States Using Shell Holding Companies

133.    On information and belief, no later than 2014, Razon was introduced to an investment banker in New York, Ahmad Atwan ("Atwan"), whom Razon personally engaged to source large investment opportunities for Razon in the U.S. mineral and oil and gas sectors.[13]  After being introduced to Atwan, on information and belief, Razon came to the United States on numerous occasions between 2014 and 2017, including using BRHI's and ICTSI's company Gulfstream jets to travel from and back to the Philippines, to explore potential investment opportunities sourced by Atwan in Kentucky, West Virginia, Texas, and other jurisdictions in the United States.

---

[13] Razon's relationship with Atwan apparently later soured.  Razon, through CUSA and CBUSA, has sued Atwan in Texas State Court, where the case remains pending (the "Collingwood Litigation").  Many of the facts herein concerning Razon's dealings with Atwan are detailed in the parties' pleadings and motions there, including Razon's evidence and admissions in that case, and in a related Federal action commenced by Razon, through CUSA and CBUSA.

134.    On information and belief, Razon's intention, as reflected in the corporate structure he and the Razon Agents would later devise, was to build a legacy for his family in the United States, and that all funds invested in the U.S. energy interests from his Philippine entities would ultimately benefit Razon and his family personally, not GGAM or other creditors or stakeholders of the Debtor Defendants.

135.    As alleged in the Collingwood Litigation, Razon, with the assistance of Atwan, initially pursued an opportunity to purchase an equity interest in Mesa Appalachian LLC ("Mesa Appalachian"), an entity formed, owned and controlled by T. Boone Pickens, and which owned high-value sub-surface mineral rights in the extensive Appalachian Basin.[14]  On information and belief, Razon directed personnel from the Debtor Defendants to negotiate the terms of his potential investment in Mesa Appalachian, including Occeña (the Debtor Defendants' Corporate Treasurer and BRC's Chief Financial Officer and Treasurer), Gerald Festin (BRC's Vice President for Controllership), and Silverio "Benny" Tan (BRC Corporate Secretary).  On information and belief, these long-time Razon Agents carried out Razon's instructions from the *Solaire* premises, using the Debtor Defendants' resources to pursue the investment opportunity for Razon, including using their *Solaire* (and in some cases ICTSI) technology platforms to participate in the diligence and negotiations.  On information and belief, Razon came to the United States frequently to participate in the diligence and negotiation process for the proposed investment.

136.    On information and belief, Razon ultimately caused the Razon Agents to use at least $150 million of funds from his Philippine entities to acquire ownership of Mesa Appalachian. On information and belief, at Razon's direction, CUSA was formed for the purpose of and used as

---

[14] The Appalachian Basin is a vast deposit of oil, gas and minerals covering the majority of New York, Pennsylvania, Ohio and West Virginia, as well as portions of New Jersey, Maryland, Virginia, Kentucky, North Carolina, South Carolina, Tennessee, Georgia, and Alabama.

the personal holding company to acquire his interests in Mesa Appalachian, despite that the ownership interest was purchased for Razon's personal benefit and intended ownership.

137.     Ultimately, as Razon admits in the Collingwood Litigation, Razon would invest at least an additional $100 million in the United States through a series of shell holding companies.

138.     For instance, in April 2016, as admitted by Razon in the Collingwood Litigation, Razon used over $25 million of funds to acquire oil and gas assets in Waller County, Texas.  On information and belief, the Razon Agents used funds from Razon's Philippine entities, including the Debtor Defendants, to fund the transaction.  On information and belief, Razon's long-time agents from *Solaire* negotiated the transaction on Razon's behalf, and used CBUSA to acquire such rights, despite that such rights were purchased for Razon's personal benefit and intended ownership.

139.     As alleged by Razon in the Collingwood Litigation, in August of 2016, Razon used more than $30 million of funds to acquire oil and gas assets in Kentucky and West Virginia.  As set forth in the Collingwood Litigation, Atwan (on Razon's behalf) negotiated a participation agreement ("HMR Participation Agreement") with Hay Mineral Resources, LLC ("HMR") under which HMR would acquire mineral rights on Razon's behalf, through his CUSA entity.  After the HMR Participation Agreement was executed, Razon traveled to the United States to meet with Monte Hay, HMR's principal, in Huntington, West Virginia, where Razon confirmed to Mr. Hay that he owned and controlled CUSA, and that all acquisition decisions come directly from him or the Razon Agents in the Philippines.  The HMR Participation Agreement signed by Razon specified that all notices for CUSA should be sent to Occeña at her ICTSI address in Manila.  On information and belief, the Razon Agents used funds from Razon's Philippine entities to fund the transaction.  On information and belief, Razon's long-time agents from *Solaire* negotiated the

transaction on Razon's behalf, and used CUSA to acquire such rights, despite that such rights were purchased for Razon's personal benefit and intended ownership.

140. On information and belief, in 2017, Razon instructed the Razon Agents to change the name of Mesa Appalachian to "Collingwood Appalachian Minerals, LLC." That entity, under the domination and control of Razon and the Razon Agents, continues to own the valuable minerals rights described above.

> **b.** **Razon and His Operatives Structure the Energy Entities to Conceal Razon's Ownership and Protect Value for Razon's Personal Benefit**

141. Through the transactions detailed above, on information and belief, Razon diverted significant resources from his Philippine entities, including the Debtor Defendants, to acquire U.S. energy assets. In doing so, Razon sought to create a pool of legacy wealth in the United States for his and his family's personal benefit. However, in each case, the entities Razon used to effectuate these transactions were mere instrumentalities – personal holding companies owned and controlled by Razon through a series of offshore shell companies.

142. Razon sought to construct this new arm of his enterprise in a manner, similar to his Philippine entities, whereby Razon would at all times maintain complete control over each of the entities through his ultimate decision-making authority and his use of trusted operatives in public-facing roles. Thus, Razon and the Razon Agents formed two shell entities in the United States, CUSA and CBUSA, to serve as the primary investment vehicles. These entities were, at all relevant times after December 2016,[15] wholly-owned subsidiaries of Collingwood Holdings, the primary U.S. holding company. On information and belief, Razon and the Razon Agents also

---

[15] On information and belief, prior to Collingwood Holdings' formation in December 2016, CUSA and CBUSA were wholly-owned subsidiaries of Collingwood Cayman.

formed a Cayman Islands entity, Collingwood Cayman, to serve as an offshore parent company of Collingwood Holdings.  On information and belief, Collingwood Cayman's only operation was the management of Razon's assets held by Collingwood Holdings, CUSA and CBUSA.[16]  On information and belief, at all relevant times, all of Collingwood Cayman's operations were overseen by Occeña, from her offices at *Solaire* in the Philippines, at Razon's direction.

143.    On information and belief, the following organizational chart reflects the holding company structure Razon and the Razon Agents devised and used following the transactions detailed above:



144.    As he has with the Debtor Defendants and his other Philippine entities, Razon enlisted the Razon Agents to serve in nominee leadership positions at the Energy Entities, but at all times Razon retained domination and control over the policies, practices, and investment

---

[16] Razon is and has at all relevant times been the sole director of Collingwood Cayman.

decisions of those entities.  For instance, Razon assumed and at all times served in the position of President at CUSA and CBUSA.  However, Razon also enlisted Alarilla – a Director at BRC – to serve as a nominee Director of those same entities along with Razon.[17]  On information and belief, Alarilla served only at the request of Razon, and to carry out Razon's instructions, as necessary, in his capacity as a named Director of CUSA or CBUSA.

145.    In addition, Razon used employees, resources, and common agents from the Debtor Defendants and his other Philippine entities to carry out the business of the Energy Entities and implement his instructions in the United States, as reflected in documents filed in the Collingwood Litigation.  On information and belief, Occeña served as Razon's primary agent in the United States, and at all times understood and represented that the Energy Entities and their assets were Razon's personal assets.  Occeña managed and directed the other Razon Agents in carrying out Razon's instructions relating to the Energy Entities, primarily from the offices at *Solaire*, for Razon's personal benefit.

146.    In addition, as reflected in filings in the Collingwood Litigation, other employees of the Debtor Defendants were directly involved with managing and overseeing the Energy Entities, including Arnold Rivas (BRC's Vice President for Administration), Gerald Festin (BRC's Vice President for Controllership), and Fritz Lacap (BRC's Vice President for Business Development and Corporate Planning).  At certain times, BRC's Corporate Secretary, Silverio "Benny" Tan, was identified as the person to whom CUSA-related notices should be sent, including in the HMR Participation Agreement filed in the Collingwood Litigation.  Each of these

---

[17] Razon also appointed Alarilla to serve as a nominee director of each of the wholly-owned subsidiaries of CUSA:  Collingwood Appalachian Minerals, LLC, Collingwood Appalachian Minerals I, LLC, Collingwood Appalachian Minerals II, LLC, and Collingwood Appalachian Minerals III, LLC.

personnel used *Solaire* and BRC email accounts to carry out the business of the Energy Entities, and, on information and belief, conducted that business from their offices at *Solaire*, using the Debtor Defendants' resources.

147.   The alter ego nature of the Energy Entities is further illustrated by the nature of the Energy Entities' U.S. operations, or lack thereof.   On information and belief, when Razon consummated the transactions identified herein, neither Collingwood Holdings, CUSA, nor CBUSA had a physical location in Texas or elsewhere in the United States, and while those entities later identified offices in Texas, the operations of those entities were at all times directed and overseen by Razon's agents, including employees of the Debtor Defendants, from the Philippines. It was only *after* Razon completed the acquisitions that he hired Robert Hadlow, an accountant in Texas, to act as a face of the Energy Entities in the United States.   However, on information and belief, Mr. Hadlow lacked any discretionary authority over the Energy Entities, and all Energy Entity-related decisions were and are made by Razon and communicated through the Razon Agents' instructions from the Philippines.

148.   Finally, after an apparent falling out with Atwan, Razon sought to avail himself of the U.S. courts to seek redress.  Prior to initiating suit, and consistent with Razon's desire to operate discreetly in the United States, Razon transferred his purported claims against Atwan to CUSA and CBUSA – further reflecting his use of such entities as his personal holding companies and his view that he could freely transfer assets into and out of such entities at his convenience.[18]  Shortly thereafter, in September 2019, CUSA and CBUSA commenced suit against Atwan based on

---

[18] Razon's pre-suit assignment to CUSA and CBUSA is reflected in filings in the Collingwood Litigation.

damages purportedly suffered by Razon as a result of Atwan's services. That case remains pending in the 116th District Court in Dallas County, Texas.

149.    In sum, despite the complex onshore/offshore structure of the Energy Entities and their affiliates, the Energy Entities were at all times simply vehicles through which Razon could discreetly divert funds from his Philippine operations to the United States, with the intention of building a legacy only for himself and his family, to the exclusion of the creditors and other stakeholders of the Debtor Defendants and other members of his enterprise. The Energy Entities were at all times operated and managed for Razon's benefit, and under his domination and control, including through his use of loyal operatives and personnel of the Debtor Defendants and other entities in his enterprise, acting at Razon's direction and for his personal benefit.

## V.    CAUSES OF ACTION

### COUNT I

### (Enforcement of the Arbitration Awards – Against All Defendants)

150.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-149 above as if fully set forth herein.

151.    The United States is a signatory to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "New York Convention"), codified at Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201 *et seq.*

152.    The New York Convention applies to the Liability Award and the Final Award, which were issued by a three-member arbitral tribunal seated in Singapore. Singapore is a contracting state to the New York Convention.

153.    A true and correct certified copy of the Final Award is attached hereto as **Appendix 1**. A true and correct certified copy of the Liability Award is attached hereto as **Appendix 2**. A

true and correct certified copy of the IM Order is attached hereto as **Appendix 3**.  A true and correct certified copy of the MSA is attached hereto as **Appendix 4**.

154.    The arbitration was commenced and both the Liability Award and the Final Award were obtained pursuant to the MSA, which was a signed writing containing the following arbitration provision agreed to by Plaintiff and the Debtor Defendants: "[A]ny dispute required to be settled in accordance with this Clause 19.2 shall be settled by arbitration in Singapore under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules in force at the date of this Agreement . . . ."  Clause 19.2(b) of the MSA provides, among other things, that the "decision of the arbitration panel shall be final and binding on the Parties, without right of appeal," and that the "Parties agree in advance that if one Party initiates arbitration, the other Party shall be bound to participate, and the decision of the arbitration panel shall be binding upon both Parties and enforceable in all jurisdictions."

155.    On September 27, 2019, the Final Award was issued in favor of Plaintiff against the Debtor Defendants in the total amount of $296,562,709.02 (calculated using the USD-PHP exchange rate as of the date of the Final Award), plus post-award interest in the amount of 6% per annum, compounded annually, beginning thirty (30) days after issuance of the Final Award.

156.    The New York Convention and FAA permit enforcement of a foreign arbitral award in the United States against an award-debtor and its property.

157.    The New York Convention and FAA permit enforcement of a foreign arbitral award against an award-debtor's alter egos and their property.

158.    As alleged above, the Debtor Defendants are alter egos of Razon and the Alter Ego Entities are alter egos of Razon, and vice-versa.

159.    Alternatively, as set forth above, the Alter Ego Entities are alter egos of the Debtor Defendants and their alter egos.

160.    Plaintiff is thus entitled to a judgment recognizing and enforcing the Liability Award and Final Award against the Debtor Defendants, Razon and the Alter Ego Entities as the alter egos of the Debtor Defendants (and/or as alter egos of the Debtor Defendants' alter egos). Plaintiff is therefore entitled to recover judgment in the amount of at least $296,562,709, plus interest accrued under the Final Award on the unpaid amount of that award through judgment, post-judgment interest until the Final Award amount is paid in full, and such further relief as the Court should deem just and proper.

## COUNT II
### (Declaratory Relief – Against Razon)

161.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-160 above as if fully set forth herein.

162.    Plaintiff is a creditor of the Debtor Defendants pursuant to the Final Award. Plaintiff contends that the Debtor Defendants are alter egos of Razon, and that Razon is liable for the unpaid amount of the Final Award, including the unpaid amount of any judgment entered by the Court on the Final Award (the "Alter Ego Debt").  In particular, Plaintiff contends that, at all relevant times:

        a.      Razon, in concert and with the assistance of the Razon Agents, operated the Debtor Defendants as Razon's personal entities, and part of his larger personal and family enterprise;

        b.      There was such a unity of interests between the Debtor Defendants and Razon that the separate personality of the Debtor Defendants no longer existed;

c.     Razon completely dominated, controlled, and otherwise governed the Debtor Defendants, including the policies and business practices of the Debtor Defendants, such that the Debtor Defendants had no separate mind with respect to the Debtor Defendants' dealings with Plaintiff, including the transactions and acts alleged herein;

d.     The Debtor Defendants, under the complete domination and control of Razon, were actors in the wrongful and unlawful course of conduct constituting abuse of the corporate privilege for which alter ego liability is justified, including, but not limited to:

    i.     Razon caused the Debtor Defendants to enter into the MSA with Plaintiff, knowing and intending that Plaintiff would rely on the false premise that the Debtor Defendants at all times had a separate corporate personality and would be operated for the benefit of their respective stakeholders, including creditors such as Plaintiff, and not solely for Razon's personal financial benefit;

    ii.     Razon caused the Debtor Defendants to unlawfully terminate the MSA, in material breach of the Debtor Defendants' obligations to Plaintiff, for the purpose of benefitting Razon financially, and not for any legitimate business or operational purpose;

    iii.     Razon caused the Debtor Defendants to substantially harm Plaintiff by leveraging his personal relationship with the head of the PSE, Hans Sicat, to prevent Plaintiff from exercising its rights with

respect to the Option Shares, for the sole purpose of benefitting Razon financially;

iv.     Razon caused the Debtor Defendants to ignore the express directives of the arbitral tribunal and cause continued harm to Plaintiff by obstructing Plaintiff's ongoing attempts to exercise its rights with respect to the Option Shares;

v.     Razon further dominated and controlled the Debtor Defendants, and caused the Debtor Defendants to cause substantial harm to Plaintiff, as reflected in the Final Award, all for Razon's personal benefit;

vi.     Razon concealed his domination and control of the Debtor Defendants by installing his trusted Razon Agents and other loyal personnel in management and other senior leadership positions for the purpose of falsely presenting the Debtor Defendants as legitimate business entities independently managed in the interests of the Debtor Defendants' stakeholders, including creditors and collaborators, such as Plaintiff, as opposed to the personal instrumentalities of Razon, operated for his personal benefit;

vii.     The funds and assets of the Debtor Defendants were commingled with the assets of Razon and other entity members of his personal enterprise, including, on information and belief, with the Alter Ego Entities in the United States, in each instance for Razon's personal benefit;

       viii.     Razon used the resources, personnel and other assets of the Debtor Defendants to form, fund, and manage the entities in his personal enterprise, including, without limitation, the Alter Ego Entities in the United States and their affiliated entities;

       ix.     Legal formalities at the Debtor Defendants were disregarded, and arm's-length relationships were not maintained between Razon and the Debtor Defendants.

163.    An actual case and controversy exists, in that Razon disputes he is liable for the Alter Ego Debt, whereas Plaintiff contends he is so liable.

164.    Plaintiff contends that (i) an inequitable and unjust result would follow if the corporate separateness of the Debtor Defendants were respected as against Plaintiff and the Alter Ego Debt owed to Plaintiff, (ii) no adequate alternative remedy exists, and (iii) a declaration of the liability of Razon, as the alter ego of the Debtor Defendants, is necessary to operate prospectively and allow Plaintiff to recover from Razon the unpaid amount of the Alter Ego Debt.

165.    Plaintiff desires and seeks a declaration of its right to recover the unpaid amount of the Alter Ego Debt from Razon, as alter ego of the Debtor Defendants with respect to Plaintiff and the Alter Ego Debt.

166.    Plaintiff contends such a judicial declaration is necessary and appropriate at this time and under the circumstances and to resolve the dispute between Plaintiff and Razon.

167.    Accordingly, Plaintiff seeks a declaratory judgment finding Razon liable to Plaintiff, as alter ego of the Debtor Defendants, for the unpaid amount of the Alter Ego Debt, along with interest, attorneys' fees, and costs.

168.    In addition, a substantial and imminent risk exists that Razon, including through his dominance and control of the Alter Ego Entities, will dissipate, transfer, hypothecate, or otherwise make his assets (including his ownership of the Alter Ego Entities) and the assets of the Alter Ego Entities unavailable to Plaintiff for enforcement of a judgment under this Count and the other Counts alleged herein.  Razon has consistently concealed his ownership of assets in the United States and held such assets in the name of shell companies, retaining only the equity interest so as to shield those assets from creditors and other parties-in-interest.  In addition, Razon has repeatedly and publicly cited a strategy of forcing adversaries, including Plaintiff, to pursue enforcement action against Razon in the Philippines, where Razon can harness his social and political influence to render enforcement ineffectual.

169.    Thus, appointment of a receiver over Razon's assets is necessary to preserve such assets pending entry of judgment and in aid of Plaintiff's rights to enforce the Alter Ego Debt against Razon and his assets, including execution of judgment.

## COUNT III

### (Declaratory Relief – Against the Alter Ego Entities)

170.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-169 above as if fully set forth herein.

171.    Plaintiff is a creditor of the Debtor Defendants pursuant to the Final Award. Plaintiff contends that the Debtor Defendants are alter egos of Razon, and that Razon is liable for the Alter Ego Debt.  Plaintiff further contends that the Alter Ego Entities, and each of them, is liable for the Alter Ego Debt as an alter ego of Razon.  In particular, Plaintiff contends that, at all relevant times:

a.    Razon, in concert and with the assistance of the operatives identified above and other Razon Agents acting under Razon's direction and control, formed

and operated the Alter Ego Entities as Razon's personal entities, and part of his larger personal and family enterprise;

b.  There was such a unity of interests between Razon and the Alter Ego Entities that the separate personality of the Alter Ego Entities no longer existed;

c.  Razon completely dominated, controlled, and otherwise governed the Alter Ego Entities, including the policies and business practices (including investment and divestment decisions) of such entities, such that the Alter Ego Entities had no separate mind with respect to their business dealings, including the transactions and acts alleged herein;

d.  Razon has abused the corporate privilege of the Alter Ego Entities such that alter ego liability is justified, by, without limitation:

  i.  The funds and assets of the Alter Ego Entities were commingled with Razon's personal assets and with the assets of other entity members of his personal enterprise, including, on information and belief, the Debtor Defendants, in each instance for Razon's personal benefit;

  ii.  Razon used the resources, personnel, and other assets of other members of his personal enterprise, including, without limitation, the Debtor Defendants, to form, fund, and manage the Alter Ego Entities and their affiliated entities;

  iii.  Razon used nominee directors and officers at the Alter Ego Entities, most of whom also serve as nominee directors, officers, or other

personnel of other entity members of Razon's enterprise, to conceal his true ownership, domination, and control of the Alter Ego Entities;

iv.   Legal formalities at the Alter Ego Entities were disregarded, and arm's-length relationships were not maintained between Razon and the Alter Ego Entities.

172.   An actual case and controversy exists, in that the Alter Ego Entities dispute they are liable for the Alter Ego Debt, whereas Plaintiff contends they are so liable.

173.   Plaintiff contends that (i) an inequitable and unjust result would follow if the corporate separateness of the Alter Ego Entities were respected as against Plaintiff and the Alter Ego Debt owed to Plaintiff, (ii) no adequate alternative remedy exists, and (iii) a declaration of the liability of the Alter Ego Entities, as the alter egos of Razon, is necessary to operate prospectively and allow Plaintiff to recover the unpaid amount of the Alter Ego Debt from the Alter Ego Entities.

174.   Plaintiff desires and seeks a declaration of its right to recover the unpaid amount of the Alter Ego Debt from the Alter Ego Entities, as alter egos of Razon with respect to Plaintiff and the Alter Ego Debt.

175.   Plaintiff contends such a judicial declaration is necessary and appropriate at this time and under the circumstances and to resolve the dispute between Plaintiff and the Alter Ego Entities.

176.   Accordingly, Plaintiff seeks a declaratory judgment finding the Alter Ego Entities, and each of them, liable to Plaintiff, as alter egos of Razon, for the unpaid amount of the Alter Ego Debt, along with interest, attorneys' fees, and costs.

177.     In addition, a substantial and imminent risk exists that Razon, through his dominance and control of the Alter Ego Entities, will dissipate, transfer, hypothecate, or otherwise make the assets of such entities unavailable to Plaintiff for enforcement of a judgment under this Count and the other Counts alleged herein.  Razon has consistently concealed his ownership of assets in the United States and held such assets in the name of shell companies, retaining only the equity interest so as to shield those assets from creditors and other parties-in-interest.  In addition, Razon has repeatedly and publicly cited a strategy of forcing adversaries, including Plaintiff, to pursue enforcement action against Razon in the Philippines, where Razon can harness his social and political influence to render enforcement ineffectual.

178.     Thus, appointment of a receiver over the Alter Ego Entities and their assets is necessary to preserve such assets pending entry of judgment and in aid of Plaintiff's rights to enforce the Alter Ego Debt against the Alter Ego Entities and their assets, including execution of judgment.

## COUNT IV
### (Injunctive Relief – Against Razon)

179.     Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-178 above as if fully set forth herein.

180.     Razon is liable to Plaintiff in the amount of the Alter Ego Debt, plus interest, attorneys' fees, and costs, as alleged herein.

181.     At the time of this Complaint, Razon has substantial assets in the United States, including, without limitation, his ownership interest in the Alter Ego Entities and their assets, and funds held in U.S. bank accounts by Razon and/or the Alter Ego Entities.  Such assets should be available to Plaintiff to satisfy the Alter Ego Debt and otherwise for enforcement of the Alter Ego Debt.

182.    A substantial and imminent risk exists that Razon will dissipate, transfer, hypothecate or otherwise make such assets unavailable to Plaintiff for enforcement of a judgment on the other Counts alleged herein.  Razon has consistently concealed his ownership of assets in the United States and held such assets in the name of shell companies, retaining only the equity interest so as to shield those assets from creditors and other parties-in-interest.  In addition, Razon has repeatedly and publicly cited a strategy of forcing adversaries, including Plaintiff, to pursue enforcement action against Razon in the Philippines, where Razon can harness his social and political influence to render enforcement ineffectual.

183.    Preliminary injunctive relief should issue to prevent Razon, and anyone acting on his behalf or in concert with Razon (including the Razon Agents), from taking any and all actions that would violate Plaintiff's rights with respect to this action and tend to render any judgment against Razon and his assets in the United States ineffectual.  Specifically, Plaintiff seeks an order and judgment:

a.      Restraining Razon, and anyone acting on his behalf or in concert with him, including, but not limited to the present and former agents, employees, advisors, consultants, accountants, attorneys, and representatives of Razon, and all other persons and entities acting in concert with him or them, and all persons and entities in control of, in possession of, with knowledge of, or overseeing any of Razon's assets, including but not limited to his books and records (collectively, the "Razon Enjoined Parties"), from transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, foreclosing, concealing, or in any manner dealing in or disposing of the whole or part of Razon's ownership interests,

both direct and indirect, in any of the Alter Ego Entities without further order of the Court;

b.  Restraining the Razon Enjoined Parties from transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, foreclosing, concealing, or in any manner dealing in or disposing of the whole or part of any funds or other assets of Razon (or which he holds an interest) in the United States, including any and all funds held in bank accounts or otherwise in the United States and any securities held in securities accounts or otherwise in the United States, without further order of the Court;

c.  Restraining the Razon Enjoined Parties from taking any actions that will impair, harm, or reduce the value of Razon's assets, including his direct and indirect ownership interest in the Alter Ego Entities, without further order of the Court;

d.  Restraining the Razon Enjoined Parties from taking any actions that will or would tend to materially impair, defeat, divert, prevent, or prejudice the preservation of Razon's assets, including his direct and indirect ownership interest in the Alter Ego Entities, without further order of the Court; and

e.  Restraining the Razon Enjoined Parties on the terms above pending entry of final judgment in this action.

184.  Concurrent with entry of final judgment on Count II above, Plaintiff seeks entry of judgment permanently restraining the Razon Enjoined Parties on the terms set forth in the

preceding paragraph, with such relief to expire only once the Alter Ego Debt, together with interest, attorneys' fees, and costs, has been paid to Plaintiff in full.

185.    Plaintiff will suffer serious, immediate, and irreparable harm if preliminary and permanent injunctive relief is not issued on the terms set forth herein.

186.    Absent the injunctive relief sought herein, Plaintiff will have no adequate remedy at law.

187.    Thus, Plaintiff respectfully requests the Court enter the orders and judgment set forth above granting preliminary and permanent injunctive relief against Razon and the other Razon Enjoined Parties.

## COUNT V
### (Injunctive Relief – Against the Debtor Defendants and the Alter Ego Entities)

188.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-187 above as if fully set forth herein.

189.    The Debtor Defendants and the Alter Ego Entities (the "Entity Defendants") are liable to Plaintiff in the amount of the Alter Ego Debt, as alleged herein.

190.    At the time of this Complaint, the Entity Defendants have substantial assets in the United States, including without limitation various real estate, mineral interest, and oil and gas holdings, and funds held in U.S. bank accounts under the name and control of Razon and/or the Entity Defendants.  Such assets should be available to Plaintiff to satisfy the Alter Ego Debt and otherwise for enforcement of the Alter Ego Debt.

191.    A substantial and imminent risk exists that the Entity Defendants, under the direction and control of Razon and the Razon Agents, will dissipate, transfer, hypothecate, or otherwise make such assets unavailable to Plaintiff for enforcement of a judgment on the other Counts alleged herein.  Razon has consistently concealed his ownership of such assets in the United

States through the Entity Defendants, seeking to shield those assets from Razon's creditors and other parties-in-interest.  In addition, Razon has repeatedly and publicly cited a strategy of forcing adversaries, including Plaintiff, to pursue enforcement action against Razon and his alter ego entities in the Philippines, where Razon can harness his social and political influence to render enforcement ineffectual.

192.    Preliminary injunctive relief should issue to prevent the Entity Defendants, and anyone acting in concert with the Entity Defendants (including the Razon Agents), from taking any and all actions that would violate Plaintiff's rights with respect to this action and tend to render any judgment against the Entity Defendants and their assets in the United States ineffectual. Specifically, Plaintiff seeks an order:

> a.    Restraining the Entity Defendants, and anyone acting on their behalf or in concert with them, including but not limited to the present and former directors, officers, managers, agents, employees, advisors, consultants, accountants, attorneys, and representatives of the Entity Defendants, and all other persons and entities who are acting in concert with him or them, and all persons and entities in control of, in possession of, with knowledge of, or overseeing any of the Entity Defendants' assets, including but not limited to their books and records (collectively, the "Entity Enjoined Parties"), from facilitating or effectuating the transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, foreclosing, concealing, or in any manner dealing in or disposing of the whole or part of any stock, membership interest,

partnership interest, or other equity ownership interest in such Entity Defendant, without further order of the Court;

b.    Restraining the Entity Enjoined Parties from transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, foreclosing, concealing, or in any manner dealing in or disposing of the whole or part of any funds or other assets of the Entity Defendants in the United States, including without limitation any real property, personal property, funds held in bank accounts or otherwise in the United States, securities held in securities accounts or otherwise in the United States, and ownership interest in any other entity, without further order of the Court;

c.    Restraining the Entity Enjoined Parties from taking any actions that will impair, harm or reduce the value of their respective assets, including their respective direct and indirect ownership interest in any other Entity Defendant or other entity, without further order of the Court;

d.    Restraining the Entity Enjoined Parties from taking any actions that will or would tend to materially impair, defeat, divert, prevent, or prejudice the preservation of the Entity Defendants' respective assets, including their direct and indirect ownership interest in any other Entity Defendant or other entity or venture, without further order of the Court; and

e.    Restraining the Entity Enjoined Parties on the terms above pending entry of final judgment in this action.

193.    Concurrent with entry of final judgment on Count III above, Plaintiff seeks entry of judgment permanently restraining the Entity Enjoined Parties on the terms set forth in the preceding paragraph, with such relief to expire only once the Alter Ego Debt, together with interest, attorneys' fees, and costs, has been paid to Plaintiff in full.

194.    Plaintiff will suffer serious, immediate, and irreparable harm if preliminary and permanent injunctive relief is not issued on the terms set forth herein.

195.    Absent the injunctive relief sought herein, Plaintiff will have no adequate remedy at law.

196.    Thus, Plaintiff respectfully requests that the Court enter the orders and judgment set forth above granting preliminary and permanent injunctive relief against the Entity Defendants and those who would act in concert with the Entity Defendants.

## COUNT VI

### (Conversion – Against Razon)

197.    Plaintiff repeats and realleges the allegations set forth in Paragraphs 1-196 above as if fully set forth herein.

198.    Plaintiff is and since December 2012 has been the lawful owner of the Option Shares.  As the lawful owner of the Option Shares, Plaintiff is and at all relevant times has been entitled to exercise its rights and incidents to ownership with respect to the Option Shares, including without limitation receiving dividends paid with respect to the Option Shares, and selling, in whole or in part, the Option Shares, whether on the public market or through private transactions.

199.    Since December 2012, Razon has been fully aware of Plaintiff's lawful ownership of the Option Shares, and Plaintiff's legal rights to possess, sell, and exercise all incidents of ownership of the Option Shares.  Plaintiff purchased the Option Shares from Razon's personal

holding company, Prime, with Razon's agreement in December 2012 pursuant the EOA, as detailed above. Even after Razon's contrived and unlawful termination of the MSA in September 2013, Razon publicly acknowledged Plaintiff's ownership and rights to the Option Shares, going as far as stating publicly that Razon himself would consider purchasing the Option Shares from Plaintiff.

200.    However, Razon has at all times understood that the Option Shares have significant value, and that preventing Plaintiff from realizing that value, through both receipt of dividends paid on the Option Shares and proceeds of disposition of the Option Shares, would cause significant damage to Plaintiff. Razon also sought to use his interference with Plaintiff's rights to create leverage in the dispute between Razon and Plaintiff over Razon's unlawful termination of the MSA.

201.    Thus, beginning in early 2014, Razon commenced a pattern of repeated and independently unlawful acts, personally and using his alter ego instrumentalities, the Debtor Defendants and Prime, to intentionally and without authority effectively seize and exercise control over the Option Shares, and prevent and otherwise interfere with Plaintiff exercising any of its ownership rights attendant thereto.

202.    As set forth above, in early January 2014, after Plaintiff commenced arbitration over Razon's unlawful termination of the MSA, Razon became aware that Plaintiff was planning to sell the Option Shares through a prearranged block sale to more than 50 institutional investors. On or about January 15, 2014, Plaintiff's investment bank placing agents confirmed the sale, with a final price of PHP 8.05 per share, with settlement of the transaction to occur on January 21, 2014. Neither Razon nor any of the Razon Agents or any other third party had

previously raised any question regarding Plaintiff's rights in and to the Option Shares, including Plaintiff's right to sell those shares at its discretion.

203.    On January 15, 2014, Razon leveraged his personal relationship with Hans Sicat, then-President of the PSE, and caused BRC's corporate secretary, Silverio "Benny" Tan, to send a vague, four-sentence letter to the PSE requesting that it take the dramatic action of suspending trading in *all* BRC shares for one week.  Razon made this request for the express purpose of preventing Plaintiff from liquidating the Option Shares and realizing the significant value of those assets, and for the intended purposes of creating leverage over Plaintiff in the pending arbitration proceedings and attempting to recapture the value of the Option Shares (previously sold to Plaintiff by Razon) for Razon's personal benefit.

204.    Despite Plaintiff's written objection and the brevity of Mr. Tan's correspondence, but due to Razon's personal relationship with Hans Sicat, the PSE granted the request the next day, on January 16, 2014, and Plaintiff was prevented from finalizing the anticipated block sale.

205.    The following day, on or about January 17, 2014, before the arbitral tribunal was duly constituted, Razon caused the Debtor Defendants and Prime to file a petition with the RTC for a TRO to prevent Plaintiff from selling the Option Shares once trading was no longer suspended.  On January 20, 2014, the RTC granted the TRO and on February 27, 2014, issued writs of preliminary attachment and preliminary injunction restricting Plaintiff from disposing of, selling or transferring the Option Shares, subject to the arbitral tribunal's revocation of those preliminary writs once duly constituted.[19]

---

[19] As a result of the preliminary writs issued by the RTC, Deutsche Bank (the custodian of the Option Shares) transferred the Option Shares to a restricted, non-trading account where they are still held as of the filing of this Complaint.  At all times, Deutsche Bank has refused to release the Option Shares to Plaintiff based on Razon's continued and wrongful acts to continue his seizure of the Option Shares.

206. On or about December 9, 2014, the arbitral tribunal issued the IM Order, in which the arbitral tribunal confirmed Plaintiff's right to sell the Option Shares, and expressly vacated and superseded the RTC's preliminary writs (as the RTC expressly stated the arbitral tribunal had full authority to do). The IM Order further directed the parties to make the arbitral tribunal's IM Order known to the Philippine courts and "to assure its implementation." The IM Order, by its terms, "directly binds" the parties – including Razon's alter ego entities, the Debtor Defendants, to comply with the IM Order unless and until either party obtains a court decision setting it aside.

207. Despite the express directives in the IM Order, Razon caused the alter ego entities under his domination and control (the Debtor Defendants and Prime) to refuse compliance with that Order, including refusing to authorize Deutsche Bank to return the Option Shares to a trading account, and refusing to dismiss the case before the RTC filed by the Debtor Defendants and Prime.

208. On December 11, 2014, just two days after the tribunal issued the IM Order, Razon made public his intention of disregarding the binding directive of the arbitral tribunal and, at Razon's direction, Occeña reported to the press that the "tribunal has no jurisdiction over [the] Philippine court" and that the "ruling is not a judgment in favor of GGAM."

209. On September 20, 2016, the arbitral tribunal issued the Liability Award, determining that the Debtor Defendants had no justification for terminating the MSA or defense to Plaintiff's claims of material breach. Despite the arbitral tribunal's detailed findings, on September 28, 2016, Razon caused BRC to make a public disclosure to the PSE that misleadingly stated that the Liability Award could only be enforced in a Philippine court. As the arbitral tribunal later found in the Final Award, "[t]his disclosure created widespread confusion in the market, perpetuating doubt as to GGAM's ability to sell the [Option] Shares."

210.    Less than two weeks after the Liability Award was issued, on October 3, 2016, Plaintiff requested Deutsche Bank restore the Option Shares to a trading account.  Deutsche Bank advised Plaintiff that, before it could act on that request, it would need BRC's express agreement that Plaintiff was free to sell the Option Shares.

211.    On October 10, 2016, Plaintiff requested the Debtor Defendants provide written consent to Deutsche Bank releasing the Option Shares.  The following day, at Razon's direction, counsel for the Debtor Defendants responded that they objected to Deutsche Bank releasing the Option Shares, but that "there would be no objection regarding the [Option] Shares if your clients were not demanding excessive and unwarranted 'compensation' in addition to the [Option] Shares."  As the arbitral tribunal later found, this admission demonstrated that the Debtor Defendants – under Razon's direction, domination, and control – withheld their consent to Plaintiff's sale of the Option Shares in order to improperly leverage financial concessions from Plaintiff, notwithstanding the arbitral tribunal's prior binding determinations that Plaintiff has the absolute right to sell the Option Shares.

212.    Razon also continued to make false assertions to the public regarding the Plaintiff's rights in and to the Option Shares, and Razon's wrongful termination of the MSA.  For instance, on or about November 14, 2016, after the arbitral tribunal's issuance of the Liability Award, Razon caused BRC to make a false public disclosure to the PSE, stating that the Debtor Defendants had terminated the MSA because of a material breach by Plaintiff, but failing to disclose that the arbitral tribunal had already found that Razon's termination of the MSA was unjustified.  And on December 31, 2016, Razon once again caused BRC to falsely state in a public filing with the PSE that the Liability Award could be enforced only in a Philippine court.

213.    On or about March 17, 2017, Plaintiff's counsel again wrote to the Debtor Defendants' counsel in the arbitration proceedings, requesting that the Debtor Defendants immediately assure implementation of the arbitral tribunal's IM Order and Liability Award by (i) withdrawing the Debtor Defendants' January 17, 2014 petition filed with the RTC seeking the preliminary writs, and (ii) confirming in writing to Deutsche Bank, the PSE and the Philippine Depository & Trust Corporation that the Debtor Defendants have no objection to Plaintiff's sale of the Option Shares.  In response, the Debtor Defendants, at Razon's instruction, refused to take both actions and explained that "in this particular dispute, at every state, Bloomberry's position has been that, if [Plaintiff] were not demanding unreasonable 'compensation' in addition to the [Option] Shares, objections to the sale of the [Option] Shares could be put aside as part of a compromise to resolve the Parties' dispute."  In doing so, counsel effectively confirmed that, despite having no meritorious basis to interfere with Plaintiff's rights to the Option Shares, Razon was continuing to do so based on Plaintiff's pursuit of its rights for Razon's unlawful breach of the MSA.  Plaintiff renewed its March 17, 2017 request on April 3, 2017.  On April 10, 2017, the Debtor Defendants, at Razon's direction, again refused the request.

214.    On September 27, 2019, the arbitral tribunal issued its Final Award, finding that the Debtor Defendants' actions set forth above were tantamount to a "*de facto* seizure" of the Option Shares in violation of Plaintiff's property rights in such shares and Philippine law.  As set forth above, each of the acts and omissions of the Debtor Defendants occurred while the Debtor Defendants constituted alter ego instrumentalities of Razon, under his domination and control, and each of the actions of such Debtor Defendants were taken at his ultimate direction for his own intended benefit.

215.    Notwithstanding the Final Award, Razon continued to take personal action and direct his Philippine entities, including the Debtor Defendants and Prime, to maintain his *de facto* seizure of the Option Shares and prevent Plaintiff from enjoying and exercising its rights and privileges attended to its lawful ownership of that property.

216.    Among other things, Razon caused BRC to issue multiple public statements in filings with the PSE contesting the binding conclusions of the arbitral tribunal and misrepresenting that the arbitral tribunal's awards are enforceable only in the Philippine courts, including statements in public filings on September 30, 2019, November 14, 2019, January 6, 2020, March 4, 2020, May 14, 2020, May 26, 2020, June 1, 2020, August 13, 2020, November 10, 2020, and February 16, 2021.

217.    In addition, Razon refused (and caused the Debtor Defendants and Prime to refuse) to comply with the directives in the Final Award regarding the Option Shares.  Specifically, the Final Award provides that, if the Debtor Defendants did not comply with payment to Plaintiff within 30 days of the Final Award (which they did not), Plaintiff was permitted to sell the Option Shares on the open market, and the Debtor Defendants were required to "take all steps necessary" to (i) withdraw the preliminary writs issued by the RTC; (ii) issue a joint press release regarding Plaintiff's ownership of the Option Shares; and (iii) instruct the PSE, Deutsche Bank, and Philippine Depository & Trust Corporation regarding Plaintiff's rightful ownership of the Option Shares.  The arbitral tribunal further and specifically directed the Debtor Defendants to instruct their agent – Razon's personal holding company, Prime, the majority shareholder of BRC – to cooperate in these efforts.

218.    Since the Final Award, Razon refused to take (and caused the Debtor Defendants and Prime to refuse to take) any of the steps mandated by the arbitral tribunal, despite specific

requests by Plaintiff, including on October 28, 2019, and the High Court of Singapore's and the Singapore Court of Appeal's dismissals of the Debtor Defendants' attempts to resist enforcement of both the Liability Award and Final Award.

219.     Finally, since issuance of the TRO and preliminary writs by the RTC in early 2014, Razon caused his alter ego instrumentalities (the Debtor Defendants and Prime) to maintain the pending RTC proceedings in the Philippines, notwithstanding the arbitral tribunal's issuance of the IM Order, Liability Award, and Final Award, and has repeatedly taken affirmative action to maintain the fiction that the preliminary writs remain in place and valid, and that legal impediments remain to Deutsche Bank's release of the Option Shares. Among such actions, Razon caused the Debtor Defendants and Prime to renew, on an annual basis since February 2015, the attachment bond and injunction bond (the "Bonds") that such entities were required to post to support issuance of the preliminary writs. Razon caused the Debtor Defendants and Prime to renew those Bonds even after issuance of the Final Award, including on or around February 27, 2021, which extended the Bonds through February 27, 2022. As the arbitral tribunal noted in the Final Award, Deutsche Bank, in refusing to release the Option Shares, has continued to rely on the Debtor Defendants' repeated renewal of the Bonds as evidence that the preliminary writs remain in place and valid, notwithstanding the arbitral tribunal's repeated rulings to the contrary.

220.     Razon is independently liable for the acts and omissions detailed herein, whether acting individually or through his alter ego entities (including the Debtor Defendants and Prime). Each such act and omission was intentional, and with full knowledge of Plaintiff's rights in and to the Option Shares and Plaintiff's lawful ownership of that property.

221.     Each of Razon's acts and omissions detailed above independently harmed Plaintiff and had the intended effect of depriving Plaintiff of its right to possess, obtain dividends issued upon, dispose of, and otherwise exercise its rights attended to the Option Shares.

222.     Razon's acts and omissions were taken without authority of Plaintiff and for an unlawful purpose; namely, as the arbitral tribunal found with respect to the Debtor Defendants' conduct, to obtain and maintain control over the Option Shares so as to build improper leverage in the Debtor Defendants' unmeritorious dispute with Plaintiff regarding amounts owed to Plaintiff under the MSA.

223.     At all relevant times, Plaintiff had a possessory right or interest in the Option Shares, and Razon's *de facto* seizure of the Option Shares through his conduct detailed above was in derogation of and complete interference with Plaintiff's rights.

224.     As a result of Razon's conversion of the Option Shares, including through actions taken before and after the Final Award, Plaintiff has suffered substantial damages in an amount to be proven at trial, but in no event less than $196,000,000.

225.     Razon's conduct detailed herein was unlawful, intentional, malicious and in conscious, deliberate and wanton disregard of Plaintiff's rights in and to the Option Shares.  As a result, and based on the circumstances of such conduct, an award of punitive damages in favor of Plaintiff is warranted and appropriate.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests the Court enter Judgment as follows:

**ON COUNT I:**

A.     For recognition and enforcement of the Liability Award and Final Award and judgment for Plaintiff against all Defendants in the amount of at least $296,562,709.02, plus interest accrued under the Final Award on the unpaid amount of the award from the date of

issuance of the Final Award through the entry of judgment, post-judgment interest until the Final Award amount is paid in full, attorneys' fees, and costs.

**ON COUNT II:**

B.      For a declaration that Razon is liable to Plaintiff, as the alter ego of the Debtor Defendants, for the unpaid amount of the Alter Ego Debt, plus interest, attorneys' fees, and costs.

C.      For appointment of a receiver over Razon's assets in the United States, including without limitation his ownership interests in and rights with respect to each of the Alter Ego Entities, to preserve such assets pending entry of judgment and in aid of Plaintiff's rights to enforce the Alter Ego Debt against Razon and such assets, including execution of judgment.

**ON COUNT III:**

D.      For a declaration that the Alter Ego Entities, and each of them, are liable to Plaintiff, as the alter egos of Razon (or, alternatively, as the alter egos of the Debtor Defendants' alter egos), for the unpaid amount of the Alter Ego Debt, plus interest, attorneys' fees, and costs.

E.      For appointment of a receiver over the Alter Ego Entities, and each of them, to preserve the respective United States assets of such Alter Ego Entities (and Razon's interest in such entities and their assets) pending entry of judgment and in aid of Plaintiff's rights to enforce the Alter Ego Debt against such entities and their respective assets, including execution of judgment.

**ON COUNT IV:**

F.      For preliminary and permanent injunctive relief preventing Razon and the other Razon Enjoined Parties from taking any and all actions that would violate Plaintiff's rights with respect to this action and tend to render any judgment against Razon and his assets in the United States ineffectual, including without limitation:

i.     Restraining the Razon Enjoined Parties from transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, foreclosing, concealing, or in any manner dealing in or disposing of the whole or part of Razon's ownership interests, both direct and indirect, in any of the Alter Ego Entities without further order of the Court;

ii.     Restraining the Razon Enjoined Parties from transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, foreclosing, concealing, or in any manner dealing in or disposing of the whole or part of any funds or other assets of Razon (or in which he holds an interest) in the United States, including any and all funds held in bank accounts or otherwise in the United States and any securities held in securities accounts or otherwise in the United States, without further order of the Court;

iii.     Restraining the Razon Enjoined Parties from taking any actions that will impair, harm, or reduce the value of Razon's assets, including his direct and indirect ownership interest in the Alter Ego Entities, without further order of the Court;

iv.     Restraining the Razon Enjoined Parties from taking any actions that will or would tend to materially impair, defeat, divert, prevent, or prejudice the preservation of Razon's assets, including his direct and indirect ownership interest in the Alter Ego Entities, without further order of the Court;

v.      Requiring the Razon Enjoined Parties to account to Plaintiff (and any receiver appointed by the Court) for any and all property interests Razon may have in and to assets located in the United States; and

vi.     Enjoining the Razon Enjoined Parties from otherwise interfering with Plaintiff's right (and the rights of any receiver appointed by the Court) to enforce the Alter Ego Debt against Razon and his assets.

**ON COUNT V:**

G.      For preliminary and permanent injunctive relief preventing the Entity Enjoined Parties from taking any and all actions that would violate Plaintiff's rights with respect to this action and tend to render any judgment against the Entity Defendants and their assets in the United States ineffectual, including without limitation:

i.      Restraining the Entity Enjoined Parties (including Razon) from facilitating or effectuating the transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, foreclosing, concealing, or in any manner dealing in or disposing of the whole or part of any stock, membership interest, partnership interest, or other equity ownership interest in any Entity Defendant, without further order of the Court;

ii.     Restraining the Entity Enjoined Parties from transferring, assigning, selling, conveying, devising, pledging, mortgaging, creating a security interest in, encumbering, foreclosing, concealing, or in any manner dealing in or disposing of the whole or part of any funds or other assets of the Entity Defendants in the United States, including, without limitation, any real

property, personal property, funds held in bank accounts or otherwise in the United States, securities held in securities accounts or otherwise in the United States, and ownership interest in any other entity, without further order of the Court;

iii.   Restraining the Entity Enjoined Parties from taking any actions that will impair, harm, or reduce the value of the Entity Defendants' assets, including their respective direct and indirect ownership interest in any other Entity Defendant or other entity, without further order of the Court;

iv.   Restraining the Entity Enjoined Parties from taking any actions that will or would tend to materially impair, defeat, divert, prevent, or prejudice the preservation of the Entity Defendants' respective assets, including their direct and indirect ownership interest in any other Entity Defendant or other entity or venture, without further order of the Court;

v.   Requiring the Entity Enjoined Parties to account to Plaintiff (and any receiver appointed by the Court) for any and all property interests the Entity Defendants may have in and to assets located in the United States; and

vi.   Enjoining the Entity Enjoined Parties from otherwise interfering with Plaintiff's right (and the rights of any receiver appointed by the Court) to enforce the Alter Ego Debt against the Entity Defendants and their assets.

**ON COUNT VI:**

H.   For an order preliminarily and permanently directing Razon to take all actions necessary to cause Deutsche Bank to release the Option Shares to Plaintiff without restriction, including without limitation causing the dismissal of any pending proceedings in the RTC and

dissolution of the preliminary writs, providing any written consents required by Deutsche Bank from Razon, the Debtor Defendants or Prime, and otherwise causing the Debtor Defendants and Prime to comply with the arbitral tribunal's directives in the Final Award.

I.       For an award of damages suffered by Plaintiff as a result of Razon's conversion of the Option Shares in an amount to be determined at trial, but in any event no less than $196,000,000, plus interest, attorneys' fees, and costs.

J.       For an award of punitive damages based on Razon's intentional and unlawful actions, which were taken in conscious, deliberate, and wanton disregard for Plaintiff's rights.

**ON ALL COUNTS:**

K.       For such other and further relief as the Court determines Plaintiff is entitled to or should receive.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a jury trial on all issues so triable.

| | |
|---|---|
| Dated:  March 29, 2021<br>New York, New York | Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. |

Respectfully submitted,

By: */s/  Jason P.W. Halperin*

Robert I. Bodian
Jason P.W. Halperin

Daniel T. Pascucci
   (*Pro Hac Vice application forthcoming*)
Joseph R. Dunn
   (*Pro Hac Vice application forthcoming*)
Danielle P. Richards
   (*Pro Hac Vice application forthcoming*)
Michael J. Godwin
   (*Pro Hac Vice application forthcoming*)
666 Third Avenue
New York, NY 10017
T: (212) 935-3000

F: (212) 983-3115
rbodian@mintz.com
jhalperin@mintz.com
dtpascucci@mintz.com
jrdunn@mintz.com
dprichards@mintz.com
mjgodwin@mintz.com

*Attorneys for Plaintiff*
*Global Gaming Philippines, LLC*