# APPENDIX 2

**IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH A MANAGEMENT SERVICES AGREEMENT DATED SEPTEMBER 9, 2011 AND THE UNCITRAL ARBITRATION RULES 2010**

---

**BETWEEN**

**GLOBAL GAMING PHILIPPINES LLC (AS ASSIGNOR)**
**GGAM NETHERLANDS B.V. (AS ASSIGNEE)**

**CLAIMANTS**

**AND**

**BLOOMBERRY RESORTS AND HOTELS INC.**
**SURESTE PROPERTIES, INC.**

**RESPONDENTS**

---

**PARTIAL AWARD ON LIABILITY**

SEPTEMBER 20, 2016

---

The Arbitral Tribunal:

Mr. R Doak Bishop, Esq. (Arbitrator)

Mr. Michael Hwang, S.C. (Arbitrator)

Dr. Andrés Rigo Sureda (Presiding Arbitrator)

# Table of Contents

I.   PARTIES ...........................................................................................................6
     A.  CLAIMANTS ...............................................................................................6
     B.  RESPONDENTS .............................................................................................7

II.  PROCEDURAL HISTORY ................................................................................8
     A.  PROCEEDINGS FOLLOWING THE INTERIM MEASURES HEARING .....................8
     B.  PROCEDURAL ORDERS ISSUED SINCE THE INTERIM MEASURES HEARING.........11
     C.  HEARING ON LIABILITY .............................................................................13
     D.  INTERLOCUTORY MATTERS .......................................................................13
     E.  PRIVILEGE LOG .........................................................................................13
     F.  FILING OF ADDITIONAL DOCUMENTS .........................................................19

III. CHRONOLOGY OF EVENTS LEADING TO THE ARBITRATION................22

IV.  RELIEF SOUGHT BY THE PARTIES ............................................................25
     A.  CLAIMANTS' RELIEF SOUGHT ...................................................................25
     B.  RESPONDENTS' RELIEF SOUGHT .................................................................26

V.   PRELIMINARY MATTERS ...........................................................................28
     A.  APPLICABLE LAW .....................................................................................28
     B.  PLEADINGS RELATED TO THE CONSTRUCTION OF THE CASINO .....................28
     C.  CONTRACT INTERPRETATION ....................................................................29

VI.  ALLEGED MISREPRESENTATIONS AND/OR CONDUCT OF GGAM AMOUNTING
     TO CAUSAL FRAUD .....................................................................................31
     A.  RESPONDENTS' ARGUMENTS .....................................................................31
         (i)   Equating GGAM with Las Vegas Sands .............................................32
         (ii)  Guest and VIP Player Data ..............................................................32
         (iii) Possession or Development of Policies and Procedures ....................34
         (iv)  Hands-on Management .....................................................................35
         (v)   Cantor's role ...................................................................................36
     B.  CLAIMANTS' ARGUMENTS .........................................................................37
         (i)   Equating GGAM with Las Vegas Sands .............................................38
         (ii)  Guest and VIP Player Data ..............................................................39
         (iii) Possession or Development of Policies and Procedures ....................40
         (iv)  Hands-on Management .....................................................................40
         (v)   Cantor's role ...................................................................................41
     C.  TRIBUNAL'S ANALYSIS .............................................................................42
         (i)   Equating GGAM with Las Vegas Sands .............................................43
         (ii)  Relationships with Junket Operators and Possession of Guest Data ...43
         (iii) Possession of Policies and Procedures.............................................44
         (iv)  Hands-on Management .....................................................................46
         (v)   Cantor's role ...................................................................................47

VII.    THE MISTAKE ARGUMENT ............................................................................51

VIII.   TERMINATION OF THE MSA UNDER CLAUSE 15.1(A) ...............................52
        A. RESPONDENTS' GENERAL ARGUMENTS .......................................................... 53
        B. CLAIMANTS' GENERAL ARGUMENTS .............................................................. 53

IX.     ALLEGED FAILURE TO SUBMIT BUSINESS AND MARKETING PLANS THAT MET
        PRUDENT INDUSTRY PRACTICE ..................................................................56
        A. RESPONDENTS' ARGUMENTS ......................................................................... 59
        (i)   Scope of the Claimants' Obligation ......................................................59
        (ii)  Business Plan ......................................................................................60
        (iii) Marketing Plan ....................................................................................62
        B. CLAIMANTS' ARGUMENTS ............................................................................ 64
        (i)   Business Plan ......................................................................................64
        (ii)  Marketing Plan ....................................................................................67
        C. ANALYSIS OF THE TRIBUNAL ........................................................................ 68
        (i)   Scope of the Claimants' Obligations ....................................................68
        (ii)  Business and Marketing Plans .............................................................69

X.      BREACH OF THE OBLIGATION TO ESTABLISH POLICIES AND PROCEDURES
        (ANNEX A TO THE MSA) ............................................................................76
        A. RESPONDENTS' ARGUMENTS ......................................................................... 76
        B. CLAIMANTS' ARGUMENTS ............................................................................ 77
        C. ANALYSIS OF THE TRIBUNAL ........................................................................ 77

XI.     BREACH OF CLAUSE 2.5 OF THE MSA ("STANDARD OF CARE") ..............79
        A. RESPONDENTS' ARGUMENTS ......................................................................... 79
        B. CLAIMANTS' ARGUMENTS ............................................................................ 79
        C. ANALYSIS OF THE TRIBUNAL ........................................................................ 82

XII.    BREACH OF THE OBLIGATION TO PROVIDE "HANDS-ON MANAGEMENT" ........87
        A. RESPONDENTS' ARGUMENTS ......................................................................... 87
        B. CLAIMANTS' ARGUMENTS' ........................................................................... 88
        C. ANALYSIS OF THE TRIBUNAL ........................................................................ 89

XIII.   BREACH OF CLAUSE 16.2 OF THE MSA ......................................................91
        A. RESPONDENTS' ARGUMENTS ......................................................................... 91
        B. CLAIMANTS' ARGUMENTS ............................................................................ 92
        C. ANALYSIS OF THE TRIBUNAL ........................................................................ 92

XIV.    TERMINATION OF THE MSA UNDER CLAUSES 15.3(B) OR 17 ...................94

3

XV.   THE CLAIMANTS' CLAIM THAT RESPONDENTS BREACHED THE MSA BY
      TERMINATING IT .......................................................................................97

XVI.  LEGALITY OR PROPRIETY OF THE TERMINATION OF THE MSA: PRIOR
      CONFIRMATION OF THE TERMINATION BY AN ARBITRAL TRIBUNAL.............98
      A.  CLAIMANTS' ARGUMENTS..............................................................98
      B.  RESPONDENTS' ARGUMENTS ..........................................................98
      C.  ANALYSIS OF THE TRIBUNAL ..........................................................99

XVII. WHETHER THE RESPONDENTS FAILED TO PAY GGAM ITS MANAGEMENT
      SERVICE FEES AND THEREBY BREACHED CLAUSES 3.4 AND 4 OF THE MSA..100
      A.  CLAIMANTS' ARGUMENTS..............................................................100
      B.  RESPONDENTS' ARGUMENTS ..........................................................102
      C.  ANALYSIS OF THE TRIBUNAL ..........................................................103

XVIII. THE CLAIM THAT THE RESPONDENTS MADE FALSE AND DEFAMATORY
      STATEMENTS ABOUT THE CLAIMANTS AND/OR THE ALLEGED BREACHES OF
      CLAUSE 14.2 AND 18.9 OF THE MSA......................................................104
      A.  CLAIMANTS' ARGUMENTS..............................................................104
      B.  RESPONDENTS' ARGUMENTS ..........................................................106
      C.  ANALYSIS OF THE TRIBUNAL ..........................................................107

XIX.  WHETHER THE RESPONDENTS ARE ENTITLED TO RESOLUTION OR
      ANNULMENT OF THE MSA, INCLUDING THE EQUITY OPTION AND THE EOA
      UNDER PHILIPPINE LAW .......................................................................110

XX.   RESPONDENTS' CLAIM OF UNJUST ENRICHMENT.....................................111
      A.  RESPONDENTS' ARGUMENTS ..........................................................111
      B.  CLAIMANTS' ARGUMENTS..............................................................112
      C.  ANALYSIS OF THE TRIBUNAL ..........................................................113

XXI.  DISCLOSURE OF THE LIABILITY AWARD.................................................115

XXII. RESPONDENTS' CONCERNS ON PROCEDURAL EQUALITY AND BALANCE .....116

XXIII. OTHER MATTERS .............................................................................117

XXIV. RELIEF AND REMEDIES ......................................................................118

XXV.  COSTS ..........................................................................................119

**XXVI.   DECISION** ...................................................................................................................**120**

**ANNEX TO THE AWARD ON LIABILITY: RESPONDENTS' CONCERNS ON PROCEDURAL FAIRNESS AND EQUALITY** ...............................................................................**122**

## I.  PARTIES

### A.  Claimants

1.    The Claimants are Global Gaming Philippines LLC (as assignor) and GGAM Netherlands B.V. (as assignee) (respectively "**GGAM**" and "**GGAM Netherlands**" and collectively the "**Claimants**").

2.    The Claimants are represented by:

Joseph R. Profaizer
Charles A. Patrizia
Igor V. Timofeyev
Adam J. Weiss
PAUL HASTINGS LLP
875 15th Street, N.W.
Washington, D.C. 20005
United States of America
Telephone: +1 (202) 551-1700
Facsimile: +1 (202) 551-1705
E-mail: joeprofaizer@paulhastings.com;
         charlespatrizia@paulhastings.com;
         igortimofeyev@paulhastings.com; and
         adamweiss@paulhastings.com

Daniel H. Weiner
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
United States of America
Telephone +1 (212) 837‑6000
Facsimile: +1 (212) 422-4726
E-mail: daniel.weiner@hugheshubbard.com

**B.   Respondents**

3.   The Respondents are Bloomberry Resorts and Hotels, Inc. ("**BRHI**" or "**Bloomberry**") and Sureste Properties, Inc. ("**Sureste**") (collectively the "**Respondents**"). The Respondents are owners of the Solaire Resort and Casino, an integrated casino hotel entertainment complex located in Paranque City, Metro Manila, Philippines (the "**Solaire**")

4.   The Respondents are represented by:

Michael D. Nolan, Esq.
Erin M. Culbertson
Elitza Popova-Talty
MILBANK, TWEED, HADLEY & MCCLOY LLP
International Square Building
1850 K Street, N.W.
Suite 1100
Washington, DC 20006
United States of America
Telephone: +1 (202) 835-7500
Facsimile: +1 (202) 263-7586
E-mail: MNolan@milbank.com;
        ECulbertson@milbank.com; and
        ETalty@milbank.com

Purisimo S. Buyco
Robel C. Lomibao
PICAZO BUYCO TAN FIDER & SANTOS
Penthouse Liberty Center
104 H.V. dela Costa St., Salcedo Village
1227 Makati City, Metro Manila
Republic of the Philippines
Telephone: (632) 888-0999
Facsimile: (632) 888-1011
E-mail: psbuyco@picazolaw.com
        rclomibao@picazolaw.com

5.   The Claimants and the Respondents are collectively referred to as the "**Parties**". The different Claimants and the different Respondents are, for practical purposes, treated as one entity with identical rights and liabilities. The Parties have proceeded on the basis that they are either jointly entitled or jointly liable (e.g. if the Claimants are successful with a claim, both of the Claimants will be jointly entitled and, conversely, both of the Respondents will be jointly liable for that claim; similarly, if the Respondents are successful with a counterclaim, both Respondents will be jointly entitled and both Claimants will be jointly liable for that counterclaim). Since neither the Claimants nor the Respondents have sought to distinguish or apportion entitlement or responsibility as between themselves, this award proceeds on the same basis.

## II.  PROCEDURAL HISTORY

### A.    Proceedings following the Interim Measures Hearing

6.   The procedural history of the present proceedings has been set out at paragraphs 6 – 23 of the Tribunal's decision dated December 9, 2014 following an interim measures hearing from October 20 – 22, 2014 in Washington, D.C. (the "**Decision**"). The Decision also sets out other relevant background details of the dispute, which will therefore not be repeated in this Partial Award on Liability (the **"Liability Award"**).

7.   The Liability Award adopts the abbreviations set out in the Decision, and sets out the procedural history following the interim measures hearing.

8.   On September 8, 2014, the Claimants filed their Statement of Claim ("**SOC**").

9.   On December 7, 2014, the Respondents filed their Statement of Defense along with (among others) the following documents:

   (a)   Declaration of Mr. Anthony See Toh, dated December 5, 2014 ("**See Toh Declaration**").

   (b)   Declaration of Mr. Arcan L. Lat, dated December 5, 2014 ("**Lat Declaration**").

   (c)   Declaration of Mr. Cyrus Sherafat, dated December 5, 2014 ("**Sherafat Declaration**").

(d)   Declaration of Mr. Donato C. Almeda, dated December 5, 2014 ("**Almeda Declaration**").

(e)   Declaration of Mr. Enrique K. Razon, Jr., dated December 7, 2014 ("**Razon Declaration**").

(f)   Declaration of Mr. Fritz Jerrold Lacap, dated December 5, 2014 ("**Lacap Declaration**").

(g)   Declaration of Mr. Jose Oscar O. Salvacion, dated December 7, 2014 ("**Salvacion Declaration**").

(h)   Declaration of Mr. Leo D. Venezuela, dated December 7, 2014 ("**Venezuela Declaration**").

(i)   Declaration of Ms. Lorraine Koo Mann Loo, dated December 4, 2014 ("**Lorraine Declaration**").

(j)   Expert Report of Ben Lee, dated December 7, 2014 ("**Lee Report**").

(k)   Expert Report of Jim Kilby, dated December 6, 2014 ("**Kilby Report**").

(l)   Expert Report of Roy Wheatley, dated December 7, 2014 ("**Wheatley Report**").

10.   On February 2, 2014, the Respondents filed their amended Statement of Defense and Counterclaims ("**Defense**").

11.   On June 15, 2015, the Claimants filed their Reply ("**Reply**"), along with (among others) the following documents:

(a)   Declaration of Mr. Andrew M. Klebanow, dated June 15, 2015 ("**Klebanow Declaration**").

(b)   Declaration of Mr. William P. Weidner, dated June 14, 2015 ("**Weidner Declaration**")''.

(c)   Declaration of Mr. Bradley H. Stone, dated June 15, 2015 ("**Stone Declaration**")'.

(d)    Declaration of Mr. Garry W. Saunders, dated June 15, 2015 ("**Saunders Declaration**")''''.

(e)    Declaration of Mr. Jonathan D. Rein, dated June 13, 2015 ("**Rein Declaration**")'.

(f)    Declaration of Mr. Michael D. French, dated June 13, 2015 ("**Rein Declaration**")'.

(g)    Declaration of Mr. Michael D. Otten, dated June 15, 2015 ("**Otten Declaration**")'.

(h)    Expert Report of Professor Anthony Lucas, dated June 15, 2015 ("**Lucas Report**")'.

(i)    Expert Report of Mr. William Timmins, dated June 15, 2015 ("**Timmins Report**")'.

(j)    Expert Report of Professor Guhan Subramanian, dated June 15, 2015 ("**Subramanian Report**")''.

(k)    Expert Report of Professor Joseph P. Kalt, dated June 15, 2015 ("**Kalt Report**")''.

(l)    Expert Report of Mr. Dean M. Macomber and Mr. Stephen J. Karoul, dated June 15, 2015 ("**Karoul-Macomber Report**").

(m)   Expert Report of Mr. Simon Oaten, dated June 15, 2015 ("**Oaten Report**").

12.   On September 4, 2015, the Respondents filed their Rejoinder ("**Rejoinder**") along with the following documents:

(a)    Supplemental Statement of Mr. Enrique K Razon Jr dated August 28, 2015 ("**Razon Supplemental Declaration**").

(b)    Supplemental Declaration of Mr. Donato C Almeda dated September 3, 2015 ("**Almeda Supplemental Declaration**").

(c)    Supplemental Declaration of Ms. Lorraine Koo Mann Loo dated September 2, 2015 ("**Koo Supplemental Declaration**").

(d)    Supplemental Declaration of Mr. Fritz Jerrold Lacap dated September 4, 2015 ("**Lacap Supplemental Declaration**").

(e)    Declaration of Peter Nicholas Boekel dated September 1, 2015 ("**Boekel Declaration**").

**B.   Procedural Orders issued since the Interim Measures Hearing**

13.   The Tribunal also issued the following procedural orders since the Interim Measures Hearing:

(a)    Procedural Order 5, dated January 16, 2015 ("**PO 5**"), denying in part the Claimants' request dated November 12, 2014 that the Tribunal make a determination that the Claimants may disclose Confidential Information (as defined in PO 3) to nine individuals.

(b)    Procedural Order 6, dated April 27, 2015 ("**PO 6**"), which resolved that the document production period was closed as of April 15, 2015; that the Parties were to file their principles on privilege and the application of those principles in respect of documents on their privilege log; and that the Claimants and the Respondents were to file their Reply and Rejoinder on June 15, 2015 and August 14, 2015, respectively.

(c)    Procedural Order 7, dated May 15, 2015 ("**PO 7**"), which resolved the Parties' dispute as to whether some documents on each side's privilege log were properly listed as such, and denied both the Respondents' request to appoint an independent expert to review the Claimants' privilege log and the documents contained therein as well as their request to reconsider the briefing schedule.

(d)    Procedural Order 8, dated July 1, 2015 ("**PO 8**"), which denied the Respondents' request to appoint an independent expert to review the Claimants' privilege log and the documents contained therein, and granted the Respondents' request for an extension of the deadline for the submission of its Rejoinder from August 14, 2015 to September 4, 2015.

(e)     Procedural Order 9, dated July 23, 2015 ("**PO 9**"), which denied in part (and allowed in part) the Respondents' request for production of certain categories of documents listed on the Claimants' privilege log.

(f)     Procedural Order 10, dated August 3, 2015 ("**PO 10**"), which allowed both Parties to file further submissions on the Respondents' request to bifurcate the proceedings; and denied the Respondents' request for production of reports reviewed by but not relied on by the Claimants' expert Mr. Oaten.

(g)     Procedural Order 11, dated August 12, 2015 ("**PO 11**"), which granted the Respondents' request to bifurcate the proceedings and allowed the Respondents to submit their Rejoinder as to damages by December 15, 2015.

(h)     Procedural Order 12 ("**PO 12**"), dated September 17, 2015, set out the program for the Hearing on Liability.

(i)     Procedural Order 13 ("**PO 13**"), dated October 9, 2015, denied the Respondents' request to postpone the Hearing on Liability scheduled to begin on October 15, 2015.

(j)     Procedural Order 14 ("**PO 14**"), dated December 12, 2015, denied the Respondents' request to appoint a special master and indicated that it would address in this Liability Award the allegations made by the Respondents at the closing of the Liability Hearing.

(k)     On December 21, 2015, the Claimants requested that PO 5 be amended in order to reflect the fact that Ms. Sandra Yu had replaced Mr. Eric Su. As explained by the Claimants, Mr. Su no longer worked for GGAM or Cantor Fitzgerald ("**Cantor**") and had no access to Confidential Information regarding this arbitration, and Ms. Yu bore the same title as Mr. Su and provided direct support to Mr. Jon Rein. The Respondents expressed no objection to this change. The Tribunal amended PO 5 on 28 December 2015.

### C.   Hearing on Liability

14.   On October 15, 2015, the Tribunal commenced its merits hearing on liability (the "**Liability Hearing**") at Maxwell Chambers, Singapore, and concluded the Liability Hearing on October 24, 2015.

### D.   Interlocutory Matters

15.   For completeness, the Tribunal highlights the salient circumstances surrounding interlocutory matters in relation to the production of documents and the Claimants' privilege log, and the filing of documents by and between the Parties.

### E.   Privilege Log

16.   On April 10, 2015, the Claimants sent to the Respondents their privilege log ("**Privilege Log**"). The Respondents wrote to the Tribunal on April 17, 2015 (the "**April 17 letter**"), requesting the following:

> "[T]hat the Tribunal order that an independent and impartial expert be appointed to review the documents and report on the objections. Prior to such appointment, in order to alleviate the burden on the Tribunal, the Parties should be invited to confer regarding (1) identification and appointment of an independent and impartial third- party who is an expert in U.S. privilege law, and (2) development of a procedure and process for the expert or "special master" to review the documents. In the event that a third-party review process such as this is not employed, Bloomberry requests that Claimants be directed to provide a fair response to Bloomberry's August 16 letters regarding the privilege log and subsequently to confer with Bloomberry with the objective of narrowing any disagreements about the propriety of Claimants' withholding of certain documents prior to Bloomberry's presentation of remaining points of disagreement to the Tribunal for resolution."

17.   The Respondents then sent a letter to the Tribunal dated April 18, 2015 (the "**April 18 Letter**") meant to "*supplement*" the April 17 Letter. The April 18 Letter re-iterated the Respondents' request that the Tribunal appoint an independent expert "*to analyze and resolve these and other questions of privilege*".

18.   The Claimants replied to the Respondents' April 17 and April 18 Letters with a letter dated April 22, 2015 (the "**April 22 Letter**").

19.   While the Respondents' letters addressed various facts, and asserted that these facts constituted "*exceptional circumstances*" within Article 3(8) of the IBA Rules on the Taking of Evidence in International Arbitration 2010 (the "**IBA Rules**"), the Tribunal was not assisted in relation to the law on privilege. Crucially, the Tribunal had no assistance, in the Parties' letters referred to above, as to:

(a)   What law (or rules) governed questions of privilege; and

(b)   Whether privilege should be characterized as substantive or procedural?

20.   The mere incantation of facts and assertions that entries on a privilege log contain "*questionable designations*" or constitute "*exceptional circumstances*" do not aid the Tribunal in determining whether or not Article 3(8) is applicable, or whether the Tribunal should "*appoint an independent and impartial expert*". Article 3(8) of the IBA Rules is reproduced below for ease of reference.

"*In exceptional circumstances, if the propriety of an objection can be determined only by review of the Document, the Arbitral Tribunal may determine that it should not review the Document. In that event, the Arbitral Tribunal may, after consultation with the Parties, appoint an independent and impartial expert, bound to confidentiality, to review any such Document and to report on the objection. To the extent that the objection is upheld by the Arbitral Tribunal, the expert shall not disclose to the Arbitral Tribunal and to the other Parties the contents of the Document reviewed.*"

21.   The Tribunal notes that Article 3(6) expressly contemplates that "*[u]pon receipt of any such objection, the Arbitral Tribunal may invite the relevant Parties to consult with each other with a view to resolving the objection*". In the circumstances, the Tribunal received the Claimants' privilege log on April 17, 2015, which was sent under cover of the Respondents' April 17 Letter, and received the Respondents' privilege log, dated March 24, 2015, only on April 22, 2015, when the Respondents' privilege log was sent under cover of the Claimants' April 22 Letter.

22.   Accordingly, and having regard also to the lack of principles of law or rules supporting the Respondents' request, the Tribunal thereafter issued PO 6 and determined that the Parties should be given an opportunity to fully brief the Tribunal on the following matters:

   (a)   "*the principles that the parties have followed in selecting the documents that have been included in the privilege logs*"; and

   (b)   "*how these principles have been applied in respect of any documents whose privilege status has been questioned by the other party*".

23.   On April 29, 2015, both Parties submitted the principles of privilege respectively applied in determining the documents to be listed on their privilege logs, in accordance with the Tribunal's direction in PO 6.

24.   The Tribunal considered the Parties' principles of privilege, and ordered in PO 7, dated May 15, 2015, the following:

   "*1. That, in terms of fairness, the same privilege principles shall apply to documents retained by each party and, therefore, to the extent that there may be differences in the applicable laws, the law that gives the greatest protection to privilege to both parties shall apply.*

   *2. That each party shall produce to the other party, no later than May 22, 2015, redacted documents retained on grounds of privilege that contain mixed legal and business advice.*

   *3. That each party shall justify to the other party, no later than May 22, 2015, the existence of the attorney-client relationship in the case of documents retained on the basis of attorney-client privilege.*

   *4. That, in the case of documents produced redacted before the date of this order, the party who produced them shall explain, no later than May 22, 2015, to the other party the basis on which the documents were redacted.*

   *5. To deny the request to reconsider the briefings schedule.*

   *6. To deny the request to appoint an expert.*

*7. That the parties shall report back to the Tribunal on the implementation of this order no later than May 26, 2015, and that the Tribunal shall decide any pending matters between the parties.*"

25.   The Tribunal placed emphasis on the need for procedural equality between the Parties and, accordingly, its directions in PO 7 ensured that the Parties were on an equal footing in respect of applying the same principles of privilege. The Tribunal was not persuaded that there was any reason, on the face of the facts relied on by the Respondents, to conclude that the "*propriety of an objection [i.e., that documents were privileged] can be determined only by review of the Document*".

26.   On May 27, 2015, each of the Parties wrote to the Tribunal stating how they had complied with PO 7. The Respondents took issue with the Claimants' "*perfunctory*" implementation of PO 7 and requested that the Tribunal:

"*(1) Appoint an independent and impartial expert, as contemplated by the IBA Rules of Evidence and the UNCITRAL Rules, 55 to review certain documents withheld by Claimants' and report on Bloomberry's questions regarding specific entries (attached hereto as Exhibit B) on Claimants' privilege log;*

*(2) Order Claimants to produce their engagement letters (with appropriate redactions for commercially sensitive information) with each of the law firms listed on their privilege log, or, if engagement letters do not exist, to provide as an alternative supporting documentation for when each representation of Global Gaming Philippines LLC began and the scope of each representation.*

*(3) Order Claimants to identify the parties to the "draft letter agreement regarding the exercise of the Option" referenced in Entry No. 721, the document exchanged by the CEOs of GGAM and Cantor Fitzgerald.*"

27.   The Respondents' May 27 letter also enclosed an Exhibit B, which comprised 20 pages of "*comments*" on various documents of the Claimants' Privilege Log.

28.   The Tribunal invited the Claimants to comment on the Respondents' re-iterated and new requests, as well as on the Respondents' Exhibit B. Following the Claimants' comments on June 4, 2015, the Tribunal provided the Respondents an opportunity to respond, and on June 11, 2015, the Respondents filed their

response. The Tribunal considered the Parties' submissions and decided, in an email to the Parties dated June 17, 2015, as follows.

> *"The Tribunal has considered the parties' comments and arguments in support of their requests. The Tribunal refers to its decision in Procedural Order No. 7 denying the request to appoint an independent expert under Article 3(8) of the IBA Rules to review documents withheld by Claimants on the basis that they are privileged. There is nothing in Respondents' submissions that allays the Tribunal's concerns in respect of such appointment and that would justify the revision of its decision.*
>
> *The Tribunal also recalls that in Procedural Order No. 7 the Tribunal stated that the Tribunal shall decide any pending matters between the parties. Therefore, the Tribunal orders: (a) Claimants (i) to produce the engagement letters with each of the law firms listed on their privilege log, and (ii) to identify the parties to the "draft letter agreement regarding the exercise of the Option" referenced in Entry No. 721; and (b) Respondents to produce a log of redacted documents. Such documents and identification to be communicated by each party to the other no later than five days from the date of this communication.*
>
> *As to Claimants' request that Respondents produce minutes of ExCom meetings after September 2013, the Tribunal refers to the letter of Respondents' of June 11, 2015 where Respondents explain that they produced such minutes for the period prior to GGAM ceasing to be the management services provider for the Solaire. Claimants did not object and requested on April 17, 2015 that the Tribunal declare the document exchange period to be closed, without raising any issue about the ExCom minutes post-dating the time when GGAM ceased to be the management services provider to the Solaire. In view of this explanation the Tribunal denies Claimants' request."*

29. In response to the Claimants' Reply, filed on June 15, 2015, on June 22, 2015, the Respondents filed a request for postponement of the Liability Hearing. The Respondents stated, among others, that the Claimants' damage case spans nearly 80 pages (or "*more than half*" of their Reply brief). The Respondents also submitted, among others, that "*Bifurcation of Damages Would Enhance Efficiency and Ensure that Bloomberry Is Not Prejudiced by Claimants' Repeated Attempts to Leverage the Schedule*".

30.   The Tribunal invited the Claimants to respond to the Respondents' application for postponement, and the Claimants did so by filing a response dated June 25, 2015.

31.   The Tribunal carefully considered the various issues canvassed by the Parties, and in respect of the Respondents' request that the Tribunal extend the deadline for the Respondents' Rejoinder, the Tribunal granted that request and extended the deadline for the Rejoinder from August 14, 2015 to September 4, 2015.

32.   In respect of the Respondents' further request to order the Claimants to produce the draft and final letter agreement referenced in Entry No. 721, the Tribunal found in favor of the Respondents and made such an order (among others).

33.   In particular, the Respondents themselves have stated that "*[t]he Tribunal need consider just one document to conclude that Claimants' refusal to engage in any meaningful exchange about their claims of privilege is unsustainable and that Bloomberry's concerns should be addressed*" (see Respondents' letter to Tribunal dated April 17, 2015, at page 3). The "*one document*" in question was Entry No. 721. Not only has the Tribunal had the opportunity to review Entry No. 721, the Respondents have also had a chance to be heard on Entry No. 721 during the Liability Hearing.

34.   In short, if, on the Respondents' own case, the Tribunal need consider "*just one document*", then the Tribunal has indeed considered that document – with the full benefit of the Respondents' Counsel's cross-examination at the Liability Hearing – and has found that it is neither relevant nor material to the outcome of the case. Nevertheless, the Tribunal did not stop at merely considering only one document on the Claimants' privilege log. The Tribunal has also reviewed the Claimants' privilege log and finds that on its face, there is nothing relevant or material to the outcome of the case (notwithstanding the fact that there is also nothing on its face which leads the Tribunal to disbelieve the Claimants' claims of privilege). The Tribunal further considers this matter in addressing the Respondents' concerns on procedural fairness and equality in the Annex to this Liability Award.

35.   For completeness, the Tribunal notes that, on July 24, 2015, the Respondents filed an application for bifurcation of the proceedings into a hearing on liability and a hearing on quantum. Again, the Respondents emphasized that the Claimants' damage case spans "*more than half*" of their Reply, and is

accompanied by three expert reports, 77 exhibits and 54 authorities, totaling more than 5,200 pages.

36. The Tribunal granted the Respondents' request to bifurcate the proceedings in PO 11. On the Respondents' case, this had the effect of halving the case that the Respondents had to meet. In particular, the Tribunal notes the following dates:

    (a)    The Defense was filed on December 7, 2014.

    (b)    The Amended Defense was filed on February 2, 2015.

    (c)    The Reply was filed on June 15, 2015.

    (d)    The Rejoinder was filed on September 4, 2015.

**F.   Filing of Additional Documents**

37. On October 5, 2015, in accordance with PO 12, the Claimants filed the following Witness Declarations and Expert Reports (as well as exhibits and attachments to these documents) (the "**Claimants' Additional Documents**").

    (a)    Supplemental Declaration of Andrew Klebanow Declaration;

    (b)    Supplemental Declaration of Jonathan D. Rein;

    (c)    Supplemental Declaration of Michael French;

    (d)    Supplemental Declaration of Garry W. Saunders;

    (e)    Supplemental Declaration of William P. Weidner;

    (f)    Supplemental Expert Report of William Timmins; and

    (g)    Third Expert Report of Professor Guhan Subramanian.

38. Paragraph 4 of PO 12 provided that "*No direct examination (other than introduction of the witness or expert), however Claimants may file, no later than October 8, 2015, supplemental declarations related to new evidence submitted by Respondents with the Rejoinder. Cross-examination shall be limited in scope to the witness's declaration*". This position was negotiated between the Parties,

who had agreed that both sides could submit new "*documents or information…up to October 5, 2015*"[1].

39.   The only dispute between the Parties in relation to new documents was whether, in relation to such new documents or information, each side should have the chance to respond or address them in direct examination. The Respondents submitted that no direct examination should be permitted save for witness introductions. The Claimants, however, contemplated direct examination limited to introductions and opportunities to supplement the witness's previously submitted declarations but only to the extent necessary to respond to or address any new documents or information submitted by October 5, 2015. At a teleconference on September 11, 2015, the Parties had the full opportunity to present their various positions, and had then agreed to the wording of Paragraph 4 of PO 12, which memorialized the Parties' agreement at the teleconference.

40.   Subsequently, on October 13, 2015, the Respondents wrote to the Tribunal stating that, "*in light of Claimants' submission of witness statements, expert reports, factual exhibits, and legal authorities of last Monday [October 5, 2015], Bloomberry requests that documents be included in the record of the Arbitration and also be available for cross and rebuttal*". The Respondents provided the Tribunal a link to an FTP site that contained a number of exhibits (the "**Respondents' Supplemental Exhibits**").

41.   On the first day of the Liability Hearing, the Tribunal provided both Parties with an opportunity to deal with both the Claimants' Additional Materials and the Respondents' Supplemental Exhibits[2].

42.   The Tribunal thereafter decided as follows[3]:

   "*As regards the documents filed recently by [the R]espondents, we will take them in in the record provisionally, and as we go along and see what use you make of them, we will consider it at the time specifically on each document, what we do as you use it.*"

---

[1] Annex to PO 12.
[2] See Transcript (October 15), pp 3 – 7.
[3] See Transcript (October 15), p 91 at lines 12 – 17.

43.   Accordingly, the Respondents were free to rely on and adduce material that, at their initiative, they had filed two days before the Liability Hearing. Nevertheless, the Respondents did not rely during the hearing on any of the documents that they had adduced as part of their Supplemental Exhibits.

44.   On December 10, 2015, the Respondents requested that the Tribunal include in the record the Resolution by the Philippine Court of Appeals, dated November 27, 2015 (the "**Resolution**"). At the invitation of the Tribunal, the Claimants commented on December 15, 2015 that they did not oppose the inclusion of the Resolution in the record, but that they did not agree with the Respondents' characterization of the Resolution or its intended effects. On December 17, 2015, the Tribunal informed the Parties that it had included the Resolution in the Record.

45.   At the closing of the Liability Hearing the Respondents raised concerns on procedural equality and balance. Because of their extent, these concerns are described and addressed by the Tribunal in the Annex to this Liability Award.

## III.  CHRONOLOGY OF EVENTS LEADING TO THE ARBITRATION

46.  In early March 2011, Mr. Razon and Mr. Weidner had an initial meeting. By March 16, 2011, Mr. Razon and Mr. Weidner began negotiations.

47.  By a Management Services Agreement dated September 9, 2011 (the "**MSA**") between Respondents and GGAM (collectively, the "**MSA Parties**"), the Respondents engaged GGAM to manage the Respondents' integrated casino resort, trading as the Solaire in Manila. This Arbitration arises from the Claimants' allegation of wrongful termination of the MSA by the Respondents. Under the MSA, Bloomberry Hotels and Sureste engaged GGAM to provide management and technical services in the development and construction of the Facilities, and to manage the operation of the Facilities for a ten-year period. GGAM would be paid fees according to formulae specified in the MSA.

48.  On January 26, 2012, Prime Metroline acquired 75% ownership of Active Alliance, Inc. ("**AAI**") (later renamed Bloomberry Resorts Corp., or "**BRC**").

49.  By an Equity Option Agreement dated April 16, 2012 (the "**EOA**") between and among Prime Metroline Transport Corp. ("**PMTC**," the predecessor in interest to Prime Metroline Holdings, Inc., or "**PMHI**"), BRC and GGAM (the "**EOA Parties**"). Under the EOA, PMTC, as Grantor, granted GGAM an option to purchase (the "**Option**"),[4] at an agreed-upon strike price of PHP 1.67 per share, 921,184,056 shares (the "**Shares**") in BRC.

50.  Between April 16, 2012 and May 2, 2012, the Parties took part in a roadshow (the "**Roadshow**") preceding the IPO of BRC. The Respondents submit that this is a misnomer, and that this exercise was in fact not an IPO but a "*top-up offering*" where the shares in BRC were not sold to the public. For ease of reference, the Tribunal will refer to this as the "**Top-up Offering**", without prejudice to either Party's rights. The Top-up Offering closed on May 3, 2012 at PHP 7.50 per share, with the IPO six times oversubscribed.

51.  On December 20, 2012, GGAM exercised its Option, paying approximately US$37.43 million to PMTC.[5] The price was calculated by taking the pre-IPO strike price of PHP 1.67 per share multiplied by 921,184,056 BRC shares, for a total of PHP 1,538,377,374.

---

[4] JCB-76/ Claimants' Exhibit CE-10 (Section 2.1 of the EOA).
[5] Claimants' Interim Measures Exhibit CE-4, Letter from B. Weidner to E. Razon, December 20, 2012.

52.   The Claimants say that they paid fair value for the Shares, the Shares were purchased free and clear of all liens or restrictions, and (at the time of the Statement of Claim) were valued at over US$200 million.

53.   The Claimants further say that Mr. Razon and his representatives subsequently acknowledged GGAM's ownership of the GGAM Shares on numerous occasions, both before and after the termination of the MSA, and even offered to help GGAM sell its Shares, as follows:

   (a) In a letter delivered to GGAM on July 12, 2013, Bloomberry acknowledged GGAM's "*8.7% equity stake*".[6]

   (b) On September 12, 2013, Razon publicly stated in The Wall Street Journal in reference to the GGAM's stock, "*[t]hat's their's. They can do whatever they want with the stake . . . For the right price I might buy it*".[7]

   (c) On September 13, 2013, another BRC official publicly acknowledged GGAM's independent, ongoing ownership interest in the Shares following the termination of the MSA, stating that "*[s]ome people have already been pitching to us that they are interested in acquiring the stake if GGAM wants to get rid of it*".[8]

54.   On December 20, 2012, GGAM, BRC and PMTC entered into a Participation Agreement ("**PA**") as the Investor, Company, and Grantor, respectively. Under the PA, Clause 5.4 provides that "*in the event that the MSA terminates for any reason whatsoever (other than a willful breach of the MSA by Claimants), [Claimants] shall have the ongoing right to require [PMTC] to purchase all, but not part, of [Claimant]'s Shares at the Fair Value of such Shares*".[9]

55.   On March 16, 2013, the Solaire had its Grand Opening.

56.   On July 12, 2013, Mr. Razon sent GGAM an e-mail asserting that Respondents had come to the "*firm conclusion*" that the MSA had "*failed*" and that "*an amicable parting of ways*" wa*s* "*in everyone's interest.*" That e-mail enclosed

---

[6] Claimants' Exhibit CE-3.
[7] Claimants' Exhibit CE-235.
[8] Claimants' Interim Measures Exhibit CE-82.
[9] Claimants' Interim Measures Exhibit CE-60.

an unsigned letter (the "**12 July Letter**") providing a list of grievances in connection with GGAM's performance under the MSA.

57.  On July 22, 2013, Ms. E. Occeña (Chief Financial Officer of Respondents and PMTC, as well as the Treasurer, Executive Officer, and former Director of BRC) requested that the GGAM principals meet with her "*to discuss the disengagement of GGAM*".

58.  On September 12, 2013, GGAM received a Notice of Termination of the MSA ("**Notice of Termination**") effective at midnight.[10]

59.  On September 12, 2013, GGAM submitted a Notice of Arbitration in accordance with Clause 19.2 of the MSA and Article 3 of the UNCITRAL Rules. In the Notice, GGAM requested arbitration of its claims against the Respondents "*aris[ing] out of or related to the MSA*" pursuant to Clause 19.2(a) of the MSA.

---

[10] Claimants' Exhibit CE-5.

## IV.  RELIEF SOUGHT BY THE PARTIES

### A.  Claimants' Relief Sought

60.  Claimants request that the Tribunal make an award[11]:

(a) Finding that the Respondents materially breached their obligations under the Management Services Agreement;

(b) Awarding Claimants damages for the Respondents' material breaches in an amount to be determined at the final hearing in the matter;

(c) Awarding the Claimants pre-judgment and post-judgment interest, as appropriate;

(d) Designating the Claimants as the Party whose position has been substantially upheld by the Tribunal in accordance with Clause 19.2(h) of the Management Services Agreement and awarding Claimants their costs and expenses in the Arbitration, including but not limited to:

   (i) The fees and expenses of the Claimants' counsel, experts, fact witnesses, professional advisors, and vendors;

   (ii) The Claimants' share of the fees and expenses paid or owed to the Tribunal;

   (iii) The Claimants' fees and expenses paid or owed to any vendor that provided services at the arbitral hearing(s) or otherwise;

   (iv) Compensation for the Claimants' in-house counsel;

(e) Finding that the Respondents' counterclaims are without merit and denying all relief requested by the Respondents, including but not limited to dismissing any claim for rescission, restitution or return of the Shares, whether based on putative breach, causal fraud or any other ground;

(f) Enter the following injunctive and declaratory relief:

---

[11] SOC at para. 239; Reply at para. 266.

(i) Declaring that there is no valid claim by the Respondents or their affiliates for the rescission of the EOA or for restitution of the shares granted under it;

(ii) Enjoining the Respondents and their officers and agents from further interfering with the Claimants' free disposition of the Shares and require the Respondents and their officers and agents to take all reasonable steps to enable the Claimants to sell the Shares;

(iii) Declaring that the Claimants did not breach the MSA, that the Claimants performed their duties under the MSA, and that the Respondents' termination of the MSA was wrongful; and

(iv) Determining that the final award be made public so that the Claimants can use it to vindicate their right to respond to the continuing effects of the Respondents' defamatory statements.

(g) Ordering any and all further or other relief that the Tribunal may consider appropriate.

## B. Respondents' Relief Sought

61. The Respondents have requested that the Tribunal issue an award[12]:

(a) Declaring that the Respondents rightfully ended the Management Services Agreement due to GGAM's material breach of its obligations thereunder;

(b) Declaring that the Respondents rightfully rescinded the Management Services Agreement, including the equity option granted therein, due to GGAM's substantial breach of the Parties' agreement;

(c) Annulling the Management Services Agreement, including the equity option granted therein, due to GGAM's causal fraud;

(d) Declaring that GGAM will be unjustly enriched if it is permitted to sell the Shares, and enjoining GGAM from pursuing such a sale;

---

[12] Defense at para. 190; Rejoinder at paras. 228 – 229.

(e)    Awarding the Respondents monetary damages equivalent to the value of the Shares, and/or awarding mutual restitution in the form of ordering GGAM to transfer the block of Shares to the Respondents in exchange for approximately US$ 37 million;

(f)    Awarding the Respondents damages for GGAM's willful and material breaches and non-contractual wrongs in an amount to be determined at the final hearing in this Arbitration;

(g)    Designating the Respondents as the Party whose position has been substantially upheld pursuant to Clause 19.2(h) of the Management Services Agreement, and awarding the Respondents (1) all reasonable attorneys' fees, costs and expenses, (2) its share of the fees and costs paid to the Tribunal; and all other fees and expenses incurred in connection with this Arbitration the Tribunal deems appropriate; and

(h)    Awarding such other and further relief as may be found appropriate.

## V.  PRELIMINARY MATTERS

62. The Tribunal has carefully considered the Parties' submissions, witness statements, expert reports and exhibits. Given that Philippine law, as indicated below, is the law applicable to the MSA, the Tribunal has found expert testimony on U.S. law of limited assistance. In any case, if no specific reference is made to the testimony of a witness or expert, it is not for lack of its consideration by the Tribunal.

63. When the Tribunal has not summarized an argument that either or both Parties may have made, the Tribunal has nevertheless considered the argument, but decided that it is not necessary (or helpful) to summarize it.  For conciseness, the Tribunal may also summarize the Parties' arguments by reference to the paragraph or page numbers contained in the relevant document, exhibit, or submission by the Parties.

### A.    Applicable law

64. Clause 19.3 of the MSA provides that Philippine law is the law of the contract: "*This Agreement is made under and shall be governed by and construed in accordance with the laws of the Republic of the Philippines*". In addition to the UNCITRAL Arbitration Rules in force on the date of the MSA, the parties agreed that, *"the arbitration shall be conducted according to the International Bar Association Rules of Evidence as current on the date of the commencement of the arbitration*"[13].

### B.    Pleadings Related to the Construction of the Casino

65. The Parties have dedicated a considerable part of their pleadings to the construction of the casino and the role played by the Claimants in this respect. Nevertheless, the Parties have not requested the Tribunal to grant any relief related to services that GGAM provided in this area. In their Opening Statement, the Respondents pointed out that the extended submission about the road show and the construction phase of the Solaire project is a diversionary tactic because termination of the MSA was based on other grounds. The Respondents further stated that, contrary to the Claimants' allegations, Bloomberry never alleged that the Claimants breached their construction-related obligations. On the other hand,

---

[13] See Clause 19.2(g).

the Claimants in their Closing Argument affirmed that the Respondents had challenged GGAM's performance in the construction phase.

66. Since the Parties have not requested that the Tribunal grant them any relief for claims related to the construction phase, the Tribunal understands that any pleadings that relate to the construction phase provide context to the Parties' relationship but do not require a decision of the Tribunal. The Tribunal will consider the arguments of the Parties related to the casino construction only to the extent that they have a bearing, if any, on the relief sought by the Parties.

## C.   Contract Interpretation

67. It has been a matter of dispute between the Parties whether pre-contractual evidence was admissible for purposes of interpretation of the MSA in view of the Integration Clause[14] (Clause 18.12 of the MSA). The issue is related to the claim of causal fraud, the evidence adduced in its support and the extent to which this evidence may be considered for purposes of interpreting the MSA itself.

68. The Claimants submitted that the effect of the Integration Clause is to preclude consideration of any pre-contractual conduct and negotiating history prior to the conclusion of the MSA[15]. The Respondents, meanwhile, submitted that the Integration Clause "*does not mean that the MSA is to be construed in isolation, but expressly mandates that their contemporaneous and subsequent acts be considered*"[16].

69. The Integration Clause stipulates that the MSA and the Disclosure Letters "*constitute the entire agreement between the Parties hereto pertaining to the subject matter hereof and fully supersedes any and prior oral or written agreements or understanding between the Parties pertaining to the subject matter hereof.*"

70. Under Philippine law, the law applicable to the MSA, "*If the terms of a contract are clear and leave no doubt upon the intention of the contracting parties, the literal meaning of its stipulation shall control.*" [17] For the purposes of determining the parties' intention, "*their contemporaneous and subsequent acts*

---

[14] See Clause 18.12 of the MSA.
[15] Claimants' Closing Argument at Slides 40 and 46.
[16] Respondents' Closing Argument at Slide 160.
[17] Article 1371 of the Civil Code.

*shall be principally considered.*"[18] The Tribunal notes that this article does not exclude consideration of other acts that may not be contemporaneous or subsequent, but only requires the Tribunal to "*principally*" consider those. On the other hand, under the UNCITRAL Rules agreed by the Parties, the Tribunal has ample discretion to determine "*the admissibility, relevance, materiality and weight of the evidence offered*"[19].

71.  In its analysis, the Tribunal finds that the effect of Clause 18.12 is that the MSA is to be taken as embodying the entirety of the Parties' *obligations* on the subject matter defined therein, to the exclusion of any prior or pre-existing obligation(s). However, that clause does not have the effect of precluding consideration of "*contemporaneous*"[20] facts and events leading up to and surrounding the conclusion of the MSA, for the purposes of ascertaining the proper interpretation of those obligations.

---

[18] Article 1372 of the Civil Code.
[19] Article 27 of the UNCITRAL Rules 2010.
[20] Article 1371 of the Philippine Civil Code; Respondents' Closing Argument at Slide 160.

## VI. ALLEGED MISREPRESENTATIONS AND/OR CONDUCT OF GGAM AMOUNTING TO CAUSAL FRAUD

### A. Respondents' Arguments

72. The Respondents submit that the Claimants made the following representations to the Respondents, and that these representations were false:

   (a) First, the GGAM Principals "*projected an image equating their management company with the Las Vegas Sands*"[21].

   (b) Second, the GGAM Principals "*assured [Mr. Razon] that, through their collective experience at the Las Vegas Sands, they had strong relationships with "junket operators" in Asia who would bring VIP players to the Solaire*" and also "*claimed to have data regarding individual foreign VIP players, who they would bring into the Solaire*"[22].

   (c) Third, the GGAM Principals represented that there would be "*proprietary documentations prepared by GGAM in connection with the performance of Services and furnished to the Owner*"[23] and assured the Respondents that they would "*put[] in place policies and procedures for operating the Solaire*"[24].

   (d) Fourth, "*Mr. Weidner assured [Mr. Razon] that he, along with Messrs. Stone and Saunders, would provide a "hands-on approach to management" of the Solaire*" and that "*[Mr. Weidner] would "personally oversee" the management activities, spending 'significant time in Manila with the team'*"[25].

   (e) Fifth, Cantor's role in respect of the negotiations leading up to the MSA and EOA was not fully disclosed to the Respondents.

---

[21] Defense at para. 23; Rejoinder at para. 14.
[22] Defense at paras. 25 and 107; Razon Declaration at para. 9.
[23] Defense at para. 104.
[24] Defense at para. 24; Rejoinder at para. 15.
[25] Defense at para. 26; Rejoinder at para. 27.

73. The Respondents also submit that it was "*[o]n the basis of these representations and promises*" that "*Mr. Razon decided to enter into a management services agreement with GGAM*"[26].

74. In respect of each of these alleged misrepresentations, the Respondents have submitted arguments as detailed below.

### (i) Equating GGAM with Las Vegas Sands

75. The GGAM Principals "*projected an image equating their management company with the Las Vegas Sands*"[27].

76. Mr. Weidner represented himself as the "*architect*" of Las Vegas Sands[28].

77. The GGAM Principals "*strongly assured Mr. Razon that they could deliver for the Solaire the same services and expertise that they had delivered for numerous other casino-resorts in Asia that they had developed, opened, and operated*".[29]

### (ii) Guest and VIP Player Data

<u>Junket Operators</u>

78. The GGAM Principals "*assured [Mr. Razon] that, through their collective experience at the Las Vegas Sands, they had strong relationships with "junket operators" in Asia who would bring VIP players to the Solaire*" and also "*claimed to have data regarding individual foreign VIP players, who they would bring into the Solaire*".[30]

79. The Respondents characterize these statements as "*representations that they had the data for and connections with VIP players and junket operator*".[31] This is supported by the following example. "*[D]uring the top-up offering road show,*" when asked how they planned to bring in VIP players to the Philippines, Mr. Weidner said that it would only take "*7 phone calls*".[32] See, in particular:

---

[26] Defense at para. 27.
[27] Defense at para. 23; Rejoinder at para. 15.
[28] Rejoinder at para. 39.
[29] Defense at para. 24; Rejoinder at para. 15.
[30] Defense, para. 25 and 107, Razon Declaration at para. 9.
[31] *Ibid.*
[32] Defense at para. 116; Razon Declaration at para. 45; Rejoinder at para. 89.

(a) Paragraph 9 of the Razon's Declaration.

*[The GGAM Principals] claimed to have a database of foreign (i.e., non-Filipino) VIP players, and that they would bring these BIP players into the Solaire…*

(b) Paragraph 44 of the Razon's Declaration.

*… one of the ways GGAM misled me was with respect to their promise to provide highly sought-after "Guest Data"… GGAM's principals… represented to me that they had personal relationships with junket operators and access to VIP players. During the negotiations of the MSA, GGAM heavily negotiated the language regarding "Guest Data"… GGAM sold themselves as having this Guest Data, which they caused us to believe was extremely valuable…*

80.   According to the Respondents, it was not the Claimants, but instead "*Mr. Razon and other Bloomberry employees who identified potential junket operators to target, contacted them, and convinced them to come to Solaire*"[33]. "*GGAM did not contribute to [the Respondents' junket] database or provide a list of players*".[34]

81.   Not a single VIP player has been identified as having come to the Solaire as the direct result of Mr. Weidner's "leveraging", which leads to the conclusion that "*Mr. Weidner was "leveraging" and "cultivating" his relationships for the benefit of some other entity (perhaps Weidner Resorts) or his relationships are not as strong as he led Mr. Razon to believe*".[35]

82.   GGAM "*had not made arrangements with a single junket operator prior to Opening*", and it was "*Mr. Razon and other Bloomberry executives and employees*" who "*reached out to their contacts to bring in junkets*".[36]

---

[33] Rejoinder at para. 92; Koo Supplemental Declaration at paras. 12 – 14.
[34] Rejoinder at para. 91.
[35] Rejoinder at para. 93.
[36] Rejoinder at para. 149; Razon Declaration at para. 47.

Guest Data

83. The Respondents also submit that the fact that Clause 6 of the MSA contained the phrase "*The Guest Data of GGAM shall remain to be its property*" "*indicates that GGAM's Guest Data was already in existence*"[37].

84. By way of elaboration, the phrase "*Guest Data*"" is defined as follows[38]:

*'Guest Data' shall mean any and all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences, and any other information from guests or customers of a casino or hotel.*

85. The representation that the Claimants had Guest Data was false, since "*GGAM admitted that it did not have any pre-existing "Guest Data" from which they could connect VIP players or junket operators with the Solaire*".[39]

86. In respect of inducement, the Respondents submit that the Claimants' "*misrepresentation that it would provide "hands-on" management and that its principals had the contact information for foreign VIP "high rollers" and junket operators, induced Bloomberry to enter into the [MSA]*"[40].

### (iii)   Possession or Development of Policies and Procedures

87. In March 2011, "*Mr. Razon agreed to meet with Mr. Saunders and his colleagues in Las Vegas*"[41].

88. During this meeting, the GGAM Principals "*strongly assured Mr. Razon that they could deliver for the Solaire the same services and expertise that they had delivered for numerous other casino-resorts in Asia that they had developed, opened, and operated*", and "*[t]his included putting in place policies and procedures for operating the Solaire*"[42].

---

[37] Defense at para. 110.
[38] Annex H to the MSA.
[39] Defense at paras. 114 and 164; Claimants' Exhibits C-25 and C-95.
[40] Defense at para. 180.
[41] Defense at para. 22.
[42] Defense at para. 24; Rejoinder at para. 15.

89. During the negotiations of the MSA, the Respondents submit that GGAM represented that there would be "*proprietary documentations prepared by GGAM in connection with the performance of Services and furnished to the Owner*"[43].

90. The Respondents also submit that GGAM represented – in the MSA in a section entitled "*Representations, Warranties and Covenants*" – that "*GGAM has the management and technical expertise, track record, experience, adequate capitalization and financial resources to comply with its obligations under this Agreement*"[44].

91. The Respondents further submit that "*GGAM's reliance on Cantor, an investment bank, to run its management company and provide numerous services to GGAM [evidenced by the Support Services Agreement between GGAM and Cantor dated August 28, 2012 (R-187)], which GGAM then owed to Bloomberry, is an admission that GGAM was incapable of fulfilling its obligations under the MSA and that it misrepresented its abilities to Bloomberry*"[45].

92. The Respondents contend that "*GGAM was hired based on, among other things, its promises that it had operating policies, procedures, and systems ready to be implemented*"[46].

### (iv) *Hands-on Management*

93. After the Las Vegas meeting in March 2011, the Respondents argue that "*Mr. Weidner assured [Mr. Razon] that he, along with Messrs. Stone and Saunders, would provide a "hands-on approach to management" of the Solaire*" and that "*[Mr. Weidner] would "personally oversee" the management activities, spending 'significant time in Manila with the team*"[47].

94. According to the Respondents, the Claimants also represented that "*[n]o other gaming company provides the same level of senior executive hands-on involvement in these activities at a property level*"[48].

---

[43] Defense at para. 104.
[44] Rejoinder at para. 167; Clause 10.2(J) MSA.
[45] Rejoinder at para. 167.
[46] Defense at para. 102.
[47] Defense at para. 26; Rejoinder at para. 27; Claimants' Exhibits C-33 and C-104.
[48] Rejoinder at para. 24; Respondents' Exhibit R-198.

95. The Respondents contend that, when asked how he was planning to oversee operations if he was not planning to move to Manila, Mr. Stone replied: "*Yes, will I be here? Will I have a presence here?  All the time . . . And, you know, I'll always have a presence here*"[49].

96. The Respondents submit that the Claimants' "*misrepresentation that it would provide "hands-on" management and that its principals had the contact information for foreign VIP "high rollers" and junket operators, induced Bloomberry to enter into the [MSA]*"[50].

### (v)  Cantor's role

97. The Respondents allege that the Claimants misrepresented Cantor's role. In particular:

    (a)    "*Mr. Weidner explained that Cantor Fitzgerald ("Cantor") provided "backing" and a "significant capital commitment" to GGAM's activities*"[51].

    (b)    "*When Bloomberry questioned Cantor's role in the negotiations, Bloomberry was informed that some Cantor employees provided "admin" services to GGAM. That was to be expected of a new start-up company that needed administrative support, and was consistent with Mr. Weidner's explanation to Mr. Razon in their first meeting that Cantor provided "backing"*"[52].

98. The Respondents characterize GGAM as "*an investment vehicle for a New York-based financial institution*", and submit that this was "*not what Bloomberry was seeking—and not what GGAM represented itself to be—when it entered into its agreement*"[53].

99. The Respondents submit that, while Mr. Razon had thought that he was "*getting Mr. Weidner as a partner and visionary*", in fact, Mr. Razon "*was getting Mr. Weidner as an entrepreneur with divided loyalties, who had already wedded*

---

[49] Rejoinder at para. 37; Respondents' Exhibit R-114.
[50] Defense at para. 180.
[51] Rejoinder at para. 31.
[52] Rejoinder at para. 32; Respondents' Exhibit R-235.
[53] Rejoinder at para. 154; Razon Supplementary Declaration at para. 14.

*himself to a much larger and complex organization, Cantor Fitzgerald—with which Razon had no interest in being affiliated*"[54].

100. An alternative misrepresentation pleaded by the Respondents is as follows[55]:

    (a)   The Claimants, through William Weidner, represented that they were undertaking an "*equity risk*" in purchasing the Shares[56].

    (b)   Since it was Cantor which provided the funds to purchase the Shares, GGAM in fact did not undertake any "*equity risk*" since "*Mr. Weidner, in fact, undertook no risk at all*"[57].

101. The Respondents submit that "[o]n the basis of these representations and promises, *Mr. Razon decided to enter into a management services agreement with GGAM*"[58].

## B.  Claimants' Arguments

102. The Claimants' response to the Respondents' allegations of misrepresentation and inducement is summarized below.

103. First, the MSA's Integration Clause[59] provides that the MSA (including the associated disclosure letters) "*constitute[s] the entire agreement between the Parties ... and fully supersedes any and all prior oral or written agreements or understanding between the Parties*"[60]. Accordingly, any prior oral or written agreements between the GGAM Principals and Mr. Razon (which is denied) are not part of the contract.

104. Second, and in any event, the Claimants deny that the GGAM Principals had ever made any of the following "*binding representations during the Parties' negotiations that are not reflected in the MSA*"[61]. The Claimants submit that "*[a]bsence of evidence is evidence of absence*":

---

[54] Rejoinder at para. 162.
[55] Rejoinder at para. 170.
[56] Claimants' Exhibit C-33.
[57] Rejoinder at para. 170; Respondents' Exhibit R-189.
[58] Defense at para. 27.
[59] Clause 18.12 of the MSA.
[60] Reply at para. 26.
[61] Reply at para. 40.

(a)    The Claimants deny, in particular, that they had ever "*represented to Mr. Razon or the Respondents that they had any existing "database" of foreign VIP players, nor promise to transfer such a "database" to Solaire*"[62].

(b)    The Claimants submit that it is "*implausible*" that they would have made such a representation, since "*GGAM has no proprietary right to confidential customer information to which GGAM's management principals were privy as a result of their prior employment; that information remained the property of the Las Vegas Sands or Melco Crown. Misappropriation of such information for subsequent competitive use would be illegal. It is not credible that Mr. Razon genuinely believed that high-level executives could simply misappropriate their prior employers' proprietary customer contact database, and then put that information to competitive use*"[63].

105.    Third, the Respondents could not have formed "*any legitimate, mutually-shared 'expectations' concerning GGAM's performance that are not reflected in the Parties' Agreement*"[64].

106.    The Claimants elaborate on each of these alleged misrepresentations as set forth below.

### (i) Equating GGAM with Las Vegas Sands

107.    The Claimants deny that the GGAM Principals "*projected an image equating their management company with the Las Vegas Sands*"[65], to the extent that this would be an actionable misrepresentation[66].

108.    In particular, the Claimants point to the following facts that contradict this alleged misrepresentation:

(a)    First, Mr. Razon "*knew GGAM was a newly formed gaming management company and was well aware of the GGAM [] Principals' highly-publicized split from Las Vegas Sands*"[67].

---

[62] Reply at para 28.
[63] Reply at para 28.
[64] Reply at para 40.
[65] See Defense at para. 23.
[66] Reply at para. 23.

(b)   Second, "*Mr. Razon's own headhunter, who introduced him to the GGAM management principals, pointed out that they were potentially available to assist Mr. Razon with his casino venture precisely because they were no longer employed by the Las Vegas Sands*"[68].

(c)   Third, Respondents themselves acknowledge that it was "*precisely because the GGAM Principals were not affiliated with an established large-scale casino operator (such as MGM, the Las Vegas Sands, or Melco Crown Entertainment) that Mr. Razon recognized he could obtain the expertise of a major operator to develop and manage the Project without surrendering the degree of control such an operator would demand*"[69].

### *(ii)  Guest and VIP Player Data*

109.   The Claimants deny that GGAM had promised to provide to the Solaire "*data regarding individual foreign VIP players*"[70].

110.   The Claimants submit that the Respondents have not put forward any evidence (such as contemporaneous minutes) to support Mr. Razon's allegations that the GGAM Principals had made the VIP Guest Data Representation[71]. Specifically, "*It is inconceivable that, despite having extensively negotiated the MSA, Mr. Razon's representatives failed to document a representation he now claims was central to his "expectations" from this business deal, and failed to provide any terms that would describe the data, when GGAM would provide it, and how it was to be used*"[72].

111.   According to the Claimants, Clause 6 of the MSA "*reflects the Parties' agreement with respect to customer data for the Project and dealt solely with ownership of data to be collected in the future – the* prospective *acquisition of data from Solaire's operation and the operation of other projects that GGAM would pursue with Mr. Razon's knowledge*" (emphasis in original)[73].

---

[67] Reply at para. 23.
[68] Reply at para. 23.
[69] Reply at para. 24.
[70] Defense at paras. 25 and 107; Reply at para. 26.
[71] Reply at para. 29.
[72] Reply at para. 29.
[73] Reply at para. 30.

112. The Claimants submit that the lack of contractual language obliging Claimants to make any <u>existing</u> data in its possession available to the Respondents shows that the Respondents are "*conjuring up an unrecorded "promise" that finds no support in the evidentiary record [or] the Parties agreements*"[74].

### (iii)  Possession or Development of Policies and Procedures

113. The Claimants deny that GGAM made "*promises that it had operating policies, procedures, and systems ready to be implemented*"[75], on the contrary, "*GGAM never represented that it had, on hand and ready-to-go, existing policies and procedures that could simply be transferred to Solaire*"[76].

114. Further, the Claimants submit that such a representation is implausible for the following reasons:

    (a)  Such a representation is "*contrary to standard industry practice*" since such policies "*must be tailored to a specific casino project*"[77].

    (b)  Such policies and procedures "*must be developed together with the entire management personnel; they cannot simply be imposed upon a new casino*"[78].

115. According to the Claimants, what the GGAM Principals offered to the Solaire was "*extensive familiarity with that development and implementation process [of policies and procedures]*" and "*the expertise to make [policies and procedures] to measure for Solaire*"[79].

### (iv)  Hands-on Management

116. The Claimants deny that GGAM's Principals (and, specifically, Mr. Weidner) promised to be physically present at the Solaire while performing their Services under the MSA[80].

---

[74] Reply at para. 31.
[75] Defense at para. 102.
[76] Reply at paras. 32 -33. See also the Reply at para. 123: "*GGAM never represented to the Owners during the Parties' negotiations that it had proprietary guest data or pre-fabricated plans, policies and procedures*".
[77] Reply at para. 34.
[78] Reply at para. 35.
[79] Reply at para. 35.
[80] See Defense at paras. 26, 117 – 119; Reply at para. 37.

117. The Claimants submit that – apart from the Respondents' lack of evidence to support this claim – this is implausible for the following reasons[81]:

(a)   The MSA contains no man-hour requirement[82].

(b)   Such an expectation by the Respondents is "*unreasonable and contrary to standard industry practice*"[83].

(c)   Such an expectation was "*inconsistent with GGAM's obligation to generate high-end marketing networks for Solaire elsewhere in Asia and with the MSA's requirement (insisted upon by the Owners) that GGAM was to perform its services through the Management Team*"[84].

118. Mr. Stone himself had, in speaking with investors on behalf of BRC, made clear that the GGAM Principals "*did not need to be physically present full-time in Manila to develop the property, oversee operations, and fulfil GGAM's MSA obligations*"[85].

### (v)  Cantor's role

119. The Claimants deny that GGAM is Cantor's "*investment vehicle*" to "*find and secure new investment opportunities for the deployment of Cantor Fitzgerald's capital*"[86].

120. The Claimants submit that the Respondents were aware of Cantor's role within the GGAM joint venture, including with respect to payment of the strike price for the Shares under the EOA[87].

121. The Claimants further submit that "*GGAM's management principals explained Cantor's role during the Parties' initial meeting in Las Vegas [*prior to the signing of the MSA*], including the fact that Cantor provided access to capital and credibility vis-à-vis the financial market*"[88].

---

[81] Reply at para. 37.
[82] Reply at para. 37.
[83] Reply at para. 38.
[84] Reply at para. 38.
[85] Reply at para. 39; Claimants' Exhibit C-136.
[86] Defense at para. 165; Reply at para. 41.
[87] Reply at para. 41.
[88] Reply at para. 41; Saunders Declaration at para. 15; Weidner Declaration at para. 16.

## C.  Tribunal's Analysis

122.  These sections of the Tribunal's analysis should be read in conjunction with the later sections. The Tribunal strives to be as concise as possible in each section, but much of the detail on which the Tribunal relies is set out in different sections of this Liability Award, and all of it must be considered together.

123.  The Tribunal will first consider misrepresentation and causal fraud under Philippine law, and whether the Respondents are prevented from seeking the rescission of the contract before this Tribunal by terminating the MSA under Article 1191 of the Civil Code.

124.  According to Article 1338 of the Philippine Civil Code, "*There is fraud when, through insidious words or machinations of one of the contracting parties, the other is induced to enter into a contract which, without them, he would not have agreed to*." The Supreme Court of the Philippines has defined fraud as "*a deception employed by one party to or simultaneous to the contract in order to secure the consent of the other.*"[89] Also in the words of the Supreme Court in the case of *Geraldez v. Court of Appeals*, casual fraud is fraud "*present or employed at the time of the birth or perfection of the contract*"[90].

125.  However, not every fraud makes a contract voidable. For fraud to justify annulment under Article 1390 of the Civil Code, the deceit must be serious as required by Article 1344 of the Code. The Supreme Court has held a fraud to be serious when "*it is sufficient to impress, or to lead an ordinarily prudent person into error, that which cannot deceive a prudent person cannot be ground for nullity*"[91].

126.  As to the evidence required to establish fraud, the Supreme Court has determined that it must be "*full, clear, and convincing evidence, and not merely by a preponderance thereof*"[92].

127.  Thus to justify rescission of a contract on account of causal fraud, the fraud must be serious, be present at the time of the birth or perfection of the contract, and the evidence must be "*full, clear and convincing*".

---

[89] *Samson v. Court of Appeals*, G. R. No. 108245, November 25, 1994.
[90] In answer of counsel to a question of a member of the Tribunal at Transcript (October 24) at p 59, lines 10 – 11.
[91] *Spouses Fernando and Lourdes Viloria v. Continental Airlines, Inc.* G.R. No. 188288, January 16, 2012.
[92] *Ibid*.

### (i)   Equating GGAM with Las Vegas Sands

128.   There is no evidence to support the allegation that the Claimants represented that they were the same entity as Las Vegas Sands. The evidence is clearly to the contrary. In fact, Mr. Razon contracted with GGAM because its principals were no longer employed by Las Vegas Sands. Mr. Razon thought the circumstances would be a source of motivation for Mr. Weidner, who, according to Mr. Razon, "*seemed very much 'to have something to prove' following his departure from Las Vegas Sands.*"[93] The record clearly shows that Mr. Razon did not want an established casino to manage the Solaire if it meant giving up the chance to establish his own brand; part of the bargain between Mr. Razon and the GGAM Principals was that Mr. Razon would be able to establish his own brand.

### (ii)   Relationships with Junket Operators and Possession of Guest Data

129.   In his testimony Mr. Razon states that the GGAM Principals had "*represented to [him] that they had personal relationships with junket operators and access to VIP players*". This is supported by Mr. Weidner's own testimony that he could "*bring in VIP players to the Philippines*" with just "*[seven] phone calls*"[94]. Respondents claim that this was not true because it became evident later that the GGAM Principals lack such relationships. On the other hand, Claimants say that at "*no point did GGAM's management principals represent to the Owners that they had any existing 'database' of foreign VIP players, nor promise to transfer such 'database' to Solaire.*"[95] Claimants affirm: "*What GGAM did have that Respondents did not was knowledge of, and reputation with, the junket operators and key Asian executives who would bring in high rolling casino players*".

130.   The Respondents have based their argument in relation to possession of guest data on Clause 6 of the MSA. The Respondents assert that this section shows that Claimants had guest data while as a matter of fact they did not have any at the time. Although the Parties heavily negotiated clause 6, nevertheless, the clause is ambiguous. The sentence, "*The Guest Data of GGAM shall remain to be its property*," could be interpreted to refer to existing data or to data generated in the future. The Claimants have argued that it is a prospective clause and refers only to future data generated in the Facilities or elsewhere. The

---

[93] Razon Supplemental Declaration at para. 4.
[94] Defense at para. 111; Razon Declaration at para. 45; Rejoinder at para. 89; Transcript (October 19) at p 191, line 17.
[95] Reply at para. 28.

Tribunal agrees and is unable to find that Clause 6 of the MSA, on its proper construction under Philippine law, refers to existing data that was in the Claimants' possession at the time of contracting. It would have been legally or ethically improper for Claimants to have maintained any Guest Data from prior properties at which they worked, and Respondents clearly could not have expected otherwise.  Nor was there any transfer of such data from Claimants to Respondents upon signature, nor any demand to do so.  Even if  this clause could be interpreted to  refer to existing data, the Tribunal is not persuaded that the Respondents relied on or were induced by this alleged fact or representation to enter the MSA (*i.e.*, the Clause is not one which tends to "*lead an ordinarily prudent person into error*"[96]).

131. As regards junket operators, the Tribunal observes that the Claimants' principals made statements about junket operators during the IPO road show. But by then, the MSA and the EOA had already been signed. Therefore, because of their timing, those statements could not have induced the Respondents to sign the MSA on false pretenses. The Tribunal is persuaded that, given the standing of the GGAM Principals in the gaming industry, they did have access directly or indirectly to "high rollers" as they testified. Whether their reputation was translated into clients for the Solaire once the casino started to operate is another matter. Mr. Razon may have been disappointed in this respect, but that does not support a claim of misrepresentation. Ample testimonial and documentary evidence supports the proposition that both the Claimants and the Respondents planned not to seek "high rollers" prematurely, that is, until the property was sufficiently able to provide them with a pleasant experience.  This would not have occurred until some months, or possibly even a year or more, after opening.  The Respondents, however, terminated the Claimants before that point arrived.  Thus, the Tribunal finds there was no misrepresentation in this regard.

### (iii)   Possession of Policies and Procedures

132. As a preliminary matter, the Tribunal notes that the Respondents state that, during the negotiations of the MSA, GGAM made the representation that there would be "*proprietary documentations prepared by GGAM in connection with the performance of Services and furnished to the Owner*"[97]. In other words, the Respondents argue that the Claimants should have provided all written policies and procedures themselves. However, the Respondents do not cite any witness

---

[96] *Spouses Fernando and Lourdes Viloria v. Continental Airlines, Inc.* G.R. No. 188288, January 16, 2012.
[97] Defense at para. 104.

statements but instead cite Clause 14.1 of the MSA to support this assertion. But this clause of the contract is an undertaking, <u>not</u> a "*representation*".

133. The Respondents have not shown the Tribunal that there is any evidence that such a representation was made by the Claimants to the Respondents. Notably, the best particulars that the Respondents articulate in support of their contention that the Claimants represented that they had policies and procedures is at paragraph 24 of the Defense and paragraph 15 of the Rejoinder: "*[the GGAM Principals] strongly assured Mr. Razon that they could deliver for the Solaire the same services and expertise that they had delivered for numerous other casino-resorts in Asia that they had developed, opened, and operated*", and "*[t]his included putting in place policies and procedures for operating the Solaire*".

134. At its highest, therefore, the Respondents' case on this point only discloses a mere assurance as to future performance, not a representation of existing fact. The Respondents' counsel attempted to advance the notion that misrepresentation under Philippine law did not draw the "*same bright line*" distinction between a promise or assurance as to future conduct and a representation of existing fact[98]. In support of this, reliance was placed[99] on references to "*false promises*" and the "*exaggeration of hopes and benefits*" by Tolentino in his commentary on the meaning of "*insidious word or machinations*" under Article 1338 of the Civil Code[100].

135. The Tribunal is unable to find sufficient support for this interpretation of Philippine law. In fact, the evidence of the Respondents' own expert on Philippine law, Justice Vitug, appeared to run contrary to such an interpretation[101]. The following exchange between the Claimants' counsel and Justice Vitug during cross-examination is salient[102]:

> "Q.  *Justice Vitug, let me ask you to assume that at the time the speaker said that he fully intended to perform, that he intended to do in the future what he said he would do and then in the future he did not.  Am I right that that would not be causal fraud or fraud in the inducement under Philippine law*

---

[98] See Transcript (October 24) at p 73, line 4.
[99] See Transcript (October 24) at p 73, line 18 to p 74, line 14.
[100] See *Commentaries and Jurisprudence on the Civil Code of the Philippines*, Vol. IV (2002) at p 505.
[101] See Transcript (October 23) at p 174, line 18 to p 178, line 25.
[102] See Transcript (October 23) at p 177, line 18 to p 178, line 3.

> A. *On a purely hypothetical basis if he did not intend it to be so then it's not fraud if he had no intention really to make any misrepresentation, obviously it would not be fraud.  It would be a case of his inability to perform the obligation*."

136. The Tribunal's finding on this point ultimately turns on the following:

   (a) There is no credible evidence to support the contention that the Claimants made representations that they had "*operating policies, procedures, and systems ready to be implemented*" or that they had proprietary documentation, policies and/or procedures that were ready to be implemented for the Solaire.

   (b) If anything, the Tribunal finds that the nature of the statements made were concerned with the Claimants' contractual promise and/or obligation to formulate the written policies and procedures through and in collaboration with the officers and employees of the Solaire. And in fact, such policies and procedures were prepared by the staff of the Solaire in collaboration with GGAM. In other sections of this Liability Award, the Tribunal has found that this was an obligation that the Claimants fulfilled. Further, the Respondents were not able to establish that these statements were 'false' or lacked *bona fides* at the time they were made.

   (c) Moreover, the Tribunal cannot find that these representations, even if made, were, whether subjectively or objectively assessed, serious enough to have falsely induced the Respondents to enter the MSA.

### *(iv)  Hands-on Management*

137. To prove that these "promises" were made in bad faith to induce the Respondents to contract with GGAM, something more than their alleged breach later needs to be provided. Failure to comply with promises is not, of itself, sufficient to prove that they were made with the intention not to fulfill them. Whether GGAM breached its obligations under the MSA will be considered by the Tribunal later in this Liability Award as part of its analysis of the grounds for termination of the MSA.  The evidence will be reviewed in that context in that section, but is also relevant to a certain extent here.

138. The Tribunal is persuaded by the evidence that, when the GGAM Principals stated that they would provide a *"hands-on approach to management"* of the Solaire and that *"[Mr. Weidner] would "personally oversee"* the management activities, spending *"significant time in Manila with the team"* [103] , these statements of intention were true at the time they were made. The Respondents rely on their allegations that these "promises" were not honored to show that the Principals had no intention to honor them, but they did not produce sufficient evidence to show that Claimants' principals did not intend to do the things they stated at the time they made such statements.

139. The fundamental problem with Respondents' claim is that, after Mr. Weidner made these statements, the deal that was being discussed was changed by Mr. Razon. Mr. Razon decided that he wanted the contract to reflect that the Claimants would perform their duties largely through the officers and employees of the Solaire, and Mr. Razon also changed the reporting obligations of the CFO away from the Claimants and to himself.  He certainly had the right to do so and this was accepted by the Claimants, but it necessarily had implications for the representations and obligations of the Claimants.  Based on the changes made at Mr. Razon's insistence, Respondents could no longer rely on representations that were inconsistent in material respects with the new management structure. On the full facts, the Tribunal cannot find a misrepresentation or a right to rely on such.

### (v) Cantor's role

140. In January 2011, before any contact of GGAM with Mr. Razon, Fernando Gaspar of International Container Terminal Services Inc. ("**ICTSI**") spoke to head hunters who sent him a PowerPoint presentation of GGAM, and he sent it on to E. Razon attached to an email on which Mr. Fernando explains his contacts with the head hunters and states: "*They also sent the attached document (GGAM) and felt it was important for you to consider speaking with Gary Saunders (page 12 of GGAM document) since he has experience in start ups and managing gaming operations in Las Vegas and Asia.*"[104] This GGAM document explains that the partnership of GGAM with Cantor "*provides superior access to capital and proprietary technology and infrastructure*"[105].

---

[103] Defense at para. 26; Rejoinder at para. 27.
[104] See JCB-4/Respondents' Exhibit RE-39 at p 12, which contains the biography of Saunders.
[105] *Ibid*. at p 2.

141. Subsequently, in a series of emails in May and June 2011, Ms. Occeña explained to Messrs. Alarilla and Almeda that Mr. Rein was Managing Director of Cantor[106]. Mr. Rein asked Ms. Occeña whether she had objections to changes in the MSA (this email is copied to K. Russell, Vice-President and Assistant General counsel of Cantor)[107], Mr. Russell explained to Mr. Tan, Bloomberry's counsel, that Cantor provided services to GGAM "*including but not limited to legal and financial advisory services (as a representative of the NDA)*"[108] and Mr. Russell transmitted the revised draft of the MSA to Ms. Occeña and Mr. Tan"[109]. Then on July 1, 2011, Mr. Rein stated in an email to Ms. Occeña: "*we realize and acknowledge that both you and we must consult with our principals prior to executing the MSA, and in our case neither Bill nor Howard have had a chance to review or opine on this list in its entirety.*"[110]

142. At the time of signature of the MSA, GGAM signed a disclosure letter as part of the representations made under clause 10.2 of the MSA. Exhibit A to this letter shows in a schematic fashion how the relationship between GGAM and Cantor is structured and the 50% interest of Cantor GGAM LP in Global Gaming Asset Management Holdings, LLC.

143. At an investor conference held on November 16, 2012, Ms. Occeña explained that GGAM brought the gaming expertise, but for financing had turned to Cantor, "*Cantor owns 50 per cent. So the money will come from Cantor*s"[111].

144. It follows from the above that Bloomberry was aware since the very beginning of its relationship with GGAM that Cantor provided financial support and certain other services to GGAM. The Respondents argue that the Claimants did not disclose the exact nature of the relationship: "*Cantor had a much more significant role than was disclosed, we don't really know exactly what the role is.*"[112] The argument of the Respondents is based on the non-disclosure of the terms and conditions of Cantor's provision of funds to exercise the equity option. The Respondents explain that Bloomberry has received only the third version of the related draft letter agreement during the discovery process and only by order of the Tribunal. The Claimants have repeatedly represented to the Tribunal that there was no final agreement. The Respondents have expressed

---

[106] Later Head of Business Development and Corporate Finance of GGAM; see Claimants' Exhibit CE-126.
[107] JCB-25/ Respondents' Exhibit RE-235, email dated May 18, 2011 at 12:25 AM.
[108] *Ibid.*, email dated May 24, 2011 at 10:12 PM.
[109] JCB-30/ Respondents' Exhibit RE-78.
[110] Claimants' Exhibit CE-142.
[111] JCB-124/ Claimants' Exhibit CE-127.
[112] See Transcript (October 15) at p 183, line 10 – 12.

disbelief that Cantor would provide undocumented financing for the exercise of the equity option. The Respondents suggest certain inferences from the non-production of this document based on the IBA Rules. Based on these inferences, the Respondents contend that the interests of Messrs. Razon and Weidner would not be aligned as stated in the exchange of emails between them of March 2011.

145. The Tribunal observes that the EOA had no stipulations on the financing of the option. Similarly, the EOA does not limit the time period when the option had to be exercised; there was no limitation regarding how long or short a period the Shares needed to be held. While the alignment of interests may have been one of the motivations for Mr. Razon to make the offer, by the time the EOA was signed, and notwithstanding that this was a heavily negotiated agreement, there is no provision in the EOA that translated such motivation into clear and binding terms. For these reasons, the Tribunal does not find relevant the terms on which Cantor provided financing to exercise the option and does not venture to draw inferences about the non-production of an allegedly non-existent document. Furthermore, Mr. Razon himself does not seem to have considered his interests to be perfectly aligned with the Claimants, notwithstanding GGAM's equity participation in Bloomberry. As explained in the Rejoinder, the purpose of the change in the management reporting of the CFO was to ensure the protection of the long-term interests of the Respondents in the success of the enterprise[113].

146. Crucially, the Respondents have not, in their pleadings or at the Liability Hearing, advanced any persuasive case as to whether there was an obligation to disclose this relationship, and if so, which clause of the MSA or which principle of Philippine law obligated the Claimants to disclose the relationship between Cantor and GGAM.

147. In sum, the Tribunal finds that the Respondents have not established any <u>false statement</u> made in respect of Cantor's role. To the extent that the Respondents are arguing that the Claimants <u>failed to disclose</u> Cantor's role to them, the Respondents have not shown any legal basis for imposing a duty of disclosure, and the allegedly non-disclosed document is not relevant to the Tribunal's reasoning.

---

[113] Rejoinder at para. 146.

148. The Tribunal concludes that, to the extent that the Claimants made representations, the evidence does not show that the representations were false at the time they were made. The Tribunal has rejected each of the grounds the Respondents have advanced in support of their claim of causal fraud; consequently this claim is dismissed.

## VII.  THE MISTAKE ARGUMENT

149.  The Respondents have also argued during the Liability Hearing that, if fraud could not be shown, the MSA could be voidable on the basis of Article 1331 of the Philippine Civil Code. This article provides in relevant part that "*In order that mistake may invalidate consent, it should refer to the substance of the thing which is the object of the contract, or to those conditions which have principally moved one or both parties to enter into the contract*." The Respondents adduce the fact that (a) neither Mr. Weidner nor his colleagues devoted the time and attention to the Solaire set forth in Mr. Wiedner's "*thoughts on principles of alignment*", and (b) Cantor acquired the ability to cause the Bloomberry shares to be sold for its own benefit, thus negating the alignment of interests.

150.  The Tribunal notes that the mistake argument is new, was touched upon for the first time on the ninth day of the nine-day Liability Hearing[114] and the Claimants did not address it. The Tribunal further notes that the facts the Respondents have adduced in support are the same facts also alleged in support of causal fraud. The Tribunal has dismissed the causal fraud claim, and the Respondents have not elaborated on how the evidence in support of that claim can also form the basis of a mistake argument under Philippine law. It is not self-evident from the contemporary evidence before the Tribunal that the Respondents or the Claimants were mistaken, and the evidence does not establish a mistake. For these reasons the Tribunal finds that the mistake argument has not been substantiated on the facts or on the basis of Philippine law.

---

[114] See Transcript (October 24) at p 68, line 7 – 18 and p 75, line 19 to p 78, line 15.

## VIII.   TERMINATION OF THE MSA UNDER CLAUSE 15.1(a)

151. Clause 15.1(a) of the MSA provides as follows:

*"15. Termination*

 *15.1   By owner for GGAM's Breach*

   *The Owners may at any time, by written notice addressed to GGAM, give prior notice of intention to terminate the Services under this Agreement, in whole or in part if any of the following have occurred:*

   *(a) GGAM has committed a material breach of this Agreement that either is incapable of remedy or, if capable of remedy, has not been remedied within 30 days of the Owner's notice or such longer period not exceeding 60 days as is reasonably necessary to effect the remed*y;…"

152. The Claimants' claims on wrongful termination and the Respondents' counterclaims for breach are closely linked.

153. The Claimants' case is, essentially, that the Respondents wrongfully terminated the MSA – since, according to the Claimant, it had no contractual basis to do so – and that this wrongful termination itself amounted to a material breach of the MSA.

154. The Respondents' case, meanwhile, is that the termination was justified on the basis of the various breaches of the MSA that they allege the Claimants to have committed. The Respondents' case regarding the Claimants' alleged breaches of the MSA, also form part of their counterclaims in this arbitration.

155. It follows, then, that the Respondents bear the burden of persuasion to establish the various breaches that the Respondents allege the Claimants to have committed. On the other hand, the Claimants bear the burden to establish that the termination was wrongful and that it amounted to a material breach of the MSA.

## A.    Respondents' General Arguments

156. The Respondents have asserted, without more, that "*Bloommerry exercised its right under Clause 15.1(a) of the MSA to terminate GGAM's services under the MSA due to GGAM's material breach of its obligations*" [115] and that "*in the face of GGAM's substantial and material breach of its obligations, as well as its failure to provide the consideration promised in exchange for the right to purchase the Shares, Bloommerry and Sureste have standing to maintain actions to remedy GGAM's breach*" [116].

157. The Respondents have also submitted in respect of the provision of a "*cure period*" that:

   (a)   First, the breach was not capable of remedy[117]; and

   (b)   Second, even if the breach was capable of remedy, "*Bloommerry continued to work with GGAM over the subsequent 60 days [following the Respondents' Notice of Termination dated 12 September 2013] in an attempt to reach an amicable parting of ways*"; however, "*GGAM did not use this 60-day period to address its deficient performance or to develop constructive ways to salvage the Parties' relationship*" [118].

## B.    Claimants' General Arguments

158. The Claimants submit that, as a starting point, to lawfully terminate the MSA, the Respondents must demonstrate that GGAM committed a "material breach" of its obligations under the MSA[119]. This follows from a plain reading of Clause 15.1(a) of the MSA.

159. According to the Claimants, the Philippine courts have stated that "*[a] contractual breach is material if it will adversely affect the nature of the obligation that the obligor promised to deliver, the benefits that the obligee expects to receive after full compliance, and the extent that the non-performance defeated the purposes of the contract*" [120], citing *Int'l Hotel Corp. v. Joaquin Jr*.,

---

[115] Defense at para. 47.
[116] Defense at para. 169.
[117] Defense at para. 48.
[118] Defense at paras. 48 – 49.
[119] SOC at para. 30.
[120] *Ibid.*

G.R. No. 158361, April 10, 2013 (citing Corbin on Contracts, Section 709 at 661 (One Volume Ed. 1952) ("***Int'l Hotel Corp***").

160. The Claimants submit that this means the Respondents "*must show that GGAM violated contractual provisions that require strict adherence and the performance of which is intrinsic to the benefits Respondents expected. Where the allegations regarding a party's non-performance are unsubstantiated or immaterial to the object of the agreement or where the actual harm to the terminating party is attenuated and exaggerated, termination is improper*"[121].

161. Alternatively, the Claimants submit that the Respondents failed to terminate the MSA in accordance with "*the circumstances under which either party may terminate the MSA*". Specifically, Clause 15.1 permits the Owners, "*by written notice addressed to GGAM, [to] give prior notice of intention to terminate the Services*" under the MSA if GGAM commits a "*material breach*" that is "*either incapable of remedy or, if capable of remedy, has not been remedied within 30 days of the Owners' notice*"[122].

162. In the present case, the "*Respondents did not provide GGAM with any prior notice of any breach of the MSA that would justify termination asserted in the July 12, 2013 letter, nor did Respondents afford GGAM an opportunity to cure GGAM's alleged breaches. Instead, as soon as Respondents sent the July 12, 2013 Letter to GGAM, they began to inform Solaire management and personnel that GGAM's termination was a fait accompli*"[123].

163. Specifically, after sending the Claimants the July 12, 2013 letter, which stated that the Respondents had come to the "*firm conclusion*" that the MSA had "*failed*" and that "*an amicable parting of ways*" was "*in everyone's interest*", the "*Respondents ceased providing GGAM with critical information necessary for GGAM to perform its rights and obligations under the MSA, such as the daily flash report and the daily operating report*", which "*provided GGAM with necessary operating information*". The Respondents also disabled the GGAM principals' access to the Solaire email accounts, "*including removing their access to all previously-received e-mails*"[124].

---

[121] SOC at para. 30 citing *Ong Yong v. Tiu*, G.R. No. 144476, April 8, 2003 ("***Ong Yong***") which stated that "*[The Petitioners'] shortcomings were far from serious and certainly less than substantial; they were in fact remediable and correctable under the law. It would be totally against all rules of justice, fairness and equity to deprive the [party] of their interests on petty and tenuous grounds*".
[122] SOC at para. 55.
[123] SOC at para. 125.
[124] SOC at para. 127.

164. The Claimants submit that, since they did not commit any "*material breaches*", the Respondents' purported termination of the MSA and subsequent refusal to pay the Claimants their fees were unlawful (and itself a material breach of the MSA).

* * * * *

165. In the following chapters the Tribunal will address each of the alleged specific breaches and afterwards the claim that the Respondents breached the MSA by terminating it.

## IX. ALLEGED FAILURE TO SUBMIT BUSINESS AND MARKETING PLANS THAT MET PRUDENT INDUSTRY PRACTICE

166. The Claimants' obligation to submit business and marketing plans is provided in MSA clauses 2.2, 2.5 and 2.10, read along with Annexes A and H to the MSA. They are reproduced here for convenience.

*"2 OBLIGATIONS OF GGAM*

*...*

*2.2 Services*

**___GGAM shall carry out the Services enumerated in Annex A upon the terms and conditions contained in this Agreement___**. *The Services shall constitute as rights as well as responsibilities of GGAM under this Agreement. GGAM's obligation to provide the Services shall be subject to: (A) Owners' funding of the amounts set forth in the Annual Budget for each fiscal year as provided in this Agreement, and (B) equitable adjustment in the event of any Force Majeure, change in law, or change in the provisions of the PAGCOR License. If the Owners disapprove of any Proposed Annual Budget prepared by GGAM with expenditure levels reasonably required in order to provide the Services and GGAM can reasonably demonstrate that the Owners' refusal to approve such Proposed Annual Budget will have an adverse effect on GGAM's ability to provide the services, then GGAM will not be in breach of the performance of the particular Services that is so adversely affected by such disapproval.*

*...*

*Clause 2.5 Standard of Care*

*GGAM warrants and undertakes that,* **___in performing the Services___** *through the Management Team, it* **___shall use commercially reasonable efforts___** *to comply with the following, which shall be collectively referred to as the "Standard of Care":*

(a) **___It shall exercise all the skill and care reasonably to be expected of a professionally qualified and competent manager of casino and hotel facilities experienced in performing work of similar nature and scope as the Services___** *("Prudent Industry Practice");*

(b)   *It acts in the highest standards of business ethics;*

(c)   *It will at all times act in the best interests of the shareholders of [Bloomberry] and [Sureste], and to maximize such shareholders' value in the performance of its obligation under this Agreement and in all dealings carried out by it in its capacity under this Agreement; and*

(d)   *It shall comply with applicable Philippine law in the performance of the Services under this Agreement.*"

*Provided that GGAM's obligation to meet the Standard of Care set forth in this Clause 2.5 shall be subject to: (A) Owners' funding of the amounts set forth in the Annual Budget for each operating year and as provided in this Agreement, and (B) equitable adjustment in the event of any Force Majeure, change in law, or change in the provisions of the PAGCOR License. If the Owners disapprove of any Proposed Annual Budget prepared by GGAM with expenditure levels reasonably required in order to provide the Services and GGAM can reasonably demonstrate that the Owners' refusal to approve such Proposed Annual Budget will have an adverse effect on GGAM's ability to comply with this Clause 2.5, then GGAM will not be in breach of the provision of this Clause 2.5 that is so adversely affected by such disapproval.*

*...*

*2.10 Budget*

*(a) GGAM acting through the Management Team* ***shall prepare the Annual Budget which shall include*** *(i) the replacements of and additions to FF&E and Operating Supplies to be made as part of the Services; (ii) a proposed budget of capital expenditures; and (iii) a budget of the estimated Facilities Revenue and Projected EBITDA and a Projected Base Fee EBITDA for the Facilities for the following Fiscal Year, all in reasonable detail ("Proposed Annual Budget"),* ***Business Plan, and marketing plans*** *for discussion with the Owners and approval by the Board.*

*...*

*Annex A*

**SERVICES**

*GGAM's Pre-Opening
Services*.

*GGAM acting through the Management Team has the right, authority,
obligation, and discretion, and is instructed to take all such pre-opening actions
for and on behalf of the Owners to operate all aspects of the Facilities,
including to:*

*...*

4. *Establish, implement, and monitor the pre-operating accounting, internal
controls, security, human resources, marketing and regulatory compliance
systems in accordance with the pre-operating plan and key employees.*

*...*

8. *Recommend the selection and order the gaming facilities' data processing
equipment and software, surveillance and security systems.*

*...*

*GGAM's Post-
Opening Services*.

*GGAM acting through the Management Team has the right, authority,
obligation, and discretion, and is instructed to take all such pre-opening actions
for and on behalf of the Owners to operate all aspects of the Facilities,
including:*

*Operations. GGAM through the Management Team shall operate and manage
the day-to-day operations of the Facilities, including to:*

1. *Establish, implement, and monitor all operating systems (e.g., sales,
marketing, reservations services, quality assurance), establishment of rates
and charges for guest rooms, food, beverages, entertainment and other
services or facilities, and to manage the day-to-day affairs of the Facilities.*

*...*

*3. Establish, implement, and monitor gaming systems, management information systems, [ ] surveillance and other monitoring activities, floor and entrance security, cage operations, casino accounting, slot and table operations, and the management of the day-to-day affairs of the casino.*

*...*

*Annex H*

*DEFINITIONS*

*...*

**_"Business Plan" shall mean the business plan_** *prepared by GGAM acting through the Management Team and approved by the Owners prepared in accordance with GGAM's standard planning and budgeting requirements,* **_including plans for items such as projected estimates of revenues, expenses, and cash flow associated with the Facilities, estimated results of Facilities' operations, anticipated capital expenditure projects, [furniture, fixture, and equipment] improvement and replacement plans, and marketing plans_***.*
[Emphasis added]

### A.   Respondents' Arguments

#### (i) Scope of the Claimants' Obligation

167. The Respondents submit, in essence, that the Claimants failed to provide an adequate business plan or marketing plan that was capable of being implemented or that reflected the skill and care to be expected in the industry, in breach of Clauses 2.2, 2.5 and 2.10(a) of the MSA read with Annex A of the MSA[125].

168. The Respondents further submit that the purpose of the phrase "*through the Management Team*" in Clauses 2.5 and 2.8 of the MSA was to prevent GGAM from being able to "*thoroughly take over the management and operation of a high-end resort such that the owners of the resort and the directors and officers of the company owning the resort were effectively reduced to "outsiders" without any control over the operation and management of the resort*", such that

---

[125] Defense at paras. 73 – 101.

"*the resort would not be able to operate if the foreign management team pulled out of the project*" [126].

169. According to the Respondents, "*[a]ny other interpretation would result in the absurd conclusion—and unfortunate reality—that Bloomberry was paying GGAM for services Bloomberry was expected to perform*". Accordingly, it is not true that GGAM fulfilled its obligations under Clauses 2.5 and 2.8 of the MSA simply because employees or persons paid by the Respondents have fulfilled those obligations [127].

### (ii) Business Plan

170. The Respondents submit that "*Under the MSA, the Business Plan had to include the following: (a) projected estimates of revenues, expenses, and cash flow associated with the Facilities; (b) estimated results of Facilities operations; (c) anticipated capital expenditure projects; (d) furniture, fixture, and equipment ("FF&E") improvement; (e) replacement plans; and (f) marketing plans*"[128].

171. The Respondents also submit that Clause 2.5 of the MSA "*required GGAM to deliver a business plan that satisfied the professional standard of care in the industry*" over and above the specific requirements of the MSA[129].

172. The Respondents point out as failures of the Business Plan that:

(a) GGAM continually drew comparisons to the U.S. market – the market they knew – without tailoring the Business Plan to the Philippine market. For example, page 60 boldly states that the "*wants and needs*" of the Manila mass market gaming customer are "*nearly identical*" to those of a U.S. gaming customer.

(b) Portions of the Business Plan were wholesale copied from other documents. Extensive portions parrot basic information that could have been gleaned from a textbook or the Internet.

(c) The Business Plan "*fail[s] to discuss the specifics of the Philippine gaming market. The Business Plan completely ignores the specifics of the*

---

[126] Rejoinder at para. 135.
[127] Rejoinder at para. 138.
[128] Defense at para. 73, referring to Annex A and Annex H to the MSA.
[129] Defense at para. 74, citing clause 2.5(a) MSA.

*domestic Philippine market. GGAM states that the Philippine market is more similar to the U.S. market than to the Macau market without investigating or researching the Philippine market*". According to the Respondents, "*[i]t was essential that the Philippine market be specifically and rigorously assessed so that a business model based on that research could be developed*"[130].

(d)     "*GGAM also failed to analyze Bloomberry's competitors properly. For example, GGAM's Business Plan failed to give real consideration to the actual experience of Solaire's nearest competitor, Resorts World, with respect to international players, facilities tailored for the local market, and player retention. This imparts a false impression of the competitive landscape*"[131].

(e)     "*The Business Plan failed to provide important financial information and five-year projections, some of which was expressly required by the MSA:*[132] "*"annual budgets, revenue market share, expenses, results of operations, cash flow, capital expenditure projects (such as facilities, and FF&E), profit margins (total and by department), number of employees (total and by department), EBITDA, and casino bankroll*"[133].

(f)     The Business Plan "*failed to establish an appropriate business infrastructure for the Solaire. For example, it fails to address the following essential functions: (1) Accounting, Payroll, Accounts Payable; (2) Casino Cashier Cage & Credit; (3) Convention Services; (4) Engineering & Maintenance; (5) Entertainment Management and F&B Inventory Control; (6) Finance; (7) Gaming Revenue Count; (8) Human Resources; (9) Information Technology Management; (10) Internal Audit; (11) Purchasing; (12) Receiving; (13) Safety, Security, and Surveillance Management; (14) Spa, Health Club, and Pool Management; (15) Tenant leases; and (16) Concessions*"[134].

(g)     The Business Plan "*failed to identify the Solaire's business objectives or to establish a method in which to measure whether these objectives were*

---

[130] Defense at para. 79.
[131] *Ibid.*
[132] See Claimants' Exhibit C-1, Clause 2.10(a) read with, Annex H – Definitions, "Business Plan".
[133] Defense at para. 80.
[134] Defense at para. 81.

*being met*", such as through identifying Key Performance Objectives ("**KPOs**") and Key Performance Indicators ("**KPIs**").

(h) The Business Plan was provided only "*[six] weeks before the Solaire was scheduled to open*" instead of the 60 days required by the MSA.

173. In short, the Business Plan was "*largely a boilerplate template business plan copied and pasted from other casinos*", "*included a compilation of "motherhood statements" and general descriptions largely lifted from previous reports commissioned for the Solaire*" and "*did not provide the required business road map [but] contained over-broad "strategies" and "action plans" that did not fit within the requirements of the MSA*". The "*deficiencies of the Business Plan, in combination and in the aggregate, rendered the Plan substantially inadequate and inoperable. Simply put, the Solaire could not be successfully operated under GGAM's 'Business Plan'*"[135].

### *(iii) Marketing Plan*

174. The Respondents recall that the Claimants were required to "*develop an adequate marketing plan... that conformed to industry standards*" under Clauses 2.2 and 2.10 of the MSA[136] and to "*to develop, implement, and manage a marketing plan for the Solaire*" pursuant to Clause 6 of the MSA, which provides as follows[137].

"*GGAM and the Management Team shall <u>develop, implement and manage a marketing program for the Facilities</u>, which may include utilization of brands, centralized services, affiliate programs, or other programs of GGAM, its affiliates, or third parties...*"

175. The Respondents complain that:

(a) "*The purported "marketing plans" contained within the Business Plan were merely strategic overview documents*"[138]. Similarly, the "*Casino Mass Marketing Strategic Overview*" was a PowerPoint presentation which "*contained statements of intent (i.e., "Solaire shall . . .") with no details or mechanics of what actually needed to be done*" and was merely

---

[135] Defense at para. 78; Wheatley Supplemental Report at para. 1.
[136] Defense at para. 83.
[137] Defense at para. 87.
[138] Defense at para. 89.

"*a conceptual presentation*" which was "*delivered to the Executive Committee on February 14, 2013, approximately one month before the Solaire opened*"[139].

(b) The "*marketing plan*" submitted by GGAM "*did not contain any timelines, a promotions calendar, a marketing budget, action plans, or contingency plans. GGAM failed to develop a comprehensive advertising or media plan after opening day, and there were no agreed-upon metrics to measures success or to ensure efficient spending*"[140].

(c) The "*marketing plan*" was "*simply a disorganized assembly of data and previously-drafted marketing plans without meaningful evaluation of the local conditions or the specifics of the Solaire project*". The Claimants "*assumed, without foundation, that the "Vegas" model would work*". The Respondents also submit that "*it is perplexing why GGAM, as the experts with "100 years of collective experience*" felt it necessary to hire a consultant to draft the marketing plan", concluding that "*[c]onsultants were hired to make up for GGAM's lack of time and attention at the Solaire*"[141].

176. The Respondents also submit that one of the Claimants' "*critical marketing failures was the establishment of the Solaire's customer loyalty program*"[142]:

(a) This program under the name of "*Solaire Rewards Club*" was "*a hybrid points-rewards system. Not only did the system generate complaints from customers, who did not understand the dual-points system, but even Mr. Stone admitted, notwithstanding his experience, that he did not understand the system either*"[143].

(b) The program was a "*complicated and confusing system*" which "*resulted in a loss of goodwill among new patrons*". For example, during the Solaire's grand opening, "*the "Solaire Rewards Club" complications and inefficiencies resulted in countless people waiting in line at the Rewards Club, rather than gambling*"[144].

---

[139] *Ibid.*
[140] Defense at para. 90.
[141] Defense at para. 91.
[142] Defense at para. 87.
[143] Defense at para. 93; Respondents' Exhibit R-56.
[144] Defense at para. 94; Razon Declaration at para. 40.

177. In short, "*GGAM did not prepare a marketing plan that reflected the skill and care to be expected in the industry, let alone a plan that was capable of being implemented*"[145].

178. The Respondents also point to GGAM "*develop[ing] promotions and events on the fly, on a week-by-week basis*" as evidence of the absence of a workable marketing plan[146].

179. The Respondents recall that "*Bloomberry informed GGAM that it was alarmed at and upset by the absence of a marketing plan*" in the following terms:

> [Estella Occeña is] *so upset and disappointed that we have no marketing strategy and almost two months after opening, the marketing program, promotions and events are still in the formulation stage. The mechanics are still in the drawing board…*[147]

180. Finally, the Respondents submit that, "*GGAM's principals did not rectify the situation*", and that "*GGAM's failure to provide a marketing plan is another **incurable breach** of its obligations under the MSA*"[148].

## B.    Claimants' Arguments

181. The Claimants submit that GGAM developed and implemented comprehensive Business and Marketing Plans for the Facilities that followed prudent industry practice and satisfied the requisite standard of care[149].

### (i)  Business Plan

182. GGAM asserts that it "*developed a comprehensive Business Plan, communicated that Business Plan to the Owners and Solaire's management during its development, submitted the Business Plan to the EXCOMM, obtained the EXCOMM's approval of that Business Plan, and then executed and monitored Solaire's progress as measured against the Business Plan*"[150]. The

---

[145] Defense at para. 89.
[146] Defense at para. 96.
[147] Defense at para. 98, Respondents' Exhibits R-53 and R-54.
[148] Defense at para. 99 (Emphasis added).
[149] SOC at para. 72; Reply at para. 73.
[150] Reply at para. 73.

Claimants emphasize that "*EXCOMM accepted the final Business Plan without objection*" [151].

183. The Claimants argue that "*the Business Plan presented to the EXCOMM fully complied with the requisite Standard of Care under the MSA*", for the following reasons[152]:

    (a)   *"There is no minimum or maximum limit to a written business plan in terms of size, weight, mass, number of pages, or word count that can be applied to all situations because all business situations are different…"*

    (b)   The Business Plan "*address[es] specifics of the Philippine gaming market*"[153].

    (c)   The Business Plan discussion of the mass market for the Solaire was sufficiently detailed so that "*it is hard to imagine more detail and comments regarding how Solaire will cater to the Manila/Philippines market….pre-opening Business/Marketing Plans never are since they are "best guesses" that are proven right or wrong because consumers "vote with their pocketbook" upon opening*"[154].

    (d)   The Business Plan "*contained KPIs and KPOs, even though they may not have been expressly labeled with those names. For example, in the incentive portion of Table Games and Slot sections of the Business Plan, a number of references are made to loyalty club incentive thresholds and measurements and compensation, commission, and other marketing incentive thresholds. These performance measurement mechanisms are examples of commonly utilized KPIs*"[155].

    (e)   The Business Plan "*address[es] specifics of the Philippine gaming market*"[156].

    (f)   The Business Plan "*address[es] various elements of "business infrastructure" such as systems to be employed (Bally casino software),*

---

[151] Reply at para. 76; Claimants' Exhibit C-189.
[152] Reply at para. 76; Karoul & Macomber Report at paras. 67 and 101.
[153] Karoul & Macomber Report at para. 74.1; Business Plan at pages 16 – 35, 36 – 45, 45 – 46, 47 – 52 and 52 – 53.
[154] Karoul & Macomber Report at para. 74.3.
[155] Karoul & Macomber Report at para. 73.2.
[156] Karoul & Macomber Report at para. 74.1.

*employee training programs, a loyalty club program, transportation programs, use of third parties like SK+G (advertising communication), Universal McCann (media placement), Inviro Studios (animation studio), Visions and Expressions (public relations), and the like*"[157].

(g)    In respect of "a*nticipated capital expenditure projects*", the Claimants' experts say that "*It is not uncommon for a new property like Solaire to have elected not to anticipate a capital expenditure ("CapEx") program other than, perhaps, a working capital account on the balance sheet from which small CapEx projects could be funded, during the first year of operations*"[158].

(h)    In respect of *"FF&E improvement and replacement plans"*, the Claimants' experts say that *"typical industry practice"* is to "*submit[] for each operating year after opening the capital expenditure repair and replacement request/budget*" However, "*[b]ecause GGAM was terminated prior to the start of the next operating year (2014), we believe that it is reasonable to conclude that GGAM would have satisfied this requirement just as it satisfied all other financial forecast requirements in the past*"[159].

184.    Further, "*[s]everal components of the Business Plan, as defined by Annex H of the MSA, were provided to EXCOMM and Mr. Razon under separate cover or were not necessary components of the Business Plan for the first year of operations*"[160]. These included the following:

(a)    "*Projected estimates of revenues, expenses, and cash flow associated with the Facilities*", which were submitted in a 2013 Operating Budget[161].

(b)    "Estimated *results of Facilities operations*", which were submitted in monthly "*Financial Books*" from March to July 2013[162].

185.    In respect of the timing of GGAM's submission of their Business Plan, the Claimants submit that "*[w]hile GGAM did not present the completed Business Plan to EXCOMM until January 2013…as early as January 2012, GGAM began*

---

[157] Karoul & Macomber Report at para. 75.2.
[158] Karoul & Macomber Report at para. 72.3.
[159] Karoul & Macomber Report at para. 72.4.
[160] Karoul & Macomber Report at para. 72.
[161] Karoul & Macomber Report at Exhibit 36.
[162] Karoul & Macomber Report at Exhibits 15, 37 – 40.

*to circulate detailed drafts of the Business Plan to, and discuss financial projections with, the Owners' representatives, underwriters, and attorneys. These initial drafts contained business and marketing sections of the Business Plan that also had to be incorporated into the Offering Circular for Bloomberry Resorts Corp.'s equity offering. The Owners and their representatives reviewed and vetted these drafts*"[163].

### (ii) Marketing Plan

186. GGAM explains that its marketing plan was incorporated into its Business Plan, and submit that the marketing plan:

    (a)    Was based on "*extensive, targeted market research and customer analysis of the local Philippine market commissioned by GGAM specifically for the Solaire project*"[164].

    (b)    Contained "*market research of the local Philippine gaming market and a strategic mass-marketing plan undertaken by Gaming Market Advisors ("GMA")*". GMA "*conducted in-depth market research and competitor analysis of Resorts World, in order to better inform GGAM and the Management Team which marketing strategies were likely to succeed in the local market*" and "*included interviews with local Philippine focus groups regarding their desired experience at a casino resort*"[165].

187. The Claimants also submit that, in respect of hiring (among others) GMA to conduct market research, "*engaging specialized consultants to assist with development of a marketing strategy is a normal gaming industry practice; most casinos find it beneficial and cost-effective to secure such consultant services*"[166].

188. Separately, the Claimants also developed a comprehensive strategy to attract and develop foreign VIP and junket market segment[167]. This was done by establishing a framework and strategy for the Solaire's VIP marketing and

---

[163] Reply at para. 75.
[164] Reply at para. 83.
[165] *Ibid.*
[166] Reply at para. 84.
[167] Reply at para. 88.

business development team's outreach to potential junket operators and foreign VIP customers[168].

## C.    Analysis of the Tribunal

### (i)   Scope of the Claimants' Obligations

189.   The Tribunal's starting point is to consider the precise scope of the Claimants' obligations under the MSA. Under Clause 2.4(a) of the MSA, GGAM was obliged to "*perform its Services through the Management Team*" (such Services being defined in Clause 2.2 as "*the Services enumerated in Annex A*"). The Claimants placed significant weight on this phrase in their written submissions and at the Liability Hearing, and both Parties commented on it at length. According to Clause 2.4(a), the Management Team, is "*composed of the officers that GGAM will nominate, and the other department heads and officers and personnel who report to and are under the direction of the COO*", as shown in the organizational chart attached as Annex D to the MSA.

190.   The expression "*through the Management Team*" was added to the draft contract by Mr. Razon to avoid having a company – GGAM – within a company and so that Mr. Razon could retain ultimate control of the management of the company. The Parties have different views on the significance of this expression. The Claimants submit that "*the Tribunal must assess its performance under the MSA in light of the actions of the Management Team (taken with the GGAM management principals' advice and under their direction).*"[169] On the other hand, Respondents consider that the expression "*through the Management Team 'in no way diminished GGAM's obligations, including its obligations to 'operate and manage the day-to-day operations of the Managed Facilities' … These obligations are not seconded to the Management Team; rather, they were supposed to be accomplished in collaboration with the Management Team*"[170].

191.   These statements reflect confusion in the roles of GGAM and the Management Team. This confusion is encapsulated in Clause 2.4(a) of the MSA which, if anything, reflects the Parties' failure to clearly delineate the roles of each contracting party. GGAM was to nominate and build most of the Management Team and to be involved thereafter as needed, but once the Management Team was in place and the COO had been appointed, it was the Management Team

---

[168] Reply at para. 84.
[169] Reply at para. 88.
[170] Rejoinder at para. 141.

who was responsible for the day-to-day operation of the Solaire. This was clearly the design and intent of Mr. Razon. Given the terms of the MSA and the structuring of the Management Team and its reporting requirements, it could not have been otherwise. The expressed confusion of Respondents on the roles of GGAM and the Management Team carries over to the criticism leveled at GGAM for not building up the company business infrastructure. There was no such obligation in the MSA, and the business infrastructure had been created in the Solaire as a result of how the relationship between GGAM and Bloomberry had been structured. The Respondents cannot now seek to rely on hindsight to belatedly modify their bargain when the express terms of the contract do not support such an interpretation.

192.   The plain language of the Parties' heavily-negotiated contract, entered into with the benefit of legal counsel on both sides, shows that it was through the Management Team – and not solely through the three GGAM principals – that GGAM was to perform its Services. As it became evident throughout the Liability Hearing, the GGAM Principals would approach and hire persons who could fill the roles in the Organizational Chart – roles which, it bears emphasis, were subject to the Owners' (i.e., the Respondents') consent. Thereafter, these persons formed the Management Team and were responsible for carrying out the necessary Services (in effect, to prepare the business infrastructure for the day-to-day operation of the Solaire).

193.   The Tribunal finds that what the Management Team did under Mr. French is to be attributed to GGAM for purposes of performing its obligations under Clauses 2.2, 2.5 and 2.10 of the MSA, read together with Annexes A and H to the MSA.

### (ii)   Business and Marketing Plans

194.   Under Clause 2.10, GGAM was obliged to prepare an Annual Budget, and Business and Marketing Plans and deliver them to the Respondents through the Management Team not later than 60 days before the commencement of the fiscal year, except in the case of the first time when they were due 60 days before the opening day of the Solaire[171]. The Marketing Plan was part of the Business Plan as presented in January 2013. The Tribunal will consider them together as part of its consideration of the claim of breach of the standard of

---

[171] As defined in Annex H to the MSA, the Fiscal Year coincides with the calendar year, but for Fiscal Year 2013, which starts on the Start Date.

care. The criticism leveled by the Respondents at the Business and Marketing Plans refers to their timing, length and content.

195. The Tribunal first observes that there is no record of any of the Respondents' criticisms at the time the Business and Marketing Plans and the 2013 Operating Budget were approved by EXCOMM and, by default as per Clause 2.10(b) of the MSA, by the Owners. When Mr. French was preparing for the forthcoming discussion of these documents by EXCOMM in February 2013, he noted that "*Overall it should be an 'easy' meeting. At one time or another, the above topics have been discussed with them individually so we are not starting from scratch. Also, they have all read the business plan (which they all complimented as well done) so they have that background information*"[172]. Furthermore, there is no doubt that Mr. Razon saw the Business Plan. When asked at the Liability Hearing whether he received a report from the EXCOMM on issues related to the Business Plan, he replied: "*I don't recall, but I saw the business plan. Unless there is an email there you want to point out*"[173].

196. As to the issue of timing of the Business and Marketing Plans, on January 31, 2013, Mr. Stone, President of GGAM, presented to EXCOMM and the Board of Directors the 2013 Operating Budget and the Business and Marketing Plans[174]. Thus, these documents were submitted for formal approval to the Board of Directors about six weeks before the opening date of March 16, 2013. However, there is no record that, at the time of their submission the Respondents raised timeliness as an issue. It is also evident from the record that the Management Team had worked on the Business Plan, including the Marketing Plan, since June 2012.[175] For these reasons the Tribunal is satisfied that Claimants did not materially breach the MSA by presenting the Business and Marketing Plans to EXCOMM about two weeks late.

197. As to content, the Business Plan is a document of 307 pages divided into 12 chapters. The first chapter is an Executive Summary of 13 pages. The Tribunal has heard conflicting expert opinions on the desirable length of a business plan.

---

[172] See Claimants' Exhibit C-189, E-mail from Mr. French to Mr. Saunders and Mr. Stone dated February 9, 2013 (emphasis added by the Tribunal).
[173] Transcript (20 October) at p 117, lines 5 – 8.
[174] JCB-142/ Claimants' Exhibit CE-25.
[175] JCB-66/ Claimants' Exhibit CE-184, Compilation of Management Team Meeting Minutes, at Mgmt 052, 054 (June 5, 2012) stating that the Business Plan template would be ready that day and that J. Valdes would focus on the Marketing Plan; at Mgmt 120 (August 28, 2012) stating that J. Valdes would send the revised Business Plan to "*everyone*"; at Mgmt 268 (November 13, 2012) stating that copies of the Business Plan were "*distributed to everyone during last week's meeting*".

For instance, that, on average, business plans should be 50 pages in length and not more, or that for a project of the magnitude of the Solaire, 50 pages would not be sufficient. The Tribunal does not consider the length a significant factor, the length may be affected by the way the text is laid out and presented. The question is how useful is the content of the Business and Marketing Plans to achieve their purpose. Here again the experts' opinions vary on what is the purpose of a business plan and the amount of detail to be included in it.

198. Respondents' experts opine that the "*Business Plan could not be used as a strategy document*"[176], was "*not the high level road map it was meant to be*"[177], and there was no way that, if you were an employee and were replaced with someone else, this person could take the Business Plan and know how to proceed[178]. The amount of detail to be included in a business plan varies depended on whom you ask. Experts Wheatly[179] and Kleisner[180] consider that the Business Plan did not include enough detail, while expert Lee opines the opposite and favors business plans that provide "*concise high level overviews*"[181] But experts of both Parties concur that there are diverse opinions on what is a good business plan. When at the Liability Hearing expert Wheatley was asked whether reasonable minds may disagree on what is a good business plan, he replied: "*Yes, everyone has a different point of view*"[182]. Experts Karoul and Macomber opined similarly: "*there are many ways to develop an effective business plan and execute the overall Business Effort*"[183].

199. Notwithstanding the divergence of experts' opinions on what should or should not be in a business or marketing plan, or what should be its purpose, expert Lee states: "*The areas that need to be covered are the target customers, the service product, operations, marketing, the management team and as well as a quick analysis of the market and competition, culminating in a projection of the business economics. Most of these components are covered in the Plan.*"[184]

---

[176] Wheatley Report at p 1.
[177] Lee Report at para. 2.2.
[178] Witness testimony of Jim Kilby, Transcript (October 22) at p 211, lines 8 – 16.
[179] Wheatley Report at p 1.
[180] Kleisner Report at p 22.
[181] Lee Report at para. 2.2.
[182] Transcript (October 21) at p 236, lines 24 to p 237, line 2.
[183] Karoul & Macomber Report at para. 63.
[184] Lee Report at p 2 (emphasis added by the Tribunal).

200. That they are covered in the Business Plan is evident by a simple perusal of the index of the document. It is particularly relevant how the Business Plan was developed. Mr. Klebanow describes its development:

*"by those managers who would ultimately be involved in its implementation. For example, the food & beverage ("F&B") director prepared his plan, the hotel director prepared the hotel business plan, and Dennis Andreaci and Loraine Koo (Vice President of VIP Services and Business Development) prepared the VIP plan. Individual sections were forwarded to Joe Valdes, who was the keeper of the document. He would receive the various sections from the different departments responsible for drafting, combine them together, and then sent that single, compiled document to the advertising agency, SK+G, whose job was to make the document attractive. Mr. Valdes also created a Dropbox folder containing each department's respective sections for the Business Plan, which I could access as needed."[185]*

201. Each of the managers who developed parts of the Business Plan were part of the management team put in place by GGAM and reporting to Mr. French.  Thus, the Business Plan was developed by GGAM working through the Management Team of the Solaire.

202. It is puzzling and unconvincing to the Tribunal that a document prepared by such a bottom-up approach would encounter such criticism addressed to the Claimants when it is evident that the Business Plan was the result of a group effort, and approved at the highest level by the Respondents.

203. The Tribunal turns now to specific criticisms of the Marketing Plan. It concerns the mass marketing segment prepared with the assistance of Mr. Klebanow, the lack of details related to the foreign VIP and junket segments, and the implementation of the plan.

204. The criticism of the mass marketing segment focuses on the alleged lack of understanding of the Philippine market by Mr. Klebanow, his methods and the type of incentives such as the Solaire Rewards Club. But his research and proposals were discussed with members of the Management Team[186] and Mr. Stone, a matter not disputed by the Respondents. The Respondents have shown to what extent Mr. Klebanow's report was incorporated *verbatim* in the

---

[185] Klebanow Declaration at para. 59.
[186] Klebanow Declaration at paras. 22 and 57.

Marketing Plan[187]. On the other hand, some aspects of the player rewards program may have been modified before the Strategic Marketing Plan reached EXCOMM in order to accommodate Ms. Koo, who at the time was in charge of the rewards program at the Solaire.[188] Ms. Koo was interested in "mimicking" the rewards program of the Galaxy in Macau, where she was Vice-President before joining the Solaire, and Mr. Klebanow had not fully reflected her comments in his original plan.

205. But the criticism of Mr. Klebanow's contribution is misplaced in light of Ms. Koo's description of how the mass marketing plan was prepared. Ms. Koo declared under the heading "*GGAM Had Little to No Involvement in the Development of Marketing Plans*":

"*Todd Chandler and Rober Reichard led the creation of the Casino Mass Market Strategy, which was put together by the marketing team. Robert presented it at our weekly Marketing Steering Committee Meeting on January 3, 2013. On February 14, 2013, the Mass Market Strategy was presented at the EXCOMM meeting which Mr. Saunders and Mr. Stone attended.*

*Actually, each department within marketing was responsible for creating its own marketing plan. Similarly, each department within marketing was responsible for drafting a section of the Business Plan, which we then provided to Dennis Andreaci. At the February 14, 2013 EXCOM meeting, Dennis Andreaci and I also presented the VIP Premium Player and Junket Strategies*"[189].

206. The Tribunal notes that the process to prepare the Marketing Plan, as described by Ms. Koo, a witness of the Respondents, coincides with the description of the preparation of the Business Plan of Mr. Klebanow, a witness of the Claimants. It is not surprising that the same approach was followed for what became a single document. The Marketing Plan, like the Business Plan, was prepared by the Solaire's Management Team working in conjunction with GGAM. Thus, GGAM developed the Marketing Plan partially by its own efforts working with Mr. Klebanow and partially through the Management Team of the Solaire. In any event, under the contractual structure, the Marketing Plan must be attributed to the efforts of GGAM.

---

[187] Respondents' Closing Argument at slide 75 *et seq*.
[188] Klebanow Declaration at para. 98.
[189] Koo Supplemental Declaration at paras. 10 – 11.

207. The Tribunal finds the arguments of the Respondents unconvincing. It is contradictory to attribute the defects of the Business Plan or the Marketing Plan to GGAM, and at the same time, to argue that GGAM had little or no involvement in their development.

208. As regards the lack of sufficient detail on the international mass-market segment and the VIP and junket market, the criticism is disputed by the Claimants who note that the plan discussed marketing strategies to attract premium and junket operators and addressed issues such as table games, niche marketing, player acquisition, etc. The Claimants have also explained that VIP and premium mass marketing of a new casino should take into account a ramp up period i.e. it is only after the essential facilities and services are running smoothly that VIP and premium mass marketing activities can swing into full gear. This would explain the modest marketing efforts in the initial, pre-ramp up period. The Tribunal accepts this explanation for the lack of detail on these market segments, and recalls that, as stated by Ms. Koo, Mr. Andreaci and Ms. Koo took responsibility for their preparation.

209. The Tribunal also notes that, as part of the budget review, EXCOMM was presented with the VIP Marketing Plan and the Mass Market and Advertising Plan. There is no record that these plans encountered any criticism by EXCOMM at that time.

210. The criticism of the post-opening phase is focused on the lack of proper marketing to the local mass-market. A few weeks after opening, the Respondents became alarmed by the shortfall in revenues as compared to the pre-opening forecast, in particular in the mass-market segment. In the case of that segment the shortfall seems to be attributable to overestimation of the strength of the local market by the Owners, by GGAM and by the Innovation Group, consultants to the Respondents before GGAM joined the Solaire. At the time of the IPO, the Offering Circular stated: "*The Company considers the Mass Market in the Philippines to be an established gaming market and believes that the Solaire Manila product offering, relative to its existing competitors in the Philippines, will enable it to secure a substantial share of Philippine Mass Market customers*"[190]. This statement was based on the work of the Innovation Group, hired by the Owners. It turned out to be a misperception for reasons unrelated to GGAM's performance, including the fact that the Solaire was designed as a best in its class luxury five-star resort, and thus expensive for the

---

[190] Claimants' Exhibit CE-8 (Bloomberry Offering Circular dated May 1, 2012) at pp 10 and 64.

mass market, it was of difficult access because of insufficient transportation infrastructure, amenities at the Solaire were incomplete, and it was the first property to open in Entertainment City.

211. The Tribunal notes that the shortfall in the mass market continued for more than a year after the termination of the MSA (including many months after the termination of GGAM), but that the other segments were close to the estimated level of revenues by July 2013.

212. To conclude, the Tribunal finds that GGAM fulfilled its obligation to prepare, through the Management Team, the Business and Marketing Plans under Clause 2.10 of the MSA, and, through the Management Team, started to implement them. Regardless of the criticisms that have been leveled at the Business and Marketing Plans of the Solaire in this arbitration, the fact remains that they were prepared through the Management Team, discussed at the EXCOMM[191], and approved by the management of the Solaire, including the Owners. This by itself renders hollow the belated criticism of the Business Plan and the Marketing Plans. Therefore, the Tribunal finds no merit in the Respondents' argument that GGAM breached its obligation to prepare and implement Business and Marketing Plans.

---

[191] JCB-146/ Claimants' Exhibit CE-189, email of Mr. French to Messrs. Saunders and Stone dated February 9, 2013.

## X. BREACH OF THE OBLIGATION TO ESTABLISH POLICIES AND PROCEDURES (ANNEX A TO THE MSA)

### A.    Respondents' Arguments

213.  The Respondents submit that the Claimants failed to establish policies and procedures as required in Annex A of the MSA.

214.  To the Respondents, "*[t]he preparation and implementation of policies and procedures [was] critical for the successful operation of an integrated casino*" since "*[h]aving policies and procedures that are already drafted, and which can be implemented with certain minor adjustments, creates enormous efficiencies and is one of the major benefits of hiring a management company*"[192].

215.  The Respondents' fundamental complaint is that GGAM "*failed to*" either "*have already*" or "*prepare*" such policies and procedures "*prior to the casino opening*", such that "*Solaire personnel had to develop "from scratch" the policies, systems, and procedures in-house to be able to operate the Facilities, with little to no input from GGAM*"[193].

216.  According to the Respondents, the Claimants also "*fail[ed] to provide any guidance in developing policies and procedures for Solaire or in ensuring that the policies were integrated into a coherent, workable system*"[194]. The Claimants produced no evidence that shows they "*provided… insight and guidance*" on the development of policies and procedures for the Solaire[195].

217.  In particular, "*[five] months prior to the casino grand opening, GGAM still had not provided policies and procedures in place for the credit and collections department*"[196].

218.  The Respondents also complain that GGAM "*delegated fully their obligation to establish and implement policies and procedures to the Management Team*"[197], and submit that such delegation is "*not in line with a management company's*

---

[192] Defense at para. 103; Lat Declaration at para. 5.
[193] Defense at para. 105.
[194] Rejoinder at para. 88.
[195] Rejoinder at para. 87.
[196] Defense at para. 105; Toh Declaration at para. 8.
[197] Rejoinder at para. 84.

*responsibilities*" and that "*Mr. Razon did not anticipate that Bloomberry's employees would be expected to draft the policies and procedures in-house*"[198].

## B.   Claimants' Arguments

219. According to the Claimants, GGAM developed the necessary operating policies and procedures[199]. In particular, GGAM satisfied its obligations required under Annex A of the MSA:

    (a)   GGAM worked on systems, policies and procedures ("**SP&Ps**") relating to time and attendance, training, sales incentive policy, code of good behavior, employee manual, shuttle service, performance management, employee discount, parking privilege, and child care center[200].

    (b)   GGAM also completed an SP&P on internal controls, and submitted full finance procedures to the EXCOMM for review[201].

    (c)   GGAM also completed a System of Internal Control evidencing compliance with the MSA (as assessed by the Claimants' experts)[202].

## C.   Analysis of the Tribunal

220. The Tribunal first notes that (as in respect of other obligations that GGAM had to discharge through the Management Team), the fact that the policies and procedures were prepared through the Management Team headed by Mr. French was sufficient for the discharge of GGAM's obligations.   There was no obligation for GGAM to prepare policies and procedures separately and independently from the Management Team.   Per the MSA, GGAM was to perform its obligations through the Management Team.

221. The Tribunal also notes that, in respect of timing, the Respondents assert that, "*these policies and procedures need to be in place prior to the casino opening*"[203]. The Respondents fail to cite any clause of the MSA in support of this position, nor has it been pointed out which, if any, policies, were allegedly

---

[198] Rejoinder at para. 85.
[199] Reply at para. 36; Karoul & Macomber Report at para. 150 – 153, 166; Lucas Report at para. 28.
[200] Karoul & Macomber Report at para. 174.
[201] *Ibid.*
[202] Karoul & Macomber Report at para. 175.
[203] See Defense at para. 103; Lat Declaration at para. 5.

late in their preparation, or how that affected or prejudiced the performance of the Solaire. Without such evidence it is impossible to find a breach, much less a material breach. Witness testimony shows that most of the policies were in place before opening. Thus, in his declaration, Mr. Lat, a witness for the Respondents, affirmed that "*We have so far drafted about 80 policies and procedures, most of those were prepared by us **during the pre-opening period**, all of which are currently implemented*"[204]. At the Liability Hearing Mr. Lat confirmed that the policies prepared under GGAM's management are currently in use[205]. The Minutes of the Weekly Leadership Team Meetings also confirm that policies on finance, gaming controls, human resources, etc. were being prepared in the course of 2012 and early 2013, were commented on by the principals of GGAM[206], and were reviewed at a high level of the management of the Solaire[207] including the EXCOMM and Mr. Razon for major policies. The Respondents make no complaints about the substance of the policies and procedures that were prepared by the Management Team and are in place.

222. The Tribunal concludes that the members of the Management Team appointed or recruited by GGAM and the principals of GGAM brought to the table their knowledge of policies and procedures from their previous work experience, and contributed it to the preparation of those policies and procedures for the Solaire, for the most part before the casino opened. No evidence suggests that those policies and procedures that were prepared by the Management Team were not comprehensive and competent. As a result, the Tribunal finds, based on the evidence in the record, that GGAM fulfilled its contractual obligations with regard to policies and procedures and, therefore, the Respondents had no grounds to terminate the MSA on account of the Claimants' failure to fulfill such obligations.

---

[204] Lat Declaration at para. 7 (emphasis added by the Tribunal).
[205] Transcript (October 21) at p 63, lines 2 – 11.
[206] See SOC, Exhibit 28.
[207] See the SOC, Exhibits 26, 27 and 30.

## XI. BREACH OF CLAUSE 2.5 OF THE MSA ("*STANDARD OF CARE*")

### A. Respondents' Arguments

223. The Respondents' claim for breach of the standard of care is intertwined with their arguments of breach of other obligations by the Claimants, in particular the obligations to prepare policies and procedures, and business and marketing plans. The Respondents argue that, even if the Claimants prepared such policies and procedures or such plans, they failed to meet the standard of care in their preparation or implementation.

224. According to the Respondents, "*The problem here isn't where the policies and procedures are coming from, it's the lack of GGAM involvement, exercise of a standard of care that is expected in the creation of these policies and procedures in a rational way and in a harmonized way*"[208]. The Respondents relate the breach of this obligation to the fact that certain parts of the Business and Marketing Plans were plagiarized from other plans, consultants were hired to prepare them, the Business Plan failed to establish appropriate business infrastructure, and the Claimants did not market the Solaire vigorously in the international mass market.  For the Respondents, the Business and Marketing Plans were merely strategic overview documents without key performance objectives, and without adequate financial information or benchmarks against which to measure success or failure as required by the standard of care.

### B. Claimants' Arguments

225. The Claimants assert that GGAM developed an appropriate business plan that followed prudent industry practice and satisfied the requisite standard of care. As regards timing, the Claimants recall that GGAM "*began developing the Business Plan and sharing detailed drafts with the Owners as soon as it arrived at Solaire, in late 2011, more than 13 months prior to the Opening*"[209].

226. According to the Claimants, they communicated the Business Plan to the Respondents and the Solaire's management during its development. As early as "*January 2012*", GGAM "*began to circulate detailed drafts of the Business Plan to, and discuss financial projections with, the Owners' representatives, underwriters, and attorneys. These initial drafts contained business and*

---

[208] Transcript (October 15) at p 148, line 6.
[209] Reply at para. 74; Saunders Declaration at para. 62; French Declaration at para. 39; Karoul & Macomber Report at para. 76.

*marketing sections of the Business Plan that also had to be incorporated into the Offering Circular for Bloomberry Resorts Corp.'s equity offering. The Owners and their representatives reviewed and vetted these drafts*"[210]. Afterwards the Respondents' EXCOMM "*accepted the final Business Plan without exception*"[211]. Furthermore, GGAM contends that it supplemented the Business Plan with a comprehensive strategy designed to implement it.

227. The Claimants dismiss as "quibbles" the deficiencies identified in the content of the Business Plan by the Respondents in this arbitration, and emphasize that the Business Plan constituted a dynamic document "*designed to be adjusted periodically as warranted by changing circumstances*"[212]. The Claimants affirm that the Business Plan contained the following[213]:

(a) Abundant discussion and analysis of the Philippine gaming market, including the specifics of that market[214].

(b) Key performance objectives and indicators, as well as necessary metrics to monitor and measure performance, even if it may not have labelled them as such[215].

(c) All the financial information required under Annex H of the MSA[216].

(d) All the essential systems required by the MSA, including necessary software systems, employee training programs, a loyalty club program, transportation programs, and use of third parties for advertising, media placement and public relations[217].

228. The Claimants reject the Respondents' criticism that the Marketing Plan was a disorganized assembly of data, and affirm that it was based on extensive market research and customer analysis of the local market commissioned for the Solaire.

---

[210] Reply at para. 75; Claimants' Exhibits C-179 and C-180; Saunders Declaration at paras. 62 – 63; French Declaration at paras. 38, 40 and 43.
[211] Reply at para. 75; Claimants' Exhibit C-189.
[212] Reply, para. 80.
[213] See also Karoul & Macomber Report at paras. 67 – 69.
[214] Reply at para. 77.
[215] Reply at para. 78.
[216] Reply at para. 79.
[217] Reply at para. 80.

229. The Claimants find unjustified the Respondents' criticism of the engagement of consultants by the Claimants. The Claimants explain that the engagement of specialized consultants to assist with the development of a marketing strategy is a normal and cost-effective gaming industry practice. It does not show lack of time and attention to the Solaire by the Claimants, as argued by the Respondents. Moreover, the Claimants assert that Mr. Razon and the EXCOMM were aware that a portion of the marketing strategy was based on the analysis of a consultant – Mr. Klebanow.

230. The Claimants address the Respondents' argument that the marketing plans were merely strategic overview documents with vague references to the VIP and junket market segments. The Claimants explain that a marketing plan can never encapsulate the entire marketing effort. It serves as a road map and, in the case of the Solaire, it was supplemented with other marketing documents such as the marketing research study of Mr. Klebanow, an advertising plan, a media campaign strategy, etc. The Claimants further explain that the lack of detail related to the foreign VIP and junket segments was due to their belief that targeted outreach to these customers should not begin immediately upon a casino's opening; it is necessary to make sure that the facilities are operating at the level that such customers would expect. The Claimants point out that the Respondents only discuss a PowerPoint presentation and not the actual Marketing Plan.

231. The Claimants argue that they did not pursue vigorously the international mass market because the local mass market was relatively inexpensive to attract and that the Solaire, as a new casino, needed a ramp-up period before pursuing the international mass-market segment. The Claimants submit that their marketing strategy was planned accordingly.

232. According to the Claimants, the Respondents' belated focus on the international mass market is due to their late realization that the Solaire was not designed, located or equipped to attract the local mass market. The underperformance in that segment reflects the Owners' overly optimistic prediction of the Solaire's ability to attract the local mass market rather than a marketing failure of GGAM. The Claimants point out that poor local mass-market performance meant that the VIP and junket segments performed relatively better than the Respondents expected, with gross gaming revenue exceeding the 35% expected by the Owners. The Claimants add that it was in light of these unmet expectations that they terminated the MSA, since they would owe GGAM higher fees than anticipated.

233. Finally, the Claimants argue that underperformance of the mass-market segment could not be a basis for the termination of the MSA; the MSA provided that it could not be terminated for failure to meet the performance standards at least until the fourth year of the Solaire's commercial operations. Furthermore, financial performance is not a proxy for compliance with the Standard of Care and, in any case, the Respondents did not claim until this arbitration that the Solaire's financial performance was the basis for the MSA termination.

## C.   Analysis of the Tribunal

234. Clause 2.5 of the MSA provides as follows.

"2 OBLIGATIONS OF GGAM

Clause 2.5 Standard of Care

GGAM warrants and undertakes that, in performing the Services through the Management Team, it shall use commercially reasonable efforts to comply with the following, which shall be collectively referred to as the "Standard of Care":

(a)   It shall exercise all the skill and care reasonably to be expected of a professionally qualified and competent manager of casino and hotel facilities experienced in performing work of similar nature and scope as the Services ("Prudent Industry Practice");

(b)   It acts in the highest standards of business ethics;

(c)   It will at all times act in the best interests of the shareholders of [Bloomberry] and [Sureste], and to maximize such shareholders' value in the performance of its obligation under this Agreement and in all dealings carried out by it in its capacity under this Agreement; and

(d)   It shall comply with applicable Philippine law in the performance of the Services under this Agreement.

Provided that GGAM's obligation to meet the Standard of Care set forth in this Clause 2.5 shall be subject to: (A) Owners' funding of the amounts set forth in the Annual Budget for each operating year and as provided in this Agreement, and (B) equitable adjustment in the event of any Force Majeure, change in law,

*or change in the provisions of the PAGCOR License. If the Owners disapprove of any Proposed Annual Budget prepared by GGAM with expenditure levels reasonably required in order to provide the Services and GGAM can reasonably demonstrate that the Owners' refusal to approve such Proposed Annual Budget will have an adverse effect on GGAM's ability to comply with this Clause 2.5, then GGAM will not be in breach of the provision of this Clause 2.5 that is so adversely affected by such disapproval."*

235. At the outset, the Tribunal notes that the obligation of the Claimants under Clause 2.5 of the MSA is an obligation to use *"commercially reasonable efforts"* in complying with the standard of care as defined in that clause. It is clear for the Tribunal that this is essentially a best efforts clause as understood in the gaming industry practice.

236. It is also clear for the Tribunal that there is no objective statement of the standard of care in the gaming industry. When the Tribunal asked Mr. Saunders, the Claimants' witness, whether there was an objective statement of the standard of care or was it just a matter of personal knowledge and how people do business, he replied: "*More the latter. I mean, one of the things about the standard of care, it's a business that you want to be successful and to make money, that's what we've done in our career with other gaming properties*"[218]. The Tribunal posed a similar question to expert Karoul, "*Is there any objective manifestation of industry practice or industry standard of care for us to look to, or is it just based only on their experience?*" He replied: "*I think a lot of that is based on experience …*"[219] In the same line of questioning by the Tribunal, expert Macomber added:

"*…you need process to continue to iterate identifying what is wrong and fixing them. There is no financial book that I'm aware of, no objective metric that I know of, that measures process…we have spent substantial time looking over thousands of documents and it appears to us that… they had process.*

*That's why we conclude, sir, perhaps without the metric you'd like, but that led to our conclusion they not only met but exceeded the standard of care in the case of Solaire*"[220].

---

[218] Transcript (October 19) at p 91, line 19.
[219] Transcript (October 21) at p 54, line 15.
[220] Transcript (October 21) at p 218, line 7.

237. The Tribunal has already addressed the alleged shortcomings in the Business and Marketing Plans and the Policies and Procedures. To a large extent, the grounds adduced here by the Respondents overlap with those argued under these headings. The Tribunal will address here the engagement of consultants to prepare the Business and Marketing Plans, and the Policies and Procedures, the process followed in their preparation, and ethical questions raised at the Liability Hearing.

238. In the view of the Tribunal, the hiring of consultants to prepare plans or procedures does not show *per se* lack of care. In fact, it may prove otherwise, that certain tasks required specialized knowledge and it would have been in the best interests of Respondents that consultants provided expertise for those tasks. The Respondents' emphasis on the business plan being prepared by the Claimants ignores the obligation that the plan was to be prepared through the Management Team; the contracting of consultants through the Management Team would not mean that this obligation was not performed. In any event, the Respondents approved the employment of the consultants.

239. Experts Karoul and Macomber, in replying to the Tribunal's questions, emphasized process in the preparation of policies and the business plan. The Claimants have described the iterative process in the preparation of the business plan prior to the IPO and afterwards until January 2013: "*Now following the IPO, these elements [of the business plan] are refined and developed in iterative and working process, the process that respondents' own experts highlight. Under the supervision of GGAM, Valdes and French produced drafts. They required different divisions within Solaire to draft the segments, ensuring the divisions understood the goals and expectations, and bought into the implementation*" [221]. As explained by the Claimants, Mr. Valdes had prepared the business plan of Galaxy in Macau and used it "*as a template for the Solaire plan in terms of its structure and organization, the relevant topics and the requisite level of detail*" [222]. The Claimants pointed out that Mr. Lee, the Respondents' expert, extolled the Galaxy business plan as a model. Thus it is not surprising that sections of the Galaxy's business plan found its way into the Business Plan of the Solaire.

240. In the matter of process, and as already noted at paragraph 206 above, Ms. Koo testified to the process by which her team created a VIP marketing plan of 40

---

[221] Transcript (October 15) at p 56, lines 5 – 12.
[222] Transcript (October 15) at p 57, lines 1 – 4.

pages. She sent it to Mr. Andreaci who reviewed it and in turn passed it to Messrs. Stone and Saunders, who reviewed it and copied it to Mr. French. The plan was later discussed at an EXCOMM meeting at which Messrs. Stone and Saunders were present. Consequently, that section of the plan had been prepared at the ground level of the Solaire and then it progressed through the management of the institution, including the EXCOMM with participation of two GGAM principals and the COO of the Solaire.

241.  As also already noted, Mr. Lat testified that about 80 policies were prepared (mostly before casino opening) and are still being used. The Tribunal has not been presented with any concrete evidence of how these policies lack harmony or rationalization that can be attributed to the alleged disengagement or lack of care of GGAM.

242.  The undisputed fact is that the management of the Respondents approved either explicitly or by default the policies, procedures, and the business and marketing plans, which had been previously prepared with the assistance of GGAM.

243.  Best efforts to comply with the highest ethical standards is one of the four components of the standard of care in Clause 2.5 of the MSA. During the cross-examination of Mr. French, the Respondents revealed that Mr. Stone fired Mr. French from Las Vegas Sands ("**LVS**") because he failed to stop a rigged game after he became aware of it. Later, when Mr. Stone hired Mr. French to be the COO of the Solaire, GGAM did not disclose to the Respondents this incident in Mr. French's background. In the application form for a gaming license in the Philippines, Mr. French did not disclose why he had been fired at LVS, but stated that he left LVS to be a consultant. He also replied "no" to the question of whether he had ever been licensed in another jurisdiction. These facts were elicited for the first time at the Liability Hearing; they were not argued in the Respondents' prior memorials.

244.  The Respondents have asserted that they only became aware of this issue in Mr. French's background through a Google search when they were preparing for Mr. French's cross-examination. Since the Respondents were not aware of this evidence at the time of the termination of the MSA, the Tribunal inquired from counsel as to the relevance of evidence discovered after the fact. Neither party was able to enlighten the Tribunal with certainty in this respect. In replying to the Tribunal's question of what was their case theory in this respect, counsel for the Respondents replied: "*I would not say that that incident in isolation is a*

*material breach. It is further evidence that GGAM, as manager, did not follow the standard of care.*"[223]

245. The Tribunal finds that this evidence does not prove a breach of Clause 2.5 of the MSA. This issue was not pleaded or joined, but instead it was belatedly raised in an attempt to bolster the claim that GGAM breached Clause 2.5(b) of the MSA (i.e. that it failed to act "*in the highest standards of business ethics*"), but it was not claimed that it constituted a breach itself. Although the evidence does raise legitimate concerns, it seems to be an isolated event; there is no other evidence of unethical conduct by GGAM, and thus, this evidence does not bolster or support similar evidence. Furthermore, this evidence was not known or considered by the Respondents at the time of terminating GGAM's contract, nor have the Respondents shown that they were prejudiced or damaged by such conduct. The Tribunal has taken this evidence into account, along with the stage at which it was introduced and the fact that the Respondents are not claiming that it is itself a breach. Even if this conduct could be said to fall within the terms of either Clause 2.5(b) specifically or the standard of care requirement in Clause 2.5 generally, the Tribunal is unable to find in the totality of the circumstances that the actions and/or omissions of Mr. Stone, Mr. French or GGAM in relation to these events – i.e. the circumstances of Mr. French's departure from LVS, Mr. Stone's subsequent appointment of Mr. French as COO of the Solaire and non-disclosure – either individually or collectively constitute a breach of Clause 2.5.

246. To conclude on the standard of care, the Tribunal determines that the evidence presented to the Tribunal is not sufficient to substantiate a material breach of the obligation to make commercially reasonable efforts to comply with the standard of care. Therefore, there were no grounds to terminate the MSA based on a breach of Clause 2.5.

---

[223] Transcript (October 24) at p 191, lines 21 – 24.

## XII.  BREACH OF THE OBLIGATION TO PROVIDE "*HANDS-ON MANAGEMENT*"

### A.  Respondents' Arguments

247.  The Respondents submit that the Claimants failed to provide "*hands-on management*"[224]. The source of this obligation is, according to the Respondents, based on the following "*assurance*" by Mr. Weidner: "*During the Parties' initial discussions, Mr. Razon made clear that he expected "as close to full-time management" as possible, with Mr. Weidner as the "main driver." Mr. Weidner assured him that GGAM would provide a "hands-on approach to management" of the Solaire. Moreover, Mr. Weidner assured Mr. Razon that he would "personally oversee" the management activities, spending "significant time in Manila with the team*"[225].

248.  According to the Respondents, Mr. Weidner further "*promised*" to Mr. Razon that "*[he] will personally oversee these activities, initially spending significant time in Manila with the team, then traveling about once a month to both be in Manila and in the region to set up a high end marketing network for Solaire Manila*"[226].

249.  The Respondents submit that the Claimants breached their promise to provide "*hands-on management*" for the following reasons:

(a)  First, Mr. Weidner only came to Manila three times[227].

(b)  Second, Mr. Stone and Mr. Saunders spent only a few days each month at the Solaire[228].

(c)  Third, GGAM's principals did not increase the frequency of their visits to the Solaire, even when Bloomberry specifically requested their presence to address problems and issues that were not being competently addressed by Mr. French[229].

---

[224] Defense at paras. 117 – 120.
[225] Defense at para. 117; Razon Declaration at para. 8; Claimants' Exhibit C-104; Rejoinder at para. 27.
[226] Rejoinder at para. 27; Claimants' Exhibit C-33.
[227] Defense at para. 118; Razon Declaration at para. 32.
[228] Defense at para. 118; Claimants' Exhibit R-81.
[229] Defense at para. 118; Respondents' Exhibit R-56; Claimants' Exhibit C-96.

(d)   Fourth, "*there were extensive periods of time when not one of GGAM's three principals was on the ground. Solaire, like any integrated casino resort, is a 24/7 business. GGAM's principals were absent from its premises more than one year – 440 days – out of the two years GGAM was to act as Solaire's management services provider. Thus, the "hands on" approach GGAM promised boiled down to leaving Solaire without any GGAM presence on the ground for nearly 2/3 of the time the MSA was in force*"[230].

## B.   Claimants' Arguments'

250.   The Claimants submit, first, that GGAM did not promise that its principals would be physically present at the Solaire "*while performing their Services under the MSA*". Even if they did, such promises are negated by the MSA's entire agreement clause[231]. Further, the MSA "*does not contain any on-site man-hour requirement*", and such a requirement is contrary to standard industry practice[232].

251.   According to the Claimants, the Respondents did not engage GGAM to be the "*day-to-day on-the-ground direct managers of Solaire*", for the following reasons[233]:

(a)   First, that requirement would have been inconsistent with GGAM's obligation to generate high-end marketing networks for the Solaire *elsewhere* in Asia;

(b)   Second, that requirement would have been inconsistent with the MSA's requirement (insisted upon by the Owners) that GGAM was to perform its services through the Management Team.

252.   Further, it is "*implausible*" that, in "*today's age of telephonic and electronic communications*", GGAM's CEO could only successfully oversee GGAM's activities at the Solaire by personally being present there[234].

---

[230] Rejoinder at para. 53.
[231] Clause 18.12.
[232] Reply at paras. 37 – 38.
[233] Reply at para. 38.
[234] Reply at para. 38.

253. In denying the Respondents' claims in relation to the Claimants' representations as to being hands-on, the Claimants submit that "*Mr. Stone made clear that – as was the case in their prior senior executive roles at Las Vegas Sands and Melco Crown – the GGAM management principals did not need to be physically present full-time in Manila to develop the property, oversee operations, and fulfill GGAM's MSA obligations*"[235].

254. The Claimants further submit that "*Mr. Weidner devoted significant efforts to the Project without needing to be physically present at Solaire*"; that "*Mr. Weidner developed the overall strategy for the Project and personally conducted or oversaw the development of VIP marketing and business development initiatives by leveraging his contacts and relationships in Asia*" and that once "*GGAM put in place the elements of Solaire's overall strategy, it was hardly unusual for Mr. Weidner to monitor the Project's progress from wherever he was*"[236].

## C.   Analysis of the Tribunal

255. While the GGAM Principals could have spent more time in Manila at the Solaire and provided more 'hand-holding' to their first customer who, as they acknowledge, was inexperienced in developing and operating a five-star integrated resort, the Tribunal is not persuaded that the evidence discloses any breach of the MSA.  There is no obligation in the MSA that would have required the principals of GGAM to be physically present in Manila. The assurances of the Claimants at an early stage of the project did not find a place in the text of the signed MSA. The Tribunal has already dealt with the issue of the Integration Clause[237] as a general issue and the extent to which extrinsic evidence may be taken into account in the interpretation of the MSA.  Here the issue is not a matter of interpretation of a text, but of inserting new obligations into the MSA.

256. Further, even if Mr. Weidner's "*assurance*" of "*hands-on management*" were to be considered part of the MSA (despite the Integration Clause) or as a representation, the situation changed after Mr. Razon revised the management structure.  These changes in the management structure necessarily had implications for the direct involvement of the GGAM principals. The revised management structure provided that GGAM was to recruit the Management

---

[235] Reply at para. 73; Claimants' Exhibit C-136.
[236] Reply at para. 49; Weidner Declaration at paras. 24 – 39.
[237] See above para. 67 *et seq*.

Team and thereafter perform its obligations through that team. This, the Claimants did. Thus, the Tribunal finds that the Claimants have provided the necessary hands-on management through the COO, Mr. French, and the Management Team, and therefore, the Tribunal concludes that the Respondents had no grounds to terminate the MSA on the basis of lack of hands-on management by GGAM. Given the revised management structure, there was also no misrepresentation, and certainly none on which Respondents could justifiably rely.

## XIII.   BREACH OF CLAUSE 16.2 OF THE MSA

### A.   Respondents' Arguments

257.  The Respondents submit for the first time in their Rejoinder (the last written pleading of either party) that GGAM's entry into a Support Services Agreement with Cantor (dated August 28, 2012)[238] ("**SSA**"), under which GGAM relied on "*Cantor, an investment bank, to run its management company and provide numerous services to GGAM... which GGAM then owed to Bloomberry*", amounts to "*an effective assignment of the MSA, in violation of the MSA's assignment clause, which requires Bloomberry's written consent before GGAM assigns either its obligations or benefits arising under the MSA*"[239].

258.  The Respondents explain that GGAM was obliged to provide the following to the Respondents[240]:

> "*(1) recommend the selection and order FF&E in accordance with the pre-opening plan and budget; (2) recommend the selection and order the gaming facilities' data processing equipment and software, surveillance, and security systems; (3) recruit, select, and hire employees for the Facilities and implement necessary procedures, techniques and training programs to obtain and evaluate qualified applicants; (4) review and consult on Owners' risk management program; and (5) appoint counsel.*"

259.  Under the SSA, Cantor agreed to provide the following services to GGAM.

> "*(1) Payroll services; (2) Financial, risk management and operations services (including providing technical advice as requested on commercial contracts); (3) Accounting and treasury services (including "such other accounting and treasury services as may be requested for time to time"); (4) Legal services; (5) Human Resources; (6) IT Services and Communication Facilities; (7) Promotional Sales and Marketing; (8) Investor Relations; and (9) Miscellaneous—Cantor shall provide such other miscellaneous services to the Receiving Parties as the parties may reasonably agree.*"

---

[238] Respondents' Exhibit R-187.
[239] Rejoinder at paras. 167 – 168.
[240] See Annex A to the MSA, "*Pre-Opening Services*", items 7-9, 14 and 21.

260. The Respondents submit that *"[t]o accomplish these obligations, a management company would have a complete support staff, organized department by department, broad in function and deep in personnel, and replete with systems, manuals, policies, procedures, audit, marketing, sales, and performance benchmarks"* [241].

261. The Respondents characterize the SSA as an *"effective assignment"* of the MSA. Further, *"Bloomberry was not aware of the existence of the SSA until December 2014 and never received written notice of this assignment"*[242]. The Respondents submit that the Claimants are therefore in breach of Clause 16.2 of the MSA.

## B.   Claimants' Arguments

262. There are no arguments from the Claimants in this respect in the written pleadings because the assignment argument of the Respondents can only be found in their Rejoinder.  The Claimants made a brief comment in their Opening Statement: *"Respondents say, well, there is a support services agreement between GGAM and Cantor, and that was an assignment. The SSA only permits Cantor to provide GGAM, not to third parties, and they are the typical support services; accounting and treasury, legal services, human resources"*[243].

## C.   Analysis of the Tribunal

263. It will be useful to reproduce here Clause 16.2 of the MSA. It reads as follows:

*"16. ASSIGNMENT AND SUB-CONTRACTING*

*...*

*16. 2 Assignment by GGAM*

*GGAM shall not, without the written consent of the Owners, assign either its obligations or benefits arising under this Agreement. The Parties acknowledge that GGAM may assign its functions under the Agreement to its Affiliates where William Weidner is the CEO, or William Weidner, Brad Stone or Garry Saunders, or any person nominated by any of them and approved by the Owners, are the senior officers who will be actively involved in the performance of such transferee's obligations under this Agreement, provided that such*

---

[241] Rejoinder at para. 168.
[242] Rejoinder at para. 168.
[243] Transcript (October 15) at p 88, lines 4 – 90.

*Affiliate shall have adequate capitalization and financial resources to comply with its obligations under the Agreement, including the indemnity obligations under Clause 12.1. Notwithstanding anything to the contrary herein, GGAM may assign this Agreement to an entity organized and existing under the laws of the Netherlands as required to satisfy the tax structure of GGAM provided that such entity must at all times be owned by the same constituent owners and controlled by the same individuals as GGAM (except for independent Dutch board members required under Netherlands law).*"

264. The legal nature of the "SSA" is not that of an assignment of the obligations of GGAM under the MSA. In this respect the Tribunal first notes that the SSA was signed on August 28, 2012, *before* the execution of the MSA. There is also no mention of the MSA in the SSA or that the services to be provided under the SSA would be services that GGAM needed to provide to the Solaire. The SSA provides that the Receiving Parties may request and Cantor may provide, or arrange for the provision of, the services listed in the agreement.  Thus, Cantor has no exclusive right to provide services to the Receiving Parties. The parties to the SSA further acknowledge that the services to be provided are "*intended to be administrative, technical and ministerial and are not intended to set policy for either Receiving Party*"[244]. Furthermore, services are to be provided "*subject to the ultimate authority of each Receiving Party to control its own business and affairs*"[245]. It is obvious that GGAM maintained the right to set its own policies and make its own decisions in the operation of its business.

265. It is clear from the terms of the SSA that it does not reflect an assignment of obligations or services under the MSA, or even relate to the MSA. Consequently, the Tribunal concludes that the Claimants have not breached Clause 16.2 of the MSA, since the SSA did not assign the MSA's obligations.

---

[244] Article 3 of the SSA.
 [245] *Ibid*.

## XIV.  TERMINATION OF THE MSA UNDER CLAUSES 15.3(b) OR 17

266. The Respondents claim that the Philippine Bureau of Internal Revenue's ("**BIR**") issuance of Memorandum Circular No. 33-2013 (the "**BIR Circular**") constitutes grounds to terminate the MSA either under Clause 17 or Clause 15.3(b).

267. Clause 17 deals with events of *force majeure*. It provides as follows:

"*17. FORCE MAJEURE*

*17.1 Event of Force Majeure*

*"Event of Force Majeure" means:*

*any events which was unforeseeable at the time this Agreement was signed, the occurrence and consequences of which cannot be avoided or overcome, and which arises after the time this Agreement was signed and prevents total or partial performance of this Agreement by a Party of its commitments under this Agreement. Such events will include war, declared or not, or hostilities involving the Republic of the Philippines or belligerence, blockade, revolution, insurrection, insurgency, riot, public disorder, expropriation, requisition, confiscation or nationalization by or involving any governmental authority of or within the Republic of the Philippines, earthquakes, typhoons, flood, fire, war, failures of international or domestic transportation, acts of Philippine or U.S. government or public agencies, epidemics, strikes and any other instances which cannot be foreseen, avoided or overcome, including instances which are accepted as force majeure in general international commercial practice.*

*17.2 Consequence of Event of Force Majeure*

*If an Event of Force Majeure occurs, a Party's obligations under this Agreement that are affected by such an event will be suspended during the period of delay caused by the Event of Force Majeure and will be automatically extended, without penalty, for a period equal to such suspension. The Party claiming an Event of Force Majeure will promptly inform the other Party in writing and will furnish within thirty (30) days thereafter sufficient evidence of the occurrence and duration of such Event of Force Majeure. The Party claiming an Event of Force Majeure will also use all reasonable endeavours to terminate that Event of Force Majeure. When an Event of Force Majeure occurs, the Parties will immediately consult with each other in order to find an equitable solution and will use*

*all reasonable endeavours to minimize the consequences of such Event of Force Majeure.*

*As provided in Clause 3.6, the Owners shall use the insurance proceeds to restore or rebuild the damage or loss on the Facilities."*

268. In the letter of July 12, 2013[246] from Mr. Razon to Messrs. Weidner, Stone and Saunders, Mr. Razon adduced as a further ground for termination of the MSA the issuance of the BIR Circular as an event of *force majeure*. But the Respondents have made no further references to *force majeure* as a justification for termination of the MSA, and did not make this argument in their pleadings. In the SOC, the Claimants noted that, "*it appears that Respondents have abandoned this argument.*"[247]

269. Clause 15.3(b), on the other hand, provides as follows:

*"15. TERMINATION*

…

*15.3 Mutual Termination Rights*

*Either Party may at anytime, by written notice addressed to the other Party, give notice of its termination of this Agreement, without the same being deemed a breach or default by either Party hereto, if any of the following have occurred:*

*(a) a change in the terms and/or conditions of the PAGCOR License (or its cancellation, revocation or termination) and compliance with the revised terms and/or conditions would be likely to cause a material adverse effect on Owners' or GGAM's rights and obligations under this Agreement.*

*(b) if there is any change in law, order, nule, regulation, or policy in any jurisdiction inside or outside the Philippines that results or would result in the carrying on of the Owners' or GGAM's business in the Philippines being unlawful or materially burdensome, or the Owners or GGAM losing its qualification, license, authority or capacity to perform under this Agreement.*

*(c) if there is a change in the national gaming legislation in the Philippines that results in a material adverse impact on either Party's interests in the*

---

[246] Claimants' Exhibit C-3.
[247] SOC at para. 212, footnote 334.

*Facilities, under this Agreement, or on any other business of GGAM inside or outside the Philippines.*

*(d) a failure by GGAM under the provisions of items 2 or 3 of Annex B on the Performance Standards.*

*(e) the (i) denial, revocation, suspension or non-renewal of any gaming license, approval or permit of one Party which is caused by any action or inaction of the other Party or their respective Affiliates; or*

*(ii) commencement of any action by the applicable regulatory authority seeking such a denial, revocation, suspension or nonrenewal that, if adversely determined, would result in the denial, revocation, suspension or non-renewal of any gaming license, approval or permit which is caused by any action or inaction of the other Party or their respective Affiliates; provided, however, the Party causing such event shall have the lesser of (A) one hundred eighty (180) days from commencement of such action, (B) such other time period as may be granted by the applicable regulatory authority and (C) such time period required by the threatened Party (as reasonably determined based upon the advice of legal counsel) to avoid the denial, revocation or suspension of any such gaming license, approval or permit held by such Party, as applicable, to cure any event giving rise to the commencement of such action described in clause (ii) hereof.*"

270. In his letter of September 3, 2013[248] to Messrs. Weidner, Stone and Saunders, Mr. Tan alternatively justified termination of the MSA under Clause 15.3(b) because the issuance of the BIR Circular made the operation of the Solaire "materially burdensome" for the Respondents. As explained by the Claimants, the BIR Circular had the effect of subjecting all PAGCOR licensees, including the Solaire, to a 30% corporate income tax on net taxable income, instead of the 5% franchise tax on gross gaming revenues, which was embedded within the gaming fees that PAGCOR licensees had been required to pay. The Respondents have not pursued this issue further, and have not noted it in their pleadings.

271. Since the Respondents have adduced no proof supporting these (potential) defences, to the extent that they are a live issue, the Tribunal finds that there is no evidence to support termination of the MSA based on Clause 15.3(b) or Clause 17.

---

[248] Claimants' Exhibit C-37.

## XV.  THE CLAIMANTS' CLAIM THAT RESPONDENTS BREACHED THE MSA BY TERMINATING IT

272.  The Tribunal has rejected all of the Respondents' alleged material breaches of the MSA on which they relied to terminate the MSA, and finds that the Claimants have affirmatively satisfied their burden to prove that the Respondents breached materially the MSA by terminating it without cause.

273.  The Claimants have also argued that the MSA was wrongly terminated because the Respondents did not provide any opportunity to cure the alleged breaches as required by the MSA. The Respondents' contention is that those breaches were incurable. Given the Tribunal's conclusion on the termination of the MSA, the Tribunal does not need to consider whether the Respondents granted GGAM a cure period.

## XVI. LEGALITY OR PROPRIETY OF THE TERMINATION OF THE MSA: PRIOR CONFIRMATION OF THE TERMINATION BY AN ARBITRAL TRIBUNAL

### A. Claimants' Arguments

274. The Claimants submit that, under Philippine law, "*a party may not unilaterally rescind or terminate the contract for whatever cause without first resorting to arbitration… When an arbitration clause in a contract is availing, neither of the parties can unilaterally treat the contract as rescinded since whatever infraction or breaches by a party or differences arising from the contract must be brought first and resolved by arbitration, and not through extrajudicial rescission or judicial action*"[249].

275. Since the MSA contained an arbitration clause (Clause 19.2) and the Respondents terminated the MSA before the resolution of the Parties' dispute by arbitration, the Claimants submit that "*Because Respondents' premature and unlawful implementation of the MSA's termination has prejudiced GGAM and prevented GGAM from continuing its performance under the contract, Respondents are liable to GGAM for the forfeited management fees it would have received in the interim*"[250].

### B. Respondents' Arguments

276. The Respondents submit that Clause 19.1 of the MSA provides that "*any dispute*" may be settled by arbitration, including disputes regarding the contract breach or propriety of termination[251].

277. Further, if the Parties intended for termination to be effectuated only after the determination of an arbitral tribunal, then the Parties could have specified as much in the MSA. They did not, and the Claimants "*should not be permitted now to insert extra-contractual language inconsistent with the Parties' agreement*"[252].

---

[249] SOC at para. 204; *Korea Techs. v. Lerma*, G.R. No. 143581, January 27, 2008 ("**Korea Techs**").
[250] SOC at para. 205.
[251] Defense at para. 134.
[252] *Ibid*.

**C.   Analysis of the Tribunal**

278. In light of the Tribunal's findings that the Claimants did not breach the MSA and that the Respondents had no valid grounds for termination, it is not necessary for the Tribunal to make a determination on this point.

**XVII. WHETHER THE RESPONDENTS FAILED TO PAY GGAM ITS MANAGEMENT SERVICE FEES AND THEREBY BREACHED CLAUSES 3.4 AND 4 OF THE MSA**

279. Clause 3.4 of the MSA provides as follows.

> "*3. OBLIGATIONS OF THE OWNERS*
>
> …
>
> *3.4 Payment*
>
> *The Owners shall pay the GGAM Fees in accordance with Clause 4. The obligations of the Owners to pay the GGAM Fees shall be joint and several.*"

280. Clause 4 of the MSA provides a schedule of fees, which can be summarized as follows:

(a) The Owners shall pay to GGAM a "*Development Fee*" of USD 100,000 per month from the execution of the MSA to the Start Date of the Solaire.

(b) The Owners shall pay to GGAM a base "*Pre-Opening Operations Fee*" of USD 75,000 per month from the execution of the MSA to the Start Date of the Solaire.

(c) The Owners shall pay to GGAM an "*Annual Base Fee*" of USD 100,000 per month.

(d) The Owners shall pay to GGAM certain "*EBITDA-based Fees*" which are pegged at specific percentages of the EBITDA generated post-opening from the Facilities' different revenue segments (such as the mass market segment and foreign VIP players).

**A. Claimants' Arguments**

281. Under Clause 3.4 of the MSA, the Respondents are required to pay GGAM management service fees in accordance with Clause 4. The management fee structure of this clause has been summarized above.

282. The Claimants submit that, "*as a result of Respondents' wrongful termination, GGAM has been deprived of its management service fees under the MSA*"[253]. These fees include: (1) fees for the period between March 16 to September 12, 2013, which represent the start of commercial operations of the Facilities through the date of Respondents' wrongful termination of the MSA, and (2) fees that GGAM expected to earn for the period after September 12, 2013 and over the course of the entire ten-year term of the MSA, but for Respondents' wrongful termination.

283. The Claimants further submit that "*in addition to the amount of fees for the period from March 16, 2013 to September 12, 2013, but for Respondents' wrongful termination of the MSA, GGAM would have earned fees over the course of the 10-year term of the MSA*", and are claiming "*the combined fees for Base Fee EBITDA, Local VIP EBITDA, and Foreign VIP EBITDA, for the period from September 13, 2013 to March 15, 2023, in an amount to be determined at a final hearing in this matter*"[254].

284. The Claimants' legal case for the recovery of <u>all</u> the management fees owed to it had the Respondents not terminated the MSA is set out in the following paragraphs.

285. The Claimants characterize the management fees as "*lost profits*"[255]. The Claimants submit that the legal doctrine of *lucrum cessans* (*"the recovery of lost profits"*) is a "*standard remedy for a breach of contract under the Philippine Code and case law*"[256].

286. The Claimants also submit that their "*right to recover lost profits for a breach of contract is well-established under international law*", citing as an example the UNIDROIT Principles 2010[257]. In *So v. Food Fest, Inc.*, G.R. Nos. 183628 & 183670 (S.C., Feb. 9, 2011) ("**Food Fest**"), the Supreme Court of the Philippines explained that "*[i]f there exists a basis for a reasonable expectation that profits would have continued to be generated had there been no breach of contract, indemnification for damages based on such expected profits is proper*"[258].

---

[253] SOC at para. 207.
[254] SOC at para. 210.
[255] Reply at para. 126.
[256] Reply at para. 126; § 2200 Philippine Civil Code; *Titan-Ikeda Construction & Development Corp. v. Primetown Property Group, Inc.*, G.R. No. 158768 (S.C., Feb. 12, 2008) ("**Titan-Ikeda**").
[257] *Ibid*.
[258] *Ibid*. at footnote 351.

287. The Claimants submit that this means GGAM need only have a reasonable expectation that future management fees would have continued to be generated[259] and that on the facts, "*GGAM had a reasonable expectation that it would earn the Management Fees for the MSA's full ten-year term, had Respondents not wrongfully terminated the MSA*"[260].

288. In the circumstances, GGAM submits that the "*lost profits*" in this case are the full amount of management fees which would have been earned pursuant to the schedule of fees in Clause 4 of the MSA, without any further expected costs, since "*Management Fees are calculated based on EBITDA*", under which the "*costs for operated Solaire are deducted from revenue before calculating Management Fees*"[261].

289. The Claimants support the submission in the paragraph above, as well as their claim for "*lost profits*" generally, by submitting that the compensation structure was "*backloaded*"; GGAM was paid "*only US$175,000 per month before Solaire's Opening*", and "*[i]n turn, the Parties understood that GGAM would be paid considerably more after Solaire's Opening through the Management Fees*"[262]. According to the Claimants, "*[s]tanding alone, the Pre-Opening Fee and Development Fee were not full compensation for the two years of the preceding work: the work was essential to setting up the Solaire for success and those fees were never contemplated to be the full compensation for GGAM's services*"[263].

## B. Respondents' Arguments

290. The Respondents appear to deny – implicitly – the Claimants' alleged reasonable expectation that they were to be paid the full amount of Management Fees, and submit that the Claimants were already "*compensated*" for their contributions prior to the opening of the Solaire: "*[a]lthough GGAM is careful not to acknowledge this expressly --GGAM was paid more than **US$ 3.7 million** in pre-opening and development fees for their services*"[264]. Furthermore, the

---

[259] *Ibid.*
[260] Reply at para. 127.
[261] Reply at para. 128.
[262] Reply at para. 130.
[263] *Ibid.*
[264] Defense at para. 175 (emphasis in original).

Respondents contend that the Equity Option was intended as compensation for the management services under the MSA.

## C.  Analysis of the Tribunal

291.  The Tribunal has already established that the Respondents had no legitimate contractual basis for terminating the MSA and has upheld the claim of the Claimants that the Respondents wrongly terminated the MSA. Therefore, the failure to pay fees due under the MSA until its termination by the Respondents is in breach of the Respondents' obligation to pay such fees. The Tribunal does not now make a finding in respect of the amount of the fees due under the MSA before or after the MSA's termination or in respect of the Claimants' claim for *lucrum cessans*. These matters will be considered as part of the next phase of this arbitration (the "**Remedies Phase**").

# XVIII. THE CLAIM THAT THE RESPONDENTS MADE FALSE AND DEFAMATORY STATEMENTS ABOUT THE CLAIMANTS AND/OR THE ALLEGED BREACHES OF CLAUSE 14.2 AND 18.9 OF THE MSA

## A. Claimants' Arguments

292. The Claimants submit that the Respondents had made the following defamatory statements (among others) (collectively, the "**Allegedly Defamatory Statements**") about the Claimants:

   (a) "*[GGAM] turned out to be a very expensive, glorified executive-search firm,' Razon said*"[265].

   (b) "*Ricky [Razon] said the Las Vegas management group had turned out to be nothing more than an expensive and glorified search team, disclosing that CEO Bill Weidner (the former president of Las Vegas Sands Corp.) visited the casino and resort complex only once – during the opening day in March*"[266].

   (c) "*For Solaire's nine and a half months of operations, the loss was nearly US$6 million. Bloomberry blamed the red ink largely on 'mistakes and inefficiencies' by consultant Global Gaming Asset Management (GGAM), headed by former Las Vegas Sands president and chief operating officer William Weidner*"[267].

   (d) The Claimants failed to spend "*any material time in attending to the management of Solaire*" and to its "*obligations and deliverables under the MSA*"[268].

293. The Claimants explain that these statements were made "*as early as September 12, 2013, through various media outlets and to the Philippine Stock Exchange*"", and claim that they have caused "*GGAM economic harm beyond the loss of the agreed fees under the MSA*". According to the Claimants, these statements:

---

[265] SOC at para. 159; Claimants' Exhibit C-108.
[266] SOC at para. 159; Claimants' Exhibit C-109.
[267] SOC at para. 159; Claimants' Exhibit C-110.
[268] SOC at paras. 11.

(a)    Violated the MSA, and were intended to harm the reputation of GGAM and its principals, William Weidner, Bradley Stone, and Garry Saunders[269].

(b)    Violated Clause 14.2 of the MSA, which prohibits the disclosure of any information, for purposes unconnected with the MSA, which "*by its nature or may be marked to be confidential concerning the other party, the Project Agreements, or the Facilities (including information concerning the costs of operation or the business situation or financial condition of the other party)*"[270].

(c)    Violated Clause 18.9 of the MSA, which requires the Respondents to consult with GGAM "*on all press releases containing previously non-public information relating to the Facilities*" and requires that "*neither Party shall issue such a press release without the prior written approval of the other Party*"[271].

(d)    Are false because: (i) GGAM "*spent significant time and effort performing its responsibilities under the MSA, both inside and outside the Philippines, including recovering the Project, ensuring the timely Opening of Solaire, recruiting a world-class management team, assisting in the preparation and delivery of a comprehensive Business Plan, including targeted marketing plans, and establishing numerous other operating policies, systems, and procedures necessary for the operation of the Facilities*""; and (ii) GGAM also "*spent a significant amount of time on site at Solaire. On these days, GGAM's management principals walked the Facilities; conducted in-person reviews of the Facilities and operations; met with the Management Team and the Owners' representatives, including Mr. Razon, to discuss the operational status of the Facilities and any necessary adjustments; and attended EXCOMM meetings. When not on site, GGAM communicated frequently with the Management Team via telephone, e-mail, and Skype*"[272].

---

[269] SOC at para. 231.
[270] SOC at para. 233.
[271] *Ibid*.
[272] SOC at paras. 235 – 236.

### B.   Respondents' Arguments

294. The Respondents deny that the allegedly defamatory statements are false, since they say the Claimants did in fact breach their obligations under the MSA[273].

295. Further, the Respondents submit that, in any event, their statements were justified:

(a) In respect of statements made to the Philippine Stock Exchange ("**PSE**"), Bloomberry was required by the PSE to make a prompt disclosure of this event. Notably, the PSE Disclosure Rules require prompt disclosure not only of the removal of senior management, but also of the reasons for such removal[274]. Therefore, the Respondents did not violate Clause 14.2 (governing confidentiality) of the MSA since Clause 14.2 provides, in pertinent part, as follows:

> "… Notwithstanding the foregoing, the Receiving Party may disclose *such confidential information (i) as required by law or by the court of any competent jurisdiction or by an [sic] government or regulatory body having jurisdiction over the Receiving Party including gaming, tax, financial regulators…*"

(b) In respect of the other statements, under Philippine law, statements made in self-defense or with respect to a mutual controversy are not considered libelous. In particular, "*an expression of opinion by one affected by the act of another and based on actual fact is not libelous*"[275].

(c) With regard to the statements attributed to Mr. Razon, these statements were "*expressions of his opinion arising from the mutual controversy with GGAM*". They were merely made as an incident to the questions surrounding the Respondents and the termination of the MSA.

---

[273] Defense at para. 136.
[274] Defense at para. 135.
[275] Defense at para. 138; Respondents' Exhibit RL-43, Luis B. Reyes, The Revised Penal Code, Book Two (2001) (excerpts) at Art. 353.

### C.  Analysis of the Tribunal

296. To begin with, it appears that the Claimants are, in fact, advancing two different sets of claims on the basis of the various statements and publications cited, although the manner in which these are framed has tended to conflate them.

297. The first is essentially a contractual claim for a breach of Clause 14.2 and 18.9 of the MSA. On this claim, the Tribunal finds that the Claimants have simply not discharged their burden of proof to show that that the particular statements relied on fall within the scope of these clauses and amount to a breach. The Claimants have also not adequately addressed whether these statements are permitted by the contractual exceptions cited by the Respondents.[276] Therefore, the Tribunal is unable to find that the Respondents have breached Clauses 14.2 and/or 18.9 of the MSA.

298. The second claim is essentially one for defamation or its equivalent under Philippine law. In this regard, the Tribunal observes that it has received precious little assistance from either party regarding the constituent elements and/or the applicable legal test for defamation under Philippine law. On the final day of the hearing, the Claimants' counsel provided some exegesis on this matter, which is captured in the exchange below.[277]

> "*MR PATRIZIA:  The leading case, as we understand it, on defamation is -- it's actually an interesting case. It's what we in the US would think of as a first amendment case. It's called MVRS Publications v the Islamic Da'wah Council.  GR 135306, 2003 from the Supreme Court, and it said to establish defamation, the claimant must establish by a preponderance of the evidence that there is an imputation of a crime or a vice, defect, real or imaginary, or any act, omission, condition, status or circumstance.  That imputation must be made publicly, it must be malicious, it must be directed at a natural or juridical person and the imputation must tend to cause dishonour, discredit, or contempt of the person defamed.*"

---

[276] See Defense at para. 135.
[277] See Transcript (October 24) at p 59, line 19 to p 60, line 8.

299. If the Tribunal accepts this formulation of the test for defamation under Philippine law, then the Claimants must establish "*by a preponderance of the evidence that there is an imputation of a crime or a vice, defect, real or imaginary, or any act, omission, condition, status or circumstance*" and that the imputation in question was made publicly, was malicious, was directed at a natural or juridical person and must "*tend to cause dishonour, discredit, or contempt of the person defamed*".  These elements have not been established.

300. Accordingly, the Tribunal finds that the Claimants have not discharged their burden to prove defamation on the basis of the statements relied upon. In particular, the Tribunal is not satisfied that there is a 'preponderance of evidence' to show that the statements were made maliciously, especially in the context of the ongoing disputes between the Parties. The Claimants' counsel accepted that malice was a requisite part of a claim for defamation under Philippine law[278].

301. Much of the Claimants' case on malice hinged on an email from Mr. Razon on July 12, 2013, which the Claimants characterize as "*an email stating their intent to defame GGAM as a negotiating tactic.*"[279] The contents of the email[280] are set out in full below:

> "*Attached is our letter to GGAM, as yet unsigned, clearly outlining the facts and issues that have accumulated over the last few months regarding GGAM''s execution of the MSA, of which we have come to the firm conclusion has failed. I am very much aware of the sensitive nature of this kind of process and I strongly believe that an amicable parting of ways between us is in everyone's interest. I have not signed the letter as this would qualify as a major event and trigger disclosure and I am also conscious that you are trying to build a business in Gaming management and may not welcome the publicity that would accompany such a disclosure.*"

302. Nothing in this email would allow a rational observer to conclude that Mr. Razon was threatening "*to use the destruction of GGAM's reputation as a negotiating tactic*"[281] or that there was a malicious intent to defame generally.

---

[278] See Transcript (October 24) at p 59, lines 13 to 14.
[279] Reply at para. 258.
[280] See Claimants' Exhibit C-96.
[281] Reply at para. 258.

303. This alone is sufficient to dispose of the Claimants' claims for defamation but the Tribunal also notes that:

(a) The mere act of setting out one's position in the context (or 'heat') of a dispute, even if done vigorously, cannot be sufficient to constitute malice, especially when (as in this case) the evidence suggests that the maker believed in the accuracy of the impugned statements at the time they were made;

(b) The Claimants failed to properly address the effect of the Philippine Stock Exchange's disclosure requirements on their claims for defamation; and

(c) The Claimants did not adduce any convincing evidence to show that the impugned statements tended to "*cause dishonour, discredit, or contempt*" of the Claimants.

XIX. **WHETHER THE RESPONDENTS ARE ENTITLED TO RESOLUTION OR ANNULMENT OF THE MSA, INCLUDING THE EQUITY OPTION AND THE EOA UNDER PHILIPPINE LAW**

304. It is common ground between the Parties that "*rescission or resolution of a contract is available for "substantial and fundamental violations" of the contract that would "defeat the very object of the parties in making the agreement*"[282]. In other words, rescission or resolution of the MSA can occur if there are "*substantial and fundamental violations*" of the MSA.

305. The Tribunal has determined that GGAM did not commit causal fraud and did not breach the terms of the MSA.  The Tribunal further finds that the grounds for termination of the MSA adduced by the Respondents do not qualify as material or "substantial and fundamental" violations of the MSA that would justify rescission or annulment of the MSA. Since the Respondents' arguments about the Equity Option and the EOA are based on rescission or annulment of the MSA and there are no legal bases for rescinding or annulling the Equity Option granted in the MSA and the EOA, there is equally no basis to require GGAM to return the Shares.

306. The Tribunal will turn next to the question of whether the Shares should be returned on grounds of unjust enrichment.

---

[282] Rejoinder at para. 222; Reply at para. 121 citing *Spouses Viloria v. Continental Airlines, Inc.*, G.R. No. 188288, January 16, 2012 ("***Viloria***") which provides that "*rescission of a contract will not be permitted for a slight or causal breach, but only for substantial and fundamental violations as would defeat the very object of the parties in making the agreement*".

## XX.  RESPONDENTS' CLAIM OF UNJUST ENRICHMENT

### A.  Respondents' Arguments

307. According to the Respondents, unjust enrichment exists "*when a person unjustly retains a benefit to the loss of another, or when a person retains money or property of another against the fundamental principles of justice, equity, and good conscience*"[283].

308. The Respondents further submit that a claim for restitution based on unjust enrichment "*requires two conditions: (1) a person is benefitted without a valid basis or justification and (2) such benefit is derived at the expense of another*"[284].

309. The Respondents' factual case is that GGAM "*not only failed to render the required services under the MSA, but also misrepresented what GGAM, as a management company, not an investment vehicle, was able to offer Bloomberry and Sureste, equitable principles necessitate that GGAM should not retain the value of the option*"[285].

310. On the assumption that GGAM breached the MSA, the Respondents' Philippine law expert Mr. Justice Vitug opined:

> "... *whether or not such breach produces rescission under Article 1191 of the Civil Code or mere contractual termination, the return of the Shares, whether in full or partial, may be ordered by the Tribunal in consideration of equity... If the Tribunal finds that such services were not rendered in accordance with the MSA, then an equitable return of the Shares may be ordered in exercise of its equity jurisdiction. As held in Reyes v Lim (G.R. No. 134241, 11 August 2003)...*"[286]

---

[283] Rejoinder at para. 227 citing Vitug Supplemental Opinion at para. 38.

[284] Defense at para. 182; Vitug Opinion at para. 64, citing *Republic v. Court of Appeals*, G.R. No. 160379, August 14, 2009, 596 SCRA 57 ("**Republic**"), *Benguet Corporation v. Department of Environment and Natural Resources-Mines Adjudication Board*, G.R. No. 163101, February 13, 2008, 545 SCRA ("**Benguet**") and *Cool Car Philippines, Inc. v. Ushio Realty and Development Corporation*, G.R. No. 138088, January 23, 2006, 479 SCRA 404 ("**Cool Car**").

[285] Defense at para. 183.

[286] Vitug Opinion at para. 62.

311. The Respondents also point to the following facts to establish the benefits received by GGAM "*without valid justification*"[287].

    (a)    The Shares were trading between PHP 8.28 to PHP l5.82. Thus, GGAM has already earned a book gain of about PHP 8.2 billion (or nearly US$ 200 million) after walking away from the partnership merely six months after the Solaire opened, and failing to deliver on its many promises and obligations.

    (b)    Such compensation would be beyond extreme in any context, given the Parties' agreement, the Respondents unrealized expectations, and the minimal work performed by GGAM.

    (c)    These circumstances mean that "*it would be unjust to allow GGAM to sell the Shares and enrich itself at Bloomberry's expense*".

## B.   Claimants' Arguments

312. The Claimants submit that, under Philippine law and on the basis of Justice Feliciano's legal opinion, unjust enrichment is only applicable in situations in which there is no express contract between the parties. Accordingly, the Respondents cannot succeed in their claim for unjust enrichment given the uncontroverted existence of a written agreement that established the Parties' relationship[288].

313. The salient parts of Justice Feliciano's Opinion are reproduced below[289]:

    "*79. For an action for recovery of what has been paid without just cause… the following conditions must concur: (i) the defendant has been enriched; (ii) the plaintiff has suffered a loss; (iii) the enrichment of the defendant is without just or legal ground; and (iv) the plaintiff has no other action or process available to him based on contract, quasi-contract, crime, or quasi-delict*[290].*

    …*

---

[287] Defense at para. 184.
[288] Reply at paras. 20 and 123; Feliciano Opinion at paras. 73 – 80.
[289] Feliciano Opinion at paras. 79 – 85.
[290] Citing *Shinryo (Philippines) Company, Inc. v RRN Incorporated*, G.R. No. 172525, October 20, 2010.

*81. As a general proposition, I respectfully submit that the principle of unjust enrichment finds application only in situations where there is no contract expressly entered into by the parties. Where there is a contract, which governs the rights and obligations of the parties, as in this case, the equitable remedy of unjust enrichment is not applicable.*

*82. Even assuming that the equitable remedy might be available, it should be noted that [the Respondents' have not shown that all the prerequisites necessary to sustain a claim for unjust enrichment are present.*

*83. There has been no enrichment of GGAM and no corollary loss on the part of [the Respondents] under the EOA because the transfer of the shares in BRC has been perfected and completed in accordance with the terms of the EOA Based on the pleadings of both parties, I understand that it is established fact that the purchase price for the BRC shares amounting to approximately US$37 million has been fully paid as of December 2012. GGAM, therefore, retains no benefit for which it has not paid.*

*...*

*85. ... The compensation for services rendered by GGAM under the MSA is clearly set out in Clause 4 thereof. The compensation includes development fee, pre-opening fee, annual base fee, local VIP fee, and foreign VIP fee. ON the other hand, the option is set out in Clause 18.3 of the MSA; a close scrutiny of Clause 18.3 does not show any intention of the parties to have the shares subject of the option considered as part of the compensation or to have such option subject to GGAM's performance of tis MSA obligations.*"

## C.   Analysis of the Tribunal

314.  Article 22 of the Philippine Civil Code provides as follows:

*"Every person who through an act of performance by another, or any other means, acquires or comes into possession of something at the expense of the latter without just or legal ground shall return the same to him.*"

315.  The opinions of the two distinguished former Philippine justices diverge on the basic question of whether unjust enrichment applies in the case of an existing

contract. Given the determination of the Tribunal that the Claimants did not breach the MSA, it is of no consequence to follow either line of argument.

316. Indeed, if the remedy of unjust enrichment does not apply in the context of a contractual relationship, then the claim of the Respondents should be rejected for this reason alone. On the other hand, if unjust enrichment is applicable in a contractual relationship, then it will depend on whether the contract has been breached. Judge Vitug's opinion hinges on the assumption that there has been a breach of the MSA. Since the Tribunal has determined that the Claimants did not breach the MSA and has found that the Claimants did not make any misrepresentations, then there is no basis for a claim for unjust enrichment. Thus, the Tribunal finds that there is no basis for the Respondents to recover any amounts from the Claimants based on unjust enrichment.

## XXI.   DISCLOSURE OF THE LIABILITY AWARD

317.   The Claimants have requested that the Tribunal determine that the final award[291] be made public in order for Claimants "*to vindicate their right to respond to the continuing effects of Respondents' defamatory statements*"[292]. In their Closing Argument at the Liability Hearing the Claimants also requested the Tribunal to "*allow GGAM to provide a copy of the award to the Philippine courts, government authorities and any person involved in an opportunity to sell the shares, so that GGAM can demonstrate conclusively that there is no cloud on its title to the shares and its right to sell them*"[293].

318.   The Respondents have not specifically addressed the disclosure request as set forth by the Claimants in their Closing Statement.

319.   The Tribunal has rejected the Claimants' defamation claim, which was the basis for the Claimants' request in their Reply to make this Liability Award public. Therefore, there is no justification for the Tribunal to grant this request on grounds of defamation by the Respondents.

320.   However, the Claimants' request made at the Liability Hearing is more limited and is unrelated to the defamation claim; it relates to the validity of GGAM's title to the shares. Because this request was made at the closing of the Liability Hearing and the Respondents have not had an opportunity to address it, the Tribunal reserves this matter for further order, after the Liability Award.

---

[291] This request was made before the bifurcation of the proceedings.
[292] Reply at para. 266(4)(d).
[293] Claimants' Closing Argument at Slide 204. See also the Claimants' Opening Statement at Slide 166.

## XXII. RESPONDENTS' CONCERNS ON PROCEDURAL EQUALITY AND BALANCE

321. At the closing of the Liability Hearing, Counsel for the Respondents stated:

> "[...]we have been quite concerned in this proceeding and we made quite some record of it, which again I just don't think it's appropriate to rehearse right now, of the manner in which, in particular among other things, evidence has come in, to our mind, very much out of sequence, very much out of the procedure established by the tribunal.
>
> Immediately before these hearings, there was a simply overwhelming and wildly-improper submission of what was a complete re-do, a complete third round, and frankly, as we told the tribunal, in our judgment, completely destroyed the order and appropriate development of written evidence.
>
> As you've seen, we have been really unable to deal with that material in the way that I think our client has the right to expect us to do. I don't want to belabor that.
>
> There were earlier applications which, very unfortunately, required the tribunal to bifurcate these proceedings, multiplying expense quite considerably, and also as part of our applications, we were quite concerned about other aspects of those submissions.
>
> But again, I won't go on, but I must say that in this case, I really do have to be quite ample in saying that I, with no disrespect to the efforts that the tribunal has made to deal with this, we have been confronted with endless attempts to upset the procedural balance and equality of these proceedings, and I must say that I think they have had that effect."[294]

322. Given the generality of these remarks and in order for the Tribunal to assess their significance, on November 6, 2015, the Tribunal invited the Respondents to advise the Tribunal of "*your complaints in detail and what, if anything, you are requesting the Tribunal to do.*"

323. The voluminous ensuing correspondence of the Parties, the related Procedural Order No. 14, and further correspondence of the Respondents are described in the Annex to this Liability Award. The Tribunal addresses the Respondents' concerns in said Annex, which is an integral part of this Liability Award.

---

[294] Transcript (October 24) at p 202, line 13 to p 203, line 18.

## XXIII.  OTHER MATTERS

324. The Tribunal reserves its decision on the following matters:

(a)  The Claimants' request that the Tribunal "*[s]pecifically allow GGAM to provide a copy of the award to the Philippine courts, government authorities and any person involved in an opportunity to sell the shares, so that GGAM can demonstrate conclusively that there is no cloud on its title to the shares and its right to sell them*"[295]; and

(b)  The Claimants' request that the Tribunal "*direct Respondents to inform Deutsche Bank AG that Respondents and Bloomberry Resorts Corporation have no objection to the immediate release of all dividends paid by Bloomberry Resorts Corporation for the account of the Claimant Global Gaming Philippines LLC*"[296].

325. The Tribunal will issue its directions for the determination of the matters outlined above separately from this Liability Award.

---

[295] Claimants' Closing Argument at Slide 204.
[296] Claimants' Daniel Weiner's Email dated May 4, 2016.

## XXIV.  RELIEF AND REMEDIES

326. The Tribunal reserves its decision on the Parties' respective claims for relief and remedies which will be determined in the Remedies Phase, in accordance with the order for bifurcation in Procedural Order No. 11 dated August 12, 2015. The Tribunal will issue its directions for the Remedies Phase separately from this Liability Award.

327. The Claimants, in their Closing Argument, requested that the Tribunal find the MSA to be "*enforceable.*"[297] The Tribunal is unsure as to what this request entails. It might suggest that the MSA be treated as continuing but that would appear to be inconsistent with the Claimants' requests for relief in their SOC[298] and Reply[299], which suggest that the MSA be treated as being at an end. In any case, the Tribunal reserves this question to the Remedies Phase, especially since it is a question that is inextricably linked to the question of remedies.

328. The Tribunal also reserves to the Remedies Phase its decision on the Claimants' request that the "*Respondents, having obtained an injunction to prevent the sale of the shares, and having hindered and blocked the sale of the shares after the Tribunal's order, are liable in damages in an amount to be determined in a later hearing*"[300]. The Tribunal notes that this issue involves both a question of liability (i.e. whether the Claimants "*hindered and blocked the sale of the shares after the Tribunal's order*") and, in the event that liability is established, any appropriate remedies to be ordered.

---

[297] Claimants' Closing Argument at Slide 202.
[298] At para. 239.
[299] At para. 266.
[300] Claimants' Closing Argument at Slide 203.

## XXV. COSTS

329. The Claimants and the Respondents have respectively pleaded that the Tribunal award them reasonable attorneys' fees, costs and expenses, their share of the fees and costs paid to the Tribunal and all other fees and expenses incurred in connection with this proceeding.

330. The Tribunal reserves its decision on costs until the next phase of the proceedings.

## XXVI.  DECISION

For the reasons set forth above, the Tribunal has decided:

1. That there was no causal fraud or misrepresentation by the Claimants in relation to the MSA.

2. That the Respondents have not substantiated their claim that the MSA is voidable on the basis of Article 1331 of the Philippine Civil Code.

3. That the Respondents' termination of the MSA was not justified, and thus constitutes a breach of the MSA.

4. That the Respondents had no basis to rescind or annul the MSA.

5. That there is no basis on which to rescind the EOA or to require the return of the shares.

6. To reject the Respondents' claim that GGAM would be unjustly enriched if permitted to sell the Shares.

7. That there is no basis for the Respondents to challenge GGAM's title to the Shares in BRC on the grounds pleaded, and thus GGAM can exercise its rights in relation to the Shares, including the right to sell them.

8. That the Respondents breached the MSA and are liable for the management fees in an amount to be determined in the Remedies Phase.

9. To reject the claim that the Respondents have defamed GGAM and breached Clauses 14.2 and 18.9 of the MSA.

10. To reserve its decisions on the matters outlined in paragraph 324 above.

11. To reserve its decisions on relief, remedies and costs to the Remedies Phase (as well as the question of whether there is any difference between the respective rights and liabilities of each of the Claimants and/or the Respondents).

12. Except as reserved and decided above, all other claims and counterclaims are dismissed.

13. To consult the Parties on the organization of the Remedies Phase.

Made in Singapore on this 20ᵗʰ day of SEPTEMBER   2016 .


_____
Mr R Doak Bishop, *Esq.*
Arbitrator


_____
Mr Michael Hwang *S.C.*
Arbitrator


_____
Dr. Andrés Rigo Sureda
Presiding Arbitrator

**ANNEX TO THE AWARD ON LIABILITY: RESPONDENTS' CONCERNS ON PROCEDURAL FAIRNESS AND EQUALITY**

1.  In their Letter to the Tribunal dated November 20, 2015 captioned "*Respondents' Concerns Regarding Procedural Fairness and Equality of this Arbitration*" (the "**November 20 Letter**"), the Respondents took up the Tribunal's invitation to elaborate on their oral remarks described in paragraph 321 above and did so under the following four headings:

    (a)  "*Claimants' manipulation of the document disclosure process deprived Bloomberry of its due process right to present its defence in the Liability Phase of the arbitration*".

    (b)  "*Claimant's continued leveraging of the procedural schedule resulted in a proceeding that disregarded Bloomberry's basic due process rights to be heard and to present its defence*".

    (c)  "*Claimants improper interim measures request expedited the Tribunal's consideration of the merits of the case, on an incomplete and distorted record, resulting in preconceived notions of Bloomberry's positions and counterclaims before Bloomberry had the opportunity to put forward its case*".

    (d)  "*The Tribunal issued an Interim Measures Order in disregard and violation of the procedures it had established and to which the Parties agreed*".

2.  Apart from the allegations/submissions the Respondents made under the four broad headings above, they made only two requests for relief, as follows[301]:

    (a)  "*In light of the fact that the Tribunal has not yet closed the record, Bloomberry respectfully reiterates its request for appointment of a special master and/or in camera review of the disputed documents*" (the "**First Request**"); and

    (b)  "*Bloomberry also respectfully requests the opportunity to propound document requests related to Claimants' damages claims*" (the "**Second Request**").

---

[301] See p 18 of the November 20 Letter.

3.  At the Tribunal's invitation, the Claimants responded to the Respondents' November 20 Letter by their Letter to the Tribunal dated December 1, 2015 (the "**December 1 Letter**"). Apart from responding to the various statements/submissions, the Claimants submitted that the Respondents' First and Second Requests should be denied.

4.  In Procedural Order No. 14 dated December 12, 2015 ("**PO 14**"), the Tribunal made the following directions in response to the Respondents' November 20 Letter and the Claimants' December 1 Letter:

    (a) The Tribunal would address the allegations made by the Respondents, to the extent that they refer to the Tribunal, in the Liability Award;

    (b) The Tribunal dismissed the Respondents' First Request; and

    (c) With regard to the Second Request, in the event that the Tribunal were to find against the Respondents in the Liability Award, the Tribunal would consult with the Parties on the appropriate directions for the Remedies Phase of the proceedings.

5.  On December 14, 2015, the Respondents made further (unsolicited) submissions to the Tribunal by way of email (the "**December 14 Email**"). The Respondents submitted that, contrary to the Tribunal's indications in PO 14:

    (a) The Tribunal had previously found that the Respondents' document requests were relevant and material to the outcome of this arbitration (in its Decision on Respondents' Document Requests dated February 16, 2015); and

    (b) The IBA Rules 2010 "*specifically contemplate the appointment of a special master*" under Rule 3(8).

6.  On December 28, 2015, the Tribunal wrote to both Parties by email to indicate that it had taken note of the Respondents' December 14 Email and would address the matters raised in the Liability Award.

7.  The Tribunal now addresses each of the Respondents' allegations/submissions that they advanced in their November 20 Letter and December 14 Email, in so

far as they have not been addressed already by the Tribunal during the course of these proceedings.

**A.**   **"*Claimants' manipulation of the document disclosure process deprived Bloomberry of its due process right to present its defence in the Liability Phase of the arbitration*"**

8.   The Respondents made several allegations under this heading, most of which broadly relate to the document disclosure process in this arbitration:

   (a)   That the "*Claimants engaged in a massive fishing expedition, propounding more than 170 document requests*", of which the "*Tribunal rejected (or Claimants withdrew) more than half of their improper requests*".

   (b)   That the Claimants "*withheld their privilege log for 6 weeks, frustrating the timetable*" and when they did produce the privilege log, it was "*rife with deficiencies*" and produced "*at the last possible moment at which Claimants could obtain maximum advantage in the briefing schedule*".

   (c)   That the Tribunal "*determined that the procedural schedule did not allow for appointment of a special master because, at that late date in the proceeding, to do so would have disrupted the hearing schedule*".

   (d)   That the Respondents' expert "*verified that Claimants' privilege designations appear to be improper under U.S. law*".

   (e)   That the "*suppression of critical evidence has prejudiced Bloomberry's right to a fair hearing in the liability phase of the Arbitration*" with its only examples of such prejudice relating to the role/involvement of Cantor.

   (f)   That the Claimants' "*[b]y improperly withholding their damages case until after the conclusion of the document exchange period…have deprived Bloomberry of an opportunity to request documents relevant and material to Claimants' damages claims*".

9.   The Tribunal notes that the bulk of the Respondents' allegations under this heading are directed at the Claimants' conduct and not the Tribunal's application of the relevant law and rules. Nevertheless, the Tribunal has

considered the Respondents' allegations/submissions under this heading in the context of the propriety of the document disclosure process in this arbitration, and specifically the Liability Phase.

10. The Tribunal also notes that the document disclosure process in this arbitration is governed by the IBA Rules 2010[302] read with the relevant provisions of the UNCITRAL Arbitration Rules 2010[303]. The Respondents, however, scarcely attempted to ground their allegations/submissions on the relevant provisions of the applicable rules.

11. In respect of the objection at paragraph 8(a) above, the Tribunal duly applied Article 3 of the IBA Rules 2010, which produced a result (where "*more than half*" of the Claimants' requests were refused or withdrawn) and with which the Respondents seemed broadly satisfied. Indeed, after the Tribunal issued its decisions on the Claimants' First Redfern Schedule on February 16, 2015, the Respondents did not raise any objections to the Tribunal's decisions on the Claimants' requests until its November 20 Letter.

12. In respect of the objection at paragraph 8(b) above, the Tribunal notes that the first and only time the Respondents raised the issue (before the November 20 Letter) was by their counsel's email of April 7, 2015. The Claimants then produced their privilege log on April 10, 2015. Moreover, the Respondents were not prejudiced in their procedural rights since (a) they were afforded more than four months thereafter to file their Rejoinder on Liability and (b) in any case, the documents on the privilege log and the issues to which they were alleged to be related were held not to be relevant and material to the outcome of the dispute[304].

13. In respect of the objection at paragraph 8(c) above, the Tribunal notes that the IBA Rules 2010 obliges the Tribunal to consider procedural economy in dealing with requests for document production and related evidentiary matters. Further, the procedural schedule was not the sole reason for the Tribunal's decision to refuse the Respondents' requests for the appointment of a "special master". The Tribunal specifically considered the value and utility of such an appointment and weighed it against any procedural inefficiencies. For example, in Procedural Order No. 7 the Tribunal expressly stated that "*the appointment of an expert*

---

[302] See Clause 19.2(g) of the MSA.
[303] See Clause 19.2 of the MSA.
[304] See paras. 16 – 36 on the Privilege Log in the Liability Award above.

*would be of limited value as compared to the procedural delays that may result from such appointment*".

14. At this juncture, it is appropriate to consider the Respondents' most recent request for the appointment of "*a special master and/or in camera review*" of the documents on the Claimants privilege in their November 20 Letter[305], which was refused. In addition to the considerations which it weighed when faced with the earlier request, the Tribunal was additionally satisfied, after having heard the evidence and submissions of the Parties, that the documents on the privilege log and the issues to which they were alleged to have related were not relevant and material to the outcome of the dispute[306]. PO 14 expressly recorded that the Tribunal was "*not persuaded that, regardless of claims of privilege, the documents, if admitted, would be relevant and material to the outcome of the case*". It is also pertinent to note that under Singapore law (as the *lex arbitri*) there is no "special master" or "an *in camera* review" (both terms in the sense known under US law, and presumably the sense that the Respondents intended them to bear when they made their submissions).

15. For the avoidance of doubt, the Tribunal reaffirms that (assuming that Singapore arbitration law permitted a Singapore-seated tribunal to make such appointment or order) it is satisfied that the appointment of a special master and/or an order for *in camera* review was, on each of the occasions that it was requested, not appropriate or warranted in the circumstances of this case.

16. The Tribunal notes, in passing, that the Respondents, in raising its plea for the appointment of a special master or an "*in camera* review", did not consider (a) whether such an appointment or order was permitted and/or customary under the law of the seat i.e. Singapore, and (b) what the concept of a "special master" entailed, given that this appeared to be a procedural mechanism borrowed from American court procedure (when the US is not the seat), with which not all members of the Tribunal were familiar. Neither did the Respondents adequately explain and/or justify its attempt to shoehorn this request under Rule 3(8) of the IBA Rules or Article 29 of the UNCITRAL Rules, apart from referring to these provisions (at a late stage of the proceedings) with little elaboration. Nor did the Respondents provide any useful authorities or literature which supported the utilization of such a mechanism in this case. Nevertheless, the Tribunal

---

[305] Referred to at para. 2(a) above.
[306] See paras. 16 – 36 on the Privilege Log in the Liability Award above.

proceeded to consider these provisions fully and concluded that they were not applicable and/or appropriate in these circumstances.

17. The Tribunal reaffirms that its decision to refuse the Respondents' request for the appointment of a special master, an independent expert or an *in camera* review in respect of the privileged documents ultimately rested on its analysis of the procedural implications of such an order weighed against its potential utility, viewed in light of the Parties' submissions on the relevance and materiality of those documents to the disputed issues in this arbitration.

18. In respect of the objection at paragraph 8(d) above, the Tribunal fully heard and considered the evidence, both written and oral, of the Respondents' expert on U.S. law. That evidence, however, did not assist the Respondents in overcoming the difficulties of establishing the relevance and materiality of the documents on the privilege log.

19. In respect of the objection at paragraph 8(e) above, the Respondents were afforded the opportunity to present their various requests for documents as well as any further or consequential matters flowing from such requests. The Tribunal heard and considered both Parties in respect of each request/application and reached its determination in accordance with the applicable rules. The two examples cited by the Respondents in support of their allegation of a "*suppression of critical evidence*" both relate to "*documents regarding Cantor Fitzgerald*". The Tribunal has determined that this issue is effectively a red herring and does not have either a factual or legal bearing on any of the pleaded grounds advanced by either party[307].

20. At this juncture, it is appropriate to consider the Respondents' further submission in their December 14 Email[308]. The effect of that submission is that the Tribunal's statement in PO 14 that it was not persuaded on the relevance and materiality of the Respondents' document requests in relation to the privilege log contradicted its own earlier finding on relevance and materiality in its decisions on the Respondents' First Redfern Schedule dated February 16, 2015.

21. The Tribunal notes that PO 14 (and the issue of the documents on the privilege log generally) dealt with individual documents rather than the classes of requested documents identified in the Redfern Schedule. By the time of PO 14,

---

[307] See paras. 140 – 148 of the Liability Award above for the Tribunal's findings on Cantor's Role.
[308] See para. 5(a) above.

the Tribunal also had the benefit of various rounds of submissions on this issue as well as the full suite of evidence and oral arguments presented at the Liability Hearing, which led to its conclusion on the relevance and materiality of the documents in PO 14. Therefore, the findings in PO 14 are not contradictory to the Decisions on the Redfern Schedule, but rather, with the benefit of the evidence and submissions of the Parties through the course of the Liability Phase, the Tribunal arrived at a more detailed understanding of the relevance and materiality (or lack of it) of those documents.

22. For completeness, the Tribunal reiterates that, with the benefit of the evidence and submissions presented by the Parties through the full course of the Liability Phase of this arbitration, it has determined that the Respondents have not been able to demonstrate that the documents on the Claimants' privilege log are relevant and material[309].

23. In respect of the objection at paragraph 8(f) above, the Tribunal notes that substantially the same grounds were relied upon in support of the Respondents request for bifurcation, which the Respondents submitted "*would maintain the present procedural calendar with respect to briefing on liability and the October hearing without imposing on Bloomberry the additional burden to respond to Claimants' new quantum arguments and evidence on a truncated timeframe*"[310]. In their further submissions on bifurcation in their letter dated August 5, 2015, the Respondents stated that "*Bloomberry...is equally entitled to a fair opportunity prepare its case, **which at this stage can only be accomplished by bifurcation***" [emphasis added]. The request for bifurcation was granted by the Tribunal and the Respondents were also allowed until December 15, 2015 to file their Rejoinder on damages[311].

24. The Tribunal also repeats and reaffirms the directions made in response to the Respondents' request in their November 20 Letter "*to propound document requests related to Claimants' damages claims*" (referenced at paragraph 2(b) above) i.e. that the Tribunal will consult with the Parties on the appropriate directions for the Remedies Phase of this arbitration.

---

[309] See paras. 16 – 36 on the Privilege Log and paras. 140 – 148 on the Tribunal's findings on Cantor's Role in the Liability Award above.
[310] See Respondents' Request for Bifurcation dated July 22, 2015.
[311] See Procedural Order No. 11 dated August 12, 2015 ("**PO 11**").

**B.**   **"*Claimant's continued leveraging of the procedural schedule resulted in a proceeding that disregarded Bloomberry's basic due process rights to be heard and to present its defence*"**

25.   The table below records the actual dates of filing for the respective pleadings:

| Event | Date |
|---|---|
| Claimants' Statement of Claim | September 8, 2014 |
| Respondents' Defense and Counterclaims | December 7, 2014 |
| Respondents' Amended Defense and Counterclaims | February 2, 2015 |
| Claimants' Reply | June 15, 2015 |
| Respondents' Rejoinder | September 4, 2015 |

26.   The Tribunal is satisfied that, taking the circumstances individually and as a whole, the Parties were afforded a fair and reasonable opportunity to present their respective cases and that the procedural timetable for the Liability Phase of this arbitration was in accordance with the applicable rules and the Parties' due process rights.

27.   The Tribunal also notes that the Respondents have not provided any illustrations of how additional time in respect of any one or more of the procedural deadlines above would have made a real difference to any of the pleaded grounds advanced by either party in the Liability Phase of this arbitration.

28.   Further, the substance of the Respondents' protestations is substantially the same as that previously relied upon in support of the Respondents' request for bifurcation[312]. In respect of the bifurcation request, the following points are especially salient:

(a)   The Respondents themselves submitted that bifurcation "*into a liability phase and a quantum phase will enable the Tribunal to maintain the present procedural calendar without depriving Bloomberry of a full and fair opportunity to respond in a meaningful way to Claimants' damages case*". The Respondents expressly prayed that "*Bloomberry's Rejoinder (limited to the merits of Claimants' claims for improper termination of the MSA and to Bloomberry's counterclaims) would be filed on September 4, 2015, and the merits hearing would be held October 15-24, 2015 in Singapore*".

---

[312] See Respondents' Request for Bifurcation dated July 22, 2015 and further submissions in their letter dated August 5, 2015.

(b)     The thrust of the Respondents' bifurcation case was based on the following:

    (i)     Its "*substantial concern that Claimants wholly withheld their **damages case**, including all supporting evidence and expert reports*" until the Reply;

    (ii)    That it was only in the Reply that the "*Claimants first articulated and quantified **damages** and provided any evidence at all in support of these claims*" (emphasis added);

    (iii)   That the "*Claimants raise an entirely new **damages claim***" and "*also articulate the theories underlying their **damages claims** for the first time*" (emphasis added);

    (iv)    That the "*Claimants' **damages case** spans nearly 80 pages (more than half of their "Reply" brief)*" (emphasis added); and

    (v)     The Respondents' position at the time of the request was that "*[i]f bifurcation is denied, Bloomberry will not be able to respond to Claimants' **damages** case*" and that the restoration of its "*fair opportunity prepare its case [sic]*" could "*only be accomplished by bifurcation*" (emphasis added).

29.   By PO 11 the Tribunal granted the Respondents' request for bifurcation and allowed it until December 15, 2015 for the Respondents to file their Rejoinder on damages. Having prayed for this "remedy" in such stark terms in their Request for Bifurcation, the Respondents have not been able to demonstrate the basis for their attempted resurrection of these objections at this stage, especially given that they mostly relate to the Claimants' damages case in their Reply. Further, with the bifurcation of the proceedings and the fresh, separate timelines for the Remedies Phase, the Respondents have not suffered any demonstrated prejudice in respect of the Liability Phase of this arbitration.

30.   In respect of the additional documents filed by both the Claimants and the Respondents, the following records the chronology of material events:

(a)     The Respondents filed their Rejoinder on Liability on September 4, 2015.

(b)    On September 11, 2015, a pre-hearing telephone conference was held. The Claimants suggested responding to any new evidence in the Respondents' Liability Rejoinder by way of direct examination of witnesses during the hearing. The Respondents' rejected this and proposed instead that the Claimants submit "supplemental declarations" of their witnesses. The Parties, in consultation with the Tribunal, eventually agreed to the Respondents' proposal.

(c)    That agreement was memorialized in Procedural Order No. 12 dated September 17, 2015 ("**PO 12**"). The relevant part of paragraph 4 provided that there would be "*No direct examination (other than introduction of the witness or expert), however Claimants may file, no later than October 5, 2015, supplemental declarations related to new evidence submitted by Respondents with the Rejoinder. Cross-examination shall be limited in scope to the witness's declaration*".

(d)    On October 5, 2015, the Claimants filed their supplemental declarations consisting of five witness declarations and two expert reports (the "**Claimants' Supplemental Documents**").

(e)    On October 7, 2015, the Respondents wrote to the Tribunal to state, *inter alia*, the following:

> "*Bloomberry respectfully requests at least that the hearing on the merits be postponed so that it may have some meaningful opportunity to consider and be heard with respect to the massive 11th hour submission that Claimants elected to make. Given that a further hearing is already contemplated with respect to remedies, Bloomberry submits that for the oral proceeding concerning the merits to take place at the same time as the oral proceeding concerning the remedies (which was postponed due to Claimants' tactical withholding and late provision of materials regarding their damages request) so as to lessen to some degree the unfair prejudice to Bloomberry of the procedural imbalance Claimants have created.*
>
> *Should the Tribunal not wish at this point to alter the schedule by ordering a single oral proceeding on both merits and remedies, Bloomberry submits that, at a minimum, the*

*examination of the witnesses and experts who submitted additional statements and exhibits Monday night should not take place during the oral hearing that is to commence next week. Those examinations, at least, should take place during the subsequent oral hearing. This would also mean that Bloomberry's witnesses and experts directly concerned by Claimants' submission of Monday night, and who are to be expected to address the extensive new materials, should be examined at the next evidentiary hearing as well. To do otherwise would be to tolerate serious procedural inequality and deny fundamental fairness to Bloomberry.*"

(f)     On October 9, 2015, the Tribunal issued Procedural Order No. 13 ("**PO 13**") in which it noted that "*the opportunity to file supplemental declarations was in lieu of direct examination opposed by Respondents who wished to avoid surprises at the hearing for which they could not prepare*" and, after considering the arguments of the Parties, rejected the request for postponement.

(g)     On October 13, 2015, the Respondents requested that, "*in light of Claimants' submission of witness statements, expert reports, factual exhibits, and legal authorities", a number of their own additional exhibits (consisting of approximately twenty one documents) should "be included in the record of the Arbitration and also be available for cross and rebuttal*" (the "**Respondents' Supplemental Documents**").

(h)     On October 15, 2015, at the opening of the first day of the Liability Hearing, the Tribunal heard each of the Parties on the other's Supplemental Documents[313]. The Tribunal then issued the following directions[314]:

"*As regards the documents filed recently by respondents, we will take them in the record provisionally, and as we go along and see what use you make of them, we will consider it at the time specifically on each document, what we do as you use it.*"

---

[313] Transcript (October 15) from p 2, line 23 to p 8, lines 1.
[314] Transcript (October 15) from p 91, line 12 –17.

31.  With regard to each of the steps above, the Tribunal heard the submissions of both Parties, considered the principles of equality of treatment in arbitration and the need to afford each party a fair opportunity to be heard, and applied the relevant rules that guided its procedural and evidentiary powers, including IBA Rules 2010 and the UNCITRAL Arbitration Rules 2010 and arrived at this decision accordingly.

32.  In respect of the Claimants' Supplemental Documents, the Respondents suggest that "*[i]t was a denial of fundamental procedural fairness for Bloomberry to be required to address such extensive materials during a single week immediately before an oral hearing was scheduled to begin and without being given the right to put witness testimony.*" The method and deadline for the submission of the Claimants' Supplemental Documents were agreed by the Parties and recorded in paragraph 4 of PO 12. The Respondents then proceeded to file their own Supplemental Documents eight days later, which were provisionally admitted by the Tribunal.

33.  In their November 20 Letter, the Respondents specifically (and only) pointed to the report of Professor Subramanian. The Tribunal considered the report fully but did not find it of substantial assistance in reaching the findings and conclusions on liability in this Liability Award, particularly since Professor Subramanian was opining on US law rather than the governing law of this dispute.

34.  With regard to the Respondents' Supplemental Documents that were provisionally admitted on to the record on the first day of the hearing[315], the Tribunal notes that the Respondents did not refer to any of those documents during the course of the nine-day Liability Hearing.

35.  When considered again with the benefit of hindsight and the submissions of both Parties, the Tribunal affirms that it is satisfied that the decisions and/or directions it made in each of the instances above, when considered individually and cumulatively, were within the bounds of the applicable rules and respected the Parties' due process rights.

36.  In respect of the Respondents' allegation that "*Bloomberry's witnesses were not permitted to testify in response to questions from the Tribunal that would clarify positions put forward by both sides*", the Tribunal has reviewed the transcripts

---

[315] See paragraph 30(h) above.

of the nine-day Liability Hearing and is satisfied that the relevant rules were duly applied and that the Parties were each given a fair opportunity to present its case.

37. The example cited in the Respondents' November 20 Letter[316] simply relates to objections raised by the Claimants which, after consideration, the Tribunal sustained in accordance with the applicable rules.

C. **"*Claimants improper interim measures request expedited the Tribunal's consideration of the merits of the case, on an incomplete and distorted record, resulting in preconceived notions of Bloomberry's positions and counterclaims before Bloomberry had the opportunity to put forward its case*"**

38. The Respondents make several allegations regarding the conduct of the Claimants in relation to the Request for Interim Measures of Protection (the "**Request**") and its purported effect on the Tribunal. At the outset, the Tribunal highlights the following:

(a) As noted in page 19 – 20 of the Claimants' December 1 Letter, the Respondents' submissions relating to the Request were not raised by the Respondents' counsel on the last day of the hearing[317] and were therefore beyond the scope of the Tribunal's directions on matters to be addressed by the Respondents in the November 20 Letter;

(b) Between the issuance of the Tribunal's Order on the Claimants' Request for Interim Measures dated December 9, 2014 (the "**Order**") and the November 20 Letter, the Respondents did not raise any objections on these matters; and

(c) To the Tribunal's knowledge, no challenges against the Order have been made before the Tribunal or the courts of the seat (Singapore).

39. In any case the Tribunal shall address the gist of the Respondents' objections, among which are the following:

---

[316] See pages 8 – 9 of the November 20 Letter.
[317] See paragraph 321 above.

134

(a) That the "*Claimant's sought (and appear to have largely succeeded) to bias and prejudice the Tribunal against Bloomberry by submitting an extensive and overheated interim measures application*";

(b) That the "*Claimants upended the typical arbitral process by presenting the Shares as being disembodied and disconnected from the dispute*";

(c) The "*extremely accelerated, abbreviated, and unbalanced basis on which the Claimants asked this Tribunal to resolve one of the ultimate issues in this Arbitration, out of sequence with the UNCITRAL Rules and before Bloomberry had an opportunity to articulate its counterclaims*";

(d) That the "*period of time in which Bloomberry was required to respond to Claimants' sprawling submission was insufficient to prepare a full response*";

(e) That "*what should have been a preliminary hearing on an interim measures request became a full-blown substantive hearing on the merits*";

(f) That the "*interim measures hearing was replete with Claimants' unsubstantiated factual statements and misleading characterizations that colored the Tribunal's perspective and inaccurately framed the issues in this Arbitration*"; and

(g) That the result of the "*improper application*" was that the "*Arbitration was unmoored from the factual record and the Tribunal, in Bloomberry's view, was improperly inflamed against it at a very early stage*".

40. The relevant procedural timetable concerning the Request is recorded at paragraphs 12 – 23 of the Order. The following points on the timetable are highlighted:

(a) Upon the Respondents' objection that the Request was not an application for interim measures within the meaning Article 26 of the UNCITRAL Rules 2010, both Parties were afforded an opportunity to be fully heard through written submissions on that point. The timelines for these written submissions were agreed between the Parties, in

consultation with the Tribunal, at the teleconference on April 30, 2014[318].

(b)  In respect of the main proceedings on interim measures, the Parties were unable – almost two months after the Request was filed – to agree on a procedural timetable and also disagreed on other related procedural matters. The Tribunal, after considering both Parties' positions and concerns, exercised its case management powers in accordance with Article 17 of the UNCITRAL Rules 2010 to set the appropriate timelines and procedural directions for the Parties' written cases on interim measures[319].

(c)  The Interim Measures Hearing took place from October 20 – 22, 2014, nearly six months after the Request was first filed. The hearing was moved from Singapore to Washington D.C. to accommodate the Respondents' counsel[320].

41.  The Tribunal affirms that the Parties were afforded a fair, and in fact ample, opportunity to be heard on the matter of interim measures. The Tribunal also notes that beyond its bare statements of an "*expedited*", "*extremely accelerated*" and "*truncated*" timetable, the Respondents' November 20 Letter did not identify any specific basis which would have warranted more time for the Respondents. It is also unclear what (if anything) more time would have enabled the Respondents to do, which could have had a real and/or material bearing on the Tribunal determinations on the issues raised by the Request.

42.  The Tribunal also affirms that the Request was considered and decided in accordance with the relevant provisions of the applicable law and rules, in particular section 12 of Singapore's International Arbitration Act (Cap. 143A) (the "**IAA**") read with Article 17 of the UNCITRAL Model Law (the First Schedule to the IAA) (being the relevant parts of the law of the seat) and Article 26 of the UNCITRAL Rules 2010 (being the applicable rules as agreed by the Parties).

43.  It is noted that much of the Respondents' complaints under this heading concern interim measures applications generally, which are by their very nature

---

[318] See paragraphs 14 – 15 of the Order.
[319] See Procedural Order No. 1 dated June 10, 2014.
[320] See paras. 21 – 23 of the Order.

preliminary and provisional[321]. The applicable rules on such applications also require the Tribunal to consider whether there is a "*reasonable possibility that the requesting party will succeed on the merits of the claim*"[322].

44.   Since the Order was issued – more than a year ago – the Respondents have not raised any further complaints regarding the interim measures application or Order until its November 20 Letter, nor have any challenges been filed before the Tribunal or the courts of the seat (Singapore).

45.   Finally, the Tribunal addresses the serious suggestion of "*bias and prejudice*" and/or that the Tribunal prejudged the material issues in this dispute during and/or as a result of the interim measures Request. The Tribunal expressly stated the following at paragraph 139 of the Order:

> "*The Tribunal emphasises that it makes no declaration as to the ownership of the Shares, and has not pre-judged any aspect of each side's pleaded case, and Parties shall have the full opportunity to ventilate their respective cases at the merits hearing. Accordingly, the Tribunal defers any decision as to the declaration of the legal and/or beneficial ownership of the Shares to the merits phase of the Arbitration (which is the appropriate phase in which to determine this question).*"

46.   The Tribunal reiterates its conviction that its impartiality was not affected or hampered in any way. The Tribunal previously considered the written and oral submissions, evidence and applicable rules and arrived at its decision on interim measures as recorded in the Order.

47.   Subsequently, the Tribunal has considered *de novo* the Parties' respective pleadings, written and oral submissions, witness statements/declarations, reports, exhibits and all such relevant materials submitted by the Parties in the Liability Phase of this arbitration and arrived at the reasoned conclusions in this Liability Award.  In doing so, the Tribunal freshly reviewed the full evidence before it at the conclusion of the liability hearing, independently from the interim measures hearing and without relying upon the conclusions reached at the earlier phase.

---

[321] See Article 26(2) of the UNCITRAL Rules 2010.
[322] See Article 26(3)(b) of the UNCITRAL Rules 2010.

48. The Tribunal also notes that, apart from referencing *the Claimants' conduct* during the interim measures proceedings, the Respondents have not raised any *evidence of the Tribunal's* actual or perceived bias which may give rise to justifiable doubts as to its impartiality in this arbitration. No such challenges against one or more members of the Tribunal have been filed by either Party, whether to the Tribunal or to the courts of the seat (Singapore).

**D.    "*The Tribunal issued an Interim Measures Order in disregard and violation of the procedures it had established and to which the Parties agreed*"**

49. The Tribunal repeats the points at paragraph 38 above.

50. In any case, the entirety of the submissions under this heading concern the findings and/or determinations made in the Order, and, in particular, the issue of the applicable burden of proof of each Parties' respective case on interim measures. In essence, these submissions suggest, but stop short of explicitly stating, that the Tribunal made errors of law in that Order. The Tribunal does not agree.

51. In any event, those determinations do not affect or have any material bearing on the determinations and conclusions in this Liability Award. Notably, the Respondents have not sought any relief from the Tribunal under this heading. It is therefore, neither necessary nor appropriate for the Tribunal to address the correctness of the conclusions in the Order or the Respondents' substantive submissions under this heading in this Liability Award.

52. In so far as the submissions under this heading relate to the conduct of the Parties before other fora, including the relevant Philippine courts, these by and large do not affect the material findings and conclusions in this Liability Award, and the Tribunal does not regard it as necessary or appropriate to comment on this. Wherever they are relevant, the Tribunal has objectively considered the submissions of both Parties and the exhibits of any relevant court documents that are part of the record.

53. In so far as the submissions under this heading relate to the quantum of damages, these proceedings having been bifurcated, such submissions – in so far as they may be relevant – may be raised in the Remedies Phase of this arbitration.