# APPENDIX 3

**IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH A MANAGEMENT SERVICES AGREEMENT DATED 9 SEPTEMBER 2011 AND THE UNCITRAL ARBITRATION RULES 2010**

BETWEEN

**GLOBAL GAMING PHILIPPINES LLC (AS ASSIGNOR)**
**GLOBAL GAMING NETHERLANDS B.V. (AS ASSIGNEE)**

**CLAIMANTS**

AND

**BLOOMBERRY RESORTS AND HOTELS, INC.**
**SURESTE PROPERTIES, INC.**

**RESPONDENTS**

**ORDER IN RESPECT OF CLAIMANTS' INTERIM MEASURES' APPLICATION**

The Arbitral Tribunal:

Mr. R Doak Bishop, Esq. (Arbitrator)

Mr. Michael Hwang, S.C. (Arbitrator)

Dr. Andrés Rigo Sureda (Presiding Arbitrator)

# Table of Contents

Parties ........................................................................................................................................ 3

    Claimants .............................................................................................................................. 3

    Respondents ......................................................................................................................... 3

Procedural History .................................................................................................................... 5

    Commencement of Proceedings ........................................................................................... 5

    Constitution of the Tribunal ................................................................................................. 5

    The Claimants' Interim Measures Application (the "Present Application") ........................... 5

    Procedural Orders issued to date .......................................................................................... 7

    The Interim Measures Hearing ............................................................................................. 9

Chronology of Events ............................................................................................................. 10

Reliefs Sought by Parties ........................................................................................................ 18

    Claimants' Reliefs Sought .................................................................................................. 18

    Respondents' Reliefs Sought .............................................................................................. 19

The Parties' Arguments .......................................................................................................... 20

    Claimants Arguments ......................................................................................................... 20

    Respondents' Arguments .................................................................................................... 23

The Tribunal's Reasoning ....................................................................................................... 27

    The Unusual Procedural Posture and the Procedural History of the Present Proceedings ........ 27

    The Burden of Proof on each Party ..................................................................................... 27

    Application of UNCITRAL Rules 2010 to the Respondents' Position ................................... 30

        The Applicable Test under the UNCITRAL Rules 2010 .................................................. 30

        The Respondents' case behind their proprietary claim to the Shares .................................. 34

        The Respondents' case on the possibility of dissipation of assets ..................................... 37

    Application of UNCITRAL Rules 2010 to the Claimants' Position .......................................... 38

        Irreparable Harm ......................................................................................................... 38

Operative Part ........................................................................................................................ 40

## Parties

### Claimants

1.  The Claimants are Global Gaming Philippines, LLC (as assignor) and GGAM Netherlands B.V. (as assignee) (respectively "**GGAM**" and "**GGAM Netherlands**" and collectively "**the Claimants**").

2.  The Claimants are represented by:

    Joseph R. Profaizer
    Charles A. Patrizia
    Igor V. Timofeyev
    Adam J. Weiss
    Paul Hastings LLP
    875 15th Street,
    N.W. Washington, D.C.
    20005 United States of America
    Telephone: +1 (202) 551-1700
    Facsimile: +1 (202) 551-1705
    e-mail: joeprofaizer@paulhastings.com;
    charlespatrizia@paulhastings.com;
    igortimofeyev@paulhastings.com; and
    adamweiss@paulhastings.com

### Respondents

3.  The Respondents are Bloomberry Resorts and Hotels, Inc. and Sureste Properties, Inc. (together "**the Respondents**", and respectively "**BRHI**" or the "**First Respondent**" and "**Sureste**" or the "**Second Respondent**"). The Respondents are owners of the Solaire Resort and Casino, an integrated casino hotel entertainment complex located in Paranque City, Metro Manila, Philippines ("**Solaire**").

4.  The Respondents are represented by:

    Michael D. Nolan, Esq.
    Milbank, Tweed, Hadley & McCloy LLP
    International Square Building
    1850 K Street, N.W. Suite 1100 Washington, DC
    20006-5417 United States of America
    Telephone: +1 (202) 835-7500
    Facsimile: +1 (202) 263-7586
    e-mail: mnolan@milbank.com

5.    The Claimants and the Respondents are collectively referred to as the "**Parties**".

## Procedural History

### Commencement of Proceedings

6. On **September 12, 2013**, the Claimants filed their Notice of Arbitration ("**NOA**").

7. On **October 12, 2013**, the Respondents filed their Response to the Claimants' NOA ("**Response**").

8. On **November 11, 2013**, the Claimants filed their Defense to Respondents' Counterclaims ("**Defense**").

### Constitution of the Tribunal

9. On **December 6, 2013**, Mr. R Doak Bishop was nominated by the Claimants as its party-appointed arbitrator.

10. On **January 9, 2014**, Mr. Michael Hwang S.C. was nominated by the Respondents as its party-appointed arbitrator.

11. On **March 29, 2014**, Dr. Andrés Rigo Sureda was appointed by the Parties following negotiations between the Parties.

### The Claimants' Interim Measures Application (the "Present Application")

12. On **April 14, 2014**, the Claimants filed a Request for Interim Measures of Protection ("**Claimants' Request**").

13. In response, the Respondents sent the Tribunal a letter dated **April 28, 2014** ("**Respondents' 28 April Letter**") arguing that they should not be required to respond to the Claimants' submission as if it were an application for Interim Measures, on the basis that the Claimants' Request was not an application for an interim measure under Article 26 of the UNCITRAL Rules 2010.

14. The Tribunal and the Parties had a teleconference to organize the proceedings on **April 30, 2014** (at 9.30 am EST), during which the Parties and the Tribunal agreed, amongst other things, that the Tribunal would hear the Parties in respect of the issues raised in the Respondents' 28 April Letter, in accordance with the following timelines.

(a) By close of business on **May 7, 2014**: the Claimants will provide their response (the "**Response**") to the Respondents' letter to the Tribunal dated 28 April 2014.

(b) By close of business on **May 12, 2014**: the Respondents will provide a reply (the "**Reply**") to the Claimants' Response filed by 7 May 2014.

(c) By close of business on **May 13, 2014**: the Claimants will indicate to the Tribunal if they wish to file a surreply (the "**Claimants' Surreply**").

(d) By close of business on **May 16, 2014**: If the Claimants have indicated that they wish to file a surreply, the Claimants are to file that surreply.

15. In accordance with the Parties' agreement at the teleconference, the Parties filed their respective submissions within the respective deadlines. The Claimants indicated that they wished to file a surreply and did so.

16. Upon carefully reviewing each side's submissions, the Tribunal decided, through its Decision dated May 30, 2014 (and communicated to the Parties on the same date), the following.

*1. The Philippine Court Order is a temporary order only in effect as long as not confirmed, revoked or modified by the Tribunal*

*2. That the Request qualifies as a request for interim measures under Article 26 of the UNCITRAL Rules.*

*3. To invite the Parties to consult with each other on the procedural calendar to hear arguments on the Request and inform the Tribunal of their agreement or disagreement within seven days from the date of this decision. If the parties fail to reach agreement on the procedural calendar, the Tribunal shall set such calendar promptly after the seven-day deadline*

17. Accordingly, the Parties filed the following submissions in response to the Tribunal's Decision.

(a) Respondents' Opposition to the Claimants' Request, dated July 15, 2014 ("**Respondents' Opposition**").

(b) Claimants' Reply in Support of Claimants' Request, dated July 30, 2014 ("**Claimants' Reply**").

(c) Respondents' Sur-Reply in Opposition to Claimants' Request, dated August 14, 2014 ("**Respondents' Sur-Reply**").

## Procedural Orders issued to date

18.   The Tribunal has issued the following Procedural Orders ("**PO**" in both the singular and the plural).

  (a) Procedural Order 1 ("**PO 1**"), dated **June 10, 2014**, deciding, amongst other things, that the Claimants' Request for Interim Measures qualifies as such under Article 26 of the UNCITRAL Rules, and setting down the procedural timeline for the exchange of submissions and the hearing of the Claimants' Request for Interim Measures.

  (b) Procedural Order 2 ("**PO 2**"), dated **June 23, 2014**, setting down the dates on which to hold the interim measures hearing (20-24 October 2014) and the venue for that hearing (Singapore), as well as the procedural timeline for the Parties' submissions as to the merits.

  (c) Procedural Order 3 ("**PO 3**"), dated **July 15, 2014**, resolving Parties' differences as to a Confidentiality Order, as well as setting out the terms of that Order.

  (d) Procedural Order 4 ("**PO 4**"), dated **September 1, 2014**, setting out the programme for the merits hearing.

19.   The Tribunal has received and reviewed the following documents (filed in accordance with the deadlines set out in PO 1), which are referred to in this Order.

Submissions

  (a) Claimants' Request for Interim Measures of Protection, dated April 14, 2014 (**Claimants' Request**).

  (b) Respondents' Opposition to the Claimants' Request, dated July 15, 2014 ("**Respondents' Opposition**").

  (c) Claimants' Reply in Support of Claimants' Request, dated July 30, 2014 ("**Claimants' Reply**").

  (d) Respondents' Sur-Reply in Opposition to Claimants' Request, dated August 14, 2014 ("**Respondents' Sur-Reply**").

Witness Statements

(e) Declaration of William P. Weidner dated April 13, 2014 (for Claimants) ("**Weidner Declaration**"), and the Supplemental Declaration of William P. Weidner dated July 29, 2014 ("**Weidner Supplemental Declaration**").

(f) Declaration of Bradley H. Stone dated 13 April 2014 (for Claimants) ("**Stone Declaration**"), and the Supplemental Declaration of Bradley H. Stone dated July 30, 2014 ("**Stone Supplemental Declaration**").

(g) Expert Report of Professor Guhan Subramaniam dated July 30, 2014 (for Claimants) ("**Subramaniam Opinion**"),

(h) Expert Opinion of Florentino P. Feliciano, former Senior Associate Justice of the Supreme Court of the Philippines from 1986 to 2001, dated July 30, 2014 ("**Feliciano Opinion**").

(i) Declaration of Jose Eduardo J. Alarilla, Director of BRC and BRHI, dated July 14, 2014 (for Respondents) ("**Alarilla Declaration**").

(j) Declaration of Gerard Angelo Emilio J. Festin, Corporate Controller for BRC and Sureste, dated July 15, 2014 ("**Festin Declaration**").

(k) Expert Opinion of Associate Professor Carl Braunlich dated August 14, 2014 (for Respondents) ("**Braunlich Opinion**").

(l) Expert Report of Steven Davidoff Solomon, Professor of Law at UN Berkeley School of Law, dated July 15, 2014 (for Respondents) ("**Solomon Opinion**"), and his Supplemental Opinion dated August 14, 2014 ("**Solomon Supplemental Opinion**").

(m) Expert Opinion of Jose C. Vitug, former Associate Justice of the Supreme Court of the Philippines from 1993 to 2004, dated July 15, 2014 ("**Vitug Opinion**"), and his Supplemental Opinion dated August 14, 2014 ("**Vitug Supplemental Opinion**").

Exhibits

(n) All exhibits referred to in the documents listed above, and as submitted by the Parties up to the close of the Interim Measures Hearing. Given the volume of exhibits filed, the Tribunal does not list them in this Order, but any omission in referring *specifically* to an exhibit does not mean that the Tribunal has not read the relevant parts of the relevant exhibits in respect of arguments canvassed by the Parties, and considered by this Tribunal.

20. For ease of reference, the Tribunal will refer, in this Order, to exhibits as "JCB-[]" in respect of those exhibits contained in the Joint Core Bundle, or as "CE-[]" or "RE-[]". The Tribunal will make similar references, *mutatis mutandis*, to the Parties' legal authorities ("CL-[]" and "RL-[]"), and where relevant, the Respondents' "*additional documents*" will be referred to as "RA-[]". Transcript references will take the form "T-[page number]/[line number]".

## The Interim Measures Hearing

21. Pursuant to PO 2, the Tribunal directed that the Interim Measures Hearing would take place in Singapore from 20-24 October 2014.

22. On 7 October 2014, Mr. Michael Nolan, Lead Counsel for the Respondents, emailed the Tribunal and Counsel for the Claimants to inform the Tribunal and Counsel for Claimants that he had an unexpected surgery arising from complications from a prior fracture and was not able to fly to Singapore for the Hearing.

23. Accordingly, the Tribunal (pursuant to the agreement of Counsel for the Claimants) agreed to hold the Interim Measures Hearing in Washington, D.C. The Hearing took place from 20 to 22 October 2014 in the Washington, D.C. offices of Counsel for the Respondents (on the first day) and Counsel for the Claimants (on the second and third day).

## Chronology of Events

24.  In **March 2011**, Mr. Razon and Mr. Weidner had an initial meeting. By 16 March 2011, Mr. Razon and and Mr. Weidner began negotiations.

25.  By a Management Services Agreement dated **9 September 2011** (the "**MSA**") between Respondents and GGAM (collectively, the "**MSA Parties**"), the Respondents engaged GGAM to manage the Respondents' integrated casino resort, trading as Solaire in Manila. This Arbitration arises from the Respondents' alleged wrongful termination of the MSA.

   (a)  Under the MSA, Bloomberry Hotels and Sureste engaged GGAM to provide management and technical services in the development and construction of the Facilities, and to manage the operation of the Facilities once constructed for a ten-year period. GGAM would be paid fees according to formulas specified in the MSA.

   (b)  The Respondents have purported to terminate the MSA, which Claimant says is wrongful and without proper cause. That alleged wrongful termination and the remedy for it are the principal issues in this Arbitration, but are not, for the purposes of the present interim measures application, considered by the Tribunal.

26.  On **26 January 2012**, Prime Metroline acquired 75% ownership of Active Alliance, Inc. ("**AAI**") (later renamed Bloomberry Resorts Corp., or "**BRC**").

27.  By an Equity Option Agreement dated **16 April 2012** (the "**EOA**") between and among Prime Metroline Transport Corp. ("**PMTC**," the predecessor in interest to Prime Metroline Holdings, Inc., or "**PMHI**"), BRC and GGAM (the "**EOA Parties**"). Under the EOA, PMTC, as Grantor, granted GGAM an option to purchase (the "**Option**"),[1] at an agreed-upon strike price of Php 1.67 per share, 921,184,056 shares (the "**Shares**") in Bloomberry Resorts Corp.

28.  Between **16 April 2012 and 2 May 2012**, Parties took part in a roadshow (the "**Roadshow**") preceding the IPO of BRC. Respondents submit that this is a misnomer, and that this exercise was in fact not an IPO but a "*top-up offering*" where the shares in BRC were not sold to the public. For ease of reference, the Tribunal will refer to this as a "**Top-up Offering**", without prejudice to either Party's rights. The Top-up Offering closed on **3 May 2012** at Php 7.50 per share, with the IPO six times oversubscribed.

---

[1] JCB-20 (Section 2.1 of the EOA).

29.   On **20 December 2012**, GGAM exercised its Option, paying approximately US$37.43 million to PMTC.[2]

(a)   The price was calculated by taking the pre-IPO strike price of Php 1.67 per share multiplied by 921,184,056 Bloomberry Resorts Corp. shares, for a total of Php 1,538,377,374.

(b)   Claimants say it paid fair value for the Shares, the Shares were purchased free and clear of all liens or restrictions, and are currently valued at over US$202 million.

(c)   Claimants say that Mr. Razon and his representatives subsequently acknowledged GGAM's ownership of the GGAM Shares on numerous occasions, both before and after the termination of the MSA, and even offered to help GGAM sell its Shares, as follows.

(i)   In a letter delivered to GGAM on July 12, 2013, Bloomberry acknowledged GGAM's "*8.7% equity stake*".[3]

(ii)   On September 12, 2013, Razon publicly stated in The Wall Street Journal in reference to the GGAM's stock, "*[t]hat's their's. They can do whatever they want with the stake . . . For the right price I might buy it*".[4]

(iii)   On September 13, 2013, another Bloomberry Resorts Corp. official publicly acknowledged GGAM's independent, ongoing ownership interest in the Shares following the termination of the MSA, stating that "*[s]ome people have already been pitching to us that they are interested in acquiring the stake if GGAM wants to get rid of it*".[5]

30.   On **20 Dec 2012**, GGAM, BRC and PMTC entered into a Participation Agreement ("**PA**") as the Investor, Company, and Grantor respectively. Under the PA, Clause 5.4 provided that "*in the event that the MSA terminates for any reason whatsoever (other than a wilful breach of the MSA by Claimants), [Claimants] shall have the ongoing right to require [PMTC] to purchase all, but not part, of [Claimant]'s Shares at the Fair Value of such Shares*".[6]

31.   On **12 March 2013**, the Solaire had its Grand Opening.

---

[2] CE-4.
[3] CE-81.
[4] CE-6.
[5] CE-82.
[6] JCB-27.

32.  On **12 July 2013**, Mr. Razon sent GGAM an e-mail asserting that Respondents had come to the "*firm conclusion*" that the MSA had "*failed*" and that "*an amicable parting of ways*" was "*in everyone's interest*." That e-mail enclosed an unsigned letter (the "**12 July Letter**") providing a list of grievances in connection with GGAM's performance under the MSA.

33.  On **22 July 2013**, Ms. E Occeña (Chief Financial Officer of Respondents and PMTC, as well as the Treasurer, Executive Officer, and former Director of Bloomberry Resorts Corp.) requested that the GGAM principals meet with her "*to discuss the disengagement of GGAM*".

34.  On **12 September 2013**, the GGAM received a Notice of Termination of the MSA ("**Notice of Termination**") which was to be effective that night at midnight.[7]

35.  On **12 September 2013**, GGAM submitted a Notice of Arbitration in accordance with Clause 19.2 of the MSA and Article 3 of the UNCITRAL Rules.

     (a)  In the Notice, GGAM requested arbitration of its claims against the Owners "*aris[ing] out of or related to the MSA*" pursuant to Clause 19.2(a) of the MSA.

     (b)  After the alleged wrongful termination of **12 September 2013**, GGAM says it "*began contemplating a complete severing of its relationship to Solaire, including a sale of its equity stake in the Facilities*" since it "*had (and has) no reason to remain an investor in a company whose interests were expressly adverse to GGAM's. Moreover, with no ability to participate in the management and operations of Solaire, GGAM could no longer influence the future profitability and success of the enterprise. As a result, GGAM sought to liquidate its equity position in the Project, and reallocate its resources to other opportunities through which GGAM could ensure a more certain return via GGAM's active involvement*" (at [102] of Claimant's Interim Request).

36.  On **12 October 2013**, Respondents served on GGAM their Response to Notice of Arbitration ("**Response**").

     (a)  At [7.3] of the Respondents' Response, the Respondents "*reserve the right to claim against the 921,184,056 shares in Bloomberry Resorts*

---

[7] CE-23.

> *Corporation that were granted under an option provided under Clause*
> *18.3 of the MSA".*

37. On **11 November 2013**, GGAM submitted its Defence to Respondents' Counterclaims ("**Defence**").

38. In **January 2013**, GGAM selected Credit Suisse, Deutsche Bank and Cantor Fitzgerald (the "**Banks**") to execute a block trade of the Shares.

39. On **13 January 2014**, the Banks commenced a confidential "wall-cross" exercise with certain key institutional buy-side investors to create anchor orders and deal momentum.

40. On **15 January 2014**, the Banks formally launched the deal, resulting in over 50 accounts subscribing for all of the shares at a price of Php 8.05/share.[8]

41. On **15 January 2014**, BRC wrote to the Philippines Stock Exchange ("**PSE**")[9] to request that the PSE voluntarily suspend trading in all BRC shares for one week (from 16 January 2014 to 23 January 2014).

42. On **15 January 2014**, the PSE, in reliance upon BRC's letter and before receiving any additional information, approved the suspension of trading of BRC shares effective as of 16 January 2014.[10]

43. On **16 January 2014**, GGAM submitted a letter to the President of the PSE requesting that the PSE lift the suspension and allow trading to continue.[11]

44. On **17 January 2014**, the Respondents and PMHI ("**Philippine Petitioners**") filed with the Regional Trial Court of the National Capital Judicial Region (the "**Philippine Court**") an Urgent Petition for Issuance of Interim Measures of Protection (see Exhibit 7). This Petition included a request for a Temporary Order of Protection ("**TOP**") against GGAM Philippines, Deutsche Regis Partners, Inc., the PSE, and various John Does.

45. On **17 January 2014**, Bloomberry Resorts Corp. disclosed to the PSE that the Philippine Petitioners had filed a Petition with the Philippine Court seeking the issuance of a writ of preliminary attachment and a writ of preliminary injunction over the GGAM Shares.[12]

---

[8] Weidner's Witness Statement, at [37].
[9] CE-9.
[10] CE-10.
[11] CE-11.
[12] CE-13.

46. Later that day (**17 January 2014**), upon "*a careful review of the available information presented to the Exchange*" which included GGAM's 16 January 2014 letter emphasizing its absolute ownership of the Shares and BRC's 17 January 2014 response, the PSE lifted the trading suspension in BRC shares.[13]

47. On **20 January 2014**, the PSE received the Philippine Court's order "*restraining the disposition of the GGAM Shares for a 20-day period, effective immediately*" (the "**First Philippine Court Order**").

48. On the same day, **20 January 2014**, in a letter to GGAM,[14] the PSE described its review of the Parties' correspondence and clarified its 17 January 2014 decision to lift the trading suspension as follows.

> *Based on subsequent letters sent by [Bloomberry Resorts Corp.], the Exchange found that the dispute subject of the arbitration proceeding is an intracorporate dispute and that the voluntary trading suspension effectively prevents the prospective sale of the GGAM Shares in anticipation of a favorable ruling in the arbitration proceeding. Moreover, while [Bloomberry Resorts Corp.'s] real interest lay only with preventing the disposition of the GGAM Shares, the suspension of the trading of all of [the Bloomberry Resorts Corp.'s] shares stands to prejudice the interests of [the Bloomberry Resorts Corp.'s] shareholders as well as the investing public.*

> The PSE also referred to the Philippine Court's Order and stated that, despite its decision of 17 January 2014 to lift the voluntary trading suspension, the PSE took the position that "*the GGAM Shares cannot be disposed of over the Exchange for a 20-day period as directed by the order of the [Philippine Court]*".

49. On **25 February 2014**, the Philippine Court ordered that "*a writ of preliminary attachment is… to attach to the 921,184,056 shares of Bloomberry Resorts Corp.*" and that GGAM was "*restrained from disposing of, or facilitating, allowing, implementing and completing the sale or transfer of any of the 92i,l84,056 shares*" (the "**Second Philippine Court Order**").[15]

50. On **27 February 2014** the Philippine Court issued a Writ of Attachment and a Writ of Preliminary Injunction (the "**Philippine Court Injunction**").[16]

51. On **11 March 2014**, GGAM timely submitted a Petition for Review on Certiorari to the Philippine Court of Appeals (the "**Petition**").[17] In its Petition,

---

[13] CE-12.
[14] CE-101.
[15] CE-14.
[16] CE-17 and CE-18.

GGAM sought reversal of the Philippine Court Injunction. GGAM's Petition is currently pending in the Second Division of the Court of Appeals.

52. On **28 March 2014**, this Tribunal was constituted.

53. On **14 April 2014**, the Claimants filed a Request for Interim Measures of Protection dated 14 April 2014 (the "**Claimants' Interim Request**").

54. This was followed by the events described in paragraphs 13-17 and 21-23 above.

55. Following the Interim Measures Hearing, Counsel were to respond to some of the Tribunal's questions raised at the Hearing and in respect of which Counsel needed more time to provide a comprehensive response. These questions are as follows.[18]

    (a) What is the source of the jurisdictional power of this Tribunal to make an order in the ultimate merits stage for restitution of the Shares in favor of someone who is not a party to this arbitration?

    (b) Assuming that the Claimants were permitted to sell the Shares, whether the Claimants are allowed to take the proceeds out completely or whether the Claimants have hold on to some proceeds as security?

    (c) Assuming that the Respondents prevailed in the present interim measures application, what security, if any, should the Respondents be required to post?

    (d) Assuming that the Tribunal were to modify or rescind the Second Philippine Court Order in any way, how should the Tribunal's Order be drafted so that the relevant Philippine Court would recognise the Tribunal's Order?

    (e) What textbook(s) on Philippine Contract Law do the Parties (whether individually or jointly) recommend?

56. Accordingly, on **29 October 2014**, the Claimants sent under cover of an email of the same date a letter dated 28 October 2014 ("**Claimants' 29 October Letter**"), while Respondents sent under cover of an email of the same date a letter dated (probably erroneously) 6 October 2014 ("**Respondents' 29 October Letter**"), each of which was meant to be in response to the Tribunal's questions above.

---

[17] CE-16.
[18] T-653/6-11; T-659/3 to T-661/4; T-674/2 to T-675/13; T-704/25 to T-705/9.

57.   On **30 October 2014**, the Claimants sent a letter to the Tribunal ("**Claimants' 30 October Letter**") to strike the Respondents' 29 October Letter from the record.

58.   This was followed by a letter from the Respondents dated 31 October 2014 ("**Respondents' 31 October Letter**") which repeated the Respondents' request that the Claimants' request for interim measures be denied.

59.   On the same date, the Claimants then sent a letter in reply ("**Claimants' 31 October Letter**").

60.   The Tribunal decided, following this exchange of letters, that the "*Respondent's submissions repeat what has already been submitted before or during the hearing. However, if Claimants think there is some new argument raised in those submissions, then Claimants make seek leave from the Tribunal to reply to them after Claimants identified those arguments which they consider to be new.*" The Tribunal's decision was conveyed to the Parties by way of an email dated 1 November 2014 (the "**Tribunal's 1 November Email**").

61.   On **5 November 2014**, the Respondents sent a letter to the Tribunal ("**Respondents' 5 November Letter**") under cover of an email of the same date, responding to the Claimants' Philippine Counsel's proposal of Hector S. De Leon's *Comments and Cases on Obligations and Contracts*, 2014 ed. as a Philippine law textbook which would assist the Tribunal. The Respondents' Philippine counsel counter-proposed a textbook by Desiderio P. Jurado entitled *Comments and Jurisprudence on Obligations and Contracts*, 2010, 12th ed.

62.   The Tribunal subsequently acquired a copy of each book proposed by both the Claimants and the Respondents.

63.   On **5 November 2014**, the Respondents sent a letter to the Tribunal ("**Respondents' Second 5 November Letter**") under cover of an email of the same date providing a chronology of events.

64.   Claimants' Counsel responded to this by way of an email dated 5 November 2014 requesting that the Tribunal deem the record of the Hearing closed.

65.   On **12 November 2014**, the Claimants sent a letter to the Tribunal ("**Claimants' 12 November Letter**") under cover of an email of the same date, seeking to bring to the Tribunal's attention a top-up offering involving a placement of 435 million BRC Shares, as well as a fall in the market price of those Shares.

66.   In response, on **17 November 2014**, the Respondents sent a letter to the Tribunal ("**Claimants' 12 November Letter**") setting out (amongst other things) the Respondents' position in respect of the top-up placement.

67.   The Tribunal has carefully considered the Parties' answers to the Tribunal's questions arising out of the Hearing, and has also carefully considered the Parties' submissions and evidence in respect of the top-up offering. Out of an abundance of caution, the Tribunal states that even if it had not considered the Parties' submissions and evidence in respect of the top-up offering, it would have arrived at the same conclusion.

## Relief Sought by Parties

## Claimants' Relief Sought

68. Claimants request that this Tribunal issue an order (and partial award, if needed) that, pending a final determination on the merits in this Arbitration:[19]

(a) Restores the Parties to the *status quo ante* as of January 15, 2014, when Bloomberry began to wrongfully interfere with the sale of all of GGAM's Shares;

(b) Declares that GGAM has full legal and beneficial ownership of the 921,184,056 shares in Bloomberry Resorts Corp. ("GGAM's Shares") free and clear of any claims, liens or encumbrances by the Philippine Petitioners;

(c) Directs the Philippine Petitioners and their affiliates to publicly disclose to the Philippines Stock Exchange and otherwise the declaration set forth in (b) immediately above;

(d) Permits GGAM to sell all of GGAM's Shares pending a final award by this Tribunal;

(e) Enjoins the Philippine Petitioners and their affiliates from taking any actions that would interfere with or prevent any sale of GGAM's Shares;

(f) Permits and directs the Philippine Petitioners and their affiliates and GGAM to execute such documents and to do any such other things as are necessary or appropriate to implement this Tribunal's order; and

(g) Awards GGAM reasonable attorneys' fees, costs and expenses, including its share of the fees and costs paid to this tribunal, expert witness fees, compensation for in-house counsel, and all other fees and expenses incurred in connection with the arbitration in accordance with Clause 19.2(h) of the MSA and Section 11.9(b)(viii) of the EOA.

69. The Claimants also request such further and other relief as the Tribunal determines is appropriate.

70. As a preliminary matter, the Tribunal observes that, of all the relief that the Claimants seek, only sub-paragraphs (a) and (d) can be considered *provisional* measures properly so called – and on closer scrutiny, (d) follows from (a),

---

[19] [230] Claimants' Request.

should the Tribunal be persuaded on the relevant facts and law that it is appropriate to grant the relief sought in sub-paragraph (a). In effect, the Claimants are responding to the Respondents' application before the Philippine Court, and opposing the terms of the Second Philippine Court Order – albeit before this Tribunal, now that this Tribunal is duly constituted.

71.   The Tribunal also emphasises that, since it is only considering an interim measures application, it will not make any declaration as to the legal and beneficial ownership of the Shares at this stage (and nothing herein should be construed as making any declaration to that effect), but will permit Parties to ventilate their respective ownership claims over the Shares at the merits hearing.

## Respondents' Relief Sought

72.   The Respondents have requested that the Tribunal:

(a)  Deny the Claimants' Application;[20] and

(b)  Award the Respondents costs for the fees and expenses it incurred in responding to the Claimants' request.[21]

---

[20] [30] Respondent's Opposition.
[21] [93] Respondent's Opposition.

# The Parties' Arguments

73. The Tribunal summarises the Parties' arguments below. The Tribunal has carefully considered the Parties' submissions, witness statements and exhibits listed at paragraph 19 above. The Tribunal has also considered the Parties' submissions during the Interim Measures Hearing (as well as any exhibits adduced at the Hearing). When the Tribunal has not summarised an argument that either or both Parties may have made, the Tribunal has nevertheless considered the argument, but decided that it is not relevant (or helpful) to its decision. For conciseness, the Tribunal may also summarise the Parties' arguments by reference to the paragraph or page numbers contained in the relevant document, exhibit, or submission by the Parties.

## Claimants' Arguments

74. The Claimants' arguments in support of their application are as follows.

### Claimant Suffers Actual, Ongoing, and Irreparable Harm

75. The Claimants submit that "*It is GGAM, not Respondents, that continues to suffer actual, ongoing, and irreparable harm as a result of Bloomberry's wrongful freezing and attachment of GGAM's Shares. Bloomberry should not be permitted to bootstrap its opportunistic use of the Philippines courts into an indefinite injunction and attachment of GGAM's fundamental property rights*": [5(3)] Claimants' Reply; see also [3] and [10] of Claimant's Interim Request..

76. The Claimants explain that they submit the Interim Request, "*to prevent and mitigate the ongoing irreparable harm that Bloomberry continues to inflict upon GGAM as a result of the Philippine courts' interim injunction and attachment*": [3] Claimants' Interim Request.

77. The Claimants assert that "*The Philippine Petitioners' allegations were designed to inflict, and did inflict, irreparable harm on GGAM's right— publicly conceded by Mr. Razon—to its Shares*": [10] Claimants' Interim Request.

78. The Claimants argue that the Respondents are to bear the burden of showing irreparable harm under Article 26 of the UNCITRAL Rules, since "*it is the Respondents' action of obtaining provisional relief from the Philippine Court that forced GGAM to seek the Tribunal's assistance in vacating that interim relief*": [118] Claimants' Reply.

79. Claimants submit that there can be **no harm to Respondents if the Shares were sold**, since the Shares are not subject to any claims by Respondents. In support of this contention, the Claimants submit as follows.

   (a) Respondents' contention in the Philippine courts that the Shares were granted as part of the consideration for GGAM's Services under the MSA cannot be reconciled with the text, structure, and purpose of the governing agreements—the MSA, the EOA, and the Participation Agreement.

   (b) GGAM's option under the EOA to purchase, for cash consideration, the Shares (with concomitant rights defined by the Participation Agreement) was entirely separate from Bloomberry's obligation under the MSA to make fee-based cash payments to GGAM for Services.

   (c) GGAM's Option was instead designed so that GGAM would be not merely a service provider, but a co-owner of the Project, whose interests were directly aligned with the Owner and other investors in Bloomberry Resorts Corp (at [113] of Claimants' Interim Request).

   (d) Respondents have repeatedly acknowledged – both before and after this dispute arose – that GGAM's ownership of the Shares was absolute. Respondents' contention that they are entitled to rescind the MSA, essential to the theory of their claim, is similarly belied by their own statements and actions and lacks any basis in law. Respondents' recently concocted and litigation-driven assertions of fraud are belated inventions that are inherently implausible and factually unsupported (at [114] of Claimants' Interim Request).

80. Claimants also submit at [115] of their Interim Request that "*[b]arring the sale deprives GGAM of the rightful use of its own property, forces GGAM to forgo alternative economic opportunities, and ties the fate of GGAM's capital to people who have baselessly thrown it out. To force GGAM to hold the stock that it owns until a final award in this Arbitration constitutes an ongoing violation of GGAM's fundamental property rights*".

**Harm to Claimants substantially outweighs likely harm to Respondents**

81. The Claimants' position is that, even if Respondents were to succeed in this arbitration, the express terms of the MSA and applicable law (i.e., Philippine Law) limit those damages to an amount (US$3.5 million) that is a small fraction (less than 1.8%) of the overall value of the Shares (valued at over US$202 million as at 11 April 2014). These figures were calculated as follows:

(a) Respondents terminated the MSA on grounds of alleged mismanagement.

(b) Clause 12.3(b) of the MSA ("**Clause 12.3(b)**") limits GGAM's liability under the MSA to the amount of fees that GGAM has received during the Term. Clause 12.3(b) provides as follows.

*The liability of GGAM to the Owner **shall in no event exceed the total amount of fees that GGAM has received** during the Term that such liability is incurred under this Agreement, provided that this limit shall not apply where the liability in question is incurred as a result of the willful misconduct of GGAM.*

[emphasis added.]

(c) The amount of fees that GGAM was to receive was "*no more than US$3.5 million*" (at [195] of Claimant's Interim Request).

(d) Claimants argue that the limitation found in Clause 12.3(b) applies.

(e) The final figure above (for the value of the Shares) is calculated as follows. 921,184,056 Shares x Php 9.78 (BLOOM Close Price as of April 11, 2014) = Php 9,009,180,068, then converted to U.S. Dollars based on an exchange rate of Php 44.3823 to US$1 as of April 11, 2014.

82. The Claimants submit that, accordingly, what the Respondents are entitled to (assuming they succeed) is utterly disproportionate *viz.* the value of the Claimants' shares. On the Claimants' case, the balance is simply between the loss of use of US$202 million vs. securing US$3.5 million in order to prevent the Respondents' damages award (if any) from becoming merely illusory.

83. According to the Claimants, any harm that the Respondents might ultimately experience following GGAM's sale of the Shares would be adequately remedied by an award of damages to Respondents. Further, any potential harm to the Respondents from the sale of the Shares is remote, negligible, and not imminent, because the Respondents possess no legitimate claim of entitlement or attachment of the Shares. In contrast, the harm caused to GGAM is certain, on-going, and not adequately reparable by an award of damages.

**There is a reasonable possibility that Claimants will succeed on the merits of the claim**

84. At [14(1)] of the Claimants' Interim Request, the Claimants submit that "*[t]o satisfy the legal standard under which the Tribunal should grant interim relief,*

*GGAM only needs to establish a reasonable possibility of success on the merits of its claim that it has unencumbered ownership of the shares and is entitled to sell them. GGAM easily meets that test.*" The Claimants proceed to argue that this result follows based on (a) the text and structure of the MSA and the EOA; (b) the Parties' pre-contractual negotiations; and (c) the Parties' post-contractual conduct (see, generally, Claimants' Reply, and in particular, paragraphs 11, 12, 14, 15, 18, 20-28, 32, 34, 38-44, 68, and 69).

## Respondents' Arguments

85.   The Respondents' arguments in support of their opposition are as follows.

**Claimants have not demonstrated actual, irreparable, or substantial harm**

86.   In respect of the need to show "*irreparable harm*", Respondents submit that "*Claimants have never alleged that their purported harms are not remediable by an award of damages. In their Notice of Arbitration, Claimants seek only orders from the Tribunal for payment of damages. The fact that Claimants seek only monetary damages is fatal to their Application because any alleged damage, if proven, would be compensated by monetary damages in an ultimate award. As such, Claimants fall squarely within the pronouncements made by the Plama tribunal, meaning that, even if the Tribunal ultimately decides that the injunction and attachment ordered by the Philippine Court was ordered in error, any harm Claimants have suffered would, by definition, be reparable by money damages*": [39] Respondents' Opposition.

87.   According to the Respondents, the Claimants can seek any money damages awarded to them from the following sources:

(a)   the Php 800 million bond (over US$18 million) Bloomberry posted in accordance with the Philippine Court Order; and

(b)   the assets of Bloomberry and Sureste (namely, the fully operational Solaire Resort & Casino).

88.   Respondents observe that the injunction against the sale of the Shares has resulted in Claimants reaping a US$68 million profit, since the price of the Shares had rose since January 2014 (which was when the Claimants sought to sell the Shares). Claimants are unable to show any loss, let alone irreparable harm.

**It is Respondents who will suffer irreparably harm if Claimants' Interim Measures Request is granted**

89.  First, Respondents' claim that, if GGAM is permitted to sell the Shares now, Bloomberry will be irreparably harmed since "*the Shares, as a block, have a unique value to Bloomberry that cannot be compensated by a monetary award*": [18], [29], [45] of Respondents' Opposition, citing S. Davidoff Solomon's Expert Report at [47]-[51], and [53].

90.  Respondents explain that, if Bloomberry decides in the future to retain another management services company for the Solaire Resort & Casino, it would like to be able to offer a similar block as incentive and compensation for the new company; to permit the Claimants to sell the entire block which has this unique value would prevent Respondents from being able to offer such an incentive, which does not have the same value as a monetary offer alone.

91.  According to Respondents, the value of the Shares as a block would also affect the corporate governance of BRC: [14] Respondents' Surreply; Solomon Opinion at [51] ("*this block would provide greater economic incentives to the controlling shareholder to take actions beneficial to the company*.") In this respect Respondents argue that not only would the loss of the block would impede the ability of the controlling shareholder to take actions beneficial to the company, thereby causing harm to BRC, but there is a distinct possibility that BRC's board could be deadlocked if the holder of the 8.7% block of Shares colludes with other minority shareholders.

92.  Second, the Respondents affirm that it is "*undisputed that Claimants are shell companies, and the Shares are their only assets in the Philippines. If Claimants are permitted to sell the Shares, their only assets will have fled the jurisdiction and they will be unable to satisfy any judgment for damages awarded in Bloomberry's favour*": [18] of Respondents' Opposition. On the other hand, the Respondents argue that Bloomberry has substantial and stationary assets—including the fully operating Solaire Resort & Casino—that can satisfy the Claimants' future harm (if any). Bloomberry already has paid a substantial bond in the amount of Php 800 million (over US$18 million) to demonstrate its ability and willingness to remedy Claimants' harm, if required to do so: [20] Respondent's Opposition; and RE-12.

93.  Third, the Respondents claim that the sale of the Shares would destroy the subject matter of this arbitration. Specifically, Bloomberry's Counterclaim, which will be filed on December 7, 2014, will seek rescission of the MSA and restitution of the Shares, due to GGAM's material and wilful breach of the MSA. A sale of the Shares—the subject of Bloomberry's Counterclaim—would thus deprive the Tribunal of its effective and actual jurisdiction over the substance of the Parties' dispute and deny the Tribunal its remedial authority: [27]-[28] Respondent's Opposition.

(a) By its very nature, the remedy that Bloomberry seeks— restitution—is incapable of monetary compensation. As will be explained in more detail below, and with greater detail in Bloomberry's counterclaim, Bloomberry has a claim to the Shares: [44] Respondent's Opposition.

(b) In the first draft of the MSA, the option to purchase 10% of Bloomberry's shares and the sliding fee structure were both located in a section titled "*Fees*": [52] Respondents' Opposition.

(c) Respondents acknowledge that while "*a right to purchase shares is not literally a "fee," this draft demonstrates that from the beginning of the Parties' relationship, the principals understood that the Shares would function as compensation for GGAM's performance under the MSA as a "partner."*: footnote 79, [52] Respondent's Opposition, and RE-2).

(d) Respondents deny GGAM's assertions that "*from inception*" and "*throughout the negotiations*," GGAM's performance was separate and distinct from the equity option.

**Harm to Respondents will outweigh harm to Claimants**

94.    Respondents submit that they will, in their Statement of Defense and Counterclaim due on 7 December 2014, demonstrate Claimants' wilful and substantial breach of its obligations under the MSA. Accordingly, Claimants cannot rely on the limitation clause contained at clause 12(3)(b) of the MSA.

**There is no reasonable possibility that the requesting party, GGAM, will succeed on the merits of the claim**

95.    Respondents argue that, *if* the Tribunal finds that Claimants are *in breach of the MSA*, the Tribunal can order rescission of the EOA, and, accordingly, can order restitution of the Shares. Since this remedy is open to the Respondents on their to-be-pleaded case, the Tribunal should not permit Claimants to sell those shares. This argument is developed as follows:

(a) First, the MSA and EOA must be interpreted together, as one transaction, but physically separated into two documents executed on 9 September 2011 and 16 April 2012 respectively. Crucially, the EOA formed part of the Claimants' compensation under the MSA.

(b) Second, the Respondents are entitled to rescission for breaches of (or non-compliance with) the terms of the MSA.

(c) Third, the facts disclose substantial breaches of the terms of the MSA by Claimants.

(d) Accordingly, the Respondents are entitled to rescind the agreement with the Claimants – including the EOA – since the EOA is part of a single agreement between Parties.

96.   GGAM's alleged admissions that they did not have Guest Data, or operating policies, systems and procedures indicate that GGAM committed causal fraud, thereby making the obligations under the MSA, including the grant of the equity option, annullable or voidable: [70] Respondents' Opposition.

97.   Finally, the Respondents proceed to argue that this result (i.e., rescission of the EOA) follows from (a) the text and structure of the MSA and the EOA; (b) the Parties' pre-contractual negotiations; and (c) the Parties' post-contractual conduct (see, generally, Respondents' Opposition, and in particular, paragraphs 54-56, 61, 72, 74ff, and Respondents' Surreply at paragraphs 6 and 39).

## The Tribunal's Reasoning

## The Unusual Procedural Posture and the Procedural History of the Present Proceedings

98. The Tribunal observes that the present application before it, in which the Claimants are seeking a remedy that is not usually sought as an interim measure, arises from the procedural history of the case, which the Tribunal recalls (in pertinent part) as follows:

(a) On 17 January 2014, before the Tribunal was constituted, and, while the co-Arbitrators were conferring with each other and with their respective Parties on the appointment of the Chair, the Respondents and PMHI (the Philippine Petitioners) filed with the Philippine Court an Urgent Petition for Issuance of Interim Measures of Protection.[22] This Petition included a request for a Temporary Order of Protection ("**TOP**") against GGAM Philippines, Deutsche Regis Partners, Inc., the PSE, and various John Does.

(b) On 25 February 2014, again before the Tribunal was constituted, and while the co-Arbitrators were conferring with each other and with their respective Parties on the Chair, the Philippine Court ordered that "*a writ of preliminary attachment is… to attach to the 921,184,056 shares of Bloomberry Resorts Corp.*" and that GGAM was "*restrained from disposing of, or facilitating, allowing, implementing and completing the sale or transfer of any of the 921,184,056 shares*" (the "**Second Philippine Court Order**").[23]

(c) On 29 March 2014, the third arbitrator, Dr Andrés Rigo Sureda, was appointed by the Parties following negotiations between the Parties.

## The Burden of Proof of each Party

99. The Second Philippine Court Order contained the following statements, which the Tribunal quotes extensively to provide the context in which the important statements appear (with added emphasis by the Tribunal).

(a) "*The sole issue for resolution in the instant Petition is whether or not the Petitioners are entitled to interim measures of protection **under the Special ADR Rules***".[24]

---

[22] CE-7.

[23] CE-14.

[24] JCB-57, p. 5.

(b) "*To be clear, the instant case is specifically **governed by the Special ADR Rules**".*[25]

(c) "*At this point, this Court holds that w*hether the MSA was terminated or rescinded is a question which should be resolved by the arbitral tribunal. … To emphasize, the merit of the respective claims of Respondent GGAM on the one hand, and Petitioners [Bloomberry Hotels] and [Sureste] on the other, in the arbitration proceedings in Singapore shall not be discussed by this Court as it has no jurisdiction to pass over said claims. Thus, based on this point as well, this Court shall refrain from discussing the issue of fraud allegedly committed by Respondent GGAM which induced Petitioners [Bloomberry Hotels] and [Sureste] to enter into the MSA".*[26]

(d) "*This Court would like to point out that no prejudice could be caused against [Claimants] by these interim measures of protection. For one, these interim measures of protection **may be modified, amended, revised or revoked by the arbitral tribunal** once the same has been constituted… These interim measures of protection are **issued without prejudice to the subsequent grant, modification, amendment, revision or revocation by the arbitral tribunal in Singapore, once the same is duly constituted**".*[27]

100. It is clear to this Tribunal that the Philippine Court approached the "*sole issue*" before it, and granted the relief that it granted, on a 'holding-the-ring' basis – i.e., to preserve the *status quo ante* so that the determination of any issue within the Tribunal's purview could be determined by this Tribunal. Indeed, the jurisdiction of the Philippine Court seems to have been limited to such temporary relief.

101. Accordingly, the Second Philippine Court Order arises from the fact that this Tribunal was not yet constituted, and the Philippine Court was simply 'holding the ring' – i.e., preventing any substantive change in each side's position – prior to the Tribunal's constitution. To this extent, the Court was clearly acting within its proper jurisdiction. However, the Philippine Court clearly anticipated that its Order (which simply held the status quo ante until the Tribunal was constituted) could be "***modified, amended, revised or revoked by the arbitral tribunal*** [emphasis added]" once this Tribunal was constituted. There can therefore be no doubt that the Second Philippine Court Order does not bind this

---

[25] JCB-57, p. 8.
[26] JCB-57, p. 7.
[27] JCB-57, p 10.

Tribunal. The Second Philippine Court Order only bound the **Parties** in so far as this Tribunal was **not yet constituted and had not yet ruled on the issue**.[28]

102. The Tribunal considers that the *status quo ante* is not the situation created by the Court Order but the more complex one of the situation that existed immediately before the Court Order but as *temporarily* modified by that Order. The word "temporarily" is important. The Court Order maintained the *status quo* by preventing the shares from being sold to a third party, but it also altered the status quo temporarily by preventing Claimants from making their own autonomous choices with respect to the shares. This then is the *status quo* addressed by the Tribunal.

103. Respondents suggest the Philippine Court Order is entitled to deference, but there is a distinction between "respect" (*i.e.*, honouring) and "deference," which implies special weight in decision-making. The Tribunal takes note of, and respects, the Second Philippine Court Order as being an action properly within the jurisdiction of the Court and covering the time period until the Tribunal was able to act. During that period it must be honoured. But the legal standards for the Court to act and for this Tribunal to act are different, and the facts put before the Court and this Tribunal are also different. Thus, the Tribunal cannot begin its analysis by either accepting or rejecting the Court's analysis. The Tribunal must perform its own analysis *de novo* based upon the facts put before it and the legal standards applicable to these proceedings. Thus, while respect is undoubtedly due to the Court and its decision within its sphere, that decision is not entitled to deference (i.e., special weight) by the Tribunal in making its decision.

104. This position is supported by the Second Philippine Court Order itself. While the wording of the Second Philippine Court Order did not state that the Order would automatically expire on the constitution of this Tribunal, nothing in the Order suggests that it should have any preclusive or presumptive effect such that this Tribunal's powers in respect of that Order are limited or curtailed. On the contrary, "*[t]hese interim measures of protection are **issued without prejudice to the subsequent grant, modification, amendment, revision or revocation by the arbitral tribunal in Singapore, once the same is duly constituted** [emphasis added]*".Thus, the existence of the Second Philippine Court Order is not, of itself, sufficient or persuasive evidence that it should be maintained even after the arbitral tribunal is duly constituted.

105. In short, the (unusual) procedural history of this case does not relieve any party from persuading this Tribunal of the need for interim relief. Accordingly, the Tribunal will proceed as follows.

---

[28] *Ibid.*

(a) The Tribunal will apply the legal requirements contained in Article 26(3) of the UNCITRAL Rules 2010 to the Respondents' case for maintaining the Philippine Court injunction, which the Tribunal will treat as an application for Interim Measures on the same terms as those found in the Second Philippine Court Order.

(b) Second, because of the unusual procedural posture in which the Second Philippine Court Order has temporarily altered the pre-existing *status quo*, the Tribunal will also analyse the Claimants' case, which has a dual nature in that it is in effect responsive to the Respondents' request but it also affirmatively seeks to change the situation created by the Court's Order. Thus, the Tribunal will also determine whether it is persuaded by the Claimants' case.

106. These are, in essence, the Parties' respective positions: the Respondents, while technically the respondents in opposing the Claimants' Request, are in effect asking the Tribunal to grant them an Order preventing the Claimants from selling any of the Shares. Conversely, the Claimants, while technically the applicants in the present interim measures application, are in effect both responding to the Respondents' actions in seeking interim relief before the Philippine Court but also asks to be relieved from all restrictions on their disposition of the Shares. The Tribunal notes, for completeness, that the Respondents' application was taken in response to the Claimants' attempt to sell the Shares, and the Tribunal emphasises that it is *not* suggesting that there was any impropriety on the part of either side in respect of the events leading to the present procedural posture. To the contrary, the Tribunal assumes the good faith of all parties before it and of the Philippine Court.

107. The result of the current procedural posture, however, is that the Tribunal cannot start from either the position that the Second Philippine Court Order should remain and the Party opposing it has the burden of proving that it should be revoked; or that the Second Philippine Court Order should be revoked and the Party asking for it to remain should bear the entire burden of that request. In this unusual posture, both parties bear the burden of presenting evidence and persuading the tribunal of the correctness of their explicit and implicit affirmative propositions.

## Application of UNCITRAL Rules 2010 to the Respondents' Position

### The Applicable Test under the UNCITRAL Rules 2010

108. For ease of reference, the Tribunal quotes Article 26(3) of the UNCITRAL Rules 2010, which provides as follows (with emphasis added by the Tribunal).

*3. The party requesting an interim measure under paragraphs 2(a) to (c) **shall satisfy the arbitral tribunal** that:*

*(a) Harm **not adequately reparable** by an award of damages is **likely to result** if the measure is not ordered, **and** such **harm substantially outweighs the harm that is likely to result** to the party against whom the measure is directed if the measure is granted; and*

*(b) There is a **reasonable possibility** that the requesting party will succeed on the merits of the claim. The **determination on this possibility shall not affect the discretion of the arbitral tribunal in making any subsequent determination**.*

109. The Tribunal emphasises that, given the interim nature of these proceedings, it has reviewed the evidence before it at this time, but it has well in mind that more evidence will be adduced by the Parties which could lead to greater or different insights, perspectives or conclusions. The Tribunal will continue to maintain an open mind on the merits until all evidence is adduced and all arguments heard and what follows does not pre-judge the merits of the Parties' substantive dispute.

110. As a preliminary matter, the Tribunal notes that Article 26(2)(a), read in the context of Article 26, permits the Tribunal to "*grant… any temporary measure by which… maintain[s] or restore[s] the status quo pending determination of the dispute*". Accordingly, the Tribunal may grant the relief sought by Claimants at paragraph 230(a) of the Claimants' Request.

111. As a preliminary statement of principle, the Tribunal observes that, in respect of a grant of injunctive relief, an applicant who seeks to enjoin the use of property that *prima facie* belongs to another must show, as a threshold matter, that:

(a) There is a reasonable possibility that the applicant seeking the injunction will succeed on the merits of its claim[29] in relation to the ownership of the property[30] which is the subject of the injunction (the "**Proprietary Argument**");

---

[29] Chapter 17: Provisional Relief in International Arbitration in Gary B. Born, International Commercial Arbitration, Second Edition (Kluwer Law International 2014), p. 2479.

[30] Chapter 17: Provisional Relief in International Arbitration in Gary B. Born, International Commercial Arbitration, Second Edition (Kluwer Law International 2014), p. 2440 ("*the UNCITRAL Rules are correctly understood as granting a tribunal the authority to issue any measures against a party that it deems necessary for protective or conservatory purposes, provided only that these measures have some connection to the contract, contractual or legal rights, property, requested relief, or other issues in dispute have some connection to the contract, contractual or legal rights, property, requested relief, or other issues in dispute*").

(b) The applicants are likely to suffer substantial harm (based on the *Paushok* interpretation of "harm not adequately reparable by an award of damages"); and

(c) The balance of hardships favours the applicants.

112. However, in respect of the Respondents' arguments that they may not be able to enforce an award for money damages against the Claimants, the Tribunal must be persuaded that the party against whom an injunction is sought is likely to dissipate its assets before the conclusion of the arbitration, or otherwise dispose of its assets either in an unlawful manner or in order to subvert the enforcement of the arbitral award (the "**Dissipation Argument**").[31]

113. The Tribunal has reviewed the authorities submitted by the Parties in respect of their respective positions and, for conciseness and coherence, considers it appropriate to consider the authorities in respect of the following issues.

(a) First, for what *purposes* can the Tribunal order interim measures under Article 26 of the UNCITRAL Rules 2010?

(b) Second, what is (or are) the relevant test(s) for the various limbs of Article 26 of the UNCITRAL Rules 2010?

114. The question of who bears the burden of proof in respect of satisfying the Tribunal of the legal requirements under Article 26 of the UNCITRAL Rules 2010 has been considered in the previous section.

115. The Tribunal discerns the following propositions from the authorities it has reviewed.

116. First, this Tribunal has the *authority* to issue an award of any interim - temporary- measures for the purposes of preserving the *status quo ante* and/or "*provid[ing] a means of preserving assets out of which a subsequent award may be satisfied*".

---

[31] "*Due to the time gap between commencement of the proceedings and the substantive hearing, the subject-matter or necessary evidence may disappear; by the time the final relief is to be granted irreparable and noncompensatory harm may occur. One party may frustrate the rights of the other party and make enforcement impossible by dissipating or placing beyond reach assets or the subject-matter in issue.*": Chapter 23, *INTERIM AND CONSERVATORY MEASURES* Julian D. M. Lew; Loukas A. Mistelis; Stefan Michael Kröll, p. 585 at [23-1] (RL-36); see also Chapter 17: Provisional Relief in International Arbitration in Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION, Second Edition (Kluwer Law International 2014), p 2440, and footnote 86.

117. Second, the Tribunal notes that it is more common to award security for costs rather than security for damages. Indeed, "*[a]s regards security for the damages that may be awarded, there is very little precedent for such an interim measure.*"[32]

118. Third, the term "*status quo ante*" is not defined in the UNCITRAL Rules 2010. Few decisions or commentators carefully consider the question of what it means to preserve the "*status quo.*" In one case, the term "*status quo*" was interpreted to mean "*the last peaceable state between the parties which preceded the present controversy.*"[33] For the Tribunal and (as stated earlier) the *status quo ante* is the status of the Shares immediately before the issuance of the Philippine Court's Order, but as temporarily altered by the Court Order.

119. Fourth, as a general observation, tribunals are slow (or reluctant) to order security for an *underlying claim* save where there is *evidence* that "*a party has begun to, or appears likely to engage in, conduct that goes beyond the ordinary course of business, by underlying to dissipate assets, encumber assets, or grant preferential security to insiders*" and "*assuming that the other requirements for interim relief, including urgency, prima facie jurisdiction and balance of hardships, are satisfied*" [emphasis added].[34]

120. Fifth, the appropriate test for "*irreparable harm*" is that substantial prejudice will be caused to the requesting party.[35] The possibility of monetary compensation is not sufficient in every case to bar a request for interim measures,[36] since commercial losses can in principle be rectified by an award of damages, which means that almost any application for interim measures could be defeated.[37] Two further points bear mention:

(a) If the making of a decision could await the final determination of the parties' case, there is inherently no basis for seeking interim protection of rights.[38]

---

[32] [26-71], Thomas H. Webster, HANDBOOK OF UNCITRAL ARBITRATION (2010).

[33] Chapter 17: Provisional Relief in International Arbitration in Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION, Second Edition (Kluwer Law International 2014), p. 2486.

[34] Chapter 17: Provisional Relief in International Arbitration in Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION, Second Edition (Kluwer Law International 2014), p. 2493.

[35] Chapter 17: Provisional Relief in International Arbitration in Gary B. Born, INTERNATIONAL COMMERCIAL ARBITRATION, Second Edition (Kluwer Law International 2014), p. 2469ff.

[36] David D. Caron & Lee M. Caplan, THE UNCITRAL ARBITRATION RULES (2d. ed. 2013) (excerpts) p. 522 (RL-35); *Paushok v. Mongolia*, UNCITRAL, Order on Interim Measures, Sept. 2, 2008 (RL-13).

[37] Georgios Petrochilos, *INTERIM MEASURES UNDER THE REVISED UNCITRAL ARBITRATION RULES*, ASA Bulletin, (2010, Volume 28 Issue 4) pp. 878, at 882 (CL-36).

[38] A Yesilirmak, *PROVISIONAL MEASURES IN INTERNATIONAL COMMERCIAL ARBITRATION* (The Hague: Kluwer Law International, 2005) p. 178; *ibid.* at 881.

(b)  The required degree of urgency is inevitably a subjective standard, and calls for pragmatic judgement in all circumstances.[39]

121.  Sixth, the balance of likely harms is a balance of hardships, and in determining the balance of hardships, the Tribunal must take into account the "*central condition*" of this test which requires that the "*threat of possible harm from not granting the measures must… **substantially outweigh** the harm that the party against whom the measure is being sought will suffer from its issuance*".[40]

**Respondents' Case on Irreparable Harm, Balance of Harms, and Reasonable Prospect of Success**

122.  Given the procedural posture of this case, it is not surprising that the Respondents spend much of their submissions showing how the Claimants have *failed* to satisfy the various legal and factual requirements of Article 26.

123.  To the extent that the Respondents make a positive case in favour of maintaining the Second Philippine Court Order, the Respondents' case, in the structure of Article 26, can be summarised as follows.

(a)  The Shares, as a whole, have a unique value to the Respondents. Accordingly, the sale of the Shares (which is inevitable if the Claimants were not enjoined from doing so) would irreparably, if not substantially, damage the Respondents, since it is *very difficult* (if at all possible) to re-acquire this block of Shares (the Respondents' "**Proprietary Argument**").

(b)  Further, the Respondents would be irreparably harmed if the Claimants were to sell the Shares, since the Claimants would then have *no assets* from which they could meet their liabilities, should the Tribunal find against them and award damages in favour of the Respondents. This *necessarily assumes* either that (a) the *proceeds* from the sale of the Shares would be too little to satisfy any award which this Tribunal may make in the Respondents' favour, or (b) that the Claimants would *dissipate* the proceeds of sale (the "**Dissipation Argument**").

**Irreparable Harm: The Respondents' claim that the Shares have unique value and the proprietary claim to the Shares**

---

[39] Georgios Petrochilos, INTERIM MEASURES UNDER THE REVISED UNCITRAL ARBITRATION RULES, ASA Bulletin, (2010, Volume 28 Issue 4) pp. 878, at 881 (CL-36).
[40]  David D. Caron & Lee M. Caplan, THE UNCITRAL ARBITRATION RULES (2d. ed. 2013) (excerpts) p. 522 (RL-35).

124. The Respondents have argued that the shares as a block are *of themselves* of unique value *to the Respondents* The Tribunal, having regard to Professor Solomon's Report, as well as Professor Solomon's testimony during the hearing, are not convinced that the sale of the Shares would cause the Respondents irreparable harm. It should be noted that the Respondents are free to purchase the Shares from the Claimants at market value, if indeed the Shares (*qua* Shares) have a "*unique*" value. Moreover, as Professor Solomon seemed to acknowledge at the hearing, if the Shares have any unique value, then that value would be unique to Claimants as well as to Respondents. In any case the recent sale by Bloomberry of 435 million BRC shares contradicts the unique value argument of Respondents.

125. The Tribunal further notes that, to the extent that the Respondents are also arguing that the proceeds of the sale should also belong to the Respondents (with a deduction for the price the Claimants paid for the Shares), then the Respondents are in effect seeking money damages from the Claimants. In any event, the Tribunal finds that the Shares do not have unique value beyond their monetary value, and therefore, any damage resulting from their sale can be compensated by money damages.

126. The Proprietary Claim may be summarised as follows.

   (a) The MSA is to be rescinded because of the Claimants' substantial breaches of its terms.

   (b) Since the MSA contained a clause which granted the EOA (Clause 18.3), rescission of the MSA would also mean the rescission of the EOA. This result is to be obtained either by construing both contracts to be part of the same contract, or construing Clause 18.3 as being the operative clause which in law and fact granted the option.

   (c) Once the EOA is rescinded, it follows that the property that passed pursuant to the EOA is also to be returned to the respective Parties; the Grantor recovering the Shares, and the Grantee returning the Shares (and recovering the amounts paid for those Shares).

127. In respect of the Respondents' Proprietary Claim, the Tribunal makes the following observations:

   (a) On the basis of the evidence and arguments submitted at this early stage, the Tribunal is not convinced for the purposes of enjoining Shares pursuant to Article 26 of the UNCITRAL Rules 2010 that the Respondents themselves have a serious claim to the Shares which could be subverted by the sale of those Shares.

(b) First, in respect of the identity of the party to whom the Shares could possibly return (assuming that restitution were ordered), the Tribunal is provisionally not convinced at this stage that either of the Respondents in the present proceedings is the correct party to whom those Shares would or could belong. If indeed restitution is found to be the appropriate remedy, the Shares would, on the Respondents' Experts' own case, revert to the entity in which they vested prior to their transfer.[41] That entity is PMTC.[42] However, neither PMTC, nor its successor in interest, PMHI, is a party to the present proceeding.

(c) The Tribunal is not persuaded, on the face of the record before it at this time, that there is authority for the proposition (as the Respondents argue) that "*it's entirely possible as a legal matter that the Prime Metroline entity is a beneficiary with respect to a Contract entered by its prior subsidiaries, in that sense, the Shares could be restituted to Prime Metroline, notwithstanding the fact that it's not a party*", and that "*the existence of a doctrine of privity of Contract doesn't negate the possibility of restitution to a third party beneficiary, for example, of a contract*".[43] The threshold question before this Tribunal is whether or not the <u>Respondents</u> are likely to suffer substantial harm if the Tribunal does not make an Order on the same terms as the Second Philippine Court Order.

(d) The Tribunal emphasises that it is not pre-judging any merits of this case, which the Parties will have full opportunity to ventilate in their submissions prior to and during the merits hearing. However, the Tribunal must be convinced for the purposes of maintaining or ordering an injunction against the Claimants' Shares that it is likely that the Respondents will suffer substantial harm. It is insufficient if the Respondents show that a third party – say, Mr. Razon, or PMHI, or PMTC – is likely to or even will certainly suffer irreparable harm, since it is beyond this Tribunal's remit to protect the rights of non-parties in this arbitration.

(e) In all the circumstances, the Tribunal, without pre-judging the merits of this claim, has not been presented with convincing evidence that the

---

[41] Justice Vitug's Opinion, paragraph 54 ("*[R]escission… has the effect of not merely terminating the contract but abrogating it from the beginning and restoring the parties to their relative positions before the said contract was entered into. Thus, assuming there is a substantial breach in the MSA for which BRHI and SPI may rescind the said agreement, this doctrine supports the claim that the shares given as consideration under the MSA, EOA and Participation Agreement may be recovered in order for the parties to return to their original positions before the contract was made*").

[42] JCB-20 (in which PMTC is the "*Grantor*" of the Shares).

[43] T-day 3 148 line 15 - p. 149 line 8).

Respondents themselves will suffer irreparable harm if they do not receive the Shares. Accordingly, any harm arising from the sale of the Shares would be suffered by the Grantor. The Tribunal has not been shown evidence that the Respondents are the Grantor's successors or assigns.

(f) In any event, the Tribunal notes that, even if the Respondents succeed at the merits phase on their Proprietary Claim, the Respondents have not persuaded the Tribunal that they are likely to suffer irreparable, or substantial, harm. Should the Claimants sell the Shares, the Claimants will simply have assets other than the Shares, such assets being of equivalent value to the sale price of the Shares, and out of which the Claimants can satisfy any award made against them (if at all).

128. Accordingly, the Tribunal is not persuaded (and as a corollary, the Respondents have not satisfied the Tribunal) that the Respondents are likely to suffer irreparable or substantial harm if the Claimants were to sell the Shares.

**Irreparable Harm: the Respondents' case on the possibility of dissipation of assets**

129. While the Tribunal's decision in the previous section is sufficient to dispose of the Respondents' case for making an Order in the same terms of the Second Philippine Court Order, the Tribunal will, for completeness, analyse the Respondents' alternative case that they may suffer irreparable harm if the Claimants sell the Shares and (consequently) have no assets against which the Respondents can enforce an award in their favour (if any). This fact (of enforceability) goes toward the limbs of either irreparable harm or urgency.

130. The Tribunal is not convinced by the Respondents' arguments (on the enforceability of any award in their favour), based on the following analysis.

(a) While the first Claimant is a special purpose vehicle, there is no evidence that the first Claimant will, upon the sale of the Shares, proceed to wind itself up and/or dispose of the proceeds of the sale of Shares in an unlawful manner, or to dispose of the proceeds of sale in a way that would render any award by this Tribunal "*inutile*".

(b) Absent any evidence of the propensity or likelihood that the Claimants will put the proceeds of sale out of reach of the Respondents (should they succeed on the merits of their claim), there is no basis for ordering (or maintaining) provisional measures against the Claimants.

(c) In the face of significant claims against them, it seems unlikely that the Claimants would render themselves "asset-less". If they do so, and a

significant claim against them were to succeed, there may be theories of liability that could be pursued against any affiliated companies that obtain all or substantially all of Claimants' assets.

## Reasonable possibility of Success

131. As to the third limb of Article 26, the Tribunal is not provisionally convinced at this stage, on the face of the evidence and submissions in this interim measures proceeding, that the Respondents' proprietary claim to the Shares, as currently formulated, has a reasonable prospect of success. The Tribunal repeats that it is not prejudging the merits of the case and will carefully consider *de novo* all evidence and arguments finally presented to it at the merits stage of the case.

## Application of UNCITRAL Rules 2010 to the Claimants' Position

132. As a starting point, the Tribunal refers to its previous analysis of what each Party is requesting, and what each Party has to prove (see paragraphs 98-107 above).

### Irreparable Harm

133. The Claimants argue that:

   (a) First, they suffer harm since the price of the Shares, while having risen, is nevertheless subject to the vicissitudes of the market.

   (a) Second, that, since the Respondents do not advance an alternative provisional measure, the only remedy Respondents seek in the present proceedings is a continued freeze on the sale of the Shares until the merits hearing, which is not likely to occur in the next six to nine months.

   (b) Third, that any harm to the Respondents can be met by an award of damages. According to Claimants, the reason they have no assets at present is precisely because they are unable to monetise the Shares – including being unable to use them as security for loans.

   (c) Fourth, that they suffer a violation of property rights and reputational harm.

134. The Tribunal notes that, although the Shares are worth far more today than they were at the time at which the Claimants attempted to sell them, a continued injunction against the Claimants in respect of their ability to deal with the Shares as the *prima facie* owner of those Shares presents a real risk that the

Claimants could suffer monetary damages at some time during the continuance of the injunction.

135. As the Tribunal has noted at paragraph 120 above, the possibility of monetary compensation is not sufficient in every case to bar a request for interim measures. In the full circumstances of this case, the Tribunal takes the view that the possible harm to the Respondents does not outweigh the possible harm caused to the Claimants by ordering an injunction against the block of Shares.

**Reasonable possibility of Success**

136. Claimants have argued that they are likely to succeed. The Tribunal, without pre-judging the merits of the case, considers that the Claimants have provisionally shown at this stage a reasonable possibility of success on the merits. On the other hand, the Respondents have not sufficiently persuaded the Tribunal that they ( as opposed to their related companies) have any proprietary ( as opposed to contractual) rights to protect. On the face of the EOA and the Participation Agreement, there is insufficient evidence that the Claimants are in breach of the EOA or the PA, or that there is any other outstanding act required to be done for the Shares to vest in the Claimants.

## Operative Part of this Order

137. In its final Order dated February 25, 2014 in the case entitled "*Bloomberry Resorts and Hotels, Inc., et al. vs. Global Gaming Philippines LLC, et al.*", Spec. Proc. No. M-7567, the Regional Trial Court of Makati City, Philippines, decreed that in accordance with Rule 5.6 of the Special ADR Rules, its "*interim measures of protection are issued without prejudice to subsequent grant, modification, amendment, revision or revocation by the arbitral tribunal in Singapore, once the same is duly constituted*"[44] and the Tribunal, having been duly constituted, and upon motion and hearing having ruled as set forth below.

138. The Tribunal hereby:

   (a) Restores the Parties to the *status quo ante* as of 15 January 2014, so that:

      (i) The Second Philippine Court Order is hereby **revoked** or superseded by this Order; and

      (ii) The Claimants are henceforth **free to deal with the Shares**, and this includes, out of an abundance of caution, the right to sell or dispose of the Shares at their discretion.

   (b) Denies the Claimants' requests for reliefs under sub-paragraphs 230(b), (c) and (e) of Claimants' Request; and

   (c) Defers the issue of costs incurred in respect of this Interim Measures Application to the next phase of the Arbitration.

139. The Tribunal emphasises that it makes **no declaration** as to the ownership of the Shares, and has not pre-judged any aspect of each side's pleaded case, and Parties shall have the full opportunity to ventilate their respective cases at the merits hearing. Accordingly, the Tribunal defers any decision as to the declaration of the legal and/or beneficial ownership of the Shares to the merits phase of the Arbitration (which is the appropriate phase in which to determine this question).

140. The Parties shall have leave to amend their respective claims and counterclaims as they deem necessary.

141. Considering the Order dated February 25, 2014 of the Regional Trial Court of Makati City, Philippines and Rules 5.9 and 5.13 of the Philippines Special ADR Rules, this Order of the Tribunal on Interim Relief issued in the instant

---

[44] JCB-57.

arbitration proceeding in regard to the "Claimants' Request For Interim Measures of Protection Pursuant to Article 26 of the UNCITRAL Arbitration Rules" is deemed to have superseded the final Order dated February 25, 2014 of the Regional Trial Court of Makati City, Philippines. Accordingly, the Writs of Preliminary Injunction and Attachment issued pursuant to the final Order dated February 25, 2014 of the Regional Trial Court of Makati City, Philippines shall now be deemed to be vacated and lifted. This Order of the Tribunal on Interim Relief is in all respects substituted for and replaces that Order and the Writs of Preliminary Injunction and Attachment. The parties are directed to accordingly bring this resolution before the Philippine Court of Appeals in the case entitled "*Global Gaming Philippines LLC vs. Bloomberry Resorts and Hotels, Inc., et al.*", CA-G.R. SP No. 134340, and to the Regional Trial Court of Makati City, Philippines in the case entitled "*Bloomberry Resorts and Hotels, Inc., et al. vs. Global Gaming Philippines LLC, et al.*", Spec. Proc. No. M-7567 and to assure its implementation.

Dated this __9__ day of __December__ 2014 and made in Singapore.


_____                          _____

**R. DOAK BISHOP**                               **MICHAEL HWANG S.C.**
**(Arbitrator)**                                 **(Arbitrator)**

                    _____
                    **DR ANDRÉS RIGO**
                    **(Chairman)**