# APPENDIX 4

## MANAGEMENT SERVICES AGREEMENT

This Management Services Agreement (this "Agreement") is made this 9   th day of September 2011, by and between:

**BLOOMBERRY RESORTS AND HOTELS INC.** (formerly known as "Bloombury Investments Holdings, Inc.), a corporation organized and existing under the laws of the Republic of the Philippines with address at Unit 601, 6th Floor Ecoplaza Building, Pasong Tamo Extension, Makati City, Philippines (the "Casino Owner"), and

**SURESTE PROPERTIES, INC.**, a corporation organized and existing under the laws of the Republic of the Philippines with address at 26th Floor, 139 Corporate Center Building, Valero Street, Salcedo Village, Makati City, Philippines (the "Hotel Owner"), and

(The Casino Owner and the Hotel Owner are collectively referred to herein as "Owners").

**GLOBAL GAMING PHILIPPINES LLC,** , a limited liability company organized and existing under the laws of the State of Delaware, U.S.A, with address at c/o Global Gaming Management L.P. 3575 West Post Road, Las Vegas, Nevada, U.S.A. ( "GGAM").

## RECITALS

A.      Casino Owner has a Provisional License issued by the Philippine Amusement and Gaming Corporation ("PAGCOR") to develop, construct and operate a world class integrated casino hotel entertainment facilities (the "Facilities" or "Project") at PAGCOR's Bagong Nayong Pilipino Entertainment City Manila located at the Manila Bay reclamation area in Parañaque City, Metro Manila, Philippines, and Casino Owner has enlisted its parent company, the Hotel Owner to own the hotel and non-gaming component of the Facilities. But for purposes of this Agreement the casino and hotel shall be operated as one integrated business.

B.      GGAM, together with its affiliates, is knowledgeable and experienced in developing, operating, managing, directing, and supervising world-class resorts, hotels, casinos and other related facilities.

C.      The parties agree for the Owners' to engage GGAM for management and technical services in the development and construction, and to manage the operation of the Facilities.

D.      Pursuant to the terms of this Agreement, GGAM shall provide the Services as stipulated in Annex A.

**1.      TERM**

### 1.1     Effectiveness

This Agreement shall be effective as from the date of its execution ("Effective Date").

### 1.2     Initial Term

The Initial Term shall be for a period of five (5) years from the date Commercial Operations of the Facilities start ("Start Date"). "Commercial Operations" means the date upon which all portions of the Phase 1 Facilities now under construction, including those set forth in Clause 3, are in complete and lawful operation and generating revenue. The Owners and GGAM may agree on an earlier Start Date if PAGCOR allows the operation of the gaming facilities even if some parts of the Facilities are not yet complete. In such case, all reference to "Start Date" in this Agreement shall refer to such earlier agreed Start Date.

### 1.3     Extension

No earlier than the fourth anniversary of the Start Date and no later than three (3) months from the fifth anniversary of the Start Date, GGAM may give notice to the Owners (an "Extension Notice") that it wishes to continue the performance of the Services for a subsequent period (a "Subsequent Term") of five (5) years, under the same terms and conditions. This Agreement shall then be deemed extended for the Subsequent Term of five (5) years.

### 1.4     Further Extension

The terms of this Agreement may be extended for further Subsequent Terms under such terms and conditions as the parties may agree. The parties shall negotiate in good faith on the terms and conditions of such Subsequent Term within one year from the expiration of the then expiring term.

**2.      OBLIGATIONS OF GGAM**

### 2.1     Appointment

The Owners hereby appoint GGAM to perform the Services for the Facilities upon the terms and conditions of this Agreement, and GGAM hereby accepts the appointment.

2.2     **Services**

GGAM shall carry out the Services enumerated in Annex A upon the terms and conditions contained in this Agreement. The Services shall constitute as rights as well as responsibilities of GGAM under his Agreement. GGAM's obligation to provide the Services shall be subject to: (A) Owners' funding of the amounts set forth in the Annual Budget for each fiscal year as provided in this Agreement, and (B) equitable adjustment in the event of any Force Majeure, change in law, or change in the provisions of the PAGCOR License.  If the Owners disapprove of any Proposed Annual Budget prepared by GGAM with expenditure levels reasonably required in order to provide the Services and GGAM can reasonably demonstrate that the Owners' refusal to approve such Proposed Annual Budget will have an adverse effect on GGAM's ability to provide the Services, then GGAM will not be in breach of the performance of the particular Services that is so adversely affected by such disapproval.

2.3     **Reserved Matters**

GGAM has no right to represent or bind the Owners with respect to any of the Reserved Matters. However, the Owners shall consult GGAM before they make any decision on Reserved Matters. The Reserved Matters are set out in Annex C.

2.4     **Management Team**

(a)     GGAM shall perform its Services through the Management Team composed of the officers that GGAM will nominate, and the other department heads and officers and personnel who report to and are under the direction of the COO, under the organizational chart attached as Annex D (the "Organizational Chart").

(b)     GGAM shall have the sole discretion to nominate the officers in circular boxes appearing in the Organizational Chart, subject to the Owners consent required in Clause 7. GGAM may replace its nominees in the organization subject only to the same consent process applied to Key Personnel as provided in Clause 2.4(d) below.

(c)     GGAM shall define the  functions of all offices/ positions identified in the Organizational Chart whether in circular or rectangular boxes). The definition of functions and the appointment of officers in the Organizational Chart shall be subject to approval of the Board, which approval shall not be delayed or withheld unreasonably.

(d)     The personnel and functions designated "*" in Annex D are "Key Personnel". No member of the Key Personnel may be removed from the performance of the Services without the Owners' prior written consent (which shall not be unreasonably withheld or

3

delayed, and shall not be required when such Key Personnel dies, retires, resigns, is incapacitated or loses eligibility to work in the Philippines). Provided further that GGAM, acting through the Management Team, shall have the right, without the prior consent of the Owners but upon written notice thereto, to terminate any Key Personnel for cause.

(e)    If the Owners reasonably object for cause to the manner in which any member of GGAM's nominated officers (including Key Personnel) performs the Services, the Owners may request that the officer be replaced and in such event, GGAM shall promptly propose and provide an alternative replacement officer and all costs of effecting such replacement officer  shall be the expense of the Owner.

(f)    GGAM shall designate the COO as its Management Team leader who shall have full responsibility to represent GGAM in all matters connected with the performance of this Agreement.

## 2.5    Standard of Care

GGAM warrants and undertakes that, in performing the Services through the Management Team,  it shall use commercially reasonable efforts to comply with the following which shall be collectively referred to as the "Standard of Care":

(a)    it shall exercise all the skill and care reasonably to be expected of a professionally qualified and competent manager of casino and hotel facilities experienced in performing work of similar nature and scope as the Services ("Prudent Industry Practice"),

(b)    it acts in the highest standards of business ethics;

(c)    it will at all times act in the best interests of  the shareholders of the Casino Owner and the Hotel Owner, and to maximize such shareholders' value  in the performance of its obligation under this Agreement and in all dealings carried out by it in its capacity under this Agreement; and

(d)    it shall comply with applicable Philippine law in the performance of the Services under this Agreement.

Provided that GGAM's obligation to meet the Standard of Care set forth in this Clause 2.5 shall be subject to: (A) Owners' funding of the amounts set forth in the Annual Budget for each operating year and as provided in this Agreement, and (B) equitable adjustment in the event of any Force Majeure, change in law, or change in the provisions of the PAGCOR License.  If the Owners disapprove of any Proposed Annual Budget prepared by GGAM with expenditure levels reasonably required in order to comply with this Clause 2.5 and GGAM can reasonably demonstrate that the Owners' refusal to approve such Proposed Annual Budget will

4

have an adverse effect on GGAM's ability to comply with this Clause 2.5, then GGAM will not be in breach of the provision of this Clause 2.5 that is so adversely affected by such disapproval.

2.6     **Specific Obligations**

(a)     GGAM and the COO shall comply with the instructions and directions in relation to the Services and/or this Agreement issued to them by the CEO or his authorized representative, except if such instructions and directions, or the compliance with such instructions or directions, would violate Applicable Law. If GGAM can reasonably demonstrate that GGAM and COO's compliance with the instructions and directions of the CEO under this provision will have an adverse effect on GGAM's ability to comply with the Standard of Care, then GGAM will not be in breach of the particular Standard of Care that is so adversely affected by the CEO's instruction and directions, and GGAM shall be entitled to equitable adjustment.

(b)     The Owners shall provide GGAM with copies of the PAGCOR License, the PAGCOR Lease Agreement, the   BDO Loan (collectively "Project Agreements") and of the Owner's insurances. GGAM and the Management Team shall be fully aware of the contents and import of specific provisions that Owners shall identify to GGAM of such agreements. GGAM acting through the Management Team shall comply with the obligations of the Owners under those specific provisions identified under the Project Agreements. And GGAM shall not be held liable for complying with the obligations of the Owners under the Project Agreements pursuant to this provision. The Owners shall send prompt notice to GGAM if there is any change in a Project Agreement. The Owners shall consult with GGAM before they agree on any changes in a Project Agreement which conflict with this Agreement or adversely affect GGAM's rights under this Agreement. If there is any conflict or inconsistency between the provisions of this Agreement and those of the Project Agreements, GGAM shall so notify the Owners in writing when it becomes aware of such conflict, and it shall not be liable if it is not aware of such conflict. The Owners (i) represent and warrant (a) that, individually and/or collectively, the Owners have conducted due diligence with regard to all matters arising from or related to the Project Agreements and  (b) that the obligations of the Owners under the Project Agreements are not in conflict, inconsistent, or out of compliance with this Agreement or any agreement contemplated thereunder;  and   (ii) covenant that the Owners obligations under the Project Agreements will not be in conflict, inconsistent, or out of compliance with this Agreement or any agreement contemplated thereunder.

5

2.7    **Conflict of Interest**

GGAM shall not engage in any activity involving a hotel or casino within the Philippines, which might conflict with the interest of the Owners under the Project Agreements. For the avoidance of doubt, neither Cantor Fitzgerald, L.P., a Delaware limited partnership, nor any Affiliate of Cantor Fitzgerald, L.P. (excluding GGAM and Global Gaming Management L.P.) shall be subject to this Clause 2.7.

2.8    **Books and Records**

GGAM acting through the Management Team shall see to it that up-to-date, accurate and systematic books and records of the business of the Facilities and the Services are maintained in accordance with Applicable Accounting Standards, and in such form and detail as is required under Prudent Industry Practice or as otherwise reasonably required by the Owners. GGAM acting through the Management Team shall establish an accounting system, internal controls and reporting systems that are (i) consistent in all material respects with customary policies and procedures used by GGAM or its affiliates engaged in such business and (ii) in compliance with the Applicable Law including all applicable gaming laws, and approved by the Owners, which approval shall not be unreasonably withheld or delayed.

2.9    **Reporting**

(a)    GGAM acting through the Management Team shall submit to the Owners monthly before the 10th day of the month (or more frequent, if required by the Owners) unaudited, internal financial performance reports relating to the status of the performance of the Services, including a profit and loss statement showing the results of the operation of the Facilities for the preceding month and the year to date, and containing computations of Facilities Revenue, Operating Expenses, EBITDA, and all GGAM Fees, costs, charges, and expenses payable or reimbursable to GGAM pursuant to this Agreement, and compliance with the Business Plan, Annual Budget, and the Performance Standards. The figures contained in such monthly report shall be taken from the books of account of the Facilities maintained in accordance with Clause 2.8.

(b)    GGAM, acting through the Management Team, shall submit to Owners, before the date one hundred five (105) days after the end of each operating year, with the exception of the last operating year of the Initial Term (or any Subsequent Term), a profit and loss statement certified by an independent auditor and based upon the books of account of the Facilities, which statement shall show the results of the operation of the Facilities during the preceding operating year and shall contain a computation of the Facilities Revenue, Operating Expenses, EBITDA, the GGAM Fees, and/or any accounting for reimbursable expenses, interest,

or currency matters under this Agreement ("Audited Year End Financial Statements"). The cost of the audit shall be an Operating Expense. The independent auditor shall be recommended by GGAM in consultation with the Owners, and appointed by the stockholders of the Owners. The independent auditor shall be from an internationally reputable accounting firm with a correspondent firm in the Philippines with adequate experience in auditing international gaming companies.

2.10    **Budget**

(a)     GGAM acting through the Management Team shall prepare the Annual Budget which shall include (i) the replacements of and additions to FF&E and Operating Supplies to be made as part of the Services; (ii) a proposed budget of capital expenditures; and (iii) a budget of the estimated Facilities Revenue and Projected EBITDA and a Projected Base Fee EBITDA for the Facilities for the following Fiscal Year, all in reasonable detail ("Proposed Annual Budget"), Business Plan, and marketing plans for discussion with the Owners and approval by the Board.

(b)     The Proposed Annual Budget shall be delivered by GGAM acting through the Management Team to Owners for approval not later than 60 days before the commencement of the affected Fiscal Year. The Owners shall have 30 days from Owners receipt of the Proposed Annual Budget to either (A) approve it, in which case the Proposed Annual Budget shall be deemed to be the "Annual Budget" for the Fiscal Year to which it relates; or (B) disapprove the Proposed Annual Budget by written notice to GGAM, stating the specific reasons for its rejection of all or part of the Proposed Annual Budget. If the Owners fail to either approve or disapprove the Proposed Annual Budget within such 30 days period, the Proposed Annual Budget shall be deemed to be approved by the Owners.

(c )    If the Owners and GGAM cannot reach agreement with respect to a Proposed Annual Budget (or any specific element thereof), then the operation of the Facilities shall continue based upon the last Annual Budget (increased by the percentage increase in ROPCPI, not to exceed five percent (5%)) in effect until a new Proposed Annual Budget has been approved by the Owners, modified to reflect those elements of the Proposed Annual Budget that have been approved or deemed approved.

(d)     If the Parties are unable to arrive at an Annual Budget by February 15 of any Fiscal Year, then any dispute shall be resolved pursuant to Annex I. Each Party shall have the opportunity to submit its final proposal as to the element(s) in dispute to the Expert, who shall be limited to accepting that proposal which the Expert reasonably determines most accurately reflects a reasonable and

achievable EBITDA expectation for the Facilities, with due consideration given to then current market conditions. The Proposed Annual Budget with the disputed elements as resolved by the Expert, shall be deemed the approved Annual Budget.

(e)     GGAM acting through the Management Team may incur costs or expenses or make expenditures which exceeds or are not in the Annual Budget, provided the consent of the CEO or his representative is obtained, and the Annual Budget shall be amended if necessary, subject to the approval of the Owners. Any dispute on the proposed amendment to the Annual Budget shall be resolved pursuant to Annex I. Provided, however, GGAM acting through the Management Team shall have the right to incur costs or expenses or make expenditures for (i) cost or expenses (excluding junket commission and credit) reasonably determined by GGAM to maximize EBITDA during the Fiscal Year; (ii) any uncontrollable expenses such as utilities, insurance, and taxes which are deemed increased to the actual cost level incurred; (iii) any expenditures reasonably required on an emergency basis to avoid or mitigate damage to the Facilities or injury to persons or property; (iv) amounts required to extend complimentaries to patrons at the Facilities; (v) amounts set forth in the Annual Budget which are calculated based on projected occupancy rate or Projected EBITDA or projected Facilities Revenue to the extent such amounts increase (or decrease) proportionately to the extent the actual occupancy rate of the Facilities and/or revenue for the Fiscal Year exceeds or falls below the projected occupancy or Projected EBITDA or projected Facilities Revenue; provided that the permitted variance set forth above shall not exceed 7.5% of the budgeted amount, and provided further that GGAM shall provide the Owners with prompt written notice of any anticipated expenditures in excess of what is in the Annual Budget and the permitted variance set forth above.

## 2.11    Entitlement of GGAM to Ensure Compliance

GGAM shall be entitled to take, and the Owners shall not prevent GGAM from taking, such measures as are necessary and appropriate, as permitted under Applicable Law, to ensure that the Facilities are operated in accordance with, and will not cause GGAM or its Affiliates to fail to be in compliance with (i) applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations, or guidelines, issued, administered, or enforced by any governmental agency (ii) Sanctions Laws and Regulations, and (iii) the United States Foreign Corrupt Practices Act of 1977, as amended, as well as all other applicable anti-corruption laws of other relevant jurisdictions.

3.  **OBLIGATIONS OF THE OWNERS**

3.1  **Facilities**

The Owners shall, at their own cost, develop, construct, fit out and complete the Facilities in accordance with the plans and specifications prepared by Steelman Partners LLP (excluding the Phase 1-B Facilities), which shall include the following:

a)  A world class casino (to include appropriate junket resort operator rooms and facilities) with gaming tables, slot machines and any other permitted form of gambling or games;

b)  A world class hotel with suites;

c)  Restaurants, bars, lounges;

d)  Spa, health club, pool(s);

e)  On-site retail shops and shopping areas;

f)  Meeting space/facilities;

g)  Other amenities.

Owners shall, at their own cost and as soon as possible, rectify (or cause to be rectified) any construction-related or FF&E deficiencies identified by GGAM.

3.2  **Licenses and Permits**

The Owners shall obtain and shall use its commercially reasonable efforts to maintain all governmental licenses, permits and approvals required to own, construct and operate the Facilities. The Owners shall help the Management Team liaise and maintain good relationship with PAGCOR and other relevant government agencies.

3.3  **Utilities**

The Owners shall obtain and arrange for all utility services necessary for the operation of the Facilities.

3.4  **Payment**

The Owners shall pay the GGAM Fees in accordance with Clause 4. The obligations of the Owners to pay the GGAM Fees shall be joint and several.

3.5     **Working Capital**

The Owners shall ensure that there is sufficient working capital (including casino bankroll) as budgeted or as needed, construction and capital expenditures, reserve funds, etc. to operate the Facilities in accordance with the Business Plan and Annual Budget.

3.6     **Insurance**

The Owners shall take out all necessary insurance for the operation of the Facilities; obtain all usual and customary policies for projects of this type and magnitude (including, among other things, business interruption, sabotage and terrorism, crime insurances, including fidelity, earthquake, tsunami, flood and other natural calamities, and all standard insurable risks as required under the PAGCOR License). The Owners agree to restore or rebuild the damage or loss to the Facilities in the event of any casualty caused by an insured event (to the extent of the insurance proceeds).

3.7     **Assistance**

The Owners shall provide all assistance to enable the nominees of GGAM to obtain the visas and work permits necessary for them to work in the Facilities in the Philippines.

3.8     **Actions of the Board**

Under this Agreement, all actions of the Board of Directors shall be considered as actions of the Owners. Where actions of the Owners require formal Board approval, the Owners shall be responsible to obtain such Board approval.

3.9     **Actions of the CEO**

Under this Agreement, all actions of the CEO (or his authorized representative) shall be considered as actions of the Owners. Where actions of the CEO require formal Board approval, the Owners shall be responsible to obtain such Board approval.

4.      **SERVICE FEES**

4.1     **Fees - Development**

The Owners shall pay GGAM a planning, oversight, and development base fee of One Hundred Thousand U.S. Dollars ($100,000) per month, without reduction or pro ration in such fee for a partial month, commencing upon execution of the Agreement and terminating upon the issuance of a permanent certificate of occupancy for the Phase I Facilities.

The Owners shall pay GGAM such fees as the parties may mutually agree for providing planning, oversight and development services for the Phase I-A and Phase 1-B Facilities.

### 4.2    Fees - Pre-Opening

The Owners shall pay Seventy-Five Thousand U.S. Dollars ($75,000) per month to GGAM for Pre-Opening Operations upon execution of the Agreement and terminating upon the Start Date.

### 4.3    Fees - Base Fee

The Owners shall pay GGAM an annual base fee of two percent (2.0%) of the Base Fee EBITDA from the Facilities. For this purpose, "Base Fee EBITDA" shall mean an amount equal to the EBITDA less the Local VIP EBITDA and Foreign VIP EBITDA.

### 4.4    Fees - Casino Local VIP Base

The Owners shall pay GGAM an annual fee of six percent (6.0%) of the EBITDA generated from Local High Roller Tables where PAGCOR imposes a 15% license fee under the PAGCOR License, or as that term is defined in the laws or regulations governing the Facilities ("Local VIP EBITDA").

### 4.5    Fees - Casino VIP Incentive For Foreign VIP/Junket Players

The Owners shall pay GGAM an annual casino incentive fee calculated as a Graduated Fee based on the EBITDA generated from Foreign High Roller Tables and Foreign Junket Players ("Foreign VIP EBITDA") as these terms are defined in the laws and regulations governing the Facilities for each Fiscal Year beginning in the year of the Facilities' Start Date, provided that GGAM's total fees shall not exceed forty percent (40%) on Foreign VIP EBITDA, as follows:

Graduated Fee Schedule

- 6% of the first $10,000,000 in Foreign VIP EBITDA for the Fiscal Year;
- 15% of the next $5,000,000 in Foreign VIP EBITDA for the Fiscal Year;
- 25% of the next $5,000,000 in Foreign VIP EBITDA for the Fiscal Year;
- 30% of the next $5,000,000 in Foreign VIP EBITDA for the Fiscal Year;
- 35% of the next $10,000,000 in Foreign VIP EBITDA for the Fiscal Year;
- 40% of any amount in excess of $35,000,000 of Foreign VIP EBITDA for the Fiscal Year.

The Foreign VIP Incentive Fees shall be paid pro rata monthly as adjusted based on prior months' underpayments or overpayments with an annual year end reconciliation.

### 4.6   Payment of Fees

All fees, costs, charges, and expenses payable or reimbursable to GGAM shall be due monthly upon delivery of an invoice by GGAM or its affiliates, and shall be paid to GGAM or its affiliate in  available funds after a verification is made of such invoice and its supporting papers, at the location(s) specified by GGAM from time to time. GGAM may pay such fees and other amounts owed to GGAM or its affiliates directly from the Facilities operating accounts or reserve funds, in which case the Owners shall replenish the reserve funds in the amount of such withdrawal by GGAM within thirty (30) days after notice to the Owners. GGAM may require that any such payments be effected through electronic debit/credit transfer of funds programs specified by GGAM from time to time, provided GGAM shall pay such fees and costs and do such things as GGAM deems necessary or advisable to effect such transfers of funds and such method complies with Applicable Law.

Taxes accruing on fees payable to GGAM shall be for the account of GGAM. Value Added Tax on the GGAM Fees shall be part of Operating Expenses.  The fees payable to GGAM shall be structured in the most tax effective methodology.

### 4.7   Reimbursable Expenses

The Owners shall reimburse GGAM for all reasonable and documented out-of-pocket expenses including travel expenses to and from the Facilities for GGAM's employees and consultants (and with prior written consent of the Owners, GGAM's Affiliates employees and consultants) for matters related to the Services provided under this Agreement that are not otherwise paid for by the Owners. The reimbursement shall be made after a verification of the details and supporting documents for such expenses.

### 4.8   Interest

If any fee or other amount due by the Owners to GGAM or its Affiliates or designees under the Agreement is not paid within thirty (30) days after such payment is due, the Owners shall pay, in addition to the amount due, interest for each day the amount is past due and compounded monthly, at the interest rate of 50 basis points per month or 6% per annum, or such rate to be agreed to by the Owners and GGAM.

4.9     **Currency of Payment**

a)      The GGAM Fees payable: (i) pursuant to Clauses 4.1 and 4.2 shall be paid in U.S. Dollars; (ii) pursuant to Clauses 4.3 and 4.4 shall be paid in Philippine Pesos; and (iii) pursuant to Clause 4.5 shall be paid in U.S. Dollar equivalent of such fees converted based on the monthly/annual average exchange rate of Philippine Peso to U.S. Dollar as published by the Philippine Dealing System (PDS).

b)      The reimbursable costs and expenses payable to GGAM pursuant to Clause 4.7 shall be billed and paid in U.S. Dollars irrespective of the currency of the amount(s) so paid by GGAM. The basis of conversion of these reimbursable costs and expenses paid in other currencies by GGAM shall be the PDS closing rate in effect as of that date of the individual transaction. The interest payable pursuant to Clause 4.8 shall be paid in the currency of the amount due to GGAM upon which the interest is charged.

c)      If GGAM requests that its Philippine Pesos-based fees be paid in U.S. Dollars, such amounts shall be based on the Philippine Peso to U.S. Dollar conversion rate in effect as of the effective date of such conversion and GGAM shall assume the market conversion risk.

5.      **BANK ACCOUNTS**

5.1     Operating bank accounts for the Facilities shall be established in the name of the Owners in such banks as the Board may approve. The bank requirement for Revenue Accounts to be subject to security arrangements under the BDO Loan shall be respected. GGAM shall not be held liable for complying with any restrictions or arrangements required under the BDO Loan. Subject to the review and approval of the Owners, GGAM through the Management Team shall establish sufficient controls, to ensure accurate reporting of all transactions involving the bank accounts. All deposits and withdrawals shall be in accordance with this Agreement, the Approval Matrix, approved controls (which shall include the conditions provided under the BDO Loan, and the reportorial requirements of PAGCOR), GGAM standard accounting policies and practices approved by the Board. GGAM through the Management Team shall develop the Signing Authority Matrix and the Approval Matrix, which shall be subject to the approval of the CEO and the Board.

5.2     As a rule, disbursements and transfer of funds from the Operating Accounts shall require two (2) signatures one from Group "A" and one from Group "B" signatories. There shall be two (2) groups of signatories for this purpose. Group "A" signatories shall be composed of officers nominated by GGAM. Group "B" signatories shall be composed of officers nominated by the Owners.

13

5.3     The Management Team shall only retain such funds in these Operating Accounts as are necessary to carry out its responsibilities under this Agreement for current and reasonably anticipated future operating, bankroll, gaming reserves, operating expenses, marketing, renovation, maintenance or capital expenditures, including any reserves for such purposes. GGAM acting through the Management Team shall sweep accounts on a monthly basis except for funds listed above, shall provide an accounting for Owners' review within three (3) Business Days after end of each month. And profits which are not retained in the Operating Accounts at the end of each month shall be transferred to the Owners Account which shall be under the sole control and disposition of the Owner.

## 6.    MARKETING

GGAM and the Management Team shall develop, implement and manage a marketing program for the Facilities, which may include utilization of brands, centralized services, affiliate programs, or other programs of GGAM, its affiliates, or third parties. The Guest Data of GGAM shall remain to be its property. The Guest Data generated from the operation of the Facilities shall be the property of the Owner and shall be used only for the Facilities. The Parties are free to use for their own separate purposes the data on patrons which appear in both the GGAM Guest Data and in the Facilities' Guest Data. With the Owners approval, not to be withheld or delayed unreasonably, GGAM shall be allowed to utilize the Owner owned patron or casino database for cross-marketing the Facilities with other integrated resort facilities.

## 7.    PERSONNEL

7.1     The Board following normal corporate procedure shall appoint all members of the Management Team indicated in the Organizational Chart, provided that (i) offices/positions in circular boxes shall be nominated solely by GGAM subject to the approval of Owner, which approval shall not be delayed or withheld unreasonably, and (ii) offices/positions in rectangular boxes shall be nominated by the Owners subject to approval of GGAM, which approval shall not be delayed or withheld unreasonably.

7.2     All members of the Management Team shall be employees of the Facilities/Owners, except as otherwise mutually agreed to by the Parties. No employees of the Facilities shall be employees of GGAM, except as otherwise mutually agreed to by the Parties. The employees of the Facilities shall not be employees of GGAM, and GGAM shall not be liable for any acts or omissions of these employees.

7.3     GGAM acting through the COO shall supervise, instruct and direct the members of the Management Team. And the members of the Management Team or other managers to whom they may delegate such authority in accordance with the Approval Matrix, shall recruit, screen, appoint, hire, pay, train, supervise, instruct, and direct all other personnel

14

necessary or advisable for the operation of the Facilities, and to discipline, transfer, relocate, replace, terminate, and dismiss any personnel in accordance with the approved management and personnel policies. Provided that up to certain level to be mutually agreed between the Owners and GGAM, the hiring, compensation, bonus, and promotion of certain officers shall be subject to approval of the CEO. The hiring, compensation, bonus, and promotion of the COO, chief financial officer, vice president of gaming, and vice president of marketing shall be (i) commensurate and competitive with market rates for the hiring, compensation, bonus, and promotion of similar gaming and hospitality industry positions in Southeast Asia and (ii) subject to approval of the CEO (which shall not be unreasonably withheld or delayed). The compensation and bonus of the CEO shall be commensurate and competitive with market rates for compensation and bonus of similar chief executive officers in the gaming and hospitality industry in Southeast Asia.

7.4 GGAM acting through the COO or other members of the Management Team shall have the management discretion with respect to all personnel within their departments and offices, including decisions regarding hiring, promoting, transferring, compensating, supervising, terminating, directing, and training such personnel, and, generally, establishing and maintaining all policies relating to employment, including (a) the terms of employment, including recruiting, screening, appointing, hiring, compensation, bonuses, severance, pension plans, and other employee benefits, training, supervision, instructions, direction, discipline, transfer, relocation, replacement, termination, and dismissal of personnel, and (b) the exercise of any rights or remedies under any applicable laws relating to labor matters in relation to the Facilities and the personnel, including union organization, recognition and withdrawal of recognition, union elections, contract negotiation on single employer or multi-employer basis (including the right to negotiate and execute collective bargaining or similar agreements), grievances, unfair labor practice charges, strike and lockouts.

## 8. USE OF FACILITIES BY PERSONNEL

8.1 In accordance with reasonable policies and procedures to be agreed on between the Owners and GGAM, all senior executives of the Owners or any affiliate of the Owners that are visiting the Facilities for business purposes related to the Facilities shall be permitted to stay at the Facilities and use its facilities (including food and beverage consumption), without charge to such senior executives.

8.2 In accordance with reasonable polices and procedures to be agreed on between the Owners and GGAM, all GGAM personnel (as well as GGAM's Affiliates personnel) who travel to the Facilities on an as-needed basis to perform Services (including to monitor provision of Services, or other bona fide business relating to this Agreement) shall be permitted to stay at the Facilities and use its facilities (including food and beverage consumption), without charge to GGAM or such corporate personnel.

8.3   All corporate personnel and other personnel of GGAM, the Owners or any of their respective affiliates shall be permitted to stay at the Facilities for business or non-business purposes at reduced rates in accordance with approved Management policies.

## 9.   PURCHASING

9.1   GGAM acting through the Management Team shall select manufacturers, wholesalers, vendors, suppliers, consultants, companies, or businesses, and negotiate and subject to the Approval Matrix and Signing Authority Matrix, enter into, administer, amend, and terminate, in the name and on behalf of the Owners, all agreements, purchase orders, and similar arrangements for the purchase of all supplies and other needs to meet the day-to day of the Facilities businesses and operations. The Approval Matrix and Signing Authority Matrix shall be subject to the approval of the CEO and the Board.

9.2   Consistent with the Annual Budget, GGAM acting through the Management Team shall select manufacturers, wholesalers, vendors, suppliers, companies, or businesses, and negotiate, enter into, administer, amend, and terminate, in the name and on behalf of the Owners, all agreements, leases, purchase orders, and similar arrangements for (1) the purchase or lease of all furniture, fixtures, and equipment that Management Team deems necessary or advisable for the operation of the Facilities; (2) purchase, lease, or license, in the name of and on behalf of the Owners, all software, hardware, and telecommunications connections required (3) licenses for the right to use any third party proprietary property or (4) any other property, service or rights that Management Team otherwise deems necessary or advisable for the operation of the Facilities.

9.3   GGAM acting through the Management Team may negotiate, enter into, administer, amend, and terminate, in the name and on behalf of the Owners, all (i) agreements, purchase orders, and similar arrangements for the purchase of all supplies and services, and (ii) licenses for the right to use any third party proprietary property, that Management Team deems necessary or advisable for the operation of the Facilities.

9.4   GGAM shall avoid conflicts of interest in purchasing. Where the vendor or supplier is affiliated with GGAM, this fact shall be promptly disclosed and approval of the transaction shall require Owners' consent. The Owners will be presented with a plan to enter into a purchasing services agreement with Procurement International Ltd., a GGAM affiliated company, pursuant to which Procurement International Ltd., will propose to provide certain purchasing services to the Owners; provided that the Owners may use other sources for purchasing if the terms are more favorable to the Owners than those contained in the purchasing services agreement and Procurement International Ltd., cannot match such terms, and the alternative source is otherwise acceptable to the Owners.



16

9.5     The Owner acknowledges that GGAM's affiliate, Cantor G&W (Nevada) L.P. (doing business as Cantor Gaming) is an operator of mobile gaming, race books and sports pools, and its Affiliates own a proprietary mobile gaming system, a proprietary race book and sports pool wagering system. Subject to a permit/consent from PAGCOR, and the written approval of the Owners, GGAM may engage Cantor Gaming for the operation of Cantor Gaming's or its Affiliates' proprietary mobile gaming and race book or sports pool in the Facilities, provided that the terms and conditions of such engagement shall be commercially reasonable and arms length.

## 10.   REPRESENTATIONS, WARRANTIES AND COVENANTS

### 10.1   Owners

Owners jointly and severally represent, warrant, and covenant as of the Effective Date that: (A) they are duly formed, validly existing, and in good standing under the laws of the Republic of the Philippines; (B) they have all the requisite rights, power, and authority to enter into this Agreement and perform all their obligations hereunder; (C) this Agreement constitutes the valid and legally binding obligation of Owners, enforceable in accordance with its terms and conditions; (D) neither the execution of this Agreement, nor Owner's performance of the transactions contemplated hereby, will: (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Owners are subject, or (ii) conflict with, result in a breach of, or constitute a default under any agreement to which any Owner is a party; (E) Owners have the right and authority to grant the rights to GGAM as recited herein necessary to perform under this Agreement; (F) Owners (i) directly holds all rights, title, and interest in the Facilities and the PAGCOR license and (ii) shall not transfer their rights, title, and interest without first notifying GGAM; (G) the Facilities are being constructed on land under lease from PAGCOR; (H) the Facilities being constructed are owned by the Owners free from liens and encumbrances, except for the lien of BDO under the BDO Loan; (I) the Casino Owner is the sole owner of the PAGCOR License, it is not in default under the PAGCOR License, and it is not aware of any threatened or possible default under the PAGCOR License, except as disclosed in the Disclosure Letter; (J) the directors, officers and stockholders of the Owners are listed in the Disclosure Letter; (K) the Facilities shall be developed, constructed and maintained as a 5-star international casino-hotel; (L) Owners have not engaged any broker, investment banker, advisor, or any other party to act for the Owners in this transaction where  GGAM is liable for their fees; (M) there is no litigation or proceedings pending or threatened against the Owners or the Facilities that could adversely affect the validity of this Agreement or the completion of the Project; (N) Owners have secured the Environmental Compliance Certificate (ECC) and have complied with  applicable Philippine environmental laws for the construction and development of the Facilities; (O) the Project Cost prepared by Davis Langdon and Seah attached to the Disclosure Letter is the current best estimate of the

project cost for the Project and Owners have undertaken the required due diligence and care to accept and rely on said Project Cost; (P) the Owners corporate structure identifying all persons and entities controlling them is attached to the Disclosure Letter; (Q) the Owners have complied and shall comply with the   requirements of the Philippine Anti-Money Laundering Laws in connection with this Project; (R ) the Owners have complied and shall comply with    Philippine Anti-Corruption Laws in connection with this Project; (S) to the best of Owners' knowledge after a reasonable inquiry, none of (i) the Owners, (ii) any person controlling either of them, and (iii) any person for whom either of them acts as an agent or nominee in connection with this Project, is as of the date of this Agreement a "specially designated national or blocked person" ("SDN") under any United States sanctions administered by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") (including but not limited to 31 CFR, Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, (collectively, the "Sanctions Laws and Regulations"); and (T) the Owners (excluding any shareholders or indirect constituent owners) have not as of the date of this Agreement and shall not after execution of this Agreement conduct business (i) with any person who is an SDN, (ii) in any jurisdiction in which GGAM, as a United States person, would be prohibited from doing business under the Sanctions Laws and Regulations.

10.2     **GGAM**

GGAM represents and warrants as of the Effective Date that: (A) it is duly formed, validly existing, and in good standing under the laws of the State of Delaware; (B) it has all the requisite rights, power, and authority to enter into this Agreement and perform all its obligations hereunder; (C) this Agreement constitutes the valid and legally binding obligation of GGAM, enforceable in accordance with its terms and conditions; (D) neither the execution of this Agreement, nor GGAM's performance of the transactions contemplated hereby, will: (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which GGAM is subject, or (ii) conflict with, result in a breach of, or constitute a default under any agreement to which GGAM is a party; (E) The officers and equity holders of   GGAM are listed in the GGAM Disclosure Letter; (F)  GGAM has not engaged any broker, investment banker, advisor, or any other party to act for GGAM in this transaction where   Owners   are liable for their fees; (G) there is no litigation or proceedings pending or threatened against  GGAM that could adversely affect the validity of this Agreement or the performance of GGAM of its obligations under this Agreement;  (H) to its best knowledge, GGAM has complied and shall comply with all material requirements of the Philippine Anti-Money Laundering Laws in this Project; (I ) to its best knowledge, GGAM has complied and shall comply with all material provisions of the Philippine Anti-Corruption Laws in connection with this Project; and (J) GGAM has the management and technical expertise, track record, experience, adequate capitalization and financial resources to comply

18



with its obligations under this Agreement, including the indemnity obligations under Clause 12.1.

## 11.  REGULATORY MATTERS

### 11.1  Legal Compliance

The Owners and GGAM, acting through the Management Team, shall work together and use their commercially reasonable efforts to do whatever is necessary (as an operating cost of the Facilities) to ensure that all relevant government permits and licenses necessary to develop, construct and operate the Facilities are maintained, that the Facilities operate in accordance with all government approvals and with all applicable laws of the Philippines, that all regulatory and license requirements of PAGCOR for the operation of the Facilities are complied with.  The costs and expenses of all relevant government permits and licenses obtained in connection with the initial development and construction shall be included in project costs and not treated as an operating cost of the Facilities.

### 11.2  Regulatory Disclosures

The Owner and GGAM each agree to provide the information to governmental authorities having jurisdiction over the casino, the Owner, GGAM or each of their affiliates regarding any matter within the scope of authority of the governmental authorities.

### 11.3  Privileged Licenses

The Owner and GGAM (i) acknowledges that the other party or its affiliates hold or will hold one or more licenses under gaming laws; (ii) agrees to use commercially reasonable efforts to take, or to refrain from taking, any actions that are necessary to prevent, or that would be reasonably likely to cause, the gaming license of the other party or its affiliates to expire, terminate, or not be renewed; and (iii) agrees to cooperate with the other party, as reasonably requested on a confidential basis, and at no out-of-pocket cost or expense to the cooperating party, to provide information reasonably necessary to enable the other Party and its affiliates to respond to any requests for information in connection with the acquisition or preservation of such gaming licenses or compliance with any gaming regulations applicable to the other party or its affiliates and the other party's internal compliance policies of general applicability relating thereto (including information required in connection with any necessary background checks or other investigations regarding credit standing, character, and personal qualifications).



12.    **INDEMNITY AND LIABILITY**

12.1    **Indemnity by GGAM**

GGAM shall indemnify and keep indemnified the Owners against each and every liability which the Owners may incur to any other person whatsoever and against the adverse effects of all claims, including claims by third parties, to the extent that the same arise as a result of the gross negligence or wilful misconduct of GGAM subject to the limitation set out in Clause 12.3.

12.2    **Indemnity by Owners**

The Owners shall indemnify and keep indemnified GGAM against each and every liability which GGAM may incur to any other person whatsoever and against the adverse effects of all claims, including claims by third parties, to the extent that the same arise out of or in connection with the performance by GGAM of the Services, other than to the extent such claims arise as a result of (i) the gross negligence or wilful misconduct of GGAM, (ii) the acts or omissions of GGAM or an Affiliate of GGAM in a transaction with an Affiliate of GGAM; or (iii) the taking of an action by GGAM or an Affiliate of GGAM that is outside the scope of the authority granted to GGAM in this Agreements, and subject always to the limitations set out in Clause 12.3.

12.3    **Limitation on Liability**

(a)    Neither Party shall be liable to the other under this Agreement for any indirect or consequential loss or punitive damages.

(b)    The liability of GGAM to the Owner shall in no event exceed the total amount of fees that GGAM has received during the Term that such liability is incurred under this Agreement, provided that this limit shall not apply where the liability in question is incurred as a result of the willful misconduct of GGAM.

13.    **INSURANCE**

13.1    **GGAM's Insurance**

GGAM shall maintain insurance necessary to cover its obligations and liabilities under or in connection with this Agreement.

13.2    **Owners' Insurance**

The Owner shall provide GGAM with copies of the Owner's insurances (with commercially sensitive items omitted).

The Owners shall maintain adequate personal accident insurance, medical insurance and such other insurances as may be separately required by GGAM for each of GGAM's personnel assigned to perform work in connection with the provision of any Services.

## 14.    INFORMATION AND CONFIDENTIALITY

### 14.1    Copyright in Documentation

The copyright and all other intellectual property rights in respect of all proprietary documentations prepared by GGAM in connection with the performance of the Services and furnished to the Owner under the terms of this Agreement shall remain vested in GGAM but the Owner shall have an irrevocable, royalty-free right to copy, reproduce, modify and use the same for any purpose directly related to the construction, operation, repair, replacement, renewal or operation of the Facilities.

### 14.2    Confidentiality

Each Party (the "Receiving Party") shall not, without the consent of the other party at any time divulge or suffer or permit its consultants, servants or agents to divulge to any person or use for purposes unconnected with this Agreement any information which is by its nature or may be marked to be confidential concerning the other party, the Project Agreements or the Facilities (including information concerning the costs of operation or the business situation or financial condition of the other party) or any information concerning the contents of this Agreement or of the Project Agreements.   Notwithstanding the foregoing, the Receiving Party may disclose such confidential information (i) as required by law or by the court of any competent jurisdiction or by an government or regulatory body having jurisdiction over the Receiving Party including gaming, tax, financial regulators, (ii) to its consultants, attorneys, accountants, representatives, advisors and to those of their respective personnel who need to know the same for the proper performance of this Agreement, (iii) to its affiliates and subcontractors and their employees who need to know the same for the proper performance of this Agreement and (iv) to any bank or party providing financing to the Owners, provided that such consultants, attorneys, accountants, representatives, advisors and their personnel, affiliates and subcontractors, their employees, and financiers shall be under obligation to maintain this confidentiality.

The provisions of this Clause shall continue to apply, without limit in point of time, until such information enters the public domain without fault on the part of the Receiving Party.

### 14.3   Proprietary Programs and Products

If GGAM has a copyright or patent over its proprietary programs or products which are used in the Facilities during the term of this Agreement, the continued use of such proprietary programs and products

at the Facilities after the termination of this Agreement shall be subject of a license agreement as the Parties may agree on. If GGAM or its Affiliates are developing a proprietary program or product for its own use or the use of other facilities that they are operating, they shall notify the Owners in writing of such development, and the Owners shall respect the proprietary character and GGAM's ownership of such proprietary program or product. Provided that programs and products which are developed at the Facilities shall belong to the Facilities. If GGAM wishes to use such new programs and products in another casino, it should obtain the prior written consent of the Owners, which consent shall not be withheld unreasonably. If a program or product is jointly developed by GGAM and the Management Team of the Facilities, such program or product shall be jointly owned by GGAM and the Facilities.

## 15.    TERMINATION

### 15.1    By Owner for GGAM's Breach

The Owners may at any time, by written notice addressed to GGAM, give prior notice of intention to terminate the Services under this Agreement, in whole or in part if any of the following have occurred:

(a)    GGAM has committed a material breach of this Agreement that either is incapable of remedy or, if capable of remedy, has not been remedied within 30 days of the Owner's notice or such longer period not exceeding 60 days as is reasonably necessary to effect the remedy;

(b)    failure by GGAM to comply with any applicable laws, rules, or regulations, including a default under any governmental license or permit, which will materially adversely affect the performance of its obligations under this Agreement, which, if capable of remedy, has not been remedied within 40 days (or such longer cure period as may be allowed by law, provided no cross-default is triggered thereby) from notice to it of such failure or default from the Owners or from the relevant government agency.

(c)    an act by GGAM which will violate, and cause a default on, any of the Project Agreements referred to in Clause 2.6(b), which will have a material adverse effect on the Owners or on the operations of the Facilities and which if capable of remedy, has not been remedied within the cure periods provided in the relevant Project Agreements.

(d)    the commencement of any voluntary bankruptcy or insolvency proceeding or the consent to any involuntary bankruptcy or insolvency proceeding against a GGAM.

22

(e)     the filing of any involuntary proceeding in bankruptcy or insolvency or a proceeding seeking the appointment of a receiver or custodian against GGAM that is not vacated within sixty (60) days of commencement thereof.

(f)     an affirmative act or failure to act by GGAM that results in a final order by PAGCOR that GGAM is unsuitable to participate in the management of the Facilities,   and such order by PAGCOR cannot be remedied within the cure period as may be allowed by PAGCOR, provided no cross-default is triggered thereby.

(g)     William Weidner ceases to be the CEO of GGAM, unless William Weidner, Brad Stone, or Garry Saunders, or any person nominated by any of them and approved by the Owners, continue as a senior officer of GGAM actively involved in the performance of GGAM's obligations under this Agreement.

The effective date of such termination of this Agreement shall be 60 days after receipt of such notice by GGAM, unless some other shorter or longer period is agreed between the Owners and GGAM.

Upon receipt of any such notice, GGAM shall take immediate steps to comply with the directions of the Owners and shall in any event ensure that its expenditure in relation to the Services is reduced to a minimum.

## 15.2   **By GGAM for the Owner's Breach**

GGAM may at any time, by written notice addressed to the Owners, give prior notice of intention to terminate  the Services, in whole or in part if any of the following have occurred:

(a)     the failure of Owners to fulfill any of their material obligations in the Agreement that either is incapable of remedy or, if capable of remedy, has not been remedied within 30 days of  GGAM's notice or such longer period not exceeding 60 days as is reasonably necessary to effect the remedy,

(b)     the failure of Owners to comply with any applicable laws, rules or regulations, including a default under any governmental license or permit,  which will materially adversely affect the performance of its  obligations under this Agreement, which, if capable of remedy, has not been remedied within 40 days (or such longer cure period as may be allowed by law or granted by the relevant government agency, provided no cross-default is triggered thereby) from notice to it of such failure or default from GGAM or from the relevant government agency,

(c)     a default by the Owners in any of the Project Agreements referred to in Clause 2.6(b), which if capable of remedy, has not been remedied within the cure periods provided in the relevant Project

Agreements, which will have a material adverse effect on the operation of the Facilities or on the Owners' ability to comply with their obligations under this Agreement,

(d) the commencement of any voluntary bankruptcy or insolvency proceeding or the consent to any involuntary bankruptcy or insolvency proceeding against an Owner,

(e) the filing of any involuntary proceeding in bankruptcy or insolvency or a proceeding seeking the appointment of a receiver or custodian against an Owner that is not vacated within sixty (60) days of commencement thereof,

(f) a material breach under the Option Agreement.

The effective date of such termination of this Agreement shall be 60 days after receipt of such notice by the Owners, unless some other shorter or longer period is agreed between GGAM and the Owners.

### 15.3 Mutual Termination Rights

Either Party may at anytime, by written notice addressed to the other Party, give notice of its termination of this Agreement, without the same being deemed a breach or default by either Party hereto, if any of the following have occurred:

(a) a change in the terms and/or conditions of the PAGCOR License (or its cancellation, revocation or termination) and compliance with the revised terms and/or conditions would be likely to cause a material adverse effect on Owners' or GGAM's rights and obligations under this Agreement.

(b) if there is any change in law, order, rule, regulation, or policy in any jurisdiction inside or outside the Philippines that results or would result in the carrying on of the Owners' or GGAM's business in the Philippines being unlawful or materially burdensome, or the Owners or GGAM losing its qualification, license, authority or capacity to perform under this Agreement.

(c) if there is a change in the national gaming legislation in the Philippines that results in a material adverse impact on either Party's interests in the Facilities, under this Agreement, or on any other business of GGAM inside or outside the Philippines.

(d) a failure by GGAM under the provisions of items 2 or 3 of Annex B on the Performance Standards.

(e) the (i) denial, revocation, suspension or non-renewal of any gaming license, approval or permit of one Party which is caused by any action or inaction of the other Party or their respective Affiliates; or

(ii) commencement of any action by the applicable regulatory authority seeking such a denial, revocation, suspension or non-renewal that, if adversely determined, would result in the denial, revocation, suspension or non-renewal of any gaming license, approval or permit which is caused by any action or inaction of the other Party or their respective Affiliates; provided, however, the Party causing such event shall have the lesser of (A) one hundred eighty (180) days from commencement of such action, (B) such other time period as may be granted by the applicable regulatory authority and (C) such time period required by the threatened Party (as reasonably determined based upon the advice of legal counsel) to avoid the denial, revocation or suspension of any such gaming license, approval or permit held by such Party, as applicable, to cure any event giving rise to the commencement of such action described in clause (ii) hereof.

### 15.4    Payments upon Termination

The Owner shall pay GGAM upon termination of this Agreement all amounts which are due to it but unpaid under this Agreement up to the effective date of such termination; and all costs incidental to the orderly termination of the Services including the repatriation of personnel, the termination of sub-contracts and the cost of provision of copy documentation as may be agreed upon by the Parties.

Provided that if the termination of the Agreement is due to the fault of GGAM, the reasonable market rate costs incurred by the Owner in recruiting a replacement service providers shall be deducted from the amount payable to GGAM.

### 15.5    General Obligations on Termination

(a)    Termination of this Agreement howsoever arising shall be without prejudice to the rights and remedies of either Party in relation to any negligence, omission or default of the other prior to such termination.

(b)    GGAM shall cooperate with the Owners in securing an orderly transition of the Services to a replacement service provider or to the Owners' replacement officers/managers. Without limiting the foregoing, GGAM shall permit the Owners to make offers of employment to members of GGAM's officers and staff who are providing the Services, including the COO and members of the Management Team of the Facilities, but excluding William Weidner, Brad Stone, and Garry Saunders.

16. **ASSIGNMENT AND SUB-CONTRACTING**

16.1 **Assignment by Owners**

(a) The Owners may pledge or assign their rights under this Agreement, or their shares of stock, to any bank providing finance for the Facilities without the consent of GGAM being required. GGAM shall acknowledge such assignment in writing and shall if required by the Owners' financiers enter into a direct agreement with such financiers containing customary terms reasonably required by such financiers provided that nothing therein shall increase liability of GGAM. The Owners shall use commercially reasonable efforts to convince the banks to agree to a commercially reasonable non-disturbance agreement that will allow GGAM to continue to render Services and to exercise its rights under this Agreement notwithstanding a foreclosure or exercise of security rights by such banks, provided that refusal of the banks to agree to such non-disturbance agreement shall not be a breach on the part of the Owners.

(b) Any (i) sale, assignment or transfer of shares of stocks in the Owners to third parties such that Enrique K. Razon Jr. will cease to be the ultimate controlling shareholder which controls at least 51% of the shares of stock of the Owners (the "Controlling Shareholder"), or (ii) sale, assignment or transfer of the Facilities to third parties, (iii) or sale, assignment or transfer of the PAGCOR License, (each a "Change of Control in Owners") during the Term of this Agreement shall have the following effect:

(A) If the new Controlling Shareholder of the Owners, or the new owner of the Facilities, or the new owner of the PAGCOR License following a Change of Control in Owners is (i) acceptable to GGAM, (ii) has sufficient financial resources and liquidity to fulfill Owners' obligations under this Agreement, and (iii) have passed PAGCOR's probity test, then this Agreement shall continue in force and GGAM shall continue to perform the Services and exercise its rights under this Agreement.

(B) If the new Controlling Shareholder of the Owners, or the new owner of the Facilities, or the new owner of the PAGCOR License following a Change of Control in Owners terminates this Agreement without cause or fault of GGAM, then GGAM shall be entitled to the Termination Fee to be paid by such new Controlling Shareholder of the Owners, or new owner of the Facilities, or new owner of the PAGCOR License. Provided that GGAM shall not be entitled to the Termination Fee if (i) it is in default (which is existing and uncured) under this Agreement, or (ii) the effective date of such termination occurs after the expiration of the 4th Fiscal Year and GGAM is not in compliance

with the Performance Standards provided in item 1 of Annex B during the prior full Fiscal Year.

(C)     If the new Controlling Shareholder of the Owners, or the new owner of the Facilities, or the new owner of the PAGCOR License following a Change of Control in Owners is (i) not acceptable to GGAM because it does not have sufficient financial resources and liquidity to fulfill Owners' obligations under this Agreement, or (ii) is known in the community as being of bad moral character, or has been convicted of a felony in any court (including state or federal court in the U.S.A.), or is found unsuitable to hold a gaming license, or (iii) who would cause the denial, loss, or termination of any gaming license or approval of GGAM, then GGAM has a right to terminate this Agreement and shall be entitled to receive the Termination Fee from the Owners. Provided that GGAM shall not be entitled to the Termination Fee if (x) it is in default (which is existing and uncured) under this Agreement, or (y) the effective date of such termination occurs after the expiration of the 4th Fiscal Year and GGAM is not in compliance with the Performance Standards provided in item 1 of Annex B during the prior full Fiscal Year.

(D)     If a new shareholder of the Owners, following the issuance or sale, assignment or transfer of shares of stock in the Owners (even if it does not result in a Change of Control in Owners), is an Unsuitable Person, then GGAM has the right to terminate this Agreement and shall be entitled to receive the Termination Fee from the Owners. Provided that GGAM shall not be entitled to the Termination Fee if (i) it in default (which is existing and uncured) under this Agreement, or (ii) the effective date of such termination occurs after the expiration of the 4th Fiscal Year and GGAM is not in compliance with the Performance Standards provided in item 1 of Annex B during the prior full Fiscal Year.

(c)     An initial public offering (IPO) or a back-door listing of the Owners or of the holding companies which owns or controls the Owners in the Philippine Stock Exchange or in other stock exchanges shall not constitute a trigger of a Change of Control of Owners where Enrique K. Razon Jr. continues to own or control, directly or indirectly, the Owners following such IPO or back-door listing.

## 16.2   Assignment by GGAM

GGAM shall not, without the written consent of the Owners, assign either its obligations or benefits arising under this Agreement. The Parties acknowledge that GGAM may assign its functions under this Agreement to its Affiliates where William Weidner is the CEO, or William Weidner, Brad Stone or Garry Saunders, or any person nominated by any of them and approved by the Owners, are the senior officers who will be actively involved in the performance of such transferee's obligations under this

Agreement, provided that such Affiliate shall have adequate capitalization and financial resources to comply with its obligations under this Agreement, including the indemnity obligations under Clause 12.1. Notwithstanding anything to the contrary herein, GGAM may assign this Agreement to an entity organized and existing under the laws of the Netherlands as required to satisfy the tax structure of GGAM provided that such entity must at all times be owned by the same constituent owners and controlled by the same individuals as GGAM (except for independent Dutch board members required under Netherlands law).

### 16.3   General

Any assignment to an Affiliate and/or any sub-contracting shall not in any way relieve GGAM from any liability or obligation under or in connection with this Agreement.

## 17.   FORCE MAJEURE

### 17.1   Event of Force Majeure

"Event of Force Majeure" means:

any events which was unforeseeable at the time this Agreement was signed, the occurrence and consequences of which cannot be avoided or overcome, and which arises after the time this Agreement was signed and prevents total or partial performance of this Agreement by a Party of its commitments under this Agreement. Such events will include war, declared or not, or hostilities involving the Republic of the Philippines or belligerence, blockade, revolution, insurrection, insurgency, riot, public disorder, expropriation, requisition, confiscation or nationalization by or involving any governmental authority of or within the Republic of the Philippines, earthquakes, typhoons, flood, fire, war, failures of international or domestic transportation, acts of Philippine or U.S. government or public agencies, epidemics, strikes and any other instances which cannot be foreseen, avoided or overcome, including instances which are accepted as force majeure in general international commercial practice.

### 17.2   Consequence of Event of Force Majeure

If an Event of Force Majeure occurs, a Party's obligations under this Agreement that are affected by such an event will be suspended during the period of delay caused by the Event of Force Majeure and will be automatically extended, without penalty, for a period equal to such suspension. The Party claiming an Event of Force Majeure will promptly inform the other Party in writing and will furnish within thirty (30) days thereafter sufficient evidence of the occurrence and duration of such Event of Force Majeure. The Party claiming an Event of Force Majeure will also use all reasonable endeavours to terminate that Event of Force Majeure. When an Event of Force Majeure occurs, the Parties will immediately consult with each other in order to find an equitable solution and will use all reasonable endeavours to minimize the consequences of such Event of Force Majeure.

As provided in Clause 3.6, the Owners shall use the insurance proceeds to restore or rebuild the damage or loss on the Facilities.

18. **MISCELLANEOUS**

18.1 **Language**

This Agreement is executed in English. All communications between the Owner and GGAM in connection with the Services and this Agreement, both written and oral, shall be in English.

18.2 **Notices**

Notices under this Agreement shall be in writing delivered to the address stated below.  Delivery can be by hand, or facsimile message against a written confirmation of receipt, courier with proof of delivery, or by electronic mail with confirmation receipt.

Owner:             Bloomberry Resorts and Hotels, Inc.
                   Unit 601, 6th Floor Ecoplaza Building
                   Pasong Tamo Extension, Makati City
                   Philippines

                   Attention:        Enrique K. Razon, Jr.
                                     Chairman and CEO
                   Telephone No.     +632 245 2165
                   Fax No.           +632 245 4966
                   Email             Erazon@ictsi.com

                   And:

                   Sureste Properties, Inc.
                   26th Floor, 139 Corporate Center Building
                   Valero Street, Salcedo Village
                   Makati City, Philippines

                   Attention:        Enrique K. Razon, Jr.
                                     Chairman and CEO
                   Telephone No.     +632 245 2165
                   Fax No.           +632 245 4966
                   Email             Erazon@ictsi.com

                   With copy to:

                   Estela T. Occena
                   Office of the Chairman
                   3rd Floor ICTSI Administration Building
                   MICT South Access Road
                   Manila International Container Terminal
                   North Harbor, Manila, Philippines
                   Telephone No.    +632 245 2185
                   Fax No.          +632 241 1187

29

|  | Email | EOccena@ictsi.com |
|---|---|---|

GGAM:        c/o Global Gaming Asset Management, L.P. 3575 West Post Road
Las Vegas, Nevada, U.S.A. 89118
Attention:     William Weidner
                    President
Telephone No. (702) 897-5600
Fax No.      (702)635-0202
Email        weidner@gmail.com

### 18.3    Purchase of Shares Option

GGAM is hereby granted the right to purchase up to ten percent (10%) ownership in the Facilities and the gaming license by purchasing 10% of the shareholdings of the Owners. The purchase price for this 10% interest shall be US$15 Million (representing 10% value of the license) plus 10% of the equity that the Owners have infused to the Project at the time GGAM exercises its option to purchase the 10% shares. This right to purchase 10% interest will expire if it is not exercised by Start Date.

The Parties shall execute a mutually acceptable Option Agreement (the "Option Agreement") to embody the share purchase option under this Clause within sixty (60) days  (or such extended periods as the parties may mutually agree) from the date of this Agreement. In the event the Parties are unable or fail  to execute the Option Agreement within such period, GGAM shall have the right to terminate this Agreement by sending a notice of termination to the Owners within six (6) months from the expiration of such 60 day (or extended) period.  GGAM's right to terminate this Agreement under this Clause 18.3 shall expire if  it is not exercised within such 6 months period.

The Parties shall negotiate in the Option Agreement a provision which will protect the equity invested by GGAM (when it exercises the option to purchase 10% ownership interest referred to under the Option Agreement) after the Agreement is terminated under the terms of the Agreement.

In addition, the Parties covenant and agree the Option Agreement shall grant GGAM certain co-investment rights (such rights subject to the mutual agreement of the Parties) in such competing facilities and/or casinos permitted under Clause 18.8, provided that such rights shall be in the same proportion of ownership as provided for in this Clause 18.3 and upon no worse economic terms than those enjoyed by the Owners (or their affiliates or any of their respective officers, directors, partners, shareholders) in making their investment in such competing facilities and/or casinos.

18.4   **Independent Contractor**

GGAM shall undertake its obligations under this Agreement as an independent contractor of the Owner. Nothing in this Agreement shall be construed to be or create a partnership, agency, or joint venture between the Owners, their respective successors or assigns, on the one part, and GGAM, its successors and assigns, on the other part. Notwithstanding the terms and conditions of this Agreement, nothing in this Agreement nor actions of the Parties pursuant to the provisions of this Agreement shall, directly or indirectly, expressly or implied, create, establish, or impose any principal agent relationship between Owner, its successors and assigns, as principal, and GGAM, its successors and assigns, as agent, nor create, establish or impose any fiduciary duty under the laws governing principal/agent relationships or otherwise; provided, however, that GGAM shall be a limited agent for purposes of executing documents on Owners' behalf to the extent expressly permitted under this Agreement. This is notwithstanding any equity investment of GGAM in the Owner.

18.5   **Amendment and Waiver**

The Parties may not amend or waive this Agreement, or any portion thereof, or consent to any Party's departure from this Agreement, except pursuant to a written agreement of the Parties that identifies itself as an amendment, waiver, or consent to this Agreement, as the case may be, and that is executed by a duly authorized representative of each Party. No failure or delay in exercising any right or remedy, no failure or delay in requiring the satisfaction of any condition under this Agreement, and no course of dealing between the Parties operates as a waiver or estoppel of any right, remedy, or condition. A written waiver or consent on one occasion is effective only in that specific instance and only for the purpose that it is given and is not to be construed as a waiver or consent on any future occasion or against any other Party or person.

18.6   **Partial Invalidity**

If any provision of the Agreement is found to be invalid or unenforceable by any courts of competent jurisdiction, this shall not effect the validity or enforceability of the other provisions of this Agreement.

18.7   **Conflicts**

Except as expressly set forth herein, if there is any conflict or ambiguity between the provisions of this Agreement and the provisions of any other agreement or contract between the Parties with respect to the subject matter of this Agreement, the provisions of this Agreement shall prevail.

18.8   **Non-Compete**

GGAM, or any of its directors, partners, officers or Involved Affiliates (which shall mean an affiliate of GGAM involved in rendering the

Services, or an affiliate of GGAM which has access to confidential information of the Owners and/or the Facilities except if such confidential information is limited to its CEO identified in the GGAM Disclosure Letter; provided, however, that Cantor Fitzgerald, L.P. or any affiliate of Cantor Fitzgerald, L.P. (excluding Global Gaming Management L.P. and GGAM, or its directors, partners and/or officers) shall not be deemed an Involved Affiliate unless they are rendering the Services under this Agreement) shall be prohibited from being involved in the ownership, management or operation of another casino or gaming facility in the Philippines (unless it is done together with the Owners), during the term of the Agreement and 2 years after its expiration or termination. This 2-year-from-termination restriction shall not apply if the Agreement is terminated because of a breach or default of the Owners.

The Owners, or any of its directors, partners, officers or affiliates shall be prohibited from being involved in the ownership, management or operation of: (a) another casino or casino/hotel project licensed under the same PAGCOR License as the Facilities; or (b) another casino or casino/hotel project in the Philippines of the same magnitude or scale as the Facilities (unless GGAM has been invited to render the Services in such other facilities); or (c) any other casino or casino/hotel project in the Philippines that includes Foreign Junket Players, Local High Roller Tables and/or Foreign High Roller Tables (unless GGAM has been invited to operate that portion of the casino with respect to such Foreign Junket Players, Local High Roller Tables and/or Foreign High Roller Tables therein, which operation shall be upon the same terms set forth in this Agreement), during the term of the Agreement and 2 years after its expiration or termination. This 2-year-from-termination restriction shall not apply if the Agreement is terminated because of a breach or default of GGAM or if it fails to comply with the Performance Standards provided in item 1 of Annex B.

## 18.9   Publicity

Owner and GGAM shall consult with each other on all press releases containing previously non-public information relating to the Facilities and neither Party shall issue such a press release without the prior written approval of the other Party.

## 18.10  Further Assurance

The Parties shall each perform such acts, execute and deliver such instruments and documents, and do all such other things as may be reasonably necessary to accomplish the transactions contemplated by this Agreement.

## 18.11  Survival

All Clauses that are necessary to enforce the terms and conditions of this Agreement shall survive expiration of the term of this Agreement.

18.12  **Entire Agreement**

This Agreement and the Disclosure Letter and GGAM Disclosure Letter constitute the entire agreement between the Parties hereto pertaining to the subject matter hereof and fully supersedes any and all prior oral or written agreements or understanding between the Parties pertaining to the subject matter hereof.

18.13  **Counterparts**

This Agreement may be executed in several counterparts and all such executed counterparts shall constitute a single agreement, binding on all of the Parties, their successors and assigns.  The signature of all of the Parties need not appear on the same counterpart, and delivery of an executed counterpart signature by electronic communications is as effective as executing and delivering this Agreement in the presence of the other Party to this Agreement.

19.  **DISPUTES**

19.1  **Mutual Agreement**

The Parties agree to act in good faith to resolve any and all disputes between them at the working group level.  Any dispute that cannot be settled by mutual agreement within 30 days and such dispute relates to the interpretation, carrying out of obligations, breach, termination or enforcement of this Agreement or in any way arises out of or is related to this Agreement (except the disputes covered by Annex I) shall be settled exclusively in accordance with Clause 19.2.

19.2  **Arbitration**

Except as required by Annex I with respect to Expert Disputes, any dispute required to be settled in accordance with this Clause 19.2 shall be settled by arbitration in Singapore  under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules in force at the date of this Agreement (the "Rules"), except that to the extent the then current Rules are inconsistent with the provisions of this Clause 19.2, in which event the terms hereof shall control.

(a)  If either Party asserts that a dispute has arisen which is required to be settled in accordance with this Clause 19.2, such asserting Party shall give prompt written notice (or notice as otherwise provided herein) to the other Party. The arbitration shall be administered by a panel of three arbitrators appointed in accordance with the following provision: One arbitrator shall be appointed by each Party (the Owners being considered one Party), and one arbitrator shall be jointly agreed and appointed by the two arbitrators chosen by the Parties.  Arbitration proceedings shall take place in English.

(b)     The decision of the arbitration panel shall be final and binding on the Parties, without right of appeal.  The Parties agree in advance that if one Party initiates arbitration, the other Party shall be bound to participate, and the decision of the arbitration panel shall be binding upon both Parties and enforceable in all jurisdictions.

(c)     The arbitrators may consolidate proceedings with respect to any dispute under this Agreement with proceedings with respect to any related controversy under this Agreement.  However, except as specifically set forth in the preceding sentence: (i) arbitration only will be conducted on an individual, not class-wide, basis; (ii) only GGAM and Owners (and their Affiliates and their respective officers, directors, owners, employees, agents and representatives) may be parties to any arbitration proceeding described in this Clause 19.2; and (iii) no such arbitration proceeding shall be consolidated with any other arbitration proceeding involving GGAM or Owners and/or any other Person. Except in connection with claims by third-parties for which a Party is entitled to indemnification pursuant to this Agreement (including claims where such third-party is seeking multiple, exemplary or punitive damages), the award may not include, and the parties specifically waive any right to an award of multiple, exemplary or punitive damages.

(d)     The Parties agree that, in connection with any arbitration proceeding, each Party must submit or file any claim which would constitute a compulsory counterclaim within the same proceeding as the claims to which it relates. Any such claim which is not submitted of files will be forever barred unless written notice specifying such claim is provided to the other Party within twenty-four (24) calendar months after the later of (i) the date of such breach or violation; and (ii) the date of discovery of the facts (or the date the facts could have been discovered, using commercially reasonably diligence) giving rise to such breach or violation. Such written notice shall not toll any applicable statute of limitations.

(e)     Notwithstanding anything to the contrary contained in this Agreement, the Parties shall each have the right in the proper case to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction, provided that, each Party must contemporaneously submit their dispute for arbitration on the merits, if required herein.

(f)     The provisions of this Clause 19.2 are intended to benefit and bind third-party non-signatories and shall continue in full force and effect subsequent to and withstanding the expiration or termination or this Agreement.

(g)     In addition to the Rules, the Parties agree that the arbitration shall be conducted according to the International Bar Association Rules of Evidence as current on the date of the commencement of the arbitration. The arbitration panel shall order each Party to submit within a specified

time to the arbitration panel and to the other parties witness statements by each witness on whose testimony it intends to rely.

(h)     During the pendency of the arbitration, the Parties shall share equally the fees and expenses of the arbitrator. As part of the award, the arbitrator shall designate the Party whose position is substantially upheld, who shall recover from the other Party all of its reasonable attorneys' fees, costs and expenses, including its share of the fees and costs paid to the arbitrator, expert witness fees, compensation for in-house counsel, and all other fees and expenses incurred in connection with the arbitration. The arbitrator may determine that neither Party's position was substantially upheld or otherwise allocate the fees and expenses in accordance with the relative extent to which either Party's position was upheld.

19.3    **Applicable Law**

This Agreement is made under and shall be governed by and construed in accordance with the laws of the Republic of the Philippines.

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed on the date stated above, in the place indicated below.

IN WITNESS WHEREOF the Parties hereto have caused this Agreement to be executed on the date stated above, in the place indicated below.

BLOOMBERRY RESORTS AND HOTELS INC.
By: _____

Name: Enrique K. Razon, Jr.
Designation: Chairman and CEO
Place Signed:

SURESTE PROPERTIES INC.

By: _____

Name: Enrique K. Razon, Jr.
Designation: Chairman and CEO
Place Signed:

GLOBAL GAMING PHILIPPINES LLC

By: _____

Name: William Weidner
Designation: CEO
Place Signed:

[Signature Page to Management Services Agreement]

# ANNEX A

# SERVICES

<u>GGAM's Pre-Opening
Services</u>.

GGAM acting through the Management Team has the right, authority, obligation, and discretion, and is instructed to take all such pre-opening actions for and on behalf of the Owners to operate all aspects of the Facilities, including to:

1. Provide technical assistance on all aspects of planning, design, layout, and construction of the hotel, casino, food & beverage facilities, convention services, entertainment programs (where applicable), and other facilities and amenities, and recommendation of approval of all consultants to the Facilities

2. Advise on design and layout of the casino to include operational and functional criteria, layout of casino floor, selection and ordering of gaming equipment, in conjunction with key employees hired during pre-opening.

3. Prepare a pre-opening plan and budget in consultation with Owners and construction contractor and proposed operating budget in consultation with Owners.

4. Establish, implement, and monitor the pre-operating accounting, internal controls, security, human resources, marketing, and regulatory compliance systems in accordance with the pre-operating plan and key employees.

5. Advise contractors and consultants in the selection, purchase, design, layout, and installation of all equipment and facilities necessary or desirable for the efficient and economical operation of the Facilities.

6. Review and monitor construction expenditures and progress of construction, including the right to attend all meetings with contractors and consultants involved in the development, planning, design, and construction of the Facilities

7. Recommend the selection and order FF&E in accordance with the pre-opening plan and budget.

8. Recommend the selection and order the gaming facilities' data processing equipment and software, surveillance, and security systems.

9. Recruit, select, and hire employees for the Facilities and implementation of necessary procedures, techniques, and training programs to obtain and evaluate qualified

applicants.

10. Assist Owners as reasonably required in liaising with government with respect to the design and construction of the Facilities.

11. Cause relevant background checks to be conducted to ensure suitability standards are met.

12. Develop marketing and operation plans, including junkets and similar arrangements, in conjunction with key employees.

13. Conduct partial operations prior to a full opening (i.e., soft opening) and any other pre-opening operations GGAM determines are necessary for the Owners Facilities.

GGAM's Post-
Opening Services.

GGAM acting through the Management Team has the right, authority, obligation, and discretion, and is instructed to take all such post-opening actions for and on behalf of the Owners to operate all aspects of the Facilities, including:

Operations. GGAM through the Management Team shall operate and manage the day-to-day operations of the Facilities, including to:

1. Establish, implement, and monitor all operating systems (e.g., sales, marketing, reservations services, quality assurance), establishment of rates and charges for guest rooms, food, beverages, entertainment and other services or facilities, and to manage of the day-to-day affairs of the Facilities.

2. Use reasonable efforts, in the name and on behalf of Owners, to collect all revenue from the operation of the Facilities, and, where appropriate, issue receipts with respect to any funds received.

3. Establish, implement, and monitor gaming systems, management information systems, (and subject to the oversight of the Board Audit Committee) surveillance and other monitoring activities, floor and entrance security, cage operations, casino accounting, slot and table operations, and the management of the day-to-day affairs of the casino.

4. Make all decisions regarding junkets, granting of complimentaries and extensions of credit and collections, and establish a marker policy with regard thereto, subject to the policies and guidelines approved by the Board.

5. Establish and control of FF&E reserve account and all other operational bank accounts.

6. Establish, implement, and monitor the human resources systems and policies of Facilities.

7. Recruit, select, terminate, train, manage, promote, and

establish compensation and benefit plans for all personnel necessary and, where appropriate, select and contract with vendors and service providers to manage, operate, secure, and market the Facilities.

8. Establish, implement, and monitor a payroll system for all employees of the Facilities

9. Establish and implement a marketing plan for the Facilities including advertising, promotions, joint marketing and sponsorships, engagement of advertising agency/ies for the promotion of the Facilities, preparation of marketing materials, and direction of all public relations events and efforts for the Facilities.

10. Establish, implement, and monitor all accounting and finance systems and policies of the Facilities including casino accounting, financial accounting, hotel/food & beverage accounting, maintenance of books and accounts of the Facilities in accordance with Applicable Accounting Standards, handling of all cash revenue and payment of Facilities operating expenses.

11. Establish, implement, and monitor all regulatory compliance systems and policies for the Facilities (including with respect to anti-money laundering and internal audit procedures).

12. Determine the appropriate number and location of gaming tables and slots to be operated at and after-opening.

13. Perform or cause to be performed, in the name and on behalf of the Owners, all maintenance and repair for the Facilities, and, pursuant to approved budgets, all capital improvements with respect to the Facilities.

14. Review and consult on Owners' risk management (insurance) program, including the purchase of insurance providing coverage for GGAM, Owners, and their Affiliates.

15. With the approval of the Owners, select and contract with third parties (including leases in respect of any space in the Facilities) to operate and manage any of the facilities and amenities (e.g., spa, health club, restaurants, concessions, retail, and sportsbook).

16. Negotiate, enter into, administer, amend, and terminate, in the name and on behalf of the Owners, all contracts for the use of Facilities, including hotel guest rooms, banquet, meeting and conference facilities and other Facilities and services

17. With the approval of the Owners, select tenants and operators, and negotiate, execute, and administer leases, licenses and concessions, and other agreements for third party operated areas.

18. With regard to trade payables for goods and services incurred in the ordinary course of business in the operation of the Facilities and as otherwise permitted under the

590792.2   7

Agreement and subject to policies approved by the Board, borrow money or execute credit obligations in the name and on behalf of the Owners as obligors and/or guarantors in connection.

19. GGAM and Owners shall mutually agree on the selection and hiring of appropriate lawyers, consultants, investment bankers, advisors and the like to render services for the Facilities.

20. Advise and assist with respect to any debt or equity financing, extraordinary corporate transactions, or the like.

21. Subject to a litigation policy to be approved by Owners and GGAM, appoint counsel, commence, prosecute, defend, and settle in the name and on behalf of Owners or the Facilities, and control all legal actions and proceedings.

22. Take such actions within the Management Teams reasonable control as COO deems necessary or advisable to comply with all applicable laws with respect to the operation of the Facilities (provided, however, GGAM shall not be a guarantor of the Facilities compliance with such applicable laws) and the terms of all insurance policies provided to Management Team, or to contest the validity or application of any such laws or requirements, including any such laws or requirements that could affect in any manner any gaming license of the Owners or GGAM or any of its affiliates in any jurisdiction (and the Owners shall reasonably cooperate with GGAM in connection with any such contest).

23. Establish the Compensation Committee.



ANNEX B

# PERFORMANCE STANDARDS

1.   The (a) EBITDA projected in the Annual Budget (the "Projected EBITDA"), and the (b) Base Fee EBITDA projected in the Annual Budget (the "Projected Base Fee EBITDA") shall be the performance standards that GGAM shall comply with in rendering the Services under this Agreement (the "Performance Standards").

2.   The Owners shall have the right to terminate this Agreement, without payment of any additional fee (other than GGAM Fees, costs, charges, expenses, and reimbursements (if any)  accrued and unpaid and due and owing to GGAM through the date of termination), penalty or premium, if, for any two (2) consecutive Fiscal Years (after the third (3rd) Fiscal Year from the Start Date), any of the following occurs:

   (a)  EBITDA from the Facilities is less than eighty-five percent (85%) of the Projected EBITDA for the relevant Fiscal Year; or

   (b)  Base Fee EBITDA from the Facilities is less than eighty-five percent (85%) of the Projected Base Fee EBITDA for the relevant Fiscal Year.

3.   If the EBITDA or Base Fee EBITDA of the Facilities  falls below Sixty-five percent (65%) of Projected EBITDA or Projected Base Fee EBITDA, respectively, in any Fiscal Year (after the third (3rd) Fiscal Year from the Start Date), the Owners shall have the same right to terminate this Agreement as provided in item 2 above.

4.   The termination of the Agreement under items 2 and 3 above shall be effective thirty (30) days after GGAM's receipt of the Termination Notice from the Owners; provided, however, that in the event that GGAM fails to meet the Performance Standards under item 2 above,  GGAM shall have the right  (but not the obligation) to cure such Performance Standards failure by paying the Owners the Cure Amount. The "Cure Amount" shall mean an amount equal to the difference between the actual EBITDA or Base Fee EBITDA, as applicable, for the Fiscal Year in question and 85% of the Projected EBITDA or Projected Base Fee EBITDA, as applicable, for the Fiscal Year in question.

5.   In the event:

   (A)  any of the following shall occur during any Fiscal Year:       (i) an Event of Force Majeure, (ii) all or any portion of the Facilities temporarily closes,  (iii) a breach or

590792.2

default by the Owners of its material obligations under this Agreement, (iv) a reduction of the number of available room nights at the Facilities and/or reduction of the number of slots, table games or other gaming opportunities at the Facilities through no fault of GGAM, (v) a change made by the applicable Government Authority to: (a) the terms and conditions of the PAGCOR License (or the subsequent compliance with such revised terms and conditions) except as disclosed in the Disclosure Letter, (b) Applicable Law, (c) Philippine gaming legislation, (d) a capital improvement program is undertaken at the portion of the Facilities, (vi) Owners or GGAM is required to take any action at the instructions of the CEO, or (vii) Owners or GGAM is required to comply with the Project Agreements;

(B) and those occurrences were not anticipated and provided for in the Annual Budget, the Projected EBITDA and Projected Base Fee EBITDA for such Fiscal Year; and

(C) those occurrences have an adverse impact on the Facilities ;

then the Projected EBITDA and the Projected Base Fee EBITDA for such Fiscal Year shall be reduced (by the Expert pursuant to Annex I, if the Parties cannot agree on an equitable adjustment within 30 days) to reflect, on a proportional basis, any adverse impact caused thereby.

6.   The Projected EBITDA and the Projected Base Fee EBITDA shall be increased or decreased by a percentage reflecting the increase or decline in other hotels and/or casinos monitored/tracked by PAGCOR during the relevant Fiscal Year as compared to the immediately preceding Fiscal Year.

ANNEX  C

RESERVED MATTERS

The Reserved Matters shall be:

i.      Any amendment or change to the PAGCOR License.

ii.     Any change in the architect's (Steelman) approved design inclusive of
        FF&E items, so long as Owners deliver the agreed upon Facilities  and
        fulfill the obligations and duties under this Agreement and any such
        change does not materially adversely affect GGAM's  ability to provide the
        Services or otherwise perform under this Agreement.

iii.    Naming of the Facilities.

ANNEX  D

ORGANIZATIONAL CHART



## HOTEL ORGANIZATIONAL



**LEGEND**
* Key Personnel

ANNEX E

PHASE I FACILITIES

The Phase I Facilities shall include the following:

i.    Five star hotel with 494 hotel rooms, including 45 Bay suite and 7 VIP suites with basic room size of 450-1,780 square feet (43-165 square meters);

ii.   Retail space of 5,040 square feet (468 square meters);

iii.  Convention space of 18,900 square feet (1,757 square meters);

iv.   Four (4) fine dining restaurants with approximate capacity for   655 persons;

v.    Two (2) casual dining restaurants with approximate capacity for   357 persons;

vi.   Food court and entertainment lounge;

vii.  World-class casino of approximately 185,000 square feet (17,187 square meters) with over 3,000 gaming positions

viii. 199 retail table games;

ix.   51 high limit table games;

x.    45 VIP junket table games;

xi.   1,200  retail slot devices;

xii.  Spa, health club, pool(s);

xiii. Flat parking lot with 556 parking spaces; and

xiv.  Structured parking with 1,751 parking spaces.

ANNEX  F

PHASE I-A FACILITIES

The Phase I-A Facilities shall include the following:

i.      Expanded structured parking with 700 new parking spaces;

ii.     Landscape area, night club, and feature restaurant ; and

iii.    Expanded retail space with 29,000 sq ft/2,700 sq m area.

ANNEX  G

PHASE I-B FACILITIES

The Phase I-B Facilities shall include the following:

      i.      Events Arena with approximately 5,000 seating capacity including bridge connection to Phase I-A,  to be developed at the sole option of the Owners  and conditional on the availability  of  land.

# ANNEX H

## DEFINITIONS

"Affiliates" shall mean any Person that, directly or indirectly, controls, is controlled by, or is under common control with, the referenced Party or other Person. As used herein, the term "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of any Person, or the power to veto major policy decisions of any Person, whether through the ownership of voting securities, by agreement, or otherwise.

"Agreement" shall mean this Management Services Agreement.

"Annual Budget" shall have the meaning set forth in Clause 2.10.

"Applicable Accounting Standards" shall mean those generally accepted accounting principles established under the International Financial Reporting Standards (IFRS) and International Accounting Standards (IAS) and set forth in a framework of accounting guidelines, standards, conventions, and rules thereunder.

"Applicable Law" shall mean the laws of the Philippines, and unless expressly stated otherwise, shall include (i) statutes, laws, rules, regulations, ordinances, codes, treaties, legally binding decrees, legally binding directives, legally binding guidelines or other legal requirements  of PAGCOR and any Philippine Governmental Authority, including, any legal requirements under any Approvals, and (ii) judgments, injunctions, orders or other similar requirements of any court, administrative agency or other legal adjudicatory authority, in effect at the time in question and in each case to the extent the Facilities or other assets or Person in question is subject to the same.

"Approval Matrix" shall mean the approval matrix prepared by the Parties and approved by the Owners.

"Approvals" shall mean all licenses, permits, approvals, certificates, and other authorizations granted or issued by any Governmental Authority for the matter or item in question.

"Audited Year End Financial Statements" shall have the meaning set forth in Clause 2.9 (b).

"Base Fee EBITDA" shall have the meaning set forth in Clause 4.3.

"BDO Loan" shall mean the loans under: (a) the Omnibus Loan and Security Agreement dated January 24, 2011 by Bloomberry Resorts and Hotels Inc. (Casino Owner) as borrower and Sureste Properties Inc. as surety, and (b) the Omnibus Loan and Security Agreement dated January 24, 2011 by Sureste Properties Inc. (Hotel Owner) as borrower and Bloomberry Resorts and Hotels Inc. as surety, and in both

loans Banco De Oro Unibank Inc. as Lender and Banco De Oro Unibank, Inc. - Trust and Investment Group as security trustee.

"Business Day" shall mean a day (other than a Saturday or Sunday) on which banks generally are open in Paranaque City and Makati City, Philippines.

"Business Plan" shall mean the business plan prepared by GGAM acting through the Management Team and approved by the Owners prepared in accordance with GGAM's standard planning and budgeting requirements, including plans for items such as projected estimates of revenues, expenses, and cash flow associated with the Facilities, estimated results of Facilities' operations, anticipated capital expenditure projects, FF&E improvement and replacement plans, and marketing plans.

"Board" or "Board of Directors" shall mean the board of directors of the Owners.

"Capital Expense" shall mean any item of expense that, according to Applicable Accounting Principles, is not properly deducted as a current expense on the books of the Facilities, but rather should be capitalized.

"Capital Improvement" shall mean any item of any nature incorporated into the Facilities the cost of which is a Capital Expense.

"Casino Owner" shall mean Bloomberry Resorts and Hotels Inc.

"CEO" shall mean the chief executive officer designated by Owners.

"Change of Control in Owners" shall have the meaning set forth in Clause 16.1 (b).

"Compensation Committee" shall mean that committee which sets the compensation of the Facilities' personnel and comprises the CEO or his designee, vice president of finance or CFO, and the vice president of human resources.

"Controlling Shareholders" shall mean a shareholder who controls at least 51% of the shares of stock of a corporation and who is able to elect a majority of the members of the board of directors of such corporation.

"COO" shall mean the chief operating officer designated by GGAM in accordance with this Agreement.

"Disclosure Letter" shall mean the disclosure letter dated 7 September 2011 referred to in Clause 10.

"EBITDA" shall mean, for the period in question (which, with respect to any Fiscal Year, shall not include any negative or positive EBITDA for any prior Fiscal Year), Net Income for such period PLUS (without duplication and to the extent and only to the extent actually deducted in the calculation of Net Income): (i) interest expense, net of interest income, (ii) income tax expense, (iii) depreciation and

590792.2

amortization, (iv) non-cash impairment losses, (v) extraordinary, non-recurring losses or expenses as determined by Owners or on the sale of assets for such period, (vi) losses attributable to the early extinguishment of indebtedness, (vii) losses attributable to hedging obligations or other derivative instruments, (viii) realized and unrealized foreign exchange losses (ix) other comprehensive losses and (x) pre-opening costs and expenses actually incurred and set forth in the applicable Annual Budget (or otherwise approved by Owners); MINUS (without duplication and to the extent and only to the extent actually included in the calculation of Net Income), (A) non-operating, non-recurring gains on the sale of capital assets for such period, (B) gains attributable to the early extinguishment of indebtedness,  (C) gains attributable to hedging obligations or other derivative instruments, (D) realized and unrealized foreign exchange gains, (E) other comprehensive income, and (F) pre-opening revenues and income, in each case, determined on a consolidated basis for Owners in accordance with the Applicable Accounting Standards.

"Event of Default by GGAM" shall have the meaning set forth in Clause 15.1.

"Event of Default by Owners" shall have the meaning set forth in Clause 15.2.

"Event of Force Majeure" shall have the meaning set forth in Clause 17.1.

"Expert" shall mean a senior partner from a leading internationally-recognized accounting firm with at least ten (10) years experience in gaming transactions.

"Expert Designee" shall have the meaning set forth in Annex I.

"Expert Dispute" shall have the meaning set forth in Annex I.

"Extension Notice" shall have the meaning set forth in Clause 1.3.

"FF&E" shall mean furniture, furnishings, fixtures and equipment (including Gaming Equipment), interior and exterior signs, as well as other non-real property improvements and personal property used to operate the Facilities.

"Facilities" shall mean the world class integrated casino hotel entertainment facilities as more specifically set forth in Annex E and Annex F  at PAGCOR's Bagong Nayong Pilipino Entertainment City Manila located at the Manila Bay reclamation area in Paranaque City, Metro Manila, Philippines.

"Facilities Revenue" shall mean, with respect to any period, all revenues and income of any kind derived directly or indirectly from the operation of the Facilities and properly attributable to the period under consideration determined in accordance with Applicable Accounting Standards.

"Fiscal Year" shall mean a calendar year starting 1 January and ending 31 December, provided that the first Fiscal Year shall start from the Start Date and end on 31 December of that year.

"Foreign VIP EBITDA" shall have the meaning set forth in Clause 4.5 computed following the Segment EBITDA Computation.

"Foreign High Roller Tables" shall have that meaning set forth in the Philippine laws or regulations promulgated by PAGCOR and governing the Facilities, or as the parties may mutually agree.

"Foreign Junket Players" shall have that meaning set forth in the Philippine laws or regulations promulgated by PAGCOR and governing the Facilities, or as the parties may mutually agree.

"Foreign VIP Incentive Fees" shall mean the GGAM Fees referred to in Clause 4.5.

"Gaming Authority" shall mean any governmental or quasi-governmental entity, subdivision, agency, commission, board, etc. with authority to regulate gaming activities located any place in the world.

"Gaming Equipment" shall mean all furniture, furnishings, and equipment required for the operation of the casino, including: (i) cashier, money sorting and money counting equipment, surveillance and communication equipment, and security equipment, including all equipment required pursuant to any Gaming Authority; (ii) slot machines, ticket-in/ticket-out, server based gaming, video games of chance, table games, keno equipment, and other equipment relating to gaming activities; and (iii) office furnishings and equipment for administrative offices dedicated to casino operations.

"Gaming Laws" shall mean any applicable law regulating or otherwise pertaining to casinos, legal gaming, gambling, or the conduct of gaming activities located any place in the world.

"GGAM" shall have the meaning set forth in the preamble.

"GGAM Disclosure Letter" shall mean the disclosure letter referred to in Clause 10.2(E).

"GGAM Fees" shall mean the fees set forth in Clauses 4.1 through 4.4, inclusive.

"Governmental Authority" shall mean any Philippine government, whether national, provincial, city, municipal, local, or other, any court, department, agency, board, authority, or instrumentality, whether administrative or regulatory, or other body relating thereto, or any other body which may exercise similar functions, including PAGCOR.

"Graduated Fees" shall mean those fees payable to GGAM pursuant to Clause 4.5.

"Guest Data" shall mean any and all guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences, and any other information from guests or customers of a casino or hotel.

"Hotel Owner" shall mean Sureste Properties, Inc.

"Individual" shall mean a natural person, whether acting for himself or herself, or in a representative capacity.

"Initial Term" shall have the meaning set forth in Clause 1.2.

"Involved Affiliates" shall have the meaning set forth in Clause 18.8.

"Key Personnel" shall mean those personnel designated by an "*" in Annex D. Key Personnel shall include William P. Weidner, Garry Saunders, and Brad Stone.

"Local High Roller Tables" shall have that meaning as set forth in the Philippine laws or regulations promulgated by PAGCOR and governing the Facilities, or as the parties may mutually agree.

"Local VIP EBITDA" shall have the meaning set forth in Clause 4.4 computed following the Segment EBITDA Computation.

"Management Team" shall have the meaning set forth in Clause 2.4.

"Money Laundering Laws" shall mean the Anti-Money Laundering Act of 2001 (Republic Act No. 9160), as amended, and its implementing regulations.

"Net Income" shall have the meaning as defined under Applicable Accounting Standards.

"OFAC" shall have the meaning set forth in Clause 10.1(S).

"Operating Accounts" shall mean bank accounts, which may include, but are not limited to, account(s) for the purposes of depositing all funds received in the operation of the Facilities and paying all Operating Expenses of the Facilities.

"Operating Expenses" shall mean those non-Capital Expenses that are generated by maintaining, conducting, and supervising the operation of the Facilities (whether or not included within such definitions but always excluding the GGAM Fees) in accordance with the Applicable Accounting Standards.

"Operating Supplies" shall mean all consumable items used in, or held in storage for use in (or, if the context so dictates, required in connection with), the operation of the Facilities including food and beverages, fuel, soap, shampoo, toiletries, and other guest amenities, cleaning materials, printed materials, matches, napkins, stationery, and similar items;

"Option Agreement" shall mean the  option agreement referred to  in Clause 18.3.

"Organizational Chart" shall have the meaning set forth in Clause 2.4.

"Owner" and "Owners" shall have the meaning set forth in the preamble.

"PAGCOR" shall have the meaning set forth in the preamble.

"PAGCOR Lease Agreement" means the contract of lease dated May 7, 2010 executed between Owners and PAGCOR over the 83,084 square meter lot covered by and part of the mother title Original Certificate of Title No. 289 issued by the Register of Deeds of Parañaque City.

"PAGCOR License" shall mean the  Provisional License awarded by PAGCOR to the Casino Owner for the Facilities at Entertainment City (or the license that PAGCOR will issue when the Facilities start commercial operation).

"Party" and "Parties" shall have the meaning set forth in the preamble.

"Performance Standards" shall have the meaning set forth in Annex B.

"Person" shall mean an Individual or Entity (as the case may be).

"Phase I Facilities"  shall  mean those portions of the Facilities set forth in Annex E.

"Phase I-A Facilities" shall mean those portions of the Facilities set forth in Annex F.

"Phase I-B Facilities" shall have those portions of the Facilities set forth in Annex G.

"Philippine Pesos" shall mean the currency of the Philippines.

"Philippines" shall mean the Republic of the Philippines.

"Philippine Anti-Corruption Laws" shall mean Republic Act No. 3019 (otherwise known as the Anti-Graft and Corrupt Practices Act), and similar laws against corrupt practices of public officers.

"Pre-Opening Services" shall have the meaning set forth in Annex A.

"Project Agreements" shall have the meaning set forth in Clause 2.6(b).

"Project Cost" shall mean the Project Cost prepared by Davis Langdon Seah attached to the Disclosure Letter.



590792.2

"Projected Base Fee EBITDA" shall have the meaning set forth in item 1 of Annex B.

"Projected EBITDA" shall have the meaning set forth in item 1 of Annex B.

"Proposed Annual Budget" shall have the meaning set forth in Clause 2.10.

"Purchase Option" shall mean the option set forth in Clause 18.3.

"Receiving Party" shall have the meaning set forth in Clause 14.2.

"Reserved Matters" shall mean those matters set forth in Annex C.

"ROPCPI" shall mean the Consumer Price Index for all Income Households and Headline Inflation Rates of all Items for the Philippines which uses 2000 as its base year (2000=100) published by the National Statistical Coordination Board.

"Sanctions Laws and Regulations" shall have the meaning set forth in Clause 10.1(S).

"Segment EBITDA Computation" shall mean, for purposes of calculating EBITDA for any purposes other than for the Facilities in their entirety (e.g., Local VIP EBITDA, Foreign VIP EBITDA, and Base Fee EBITDA), all Facilities Revenue shall be segregated amongst each and every category of EBITDA and, further, Operating Expenses shall be allocated between each such category in a manner which takes into account the actual amount of variable Operating Expenses incurred in generating each such category of EBITDA and a distribution of all fixed expenses to each such category of EBITDA which is fair and reasonable when calculating the relative percentages of EBITDA as a portion of all EBITDA from Facilities, the level of general and administrative support given to each category of EBITDA, and the associated costs thereof, normal and customary rules and procedures for managerial accounting under Applicable Accounting Standards, etc., all as calculated by GGAM acting through the Management Team for each period in question based upon protocols established by GGAM and approved by Owners .

"Services" shall mean those services of GGAM set forth in Annex A.

"Signing Authority Matrix" shall mean the signing authority matrix prepared by the Parties and approved by the Owners.

"Standard of Care" shall have the meaning set forth in Clause 2.5.

"Start Date" shall have the meaning set forth in Clause 1.2.

"Subsequent Term" shall have the meaning set forth in Clause 1.3.

"Term" shall mean the Initial Term or any then applicable Subsequent Term of this Agreement.



"Termination Fee" shall mean, in the event this Agreement is terminated in accordance with subclauses (B), (C) or (D) of Clause 16.1(b), an amount equivalent to:

| Period | Calculation |
|---|---|
| Commencing on the Effective Date through the date 12 months after the Start Date (the "First Operating Year") | $ 11,000,000 |
| Commencing on the day following the expiration of the First Operating Year through the date 24 months after the Start Date (the "Second Operating Year") | 4 x the sum of the GGAM Fees due and owing for the immediately prior 12 months |
| Commencing on the date following the expiration of the Second Operating Year through the date 36 months after the Start Date (the "Third Operating Year") | 3 x the sum of the GGAM Fees due and owing for the immediately prior 12 months |
| Commencing on the date following expiration of the Third Operating Year through the date 48 months after the Start Date (the "Fourth Operating Year") | 2.5 x the sum of the GGAM Fees due and owing for the immediately prior 12 months |
| At any time after the expiration of the Fourth Operating Year | 2 x the sum of the GGAM Fees due and owing for the immediately prior 12 months |

"Unsuitable Person" shall mean any individual or entity which (i) is known in the community as being of bad moral character; (ii) has been convicted of a felony in any state or federal court (including courts in the U.S.A.); (iii) would cause the denial, threatened denial, revocation, threatened revocation, suspension, threatened suspension or non-renewal of any gaming license, approval or permit of GGAM; r (iv) is a SDN.

590792.2

ANNEX I

EXPERT RESOLUTION

1.1   Any Dispute that requires resolution of the following matters (individually or together, an "Expert Dispute") shall be exclusively resolved according to the following:

(a)   the calculation of the EBITDA;

(b)   a determination under Clause 2.9 of which Party's proposed budget element(s) is most likely to optimize financial performance of the Facilities, with due consideration given to then current market conditions; and

(c)   Equitable adjustment under item 5 of Annex B.

1.2   If any Expert Dispute is brought with a dispute, controversy, or claim pursuant to Clause 19.2 of the Agreement, such Expert Dispute shall be immediately severed from any arbitration pursuant to Clause 19.2 and independently and exclusively resolved in accordance with the procedures set forth in this Annex I.

1.3   If a Party is entitled to and elects to have an Expert designated, it shall notify the other Party in writing and the Parties shall attempt to designate a mutually acceptable Expert within twenty (20) Business Days of such notice. In the event that the Parties are unable to agree upon an Expert within such period, each of the Parties shall select an Individual meeting the requirements of an Expert (each, an "Expert Designee") within two (2) Business Days, and the two (2) Expert Designees shall thereafter meet in good faith within five (5) Business Days and select an Expert in accordance with the qualifications set forth in this Agreement.   If the Expert Designees are unable to agree on an Expert with such five (5) Business Days, the Parties shall grant the current Expert Designees an additional five (5) days to mutually agree upon an Expert.

1.4   The Expert shall establish, in its sole and absolute discretion, the procedure for resolving the dispute, including what evidence to consider, whether to allow written submissions, and whether to hold a hearing, subject to the following:

(a)   unless otherwise agreed by the Parties, the Expert shall hold at least one (1) proceeding at which the Parties present and respond to evidence, which shall take place on a Business Day not later than twenty (20) Business Days, nor earlier than ten (10) Business Days, from the date notice of the dispute is given or as soon thereafter as the Expert is available.  Unless otherwise agreed, all proceedings shall be conducted in Singapore;

590792.2

(b)     the Expert has the power to demand from either Party whatever information in that Party's possession the Expert deems necessary to resolve the dispute;

(c)     except as specifically requested by a Expert, no Party may present any evidence that was not shared with the other Party before the Expert resolution proceeding was initiated;

(d)     no discovery may be conducted between the Parties;

(e)     no attorneys may appear on behalf of either Party (although either Party may use attorneys for their own consultation or advice);

(f)     the Expert shall schedule and conduct all proceedings with the objective of resolving the dispute as quickly and efficiently as possible; and

(g)     the Parties shall not engage in any communications with an Expert except in response to formal requests by an Expert or at proceedings scheduled by an Expert.

1.5     All decisions of the Expert, absent fraud, willful misconduct, or demonstrated conflict of interest, are final and binding on the Parties (without appeal or review) and are enforceable in any court of competent jurisdiction.

1.6     During the pendency of the Expert resolution proceedings, the Parties shall share equally the fees and expenses of the Expert.  In rendering its decision, the Expert shall designate the Party whose position is substantially upheld, who shall recover from the other Party its share of the fees and costs so paid.  The Expert may determine that neither Party's position was substantially upheld.  The Parties shall otherwise bear their own costs and expenses of the Expert resolution proceedings, including each Party's respective attorneys' fees and costs.

**Global Gaming Asset Management, L.P.**
**3575 West Post Road**
**Las Vegas, NV 89118**

**Strictly Personal and Confidential**

September __8__, 2011

Bloomberry Resorts and Hotels, Inc.
Unit 601, 6th Floor Ecoplaza Building
Pasong Tamo Extension, Makati City
Philippines

Sureste Properties, Inc.
26th Floor, 139 Corporate Center Building
Valero Street, Salcedo Village
Makati City, Philippines

Dear Mr. Razon:

   Reference is made to that certain Management Service Agreement dated as of September __8__, 2011 among Bloomberry Resorts and Hotels, Inc., Sureste Properties, Inc. and Global Gaming Philippines Management, LLC (the "MSA"). Pursuant to Section 10.2(e) of the MSA, William P. Weidner is the Chief Executive Officer of Global Gaming Philippines, LLC and Global Gaming Asset Management, L.P. is the sole equity holder of Global Gaming Philippines, LLC. Pursuant to Section 10.2(g) of the MSA attached hereto as Exhibit A is a chart of the corporate structure of Global Gaming Philippines, LLC.

Sincerely,

GLOBAL GAMING ASSET MANAGEMENT, L.P.

By: _____
Name: William Weidner
Title: President

41373 v2

EXHIBIT A



*Certain other parties hold non-economic interests

41373 v2