# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLOBAL GAMING PHILIPPINES, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>ENRIQUE K. RAZON, JR.; BLOOMBERRY RESORTS AND HOTELS INC.; SURESTE PROPERTIES, INC.; COLLINGWOOD OIL & GAS HOLDINGS, LLC; COLLINGWOOD USA, INC.; COLLINGWOOD BROOKSHIRE USA, INC.; COLLINGWOOD APPALACHIAN MINERALS, LLC; ASIA ARROW LIMITED; RIZOLINA LLC; ENSARA LLC; NOZAR LLC; BOWERY BAY LLC; CAMPANILLA LLC; FESARA LLC; AND 11 ESSEX STREET REALTY LLC,<br><br>*Defendants*. | No. 21-CV-2655 (LGS) |

**DEFENDANTS BLOOMBERRY RESORTS AND HOTELS INC.'S AND SURESTE PROPERTIES, INC.'S FIRST SET OF REQUESTS FOR PRODUCTION OF <u>DOCUMENTS TO PLAINTIFF GLOBAL GAMING PHILIPPINES, LLC</u>**

PLEASE TAKE NOTICE THAT, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and Rule 26.3 of this Court's Local Civil Rules, Defendants Bloomberry Resorts and Hotels Inc. ("BRHI") and Sureste Properties, Inc. ("SPI"), by their undersigned counsel, hereby request Plaintiff Global Gaming Philippines, LLC ("GGP") to produce the Documents described below (the "Requests"). The Requests are subject to the Definitions and Instructions enumerated below.

# DEFINITIONS

1. The Requests incorporate by reference the Uniform Definitions in Discovery Requests set forth in Rule 26.3 of the Local Civil Rules for the United States District Courts for the Southern and Eastern Districts of New York.

2. "Arbitration" means the arbitration in accordance with the MSA and the UNCITRAL Arbitration Rules 2010 between Claimants and Respondents.

3. "Arbitration Proceedings" means the proceedings in connection with the Arbitration.

4. "BRC" means Bloomberry Resorts Corporation.

5. "Cantor Fitzgerald" means Cantor Fitzgerald L.P. and its affiliates.

6. "Claimants" means Global Gaming Philippines LLC and GGAM Netherlands B.V., which were the Claimants in the Arbitration.

7. "Chinese" means of or relating to the People's Republic of China (including all territories of China, such as Macau and Hong Kong).

8. "Chiu" means Eric Chiu, GGP's President for Asia.

9. "Dr. Chen" means Dr. Chen Xiang, a Chinese government official with the CLO.

10. "Chu Kong Shipping" means Chu Kong Shipping Enterprises (Group) Company Ltd. and its affiliates.

11. "CITS" means China International Travel Services, Ltd. and its affiliates.

12. "CLO" means the Chinese Liaison Office in Macau.

13. "DOJ" means the United States Department of Justice.

14. "DOJ NPA" means the DOJ's January 17, 2017 Non-Prosecution Agreement with LVS.

15. "EOA" means the Equity Option Agreement between Prime Metroline, BRC and GGP dated April 16, 2012.

16. "FCPA" means the U.S. Foreign Corrupt Practices Act.

17. "FCPA Orders" means the SEC Order and the DOJ NPA.

18. "Final Award" means the Tribunal's September 27, 2019 award in the Arbitration entitled "Final Award."

19. "GGP" or "GGAM" or "You" or "Your" means Plaintiff Global Gaming Philippines, LLC, GGAM Netherlands B.V., Global Gaming Asset Management L.P., and their affiliates.

20. "GGP's Chinese Government Official Strategy" means the first of GGP's two strategies for delivering VIPs and junkets to Solaire, which Weidner described in a declaration as "a sophisticated and unique government-led, top-down junket approach," and which Weidner further testified about during an Arbitration hearing held on October 19, 2015.

21. "GGP's Cross-Border Trading Strategy" means the second of GGP's two strategies for delivering VIPs and junkets to Solaire, which Weidner described in a declaration as developing "direct VIP play" by establishing "a cross-border trading platform to promote business and gaming visitation between China and the Philippines," and which Weidner further testified about during an Arbitration hearing held on October 19, 2015.

22. "GGP's Two Strategies" means GGP's Chinese Government Official Strategy and GGP's Cross-Border Trading Strategy.

23. "Interim Measures Order" means the Tribunal's December 9, 2014 order in the Arbitration entitled "Order in Respect of Claimants' Interim Measures' Application."

24. "Liability Award" means the Tribunal's September 20, 2016 award in the Arbitration entitled "Partial Award on Liability."

25. "Lucky Dragon Hotel & Casino" means the Lucky Dragon Hotel & Casino that was located and operating at 300 W Sahara Ave, Las Vegas, NV 89102, and any of its owners or affiliates, including Las Vegas Economic Impact Regional Center, LLC and other entities owned or beneficially owned by Weidner, Andrew S. Fonfa, or members of their families.

26. "Lutnick" means Howard W. Lutnick, Cantor Fitzgerald's Chief Executive Officer and Chairman, and GGP's Co-Chairman.

27. "LVS" means Las Vegas Sands Corp. and its affiliates.

28. "MSA" means the Management Services Agreement between BRHI, SPI and GGP dated September 9, 2011.

29. "Neptune" means Neptune Group, a junket operator in Macau, and its affiliates.

30. "Option Shares" means the shares of BRC purchased by GGP under the option to purchase shares granted to GGP in the MSA.

31. "Person" means a natural person or any corporation, partnership, association, joint venture, firm, trust, or other business enterprise or legal entity.  Each reference to a Person shall be deemed to include that Person's agents, attorneys, and any other Person who acted on that Person's behalf.

32.  "Philippine Proceedings" means the proceedings in the Philippine Regional Trial Court in Makati City, the Philippine Court of Appeals and the Philippine Supreme Court regarding the injunction and attachment on the Option Shares, subjects of the Arbitration Proceedings, and decisions issued by the Tribunal in connection with the Arbitration Proceedings.

33. "RA-" means Respondents' Additional Exhibit submitted in the Arbitration.

34. "RE-"means Respondents' Exhibit submitted in the Arbitration.

35. "Respondents" means Bloomberry Resorts and Hotels Inc. and Sureste Properties, Inc., which were the Respondents in the Arbitration.

36. "Sahara ASF Asia" means Sahara ASF Asia Ltd., which GGP has represented to be its Macau Office, with address of Unit C, 11th Floor, Nam Tung Comm. Building, 517 Avenida da Praia Grande, Macau, and telephone number of +853.2832.9986, and which GGP has also represented to be the office that GGP's President of Asia Operations, Eric Chiu, works out of.[1]

37. "SEC" means the United States Securities and Exchange Commission.

38. "SEC Order" means the SEC's April 7, 2016 Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and-Desist Order against LVS.

39. "Singapore Proceedings" means the proceedings in the High Court of Singapore and the Singapore Court of Appeal regarding the Liability Award and Final Award issued by the Tribunal in connection with the Arbitration Proceedings.

40. "Solaire" means the Solaire Resort & Casino, located at 1 Asean Avenue, Entertainment City, Tambo, Parañaque City, Philippines.

41. "Tai Gor" means Cheung Chi Tai, a partial owner and/or executive of Neptune in 2013, and who was identified in a 1992 US Senate committee investigation as a leader of the Wo Hop To triad, was reportedly accused in 2010 of being the leader of the Wo Hop To triad and ordering a murder, and reportedly had business dealings with LVS prior to the accusations against him in 2010.[2]

42. "Tribunal" means the arbitral tribunal in the Arbitration.

---

[1] *See, e.g.,* GGAM Case Study: Bloomberry Resorts IPO, July 2012, at 8 (RE-123).

[2] *See generally* Expert Report of Fredric Gushin and Daniel Reeves, Spectrum Gaming Group, August 31, 2017 (ECF No. 30-1) at n. 65; Matt Isaacs, "Special report: High-rollers, triads and a Las Vegas giant," Reuters, March 29, 2010 (RA-402); Chris McGreal and Matt Isaacs, "Sheldon Adelson faces new scrutiny as documents challenge his testimony," The Guardian, May 9, 2015 (RA-415).

43. "Weidner" means William P. Weidner, GGP's Chief Executive Officer.

44. "Weidner Holdings" means any company owned or affiliated with Weidner that is referred to as Weidner Holdings, including Weidner Holdings LLC, and any such company's affiliates.

45. "Weidner Resorts" means any company owned or affiliated with Weidner that is referred to as Weidner Resorts, including Weidner Resorts Development, Inc., Weidner Resorts China, Weidner Resorts India and Weidner Resorts Taiwan, and any such company's affiliates.

## INSTRUCTIONS

1. You are instructed to produce all Documents responsive to the Requests that are within Your possession, custody, or control, or in the possession, custody, or control of any other person or entity acting or purporting to act on Your behalf, or who, upon Your request, would surrender possession, custody or control to You.

2. Unless otherwise stated, these Requests seek production of documents dated, prepared, generated, transmitted, or received during the period from and including January 1, 2011 to the present.

3. "Including" shall be construed to mean "without limitation."

4. "Concerning" shall be defined as provided in Local Civil Rule 26.3. "Concerning" means relating to, referring to, describing, evidencing, or constituting.

5. "Any" shall also be construed to mean "all" and "all" also shall be construed to mean "any."

6. Each reference to a corporation, partnership, joint venture, unincorporated association, government agency, or other entity, shall be deemed to include each and all of its parents, subsidiaries, affiliates, predecessors, and successors, and with respect to each of such

entities, its officers, directors, shareholders, employees, partners, limited partners, managers, representatives, agents, accountants, attorneys, trustees, and any other Person who acted on its behalf.

7. Each request for production shall be responded to completely, separately and fully. If there are no Documents responsive to any particular request, Your response shall state so in writing.

8. If, in responding to the Document Requests, You encounter any ambiguities when construing a request or definition, Your response shall set forth the matter deemed ambiguous and the construction used in responding.

9. Each request for the production of Documents shall be deemed to be continuing in nature. If at any time additional Documents come into Your possession, custody or control or are brought to Your attention, You will promptly supplement Your response to these Document Requests.

10. All Documents shall be produced in the manner in which they are maintained in the usual course of Your business and/or You shall organize and label the Documents to correspond to each request contained herein. A request for a Document shall be deemed to include a request for any and all file folders within which the Document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself. Documents attached to each other shall not be separated.

11. You shall produce all Electronically Stored Information in accordance with the ESI Protocol agreed between the Parties on May 28, 2021.

12. Any Document withheld from production based on privilege or any similar claim shall be identified by (1) the type of document, (2) the general subject matter of the Document,

(3) the date of the Document, and (4) such other information as is sufficient to identify the Document, including the author of the Document, the addressee of the Document, other recipients of the Document and, where not apparent, the relationship of the author and the addressee to each other. The nature of each claim of privilege shall be set forth. If a portion of a Document contains information subject to a claim of privilege, only that portion shall be redacted and the remainder shall be produced.

13. If any Document within the scope of these Document Requests has been modified or altered in any way, including in part, identify (i) each such Document; (ii) its custodian; and (iii) the person who modified or altered it. The circumstances of such modification or alteration shall be set forth, including how and why the Document was modified or altered.

14. If any Document within the scope of these Requests is no longer in Your possession or subject to Your control, state whether it is (i) missing or lost; (ii) destroyed; (iii) transferred voluntarily or involuntarily to others; or (iv) otherwise disposed of. In each instance, identify the current or last known custodian and the circumstances surrounding such disposition.

15. If You object to any part of any Request, You shall state fully the nature of the objection. Notwithstanding any objections, You shall nonetheless comply fully with the other parts of the Document Request not objected to.

16. BRHI and SPI reserve the right to request additional Documents as needed and to submit additional or supplemental document requests, <u>provided</u>, further, that they expressly reserve their rights to supplement or amend the Requests .

## DOCUMENT REQUESTS

1. All Documents and Communications Concerning the conduct of Weidner and Chiu while at LVS that related to the LVS transactions and conduct that the DOJ and SEC investigated

8

for violations of the FCPA, including the conduct of Weidner and Chiu that was described in the FCPA Orders.

2. All Documents and Communications Concerning GGP's revision in March 2012 of GGP's anti-corruption representation in the draft EOA as follows: "<u>Anti-Corruption Laws</u>. None of the Grantee or any Person owned, directly or indirectly, thereby, nor any of their senior management or directors or their supervisors, managers, employees or agents **has, directly or indirectly, violated** applicable anti-corruption laws, including, but not limited to, **Philippine Anti-Corruption Laws**."[3]

3. All Documents and Communications Concerning (i) BRHI's and SPI's questions on August 14 and 16, 2012 about the involvement of GGP executives in the transactions and conduct at LVS that were being investigated by the DOJ and SEC for violations of the FCPA,[4] and (ii) GGP's responses to those questions on August 14, 15, 16 and 18, 2012.

4. All Documents and Communications Concerning GGP's, Weidner's or Chiu's Communications with LVS, the DOJ, and/or the SEC—whether directly or through counsel or agents—in connection with the DOJ's and SEC's investigations into LVS for violations of the FCPA.

5. All Documents and Communications Concerning GGP's or Weidner's decision and efforts, following the release of the FCPA Orders, for (i) GGP to take down its website,

---

[3] *See* Email from J. Meyers (Paul Hastings) to B. Tan, March 31, 2012 (attaching revised EOA and redline to prior draft) (emphasis added) (strikethrough in original) (RE-320).

[4] *See generally* Emails between BRHI, SPI and GGP, August 14, 2012 (RE-311); Emails between BRHI, SPI and GGP, August 15, 2012 (RE-312); Emails between BRHI, SPI and GGP, August 16, 2012 (RE-313); Email from B. Weidner to E. Occeña, August 18, 2012 (RE-314).

www.ggam.com, and (ii) Weidner to no longer be identified publicly as an owner and President of the Lucky Dragon Hotel & Casino.[5]

6. All Documents and Communications Concerning Tai Gor and any of Tai Gor's associates or representatives, whether affiliated with Neptune, the Wo Hop To triad or otherwise, including GGP's and Chiu's direct and indirect dealings with Tai Gor that began in June 2013.[6]

7. All Documents and Communications Concerning GGP's decision not to search for or produce in the Arbitration the Documents and Communications in Chiu's possession, custody, or control.

8. All Documents and Communications in Chiu's possession, custody, or control related to BRHI and SPI.

9. All Documents and Communications Concerning GGP's decision not to search for or produce in the Arbitration the Documents and Communications in Lutnick's possession, custody, or control.

10. All Documents and Communications in Lutnick's possession, custody, or control related to BRHI and SPI.

11. All Documents and Communications Concerning the October 15, 2018 revision by GGP of the statement made in an affidavit submitted in the Singapore Proceedings that prior to August 2012, Weidner's counsel that was representing him in connection with the United States government's investigation into LVS had received "specific assurances" from the United States

---

[5] *See, e.g.*, John L. Smith, "The Unlucky Dragon: Chinese Investors Receive Assurances, Take a Beating," The Nevada Independent (October 28, 2018), available at https://thenevadaindependent.com/article/the-unlucky-dragon-chinese-investors-receive-assurances-take-a-beating.

[6] *See, e.g.*, Email from E. Chiu to B. Weidner, June 6, 2013 (RE-185) ("Ming said he can quickly get Neptune (Tai gor) and others to Solaire but it doesn't work without a company title, Tai Gor won't give him face if he doesn't really work for us. . . .  Neptune is sponsoring porker [sic] tournament in City of Dreams now, tomorrow is the final contest, Ming arranged Tai Gor who invited me just now to be VIP guest to watch the final contest tomorrow. [L]et's talk on that.").

government authorities conducting the LVS investigations that Weidner was not a "subject" of that investigation.

12. All Documents and Communications Concerning the "further discussions" between GGP's counsel or Weidner's counsel and the DOJ or other United States government authorities that led to the October 15, 2018 revision by GGP, including all Communications with the DOJ or other United States government authorities.

13. All Documents and Communications Concerning GGP's Two Strategies (i.e., GGP's Chinese Government Official Strategy and GGP's Cross-Border Trading Strategy), including GGP's decision not to disclose GGP's Two Strategies to BRHI or SPI and GGP's decision not to put GGP's Two Strategies in writing (including in the business plan that GGP created for Solaire or otherwise).

14. All Documents and Communications between Weidner or Chiu, on the one hand, and any Chinese government officials or Chinese individuals or entities, including Dr. Chen, the CLO, Chu Kong Shipping and CITS, on the other hand, Concerning GGP's Two Strategies.

15. All Documents and Communications Concerning Chinese government officials' efforts, including Dr. Chen's or the CLO's efforts, to introduce GGP to junket operators and/or exert influence over junket operators, including between March and June 2013.[7]

16. All Documents and Communications Concerning any transfers of funds made from GGP, Weidner and/or any Person affiliated with GGP or Weidner (including Weidner Holdings and Weidner Resorts) to Sahara ASF Asia, Chiu, and/or any Person affiliated with Sahara ASF

---

[7] *See generally* Email from E. Chiu to B. Weidner, March 31, 2013 (RE-324) ("Dr. C said meetings with junket owners will start next week."); Email from E. Chiu to Bill Weidner, April 3, 2013 (RE-325) ("Dr. C just called me, in order for him to fully facilitate Macau junkets to operate in the Philippines and other of our future project locations, from now on all Macao junket liaisons must be done thru me to avoid confusions."); Email from E. Chiu to B. Weidner, May 11, 2013 (RE-185) ("I have just started building good relationships with those big Macao junkets bringing high rollers to the Solaire!").

11

Asia or Chiu, including all Documents and Communications Concerning the at least two $25,000 payments made from GGP to Sahara ASF Asia between March and June 2013.[8]

17. Documents and Communications sufficient to identify all of Sahara ASF Asia's direct and indirect parent and subsidiary companies since its formation and all Persons holding an interest in Sahara ASF Asia since its formation.

18. All Documents and Communications Concerning Sahara ASF Asia.[9]

19. Documents and Communications sufficient to reflect all payments made by GGP, Weidner, any affiliates of GGP, or any affiliates of Weidner (including Weidner Holdings and Weidner Resorts) to Chiu or any affiliates of Chiu from January 1, 2011 through September 12, 2013.

20. All Documents and Communications Concerning GGP's involvement with the Lucky Dragon Hotel & Casino and/or Andrew S. Fonfa, including All Documents and Communications Concerning or supporting GGP's counsel's statements to the Tribunal in a letter dated March 29, 2019 that suggested that "Sahara ASF Asia is owned by the Las Vegas Property developer Andrew Fonfa," and that the at least two $25,000 payments that GGP made to Sahara ASF Asia between March and June 2013 "in fact were made to a Nevada property developer."

21. All Documents and Communications Concerning Weidner intermingling personal or GGP assets or funds with the assets or funds of Sahara ASF Asia or any other entities owned by

---

[8] *See generally* Email from G. Saunders to B. Weidner, et al., June 7, 2013 (RE-330) ("Separately, looking at the last P&L, I noticed the second month of a $25,000 charge to Sahara ASF Asia (Andy Fonfa?) for a Macau office. Is this for Eric? How is Any involved?").

[9] *See generally* GGAM Case Study: Bloomberry Resorts IPO, July 2012, at 8 (RE-123) (listing the address of GGAM's Macau Office, where Eric Chiu is located as "President of Asia Operations," as "Sahara ASF Asia Ltd. Unit C, 11th Floor Nam Tung Comm. Building 517 Avenida da PraiaGrande, Macau").

12

Weidner and/or Andrew S. Fonfa, including Sahara Investments LLC and any other entities owned by Weidner and/or Andrew S. Fonfa.[10]

22. All Documents and Communications Concerning GGP's efforts to set up a "cross-border trading platform," including all Documents and Communications (i) with or Concerning the CLO, Chu Kong Shipping, CITS and other Chinese individuals or entities working with GGP to set up a "cross-border trading platform," (ii) Concerning GGP's efforts to assist Chinese individuals to evade Chinese Currency restrictions, through manipulating and/or misrepresenting commodity trade settlements or otherwise, as part of a "cross-border trading platform" or otherwise,[11] and (iii) Concerning the risks associated with setting up a platform to enable Chinese individuals to evade Chinese currency controls.

23. All Documents and Communications that GGP may use or intend to use to support any claim against BRHI or SPI in this action.

24. All Documents and Communications Concerning the Philippine Court of Appeals Resolution, CA-G.R. SP No. 13430, Nov. 27, 2015 (RE-269), which stated, among other things, that "we remain firm with Our May 29, 2015 Resolution remanding the case to the RTC, Branch 66 for the conduct of further proceedings for the recognition and enforcement of the Arbitral Tribunal's Order dated December 9, 2014."

---

[10] *See, e.g.* Am. Compl. at ¶ 11, *Yang, et al. v. Weidner, et al.*, No. 2:20-cv-01518-KJD-DJA (D. Nev.) ("Sahara Investments, LLC ("Sahara") was a Nevada limited liability company, formed October 23, 2006, with its principal offices at 200 W. Sahara Ave., 4001, Las Vegas, NV at the time of its dissolution. Sahara filed for dissolution on October 18, 2019. Both Weidner and Fonfa managed and controlled Sahara. Both were its agents. **Sahara was an alter ego of Weidner and Fonfa in that they were the sole managers of that entity; Sahara accounts commingled assets of Weidner and Fonfa, their other businesses, personal accounts related to their families, and they used Sahara to carry out the scheme alleged herein**.") (emphasis added).

[11] *See generally* Expert Report of Fredric Gushin and Daniel Reeves, Spectrum Gaming Group, August 31, 2017 (ECF No. 30-1) at § IV.

25. All Documents and Communications Concerning proceedings in the Philippines to recognize and enforce the Interim Measures Order, the Liability Award and/or the Final Award, including any discussions related to pursuing, or not pursuing, recognition and enforcement in the Philippines.

26. All Documents and Communications that provide a basis for the statement in GGP's May 21, 2021 letter to the Court (ECF No. 56) that BRHI and SPI "traveled to New York to negotiate the Management Services Agreement ("MSA") that is the subject of the arbitral awards."

27. All Documents and Communications that provide a basis for the statement in GGP's May 21, 2021 letter to the Court (ECF No. 56) that BRHI and SPI "expressly provided that pre-contract due diligence was governed by New York law."

28. All Documents and Communications that provide a basis for the statement that BRHI and SPI "performed some of their contractual obligations by joining GGAM in New York for numerous investor "road show" meetings and conferences, seeking and obtaining investments from New York-based investors."

29. All agreements between GGP and Cantor Fitzgerald, including any agreements Concerning the Option Shares, and All Documents and Communications Concerning such agreements, including the negotiations of any such agreements between Weidner and Lutnick.

30. All Communications with any witness required to provide a report under Rule 26(a)(2)(B) that (a) relate to the compensation for the expert's study or testimony; (b) identify facts or data that You provided and that the expert considered in forming the opinions to be expressed; or (iii) identify assumptions that You provided and that the expert relied on in forming the opinions to be expressed.

Dated: June 4, 2021
       New York, New York

MILBANK LLP

By:  */s/ Daniel M. Perry*
    Daniel M. Perry
    55 Hudson Yards
    New York, NY 10001
    Telephone: (212) 530-5000
    Facsimile: (212) 530-5219

    Michael D. Nolan
    Erin M. Culbertson
    Brett P. Lowe (admitted *pro hac vice*)
    1850 K Street, NW
    Suite 1100
    Washington, DC 20006
    Telephone: (202) 835-7500
    Facsimile: (202) 263-7586
    *Counsel to Defendants Bloomberry Resorts and Hotels Inc. and Sureste Properties, Inc.*

## Certificate of Service

I hereby certify that on June 4, 2021, I caused a true and correct copy of the foregoing Defendants Bloomberry Resorts and Hotels Inc.'s and Sureste Properties, Inc.'s First Set of Requests for Production of Documents to Plaintiff Global Gaming Philippines, LLC to be sent via email and overnight delivery to Plaintiff's counsel:

Robert I. Bodian
Jason P.W. Halperin
Kevin N. Ainsworth
Daniel T. Pascucci
Joseph R. Dunn
Iris B. Greenquist
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
Chrysler Center
666 Third Avenue
New York, NY 10017
T: (212) 935-3000
F: (212) 983-3115
rbodian@mintz.com
jhalperin@mintz.com
kainsworth@mintz.com
dtpascucci@mintz.com
jrdunn@mintz.com
ibgreenquist@mintz.com

Joseph R. Dunn
Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.
3580 Carmel Mountain Road, Suite 300
San Diego, CA 92130
T: (858) 314-1500
F: (858) 314-1501
jrdunn@mintz.com

                                                      */s/ Daniel M. Perry*
                                                      Daniel M. Perry