**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLOBAL GAMING PHILIPPINES, LLC,<br><br>  *Plaintiff*,<br><br>  v.<br><br>ENRIQUE K. RAZON, JR.;<br>BLOOMBERRY RESORTS AND HOTELS<br>INC.; SURESTE PROPERTIES, INC.;<br>COLLINGWOOD INVESTMENT<br>COMPANY LIMITED; COLLINGWOOD<br>OIL & GAS HOLDINGS, LLC;<br>COLLINGWOOD USA, INC.;<br>COLLINGWOOD BROOKSHIRE USA,<br>INC.; COLLINGWOOD APPALACHIAN<br>MINERALS, LLC; ASIA ARROW<br>LIMITED; RIZOLINA LLC; ENSARA LLC;<br>NOZAR LLC; BOWERY BAY LLC;<br>CAMPANILLA LLC; FESARA LLC; AND<br>11 ESSEX STREET REALTY LLC,<br><br>  *Defendants*. | No. 21-CV-2655 (LGS) |

<u>**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**</u>

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT .................................................................................................. 1

ARGUMENT ................................................................................................................................ 7

I.  THE COURT LACKS JURISDICTION OVER ALL ENTITY DEFENDANTS ............. 7

    A.  The Court Lacks Personal Jurisdiction Over the Debtor Defendants ..................... 7

    B.  The Court Lacks Personal Jurisdiction Over CICL and the Energy Entities ......... 12

II.  GGP FAILS TO STATE A CLAIM FOR ALTER EGO LIABILITY ........................... 14

    A.  GGP Fails To Allege Alter Ego Liability Against Mr. Razon ............................. 15

        1.  GGP Does Not Allege "Complete Domination" of Bloomberry by Mr. Razon ................................................................................................... 15

        2.  GGP Does Not Allege a Fraud or Other Wrong ....................................... 19

            a.  GGP Does Not and Cannot Allege Siphoning of Assets ............. 20

            b.  GGP Does Not and Cannot Allege Fraud ..................................... 21

            c.  The "Wrongs" Alleged in the FAC Are Not a Basis for Veil-Piercing. ..................................................................................... 23

    B.  GGP Fails to Allege "Reverse Piercing" Against the Non-Bloomberry Entities . 27

III.  GGP FAILS TO STATE A CONVERSION CLAIM AGAINST MR. RAZON ............. 32

IV.  THE COURT SHOULD DISMISS UNDER *FORUM NON CONVENIENS* .................. 37

    A.  GGP Forum-Shopped and So Its Forum Choice Does Not Deserve Deference ................................................................................................. 37

    B.  The Philippines Is an Adequate Forum, as U.S. Courts Have Repeatedly Held ................................................................................................. 38

    C.  Dismissal Would Promote Convenience and Comity and Avoid Conflicts of Laws ................................................................................................. 39

## TABLE OF AUTHORITIES

**Page(s)**

**Federal and State Cases**

*In re Adler*,
    467 B.R. 279 (Bankr. E.D.N.Y. 2012) ....................................................................29

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
    39 F. Supp. 3d 516 (S.D.N.Y. 2014) .....................................................................29

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
    126 F. Supp. 3d 388 (S.D.N.Y. 2015) .............................................................20, 25

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
    716 F. App'x 23 (2d Cir. Nov. 16, 2017) .................................................20, 23, 26

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
    122 F.3d 130 (2d Cir. 1997) ......................................................................... *passim*

*Matter of Arb. between Am. Fuel Corp. v. Utah Energy Dev.*,
    1996 WL 396131 (S.D.N.Y. July 16, 1996) ........................................................25

*Am. Protein Corp. v. AB Volvo*,
    844 F.2d 56 (2d Cir. 1988) ..............................................................................14, 30

*Amalgamated Sugar Co. v. NL Indus., Inc.*,
    825 F.2d 634 (2d Cir. 1987) ................................................................................35

*In re Arb. between Monegaque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*,
    311 F.3d 488 (2d Cir. 2002) ..........................................................................37, 39

*Art Assure LTD., LLC v. Artmentum Gmbh*,
    2014 WL 5757545 (S.D.N.Y. Nov. 4, 2014) ................................................10, 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................... *passim*

*AVRA Surgical Robotics, Inc. v. Gombert*,
    41 F. Supp. 3d 350 (S.D.N.Y. 2014) ....................................................................10

*Beacon Enter., Inc. v. Menzies*,
    715 F.2d 757 (2d Cir. 1983) ................................................................................10

*Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*,
    655 F. Supp. 2d 177 (E.D.N.Y. 2009) .................................................................30

*Brunswick Corp. v. Waxman*,
    599 F.2d 34 (2d Cir. 1979)..................................................................................26, 27

*Canario v. Lidelco, Inc.*,
    782 F. Supp. 749 (E.D.N.Y. 1992) .......................................................................19

*CBF Indústria de Gusa S/A v. AMCI Hldgs., Inc.*,
    850 F.3d 58 (2d Cir. 2017)................................................................................12, 14

*City of Almaty v. Ablyazov*,
    278 F. Supp. 3d 776 (S.D.N.Y. 2017)....................................................................15

*Colgate Palmolive Co. v. S/S Dart Canada*,
    724 F.2d 313 (2d Cir. 1983)...................................................................................33

*Contant v. Bank of Am. Corp.*,
    385 F. Supp. 3d 284 (S.D.N.Y. 2019).......................................................................7

*Crigger v. Fahnestock & Co.*,
    443 F.3d 230 (2d Cir. 2006)...................................................................................22

*In re Currency Conversion Fee Antitrust Litig.*,
    265 F. Supp. 2d 385 (S.D.N.Y. 2003).....................................................................19

*de Borja v. Razon*,
    2019 WL 4724317 (D. Or. Aug. 16, 2019).................................................. *passim*

*de Borja v. Razon*,
    2019 WL 4723070 (D. Or. Sept. 25, 2019) .................................................. *passim*

*de Borja v. Razon*,
    835 F. App'x 184 (9th Cir. Nov. 3, 2020) ................................................... *passim*

*Eagle Transport Ltd. v. O'Connor*,
    470 F. Supp. 731 (S.D.N.Y. 1979) ........................................................................17

*Ehrenfeld v. Bin Mahfouz*,
    9 N.Y.3d 501 (2007) ................................................................................................8

*Elsevier, Inc. v. Grossman*,
    77 F. Supp. 3d 331 (S.D.N.Y. 2015).........................................................................7

*Feitshans v. Kahn*,
    2006 WL 2714706 (S.D.N.Y. Sept. 21, 2006)....................................................35, 36

*Finanz AG Zurich v. Banco Economico S.A.*,
    192 F.3d 240 (2d Cir. 1999)....................................................................................40

*Ford Motor Co. v. Montana Eighth Judicial Dist.*,
    141 S. Ct. 1017 (2021) ..........................................................................7, 12, 13

*Fotochrome, Inc. v. Copal Co.*,
    517 F.2d 512 (2d Cir. 1975).................................................................................25

*Freeman v. Complex Computing Co.*,
    119 F.3d 1044 (2d Cir. 1997)........................................................................15, 16

*Gartner v. Snyder*,
    607 F.2d 582 (2d Cir. 1979)..........................................................................17, 19

*Gate Techs, LLC v. Delphix Cap. Mkts., LLC*,
    2013 WL 3455484 (S.D.N.Y. July 9, 2013) ........................................................36

*George Moundreas & Co. SA v. Jinhai Intell. Mfg. Co.*,
    2021 WL 168930 (S.D.N.Y. Jan. 18, 2021) ......................................................7, 8

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*,
    449 F.3d 377 (2d Cir. 2006).................................................................................34

*Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*,
    270 F. Supp. 3d 716 (S.D.N.Y. 2017)..................................................................23

*Hyundai Merchant Marine Co. v. Mitsubishi Heavy Indus., Ltd.*,
    2015 WL 7758876 (S.D.N.Y. Dec. 1, 2015) .......................................................38

*ICO Servs., Ltd. v. Coinme, Inc.*,
    2018 WL 6605854 (S.D.N.Y. Dec. 17, 2018) ...................................................9, 11

*Int'l Customs Assocs., Inc. v. Ford Motor Co.*,
    893 F. Supp. 1251 (S.D.N.Y. 1995), *aff'd*, 201 F.3d 431 (2d Cir. 1999) ...............10

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001)...................................................................................37

*James v. Loran Realty V Corp.*,
    20 N.Y.3d 918 (2012) ..........................................................................................20

*Kalin v. Xanboo, Inc.*,
    526 F. Supp. 2d 392 (S.D.N.Y. 2007)..................................................................31

*Kasper Global Collection & Brokers Inc. v. Global Cabinets & Furniture Mfg'rs Inc.*,
    952 F. Supp. 2d 542 (S.D.N.Y. 2013)..................................................................15

*Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*,
    2002 WL 432390 (S.D.N.Y. Mar. 20, 2002) .......................................................18

*Koninklijke Philips Elecs. N.V. v. The ADS Grp.*,
    694 F. Supp. 2d 246 (S.D.N.Y. 2010) .................................................................15

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991) .............................................................................17

*Lakah v. UBS AG*,
    2017 WL 7245365 (S.D.N.Y. Feb. 14, 2017) ......................................................17

*Lakah v. UBS AG*,
    996 F. Supp. 2d 250 (S.D.N.Y. 2014) ...........................................................15, 26

*Lee v. Arnan Dev. Corp.*,
    77 A.D.3d 1261 (3d Dep't 2010) .......................................................................32

*In re Level 8 Apparel, LLC*,
    2021 WL 408981 (Bankr. S.D.N.Y. Feb. 3, 2021) ..............................................34

*Marie v. Altshuler*,
    30 A.D.3d 271 (1st Dep't 2006) .........................................................................7

*McAnaney v. Astoria Fin. Corp.*,
    665 F. Supp. 2d 132 (E.D.N.Y. 2009) ...............................................................31

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)................................................................................12

*Mills v. Polar Molecular Corp.*,
    12 F.3d 1170 (2d Cir. 1993)..............................................................................22

*Mirage Ent'mt, Inc. v. FEG Entretenimientos S.A.*,
    326 F. Supp. 3d 26 (S.D.N.Y. 2018)..................................................................23

*Mohamad v. Rajoub*,
    2018 WL 1737219 (S.D.N.Y. Mar. 12, 2018) ....................................................14

*Monahan v. N.Y.C. Dep't of Corrections*,
    214 F.3d 275 (2d Cir. 2000)..............................................................................35

*Morris v. Dep't of Taxation*,
    82 N.Y.2d (N.Y. 1993) ......................................................................................24

*Murray v. Brit. Broad. Corp.*,
    81 F.3d 287 (2d Cir. 1996)................................................................................39

*N.Y.C. Transit Auth. v. N.-Y. Historical Soc'y*,
    635 N.Y.S.2d 998 (Sup. Ct. 1995) .....................................................................34

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC,*
   975 F. Supp. 2d 392 (S.D.N.Y. 2013)....................................................................25

*Navaera Scis., LLC v. Acuity Forensic Inc.,*
   667 F. Supp. 2d 369 (S.DN.Y. 2009)..................................................................8, 11

*Nelson v. Adams USA, Inc.,*
   529 U.S. 460 (2000)...............................................................................................29

*NewLead Holdings Ltd. v. Ironridge Glob. IV Ltd.,*
   2014 WL 2619588 (S.D.N.Y. June 11, 2014) ........................................................10

*Norex Petroleum Ltd. v. Access Indus., Inc.,*
   416 F.3d 146 (2d Cir. 2005)...............................................................................37, 38

*2138747 Ontario, Inc. v. Samsung C&T Corp.,*
   31 N.Y.3d 372 (2018) ............................................................................................34

*Pike v. Freeman,*
   266 F.3d 78 (2d Cir. 2001)......................................................................................35

*Pincione v. D'Alfonso,*
   506 F. App'x 22 (2d Cir. Dec. 20, 2012) ...............................................................10

*Pollux Holding Ltd. v. Chase Manhattan Bank,*
   329 F.3d 64 (2d Cir. 2003)......................................................................................37

*Realuyo v. Villa Abrille,*
   2003 WL 21537754 (S.D.N.Y. July 8, 2003) .........................................................40

*Rosenblatt v. Coutts & Co. AG,*
   2017 WL 3493245 (S.D.N.Y. Aug. 14, 2017) ..........................................................8

*San Remo Hotel, L.P. v. San Francisco,*
   545 U.S. 323 (2005)................................................................................................35

*Schiro v. Cemex, S.A.B. de C.V.,*
   396 F. Supp. 3d 283 (S.D.N.Y. 2019).....................................................................15

*Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC,*
   146 A.D.3d 1 (1st Dep't 2016) ...............................................................................27

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,*
   450 F.3d 100 (2d Cir. 2006)................................................................................8, 14

*State Narrow Fabrics, Inc. v. Fisher,*
   2016 WL 11002147 (C.D. Cal. Nov. 29, 2016).......................................................18

*Strojmaterialintorg v. Russian Am. Comm. Corp.*,
　　815 F. Supp. 103 (E.D.N.Y. 1993) ...............................................................19

*Sunward Elecs, Inc. v. McDonald*,
　　362 F.3d 17 (2d Cir. 2004)...................................................................9, 11

*Sutton 58 Assocs. LLC v. Pilevsky*,
　　189 A.D.3d 726 (1st Dep't 2020) ...............................................................20

*Swain v. Brown*,
　　135 A.D.3d 629 (1st Dep't 2016) ...............................................................34

*Sysco Food Serv. of Metro N.Y., LLC v. Jekyll & Hyde, Inc.*,
　　2009 WL 4042758 (S.D.N.Y. Nov. 17, 2009).........................................30

*TNS Holdings v. MKI Sec. Corp.*,
　　92 N.Y.2d 335 (1998) ...............................................................................20

*Tongue v. Sanofi*,
　　816 F.3d 199 (2d Cir. 2016)......................................................................23

*Transience Corp. v. Big Time Toys, LLC*,
　　50 F. Supp. 3d 411 (S.D.N.Y. 2014).........................................................37

*Tycoons Worldwide Group (Thailand) Pub. Co. v. JBL Supply Inc.*,
　　721 F. Supp. 2d 194 (S.D.N.Y. 2010)........................................................29

*United States v. Funds Held for Wetterer*,
　　210 F.3d 96 (2d Cir. 2000).......................................................................15

*Waldman v. PLO*,
　　835 F.3d 317 (2d Cir. 2016)........................................................................7

*William Wrigley Jr. Co. v. Waters*,
　　890 F.2d 594 (2d Cir. 1989).............................................................16, 29

*Zhao v. Wang*,
　　558 F. App'x 41 (2d Cir. 2014) ...............................................................34

**Federal and State Statutes**

28 U.S.C. § 1367.............................................................................................33

CPLR 202........................................................................................................34

CPLR 214........................................................................................................34

CPLR 302.................................................................................................. *passim*

Federal Arbitration Act, 9 U.S.C. §§ 201-208 ...........................................................................1, 6

**Philippine Legal Sources**

*Abuhay Holdings Corp. v. Sembcorp Logistics Ltd.* (Phil.),
    G.R. No. 212734 (S.C. Dec. 5, 2018), *available at*
    https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64839 .........................................38

Alter. Dispute Resol. Act of 2004 § 42, Rep. Act 9285 (Phil.), *available at*
    https://www.lawphil.net/statutes/repacts/ra2004/ra_9285_2004.html....................................38

Order by the Regional Trial Court, Branch 66, Makati City, National Capital
    Judicial Region, Republic of the Philippines, in *Bloomberry Resorts and
    Hotels Inc., et al. v. Global Gaming Philippines, LLC, et al.*, Spec. Proc. No.
    M-7567, November 23, 2017.................................................................................................33

Philippine Stock Exchange, Consolidated Listing and Dislclosure Rules, *available at*
    https://documents.pse.com.ph/wp-content/uploads/sites/15/2021/04/Listing-and-
    Disclosure-Rules.pdf...........................................................................................................16

*Riviera Golf Club, Inc. v. CCA Holdings, B.V.* (Phil.),
    G.R. No. 173783 (S.C. June 15, 2015), *available at*
    https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/60835 .........................................37

Securities Regulation Code, § 17, Rep. Act 8799 (Phil.), *available at*
    https://lawphil.net/statutes/repacts/ra2000/ra_8799_2000.html ...........................................17

Securities Regulation Code, § 38, Rep. Act 8799 (Phil.), *available at*
    https://lawphil.net/statutes/repacts/ra2000/ra_8799_2000.html ...........................................18

**Other Authorities**

Fed. R. Civ. P. 10(c) ....................................................................................................................23

Fed. R. Civ. P. 9(b) ........................................................................................................21, 22, 28

Fed. R. Civ. P. 12(b)(6).........................................................................................................14, 31

O'Neal and Thompson's Close Corporations and LLCs (Rev. 3d ed.) ........................................16

U.N. Convention on the Recognition and Enforcement of Foreign Arbitral Awards,
    *available at* https://www.newyorkconvention.org/english ............................................. *passim*

## PRELIMINARY STATEMENT

This lawsuit has no merit; it was brought to personally harass Defendant Enrique K. Razon, Jr. With no basis for establishing jurisdiction over Bloomberry Resorts and Hotels Inc. ("BRHI") and Sureste Properties, Inc. ("SPI", and together with BRHI, the "Debtor Defendants"), Plaintiff Global Gaming Philippines, LLC ("GGP"), the holder of arbitration awards ("Award") against the Debtor Defendants, has filed what purports to be an *arbitration recognition* action but is, in reality, an improper *collection* action against Mr. Razon personally and against thirteen unrelated entities owned by the Razon family (the "Non Bloomberry Entities").[1] This case should be dismissed.

BRHI and SPI are units of Bloomberry Resorts Corporation ("BRC," and together with the Debtor Defendants, "Bloomberry") a publicly traded company in the Philippines of which Mr. Razon is the indirect controlling shareholder. Bloomberry has *no* assets or operations in the U.S. The arbitration was seated in Singapore, conducted under a contract governed by Philippine law, and arose from claims with no nexus to New York. The Federal Arbitration Act, which implements the UN Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention"), does allow for the recognition of arbitral awards, *provided that the Court can assert personal jurisdiction*.

But rather than enforce the Award in the Philippines – where Bloomberry has ample assets to pay the Award, where the claims arose, and where the courts stand ready to entertain an arbitral enforcement action – Plaintiff asks *this* Court to enforce the Award. The subtext of course is that the Philippine court system cannot be trusted to dispense justice in this matter. And so Plaintiff

---

[1] The Non-Bloomberry Entities are: Asia Arrow Ltd. ("Asia Arrow"), 11 Essex Realty LLC, Bowery Bay LLC, Campanilla LLC, Ensara LLC, Fesara LLC, Nozar LLC, and Rizolina LLC (the "Real Estate Entities"); Collingwood Oil & Gas Holdings, LLC, Collingwood USA, Inc., Collingwood Brookshire USA, Inc., and Collingwood Appalachian Minerals, LLC (the "Energy Entities"); and Collingwood Investment Company Limited ("CICL," which Plaintiff refers to as "Collingwood Cayman").

proposes to enforce the Award not just against the Debtor Defendants (who would unquestionably be subject to jurisdiction in the Philippines), but also against Mr. Razon personally and against the Non-Bloomberry Entities. These entities had nothing – at all – to do with the arbitration or the facts underlying it. Neither Mr. Razon nor any of these entities did a *single thing* that could possibly make any of them legally responsible for the Award under any reasonable understanding of limited shareholder liability and the most elementary principles of contract law. And on top of that, the majority of the thirteen entities, like the Debtor Defendants, lack any relevant connection to New York and so are not subject to this Court's personal jurisdiction.

This dispute arises from a relationship between GGP and Bloomberry that began in 2011. Dkt. 85 (First Amended Complaint) ("FAC") ¶ 50. In September of that year, after conducting "extensive diligence" (*id*. ¶ 52), GGP entered into a Management Services Agreement ("MSA") with BRHI and SPI pursuant to which GGP would provide management services for a casino-resort complex in Manila. Dkt. 85-4 (MSA). The complex, known as Solaire, opened in March 2013 and is owned (as to the casino component) by BRHI and (as to the resort component) by SPI. FAC ¶¶ 4, 13-14, 92. Under the MSA, GGP received management fees and also a block of shares in BRC, known as the "Option Shares." FAC ¶¶ 57, 60; Dkt. 85-4 § 18.3.

The MSA is governed by the law of the Philippines, Dkt. 85-4 § 19.3, which is where BRC, BRHI, and SPI are incorporated, headquartered, and have nearly all of their operations. FAC ¶¶ 13-14, 67. BRC is listed on the Philippine stock exchange ("PSE") and regulated by it and by the Philippine Securities and Exchange Commission ("PSEC"). Mr. Razon indirectly owns 64.22% of BRC and also serves as its chair and CEO. *Id*. ¶¶ 72, 91. Mr. Razon is a resident of the Philippines. *Id*. ¶ 12. Mr. Razon is not a party to the MSA. The Non-Bloomberry Entities are not parties to the MSA. Plaintiff did not contract with Mr. Razon, let alone with the Non-Bloomberry Entities. Mr.

Razon gave Plaintiff no personal guarantee of Bloomberry's performance, and neither did the Non-Bloomberry Entities. Plaintiff does not allege that it was ever given a reason to believe that the assets of Mr. Razon, let alone his family investments, would be available to satisfy Bloomberry's obligations.

When GGP, in Bloomberry's view, failed to perform as promised, Bloomberry on September 12, 2013 terminated the MSA. FAC ¶¶ 100, 102. GGP submitted the matter to arbitration pursuant to provisions in the MSA that provide for ad-hoc arbitration in Singapore. In a series of rulings, the arbitrators sided with GGP. The arbitrators awarded GGP approximately $100,000,000 in money damages, consisting mostly of lost management fees. *Id*. ¶ 120. The arbitrators also awarded injunctive-style relief, referred to as a "Constructive Remedy," worth approximately $196,00,000. Dkt. 85-1 ¶¶ 446-50, 467-74. The parties have been litigating the validity of the Award in the Singapore courts, which thus far have sided with Plaintiff (but in which an appeal is still pending). FAC ¶¶ 122-24.

Having obtained the Award against Bloomberry, Plaintiff now seeks to hold Mr. Razon and the Non-Bloomberry Entities liable on the Award. Plaintiff's core theory is that Mr. Razon is the "alter ego" of the Debtor Defendants – that the veil of a *listed, publicly traded company* should be pierced to hold that company's majority shareholder liable on the award. There is simply no basis for such a move. To pierce the veil of a corporation, there must have been "complete domination" of the corporation to the point that it had no independent, separate existence, and *in addition* the corporate form has to have been abused to perpetrate a fraud or other wrong on the plaintiff. This is a very rare thing (in fact, close to unheard-of for *solvent* companies), and it is not lightly done. The paradigmatic case is when an owner treats the corporation as his personal piggy bank, defrauding creditors by siphoning assets out of the company.

As far as our research has uncovered, no court in U.S. history has ever pierced the veil of a company listed and in good standing on a stock exchange. No court has even held that such a claim was *stated*, let alone proved. To become and remain listed on a stock exchange, a corporation must satisfy requirements of capitalization, governance, and disclosure designed to protect the dispersed *non-insider* shareholders. This is no less true in the Philippines than it is in the U.S. A corporation in compliance with these requirements is practically guaranteed *not* to meet the requirements for veil-piercing. And sure enough, the FAC does not come close to plausibly (as opposed to with *Iqbal*-deficient boilerplate) alleging the requisite domination. Plaintiff does not even try to allege (because it cannot allege) that Bloomberry is undercapitalized, which is practically a *sine qua non* of alter ego status. In fact, Bloomberrry is well capitalized, and has ample assets to satisfy a judgment.

Plaintiff also identifies no abuse of the corporate form resulting in a fraud or other wrong perpetrated against it. Despite sinister and deliberately vague innuendo, Plaintiff carefully avoids alleging that Mr. Razon siphoned Bloomberry's assets off to himself or his U.S. investments. Linguistic embellishments aside, what the FAC actually alleges is that Mr. Razon took legitimate earnings in the form of corporate dividends from the portfolio of successful companies he runs, and used those earnings to invest in real estate and energy assets in the U.S. There is nothing the least bit untoward, or, for a person of his wealth, unusual in Mr. Razon's having done so.

Plaintiff suggests that Bloomberry's decision to terminate GGP as a services provider is itself a "wrong." But black-letter law holds that a simple breach of contract, without more, is not the kind of injustice that warrants piercing the veil. Plaintiff additionally suggests that the veil should be pierced because of Bloomberry's decision to resist arbitral enforcement. This theory, too, has no legal support. Foreign awards are not self-executing, and under the Convention,

Bloomberry is entitled to assert certain defenses to award enforcement. Here, Plaintiff's extraordinary misconduct in the arbitration included concealing evidence apparently bearing on federal criminal violations that would likely have resulted in the tribunal reaching a different decision.[2] Bloomberry is surely entitled to press lawful defenses without creating personal liability for its majority shareholder.

At the end of the day, Plaintiff's real point seems to be that the Court should impose alter ego liability on Mr. Razon because Plaintiff cannot otherwise obtain justice given Mr. Razon's prominence in the Philippines and resulting alleged "influence" in that country's "local courts." FAC ¶¶ 5, 7, 37, 130. But our research has uncovered no case in which aspersions against a foreign country's institutions (or allegations about a corporate defendant's supposed impunity in some other jurisdiction) were used as a basis for veil-piercing in this country. Beyond that, the notion that the Philippine courts are rigged in favor of Mr. Razon is baseless and in fact *that specific contention in a case involving Mr. Razon himself* was recently rejected by the District of Oregon in a decision affirmed by the Ninth Circuit. Those courts could not help noticing that the Philippine courts have frequently ruled against Mr. Razon and his family: "Why the Philippine judiciary is now suddenly incapable of fairly administering justice is unclear."[3]

And Plaintiff has gone further still. Plaintiff *also* alleges that the Non-Bloomberry Entities are liable on the Award as alter egos of Mr. Razon. This effort, too, is dead on arrival, and not just because "reverse piercing" from Mr. Razon to these entities would require valid allegations, absent here, that Mr. Razon himself is liable for a debt as Bloomberry's alter ego. The FAC *nowhere* identifies, nor could it, a fraud or other wrong visited on Plaintiff as a result of Mr. Razon's alleged

---

[2] *See* Dkt. 104 (Bloomberry motion to compel); *see also* Dkt. 30 (Defs' Opp. to TRO application) at 12-13 & appended Spectrum Report (Dkt. 30-1).

[3] *de Borja v. Razon*, 2019 WL 4724317, at *6 (D. Or. Aug. 16, 2019), *R. & R. adopted*, 2019 WL 4723070 (D. Or. Sept. 25, 2019), *aff'd*, 835 F. App'x 184 (9th Cir. Nov. 3, 2020).

domination of these entities. Nor does the FAC manage to allege (again, apart from in defective boilerplate) the requisite domination. The Non-Bloomberry Entities are closely held, mostly special-purpose entities – what the FAC derogatorily refers to as "shell companies," as if that were enough to pierce the veil. But case law is clear that this type of entity is permissible, and that it is allowed to share (as Plaintiff alleges happened here) resources, personnel, and an owner without transforming any of them into alter egos.

The FAC asserts a claim for arbitral enforcement under the Federal Arbitration Act against all Defendants (Count I), and, as remedies on that claim, declaratory relief, receiverships, and asset freezes against Mr. Razon and the Non-Bloomberry Entities, which Plaintiff styles as separate claims (Counts II through V). Finally, under the label of a "conversion" claim (Count VI), Plaintiff seeks to have this Court enforce the tribunal's Constructive Remedy against Mr. Razon personally. The conversion claim is time barred under New York's borrowing statute of limitations, barred by res judicata, and impermissibly duplicative of the other claims.

The Court should dismiss the claims against the Debtor Defendants, CICL, and the Energy Entities for lack of personal jurisdiction, and should dismiss, with prejudice, the claims against Mr. Razon and (to the extent not dismissed for lack of personal jurisdiction) all of the Non-Bloomberry Entities for failure to state a claim. In the alternative, the Court should dismiss this action under *forum non conveniens* given that every imaginable consideration of convenience, efficiency, and foreign comity points to Plaintiff enforcing its Award in the Philippines, which is a perfectly adequate forum in which to do so.

## ARGUMENT

I.   **THE COURT LACKS JURISDICTION OVER ALL ENTITY DEFENDANTS**[4]

Personal jurisdiction over a defendant requires a statutory basis for jurisdiction and comportment with constitutional due process principles, itself a two-party inquiry into "minimum contacts" and "reasonableness." *E.g.*, *Waldman v. PLO*, 835 F.3d 317, 327, 331 (2d Cir. 2016). For general (all-purpose) jurisdiction over a corporate defendant, the defendant must be "at home" in the forum, which translates to where the defendant is incorporated and has its principal place of business. *Ford Motor Co. v. Montana Eighth Judicial Dist.*, 141 S. Ct. 1017, 1024 (2021). A court can only assert specific (case-linked) personal jurisdiction where the plaintiff's claims "'arise out of or relate to the defendant's contacts' with the forum." *Id*. These requirements are unsatisfied for the Debtor Defendants, CICL, and the Energy Entities.[5]

### A.  The Court Lacks Personal Jurisdiction Over the Debtor Defendants

The New York contacts here are insufficient for specific personal jurisdiction under both

---

[4] Plaintiff's factual allegations in support of personal jurisdiction must be specific and non-conclusory. *Contant v. Bank of Am. Corp.*, 385 F. Supp. 3d 284, 290 (S.D.N.Y. 2019) (Schofield, J.) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998)). The Court will not "resolve 'argumentative inferences in the plaintiff's favor.'" *Id.* (quoting *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013)).

[5] The Court also lacks jurisdiction over Asia Arrow. Asia Arrow was formed under the laws of the British Virgin Islands and has its principal place of business in the Philippines. Fissell Decl. Ex. 2 at 1. Accordingly, there is no general jurisdiction over Asia Arrow. Despite eliciting this disclosure through a Local Rule 26.1 response prior to filing the FAC, Plaintiff still alleges that Asia Arrow's principal place of business is New York. FAC ¶ 22. Fissell Decl. Exs. 1, 2. Rather than have a factual dispute on this motion about Asia Arrow's principal place of business, Asia Arrow will reserve, and does not waive, its jurisdictional defenses. It is important to note, however, that specific jurisdiction over Asia Arrow also is lacking, as the claims here in no way "arise from" Asia Arrow's ownership of an apartment in New York. *See* CPLR 302(a)(4). *See George Moundreas & Co. SA v. Jinhai Intell. Mfg. Co.*, 2021 WL 168930, at *10 (S.D.N.Y. Jan. 18, 2021) (CPLR 302(a)(4) unsatisfied where there was no "connection between any of the property [an alleged alter ego of arbitration respondent] allegedly owns in New York and the arbitration awards or the underlying contracts"); *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 346 (S.D.N.Y. 2015) (Under CPLR 302(a)(4), "the plaintiff's cause of action must arise out of the fact of ownership, use or possession of New York realty.") (cleaned up) (citing *Lancaster v. Colonial Motor Freight Line, Inc.*, 188 A.D.2d 152, 159 (1st Dep't 1992)); *Marie v. Altshuler*, 30 A.D.3d 271, 272 (1st Dep't 2006). Asia Arrow also did not transact any relevant business in New York, *see* CPLR 302(a)(1) – the property it owns is used purely as a pied-à-terre (FAC ¶ 145(a)), not a rental property, and the claims here do not "arise from" the initial purchase of the apartment.

New York's long-arm statute and constitutional principles.[6] New York has long emphasized that "'defendants, as a rule, should be subject to suit where they are normally found . . . . Only in [a] rare case should they be compelled to answer a suit in a jurisdiction with which they have the barest of contact.'" *Navaera Scis., LLC v. Acuity Forensic Inc.*, 667 F. Supp. 2d 369, 374 (S.D.N.Y. 2009) (quoting *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y.2d 377, 383 (1967)). Under the relevant prong of New York's long-arm statute, CPLR 302(a)(1), a defendant "must have transacted business within the state, and the claim must arise from that business activity." *Moundreas*, 2021 WL 168930, at *9. To have "transacted business" within the meaning of CPLR 302(a)(1), a defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within" New York, which requires the "'sustained and substantial transaction of business in New York.'" *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007). In the context of arbitral enforcement, the relevant contacts are the ones "that *gave rise to the arbitration*." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 105 (2d Cir. 2006) (emphasis added).

Of "great significance" to the CPLR 302(a)(1) analysis is whether "the agreement was performed outside of New York." *Navaera*, 667 F. Supp. 2d at 376 (quoting *Lehigh Valley Indus., Inc. v. Birenbaum*, 527 F.2d 87, 91 (2d Cir. 1975)). Where the defendant's connection to New York is incidental, rather than purposeful, then CPLR 302(a)(1) is unsatisfied. *E.g.*, *Rosenblatt v. Coutts & Co. AG*, 2017 WL 3493245, at *3-*4 (S.D.N.Y. Aug. 14, 2017) (no jurisdiction under CPLR 302(a)(1) over a Swiss defendant, despite communications with a New York resident, where the relevant agreement was negotiated in Switzerland and governed by Swiss law, and the subject property was located in Switzerland), *aff'd*, 750 F. App'x 7 (2d Cir. 2018). In this regard the Second Circuit has developed certain non-dispositive factors, known as the *Sunward* factors, to

---

[6] As this Court has already found, BRHI and SPI, which are headquartered and incorporated in the Philippines, are not subject to general jurisdiction in New York. April 2, 2021 Hr'g Tr. ("Tr.") 26-27.

consider: (i) whether the defendant has an on-going contractual relationship with a New York corporation, (ii) (a) whether the contract was negotiated or executed in New York and (b) whether, post-execution, the defendant visited New York for meetings regarding the relationship, (iii) what the choice-of-law clause says, and (iv) whether the contract requires notices or payments sent into New York, or entails supervision by a corporation in New York. *ICO Servs., Ltd. v. Coinme, Inc.*, 2018 WL 6605854, at *3 (S.D.N.Y. Dec. 17, 2018) (Schofield, J.) (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004)).

Here, the claims arise from *Philippine* contacts, with no nexus to New York. In fact, GGP has failed to allege that Bloomberg transacted *any* relevant business within New York. Bloomberry did not avail itself of New York privileges in relation to the MSA, the whole point of which was to provide management services for a casino and resort located *in the Philippines*. That is why Plaintiff is named "Global Gaming ***Philippines***" – the plaintiff was *specifically created to perform services in the Philippines*. Relatedly, none of the *Sunward* factors are met. Bloomberry's only contractual relationship was with GGP, which is not a New York corporation. FAC ¶ 11; Dkt 85-4 at 2. The MSA chose Philippine law, does not require that notices be sent to New York, and does not provide for payments into New York. Dkt. 85-4 §§ 4.6, 18.2, 19.3. The only in-person negotiations that Bloomberry conducted took place outside of New York, including in overseas locations. *See* FAC ¶¶ 50, 56 (Macau).

GGP's primary jurisdictional allegation is that BRHI and SPI hashed out aspects of the MSA with *non-party* Cantor Fitzgerald via *email* and *phone* to New York. FAC ¶ 54.[7] But

---

[7] While the FAC alleges "[o]n information and belief" that "during this same time period Razon also traveled to New York and conducted negotiations with [Plaintiff] while staying at his" pied-à-terre in New York, FAC ¶ 54, the FAC does not (and cannot) allege that Mr. Razon attended any in-person meetings or negotiations with GGP in New York. Even if Plaintiff *had* made such an allegation, mere "physical presence in New York for [] initial meetings . . . cannot transform this fundamentally [Philippine] deal into a New York business transaction." *Pincione v. D'Alfonso*, 506 F.

"'conducting contractual negotiations by phone, fax or mail with a party" – let alone a non-party – "in New York does not constitute the transaction of business within the state.'" *Art Assure LTD., LLC v. Artmentum Gmbh*, 2014 WL 5757545, at *4 (S.D.N.Y. Nov. 4, 2014) (Schofield, J.); *see also, e.g.*, *Int'l Customs Assocs., Inc. v. Ford Motor Co.*, 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995) ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction." (collecting cases)), *aff'd*, 201 F.3d 431 (2d Cir. 1999); *Beacon Enter., Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983) ("New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York."). Similarly, the MSA was *not* executed in New York, even if Cantor Fitzgerald lawyers located in New York collected signature pages. Rather, the MSA was signed in the Philippines. FAC ¶ 59.

The FAC contains allegations about "roadshow" meetings with investors in five U.S. cities (FAC ¶¶ 64, 82-89), including Bloomberry's attendance *at a single day of meetings in New York* (*id*. ¶¶ 82, 84), and related lockup agreements that chose New York law. But the roadshow and investor meetings (*id*. ¶¶ 82, 84, 87) were not conducted under the MSA, and the claims in the arbitration did not arise from the roadshow or public offering. The arbitrators specifically found that Plaintiff's participation in the roadshow and investor conferences fell "outside the scope of the MSA." Dkt. 85-1 ¶¶ 366(b), 370, 372. *See AVRA Surgical Robotics, Inc. v. Gombert*, 41 F. Supp. 3d 350, 359 (S.D.N.Y. 2014) (defendant's conferring with investors in New York was

---

App'x 22, 24-25 (2d Cir. Dec. 20, 2012); *see also NewLead Holdings Ltd. v. Ironridge Glob. IV Ltd.*, 2014 WL 2619588, at *5-*6 (S.D.N.Y. June 11, 2014) ("claim[] that [representative of defendant] participated in negotiations from New York by phone and email" failed to establish jurisdiction because plaintiff "only speculate[d] about [defendant's] location" and could only show that two meetings actually occurred in New York). The FAC also notes that New York law was chosen for the *pre-MSA* Confidentiality Agreement (FAC ¶ 52), which, like the MSA, was between GGAM and Bloomberry, not between Mr. Razon and Cantor. Perry Decl. Ex. 1. But the claims here do not arise from the Confidentiality Agreement.

insufficient for personal jurisdiction without a showing that "these activities relate—much less substantially relate—to the causes of actions pled"). In fact, the arbitration did not arise from *anything* that could conceivably be linked to New York. Across the 353 pages of arbitral rulings that GGP seeks to enforce (*see* Dkt. 85-1, 85-2, 85-3), the phrase "New York" appears exactly once (not counting in the address of Plaintiff's counsel).[8] Even supposing, wrongly, that the investor meetings somehow were relevant, one day of New York meetings out of a two-and-half year (*see id.* ¶¶ 50, 102) relationship otherwise conducted exclusively in other locales does not, under the *Sunward* analysis, create CPLR 302(a)(1) jurisdiction that otherwise is lacking.

As part of its effort to get around the Court's previous ruling that it lacks personal jurisdiction over Bloomberry (Tr. 26-27), Plaintiff has littered the FAC with gratuitous references to Cantor Fitzgerald, a global financial services firm that happens to be headquartered in New York. But Cantor is not party to the MSA, the Award, or this litigation, and Cantor's contacts with New York are irrelevant.[9] The jurisdictional "inquiry centers . . . on *defendants'* activities in New York" and not *plaintiff's*, let alone a non-party's, own activities in New York. *Navaera*, 667 F. Supp. 2d at 375; *see also, e.g.*, *ICO Servs.*, 2018 WL 6605854 at *4; *Art Assure*, 2014 WL 5757545, at *3 (Plaintiff's "own conduct in New York" was "immaterial in evaluating personal jurisdiction over Defendants"). This is also why the FAC's vague allegations about services

---

[8] That reference was a quote from *Bloomberry*'s papers stating that GGP is "an investment vehicle for a New York-based financial institution [i.e. Cantor]", which was "not what Bloomberry was seeking—and not what GGAM represented itself to be—when it entered into its agreement." Dkt. 85-2 ¶ 98.

[9] Moreover, the FAC relies on misleading or incorrect allegations to suggest that Bloomberry intentionally dealt with Cantor. For example, GGP alleges that on December 20, 2012, "**Cantor** provided notice from **its** New York headquarters" that GGP was exercising its option to purchase the Option Shares, "with **Cantor** paying the approximately $37.43 million option price." FAC ¶ 90 (emphasis added). But the actual notice was (i) sent by "Global Gaming Philippines, LLC", (ii) signed not by Cantor but by GGP's CEO William Weidner, (iii) signed by Weidner in Montana, judging from the fax header on the signature page, and (iv) does not mention Cantor Fitzgerald, much less its paying for the Option Shares. *See* Perry Decl. Ex. 2 (GGP's Notice dated December 20, 2012). The FAC also misleadingly excerpts a transcript of remarks by Ms. Occeña at an investor conference. FAC ¶ 87. The complete quote and context (submitted as Perry Decl. Ex. 3) reveals that Ms. Occeña was *downplaying* Cantor's role, which she described as effectively just the "bank account" for the three principals of GGAM (Weidner, Saunders, and Stone), who were the ones with the relevant expertise. *See also* FAC ¶ 48.

Plaintiff purportedly provided in the "United States, including in New York" (FAC ¶ 64) are insufficient.[10] In sum: CPLR 302(a)(1) is unsatisfied.

Asserting jurisdiction over BRHI and SPI also would not comport with due process. "Minimum contacts" are lacking. As reviewed above, BRHI/SPI in no way "exploited a market" in, "entered a contractual relationship centered" in, or otherwise "purposefully availed" itself of New York. *Ford*, 141 S. Ct. at 1024-25 (cleaned up). Nor do the claims here in any way "'arise out of or relate'" to any *de minimis* contact that BRHI/SPI may have had with New York. *Id*. at 1025. Additionally, the "reasonableness" requirement is unsatisfied.[11]  The Court should dismiss BRHI and SPI from the case. Further, because BRHI and SPI, the only Defendants party to the arbitration, are the only Defendants properly positioned to raise *defenses* to arbitral enforcement under the Convention, the lack of jurisdiction over BRHI and SPI means that the Court should dismiss this action in its entirety, which it has the discretion to do. *See* Section IV below.[12]

## B. The Court Lacks Personal Jurisdiction Over CICL and the Energy Entities

The Energy Entities are organized in Delaware and have their principal place of business in Houston. FAC ¶¶ 16-19. CICL is a Cayman entity with its principal place of business in the

---

[10] The particular services that Plaintiff contracted to perform are detailed in Annex A to the MSA; virtually all of them are plainly centered around operating Solaire locally. Dkt. 85-4 at 38-41. Notably, in the one instance where the FAC attempts to supply specifics of supposed services performed by Plaintiff in New York, the pleading falls short. The FAC alleges that Mr. Razon asked Plaintiff to meet with a potential retail tenant of Solaire in New York. FAC ¶ 88. The FAC does not allege that this meeting actually happened. *Id*.

[11] "Minimum contacts" and "reasonableness" function like a see-saw: The weaker a defendant's "contacts," the less a defendant needs to show to establish that the exercise of jurisdiction would be unreasonable. *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568-69 (2d Cir. 1996). The "reasonableness" factors are similar to *forum non conveniens* factors (*see id.*; *see also* Section IV below), and all of them here point to unreasonableness: the burden on Bloomberry from litigating in New York when all of its people and documents are overseas; the fact that New York has no interest in hearing the underlying dispute; and the reality that seeking arbitral enforcement in New York does not ensure convenient and effective relief, nor judicial efficiency given that Bloomberry has no assets in New York and that GGP is instead seeking to reach U.S. assets using convoluted veil-piercing theories– the height of *in*efficiency.

[12] Defendants also reserve the right to argue that in the absence of a judgment recognizing the award against BRHI and SPI, subject matter jurisdiction is lacking as to all other Defendants. To the extent it suggests otherwise, *CBF Indústria de Gusa S/A v. AMCI Hldgs., Inc.*, 850 F.3d 58 (2d Cir. 2017), is distinguishable and/or wrongly decided.

Philippines.[13] Accordingly, there is no general jurisdiction over these entities.[14] Specific jurisdiction is also wholly lacking under CPLR 302(a)(1) and the due process analysis. GGP has not alleged that CICL or the Energy Entities transacted any business in New York, and even if GGP had done so (which it did not), GGP has not alleged that this *suit*, that is, GGP's cause of action for enforcement of the Award, "aris[es] from" such (non-pled) New York business. The alleged acts in this case which gave rise to GGP's suit against Bloomberry, and which resulted in the Award and this enforcement action, occurred in the Philippines. *See* pages 9-12 above.

The business actually transacted by the Energy Entities is described at some length in the FAC, and, as Plaintiff's "extensive investigation" (FAC ¶ 8) reveals, all of it involves purchases of subsurface mineral rights in Texas, Kentucky, and West Virginia. *Id*. ¶¶ 159, 167, 169, 170, 179. Some of these assets were purchased from the late Texas billionaire T. Boone Pickens, with whom Mr. Razon met in Dallas and Georgia (*id*. ¶¶ 164, 171) and whose company participated in "numerous conference calls" with representatives of Mr. Razon in the Philippines (*id*. ¶ 163). Other assets were purchased from Hay Mineral Resources, LLC, whose representatives Mr. Razon met with in Kentucky and West Virginia. *Id*. ¶ 170. None of the Energy Entities is alleged to have purchased an asset from or otherwise transacted with a New York entity. CICL is an offshore holding company that owns the Energy Entities and Asia Arrow (*id*. ¶ 15), and also is not alleged to have entered into any transaction in New York.[15]

---

[13] *See* FAC ¶¶ 15 (CICL's sole director is Mr. Razon), 177 (CICL's operations are overseen from the Philippines).

[14] Plaintiff alleges that "*When the Energy Entities had no physical presence in the United States*," Mr. Razon's pied-à-terre in Manhattan "served as the home base *of the U.S. operations*," FAC ¶ 187, and that a New York address was used on a single form almost five years ago (*id*. ¶ 186). But Plaintiff correctly alleges that the Energy Entities *do* have a physical office and that their principal place of business *is* in Texas (*id*. ¶¶ 16-19, 184), and, according to the FAC, the Energy Entities were actually run out of the Philippines at all times. *Id*. ¶ 184. Thus, the only place in the U.S. (other than Delaware) where the Energy Entities could be said to be "at home" is Texas. *Ford*, 141 S. Ct. at 1024.

[15] CICL's status as the parent of Asia Arrow (a foreign entity with its principal place of business overseas that owns an apartment in New York) does not begin to create CPLR 302(a) jurisdiction, as the claims here in no way arise from Asia Arrow's *direct* – let alone from CICL's *indirect* – ownership of the apartment. See footnote 5 above.

Faced with this jurisdictional problem, Plaintiff tries to hang its hat on alleged dealings between Mr. Razon and Ahmad Atwan, an investment banker who spent time in Houston and New York and helped Mr. Razon to source energy investments. *See* FAC ¶¶ 159, 161, 164, 176. Plaintiff also alleges in largely vague, conclusory, and speculative terms that Mr. Razon conducted Energy Entity business from his apartment in New York. *Id.* ¶¶ 184, 187.

But the claims here in no sense "arise from" any energy business conducted by Mr. Razon, whether from the Manhattan apartment or elsewhere, with or without Atwan. In post-arbitral proceedings, the Second Circuit requires "some articulable nexus" or a "substantial relationship" between the arbitral contract and the business a given defendant supposedly transacted in New York. *Sole*, 450 F.3d at 103, 105. And here, the energy investments and therefore the Energy Entities have literally nothing to do with the MSA and with the alleged breaches of it that gave rise to and were the subject of the arbitration proceeding. There is no specific long-arm jurisdiction over any of the Energy Entities or CICL under CPLR 302(a)(1) and the due process analysis.[16]

## II.   GGP FAILS TO STATE A CLAIM FOR ALTER EGO LIABILITY[17]

"Because a principal purpose for organizing a corporation is to permit its owners to limit their liability, there is a presumption of separateness between a corporation and its owners, which is entitled to substantial weight." *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988)

---

[16] Because the relevant New York contacts are lacking, Plaintiff may retreat to an argument that the Energy Entities, CICL, and the Debtor Defendants are subject to personal jurisdiction as the alleged alter egos of Mr. Razon, who does not dispute the Court's all-purpose jurisdiction over him. This argument fails. For one thing, alter ego is not adequately alleged. *See* Section II below. For another, Mr. Razon is subject to all-purpose jurisdiction here only because he is an *individual who was personally served* in the jurisdiction. Such "tag" jurisdiction does not apply to corporations. *See, e.g.*, *Mohamad v. Rajoub*, 2018 WL 1737219, at *5-*7 (S.D.N.Y. Mar. 12, 2018); *see also* Tr. 19 ("[T]here is no tag jurisdiction for corporations."). The all-purpose jurisdiction to which Mr. Razon is subject thus does not apply to the entity defendants, as this Court has already held. Tr. 25-27.

[17] To withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *South Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 110 (2d Cir.2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). This determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 662.

(citation omitted).[18] "Disregard of the corporate form is warranted only in extraordinary circumstances, and conclusory allegations will not suffice to defeat a motion to dismiss." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 303 n.11 (S.D.N.Y. 2019) (cleaned up); *see also United States v. Funds Held for Wetterer*, 210 F.3d 96, 109 (2d Cir. 2000) ("courts must be extremely reluctant to pierce the corporate veil"); *Koninklijke Philips Elecs. N.V. v. The ADS Grp.*, 694 F. Supp. 2d 246, 251-52 (S.D.N.Y. 2010) ("[T]he corporate form is accorded great respect and is set aside only when necessary to avoid a manifestly inequitable result."). "'Those seeking to pierce a corporate veil . . . bear a heavy burden.'" *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 799 (S.D.N.Y. 2017) (quoting *TNS Holdings v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998)).

In particular, a plaintiff must plead and prove: (1) "that the owner exercised complete domination over the corporation with respect to the transaction at issue", *and* (2) "that such domination was used *to commit a fraud or wrong*," *and* (3) that the fraud or wrong "*injured the party seeking to pierce the veil*." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (emphasis added); *accord Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1052 (2d Cir. 1997). Plaintiff has not begun to adequately allege these elements, requiring dismissal of Counts II through V and Count I except to the extent asserted against BRHI and SPI.

## A.  GGP Fails To Allege Alter Ego Liability Against Mr. Razon

### 1.  GGP Does Not Allege "Complete Domination" of Bloomberry by Mr. Razon

"Complete domination" is not the same thing as majority control or even sole ownership. "[T]he mere fact that an individual is the sole member, shareholder, or a controlling person in an entity does not, by itself, justify piercing the corporate veil." *Kasper Global Collection & Brokers*

---

[18] GGP's alter ego/veil piercing claims are governed by the law of the "enforcing jurisdiction," *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 75 (2d Cir. 2017), and the "Second Circuit's common law standard [for piercing the veil] is taken directly from New York law." *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014).

*Inc. v. Global Cabinets & Furniture Mfg'rs Inc.*, 952 F. Supp. 2d 542, 578 (S.D.N.Y. 2013). In

*William Wrigley Jr. Co. v. Waters*, 890 F.2d 594 (2d Cir. 1989), for instance, Waters was the sole

owner of a business that was seriously negligent and delinquent in fulfilling its contractual

obligations. Yet even though "Waters oversaw and controlled the [] business [did] not mean that

the corporate entities were mere alter egos." *Id*. at 601 n.2. Rather, "complete domination"

normally turns on: (1) disregard of corporate formalities, (2) inadequate capitalization, (3)

intermingling of funds, (4) overlap in ownership, officers, directors, and personnel, (5) common

office space, address and telephone numbers, (6) the degree of discretion shown by the allegedly

dominated corporation, (7) whether the alleged dominator deals with the dominated corporation at

arm's length, (8) whether the corporations is treated as an independent profit center, (9) payment

or guarantee of the corporation's debts by the alleged dominator, and (10) intermingling of

property. *Am. Fuel*, 122 F.3d at 135; *Freeman*, 119 F.3d at 1053.

Here, it is crucial to consider "context" and to apply "judicial experience" and "common

sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The Debtor Defendants' parent is listed on

the PSE and regulated by it and by the PSEC. As far as Defendants' research has uncovered, *no*

*U.S. court has ever pierced the veil of a corporation listed on a stock exchange* or held its majority

shareholder liable as its "alter ego," or even held that a claim was stated for doing so.[19] And this

is no surprise: to become and remain listed on a stock exchange, a corporation must satisfy

requirements of capitalization and governance that among other things are designed to protect *non-*

*insider* public shareholders.[20] As a listed company, BRC also must make frequent reports to the

---

[19] *See, e.g.*, O'Neal and Thompson's Close Corporations and LLCs: Law and Practice § 8:19 (Rev. 3d ed.) ("Piercing principles are stated as having general applicability to all corporations, but the reality of piercing litigation is that this issue is limited to closely held entities. . . . [P]iercing only occurs in close corporations.").

[20] *See* PSE Consolidated Listing and Disclosure Rules ("PSE Rules") art. III Part D § 1, art. III Part E § 1. URLs for all Philippine legal sources not submitted as an exhibit are in the Table of Authorities.

public that are filed with the PSE and the PSEC, just like in the U.S.[21] And, just like in the U.S., BRC's financials must be, and are, audited by a reputable registered audit firm. *See* Dkt. 12-3 at 68 (Bloomberry audited by the local Ernst & Young affiliate). A corporation in compliance with these requirements is practically guaranteed *not* to satisfy the above-listed "complete domination" factors.

Plaintiff does not come close to plausibly alleging those factors. Start with the crucial factor of **undercapitalization**, which weighs heavily in the analysis. *E.g.*, *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) (courts "generally consider whether the corporation was adequately capitalized in determining whether to disregard the corporate form"); *see also Lakah v. UBS AG*, 2017 WL 7245365, at *92 (S.D.N.Y. Feb. 14, 2017); *Eagle Transport Ltd. v. O'Connor*, 470 F. Supp. 731, 733 (S.D.N.Y. 1979). The FAC nowhere alleges that Bloomberry is undercapitalized, nor can it, with BRC subject to annual public audits and the Debtor Defendants operating a world-class casino resort complex (FAC ¶ 4). Unlike in typical veil-piercing cases, in which a defendant has allegedly siphoned assets from a corporate debtor, Bloomberry is perfectly *capable* of paying the Award,[22] and Plaintiff does not allege otherwise.

Additionally, apart from some half-hearted, *Iqbal*-deficient boilerplate recitations,[23] the FAC nowhere alleges that Bloomberry did not observe **corporate formalities**, or that Mr. Razon's

---

[21] *E.g.*, Securities Regulation Code, § 17, Rep. Act 8799 (Phil.) (reporting requirements); PSE Rules art. VII § 4.4 (extensive disclosure requirements); *see also* Dkt. 12-3 (BRC Annual Report). The Court can take judicial notice of BRC's filings with the PSEC. *E.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[22] As of December 31, 2020, BRC reported assets equal to $2.355 billion. Dkt. 12-3 at 74 (reporting assets in Philippine pesos); Treasury Reporting Rates of Exchange as of December 31, 2020, at https://tinyurl.com/58vdr3mc.

[23] *See* FAC ¶ 206(ix) ("Legal formalities at the Debtor Defendants were disregarded, and arm's-length relationships were not maintained between Razon and the Debtor Defendants"), ¶ 206(vii) ("The funds and assets of the Debtor Defendants were commingled with the assets of Razon"), ¶ 206(c) ("the Debtor Defendants had no separate mind"), ¶ 141 ("Razon has disregarded the corporate separateness of the Debtor Defendants, instead treating and intending to treat the Debtor Defendants and their assets as his own.").

**funds were intermingled** with those of Bloomberry,[24] or that **arm's length relationships** were not maintained between Mr. Razon and the Debtor Defendants, or that Bloomberry, which by law is required to have two independent directors,[25] lacked **independent discretion**. *See, e.g.*, *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, 2002 WL 432390, at *12 (S.D.N.Y. Mar. 20, 2002) ("In order to overcome the 'presumption of separateness'" afforded a corporation, plaintiff "is required to plead specific facts supporting its claims, not mere conclusory allegations."); *see also State Narrow Fabrics, Inc. v. Fisher*, 2016 WL 11002147, at *5 (C.D. Cal. Nov. 29, 2016) (allegations that Defendant commingled funds with corporation, did not follow formalities in forming corporation, did not conduct transactions at arms-length with corporation, and did not maintain proper records were "merely recitations of hornbook law regarding piercing the corporate veil. They are not the requisite plausible, factual allegations required.").

The FAC also does not, and cannot, allege **common office space and contact information** shared by Bloomberry and Mr. Razon or his other holdings (Bloomberry has its own headquarters on the premises of Solaire, *see* FAC ¶¶ 13-14; Dkt. 12-3 at 2), **payment or guarantee of Bloomberry's debts** by Mr. Razon (this never happened), or failure to treat Bloomberry **as an independent profit center** (something of course not allowed by audit, PSE, and PSEC requirements). Instead the FAC falls back on the mantra that Razon "dominates and controls"

---

[24] The closest Plaintiff ever comes to alleging *any* commingling is a *single email* from *December 2011* – long before the termination of the MSA and the arbitration proceedings – that on its face reflects not "*commingling*" with the *personal assets of Mr. Razon*, but *intercompany transfers that are carefully accounted for*, in other words that corporate formalities are *observed*. FAC ¶ 140. This is hardly the stuff of which veil-piercing is made. Note too that Plaintiff (i) by its own account is a sophisticated player that conducted extensive pre-contract due diligence on Bloomberry (FAC ¶¶ 11, 48, 52, 54), (ii) did business with Bloomberry for several years, (iii) for many years after that has been engaged in hard-fought arbitration and litigation involving far-ranging discovery of Bloomberry, and (iv) has conducted a *separate* "extensive investigation" for purposes of this action (FAC ¶ 8). If Bloomberry actually had a practice of not observing formalities and wantonly commingling funds, Plaintiff would be able to adduce more than a single, decade-old email.

[25] *See* Securities Regulation Code, § 38, Rep. Act 8799 (Phil.); *see also* 2020 BRC Annual Report (Dkt. 12-3) at 53 (listing independent directors of BRC).

Bloomberry. *E.g.*, FAC ¶¶ 1, 3, 8, 12, 36, 74, 91, 133, 139, 143, 206(c), 206(d)(v). But this is insufficient. *E.g.*, *In re Curr. Conv. Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 426 (S.D.N.Y. 2003) ("The unadorned invocation of dominion and control is simply not enough."); *Strojmaterialintorg v. Russian Am. Comm. Corp.*, 815 F. Supp. 103, 105 (E.D.N.Y. 1993) ("a plaintiff must do more than conclusorily state that the shareholder or officer exercises dominion and control over the corporation. Rather, a plaintiff must allege specific facts showing that the shareholder or officer is doing business in his or her individual capacity without regard to corporate formality.").

Plaintiff does allege that Mr. Razon sometimes used BRHI's plane while traveling on non-Bloomberry business (FAC ¶¶ 141, 148, 164). While this allegation is (arguably) relevant to the **intermingling of property** factor, it is, without more, utterly inadequate as to that sole factor, let alone sufficient to plead "complete domination." *Limited* use of corporate property – which is all that is alleged here – does not transform an individual into an alter ego of a corporation. For example, in *Canario v. Lidelco, Inc.*, 782 F. Supp. 749 (E.D.N.Y. 1992), a director allegedly purchased a private airplane with corporate funds, took personal income tax deductions for its depreciation while the corporation paid for its upkeep, and kept all profits upon its sale – much more extreme allegations than those present here, but still ones that did not "rise to the level necessary to pierce the corporate veil," *id.* at 760. *See also Gartner*, 607 F.2d at 587 (defendant controlled corporation; corporation paid for the care of horses owned by defendant's father; *held*, defendant was not an alter ego of corporation).[26]

### 2.  GGP Does Not Allege a Fraud or Other Wrong

Even if Plaintiff *had* adequately alleged "complete domination" of Bloomberry by Mr. Razon, Plaintiff does not begin to establish the separate requirements that any such domination

---

[26] Plaintiff's (insufficient) allegations of overlapping personnel are discussed in Section II.B. below.

was used *to commit a fraud or other intentional wrong* that injured Plaintiff. Case after case holds that complete domination alone "does not suffice without an additional showing that it led to inequity, fraud or malfeasance," *TNS Holdings*, 92 N.Y.2d at 339; *see also, e.g.*, *Am. Fuel*, 122 F.3d at 134 ("'wrongful or unjust act toward [the party seeking piercing] is required.'").

In practice these elements are not deemed satisfied unless the corporate form was used to defraud creditors or consumers, or unless funds were siphoned from the corporation to the point that it was judgment-proof. *See, e.g.*, *James v. Loran Realty V Corp.*, 20 N.Y.3d 918, 919 (2012) (dismissing alter ego claim where plaintiffs made no showing "that the individual defendants took steps to render the corporate defendant insolvent in order to avoid plaintiffs' claim for damages or otherwise defraud plaintiffs"); *Sutton 58 Assocs. LLC v. Pilevsky*, 189 A.D.3d 726, 729-30 (1st Dep't 2020) (same); *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 410 (S.D.N.Y. 2015) ("*AFTC II*") ("Siphoning assets to frustrate a creditor is precisely the type of deceptive and unjust abuse of corporate limited liability that warrants equitable relief."), *aff'd*, 716 F. App'x 23, 28 (2d Cir. Nov. 16, 2017) ("*AFTC III*").

### a.  GGP Does Not and Cannot Allege Siphoning of Assets

There is no serious suggestion here that Mr. Razon has siphoned assets out of Bloomberry. Plaintiff's allegations that Mr. Razon "has *diverted **funds** and other assets **from the Philippine members of his enterprise***, including the Debtor Defendants, to fund [] U.S. entities for the sole personal benefit of Razon and his family," *e.g.*, FAC ¶ 8 (emphasis added), are a red herring. Despite the sinister innuendo, Plaintiff carefully avoids alleging that Mr. Razon "diverted" *Bloomberry's assets*, much less that any alleged "diversion" impacted Bloomberry's ability to pay a judgment. Rather, Plaintiff mainly uses the word "diversion" to refer to Mr. Razon's decision to take some of the *profits he received as a **shareholder** of numerous successful Philippine*

*companies, of which Bloomberry was just one*[27] (in Plaintiff's parlance, "funds . . . from the Philippine members of his enterprise"), and invest them in U.S.-based ventures. *See, e.g.*, FAC ¶¶ 37 (Razon used "the fruits of his enterprise . . . in the United States"), 141 ("Mr. Razon has invested significant *funds from his Philippine entities* . . . into various . . . investments in the United States"), 171 & 173 (Mr. Razon "anticipated obtaining a large amount of funds from his *Solaire* operation by the end of 2016, which he intended to use for investments in U.S. energy assets"); *compare id*. ¶¶ 143-44, 150, 175-76, 193 (generally alleging that funds were "diverted" "from the Philippines" and placed into U.S. investments).

Notwithstanding Plaintiff's linguistic embellishments, the reality is that the FAC alleges nothing other than that Mr. Razon took legitimate earnings (i.e. corporate dividends) from the large businesses he ran and used them to purchase other assets in the U.S. None of this is in any way untoward or, for a person of Mr. Razon's wealth, unusual. And all of it is irrelevant to veil-piercing analysis. Bloomberry, meanwhile, is the exact opposite of judgment proof. It has abundant assets in the Philippines, *see* footnote 22 above, where nothing prevents Plaintiff from seeking enforcement of the Award.

### b.  GGP Does Not and Cannot Allege Fraud

The word "fraud" and its variants do not appear in the FAC. And any fraud would have to have been, and is not, pled with particularity under Rule 9(b). Nor do the FAC's cursory allegations that Plaintiff relied on "the false premise that the Debtor Defendants at all times had a separate corporate personality *and would be operated for the benefit of their respective stakeholders,*

---

[27] Plaintiff correctly notes that the "cornerstone" of Mr. Razon's holdings is ICTSI, a company founded by Mr. Razon's father and "one of the largest shipping, port, and container terminal operators in the world." FAC ¶ 38. Plaintiff also correctly notes that Mr. Razon is the largest shareholder of Apex Mining, "a Philippines-based mining company," and MORE Electric and Power Corp., "which handles power distribution in the Philippines." *Id*. ¶ 39. The profits from these businesses would have supplied the Razon family with ample cash to invest in energy and real estate in the U.S. There is nothing remotely improper about any of this.

*including creditors such as Plaintiff*, and not solely for Razon's personal benefit" and that Mr. Razon "falsely present[ed] the Debtor Defendants as legitimate business entities *independently managed in the interests of the Debtor Defendants' stakeholders, including creditors and collaborators . . . as opposed to . . . operated for [Razon's personal benefit]*," FAC ¶¶ 206(d)(i), 206(d)(vi), begin to make out a fraud for veil-piercing purposes.

First, these allegations rehash the (inadequately alleged) "complete domination" element. Second, to the extent these allegations can be read to allege representations by Mr. Razon (or anyone else) that Bloomberry would have management that was *independent of Mr. Razon*, or that Bloomberry would be operated *in the best interests of Plaintiff rather than of Bloomberry's shareholders*, Rule 9(b) is unsatisfied, as the FAC nowhere specifies the "where," "when," and "by whom" of any such representation. *See, e.g.*, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993). Third, the very idea that any such representations ever were made is inherently implausible, *cf. Iqbal*. Fourth, reliance on such (non-existent) representations would have been totally unreasonable, especially for a sophisticated actor such as Plaintiff. At the time of contracting, Mr. Razon was the chairman, CEO, and indirect sole owner of Bloomberry (FAC ¶ 62), so it is hard to see how Plaintiff could have been under the impression that Bloomberry's management would be "independent" of Mr. Razon. *See, e.g.*, *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234-35 (2d Cir. 2006) (fraud requires reasonable reliance by Plaintiff; the more sophisticated the plaintiff, the less likely the reliance is to be reasonable). Fifth, Plaintiff elsewhere claims, in direct contradiction to FAC ¶¶ 206(d)(i) & 206(d)(v), that "*even though the Debtor Defendants were express parties to the MSA, it was understood by all parties . . . that the Debtor Defendants were simply vehicles through which Razon was pursuing his personal gaming aspirations*." FAC ¶ 63. There was no fraud.

### c.  The "Wrongs" Alleged in the FAC Are Not a Basis for Veil-Piercing.

Ultimately the only "wrongs" alleged in the FAC are that: (1) "Razon caused [Bloomberry] to unlawfully terminate the MSA, in material breach of [Bloomberry's] obligations to Plaintiff" (FAC ¶ 206(d)(ii)); (2) Mr. Razon "leverag[ed] his personal and business relationship with the head of the PSE, Hans Sicat, to prevent Plaintiff from exercising its rights with respect to the Option Shares" (*id.* ¶ 206(d)(iii)), (3) "Razon caused [Bloomberry] to ignore the express directives of the arbitral tribunal and . . . obstruct[ed] Plaintiff's ongoing attempts to exercise its rights with respect to the Option Shares" (*id.* ¶ 206(d)(iv)), and Mr. Razon has caused Bloomberry "to refuse to pay the amounts awarded to [Plaintiff] under the Final Award." FAC ¶ 143.

On the first of these: "'a simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil.'" *AFTC III*, 716 F. App'x at 28; *see also Mirage Ent'mt, Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 34 (S.D.N.Y. 2018) ("Critically, the wrongful or unjust act 'must consist of more than merely the . . . breach of contract that is the basis of the [party's] lawsuit.'").[28] The FAC suggests that Mr. Razon somehow caused Bloomberry to terminate the MSA for his "personal benefit." FAC ¶ 143; *see also id.* ¶¶ 133, 139, 143, 206(d)(i), 206(d)(vi). But that does not cut it. "A summary allegation that [a corporation] operates solely for [its CEO and owner's] benefit is insufficient." *Mirage Ent'mt*, 326 F. Supp. 3d at 34. And the FAC's "personal benefit" allegation is also incoherent. Plaintiff never explains why it was not *squarely in Bloomberry's interest* to terminate a management contract that would have

---

[28] The FAC suggests that the tribunal found that Bloomberry's contemporaneous grievances with Plaintiff's performance were pretextual "contrivances" and in "bad faith." FAC ¶ 100. This is a gross distortion of the arbitral rulings, which are a part of the FAC for all purposes, *see* Fed. R. Civ. P. 10(c), and which control over the mischaracterizations in the body of the FAC, *see, e.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016). The rulings contain no finding of pretext or bad faith on Bloomberry's part, *see, e.g.*, Dkt. 85-2 ¶ 272, nor would the "fraud or wrong" element be satisfied even if there actually had been a bad-faith termination. *See Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, 270 F. Supp. 3d 716, 732 (S.D.N.Y. 2017) (rejecting the proposition that breach of the duty of good faith and fair dealing "constitutes a wrong for purposes of veil piercing.").

obligated Bloomberry to pay tens of millions of dollars annually to a counterparty who, in Bloomberry's view, was not living up to its obligations. Nor does Plaintiff explain why it was not *in Bloomberry's interest* to press its counterclaims and legal defenses. Notably, Solaire remained highly successful – and consistently profitable – *even after* Bloomberry parted ways with Plaintiff. *See, e.g.*, FAC ¶ 4; Dkt. 85-1 ¶ 199.

Faced with this problem, Plaintiff posits some sort of obligation to operate Bloomberry in the best interests of its "creditors and collaborators, such as Plaintiff" (FAC ¶¶ 206(d)(i), 206(d)(vi)), but of course there is no such obligation. Solvent corporations are run in the best interests of their *shareholders*, not their "creditors and collaborators." A solvent corporation is entitled to assert its legal rights against its counterparties (its "creditors and collaborators") without creating personal liability for its majority shareholder.

Second, the theory that Mr. Razon used his relationship with Hans Sicat, the head of the PSE, to harm Plaintiff (*id.* ¶ 206(d)(iii)), even if it were true (it is flatly untrue), does not satisfy the requirement that the "wrong" be a *cause of harm* to Plaintiff. *See* page 15 above. Plaintiff's proposed block sale of the Option Shares was confirmed on January 15, 2014 but not scheduled to close until January 21, 2014. FAC ¶ 107. The PSE's trading suspension began on January 16, 2014 and was lifted the very next day at *Plaintiff's* insistence. Dkt. 85-3 ¶¶ 42-46. The PSE suspension therefore cannot possibly have been the cause of Plaintiff's inability to consummate its planned sale of the Option Shares. The real reason Plaintiff was unable to realize value from the Option Shares is that, beginning on January 20, 2014, the *Philippine courts* issued a restraining order preventing Plaintiff from accessing the Option Shares. FAC ¶ 111; Dkt. 85-3 ¶¶ 44-50. The Hans Sicat theory also fails because it does not allege *an abuse of the corporate form*, as is required to make out a "fraud or other wrong." *E.g.*, *Morris v. Dep't of Taxation*, 82 N.Y.2d 135, 142-43

(1993); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys.*, LLC, 975 F. Supp. 2d 392, 406 (S.D.N.Y. 2013). Defendants' research has uncovered no case in which a company's controlling shareholder's alleged improper influence over a third party somehow warranted piercing the veil.

Plaintiff's third posited "wrong" is essentially that under Mr. Razon's influence, Bloomberry has elected not to voluntarily comply with the Award before it is recognized and enforced by a court. But an arbitral award, unlike a court judgment, is not self-executing (as Plaintiff knew when it agreed to the arbitration clause in the MSA), *see, e.g.*, *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 519 (2d Cir. 1975), and this Award was obtained at least in part through Plaintiff's misconduct. Plaintiff does not explain how or why it would be inappropriate to assert legal defenses to arbitral enforcement that are specifically provided for in the Convention (to which the Philippines is party).

There is simply no support for the suggestion that Bloomberry's decision to contest arbitral enforcement is somehow an abuse of the corporate form that transforms the company into an alter ego of Mr. Razon. Consider *American Fuel*. There the district court went out on a limb and held that "an unfair avoidance of arbitration is a cognizable wrong that can justify piercing the corporate veil." 1996 WL 396131, at *6 (S.D.N.Y. July 16, 1996). The Circuit reversed: "We fail to see how" pursuing a lawsuit instead of an arbitration "constitutes the kind of fraudulent or wrongful conduct that calls for piercing the corporate veil." 122 F.3d at 135. *See also AFTC II*, 126 F. Supp. 3d at 412 (decision to pursue unsuccessful lawsuit and other legal actions that "may well have been weak on the merits" and "ended unfavorably" for the companies was not "deceptive or intentionally unjust corporate conduct").[29]

---

[29] *AFTC* got past a motion to dismiss, but only because the plaintiff there alleged what GGP cannot and does not allege here, which is that "Defendants had purposefully stripped assets . . . in order to frustrate [plaintiff] in its capacity as creditor." 126 F. Supp. 3d at 413.

At the end of the day, Plaintiff's theory of alter ego liability against Mr. Razon has no basis in established legal principles. Instead, Plaintiff's real point seems to be that the Court should impose alter ego liability because Plaintiff supposedly cannot otherwise obtain justice against Bloomberry given Mr. Razon's alleged "influence in the Philippines and its local courts." FAC ¶ 7; *accord id.* ¶¶ 5, 37, 130. But first of all, Defendants' research has uncovered no case in which aspersions against a foreign country's courts and other institutions were used as a basis for imposing *alter ego liability* in this country – that is a non-sequitur. (The effort to do so is particularly inappropriate here, where Plaintiff has not even *attempted* to use the Philippine court system to conduct recognition proceedings under the Convention.) Alter ego liability does not exist to remedy (baselessly alleged) judicial corruption. Beyond that, the notion that the Philippine courts are rigged in favor of Mr. Razon would require this Court to find that the Philippine court system cannot be trusted to dispense justice in cases involving Mr. Razon. But as the District of Oregon, affirmed by the Ninth Circuit, recently noted in another case brought against Mr. Razon, the Philippine courts have frequently ruled against Mr. Razon and his family.[30]

Finally, courts are particularly reluctant to pierce the veil where the plaintiff "had the opportunity to investigate the financial records and structure of the relevant corporation ahead of time." *Lakah*, 996 F. Supp. 2d at 268; *see also AFTC III*, 716 F. App'x at 29 (that plaintiff had "full knowledge of [supposed dummy entity's] status tends to confirm" that veil should not have been pierced). Courts are relatedly reluctant to pierce where a sophisticated plaintiff *chose not to* contract with the person against whom alter ego liability is sought, because to do so would rewrite the parties' bargain. *Brunswick Corp. v. Waxman*, 599 F.2d 34 (2d Cir. 1979) is instructive on these points. The Circuit there held that it would not accomplish "justice or equity" to impose alter

---

[30] *de Borja v. Razon*, 2019 WL 4724317, at *6 (D. Or. Aug. 16, 2019), *R&R adopted*, 2019 WL 4723070, at *1 (Sept. 25, 2019), *aff'd*, 835 F. App'x 184 (9th Cir. Nov. 3, 2020).

ego liability where Brunswick, a seller of bowling-alley equipment under an installment contract, had had an opportunity to conduct a financial investigation and was aware all along that the buyer with which it contracted was a shell entity set up by, and created in order to avoid personal liability for, the alleys' owners. *Id*. at 36. "Brunswick obtained precisely what it bargained for, and it did not bargain for or contemplate the individual liability . . . which it now seeks to enforce." *Id. See also Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 146 A.D.3d 1, 12-13 (1st Dep't 2016) (having failed to negotiate for contractual rights against an affiliate of the contracting defendant, "plaintiff cannot now claim that it . . . should be allowed to assert claims against" the affiliate).

Here, Plaintiff is a highly sophisticated actor that performed "extensive diligence" before contracting with Bloomberry. FAC ¶¶ 11, 48, 52, 54. Plaintiff knew full well that it was structuring its contractual relationship only with the two Bloomberry subsidiaries, that they had operations solely in the Philippines, and that Mr. Razon was not a party to or guarantor on the MSA. Yet Plaintiff is now seeking to rewrite its contractual bargain and have this *Court* bind Mr. Razon to a personal guaranty that Plaintiff did not obtain at the time. That was not the parties' agreement, it would not accomplish justice or equity, and it is not what veil-piercing is for.

## B.  GGP Fails to Allege "Reverse Piercing" Against the Non-Bloomberry Entities

Plaintiff asserts that the Non-Bloomberry Entities (*i.e.*, the eight Real Estate Entities, the four Energy Entities, and CICL) are alter egos of Mr. Razon. FAC ¶¶ 202, 215.[31] This is known as "reverse piercing," because the plaintiff seeks to hold an *entity* liable for its *owner*'s alleged obligations. *See, e.g.*, *Am. Fuel*, 122 F.3d at 134. The Court can and should make short work of these theories. As an initial matter, the Court need not reach the "reverse piercing" from *Mr. Razon*

---

[31] The FAC also contains a cursory allegation that the Non-Bloomberry Entities "alternatively" are "alter egos of the Debtor Defendants." FAC ¶ 203. Plaintiff nowhere alleges (let alone does so in compliance with *Iqbal*) that the Debtor Defendants exercised "domination" over the Non-Bloomberry Entities, nor pleads any of the other elements that would be required to allege alter ego liability on this (utterly meritless) theory. *See id.* ¶¶ 215, 217.

to the Non-Bloomberry Entities given that, as discussed above, Plaintiff has failed to allege that *Mr. Razon* is the alter ego of the Debtor Defendants. In other words, assuming the Court determines that the Debtor Defendants are *not* the alter egos of Mr. Razon, the relationship between Mr. Razon and the Non-Bloomberry Entities would be moot.

Even so, the FAC does not adequately allege that the Non-Bloomberry Entities are alter egos of Mr. Razon.  For one, the FAC *nowhere alleges* that the corporate form of the Non-Bloomberry Entities was abused such that a fraud or other wrong was visited on *Plaintiff* as a result of Mr. Razon's alleged domination of those entities. *See* FAC ¶¶ 215, 217 (conspicuously failing to identify a fraud or wrong). Plaintiff of course did not contract with Mr. Razon personally, and had no dealings with the Non-Bloomberry Entities, which hold assets unrelated to Bloomberry and Solaire. Plaintiff therefore cannot possibly have been defrauded or otherwise wronged by Mr. Razon's alleged domination of these other entities.

To the extent that Plaintiff is alleging that Mr. Razon transferred his personal funds to these entities, it is unclear how doing so would have wronged or harmed Plaintiff. To the extent that Plaintiff intends to insinuate that Mr. Razon *transferred Bloomberry's assets* (as opposed to dividends he received as a shareholder of numerous successful companies, *see* footnote 27 above) to the Non-Bloomberry Entities, the FAC stops short of alleging such a thing (because it did not happen), *see* Section II.A.2.a. above, much less alleges it with the degree of specificity that would be required under *Iqbal* if not Rule 9(b) – much less alleges further that any such transfers wronged Plaintiff by rendering Bloomberry incapable of paying the Award.

Beyond all this, the FAC *also* fails to allege Mr. Razon's "complete domination" of the Non-Bloomberry Entities. The formulaic incantation that Mr. Razon "dominates and controls" them (*e.g.* FAC ¶ 12, 146, 151, 180, 193, 215(c), 215(d)(iii)) of course is insufficient. *See* pages

18-19 above. The suggestion that the Non-Bloomberry Entities do not each have their own workforce, unique office, or "the trappings of sophisticated corporate life," *Wrigley*, 890 F.2d at 601, is of no moment. These are closely held, mostly single-purpose entities.[32] Also beside the point are Plaintiff's pejorative characterizations of these entities as "shell companies." *Id.* ¶¶ 8, 12, 36, 144-146, 149, 166, 175, 212. There is of course nothing "'unique or in any way nefarious' about using single-purpose entities to lease or acquire real estate" or other investments, nor is there anything "untoward about incorporating an entity for the specific purpose of limiting one's liability." *AFTC v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 527 (S.D.N.Y. 2014).

As regards the actual factors used to assess "complete domination," *see* II.A above, the FAC contains no allegations that any of the Non-Bloomberry Entities was ever inadequately capitalized, not treated as an independent profit center, or that any of them guaranteed Mr. Razon's debts or vice versa. *See* FAC ¶¶ 215(b), (c), (d). There are allegations that the Energy Entities all shared an office (FAC ¶ 184), but this is unimportant in the context of closely held special purpose entities. *See, e.g.*, *Adler*, 467 B.R. at 289.

The FAC also contains no *specific* allegation – as opposed to conclusory allegations made "on information and belief," *see, e.g.*, *id.* ¶¶ 206(d)(vii), 215(d)(i), 215(d)(iv) – that *any* of these thirteen entities disregarded corporate formalities or commingled their funds with Mr. Razon or with each other. *See, e.g.*, *Sysco Food Serv. of Metro N.Y., LLC v. Jekyll & Hyde, Inc.*, 2009 WL

---

[32] *See, e.g.*, *Tycoons Worldwide Group (Thailand) Pub. Co. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 205 (S.D.N.Y. 2010) ("with respect to small, privately-held corporations, . . . we must avoid an over-rigid preoccupation with questions of structure, financial and accounting sophistication or dividend policy or history.") (citing *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 18 (2d Cir. 1996) (cleaned up)); *In re Adler*, 467 B.R. 279, 289 (Bankr. E.D.N.Y. 2012) ("Debtor was the sole owner, officer, employee and director of each of the [five] Corporations, and the Corporations all operated out of the same office and had the same telephone and fax numbers. . . . However, in the case of closely-held corporations these facts are not uncommon, and often create a scenario where a sole principal dominates corporate decision-making. As such, these facts . . . are not enough to pierce the corporate veil."); *see also Nelson v. Adams USA, Inc.*, 529 U.S. 460, 471 (2000) ("One-person corporations are authorized by law and should not lightly be labeled [a] sham.").

4042758, at *3 (S.D.N.Y. Nov. 17, 2009) (alter ego insufficiently pled: "[w]hile [plaintiff] claims that the defendants intermingled their assets and liabilities, it fails to allege which corporation took funds from which."); *Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 197 (E.D.N.Y. 2009) (alter ego allegations were "too vague"; plaintiffs "failed to specify, for example, which individual defendant took funds from which corporation."). In fact, the FAC mostly depicts the exact *opposite* of commingling: It reviews, in detail, the unique assets *separately owned* by *each one* of the companies. FAC ¶¶ 145, 162, 165, 167-170, 173-74, 177-79.

The FAC alleges that CICL, a parent of the Energy Entities, provided funds needed by the Energy Entities, which Plaintiff alleges were sometimes launched without their own bank account. FAC ¶¶ 165, 167-170, 173. Such a practice, according to the Second Circuit, is unremarkable and not a basis for veil-piercing. *See Am. Protein*, 844 F.2d at 60 (reversing district court decision to pierce veil: "While concededly [parent] supplied its subsidiary with working capital from time to time, there is no evidence that [subsidiary] received such financing specifically for" the transaction with plaintiff that gave rise to the action). Also, the alter ego analysis does not require that an entity have a bank account. In *American Fuel*, the company at issue "had no separate bank account" (in addition to having "no contracts, no employees, and no independent office space"), but that showed no more than that it "was a start-up company, with so little ongoing business that there was no need for independent accounts in its name." 122 F.3d at 134-35. The Circuit found it significant, too, that the company's president "shifted personal funds to [the company], but never [company] funds to his personal account." *Id*. at 135. Similarly here, there is no allegation, nor could there be, that Mr. Razon has raided the Energy Entities for personal use, and so it is irrelevant that those entities (special-purpose owners of highly illiquid assets) lacked bank accounts. Finally, CICL's practice of funding the Energy Entities' acquisitions has no bearing on whether the Energy Entities

are alter egos of *Mr. Razon* (as opposed to whether the Energy Entities might be alter egos of CICL
– which is not alleged and which they are not and which would be irrelevant in any event).

To the extent the FAC insinuates that Mr. Razon "commingled and used [Bloomberry's]
*assets*" or "*resources*" for non-Bloomberry purposes (FAC ¶¶ 141, 148, 151, 164), the FAC is not
referring to mingling of corporate funds (which, again, is not and could not be alleged). Rather,
the FAC is referring to Mr. Razon's alleged use of a Bloomberry company plane, which is
discussed above at page 19 and has no conceivable bearing on the Non-Bloomberry Entities' alter
ego liability, and to the allegation that Mr. Razon used "common agents from the Debtor
Defendants *and his other Philippine entities* to carry out the business of the Energy Entities," *id.*
¶ 181, which resulted in *de minimis* use of Bloomberry email addresses and office equipment for
Energy Entity work. *See id.* ¶¶ 137, 151, 157, 163, 164, 183, 184, 190, 193.[33]

These alleged multiple hats of Razon-associated personnel (and *de minimis* office use)[34]
do not come close to making any of these entities an alter ego of Mr. Razon. Overlap among
personnel is "commonplace", "generally-accepted," and "insufficient without more, as a matter of
law, to eviscerate the presumption of corporate separateness." *McAnaney v. Astoria Fin. Corp.*,
665 F. Supp. 2d 132, 145 (E.D.N.Y. 2009); *see also, e.g.*, *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d
392, 404 (S.D.N.Y. 2007) (granting Rule 12(b)(6) dismissal because allegations that entities shared
a common office address, common principals and owners, and common ownership of a factory
were insufficient for veil-piercing); *Lee v. Arnan Dev. Corp.*, 77 A.D.3d 1261, 1262-63 (3d Dep't

---

[33] The FAC also alleges – conclusorily, and on information and belief – that Bloomberry personnel were used to
"oversee acquisition and maintenance of the portfolio of real property assets owned by the Real Estate Entities." FAC
¶ 148. But the only individuals (other than Mr. Razon) identified in the FAC as associated with the real estate
investments are Medel Payumo, Mr. Razon's wife, and Mr. Razon's children (*id.* ¶¶ 23-29), none of whom is alleged
to have played any role at Bloomberry.

[34] The overlap is no secret. BRC's public disclosures clearly indicate that a number of Bloomberry's officers and
directors (including so-called "Razon Agents" Mr. Alarilla, Mr. Tan, and Ms. Tuason-Occeña, *see* FAC ¶¶ 17, 18, 68,
71 n.11, 157, 163, 170, 177, 180, 183) hold multiple roles at various entities affiliated with Mr. Razon. *See, e.g.*, Dkt.
12-3 at 53-55.

2010) ("'[C]losely associated corporations, even ones that share directors and officers, will not be considered alter egos of each other if they were formed for different purposes, neither is a subsidiary of the other, their finances are not integrated, assets are not commingled, and the principals treat the two entities as separate and distinct.'"). The Non-Bloomberry Entities should be dismissed from the case with prejudice.

## III.    GGP FAILS TO STATE A CONVERSION CLAIM AGAINST MR. RAZON

The background to the conversion claim is as follows. As the arbitration was getting underway, GGP sought to sell the Option Shares. FAC ¶¶ 106-07, 246; Dkt 85-3 ¶¶ 38-40, 52. Bloomberry sought to prevent GGP from doing so, in part because Bloomberry was seeking restitution of the Option Shares in the arbitration as a remedy for Bloomberry's counterclaims against GGP for breach of the MSA and for the Philippine equivalent of fraud in the inducement ("causal fraud"). FAC ¶ 105; Dkt. 85-3 ¶¶ 93, 96; Dkt. 85-1 ¶ 170(a). Bloomberry notified the PSE of the dispute, leading the PSE to suspend trading in BRC's shares for one or two days. FAC ¶¶ 110-11, 247-48; Dkt. 85-3 (Interim Measures Award) ¶¶ 42-46. On January 20 and February 27, 2014, Bloomberry obtained, respectively, a temporary restraining order and preliminary injunction from the Philippine courts against GGP's sale (FAC ¶¶ 111, 249), prompting Deutsche Bank, the custodian of the Option Shares, to transfer them to a restricted account. *Id*. ¶¶ 112, 249 n.31. In December 2014, the arbitrators issued the so-called Interim Measures order purporting to vacate the Philippine injunction and directing the parties to act accordingly. *Id*. ¶¶ 250-51; Dkt. 85-3 ¶ 141. Bloomberry did not comply (FAC ¶¶ 251-52), and the judicial restraint remains in place. *E.g.*, *id*. ¶¶ 249 n.31, 263 (Deutsche Bank refuses to release the shares because of the restraints); Fissell Decl. Ex. 3 (Regional Trial Court ruling affirming that injunction remains in effect).[35]

---

[35] GGP believes that the Interim Measures award was "self-executing" and somehow automatically dissolved the

The arbitrators found that as a result of Bloomberry's perceived disobedience, Bloomberry had "wrongful[ly] interfer[ed]" with and accomplished a "de facto seizure" of the Option Shares. FAC ¶ 258; Dkt. 85-1 ¶¶ 446-50. As a Constructive Remedy, the arbitrators instructed Bloomberry to either (a) buy the shares back from GGP for approximately $196,000,000 (the value of the Option Shares at the time of the Interim Measures award), or (b) take a series of specified measures that would allow GGP to sell the shares on the open market, but if the sale netted more than $196,000,000, GGP would have to remit the overage above $196,000,000 to Bloomberry (and if the sale netted less than $196,000,000, Bloomberry would owe that difference). FAC ¶¶ 118-19; Dkt. 85-1 ¶¶ 467-74, 507(c)-(e). Here Plaintiff alleges that Bloomberry's actions to prevent GGP from disposing of the Option Shares – the same actions that the arbitrators ruled were a "de facto seizure" by Bloomberrry – are also a "de facto seizure" by, and therefore a conversion committed by, Mr. Razon personally. FAC ¶ 267; *see also id.* ¶¶ 242-69.

This claim rests solely on the Court's supplemental jurisdiction (FAC ¶ 31), and therefore if the FAA claims are dismissed (whether for lack of personal jurisdiction or for failure to state a claim), the conversion claim should be too. *See* 28 U.S.C. § 1367(c)(3). To the extent, however, that the Court reaches this claim, this Court must apply the choice of law rules of New York. *E.g.*, *Colgate Palmolive Co. v. S/S Dart Canada*, 724 F.2d 313, 316 (2d Cir. 1983). For the *substance* of the claim, New York applies "the law of the jurisdiction having the greatest interest in the litigation." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 384 (2d Cir.

---

judicial restraints such that they are now a "fiction," FAC ¶ 263; *see also* Fissell Decl. Ex. 3 at 2. But arbitrators of course cannot vacate judicial rulings, and the Philippine courts have rejected GGP's position, insisting that GGP institute recognition proceedings under local procedures implementing the Convention if GGP wants the local courts to effectuate the Interim Measures award. Fissell Decl. Ex. 3 at 6. For GGP to succeed on the conversion claim, this Court will have to find that the Philippine courts are wrong about the existence and validity of their own injunctions.

2006). That jurisdiction is the Philippines, where the conduct constituting the alleged conversion occurred and where the allegedly converted property (the Option Shares) is located.

The applicable statute of limitations, however, is that of New York. Under New York's borrowing statute, CPLR 202, a claim asserted by a non-resident that accrued outside of New York must be timely under the limitations periods of *both* New York and the jurisdiction where the claim accrued. *E.g.*, *2138747 Ontario, Inc. v. Samsung C&T Corp.*, 31 N.Y.3d 372, 377 (2018). In New York, conversion is subject to a three-year limitations period. *See* CPLR 214(3); *Swain v. Brown*, 135 A.D.3d 629, 631 (1st Dep't 2016). The period "begins to run when the property was taken." *Zhao v. Wang*, 558 F. App'x 41, 43 (2d Cir. 2014); *see also, e.g.*, *N.Y.C. Transit Auth. v. N.-Y. Historical Soc'y*, 635 N.Y.S.2d 998, 1000 (Sup. Ct. 1995) ("[W]here the initial possession of a chattel is wrongful or unlawful, the cause of action to recover the chattel accrues and the Statute of Limitations begins to run at the time of the initial unlawful possession.").

Here, Plaintiff alleges that the Option Shares were allegedly taken and unlawfully possessed *beginning* in January 2014 (more than seven years before filing suit), when the Philippine court issued the restraint that prevented Plaintiff from disposing of the Option Shares. FAC ¶ 249. Years later, as the FAC explains, the arbitrators ruled that Bloomberry's "actions set forth above [in the FAC] were tantamount to a 'de facto seizure' of the Option Shares in violation of Plaintiff's property rights in such shares and Philippine law." *Id*. ¶ 258. The latest of the "actions set forth above" occurred on April 10, 2017 (*id*. ¶ 257) – approximately *four* years before this action was filed. The conversion claim is time-barred by New York's three-year statute.[36]

---

[36] Plaintiff alleges that Mr. Razon continued "to maintain his *de facto* seizure of the Option Shares" (*id*. ¶ 259), but *maintaining* wrongful possession is not a basis for resetting or pausing the limitations clock. *E.g.*, *In re Level 8 Apparel, LLC*, 2021 WL 408981, at *9 (Bankr. S.D.N.Y. Feb. 3, 2021) ("the 'continuing wrong' doctrine does not apply to claims for conversion") (collecting cases)).

The claim is also barred by res judicata, the proscription against relitigating decided claims. *See San Remo Hotel, L.P. v. San Francisco*, 545 U.S. 323, 336 (2005). Res judicata applies where: "(1) the previous action involved an adjudication on the merits; (2) the previous action involved *the [same parties] or those in privity with them*; and (3) the claims asserted in the subsequent action *were, or could have been, raised* in the prior action." *Monahan v. N.Y.C. Dep't of Corrections*, 214 F.3d 275, 285 (2d Cir. 2000) (emphasis added). The doctrine is no less applicable where the prior proceeding is an arbitration rather than a court action. *E.g.*, *Pike v. Freeman*, 266 F.3d 78, 90 (2d Cir. 2001).

All of the *res judicata* requirements are met here. The arbitrators considered whether, and decided that, Bloomberry's actions in relation to the Option Shares were a wrongful interference with property. Dkt. 85-1 ¶ 450. The parties-or-privity requirement is satisfied. Plaintiff was a claimant in the arbitration. The respondents in the arbitration were BRHI and SPI, which Plaintiff alleges are alter egos of – legally indistinguishable from – Mr. Razon. Even without accepting the alter ego theory (and we do not accept it), privity would be satisfied under Plaintiff's theory of this case, as there is (according to the allegations of the FAC) a "sufficiently close relationship" between Mr. Razon and Bloomberry that Mr. Razon's "interests were at stake in the prior arbitration." *See Feitshans v. Kahn*, 2006 WL 2714706, at *4 (S.D.N.Y. Sept. 21, 2006) (distinguishing between alter ego liability and privity for res judicata purposes); *see also Amal. Sugar Co. v. NL Indus., Inc.*, 825 F.2d 634, 640 (2d Cir. 1987) (shareholder was in privity with corporation where interests of shareholder "were adequately represented" by corporation in prior action).

And finally, the claim asserted here was (or at the very least could have been) asserted in the arbitration. The tribunal concluded Bloomberry had "willfully or at least negligently caused

damage to [Plaintiff] by interfering with and blocking the exercise of its ownership rights in the shares." Dkt. 85-1 ¶ 450. The panel imposed the Constructive Remedy on BRHI and SPI so that Plaintiff would have the benefit of owning the shares. FAC ¶ 261; Dkt. 85-1 ¶¶ 446-50, 467-74, 507(c)-(e). Plaintiff now seeks substantially the same relief based on the same fact pattern, but against *Mr. Razon personally. Compare* FAC at 99 *with* Dkt. 85-1 ¶¶ 507(c)-(e). Plaintiff is thus seeking to determine in a judicial action what has already been determined in the arbitration. It is no answer to say that this claim, unlike that one, is asserted against Mr. Razon personally. The theory that Mr. Razon is liable as an alter ego for BRHI's and SPI's actions was obviously available at the time of the arbitration *and easily could have been* asserted then. In any case, res judicata does not require an exact identity of parties – that is the point of privity. *Feitshans*, 2006 WL 2714706, at *4 ("Naming new defendants in this action does not help plaintiffs because res judicata 'operates to preclude claims, rather than particular configurations of parties.'").

Even apart from res judicata, the conversion claim is just a relabeled attempt to enforce the Award (specifically the Constructive Remedy) against Mr. Razon as the alter ego of BRHI and SPI. The conversion claim thus impermissibly duplicates both the (already arbitrated) contract claims that are the basis for the Award and the action here to enforce that award against Mr. Razon. *See, e.g.*, *Gate Techs, LLC v. Delphix Cap. Mkts., LLC*, 2013 WL 3455484, at *4-*5 (S.D.N.Y. July 9, 2013) (rejecting argument that "the fact that a conversion claim could conceivably be maintained against [corporate defendants' majority shareholder] in his individual capacity, even in the absence of a valid contract claim, underscores its distinctiveness from the contract claim": "where the remedy for the proposed claims would merely duplicate that already sought," "the addition of new claims is not warranted." (internal quotation marks omitted)); *see also Transience*

*Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 456 (S.D.N.Y. 2014) (noting that duplicative conversion claims are "routinely dismissed").[37]

## IV.  THE COURT SHOULD DISMISS UNDER *FORUM NON CONVENIENS*

The doctrine of *forum non conveniens* gives the Court discretion to dismiss if "a case may be more appropriately tried in another forum, either for the convenience of the parties or to serve the ends of justice." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 67 (2d Cir. 2003); *see also In re Arbitration*, 311 F.3d 488, 495-96 (2d Cir. 2002) ("*Monde Re*") (*forum non* dismissal of action to enforce a foreign award under the Convention). This Court should: (i) determine the level of deference due to Plaintiff's choice of forum, (ii) consider whether an adequate alternative forum exists, and (iii) if one does exist, balance the "private and public interest implicated in the choice of forum." *Norex Petrol. Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).

### A.  GGP Forum-Shopped and So Its Forum Choice Does Not Deserve Deference

"[T]he more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71-72 (2d Cir. 2001). Here, GGP has confessed to forum-shopping by repeatedly alleging (FAC ¶¶ 7, 97, 130, 212, 221, 226, 235) that it is unable to get justice in the Philippines due to Mr. Razon's purported influence in his home country. *See Iragorri*, 274 F.3d at 71 (the parties' popularity or unpopularity in different regions are classic forum-shopping reasons).

On top of that, GGP has failed to establish "valid reasons" for its choice of forum. *Hyundai Merchant Marine Co. v. Mitsubishi Heavy Indus., Ltd.*, 2015 WL 7758876, at *2 (S.D.N.Y. Dec.

---

[37] Mr. Razon reserves the right to argue for the application of foreign law to the res judicata and claim-duplication issues. Philippine law appears if anything to be less forgiving than U.S. law on res judicata and "claim-splitting." *See Riviera Golf Club, Inc. vs. CCA Holdings, B.V.*, G.R. No. 173783 (S.C. June 15, 2015) (Phil.) (holding that a management company could not sue for *unearned* management fees for the remaining term of a management agreement that was prematurely terminated since the company had previously sued for *unpaid* fees earned prior to the termination and had agreed to a compromise of that earlier claim; to allow the plaintiff to pursue the second claim based on breach of the same contract after compromising the first claim would circumvent res judicata).

1, 2015) (Schofield, J.) (citing *Iragorri*, 274 F.3d at 72). Among other things: GGP is not a New York entity, *see, e.g.*, *de Borja*, 2019 WL 4724317, at *7 (deference reduced because plaintiff chose to sue in a U.S. state other than its home forum); personal jurisdiction cannot be obtained here over most of the Defendants; and GGP has already engaged in proceedings in the Philippines in connection with the subject matter of this action, *see, e.g.*, Dkt. 85-3 ¶ 51, closing off any argument that GGP would have insufficient legal assistance in the Philippines.

**B.  The Philippines Is an Adequate Forum, as U.S. Courts Have Repeatedly Held**

If Defendants are amenable to suit in the Philippines, and the Philippines permits litigation of the subject matter at issue in this case, then the Philippines is an adequate forum. *See Norex*, 416 F.3d at 146 (citing *Pollux*, 329 F. 3d at 70 (articulating two-part standard)). On the first point: BRHI and SPI obviously can be sued in the Philippines. However, in the Philippines, there would be no point to asserting alter ego theories of liability because Bloomberry has ample assets in the Philippines to satisfy a judgment. It also cannot be disputed that the Philippine courts will entertain actions for the enforcement of foreign awards under the Convention, to which the Philippines is a party.[38] Additionally, as discussed in Section III above, GGP's conversion claim is governed by Philippine law, making the Philippines the appropriate forum to litigate any conversion claim that is not time barred and has not already been determined.[39]

GGP's outlandish suggestion that the Philippines is inadequate due to Mr. Razon's purported influence over the Philippine judiciary is meritless. In *de Borja*, five judges at three levels of the federal court system rejected this assertion, in part because the Philippine courts have

---

[38] *See, e.g.*, Alter. Dispute Resol. Act of 2004 § 42, Rep. Act 9285 (Phil.); *Abuhay Holdings Corp. v. Sembcorp Logistics Ltd.*, G.R. No. 212734 (S.C. Dec. 5, 2018) (Phil.) (the "Convention primarily governs the recognition and enforcement of foreign arbitral awards by our courts.").

[39] *See de Borja*, 2019 WL 4724317, at *6, *R&R adopted*, 2019 WL 4723070, *aff'd*, 835 F. App'x 184 (9th Cir. Nov. 3, 2020) (Philippines was adequate alternative forum where Philippine law would govern the dispute and claims asserted included conversion).

frequently ruled against Mr. Razon and members of his family: "Why the Philippine judiciary is now suddenly incapable of fairly administering justice is unclear." 2019 WL 4724317, at *6. *De Borja* also notes that U.S. courts have repeatedly "held that the Philippines is an adequate forum." *See id*. (citing cases from this Circuit, *inter alia*).

**C. Dismissal Would Promote Convenience and Comity and Avoid Conflicts of Laws**

The private and public interest factors all strongly favor dismissal. *See Murray v. Brit. Broad. Corp.*, 81 F.3d 287, 293-94 (2d Cir. 1996) (listing the private and public factors). The evidence and witnesses are largely in the Philippines. Handling discovery and attending trial in the U.S. are no small burden for executives on the other side of the globe. At the same time, proceeding in the Philippines will render the factually complex, Philippine-centric veil-piercing claims unnecessary. *See Monde Re*, 311 F.3d at 500 ("While the private interest factors might not ordinarily weigh in favor of forum non conveniens dismissal in a summary proceeding to confirm an arbitration award, this case does not lend itself to summary disposition. Here, [Plaintiff] has brought [fourteen additional defendants] into the proceeding although [none of them] was a party to the agreement providing for arbitration."). Finally, proceeding in the Philippines also makes enforcement more straightforward, as that is where Bloomberry has the assets to satisfy the Award.

As for the public interest factors, New York has no connection to or interest in hearing the case. And on the conversion claim, the Court would have to decide whether *local court proceedings in the Philippines* could be a tort under *Philippine law*. This presents an extraordinary, multi-layered comity problem: this Court not only would be sitting in judgment of the Philippine courts as the alleged tortious instruments of Mr. Razon's will, but also would be asked to hold that *the foreign courts did not properly apply their own law when they declined to lift the injunction*. *See* footnote 35 above. (If the foreign courts have properly applied their own law, it is hard to see how Bloomberry and Mr. Razon could have accomplished a tortious seizure.) *See, e.g., Finanz AG*

*Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999) ("'United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries.'").

There are also significant potential problems with conflicts of laws (and related further comity problems), as this Court may have to decide whether a public company in good standing with *Philippine* regulators is nonetheless an alter ego for its majority shareholder *under U.S. federal common law*. The Court would also have to decide whether facts disclosed to the public and allowed by the *Philippine* stock exchange and the *Philippine*'s corporate and securities-regulation codes (for example, surrounding Bloomberry and ICTSI personnel wearing multiple hats, *see* footnote 34 above) could nonetheless give rise to Mr. Razon's alter ego liability under *U.S. federal common law*. *See, e.g., Realuyo v. Villa Abrille*, 2003 WL 21537754, at *14 (S.D.N.Y. July 8, 2003), *aff'd sub nom. Realuyo v. Abrille*, 93 F. App'x 297 (2d Cir. 2004) ("avoiding difficult problems in conflict of laws and the application of foreign law" is a public interest factor supporting dismissal). With all factors of convenience, efficiency, justice and comity overwhelmingly pointing to the Philippines, this case is a classic candidate for a *forum non conveniens* dismissal.

Dated: July 15, 2021
    New York, New York

MILBANK LLP

/s/ *Daniel M. Perry*
Daniel M. Perry
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
dperry@milbank.com

Brett P. Lowe (admitted *pro hac vice*)
1850 K Street, NW
Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
blowe@milbank.com

*Attorneys for Defendants Bloomberry Resorts
and Hotels Inc. and Sureste Properties, Inc.*

MEHAFFYWEBER, PC

/s/ *Corey J. Seel*
Corey J. Seel (admitted *pro hac vice*)
Konor Cormier (admitted *pro hac vice*)
Diana J. Shelby (admitted *pro hac vice*)
500 Dallas, Suite 2800
Houston, TX 77002
Telephone: 713-655-1200
Facsimile: 713-655-0222
coreyseel@mehaffyweber.com
konorcormier@mehaffyweber.com
dianashelby@mehaffyweber.com

*Attorneys for Defendants Collingwood
Investment Company Limited; Collingwood Oil
& Gas Holdings, LLC; Collingwood USA,
Inc., Collingwood Brookshire USA, Inc. and
Collingwood Appalachian Minerals, LLC*

Respectfully submitted,

WALFISH & FISSELL PLLC

/s/ *Rachel Penski Fissell*
Rachel Penski Fissell
Daniel R. Walfish
405 Lexington Ave 8th floor
New York, NY 10174
Telephone: 212-672-0523
rfissell@walfishfissell.com
dwalfish@walfishfissell.com

*Attorneys for Defendants Enrique K.
Razon Jr., Asia Arrow Limited,
Rizolina LLC, Ensara LLC, Nozar
LLC, Bowery Bay LLC, Campanilla
LLC, Fesara LLC, and 11 Essex Street
Realty LLC*