L845gloC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GLOBAL GAMING PHILIPPINES,
LLC,

                    PLAINTIFF,

          v.                              21 Civ. 2655 (LGS)(SN)
                                          Remote Proceeding
ENRIQUE K. RAZON, JR.,
BLOOMBERRY RESORTS AND HOTELS,
INC.,
SURESTE PROPERTIES, INC.,
COLLINGWOOD OIL & GAS
HOLDINGS, LLC,
COLLINGWOOD USA, INC.,
COLLINGWOOD BROOKSHIRE USA,
INC.,
COLLINGWOOD APPALACHIAN
MINERALS, LLC,
ASIA ARROW LIMITED,
RIZOLINA LLC,
ENSARA LLC,
NOZAR LLC,
BOWERY BAY LLC,
CAMPANILLA LLC,
FESARA LLC,
11 ESSEX STREET REALTY LLC,
COLLINGWOOD INVESTMENT COMPANY
LIMITED,

                    Defendants.

------------------------------x
                                          New York, N.Y.
                                          August 4, 2021
                                          12:00 p.m.

Before:

                    HON. SARAH NETBURN,

                                          U.S. Magistrate Judge

L845gloC

APPEARANCES


MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.
     Attorneys for Plaintiff
BY:  KEVIN N. AINSWORTH
BY:  JOSEPH R. DUNN

MILBANK LLP
     Attorneys for All Defendants
BY:  BRETT P. LOWE
BY:  DANIEL M. PERRY

MEHAFFY WEBER, P.C.
     Attorneys for Defendants Collingwood USA, Inc.,
Collingwood Brookshire USA, Inc., Collingwood Appalahcian
Minerals, LLC
BY:  COREY J. SEEL

WALFISH & FISSELL PLLC
     Attorneys for Defendants Enrique K. Razon, Jr., Asia Arrow
Limited, Rizolina LLC, Ensara LLC, Nozar LLC, Bowery Bay LLC,
Campanilla LLC, Fesara LLC, and 11 Essex Street Realty LLC
BY:  RACHEL PENSKI FISSELL

L845gloC

(The Court and all parties appearing telephonically)

THE COURT:  Let's get started.  This is Global Gaming Philippines, LLC v. Razon, et al. docket no. 21 civil 2655.  Can I ask counsel for the plaintiff to state his appearance?

MR. AINSWORTH:  Your Honor, Kevin Ainsworth with Mintz Levin, Cohn, Ferris, Glovsky & Popeo for plaintiff.  I have several colleagues on the line.  Would you like each of them to announce their appearance, your Honor?

THE COURT:  I think only if they're going to speak do I need an appearance stated.

MR. AINSWORTH:  I think Mr. Dunn may speak.  So, Joe?

MR. DUNN:  Good morning.  Joseph Dunn of Mintz Levin on behalf of plaintiff.

THE COURT:  Thank you.

And on behalf of Bloomberry Resorts and Hotels?

MR. LOWE:  Good afternoon, your Honor.  Brett Lowe of Milbank LLP on behalf of defendants Bloomberry Resorts and Hotels, Inc. and Sureste Properties, Inc., which I will refer to collectively as Bloomberry.  Also on the line is my colleague Dan Perry, who was just speaking.

MR. PERRY:  Good afternoon, your Honor.

THE COURT:  Good afternoon.

And on behalf of the Collingwood energy defendants?

MR. SEEL:  Good afternoon, your Honor.  This is Corey Seel with the law firm of Mehaffy Weber down in Houston.  I do

L845gloC

represent all of the Collingwood entities or the entities that have Collingwood in their name. I know we have used the word "energy entities" but I also represent Collingwood Investment Co. Ltd. which isn't part of the energy entity acronym, as we have used it. But, in any event I represent all of the Collingwood entities.

THE COURT: And on behalf of defendant Razon and the real estate entities?

MS. FISSELL: Good morning, your Honor. This is Rachel Penski Fissell of Walfish & Fissell, PLLC, and we represent Mr. Razon and the real estate entities. I won't list them unless you need me to.

THE COURT: That's not necessary. Thank you.

A few housekeeping matters to begin with. First, I hope everybody is healthy and safe on the line. We are obviously conducting this proceeding remotely because of the pandemic. I am going to remind everybody that it is difficult for the court reporter to manage everybody's remarks so, please, state your name each and every time that you speak.

If you are not speaking, please mute your line. If you are speaking, it is often much easier if you are speaking directly into a phone. Often times headsets create additional background noise that can be complicated. And, please, be sensitive to other people who are speaking. I will give everybody an opportunity to be heard but please don't speak

L845gloC

over one another.

All right.  We have an enormous amount of work to do this afternoon.  I am going to do my best to get through it. Part of my sort of overall reaction to these motions -- I think there are something like six motions, each of which has dozens of disputes -- is that, at least in some instance, there has been an agreement to produce certain documents and maybe a dispute over the full scope of those documents.  It may be that the best way to proceed here is for the parties to exchange those documents that they have agreed to exchange so that everybody has a better sense of what will be produced and whether or not there is, based on that production, a better basis to continue the search for additional documents.

That is my view here.  I do not intend to go discovery demand by discovery demand.  That's unfair to the Court to do, there is just too much here.  So, my intention is to give the parties some direction and scope and hopefully to give you then an opportunity to go back into your discovery efforts and report back to me at a later date.

With that, I think I will begin by addressing plaintiff's motions first and I want to focus, initially, on plaintiff's motion with respect to Razon and the real estate entities, and I believe that those motions are filed at ECF 112 and ECF 113.  So let's begin with those first.

Mr. Ainsworth, do you want to focus my attention on

L845gloC

particular areas?

MR. AINSWORTH:  Your Honor, good afternoon.

One of the overarching issues with regard to Razon and the real estate entities is that Razon controls everything. Right?  So, everything that any of these defendants has is within Razon' possession, custody, and control.  And yet he is saying, Oh, get it from them.  Go get it from them.  Not one of them has produced any communications other than what was produced in the underlying arbitration.  From Razon and the real estate entities, your Honor, we received a total of 107 documents that had not been produced in the arbitration.  So, they refused to do any search whatsoever of communications relating to any of these issues and the issues are about control and dominance over these entities.

So, for example, we have, through our own investigation, found his ownership and control of the real estate entities in New York.  We have found that he bought Asia Arrow through one of the Collingwood entities.  We found that while is he in New York doing business he is signing a W-9 giving one of the real estate entities addresses, Paiumo, who is the manager of the realty as the address to one of the Collingwood entities.  So, he is intermingling and using these entities at different times from his New York address.  He signed hundreds of, or more than hundreds, anyway of deeds or purchase --

L845gloC

THE COURT:  If you are on a headphone or speaker phone, sometimes we find that those can be feedback or break up.

MR. AINSWORTH:  I will try this, your Honor. Hopefully it is an improvement.

So, what we have found is an utter refusal to search for any communications.  And regardless of which category it is, which request it is, there is just refusal do that and it's overarching, it is for all of the entities.  So, they have produced zero communications that were not previously produced in the underlying arbitration.

On this letter with regard to Razon, we could go through it just in the order of the letter, your Honor, that's a decent priority, but this overarching issue is really what underlies it.  He is not willing to search for documents that would show his direction of investments, his control.  We have got admissions that he controls, there is a lot of admissions regarding Razon' ownership and transfer of funds, but they want to pretend that each of these entities is independent and, as for some of the real estate entities, that Razon's wife is the one who is controlling everything.  The documents show otherwise.  They show that Razon signed purchase contracts for the property before the entity was formed, then they sign the contract to the entity and Razon's wife is named as the controller or the manager.

L845gloC

THE COURT:  Is that, alone, problematic?  My understanding is that Razon admits that he controls all of these entities, he is the president and chief officer and so everything is, on some level, controlled by him.  That doesn't necessarily mean that all of these defendants are appropriate pockets for your arbitration award.  I mean, aren't you looking for documents to establish that there was some fraud in the creation or that it was really a fictitious shell entity and not established for any legitimate reason other than to hide assets?

MR. AINSWORTH:  The point is, yes, your Honor, that these were established to hide assets.  He is creating these entities in New York, transferring funds.  He has admitted the transfers, we have got documents -- by the way, to the extent they have produced documents, they have heavily redacted them.  That's another issue that we will have to address.  But, what we have been able to discern has corroborated much of what we have alleged, your Honor, but it is the tip of the iceberg, it is not showing his direction, his use of -- they haven't produced communications which they're hiding.  Right?  They're not willing to look for communications from -- in any of defendants' systems, if there are different systems, showing why, when this transfer occurred, who directed it, and showing Razon's involvement.

THE COURT:  I think I need you to be a little bit more

L845gloC

narrower and circumspect.  As I review these letters and your requests, they could potentially cover every single communication that was ever sent so maybe you could help me figure out a way to target in on the types of documents that you think are likely to be helpful in your efforts.

MR. AINSWORTH:  Well, since we are talking about the real estate entities I will limit it to that for now but there is separate issues with regard to the other entity defendants.

Some of these real estate entities defendants are saying are controlled by Razon's wife; that she is the manager, she made the decision, Razon supported it.  They've not admitted his control.  And if he is not the one making the decisions there is no e-mails -- there wouldn't be e-mails and communications about the decisions.  All right?  So, there is no burden to search for them if he is not the one making the decisions.  The fact that they don't want to search for the e-mails tells you who is making the decision.  It is Razon. The idea that it is his wife is a sham.  Now, if they want to admit his control and take this issue off the table, that's one thing, but we issued requests for admissions and we get these parsed out answers that make these issues still live requiring document discovery.  We tried to narrow the issues through requests for admission and they're not willing to do that.  So, until the issue is off the table, we are entitled to documents to show the communications about the control of funds and

L845gloC

control of the investments and the decision-making.

THE COURT:  OK.  Well, that's too broad for me so we need to focus here.  I understand that you have received the corporate formation documents; is that correct?

MR. AINSWORTH:  I would say, your Honor, we have received some, and much of what's been produced has been redacted and I can't point to whether that is true for the corporate formation documents.  Ms. Greenquist is on the line and might be able to answer that more specifically.

THE COURT:  So you have received some corporate formation documents, maybe they're overly redacted.  Have you received documents related to funding, funding for purposes of asset purchases?

MR. AINSWORTH:  Those, to the extent we have received any, your Honor, are heavily redacted, to the extent of redacting account numbers and much relevant information that would facilitate issuing subpoenas if we wanted to.

MS. FISSELL:  Your Honor, this is Ms. Fissell.  Can I just jump in here for a second on the real estate entities?

We have produced all of the corporation formation documents for each of the real estate entities and we have produced documents with bank account numbers -- bank account numbers -- redacted showing the owner of the bank account that paid for the acquisition of each real estate property underlying that is held by the real estate entities.  So they

L845gloC

know the owner of the bank account that sent, wired the money into the attorney trust account for the purchase.  We did redact the bank account number because it is highly confidential information and there is no reason they need to know the actual number of Mr. Razon's personal bank account in the Philippines.

THE COURT:  Have you produced those records to support every asset purchase by the real estate entities?

MS. FISSELL:  Yes.  That's correct.

THE COURT:  And did the real estate entities, the ones that we are talking about here, I assume we are just talking about U.S.-based properties?

MS. FISSELL:  The property is all in the U.S.  One of the entities that holds the property of the Plaza Hotel is actually a Cayman Islands entity but the entity is in the U.S. -- excuse me, the property is in the U.S.

THE COURT:  The property.  OK.

Let me turn back to you, Mr. Ainsworth.

MR. AINSWORTH:  Thank you, your Honor.

What they haven't produced is communications about the decision-making directing the purchase, directing the funding. For example, I would say one of these real estate entities, 11 Essex, the contract of purchase was signed before 11 Essex was signed.  Right?  So, 11 Essex saying I have got no documents or no communications would be one thing but they're not evening

L845gloC

saying that.  They're just saying we refuse to produce anything about any communication about that acquisition or about the funding.  And we are not asking for every single communication that they've ever had with Razon, although if they had no affiliation with Razon there would be no communications.  So, this idea that they're separate from him is a sham and that's why we are asking for the communications, to point that out.

THE COURT:  Maybe I misunderstand the parties' positions.  I was not under the understanding that the real estate entities are taking the position that they were separate from Razon but, rather, that these were entities that were established for a particular purpose which is a legitimate purpose.

Ms. Fissell, is that not correct?

MS. FISSELL:  So, I think it is a little bit nuanced and I think the answer can be found in the RFA responses.  They served 18 to 19 RFAs on each of the real estate entities.  We undertook to answer all of them.  They weren't really proper RFAs in that they went to the heart of the issues but we offered explanations almost as if they were interrogatories explaining that as to Asia Arrow, which is one of the real estate entities that Mr. Razon is sole director of that entity, it owns the largest real estate asset of all of the properties by a lot; that he made the division to form that entity, he made the decision to acquire that property, and he is the sole

L845gloC

director of that property.

As to the other real estate entities, the director is Mrs. Razon, Mr. Razon's wife -- sorry, the member of the LLCs is Mrs. Razon, and we explained that she formed those entities with Mr. Razon's knowledge and support.  We explained that she made the decision regarding the acquisitions of the properties that each of the entities owns as to, meaning that she picked the properties that Mr. Razon makes decisions regarding their construction, there is a day-to-day manager of each of those properties.  To the extent they have the purchase and sale agreement, and I think in some cases maybe Mrs. Razon signs them and, according to Mr. Ainsworth, in other instances Mr. Razon signed them, they have, again, the bank transfers for all of those purchases and a good number of them were the funds went from Mr. Razon's bank accounts.  So, whatever arguments that they want to make regarding Mr. Razon's connection to those entities, they have every document they could possibly need on it.  It is not clear what they're hoping to find in some e-mail search of Mr. Razon's e-mails about them beyond what's already been admitted or provided in documents that they have.  It seems to just be burden for burden's sake and not for any case-specific purpose for them to support their claims.

MR. AINSWORTH:  So, your Honor --

THE COURT:  Yes, Mr. Ainsworth?

MR. AINSWORTH:  RFP -- request for production --

L845gloC

numbers 3 and 4 to Razon seek documents, communications concerning transfers between Razon and any of the entity defendants -- any of them -- of a value greater than $5,000. So, this is not all communications, it is communications concerning transfers to these entities that he is claiming are separate and if he is directing these funds to be paid, acquisitions to be made, that's relevant. That's what we're seeking. But, they're not willing to even look for those communications.

That's one example, your Honor. And I think it is pretty poignant for the veil piercing analysis.

THE COURT: I want to try to focus our attention here because of the broad scope of disputes here. Can we focus, for now, on the real estate entities? I understand that discovery as to Mr. Razon includes all the other entities as well but with respect to the real estate entities, so, you are looking for an e-mail that would say this window in our home broke and we need a new window and so take out $5,000 to pay for it.

Is that the type of e-mail you are looking for?

MR. AINSWORTH: No, your Honor. And I thank you for bringing that up because the hyperbole in their argument is ridiculous.

We seek investment information and loan information. So, once the money is in the company we are not asking how it is spent and whether reimbursements are done, we are asking for

L845gloC

investments made in the company and loans made to the company. I think it's highly unlikely that the company would go to Razon or to any investor or lender and say, hey, I need money to fix this window.  That's not what was going on.  Money went in to make acquisitions, money went in to fund operations, perhaps, but not to reimburse fixing the toilet or fixing the window.

THE COURT:  So if you have the bank records already that show the initial funds into the entity's accounts and any subsequent funds into the entity's accounts and the money that was withdrawn from those bank accounts in order to either acquire assets or manage the properties, why do you additionally need communications about that?

MR. AINSWORTH:  Well, let's start, your Honor, with the investment.  Money went into this company, and if Razon is the one directing it or Razon is saying, hey, transfer this to my wife, that sort of thing is going on, that shows his control as domination.  That's what we are talking about.  We are not asking how the company spent the money once it got it, we are asking about the investments made in the company.  Those are probably very few, from what I understand from what defendants point out to us, there are very few times when investments were made, they were telling us there were no loans so that takes that issue off the table, or at least they are saying there are no loans because it is not clear whether there were any loans.

THE COURT:  Could you, for example, review the bank

L845gloC

statements that you have received and if they identify investments or distributions to the entity accounts on three dates, for example, could you then ask for communications relating to those particular transactions?

MR. AINSWORTH:  I guess the short answer is that's what we have done, your Honor.  There is not that many investments made in the company and, in some instances, it might have been just one.  So, when with say give us communications regarding investments of the company, it's not a hundred transactions, it is one transaction.  So, we could go back and say, all right, give us communications about the investments made on this day but that is no different than what we have done and it just delays things which really is the goal here.

MS. FISSELL:  Your Honor?  Sorry.  I didn't mean to speak over Mr. Ainsworth.  This is Ms. Fissell again.

So, he says he wants these communications to establish that Mr. Razon was directing the acquisitions.  The funding information shows that in all but I believe two instances or possibly three instances, the funds went from a bank account to the funds to purchase the property -- if we are focused solely on the purchase of the properties -- the funds went from a bank account in Mr. Razon's name in all but three instances and we provided RFAs regarding this.  And then, in two instances, the money went from CICL, which is the Cayman --

L845gloC

THE COURT:  Ms. Fissell, you just cut out for a second.  In two instances --

MS. FISSELL:  I'm sorry.

In two instances, the money went from CICL, which is an entity which Mr. Razon is the sole director of, and in one instance the money went -- I'm sorry -- the money, we provided a bank statement for the entities and the money went from -- and it shows the money coming into that entity's bank account and then the money going out of that entity's bank account and the money, I believe, comes in from Mr. Razon or it could be from CICL and then it goes out of that bank account to the attorney trust account to purchase the asset.

They have all the information.  I am not sure why they're focused on the communications related to the real estate entities and the extent of Mr. Razon's control in terms of the purchase of those entities.  They have documents showing that the money came from Mr. Razon's bank account.  We produced that and we are not disputing that.  And we gave them the documents and they wanted us to answer RFAs on it so we went back and we answered the RFAs on this.  I'm not sure why we are still on this issue and why we are wasting the Court's time with this.

THE COURT:  Have you admitted in those RFAs that the funds for these entities and these assets came directly from Mr. Razon?

L845gloC

MS. FISSELL:  Yes, we did.  To the extent they came directly from him, we did.  And they have the documents themselves.

THE COURT:  OK.  Mr. Ainsworth, I don't see why you need to go back in for these communications.  It seems to me, based on the information you have, that you can establish what you seek to establish which is that Mr. Razon funded these accounts and funded these entities for the purposes of acquiring these assets.  To the extent there is further discovery to be done I think it would be to take a deposition.  But, I'm not sure I have heard a basis to justify compelling the real estate entities or Mr. Razon to canvass communications concerning these entities broadly.

MR. AINSWORTH:  Well, your Honor, if I could say one thing?  Again, we are not seeking a broad canvass, we are seeking communications concerning the investments.  The funding is not the same thing as control.  We issued requests for admissions asking them to admit its control and we got cagey answers.  He admits he owes 50-plus percent of the investments.  They are not admitting things that would take this out of the -- that would eliminate the need for this discovery.

THE COURT:  So what, specifically, do you need them to admit to?

MR. AINSWORTH:  That he is controlling these entities.  The issue is domination and control.  And, to the extent he is

L845gloC

saying his wife is the controlling member and the communications show otherwise, that would be important.

THE COURT:  So, with respect to those entities for which she is the sole member?  Is that what you are seeking?

MR. AINSWORTH:  Did you say she?  Or he?  It was a little blurred, your Honor.

THE COURT:  She.  I mean, when he is the sole member I assume he is controlling the decision, so you are suggesting that when she is the sole member it is really being controlled by Mr. Razon.

MR. AINSWORTH:  Yes, your Honor.  And if there is communications about making her the member, that's relevant.

MS. FISSELL:  Your Honor, if I may?

We are now getting back to he does want every e-mail about a broken window that needs to be fixed because if he wants to know how these entities are operated, I mean, they own one piece of real estate.  I mean, there is not much being operated other than, you know, the signing of a lease, fixing small things in apartments and so then we are getting into that request that he said he wasn't looking for just a few moments ago.

THE COURT:  What if we focus our search here for the formation of these entities and the decision to place Ms. Razon as the sole member?  Have you looked for those communications, Ms. Fissell.

L845gloC

MS. FISSELL:  No, we have not looked for those.

THE COURT:  OK.  So, I will direct that you look for communications related to the formation of these entities and specifically the decision to make Ms. Razon the sole member.

Mr. Ainsworth, let's move on.  Are there other issues related to Mr. Razon or his real estate entities?

MR. AINSWORTH:  Your Honor, I am going through the letter here real quick just to see what is worth highlighting now that you have made that ruling.

THE COURT:  I will say, with respect to the RFAs -- and this issue seems to come up occasionally -- I don't think it is appropriate for a defendant or for any party to answer an RFA by simply saying see somebody else's response.  RFAs can serve as admissions during a litigation and to the extent that an answer that isn't sort of confined to the responding parties' own knowledge, it has the potential down the road to create issues related to exactly the basis for the response.

So, to the extent any party has responded to an RFA by indicating that it is just incorporating somebody else's responses, those need to be amended and responses based on personal knowledge of the responding party need to be submitted.

MS. FISSELL:  Understood, your Honor.

THE COURT:  Mr. Ainsworth, anything else you would like to discuss?

L845gloC

MR. AINSWORTH:  As to the real estate entities, your Honor?  No.  Thank you.

THE COURT:  Let's move to the Collingwood entities. It seems like the definition with respect to Mr. Razon has been mooted so we can move on to that.

MR. AINSWORTH:  Your Honor, Kevin Ainsworth here.

Counsel's representation, I think, overstates the situation so it might not be a resolved issue.

THE COURT:  What is outstanding?

MR. AINSWORTH:  Our concern, your Honor, was that they limited their responses to instances where Razon was acting in his corporate capacity or official capacity and our position is if the company has documents in its possession, custody, or control, regardless of whatever capacity Razon is acting in, the company has got to produce it.  Now, the question came up at the meet and confer as to whether Razon -- is the company obligated to go to Razon and get everything Razon has and that is an issue, of course, in the company's possession, custody, or control, but I am trying to pull up counsel's letter here.

So, he says that we don't intend for the energy entities -- I am reading from the letter here -- representing that the plaintiff does not intend for the energy entities to produce in the care, custody, or control of Razon unrelated to the energy entities.  The point is if the company has those documents in its possession, custody, or control, the company

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L845gloC

has to produce them.  So, I don't want to get -- I'm not sure that this is an accurate representation of what we had discussed.  I don't think it is an accurate representation.

THE COURT:  So, can you state for me what your concern is with respect to how the Collingwood defendants may be responding to discovery?

MR. AINSWORTH:  So, Razon, in his responses, often says this is duplicative of a request to another entity which will provide documents, and then the Collingwood document responses say we are not giving you anything that Razon did in his personal capacity, we are only giving you what is what was done in his corporate capacity.  There is, potentially, a gap there which, eventually, we might figure out in a deposition but it seems a little ridiculous.  If they can say we will give you what we have got in our possession, custody, and control -- both of them -- there is no issue here.  But neither of them wants to say that.

THE COURT:  I will turn to --

MR. SEEL:  Corey Seel speaking on behalf of Collingwood.

I withdrew the objection that we have spent now a few minutes talking about so I will say it, that our responses are based upon the documents in the care, custody, or control of Collingwood.  I think I have made that clear in our multiple meet and confers with Mr. Ainsworth and his partner, and I made

L845gloC

it clear in the letter.  I withdrew the objection which I thought would have resolved this issue.

THE COURT:  So, to the extent you are responding to a discovery demand that says produce documents between you and Razon, you are not distinguishing between any potential corporate capacity or personal capacity; is that correct?

MR. SEEL:  Right.  I think if I understand your inquiry, yes.  We aren't -- if we have the documents in our care, custody, or control and we are agreeing to produce it, we are agreeing to produce it.  We are not suggesting what Mr. Ainsworth says, that we are not agreeing to produce things that are in our care, custody, or control.  That's not what we are doing here.

Now, we haven't discussed it but we haven't agreed -- Mr. Razon, in our instance, as opposed to the relates entities, for each of the Collingwood entities Mr. Razon is the president and at times the only sole director of the entities, sole director of Collingwood Investment Company Ltd. which is not a party to the motion to compel, he is the president of the underlying subsidiaries.  So, he is going to obviously have communications involving these, the company that he is the president of.  We are just not agreeing to do that type of broad search.  We have admitted that he has made the decisions in that regard.  We have provided I think it is about over $200 million worth of transactions over the course of several

L845gloC

years and if my math is correct in the documents I have produced I have provided, to plaintiff, a communication from Mr. Razon to the bank providing the transfer information for each of those transactions funded from Collingwood Investment Company Limited to the various third-parties that these assets or interests had been purchased.  I have provided to Mr. Ainsworth and the plaintiff the actual documents that form the basis for those transactions which were signed by Mr. Razon in whatever capacity he was acting as whether it be president or director, I have provided these documents for every dollar that has been spent towards these transactions and I haven't heard otherwise from the plaintiff.  And so --

THE COURT:  Just to put a fine point on it because this issue seems like it is not resolved, at least from the plaintiff's perspective, the initial issue, as I understood it, was a concern from plaintiff that you would be distinguishing between acts by Mr. Razon in his "corporate capacity" and acts by Mr. Razon in a "personal or individual capacity."  I am actually not even sure what those would be in the context of transactions with the Collingwood entities but I think Mr. Ainsworth is concerned that there is a subset of documents that reflect Mr. Razon's conduct in a "individual or personal capacity" and he wants to make sure that you are not excluding those documents from any production you might make.

MR. SEEL:  I'm not.  And under that description, what

L845gloC

I tried to explain to Mr. Ainsworth was that it is more of -- and I took the objection away but the objection was there, more of the reverse concern. I didn't want there to be an argument that Collingwood is in possession, custody or control of something just because Razon may have it, for instance, in a real estate entity. Just because -- his allegations want everything to flow up to Mr. Razon and then flow back down to all of these other entities. I didn't want to be in a position -- and I was told by Mr. Ainsworth and Mr. Dunn that's not what they were trying to do -- where I was under some obligation to go up the chain to Mr. Razon and back down some other chain, unrelated to the energy entities. And that's what I was trying to explain that I didn't want to have to do.

THE COURT: OK. Understood. I think everybody now appreciates what is being produced. It doesn't sound like there are documents that are being withheld because of some view that documents that Collingwood has reflect Razon's conduct in something other than a corporate capacity. And so, I think this issue can be put to rest but, Mr. Ainsworth, tell me if you still have a concern.

MR. AINSWORTH: As to that definition of Razon, your Honor, I don't have a concern now that he has said they're producing everything in their possession, custody, or control.

THE COURT: OK. All right. Good.

The next issue in Mr. Ainsworth's letter concerns

L845gloC

confidentiality.  I think there was a concern from the energy entities, the Collingwood entities about documents related to sort of commercial transactions that those entities are carrying out, the actual work of those entities and not necessarily sort of funding or corporate governance of those entities.  I think that's where this issue meets.

Mr. Ainsworth, is your objection that those documents are being produced under a confidentiality order or that they are refusing to produce documents that you think you are entitled to?

MR. AINSWORTH:  When I wrote this, your Honor, it was the latter, but I think I understood from counsel's letter that they've withdrawn that objection so it may be moot.

Am I correct, Mr. Seel?

MR. SEEL:  I have withdrawn the objection based upon confidentiality.  I have not withdrawn the objection that I think that I should have to produce those documents.  It is covered by some of these other requests and just the overly broad nature of it.  Yes, plaintiff's request, even to this day, seek the commercial negotiations and communications with third-parties leading up to the transactions in order -- for no valid reason but, yes.  And so I would, if ordered to go find those communications and produce them, they would include confidential seismic commercial data, lease negotiations, pricing that I would end up ultimately producing under the

L845gloC

confidentiality stipulated order at either an attorney's eyes only or confidential level. So, I had the objection, it was just a general objection, that these requests are so overly broad they seek this proprietary data that has no basis in the lawsuit. His response was, well, you have a protective order to protect you in that regard. OK. I do. So, I have taken out the confidentiality objection but not to the objection of just having to produce it, go through the burden of finding these communications and this data only to produce it under a protective order.

THE COURT: Well, let's start talking about some of the specific information that's being sought. I think documents, requests 2 and 4 are seeking information related to corporate governance and relationships between corporate entities as far as controlling interests. Have those documents been produced to your satisfaction, Mr. Ainsworth?

MR. AINSWORTH: Your Honor, they have produced some ownership and formation documents but, again, zero communications. It is the same issue with regard to communications, in each of these they've not been willing to search for any communications. So, to the extent Razon is directing the activities, the acquisitions, the transfers of funds, in this case the acquisition of the companies, those communications are relevant to showing not just his domination and control of these entities, your Honor, but tying the funds

L845gloC

back to the award debtors and tying his control over the group of companies.

THE COURT:  And so, I think all communications concerning all transactions is too broad and burdensome.  Is there a way for you to narrow the scope of your request to focus on an area where you think you might have some traction with your theory?  I mean, I assume you have received corporate minutes.  Have you received that already?

MR. SEEL:  Yes, your Honor.  He has received all corporate formation documents.

THE COURT:  This is Mr. Seel speaking?

MR. SEEL:  Yes, I'm sorry.  This is Corey Seel speaking.

He has received all the corporate formation or corporate formality documents that we have and all of the documents regarding any of the transactions related to the actual transactions including the funding of those transactions, including communications by Mr. Razon instructing the funds.  So, he continues to say we have not provided communications but that is just inaccurate.  We have provided Mr. Razon signed letters to the bank instructing the transfer of funds from Collingwood Investment Company Limited in this instance to the third-party transactions.  We have also provided signed notes, promissory notes between Collingwood Investment Company Limited on the one hand being the lender,

L845gloC

and the subsidiaries that took loans from that entity signed by Mr. Razon.  We have produced all of the stuff.

I don't know what fact is in dispute as it relates to Mr. Razon making the decision.  We have admitted he made the decisions to form these companies.  These were special purpose vehicles, it is undisputed these are special purpose vehicles created for these transactions, and after that point in time they continued operating those transactions and he was the president and/or director or manager, whatever, we have got LLCs and we have corporations of each of those entities.  I haven't been told what is missing from this link other than saying I want all communications that exist.  They have now said prior to the transactions as if that limits it at all.

THE COURT:  Mr. Ainsworth, are you looking for operational communications?  Let's go ahead -- and I don't know exactly what the companies do -- dig for oil in this region and send the digging machine out?  Is that the type of communications that you are seeking?

MR. AINSWORTH:  No, your Honor.  And counsel said he produced minutes but I don't believe we have seen any so I am leaving that as something we can follow up on but we had defined transactions to be narrow.  It is the acquisition of these energy-related investments, it is not every transaction -- everything -- of the nature you described, your Honor.  These are major transactions.  And Razon's control is

L845gloC

one aspect but his use of BRHI, the award debtor's personnel to interact and act on his behalf in relation to the Collingwood entities and even real estate entities is relevant and that's where these communications come in.  If Razon is telling somebody at BRHI, hey, transfer the money over here to Collingwood for me, that's his use of one corporate assets for the benefit of another.  These are not separate entities.  And that's part of what we are trying to show with this veil piercing analysis, that these are not separate, independent corporate entities, he is treating them all as his pool of companies that he can transfer things around and direct personnel at one to do stuff for the other.

THE COURT:  OK.  Let me stop you for a second because that is, I think, a more narrowed and I think appropriate inquiry which is are there communications, for example, between the Collingwood entities and the BRHI entities.  That seems like an area where I think there is an appropriate question to see whether or not these seemingly separate entities are actually working in a more coordinated fashion but that, I think, is different than seeking sort of general business records within an entity.

MR. AINSWORTH:  Well, as to the coordination, your Honor, it really is Razon who is the CEO of the Collingwood entities or the lead person and he is directing activities -- he is involved with BRHI and Sureste.  It is not like somebody

L845gloC

else at Collingwood is coordinating with somebody at BRHI, it is Razon telling somebody at BRHI to do this and that for the Collingwood entities or the real estate entities. So, again, it comes down to Razon's communications really are key here. I don't even know, from what I have heard from counsel, that the Collingwood entities have a separate e-mail system. It sounds like it is all going to be Razon's one e-mail address.

THE COURT: Mr. Seel, have you searched for documents or communications that would, among the entities that you represent, to search for entities for other defendants, meaning have you searched for e-mails that, you know, refer to the real estate entities or the BRHI entities? Have you conducted that sort of a search?

MR. SEEL: No, your Honor. We have been faced with all communications involving Razon so that specific request hasn't been made. However, one of the things that, you know, this maybe brings us back full circle to where we started, is Mr. Ainsworth mentioned the use of e-mail and it is true, Collingwood does have its own server and does have its own e-mail address, but Mr. Razon may have his own e-mail that he uses for purposes of businesses unrelated to Collingwood. And so -- and we get back to this idea that as Collingwood -- it is sued in all different capacities -- as Collingwood, do I have to go to Razon and get all of his personal email because he happened to use his personal e-mail for businesses with

L845gloC

Collingwood?  And I don't think that that's under the care, custody, and control of Collingwood.  And so, to answer your question about Razon, no, I haven't.

THE COURT:  No, I am asking a different question.  I am asking for communications between or among Collingwood individuals, which may be Razon and may be somebody else, but we are looking for your business records, Collingwood entities, so that would not be searching Mr. Razon's personal e-mail address, for communications that reference either the real estate entities or the BRHI entities.  So, for instance, if there was an e-mail from Mr. Razon or anyone that said hey, Collingwood, I want to you speak with the folks at 11 Essex Street and make arrangements transfer funds from this account to that account, that would be a relevant document to produce.

MR. SEEL:  Your Honor, the answer is we have not searched for that.  That particular example could be, is just problematic only because we have produced all of the funds that were actually used.  So there was not -- this idea of transfers between the award debtors -- we have produced the document that says that that never happened.  He say that we have produced documents that show support of his complaint.  I don't know how he can say that at this point.  But, we have produced the documents showing the funds or this idea of where the transfers came from.  I know you were using that as an example, but we have not done the search for any reference to a co-defendant in

L845gloC

our e-mail system.

THE COURT:  Mr. Ainsworth, why is that not a better way to focus on your interest?  Right?  I think the problem here is that all communications with Mr. Razon, has the potential, as I understand it, to be incredibly broad and may not really focus on what your concern is.  But if your concern here is that Mr. Razon is cross-pollinating among these entities why wouldn't the better way to try and discover that be to search each defendant for communications that concern any of the other defendants and see whether or not these businesses are really operating at Mr. Razon's direction all for one interest?

MR. AINSWORTH:  I appreciate the narrowing, your Honor, it is helpful, and in some instances we have issued requests like that and they have been stonewalled as well but we can come to those separately.

That narrowing is helpful.  The trouble is, as I think Mr. Seel expressed, Mr. Razon used -- my understanding is used one e-mail address for all of his business.  And so, he is conducting one e-mail address and he is directing somebody at BRHI to do something for the benefit of Collingwood, that may not show up on Collingwood's server.  That's a concern and why we have issued requests to Mr. Razon as well.

But, to the extent Collingwood's servers show communications with BRHI personnel or personnel, Mr. Paiumo,

L845gloC

for example, who is involved with the real estate entities, that's relevant and that's a good search to be conducted.

THE COURT:  It seems to me that if you are getting all of the corporate records, you are getting all of the financial records that show funds in and funds out, and now we add to that communications about other defendant entities, that that should be at least a good road map to see whether or not there is a there there.

MR. AINSWORTH:  Yes, your Honor.  That would be helpful information to help plan for the discovery.  I understand your point.  Then decide whether or not further discovery would be fruitful.

THE COURT:  Right.  Because I think, generally speaking, what the defendants have been saying is either we have produced all of this during arbitration and so we shouldn't be required to go back and do another full search, or what is being sought is so broad that it would be incredibly burdensome.  And if the reality is, if that is in fact true, you are not going to want those documents either.  Often times the party wants broad discovery demands and then complains when the dump happens.

So, I think what we should do, and my intention today, is to allow the parties to do a little bit more work, again, it seemed to me based on my review of these letters that there were documents that were agreed to be produced but maybe hadn't

L845gloC

been produced.  To the extent Mr. Ainsworth hasn't had an opportunity to review all of the production, for instance I have heard today that things like corporate minutes have been produced but you haven't seen them, maybe that's because you haven't had an opportunity to review them.

MR. AINSWORTH:  It has been a very small production, your Honor.

THE COURT:  OK.  So, I would like us to be moving in a way that will allow the Court to better understand where we think potentially relevant documents lie.

MR. AINSWORTH:  Your Honor, I don't want to disagree with you with that at all.  I want to explain the tension that is perhaps driving some of this.

When we met with Judge Schofield for the case management plan we, the plaintiff, asked for a one-year discovery window.  Defendants' position was this is a simple case, four months is enough.  And Judge Schofield gave us five. We are now three months into it and we have got 170 documents from the Collingwood entities and a hundred something from the real estate entities and Razon together that weren't produced at the arbitration, new stuff.  My point is, we had to jump early and fast because of the short window here.  I welcome the idea of trying to work through and narrow things given time but, right now, discovery closes in two months and that's a concern.  So, if we got documents next week we are still

L845gloC

negotiating over additional productions and the like.  And I just bring this up I guess in the notion that if we got more time this would all be easier for everybody.

THE COURT:  OK.  Well, discovery has been referred to me so if the parties need more time you can come back to me for that.  What I would like is to everybody really zero in on the areas where we think there is the greatest likelihood of responsive documents and that's why I think getting some additional documents that I have been discussing today is appropriate and then to have the parties check back in with me in a couple of weeks and see where things stand.

MR. AINSWORTH:  Thank you, your Honor.

THE COURT:  All right.

Mr. Ainsworth, are there other categories that you want to talk to me about with respect to the Collingwood defendants?

MR. AINSWORTH:  No. 5 in my letter, on page 4 is one of the narrowed requests that you suggested, documents concerning Estella Puason-Occena.

THE COURT:  Spelled capital P-U-A-S-O-N, O-C-C-E-N-A.

MR. AINSWORTH:  Thank you, your Honor; and the first name is E-S-T-E-L-L-A.

In response counsel argued, they've admitted that she's acting as CFO for one of the Collingwood entities so this is essentially moot.  I think they said it is undisputed but

L845gloC

they have not produced any agreement for her to act in that capacity. It is not undisputed. Her role is an issue here. She is tied to the debtor defendants and BRC which owns the debtor defendants. And to the extent she is doing things for the Collingwood entities acting for them, that's relevant to the veil piercing analysis. So, her agreement, if there is one should be produced, and the communications with her should be produced.

THE COURT: When you say "agreement" you mean a work agreement? Employment agreement?

MR. AINSWORTH: Yes, your Honor. Thank you.

THE COURT: I understand that the Collingwood entities say that she is the Chief Financial Officer of CICL. Can you tell me -- and you indicate that she also is affiliated with the debtor defendants. In what capacity is she affiliated with them?

MR. AINSWORTH: Your Honor, I will ask Joe Dunn to answer that question.

MR. DUNN: Good afternoon, your Honor. Joseph Dunn.

She is the CFO for the award debtors and she is also affiliated with a number of other entities in Mr. Razon's enterprise including ICTSI, the port company that he runs out of the Philippines. So, she is someone that shows up across numerous entities in his enterprise but has been most prominent with respect to the Bloomberry entities that are subject of the

L845gloC

arbitration award.

THE COURT:  OK.  And so what document are you seeking from the Collingwood entities in connection with her?  The demand is all documents and communications concerning her. That seems very broad.  What are you actually looking for?

MR. AINSWORTH:  Certainly her employment agreement if there is one, your Honor.

THE COURT:  That seems easy.

MR. DUNN:  Your Honor, if I may?  This Joseph Dunn again.

One thing I want to point out that is relevant to your question is that the allegations in our first amended complaint, which are supported by a number of documents that we have obtained and that all the defendants have in discovery from a third-party witness reflect that these transactions being undertaken by the Collingwood defendants, where Mr. Razon was acquiring oil and gas assets in the United States, were all being facilitated, negotiated, and consummated, ultimately, by the award debtor personnel including Ms. Occena, and others, and that Ms. Occena and other Bloomberry personnel are listed as signatories on the bank account for the Collingwood entities, there is multiple correspondence with Ms. Occena and other Bloomberry personnel using their Bloomberry and Soler e-mail accounts.

So, just to kind of give you a sense, the theory that

L845gloC

is articulated in our first amended complaint is that these are all Razon personal assets in these Collingwood entities and he has effectually picked and choosed (sic) and just used these operatives across his enterprise and used them, co-mingled the resources, co-mingled the personnel, and our understanding from Collingwood in this case is that Ms. Occena serves as the CFO of Collingwood Cayman, the offshore parent company of these Collingwood entities.  And I will just note, as a side note, we have requested that employment agreement and the documents relating to her appointment and they have refused to produce them.  But, our understanding is she is not employed by any of the Collingwood entities.  And, in fact, all of the e-mail correspondence that we were able to obtain through a third-party thus far reflected that she was e-mailing from Bloomberry and operating from the Bloomberry offices, the award debtors in the Philippines.

So, there is a fairly wide scope of relevant documents relating to Ms. Occena and we are happy to try to narrow it but the reality is any work that she was doing for these Collingwood entities by whom she is not employed and that she is doing from the Bloomberry premises on their e-mail accounts, etc., is going to be relevant to our alter ego case.

And I will just finally note that we have asked for documents from BRHI and Sureste, the Bloomberry entities, for communications and documents relating to these personal

L845gloC

investments by Mr. Razon and the Collingwood entities that are in their possession, custody, or control and they have refused to produce those.  So, we are getting this kind of everyone is pointing the fingers at someone else and saying, well, this doesn't relate to me, but the reality is what is reflected in the evidence, what is reflected in our detailed allegations is that this was all just operated as one enterprise with various operatives and personnel working across all of these entities. So, it is difficult, we can certainly narrow it down, but the actual scope of relevance is actually much broader.

THE COURT:  Thank you.

MR. SEEL:  Your Honor, Corey Seel.

I let these guys talk and they sometimes misrepresent so I just want to have a brief opportunity to respond.  First to Mr. Dunn's point that we have refused Collingwood Cayman, as they call it, CICL is what I refer to it -- it doesn't really matter for purposes of today what we call it -- but we haven't refused to produce any -- we are not even subject to this motion, CICL, but we haven't produced to any documents regarding an employment agreement.  It just doesn't exist. But, instead, we have provided them details as to how much she was being paid by CICL.  She serves as the Chief Financial Officer of CICL.  CICL is the holding company for the Collingwood energy entities.  Of course she is providing services for these entities.  There is no dispute about that

L845gloC

and that's --

THE COURT:  She doesn't have an employment agreement?

MR. SEEL:  There is not a written employment agreement.  There is obviously an agreement to be paid because she is being paid by CICL.

THE COURT:  And that's an oral agreement?

MR. SEEL:  An oral agreement, yes, as far as I'm aware of.  There is not a written agreement that outlines her compensation other than that that's what they've been acting under, is -- I think it was $3,000 a month or $1,500 a month, don't quote me on that.  But we have put that in our discovery responses --

THE COURT:  We are quoting you, that's why we have a court reporter here.

MR. SEEL:  I know.  I appreciate that.  But I don't remember the exact amount but the point being we put that in our response to these folks.  And so, to just suggest that we have refused to provide information on that is just inaccurate.

But, yes, she is the CFO for CICL which her services then obviously would flow down to these closely-held companies on these -- these aren't Exxons and Shells where we have separate chief financial officers for every potential subsidiary.  She is acting as, in some respect, the CFO for all of the entities below whether or not there is -- Mr. Dunn uses the term "employed by."  I don't think she is employed by the

L845gloC

debtor defendants.  I don't think there is an employment agreement between the debtor defendants.  So, I don't know that she is employed by the debtor defendants.  I don't represent the debtor defendants.  I don't think she is employed by them as they have suggested.

And so, what they've essentially requested, similar to Mr. Razon, is all documents that may relate to somebody that's undoubtedly serving as an agent or officer of the companies and I just think it is overly broad.

THE COURT:  Well, I think the parties need to meet and confer here to come up with a response but I do think discovery into Ms. Occena is appropriate.  Certainly to the extent there is any document that reflects the scope of her employment and authority, I think those types of communications or documents need to be produced.  Even if these are closely-held companies, if she has the title of CFO for the Collingwood -- at least for CICL but as also simultaneously carrying out business transactions for the debtor entities, then I think there is a legitimate basis for discovery here into the scope of her work and how she is serving potentially two masters, or not, as the plaintiffs might allege.  And so, I am going to order that there be discovery into her work and I will direct that the parties meet and confer and try to work on appropriate search terms that include not just the nature and scope of her employment but also documents that the plaintiff I think is

L845gloC

entitled to pursue, or I should say lines of discovery that the plaintiff is entitled to pursue to reflect or reveal how this individual is sort of mixing her work and working on multiple entities which may be relevant to the plaintiff's veil piercing theories.

Anything further with respect to Collingwood, Mr. Ainsworth or Mr. Dunn?

MR. AINSWORTH:  Your Honor, Kevin Ainsworth here.

So, the next paragraph in my letter, paragraph 6, refers to request nos. 15 and 16.  Those relate to, again, very similar to the request with regard to Ms. Puason Occena, these relate to communications regarding Gerard Festin, F-E-S-T-I-N, and Fritz Lacap, L-A-C-A-P, who both have high-level positions in Bloomberry and were interacting with -- acting for some of the Collingwood entities.  And so we want, again, just communications regarding their roles and what they were doing with Collingwood and the intermingling or co-mingling of personnel.

THE COURT:  I am inclined to allow my ruling with respect to Puason Occena to apply to these two individuals but I will hear from Mr. Seel first.

MR. SEEL:  And I respect that, your Honor.  I think that here the plaintiff is further blurring the lines.  How much do they not have to allege in order to actually get this discovery here?  These folks are not employed by the debtor

L845gloC

defendants, to my knowledge.  They're not employed by them.  And that's what the allegation in this case is, is that the debtor defendant's resources are being used to the benefit of the other co-defendants.  But these aren't employees of the debtor defendants, they're not employees of those folks or employees of Mr. Razon personally if they think that the debtor defendants are the alter ego of Mr. Razon.  So, what is the next request?  Anybody else that potentially works for some other company that's not a debtor defendant that may interact with Collingwood is -- where else does this go if we start allowing it to be broader when they're not even the debtor defendant employees.

THE COURT:  At least Mr. Ainsworth's letter to me reflects that these two individuals hold high-level positions in the Bloomberry companies.

MR. SEEL:  He is intentionally vague about that.  He is intentionally broad.  He is not saying that they hold high-level positions in the debtor defendants and I don't think he is going to represent that to the Court.

MR. AINSWORTH:  Your Honor, they are employees of the parent company of the debtor companies, right, so it is part of Razon's domination and control of this whole group.  And the fact is I'm certain we are going to see their involvement in the debtor defendants as well as Collingwood and so it is highly relevant to Razon's use of the resources of various

L845gloC

companies for each other.

THE COURT:  OK.  I'm going to allow discovery into these two individuals.  It is 1:20, I have a conference coming up in another matter so I am going to need to wind up here. Let's try and move as quickly as we can through any other outstanding issues with respect to Collingwood.

Anything else, Mr. Ainsworth, you want to address?

MR. AINSWORTH:  Your Honor, so I am looking at the last two paragraphs of the letter and they both deal with the -- what we talked about earlier, transactions.  And our concern wasn't every transaction the company did but we had defined transactions fairly narrowly and we wanted communications regarding those transactions.  We are not seeking the confidential seismic reports that counsel has suggested we are seeking.  What we are seeking is communications regarding Razon's exercise and control, direction of the investments, his use of various personnel to engage in these transactions.

THE COURT:  So, how are you narrowing this request? What are you seeking?

MR. AINSWORTH:  One second, your Honor?

I think if we, your Honor, can work with counsel as you had suggested on communications between Collingwood and the other personnel of the other entities, that may narrow this.

THE COURT:  OK.  Good.  Let's do that.

L845gloC

Let me turn now to ECF 109 which is plaintiff's motion to compel the BHRI and SPI entities.

MR. AINSWORTH:  Your Honor, given that we have a very short window, I would like to jump to the last paragraph which is 35 and 36.

THE COURT:  OK.

MR. AINSWORTH:  What this is asking, what we had sought from defendants -- BRHI and Sureste -- is documents in their possession, custody, or control relevant to the real estate entities for Collingwood.  There is really no reason for the documents to be at BRHI and Sureste if they are independent entities.  The fact that they have those documents shows the co-mingling of resources.  And so, I think it is highly relevant, it is not a burdensome request, a burdensome issue. They should do the search and produce those documents.

THE COURT:  This is essentially what I had suggested previously.

Mr. Perry?

MR. LOWE:  Your Honor, this is Brett Lowe.

THE COURT:  I'm sorry.  Mr. Lowe.

MR. LOWE:  Yes; on behalf of Bloomberry.

I think that's, just as an initial point, I think as mentioned previously with Mr. Razon and Ms. Occena, they use similar e-mail addresses for the all the work they do, Razon is and ICTSI e-mail address.  So whether that, and all of his

L845gloC

e-mails from his ICTSI address are in Bloomberry's possession, I don't know if that's really a fair characterization to the extent that that's the case. But I think, as your Honor just mentioned, I think that all of this is really kind of covered by the ruling that you just made.

THE COURT: OK. So, I think you should go through your documents and seek out communications that involve any of the other defendant entities.

Good. Mr. Ainsworth, anything else you want to focus on?

MS. FISSELL: Hold on? Your Honor, this is Ms. Fissell.

THE COURT: Yes.

MS. FISSELL: Just on that last ruling with respect to Mr. Razon's e-mails, what I understand you to be saying is that we should search Mr. Razon's e-mails for the categories of documents that you have ordered with respect to the entity defendants. So, you know, with respect to Mr. Razon's e-mails, I think we agreed we are not searching for e-mails about broken windows at the real estate entities but we are searching for e-mails related to the formation of those entities. I just want to clarify that what you just said with respect to Mr. Razon's e-mails is not any broader than your more specific rulings that you made earlier on the call.

THE COURT: I think with Mr. Razon it is more

L845gloC

complicated because he is the common element of all of these entities so, presumably, his e-mail is going to have communications about all of this.  I think that the focus right now is going to be with respect to the other entities who are saying we are separate and not a co-mingled entity.  And so, I think the plaintiffs are entitled to search for documents that might reveal that these entities are more either closely held or operating with a common interest in a way that might suggest that they are corporations whose assets can be attached for purposes of the award.

All right.  Let me go through quickly here. Mr. Ainsworth, there was an objection with respect to the date by which the BRHI defendants were searching for documents.

Maybe I will turn to Mr. Lowe.  Is that still an outstanding dispute?

MR. LOWE:  I think it is kind of a non-issue.  In each of our responses we have indicated the date ranges for which we are producing documents so it's really kind of a non-issue. The date was basically a boilerplate objection that to the extent that we don't say otherwise, the relevant date would be the termination of the MSA.  But really, at this point, it really doesn't make a difference because we have indicated, for all of the specific requests, the dates for which documents are being produced.

THE COURT:  I'm not sure that moots out the objection.

L845gloC

As I understand from Mr. Ainsworth's letter, the concern is that you are searching for documents from the date of the termination, September 12, 2013, and refusing to search for documents at around the time that the MSA was negotiated in early 2001 and then moving forward.

MR. LOWE:  That's not correct, your Honor, and our specific responses and objections where we indicated we will search for and produce documents, we provide the time frame that we re doing that.  Many of those time frames are starting at the time that the MSA was executed so, like, years before -- years before the termination of the MSA.  I mean, it may be just simpler if we just withdraw that general objection.  It is really kind of an inequitable point at this point because of all of our specific objections and our specific responses provide the specific date ranges for which we are going to produce documents including our offers to produce additional documents that we made after submitting our responses and objections.

THE COURT:  OK.  All right.  Well, I will assume that that issue then is resolved and, if not, you can come back to me.

Mr. Ainsworth, anything else you want to focus on?

MR. AINSWORTH:  No, your Honor; just to respond what he said.  If he is withdrawing the general objection, we are fine, but their responses do not all give a date range and

L845gloC

that's why we raised it.  So if he is withdrawing it, the issue is moot, but --

THE COURT:  OK.  I understand Mr. Lowe to be saying the objection is then withdrawn.

MR. LOWE:  And, your Honor, this is Mr. Lowe again.

I have asked counsel if there is any specific request for which they don't know what date range is and they haven't identified that.  If there is an issue, if they don't know, I am happy to provide that information.  So, presumably we can address this amongst counsel.

THE COURT:  OK.  Good.

MR. AINSWORTH:  Kevin Ainsworth again here, your Honor.

With regard to paragraph 2 in my letter, request nos. 2 and 3, the response, essentially, is we gave you everything in arbitration, we are not searching for anything else responsive to these requests.  And, the issues here are different so there is an obligation to search.  I'm not saying they have to reproduce everything they have produced in the arbitration, they have to do everything they did in the arbitration to search for documents, but there are different issues and if they have got documents in their possession, custody or control, for example, regarding contacts with New York which relate to the jurisdiction issue, they've got to produce these.  They can't say, You should have them.  I

L845gloC

shouldn't have to guess what they're talking about. It is simple. And this is kind of a common theme through all of the responses for all of the defendants. They won't say what they're withholding or whether they're withholding anything and leaving us to guess what the objection means.

THE COURT: All right. Mr. Lowe, I am inclined to agree with Mr. Ainsworth here, both on the general proposition that all defendants need to be very clear what they are producing and what they are withholding if they're asserting objections. The federal rules have been modernized over the years and that is a requirement of a party responding to discovery. So, I agree that objecting and not being clear about whether anything is being withheld is not permissible and I also think that there is a lack of clarity here with respect to what was produced previously and whether there are areas here, based on requests 2 and 3, that should be responded to.

I will note that Mr. Lowe's response letter says that they're prepared to continue negotiations and try and come up with some targeted searches and that offer was unrequited. So, I wonder whether or not the parties should have a conversation with the understanding that I am inclined to direct the defendants to respond to this category of discovery and see if the parties can work together to come up with the best way to search for those documents.

MR. LOWE: Your Honor, this is Mr. Lowe again.

L845gloC

I think the real issue here is many of these requests that they made to us are literally, word-for-word, verbatim to what they requested in the arbitration.  We searched the documents of, I think, twenty-something custodians and produced thousands of documents in response to those requests.  And so, it is just unduly burden some and not proportional now to ask us to go back and do that again.  I think the issue here is that GGP is asking us to affirm that we have produced everything.  The problem here is, with respect to requests 2 and 3, for example, they seek documents regarding the negotiation of the MSA, which is verbatim what we searched for and already produced in the arbitration, and they also seek documents regarding the performance of the MSA which this particular component of the request is so vague and overbroad that it would really be impossible for Bloomberry to search for and produce responsive documents to that which is why GGP didn't make such a vague and broad request in the arbitration. What GGP did in the arbitration is made specific requests, for example, and these are requests that we put in our responsive objections flagging that they've already requested and we have already produced documents in response to.  But, for example, they sought documents discussing the development --

THE COURT:  Sorry.  Mr. Lowe, you need to speak more slowly.

MR. LOWE:  Sorry, your Honor.

L845gloC

So, what I was saying is, in the arbitration they sought specific documents regarding the performance of the MSA that we could actually search for and produce, such as --

THE COURT:  That word, just for the court reporter, is MSA.  Just so the court reporter understands it is M, as in Mary; S, as in Sam; A, as in agreement.

MR. LOWE:  Yes.  And, sorry.  I will try to go more slowly, your Honor.

But, for example, they requested the specific documents such as documents discussing the development and implementation of business plans, strategic plans, and financial plans for Soler.  And we produced those documents. They sought documents discussing the approval and implementation of operating policies, systems, and procedures for Soler.  We searched for and produced those documents.  And in trying to negotiate with GGP we said, you know, tell us if there is specific requests that would you like us to search for and produce and they just stonewalled.  We didn't receive any kind of specific requests or anything that we could actually search for.  And that's been their position to this day.

And so, we have already undertaken extensive time and effort producing thousands of documents, searching dozens -- 10, 20 custodians.  Those productions were done, they were made, and now they're basically asking us to redo the same thing and have us try to figure out what they're missing.  And

L845gloC

we are trying to be helpful, we are trying to produce documents, but they haven't provided any kind of specificity of what they're actually searching for.  And a good example of this is the similar request they made with respect to the option shares.  They made those same exact requests in the arbitration.  We searched for and produced those documents. And they say that, well, some of the issues are different, for example, now they have an issue with Hans Sicat, and to the extent that Hans Sicat was involved in the option shares, those documents were searched for and produced.  We indicated we would be willing to conduct additional specific searches such for documents involving Sicat, they didn't agree and suggest that we make any of those specific searches.

So, we have already undertaken huge amounts of time and expense producing these documents and they're not willing to work us with and negotiate anything here.

THE COURT:  OK.  So, I'm going to direct that the parties work better together.  So, we have a situation where we have significant document productions from the arbitration. Both sides should be looking at those discovery demands from the arbitration and what was produced, to the extent the defendants here believe that request 2 in the litigation was similar to arbitration request X, Y, or Z, should indicate that the documents that were produced in the arbitration are responsive to the litigation requests, and that if there is

L845gloC

targeted additional discovery that is appropriate because the plaintiff believes that there is additional areas that were not covered by the arbitration, then the parties should work together to come up with focused searches that will reveal the types of documents that the plaintiff is seeking, whether those are communications with Mr. Sicat, which is spelled S-I-C-A-T, or any other area of discovery.

All right. I really am going to have to leave soon but I know that there is an outstanding issue about the flight manifests. Mr. Ainsworth, do you want to talk to me about why these are important?

MR. AINSWORTH: Your Honor, I am flipping through my letter here to see what we have got but, in essence, you have BRHI is leasing a plane that's owned by Razon through various entities, Eagle Flight -- I won't even say the other name because then I would have to spell it -- but other entities, and then Razon is using that plain or planes for personal and family business. It just shows use of corporate assets for first personal and other businesses. So, it goes directly to veil piercing analysis of co-mingling of assets.

We had offered to narrow the flight manifest to Razon's family and non-employees, right, so a family and friends kind of situation. We are not seeking all business flights but non-customers of BRHI and Sureste are relevant. And so, there is a protective order, it has two-tier

L845gloC

protection, it seems to me that the burden that the defendants are alleging is not that big.

THE COURT:  Why do you need to know about VIPs who are getting on this plane?

MR. AINSWORTH:  That's what I am saying.  We are not seeking customer information, your Honor.  We have agreed to narrow it to non-customer.  So, VIP, it depends on what you mean by VIP.  If it is a company customer that they're trying to woo, that's one thing.  If it is a friend of Razon's who happens to be a VIP because he is a politician or she is a politician, then that's a different story.  It depends on --

THE COURT:  Why is that relevant to this case?

MR. AINSWORTH:  Well, it shows --

THE COURT:  If Nancy Pelosi is getting a ride on the plane, why does that matter to your case?

MR. AINSWORTH:  It shows the use of corporate assets for his personal benefit, your Honor.  That's what we are getting at.  Or, for the benefit of his other companies.  It is just a co-mingling issue.

MS. FISSELL:  Your Honor, this is Ms. Fissell.

There are similar requests directed to Mr. Razon so I just want to respond to this point for a minute because there is also a huge amount of requests related to the entities that there is one entity that owns the plane and there is an entity that is a trustee of the plane and they have a ton of requests

L845gloC

related to the plane and the request of Mr. Razon that are way overbroad, way beyond travel manifests.

But, focusing on the travel manifest, the plaintiff, you know, there was a TRO early in this case in April where they sought to attach the plane that is leased to BRHI and that request was denied by Judge Schofield but in the motion papers for that, plaintiff attached a document showing that the BRHI lease began in December of 2013 and there is a paper that is in their motion papers so they know that. So, the complaint mostly refers to Mr. Razon using the plane between 2011 and 2013 and that was at a time period where the plane was his own and was not being leased to BRHI. So, his personal -- it can't go to Mr. Ainsworth's concern about the use of corporate property, it was his own plane, it was before he began leasing his plane to BRHI, and before he purchased a second plane which was in 2014 and which they also noted in the record and as they noted on the record testimony from Mr. Ainsworth's partner, that the G450 plane that is leased to BRHI only came to the United States twice since 2014; it was once for maintenance and the one time that Mr. Razon used it in March of 2021, which is when they tried to attach it when it was in the United States. And, as they know, and as was stated on the record, it was because Mr. Razon's pilot for his G650 plane had COVID and so he used the BRHI plane to come to the United States. And he has admitted that he has, on occasion, used the plane. But

L845gloC

beyond the occasional use of the plane they don't need travel manifests.  It is a clear fishing expedition.  He is looking to see if he has ever -- it hasn't been used in the United States so he thinks there might be some evidence that somewhere in Asia -- it is just fishing -- that Mr. Razon took some dignitary from the Philippines to somewhere else in Asia?  On the plane that's leased to BRHI?  It is just -- it is really beyond anything that's necessary for this lawsuit.

MR. AINSWORTH:  Your Honor, may I respond?

THE COURT:  Yes.

MR. AINSWORTH:  OK.  Kevin Ainsworth here.

A couple points.  One, I think earlier I said we weren't looking for employee information, I meant to say customer information.  The fact is if they're flying employees to New York, that's relevant to jurisdiction.  If they're flying employees to Texas to do work with Collingwood, that's relevant to the veil piercing analysis.  If they're flying Razon's family to New York and to other places, whether it's in Asia or the United States, that's relevant to the veil piercing analysis and co-mingling of assets.  And the same as when they're flying other non-customer personnel.  It goes to his use of the corporate assets for his personal benefit.

THE COURT:  All right.  It seems to me that to the extent that the BRHI plane is being used for other defendants, for the use of other defendant entities, that that is relevant

L845gloC

for the reasons Mr. Ainsworth just said.  I don't know that the best way to resolve this is to go through flight manifests.  I just don't know how this is kept.  So, I'm going to authorize discovery that would reveal if any non-BRHI defendant entities used that plane as well as whether or not BRHI used the plane to conduct business in New York to the extent there is a personal jurisdiction challenge that is anticipated.  If that's not anticipated, then that discovery I think is unnecessary.  But I'm going to authorize that limited discovery but I will ask that the parties work together to come up with the best way to locate it.

MR. AINSWORTH:  Your Honor, thank you.  Your direction was referred to plane singular; there are two planes.  I understood that the argument applies to both.

THE COURT:  Well, if Mr. Razon has his own personal plane that he is using for all of his entities I don't know why that would be problematic.  If it is his plane and he controls all of these entities, then it would be normal that he would be using it for all purposes.

MR. DUNN:  Your Honor, this is Mr. Dunn on behalf of plaintiff.

Just to clarify, BRHI, I believe, has two planes and Mr. Razon I believe has a, what Ms. Fissell was referring to as his personal plane, I believe actually that's actually technically leased to ICTSI, one of his other entities.  But,

L845gloC

regardless, I think the G6 issue that she was referring to, that's not a BRHI plane.  So, we are not looking to expand your ruling to that plane, we are talking about the BRHI planes.

MS. FISSELL:  There is only one BRHI plane.  There is one plane that is leased to BRHI -- unless, Brett, you can correct me if I am wrong on that.

MR. LOWE:  I think that's right.  I'm only aware of the one.

THE COURT:  So, the parties should meet and confer on that.

I have another court conference so I'm going to have to go.  I am sure our court reporter, who has gone an hour and 45 minutes working non-stop, would like to take a break as well.

I know that there remain the motions that the defendant entities have submitted.  I may be able to address that in a written ruling.  If not, I will schedule oral argument later on with respect to those applications.

What I would like to do is to direct that the parties engage in a meet and confer that I have directed, produce those documents that I have ordered, and then contact the Court again to see where things stand.  Today is August 4th.  What if we set a status letter to be filed on August 20th, which will give you a little over two weeks to complete this process.  I think that should be sufficient.  Any objections to filing a status

L845gloC

letter before me with respect to the discovery we have been talking about today on August 20th?

MR. AINSWORTH:  Your Honor, Kevin Ainsworth here.

The date is fine.  We hadn't gotten into plaintiff's letter with regard to Razon and there was quite a number of requests at issue there.  I will work with Razon's counsel in the meantime to see if we can narrow those but I just want to highlight that that hasn't been addressed today.

THE COURT:  OK.  I thought we had discussed that in the context of the real estate entities as well but I will go over those letters.  Maybe in light of my rulings, with respect to other issues, that the parties can revisit some of the disputes that were raised in the letters and report back to me whether or not there has been a narrowing of any of the disputes vis-à-vis Mr. Razon.  I think that is probably the most efficient way to proceed.

All right.  Hearing no objections, I am going to order that the parties work together and provide a status letter to me on the 20th.  I would prefer that to e a joint letter, if possible, but I would rather get the information to me on the 20th and if there is going to be a lot of disputes and complications in filing a joint letter each entity -- I should say each group of entities can file their own letter.  If it is going to be individual letters, I would like them to be limited to three pages.  Ideally, you can file one joint letter which

L845gloC

can be slightly longer than three but shouldn't be much longer. And I will, in the meantime, look at some of the other issues we weren't able to get to in the hour and 45 minutes we have been able to get together.  All right?  So, I will look out for that letter on the 20th.

Thank you, everybody.  We are adjourned.

o0o