LBNCgloC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GLOBAL GAMING PHILIPPINES,
LLC,

                Plaintiff,

          v.                        21 Civ. 2655 (LGS) (SN)

ENRIQUE K. RAZON, JR. et al.,

                Defendants.

------------------------------x
                                    New York, N.Y.
                                    November 23, 2021
                                    3:00 p.m.

Before:

                    HON. SARAH NETBURN,

                                    Magistrate Judge

                         APPEARANCES

MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO PC
     Attorneys for Plaintiff
BY:  JOSEPH R. DUNN
     KEVIN N. AINSWORTH
     IRIS GREENQUIST

WALFISH & FISSELL PLLC
     Attorneys for Defendants Enrique K. Razon, Jr., Asia Arrow
     Ltd., 11 Essex Realty LLC, Bowery Bay LLC, Campanilla LLC,
     Ensara LLC, Fesara LLC, Nozar LLC, and Rizolina LLC
BY:  RACHEL P. FISSELL

MILBANK LLP
     Attorneys for Defendants Bloomberry Resorts and Hotels
     Inc. and Sureste Properties, Inc.
BY:  DANIEL M. PERRY

MEHAFFY WEBER PC
     Attorneys for Defendant Collingwood
BY:  COREY J. SEEL

                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

LBNCgloC

(Case called and appearances noted for the record)

THE COURT:  Good afternoon.  I hope everybody is well. I have a letter from yesterday suggesting that the conference for today remains necessary, so we are here.

The report, as I understand it, is that nonparty Mr. Alarilla has agreed to run certain searches.

With respect to nonparty Mr. Tan, he is still trying to figure out exactly what he can do.  It's not entirely clear, at least to me, what will be available.

Mr. Dunn, does that sound like where things stand?

MR. DUNN:  On that one issue, yes, your Honor.

First of all, I thank the Court for making time before the holiday.

We have made some progress, I believe, over the time period since the last time we were before your Honor on the 12th, but we do have what I see as five discrete issues that are still in dispute.  If it would be helpful, I'm happy to lay them out and we can take them in turn.

THE COURT:  Sure.

MR. DUNN:  If it would benefit the Court.

So, the first really relates to the results of the defendant's searches that your Honor directed after the last hearing.  The defendants reported that ICTSI and Solaire ran the searches, that plaintiff provided the 18 searches for each repository.  They provided the hit counts.

LBNCgloC

We understand the defendants have agreed to extract that data resulting from those searches to Milbank's relativity system where they can be deduped and reviewed for responsiveness. Other than with respect to two searches, over the results of two searches, but really three separate searches.

So plaintiff believes that those other search results should also be extracted so there can be reduplication and review for responsiveness. The defendants believe that number is too high still. So that's issue number 1, is whether those search results should be extracted and reviewed.

THE COURT: Sorry, just so I understand that issue, of the 18 string searches, some of those produced, in the defendants' views, too high a number and they don't think it should be processed?

MR. DUNN: Correct your Honor.

THE COURT: All right. Go ahead.

MR. DUNN: The second issue relates to the issue your Honor spoke of relating to Jose Alarilla and Silverio Tan.

With respect to Mr. Tan, because the defendants have informed us, as they informed the Court, that Mr. Alarilla will be searching his emails. So it's really with respect to Mr. Tan whether the defendants should be compelled to search and produce those documents.

Your Honor mentioned last time if we couldn't resolve

LBNCgloC

the issue, then perhaps a briefing schedule on the issue may be appropriate, to set a briefing schedule on that issue.  So that's issue number 2.

THE COURT:  Is he a lawyer, does he have a lawyer, or are one of the defendants' lawyers representing him?

MR. PERRY:  No, your Honor.  Mr. Tan is outside counsel for BRHI and SBI and a number of the other entities.  He's a lawyer.  He works for an outside law firm.  None of the lawyers at this table represent him and I don't understand him to be represented.  He's been taking direction from the chairperson of his firm and that's sort of how we've been interacting with him on this subject.

THE COURT:  Okay.  Thank you.  All right.  Third issue.

MR. DUNN:  Third issue is kind of a pointed issue, which is resuming document production and what goes along with that, maybe setting some timelines and deadlines.  At the last conference, your Honor issued, I guess, kind of a temporary stay of document production while the parties worked through these search term issues.  We believe that should be lifted. Document production should resume based on the search results that the parties have exchanged.

And relatedly, if your Honor recalls at the last conference, we spoke of a list of narrowed RFPs that plaintiff believes are still outstanding.  There is some dispute between

LBNCgloC

the parties as to whether there is some overlap between those RFPs and RFPs they've already responded to or the Court orders they've already responded to.  We believe there is a simple solution to that.  So that's issue number 3.

And then issue number 4 would be plaintiff's searches for documents responsive to certain RFPs propounded by Mr. Razon and the real estate entities.  Those are RFPs 5, 7, 8, and 12 that the Court had previously issued orders regarding Mr. Razon and the real estate entities' motion to compel.  The parties have gone back and forth on search terms.

I believe the dispute about what, if anything, needs to be done going forward needs to be narrowed to whether plaintiff needs to search a personal email address that the defendants have demanded.  And so that's issue number 4, your Honor.

And then issue number 5 is a dispute about the scope of the Court's directive at our last conference regarding the post-January 2014 discovery and, particularly, what plaintiff's obligations are with respect to post-2014 discovery.

Mr. Perry's clients, the defendants — BRHI and Sureste — are taking the position that your Honor effectively granted a motion to compel, but wasn't before the Court in our view.  And this was on an issue that had effectively been abandoned by these defendants back in June when this was first raised.

LBNCgloC

We believe that the Court issued a very specific directive to plaintiff, which was BRHI and Sureste, are going to give you three search terms, run the search terms, and improvise a hit list.  So that was the extent of your Honor's ruling.

So the issue is really one of plaintiffs seeking clarification or, if necessary, reconsideration of the directive at the last hearing, which we feel was clear, but there was obviously room for dispute because the defendants dispute that position.

So those are the five issues we see, your Honor.

THE COURT:  I know that this case concerns a multi hundred-million-dollar judgment.  You guys are going to spend that money in legal fees.  I've never had a case that litigates like this, and I have a lot of really big cases.  So I don't know what's happening in this case and, if necessary, I'm going to have you all come into the courthouse every week and I'll babysit, but that's what I sort of feel like I'm doing at this point.

So I'm not sure where the breakdown is happening and I'm not accusing anybody or calling anybody out.  I remember when I became a judge, one of my goods friends who's a lawyer said, I'm always so annoyed when the other side is misbehaving and the judge yells at both of us, what should I do and I said just behave.

LBNCgloC

It's frustrating from the Court's perspective, whoever is responsible or everybody is responsible, but it is sort of amazing to me where we are and I do think we're going to soon have the legal fees eclipse the judgment.

I'm going to tick off the ones that are easiest.

With respect to Mr. Tan, who's not present, so I'm not going to rule. I think that the answer is, if you would like to make an application, you should make your application. Obviously, you need to serve the nonparty and make sure that they receive it. He'll have to hire a lawyer or make an appearance or deal with the issue as any nonparty does. I assume you've subpoenaed him.

MR. DUNN: We have not, your Honor. Let me just make sure I'm more clear. Mr. Tan is a corporate officer of the defendants. Mr. Tan is the compliance officer for the Bloomberry entities. Mr. Tan performs services for these defendants and our position has been the emails that are in his account, through which he conducts the business of these defendants, are in the possession, custody, or control of these defendants, and that those emails should be searched and responsive emails produced as part of the defendants' production in this case.

So this is not a case where there is some unaffiliated third-party outside counsel that performs some random services on specific transactions. This is, if you look at the letter

LBNCgloC

that was submitted by his law firm, this is someone who provides a multitude of services for Mr. Razon in what he calls the Razon group of companies.  There is no question about Mr. Tan's involvement in these entities and his work for these entities.

The issue I think your Honor was highlighting was why so much difficulty in getting to the bottom of these issues, and obviously we're going to have different perspectives on that, but our perspective is there are lines being drawn around buckets of discovery in this case.

First it was all communications, we didn't get any communications.  Then there was specific types of communications and repositories of communications.  We've had to fight through each of those barriers to try to get to responsive communications, responsive documents.

The one that's been drawn around Mr. Tan is, well, he's technically working for an outside law firm, even though he holds these positions with the company, so we're not going to search his emails.  His law firm is going to say he's not going to search these emails, but we'll do limited searches on specific topics.

The answer here is we don't need searches to be run if Mr. Tan reviews his email account and turns over all of the responsive documents to the defendants, which presumably are either company property or they're client files.

LBNCgloC

So that's all that we've been seeking, is to make sure that responsive documents that are not duplicative and that are in the possession of Mr. Tan are turned over and produced by the defendants because it's part of their production. So it's really an issue of whether Mr. Tan --

THE COURT: It's an issue of custodians.

MR. DUNN: That's right.

THE COURT: Mr. Perry.

MR. PERRY: So, your Honor, I actually think Mr. Tan should be easy to deal with. Mr. Tan holds the title of secretary for a bunch of these corporate entities in the Philippines. Typically, the secretary is the lawyer that takes minutes and produces minutes at a board meeting. So he's not paid by the company as an employee, he doesn't have an email address with any of the Razon companies. His email address is his law firm, the Picazo law firm, and he's compensated for his time as an hourly lawyer charges for their time. So he's not in any sense an employee of my client or any of the defendant clients. He's a lawyer. He's an outside lawyer.

So Mr. Tan has agreed there are two potential categories of documents in the Picazo law firm. They have a server which is somewhat limited and which contains a variety of client files that have nothing to do with this case, and Mr. Tan has his own personal laptops which go back earlier in time than the server.

LBNCgloC

Mr. Tan has agreed to search his laptops for all documents, all communications with the Philippines stock exchange about the option shares and also all communications with Han Sacott (ph.) or anybody else about the option shares and Deutsche Bank.  I think that was the subject of 24 of the 36 requests, and one place in which there isn't likely to be a lot of privilege.  If he's discussing issues of core relevance to this case with an outside third party, Mr. Tan has agreed to conduct a manual review.

What we don't want here and what I don't think is appropriate is for Mr. Tan to be tasked with going through everything related to anything in the case because Mr. Tan is the primary outside counsel for the energy entities and BRHI and SBI, but I don't think he had anything to do with real estate, but those two, he's providing legal services.

We've not subpoenaed all the lawyers on their side that provided legal services because this is inevitably privileged material to the extent that there is communications with Mr. Achuan (ph.) or others that are not privileged in nature, they've already been produced.

But as to the specific options share issue that they've spent a lot of time on before your Honor, Mr. Tan has offered to go through and do a personal review of his laptops, including the old laptop.  So that's the Tan issue.

THE COURT:  Can I ask a technology question.  When you

LBNCgloC

say searching a laptop, does that mean searching your email?

MR. PERRY:  It's literally like me going into my Milbank account and sorting it by PSE or searching Sacott, things like that in order to bring up specific documents, because if he can't just turn over his email account to Milbank, for example, and I don't think they're asking him to, because he's got other clients.

THE COURT:  I'm trying to figure out what the distinction is between searching it on his laptop versus searching it on his desktop.  You seem to be --

MR. PERRY:  Same thing.  I think his laptop is his desktop.  He conducts his business on a laptop.  The one issue is he has an older laptop that has documents in addition to what would be on the Picazo server.

So the Picazo server cuts off in 2018.  He's basically said, I have a laptop that I used prior to '18 that I believe still has emails on it and I will search that dated laptop, as well.

THE COURT:  And how quickly can he do that?

MR. PERRY:  I think we should give him about 30 days. It's a manual review that he's going to do of seven years' worth of emails.  If it's just the option shares and the communications with DB, I'm confident that he will do that as quickly as possible and we can then take those documents and produce them and that should be it with the Tan issue.  If we

LBNCgloC

can have 30 days -- I don't control him.  I literally don't control him.  But if you give us 30 days, I think we could convince him to work in that time to review manually seven years' worth of emails.

THE COURT:  I think in the first instance before there is additional motion practice, which would likely take 30 days to run through anyway, that it makes sense to see what is produced, because it may be that you get everything that you want through this production or that you find a few things and you say, can you go back and look for this and you can have a meet and confer and agree on followup as opposed to having full-blown motion practice on whether or not the BRHI defendants control Mr. Tan, and if so or if not, and a subpoena to Mr. Tan, if not, et cetera.

It seems like the faster way to approach the problem is to accept, without prejudice, the production and see what it shows, and if it shows you something that you feel like justifies further litigation on the issue, then we can revisit it then.

MR. DUNN:  Your Honor, we will live with that for now.

Can I just make one request, because this is kind of that ring fencing that I was referring to in terms of a specific device for a specific period of time for a specific topic.

I think it would help going forward if we were given

LBNCgloC

more information and a detailed written explanation of what is on that device, what is being actually searched, because the description -- this is the first time I heard the description of the distinction between what is on the Picazo Law Firm server and what date ranges might be on other laptops and other devices.

I'll be honest, when I hear the term searching locally saved documents, I think of searching a device that's not connected to somewhere else. So when I pull up an Outlook program on my laptop, I pull it up and I can do searches in my Outlook, but that's because it's connected to another server that is storing the actual information. That's a distinction from just searching a locally saved set of documents that would be on a hard drive or on the desktop of the computer.

So, it would be helpful going forward, to the extent we have to have any motion practice, to have an explanation from Mr. Perry as to exactly what's on these locally stored laptops or whatever other devices there are as opposed to the timeframe that's actually stored on the law firm's server. That would be my request, your Honor.

THE COURT: I know what you're asking for, but I don't know exactly what form you would accept it in. I think we should just move forward with the production and you can ask questions about exactly the volume of documents that were there.

LBNCgloC

I asked the question about the difference between a laptop and a desktop at the office and I was told it was the same thing, so I assume it's connected to a server and it's not just the hard drive of the laptop. If the production suggests otherwise and you're only getting documents from 2021, then you'll learn that when the production comes and we'll revisit the issue. So I think we should just wait and see what is produced and go from there.

I want this produced before the holidays. So 30 days is December 23rd. I don't want there to be an argument, oh, we're moving to the holidays now and we need to push this over. So if that's the date that you want, I will give you until that date, but I don't want an application that says we didn't realize the 23rd was two days before Christmas.

MR. PERRY:  Totally understand, and with the caveat that I don't control Mr. Tan in a practical sense, yes, I ask for 30 days and we will get it done.

THE COURT:  Okay. Let's turn to topic number 1, which is the search report. I think I'm going to stick with you, Mr. Perry; is that correct?

MR. PERRY:  I believe Ms. Fissell is going to address this issue.

THE COURT:  Ms. Fissell. So, apparently, there are a few of the search strings that, in your view, produced too many hit reports. Nobody sent me any information on this, so I

LBNCgloC

don't know where we are on this particular issue.

MS. FISSELL: Yes, your Honor. So, I can give you the numbers, but if you'll permit me to just give a little intro on this, because I think it's really important to look at these search hits in the context of what they're looking for.

So, initially, you had given them 15 searches per ICTSI and Solaire, so that was a total of 30 searches, and they're mostly overlapping, but not identical. And then they asked for three more, so they had 36. Well, they asked for five more and you gave them three. They asked for five more on the option share.

So of their 36 searches that they had to give us, there was 24, maybe 26, depending on how you count it on the option share issue. So 12 of the 18 for ICTSI, 12 of the 18 for Solaire are solely on the issue of option shares.

So I just want to back up for a minute. I'm not going to go into detail like we did last time on the option share issue, but I just want to summarize the plaintiff's position on this issue.

What Mr. Dunn said at the last conference was, they need these documents to show, quote, "Mr. Razon's involvement after the stock raise in the continued conversion of these shares." That's at page 50, line 21 to 23 of the transcript from the November 12th hearing.

In other words, plaintiff's theory is that there is a

LBNCgloC

continuing conversion of the option shares by Mr. Razon because he's not gone to the Philippine courts and asked them to lift the court ordered injunction that keeps these option shares frozen.

So, I want to point out that this legal theory about the continued conversion is legally deficient.  There is a New York Court of Appeals -- I'll be brief.  There is a New York Court of Appeals decision from 1983, which we cited in our reply brief on the motion to dismiss, is that that makes clear the deficiency of this theory in the context of a statute of limitations defense, which we raised in our motion to dismiss. The case is *Sporn v. MCA Records, Inc.*, 58 N.Y.2d 482.

In *Sporn*, the Court of Appeals distinguished between trespass, a mere interference with plaintiff's property and conversion, the denial of plaintiff's rights to the property or possession of that property.

What *Sporn* explained is that the continuing wrong doctrine applies only to trespass and not to conversion.  What the Court said, a defendant hits plaintiff's horse repeatedly, plaintiff has a new cause of action upon striking, but if defendant destroys plaintiff's horse or takes it and claims it as its own, plaintiff's right accrues immediately and he must sue with the period of limitation measured from that date or never.

THE COURT:  The hypothetical is about beating a horse?

LBNCgloC

MS. FISSELL:  I know.  It's from 1983.  So to the extent that plaintiff is hanging its hat on all of these documents related to the option shares, on their continuing conversion theory, the Court should be aware this theory has no legs.  So the balancing of the need and the burden of searching for these documents is very excessive.  We're not asking for a ruling on that legal theory right now, but I want to go over the topics that Mr. Dunn said plaintiff wants done on these option shares.

At the last hearing, this is quoting again, "The communications from 2014 going forward by Mr. Razon relating to his exercise and control over the award debtors to keep the injunction in place or the facade of an injunction in place, refusal to follow the tribunal's directives and communications with Deutsche Bank, which is the custodian holder of the shares."  That's the transcript at page 50 lines 8 to 15.

As to those first two topics, Mr. Razon exercising control over the award debtors to keep the injunction in place and the refusal to follow the tribunal's directives, the odds of there being a nonprivileged email where Razon is directing someone to keep an injunction in place are extraordinarily low.  Still, we've agreed that we would review over 10,000 -- we've agreed to upload over 14,000 documents.  Almost all of them are on the option shares.  There is a little bit on some other topics which we can get to.

LBNCgloC

There is one search, search 6, that had combined from ICTSI and Solaire, had a combined of 26,871 hits. That search was searching for the words, the letters GG with an asterisk after it, and share with an asterisk after it. They also have other searches, because they used 12 of their 18 on option shares, they had other searches with GG and PSE that had smaller hits. They had searches with GG and bond, smaller hits. GG and injunction, smaller hits. But GG and share had this 26,000 hits and we're saying we shouldn't have to upload those and prove to them that there is obviously false hits in there.

THE COURT: When you say false hits, you mean they're going to be privileged documents?

MS. FISSELL: No, I think there is nothing related to the option shares in them at all. I think there is unlikely to be very many documents on this issue. There is a court ordered injunction, and so the odds of there being any nonprivileged communications after 2014 when the injunction went in place are just low, but we said we'll review thousands of documents on this and produce on those three topics that Mr. Dunn identified.

And I want to talk about this, also, in the context of what Mr. Dunn called issue 5, which is they've taken the position that they don't have to do any searching whatsoever on the option shares. Their position is, yes, you ordered us to

LBNCgloC

give you some hits, your Honor, but you don't actually want us to do it because it's not related to any defense of BRHI and SBI.

Now, I don't represent BRHI and SBI, but they're saying this is all related to the continuing conversion theory directed to Mr. Razon.  So to the extent it's related to that, then Mr. Razon is entitled to see what plaintiffs have done. He's entitled to argue that he's not the proximate cause of any injury they have from the continued conversion, assuming that was a viable theory, which we don't believe it is, but we were entitled to documents showing that plaintiff was delinquent in failing to have the injunction lifted and why plaintiff hasn't gone into the Philippines to get the injunction lifted.

Now, odds are those communications are going to be privileged just like Mr. Razon, but if they're going to take the position that Mr. Razon may be directing something related to the injunction, then he's entitled to see what they've done with respect to the injunction in defense of this continued conversion theory.  And they're saying we don't have to do anything at all, you have to produce these and you also have to, in addition to the 14,000 documents you've agreed to upload and look at, also these 26,000.  They've got 12 hits on option shares and one of them hit too many and we'll do the other ones.

THE COURT:  Why isn't the solution with respect GG and

LBNCgloC

share search just to add in some other qualifier to see if we can reduce the number of hits, whether it's but not a lawyer or and something else.

MS. FISSELL:  It has and not Milbank in it, and Milbank was its counsel.  So it is excluding Milbank and Milbank was its counsel in arbitration proceedings.  So it's unlikely -- I mean, we're happy to add another term in and see, but they kind of have done that because they did GG and injunction, GG and -- they did Global Gaming and share --

THE COURT:  So I gave them 18 for each server and I'm not going to give them 17 because one of them hits too high. So it seems to me the solution is to come up with some other limiting factor.  Maybe it's GG within four shares as opposed to and.  It seems to me that this is some sort of wordsmithing that the parties should be able to figure out so that the hit report is more in line with what you're seeing with the other proposals.

MS. FISSELL:  That's fine.

THE COURT:  Okay.  So you should just work with counsel to come up with some modification.

MS. FISSELL:  Can I talk about the other big hit we got?

THE COURT:  Sure.

MS. FISSELL:  So the other one that had 15,000 hits searched solely for srockenergy.com.  That is pulling up all

LBNCgloC

emails with Ahmad Atlan (ph,) and that all relates to the energy entity cross pollination issue, which we've already reviewed 20,000 documents on the energy cross pollination issue, and Mr. Atlan himself has produced 10,000 emails in this matter.

Unfortunately, we can't -- so we think those are probably actually real hits, like they are -- they're not like false hits where it's probably pulling up something weird.  But they already have 10,000 documents from Ahmad Atlan and we can't dedupe against -- we could dedupe against the 20,000 we already reviewed, I think, I can't say for sure, but as to against Mr. Atlan's production, we can't dedupe.  And we can't just say we won't -- it's only pulling up emails with Ahmad Atlan on them because it has his domain, his email domain. He's the only one who used it in this case as far as I'm aware of.  So, there is no way to -- I mean if they're looking for some -- if they want to add a term to that, we can see if that's something they're willing to do, but to the extent they want everything from Ahmad Atlan, again, it just seems excessive to redo that.  We're not drawing boxes around it, we're just asking to stop doing the same searches over and over again.

THE COURT:  Okay.  Any others?  I think Mr. Dunn said there were two or three.  Any others that are at issue?

MS. FISSELL:  So it was the two were the GG and

LBNCgloC

shares.  One for ITCSI, one for Solaire.  Both of those have like 12 and 15, and then the third one was the srockenergy.com one.

THE COURT:  So my same question that I had with the GGN share goes with the srockenergy.com.  Is there a way to add some sort of additional term so you can really focus on what matters?

MS. FISSELL:  I mean it's up -- yeah, I'd be happy to. I don't know if they'll limit it.  I don't know why they need it, so it's up to them to whether they can limit it.

THE COURT:  Can you work with Ms. Fissell to try and add an additional search term so we can get a more reasonable report?

MR. DUNN:  I can, your Honor.  I want to make sure we're talking about the same thing, because we're not saying turn over all of these documents.  If you recall, we talked about this last time, these two repositories, these are just raw, raw data, they haven't been deduplicated.  One of the repositories, Solaire, is comprised of a number of backup tapes that have been restored from archive.  So there is probably mass duplication in these numbers.

I understand what the Court is saying, that maybe there is some ways to limit it, but let's just take that last one as an example.

There is no question that the emails to and from this

LBNCgloC

email address that we included as our search term are relevant to the transactions that are talked about in the case. Their issue is whether there may be duplication. Their issue also may be that some of those may be privileged. All we're asking at this point, your Honor, is that they take those search results and upload them so they can use TAR software to get rid of duplicates and actually understand, okay, if there is a false positive, as Ms. Fissell suggests that there is, we know what it is because there has been no data dispute provided to us.

So all we're asking is, take the search results, put it on a platform where you can dedupe it against stuff you've already reviewed and produced. We're not trying to create extra burden, we're trying to make sure we have a complete picture as possible. That's it. We're happy if your Honor would prefer us try to narrow through additional searches. We can try to do that, work with counsel, but we're actually just asking them to use the resources that are available to them, which is the new platform they suggested they're going to extract all of the ownership data to and whittle that number down --

THE COURT:  Right.  The only problem is that if they plop these whatever it is, 40,000 hits between these three different collections into the system and it turns out they're not all duplicates, and so you've all of a sudden got all of

LBNCgloC

this volume, you're going to say, well, it's there, you should just search it for responsiveness and then we're talking about a huge volume of documents.

MR. DUNN:  If that is the case, I would be shocked beyond shocked, but I'm happy to whittle it down.  If they want to take the position -- we're not saying you have to produce all of that if they can't somehow figure out whether there are duplicates.  If they want to whittle it down and make sure that there are additional potential privileged issues that can be taken out of the equation, we can work with them on that, but we don't have any data to make those calls --

THE COURT:  Let me ask a question, Ms. Fissell --

MS. FISSELL:  Can I respond to the deduplication thing?  Sorry.  I'm sorry.

THE COURT:  Sure.  Go ahead.

MS. FISSELL:  So Mr. Dunn said it last time and today that these hits are essentially overcounting documents, but we've done this a few times now where we've given them hit reports, exported -- we dedupe on exportation, we dedupe when it hits Milbank's servers, and I can tell you it expands because hits are only giving you a hit.  So if there is one email and five attachments, it's counting it once, because if the hit only hits on the emails -- so S Rock Energy, that's only going to be pulling up emails, but there could be ten attachments to all these emails.  There could be -- I mean,

LBNCgloC

some of these documents, the some that we've produced to them have had like 20 or 50 attachments.  So these expand on exportation.

So the notion that there is deduplication that cuts it down is not true.  These hits are undercounting what we would actually be exporting.  None of this is costless or timeless, and then applying software, then I have to have another negotiation with him about what's in, what I'm going to do, what's a reasonable number of hits and we'll just -- it's just ongoing and ongoing.

And Ahmad Atlan produced 10,000 emails, and that is what they're looking for.  S Rock Energy is Ahmad Atlan's emails.  He produced 10,000 emails in this case.  We also produced our own emails, many of which included Mr. Atlan.  So it's kind of baffling why we need to keep doing this particular search.

THE COURT:  If you were to take all the documents that are generated on the hit report and throw them into relativity to see and play out that deduplication process, you said that there is time and money associated with that.

Can you just explain that to me, and then the other question is if you were to do that and it proved to be as voluminous as you fear it will be, is there a do-over, do you export things out?  What does one do in that situation or have you sort of corrupted the file?

LBNCgloC

MS. FISSELL: So this is all happening on Milbank's server and I don't work for Milbank, so I can't give you all the details, but what I understand is happening is that it goes from a server in the Philippines and then there is time associated with that. So there is the COVID test, he goes into the office, he runs the searches, he uploads them, he sends them to Milbank. I know last time it took, you know, when we transferred a huge number of documents, it took half a day to get those transferred to Milbank and get those processed by the Milbank IT people. Then there is the cost of the Milbank IT people running various deduplications.

Now, I don't know if they're going to accept near deduplication, are they going to -- I know we tried to dedupe against Atlan's production previously and we weren't able to do that, so we did try taking the ones from ICTSI and Solaire and deduping them against Atlan and that was not possible.

Now we can dedupe, I believe, because a lot of the same custodians, right, that we've had before, so I imagine we would be able to dedupe with the same custodians, their emails. But it will take hours of IT personnel time to do that. And I assume that will work, but I don't know for sure, and I would imagine there is still going to be a lot left over with 26,000 coming in. We already reviewed, from our searches, which were really broad and used all the entity names, we already reviewed 20,000 on the energy entity.

LBNCgloC

THE COURT:  Mr. Dunn, what are you searching for, for the Atlan emails, and why is Ms. Fissell's comment not valid, that you've already received all of these emails and that this search term is just going to give you 100 percent of emails, at least some significant portion you already have.  So what are you looking for in this particular custodian that you think you don't think you already have?

MR. DUNN:  It's not about the custodian.  It's about the email system itself.  Mr. Atlan was involved in the -- there is the Collingwood entities in the United States, your Honor.  Mr. Atlan was hired by Mr. Razon to source oil and gas opportunities in the United States.  He sourced oil and gas opportunities, the assets were transferred to purchase oil and gas opportunities in the U.S.  They came through various entities.

The CICL, which your Honor has a motion to compel on that entity pending before the Court, those transactions were all undertaken by Mr. Razon through these various special purpose entities.  Those entities are defendants in this case. We have alterego claims against those entities and that our theory of the case with respect to those entities is that if Mr. Razon is liable, he can't shield his personal assets behind these corporate entities here in the U.S. that he's using to hold his personal assets.

Mr. Atlan's involvement in those transactions, in

LBNCgloC

finding those for Mr. Razon, not for the Collingwood entities, finding them for Mr. Razon, procuring the opportunities, working for Mr. Razon and the personnel of the Bloomberry entities and ICTSI to negotiate these transactions for Razon and ultimately consummate these transactions in the U.S.  Those are important communications.  Yes, we received a trove of documents from Mr. Atlan pursuant to a subpoena early in this case.  Yes, we have received some documents from --

THE COURT:  I'm sorry.  Why are these documents important?  I mean, I assume that nobody is disputing that Mr. Atlan does what he does for the entities he works for.  You may be disputing whether or not alterego and whether or not by funneling money into these other companies, Razon is doing something nefarious.  But why do you need the emails confirming that he's doing the job that we all know he's doing?

MR. DUNN:  Mr. Razon disputes and the Collingwood entities dispute that these are just mere holding company instrumentalities of Razon, that he dominates and controls them to the extent necessary to impose alterego liability and pierce the veil of these corporate entities.  So, as long as that is a live issue in this case, we want documents, and we have documents, to be fair, your Honor, relating to the level of domination and control by Mr. Razon.  So, it is very clear from some of the documents that Mr. Razon, these entities were just holding companies for him.

LBNCgloC

So Mr. Atlan was involved with setting up the bank accounts, putting Mr. Razon's personnel at his various entities, including the award debtors, including ICTSI on the bank accounts, giving them signatory authority.  It was all run as part of the same enterprise and money was just moved around to make these acquisitions for Mr. Razon in the United States. So, the emails with Mr. Atlan necessarily reflect the communications going back and forth negotiating the transactions.

THE COURT:  You seem to have those.  You just rattled off to me all these examples.

MR. DUNN:  We have them in part, I believe, which is from Mr. Atlan.  So Mr. Atlan is only going to have the emails that he received and sent, but there is a whole other side of the equation, which is what was going on at ICTSI and at the Bloomberry entities with respect to these transactions.  So we want to make sure --

THE COURT:  But why would that be an email?  As I understand it, the search term that's giving us the problem is his email domain name.  So, if you're saying we have all of his emails but we want to know what's happening behind the scenes, you're not going to get -- please don't interrupt me.  It's both rude and it makes it impossible for the court reporter to make a transcript.

So if you have all of the emails or at least many of

LBNCgloC

the emails from Mr. Atlan, and you have many of the emails that he's copied on from the defendants' production already, why do you need additional searches of his emails if what you just said to me is the behind-the-scenes part?

MR. DUNN:  Your Honor, the search term that we gave the defendants was not just emails to and from Mr. Atlan.  It was his email address.  So, if Mr. Atlan sent an email to someone at ICTSI and then that person had a conversation internally with the Bloomberry folks, with the ICTSI folks about something in that email, those emails aren't going to necessarily show up in Mr. Atlan's email inbox.  So there are conversations potentially going on about the transactions that Mr. Atlan is involved in that don't involve Mr. Atlan.  He's not on those communications at the top of the thread.

THE COURT:  That seems like a real needle in a haystack.

MR. DUNN:  Your Honor, that's what this effort has been about, is to deduplicate, and we're not asking for them to reproduce things they've already produced or Mr. Atlan has produced.

THE COURT:  But they just said they don't think they can match up these 16,000 or however many srockenergy.com hits they have with Mr. Atlan's production.

MR. DUNN:  Your Honor, I'm not a fully technical person, but I believe there are ways to at least near dedupe

LBNCgloC

against documents.  I didn't hear counsel say that they've actually tried it with respect to this dataset.  So I would say we can consult with our IT folks and understand whether there is a way to do that.  I can't, sitting here today, say, no, they certainly can or I agree that they cannot.

THE COURT:  So with respect to the GG and share hits, I'm going to direct that the parties come up with additional qualifying language that we can get to a more appropriate hit report and then those numbers need to be put into the system and run through relativity.

With respect to the srockenergy.com emails, I want the parties or the IT vendors to communicate and see whether or not it's possible to take that catchment of documents and compare it to the documents Mr. Atlan has produced and/or the documents that have already been produced that contain that email.  So let's at least get some clarification on that so we know whether or not that's technologically possible and then we'll revisit the issue.  I want a report on that next Friday, which is December 4th.

Category number 3, document production, lift the stay, and address outstanding RFPs.  There is sort of the related issue number 4 about plaintiff searching for outstanding RFPs, so we're moving forward with the searching for the documents.

What other production needs to be revisited?  Mr. Dunn, what are you seeking here?

MR. DUNN:  Your Honor, back in August with the motions to compel, there were certain RFPs that weren't resolved at that hearing.  We made proposals during that meet and confer to try to narrow them and resolve the issues about the breadth of those RFPs.  Ultimately, the Court issued some orders on certain RFPs, but not those, they've been left hanging out there.

We've proposed some narrowed RFPs to the defendants.  Their response has been, well, we've given you a bunch of documents on this topic already, why do we have to respond to these.  And our position has been if you've already produced the responsive documents, that's fine, just say so, but it's been more of the defendants saying, well, tell us why what we've given you is not enough, what else do you need.  And our view, your Honor, is it should be very simple.  It should be, here are the narrowed RFPs that were never resolved.  If you've already produced the documents, we're willing to accept that if you say so.  If there are additional responsive documents that are a part of the searches that your Honor is having them run and the data that's being extracted and the searches that they've already run, those documents should be produced.  So we're not proposing additional searches on top of what your Honor has already ordered.  We're saying from the dataset of the data that's been gathered from defendants' own searches and through the searches that your Honor is talking about here

LBNCgloC

today and that data that will be extracted, produce the documents that are responsive to these narrowed RFPs.

For the record, your Honor, those narrowed RFPs were attached to our joint letter on November 10th as Plaintiff's Exhibit 2.

And the only response -- I suppose the difficulty that we're having of getting to an endpoint on this discussion point is the approach to it, which is we just want to know that all responsive documents have been produced to this. If not, then look at the data that's been compiled and produce the responsive documents.

THE COURT: Unless the RFPs are identical to ones that they've represented to you that they've produced all responsive documents, then the answer probably is there are some other documents that are responsive to these other demands.

I assume that the issue is sort of what are you actually seeking, because parties all the time serve voluminous requests for production and hoping to sort of catch every loophole and then, typically, lawyers work together to make sure that the documents that you're actually seeking have been produced. So even if I didn't respond fully to request 8, what you really want is information about X and you got information about X.

Which of the lawyers is the lucky one to deal with this issue? Ms. Fissell, okay. Where do things stand, from

LBNCgloC

your perspective?

MS. FISSELL:  From our perspective, we've produced everything that the Court has ordered us to produce and everything we've agreed to produce, and I don't know what else they want.  From when I look at the exhibit he's referring to, I would say, other than the dispute over search terms, we've produced everything on these topics.

So, if they think there -- I mean, they know what we produced because they know how we defined the court orders from the August 4th hearing, they know we've produced and they know we've taken a position that we've produced everything in response to those court orders.  We've produced everything we've agreed to produce.

So in that regard, our productions, from our perspective, are complete and I don't know what distinction they're drawing.  Generally, the topics have been covered.  I don't know what else they're looking for.

THE COURT:  Mr. Dunn, how many RFPs do you believe you have a lack of clarity on?

MR. DUNN:  Our proposals are there are two with respect to the RFPs to the Cullen defendants, three with respect to the RFPs to the BHRI and Sureste, and three with respect to the RFPs to the real estate entities.

THE COURT:  So eight RFPs?

MR. DUNN:  I say proposals, because we took some of

LBNCgloC

the RFPs and we just packaged it up as a proposal of a narrowed scope of those taken together.

THE COURT:  Your narrowed renewed RFPs, are they seeking a particular area of discovery that you believe was excluded from the document production that they've produced or agreed to produce or is this your effort to just make sure that all I's are dotted and T's are crossed?

MR. DUNN:  It's more than that, your Honor.  It relates to, for instance, financial dealings that we would not know about unless they've produced the documents.  So transfers of funds over a hundred thousand between Collingwood Investment Company and any of the entity defendants, things of that nature.  So, unless they disclosed that and turn over those documents, then we may not know whether they exist or not.  And that's the predicament and that's why we want to make sure that those areas are covered.

If the defendants and Ms. Fissell are saying, well, we have no other responsive documents to produce, then that's the case and that's their position.  But if the reality is that, in their searching, they have responsive documents, they should be able to produce them.

THE COURT:  Okay.  So by next Friday I want a single document.  We're getting a lot of stuff in next Friday.  What I want next Friday is a single document.  It will look like this: It will have an RFP, it will then have four sentences from the

plaintiff's perspective why this discovery is necessary or documents should be searched, and four sentences from the one group of defendants to whom it is responsive, Collingwood, BRHI, Razon.  So I want the RFP, I want four sentences of the plaintiff's position and four sentences of the defendants' position, then I want the next one and four sentences and four sentences.  I don't want five sentences, I want four sentences, and I will look at it.

In the process of preparing this, maybe you'll agree that either the documents have been produced or other discovery covers this and I won't need to look at eight, but if I need to look at eight, I will look at eight.  So I want each one, four sentences for each side's position.  Maybe that should also cover the issue that Mr. Dunn raised, which I think is really a defense issue, it seems, about searches of the plaintiff's, potentially, email addresses, seems to be the issue.  So why don't I turn to the defendants on this issue first.

MS. FISSELL:  So I think this was -- you're talking about Mr. Dunn's issue 4?

THE COURT:  Correct.

MS. FISSELL:  Right.  So this is with respect to what we call the due diligence request.  These are RFPs served by Mr. Razon and the real estate entities.  I think it's four requests, and they all go to the issue of due diligence.

They've agreed that as to three custodians who used

LBNCgloC

their personal email accounts, they will search those personal email accounts, but as to one custodian, they're not willing to search his personal email account, and I believe their position is that he's not relevant to -- he wasn't involved in the due diligence. They base it a little bit on the production they made which they haven't completed their production on these requests anyhow.

But I do want to note, they sent me an email on November 9th where they listed what I think anyone reading the email would believe were custodians that they were going to search and they listed -- the custodian we're talking about is Eric Choo (ph.), and they listed Eric Choo under a custodian who had a Global Gaming email address and that he was a custodian, his emails, they would search for the due diligence requests. It turns out Mr. Choo doesn't have a Global Gaming email account — or if he does, he never used it, as far as we can tell — exclusively used his Gmail account to conduct business for GGP.

So the plaintiffs, by adding him on their list of custodians, seem to believe that he was relevant, but now if it's his personal email account — again, the only account he used — they're saying he's not relevant.

THE COURT: What's his role at GGP?

MS. FISSELL: He was a president of Asia for GGP. So he was the chairman and CEO of GGP. He was sort of his

LBNCgloC

right-hand man on the ground in Asia.  And so, it would make sense that he would have been involved in the due diligence of a business opportunity in Asia.

And they have produced a few documents, 500 documents on this due diligence issue, but those 500 documents, some of them are completely redacted for privilege.  So I guess it counts as producing it, but it could have easily gone on a privilege log.  It doesn't include the personal email accounts of the three people from GGP who almost exclusively used their email accounts.

Even so, in this small production on this due diligence issue, there are still two emails that show Mr. Choo attending meetings in Manila, presumably when they're doing due diligence of Solaire's business.  There is also an email where Bill Winier (ph.) sends an email to Razon saying how my team is looking at the analysis that you sent and he then forwards it to Mr. Choo, among others.

So, it seems to us that he's plainly involved in the issue and there is no reason why he should not be an additional custodian.  We've searched tens and tens of custodians, and this is just one more custodian that we want added.

THE COURT:  Okay.  Mr. Dunn.

MR. DUNN:  Your Honor, let's start with the scope of these document requests.  Your Honor previously dealt with them on the motion to compel.  These are not just any due diligence

LBNCgloC

documents that there may exist.  These are specific documents specifically relating to topics like investigation and due diligence regarding the siphoning or lack of siphoning by Razon of funds at BRHI, Sureste, and BRC, the parent company, investigation about the treatment or lack of treatment of these entities as an independent profit center, the commingling or intermingling of assets.  So basically just listing the indicia of alterego.  Its requests relating to due diligence about whether the real estate entities, only one of which existed at the time, were going to be available to satisfy the assets -- excuse me.  To satisfy the debts of BRHI and Sureste.  So these are specific due diligence topics relating to alterego liability.

So, the question is, what does Eric Choo have to do with any of this?  Well, the answer is nothing.  Mr. Choo wasn't involved in that due diligence.  Mr. Choo is someone who was brought in for operations because Mr. Choo is responsible, helps facilitate the junket operations for this casino that Mr. Razon opened in the Philippines.  So bringing in large groups of customers to the casino to hopefully drive up revenues.  He wasn't involved in the due diligence of whether the MSA was a good deal, whether Mr. Razon was commingling assets, whether Mr. Razon was the alterego of BRHI and Sureste, the topics that they've sought discovery on in these requests.

THE COURT:  Then the production will be small.

LBNCgloC

MR. DUNN:  Mr. Choo is a former employee.  Our plaintiff here at Global Gaming Philippines was a special purpose entity for this specific project in the Philippines. After Mr. Razon and the award debtors terminated the MSA, there was no ongoing operation of Global Gaming Philippines, other than with respect to the litigation.  So that was in late 2013.

So Mr. Choo, our understanding is that he hasn't been affiliated with either of the joint venture partners of plaintiff, Global Gaming Philippines for six or seven years. So we're talking about a former employee's personal email account to find documents that would tend to show Mr. Razon is the alterego of BRHI and Sureste when Mr. Choo wasn't involved in the diligence of that process and these are facts that they claim don't even exist.

So they're focused on Mr. Choo right now because Mr. Choo is the focus of their failed attempt to try to show there was something wrong with the arbitration.  They raised these issues about Mr. Choo and his dealings during the casino's operations.  In the arbitration, they raised these issues, panel rejected them multiple times.

THE COURT:  As I recall, the due diligence or discovery that I ordered was limited in time.

MR. DUNN:  It is.  It's pre MSA, your Honor.

THE COURT:  Right.  I don't know when the potential allegations are of Mr. Choo's wrongdoing, but we've got a

LBNCgloC

pretty small window of time.  It sounds like you've noticed this person as somebody who might have information relevant to the litigation.  According to the defendants, they believe that he was the chairman's point person in Asia.  Did he have the title of president of Asia?

MR. DUNN:  There was a misnomer, but my understanding is that, yes, he was given --

THE COURT:  I'm sure he appreciates you saying that.

MR. DUNN:  Your Honor, if I may, can I let my colleague -- he's been tracking this issue, Mr. Ainsworth.

THE COURT:  Sure.  Mr. Ainsworth.

MR. AINSWORTH:  Thank you, and I'll be brief.

As your Honor noted, if he wasn't involved, there shouldn't be any emails.  In fact, he searched our clients' email servers for emails, and we've looked at all the emails that we've produced, 2400 emails before the MSA.  We've looked at all the emails defendants have produced, thousands of emails, and they've identified two documents that have his name involved with a meeting in Manila, and they're asking us now to go to a former employee and look through all his -- by the way, I believe he's in Asia, he's not in the United States, so there is A statutory provision for issuing subpoenas to people abroad, which they haven't bothered to follow.  But they're asking that we somehow get access to his Gmail account to look for something that would show that our client knew that they

LBNCgloC

were going to get maltreated by Mr. Razon in the end.  This is all about the Brunswick analysis in your Honor's prior opinion.  What does our client know when they entered into this agreement?  Did they know that Razon was controlling?  Did they know --

THE COURT:  Right.  I understand.

MR. AINSWORTH:  So they're asking us to go to a former employee who we have no control over and look through his Gmail accounts to see what he might have known when we've already produced the emails of the principals who are involved in the due diligence, who are involved in the analysis and in the decision, and the principles of its partner -- I don't know if partner is the right term, but Fitzgerald, who was in the joint venture.  Those have all been scoured and produced, your Honor.  So this is a --

THE COURT:  I mean, with all respect, you guys should hear each other.  So you wanted them to search the Atlan emails to find the email that's forwarded because you have all of the direct emails, but maybe there is a forwarded email where somebody says something that will break open the case.  And you're making basically the same type of argument that, where everybody is searching for these crazy emails and no one is going to get anything.  So everybody wants the other side to do all the work and thinks that their position is reasonable.

Mr. Choo, it sounds like, was involved in projects in

LBNCgloC

Asia.  We're talking about a narrow scope of time.  Before I would rule, I would want to be briefed on the issue, but if it was understood that he was conducting his business on his Gmail account, I think there is a pretty good argument.  Again, I would reserve to be briefed on it.  I think it's a pretty good argument that those emails are controlled by the company.  If he knew he was doing those emails -- I think I made a reference to Hillary Clinton the last time we were here.

Have you spoken to Mr. Choo?  Are we having a fight here that doesn't need to be had?

MR. AINSWORTH:  I thought we were, your Honor, in the sense that he didn't have any involvement in the due diligence at issue.  So it seems like, no, I haven't spoken to him.  I don't know that any of us have in years.  He wasn't involved in this issue.  So it seemed like there was no need to ask him if he had emails about issues he wasn't doing work on.

If our clients come into a deposition and are asked what was Mr. Choo's role in determining what the assets of the company were or whether Mr. Razon was going to defraud our client and it turns out he in fact was involved in those sorts of analyses, then of course we're going to look at it.  But that's not what happened and there is ways to deal with that in depositions, your Honor.

THE COURT:  Right.  I'm happy to let discovery proceed in this case based on the other side's representation what one

LBNCgloC

would find if they were to do email.  That's one way to proceed and then we'd probably just shut it all down.

I guess I don't understand why you haven't had a conversation with Mr. Choo.  Maybe he'd be willing.  We're talking about a relatively small window of time.  My guess it's a year.  I don't know exactly what we're talking about, but it's probably not a voluminous period of time.  If he may be called for a deposition, he should know that that may happen, too.  It seems to me that the first order of business is to connect with him, find out whether or not he's willing to either let counsel look at his email or search himself.  Maybe you could even, with defense counsel, come up with a few search terms that he could run himself like we're doing on the other side.  So say look, can you run these terms on your Gmail with these dates and tell us what you find and report back.  Why isn't that sort of the best way to proceed here?

MR. AINSWORTH:  One issue that perhaps could be a stoning block, your Honor, I know from reading the final award in the arbitration is that he conducted a lot of his business using Chinese characters, which is why there was difficulty with his emails some years ago.  If defendants want proposed search terms in Chinese characters and we can find somebody to do the same and if he's willing to do that, perhaps we can reach agreement, but I haven't spoken to him, your Honor.  I don't know how --

LBNCgloC

THE COURT:  That seems the first order of business. He's obviously a senior former employee of the company working in Asia.  Maybe he was president of Asia.  Maybe that was just a glorious title that he got.  So it sounds like he's at least in the heart of the issue, even if he's not specifically involved in the due diligence.  I think you need to speak with him, let him know that people are asking about his communications, including his business communications that he conducted over his own personal account, and find out whether or not these were in English or in Chinese, whether or not we can run some searches, maybe not a full set of 18, but about one or two to see what we're even talking about, because I find sometimes people have fights about discovery that are unnecessary if we actually just did a little exploration.

So I'm going to direct you to reach out to Mr. Choo and find out what language his emails would be in during the relevant period of time, work with defense counsel to see if there is a couple of words we can look for during the particular window, and see if anything is there.  Maybe it's nothing there and maybe that there is a trove there.  We just don't know.

Our last issue is the issue we addressed last time, which is the discovery of what plaintiff did post-2014 with respect to lifting the injunction, the relations related to the options shares.  That's where we are?

LBNCgloC

MS. FISSELL:  Yes, I covered that a bit earlier.

THE COURT:  Is there still outstanding issues or do we feel like we're --

MS. FISSELL:  The plaintiffs are refusing to produce any documents on the options shares.

THE COURT:  Beyond the three that I ordered --

MS. FISSELL:  They've given hit reports, but not on the personal email accounts, and they're saying not only will we not give you the documents that are responsive to those on the nonpersonal email accounts, and even though we know these guys almost exclusively use their personal email accounts and we've agreed to search the personal email accounts for the due diligence requests, we're not going to search it for the option shares and we're not going to produce anything on the option shares because it's not at all relevant.

THE COURT:  Okay.  I think on the relevancy point, I think I've ruled.

MR. DUNN:  Your Honor, if I may, if we can step back for a moment, because Ms. Fissell's presentation on this earlier did not really get to the issue that I teed up for your Honor, because the issue regarding the option shares is a different issue.

What has been presented to the Court and what was not presented to the Court last time was what discovery requests have even been made in this case relating to the option shares

LBNCgloC

and any relevant issues on plaintiff's side.

At the last hearing on the 12th, counsel for BRHI and Sureste presented this sauce-for-the-goose sauce-for-the-gander argument, but BRHI and Sureste, there are no claims against them for conversion. There are claims against Mr. Razon. Mr. Razon hasn't served any discovery on plaintiff relating to the option shares or enforcement of any arbitration award against the debtor defendants in the Philippines.

The only discovery request that's been made of plaintiff at this point was back in June and it was request number 25 by BRHI and Sureste, and it asked for all documents and communications concerning proceedings in the Philippines to recognize and enforce the interim measures award, the liability award, and/or the final award.

These are documents and communications regarding proceedings in the Philippines to enforce awards issued by the arbitration tribunal, and we objected to that request because it has no relevance to any claim or defense in this case. Whether we go into the Philippines or we go in here, the New York convention says we can choose where we want to go and enforce the award. There is no valid defense under the New York convention for a decision to go into one jurisdiction or not.

So we objected to this particularly because it was irrelevant, but also because anything discussing the decisions

LBNCgloC

and the strategy of where to enforce the awards, whether to go into the Philippines or not, what we're doing in the Philippines, they're going to be just largely privileged discussions, they're going to be legal strategy, and they have no bearing on this case.  So we objected and we said we're not producing documents.

We met and conferred with counsel for BRHI and Sureste, we gave them our rationale, we said we're not going to do this, and then your Honor in late June said, if you have any outstanding issues, bring them before me, file your motions to compel by July 9th, and they dropped that issue, rightly so, because there was no relevance of that request to this case.

And then last week or on the 12th, your Honor, when we were before you, without notice, they raised this issue again and said, well, if they get to do discovery as to what actions Mr. Razon took post-January 2014 in connection with the option shares and taking actions in the Philippines or wherever it may be, then we get to do discovery or they should have to respond to our discovery.  But the only discovery that's ever been propounded is the discovery that we objected to and they decided to live with.

So, their read of your Honor's ruling last week is that they get to go back to a request regarding enforcing an arbitration award in the Philippines as some sort of corollary to our discovery that your Honor allowed regarding the option

LBNCgloC

shares and the actions Mr. Razon took regarding those option shares.

THE COURT:  Just so I'm clear, are you objecting also to my granting them permission to propose three search terms to you?

MR. DUNN:  We ran the search terms and we provided them with the search reports.  We followed your Honor's directive and we ran those search terms through the Global Gaming asset management email system for that period and we ran it through Canter Fitzgerald and we provided those search hits to the defendants.

So it's really a question, your Honor, and let me make sure I correct something that was said earlier, as well, which was the proceedings in the Philippines and this question of why plaintiff has not gone into the Philippines, again, that misstates the circumstances.

Plaintiff has been involved in the Philippines because Mr. Razon and his entities have been taking actions to try to keep the facade of this injunction in place, to keep plaintiff from being able to sell its shares.  I don't want to get too deep in the weeds here, but the idea that plaintiff has never gone into the Philippines to take action is just false.  There are ongoing proceedings there now because Mr. Razon and the Bloomberry companies and Mr. Razon's company had been trying to keep that facade of this injunction in place.

LBNCgloC

But it's really -- it comes back to, your Honor, the case regarding conversion, is that the arbitration tribunal in 2014 issued an award and said that injunction that was temporarily issued by the Philippine courts is dissolved.  And, in fact, the injunction order that was issued by the Philippine court said this is subject -- this is just an interim thing, this is subject to be dissolved by the arbitration tribunal, which they did, they ordered it this in 2014, they ordered it and reiterated it in 2016, they ordered it again and reiterated the final award in 2019 and issued $200 million in damages for violating those prior orders.  So, there is no real dispute about something that's been done on the plaintiff's side.

Any discovery into action or inaction by plaintiff relating to enforcement of any of these awards, it's irrelevant and it's going to be largely, if not exclusively, litigation strategy and privilege documents.  There is nothing that has any relevance to a claim or defense in this case.

MR. PERRY:  Just one clarification, the notion that the arbitral panel could dissolve a court injunction in the Philippines, it's just wrong.  First of all, that's not what the panel purported to do.  It's not the law in the United States, it's not the law in the Philippines that an arbitral panel can just dissolve an order, an active order of a court.  So this is argument.

In the Singapore High Court decision that recently

LBNCgloC

came down, they actually treated this issue in a way that's inconsistent with how Mr. Dunn expressed it. Literally, there is an injunction in the Philippines and somebody needs to go dissolve it. So that, they're saying you didn't go dissolve it, you, Mr. Razon, didn't go dissolve it, and the flip-side, the precise -- nothing has happened since 2014 on that issue. The precise flip-side of it is, well, you were represented by lawyers there, you participated in the injunctive proceedings, why didn't you go and dissolve it, why didn't you make an application to dissolve it? His observation that this is all likely to be privileged, I agree with that, the same is true of us.

So he's asking us to effectively engage in discovery that's a mirror image of what he's asking us to engage in. To the extent that it's largely privileged for him, it's going to be largely privileged for us, the issue of whether somebody needs to go in and seek vacatur of an injunction of a court in the Philippines. Ms. Fissell went over that, I think, in depth.

Again, if there is no -- one of the reasons that we have a hard time here is if they're not willing to live by the rules that they set with us in the discovery process, it becomes very, very difficult to do some of the compromises that your Honor would typically see in a case. All we're asking here is that they do exactly what they've asked of us. If they

LBNCgloC

want to abandon this issue altogether, because it will be somewhat -- there is going to be a lot of documents, most of them are going to be privileged. If they want to abandon this issue, that's fine, I'll do the horsetrading with them, but if they're not willing to live by the same rules that they're imposing on us on discovery, this whole thing becomes very difficult.

THE COURT: Do you dispute the characterization that Mr. Dunn gave that the only discovery that sought this sort of document was your discovery 25, that there were objections raised that when the time came to move to compel, that was not part of the motion and so those claims have essentially been forfeited? I assume you're not going to agree they've been forfeited, but do you agree with the general recitation of the history?

MR. PERRY: So what happened was we saw them, on this subject matter, making an objection on privilege grounds that we basically said, okay, we expect you to live by the same rule, and then they didn't. So the only qualification I would make is when we saw them make the objection, we didn't push it thinking that the rules they were imposing on our discovery, they would abide to in their own discovery. They haven't done that. And then I think Ms. Fissell went through her requests and identified a request on behalf of Mr. Razon that would get at the same topic.

MS. FISSELL:  So to the extent they're making this all about Mr. Razon and the conversion claim as to Mr. Razon, your Honor did order Mr. Razon to produce certain documents on the option shares.  He did searches and we produced documents that he had.  So they're now using their searches to BRHI and SBI and they're saying this is all now related to the conversion theory.

So, if Mr. Razon is then entitled -- if this is all related -- we thought this was all getting resolved through BRHI and SBI fighting.  But if this is related to the conversion theory -- then Mr. Razon served RFP 16 which sought all documents concerning or providing a basis for allegations in the complaint or an amended complaint that Razon has, quote, "influence in or over the Philippine courts or judicial system or to the Philippine stock exchange."  I think that really gets at the heart of the issue.

If Mr. Razon needs to serve a specific document request on this issue, document discovery is not disclosed, he can propound another document request seeking documents in his defense to the continued conversion theory that he is not the proximate cause of any injury from a continued conversion, but plaintiff's failure to go into the Philippine court system and seek a list of the injunction is the proximate cause of his injury.

So I think it's covered by RFP 16, but if we need to

LBNCgloC

serve another document request on it, we can do that, as well.

THE COURT:  Was that subject to my motions?

MS. FISSELL:  No, because they agreed to produce documents.  They will produce nonprivileged documents within its possession, custody, or control, if any, concerning Razon's influence in the Philippines, including its courts and the Philippine stock exchange.

THE COURT:  So Mr. Dunn, did you respond to that, to 16?

MS. FISSELL:  That was the response to 16 I just read.

MR. DUNN:  Yes, and that was the response, but that has nothing to do with enforcement of the awards.  We're not talking about even the same topics.  I think what Ms. Fissell was saying is, if you open the door for us now, we'll open another RFP on this issue.  That's not what they asked about, that's not what RFP 16 relates to, and that's not what our response was.

THE COURT:  Did you produce the documents that you said you ran the searches and you produced something?  Did you produce documents or did you produce hit reports?

MR. DUNN:  We produced hit reports, your Honor.

THE COURT:  What does that show, generally speaking?

MS. FISSELL:  It was small numbers of hits for the three search terms.  It was in the 1500 range, but I just want to note that this isn't of the personal email accounts that

LBNCgloC

were used by these parties.  So it's not conferring everything. These Wagner Stones, French, Saunders, they all use personal email accounts and they have not searched the personal email accounts.  They only provided hit reports for the Canter and G Gam servers, and each hit was within -- well everything they think is reasonable, but these were small numbers.

THE COURT:  So you should review those documents for responsiveness, turn over those documents.

I'm not sure I'm going to allow any more discovery on this.  I authorized the three search terms.  You should be producing the documents that were presented there.  I'm disinclined to continue further.  Maybe by the time we get there, a decision will be rendered on the motion, but I'm disinclined to open up to new RFPs or to revisit old RFPs.

MS. FISSELL:  Could we agree that they'll search the personal email accounts, because those were the ones that were predominantly used on this issue.

THE COURT:  Those are the three plus two, I assume what you're talking about?

MS. FISSELL:  I think there is a fourth on the option shares, French.

THE COURT:  Why don't I ask you to meet and confer on the personal emails with respect to those search terms.

I think that addresses all of the issues, I think. Mr. Tan is going to make his production by December 23rd.  I'd

like counsel to write a letter to the Court confirming that that happened.  By December 4th, which is next Friday, I want to have a report on the parties' efforts to modify the GG and share search term.  And whether or not with respect to the Atlan domain name or email address, what we've learned about the ability to run deduplication efforts from that catchment of documents to those that have already been produced.

Also, on the 4th, I want a document that has no more than the eight disputed RFPs.  If you resolve some before then, great.  And then four sentences from the plaintiff as to why those RFPs need to be responded to and four sentences from the appropriate defendant for each of those categories.

I want a report on the 4th regarding the status of Mr. Choo, whether or not you have spoken with him, whether or not he will voluntarily search these emails.  Hopefully, I also want defendants before then to have provided search terms.  I guess you can just provide them in English and then you can discuss whether they should be translated into Chinese.  But we should have an answer on whether or not he's prepared to voluntarily search those emails.  Ideally, he will have it and we'll have an answer there.

And I want the plaintiff to produce the responsive documents from the GGP and Canter Fitzgerald searches of the three option share search strings, as well as a report on the parties' position with respect to those outstanding personal

LBNCgloC

email addresses.

Mr. Dunn, it looks like you have something to say.

MR. DUNN:  Just one more housekeeping issue.  I mentioned earlier the motion to compel with respect to Collingwood Investment Limited.

The Court had previously set today as the deadline to file a reply to the opposition.  Given the Court's ruling today and the fact that the parties are going to need to meet and confer on some of these issues, which I assume overlap with some of the issues, Mr. Seel's opposition, I request that we move the reply deadline and see if we can resolve the issues that were raised in the context of the search terms and what else is actually being dealt with.  My understanding is that the Collingwood Investment Limited communications were all done through the same repositories that we're talking about and that your Honor has made some orders on here today.

THE COURT:  Sure.  Do you want to report to me on the 4th where things stand with respect to that and either you'll have clarification --

MR. DUNN:  I think we'll report or just file the reply if we can't come to an agreement on that date.  My hope is we can find some resolution in this case.

MR. SEEL:  Your Honor, on behalf of Collingwood Investment Limited, I'm happy to report.

What I would suggest is, follow the Court's guidance

LBNCgloC

as it relates to these four sentences.  I would say that their request for production that Collingwood Investment Company and a motion to compel, they completely overlap with their other requests for production to Collingwood or request for production that they already failed on a motion to compel to Mr. Razon on --

THE COURT:  I'm sorry.  Can I ask you to bring the microphone closer and speak more slowly.  I'm having trouble and I'm sure the court reporter is, too.

MR. SEEL:  The issues that are contained in the Collingwood are called CICL motion to compel.  They do wholly overlap, or I agree with Mr. Dunn that they either overlap with requests for production already served upon my other clients, the Collingwood entities, or they overlap almost word for word with requests for production that were served upon Mr. Razon that the Court already ruled upon denying motions to compel on.  So, I'm happy to meet and confer.  I think the parties should do that.  I've requested, a few times, to do that.

But what I'm afraid of, we kick the ball down the court, they file a reply on Friday, and you get the report on the eight disputed items, then they come back to the Court later with the same issue saying it's under a different request to a different entity, and we haven't covered that.  We want new search terms, we want new document production, and I want to avoid that.  I want to get to December 4th and let the Court

LBNCgloC

know where we stand as we request all requests for production because they all overlap.  And he is right that Collingwood Investment Company does not have its own email system.

So to the extent that there are emails related to CICL, they are going to be in the repository that either exist at Solaire or ICTSI or otherwise, so I don't want to pretend we have these issues that are going to be resolved on December 4th and then the court look at the motion to compel after it's been briefed and then you realize you're looking at the same issues.

THE COURT:  I share your desire.  I'm not sure what your ask is.

MR. SEEL:  I would request that, by the 4th, they put the requested or disputed RFPs as it relates to CICL, their four sentences as to why they need those, and I give you the four sentences in response, either I've already given those documents to them or why they are relevant or whatever objection I may have.

THE COURT:  Why don't we do the following:  I have not looked at your motion to compel, I have a trial next week.  I probably won't look at it until after my trial.  So either on the 4th you can say we've resolved everything, Judge, and that would be great, or you could say here's my reply brief, we want to continue to finish this motion, and here's a reply brief or you can say we're mooting the brief but we're raising the issues in the same context with respect to the other RFPs.

LBNCgloC

So I will defer to you all to proceed in the way that is most efficient. I agree with you that I don't want to have seriatim applications, and I really don't want discovery motions either. So I'll take it if it comes to me, but if you want to put it into this other format, that's fine, as well. I don't know enough about the motions to know whether or not you're right, that it's sufficient or not. I haven't looked at them enough.

MR. SEEL:  That's fair.

THE COURT:  Because it's my job to do so, I will ask, once again, whether or not the parties think any sort of settlement discussion would be of value. As I said, and I didn't mean it to be ironic, I actually do worry that the fees in this case are going to eclipse the $300 million arbitration award.

I don't know if there is any openness, I don't know if there has been a demand beyond the arbitration award. If there is an interest in making a demand that's different from that, whether or not the defendants are interested in engaging in settlement discussions, we're on the record, I can ask the court reporter to go off the record if you would like, or we can keep doing what we're doing.

MR. DUNN:  I would just say, your Honor, and this has been previously discussed in letters to Judge Schofield, is that the parties engaged in settlement discussions in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

LBNCgloC

connection with the underlying arbitration. There have not been those discussions. Our clients are effectively -- these joint venture partners participated in those prior discussions. There have been no discussions since that point in time. They're always open to discussing settlement at the right time, but I would just say our desire in this case has been to get a complete picture of facts and that's the trouble that we run into, and I think that's impeded any type of discussion. So that's all I can say at this point, your Honor.

THE COURT: Okay. Mr. Perry.

MR. PERRY: So, what I'd very much like is for this document process to be over and for us to move to the discovery phase of the deposition phase of the case. I do worry about the cost here and the burden that's being imposed. My experience is that you tend to have more meaningful settlement discussions the further one gets into a case and the further one understands and develops the facts. We haven't even gotten to depositions yet and we've been at this for months now.

Your Honor had at one point said, somewhat jokingly, we call all of this off all of this. And I do think that we need to be focused on getting to the end of the document process, getting depositions on calendar, and that, in my experience, tends to produce more fruitful settlement dialogue when you have a full understanding of each sides' position and people's testimony is taken under oath and they can sort of

LBNCgloC

understand and experience what a trial would look like.  That hasn't happened here yet and I very much would like to see the document process pushed along and concluded so we can get to the depositions, get to the end of fact discovery, and I think that might be a more appropriate time to explore the question that you had asked.

THE COURT:  Okay.  I'll just say, in summary, you said that you wanted to wait until depositions were over.  Previously, I think you suggested that maybe just getting depositions on the calendar might help focus everyone's attention.  To the extent you asked me today for my first available time that I could see you for a settlement conference, it would probably be the middle of January.  So if you ask me in the middle of January when my next available settlement conference will be, it will probably be in March or April.  I'm thinking about my schedule in March, it will almost certainly be in April.  So I'm not going to move your deadlines to accommodate a late request, and I'm perfectly happy to have you cancel a settlement conference that you realize, as it approaches, will no longer will be productive.  I will be able to fill the date for sure.

So if you think that having a settlement conference in mid-January might be a productive time to have a settlement conference, it will be in your interests to schedule it now.  Again, we can cancel it with no penalty, but I won't be able to

LBNCgloC

just schedule a conference at the drop of a dime or the hat or whatever the expression is.

So I will leave it to you all, but the best way to schedule a settlement conference is for all of the lawyers to email my courtroom deputy.  I think you have her email address, you can also just email my chambers's email address, which is on the website, I believe.  It's certainly in orders.  I'm pausing because we took it off the website because of a particular case.  In any event, I'm sure you can find it. You're all smart people.  Send me an email if you think it would be helpful and say we would like to come in in the middle of January and she can give you a couple of dates.

Right now, I'm doing my settlement conferences still remotely.  Unfortunately, I predict that in January I will continue to be doing my settlement conferences remotely.  That means that for all of your principals who need to participate, wherever they are, they can call in, I just do them by telephone.  I found them to be totally productive.

Keep that in mind.  It may be a good idea before depositions start or maybe there is one or two depositions that everybody agrees need to happen and then we can have a settlement discussion.  Otherwise I'll keep doing my job pushing discovery forward.

All right.  Anything further from the plaintiffs?

MR. DUNN:  No, your Honor.

LBNCgloC

THE COURT:  Anything further from the team of defendants?

MS. FISSELL:  No, your Honor.

THE COURT:  All right.  Have a happy Thanksgiving.  I hope everybody remains healthy and safe.  I will look out for your order on the 4th.  I am finding these in-person conferences — for which are a very rare case that I am doing now — to be productive.  So if there are continuing disputes that I think having you here, I'm going to have you keep coming back into court.  So I'll wait and see what you do on the 4th.

* * *