# APPENDIX 1

**IN THE MATTER OF AN ARBITRATION BEFORE A TRIBUNAL CONSTITUTED IN ACCORDANCE WITH A MANAGEMENT SERVICES AGREEMENT DATED SEPTEMBER 9, 2011 AND THE UNCITRAL ARBITRATION RULES 2010**

---

**BETWEEN**

**GLOBAL GAMING PHILIPPINES LLC (AS ASSIGNOR)**
**GGAM NETHERLANDS B.V. (AS ASSIGNEE)**

**CLAIMANTS**

**AND**

**BLOOMBERRY RESORTS AND HOTELS INC.**
**SURESTE PROPERTIES, INC.**

**RESPONDENTS**

---

**FINAL AWARD**

**SEPTEMBER 27, 2019**

---

The Arbitral Tribunal:

Mr. R Doak Bishop, *Esq.* (Arbitrator)

Dr. Michael Hwang, *S.C.* (Arbitrator)

Dr. Andrés Rigo Sureda (Presiding Arbitrator)

## Table of Contents

I.   GLOSSARY OF TERMS AND LIST OF DRAMATIS PERSONAE..........5
     A.   Glossary of terms .................................................................5
     B.   List of *dramatis personae* ....................................................9

II.  PARTIES ........................................................................................11
     A.   Claimants..................................................................................11
     B.   Respondents..............................................................................11

III. PROCEDURAL HISTORY ............................................................13
     A.   Procedural history of the present proceedings ......................13
     B.   Summary of Procedural Orders Issued since the Liability Award................14
     C.   Matters in relation to Paragraph 324 of the Liability Award ..........15
     D.   Matters in relation to the Respective Rights and Liabilities of each of the Parties ........18
     E.   Matters in relation to Document Production in the Remedies Phase............18
     F.   Matters in relation to the Parties' Supplemental Submissions and the Remedies Hearing................19
     G.   Matters in relation to Claimants' application to direct Respondents to cease actions opposing the implementation of the IM Order ........36
     H.   The Remedies Hearing .............................................................37
     I.   Matters relating to issues after the conclusion of the Remedies Hearing.......38
     J.   Other Procedural Matters .........................................................43

IV.  RELIEF SOUGHT BY THE PARTIES.........................................44

V.   PRELIMINARY MATTERS: PARTIES' RIGHTS AND LIABILITIES................50

VI.  DAMAGES UNDER PHILIPPINE LAW – GENERAL PRINCIPLES...................53
     A.   Claimants' Arguments ..............................................................53
     B.   Respondents' Arguments ..........................................................54
     C.   Analysis of the Tribunal............................................................55

VII. DAMAGES FOR WRONGFUL TERMINATION OF THE MSA ............................58

**A.**     **Claimants' Arguments** ............................................................**58**

**B.**     **Respondents' Arguments** ........................................................**67**

**C.**     **Analysis of the Tribunal** ........................................................**80**

   (i)      Framework of the Analysis.................................................80

   (ii)     Term of the MSA .............................................................80

   (iii)    Sources of Information for Historical Costs and Revenue .......87

   (iv)     Allocation of Revenues.....................................................88

   (v)      Allocation of Costs: Specific Issues ..................................90

   (vi)     Date of Valuation.............................................................97

   (vii)    Discount rate ..................................................................98

   (viii)   Projections of revenues....................................................99

   (ix)     Projections of costs and expenses......................................99

   (x)      Failure to Mitigate Damages ...........................................100

   (xi)     Pre-award interest ........................................................100

   (xii)    Amount of the Lost Management Fees................................101

**VIII.**  **SHOULD THE TRIBUNAL APPLY THE DOCTRINE OF EQUITABLE MITIGATION?**.................................................................................**105**

**A.**     **Respondents' Arguments** ........................................................**105**

**B.**     **Claimants' Arguments** ............................................................**105**

**C.**     **Analysis of the Tribunal** ........................................................**105**

**IX.**    **GROSS-UP OF MANAGEMENT FEES TO ACCOUNT FOR PHILIPPINE TAXES**.........................................................................................**110**

**A.**     **Claimants' Arguments** ............................................................**110**

**B.**     **Respondents' Arguments** ........................................................**111**

**C.**     **Analysis of the Tribunal** ........................................................**113**

**X.**     **PRE-OPENING FEES AND EXPENSES** ........................................**115**

**A.**     **Claimants' Arguments** ............................................................**115**

**B.**     **Respondents' Arguments** ........................................................**116**

**C.**     **Analysis of the Tribunal** ........................................................**116**

**XI.**    **OBSTRUCTION OF THE SALE OF GGAM'S SHARES** ................**118**

A.    Background ................................................................................118

B.    Claimants' Arguments ...............................................................119

C.    Respondents' Arguments ...........................................................128

D.    Analysis of the Tribunal............................................................133

      (i)    Matters Previously Decided by the Tribunal ...........................133

      (ii)   Jurisdiction.................................................................................135

      (iii)  Liability.....................................................................................141

      (iv)   Remedies....................................................................................147

             a.    Quantum ...........................................................................147

             b.    The "Constructive Remedy"...............................................151

             c.    Other relief in respect of the Shares and the Dividends .............153

XII.    DIVIDENDS...............................................................................155

XIII.   INTEREST ................................................................................158

XIV.    ISSUES RAISED BY THE RESPONDENTS' REQUEST FOR RELIEF .............159

XV.     COSTS ......................................................................................160

XVI.    DECISION..................................................................................167

## I.    GLOSSARY OF TERMS AND LIST OF DRAMATIS PERSONAE

### A.    Glossary of terms

| | |
|---|---|
| **Additional Expenses** | Expenses related to work on behalf of the Respondents and BRC, including the roadshow, investor conferences, and a potential investment opportunity in Argentina (quantified at US$ 45,557 by the Claimants). |
| **Bloomberry Model** | A financial model Bloomberry provided to GGAM when the Parties were negotiating the MSA. |
| **Cantor Model** | The model and presentation created by Cantor Fitzgerald that summarized the amount of management fees they expected to earn over the course of the MSA. |
| **CCP** | The Civil Code of the Philippines (Title XVI), Batas Pambansa Bilang 68. |
| **Claimants** | The Claimants in this arbitration, Global Gaming Philippines LLC and GGAM Netherlands B.V. |
| **Cornell Report** | An article authored by Prof. de Roos and Scott D. Berman entitled "*Cornell Hospitality Report – Calculating Damage Awards in Hotel Management Agreement Terminations*" (Vol. 14. No. 16, CHR, published August 2014). |
| **Decision on Reconsideration** | Tribunal's Decision on Request for Reconsideration of the Partial Award on Liability dated November 22, 2017. |
| **EBITDA** | Earnings before Interest, Tax, Depreciation and Amortization. |
| **EBITDAM** | Earnings before Interest, Tax, Depreciation, Amortization and Management Fees. |
| **Equity Option Agreement or EOA** | Equity Option Agreement, signed by BRC, PMHI and the Claimants on April 16, 2012 providing the Claimants with the |

| | right to purchase up to 10% of the share capital of Bloomberry. The equity option was granted under Clause 18.3 of the MSA. |
|---|---|
| **February Invoice** | Respondents' unpaid invoice of US$ 148,750 for services performed outside the Philippines for the month of February 2013. |
| **Foreign VIP EBITDA** | EBITDA generated from Foreign High Roller Tables and Foreign Junket Players. |
| **Final Award** | This Final Award dated 27 September 2019. |
| **FTE** | Full-time Equivalent. |
| **G&A Expenses** | General & Administrative expenses. |
| **GEL** | Gaming Employment License. |
| **HIDV** | Highest Intermediate Value. |
| **HIVT** | Highest Intermediate Value Test. |
| **IAA** | International Arbitration Act (Chapter 143A), Singapore. |
| **IM** | Interim Measures. |
| **IM Order** | Interim Measures Order. |
| **IM Request** | The Claimants' request for Interim Measures. |
| **Initial Term** | First term of five years of the MSA. |
| **Liability Hearing / Liability Award** | Merits hearing on liability at Maxwell Chambers, Singapore conducted from October 15, 2015 to October 24, 2015 / Partial Award on Liability dated September 20, 2016. |
| **Local VIP EBITDA** | EBITDA generated from Local High Roller Tables where PAGCOR imposes a 15% license fee under the PAGCOR License, or as that term is defined in the laws or regulations governing the Facilities. |

| | |
|---|---|
| **Manifested Tables** | A category of VIP tables which is used to calculate Foreign VIP EBITDA, and is also referred to as "Junket Tables" or "Foreign Tables." |
| **Non-Manifested Tables** | A category of VIP tables which is used to calculate Local VIP EBITDA, and is also referred to as "High Roller Tables" or "Local Tables." |
| **MSA** | The Management Services Agreement dated September 9, 2011 and entered into between the Claimants and the Respondents for the provision of management and technical services in the development and construction of Solaire Resort and Casino. |
| **MSA Damages** | The damages that the Claimants have petitioned the Tribunal to award GGAM on account of management fees, pre-termination fees and expenses, Philippine withholding tax gross-up. |
| **PAGCOR** | Philippine Amusement and Gaming Corporation, the regulator of the Philippine gaming industry and the owner of a number of gambling facilities in the Philippines. |
| **Participation Agreement or PA** | Participation Agreement dated December 20, 2012 entered into by GGAM, BRC and PMTC entered into a Participation Agreement as the Investor, Company, and Grantor, respectively. |
| **PHP** | Philippines Peso. |
| **Preliminary Writs** | Writs of preliminary attachment and preliminary injunction issued by the RTC on February 27, 2014. |
| **Request for Reconsideration** | Respondents' Request for Reconsideration of the Partial Award on Liability dated August 31, 2017. |

| Remedies Hearing | Evidentiary hearing on remedies held in Washington D.C. on May 28, 2018 to June 1, 2018. |
|---|---|
| Respondents | The Respondents in this arbitration, Bloomberry Resorts and Hotels, Inc. and Sureste Properties, Inc. |
| RTC | Regional Trial Court. |
| Services | A term defined in Annex H of the MSA as "those services of GGAM set forth in Annex A [of the MSA]." |
| SGV/EY Report | A report which Respondents commissioned from SyCip Gorres Velayo & Co., a Philippine-based affiliate of Ernst & Young, in 2013. |
| GGAM Shares / Shares | GGAM's 921,184,056 shares in the Respondents' parent, BRC, acquired by GGAM exercising its option to purchase these shares under the EOA. |
| Solaire | Solaire Resort and Casino, an integrated casino hotel entertainment complex located in Paranque City, Metro Manila, Philippines. |
| Travel Expenses | Expenses incurred by the Claimants in travelling to and from the Solaire (quantified at US$ 242,747 by the Claimants). |
| UNCITRAL Rules | UNCITRAL Arbitration Rules 2010. |

**B.**     **List of *dramatis personae***

| | |
|---|---|
| **BRC** | Bloomberry Resorts Corporation, a company registered under the laws of the Republic of the Philippines and listed on the Philippines Stock Exchange. The parent company of Bloomberry Resorts and Hotels, Inc. and Sureste Properties, Inc. |
| **BRHI** | Bloomberry Resorts and Hotels, Inc., the First Respondent, a company registered under the laws of the Republic of the Philippines. |
| **Cantor  Fitzgerald  or  Cantor** | Cantor Fitzgerald, US-based investment banking corporation employed by GGAM. |
| **Claimants** | Collectively, Global Gaming Philippines LLC (as assignor) and GGAM Netherlands B.V. (as assignee). |
| **de Roos, Jan A.** | Claimants' expert and author of the Cornell Report. HVS Professor of Hotel Finance and Real Estate in the School of Hotel Administration at Cornell University's SC Johnson College of Business. |
| **French, Michael D.** | Former COO of the Solaire. |
| **GGAM / GGAM Philippines** | Global Gaming Philippines LLC. The original party to the MSA. Party to the EOA and PA (as assignor). |
| **GGAM Netherlands** | GGAM Netherlands B.V. (as assignee). |
| **Kalt, Joseph P.** | Claimant's Expert who opines on the valuation of the management fees due to the Claimants, and the damages arising from GGAM's inability to sell the Shares in three (3) reports dated June 15, 2015, May 15, 2017 and March 12, 2019. Emeritus Professor of International Political Economy at Harvard's JFK School of Government. |

| | |
|---|---|
| **Oaten, Simon** | Claimant's valuation expert. He opines on the method of calculating the management fees in three (3) reports dated June 15, 2015; May 15, 2017; and March 12, 2019. Employed as a Chartered Accountant and Partner within Deloitte LLP (UK). |
| **PMHI** | Prime Metroline Holdings, Inc, an agent and controlling shareholder of Respondents. |
| **PMTC** | Prime Metroline Transport Corp, the predecessor in interest to Prime Metroline Holdings, Inc |
| **Puno, Reynato** | Claimants' Philippine Law Expert. |
| **Razon, Enrique K.** | CEO of Bloomberry. |
| **Respondents** | Collectively, Bloomberry Resorts and Hotels, Inc. and Sureste Properties, Inc. |
| **Searby, James** | Respondents' Expert who opines on the method of calculating the management fees in two (2) reports dated August 31, 2017 and March 12, 2019. |
| **Stone, Bradley H.** | One of the three management principals of GGAM. |
| **Sureste** | Sureste Properties, Inc., the Second Respondent, a company registered under the laws of the Republic of the Philippines. |
| **Tantleff, Alan** | Respondents' valuation expert. He opines on the method of calculating the management fees in three (3) reports dated December 15, 2015; August 31, 2017; and February 4, 2019. Senior Managing Director at FTI Consulting and an expert in the hospitality industry. |
| **Vitug, Jose** | Respondents' Philippine Law Expert. |

## II.      PARTIES

### A.      Claimants

1.      The Claimants are Global Gaming Philippines LLC (as assignor) and GGAM Netherlands B.V. (as assignee) (respectively **"GGAM"** / **"GGAM Philippines"** and **"GGAM Netherlands"**; collectively the **"Claimants"**).

2.      The Claimants are represented by:

Daniel H. Weiner
Hagit Muriel Elul
Meaghan Gragg

HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
United States of America
Telephone +1 (212) 837-6000
Facsimile: +1 (212) 422-4726
E-mail:  daniel.weiner@hugheshubbard.com
            Hagit.Elul@HughesHubbard.com
            Meaghan.Gragg@HughesHubbard.com

### B.   Respondents

3.      The Respondents are Bloomberry Resorts and Hotels, Inc. (**"BRHI"**) and Sureste Properties, Inc. (**"Sureste"**) (collectively, the **"Respondents"** or **"Bloomberry"**). The Respondents are owners of the Solaire Resort and Casino, an integrated casino hotel entertainment complex located in Paranque City, Metro Manila, Philippines (the **"Solaire"**).

4.      The Respondents are represented by:

Michael D. Nolan, *Esq.*
David Cohen
Erin M. Culbertson
Brett Lowe
Kamel M. Aitelaj

11

MILBANK, TWEED, HADLEY & MCCLOY LLP
International Square Building
1850 K Street, N.W.
Suite 1100
Washington, DC 20006
United States of America
Telephone: +1 (202) 835-7500
Facsimile: +1 (202) 263-7586
E-mail:  mnolan@milbank.com
   eculbertson@milbank.com
   dcohen2@milbank.com
   blowe@milbank.com
   kaitelaj@milbank.com


Purisimo S. Buyco
Robel C. Lomibao
PICAZO BUYCO TAN FIDER & SANTOS
Penthouse Liberty Center
104 H.V. dela Costa St., Salcedo Village
1227 Makati City, Metro Manila
Republic of the Philippines
Telephone: (632) 888-0999
Facsimile: (632) 888-1011
E-mail:  psbuyco@picazolaw.com
   rclomibao@picazolaw.com


5.   The Claimants and the Respondents are collectively referred to as the "**Parties**".  In the Partial Award on Liability dated September 20, 2016 ("**Liability Award**"), the Tribunal treated the different Claimants and the different Respondents as a single Claimant entity and Respondent entity respectively. At that time, the Parties proceeded on the basis that they were either jointly entitled or jointly liable.[1] In this Award ("**Final Award**"), the Tribunal sets out the Parties' positions and its views on the Parties' respective rights and liabilities at paragraphs 172 to 180 below.

---

[1] Liability Award, para. 5.

## III.    PROCEDURAL HISTORY

### A.    Procedural history of the present proceedings

6.    The procedural history of the present proceedings has been set out, in part, in the following.

    (a)    Paragraphs 6 – 23 of the Tribunal's Order in respect of the Claimants' Interim Measures Application dated December 9, 2014 following an interim measures hearing from October 20 – 22, 2014 in Washington, D.C. ("**IM Order**");

    (b)    Paragraphs 6 – 45 of the Liability Award; and

    (c)    Paragraphs 6 – 13 of the Tribunal's Decision on Request for Reconsideration of the Partial Award on Liability dated November 22, 2017 ("**Decision on Reconsideration**").

7.    The IM Order, Liability Award, and Decision on Reconsideration also set out other relevant background details of the dispute, which will therefore not be repeated in this Remedies Award. Besides the procedural history already set out in those decisions, the Tribunal notes for completeness that part of the Respondents' case on remedies had been set out in their Rejoinder Memorial on Damages and Other Remedies dated December 15, 2015 ("**Rejoinder Memorial on Damages**") pursuant to Procedural Order No. 11.

8.    This Final Award adopts the abbreviations set out in the IM Order, Liability Award and Decision on Reconsideration unless otherwise specified in this Award.

9.    For purposes of clarity, the present section will deal with the procedural history not already set out in the IM Order, Liability Award, and Decision on Reconsideration (as set out at paragraphs 6(a) to 6(c) above), and will be organized in the following manner.

    (a)    Summary of Procedural Orders issued since the Liability Award;

    (b)    Matters in relation to paragraph 324 of the Liability Award;

    (c)    Matters in relation to the respective rights and liabilities of each of the Parties;

13

| | (d) | Matters in relation to document production; |
|---|---|---|

(e)    Matters in relation to the Parties' supplemental submissions, and the evidentiary hearing on remedies ("**Remedies Hearing**");

(f)    Matters in relation to the Claimants' application to direct the Respondents to cease actions opposing the implementation of the IM Order;

(g)    The Remedies Hearing;

(h)    Matters in relation to issues after the conclusion of the Remedies Hearing; and

(i)    Other procedural matters.

**B.**    **Summary of Procedural Orders Issued since the Liability Award**

10.    On October 26, 2016, the Tribunal issued Procedural Order 15 ("PO 15"), which addressed matters in relation to paragraph 324 of the Liability Award, and the respective rights and liabilities of each of the Parties.

11.    On November 17, 2016, the Tribunal issued Procedural Order 16 ("**PO 16**"), which addressed matters in relation to paragraph 324 of the Liability Award, and document production.

12.    On February 2, 2017, the Tribunal issued Procedural Order 17 ("**PO 17**"), which addressed matters in relation to the Parties' supplemental submissions and the Remedies Hearing.

13.    On January 6, 2018, the Tribunal issued Procedural Order 18 ("**PO 18**"), which addressed matters in relation to the Parties' supplemental submissions and the Remedies Hearing.

14.    On January 16, 2018, the Tribunal issued Procedural Order 19 ("**PO 19**"), which addressed matters in relation to Claimants' application to direct Respondents to cease actions opposing the implementation of the IM Order.

15.   On March 30, 2018, the Tribunal issued Procedural Order 20 ("**PO 20**"), which addressed matters in relation to the Parties' supplemental submissions and the Remedies Hearing.

16.   On April 10, 2018, the Tribunal issued Procedural Order 21 ("**PO 21**"), which further addressed matters in relation to the Parties' supplemental submissions and the Remedies Hearing.

**C.    Matters in relation to Paragraph 324 of the Liability Award**

17.   On September 23, 2016, the Claimants requested the Tribunal to issue directions for prompt determination of the matters outlined in Paragraph 324 of the Liability Award, and set a schedule for prompt consultation with the Parties on the organization of the Remedies Phase (the "**Claimants' Letter of September 23, 2016**").

18.   On September 26, 2016, the Respondents provided their comments on the Claimants' Letter of September 23, 2016 (the "**Respondents' Letter of September 26, 2016**").

19.   By email dated September 29, 2016, the Tribunal noted the Claimants' Letter of September 23, 2016 and Respondents' Letter of September 26, 2016, and invited the Claimants to file their formal application in pursuance of either or both of the matters at paragraph 324 of the Liability Award if they still wished to do so. The Tribunal set a deadline of October 6, 2016 for the Claimant to do so, and a deadline of October 13, 2016 for the Respondents to respond to the application.

20.   On October 6, 2016, the Claimants applied for relief in relation to both of the matters at paragraph 324 of the Liability Award. The Claimants argued that the Respondents' corporate parent, Bloomberry Resorts Corporation ("**BRC**"), had publicly issued a misleading disclosure regarding the Liability Award which led to the continued hindrance of GGAM's ability to sell its Shares and to receive dividends paid on them. The Claimants sought the following relief pursuant to Clauses 2, 8 and 12 of PO 3, Annex A.

  (a)   Granting GGAM immediate leave to provide a complete copy of the Liability Award to the following entities and individuals:

    (i)    the Philippine courts;

(ii)    Philippine government authorities, including the Philippine Amusement and Gaming Corporation;

(iii)   the Philippine Stock Exchange;

(iv)    the Philippine Depository & Trust;

(v)     Deutsche Bank AG and its affiliates;

(vi)    any other investment bank or brokerage firm involved in a potential transaction in GGAM' s Shares;

(vii)   prospective purchasers of GGAM' s Shares; and

(viii)  any other entity or person involved in GGAM' s opportunity to sell or transfer GGAM' s Shares.

(b)    Directing the Respondents to submit a certified letter from BRC addressed to Deutsche Bank AG stating that, "*Bloomberry Resorts Corporation, Bloomberry Resorts and Hotels, Inc. and Sureste Properties, Inc. have no objection to Deutsche Bank AG' s immediate release of all dividends paid by Bloomberry Resorts Corporation for the account of Global Gaming Philippines LLC.*"

21.    On October 13, 2016, the Respondents submitted the following reply.

(a)    The Respondents indicated that they had no objection to the Tribunal allowing Claimants to provide a complete copy of the Liability Award to the Regional Trial Court, Makati City, Branch 66 ("**RTC-Makati**") pursuant to the relief sought at paragraph 20(a)(i) above.

(b)    The Respondents submitted that BRC had released the cash dividend to Deutsche Bank AG, as the holder of record. The Respondents submitted that Deutsche Bank AG's failure to release the cash dividend was a contractual issue between Deutsche Bank AG and the Claimants. Further, Respondents submitted that BRC had not blocked, and would not block, the release of the cash dividend to Claimants.

(c)    The Respondents submitted that the Claimants may share the letter sent from Mr. Nolan to Mr. Weiner dated October 11, 2016 ("**Nolan's Letter of**

16

**October 11, 2016**"), where the Respondents indicated that there was no objection to the release of the cash dividend that BRC had paid to Deutsche Bank AG.

(d)    The Respondents submitted that the relief sought at paragraphs 20(a)(ii) to 20(a)(viii) above should be denied.

22.    On October 14, 2016, the Claimants sought leave to provide the Tribunal with the letter sent from Mr. Weiner to Mr. Nolan dated October 10, 2016 ("**Weiner's Letter of October 10, 2016**"), which was the letter preceding the October 11, 2016 Letter.

23.    On October 16, 2016, the Tribunal invited the Respondents to:

(a)    comment on the Claimants' request for leave to provide the October 10, 2016 Letter; and

(b)    furnish the Tribunal with a copy of the document that disclosed the Liability Award to the Philippine Stock Exchange.

24.    On October 18, 2016, the Respondents provided the Tribunal with the October 10, 2016 Letter, and the disclosure filed by BRC with the Philippine Stock Exchange.

25.    On October 26, 2016, the Tribunal issued PO 15. By agreement of the Parties, the Tribunal granted leave for the Claimants to provide a complete copy of the Liability Award to the RTC-Makati, and to provide a copy of Nolan's Letter of October 11, 2016 to Deutsche Bank AG. In respect of the relief sought at paragraphs 20(a)(ii) to 20(a)(viii) above, the Tribunal directed the Claimants to supplement their application with information on (i) the legal basis for and/or the Tribunal's power to grant such disclosure, (ii) the specific individuals and/or entities to which disclosure was sought, (iii) the need for such disclosure, and (iv) the necessity for such disclosure.

26.    On November 2, 2016, the Claimants submitted their response pursuant to the Tribunal's direction in PO 15, and the Respondents filed their reply on November 9, 2016.

27.    On November 17, 2016, by the issuance of PO 16, the Tribunal allowed the disclosure of the Liability Award to Deutsche Bank AG on the basis that the review of the Liability Award by Deutsche Bank AG was a preliminary step for the sale of

the Shares, and the Tribunal had decided previously in the Liability Award that GGAM could "*exercise its rights in relation to the Shares, including the right to sell* them." The Tribunal also noted that under Article 34(5) of the UNCITRAL Arbitration Rules 2010 ("**UNCITRAL Rules**"), "*[a]n award may be made public [...] where and to the extent disclosure is required of a party by legal duty, to protect or pursue a legal right or in relation to legal proceedings before a court or other competent authority.*" Further, the Tribunal granted the Claimants the liberty to apply for disclosure to other specific third parties in the event that circumstances had materially changed.

**D.**   **Matters in relation to the Respective Rights and Liabilities of each of the Parties**

28.   On September 29, 2016, the Tribunal invited the Parties to address the question of whether there was any difference between the respective rights and liabilities of each of the Claimants and/or the Respondents.

29.   On October 6, 2016, the Parties submitted their respective positions on the respective rights and liabilities of each one of them. By email dated October 13, 2016, the Respondents submitted that they had no comment on the Claimants' submission on this matter at the time. This was confirmed and recorded by the Tribunal in PO 15.

**E.**   **Matters in relation to Document Production in the Remedies Phase**

30.   On November 9 and 10, 2016, the Parties exchanged communications in relation to document production but were unable to reach agreement. The Respondents were willing to provide some of the documents requested subject to the Claimants informing the Respondents whether they "*believe information in addition to what Bloomberry has offered is necessary for its experts' computations.*" By contrast, the Claimants had proposed to provide a Redfern Schedule or to follow another procedure as directed by the Tribunal. In turn, the Respondents were opposed to the use of a Redfern Schedule.

31.   On November 17, 2016, by the issuance of PO 16, the Tribunal directed that the Respondents produce the documents that they had offered to provide. In the event that the Claimants' experts view such documents as being insufficient for their computations, the Claimants shall request from the Respondents the additional documents needed for that purpose. If the Respondents were not prepared to

produce the documents upon request, at the request of either party, the Tribunal would consider the respective position of the Parties by way of a Redfern Schedule.

32.     On December 22, 2016, the Tribunal received the Redfern Schedule containing Respondents' responses and/or objections to the Claimants' supplemental document requests.

33.     By email dated January 16, 2017, the Tribunal circulated the completed Redfern Schedule, and directed the Respondents to produce various documents by January 23, 2017.

34.     By email dated January 18, 2017, the Respondents applied for an extension to January 31, 2017 for the production of the documents ordered by the Tribunal. By email of the same date, the Tribunal granted the request.

35.     On February 6, 2017, the Respondents produced the documents as ordered by the Tribunal on January 16, 2017 ("**Respondents' Document Production of February 6, 2017**"). The Respondents had redacted certain information, including budget data, monthly figures, and statistics.

**F.     Matters in relation to the Parties' Supplemental Submissions and the Remedies Hearing**

36.     On September 29, 2016, the Tribunal invited the Parties to consult with each other on the most appropriate manner to proceed in the remedies phase ("**Remedies Phase**"), and to inform the Tribunal of their points of agreement or disagreement.

37.     On October 13, 2016, the Parties reported to the Tribunal that they agreed that each will file one further submission to address those issues reserved by the Tribunal for the Remedies Phase ("**Supplemental Submission**"), with the Claimants making their Supplemental Submission first. However, the Parties did not agree on the period of time each side should have to prepare their respective Supplemental Submissions, and indicated that the Parties were still consulting on additional disclosure regarding Solaire's financial performance since July 2013.

38.     By email dated January 31, 2017, the Claimants requested the Tribunal to set a schedule for the Parties' Supplemental Submissions, and the date for the Remedies Hearing, with the Remedies Hearing to occur no later than the summer of 2017.

39.     By email dated February 1, 2017, the Respondents expressed their concern about having adequate time to prepare their written submission, and reiterated their request that each side should be provided with three months to prepare their respective submissions.

40.     On February 2, 2017, by the issuance of PO 17, the Tribunal fixed the following time limits.

(a)     May 8, 2017 for the Claimants' Supplemental Submission; and

(b)     August 6, 2017 for the Respondents' Supplemental Submission.

41.     The Tribunal also directed the Parties to consult with each other, and advise the Tribunal on the expected length of the Remedies Hearing and counsel's common availability.

42.     On February 8, 2017, the Parties proposed to reserve five days for the Remedies Hearing, and indicated several dates in the months of September, October and November 2017. By email dated February 15, 2017, the Tribunal informed the Parties that the Tribunal members were not available on the dates proposed. The Tribunal directed the Parties to consult with each other, and advise the Tribunal on their common convenient hearing dates, taking into account the Tribunal's availability.

43.     On February 22, 2017, the Parties submitted their respective availabilities, but did not agree on dates. By email dated March 24, 2017, after considering the availability of counsel, the Tribunal fixed the Remedies Hearing for January 8 to 12, 2018.

44.     By email dated February 26, 2017, the Claimants applied for a three-month extension for the submission of their Supplemental Submission (with an extension of the same period for the Respondents) on the basis that doing so would allow for the presentation of more current data on Solaire's performance at the Remedies Hearing ("**Claimants' Application of February 26, 2017**").

45.     By email dated February 27, 2017, the Respondents disagreed with the Claimants' proposal. By email dated February 27, 2017, the Tribunal invited the Parties to confer on the Claimants' Application of February 26, 2017, and to inform the Tribunal of the results of their consultations.

46.     By emails dated March 6, 2017, the Parties informed the Tribunal that no agreement was reached. By email dated March 9, 2017, the Tribunal ordered that the schedule as set forth in PO 17 be maintained.

47.     By email dated May 3, 2017, the Claimants applied for a one-week extension for their Supplemental Submission as their primary expert under the MSA had not completed his analysis.

48.     By email dated May 3, 2017, the Respondents objected to the Claimants' application for a one-week extension, and submitted that an extension would disrupt the various obligations that the Respondents' counsel and personnel had arranged. By email of the same date, the Claimants submitted that they were willing to consent to a longer extension of time for the Respondents in order to accommodate their various obligations.

49.     By email dated May 4, 2017, the Tribunal granted the Claimants' request for a one-week extension given the limited time extension requested. The extension was subjected to an extension of the time limit for the Respondents' Supplemental Submission, the length of which was to be agreed by the Parties.

50.     By the emails dated May 11 and 12, 2017, the Parties agreed to a 25-day extension of the time limit for the Respondents to file their Supplemental Submission. By email dated May 12, 2017, the Tribunal confirmed this extension.

51.     On May 16, 2017, the Claimants filed their Claimants' Supplemental Submission on Matters Reserved for the Remedies Phase ("**Claimants' Supplemental Submission**"), together with the following supporting Witness Declarations and Expert Reports:

   (a)     Declaration of Bradley H. Stone ("**Mr. Stone**") in Support of Claimants' Supplemental Submission on Matters Reserved for the Remedies Phase dated May 15, 2017 ("**4th Stone Declaration**");

   (b)     Declaration of Jonathan D. Rein in Support of Claimants' Supplemental Submission on Matters Reserved for the Remedies Phase dated May 13, 2017 ("**4th Rein Declaration**");

   (c)     Expert Report of Chief Justice Reynato S. Puno (ret.) ("**Justice Puno**") dated May 12, 2017 ("**Puno Report**");

21

(d)     Expert Report of Guhan Subramanian dated May 15, 2017 ("**4th Subramanian Report**");

(e)     Expert Report of Jan A. de Roos ("**Prof. de Roos**") dated May 14, 2017 ("**de Roos Report**");

(f)     Supplemental Expert Report of Joseph P. Kalt ("**Prof. Kalt**") dated May 15, 2017 ("**2nd Kalt Report**"); and

(g)     Supplemental Expert Report of Simon Oaten ("**Mr. Oaten**") dated May 15, 2017 ("**2nd Oaten Report**").

52.     On May 19, 2017, the Claimants filed a corrected copy of the Claimants' Supplemental Submission. The Claimants indicated that they had corrected some of the citations and typographical errors in the Claimants' Supplemental Submission, and had included a corrected set of Exhibits and Authorities to correspond with the corrected citations.

53.     By email dated May 20, 2017, the Respondents requested the Claimants to circulate a redline comparison of the corrected Claimants' Supplemental Submission and the original Claimants' Supplemental Submission. By email of the same date, the Claimants circulated the requested document.

54.     On June 8, 2017, the Claimants applied for Mr. Michael S. Popok (Deputy General Counsel and Head of Litigation for Cantor Fitzgerald ("**Cantor**" or "**Cantor Fitzgerald**")) to (i) attend the Remedies Hearing in Singapore in January 2018, and (ii) review redacted versions of the Parties' pleadings, submissions and statements in this arbitration, as well as any rulings or awards of the Tribunal ("**Claimants' Application of June 8, 2017**").

55.     By email dated June 9, 2017, the Tribunal invited the Respondents to comment on the Claimants' Application of June 8, 2017. By email of the same date, the Respondents requested clarifications on whether confidential information (pursuant to PO 3 and PO 5) had been disclosed by any of the Claimants' counsel, party representatives, witnesses, or experts to any employee, officer, director, and/or affiliate of Cantor Fitzgerald, and if so, what confidential information had been disclosed and to whom.

56.     By email dated June 10, 2017, the Tribunal allowed the clarifications sought by the Respondents.

57.     By email dated June 12, 2017, the Claimants confirmed that "*with the exception of those persons permitted by Procedural Orders Nos. 3 and 5 (as amended) – i.e., Jonathan Rein, Christine Levett and Sandra Lu -- no employee, officer, director or affiliate of Cantor Fitzgerald has reviewed any Confidential Information in this arbitration, including the Management Fees damages analysis prepared by Mr. Oaten of Deloitte.*" The Claimants also submitted that the Respondents' concerns of confidentiality could be readily addressed by the redaction of confidential information and the exclusion of Mr. Popok from the Remedies Hearing where confidential information is discussed. Further, the Claimants submitted that the Respondents had themselves communicated with an employee of Cantor Fitzgerald previously to "*discuss this arbitration.*"

58.     By email dated June 12, 2017, the Respondents clarified that the previous communication with the employee from Cantor Fitzgerald was made in connection with discussions regarding settlement. Further, the Respondents submitted that they had previously made clear to the Claimants that "*no confidential information could be disclosed to Mr. Popok or any other Cantor Fitzgerald employee, save Christine Levett and Sandra Yu.*"

59.     By email dated June 14, 2017, the Tribunal, having considered the Parties' views, denied the Claimants' Application of June 8, 2017. The Tribunal stated that the relevant considerations behind PO 3 and PO 5 had not changed, in particular, members of Cantor Fitzgerald might find themselves in a position as being actual competitors of the Respondents. Further, Mr. Popok was not taking over from one of the persons permitted to review confidential information pursuant to the provisions of PO 3 and PO 5.

60.     On August 8, 2017, the Claimants sought leave to amend their request for relief in the Claimants' Supplemental Submission due to alleged additional misconduct by Respondents ("**Claimants' Application of August 8, 2017**"). By email of the same date, the Respondents acknowledged receipt of the Claimants' Application of August 8, 2017, and requested to have until August 31, 2017 to provide a response.

61.     By email dated August 9, 2017, the Tribunal invited Respondents to comment on the Claimants' Application of August 8, 2017 by August 18, 2017. The Tribunal considered that a three-week deadline would have been excessive given the nature of the Claimants' request.

62.  By email dated August 14, 2017, the Respondents indicated that they had no objection to the Claimants' application to amend their request for relief in the Claimants' Supplemental Submission.

63.  By email dated August 15, 2017, the Tribunal granted leave for the Claimants to amend their request for relief in the Claimants' Supplemental Submission.

64.  On August 24, 2017, the Claimants filed their amended request for relief in the Claimants' Supplemental Submission ("**Amended Request for Relief**").

65.  On August 31, 2017, the Respondents filed their Sur-Rejoinder Memorial on Damages and Other Remedies ("**Respondents' Sur-Rejoinder on Damages**") and their Request for Reconsideration of the Partial Award on Liability dated August 31, 2017 ("**Request for Reconsideration**"), together with the following Witness Declarations and Expert Reports:

(a)  Second Supplemental Declaration of Donato C. Almeda ("**Mr Almeda**") dated August 31, 2017 ("**3rd Almeda Declaration**");

(b)  Supplemental Declaration of Gerald Angelo Emilio J. Festin dated August 31, 2017 ("**2nd Festin Declaration**");

(c)  Declaration of Jorge V. Sarmiento ("**Mr. Sarmiento**") dated August 28, 2017 ("**Sarmiento Declaration**");

(d)  Expert Witness Statement of Carlos Baniqued dated August 31, 2017 ("**Baniqued Report**");

(e)  Expert Report of James Searby ("**Mr. Searby**") dated August 31, 2017 ("**Searby Report**");

(f)  Fourth Expert Report of Steven Davidoff Solomon dated August 31, 2017 ("**4th Solomon Report**");

(g)  Expert Report of Fredric Gushin and Daniel Reeves of Spectrum Gaming Group dated August 31, 2017 ("**Spectrum Report**");

(h)  Expert Report of Alan Tantleff ("**Mr. Tantleff**") in reply to Reports Prepared by Simon Oaten and Jan de Roos on behalf of Claimants dated August 31, 2017 ("**2nd Tantleff Report**");

(i)     Expert Opinion of Prof. Stef van Weeghel dated August 31, 2017 ("**van Weeghel Report**"); and

(j)     4th Supplemental Opinion of Justice Jose C. Vitug (ret.) ("**Justice Vitug**"; "**4th Vitug Report**").

As noted above, the procedural history in respect of the Request for Reconsideration has been set out in the Decision on Reconsideration and will not be repeated here.

66.    By email dated September 8, 2017, the Respondents filed the Exhibits and Authorities for the Expert Witness Statement of Carlos G. Baniqued, which were not available when the Respondents' Sur-Rejoinder on Damages was submitted on August 31, 2017.

67.    By email dated November 24, 2017, the Tribunal invited the Parties to confer on the organization of the January Remedies Hearing, and to advise the Tribunal of the results of their consultations, including the venue of the Remedies Hearing.

68.    By email dated December 4, 2017, the Parties agreed to the Tribunal's proposal to move the Remedies Hearing to Washington, D.C. for health reasons of a member of the Tribunal.

69.    By email dated December 8, 2017, the Parties submitted their joint proposal on the organization of the Remedies Hearing. By email dated December 11, 2017, the Tribunal accepted the Parties' joint proposal.

70.    On December 14, 2017, the Claimants filed a letter to the Tribunal in support of their gross-up claim, purporting to "*address an issue that Respondents raised for the first time in their Sur-Rejoinder Memorial on Damages and Other Remedies and their Request for Reconsideration of the Partial Award on Liability*" and enclosing:

(a)     Report of Frederik Gillis Barnard dated December 14, 2017 ("**Barnard Report**"); and

(b)     Expert Report of Maria Elizabeth E. Peralta-Loriega dated December 14, 2017 ("**Peralta-Loriega Report**")

(together, the "**Claimants' Submission of December 14, 2017**").

71.     On December 19, 2017, pursuant to the Tribunal's direction, the Respondents submitted that the Claimants' Submission of December 14, 2017 was not in accordance with PO 17, the UNCITRAL Rules and the Parties' agreement to arbitrate. The Respondents submitted that the Remedies Hearing should be postponed in order to allow the Respondents to have a meaningful opportunity to consider and be heard in respect of the Claimants' Submission of December 14, 2017. In the alternative, the Respondents submitted that the proceedings should be stayed in order to allow the Parties to make a joint application to the Philippines' Bureau of Internal Revenue to issue guidance and/or a ruling to the Tribunal.

72.     On December 21, 2017, pursuant to the Tribunal's direction, the Claimants explained the reasons for the Claimants' Submission of December 14, 2017, and argued that they should be given the opportunity to respond to Respondents' "*lengthy, complex expert witness reports on a never-before-raised issue*" that was raised in the Respondents' Sur-Rejoinder on Damages (the "**Claimants' Response of December 21, 2017**"). Further, the Claimants submitted that the postponement of the Remedies Hearing was not warranted.

73.     On December 21, 2017, the Respondents (i) informed the Tribunal that they had petitioned the High Court of the Republic of Singapore to set aside the Liability Award (the "**Singapore High Court Proceedings**"), and (ii) applied to the Tribunal to order a stay of the Remedies Hearing, and provide for appropriate further written proceedings (the "**Respondents' Application of December 21, 2017**").

74.     On December 22, 2017, pursuant to the Tribunal's direction, the Claimants replied to the Respondents' Application of December 21, 2017, and reiterated that the Tribunal should hold the Remedies Hearing as scheduled.

75.     By email dated December 22, 2017, pursuant to the Tribunal's direction, the Respondents commented on Claimants' Response of December 21, 2017,

76.     On December 22, 2017, pursuant to the Tribunal's direction, the Respondents furnished the High Court Originating Summons and supporting affidavit of Mr. Michael Nolan (collectively the "**High Court Documents**"). The High Court Documents were furnished to the Claimants on December 23, 2017, pursuant to the Tribunal's direction.

77. On December 24, 2017, the Claimants made a further submission to reiterate that the Remedies Hearing should proceed as scheduled.

78. By email dated December 26, 2017, the Tribunal informed the Parties of the following.

> *"First, from an efficient case management point of view, the Tribunal considers that all issues related to quantum should be dealt with together after they have been fully briefed, and it has decided to postpone the January hearing.*
>
> *Second, the Tribunal would be available for a 5-day hearing in Singapore May 28 to June 1, 2018.*
>
> *Third, the Tribunal will allow further filings on the tax issue; each filing to be restricted to responding to what has been filed before.*
>
> *Fourth, the Tribunal invites the Parties to confer on the schedule of filings between now and May 28, 2018, and inform the Tribunal no later than January 3, 2018 of the resulting procedural calendar. For purposes of these consultations, the Parties shall treat May 28 as the latest date to which the Tribunal wishes to postpone the hearing.*
>
> *Fifth, the last filing shall be no later than 60 days before the start of the hearing.*
>
> *Sixth, shortly after receiving the result of the Parties' consultations, the Tribunal will issue a reasoned procedural order."*

(the "**Tribunal's Direction of December 26, 2017**")

79. On January 3, 2018, pursuant to the Tribunal's Direction of December 26, 2017, the Parties submitted that they were unable to agree on the schedule of filings, and presented their respective proposals.

80. On January 6, 2018, by the issuance of PO 18, the Tribunal set out the calendar for submissions, and confirmed that each Party's filing shall be restricted to responding to the other party's preceding filing. Further, the Tribunal fixed the Remedies Hearing for the week of May 28 to June 1, 2018 in Singapore.

81.   On February 14, 2018, pursuant to PO 18, the Respondents filed a letter enclosing the following Expert Reports in response to the Claimants' Submission of December 14, 2018:

    (a)   Expert Opinion of Professor Hugh J. Ault dated February 14, 2018 ("**Ault Report**");

    (b)   Second Expert Opinion of Prof. Dr. Stef van Weeghel ("**2nd van Weeghel Report**"); and

    (c)   Reply to Expert Report of Maria Elizabeth E. Peralta-Loriega by Carlos G. Baniqued dated February 14, 2018 ("**2nd Baniqued Report**")

    (collectively, the **"Respondents' Submission of February 14, 2018"**).

82.   On March 7, 2018, pursuant to PO 18, the Claimants filed the following Expert Reports and Declaration in response to the Respondents' Submission of February 14, 2018:

    (a)   Declaration of James Ficarro dated March 7, 2018 ("**Ficarro Declaration**");

    (b)   Second Report of Frederik Gillis Barnard dated March 7, 2018 ("**2nd Barnard Report**");

    (c)   Expert opinion of Peter Kavelaars dated March 7, 2018 ("**Kavelaars Report**"); and

    (d)   Expert Report of Maria Elizabeth E. Peralta-Loriega dated March 7, 2018 ("**2nd Peralta-Loriega Report**")

    (collectively, the **"Claimants' Submission of March 7, 2018"**).

83.   On March 28, 2018, pursuant to PO 18, the Respondents filed a letter enclosing the following Expert Reports in response to the Claimants' Submission of March 7, 2018:

    (a)   Second Expert Opinion of Professor Hugh J. Ault dated March 28, 2018 ("**2nd Ault Report**");

(b)     Third Expert Opinion of Prof. Dr. Stef van Weeghel dated March 28, 2018 ("**3ʳᵈ van Weeghel Report**"); and

(c)     Sur-Reply to Second Expert Report of Maria Elizabeth E. Peralta-Loriega dated March 7, 2018 by Carlos G. Baniqued dated March 28, 2018 ("**3ʳᵈ Baniqued Report**")

(collectively, the "**Respondents' Submission of March 28, 2018**").

84.    By email dated February 8, 2018, the Tribunal directed the Parties to confer and agree upon (i) the timetable for the Remedies Hearing, (ii) a program for the presentation of witnesses, ensuring that the five hearing days scheduled are adequate, and (iii) whether witness conferencing of expert witnesses should be employed. Further, the Tribunal requested that the Parties' witnesses testifying on similar issues produce a Redfern-styled document setting out the agreed list of issues, and the differing views of the experts on each issue of contention.

85.    On February 28, 2018, the Parties informed the Tribunal that they were unable to reach agreement on items (i)–(iii) mentioned at paragraph 84 above. First, the Respondents requested that the Parties be permitted to confer on items (i) and (ii) mentioned at paragraph 84 above after the Claimants' March 7, 2018 submission. This was, in turn, challenged by the Claimants. Second, while the Respondents were amenable to witness conferencing, the Claimants were of the view that conferencing of expert witnesses should not be employed.

86.    On March 6, 2018, the Tribunal directed the Parties to continue to confer, and inform the Tribunal of the results of their consultations.

87.    On March 14, 2018, the Parties informed the Tribunal that they were in agreement on items (i) and (ii) mentioned at paragraph 84 above. However, the Parties were unable to reach agreement on item (iii) at the same paragraph. The Claimants submitted that "*conferencing of expert witnesses need not be employed, primarily due to the efficiency of standard cross-examination in eliciting areas of concern.*" On the other hand, the Respondents submitted that they were "*amenable to witness conferencing, provided that the Parties agree on a defined list of issues pursuant to which conferencing will proceed and adequate time for cross-examination is separately allowed in respect of the witnesses.*" Further, the Parties submitted that they were amenable to holding the Remedies Hearing in Washington D.C.

88.   On March 16, 2018, the Tribunal directed the Parties to confer further on the matter of expert witness conferencing, and inform the Tribunal of the results of their consultations. The Tribunal also confirmed that it was amenable to holding the Remedies Hearing in Washington D.C.

89.   On March 23, 2018, the Parties confirmed their agreement with the Tribunal's suggestion that "*experts meet before the hearing and prepare an agreed list of issues, and summaries of their opinions on those issues*" and "*Counsel may then use the schedule of issues and summaries as a basis for their cross-examination.*" The Parties submitted the following proposed schedule ("**Proposed Schedule**").

  (i)     Expert witnesses to complete pre-hearing meetings (either in-person or telephonic, depending on the needs of the experts) by April 17, 2018;

  (ii)    Expert witnesses to complete agreed list of issues by May 1, 2018;

  (iii)   Expert witnesses to complete summaries of opinions on agreed list of issues by May 15, 2018; and

  (iv)    Parties jointly submit their schedule of issues and summaries to the Tribunal by May 16, 2018.

90.   By email dated March 23, 2018, the Tribunal acknowledged receipt of the Proposed Schedule, and indicated that a new procedural order would be issued to reflect the Parties' agreement.

91.   By email dated March 29, 2018, the Claimants requested confirmation on whether the Proposed Schedule submitted to, and acknowledged by the Tribunal, superseded the Tribunal's prior direction of February 8, 2018. By email dated April 2, 2018, the Tribunal confirmed that the prior direction had been superseded.

92.   On March 30, 2018, by the issuance of PO 20, the Tribunal consolidated and fixed the logistics for the Remedies Hearing. By email of the same date, the Tribunal directed the Parties to confer on and confirm the following items in PO 20 (including the dates as set out): (i) venue of the Remedies Hearing (paragraph 1 of PO 20); (ii) examination of witnesses and experts (paragraph 9(c)i of PO 20); (iii) deadline for the designation of party representatives (paragraph 11 of PO 20); and (iv) deadline and location with regard to documents to be used at the Remedies Hearing (paragraph 12 of PO 20).

93.   On April 4, 2018, the Parties submitted their confirmation on items (i) to (iii) mentioned at paragraph 92 above. However, the Parties were unable to agree on the deadline for the exchange of documents that were not previously submitted in the record. While the Claimants agreed to the deadline originally set by the Tribunal for May 17, 2018, Respondents proposed May 3, 2018 to be the deadline, but with a *"proviso that to the extent either Party believes that additional documents are necessary in light of the exchange of expert summaries on May 16, those additional documents could be exchanged on May 17."*

94.   On April 10, 2018, by the issuance of PO 21, the Tribunal amended paragraph 12(d) of PO 20 as follows:

   *"1. Deadline for the exchange of documents not previously submitted in the record.*

   *Paragraph 12(d) of Procedural Order No. 20 is to be amended to read:*

   *(d) Any additional documents not previously submitted in the record shall be provided to the other Party by 3 May, 2018, subject to the exceptions below:*

   *i.      Documents which the relevant Party, on 3 May, 2018, had indicated to the Tribunal that they will be producing on 17 May, 2018.*

   *ii.     New documents which surfaced as a result of the 10 May, 2018 expert meeting.*

   *In the event that any of these exceptions is applicable, the further documents shall be produced by 17 May, 2018. The Parties' use of additional documents to be exchanged on 3 May and 17 May, 2018 is to be limited to cross-examination or rebuttal. The Parties may use documents previously submitted in the record."*

95.   By email dated April 2, 2018, the Claimants sought permission from the Tribunal to address the Respondents' allegation in the Respondents' Submission of March 28, 2018, that the Claimants violated the Tribunal's orders on confidentiality. By email dated April 3, 2018, the Tribunal granted the request, and the Claimants' response was submitted on April 5, 2018 (**"Claimants' Response of April 5, 2018"**).

96.   By email dated April 6, 2018, the Respondents sought permission from the Tribunal to respond to the Claimants' Response of April 5, 2018. By email dated April 9,

2018, the Tribunal granted the request, and the Respondents' response was submitted on April 11, 2018.

97.   On April 12, 2018, the Claimants applied to the Tribunal to (i) direct the Respondents to update the Respondents' Document Production of February 6, 2017 to include the latest non-public information available regarding Solaire's financial performance, or (ii) if the Respondents refuse to do so, to preclude the Respondents from using that information at the Remedies Hearing (the "**Claimants' Application of April 14, 2018**").

98.   By email dated April 14, 2018, the Tribunal granted permission for the Respondents to reply to the Claimants' Application of April 14, 2018. On April 17, 2018, the Respondents submitted that there was no reason for the Tribunal to order a production of documents or a blanket prohibition against the Respondents' use of that information.

99.   By email dated April 19, 2018, the Tribunal (i) denied the Claimants' application that the Respondents be ordered to update the Respondents' Document Production of February 6, 2017 to include the latest non-public information available regarding Solaire's financial performance, and (ii) ordered that the Respondents be precluded from using that information in the Remedies Hearing, as the Tribunal had previously decided only to allow further filings related to the tax issue.

100.   By email dated April 13, 2018, Claimants applied to the Tribunal for a three-day extension to the deadline for the expert witnesses to complete their pre-hearing meetings. By email dated April 15, 2018, the Tribunal granted the extension.

101.   By email dated April 16, 2018, the Respondents submitted that the Parties were unable to agree on the approach for the preparation of the experts' joint issue lists. While the Respondents were of the view that it was better for the preparation to be done without the involvement of counsel, the Claimants indicated that it was appropriate for counsel to review the experts' joint issue lists and summaries of opinion prior to their completion.

102.   By email dated April 19, 2018, the Tribunal ordered that the experts shall have their meeting and produce their joint issue lists without the involvement of counsel. However, the experts may report to counsel after their meeting.

103.   By email dated May 4, 2018, the Claimants notified the Tribunal that they will be producing the first-quarter financial results of BRC, together with independent

industry analyst reports discussing those results on May 17, 2018. By email dated May 6, 2018, the Respondents submitted that they reserved their rights with respect to the Claimants' notice of intent to submit new financial data and analysis, so as to ensure that they will be given an opportunity to be heard before the use of those materials.

104. On May 16, 2018, the Parties submitted their experts' summaries and lists of issues ("**Experts' Issue Summaries**"). For convenience, these are set out below.

105. The Claimants submitted 8 summaries from their experts, with one set of appendices:

    (a)    Joint Statement of Matters of Expert Agreement and Disagreement – Professor Jan de Roos (on behalf of Claimants) and Alan Tantleff (on behalf of Respondents) dated May 15, 2018 ("***Claimants' de Roos-Tantleff Summary***");

    (b)    Summary of Expert Opinion Regarding Issues of Agreement, Difference, and Disagreement between Joseph P. Kalt, PhD and James Searby by Joseph P. Kalt, PhD dated May 15, 2018, enclosing Appendices A and B ("***Claimants' Kalt-Searby Summary***");

    (c)    Schedule of summaries of opinions of Frederick Gillis Barnard and Peter Kavelaars ("***Claimants' Barnard/Kavelaars Summary***");

    (d)    Schedule of Chief Justice Reynato S. Puno's summaries of opinion ("***Claimants' Puno Summary***");

    (e)    Schedule of Maria Elizabeth E. Peralta-Loriega's summaries of opinion ("***Claimants' Peralta-Loriega Summary***");

    (f)    Schedule of Guhan Subramanian's summaries of opinion ("***Claimants' Subramanian Summary***");

    (g)    Summary of Opinions of Simon Oaten on List of Issues agreed with Alan Tantleff dated May 15, 2018 ("***Claimants' Oaten-Tantleff Summary***"); and

    (h)    Summary of Opinions of Simon Oaten on List of Issues agreed with James Searby dated May 15, 2018 ("***Claimants' Oaten-Searby Summary***").

106. The Respondents submitted 9 summaries from their experts:

(a)     List of Experts' Issues and Summaries of Opinions by Stef van Weeghel and Hugh Ault ("***Respondents' van Weeghel/Ault Summary***");

(b)     Summary of Opinion on Agreed List of Issues by Carlos G. Baniqued dated May 15, 2018 ("***Respondents' Baniqued Summary***");

(c)     Summary of Opinions of Justic Jose C. Vitug dated May 16, 2018 ("***Respondents' Vitug Summary***");

(d)     Summary of Expert Opinion Regarding Issues of Agreement, Difference, and Disagreement between Joseph P. Kalt, PhD and James Searby by James Searby dated May 15, 2018 ("***Respondents' Kalt-Searby Summary***");

(e)     Joint Statement of Matters of Expert Agreement and Disagreement Simon Oaten (on behalf of Claimants) and James Searby (on behalf of Respondents) dated May 15, 2018 ("***Respondents' Oaten-Searby Summary***");

(f)     Solomon-Subramanian Scope of Disagreement ("***Respondents' Solomon-Subramanian Summary***");

(g)     Summary of Expert Opinions of Fredric Gushin and Daniel Reeves of Spectrum Gaming Group ("***Respondents' Gushin/Reeves Summary***");

(h)     Joint Statement of Matters of Expert Agreement and Disagreement Professor Jan de Roos (on behalf of Claimants) and Alan Tantleff (on behalf of Respondents) dated May 15, 2018 ("***Respondents' de Roos-Tantleff Summary***"); and

(i)     Joint Statement of Matters of Expert Agreement and Disagreement Simon Oaten (on behalf of Claimants) and Alan Tantleff (on behalf of Respondents) dated May 15, 2018 ("***Respondents' Oaten-Tantleff Summary***").

107.    On May 16, 2018, the Respondents applied to the Tribunal for the postponement of the Remedies Hearing in its entirety, or at the minimum, to have the oral examination of the Parties' valuation experts (*i.e.*, Mr. Oaten and Prof. Kalt for the Claimants; Mr. Tantleff and Mr. Searby for the Respondents) conducted at a later hearing ("**Respondents' Application of May 16, 2018**"). The Respondents

submitted that the matters described by the Claimants' expert, Mr. Oaten, in his May 16, 2018 summary (citing portions from the Claimants' Oaten-Tantleff Summary set out in Exhibit A to the Respondents' Application of May 16, 2018) *"fundamentally departs from his prior testimony."* The Respondents submitted that without the adjustment sought, the Respondents would have no ability to confront new principal evidence supporting the Claimants' valuation.

108.    On May 18, 2018, pursuant to the Tribunal's directions, the Claimants objected to the Respondents' application to postpone the Remedies Hearing. The Claimants submitted that the matters described in Claimants' Oaten-Tantleff Summary were not new, and were previously addressed in his reports dated June 15, 2015 and May 15, 2017.

109.    By its email dated May 18, 2018, the Tribunal observed that *"a summary testimony of an expert by its very nature should not depart from the reports on which it is based and these reports shall be the documents on which the expert shall be examined."* Therefore, the Tribunal considered that postponement of the Remedies Hearing was not justified, and ordered that the Remedies Hearing be held as scheduled.

110.    On May 20, 2018, the Respondents reiterated their position that the Claimants' Oaten-Tantleff Summary should not be included in arguments by counsel, or the oral testimony of fact witnesses or other experts. The Respondents submitted that the various new matters described in the Claimants' Oaten-Tantleff Summary had to be considered in the light of paragraph 1.1(a) of Annex I of the MSA.

111.    On May 23, 2018, the Tribunal instructed the Parties to refrain from referring to the various segments of the Claimants' Oaten-Tantleff Summary, as highlighted in Exhibit A of Respondents' Application of May 16, 2018, in their arguments or cross-examination of experts or fact witnesses at the Remedies Hearing (**"Tribunal's Instruction of May 23, 2018"**).

112.    On May 19, 2018, the Claimants applied to the Tribunal to (i) direct the Respondents to present Mr. Enrique K. Razon (**"Mr. Razon"**) for examination at the Remedies Hearing, or (ii) if Mr. Razon refused to appear, to disregard Mr. Razon's witness statements and prior hearing testimony (**"Claimants' Application of May 19, 2018"**).

113.    On May 21, 2018, pursuant to the Tribunal's directions, the Respondents submitted that Claimants' Application of May 19, 2018 should be denied. Respondents argued

that Mr. Razon had not submitted any witness statement for the Remedies Hearing, and that Claimants have had the opportunity to cross-examine Mr. Razon regarding the content of his prior statements during the hearing on liability in October 2015.

114. On May 23, 2018, the Tribunal denied Claimants' Application of May 19, 2018. The Tribunal noted that Claimants had already cross-examined Mr. Razon on his prior statements during the hearing on liabilities, and no new witness statement of Mr. Razon had been submitted for the Remedies Phase.

115. By email dated May 23, 2018, the Parties sought leave to present the Claimants' expert Justice Puno, and the Respondents' expert Justice Vitug, for examination at the Remedies Hearing via video conference. The Claimants also sought leave to present their expert, Mr. Peter Kavelaars, for examination via video conference. The Tribunal decided by email dated May 24, 2018 that it had no objection to the examination of witnesses via video conference.

116. By email dated May 23, 2018, the Claimants submitted their list of witnesses and experts, and the order in which they would be presented at the Remedies Hearing ("**Claimants' Submission of May 23, 2018**"). By email of the same date, the Respondents submitted that the Claimants' Submission of May 23, 2018 was not in accordance with PO 20, and argued that expert witness conferencing was previously ordered pursuant to PO 20 ("**Respondents' Response of May 23, 2018**").

117. By email dated May 24, 2018, the Claimants objected to the Respondents' Response of May 23, 2018 ("**Claimants' Response of May 24, 2018**"). By email of the same date, the Respondents replied to the Claimants' Response of May 24, 2018 stating that it "*is amenable to proceeding with or without witness conferencing in the Remedies Hearing.*" By email dated May 25, 2018, the Tribunal noted that since the Respondents had expressed their willingness to proceed without witness conferencing, the hearing would proceed without witness conferencing.

118. By emails dated May 26, 2018, the Claimants confirmed that their Party Representative to the hearing would be Mr. William P. Weidner, while the Respondents confirmed that their Party Representative would be Mr. Almeda.

**G.      Matters in relation to Claimants' application to direct Respondents to cease actions opposing the implementation of the IM Order**

119.   On December 28, 2017, the Claimants applied to the Tribunal to "*direct Respondents to cease opposing implementation of the Interim Measures Order in the Philippines Courts and take all steps necessary (including directing their agent and controlling shareholder Prime Metroline Holdings Inc. to cooperate) to file a motion to withdraw the original petition in the Philippine Regional Trial Court*" (the "**Claimants' Application of December 28, 2017**"). The Claimants submitted that, *inter alia*, the RTC-Makati was mistaken in considering the IM Order as an arbitral award subject to recognition and enforcement proceedings. Instead, the Claimants submitted that the IM Order was "*self-executing*" and did not require enforcement or recognition by the Philippine courts.

120.   On January 5, 2018, the Respondents objected to the Claimants' Application of December 28, 2017. The Respondents submitted, *inter alia*, that the Claimants had failed to initiate recognition and enforcement proceedings of the IM Order and Liability Award before the RTC-Makati.

121.   On January 16, 2018, by the issuance of PO 19, the Tribunal denied the Claimants' Application of December 28, 2017. The Tribunal was of the view that the Liability Award had appropriately addressed the issues in relation to the title of the Shares, and the Tribunal did not consider it appropriate at that stage of the proceedings to make further orders on the matter while it was before the Philippine courts.

**H.     The Remedies Hearing**

122.   On May 28, 2018, the Tribunal commenced the Remedies Hearing in Washington D.C., and concluded the Remedies Hearing on June 1, 2018.

123.   On May 29, 2018, the Respondents wrote to the Tribunal by way of email to "*make a record of Bloomberry's objection to Claimants' reference in their Opening Presentation for the Remedies Hearing to the new arguments made by Mr. Oaten in his "summaries" of opinion,*" which they contend "*has deprived Bloomberry of its ability to confront the principal evidence supporting the two main drivers of Claimants' valuation model and to develop a factual record to contend with Mr. Oaten's new opinions, which Claimants have now advocated in the oral proceedings in disregard of the Tribunal's direction, implicate Paragraph 1.1(a) of Annex I (Expert Resolution) of the MSA.*"

124.   On May 30, 2018, the Presiding Arbitrator confirmed the Tribunal's Instruction of May 23, 2018 before the start of the hearing day, and clarified that this instruction did not tie the hands of the Tribunal in interpreting the MSA.

I.      **Matters relating to issues after the conclusion of the Remedies Hearing**

125.    By way of an email dated June 4, 2018, the Presiding Arbitrator confirmed *"the Tribunal's request to the Parties to provide to the Tribunal a list of issues to be decided. The list should be devoid of argument or submissions, should not exceed ten pages with 1.5 line spacing and be received by the Tribunal no later than June 30, 2018."*

126.    On June 12, 2018, the Claimants sent a letter to the Tribunal alleging that their representatives had been turned away from BRC's annual meeting, and requesting that *"the Tribunal take into account this recent development in assessing GGAM's damages arising from Bloomberry's continued hindering and blocking of GGAM's rights in relation to its shares."*

127.    By email dated June 14, 2018, the Tribunal invited the Respondents to provide comments to the Claimants' letter dated June 12, 2018.

128.    By email dated June 16, 2018, the Claimants submitted their Errata Sheet pursuant to Clause 13 of PO 20.

129.    On June 18, 2018, the Respondents provided their comments to the Claimants' letter dated June 12, 2018 pursuant to the Tribunal's invitation dated June 14, 2018 by way of letter.

130.    By email dated June 26, 2018, the Claimants submitted *"the record citations that support the chart on page 89 of Claimants' Opening Argument slides... which compares the bad debts (shown as a percentage of VIP gaming revenues) reported by Solaire with those of comparable resorts in Macau from 2013 to 2017."*

131.    By email dated June 29, 2018, the Claimants submitted a letter dated June 29, 2018 attaching a document titled *"GGAM SHARE DAMAGES CALCULATIONS REQUESTED BY THE TRIBUNAL AT THE REMEDIES PHASE HEARING"* (also dated June 29, 2018) (the "**Claimants' Letter of June 29, 2018**"). The document was prepared by Prof Kalt purportedly in relation to a comment that a member of the Tribunal had made at the Remedies Hearing ("**Prof Kalt's Calculations of June 29, 2018**").

132.   By email dated June 30, 2018, the Claimants submitted their post-hearing List of Issues to be decided by the Tribunal (the "**Claimants' Post-Hearing List of Issues**").

133.   By email dated June 30, 2018, the Respondents submitted their post-hearing List of Issues to be decided by the Tribunal (the "**Respondents' Post-Hearing List of Issues**").

134.   On July 3, 2018, the Tribunal invited the Respondents' comments on the Claimants' Letter of June 29, 2018 by July 10, 2018.

135.   On July 10, 2018, the Respondents provided their comments on the Claimants' Communication of June 29, 2018 by way of email (the "**Respondents' Letter of July 10, 2018**"). In the Respondents' Letter of July 10, 2018, the Respondents submitted that Prof Kalt's Calculations of June 29, 2018 should be rejected, and the Respondents annexed a document titled "Updated Calculations Relating to Claimants' Shares in Bloomberry Resorts Corporation" prepared by James Searby ("**Searby's Calculations of July 10, 2018**").

136.   By email dated August 23, 2018, the Claimants requested leave from the Tribunal to submit a short response to the Respondents' Letter of July 10, 2018.

137.   By email dated August 23, 2018, the Tribunal granted the Claimants' request for leave to reply to the Respondents' Letter of July 10, 2018. The Tribunal further provided that the Respondents may submit comments on such reply no later than 10 days after receipt of the Claimants' reply.

138.   On August 24, 2018, the Claimants provided their comments on the Respondents' Letter of July 10, 2018 by way of letter (the "**Claimants' Letter of August 24, 2018**").

139.   By email dated August 28, 2018, the Respondents requested an extension of time to reply to the Claimants' Letter of August 24, 2018, and an opportunity to respond by September 14, 2018. By email dated August 29, 2018, the Tribunal granted the Respondents' requested extension of time.

140.   On September 14, 2018, the Respondents provided its response to the Claimants' Letter of August 24, 2018 (the "**Respondents' Letter of September 14, 2018**"), which enclosed a further memo from Mr Searby ("**Searby's Memo of September 14, 2018**").

141.    On February 4, 2019, the Presiding Arbitrator wrote to the Parties on behalf of the Tribunal, requesting (a) updated information; and (b) the assistance of the Parties' experts to provide updated calculations of GGAM's lost management fees based on parameters set out by the Tribunal (the "**Tribunal's Directions of February 4, 2019**"). The Tribunal set a deadline of February 19, 2019 to submit the updated information requested, and a deadline of March 5, 2019 for the Parties' experts to submit updated calculations of the lost management fees based on parameters set out by the Tribunal in its email.

142.    On February 18, 2019, the Respondents wrote to the Tribunal, requesting for an extension until March 18, 2019 to provide the financial information requested by the Tribunal (*see* paragraph 141 above) on the basis that "[a]*t this point in the calendar year, Bloomberry's representatives are and need to be focused on year-end financial reporting and audit deadlines.*" On the same day, the Claimants responded, objecting to the requested extension on the basis that "[t]*here is no good reason that Bloomberry cannot provide its Financial Books, since that is financial information prepared monthly as part of Solaire's regular business operations. Nor is there any good reason for Bloomberry to have waited two weeks to inform the Tribunal that, because of its regular financial reporting schedule, it needs another full month to provide that information,*" and requesting that the Tribunal require the Respondents to adhere to the original schedule.

143.    On February 19, 2019, the Parties both submitted various information to the Tribunal pursuant to the Tribunal's Directions of February 4, 2019. In the Respondents' submission of updated information, the Respondents reiterated their request for an extension until March 18, 2019 to submit the further information requested by the Tribunal (i.e. Solaire's Financial Books).

144.    On February 20, 2019, the Presiding Arbitrator wrote to the Parties on behalf of the Tribunal to: (a) note that only the information pertaining to Solaire's Financial Books remained outstanding; (b) request that the Respondents also provide the daily price of the Shares for the month of April (in addition to March); and (c) extend the deadline for the Respondents' submission of Solaire's Financial Books by 1 week to February 26, 2019. The Tribunal also made a further consequential extension to allow the Parties to submit their experts' further calculations by March 12, 2019.

145.   On February 26, 2019, the Respondents made a further supplemental production of documents pursuant to the Tribunal's Directions of February 4, 2019 and the Tribunal's further directions of February 20, 2019.

146.   On March 8, 2019, the Claimants submitted an application for a one-week extension of time to submit its experts' updated calculations in order to take into account Bloomberry Resorts Corporation's year-end and fourth-quarter financial results.

147.   On March 9, 2019, the Respondents wrote to the Tribunal, objecting to the Claimants' request for extension of time to submit the updated calculations on the basis that *"there is no data about Solaire's historical financial results that is contained in BRC's Financial Statements and/or analyst reports that is not also contained in Solaire's Financial Books."*

148.   On March 11, 2019, the Tribunal wrote to the Parties denying the Claimants' request for an extension of time to submit its experts' updated calculations.

149.   On March 12, 2019, the Parties submitted their experts' updated calculations pursuant to the Tribunal's Directions of February 4, 2019 (each expert's "**Updated Calculations of March 12, 2019**").

150.   On March 20, 2019, the Respondents made an application to the Tribunal, requesting that it either *"strike from the record the March 12, 2019 supplemental expert reports of Mr. Oaten and Mr Kalt,"* or, in the alternative, *"allow Bloomberry to make a further written submission so that it can, for the first time, be afforded an opportunity to address Mr. Oaten's new opinions, as well as the new calculations that Mr. Oaten and Mr. Kalt have now improperly made based on those new opinions"* (the "**Respondents' Application of March 20, 2019**"). The Respondents' application was based on the Claimants' experts allegedly contravening the Tribunal's order of May 28, 2018.

151.   On March 21, 2019, the Tribunal invited the Claimants to comment on the Respondents' Application of March 20, 2019 by March 26, 2019.

152.   On March 26, 2019, the Claimants responded to the Respondents' Application of March 20, 2019 pursuant to the Tribunal's invitation above.

153.   On March 28, 2019, the Respondents made a further submission in response to the Claimant's response. On the same day, the Claimants made a further submission in

response to the Respondents' further submission, which the Respondents again briefly responded to on the same day.

154.     On March 29, 2019, the Tribunal granted the Respondents leave to file, by no later than April 8, 2019, written submissions in response to the reports of Mr. Oaten and Prof. Kalt.

155.     On April 2, 2019, the Tribunal requested the Parties to refrain from sending submissions to the Tribunal unless requested or authorized by the Tribunal.

156.     On April 8, 2019, the Respondents submitted its written submissions in response to the supplemental reports of Mr. Oaten and Mr. Kalt pursuant to the Tribunal's directions of March 29, 2019.

157.     On April 11, 2019, the Claimants requested *"authorization from the Tribunal to report on Bloomberry's refusal to allow GGAM's duly appointed representative to attend and vote at the annual shareholders' meeting of Bloomberry Resorts Corporation."*

158.     On April 12, 2019, the Tribunal granted the Claimants leave to report on the issue set out at paragraph 157 above to the Tribunal by no later than April 16, 2019. The Tribunal also granted leave to the Respondents to comment on said report by no later than April 19, 2019 (the "**Tribunal's Directions of April 12, 2019**").

159.     On April 16, 2019, the Claimants submitted their report to the Tribunal pursuant to the Tribunal's Directions of April 12, 2019 (the "**Claimants' Report of April 16, 2019**").

160.     On April 19, 2019, the Respondents requested a short extension until April 22, 2019 to submit its response to the Claimants' Report of April 16, 2019, on account of the fact that it was Holy Week in the Philippines. This request was granted by the Tribunal.

161.     On April 22, 2019, the Respondents submitted their response to the Claimants' Report of April 16, 2019.

162.     On August 6, 2019, the Tribunal directed that the Parties (a) make supplementary deposits; (b) submit costs schedules and submissions; and (c) confirm which Deutsche Bank entity holds GGAM Philippines' 921,184,056 shares in Bloomberry Resorts Corporation, as well as the dividends declared thereon; and (d) confirm the

final, exact amount of undistributed dividends held by Deutsche Bank (the "**Tribunal's Direction of August 6, 2019**").

163. On August 21, 2019, the Parties filed letters in response to the Tribunal's Direction of August 6, 2019 (each Party's "**Letter of August 6, 2019**"), as well as submitted their costs schedules and submissions (each Party's "**Costs Schedule**" and "**Costs Submissions**").

164. The Tribunal has considered whether or not it would be necessary to declare the hearings closed pursuant to Article 31(1) of the UNCITRAL Rules 2010. In the present circumstances, and having regard to the fact that the power to close the hearings is discretionary, the Tribunal considers that it will not be necessary in this case to exercise its discretionary powers under Article 31(1).

**J.      Other Procedural Matters**

165. By email dated January 20, 2017, the Tribunal proposed, and the Parties thereafter consented to, the appointment of Mr. Byron V Karuppiah as its Secretary in place of Mr. Divyesh Menon.

166. By email dated June 29, 2018, the Tribunal proposed, and the Parties thereafter consented to, the appointment of Mr. Chan Min Jian as its Secretary in place of Mr. Byron V Karuppiah.

167. The Tribunal has not included the Parties' various updates on the various court proceedings in Singapore, Hong Kong, and the Philippines as it is the Tribunal's view that they do not pertain to the procedural history of this arbitration.

## IV.   RELIEF SOUGHT BY THE PARTIES

168.   In the Claimants' Amended Request for Relief (which amendment was not opposed by the Respondents (*see* paragraphs 60 to 64 above)), the Claimants request that the Tribunal issue an award:

(a)   of monetary damages to GGAM for Respondents' breach of the MSA and Respondents' wrongful restriction of GGAM' s sale of its BRC Shares in the following amounts:

(i)   the Management Fee in the amount of US$ 263,238,746.

(ii)   Pre-Termination Fees in the amount of US$ 568,180.

(iii)   a gross-up of damages to account for GGAM's exemption from the Philippine withholding tax in the amount of US$ 112,900,100.

(iv)   the full value of the Shares in the amount of US$ 383,472,464.

(v)   GGAM's attorneys' fees, costs and expenses to be calculated and submitted to the Tribunal at the time of the January 8, 2018 hearing on the matters reserved for the Remedies Phase.

(vi)   post-Award interest for each day payment in full of the Award is past due and compounded monthly, at the interest rate of 50 basis points per month or at six percent (6%) per annum, as permitted under Article 20 of the Singapore International Arbitration Act.

(vii)   the Claimants quantify their total monetary damages (excluding attorneys' fees, costs and expenses to be calculated at a later date) at US$ 760,179,490, and ask for post-Award compound interest.

(b)   the following relief:

(i)   an order directing Respondents to take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to file a motion to withdraw the original Petition seeking the writs of preliminary injunction and attachment in the Regional Trial Court within seven (7) days of the date of issuance of the Tribunal's Award;

44

(ii)   an order directing Respondents to take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to issue the joint press release in substantially the same form set forth in Annex A hereto, to be modified based on the Tribunal's Award, within seven (7) days of the date of issuance of the Tribunal's Award; and

(iii)   an order directing Respondents to, within seven (7) days of the date of issuance of the Tribunal's Award, take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to instruct the Philippine Depository & Trust Corporation, the Philippine Stock Exchange, Deutsche Bank and the market that GGAM has free and clear title to the Shares and the absolute right to sell the Shares, and to instruct Deutsche Bank to transfer the Shares to an unrestricted trading account.

(iv)   an order directing Respondents to, within seven (7) days of the date of issuance of the Tribunal's Award, submit a certified letter from their affiliate Bloomberry Resorts Corporation addressed to Deutsche Bank that states as follows:

> "Bloomberry Resorts Corporation, Bloomberry Resorts and Hotels, Inc., Sureste Properties, Inc. and Prime Metroline Holdings, Inc. have no objection to Deutsche Bank AG' s immediate release of all dividends paid by Bloomberry Resorts Corporation for the account of Global Gaming Philippines LLC."

169.   The Claimant also made the following submissions at paragraphs 331 to 332 of its Supplemental Submission:

*331. To implement the Constructive Remedy, the Tribunal should order the following injunctive and declaratory relief that would permit GGAM to transfer the Shares:*

*(i)   an order directing Respondents to take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to file a motion to withdraw the original Petition in the Regional Trial Court within seven (7) days of the date of issuance of the Tribunal's Award;*

(ii)   *an order directing Respondents to take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to issue the joint press release in substantially the same form set forth in Annex A hereto, to be modified based on the Tribunal's Award, within seven (7) days of the date of issuance of the Tribunal's Award; and*

(iii)   *an order directing Respondents to take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to instruct the Philippine Depository & Trust Corporation, the Philippine Stock Exchange, Deutsche Bank and the market that GGAM has free and clear title to the Shares and the absolute right to sell the Shares, and to instruct Deutsche Bank to transfer the Shares to an unrestricted trading account.*

332. *The Tribunal should also order the following relief:*

(iv)   *an order directing Respondents to pay to GGAM the damages amount of US$ 383,472,464 within thirty (30) days of the date of issuance of the Tribunal's Award; and*

(v)   *an order directing Respondents to, within thirty (30) days of the date of the issuance of the Tribunal's Order, notify GGAM if Respondents elect to have GGAM transfer ownership of the Shares to Respondents or to Respondents' designee, as instructed by Respondents, upon Respondents' payment in full of the damages amount (the "Transfer Election"); and*

(vi)   *an order directing GGAM, if Respondents notify GGAM of the Transfer Election within thirty (30) days of the date of the issuance of the Tribunal's Award, to transfer ownership of the Shares to Respondents or to Respondents' designee, as instructed by Respondents, within ten (10) business days of Respondents' payment in full of the damages amount of US$ 383,472,464; and*

(vii)   *an order directing, declaring and providing that, if Respondents do not notify GGAM of the Transfer Election within thirty (30) days of the date of the issuance of the Tribunal's Award, GGAM may sell its Shares on the market (the "Share Sale"); and*

  (viii) *an order directing GGAM to pay to Respondents the net proceeds of the Share Sale (i.e., the proceeds of the Share Sale net of any and all expenses GGAM incurs in connection with the Share Sale) within five (5) business days of completion of the Share Sale provided that Respondents have made payment in full of the damages amount of US$ 383,472,464 set forth in subpart (i) above.*

170. The Respondents request the Tribunal to award the following remedies:[2]

  (a) If the Tribunal annuls the Management Services Agreement (the "**MSA**"), including the equity option granted therein, due to GGAM's causal fraud; or, in the alternative, finds that Respondents rightfully ended the MSA due to GGAM's material breach of its obligations thereunder:

    (i) Deny Claimant GGAM Netherland's request for monetary damages for Management Fees;

    (ii) Deny Claimant GGAM Netherland's request for a "gross-up" of damages to account for Philippine withholding tax;

    (iii) Deny Claimant GGAM Philippines' request for monetary damages for Pre- Termination Fees;

    (iv) Deny Claimant GGAM Philippines' request for monetary damages related to the Shares;

    (v) Grant Respondents monetary damages for all pre- opening and post-opening management fees and reimbursable expenses previously paid by Respondents to GGAM and further as the Tribunal deems fit; and

    (vi) Order GGAM to transfer the 921,184,056 shares in Bloomberry Resorts Corporation (the "Shares") to Respondents on behalf of Prime Metroline;

    (vii) Order GGAM to direct its stockbroker, Deutsche Bank, to return the dividend paid in May 2015 by Bloomberry Resorts Corporation to Bloomberry Resorts Corporation.

---

[2] Respondents' Sur-Rejoinder on Damages, para. 269.

(b) If the Tribunal does not revisit the Liability Award and maintains its finding that the MSA was wrongfully terminated:

(i) Deny Claimant GGAM Netherlands' request for monetary damages for Management Fees and a "gross-up" of damages because GGAM Netherlands is a sham entity.

(ii) Award Claimant GGAM Philippines monetary damages for Management Fees in an amount no greater than one of the following:

1. US$ 15.8 million to account for the April 7, 2016 release of the U.S. Securities and Exchange Commission's finding that William P. Weidner and Eric Chiu violated the Foreign Corrupt Practices Act;

2. US$ 19.8 million to account for the January 17, 2017 release of the U.S. Department of Justice's finding that William P. Weidner and Eric Chiu violated the Foreign Corrupt Practices Act;

3. US$ 23.5 million to account for the end of the five-year term of MSA. US$ 35 million to account for the end of a second, optional five-year term of the MSA.

(iii) Award Claimant GGAM Philippines US$ 148,750 plus interest in unpaid Pre- Opening and Development Fees;

(iv) Deny Claimant GGAM Philippines a "gross-up" of damages to account for Philippine withholding tax;

(v) Deny Claimant GGAM Philippines' request for monetary damages related to the Shares;

(vi) Deny Claimant GGAM Philippines' request for injunctive and declaratory relief related to the Shares; and

(vii) Deny Claimant GGAM Philippines' request for post-Award interest.

(c)     Find that Claimants and their counsel failed to conduct themselves in good faith in the taking of evidence, and, pursuant to Article 9(7) of the IBA Rules on the Taking of Evidence in International Arbitration, deny Claimants' request for attorneys' fees, costs, and expenses;

(d)     Award monetary damages to Respondents for attorneys' fees, costs and expenses to be calculated and submitted to the Tribunal at the time of the hearing for the Remedies Phase; and

(e)     Such other and further relief as may be found appropriate.

49

## V.     PRELIMINARY MATTERS: PARTIES' RIGHTS AND LIABILITIES

171.    The Claimants have petitioned the Tribunal to award GGAM damages on account of management fees, pre-termination fees and expenses, Philippine withholding tax gross-up (the "**MSA Damages**") and obstruction of GGAM's ability to sell its shares in BRC, which requires from the Tribunal a prior determination of the Respondents' liability for such obstruction, a matter reserved for the Remedies Phase in the Liability Award. The Tribunal will consider each of these items in turn after addressing (a) the question raised earlier with the Parties by the Tribunal on the respective rights and liabilities of each of the Claimants and each of the Respondents, and (b) whether management fees may be awarded to GGAM Netherlands.

172.    On September 29, 2016, the Tribunal invited the Parties to comment on whether there is any difference between the respective rights and liabilities of each of the Claimants and each of the Respondents. It will be useful at the outset to set forth their replies. The Claimants explained:

> "*GGAM Philippines is a signatory to the MSA. However, under the Assignment and Assumption Agreement dated as of March 8, 2013, GGAM Philippines assigned to GGAM Netherlands all of its rights and liabilities under the MSA with respect to Post-Opening Services only. GGAM Philippines retained its rights and liabilities related to Pre-Opening Services under the MSA; therefore, with respect to damages resulting from Respondents' breach of the MSA, GGAM Philippines is the entity entitled to damages on unpaid Development and Pre-Opening Fees, as well as unpaid Pre-Opening Reimbursable Expenses.*
>
> *GGAM Philippines is also a signatory to the Equity Option Agreement and remains the sole owner of the approximately 921 million shares in Bloomberry Resorts Corporation ("BRC") granted under that agreement by BRC and Prime Metroline Transit Corporation ("GGAM's Shares"). GGAM Philippines is therefore the entity entitled to damages arising from the efforts of Respondents and their affiliates to hinder and block the sale of GGAM's Shares.*"[3]

173.    The Respondents replied as follows:

---

[3]    Letter from the Claimants to the Tribunal dated October 6, 2016.

> *"Respondent Bloomberry Resorts and Hotels, Inc. ("BRHI") holds a provisional license issued by the Philippine Amusement and Gaming Corporation to develop, construct, and operate Solaire Resort and Casino ("Solaire"). BRHI is wholly owned by Respondent Sureste Properties Inc. ("SPI"), which owns the hotel and non-gaming components of Solaire. Both BRHI and SPI (collectively, "Bloomberry") are parties to the Management Services Agreement (the "MSA"), which was terminated on September 12, 2013. GGAM Philippines is a signatory to the MSA."[4]*

174.    In its considerations, the Tribunal will be guided by the Parties' replies unless developments in the Remedies Phase would justify otherwise. In this respect, the Tribunal notes the Respondents' statement in their reply that it was their *"expectation that certain aspects of the Parties' respective rights and liabilities will be further developed in the Remedies Phase."*[5] The Tribunal further notes that there were no further developments in this respect.

175.    Based on the foregoing, GGAM Philippines, as signatory of the Equity Option Agreement ("**EOA**"), is entitled to any relief granted by the Tribunal in respect of the Shares. As regards the claim for unpaid fees, the Tribunal agrees that GGAM Philippines is also entitled to unpaid Development and Pre-Opening Fees, as well as unpaid Pre-Opening Reimbursable Expenses. As for the claim for lost management fees, the Tribunal will address first whether the lost management fees may be awarded to GGAM Netherlands.

176.    The Respondents claim that GGAM Netherlands is a sham entity created by GGAM Philippines for no other purpose other than to evade both US and Philippine taxes; for this reason, no management fee should be awarded to it.[6] The Respondents also allege that the assignment of the MSA to GGAM Netherlands appears to have been intended to evade GGAM Philippines' obligations under the MSA, including an obligation to indemnify the Respondents for any liability arising as a result of GGAM's gross negligence or wilful misconduct.[7] The Respondents note that GGAM Netherlands had no employees, no revenue and little capitalisation.[8] On the other hand, the Claimants have defended the nature of GGAM Netherlands as a legitimate Dutch corporation resident of the Netherlands and entitled to the withholding exemption under the Netherlands-Philippines Tax Treaty mostly as part of their claim to a tax gross-up.

---

[4]    Letter from the Respondents to the Tribunal dated October 6, 2016.
[5]    *Ibid.*, first paragraph.
[6]    Respondents' Sur-Rejoinder on Damages, para. 33.
[7]    *Ibid.*, para. 34.
[8]    *Ibid.*, para. 35.

177.  The Tribunal refers to Section 16.2 of the MSA on "Assignment by GGAM." This article provides the conditions under which GGAM may assign the MSA and at the end of the section, it states: "*Notwithstanding anything to the contrary herein, GGAM may assign this Agreement[9] to an entity organized and existing under the laws of the Netherlands as required to satisfy the tax structure of GGAM provided that such entity must at all times be owned by the same constituent owners and controlled by the same individuals as GGAM (except independent Dutch members required under Netherlands law).*"

178.  It is evident that since the beginning of their relationship the parties to the MSA had contemplated that a Dutch affiliate may be established exclusively for tax purposes. The only condition was that the constituent owners and controlling individuals must be the same as those owning and controlling GGAM. It has not been contended in the proceedings that this condition was not met.

179.  Furthermore, Article 16.3 of the MSA shows the preoccupation of BRHI and Sureste to maintain GGAM Philippines as their partner and obligated party under the MSA. It provides that "*Any assignment to an Affiliate and/or any sub-contracting* [sic] *shall not in any way relieve GGAM from any liability or obligation under or in connection with this Agreement.*" Thus, GGAM Philippines' obligations continue in effect notwithstanding the corporate structures it sets up or to whomever GGAM sub-contracts services required under the MSA.

180.  Given these provisions of the MSA, the Tribunal finds that the sham entity argument of the Respondents lacks merit. This notwithstanding, and, as noted above, Article 16.3 of the MSA shows the preoccupation of BRHI and Sureste to maintain GGAM Philippines as their partner and obligated party under the MSA irrespective of the corporate structures GGAM may set up. For these reasons, the Tribunal determines that any relief granted by the Tribunal on account of lost management fees shall be payable by the Respondents to both Claimants, with full payment to one or the other (or some combination of both) sufficient to discharge the Respondents' liability to pay such damages.

---

[9]   Read together with Section 16.3 of the MSA, this may be construed as "assign its rights [only] under this Agreement."

## VI.      DAMAGES UNDER PHILIPPINE LAW – GENERAL PRINCIPLES

### A.      Claimants' Arguments

181.      The Claimants explain that the applicable law is Philippine law[10] and damages for breach of contract under Philippine law must be reasonably foreseeable. The Claimants argue that damages may be awarded for a contractual breach, even if the breach began long before the period during which the profits will accrue. This includes the recovery of anticipated damages.[11]

182.      The Claimants' expert opines that the *prima facie* measure of damages for a breach of contract for services, like the MSA, is the contractually required fees.[12] Further, when a management services contract like the MSA is wrongfully terminated before the expiration of its agreed term, the plaintiff is entitled to damages for all fees that it was contractually entitled to receive for the entire term of the contract, including prospective fees due over a prolonged period.[13] Also, absolute certainty as to the amount of loss is not required; instead, the compensatory damages need only be proven with reasonable certainty.[14] The Claimants cite the Philippine Supreme Court[15] for the proposition that for breach of contract, the question is, "*is there a basis for determining with reasonable certainty such unearned profits?*"[16]

183.      The Claimants argue that the Philippine Supreme Court has "*adopted a broad approach to evidence sufficient to prove the existence of future profits and their amount,*"[17] and that GGAM's burden is to "*base its Management Fee damages on some reasonable defined standard such as market value, established experience, or direct inference from known circumstance*"[18], and that GGAM has done so.[19]

---

[10]   Claimants' Supplemental Submission, para. 34.

[11]   *Ibid.,* para. 35.

[12]   *See,* Claimants' Supplemental Submission, para. 36; Puno Report, para. 115.

[13]   *See, e.g., Garcia Palomar v. Hotel de France Co.*, G.R. No. L-15878 (S.C., January 11, 1922) (Phil.) in which a hotel manager was unjustly terminated by the hotel two years into his nearly five-year employment contract, the Philippine Supreme Court awarded damages for total amount due under contract from the date of termination until the end of the term

[14]   Claimants' Supplemental Submission, para. 37.

[15]   *Central Bank of the Philippines v. Court of Appeals*, G. R. No. L-33022 (S.C., April 22, 1975) (Phil.).

[16]   Claimants' Supplemental Submission, para. 37.

[17]   *Ibid.,* para. 39.

[18]   *See Casiño v. Court of Appeals*, G.R. No. 133803 (S.C., September 16, 2005) (Phil.).

[19]   Claimants' Supplemental Submission, para. 40.

**B.**     **Respondents' Arguments**

184.    The Respondents argue that under Philippine law damages are those "*which the parties have foreseen or could have reasonably foreseen at the time the obligation was constituted,*"[20] and that damages cannot be presumed. Unrealised profits must be analysed in a two-step process:[21]

(a)     First, it must be determined whether the Claimants are entitled to damages. The Claimants must prove with reasonable certainty, and not based on speculation, that they have been injured by their failure to realize "*otherwise reasonably expected profits.*"

(b)     Second, if it is determined that the Claimants actually suffered a loss by way of unrealized profits, the amount of damages must be determined through the presentation of "*competent proof of the actual amount of loss suffered*" or the "*best evidence obtainable.*" The amount must be estimated with reasonable accuracy.

185.    The Respondents further argue that the Claimants have misleadingly indicated that the Supreme Court of the Philippines "*has adopted a broad approach to evidence sufficient to prove the existence of future profits*" and that the rule remains that the claim must be supported with the "*best evidence available.*"[22] The Respondents assert that the best evidence available is the "*financial data that Bloomberry produced in this arbitration.*"[23]

186.    The Respondents contend that, contrary to what the Claimants assert, year-end data that was produced in addition to Solaire's Financial Books was not created for purposes of this Arbitration. Rather, this was data that Bloomberry maintained in its ordinary course of business on its internal systems.[24]

187.    The Respondents assert that damages must be proven with a "*reasonable degree of certainty*" and not be "*speculative.*"[25] The Respondents dispute that the Claimants'

---

[20]   Respondents' Sur-Rejoinder on Damages, para. 36.
[21]   *Ibid.,* para. 37.
[22]   *Ibid.,* para. 44.
[23]   *Ibid.,* para. 45.
[24]   *Ibid.*
[25]   Respondents' Sur-Rejoinder on Damages at para. 104, citing *Talisay-Silay Milling Co., Inc. vs. Asociacion de Agricultores de Talisay-Silay, Inc.*, G.R. No. 91852 (Phil. August 15, 1995) which held that "The familiar rule is that damages consisting of unrealized profits . . . are not to be granted on the basis of mere speculation, conjecture or surmise . . ."; *cf. Hicks v. Manila Hotel Company*, G.R. No. L-9973 (Phil. November 6, 1914)  which held

contention that the *prima facie* measure of damages for breach of a contract for services, is the *"contractually required fees"* is not supported by the cases their expert cited. The cases cited pertained to the wrongful dismissal of an employee whose remuneration in exact, precise figures was stipulated in the contract for services and/or employment. In this respect, the amount of fees to which the dismissed employee was entitled was readily ascertainable with reasonable certainty—a textbook case of *lucrum cessans*. In contrast, here the management fees in the MSA do not correspond to any exact figure.[26]

188.  According to the Respondents, in the present case, the calculation is based on percentages which are contingent on other figures (such as Solaire's EBITDA), which can only be calculated *"after-the-fact."*[27] Solaire's EBITDA cannot be determined with reasonable certainty from year to year.[28] Furthermore, the management fees were incentive fees, and the Claimants acknowledged that the fee structure was risky.[29] These risks include risks that can impact Solaire's probability of success and profitability, such as entry of local and regional competitors, market movements, and regulatory changes. Some of these risks have already come to fruition, particularly in 2013-2015 with changing market conditions and China's crackdown on gaming. Moreover, these risks still exist on the horizon for Solaire and other integrated resorts in Southeast Asia.[30]

189.  The Respondents submit that the Philippine Supreme Court has not hesitated to reject claims for damages for lost profits when the realisation of profits was uncertain and dependent on a number of factors.[31]

**C.   Analysis of the Tribunal**

190.  The Parties' experts agree that damages need to be proven with reasonable certainty and that for this purpose the Tribunal needs to rely upon the best evidence. The Parties' experts have referred to the Philippine Supreme Court decisions that reflect these principles but differ on the degree of certainty required and whether the

---

"where a loss of profits is not too remote or conjectural to be susceptible of computation with reasonable accuracy, they are proper elements of damage."

[26]  *See* Respondents' Sur-Rejoinder on Damages, para. 39.
[27]  *Ibid.*
[28]  *Ibid.*
[29]  *Ibid*, para. 40.
[30]  *Ibid.*, para. 42.
[31]  *Ibid.*, para. 43; *See, e.g., Lufthansa German Airline v. Court of Appeals*, G.R. No. 108997 (Phil. April 21, 1995) where a claim for damages on lost profits was rejected, holding that such claim was speculative because the realization of profits was not a certainty but dependent on a number of factors.

Supreme Court has adopted a broad approach in determining what is the best evidence.

191.  In the case of *Central Bank of the Philippines v. Court of Appeals,* the Supreme Court remarked: "*When the existence of a loss is established, absolute certainty as to its amount is not required…The benefit to be derived from a contract which one of the parties has absolutely failed to perform is of necessity to some extent, a matter of speculation, but the injured party is not to be denied all remedy for that reason alone. He must produce the best evidence of which his case is susceptible and if that evidence warrants the inference that he has been damaged by the loss of profits which he might with reasonable certainty have anticipated but for the defendant's wrongful act, he is entitled to recover.*"[32]

192.  In the same vein, "*[t]he rule on compensatory damages is well established. Indemnification for damages comprehends not only the loss suffered, that is to say actual damages (damnum emergens), but also profits which the obligee failed to obtain, referred to as compensatory damages (lucrum cessans). However, to justify a grant of actual or compensatory damages, it is necessary to prove with a reasonable degree of certainty, premised upon competent proof and on the best evidence obtainable by the injured party, the actual amount of loss.*"[33]

193.  Former Supreme Court Chief Justice Reynato Puno ("**Justice Puno**"), the Claimants' Philippine law expert , has opined that the Philippine Supreme Court has adopted "*a broad approach to evidence sufficient to prove the existence of expectation damages and their amount.*"[34] Former Supreme Court Justice Jose Vitug, the Respondents' Philippine law expert ("**Justice Vitug**"), questions such statement because the remarks of the Supreme Court in *Producers Bank of the Philippines vs. Court of Appeals* referred to by GGAM and Justice Puno are "no more than mere innocent statements which are, at best, *obiter dicta.*"[35] The Tribunal notes that the opinion of Justice Puno also refers to *Philippine Nat'l Bank v. RBL Enterprises, Inc.* in which the Supreme Court affirmed: "*The quarterly report income tax report of Respondent RBL Enterprises, Inc., which was presented by petitioner and used by the appellate court as a basis for computing the average*

---

[32]  *Central Bank of the Philippines v. Court of Appeals,* G. R. No. L-33022 (S.C., April 22, 1975) (Phil.) (quoting *Cerrano vs. Tan Chuco,* G.R. No. L-12907 (S.C. August 1, 1918) quoted in the Puno Report, para. 117. Emphasis added.

[33]  *Integrated Packaging Corp. vs. Court of Appeals,* G.R. No. 115117, June 8, 2000. Quoted in the 4th Vitug Report, para. 20.

[34]  Puno Report, para. 119.

[35]  4th Vitug Report, para. 27.

*profits earned by respondents in their business, provided a reasonable means of ascertaining their claims for lost profits.*"[36]

194.   *Reasonable certain*ty based on the *best obtainable evidence* are the two elements on which an estimation of future lost profits should be premised. Reasonable certainty is neither speculative nor is it the same as absolute certainty, which would require one to know what the future would entail. There may be a matter of degree in the appreciation of what is reasonable and what constitutes the best obtainable evidence.

---

[36]   *Philippine Nat'l Bank v. RBL Enterprises, Inc.,* G.R. No. 149569 (S.C., May 28, 2004) (Phil.)

## VII.     DAMAGES FOR WRONGFUL TERMINATION OF THE MSA

195.    Before summarizing the Parties' arguments, it will be useful to reproduce here salient portions of sections 4.3 to 4.5 of the MSA. They provide that GGAM is entitled to the following management fees:

a)      "*[A]n annual fee of six percent (6.0%) of the EBITDA generated from Local High Roller Tables[37] where PAGCOR imposes a 15% license fee under the PAGCOR License, or as that term is defined in the laws or regulations governing the Facilities*";

b)      "*[A] Graduated Fee based on the EBITDA generated from Foreign High Roller Tables[38] and Foreign Junket Players[39]*"; and

c)      "*[A]n annual base fee of two percent (2%) of the Base Fee EBITDA from the Facilities. For this purpose, 'Base Fee EBITDA' shall mean an amount equal to the EBITDA less the Local VIP EBITDA and the Foreign VIP EBITDA.*"[40]

### A.     Claimants' Arguments

196.    Preliminarily, the Tribunal observes that part of the Claimants' case on damages was contained in their Reply to Respondents' Statement of Defense and Amended Counterclaims dated June 15, 2015, which had been submitted in the Liability Phase (the "**Claimants' Reply**"). In this Final Award, the Tribunal will address the arguments made by the Claimants in their Supplemental Submission as a primary starting point (since this was the latest (and primary) submission relied on by the Claimants in the Remedies Phase), but will address any other arguments contained in the Claimants' Reply as the Tribunal deems necessary.

---

[37]    "Local High Roller Tables" shall have the meaning as set forth in the Philippine laws or regulations promulgated by PAGCOR and governing the Facilities, or as the parties may mutually agree. This is according to Annex H of the MSA.

[38]    "Foreign High Roller Tables" shall have the meaning set forth in the Philippine laws or regulations promulgated by PAGCOR and governing the Facilities, or as the parties may mutually agree. This is according to Annex H of the MSA.

[39]    "Foreign Junket Players" shall have the meaning set forth in the Philippine laws or regulations promulgated by PAGCOR and governing the Facilities, or as the parties may mutually agree. This is according to Annex H of the MSA.

[40]    MSA, Section 4.4.

197.    The Claimants argue that it is reasonably certain and foreseeable that they would have earned the management fee for the following reasons: First, under the MSA, GGAM's monthly fee for providing "pre-opening" management and technical services was only US$ 175,000.[41] According to the Claimants, this fee under-compensated GGAM for its assistance during the pre-opening phase of Solaire in reliance on the Parties' agreement that GGAM would earn a Management Fee for the MSA's full ten-year term.[42] The Claimants note that GGAM's Management Fee consisted of a significantly reduced base fee combined with a structure which rewarded its success in attracting foreign VIPs.[43]

198.    Second, a 10-year period was foreseeable under Sections 1.2 and 1.3 of the MSA under which the Respondents had the obligation to pay a Management Fee for ten years from opening, unless GGAM, at its sole discretion, did not exercise its unilateral right of renewal to extend the first term of five years of the MSA (the "**Initial Term**") for a second five-year term.[44]

199.    The Claimants submit the following as an illustration that GGAM had every incentive to exercise its option to renew the MSA for its full 10-year term:[45]

    (a)    In May 2017, shares in BRC had been trading at a nearly two-year high, with prices continuing to climb each day.

    (b)    With its year-end financial results for 2016, BRC reported that Solaire was enjoying "*all-time high records in VIP volume, mass table drop and EGM coin-in, gross gaming and non-gaming revenues as well as EBITDA and hold-normalized EBITDA.*"[46]

    (c)    The most recent investment analyst reports project continued growth at the EBITDA level for Solaire over the next several years.[47]

    (d)    As recently as May 2, 2017, Mr. Enrique K. Razon ("**Mr. Razon**"), CEO of Bloomberry, boasted that Solaire's Foreign VIP segment has been benefitting from improving relations between the Philippines and China:

---

[41]   Claimants' Supplemental Submission, para. 41.
[42]   *Ibid.*
[43]   *Ibid.*
[44]   *Ibid.,* para. 44.
[45]   *Ibid.,* para. 49.
[46]   *Ibid.,* para. 49(ii).
[47]   *Ibid.,* para. 49(iii)

> "***The market has been growing tremendously in the last two to three years, so I think the bet is paying off. We are making more money***. *We are seeing huge growth in visitation from China since the visit of [Philippine] President Duterte to Beijing… China visitation is growing north of 100 percent.. **VIP volume is growing 25 to 40 percent***."[48]

200.    The Claimants criticize the Respondents' reliance on (i) the model and presentation created by Cantor Fitzgerald that summarized the amount of management fees they expected to earn over the course of the MSA (the "**Cantor Model**") and (ii) the "*sanity checks*" benchmarks, to show the lack of reasonableness of the Claimants' Management Fee claims. The Claimants explain:[49]

(a)    The Cantor Model contained early-stage, partial projections for only Phase I of Solaire. Those projections did not reflect expectations regarding Phase 1A of Solaire's long-planned expansion, which would add approximately 300 all-suite hotel rooms, 540 slots and electronic gaming machines and 100 more gaming tables, all to drive Solaire's EBITDA upwards and increase GGAM's expected Management Fee.

(b)    The Management Fee figures from the Cantor Model were based on a higher discount rate than is appropriate today because, in 2011, the property was under construction and was a riskier venture at that stage of development than it is now, four years after opening.

201.    The Claimants further contend that the Respondents' reliance on the Termination Fee Schedule of the MSA is inappropriate because that schedule provided for payment to GGAM of an $11 million fee only in the event of the MSA's termination in the first year of Solaire's operations due to one of the "*Change of Control in Owners*" scenarios specified in the MSA, and does not have any bearing on the calculation of the Management Fees GGAM could reasonably have expected to earn.[50]

202.    The Claimants argue that their financial models as updated by experts Mr Oaten and Prof Kalt demonstrate the lost management fees with reasonable certainty. Mr. Oaten segments Solaire's annual revenues and expenses into three categories for each year of the MSA's ten-year term from March 16, 2013 to March 15, 2023:[51]

---

[48]    Claimants' Supplemental Submission, para. 49(iv). Emphasis added by the Claimants.
[49]    *Ibid*, para. 123.
[50]    *Ibid.,* para. 124.
[51]    *Ibid.,* para. 54.

(a)     gaming activities of foreign VIP customers,

(b)     gaming activities of local Filipino VIP customers, and

(c)     gaming activities of mass customers, as well as all non-gaming operations including the hotel, restaurants and retail shops of Solaire.

203.    For the period of 2013 to 2016, Mr. Oaten uses Solaire's actual results reported in BRC's financial statements and in investment analyst reports to first divide revenues between the gaming and non-gaming business, and then, within the gaming business, to further segment revenues among Foreign VIP, Local VIP and Mass Gaming. For projecting Solaire's future revenues from 2017 to 2023, Mr. Oaten uses current investment analyst reports, which provide detailed projections of Solaire's expected revenues from different aspects of its business based on Solaire's actual performance to date.[52]

204.    Mr. Oaten also uses Solaire's actual results from the financial statements and investment analyst reports to determine Solaire's total operating expenses, both actual results (from 2013-2016) and projected (for 2017 onward). Mr. Oaten then allocates expenses to the relevant business segment: as certain expenses are directly proportional to revenue from a particular segment, he allocates them as a percentage of that revenue (e.g., taxes on different gaming segments). Since other expenses are not tied to a particular segment of Solaire (e.g., utilities), Mr. Oaten allocates them based on other available information that reasonably reflects the relative usage or benefit of that expense to the respective segment (e.g., for expenses driven by customer volume, the allocation is based on relative proportion of floor area designated for different segments).[53] Then Mr. Oaten applies the 6% contractually determined pre-judgment interest rate to the Management Fee accruing before the date of the Tribunal's damages award and a discount rate of 9.8% to the Management Fee accruing after that date.[54]

205.    The Claimants contend that Mr. Oaten's calculations provide a reasonably certain quantification of Solaire's segmented EBITDA[55] for the following reasons:

---

[52]  Claimants' Supplemental Submission, para. 55.
[53]  Ibid., para. 56.
[54]  Ibid., para. 101.
[55]  Ibid., para. 59.

    (a)    Mr. Oaten's analysis reflects Solaire's actual financial results from the first four years of the property's operations, with less years of the ten-year term needed to be projected, thus increasing its reliability.[56]

    (b)    Entering the fourth year of Solaire's operations, the property is no longer in the launch phase or ramp-up phase: therefore, the property is more established and predictable.[57]

    (c)    There is a broader range of sources — both from Bloomberry's additional financial disclosures and new investment analyst reports — that capture additional data concerning Solaire's actual and predicted performance relevant to calculating GGAM's Management Fee.[58] These analyst reports not only incorporate Solaire's actual results but provide additional breakdown between revenue and cost types.[59]

206.    The Claimants assert that Mr. Oaten's calculation shows a conservative measure of damages, in particular, because Solaire's performance is based on Respondents' relatively less-experienced management, and thus understates what Solaire's EBITDA breakdown would likely have been had the Claimants still managed the property.[60] Particularly, in view of Mr. Razon's inexperience and Claimants' wealth of experience, Solaire would have been more profitable. GGAM highlights Mr. Razon's inexperience by the following:

    (a)    In 2015, Solaire's financial results show that the property suffered a massive bad debt loss, amounting to approximately 16% of total Foreign and Local VIP gaming revenues, an extraordinarily high figure for a casino managed by experienced operators.[61]

    (b)    The Respondents compounded their mistake, by over-compensating for Solaire's 2015 bad-debt loss through a severe restriction of credit to VIP customers in 2016, which likely had a significantly negative impact on VIP gaming revenues at Solaire.[62]

---

[56]  Claimants' Supplemental Submission , paras. 59 and 61.
[57]  *Ibid.,*  para. 62.
[58]  *Ibid.,* para. 63.
[59]  *Ibid.,* para. 64.
[60]  *Ibid.,* para. 94.
[61]  *Ibid.,* para. 98.
[62]  *Ibid.,* para. 99.

207.   As regards general & administrative expenses ("**G&A Expenses**"), the Claimants explain that, in many cases, Mr. Oaten could not apply the methods suggested in the report which the Respondents commissioned from SyCip Gorres Velayo & Co. ("**SGV/EY Report**"). This was because certain internal data about Solaire's operations, such as the number of employees assigned to different segments of the business, were either withheld by Respondents or the data available was without sufficient context or documentation and thus was not deemed reliable.[63] In those cases Mr. Oaten allocated G&A Expenses on other available information.[64]

208.   According to the Claimants, the Respondents' expert's heavy reliance on the SGV/EY Report is in itself a cause for concern, because, before termination of the MSA, the Parties could not agree on an allocation methodology, and the Claimants had rejected the Respondents' proposed methodology which would load costs into the segment for which the Claimants would have the highest percentage fee. The same objected methodology is how the SGV/EY Report allocates costs.[65]

209.   Claimants also argue that the methodology in the SGV/EY Report is inappropriate because it allocates all G&A costs among gaming segments based on each segment's gross revenue, regardless of the type of cost involved. Such an allocation does not make sense, for instance:[66]

(a)   The Solaire's advertising expenses were almost entirely dedicated to advertising in the Philippines through local billboards, radio spots and print advertisement. Local advertisements may bring in additional Filipino mass market players, but they will do nothing to recruit foreign VIPs or junkets from other countries.

(b)   Despite explaining that "*[e]lectricity cost is driven by the number of machinery and equipment in operation*" and "*[w]ater cost is driven by the number of water outlets and their average consumption,*" these costs were allocated based on segment revenue and not based on the location and number of devices, outlets and consumption.[67]

210.   The Claimants contend that the Respondents liberally allocate expenses to the Foreign VIP segment, but restrictively allocate revenues to that same segment. This

---

[63]   Claimants' Supplemental Submission, para. 69.
[64]   *Ibid.,* para. 56.
[65]   *Ibid.,* para. 72.
[66]   *Ibid.,* para. 75.
[67]   *Ibid.*

is evident in the Respondents' allocation of revenues to "*Foreign High Roller*" tables based only on revenues from foreigners playing on "*Junket Tables*" but the Respondents allocate to that same segment bad debt expenses of foreigners playing on "*Junket Tables*" or "*High Roller Tables.*"[68] This inconsistent method of allocation contravenes the MSA, which requires that expenses follow the source of revenue.[69]

211.    The Claimants assert that the Respondents fail to allocate VIP gaming revenues between Foreign VIP and Local VIP segments pursuant to the terms of Section 4.5 of the MSA. Section 4.5 of the MSA provides:

> "*4.5    Fees - Casino VIP Incentive For Foreign VIP/ Junket Players*
> *The Owners shall pay GGAM an annual casino incentive fee calculated as a Graduated Fee based on the EBITDA generated from Foreign High Roller Tables and Foreign Junket Players ("**Foreign VIP EBITDA**") as these terms are defined in the laws and regulations governing the Facilities for each Fiscal Year beginning in the year of the Facilities' Start Date, provided that GGAM's total fees shall not exceed forty percent (40%) on Foreign VIP EBITDA, as follows: ...*"

212.    This notwithstanding, the Respondents define any and all gaming on "*High Roller Tables*" as part of Local VIP revenue, despite acknowledging that foreign VIP players can play on those tables. This allocation is in contravention of section 4.5 of the MSA, since it eliminates one of the components of Foreign VIP EBITDA. Section 4.5 of the MSA provides that the Foreign VIP/Junket players EBITDA is based on EBITDA generated from "*Foreign High Roller Tables and Foreign Junket Players.*"[70]

213.    The Claimants assert that, although the Philippine Amusement and Gaming Corporation ("**PAGCOR**") does not distinguish between Local and High Roller Tables to comply with the MSA, gaming by foreign and local customers on those tables must be separately accounted for.[71]

214.    Claimants dispute the reliability of documents disclosed by the Respondents in February 2017 in respect of the allocation of annual VIP gaming revenues between Foreign VIP/Junket and Local VIP ("**VIP-Split Disclosure**"). According to Mr. Oaten, the VIP-Split Disclosure is inherently suspect because "*it is contradicted by*

---

[68]    Claimants' Supplemental Submission, para. 84.
[69]    *Ibid.*, para. 86. *See* MSA, Annex H.
[70]    Claimants' Supplemental Submission, para. 86.
[71]    *Ibid.*, para. 89.

*Respondents' own financial book figures, Respondents' own published financial statements, Mr. Razon's own statements to the press, and independent investment analysts reports on Solaire.*"[72]

215.　As regards the discount rate, the Claimants explain that the post damages award discount rate was derived by applying the Capital Asset Pricing Model, using updated information on the risk of businesses comparable to Solaire, the country-risk premium, the risk-free rate, and the equity risk premium.[73] The Claimants note that this method is one which the Respondents' expert is "*in fundamental agreement*" with,[74] but they disagree as regards the applicability of the company size premium, the incentive fee risk premium and the renewal risk premium applied by the Respondents.[75]

216.　The Claimants argue that the contention that a "*size premium*" should be taken into account for the purported riskiness associated with a company of GGAM's size is flawed.[76] The Claimants explain that the Respondents' expert, Mr. Tantleff starts from the premise that the rate to discount the Management Fee cash flows to their present value should be based on the cost of capital of GGAM or its parent entity, which is contrary to the fundamentals of valuation analysis. According to the Claimants, the appropriate discount rate should be based on the risk characteristics of the cash flows that make up the damages — in this case, the contractually defined percentage share of Solaire's EBITDA that makes up GGAM's Management Fee.[77]

217.　The Claimants further explain that Mr. Tantleff's premise leads to the untenable conclusion that, when assessing the same set of projected annual cash flows due as damages, the present value of those damages changes depending on the characteristics of the injured party. That is, damages would be higher if the harmed party is a large company rather than a small one.[78]

218.　According to the Claimants, Mr. Tantleff's premise, that an additional 3% to 6% premium should be included to account for the MSA's "*incentive fee structure*[79], is also flawed because: (a) the Claimants' discount rate properly reflects the riskiness associated with Solaire's EBITDA (not revenues), and (b) the contractually-fixed

[72]　Claimants' Supplemental Submission , para. 81.
[73]　*Ibid.,* para. 102.
[74]　*Ibid.*
[75]　*Ibid.*, para. 105 to 116.
[76]　*Ibid.,* para. 106.
[77]　*Ibid.*
[78]　*Ibid.*, para. 107.
[79]　Tantleff Report dated December 15, 2015 ("**1ˢᵗ Tantleff Report**"), para. 144.

65

portion of Solaire's EBITDA from which GGAM earns its Management Fees carries precisely the risk characteristics (e.g., volatility, correlation with overall market performance) of the overall EBITDA-based cash flows of the property.[80]

219.    The Claimants contend that, if there is any difference in the risk profiles of those two cash flows, the Management Fee is less risky than Solaire's cash flows, because the MSA requires the Management Fee to be paid from EBITDA, that is to say, before deductions such as capital expenditures and working capital, which reduce the amount of Solaire's cash flows relative to its EBITDA. The fact that the Management Fee is derived from Solaire's EBITDA implies that any adjustment should be to decrease the discount rate and not to increase it.[81]

220.    Further, the Claimants assert that Mr. Tantleff does not provide any empirical evidence that the Management Fee is riskier as it depends on three different EBITDA streams, as opposed to the Respondents who benefit equally from all revenue generated by Solaire.[82] In this regard, the Claimants point out that this is logically incoherent as, if Solaire's overall EBITDA had a different discount rate than Solaire's individual EBITDA streams, with a higher-than-average discount rate for its Foreign VIP EBITDA than for the other two EBITDA streams, it would imply an offsetting, lower-than-average discount rate for the other EBITDA streams (as the average of the three streams would result in Solaire's overall discount rate).[83]

221.    The Claimants contend that Mr. Tantleff provides no economic basis for his quantification of the risk resulting from the "incentive fee structure." Instead, he assigns 6% to the Foreign VIP EBTIDA stream and 3% to the Local VIP and mass gaming EBITDA streams, based on a Hawaiian bankruptcy court's decision in *Waikiki* and Prof de Roos' Cornell Report.[84] The Claimants submit that Mr. Tantleff misreads the *Waikiki* decision as the court in that case did not impose any discount rate premium for the "*incentive fees.*"[85]

222.    As to the renewal term risk, the Claimants dispute Mr. Tantleff's assertion that a 6% premium should be added to the discount rate to account for the risk that the

---

[80]   Claimants' Supplemental Submission, para. 110.
[81]   *Ibid.*, para. 110.
[82]   *Ibid.,* para. 111.
[83]   *Ibid.*
[84]   *Ibid.,* para. 112. The "**Cornell Report**" refers to an article authored by Prof. de Roos and Scott D. Berman entitled "Cornell Hospitality Report – Calculating Damage Awards in Hotel Management Agreement Terminations" (Vol. 14. No. 16, CHR, published August 2014)
[85]   Claimants' Supplemental Submission, para. 112.

MSA would not be renewed for a second five-year term, and submit that such an approach is flawed. The Claimants highlight that this approach ignores Claimants' unilateral right to continue the MSA for the full 10-year term.[86] In fact, GGAM's unilateral right to renew empowers GGAM to take advantage of anticipated good economic opportunities and avoid bad ones. Such an option cannot possibly increase the risk to GGAM and increase the discount rate that would be applicable to cash flows available under the MSA.[87]

223.   The Claimants explain that their model did factor in "*avoided costs*"[88], but the Claimants had no avoided costs. They did not incur any other costs specific to managing the Solaire because the MSA required the Respondents to reimburse the Claimants for all out of pocket expenses incurred for matters related to the Services.[89]

224.   As regards mitigation, the Claimants observe that Professor Kalt correctly did not make any deduction in respect of GGAM's mitigation efforts. The Claimants explain that "*GGAM's business model is structured to accommodate managing multiple projects simultaneously, so the addition of a new project would not be considered mitigation because GGAM could likely have taken on that project in addition to managing Solaire.*"[90]

225.   The Claimants point out that under Philippine law the burden of proof is on the Respondents, who must prove that GGAM failed to mitigate its damages and the amount of damages. The Claimants assert that the Respondents have made no attempt to meet that burden.

**B.     Respondents' Arguments**

226.   Preliminarily, the Tribunal observes that the Respondents had previously submitted a Rejoinder Memorial on Damages pursuant to PO 11 (*see* paragraph 7 above; *see* paragraph 13(g) of the Liability Award). The Tribunal will address the arguments made by the Respondents in their Sur-Rejoinder on Damages as a primary starting point (since this was the latest (and primary) submission relied on by the

---

[86]   Claimants' Supplemental Submission, para. 114.
[87]   *Ibid.,* para. 115.
[88]   The Claimants purport to adopt the Respondents' definition in its Rejoinder Memorial on Damages, para. 74, and state that this refers to "marginal expenses that managers avoid due to the fact that the manager is no longer managing the property in question": Claimants' Supplemental Submission, para. 117.
[89]   "Services" is defined in Annex H of the MSA as "*those services of GGAM set forth in Annex A*".
[90]   Claimants' Supplemental Submission, para. 119.

Respondents in the Remedies Phase), but will address any other arguments contained in the Rejoinder on Damages as the Tribunal deems necessary.

227.   The Respondents argue that the assumptions made by the Claimants are speculative and highly unlikely. First, the Claimants' assertion that the MSA would have been renewed for a second 5-year term is unsupported at law.[91] Under Philippine law, as Justice Vitug explained, it cannot be inferred that a party would have exercised an option to renew a contract.[92] Furthermore, since the Claimants seem to anchor their decision to renew on the current *profitability* of Solaire, it underscores that Claimants had not decided whether they would renew the MSA at the end of the original period.[93]

228.   The Respondents also note that the Claimants have not considered the real possibility that GGAM might be terminated prior to renewing the MSA or that GGAM might decide not to renew the MSA in light of the prospect of termination. Numerous potential events, such as change of control in the company, bankruptcy proceedings, change in the terms and conditions of the PAGCOR license, etc., make the MSA's renewal speculative. In fact, the Respondents argue that at least one of the events has come to fruition. Indeed, during the Liability Hearing, it was revealed through cross-examination that Mr. Stone had previously fired Mr. French for his role in rigging a drawing at another casino. Mr. French failed to disclose this material fact on his Gaming Employment License ("**GEL**") application to PAGCOR, which is a sufficient basis to revoke his license in the Philippines.[94]

229.   The Respondents also argue that, following the Liability Hearing and issuance of the Liability Award, the US Department of Justice (the "**DOJ**") and the US Securities Exchange Commission (the "**SEC**") made findings that Mr. Weidner, Chairman and CEO of GGAM Philippines and Mr. Chiu, GGAM Philippines' President for Asia, had violated the US Foreign Corrupt Practices Act ("**FCPA**") while they were earlier employed by Las Vegas Sands Corp ("**LVS**") just prior to forming GGAM. The Respondents argue that this means that "it is certain" that,

---

[91]   Respondents' Sur-Rejoinder on Damages, para. 105.

[92]   Third Supplemental Opinion of Justice Jose C. Vitug dated December 12, 2015 ("**3rd Vitug Report**"), para. 29. He stated that "*unless and until the five- year period has elapsed, and, in accordance with the MSA, GGAM gives notice to BRHI and SPI that it wishes to continue the performance of the services under the MSA for another five years, BRHI and SPI cannot be held accountable for the additional five-year term. To consider it, as if GGAM would have exercised its right to continue the MSA, would appear to be speculative.*"

[93]   Claimants' Supplemental Submission, para. 46, where GGAM's Head of Business Development and Corporate Finance is cited as saying that "*GGAM fully expected that it would decide to continue with the second five-year period unless GGAM was not profiting.*"

[94]   Respondents' Sur-Rejoinder on Damages, para. 108.

had Bloomberry not terminated GGAM in September 2013, it would have done so after the discovery of these findings, or GGAM would have resigned or agreed not to renew the MSA to "save face."[95] The Respondents argue that this is supported by the testimony of Mr Jorge Sarmiento, the former President and Chief Operating Officer of PAGCOR, which the Respondents say shows that the findings of the US federal authorities and Mr. Weidner's repeated deceptions to Bloomberry would be sufficient to disqualify GGAM from being involved in gaming in the Philippines.[96] The Respondents further argue that the "crackdown in China" and the possibility of Mr Weidner's strategies leading to the GGAM being investigated would "likely" result in Bloomberry terminating GGAM, or GGAM resigning or agreeing not to renew the MSA.[97]

230.    According to the Respondents, similarly speculative are the counterfactuals about GGAM's performance had they continued managing Solaire.[98] They submit that as *"the Liability Hearing made clear, there is no evidence that any GGAM executive had any direct connections with any specific VIPs or junket operators that they could use to drive VIPs to Solaire."*[99]

231.    According to the Respondents, equally speculative is Mr. Oaten's assumption that VIP revenue will grow by 2% from 2016 to 2017 and then by 2.5% from 2020 through 2023 without citing any specific document for support. According to the Respondents, this rate does not take into consideration the broader economic trends that have impacted casinos in Macau and affected VIPs at casinos in Southeast Asia.[100] Prior to the MSA, Macau casinos were booming. However, in the wake of China's "crackdown on corruption" that began in 2012, VIP revenue in Macau plummeted by 50% from 2013 to 2016.[101] In an environment where Chinese governmental action can shift billions of dollars in casino revenue between different regions, assuming steady growth for the next six years is highly speculative.

232.    The Respondents affirm that another unrealistic assumption made by the Claimants is that VIP bad debt expenses would only amount to 1% of VIP gross gaming revenue, an historic low. One of the fall-outs from China's corruption crackdown has been the incurrence of bad debt expenses as Macanese junkets went bankrupt.[102]

---

[95]   Respondents' Sur-Rejoinder on Damages, para. 108, paras. 109 to 110.
[96]   *Ibid.*, para. 110.
[97]   *Ibid.*, paras. 108 to 112.
[98]   *Ibid.*, para. 113.
[99]   *Ibid.*, para. 114.
[100]  *Ibid.*, paras. 115 – 118.
[101]  *Ibid.*, para. 116.
[102]  *Ibid.*, para. 123.

This assumption is not only inherently speculative, but ignores the JP Morgan analyst reports which GGAM relies upon in support for other components of its projection. Those reports predict Solaire's bad debt expenses will be 8% of VIP gross gaming revenue.[103]

233.   The Respondents consider that, since the MSA is silent as to what the Owner shall pay GGAM if a termination is found to be wrongful, the Tribunal may be assisted by two useful benchmarks: (a) the Termination Fee Schedule located in the MSA itself; and (b) the financial model that Cantor Fitzgerald and GGAM created and presumably relied upon when signing the MSA in September 2011.[104]

234.   The Respondents contend that both benchmarks serve as "*sanity checks*" on the Claimants' damage calculation.  The MSA's Termination Fee Schedule provides a "*sanity check*" on the Claimants' damage claim and illustrates the value that the Parties agreed GGAM's services were worth in the first year of operations— namely, US$ 11 million (as opposed to over US$ 260 million for a 10-year period). The second "sanity check" is the Cantor Model, which, in the best-case scenario, indicated that the Claimants would be entitled to no more than an amount in the range of US$ 35 to 47.4 million. The Claimants' calculations are 5 to 7 times greater than this range.[105]

235.   The Respondents recall that in 2011, when deciding whether to invest and manage Solaire, GGAM and Cantor Fitzgerald created a model and presentation that summarized the amount of management fees they expected to earn over the course of the MSA (i.e. the Cantor Model). The Cantor Model was built on a model Bloomberry provided to GGAM when the Parties were negotiating the MSA (the "**Bloomberry Model**"). This model was used to express three scenarios: "*GGAM's case*" which is the best-case scenario; "*Bloomberry Case,*" which is a Mid-Case Scenario and based on the Bloomberry Model; and a "*Downside Case,*" which is the worst of the three scenarios.[106] Under GGAM's case, Cantor expected a fee between $60 - $70 million for a five-year term; under the Bloomberry Case, Cantor expected US$ 16.9 million for a five-year term.[107]

236.   The Respondents argue that the Cantor Model can easily be adjusted for certain calculation errors, unsatisfactory calculation approaches, and unsatisfactory

---

[103]   Respondents' Sur-Rejoinder on Damages, para. 124.
[104]   *Ibid.*, para. 132.
[105]   *Ibid.,* para., 133 – 135.
[106]   *Ibid.*, para. 6, footnote 16.
[107]   *Ibid.*, para. 6.

modelling assumptions,[108] and to take into account the Parties' expectations at the signing of the MSA in September 2011, and when the MSA was terminated in September 2013.[109]

237.    In taking into account the Parties' expectations at the signing of the MSA, Mr. Searby, the Respondents' expert, calculates a discount rate of 15.5%[110] (if management fees are assessed at the MSA signing date)[111] and adds his assessment of the cash flows that could have been expected to be generated by Phase I-A once it opened.[112] These projections are referred to as the "**Adjusted 2011 Projections**."

238.    In updating his model to the termination date, Mr. Searby first reduced the discount rate from 15.5% in September 2011 to 12.4%.[113] Second, the Adjusted 2011 Projections were updated to reflect the actual historical revenues and costs of Solaire during the first nine months of 2013. In particular, Solaire's EBITDAM (*i.e.*, Earnings Before Interest, Taxes, Depreciation, Amortization and Management Fees)[114] for the first 6 months was 63% below the projected GGAM case and 55% below the projected Bloomberry case. This led to a downward revision of the EBITDAM projections from the Adjusted 2011 Projections.[115] Third, based on contemporary evidence from equity analysts and other sources, Mr. Searby updated the Adjusted 2011 Projections to reflect changes in expectations about the prospects for the Asian gaming industry in general and for Solaire in particular.[116] Mr. Searby specifically considered: (a) the crackdown on corruption in China, which began in late 2012 and was expected to reduce the overall number and value of Chinese gambling on a macro level,[117] and (b) an increase in local and regional competition, in particular, the VIPs targeted by Solaire, which was expected to reduce particularly the number and value of Chinese gambling at Solaire.[118] Based on these considerations, Mr. Searby used different assumptions about the rate of revenue growth, bad debt expenses, commissions and rebates, and complimentaries,[119] all of which further revised the revenue and EBITDAM projections downwards from

---

[108]  Searby Report paras. 3.19 - 3.61.
[109]  Respondents' Sur-Rejoinder on Damages, para. 149.
[110]  Searby Report, paras. 3.63 - 3.65.
[111]  *Ibid.*, paras 3.63 – 3.65.
[112]  *Ibid.*, paras. 3.66 - 3.72.
[113]  *Ibid.*, paras. 4.45 - 4.47.
[114]  As set out in the Glossary to Searby's Report.
[115]  Respondents' Sur-Rejoinder on Damages, para. 155.
[116]  Searby Report, paras. 4.27 – 4.43.
[117]  *Ibid.*, para. 4.36.
[118]  *Ibid.*
[119]  *Ibid.*, paras. 4.28 – 4.36.

the Adjusted 2011 Projections. These updated projections were termed the **"Updated 2013 Projections."**[120]

239. To update the Updated 2013 Projections to estimate the amount of the management fees that can be awarded by the Tribunal, Mr. Searby first adjusted them to reflect Solaire's historical performance from 2013 through 2016, as calculated by the Respondents' expert Mr. Tantleff. Second, Mr. Searby projected Solaire's future performance based on current market expectations. Third, he reflected a discount rate as of August 15, 2017, the date Mr. Searby used for his assessment. Fourth, he assessed the Claimants' lost management fees valued at the date of termination of the MSA (Mr. Searby's preferred approach) as well as a prospective date of January 8, 2018 (Mr. Oaten's approach).

240. As explained by Mr. Searby, historical performance from 2013 to 2016 related to the three fee segments is evidenced in the Financial Books by calculating the sum of EBITDA from all operating departments except those in the VIP segment. However, Local VIP EBITDA[121] and Foreign VIP EBITDA[122] are not directly reflected in Solaire's Financial Books, which break EBITDA into VIP Premium and VIP Junket.[123] Based on the Financial Books of Solaire, Mr. Tantleff arrived at the breakdown for Local VIP EBITDA and Foreign VIP EBITDA through the following:[124]

    (a) There are two types of VIP Tables, Manifested Tables[125] and Non-Manifested Tables[126]. The Respondents understood that revenue from Manifested Tables were to be used to calculate Foreign VIP EBITDA, and Non-Manifested Tables to calculate Local VIP EBITDA.

    (b) There are two VIP areas – (i) VIP Junkets, where Junket operators bring in VIPs to play and (ii) VIP Premium, where VIPs not brought in by junkets can play. Data from each is tracked by Solaire. Both types of tables are found in each VIP area.

---

[120] *See* Table 4-10 in the Searby Report for the projected management fees at various cut-off points.

[121] EBITDA generated from Local High Roller Tables where PAGCOR imposes a 15% license fee under the PAGCOR License, or as that term is defined in the laws or regulations governing the Facilities (**"Local VIP EBITDA"**).

[122] EBITDA generated from Foreign High Roller Tables and Foreign Junket Players (**"Foreign VIP EBITDA"**).

[123] Respondents' Sur-Rejoinder on Damages, para. 168.

[124] *Ibid.*, paras. 169 – 178.

[125] Defined as junket tables, with its generated revenue used to calculated Foreign VIP EBITDA. See Respondents' Sur-Rejoinder on Damages, para. 169.

[126] Defined as high-roller tables, with its generated revenue used to calculated Local VIP EBITDA. See Respondents' Sur-Rejoinder on Damages, para. 169.

(c)     Data organised by VIP area as well as VIP table type was produced for the Arbitration.

(d)     Assuming that all results generated from the VIP Junket Department of Solaire (whether generated from Junket/Manifested/Foreign Tables or High Roller/Non-Manifested/Local Tables) are part of Foreign VIP EBITDA. This inflates Foreign VIP revenue (to GGAM's benefit).

(e)     By then breaking down results from VIP Premium into Foreign VIP and Local VIP and assume that all revenue generated from Junket/Manifested/Foreign Tables constitutes Foreign VIP revenue, and that all revenue generated by High Roller/Non-Manifested/Local Tables constitutes Local VIP Revenue.

(f)     The resulting percentage of VIP revenue classified as Foreign VIP is generally in line with the determination made by Mr. Oaten.

(g)     Expenses are then treated to follow the source of VIP revenues.

241.    An adjustment is made to the calculations for 2014 through 2016 to set the Gaming Taxes & License Fees equal to the expenses under the original structure. The Respondents explain that this is necessary to account for a reduction of PAGCOR license fees which was granted to compensate for a ruling by the Philippine Bureau of Internal Revenue in April 2014, which was successfully challenged by Bloomberry and PAGCOR, and led to a reversion to the previous regime in July 2016. The reduction in the license fee artificially inflated the EBITDA.[127]

242.    Mr. Tantleff allocated Solaire's G&A Expenses to each of the EBITDA segments using the methodology proposed by SGV/EY.[128] The Respondents point out that the SGV/EY methodology was prepared for the purpose of deciding how to allocate G&A among the EBITDA segments when the Claimants were still the management services provider for Solaire.[129]

243.    As regards current market expectations, growth projection rates for revenues from 2017 to 2019 were based on a Morgan Stanley report for Mass gaming, Mass non-gaming, and VIP gaming with an assumption that growth rates for Local and

---

[127]   Respondents' Sur-Rejoinder on Damages, paras. 179 – 182.
[128]   *Ibid.*, para. 183.
[129]   *Ibid.*, paras. 79 – 80 and 183.

Foreign VIP revenues would be the same, as the 2nd Oaten Report assumed. For 2020 to 2023, the 2.0% growth rate applied by Morgan Stanley was carried forward.

244.    Mr. Searby considered different buckets of costs: (a) direct costs, (b) G&A Expenses, and (c) bad debt expenses. With respect to direct costs such as commission rates, payroll expenses and promotional expenses, he measured each cost item as a proportion of gross gaming revenue (on the assumption that direct costs are likely to grow with revenues), and projected them using an average of the last two years of historical data.[130] With respect to G&A and Other Expenses, Mr. Searby projected that they will grow at the same rate as inflation on the assumption that these types of expenses develop independently of fluctuations in revenue.[131] With respect to bad debt expenses, Mr. Searby projected these expenses based on recent analyst reports[132] and historical data showing that most bad debt expenses were incurred with respect to Foreign VIP Activity.

245.    After adjusting the Updated 2013 Projections to reflect Solaire's historical performance to project future performance based on market expectations, Mr. Searby further adjusted the Updated 2013 Projections by applying a discount rate of 12.7% to reflect the relative volatility of Solaire's value as an asset, and to account for additional volatility when calculating the cost of equity.[133]

246.    The Respondents criticize the Claimants' model and the data used. They argue that GGAM's interpretation -- that Foreign VIP EBITDA must be calculated using revenue from VIP gaming by Foreign VIP players regardless of the type of table they choose to play on -- ignores the plain language of the MSA, it would be impossible to implement, and it has never been the Respondents' interpretation.[134]

247.    The Respondents explain that they understand Foreign VIP EBITDA to be calculated from revenue from Junket Tables, while Local VIP EBITDA is calculated from High-Roller tables. According to the Respondents, this understanding is consistent with the classification of tables in PAGCOR's Casino Regulatory Manual for Entertainment City Licensee. The Respondents note that PAGCOR Manual limits Junket Tables to players with Foreign Passports.[135]

---

[130]  Searby Report, paras. 5.37 – 5.38.
[131]  *Ibid.,* para. 5.39. Mr. Searby assumed an annual inflation of 2.5% from 2017 to 2023. This is consistent with Claimants' expert's assumption. *See* 2nd Oaten Report, footnote 134.
[132]  Searby Report, para. 5.41.
[133]  Respondents' Sur-Rejoinder on Damages, para. 188.
[134]  *Ibid.*, para. 50.
[135]  *Ibid.*, paras. 51 – 54.

248.   The Respondents claim that their interpretation of the MSA is practical since it is easy for Solaire to track revenues generated from the two types of table games, and Bloomberry is required by the PAGCOR Manual to track and report this data for purposes of calculating Solaire's license fees.[136] Furthermore, prior to signing the MSA, the Bloomberry Model showed that Bloomberry was calculating Foreign VIP EBITDA from the revenue that would be generated from the Junket Tables.

249.   The Respondents claim that GGAM disregards the best evidence of Bloomberry's actual data regarding revenues and expenses of local and foreign VIPs. The Respondents explain that Bloomberry tracks Local VIP and Foreign VIP revenue by the revenue generated from different types of VIP tables and subtracts from those revenues various Local VIP and Foreign VIP expenses in order to arrive at Local VIP EBITDA and Foreign VIP EBITDA. The Respondents admit that this necessarily creates inconsistencies in practice because, unlike VIP revenues, which Bloomberry tracks based on the type of VIP table, Bloomberry is only able to track certain VIP expenses based on individuals or junket operators.

250.   The Respondents observe that GGAM attempts to use this fact to suggest that the data produced by Bloomberry is unreliable, and explain that any perceived "inconsistency" is merely indicative of the limitations inherent in tracking revenues and expenses at a large casino. Specifically, with respect to tracking bad debts, the Respondents further explain that Bloomberry does not loan money to VIP tables, rather, Bloomberry loans money either directly to individual VIPs playing in the "Premium Area" of Solaire (i.e., the VIP areas of Solaire that are not "Junket Rooms" designated for junket operators), or directly to junket operators who, in turn, lend money to the VIPs that they bring to Solaire to gamble in their designated Junket Rooms at Solaire. When Solaire is unable to collect on the loans made to individual VIPs and/or junket operators, it accounts for these as bad debt expenses. Accordingly, although Bloomberry is incapable of tracking bad debt expenses by table type, it is capable of tracking whether bad debts are incurred by junket operators, individual Foreign VIPs, or individual Local VIPs. Bloomberry collected and produced this *"best evidence"* of its bad debt expenses to GGAM in this arbitration. Instead of using this best evidence, GGAM has simply rejected it, along with all of the other best evidence that Bloomberry produced.

251.   The Respondents insist that the Claimants' calculation of Foreign VIP EBITDA disregards the best evidence. Indeed, Mr. Oaten acknowledges the accuracy of Solaire's Financial Books but relies on them only for certain data and cherry picks

---

[136]   Respondents' Sur-Rejoinder on Damages, para. 55.

from assumptions and inapplicable financial statements. Thus, Mr. Oaten calculates Solaire's Foreign VIP Junket EBITDA to be significantly more than the actual Total VIP EBITDA reported in Solaire's Financial Books and above the maximum amount possible based on them.[137]

252.  The Respondents further argue that Mr. Oaten projects Solaire's future VIP EBITDA by basing future VIP EBITDA projections on his calculation of VIP EBITDA for 2016 with the result that they are even more inflated than his historical calculations. Accordingly, Claimants' alleged damages are untethered from reality, have not been proven with "*a reasonable degree of certainty*," nor "*competent proof or best evidence available*," and must therefore be rejected as a matter of Philippine law.[138]

253.  It is the Respondents' contention that the Claimants' allocation of complimentaries ("**Comps**") between the three EDITDA segments is contrary to the MSA and ignores Solaire's actual data. The Respondents explain that, in its Financial Books, Solaire accounts for these intercompany Comp expenses, such as "comped" hotel rooms, as an expense to its gaming operations and as revenue to its hotel operations. In the consolidated financial statements of Solaire's parent company, BRC, however, these intercompany expenses are netted-out such that they are not included as casino expenses or as hotel revenues.[139]

254.  The Respondents argue that, in order to avoid the MSA's requirement that expenses must follow the source of revenue,[140] Mr. Oaten nets-out intercompany Comp expenses on the ground that he is "*following the MSA definition that EBITDA should be based on a consolidated basis.*"[141] Netting-out Comps has a dollar-for-dollar increase to the higher MSA fee categories (Local VIP and Foreign VIP) with a directly correlated decrease to the lower MSA fee category (Base Fee). The Respondents' experts estimate that the netting-out of intercompany Comp expenses by the Claimants' expert leads to an improper increase in management fees of over US\$ 6 million from 2013-2016, followed by an increase of over US\$ 3 million per annum thereafter, resulting in a total improper increase to management fees of more than US\$ 24 million.[142]

---

[137]  Respondents' Sur-Rejoinder on Damages, paras. 70 - 72. "Solaire's Financial Books can be used to show the maximum amount of Foreign VIP EBITDA (before deducting G&A) that could possibly be calculated by each party for a given year. This sanity check can be performed by simply assuming (counter-factually) that there is no Local VIP EBITDA, and thus Foreign VIP EBITDA equals Total VIP EBITDA."

[138]  *Ibid.*, para. 74.

[139]  *Ibid.*, para. 75.

[140]  MSA, Annex H, Definitions, "Segment EBITDA Computation."

[141]  Respondents' Sur-Rejoinder on Damages, para. 76.

[142]  *Ibid.*, para. 78.

255. The Respondents recall that the MSA is silent as to how G&A Expenses are to be allocated between the three EBITDA segments, and argue that the allocation of G&A Expenses of the Respondents among the EBITDA segments is based on arbitrary assumptions intended to inflate management fees. The Respondents explain that to fill this gap SGV/EY prepared a report for Bloomberry on how to make this allocation. The report was prepared while the Claimants were still the management services provider for Solaire.

256. The Respondents claim that the rejection of the SGV/EY methodology by the Claimants is without basis. They argue that the Claimants' contention that the method cannot be applied without certain internal data such as "*the number of employees assigned to different segments of the business*,"[143] and its follow up contention that the "*Respondents…withheld that data*[144]" or that the data is unreliable,[145] are flimsy. The Respondents claim that sufficient data was provided, and observe that Bloomberry's expert used this data to follow the SGV/EY allocation method.[146]

257. The Respondents observe that Mr. Oaten applies a cost allocation methodology based on floor area as opposed to revenue generated that results in over 2/3 of G&A Expenses being allocated to Non-Gaming operations, thereby inflating EBITDA for the higher MSA fee categories.[147] According to the Respondents, this "volume" vs. "value" approach is nonsensical and impossible to apply with any objectivity. Mr. Oaten provides no insight whatsoever into how he determines whether a given G&A Expense is driven by "volume" as opposed to "value."[148]

258. The Respondents contend that the larger point that Mr. Oaten misses is that virtually all of the G&A Expenses are "value" driven, in the sense that they are necessary expenses to support the operations of the property as a whole, which is meant to (and does) generate the vast majority of its revenues from gaming, rather than hotel accommodation, restaurants, event space or theatre.[149] Mr. Oaten's allocation results in more than 66% of G&A Expenses being allocated to Non-Gaming operations, which comprise less than 6% of Solaire's total revenue.[150] This results

---

[143] Claimants' Supplemental Submission, para. 69.
[144] *Ibid.*
[145] *Ibid.*
[146] Respondents' Sur-Rejoinder on Damages, paras. 82 to 85.
[147] *Ibid.*, para. 87.
[148] *Ibid.*, para. 88.
[149] *Ibid.*, para. 91.
[150] *See* 2nd Oaten Report, Appendix 11.

in a negative EBITDA for Non-Gaming operations and an increase in management fees of more than US$ 17 million.[151]

259.  The Respondents further contend that Mr. Oaten's calculation of VIP rebates is designed to inflate management fees and it is flawed for the following reasons:

(a)  He inconsistently relies on a document that Bloomberry produced showing the breakdown of Local VIP revenues and Foreign VIP revenues that he had rejected on the ground that the document allocated too high a percentage of Total VIP revenues to Local VIPs. Relying on this document results in a large amount of VIP Commissions and rebate expenses being allocated to Local VIPs.[152]

(b)  He applies the wrong commission/rebate rate to the wrong tables. Specifically, Mr. Oaten applies a 1.5% commission to the turnover on Junket Tables located in the Premium Area (when he should apply a 1% rebate, as this is a direct VIP rebate), and he applies a 1% rebate to the turnover on High Roller Tables located in Junket Rooms (when he should apply a 1.5% commission, as this is a junket operation commission). Because turnover on the High Roller Tables located in Junket Rooms is on average nearly four times as much as the turnover on Junket Tables located in the Premium Area, by applying a 1% rebate rate to these High Roller Tables located in Junket Rooms, instead of a 1.5% commission, Mr. Oaten significantly reduces the total amount of historical junket commissions expenses.[153]

(c)  He compounds the impact of this mistake by relying on what he refers to as "Total commissions" figures from BRC's financial statements. The BRC financial statements actually refer to "gaming promoter's expenses" and, contrary to what Mr. Oaten assumed, "gaming promoter's expenses" does not refer to "Total commissions" (i.e., junket commissions + direct VIP rebates), but only to junket commissions.[154]

260.  The Respondents argue that Mr. Oaten's inappropriate and mistaken assumptions led to implying a 1% direct VIP rebate rate going forward despite the fact that accurate historical data produced by Bloomberry implies a historical VIP rebate

[151]  Respondents' Sur-Rejoinder on Damages, para. 93.
[152]  *Ibid.*, para. 99.
[153]  *Ibid.*, para. 100.
[154]  *Ibid.*, para. 101.

rate of approximately 1.3%. This results in an improper increase of management fees of approximately US$ 44 million.[155]

261.    When calculating damages from lost fees in the management agreement context, it is well-accepted that damages must be adjusted downward to account for the manager's avoided costs.[156] The Claimants take the position, which their experts accept as true, that GGAM would not have expended any funds of its own over a period of ten years to continue earning Management Fees. The Claimants have argued that they were able to discharge all of their MSA obligations through Mr. French, the Management Team, and consultants (all paid by Bloomberry). Aside from that, the Claimants have produced little evidence regarding GGAM's "business model" and attendant costs.[157]

262.    In respect of avoided costs, the Respondents argue that Claimants followed a strategy of manipulation of corporate forms:

        (a)    When faced with expenses, GGAM tried to shift such costs inappropriately to Bloomberry.[158] GGAM also ensured that its executives were paid by somebody other than GGAM.[159]

        (b)    The Claimants have taken conflicting positions with respect to Cantor and the Support Services Agreement. On the one hand, the Claimants have stated that Cantor provided the back-office services pursuant to the Support Services Agreement necessary to keep GGAM running as a company. On the other hand, the Claimants have said that they would not have incurred any costs, notwithstanding their contractual obligation to pay Cantor for any services at cost plus 10%.[160]

        (c)    GGAM purported to assign its Post-Opening Services under the MSA to GGAM Netherlands, a shell company with no employees, no revenue, little capital, and presumably no costs.[161]

---

[155]   Respondents' Sur-Rejoinder on Damages, para. 103.

[156]   *Ibid.*, para. 213.

[157]   *Ibid.*, para. 213.

[158]   *Ibid.*, para. 214. Respondents cite an email in which Mr. Saunders wrote to Mr. Weidner that suggested that GGAM were not happy to incur expenses and that it would be difficult to push the expenses to Bloomberry.

[159]   *Ibid.*, para. 214.

[160]   *Ibid.*, para. 215.

[161]   *Ibid.*, para. 216.

263.    Finally, the Respondents assert that the Parties' agreement to apply 6% interest to fees and other amounts due to GGAM does not apply in a situation where, as here, a contract purportedly has been breached and the amount of fees due and owing is in dispute. Moreover, pre-judgment interest is not permitted under Philippine law if the damages cannot be established with reasonable certainty at the time the damages are demanded.[162]

## C.    Analysis of the Tribunal

### (i)    *Framework of the Analysis*

264.    Because of the implications it has for the calculation of damages, the Tribunal will first determine whether the MSA would have likely been renewed for a second five-year term, followed by a determination of the sources of financial information to be relied on for the calculation of historical revenues and costs.

265.    The remaining questions raised in the Parties' arguments and to be decided by the Tribunal will be considered in the following order: (i) allocation of revenues (ii) specific issues of cost allocation: G&A Expenses, temporary adjustment of PAGCOR's license fees, complimentaries, commissions and rebates, bad debt, and avoided costs, (iii) failure to mitigate damages, (iv) date of valuation, and (v) amount of the lost management fees.

266.    In addition to the arguments made by the Parties in their submissions on quantum as well as at the Remedies Hearing, the Tribunal requested updated financial information as well as updated calculations by the Parties' experts based on Tribunal-directed parameters by way of the Tribunal's Directions of February 4, 2019 (*see* paragraph 141 above). Where appropriate, the Tribunal's decision will take into account such updated financial information as well as the experts' Updated Calculations of March 12, 2019.

### (ii)    *Term of the MSA*

267.    The Initial Term would have ended on March 16, 2018. Whether the MSA would have been allowed to lapse or been terminated by either Party at the end of the first term, or continued by unilateral decision of the Claimants, is the subject of dispute and is determined by the Tribunal in this section.

---

[162]   Respondents' Sur-Rejoinder on Damages, para. 126.

268.   In answering the question on whether the unearned management fees for the second five-year term would have been earned by the Claimants with reasonable certainty – i.e., *"is there a basis for determining with reasonable certainty such unearned profits?"*[163] – the Tribunal's view is that there is such a basis. The Claimants had a unilateral option to renew the MSA. It is not disputed that managing the casino and hotel was a profitable venture. These are the undisputed facts on the evidence before the Tribunal. The strong inference, therefore, is that (without any extenuating circumstance, such as the Respondents being entitled, and exercising such entitlement, to terminate the MSA) GGAM would have exercised its unilateral option to renew the MSA for a further 5 years. In other words, the evidence warrants *"the inference that* [GGAM] *has been damaged by the loss of profits which he might with reasonable certainty have anticipated but for* [the Respondents'] *wrongful act."*[164] For the reasons below, the Respondents have not shown any countervailing evidence that would displace this inference.

269.   The Respondents have argued that the MSA might not have been renewed and may have even been terminated before the end of the Initial Term. The Respondents refer to the opinion of Justice Vitug in support of their argument that, under Philippine law, it cannot be inferred that a party would have exercised an option to renew a contract. On the other hand, the Claimants affirm on the basis of Justice Puno's opinion that, *"where the non-breaching party has a unilateral option to renew a contract, but the other party's breach deprives the non-breaching party of its right to extend for the renewal term, the non-breaching party may recover damages for the renewal term."*[165]

270.   In the view of the Tribunal, the cases referred to by Justice Vitug are not apposite. None of them contemplate **wrongful termination** of the contract by the counter-party that does not have an option to renew. In the case of *Dioquino vs. Intermediate Appellate Court*,[166] the court held that a tenant could not be held for the additional term unless the tenant has exercised the privilege by some affirmative act. In that case, however, the entire original period had lapsed, and the issue in question was whether the tenants had renewed the lease, and whether they needed to notify the landlord of their intention to do so. In the other case referred to by Justice Vitug, the court held that "it cannot be inferred that the lessees, who were given the option

---

[163]   Paragraph 182 above; Claimants' Supplemental Submission, para. 37.
[164]   Applying *Casiño v. Court of Appeals*, G.R. No. 133803 (S.C., September 16, 2005) (Phil.) as set out at.Claimants' Supplemental Submission, para. 38.
[165]   Puno Report, para. 115.
[166]   *Dioquino vs. Intermediate Appellate Court*, G.R. Nos. 68580-81, (Phil. November 7, 1989) (RL- 69); cited by the Respondents in its Rejoinder on Damages at footnote 252; 3rd Vitug Report, para. 28.

to renew the lease contract, would have exercised such option when there was never any *positive act* on the part of the lessees, *before or after* the termination of the original period, showing their exercise of such option."[167] Preliminarily, the Tribunal observes that the present case is not about a tenant-landlord relationship. Further, the Claimants had been directly deprived of the benefits of the first term of the MSA because of the Respondents' wrongful termination of the MSA. GGAM could not have exercised or indicated that it would exercise an option in the wrongfully terminated contract. It would have served no purpose as the contract had already been wrongfully terminated. The Respondents may not at the same time deprive GGAM of the benefit of the MSA and then argue that a right granted to GGAM in the MSA has not been exercised by GGAM.

271.    Under Article 1.3 of the MSA, "*GGAM may give notice to the Owners [...] that it wishes to continue the performance of the Services for a subsequent period [...] of five (5) years under the same terms and conditions. This Agreement shall then be deemed extended for the Subsequent Term of five (5) years.*" These terms are clear in giving GGAM the option to extend the MSA if it wishes to do so. The MSA is extended by the mere fact of giving notice to the Owners of the desire to extend it. The terms of Article 1.3 contrast with those of Article 1.4. No convincing evidence has been presented to the Tribunal to show that GGAM would not have exercised the option to renew but for termination of the MSA by the Respondents.

272.    Further, while GGAM was subject to the performance standards set forth in the MSA,[168] and the Cornell Report recognizes that "*renewal clauses are often tempered with language giving the owner the right to terminate if certain performance hurdles have not been achieved, and thus the probability of continuation needs to be tempered by this fact, if such language appears,*"[169] the Respondents have not shown the Tribunal that there was a probability that GGAM would not have met the performance standards set out in the MSA (which might have justified GGAM's termination at some later date). It was Respondents' premature wrongful termination of the MSA that prevented GGAM from meeting the performance standards.   For the same reason, the Tribunal rejects the Respondents' argument that a renewal risk premium should be added to the applicable discount rate (*see also* the Tribunal's analysis at paragraph 318 below).

---

[167]  Respondents' Sur-Rejoinder on Damages, footnote 192; 4th Vitug Opinion, para. 34. Emphasis in the original. *Estate of Llenado vs. Llenado*, G.R. No. 145736 (Phil. March 4, 2009) (RL-143).
[168]  Set out at Annex B of the MSA.
[169]  Cornell Report, p. 10 (set out in the de Roos Report, Appendix A).

273.    The Tribunal turns to address the Respondents' concerns in relation to the findings made by the DOJ and SEC (together the "**FCPA Findings**") (*see* paragraph 229 above). While the majority of the Respondents' submissions on this issue were made in the context of their request to the Tribunal to reconsider the Liability Award (which the Tribunal denied on the basis that it could not do so under Singapore law), the Tribunal will address this issue insofar as it is relevant to the question of damages (and, in this section, to the issue of reasonable certainty of damages). The Parties will recall that, while the Tribunal rejected the Respondents' Request for Reconsideration on the basis that it could not reconsider the Liability Award under Singapore law, it did not consider the merits of the Request. As to the relevance of these findings vis-à-vis the reasonable certainty of damages, the Respondents primarily pitch their arguments on two possibilities: (a) that the Respondents would have terminated the MSA in light of the FCPA Findings before the second five-year term could start; or (b) that GGAM would have resigned or agreed not to renew the MSA in order to "save face" (*see* paragraph 229 above).

274.    At the outset, the Tribunal observes that the FCPA Findings were made in relation to a different entity (*i.e.*, LVS), and not in relation to GGAM. Moreover, they do not on their face name either Mr. Weidner or Mr. Chiu, although their identities seem to be conceded by Claimants. Further, the most that the FCPA Findings could mean is that the US DOJ and SEC have come to certain conclusions about the actions of certain persons (who have not apparently been given an opportunity to personally answer the allegations against them by those authorities). Moreover, the FCPA Findings, while raising questions, do not appear on their face to actually find any illegal conduct by those persons, except possibly for LVS to have a sufficient internal monitoring and compliance system in place. Facially, the DOJ Non-Prosecution Agreement, which attaches the Findings, seems aimed at requiring that such a system be put in place for the future for LVS. In the context of the present arbitration, these findings clearly do not bind the Tribunal as to their correctness. What the Tribunal considers relevant is the possibility that these findings may have influenced PAGCOR (if and when it became aware of such findings) to institute its own investigations. This, however, is not in itself sufficient for the Tribunal to find that there is a probability that the situations envisaged at 273(a) and (b) above would have materialised. Even if the Tribunal accepts the Respondents' identification of Messrs Weidner and Chiu in the FCPA Findings[170] at face value (over which there does not seem to be serious dispute), the Respondents have not shown how exactly the FCPA Findings would have entitled them to terminate the MSA prematurely (*i.e.*, at the time the FCPA Findings came to light, or before the commencement of the second five-year term, or at any time after that). In the

---

[170]    Annex B of Respondents' Request for Reconsideration.

Tribunal's view, there is a missing link between the FCPA Findings and the Respondents' position that the MSA would have been terminated after (at most) the first five-year term of the MSA (or that GGAM would resigned or not renewed the MSA).

275.   In this regard, the Tribunal's view is that the Respondents have not presented a convincing case showing how exactly the SEC and DOJ findings would have led to an event or sequence of events that would have culminated in a contractually recognised event entitling the Respondents to terminate the MSA. The most relevant provisions of the MSA are clauses 15.1(f) and 15.1(g) of the MSA – neither of which, on their face, would be triggered by the mere fact that (even accepting the Respondents' case at its highest) Mr Weidner and Mr Chiu were necessarily "tainted" by the FCPA findings.

276.   Clauses 15.1(g) and 15.1(f) state:

"*15.   TERMINATION*

    *15.1   By Owner for GGAM's Breach*

*The Owners may at any time, by written notice addressed to GGAM, give prior notice of intention to terminate the Services under this Agreement, in whole or in part if any of the following have occurred:*

*...*

    *(f)   an affirmative act or failure to act by GGAM that results in a final order by PAGCOR that GGAM is unsuitable to participate in the management of the Facilities, and such order by PAGCOR cannot be remedied within the cure period as may be allowed by PAGCOR, provided no cross-default is triggered thereby.*

    *(g)   William Weidner ceases to be the CEO of GGAM, unless William Weidner, Brad Stone, or Garry Saunders, or any person nominated by any of them and approved by the Owners, continue as a senior officer of GGAM actively involved in the performance of GGAM's obligations under this Agreement.*

277.   At the Remedies Hearing, counsel for Bloomberry sought to argue that Bloomberry *"would have had the ability to rely on* [Clause 15.1(f)]*"* to terminate the MSA.[171] Based on the evidence submitted, the Tribunal disagrees. On a plain reading, the engagement of Clause 15.1(f) clearly requires an affirmative act or failure to act by GGAM which results in a final order by PAGCOR that GGAM is unsuitable to participate in the management of the Solaire. Even if the Tribunal took the FCPA Findings at face value, there is no mention of GGAM in those Findings, much less any act or failure to act by GGAM. Even if Mr Weidner and Mr Chiu's acts while they were working for LVS could somehow be attributed to GGAM, there is no evidence (besides the Sarmiento Declaration and Mr Sarmiento's testimony, in which Mr Sarmiento made important concessions (*see* paragraph 278 below)) that PAGCOR would have made "a final order" that GGAM itself is unsuitable to participate in the management of the Solaire.

278.   Further, while the Sarmiento Declaration makes the assertions that that the FCPA Findings and the hiring of Mr French were *"reasons enough for PAGCOR to disqualify GGAM from being involved in gaming in the Philippines,"* that PAGCOR would have required that Bloomberry *"disassociate itself from Mr. Weidner, Mr. Chiu and Mr. French,"* and that PAGCOR *"would have required the immediate termination of the MSA if its continuation would not be possible without the involvement of Mr. Weidner, Mr. Chiu and Mr. French,"* there is no reference to, or evidence of, any previous case where any disqualification was based on similar reasons, nor any reference to, or evidence of, any specific regulation to support these statements. While the Respondents made some reference to the revelation that Mr Stone had previously fired Mr French for his role in rigging a drawing while he worked for LVS, there appears to be nothing in the FCPA Findings implicating Mr Stone. Any suggestion that Mr Stone would have been somehow disqualified by reason of the FCPA Findings, or his connection with Mr French, would thus appear to be speculative. Further, even if the Tribunal were to assume *arguendo* that Mr Stone would somehow be disqualified by PAGCOR from being involved in the management of the Solaire, Mr Sarmiento conceded in cross-examination during the Remedies Hearing that he did not know of any reason to disqualify Mr Saunders (one of the key personnel under the MSA and a senior officer named in Clause 15.1(g) of the MSA) from running the Solaire through GGAM. The Tribunal also does not see any reason why (even if, *arguendo*, it assumed for the Respondents' benefit that Mr Weidner and Mr Stone (through his connection with Mr French) would be "disqualified" by PAGCOR from being involved in the management of the Solaire) Mr Saunders would not have continued as a senior officer of GGAM actively involved in the performance of GGAM's obligations under the MSA. This

---

[171]   Transcript of Hearing on June 1, 2018 (**"Day 5 Transcript"**), page 190 lines 6 to 19.

would effectively take the present scenario out of the ambit of the Respondents' right to terminate under Clause 15.1(g) of the MSA.

279. The Tribunal's view, therefore, is that the evidence is simply not strong enough to show that there was any likelihood that PAGCOR would have ordered GGAM to be dismissed as the manager under the MSA, nor that any other clause in the MSA would have entitled the Respondents to terminate the MSA simply by reason of the FCPA Findings.

280. Following from the reasoning above, the Tribunal is even less convinced by the Respondents' argument that GGAM would have resigned or that the Parties would have brought the MSA to a mutual end by the end of the first five year term to "save face." If there is no probability that the Respondents could have justifiably terminated the MSA before the start of the second five-year term, the Tribunal considers it even less likely that GGAM would have given up on what is indisputably a valuable right worth millions of dollars in order to "save face," or that it would have simply walked away from such a valuable right without at least some form of negotiated settlement fee.

281. Accordingly, the Tribunal does not consider that the FCPA Findings would have entitled the Respondents to terminate the MSA. The Tribunal also does not consider it likely that the FCPA Findings would have led to GGAM's resignation, or to the Parties bringing the MSA to a mutual end. Put another way, the Tribunal finds that the FCPA Findings would not have substantially impacted the "reasonable certainty" of GGAM exercising its unilateral right to renew.

282. Besides the FCPA Findings themselves, the Respondents also alleged that the findings of the DOJ and the SEC revealed that the Claimants concealed critical information from, and made misrepresentations to, the Respondents and the Tribunal. The Tribunal has ruled that it cannot re-open the Liability Award under Singapore law pursuant to its Decision on Reconsideration. Further, as noted above, although raising questions, the Findings do not appear on their face to actually find illegal conduct by Mr. Weidner or Mr. Chiu, and no evidence beyond the DOJ and SEC documents was presented by Respondents to prove the underlying facts and conduct. For the reasons above, the Tribunal has also found that, even if it took the FCPA Findings at face value, such findings do not, on balance, affect the reasonable certainty of GGAM exercising its unilateral right to renew the MSA for the second five-year term. Therefore, even if there had been any concealment, there would have been no prejudice suffered by the Respondents.

283.    In conclusion, the Tribunal finds that Claimants would have been entitled, and indeed probably would have, exercised its option to renew the MSA beyond the Initial Term, and hence that it is reasonably certain they would have been in a position to earn the lost management fees beyond the Initial Term.  Therefore, for purposes of the calculation of the lost fees, the Tribunal finds that the MSA would likely have been renewed for a second term and will thus assess GGAM's lost management fees over a period of 10 years.

### (iii)    *Sources of Information for Historical Costs and Revenue*

284.    The Tribunal will next consider the sources of information that the Parties' experts rely on to arrive at their calculations of the Claimants' lost management fees.

285.    For the period 2013-2018, both Parties' experts, Mr. Oaten and Mr. Tantleff, purport to use the actual results at Solaire to determine the historical revenues and costs. They have assumed that Solaire's actual performance under the Respondents is the same as it would have been under GGAM, but the experts use different sources to determine Solaire's actual results: for the most part, BRC's financial statements and analyst reports in the case of Mr. Oaten versus Solaire's Financial Books relied on by Mr. Tantleff.

286.    Mr. Oaten justifies the use of BRC's financial statements as the primary source because they have been audited by BRC's independent, external auditors and, thus, received greater scrutiny than documentation generated internally. On the other hand, Mr. Tantleff has relied on Solaire's Financial Books for historical performance and various disclosures provided by the Respondents (VIP-Split Disclosure, VIP Premium Disclosure, 2nd Festin Declaration, etc.). In Mr. Tantleff's opinion, these documents, based upon Solaire's actual operational reporting, provide a more complete picture than the financial statements of BRC to estimate the MSA Fees.

287.    For the Tribunal, the question is how the choice of sources affect the credibility of the results of the calculations as the best evidence. BRC's financial statements reflect consolidated accounts and include the results of Jeju Sun casino, which is not involved in this case. On the other hand, the Financial Books are prepared in the ordinary course of business as part of management reporting, are more detailed than the financial statements, and the financial information is exclusively that of Solaire. While the Tribunal recognizes the merit of audited financial statements, the accuracy of the Financial Books has not been disputed by the Claimants. Indeed, Mr Oaten, one of the Claimants' experts, makes the observation that the Financial

Books "*do not appear to have been prepared for the purposes of this Arbitration,*"[172] and relies on the Financial Books for certain components of his own calculations.[173] For these reasons, the Tribunal is persuaded to generally rely on the Financial Books unless there is a compelling reason why it should not do so for a given item of cost or revenue. This was reflected in the Tribunal's request for updated calculations from the Parties' experts in the Tribunal's Directions of February 4, 2019, after which the Parties' experts provided their Updated Calculations of March 12, 2019 based on the Financial Books.

### (iv)  *Allocation of Revenues*

288.   The Claimants dispute the reliability of the evidence produced by the Respondents on the allocation of revenues to the various segments, particularly because they say it does not permit the Tribunal to determine Foreign VIP EBITDA and Local VIP EBITDA as defined in Sections 4.4 and 4.5 of the MSA. On the other hand, the Respondents submit that the data provided by Solaire may be used to calculate Solaire's historical Local VIP EBITDA and Foreign VIP EBITDA as has been done by Bloomberry's experts by assuming: (a) that all the revenue generated by High Roller Tables and Junket Tables in Junket Rooms, and Junket Tables in the Premium Area are used to calculate Foreign VIP EBITDA, irrespective of how they are classified in the VIP-Split Disclosure; and (b) all revenue generated from the High Roller Tables located in the Premium Area are used to calculate Local EBITDA. The Respondents observe that this method under-allocates the amount of revenue generated from Local VIP players to Local VIP EBITDA but it allows expenses to track revenues more closely, as required by the MSA.

289.   The issue of revenue allocation stems from the MSA terms "Foreign VIP EBITDA" and "Local VIP EBITDA," which in turn comprises revenue from "Foreign High Roller Tables" and "Foreign Junket Tables" and revenue from "Local High Roller Tables," respectively. Under the MSA these terms were to take the meaning as set forth in the PAGCOR Regulations, but the PAGCOR Regulations only refer to "Junket Tables" and "High Roller Tables." In these circumstances, the Claimants take the position that, because the MSA distinguishes between "Local High Roller Tables" and "Foreign High Roller Tables," gaming on "High Roller Tables" must separately account for revenue by local and foreign customers on this type of table. Thus, the emphasis of the Claimants is on the geographical origin of customers who play on High Roller Tables, (*i.e.* the "Foreign" and "Local" part of the phrase).

---

[172]   2nd Oaten Report, para 4.3.

[173]   *See e.g.* page 7 of the Claimants' Oaten-Tantleff Summary, where Mr. Oaten lists the Financial Books as input for certain aspects of his calculations (this is repeated at page 6 of the Claimants' Oaten-Searby Summary).

290. On the other hand, the Respondents argue that "Foreign High Roller Tables" and "Foreign Junket Tables" refer to gaming on "Junket Tables" (as defined in the PACGOR Regulations), and "Local High Roller Tables" refers to gaming on "High Roller Tables" (as defined in the PACGOR Regulations). The Respondents' focus is thus on the type of table on which on which the customers played.

291. The Tribunal notes that, in support of their argument, the Respondents point to the Bloomberry Model (RE-381) and the Cantor Model (RE-411). Both documents are contemporaneous and pre-date the dispute. According to the Respondents, these documents show that there was a common understanding between the Parties at that time. The Tribunal further notes that both Parties' experts agree that the overwhelming majority of VIP revenues come from Foreign VIPs. Thus, Mr. Oaten assumes:[174] (i) for 2013 and 2014 local VIP revenue makes up 20% and foreign VIP revenue makes up 80% of Solaire's total VIP revenue; (ii) for 2015, local VIP revenue makes up 15% and foreign VIP revenue 85% of Solaire total VIP revenue; and (iii) for 2016 onwards, local VIP revenue makes up 10% and foreign VIP makes up 80% of Solaire's total VIP revenue. On the other hand, Mr. Tantleff splits revenues between foreign and local VIP revenue as follows:[175]

| Year | Foreign VIP Revenue | Local VIP Revenue |
|------|---------------------|-------------------|
| 2013 | 87% | 13% |
| 2014 | 89% | 11% |
| 2015 | 93% | 7% |
| 2016 | 94% | 6% |
| 2017 | 94% | 6% |
| 2018 | 94% | 6% |

292. The Tribunal is aware that the Claimants consider the Cantor Model dated and that the interpretation advanced by the Respondents may result in allocating to foreign revenues, those revenues actually generated from the Local VIP Tables. However, Mr Tantleff's methodology actually allocates more VIP revenue to Foreign VIP Revenue than Local VIP Revenue in *every single year* from 2013 to 2018 (*see* paragraph 291 above). The Claimants' concern that the Respondents' methodology under-allocates revenue to the Foreign VIP Revenue Segment is therefore unfounded. Further, the Tribunal is persuaded by the Respondents' understanding

---

[174] *See* para. 2.6 of Mr. Oaten's Updated Calculations of March 12, 2019.
[175] *See* para. 175 of the Respondents' Sur-Rejoinder on Damages, which compares Mr. Oaten's and Mr. Tantleff's VIP revenue allocations. For 2017 and 2018 figures, see Figure 2 of Mr. Tantleff's Updated Calculations of March 12, 2019.

because it was formulated before, or independent of, the dispute with the Claimants and seems to have been at least generally embraced by Claimants as well.

### (v)    *Allocation of Costs: Specific Issues*

#### a.    G&A Expenses

293.    The Parties agree on the need to identify an appropriate driver for each item of cost when allocating G&A Expenses. They also agree that the casino is the primary driver of the resort. But they differ on how these premises are to be applied. The MSA is silent on how G&A Expenses are to be allocated between gaming and non-gaming revenues and then among the three gaming segments corresponding to the fees to be perceived by GGAM. In June 2012, the Parties agreed to engage an accounting firm to prepare a report on how to make this allocation. The Respondents retained SVG/EY. There is no record of GGAM retaining PricewaterhouseCoopers as it had originally proposed.

294.    The Report produced by SVG/EY allocates G&A Expenses to two levels. In the first, allocation of G&A Expenses between gaming and non-gaming is made on the basis of generated gross revenue. In the case of costs incurred jointly by gaming and non-gaming, they are allocated according to attributed cost drivers (occupied floor area, usage or fixed asset value). The remainder of the costs are allocated by payroll costs and by full-time equivalent ("**FTE**") personnel. The level two allocation among gaming segments depends on the gross revenue contribution.

295.    Mr. Tantleff, the Respondents' expert, has applied the allocation proposed in the SGV Report as shown in the tables in Appendix D to his Second Report. The results for the years 2013-2016 for which data was produced show (a) roughly, a 50% split allocation of G&A Expenses between gaming and non-gaming revenues,[176] and (b) an allocation of G&A Expenses to gaming segments of 20%-23% to Foreign VIP, 1%-3% to Local VIP, and the remainder to Mass Gaming.

296.    Mr. Oaten, Claimants' expert, uses a different methodology because he claims not to have sufficient information or that the information available is not reliable. This results in charging as much as two thirds of the G&A Expenses to non-gaming, which generates only between 10 and 15% of revenue. On the other hand, according to the Claimants, the allocation among gaming segments based solely on revenue proposed in the SGV/EY Report may make sense for some (but not all) costs.

---

[176]    Between 2013 and 2016, the proportion of G&A Expenses allocated to Non-Gaming (as set out in Appendix D to the 2nd Tantleff Report) ranged between 44% and 54%.

297.   The Tribunal first notes that the Claimants had the opportunity to seek independent assistance to develop a methodology responsive to different criteria, but that they did not do so. Second, Mr. Oaten's methodology has been developed in the context of this proceeding rather than in a non-adversarial context. Third, the Parties agree on the need to identify an appropriate driver for each category of costs in allocating G&A Expenses. Fourth, the casino is the primary driver of the integrated Solaire resort. Fifth, the argument that data is unreliable or missing to apply the SGV/EY methodology is not convincing since the experts of the Respondents have been able to apply the SGV/EY methodology with the same data as provided by the Respondents to the Claimants. Sixth, the Claimants recognized that the alleged missing data on the number of employees assigned to different segments of the business was actually provided by the Respondents.  As to this data's reliability, the Respondents explained that Mr. Oaten failed to account for about 1,000 employees that perform G&A functions, such as executive, internal audit, legal, finance and security, and inappropriately compared data showing the monthly average of FTEs for the year and data showing the year-end number of FTEs.[177] For these reasons, the Tribunal considers that the methodology of SGV/EY is a reasonable starting point for the allocation of the G&A.

298.   The Tribunal is mindful that the MSA does not provide any parameters for the allocation of fixed expenses to each category of EBITDA and only stipulates that it be "fair and reasonable."[178] Having looked at both expert reports, and considering the Parties' submissions, the Tribunal's view that the SGV/EY allocation methodology is a good starting point is reinforced, and the Tribunal is convinced that this satisfies the requirement of "fair and reasonable" under the MSA. In this regard, the Tribunal is mindful that the SGV/EY report was prepared by external accountants and was done before the onset of the present dispute. Further, while the SGV/EY Report does not contain allocation methodologies for the sub-categories of "Internal Audit," "Construction," and "Scheduling," the Parties' experts actually agree on the allocation methodology to be used (*see* paragraph 90 of the 2nd Tantleff Report; paragraph 9.33 of the 2nd Oaten Report). The Tribunal is therefore content to adopt those agreed allocation methodologies in addition to the SGV/EY allocation methodology.

299.   In this regard, the Tribunal had previously directed that this approach (*i.e.*, the SGV/EY methodology, supplemented by the Parties' experts agreed allocation methodologies) be adopted by the Parties' experts in their further calculations

---

[177]   Respondents' Sur-Rejoinder on Damages, para. 84.
[178]   MSA, Annex H, definition of Segmentation EBITDA Computation.

submitted on March 12, 2019 (which had been requested pursuant to the Tribunal's directions of February 5, 2019).

### b.    Temporary Adjustment of PAGCOR License Fees

300.   In April 2014, BIR[179] issued a ruling whereby Bloomberry and other PAGCOR licensees became subject to regular corporate income tax. PAGCOR temporarily reduced its license fees by 10% to compensate the licensees for the financial impact of the BIR Ruling. PAGCOR and Bloomberry successfully challenged the ruling and in July 2016 the income tax and license fee regime reverted to their previous level. This temporary change in the license fee and tax regime had the effect of reducing PAGCOR license fees – an expense factored into EBITDA – and increasing income taxes – an expense that is not considered when calculating EBITDA. The adjustment in license fees cancelled out the financial impact on Bloomberry's income tax. The issue is the impact of the fee reduction on the calculation of EBITDA. By definition, the calculation of EBITDA does not include income taxes, but would take into account the reduction of fees as part of the costs. The Parties disagree on whether the temporary adjustment in fees should be taken into account in the calculation of EBITDA.

301.   The Tribunal is of the view that the actual fees paid should be used in the calculation of the EBITDA as required by the definition of EBITDA. There is no basis for the Respondents to contend that historical EBITDA should be adjusted to reflect "original expectations" when objective facts contradict such "expectations."

### c.    Complimentaries ("**Comps**")

302.   The Parties disagree on whether Comps[180] should or should not be netted out. In the Claimants' view, the value of Comps should be accounted for as an intercompany allocation (*i.e.*, a cost in the casino and an equal amount in hotel revenue). Mr Oaten justifies this on the basis that he is "following the MSA definition that EBITDA should be based on a consolidated basis."[181] In the Claimant's Oaten-Tantleff Summary, Mr Oaten also states that this is consistent with the MSA definition of "Segment EBITDA Computation" and "Facilities Revenue," as well as the International Financial Reporting Standards, which require the contra (elimination) of comp revenue and expenses.

---

[179]   This refers to the Bureau of Internal Revenue (Philippines).
[180]   Comps or Complimentary Expenses consist of the costs of services and products provided by Solaire that are (generally) free of charge to gaming customers. *See* Respondents' Sur-Rejoinder on Damages, para. 75.
[181]   2nd Oaten Report, paras 7.1 to 7.3.

303.   The Respondents, on the other hand, rely on the provision of the MSA that provides that "Operating Expenses shall be allocated between each such category in a manner which takes into account the actual amount of variable Operating Expenses incurred in generating such category of EBITDA." For the Respondents, Comps expenses are a direct cost of doing business and, consistent with the MSA, should be allocated to the operating segment that generates the revenue.

304.   For the most part, the issue of Comps arises in the context of the fees due to GGAM for Foreign VIP and Junket Players and to a lesser extent in respect of the local VIP base because Comps are essentially incentives for such players to play in the casino. Section 4.3 of the MSA provides that the owners shall pay GGAM an annual base fee of two per cent of the Base Fee EBITDA from the Facilities. Thus, in the case of the Base Fee, any Comps expenses should be netted out in calculating the EBITDA for the Facilities as a whole. As regards the Local VIP Base Fee and the Foreign VIP/Junket Fee the Tribunal refers to the Segment Computation prescribed in Annex H of the MSA, which has been quoted above but may be clearer if a fuller portion is quoted here:

> "[...] all Facilities Revenue shall be segregated amongst each and every category of EBITDA and, further, Operating Expenses shall be allocated between each such category in a manner that takes into account the actual amount of variable Operating Expenses incurred in generating each and every such category of EBITDA and a distribution of all fixed expenses to each such category of EBITDA which is fair and reasonable [...]"

305.   As the Tribunal understands this definition, Operating Expenses must be allocated to the operating segment that generates the revenue. Therefore, for purposes of calculating the EBITDA of the Local VIP and Foreign VIP, the cost of the Comps should not be netted out.

306.   On this issue, the Tribunal notes that Mr Oaten introduced an argument based on the International Financial Reporting Standards ("**IFRS**") in the Claimants' Oaten-Tantleff Summary that such standards required the "contra" of Comp revenue and expenses; this was objected to by the Respondents for being made late.[182] Further, Mr. Oaten advanced another late argument in the Claimants' Oaten-Tantleff Summary not previously made (and also objected to by the Respondents), that if the Tribunal decided not to net out the Comps then "the *appropriate calculation of*

---

[182]   *See* paragraphs 107 and 110 above.

*that expense would be the actual marginal/variable cost of providing the comps, not the retail value.*"[183] Because these arguments were made out of time, the Tribunal instructed the Parties in the Tribunal's Instruction of May 23, 2018 to refrain in their arguments or cross-examination of experts or fact witnesses in the Remedies Hearing from referring to the highlighted segments of Mr. Oaten's summary in Exhibit A to the letter of Respondents dated May 16, 2018.[184] The Claimants reiterated these arguments in their opening presentation at the Remedies Hearing, and further reiterated the actual marginal/variable cost argument in the updated financial calculations requested by the Tribunal on February 4, 2019. On each occasion the Respondents objected to the late arguments of Mr. Oaten,[185] and on the latter occasion this led to a flurry of correspondence between the Parties (*see* paragraphs 150 to 156 above). The Tribunal makes clear that it has not taken these late arguments into account. Nevertheless, even if they had been taken into account, the Tribunal does not agree with Mr. Oaten's views on this issue and would have reached the same conclusions. The key point is that there is no basis for the netting-out of Comps in the face of the clear terms of the MSA that Operating Expenses must be allocated to the operating segment that generates the revenue.

d.   Commissions and Rebates

307.  The Parties' disagreements arise from misunderstandings of the terminology used and differences in assumptions. As explained by the Respondents, the Claimants apply the wrong commission or rebate rate to the wrong tables, which result in reducing the historical expenses for junket commissions. There is also a misunderstanding of the expression "gaming promoter's expense" in BRC's financial statements. This expression does not refer to total commissions including rebates, it refers to junket commissions and does not include direct VIP rebates as shown in documents in the record.[186] Mr. Oaten comments that, if one assumed that the commission amount shown in the financial statements relates only to junket commissions, this would significantly exceed the PAGCOR maximum percentage limit.[187]

308.  The issue of the limits set by PAGCOR on junket commissions surfaced only when the Experts' Issue Summaries were submitted to the Tribunal. It had not been raised in either of Mr. Oaten's reports, and was only raised in the Claimants' Oaten-Tantleff Summary and, as in the case of the use of IFRS and Comps, opposed by

---

[183]  Claimants' Oaten-Tantleff Summary, p. 11.
[184]  Email to the Parties from the Tribunal dated May 23, 2018.
[185]  Letter of the Respondents dated May 29, 2018 and Respondents' submission of April 8, 2019.
[186]  *See* Exhibits RE-388, RE-389 and RE-383.
[187]  Claimants' Oaten-Tantleff Summary, p. 20.

the Respondents for being made out of time. Thus, the Tribunal instructed the Parties to refrain in their arguments or cross-examination of experts or fact witnesses in the Remedies Hearing from referring to the highlighted segments of Mr. Oaten's summary in Exhibit A to the letter of Respondents dated May 16, 2018 (which included this issue) in the Tribunal's Instruction of May 23, 2018. Nevertheless, in Mr. Oaten's Updated Calculations dated March 12, 2019 in response to the Tribunal's Directions of February 4, 2019, Mr. Oaten again based his calculations on purported "maximum rate limits" set by PAGCOR in respect to commissions and Comps.[188] This was again objected to by the Respondents, and, as observed above, led to a flurry of correspondence between the Parties (*see* paragraphs 150 to 156 above). In any event, the Respondents presented Mr. Sarmiento as a person who could address this issue during the Remedies Hearing. While the Claimants noted in their letter dated May 18, 2018 that Mr Sarmiento was "*presumably able to address at the hearing issues arising under those regulations,*" the Claimants chose not to ask Mr. Sarmiento any question on PAGCOR's limits. It became clear and undisputed at the hearing that the commissions for fixed junket room operators were part of revenue sharing programs and that there were no limits set by PAGCOR for these programs.[189] Furthermore, already in 2013, before the termination of the MSA, GGAM itself implemented a revenue sharing program with implied commission rates of 1.5% or 1.6% depending on the amount of turnover before the termination of the MSA.[190] UBS Securities Philippines Inc. has, in analyst reports, reported on implied commissions as part of a revenue sharing program of Bloomberry with Suncity without any indication that such an arrangement would be contrary to PAGCOR regulations.[191]

309.   The Tribunal therefore rejects the Claimants' reliance on the purported maximum rate limits set by PAGCOR. Besides being made out of time, this argument was unmeritorious for the reasons already stated above (*see* above at paragraph 308). That being the case, the Tribunal fails to see the need to base the calculation of the commissions and rebates on the financial statements or outside analysts' reports, instead of the actual amounts in the Financial Books. Therefore, the Tribunal concludes that the information in the Financial Books should be used for purposes of calculating the commissions and rebates.

---

[188]   Mr. Oaten's Updated Calculations dated March 12, 2019, paras. 2.9; 2.19-2.24.
[189]   *See* examination of Mr. Almeda, Transcript of Hearing on May 29, 2018, pp. 202 and ff.
[190]   Email from Mr. Sanders to Mr. Chiu, JCBR-166, p. 49. *See also* testimony of Mr. Almeda.
[191]   Exhibit 38 to the 2nd Oaten Report, Exhibit 6 to the 4th Stone Declaration, slide 20 of Respondents' Closing Argument.

e.      Bad Debt Expenses

310.    As regards the allocation of bad debt expenses, the Respondents explain that, *"When Solaire is unable to collect on the loan it makes to individual VIPs and/or junket operators, it accounts for these as bad debt expenses. Accordingly, although Bloomberry is incapable of tracking bad debt expenses by table type, it is capable of tracking whether bad debts are incurred by junket operators, individual Foreign VIPs, or individual Local VIPs."*[192]   The Respondents recognize that the MSA requires that expenses must follow the source of revenues, but the system in place for tracking VIP revenues and expenses does not always allow this to be done. The Respondents point out that the current system was already in place when GGAM managed Solaire. The Respondents add that the imperfections of the system do not justify disregarding Solaire's actual financial and operating data in exchange for analyst reports and experts' assumptions.

311.    The Tribunal is persuaded by the undisputed facts that the current system is actually used in the management of Solaire, and was already in place when GGAM managed it. As stated earlier, the Tribunal considers that, in general, the financial information provided by Solaire in the Financial Books should be used with preference to the financial statements and external reports.

312.    As regards the Claimants' contention that, under their experienced management, the level of debt would have been lower, particularly in light of the provision for bad debt of 16% in 2015, the Tribunal declines to speculate on whether the financial results of Solaire would have been better if the MSA had not been terminated. The Tribunal will only observe that Mr. Oaten in his bad debt assumptions commented that the high level of bad debts in 2015 appeared to have been an anomaly. Bad debts were around 1% of VIP revenue in 2016. Mr. Oaten adds *"In Bloomberry's most recent financial statements (for the year-ended 31 December 2017), the bad debt 'write-off' was negative, i.e. there was a net recovery of bad debts."*[193]

f.      Avoided Costs

313.    The Claimants contend that they have no avoided costs. The Respondents disagree and have argued that the Claimants manipulated corporate forms to shift costs inappropriately. The Tribunal notes that Section 4.7 of the MSA requires the Respondents to reimburse the Claimants for expenses related to the Services which

---

[192]   Respondents' Sur-Rejoinder on Damages, para. 64.
[193]   Claimants' Oaten-Searby Summary, p. 22.

have not been paid by the Respondent. According to Prof. de Roos's testimony, it is consistent with industry norms that there would not be any avoided costs to attribute to the Respondents' termination of the MSA.[194] The Tribunal has no evidence of any specific costs (which the Claimants would have expended and which would not have come within the reimbursement clause in the MSA) that could have been avoided or the basis on which an amount could be calculated. The Tribunal also notes that the Respondents' own expert, Mr. Searby, proceeded with the calculations in his Searby Report on the understanding that "*it is not disputed that… the Claimants have avoided no cost by not performing the MSA*"[195]. Indeed, this was an express matter of agreement between Prof Kalt and Mr. Searby (as listed in the Claimants' Kalt-Searby Summary at (III)(A)(5); Respondents' Kalt-Searby Summary at (III)(A)(5)).

314. Therefore, the Tribunal will not deduct any costs. The Tribunal has already rejected the Respondents' sham entity argument above (*see* paragraph 180 above).

### (vi)    *Date of Valuation*

315. As explained by the Respondents, there are two possible dates for the valuation of lost management fees under the MSA: the date of termination or the date of the eventual award. The Respondents argue that the more appropriate date of valuation is the date of termination. The Claimants, on the other hand, have used a proxy date of the eventual award for their calculations of the lost management fees.

316. The Tribunal finds that the date of valuation should be the date of the eventual award (as represented by the proxy date of April 30, 2019, which was the latest date used by the Parties' experts in calculating damages) as opposed to the date of wrongful termination. As the Solaire's cash flows from 2013 up to the date of the Award would (theoretically) have been known to the Parties (had the MSA not been wrongfully terminated), the Tribunal's view is that it is not appropriate to discount the historical management fees (*i.e.* the management fees that would have been paid to GGAM to-date, had it not been for the Respondents' wrongful termination of the MSA). The discount rate is employed to account for the risk of the cash flows that underlie the lost fees. As the historical management fees no longer carry any risk (in the words of Claimants' counsel, they are "de-risked"[196]), the Tribunal's view is that they should not be discounted. Further, using the date of wrongful termination would result in the Claimants being undercompensated (since the

---

[194] de Roos Report, para. 39.
[195] *See* Searby Report, para. 5.24.
[196] *See* Day 5 Transcript, page 53 line 17 to page 54 line 6.

historical fees would have to be artificially discounted to the date of wrongful termination, despite the fact that the Claimants would certainly have earned that amount of fees had the MSA not been wrongfully terminated). In such circumstances, the Tribunal finds that it is more appropriate to use the date of the Award rather than the date of the wrongful termination as the date of valuation (so that there is no discounting of management fees that the Claimants would have already earned).

### (vii)    *Discount rate*

317.   The Tribunal finds that a discount rate of 10.7% is appropriate in the present case. This is the discount rate that was calculated by Mr. Kalt by applying the Capital Asset Pricing Model (which the Parties' experts agree should be used).[197] The Tribunal considers that this discount rate is appropriate because it may also be reached by making appropriate adjustments to Mr. Searby's proposed discount rate. In this regard, the Tribunal notes that if it adjusts the beta Mr. Searby uses to take into account five years of data, the beta will change from 1.28 to 0.96 (*see* pages 8 to 9 of the Respondents' Kalt-Searby Summary). The Tribunal considers that this adjustment is appropriate as five years of data would be subject to lower variance and include more data, rendering the measure of beta more reliable. After this adjustment, and based on the formula set out in Appendix 5 of the Searby Report at A.540, Mr Searby's discount rate would be adjusted to 10.738% - very close to the 10.7% used by Mr. Kalt. The discount rate of 10.7% may therefore be justified on both experts' views, and is adopted by the Tribunal.

318.   For the avoidance of doubt, this means that the Tribunal rejects Mr. Tantleff's initial position set out in his expert report dated December 15, 2015, which added several unique discount premiums to the applicable discount rate (*i.e.*, company size premium, the incentive fee risk premium and the renewal risk premium). The addition of these premiums appear to have been the position taken by the Respondents at the time of its Rejoinder on Damages (where the Respondents criticised the Claimants for not adopting these risk premiums);[198] However, the use of these premiums was all but abandoned in their Sur-Rejoinder on Damages, where the Respondents relied primarily on the expert evidence of Mr Searby on this issue, and did not raise these premiums at all. Indeed, Mr Searby does not make any mention of a company size premium, incentive fee risk premium, or renewal risk premium in the Searby Report and had, in his calculation for discount rate, set out

---

[197]   This is expressly listed as a matter of agreement in both Parties' Kalt-Searby Summaries – Claimants' Kalt-Searby Summary at (III)(A)(3); Respondents' Kalt-Searby Summary at III(A)(2).
[198]   Respondents' Rejoinder on Damages, paras. 68 to 72.

only the following elements: risk-free rate, equity market risk premium, beta, country risk premium (*see* Appendix 5 of Searby Report).

### (viii)    *Projections of revenues*

319.    As the Tribunal has found that damages should be awarded for lost management fees for ten years rather than five years, it turns to consider projected revenue growth rates for the years 2019-2023.

320.    In Mr Oaten's Updated Calculations dated March 12, 2019, he applies the growth rates reflected in the latest MS Report for his revenue projections for 2019 and 2020. Thereafter, for the remaining years (2021-2023), he projects revenue at the 2020 growth rate.[199] This is a departure from his previous methodology, where Mr Oaten uses a "long-run" growth rate of 2.5% for these years.[200]

321.    In Mr Searby's Updated Calculations dated March 12, 2019, he also applies the growth rates reflected in the latest MS Report for his revenue projections for 2019 and 2020. However, he uses "*the same longrun forecasts of revenue and cost growth rates* that [he] *used in* [his] *first report to project Solaire's revenues and costs.*"[201] This is a departure from his previous methodology, where he explicitly carried forward the latest projected growth rate from the MS Report available then.[202]

### (ix)    *Projections of costs and expenses*

322.    Mr Searby's updated Report (consistent with his previous report) projects costs in two ways: first, in proportion with revenues for direct costs; second, for indirect costs, at 2.5% in line with inflation. Mr Oaten's updated Report does not segment direct and indirect costs, but projects costs to grow proportionately with the revenue segment to which they are attributed.

323.    The Claimants argue that that Mr Searby's way of projecting indirect expenses would "inexplicably" lead to the conclusion that "Solaire will become unprofitable

---

[199]    Oaten's Updated Calculations dated March 12, 2019, at para. 2.8. It is not clear from Mr Oaten's report what the particular rate he used is, or whether he has split the growth rate used in the way that the MS Report has. In the MS Report, there are projected growth rates for 2019 and 2020 for gross revenue (6% / 7%); VIP revenue (0% / 6%); Mass revenue (14% / 7%); Slot revenue (9% / 8%); Non-Gaming (4% / 3%).

[200]    *See e.g.* 2nd Oaten Report, paras. 6.21, 6.25, 6.30, and footnote 134.

[201]    Searby's Updated Calculations dated March 12, 2019, para. 2.13.

[202]    Searby Report, para. 5.35.

over time."[203] It is not clear what are the "indirect expenses" to which Mr Searby refers. Mr Oaten's Report does not refer to indirect expenses. The Tribunal notes that the experts had previously agreed in their summaries (i.e. the Claimants' Kalt-Searby Summary and the Respondents' Kalt-Searby Summary) that it would be appropriate to apply an inflation rate of 2.5%[204] to projected costs from 2019 onwards.

### (x)       *Failure to Mitigate Damages*

324.    The Respondents carry the burden of proof that the Claimants failed to mitigate damages.[205] The Respondents have not provided any evidence to substantiate that the Claimants could have mitigated damages or the amount of the damages that they could have mitigated (which is required under Philippine law).[206] Moreover, conceptually, it seems unlikely that the Claimants could have mitigated its damages in the circumstances of this case since it had the capacity and ability to manage the Solaire resort as well as others at the same time.

325.    For these reasons, the Tribunal finds that the Respondents' claim that the Claimants failed to mitigate damages has no merit.

### (xi)      *Pre-award interest*

326.    The Claimants argue that the Respondents must pay GGAM pre-judgment interest of 6% per annum (either under the MSA or Philippine law), while the Respondents disagree. The Respondents argue that the contractually agreed rate of 6% does not apply in a situation of breach of contract in which the amount of fees due and owing is in dispute. The Respondents assert that, under Philippine law, post-award interest is not mandatory and the Claimants are not entitled to it under the circumstances. The Respondents explain that the *"Claimants seek damages in the form of lost profits that have yet to be earned, and thus, they cannot point to a loss of capital, investment, or 'cost of money.'"*[207]

327.    The Tribunal agrees with the Respondents that the rate to be applied on account of fees lost after the wrongful termination of the MSA is not necessarily the contractually agreed interest rate. The Tribunal further agrees that the amount

---

[203]   GGAM's letter to the Tribunal dated March 26, 2019.
[204]   Claimants' Oaten-Searby Summary, page 2.
[205]   *Hicks v. Manila Hotel Co.*, cited by the Claimants in their Supplemental Submission, para. 120.
[206]   *Lim v. Court of Appeals*, G.R. No. 125817 (S.C., January 16, 2002) (Phil.), cited by the Claimants in their Supplemental Submission, para. 120.
[207]   Respondents' Sur-Rejoinder on Damages, para. 127.

remains uncertain until determined by the Tribunal. Therefore, in accordance with Philippine law, no pre-award interest will be granted on the MSA management fees.

### (xii)   *Amount of the Lost Management Fees*

328.   The Tribunal's analysis above guides, in large part, the Tribunal's decision on the final amount of lost management fees due to the Claimants.

329.   On February 4, 2019, the Tribunal directed the Parties to provide the Tribunal with updated calculations related, *inter alia*, to the amount of lost management fees (*see* paragraphs 10 to 31 of the Tribunal's Direction of February 4, 2019), which resulted in the Parties submitting each expert's Updated Calculations of March 12, 2019. This direction included the Tribunal's guidance on the various bases on which the Parties' experts should update their calculations in relation to the lost management fees. This guidance corresponds with the Tribunal's findings in this Final Award, which, for convenience are all set out at paragraph 330 below.

330.   To recapitulate, the Tribunal has decided in this Final Award that:

(a)   damages for lost management fees should be assessed over a 10-year term (*see* paragraph 283 above);

(b)   it will generally rely on the Financial Books unless there is a compelling reason why it should not do so (*see* paragraph 287 above);

(c)   it prefers Mr. Tantleff's revenue allocation methodology, for the reasons set forth above (*see* paragraph 292 above);

(d)   it prefers the SGV/EY allocation methodology supplemented by the Parties' experts agreed allocation methodologies (*see* paragraph 299 above);

(e)   there should be no "adjustment" to historical EBITDA on account of the PAGCOR license fees (*see* paragraph 300 above);

(f)   there should be no "netting-out" of Comps, and the Tribunal also rejects the Claimants' late argument that the appropriate calculation of that expense should be the actual marginal/variable cost of providing the comps, not the retail value (*see* paragraph 305 above);

    (g)    there is no PAGCOR "maximum rate limit" on junket commissions, and the relevant information in the Financial Books should be used for purposes of calculating the commissions, rebates, and bad debts (*see* paragraphs 308, 309 and 311 above);

    (h)    the Claimants have not avoided costs (*see* paragraph 313 above);

    (i)    the Respondents have not shown that the Claimants could have mitigated damages or the amount of the damages that they could have mitigated (*see* paragraphs 324 to 325 Above);

    (j)    damages for the lost management fees should be calculated for a full 10-year term (*see* paragraph 315 above); and

    (k)    there should be no pre-award interest awarded (*see* paragraphs 326 to 327 above).

331.    For convenience, the table below sets out the various updated calculations submitted to the Tribunal by way of the Parties' experts' Updated Calculations of March 12, 2019:[208]

|  | Claimant | Respondent |
|---|---|---|
| 5-year term (without pre-award interest) | $ 85.12m | $ 52.9m |
| 10-year term (without pre-award interest) | $ 206.17m | $ 85.2m |
| 5-year term (with pre-award interest) | $ 101.58m | $ 62.7 / 63.6 (5.33%; simple / compound) 64.0 / 65.0 (6%; simple / compound) |
| 10-year term (with pre-award interest) | $ 223.48m | $ 95.0 / 95.9 (5.33%; simple / compound) 96.3 / 97.3 (6%; simple / compound) |

---

[208] The Tribunal notes that Mr Searby had additionally provided calculations based on alternative assumptions (i.e. that the date of valuation should be the date of termination, or that there should be a hypothetical adjustment to account for the reduction in PAGCOR license fees). In line with the Tribunal's analysis, these bases are rejected, and the alternative figures proffered by Mr Searby are not included in the analysis here.

332.    For clarity, the Tribunal observes that the most responsive figure that the Claimants' experts have proffered in respect of the lost management fees for a 10-year term is **US$ 206.17** million without pre-award interest.[209] While the Respondents' experts provided several updated calculations at the request of the Respondents' counsel, the most responsive figure set out in Mr. Searby's Updated Calculations of March 12, 2019 calculates lost management fees of **US$ 85.2 million** without pre-award interest.[210]

333.    One of the main differences between the Claimants' and Respondents' experts' Updated Calculations of March 12, 2019 can be explained by the experts' allocation of costs for Comps, commissions, and rebates. As explained above, Mr. Oaten allocated costs and based his calculations in part on late arguments previously made in his Summary of Issues, which the Tribunal has decided not to take into account (*see* paragraphs 330(f) and 330(g) above). In particular, Mr Oaten based his calculations, in part, on: (a) the argument that the "actual marginal cost" be used in determining the cost of Comps, and (b) the existence of a PAGCOR regulatory limit. These bases for calculation were raised late and have been rejected by the Tribunal in its analysis above (*see* paragraphs 306 and 308 above).

334.    While there is also a difference in the way the experts allocated revenues to mass gaming, Local VIP and Foreign VIP, the Tribunal is persuaded to use Mr. Tantleff's revenue allocation methodology, as reflected in the Tribunal's analysis and decision at paragraph 330(c) above.

335.    The other main difference between the Claimants' and Respondents' Updated Calculations of March 12, 2019 lies in the way that their respective experts have projected costs and revenues. In this regard, the Tribunal observes that both sides' experts could be said to have departed from their previous methodologies in their projections.

336.    Having closely considered the evidence, the submissions, the expert reports, and the Updated Calculations of March 12, 2019, the Tribunal is persuaded to use the Respondents' experts' Updated Calculations of March 12, 2019 for the Claimants' lost management fees for a 10-year term, because, in the Tribunal's view, the Respondents' experts (i.e. Mr. Tantleff and Mr. Searby) present calculations that adhere more closely to the decisions of the Tribunal set out at paragraph 329 above (*see* especially the analysis at paragraph 333 above). While both sides' updated

---

[209]   Prof. Kalt's Updated Calculations of March 12, 2019 , para. 7; Figure 3.
[210]   Mr. Searby's Updated Calculations of March 12, 2019, Table 1-1; para. 3.9.

calculations are not without reproach (especially in relation to the projections of revenues and costs), the Tribunal's view is that, on the whole, the Respondents' updated calculations more accurately reflect the lost management fees suffered by the Claimants.

337.   Accordingly, based on the above considerations and the conclusions reached above by the Tribunal on each of the elements of the lost management fees calculation, the Tribunal finds that the lost fees as calculated by the Respondents' experts are more aligned with the Tribunal's directions, and determines that the lost management fees for the MSA's 10-year period amount to **US$ 85.2 million**.

## VIII.    SHOULD THE TRIBUNAL APPLY THE DOCTRINE OF EQUITABLE MITIGATION?

### A.    Respondents' Arguments

338.   The Respondents contend that the Tribunal should apply equitable principles in determining the amount of damages based on Article 2215 of the Civil Code of the Philippines ("**CCP**").[211] According to the Respondents, the amount of damages should be reduced on a number of grounds:[212] (a) because the Claimants have already derived substantial benefits from the MSA for their pre-opening and development services;[213] (b) the instances in which the Claimants contravened the MSA revealed by the FCPA Findings, as well as the purported concealment of evidence by GGAM in the present Arbitration;[214] (c) the imbalance between the MSA's obligations and compensation caused by the Tribunal's interpretation of the phrase "through the Management Team";[215] (d) because Cantor will "benefit handsomely" from any damages award despite being a non-party whose role was suppressed by the Claimants; (e) GGAM's manipulation of corporate forms;[216] and (f) the repeated desire of the Respondents to compromise.[217]

### B.    Claimants' Arguments

339.   The Claimants oppose the application of the doctrine of equitable mitigation, and contend that the Respondents' arguments on the basis of the Claimants' alleged breach of the MSA are an attempt to re-litigate the unfounded allegations made in the Liability Phase. In this regard, as the Tribunal has already found that the Respondents, and not GGAM, breached the MSA, the arguments on equitable mitigation of damages based on those allegations is moot.[218]

### C.    Analysis of the Tribunal

340.   Article 2215 of the CCP provides:

---

[211]   RL-1.
[212]   *See e.g.* Respondents' Sur-Rejoinder on Damages, para. 25.
[213]   *Ibid.*
[214]   *Ibid.*, paras. 193 to 204.
[215]   *Ibid.*, paras. 205 to 212.
[216]   *Ibid.*, paras. 213 to 216.
[217]   *Ibid.*, paras. 217 to 218.
[218]   Claimants' Supplemental Submission, footnote 237.

> "**Article 2215.** *In contracts, quasi-contracts, and quasi-delicts, the court may equitably mitigate the damages under circumstances other than the case referred to in the preceding article, as in the following instances:*
>
> *(1) That the plaintiff himself has contravened the terms of the contract;*
>
> *(2) That the plaintiff has derived some benefit as a result of the contract;*
>
> *(3) In cases where exemplary damages are to be awarded, that the defendant acted upon the advice of counsel;*
>
> *(4) That the loss would have resulted in any event;*
>
> *(5) That since the filing of the action, the defendant has done his best to lessen the plaintiff's loss or injury.*"

341. The Respondents have highlighted, in particular, that Article 2215 allows a court (or a tribunal) to mitigate damages in certain circumstances, including where the plaintiff himself has contravened the terms of the contract, where the plaintiff has derived some benefit as a result of the contract, or the loss would have resulted in any event.[219]

342. The first ground on which the Respondents rely to argue that they are entitled to an equitable reduction of damages against them is that the Claimants have already derived great benefits from the MSA. In this regard, the Respondents argue that GGAM was paid extraordinarily well for its development and pre-opening services, while, in the view of the Claimants, they were under-compensated. The fees for the services of GGAM were those provided in the MSA, which was freely entered into by the Parties. There is no claim that the development and pre-opening services were not performed, only that the contracted fees were high. In the Tribunal's view, both Parties derived benefits from the MSA, and this cannot form a basis for the equitable reduction of damages to which the Claimants are entitled (whether contractually or by the decision of this Tribunal).

343. The second ground for equitable reduction, viz the allegation that the Claimants contravened the MSA, is based on (a) the FCPA Findings;[220] and (b) on the fact that a significant portion of any damage award may ultimately go to Cantor.[221] At

---

[219] Respondents' Sur-Rejoinder on Damages, para. 190.
[220] Respondents' Sur-Rejoinder on Damages, paras. 193-196.
[221] *Ibid.*, para. 25.

the outset, the Tribunal reiterates that it did not find any breaches of the MSA by GGAM in its Liability Award, and that it is unable to revisit the issues of liability already decided in the Liability Award (as decided in its Decision on Reconsideration). Insofar as the Respondents' submissions on the equitable reduction of damages invite the Tribunal to revisit issues of liability (for example, the first allegation submitted to the Tribunal as the basis of the Respondents' request for reconsideration of the Liability Award was that "*Bloomberry urges the Tribunal to take notice of GGAM's multiple breaches of the MSA, the existence of which the FCPA Orders permitted Bloomberry to discover, as a contributory factor to GGAM's damages claim, which should be reduced to nil*"[222]), the Tribunal finds that this is an attempt by the Respondents (through the invocation of equitable principles) to re-litigate matters submitted earlier to the Tribunal. For the same reasons that the Tribunal decided not to reconsider the Liability Award, the Tribunal finds that it is not appropriate through the application of equitable principles to circumvent its inability to reconsider it.

344.   The allegation regarding the role of Cantor is related to supposed suppression of evidence of Cantor's role and relationship with the Claimants. It was considered by the Tribunal in the Liability Award.[223] The Tribunal concluded on this question: "*In sum, the Tribunal finds that the Respondents have not established any <u>false statement</u> made in respect of Cantor's role. To the extent that the Respondents are arguing that the Claimants <u>failed to disclose</u> Cantor's role to them, the Respondents have not shown any legal basis for imposing a duty of disclosure, and the allegedly non-disclosed document is not relevant to the Tribunal's reasoning.*"[224] Moreover, the Respondents clearly knew of Cantor's involvement with GGAM from an early point in the project.  As early in the relationship with GGAM as 2012, Ms. Occeña of Bloomberry explained that "*GGAM brought the gaming expertise, but for financing had turned to Cantor, 'Cantor owns 50 per cent. So the money will come from Cantors.'*"[225] Again, this is an issue already considered by the Tribunal, and the Tribunal finds that this cannot form the basis for any equitable reduction of damages.

345.   In any event (and as already foreshadowed in the Tribunal's analysis at paragraphs 273 to 283 above), the FCPA Findings on their face do not establish or imply that GGAM did not perform its obligations under the MSA. In fact, those Findings do not refer to GGAM at all, much less address GGAM's performance under the MSA.

---

[222]   Respondents' Sur-Rejoinder on Damages, para. 196.
[223]   Liability Award, paras. 140-147
[224]   *Ibid.*, para. 147. Emphasis in the original.
[225]   *Ibid.*, para. 143. Emphasis in the original.

Just as the Tribunal has found that the Respondents did not show how the FCPA Findings could, or would, have impacted the reasonable certainty of the Claimants exercising their unilateral right to renew the MSA, so the Respondents have not shown how the FCPA Findings (which deal with another entity altogether, and do not deal with GGAM at all) could justify the equitable reduction of damages to which the Claimants are entitled.

346. The third ground the Respondents rely on for equitable reduction is the contractual imbalance between obligations and compensation created by the Claimants' interpretation of the phrase "through the Management Team" (which, the Respondents say, if they had appreciated, they would not have agreed).[226] In addition to righting this imbalance, the Respondents request that the Tribunal consider that the FCPA Findings have revealed that GGAM was not performing its functions, and that the Tribunal should not enforce the terms of the MSA as written. Again, the Tribunal considers that each of these reasons adduced as justification to apply equitable principles imply a reconsideration of previous decisions of the Tribunal on the interpretation of the MSA or its conclusion on the performance by GGAM of its duties. As already highlighted above, at this phase of the proceedings (i.e. the Remedies Phase), and having already declined the Respondents' Request for Reconsideration in the Decision on Reconsideration, it is not appropriate for the Tribunal to revisit questions of liability. Moreover, and as already set out above, the FCPA Findings simply do not refer to GGAM at all, much less address GGAM's performance under the MSA. For these reasons, the Tribunal finds that there is no basis to equitably reduce or mitigate the damages that the Claimants are entitled to. As regards the plea not to enforce the terms of the MSA based on the premise that it will result in unjust enrichment, the Tribunal decided in the Liability Award that there was no basis for the Respondents to recover any amounts from the Claimants based on unjust enrichment.[227] The Tribunal reiterates that it does not consider appropriate through the application of equitable principles to circumvent its inability to reconsider it. The Tribunal finds no basis for an unjust enrichment claim by Respondents (nor the equitable reduction of damages on the basis of unjust enrichment or on the basis of an "imbalance" in the interpretation of the phrase "through the Management Team").

347. The fourth ground relied on by the Respondents for the equitable reduction of damages is that the Claimants manipulated corporate forms to avoid incurring any costs. In light of the Tribunal's finding in relation to avoided costs and the rejection

---

[226] Respondents' Sur-Rejoinder on Damages, para. 207.
[227] Liability Award., para. 316.

of the "sham entity" argument advanced by the Respondents, this ground is also meritless.

348. The fifth ground relied on by the Respondents for the equitable reduction of damages is based on the alleged repeated willingness of the Respondents to compromise. The Tribunal observes that the Respondents' professed willingness to compromise was subject to the reduction or withdrawal of the claim of the Claimants for damages on account of the wrongful termination of the MSA. The Respondents clearly stated their position in objecting to the release of the Shares by Deutsche Bank: "*[T]here would be no objection regarding the Shares if your clients were not demanding excessive and unwarranted 'compensation' in addition to the Shares.*"[228]

349. In this regard, it is clear that the Respondents' desire to compromise is based on their own narrative of the dispute. The use of the writs of attachment and injunction after they have been vacated by the IM Order of the Tribunal as leverage to settle the dispute on the termination of the MSA in open disregard of the implementation of that Order does not show a good faith effort by the Respondents to compromise, and the Tribunal concludes that this does not justify any equitable mitigation or reduction of damages.

---

[228] Claimants' Ex. 244, letter from M. Nolan to D. Weiner dated October 11, 2016.

## IX.   GROSS-UP OF MANAGEMENT FEES TO ACCOUNT FOR PHILIPPINE TAXES

### A.   Claimants' Arguments

350.   The Claimants contend that the tax treatment contemplated by the Parties in the MSA requires that the Respondents gross up the Management Fee payment to include withholding tax under Philippine law unless the Respondents also timely provide the certifications required by law to support GGAM's exemption from the withholding tax under the Philippines-Netherlands Tax Treaty.[229] The Claimants base this argument on Section 4.6 of the MSA: "*the fees payable to GGAM shall be structured in the most tax effective methodology.*"[230]

351.   The Claimants explain that, before opening, GGAM Philippines established, as allowed under the MSA, GGAM Netherlands. GGAM Philippines then assigned to GGAM Netherlands the post-opening service obligations and the concomitant right to receive the Management Fee for performance of those services. By doing so, GGAM assured that the Management Fee paid would be exempt from withholding tax under the Philippines-Netherlands Tax Treaty.[231]

352.   According to the Claimants, in the ordinary course, GGAM Netherlands would have filed an "Application for Relief from Double Taxation" with the Philippine tax authorities, and Respondents would have filed two certificates, which constitute an essential supporting element for GGAM's request for relief from double taxation in the Philippines:[232]

(a)   The first certificate attesting that, to Respondents' knowledge, the fees to be paid to GGAM were not subject to any administrative protest, audit, investigation or similar proceeding, and

(b)   The second certificate attesting that, to Respondents' knowledge, GGAM Netherlands would not assign its own personnel to the performance of the services in the Philippines for more than 183 days annually.

353.   The Claimants contend that, if not for the Respondents' wrongful termination of the MSA, they would have earned the Management Fee, and it would not have been

---

[229]   Claimants' Supplemental Submission, para. 138.
[230]   MSA, Section 4.6.
[231]   Claimants' Supplemental Submission, para. 140.
[232]   *Ibid.*, para. 141.

subject to withholding tax. The Philippine withholding tax is 30%, approximately US$ 112,900,100.[233]

354.    The Claimants request that the Tribunal include in the damages award a gross-up of damages equal to the Philippine withholding tax, to be reduced if, within 30 days of the Award, the Respondents file the necessary certificates.[234]

## B.    Respondents' Arguments

355.    The Respondents contend that the Claimants' request for a "gross-up" is not based on any analysis of the MSA, the Philippine tax code, taxation treaties or other applicable tax systems. Notably, the MSA does not oblige Bloomberry to indemnify GGAM for any taxes paid in the Philippines,[235] on the contrary, it provides that "*[t]axes accruing on fees payable to GGAM shall be for the account of GGAM.*"[236]

356.    The Respondents further contend that the assignment of the MSA to GGAM Netherlands would be treated as a sham or, in the alternative, be regarded as an abuse of the Philippines – Netherlands Tax Treaty.[237] In both instances the benefits of the tax treaty would be denied. Parties to tax treaties must ensure that the tax treaty is not improperly used and that the tax advantage does not operate to the benefit of persons for whom it is not intended.[238]

357.    While the Respondents acknowledge that the interposition of a company with a view to benefit from a more favourable tax treaty *per se* does not lead to the conclusion that the benefits of the treaty should be denied,[239] in the present instance, the Respondents contend that GGAM's actions warrant such conclusion for the following reasons:

(a)    The Assignment and Assumption Agreement failed to reflect economic reality by referring to GGAM Netherlands as being "highly capable" of providing the Post-Opening Services despite the fact that GGAM Netherlands did not conduct a business, had no revenue or employees, and

---

[233]   Claimants' Supplemental Submission, para. 142.
[234]   *Ibid.,* para. 144.
[235]   *Ibid.,* para. 220.
[236]   MSA, Section 4.6.
[237]   Respondents' Sur-Rejoinder on Damages, para. 228.
[238]   *Ibid.,* para. 224; *see also* Van Weeghel Report, para. 130 – 139.
[239]   Respondents' Sur-Rejoinder on Damages, para. 225.

therefore could not have been capable of providing such services. The office address of GGAM Netherlands is the office address of a large trust company that provides an address, and often nominee directors, to companies established in the Netherlands for tax purposes; indeed, the website of the Netherlands Chamber of Commerce indicates that almost 700 companies are registered at this address.[240]

(b)     Revenue and reimbursable expenses were allocated to GGAM Philippines, when legally they should have been recognized at the level of GGAM Netherlands pursuant to the Assignment and Assumption Agreement. As appears from the 2013 Financial Report of GGAM Netherlands, none of the payments made to and/or invoiced by GGAM Philippines pursuant to the MSA and relating to Post-Opening Services rendered in 2013 were recorded in the accounts of GGAM Netherlands. The failure to do so indicates the failure of GGAM and GGAM Netherlands to respect their own structure.[241] It may also even amount to tax fraud in the Netherlands.[242]

(c)     The Assignment and Assumption Agreement did not represent the Claimants' true intention in establishing GGAM Netherlands since there is no evidence of GGAM Netherlands actually having any involvement in providing the Post-Opening Services. For example, GGAM Philippines sent invoices for reimbursable expenses (concerning the trips of Messrs. Garry Saunders and Brad Stone who were not employed by GGAM Netherlands, as GGAM Netherlands has reported that it has no employees) to Bloomberry relating to a period following the assignment of the MSA to GGAM Netherlands. These various trips were undertaken in relation to the provision of the Post-Opening Services despite the fact that these services should have been carried out by GGAM Netherlands. Thus, while formally the assignment of the MSA created rights and obligations for GGAM Netherlands, in substance, the role of GGAM Philippines did not change.[243]

358.    Further, the certificates that GGAM prepared, and which Bloomberry would have to file, are counterfactual and insufficient to ensure that the Claimants would not need to pay Philippine taxes.[244] Indeed, the draft certificates require Bloomberry to certify that *"the assignment of GGAMNBV's employees to the Philippines is not expect [sic] to last for an aggregate period of more than 183 days within any*

---

[240]   Respondents' Sur-Rejoinder on Damages, para. 225.
[241]   *Ibid.,* para. 226.
[242]   *See* Van Weeghel Report, para. 151.
[243]   Respondents' Sur-Rejoinder on Damages, para. 227.
[244]   *Ibid.,* para. 229.

*twelve-month period.*" As noted above, to the Respondents' knowledge, GGAM Netherlands did not have any personnel that would be "assigned" to the Philippines to perform services under the MSA. Instead, all work was performed by the Management Team.

359. The Respondents contend that, given that GGAM Netherlands is a sham entity, an order requiring Bloomberry to sign the certificates prepared by GGAM would make Bloomberry and the Tribunal complicit to an illegal tax evasion scheme.[245]

360. Should GGAM Netherlands be disregarded as a sham entity, the Respondents affirm that the revenue authorities would treat GGAM Philippines as the taxable entity.[246] The Respondents contend that GGAM Philippines would be deemed to have had a "permanent establishment"[247] in the Philippines, and that the remuneration it received for its services rendered under the MSA constitutes "business profits" or income derived from active conduct of a business. Likewise, an arbitral award for damages in the Respondents' favour would be considered to be in the nature of indemnification for lost business profits or income that GGAM Philippines would have otherwise received—and on which it would have paid income tax—had the MSA not been terminated, and would be subject to Philippines taxes. As noted above, the MSA does not oblige Bloomberry to indemnify GGAM for any taxes paid in the Philippines.[248]

## C.   Analysis of the Tribunal

361. The Tribunal has already considered and rejected the Respondents' contention that GGAM Philippines is a sham entity (*see* paragraph 180 above). In addressing the gross-up claim, the key question is whether the Respondents were obliged under the MSA to issue the certificates in question and, failing to issue them, be responsible for the payment of the taxes of the Claimants. The MSA is clear in stating that "*[t]axes accruing on fees payable to GGAM shall be for the account of GGAM.*"[249] The arguments of the Claimants are based on the general statement that "*the fees payable to GGAM shall be structured in the most tax effective methodology.*"[250] The plain reading of this sentence does not support the Claimants' position. First, the issuance of the certificates is not related to the structure of the

---

[245] Respondents' Sur-Rejoinder on Damages, para. 229.
[246] *Ibid.*, para. 230.
[247] "permanent establishment" is a relevant concept since GGAM Philippines is a U.S. resident (*see* Respondents' Sur-Rejoinder on Damages, para. 231).
[248] Respondents' Sur-Rejoinder on Damages, para. 232.
[249] MSA, Section 4.6.
[250] MSA, Section 4.6.

fees but to the fulfilment of the requirements under the Philippines-Netherlands Tax Treaty. Second, even if the fee structure could be understood to fall within the terms of Section 4.6 of the MSA, this section does not impose any specific obligation on the Respondents to take any action to assist the Claimants before the tax authorities. Third, Section 4.6 needs to be read as a whole. The Claimants' understanding of this clause contradicts the clearly stated obligation of GGAM to pay the taxes that accrue on fees payable to GGAM. There is no record of what the Parties meant when they used the phrase "tax effective methodology" and no such evidence has been offered in the extensive exchanges on the tax gross up issue. Therefore, the Tribunal concludes that the Respondents are not responsible for any tax gross up and have no obligation to indemnify the Claimants for any taxes due on their fees or damages awarded by the Tribunal.

362.   The Tribunal notes that there were two further rounds of expert reports submitted by the Parties after the Parties made their respective supplemental submissions for the Remedies Phase (*see* paragraphs 70, 81, 82, and 83 above). These expert reports focused primarily on the issue of whether or not GGAM Netherlands qualified for treaty benefits under the Netherlands-Philippines Tax Treaty. In view of the Tribunal's conclusion at paragraph 361 above, it is unnecessary for the Tribunal to consider this issue as well as the other issues raised by the Parties' arguments.

## X.   PRE-OPENING FEES AND EXPENSES

### A.   Claimants' Arguments

363.   The Claimants argue that the Respondents must fulfil their contractual obligations, including paying all fees and expenses accrued before termination as required by Section 15.4 of the MSA: *"The Owner shall pay GGAM upon termination of this Agreement all amounts which are due to it but unpaid under this Agreement up to the effective date of such termination."*[251]

364.   According to the Claimants, GGAM is entitled to payment of fees and expenses owed to them under the MSA before its termination on September 12, 2013. The unpaid fees and expenses amount to $525,761.

365.   As regards fees and expenses the Claimants contend that the Respondents have yet to pay an invoice of US$ 148,750 for services performed outside the Philippines for the month of February 2013 (**"February Invoice"**), which the Claimants had failed to include in their earlier submission of invoices to the Respondents. After realising the omission, GGAM on June 5, 2013 submitted the outstanding February 2013 invoice to the Respondents with a note explaining the oversight. The Respondents never paid this outstanding invoice.[252] This claim amounts to US$194,820, which is comprised of the US$ 148,750 invoice and interest owed under the MSA.[253]

366.   The Claimants also contend that the Respondents have yet to compensate GGAM for US$ 288,031 in reimbursable expenses consisting of:[254] (a) US$ 242,474 in travel expenses to and from the Solaire (**"Travel Expenses"**), and (b) US$ 45,557 in expenses related to work on behalf of Respondents and BRC, including a roadshow, investor conferences, and a potential investment opportunity in Argentina (**"Additional Expenses"**).

367.   The Claimants argue that, while the Additional Expenses were incurred outside the scope of the MSA, it should be reimbursed as the Respondents established a practice of reimbursing GGAM for expenses related to GGAM's efforts on behalf of them and BRC that were not directly related to Solaire, which GGAM relied on

---

[251]   MSA, Section 15.4.
[252]   Claimants' Supplemental Submission, para. 132.
[253]   *See* 2nd Kalt Report, Fig.5.
[254]   Claimants' Supplemental Submission, paras. 136 – 137.

in incurring these expenses.[255] Alternatively, not awarding the Additional Expenses to GGAM would unjustly enrich the Respondents.[256]

## B. Respondents' Arguments

368.  With regard to the February Invoice, the Respondents note that it has searched its records, and it does not appear that payment was made to GGAM for this invoice. The Respondents explain that the Respondents' experts have taken this into account and calculated accrued interest. Indeed, in the Respondents' request for relief there is the item "*Award Claimant GGAM Philippines US$ 148,750 plus interest in unpaid Pre-Opening and Development Fees.*"[257]

369.  With regard to the Travel Expenses, the Respondents contend that GGAM has provided no evidence that these invoices and supporting documentation were submitted to the Respondents prior to this Arbitration. According to BRC's Corporate Controller, it will be quite difficult, if not impossible, to verify expenses that were incurred four or five years ago. Further, a significant portion of these expenses were incurred in March to June 2013 after GGAM Philippines assigned the MSA to GGAM Netherlands. Yet, the invoices are on GGAM Philippines' letterhead. Such disregard of corporate form is yet another sign that the purported assignment was to evade taxes. The Respondents should not be ordered to pay expenses to a sham entity.

370.  As regards Additional Expenses, the Respondents contend that these activities were all undertaken in GGAM's role as a shareholder (or prospective shareholder) in Bloomberry Resorts Corporation under the EOA and the Participation Agreement ("**PA**"). Neither BRHI nor SPI is a party to either of those agreements, and thus, should not be ordered to reimburse GGAM for activities undertaken in furtherance of those agreements.

## C.  Analysis of the Tribunal

371.  The February Invoice plus accrued interest does not seem to be in issue and the Tribunal will include the amount of this invoice (*i.e.*, US$ 148,750) in the amount awarded.

---

[255]  Claimants' Supplemental Submission, para. 137.
[256]  *Ibid.*
[257]  Respondents' Sur-Rejoinder on Damages, para. 269(ii)(c).

372.  The Additional Expenses amounting to US\$ 45,557, as the Claimants themselves recognize, were incurred outside the scope of the MSA. For that reason, the Tribunal will not order that the Respondents pay them.

373.  As regards the Travel Expenses amounting to US\$ 242,474, the Tribunal notes that they have been incurred for the benefit of the Respondents irrespective of the letterhead used in the invoices. In this respect, the Tribunal further notes that GGAM Philippines is the responsible party under the MSA no matter to whom it assigns the MSA or to whom it sub-contracts. To the extent that the Travel Expenses are documented in this proceeding, the Tribunal will include their aggregate amount as part of the amount awarded. The Tribunal is satisfied that GGAM Philippines is entitled to be awarded Travel Expenses amounting to US\$ 242,474 plus interest at a rate of 6% per annum compounded monthly and beginning thirty (30) days after the pertinent invoices became due in accordance with the terms of Article 4.8 of the MSA.

## XI.     OBSTRUCTION OF THE SALE OF GGAM'S SHARES

### A.     Background

374.     After the Respondents terminated the MSA, GGAM prepared to sell[258] its 921,184,056 shares in BRC.[259] On January 15 or early January 16, 2014, GGAM's investment bank placing agents had confirmed sales of GGAM's Shares to more than 50 institutional investors, with a final price of Philippine Pesos ("**PHP**") 8.05 per share. Settlement of the transaction was scheduled to occur on January 21, 2014.[260]

375.     On January 15, 2014, BRC wrote to the Philippine Stock Exchange requesting suspension of trading in all BRC shares for one week. On January 16, 2014, the Philippine Stock Exchange suspended trading in BRC shares, effectively preventing the settlement of GGAM's planned sale transaction.[261]

376.     On or about January 17, 2014, before the Tribunal was constituted, the Respondents and Prime Metroline Holdings, Inc. ("**PMHI**") filed with the Regional Trial Court ("**RTC**") in Manila a Petition seeking the issuance of writs of preliminary attachment and preliminary injunction of GGAM's sale of its Shares, and seeking a temporary restraining order. In their Petition, the Respondents and PMHI acknowledged that "*GGAM has contracted for the sale of the Shares on 15 January 2014 to approximately 50 institutional investors, and was poised to complete the sale by a cross transaction through the Philippine Stock Exchange.*"[262] The Respondents and PMHI informed the RTC in their Petition that the Shares were the subject of the Respondents' counterclaims in this arbitration under the MSA.[263]

377.     On January 20, 2014, the RTC granted the Respondents' and PMHI's application for a temporary restraining order. Thereafter, on February 25, 2014, the RTC issued the Philippine Preliminary Injunction Order providing interim measures of protection in the form of writs of preliminary attachment and preliminary injunction restraining GGAM from disposing of, selling, or transferring its Shares.[264] On

---

[258]   Claimants' Supplemental Submission, para. 168.
[259]   *Ibid.,* para. 146.
[260]   *Ibid.,* para. 168.
[261]   *Ibid.,* para. 169.
[262]   *Ibid.,* para. 170.
[263]   *Ibid.*
[264]   *Ibid.,* para. 171.

February 27, 2014, the RTC issued writs of preliminary attachment and preliminary injunction (the "**Preliminary Writs**").[265]

378.   The Philippine Preliminary Injunction Order expressly provides that the Preliminary Writs were subject to revocation by this Tribunal once it was duly constituted.[266]

## B.   Claimants' Arguments

379.   According to the Claimants, on September 28, 2016, BRC made a disclosure to the Philippine Stock Exchange that misleadingly stated that the Liability Award could only be enforced in a Philippine court. This disclosure created widespread confusion in the market, perpetuating doubt as to GGAM's ability to sell the Shares.[267] This confusion was apparent in various media and analyst reports.[268]

380.   The Claimants contend that, on November 14, 2016 after issuance of the Liability Award by the Tribunal, BRC made another misleading disclosure to the Philippine Stock Exchange stating that Respondents had terminated the MSA "*because of a material breach by [GGAM]*" without disclosing that the Tribunal found that Bloomberry's termination of the MSA was unjustified.[269] On December 31, 2016, once again BRC misleadingly stated that the Liability Award could only be enforced in a Philippine court.[270]

381.    The Claimants explain that it could not publicly correct BRC's misstatements because of the confidentiality restrictions ordered by the Tribunal in Procedural Order No. 3. The Claimants requested the Respondents to issue a joint press release to resolve the marketplace confusion. The Respondents refused.[271]

---

[265]  Claimants' Supplemental Submission, para. 171.
[266]  *Ibid.,* para. 172.
[267]  *Ibid.,* para. 205.
[268]  *See* Richard Lañeda, Bloomberry Resorts Corporation: Arbitration ruling creates uncertainty and overhang, COL Financial, September 29, 2016; Patricia Palanca & Kenneth Fong, Bloomberry—Quick take: Arbitration says GGAM entitled to shares and damage claims, Credit Suisse (September 29, 2016); BRC's SEC Form 17-C, dated September 28, 2016; Keith Richard D. Mariano, Ex-Solaire manager scores win against Bloomberry Resorts, Business World Online (September 29, 2016); Kristyn Nika M. Lazo, Global Gaming wins arbitration case vs Bloomberry, The Manila Times (September 30, 2016); Angping Securities, Inc., Daily Market Insights, September 30, 2016; Bloomberry Resorts: Gloomy In The Short Term, Booming In The Long Term, Seeking Alpha (February 18, 2017).
[269]  Claimants' Supplemental Submission, para. 209.
[270]  *Ibid.,* para. 210.
[271]  *Ibid.,* para. 212.

382.   Following the Tribunal's issuance of the Liability Award on September 20, 2016, GGAM again took prompt action to attempt to sell its Shares.[272] Deutsche Bank (the custodian of GGAM's Shares) held the Shares in a restricted, non-trading account since the RTC issuance of the Preliminary Writs. On October 3, 2016, Mr. Rein requested on behalf of GGAM that Deutsche Bank restore GGAM's Shares to a trading account, in light of the Liability Award. Deutsche Bank advised Mr. Rein that, before it could act on GGAM's request, it would need to see a complete certified copy of the Liability Award or receive BRC's express agreement that GGAM can sell the Shares.[273]

383.   Following the Tribunal's ruling on November 17, 2016, allowing GGAM to disclose the Liability Award to several entities, GGAM disclosed the Liability Award to Deutsche Bank. However, Deutsche Bank continued to take the position that, without the Respondents' express permission for it to "unfreeze" the Shares, Deutsche Bank would not release the Shares to GGAM.[274] The Claimants contend that Deutsche Bank, in refusing to release the shares, relies upon Respondents' renewal of the Preliminary Writs' bonds as evidence that the Preliminary Writs remain in place.[275]

384.   In a letter dated October 10, 2016, GGAM's outside counsel requested the Respondents' outside counsel to provide written consent to Deutsche Bank releasing the Shares. The following day, Respondents' counsel responded that it objected to Deutsche Bank releasing the Shares,[276] and: "*[T]here would be no objection regarding the Shares if your clients were not demanding excessive and unwarranted 'compensation' in addition to the Shares.*"[277] Thus, the Respondents acknowledge that they are withholding their consent to GGAM's sale of the Shares in order to leverage financial concessions from GGAM notwithstanding the Tribunal's unanimous decision that GGAM has the right to sell the Shares.[278]

385.   On March 17, 2017, GGAM's counsel again wrote to the Respondents' counsel requesting that the Respondents "*immediately assure implementation*" of the Tribunal's IM Order ("**IM Order**") and Liability Award by (a) withdrawing the Respondents' January 17, 2014 petition filed with the RTC seeking the Preliminary

---

[272] Claimants' Supplemental Submission, para. 214.

[273] *Ibid.*, para. 215.

[274] *Ibid.*, para. 218.

[275] *Ibid.*, para. 219.

[276] *Ibid.*, para. 222.

[277] Letter from M. Nolan to D. Weiner (October 11, 2016).

[278] Claimants' Supplemental Submission, para. 223.

Writs, and (b) confirming in writing to Deutsche Bank, the Philippine Stock Exchange and the Philippine Depository & Trust Corp. that the Respondents have no objection to GGAM's sale of its BRC shares.[279] The Respondents refused to take both actions[280] and explained that their position was that: "*In this particular dispute, at every stage, Bloomberry's position has been that, if your side [i.e., GGAM] were not demanding unreasonable 'compensation' in addition to the Shares, objections to the sale of the Shares could be put aside as part of a compromise to resolve the Parties' dispute.*"[281]

386.   The Claimants conclude that the Respondents have admitted that they will not comply with the Tribunal's ruling and withdraw their objection to GGAM's sale of the Shares unless GGAM withdraws its claims for damages resulting from the Respondents' wrongful termination of the MSA and wrongful restraint on the Shares.[282] The Claimants renewed their request to the Respondents on April 3, 2017. The Respondents refused the request once more on April 10, 2017.[283]

387.   The Claimants contend that the Philippine Special ADR Rules require a court's interim measures of protection to be issued without prejudice to subsequent *ipso jure* revocation by the arbitral tribunal.[284] In particular, the Claimants refer to Rules 5.9 and 5.13:

> Rule 5.9
>
> "*[T]he [court's] order granting or denying any application for interim measure of protection in aid of arbitration must indicate that it is issued without prejudice to subsequent grant, modification, amendment, revision or revocation by an arbitral tribunal.*"
>
> Rule 5.13
>
> "*Any court order granting or denying interim measure/s of protection is issued without prejudice to subsequent grant, modification, amendment, revision or revocation by the arbitral tribunal as may be warranted.*

---

[279]   Claimants' Supplemental Submission, para. 224.
[280]   *Ibid.,* para. 225.
[281]   Letter from M. Nolan to D. Weiner (March 27, 2017).
[282]   Claimants' Supplemental Submission, para. 229.
[283]   *Ibid.,* paras. 230 to 231.
[284]   *Ibid.,* para. 241.

> *An interim measure of protection issued by the arbitral tribunal shall, upon its issuance be deemed to have ipso jure modified, amended, revised or revoked an interim measure of protection previously issued by the court to the extent that it is inconsistent with the subsequent interim measure of protection issued by the arbitral tribunal.*"

388.    The Claimants contend that the IM Order by its terms is self-executing:

> "**This Order of the Tribunal on Interim Relief issued in the instant arbitration proceeding . . . is deemed to have superseded the final Order dated February 25, 2014 of the Regional Trial Court of Makati City, Philippines**.
>
> *Accordingly, the Writs of Preliminary Injunction and Attachment issued pursuant to the final Order dated February 25, 2014 of the Regional Trial Court of Makati City, Philippines **shall now be deemed vacated and lifted.***
>
> *This Order of the Tribunal on Interim Relief is in all respects substituted for and replaces [the Regional Trial Court's Preliminary Injunction Order] and the Writs of Preliminary Injunction and Attachment.*"[285]

389.    The Claimants, relying on their expert, Justice Puno, submit that, under the Special ADR Rules, the Parties need not have taken any further action, as the IM Order revoked or superseded the Philippine Preliminary Injunction Order and vacated and lifted the Preliminary Writs issued pursuant to such Order, *ipso jure*.[286]

390.    The Claimants cite *Limitless Potentials v. Court of Appeals*[287] for the proposition that an improvidently granted injunction or wrongful attachment – even one obtained in good faith – gives rise to a claim for actual and compensatory damages[288]. Claimants also contend that Rule 57, section 20, of the Philippine's 1997 Revised Rules of Civil Procedure,[289]makes it clear that malice is unnecessary to recover damages for a wrongful attachment::

> "*Nothing herein contained shall prevent the party against whom the attachment was issued from recovering in the same action the damages*

---

[285]   IM Order, para. 141. Emphasis added by the Claimants.
[286]   Claimants' Supplemental Submission, para. 253.
[287]   G.R. No. 164459 (S.C., April 24, 2007) (Phil.).
[288]   Claimants' Supplemental Submission, para. 256.
[289]   *Ibid.,* para. 258.

> awarded to him *from any property of the attaching party* not exempt from execution should the bond or deposit given by the latter be insufficient or fail to fully satisfy the award."[290]

391.   The Claimants further contend that the right of a party to recover actual or compensatory damages for an improvidently issued injunction is also consistent with Articles 20 and 2176 of the CCP.[291] Article 20 provides:

> *"Every person who, contrary to law, willfully or negligently causes damage to another, shall indemnify the latter for the same."*[292]

392.   The Philippine Supreme Court has held that *"Article 20 does not contemplate malice per se."*[293] Article 2176 provides:

> *"Whoever by act or omission causes damage to another, there being fault or negligence, is obliged to pay for the damage done. Such fault or negligence, if there is no pre-existing contractual relation between the parties, is called a quasi-delict and is governed by the provisions of this Chapter."*[294]

393.   Justice Puno submits that, under Philippine law, the Tribunal's IM Order revoking the Philippine Preliminary Injunction Order and vacating and lifting the Preliminary Writs amounts to a determination that the preliminary injunction was wrongfully obtained, and therefore a right of action for the full amount of its damages on the injunction immediately accrued to GGAM.[295]

394.   The Claimants contend that, separate and apart from Respondents' liability for the improvidently granted preliminary injunction and wrongful attachment, Respondents are also liable for their obstructive conduct in preventing GGAM's sale of its Shares.[296] As Justice Puno explains, Philippine law recognizes the right of an owner *"to enjoy and dispose of a thing"* and a corresponding right of action for interference with that right. Under Article 428 of the CCP, *"the owner has the right to enjoy and dispose of a thing, without other limitations than those*

---

[290]  Philippine R. of Civ. P. 57 § 20 (1997). Emphasis added by the Claimants.
[291]  Claimants' Supplemental Submission, para. 259.
[292]  CCP, Rep. Act 386, as amended (Phil.), Art. 20.
[293]  *Federation of Free Farmers v. Court of Appeals*, G.R. No. L-41161 (S.C., September 10, 1981) (Phil.).
[294]  CCP, Rep. Act 386, as amended (Phil.), Art. 2176.
[295]  Claimants' Supplemental Submission, para. 260.
[296]  *Ibid.*, para. 262.

*established by law*"[297] and "*The owner has also the right of action against the holder and possessor of the thing in order to recover it.*"[298]

395.   The Claimants note that, in *Fleischer v. Botica Nolasco Co.*, Inc.,[299] the Supreme Court of the Philippines, in discussing the nature, character and transferability of shares of stock on the basis of Section 35 of the Corporation Code, held that the holder of shares, as owner of personal property, is at liberty to dispose of them in favour of whomsoever he pleases, without any other limitation in this respect, other than the general provisions of law.[300]

396.   The Claimants contend that, as a BRC shareholder, GGAM thus has the undisputed right to dispose of its Shares and that Respondents' continued obstruction of the implementation of the IM Order is directly analogous to the deprivation and corresponding right of action addressed by Article 428 of the CCP[301] (*see* paragraph 394 above). Having been wrongfully deprived of that right by the Respondents, GGAM is entitled to compensation from the Respondents.[302]

397.   According to the Claimants, the Respondents by their actions have injured GGAM by reducing the value of the Shares. They contend that the damage was caused by the following:

(a)   <u>Involuntary Lockup</u>. Respondents' actions effectively converted GGAM's Shares into restricted shares that cannot be sold. Shares that cannot be sold are worth far less to GGAM than shares that can be sold: not only can GGAM not sell them, but it cannot use them as collateral for loans or derivative transactions.[303]

(b)   <u>Prevented Reinvestment</u>. Respondents' actions also prevent GGAM from realising and reinvesting the proceeds from the sale of its Shares into other projects or investments. Had GGAM's sale of the Shares proceeded in January 2014, GGAM would have had more than US$ 165 million to invest for more than three years. While it is not known exactly in which projects

---

[297]   CCP, Rep. Act 386, as amended (Phil.), Art. 428.
[298]   *Ibid.* Art. 428.
[299]   G.R. No. L-23241 (S.C. March 14, 1925) (Phil.).
[300]   Claimants' Supplemental Submission, para. 265.
[301]   *Ibid.,* para. 267.
[302]   *Ibid.,* paras. 266 – 267.
[303]   *Ibid.,* para. 270.

GGAM would have invested, at the very least GGAM would have invested broadly in equities and received a commensurate rate of return.[304]

(c) <u>Block Sale Discount.</u> At the time that GGAM originally planned to sell the Shares in January 2014, it considered selling them in increments to avoid a steep drop in the BRC share price. However, the investment banks that GGAM retained advised that, because the market knew that GGAM was positioned to sell the entirety of the Shares, GGAM should sell the block as a whole, because an incremental sale would create a "market overhang" that would result in a loss of value. This "market overhang" reflects that the immediate supply of shares is greater than the average daily trade demand. When Respondents finally cease their unwarranted interference with GGAM's sale of the Shares, it is likely that the market will expect GGAM to liquidate all of the Shares and therefore again expect the Shares to be sold as a block or otherwise reduce the BRC share price in contemplation of GGAM's sale of the entire holding.[305]

(d) <u>Controlling Shareholder Effect.</u> Beyond the effects of their actions on GGAM directly, the Respondents' actions since January 2014 have demonstrated that Mr. Razon, as controlling shareholder, has not protected and will not protect the interests of BRC's minority shareholders. This has the effect of making BRC shares a riskier investment, which in turn negatively affects the value of the shares for all investors.[306]

398. The Claimants submit that the Philippine Supreme Court has adopted the "Highest Intermediate Value" ("**HIDV**") approach[307] to measure damages when sales of shares or stocks are improperly restricted. Claimants cite *Tan Tiong Teck vs. SEC & CUA OH & Co.,*[308] in which the Supreme Court stated: "*[T]here is no reason for us not to adopt and apply in this jurisdiction the 'Highest Intermediate Value' rule, adopted in the United States, which is a fair and universally accepted rule.*"[309]

---

[304] Claimants' Supplemental Submission, para. 272.
[305] *Ibid.,* paras. 273 – 274.
[306] *Ibid.,* para. 275.
[307] Claimants' Supplemental Submission, paras. 279 to 280. Under this approach, where a party restricts stockholders' ability to sell their shares, courts determine the loss caused by the restrictions. Specifically, U.S. courts calculate damages by taking the difference between (a) the price at which the stockholder would have sold the shares but for the restriction (the "But-For Price"), and (b) the price at which the stockholder could have sold the shares at the end of the restricted period (the "Post-Restriction Price") – Claimants' Supplemental Submission, para. 298.
[308] G.R. No. L-46472. (S.C., January 23, 1940) (Phil.).
[309] As cited by the Claimants in the Claimants' Supplemental Submission, para. 279.

399.   The Claimants argue that the Respondents' attempt to distinguish this case[310] as one which does not involve a court order prohibiting the sale of shares is inapposite.[311] The Claimants assert that the *Tan Tiong Teck* decision does involve interference in the sale of shares. In that case, the shareholder claimed he was damaged by the inability to sell his shares at the time and for the price that he instructed the shares to be sold. The failure of the shareholder's broker to sell the shareholder's shares in accordance with the shareholder's instructions was a wrongful restriction or interference on the shareholder's sale of his shares.[312]

400.   According to the Claimants, for purposes of determining the measure of damages, there is no principled basis to distinguish between interference with a shareholder's sale of its shares as a result of an improvidently granted injunction, on the one hand, and the interference with a shareholder's sale of its shares as a result of a broker's wrongful actions, on the other.[313] The Claimants agree with the Respondents' expert, Justice Vitug, that "*[t]here is no set method for computing lost profits under Philippine Law. What is important, however, is that such damages be actually proven and not mere conjecture or speculation.*"[314] In this vein, the Claimants contend that *Tang Tiong Teck* is consistent with these principles and invites the Tribunal to consider the manner in which the US courts have applied the HIDV.[315]

401.   The Claimants also rely upon *Duncan v. TheraTx, Inc.*[316] In that case the court adopted the HIDV for calculating damages where an issuer's temporary suspension of a shelf registration prevented trading by stockholders during a certain time in breach of a merger agreement.[317] Claimants also find support in the case *re New York, N.H. & H.R. Co*[318], where the court adopted the HIDV to calculate damages resulting from an *ex parte injunction.* The court found that the injunction was strongly analogous to a conversion based on the underlying principle that the owner of property has the unrestricted choice of whether to hold and enjoy it or to sell it and obtain its equivalent in cash.[319] The Claimants argue that this principle is directly analogous to the principles underlying the right of action recognized under

---

[310]   *See* below, para. 414.
[311]   Claimants' Supplemental Submission, para. 280.
[312]   *Ibid.*
[313]   *Ibid.,* para. 281.
[314]   *Ibid.,* para. 285; 3rd Vitug Report, para. 47.
[315]   Claimants' Supplemental Submission, para. 285.
[316]   775 A.2d 1019 (Del. 2001).
[317]   Claimants' Supplemental Submission, para. 286. *See also* the 4th Subramanian Report, para. 20.
[318]   64 F. Supp. 487 (D. Conn. 1945).
[319]   Claimants' Supplemental Submission, para. 287.

Philippine law for interference with the right of an owner "*to enjoy and dispose of a thing,*" (*jus disponendi*), and the right of a party against whom an improvidently granted injunction is obtained to recover for the damages it has suffered.[320]

402.    The Claimants argue that the Tribunal should implement a remedy that addresses both the past and ongoing harm suffered by GGAM resulting from the Respondents' restriction on GGAM's sale of the Shares.[321] The Claimants explain that, ordinarily, where the restriction has been lifted by the time of the hearing, the Tribunal would compare (a) the highest price of BRC's shares in the reasonable period following imposition of the restriction with (b) the price in the period after the restriction is removed. But here, GGAM cannot present evidence of the price during a reasonable period following lifting of the restriction because the restriction is still in effect. The Tribunal, therefore, should adopt a constructive remedy, and determine the highest price at which GGAM's sale would have occurred once the restriction began, and award GGAM that value for the Shares in exchange for GGAM giving the Shares to the Respondents.[322]

403.    The Claimants submit that the Tribunal has the authority to adopt a constructive remedy under Singapore law (the law of the seat) and would be able to grant this injunction.[323] In particular, section 12(5) of the International Arbitration Act ("**IAA**") provides:

> "*an arbitral tribunal, in deciding the dispute that is the subject of the arbitral proceedings — (a) may award any remedy or relief that could have been ordered by the High Court if the dispute had been the subject of civil proceedings in that Court.*"[324]

404.    The Claimants contend that a constructive remedy is appropriate because of the Respondents' continued obstruction of implementation of the Tribunal's IM Order in violation of that Order, even following the Tribunal's issuance of the Liability Award in which the Tribunal unequivocally recognized GGAM's right to sell its Shares. The constructive remedy is also consistent with the GGAM's put right, which demonstrates that the Parties contemplated, in the event the MSA terminated, that GGAM would have the right to put the Shares back to the Respondents through

---

[320]  Claimants' Supplemental Submission, para. 290.
[321]  *Ibid.,* para. 294.
[322]  *Ibid.*
[323]  *Ibid.,* para. 295.
[324]  International Arbitration Act (Chapter 143A) section 12(5)(a) (Sing.). The Tribunal parenthetically notes that the Tribunal has the power to issue interim injunctions pursuant to section 12(1)(i) of the IAA.

their agent and controlling shareholder PMHI. This would result in the Respondents receiving the Shares that they have previously argued have "*unique value*"[325] for them while assuring that Respondents bear only the difference between the value of the Shares and their Highest Intermediate Value but for the Respondents' restriction. In this manner, GGAM would receive the full amount of the damages it has suffered, and the Respondents would have paid only the amount that the HIDV approach demands.[326]

## C. Respondents' Arguments

405.   The Respondents dispute that there is an automatic effect to be given to arbitral awards or orders. Under Philippine law, an award means "any partial or final decision by an arbitrator in resolving the issue in a controversy."[327] Hence, it is subject to judicial review by the RTC.[328] The RTC can set aside the IM Order under the New York Convention.[329]

406.   The Respondents further note that the Claimants' interpretation that the IM Order is "self-executing" is solely based on Rule 5 (Interim Measures of Protection) of the Special ADR Rules, which is inapposite, because the IM Order is an award.[330] The Respondents argue that "*by ordering that GGAM be 'free to… sell or dispose of the Shares at their discretion,' the Tribunal disregarded the distinct rights and interests that Prime Metroline, as the party to the Equity Option Agreement ("EOA") and the party that transferred the Shares to GGAM for below market price, had in the Shares.*"[331] According to the Respondents, this is relevant as the Claimants commenced this Arbitration under the MSA only and not the EOA, and accordingly the relief is inappropriate, in light of the fact that PMHI, the party to the EOA, was not heard in connection with GGAM's claim concerning the Shares. The Tribunal therefore did not have the competence to grant that relief.

---

[325]   Respondents' Memorial in Opposition to Claimants' Request for Interim Measure of Protection dated July 15, 2014 ("**Respondent's Opposition Memorial to IM Request**"), paras. 18 and 29.

[326]   Claimants' Supplemental Submission, paras 296 - 297.

[327]   Alternative Dispute Resolution Act of 2004, Philippines Republic Act No. 9285 ("**ADR Act**"), Section 3(f).

[328]   Respondents' Sur-Rejoinder on Damages, para. 237.

[329]   Respondents' Sur-Rejoinder on Damages, para. 237, footnote 496, citing the ADR Act, Section 42 (Alternative Dispute Resolution Act of 2004) which states that "*The New York convention shall govern the recognition and enforcement of arbitral awards covered by the said Convention. The recognition and enforcement of such arbitral awards shall be filed with regional trial court in accordance with the rules of procedure to be promulgated by the Supreme Court.*"

[330]   Respondents' Sur-Rejoinder on Damages, para. 238.

[331]   *Ibid.*, para. 240.

407.   Also, the Tribunal granted GGAM's request for PMHI to be "*bound by this decision*" in the IM Order, at GGAM counsel's urging, despite its acknowledgement that it was "*not convinced at this stage that either of the Respondents in the present proceedings is the correct party to whom those Shares would or could belong.*"[332] If it is "*beyond this Tribunal's remit to protect the rights of non-parties in this arbitration,*"[333] it is also beyond its remit to affect such rights, a cardinal rule of due process. Therefore, Bloomberry, Sureste and PMHI are entitled to oppose enforcement of the Liability Award and the IM Order under Article V(1)(c) of the New York Convention.[334]

408.   The Respondents further contend that, as award-debtors, Bloomberry and Sureste have legitimate grounds to oppose the enforcement of the Tribunal's IM Order and Liability Award under Article V(1)(b) of the New York Convention. In this regard, the Respondents make the following assertions:

(a)   GGAM committed fraud in the arbitration, in addition to having engaged in corrupt practices in the course of the contractual performance that was at the heart of the arbitration such that enforcing the Liability Award would be contrary to the public policy of the Philippines.[335]

(b)   Bloomberry and Sureste were denied an adequate opportunity to present their case, as a result of GGAM's manipulation of the document disclosure process,[336] which included on the part of the Claimants the withholding of emails and documents exchanged between GGAM and Cantor Fitzgerald, failing to search the files of Eric Chiu or Howard Lutnick, and forcefully objecting to the production of documents from Weidner Resorts on the basis that Weidner Resorts was a nonrelated party notwithstanding the fact that Eric Chiu, GGAM's President for Asia, was by GGAM's counsel's admission, on Weidner Resorts' payroll.

---

[332]   *See, e.g.,* IM Order at para. 127(b) which states "*[f]irst, in respect of the identity of the party to whom the Shares could possibly return (assuming that restitution were ordered), the Tribunal is provisionally not convinced at this stage that either of the Respondents in the present proceedings is the correct party to whom those Shares would or could belong. If indeed restitution is found to be the appropriate remedy, the Shares would, on the Respondents' Experts' own case, revert to the entity in which they vested prior to their transfer. That entity is PMTC. However, neither PMTC, nor its successor in interest, PMHI, is a party to the present proceeding.*"

[333]   *See,* IM Order at para. 127(c) which states "*[I]t is insufficient if the Respondents show that a third party – say, Mr. Razon, or PMHI, or PMTC – is likely to or even will certainly suffer irreparable harm, since it is beyond this Tribunal's remit to protect the rights of non-parties in this arbitration.*"

[334]   Respondents' Sur-Rejoinder on Damages, para. 242.

[335]   *See generally* Respondents' Request for Reconsideration, paras. 39 – 66.

[336]   Respondents' Sur-Rejoinder on Damages, paras. 246.

(c)   The IM Order manifests a procedural defect in the adversarial proceeding, which denied Bloomberry and Sureste their due process rights, because the Tribunal decided to require both GGAM and Bloomberry to bear the burden of proof contained in UNCITRAL Rules, Article 26 on interim measures, notwithstanding the fact that it was GGAM and not Bloomberry that filed a request under Article 26. At no time did the Tribunal notify Bloomberry of any intent to shift the burden of proof, much less explain the rationale for such shift.[337]

409.   The Respondents contend that, had the Claimants wanted to enforce the IM Order or Liability Award regarding the disposition of the Shares, it was for GGAM to seek enforcement before the appropriate trial court in the Philippines, and not for Bloomberry to withdraw its petition for a preliminary injunction and attachment in court.[338] Yet, the Claimants have not sought to enforce the IM Order before the RTC as it was directed to by the Philippine Court of Appeal.[339] The Respondents therefore argue that the equitable doctrine of laches[340] bars GGAM's claim for damages purportedly arising from the tort of conversion.[341]

410.   The Respondents dispute GGAM's theories of damages based on improvidently granted court orders. According to the Respondents, there was "*no malice in Bloomberry seeking to protect its interests, through its request to the Regional Trial Court for a preliminary injunction and attachment order, at a time when the Tribunal was not yet constituted and GGAM was attempting to sell the Shares pre-emptively.*"[342] The RTC found that ownership of the Shares was in dispute in the arbitration and warned against disposing of the Shares before the Tribunal's final determination.[343] The RTC's findings thus make clear that Bloomberry's request was legitimate.[344]

411.   The Respondents also contend that GGAM's *ipse dixit* that the RTC "*acknowledged*" a purported "*unrestricted right to seek damages before the*

---

[337] Respondents' Sur-Rejoinder on Damages, paras. 247.
[338] *Ibid.*, paras. 239.
[339] *Ibid.*, para. 250.
[340] *See*, 4th Vitug Report, paras. 87 to 89, which explain that laches is the failure or neglect for an unreasonable and unexplained length of time to do that which by exercising due diligence could nor should have been done earlier; it is negligence or omission to assert a right within a reasonable time, warranting a presumption that the party entitled to assert it either has abandoned it or declined to assert it.
[341] Respondents' Sur-Rejoinder on Damages, para. 250.
[342] *Ibid.*, para. 251.
[343] Order of the Republic of the Philippines, Spec. Proc. No. 7567, February 25, 2014.
[344] Respondents' Sur-Rejoinder on Damages, para. 252.

*Tribunal in the event that injunction was improvidently granted*" is irrelevant[345] because the RTC never "*acknowledged*" that GGAM could unrestrictedly seek damages beyond damages charged against the bond to be secured by Bloomberry.[346]

412.    Further, GGAM's reliance on *Limitless Potentials* is beneficial to the Respondents because the Philippine Supreme Court specified that "*malice or lack of good faith is not a condition* sine qua non *for liability to attach on **the injunction bond**.*"[347] The Respondents further contend that GGAM have failed to point to a case where in the absence of malice, damages exceeding the amount posted in a bond was awarded.[348] For this reason, GGAM's request for damages above the bonded amount must fail.[349]

413.    The Respondents argue that GGAM's argument that Bloomberry has "converted" the Shares must also fail because Bloomberry never exercised any "*dominion and control*" over the Shares nor "*unauthorised and wrongful dominion and control.*"[350] The Respondents elaborate as follows:

(a)    Bloomberry's alleged inaction in not pre-emptively dropping the injunction does not create dominion and control over the Shares, as the Shares are not held by Bloomberry but by Deutsche Bank AG subject to the Philippine RTC's orders. Thus, even if there was dominion and control on the part of Bloomberry, such dominion and control would not be "*unauthorized and wrongful.*" GGAM's conversion theory thus falls short of the legal requirements for asserting conversion-based damages.[351]

(b)    If GGAM believed that the Philippine injunction and attachment had been "*improvidently granted,*" it should have brought forth this assertion before the RTC, along with a request to enforce the IM Order, as the proper body to determine this issue when the Court of Appeal remanded the issue back to the RTC. This decision became final on January 21, 2016 when GGAM declined to file a petition with the Philippine Supreme Court to appeal the decision. In the intervening 19 months, GGAM has not taken any action

---

[345]  Respondents' Sur-Rejoinder on Damages, para. 253.
[346]  *Ibid.*
[347]  *Ibid.*, para. 254. Emphasis in the original.
[348]  *Ibid.*
[349]  *Ibid.*
[350]  *Ibid.*, para. 256.
[351]  *Ibid.*, para. 257.

before the RTC to commence recognition and enforcement proceedings. Instead, GGAM has decided to seek relief from this Tribunal in the form of a manufactured tort of conversion. By failing to exercise its remedies before the proper Philippine court on the basis of the IM Order or Liability Award, under the equitable doctrine of laches, GGAM cannot now be heard to complain that it is somehow prejudiced by an allegedly "*improvidently granted*" order from the RTC.[352]

414.    The Respondents also contend that a court of law in the Philippines under these circumstances would not apply the "Highest Intermediate Value Test" ("**HIVT**") because there is clear evidence of the price at which GGAM tried to sell the Shares at the time of the IM Order in January 2014.[353] The Respondents distinguish *Tan Tiong Teck* from the present case by noting that, in that case, a stock broker refused to account for the actual price at which it sold the shares of stock of the Complainant which the broker said to have sold at PHP 0.15 per share, when stock exchange records show that all sales on that day occurred at prices higher than PHP 0.15. The Court resolved that case based on the Code of Commerce and CCP provisions that a broker must act with the prudence and care of a good father. The broker was ordered to pay for the shares at PHP 0.175 per share, the highest price the shares were sold on that same day the broker said it sold the shares. The Court said a broker has the fiduciary duty to sell the shares of a client at the highest price they can be sold at the time the broker sells them. While the Court mentioned a HIDV rule adopted in the United States, it did not explain what the rule was, and it was clearly *obiter dictum*. Further, unlike the broker in *Tan Tiong Teck*, Bloomberry has no fiduciary duty to GGAM with respect to the BRC Shares.[354]

415.    The Respondents contend that the HIVT is self-contradictory and outside the Parties' agreement to arbitrate, and highlight the following:

(a)    GGAM has to rely on the PA's "Buy-Out Option" to argue that their proposed HIVT remedy is consistent with the Parties' agreement. But the PA did not involve the Respondents, this arbitration does not involve the PA, and the Tribunal admittedly cannot direct a non-party to the arbitration to take any actions.[355]

---

[352]   Respondents' Sur-Rejoinder on Damages, para. 258.
[353]   *Ibid.*, para. 263.
[354]   *Ibid.*, paras. 263 – 264.
[355]   *Ibid.*, para. 266.

(b)   GGAM expressly disavows any explicit or implicit invocation of the "put right" in the PA, which is contractually limited to the "Fair Value" of the Shares —not the HIDV of the Shares.[356] Fair Value is, in turn, defined as "*the applicable share price of the Shares as listed on the PSE . . . as of the date of such sale.*"[357]

416.   The Respondents further argue that GGAM admits that their "constructive remedy" based on HIVT is a form of damages that is intended to deter future bad conduct.[358] As such, GGAM is seeking punitive damages. Yet, the Parties expressly agreed in the MSA that neither Party would be liable for punitive damages.[359] Further, punitive damages are considered an "*exemplary*" or "*corrective*" damage under Philippine law,[360] which can only be awarded in cases involving breach of contract if the defendant acted in a "*wanton, fraudulent, reckless, oppressive, or malevolent manner.*"[361] Respondents contend that there is simply no argument in GGAM's submissions to suggest that punitive damages would be appropriate.

417.   Respondents also reject Claimants' references to "prevented reinvestments" as being purely speculative under Philippine law, and not allowed under the MSA because it is in the nature of a claim for consequential damages.[362]

**D.   Analysis of the Tribunal**

418.   The Tribunal will first address matters already decided by the Tribunal and which continue to be raised by the Respondents in their arguments. It will then proceed to consider matters of jurisdiction, liability and quantum in respect of the alleged obstruction of the sale of the Shares reserved for this phase of the proceedings in the Liability Award.

*(i)   Matters Previously Decided by the Tribunal*

419.   The Respondents continue in their Sur-Rejoinder on Damages to argue on the basis of claims already decided by the Tribunal in the IM Order or the Liability Award. The Tribunal will not reconsider them and will only refer to the rulings *by which it*

---

[356]   Respondents' Sur-Rejoinder on Damages, para. 266.
[357]   PA, Clause 5.4.
[358]   Claimants' Supplemental Submission, para. 291.
[359]   MSA, Section 12.3(a).
[360]   *See*, CCP, art 2229.
[361]   *Ibid*, art 2232.
[362]   Respondents' Sur-Rejoinder on Damages, para. 265.

*decided them. Thus, on the claim of causal fraud, the Tribunal concluded that: "to the extent that the Claimants made representations, the evidence does not show that the representations were false at the time they were made. The Tribunal has rejected each of the grounds the Respondents have advanced in support of their claim of causal fraud; consequently, this claim is dismissed."*[363] Further allegations of fraud were made by the Respondents in the Request for Reconsideration of the Liability Award. The Tribunal did not consider them because it found that it "*may not reconsider the Liability Award. In particular the request for reconsideration does not fall within any of the enumerated exceptions of section 19B of the IAA.*"[364]

420.    On the Respondents' allegation of the *shifting of the burden of proof* by the Tribunal in the Interim Phase of the proceedings, the Tribunal addressed the alleged shifting of the burden of proof in its IM Order. GGAM owned and possessed the Shares in question, but the Respondents obtained an injunction from the RTC preventing their sale.  But the RTC only had jurisdiction until this Tribunal was constituted and could act on the injunctive request, which it did.  Since it was the Respondents which sought the injunction from the RTC, it is at least arguable that it should have been the Respondents who sought the same relief from the Tribunal because of the limits of the RTC's jurisdiction.  The Tribunal explained the unusual procedural posture of the Parties:

> "*These are, in essence, the Parties' respective positions: the Respondents, while technically the respondents in opposing the Claimants' Request, are in effect asking the Tribunal to grant them an Order preventing the Claimants from selling any of the Shares. Conversely, the Claimants, while technically the applicants in the present interim measures application, are in effect both responding to the Respondents' actions in seeking interim relief before the Philippine Court but also asks to be relieved from all restrictions on their disposition of the Shares. The Tribunal notes, for completeness, that the Respondents' application was taken in response to the Claimants' attempt to sell the Shares, and the Tribunal emphasises that it is not suggesting that there was any impropriety on the part of either side in respect of the events leading to the present procedural posture. To the contrary, the Tribunal assumes the good faith of all parties before it and of the Philippine Court.*"[365]

421.    After these considerations, the Tribunal concluded:

---

[363]  Liability Award, para. 148.
[364]  Decision on Reconsideration, para. 75.
[365]  IM Order, para. 106.

> *"The result of the current procedural posture, however, is that the Tribunal cannot start from either the position that the Second Philippine Court Order should remain and the Party opposing it has the burden of proving that it should be revoked; or that the Second Philippine Court Order should be revoked and the Party asking for it to remain should bear the entire burden of that request. In this unusual posture, both parties bear the burden of presenting evidence and persuading the tribunal of the correctness of their explicit and implicit affirmative propositions."*[366]

### *(ii)   Jurisdiction*

422.   For purposes of considering the arguments that PMHI was not heard and the lack of jurisdiction of this Tribunal in respect of non-parties to the MSA, it will be useful to review in detail the Parties' arguments at the various phases of this proceeding and the Tribunal's decisions in their respect.

### a.   Interim Measures Phase

423.   At the Interim Measures ("**IM**") Hearing Mr. Nolan stated for the Respondents: *"Were this Tribunal to accept GGAM's argument as correct and grant their Application, it would be granting preliminary relief pursuant to an agreement as to which no arbitration has been brought, certainly none before this Tribunal. Claimant, thus, makes of this Tribunal a request that it has not been given competence to grant."*[367]

424.   The Claimants in their Request for Interim Measures ("**IM Request**") in the section on "The Parties to the Arbitration and Related Entities" stated:

> *"Prime Metroline is not a party to the MSA (MSA Clause 19.2), nor was it an original party to the Arbitration. However, in the Philippine Court Proceedings, Prime Metroline represented that as 'the owner of the Shares which transferred the Shares to Respondent GGAM . . . [Prime Metroline] is a real party in interest who stands to be benefitted or injured by any order of the [Philippine Court], or entitled to the avails of the suit.' MSA Clause 19.2(f) provides that the arbitration provisions of the MSA are 'intended to benefit and bind third-party non-signatories and shall continue in full force and effect subsequent to and notwithstanding the expiration or termination*

---

[366]   IM Order, para. 107. Emphasis added.
[367]   Transcript of Interim Measures Hearing, page 637 lines 2 to 11.

*of this Agreement.' By asserting it is a real party in interest and acknowledging that the Philippine proceeding was only in aid of this Arbitration, Prime Metroline has acknowledged both that the Tribunal has jurisdiction with respect to this issue (among others), and that it is bound by any determination by this Tribunal regarding any interim measures."*[368]

425.    In their Opposition Memorial to the IM Request, the Respondents asserted that *"There is simply no reason for the Tribunal to grant Claimants' extraordinary request [for interim measures], which would impair, if not destroy, the Tribunal's effective jurisdiction to make an award in Bloomberry's favor, and thereby irreparably prejudice Bloomberry—precisely the effect interim measures are not supposed to have."*[369] The Respondents also reserved their *"right to include any plea as to the arbitral tribunal's jurisdiction, assert additional defenses and counterclaims and/or seek further or alternative relief as appropriate, in their Statement of Defence."*[370]

426.    In their Sur-Reply Memorial in Opposition to the Claimants' Request for Interim Measure of Protection dated August 14, 2014 (the **"Respondents' Sur-Reply Memorial in Opposition to the IM Request"**), the Respondents continued to refer to the remedial jurisdiction of the Tribunal:

> *"[...] When GGAM initiated this Arbitration, the status quo was as follows: the block of Shares was intact, held by GGAM, and within the Tribunal's remedial jurisdiction. That situation has not changed. As of today, the block of Shares is intact, held by GGAM, and within the Tribunal's remedial jurisdiction. GGAM's request to sell the Shares—thereby dispersing the block and eliminating the Tribunal's remedial jurisdiction over the Shares—is a request to alter permanently the status quo prior to the resolution of this Arbitration."*[371]

427.    In the IM Order the Tribunal made the following observations in respect of the Respondents' Proprietary Claim (as defined at paragraph 126 of the IM Order):[372]

> *"(a) On the basis of the evidence and arguments submitted at this early stage, the Tribunal is not convinced for the purposes of enjoining Shares pursuant to Article 26 of the UNCITRAL Rules 2010 that the Respondents*

---

[368]  IM Request, para. 20(3)(ii).
[369]  Respondents' Opposition Memorial to the IM Request, para. 21. Emphasis added. *See* also paras. 27 and 28.
[370]  *Ibid.*, footnote 139.
[371]  Respondents' Sur-Reply Memorial in Opposition to the IM Request, para. 5.
[372]  IM Order, para. 127.

*themselves have a serious claim to the Shares which could be subverted by the sale of those Shares.*

*(b) First, in respect of the identity of the party to whom the Shares could possibly return (assuming that restitution were ordered), the Tribunal is provisionally not convinced at this stage that either of the Respondents in the present proceedings is the correct party to whom those Shares would or could belong. If indeed restitution is found to be the appropriate remedy, the Shares would, on the Respondents' Experts' own case, revert to the entity in which they vested prior to their transfer. That entity is Prime Metroline Transport Corp ("**PMTC**"). However, neither PMTC, nor its successor in interest, PMHI, is a party to the present proceeding.*

*(c) The Tribunal is not persuaded, on the face of the record before it at this time, that there is authority for the proposition (as the Respondents argue) that "it's entirely possible as a legal matter that the PMHI entity is a beneficiary with respect to a Contract entered by its prior subsidiaries, in that sense, the Shares could be restituted to PMHI, notwithstanding the fact that it's not a party", and that "the existence of a doctrine of privity of Contract doesn't negate the possibility of restitution to a third party beneficiary, for example, of a contract." The threshold question before this Tribunal is whether or not the Respondents are likely to suffer substantial harm if the Tribunal does not make an Order on the same terms as the Second Philippine Court Order.*

*(d) The Tribunal emphasizes that it is not pre-judging any merits of this case, which the Parties will have full opportunity to ventilate in their submissions prior to and during the merits hearing. However, the Tribunal must be convinced for the purposes of maintaining or ordering an injunction against the Claimants' Shares that it is likely that the Respondents will suffer substantial harm. It is insufficient if the Respondents show that a third party – say, Mr. Razon, or PMHI, or PMTC – is likely to or even will certainly suffer irreparable harm, since it is beyond this Tribunal's remit to protect the rights of non-parties in this arbitration.*

*(e) In all the circumstances, the Tribunal, without pre-judging the merits of this claim, has not been presented with convincing evidence that the Respondents themselves will suffer irreparable harm if they do not receive the Shares. Accordingly, any harm arising from the sale of the Shares would*

*be suffered by the Grantor. The Tribunal has not been shown evidence that the Respondents are the Grantor's successors or assigns.*

*(f) In any event, the Tribunal notes that, even if the Respondents succeed at the merits phase on their Proprietary Claim, the Respondents have not persuaded the Tribunal that they are likely to suffer irreparable, or substantial, harm. Should the Claimants sell the Shares, the Claimants will simply have assets other than the Shares, such assets being of equivalent value to the sale price of the Shares, and out of which the Claimants can satisfy any award made against them (if at all).*"[373]

    b.    <u>Merits Phase</u>

428.    In the Statement of Defense and Amended Counterclaims dated February 2, 2015 (**"Respondents' Statement of Defense"**), the Respondents submitted their counterclaims:

*"Bloomberry now asserts amended counterclaims for (1) monetary damages equivalent to the value of the Shares, (2) rescission of the equity option grant and restitution of the Shares on behalf of its agent, Prime Metroline; (3) annulment of the MSA on the basis of causal fraud and restitution of the Shares on behalf of its agent, Prime Metroline; and (4) equitable relief from GGAM's unjust enrichment.*"[374]

429.    The Respondents explained:

*"As the Grantor, Prime Metroline acted on behalf of, and as agent for, Bloomberry and Sureste to comply with their enforceable obligation under the MSA to grant GGAM the right to purchase up to 10% ownership rights in the Solaire. Under Philippine law, agency may be implied from the words and conduct of the parties, as well as the circumstances of a particular case. Although there was not a separate written agreement between Bloomberry, Sureste and Prime Metroline, the Parties' actions make clear that Prime Metroline was acting as the agent of Bloomberry and Sureste.*"[375]

430.    At the Remedies stage, the Claimants argued that the Respondents have no basis to challenge the Tribunal's jurisdiction over GGAM's Shares damages claim because,

---

[373]  IM Order, para. 127.
[374]  Respondents' Statement of Defense, para. 143.
[375]  Respondents' Statement of Defense, para.156. *See also* paras. 169-70, 172, 174- 78, 181, 190(b)-(e).

*inter alia*, the Respondents' counterclaims put damages related to the Shares before the Tribunal, and Respondents waived any jurisdictional challenge regarding the Shares dispute. The Claimants added that the Tribunal should not "*credit any argument by Respondents (should they make one) that the Tribunal lacks jurisdiction to award GGAM damages arising from Respondents' interference with GGAM's sale of its Shares on the basis that PMHI is not a party to the Arbitration. Respondents themselves acknowledge that PMHI is their agent, and acts on behalf of Respondents (BRHI and Sureste)*."[376]

431.   The Respondents made the following argument:

> "'*First*, by ordering that GGAM be "*free to... sell or dispose of the Shares at their discretion,*' the Tribunal disregarded the distinct rights and interests that Prime Metroline, as the party to the Equity Option Agreement ("**EOA**") and the party that transferred the Shares to GGAM for below market price, had in the Shares. By virtue of these rights, Prime Metroline was a joint petitioner for the Writs of Attachment and Preliminary Injunction that were granted by the Regional Trial Court in Makati.*"

> "*Claimants commenced this Arbitration, however, under the MSA only, not the EOA. Bloomberry expressly objected to the relief GGAM was seeking, which was outside of the Tribunal's jurisdiction. GGAM took the position that the EOA was the sole basis for the equity option, pursuant to which it bought the Shares, and therefore, on the basis of GGAM's theory, the EOA was the source of the rights GGAM wanted to vindicate. Such relief was inappropriate, in light of the fact that Prime Metroline, the party to the EOA, was not heard in connection with GGAM's claim concerning the Shares, and that the Tribunal did not have the competence to grant that relief.*"

> "'*That the Tribunal granted GGAM's request for Prime Metroline to be 'bound by this decision' in the IM Order, at GGAM counsel's urging despite its acknowledgement that it was 'not convinced at this stage that either of the Respondents in the present proceedings is the correct party to whom those Shares would or could belong' militates against enforcement. If it is 'beyond this Tribunal's remit to protect the rights of non-parties in this arbitration', it is also beyond its remit to affect such rights, a cardinal rule of due process. Therefore, Bloomberry, Sureste **and** Prime Metroline are*"

---

[376] Claimants' Supplemental Submission, para. 233.

> *entitled to oppose enforcement of the Partial Award on Liability and the IM Order under Article V(1)(c) of the New York Convention."*[377]

432.    First, the Tribunal observes that, as pointed out by Justice Puno, the RTC "issued the limited preliminary injunction and preliminary attachment ***notwithstanding*** the presence of a non-party to the arbitration."[378]

433.    Second, at the same time as the Respondents claimed that PMHI was not heard, they affirmed to this Tribunal that PMHI was their agent in the context of the counterclaims for damages. In their Amended Statement of Defense and Counterclaims the Respondents argued:

> *"As Grantor [of the shares] Prime Metroline acted on behalf of, and as agent for, Bloomberry and Sureste to comply with their enforceable obligation under the MSA to grant GGAM the right to purchase up to 10% ownership rights in the Solaire. Under Philippine law, agency may be implied from the words and conduct of the parties, as well as the circumstances of a particular case. Although there was not a separate written agreement between Bloomberry, Sureste and Prime Metroline, the Parties' actions make clear that Prime Metroline was acting as the agent of Bloomberry and Sureste. The EOA plainly states that it was entered into because of Clause 18.3 of the MSA (even though Prime Metroline was not a party to the MSA). The EOA then goes on to imply that the agreement was being entered to satisfy the obligations of Bloomberry and Sureste, which had granted the equity option in the MSA and were causing Prime Metroline to act as their agent in the equity transaction. GGAM was well aware of the relationship between Bloomberry, Sureste, and Prime Metroline. For example, even when GGAM chose to exercise the equity option, it could not effectively close the transaction until the boards of directors for Bloomberry and Sureste had approved the sale."*

> *"The Respondents further explained that common ownership and interrelatedness of corporations may "give rise to a valid inference as to the broad scope of agency." In the corporate context, it is not unusual to see situations where an affiliate will facilitate performance of another affiliate's obligation, particularly when the affiliates are owned and controlled by the same corporate parent. Courts recognize the possibility that a parent corporation may act as the agent of its subsidiary. For*

---

[377]    Respondents' Sur-Rejoinder on Damages, paras. 240 to 242. Emphasis in original.
[378]    Claimants' Puno Summary, p. 3. Emphasis in the original.

*example, when a parent company acts as an agent for its subsidiary for a particular purpose, the parent has necessarily acquiesced to the subsidiary's control, albeit only for the particular purpose."*[379]

434.   The Tribunal considers that the issues raised by the Respondents in this proceeding relating to the competence of the Tribunal in respect of (i) PMHI, and (ii) the obstruction of the sale of the Shares, contradict what had been stated by the Respondents to the Tribunal as the basis for the Respondents' standing to submit counter-claims on which the Tribunal relied. If PMHI was the Respondents' agent, then the principals were before the Tribunal, and they owned any claim or defence of the agent and were fully heard on all issues related to the dispute relating to the Shares. The RTC itself granted the interim measures of protection without prejudice to the subsequent grant, modification, amendment, revision or revocation by the arbitral tribunal.

435.   Furthermore, the agency relationship is confirmed by the relief requested by the Respondents that the Tribunal order GGAM to transfer the Shares to the Respondents on behalf of PMHI.[380]

### (iii)   Liability

436.   The Respondents have argued that they have a right to challenge the Liability Award. The Tribunal agrees. But the Respondents also have an obligation to comply with the IM Order and the Liability Award, and Claimants have no obligation to seek enforcement of the IM Order or the Liability Award in the RTC. Both Parties are, however, bound by the IM Order and the Liability Award and are obliged to comply with them (*see* the Tribunal's analysis at paragraphs 440 to 445 below).

437.   The Tribunal observes that the RTC had the initial authority to grant an IM Order but, as a matter of Philippine law, this was subject to the Tribunal's express power to modify or lift the RTC's order. In the IM Order the Tribunal recognized that the RTC clearly acted within its proper jurisdiction. The Tribunal observed:

> *"[...] the Second Philippine Court Order arises from the fact that this Tribunal was not yet constituted, and the Philippine Court was simply 'holding the ring' – i.e., preventing any substantive change in each side's*

---

[379]   Respondents' Statement of Defense, paras. 156-157.
[380]   Respondents' Sur-Rejoinder on Damages, para. 269(i)(f).

> *position – prior to the Tribunal's constitution. To this extent, the Court was clearly acting within its proper jurisdiction."*[381]

The Tribunal did not find that the RTC acted improvidently at the time it issued the injunction. The question for the Tribunal is whether the Respondents' continuing non-compliance with this Tribunal's IM Order and the Liability Award, the resulting interference with the right of GGAM to dispose of the Shares, and the Respondents' stated intent to continue to interfere, constitute grounds for a finding of liability by this Tribunal.

438.   The IM Order observed that "*the Philippine Court clearly anticipated that its Order (which simply held the status quo ante until the Tribunal was constituted) could be 'modified, amended, revised or revoked by the arbitral tribunal [emphasis added]' once this Tribunal was constituted. There can therefore be no doubt that the Second Preliminary Court Order does not bind this Tribunal. The Second Philippine Court Order only bound the Parties in so far as this Tribunal was not yet constituted and had not yet ruled on the issue.*"[382]

439.   The Tribunal vacated the Second Preliminary Court Order when it issued its IM Order. The IM Order is binding on the Parties and, if it is considered an award, it can be enforced in any country signatory to the New York Convention. On the other hand, awards issued by this Tribunal may only be vacated by the courts of Singapore. The Philippine courts may enforce or not enforce them but have no power to vacate them. None of this Tribunal's orders or awards have been vacated. Regardless of whether the IM Order is enforceable in the courts, it directly binds the parties and they are obligated to comply with it.

440.   Whether the IM Order is self-executing in the Philippines is a matter of whether it can be enforced in that country without the intervention of a Philippine court recognizing and enforcing it. Even if it is not self-executing, the Parties still have an obligation to comply with the IM Order and the Liability Award unless vacated by a court in Singapore.[383]

441.   The Respondents have the right to challenge the IM Order and the Liability Award as they have argued, but they have not obtained any court decision from Singapore setting aside the IM Order or the Liability Award. Until they do, the Parties are bound by them and must comply with them. It is evident from the Respondents'

---

[381]   IM Order, para. 101.
[382]   *Ibid.*, Emphasis in the original.
[383]   UNCITRAL Rules, Article 34(2).

arguments that they take the position that the IM Order and Liability Award are defective and they have not complied with them. Nonetheless, the Tribunal understands that they did not seek to vacate either the IM Order or the Liability Award in the Singapore courts within the time limits fixed by Singapore law, which would have been the legitimate action for the Respondents to take. Eventually, the Respondents sought to vacate the Liability Award apparently out of time, and proceedings are pending. Those proceedings are properly for the courts of Singapore to decide.

442.    After the Tribunal issued the Liability Award, and since early 2017, the Claimants corresponded with the Respondents to implement the IM Order and the Liability Award as ordered by the Tribunal. As already noted at paragraph 384 above, the Respondents refused and used their refusal to consent to try to bargain a reduction of the Claimants' damage claim for breach of contract.

443.    In their defence, the Respondents have contended that the Shares are not under their dominion or possession since they are held in escrow by Deutsche Bank and possession or ownership over the Shares could not have passed to the Claimants by virtue of the RTC's writ of attachment. They argue that Justice Vitug has explained that the effect of the attachment is that the property is brought under the custody of the law and not the party who sought attachment.[384]

444.    This notwithstanding, the Respondents' replies to the Claimants when requested to agree to the release of the Shares and to withdraw their petition for interim measures to the RTC attest to the fact that the release of the Shares and the withdrawal of the petition are, *de facto*, effectively under their control. Thus, in their letter of March 27, 2017, the Respondents stated: "*In this particular dispute, at every stage, Bloomberry's position has been that, if your side [i.e., GGAM] were not demanding unreasonable 'compensation' in addition to the Shares, objections to the sale of the Shares could be put aside as part of a compromise to resolve the Parties' dispute.*"[385] Deutsche Bank itself has taken the position that, notwithstanding the IM Order and Liability Award, which have been disclosed to Deutsche Bank, it will not unfreeze the Shares without the Respondents' express permission to this effect.[386]

---

[384]   4th Vitug Report., para. 99; Respondents' Sur-Rejoinder on Damages, para. 257.

[385]   Claimants' Ex. 243. This is a reiteration of the position taken by the Respondents in previous correspondence dated October 11, 2016: "[T]here would be no objection regarding the Shares if your clients were not demanding excessive and unwarranted 'compensation' in addition to the Shares." Claimants' Ex. 244.

[386]   Claimants' Supplemental Submission, para. 218.

445.     Under Section 19.2(b) of the MSA, the decisions of the Tribunal are binding on the Parties without right of appeal. The UNCITRAL Rules provide that the Parties are to carry out all awards without delay.[387] This notwithstanding, the Respondents have failed to give effect to the IM Order and the Liability Award. When the Tribunal rendered the IM Order, it ordered that the Claimants were "henceforth free to deal with the Shares,"[388] which included "the right to sell or dispose of the Shares at their discretion" even though it left open the issue of title to the Shares.[389] It was clear at the time of the IM Order that Claimants were likely to prevail on their claim to the Shares.  The Liability Award decided that issue in December 2016.[390]

446.     To recapitulate, GGAM has tried to sell, or initiate the process of selling, the Shares on at least the following occasions, only to be effectively prevented by the Respondents in each instance:

(a)     In January 2014, GGAM, after consultation with investment bankers, came close to selling its Shares at the final price of Php 8.05 per share. Settlement was scheduled to occur on January 21, 2014. On January 15, 2014, BRC wrote to the Philippine Stock Exchange requesting suspension of trading in all BRC shares for one week, which was done on the next day. On January 17, 2014, the Respondents and PMHI filed an application with the RTC seeking the issuance of writs of preliminary attachment and preliminary injunction of GGAM's sale of its Shares, and seeking a temporary restraining order. This was granted on February 27, 2014 (*see* paras 374 to 377 above).

(b)     In October 2016, after the issuance of the Liability Award, GGAM tried to initiate the sale of the Shares again, and wrote to Deutsche Bank to ask that it restore GGAM's Shares to a trading account. Deutsche Bank took the position that it would need the Respondents' express consent to release the Shares, which the Respondents refused to give (and which the Respondents

---

[387]   UNCITRAL Rules, Article 34(2).

[388]   IM Order, para. 138(a)(ii).

[389]   "The Tribunal emphasizes that it makes **no declaration** as to the ownership of the Shares, and has not pre-judged any aspect of each side's pleaded case, and Parties shall have the full opportunity to ventilate their respective cases at the merits hearing. Accordingly, the Tribunal defers any decision as to the declaration of the legal and/or beneficial ownership of the Shares to the merits phase of the Arbitration (which is the appropriate phase in which to determine this question)." IM Order, para. 139.

[390]    In the Liability Award the Tribunal concluded: "Since the Respondents' arguments about the Equity Option and the EOA are based on rescission or annulment of the MSA and there are no legal bases for rescinding or annulling the Equity Option granted in the MSA and the EOA, there is equally no basis to require GGAM to return the Shares." Liability Award, para. 305. In the operative part of the Liability Award, the Tribunal decided that "there is no basis on which to rescind the EOA or to require the return of the shares" at p. 120.

tried to use as a bargaining chip to reduce the compensation it was liable to pay the Claimants) (*see* paras 382 to 384 above). Deutsche Bank specifically relied on Respondents' continuing renewal of their original preliminary injunction and preliminary attachment bonds as evidence that the Philippine Preliminary Injunction Order and Preliminary Writs remain in place.

(c)   In March 2017, GGAM's counsel wrote to the Respondents' counsel again requesting that the Respondents "*immediately assure implementation*" of the Tribunal's IM Order  and Liability Award by (a) withdrawing the Respondents' January 17, 2014 petition filed with the RTC seeking the Preliminary Writs, and (b) confirming in writing to Deutsche Bank, the Philippine Stock Exchange and the Philippine Depository & Trust Corp. that the Respondents have no objection to GGAM's sale of its BRC shares.[391] The Respondents refused to take both actions, seeking again to use its consent to releasing the shares as a basis for negotiating its damage exposure. This request was renewed in April 2017 and rejected once more when GGAM sought to sell its Shares at a 19.5 month high[392] (*see* paras 385 to 386 above).

447.   At the final hearing, the Respondents stated clearly that they would continue to obstruct GGAM's access to the Shares irrespective of the Tribunal's ruling.[393]

448.   In these circumstances, the Respondents' flagrant disregard for the Tribunal's IM Order and Liability Award, and willful refusal indefinitely to enable GGAM access to the Shares for the apparent purpose of pressuring the Claimants into a settlement on Respondents' terms is tantamount to their *de facto* seizure, a misappropriation for the purpose of using them to settle other matters in dispute between the Parties. There is no doubt that the Respondents have refused to comply with the IM Order and the Liability Award even though they had committed themselves to comply, and have prevented the Claimants from the free disposal of their Shares.

449.   On this basis, the Tribunal finds that, at least since the IM Order, the Respondents are liable for damages under Articles 20 and 2176 of the CCP. The Respondents have acted contrary to their legal obligations under the MSA and the UNCITRAL Rules to be bound by the Tribunal's IM Order and Liability Award, and this act has caused damage to GGAM Philippines, the rightful owner of the Shares. Pursuant

---

[391]   Claimants' Supplemental Submission, para. 224.
[392]   *Ibid.*, para 230.
[393]   Day 5 Transcript, page 274 line 15 to page 275 line 14.

to Article 20 of the CCP, this gives rise to an obligation on the Respondents' part to indemnify GGAM Philippines for the damage it has suffered as a result of Respondents' actions. Further, the Respondents have acted willfully, and in doing so, have committed a quasi-delict within the meaning of Article 2176 (which, again, gives rise to an obligation on the Respondents' part to pay compensation for the damage caused to GGAM Philippines). Under such circumstances, there is no need for the Tribunal to determine whether the RTC order was improvident in order to award damages for the wrongful interference with the property rights of the Claimants, since the Respondents' actions in not complying with the IM Order and Liability Award (despite clearly being bound to do so) would by themselves give rise to liability under Articles 20 and 2176.

450.    As demonstrated by the evidence set out above, the Respondents have willfully or at least negligently caused damage to GGAM by interfering with and blocking the exercise of its ownership rights in its Shares, especially its right to sell the Shares (Article 428 of the CCP).

451.    For completeness, the Tribunal dismisses the Respondents' argument that the equitable doctrine of laches "*bars*" the Claimant's requested constructive remedy[394] and "*GGAM's claim for damages purportedly arising from the tort of conversion.*"[395] As already explained, the Claimants had no obligation to enforce the IM Order or the Liability Award. The Respondents, however, do have the obligation to comply with the IM Order and the Liability Award, and that obligation is a continuing one. It has not lapsed or been prescribed. In such circumstances, the doctrine of laches is clearly inapplicable. Moreover, no delays on the part of Claimants have been substantiated. It is not open for the Respondents to disregard orders and awards of the Tribunal (which are binding on them) when the Claimants have continuously asserted their rights properly in this arbitration, and then to argue that the Claimants are barred by laches when it is the Respondents who have refused to abide by the IM Order and Liability Award. The Tribunal also notes that the Respondents' defence of laches is not substantiated by authority. In this regard, the Respondents rely solely on the 4th Vitug Report to substantiate this defence – however, the only authority cited by him is used merely to illustrate the general principles or elements of a laches defence. The Tribunal finds that the elements of laches are not substantiated and thus dismisses the defence of laches.

---

[394] Respondents' Sur-Rejoinder on Damages, para 250.
[395] *Ibid.*

### (iv)  *Remedies*

#### a.  *Quantum*

452.   The Claimants have argued for the application of the HIDV on the basis of a single Philippine case - *Tan Tiong Teck* - considered by the Philippine Supreme Court in 1940. The Respondents disagree. The Tribunal notes that no other Philippine authority has been adduced by the Parties, and is not convinced that a single case decided in 1940 that does not clearly involve the same circumstances is sufficient evidence to demonstrate that the HIDV is necessarily part of Philippine law, and should be applied in the circumstances of the instant case.[396]

453.   Flowing from the Tribunal's finding that the Respondents are liable under Articles 20 and 2176 of the CCP from the time of the IM Order, the Tribunal finds that the most appropriate date to use to value the Shares is the date of the IM Order (*i.e.* December 9, 2014). This was the first date on which GGAM's right to sell the Shares was confirmed by this Tribunal. The Tribunal is left in no doubt that GGAM would have tried to sell the Shares had the Respondents then allowed them to do so by taking the necessary steps to permit the sale (especially as the Claimants had agreed on a substantially lower sale price for the Shares less than one year earlier). While the Tribunal appreciates that the sale of the Shares might have taken some time to negotiate (especially for what both Parties seem to accept to be a large chunk of fairly thinly traded-shares), the Tribunal finds that the date of December 9, 2014 provides a principled date to value the Shares.

454.   In this regard, the Tribunal requested that the Parties consider different possible dates to value the Shares on the last day of the Remedies Hearing.[397] These dates were: (a) January 15, 2014 (the date on which GGAM was first supposed to sell the Shares); (b) December 9, 2014 (the date of the IM Order); and (c) September 20, 2016 (the date of the Liability Award). This resulted in what the Respondents have termed the Claimants' "unsolicited" submission of June 29, 2019, and which sparked off a chain of correspondence in which experts from both sides tendered further expert reports to calculate the share prices on these specified dates (accompanied with comments by counsel).

---

[396]  Justice Vitug says that "It is, accordingly, my considered view, that the "Highest Intermediate Value," as a measure of quantification, hardly has any solid foundation in Philippine law context and it is wrong to say that the same has been '"adopted" in the Philippine jurisdiction." 4th Vitug Report, para. 103.
[397]  Day 5 Transcript, page 95 line 16 to page 98 line 3.

455.   For the purposes of this part of the Final Award, the Tribunal does not propose to set out exhaustively the Parties' contentions in detail. Instead, it will briefly summarise the Parties' key contentions, as well as set out the Tribunal's views on those contentions, before concluding on the value of the Shares (and corresponding damages due to the Claimants).

456.   The Claimants' Letter of June 29, 2018 was fairly brief. The key enclosure was Prof Kalt's Calculations of June 29, 2018, which set out (a) Prof Kalt's calculations on hypothetical sale dates of January 15, 2014 and December 9, 2014; and (b) Prof Kalt's calculations based on the HIDV for sale periods beginning on (i) January 15, 2014, (ii) December 9, 2014, and (iii) September 20, 2016. Prof Kalt only applied a discount to the hypothetical sale date of January 15, 2014, and did his calculations on the basis of the PHP/USD conversion rate as of the selected date.

457.   The Respondents' Letter of July 10, 2018, disagreed with Prof Kalt's methodology. Besides submitting that there was no basis to hold the Respondents liable for the injunction and attachment the Respondents also submitted that the Claimants' Letter of June 29, 2018 was unsolicited and put forth "entirely new calculations for damages related to the Shares based on new and/or inconsistent positions." The Respondents highlighted, *inter alia*, that Prof Kalt's Calculations of June 29, 2018 did not include any discounts on the HIDV calculations; offered a calculation based on the non-discounted sale price of the Shares on January 15, 2014; grossed up his current value calculation of the Shares by including returns accruing at an annualized S&P 500 total return, which is unsupported by record evidence; provided for the first time a calculation based on the HIDV after the Liability Award; failed to satisfy the requirements of Philippine law because it did not show the actual damages suffered by the Claimants (and only showed the current value of the Shares at selected dates); and was based on the HIDV method, which was impermissible under both Philippine and Singapore law. The Respondents also argued that "*no damages of any kind should be awarded to Claimants in light of the FCPA Orders, which have revealed GGAM's fraud and contravention of the MSA.*" In contrast with Prof Kalt's calculations, Mr Searby contended in Searby's Calculations of July 10, 2018 that the HIDV was inappropriate; that a block sale discount should be used regardless of date; that the currency and interest rates should be matched (*i.e.*, PHP for Philippine statutory interest rate); that the S&P 500 index should not be used; that he was instructed to use simple interest, and that because Prof Kalt's calculations do not include any deduction for the actual value of the Shares, there is no assessment of the Claimants' loss (if any).

458.   The Claimants' Letter of August 24, 2018 rejects the Respondents' allegation that Prof Kalt presented entirely new calculations to the Tribunal; instead, the Claimants say that Prof Kalt focused on addressing the Tribunal's query in the Remedies Hearing through "three simple tables." The Claimants also argue that Prof Kalt's failure to apply a block sale discount was appropriate because "GGAM would not have sold the Shares in a single block at one time" were it not for "Respondents' unjustified termination of the MSA and subsequent efforts to prevent GGAM from selling the Shares." Indeed, the Claimants argue that they would have dribbled out the Shares to avoid suffering a block sale discount. The Claimants also argue that Mr Searby's criticism of Prof's Kalt conversion of PHP to USD at the date of the sale is unfounded and belated (since Prof Kalt had consistently been doing this), and that Prof Kalt's use of compound interest (rather than simple interest) is "*entirely reasonable and appropriate, if not conservative*" (and that Prof Kalt's use of the annualized return rate of the S&P 500 illustrates this).

459.   The Respondents' Letter of September 14, 2018 reiterates much of their Letter of July 10, 2018. Further, the Respondents again reiterate in their Letter of September 14, 2018 that "*no damages of any kind should be awarded to the Claimants in light of the FCPA Orders, which have revealed GGAM's fraud and contravention of the MSA.*" The Respondents further submitted that "*Mr Weidner, assisted by his counsel, engaged in a continuum of deceit and misrepresentations from the beginning of the Parties' relationship,*" and that the unrebutted expert opinion of Mr Thomas Mason was that "*the Arbitration was compromised by the conduct of GGAM's former arbitration counsel's violation of their professional obligations.*" The Respondents also criticized Prof Kalt for not disclosing the data underlying his new calculations, as well as his omission of providing calculations at the date of the Liability Award despite this being specifically mentioned by the Tribunal. The Respondents also argue that Prof Kalt's "new positions" were belatedly presented to the Tribunal, which deprived them "*of an opportunity to confront the case against it*" (an allegation it repeats from its Letter of July 10, 2018).

460.   As a preliminary point, the Tribunal makes clear its view that it is entitled to take into account both Parties' expert calculations and submissions in relation to the exact quantum to be awarded at various dates. That is the extent of the Tribunal's query raised at the Remedies Hearing. The Tribunal does not think that taking into account the submissions at paragraphs 456 to 459 above in relation to the issue of quantum at a specific date would (as the Respondents submitted in the last paragraph of its Letter of July 10, 2018) "[deprive] *Bloomberry of an opportunity to confront the case against it.*"  In this regard, the Tribunal notes that the HIDV methodology for which Claimants have consistently argued, and which

Respondents have consistently argued against, would allow the Tribunal to consider all of the share prices since January 2014 and select the highest price. The Tribunal has preferred instead to ground its decision in specific dates on which Respondents should have allowed Claimants to sell the shares, which Claimants own. In this regard, the Tribunal has considered the entirety of the submissions of both Parties, and has come to a conclusion on liability on the basis of all the submissions before it. The calculations by the experts on June 29, 2018 and July 10, 2018 (*see* paragraphs 131 and 135 above) merely represent calculations by the Parties' experts, adjusted to the dates on which the Tribunal thought (at the time) were possible dates for valuing the Claimants' loss.

461.   Notwithstanding this, the Tribunal reiterates its earlier view that it is inappropriate for it to revisit issues of liability already decided in the Liability Award, which is a view confirmed by the Tribunal in its Decision on Reconsideration. Therefore, insofar as the Respondents' submissions rely on arguments directed to the re-opening of issues of liability (*i.e.*, whether GGAM has breached the MSA), the Tribunal rejects these outright.

462.   Moving to the substantive decision on quantum, the Tribunal accepts the Respondents' submission (including in Searby's Calculations of July 10, 2018 and in Searby's Memo of September 14, 2018) that a block sale discount should be applied in assessing the value of the Shares at a specified date (especially, as the Tribunal has observed, for such a large chunk of thinly-traded shares). The Claimants themselves have explained that, because of the relatively large number of Shares in relation to the daily trade of BRC shares, the block sale discount would be significant. On their own case, it would have been 10.4% if the sale had materialized on January 15, 2014.[398]

463.   In the present case, the Tribunal has decided that the appropriate date to value the Shares (in order to ascertain the Claimants' loss) is December 9, 2014, which is the date of the Tribunal's IM Order. Mr Searby has calculated that an appropriate block sale discount on that date would have been 10.8%.[399] While the Claimants disagree that a block sale discount should be applied, they have not disputed that this would be an appropriate block sale discount to use should the Tribunal find (as it has) that a block sale discount should be applied. The Tribunal is persuaded that a block sale discount of 10.8% (which was provided by an expert, is close to the figure originally already agreed by GGAM in January 2014, and which is not specifically

---

[398]   Claimants' Supplemental Submission, paras. 168 and 274.
[399]   Searby's Calculations of July 10, 2018, Appendix 1.

disputed by the Claimants) is suitable. The Tribunal therefore adopts Mr. Searby's 10.8% block sale discount to the price of the shares on December 9, 2014.

464.   For the same reasons that the Tribunal declined to award pre-award interest on the lost management fees (*see* paragraph 326 above), the Tribunal also declines to award pre-award interest on the value of the Shares.

465.   The Tribunal is also inclined to accept that all calculations should be done in PHP (since that is the currency in which the Shares are traded, and the Philippine statutory interest has been pleaded by the Claimants as being applicable).

466.   In the premises, the Tribunal accepts Searby's Calculations of July 10, 2018 as the basis for calculating the value of the Shares as of December 9, 2014. Applying the block sale discount of 10.8% to the December 9, 2014 closing price per share of 12.38 PHP for the Shares (*see* paragraph 463 above), the discounted price would be PHP 11.04. The total value of the Shares as of December 9, 2014, would therefore be:

921,184,056 x 11.04 = **10,169,871,978.24 PHP**.

### b.   The "Constructive Remedy"

467.   In the Claimants' Supplemental Submission, the Claimants argued that they should be entitled to a "Constructive Remedy" in relation to the damages they have suffered by reason of the Respondents' refusal to abide by the IM Order and Liability Award (thereby denying the Claimants access to the Shares). To recapitulate, the Claimants' "Constructive Remedy" is set out at paragraph 156 of the Claimants' Supplemental Submission:

> "*156. The Tribunal should issue the following relief with respect to GGAM's Share damages claim: an award of damages to GGAM in the amount of US$ 383,472,464 (the NPV of the "Highest Intermediate Value" of the Shares) in exchange for GGAM's transfer of the Shares to Respondents (the "Constructive Remedy").*"

468.   The Tribunal turns to address questions related to the authority of the Tribunal which may arise. The Claimants argue that the Tribunal has the power to grant the Constructive Remedy on the grounds that it may grant any remedy or relief that could have been awarded by the Singapore High Court if the dispute had been the subject of civil proceedings in that Court, and that includes the power to grant an

injunction (*see* paragraph 403 above). On the other hand, the Respondents plead that the constructive remedy by which the Tribunal would compel Bloomberry to purchase the Shares should be denied. The Respondents did not dispute that the Singapore High Court would have the power to grant the Constructive Remedy as pleaded by the Claimants; nor did they dispute that the Tribunal accordingly also has the power to make such relief. Rather, the Respondents argue that "[t]*his constructive remedy conveniently would allow GGAM to avoid the difficulties of trying to enforce an award that was rendered against the rights and interests of a party that is not present in these proceedings, Prime Metroline. The Claimants' constructive remedy is barred not only due to Prime Metroline's rights as party to the EOA, but also by both Parties' contractual disavowal of punitive damages and the equitable doctrine of laches.*"[400] The Respondents also argue that GGAM's reliance on the PA to argue that the Constructive Remedy is consistent with the Parties' agreement is misplaced and self-contradictory,[401] and that the Constructive Remedy is a form of punitive damages.[402]

469.    While the Tribunal has declined to apply the HIDV/HIVT methodology to determine the share price, it decides that the Respondents must pay the full value of the Shares as of December 9, 2014 as damages to the Claimants, in exchange for GGAM's transfer of the Shares to the Respondents, for the reasons it explains below. Primarily, such a remedy would shift the risk of price fluctuations in the Shares to the Respondents while avoiding the prospect of double recovery by the Claimants.

470.    While the Tribunal does not use the HIDV, it accepts that the Respondents' recalcitrance justifies ordering that the Respondents pay the full value of the Shares as of December 9, 2014 as damages to the Claimants, in exchange for GGAM's transfer of the Shares to the Respondents. In particular, the Respondents' statement that it would not allow GGAM to sell its Shares despite the IM Order and Liability Award signals to the Tribunal that the exercise of such relief (*i.e.*, an award for the full value of the Shares based on the December 9, 2014 price to GGAM Philippines, in exchange for GGAM Philippines transferring the Shares to the Respondents) is necessary so that GGAM is not forced to bear the risk of price fluctuations on its Shares and also to compensate GGAM fully for the value of its Shares.

471.    In relation to the Respondents' objections, the Tribunal has dealt with the objections in relation to PMHI's rights, as well as the doctrine of laches, above (*see* paragraphs

---

[400]  Respondents' Sur-Rejoinder on Damages, para. 29.
[401]  *Ibid.*, para. 266.
[402]  *Ibid.*, para. 267.

432-435 and 451 respectively). The Tribunal further finds that it does not need to use or refer to GGAM's so-called reliance on the PA in order to find it has the power to provide the relief claimed by the Claimants in respect of the Shares. The Tribunal is not ordering specific performance or enforcing the "put right" in the PA. Rather, it is exercising its power to fashion appropriate relief in the face of the Respondents' transparent recalcitrance to allow GGAM to sell its Shares (despite the IM Order being made almost five years ago), and considers that such relief would shift the risk of fluctuations in the price of the Shares to the Respondents. Finally, as the Tribunal has rejected the HIDV, the Respondents' objection that the Constructive Remedy (based on the HIDV) is a form of punitive damages falls away. There is nothing "punitive" in valuing the Shares as of the date that GGAM clearly had the right to sell those Shares pursuant to the IM Order (and on which date the Respondents should have started to facilitate the implementation of the IM Order).

### c.    *Other relief in respect of the Shares and the Dividends*

472.    Since the Tribunal has decided that the Respondents shall pay the full value of the Shares as of December 9, 2014 as damages to the Claimants, in exchange for GGAM's transfer of the Shares to the Respondents, the Tribunal will make such orders as are reasonably necessary to give effect to this decision (*see* dispositive section at paragraph 505(c) to [e] below.

473.    Separately, the Tribunal notes that the Claimants have argued that the Respondents' actions in hindering and blocking GGAM's sale of the Shares have reduced the value of the Shares– *i.e.*, involuntary lockup of the Shares, prevention of reinvestment, and controlling shareholder effect. The Tribunal simply observes that the Claimants have not (other than their Constructive Remedy) pleaded any separate remedy for these supposed ways that GGAM's Shares were reduced in value. As the Tribunal has awarded the **full** value of the Shares as of December 9, 2014 (less a block sale discount) to the Claimants in return for the Claimants transferring the Shares to the Respondents, these points are no longer live (since any such harm would already be priced into the value of the Shares, and would accordingly be passed on to the Respondents with the transfer of the Shares to them after they pay GGAM Philippines the full value of the Shares).

474.    In the event that Respondents refuse to comply with the damage award, and as an alternative remedy, the Tribunal grants the relief (which is described more precisely in paragraphs 505[c] to[e] below) sought by Claimants to give effect to their ownership rights in the Shares.  This relief is necessary because Respondents have indicated that they would not allow Claimants to sell their shares in response to this

Tribunal's IM Order and Liability Award, and their conduct to date is consistent with that intent.  This relief will become effective only if Respondents refuse to comply with the damages award for the Shares within thirty (30) days of the date of this Award, and will only have the effect of enabling Claimants to sell the Shares to remedy the damages they suffered.

## XII.      DIVIDENDS

475.   According to the Parties, dividends were paid on the Shares in May 2015, April 2018, and April 2019, totaling **PHP 193,448,652**. This is undisputed and was confirmed by the Parties in their respective letters dated August 21, 2019.

476.   After the issuance of the Liability Award on October 6, 2016, the Claimants applied to the Tribunal to direct the Respondents to state to Deutsche Bank that they had no objection to the release of the dividends paid by BRC for the account of GGAM. On October 13, 2016, the Respondents confirmed they had no objection to the release of the dividends paid by Deutsche Bank. The lack of objection was recorded in Procedural Order No. 15 dated October 26, 2016. Subsequently, the Respondents changed their position. On August 8, 2017, the Claimants requested leave from the Tribunal to amend their request for relief in the Supplemental Submission because the Respondents, through PMHI, reneged on their affirmation that they had no objection to the release of dividends. The requested amendment was to include an order from the Tribunal directing Respondents to submit a certified letter from BRC addressed to Deutsche Bank that states: "*Bloomberry Resorts Corporation, Bloomberry Resorts and Hotels, Inc., Sureste Properties, Inc. and Prime Metroline Holdings, Inc. have no objection to Deutsche Bank AG' s immediate release of all dividends paid by Bloomberry Resorts Corporation for the account of Global Gaming Philippines LLC.*"

477.   Pursuant to the Tribunal's invitation, the Respondents confirmed on August 14, 2017 that it did not object to granting the Claimants leave to include the requested amendment (even though they disagreed with the substance of the amendment). Thereafter, in their Sur-Rejoinder on Damages, the Respondents stated that "*BRHI, Sureste, and Prime Metroline now object to Deutsche Bank's release to GGAM of the dividend paid by Bloomberry Resorts Corporation in May 2015*"[403] due to their appreciation of "*the full context of the FCPA Orders and their implications for the 'strategies' Mr. Weidner was pursuing.*"[404] Respondents request that the Tribunal "*[o]rder GGAM to direct its stockbroker, Deutsche Bank, to return the dividends paid in May 2015 by Bloomberry Resorts Corporation to Bloomberry Resorts Corporation.*"[405]

---

[403]   Respondents' Sur-Rejoinder on Damages, footnote 438.
[404]   *Id.*, para. 217.
[405]   *Id.*, para. 269(i)(g).

478.    The Respondents' change in position is not disputed and was noted by both Parties in the Remedies Hearing. Counsel for the Claimants submitted that the Respondents had been applying pressure on Deutsche Bank not to release the dividends,[406] and that in fact the Respondents had made filings stating that they objected to the release of the dividends in the Philippines and in Hong Kong.[407] Counsel for the Respondents explained: "*[n]ow, there has been a change in position with respect to release of the dividends. This change was -- this change was brought about for a very simple reason, the FCPA orders... So it was the release of the FCPA orders that caused Bloomberry to object to the release of the dividends.*"[408]

479.    While the Parties disagree on whether the dividends should be released to GGAM, they agree that, in the eventuality that the Tribunal finds that the dividends should be released to GGAM, their amount should be used to reduce GGAM's share of damages. Thus, in their post-hearing list of issues, the Claimants said: "*if the Tribunal grants GGAM's request for an order directing Respondents to submit a certified letter to Deutsche Bank stating that Respondents and their affiliates have no objection to Deutsche Bank's immediate release of all dividends paid by BRC for the account of Global Gaming Philippines LLC, and those amounts are actually paid to GGAM, then GGAM's share damages should be reduced by the value of those dividends.*" [409] In the Respondents' Letter of July 10, 2018, Mr. Searby, the Respondents' expert, also deducts the value of the dividends from the assessed damages.[410]

480.    Consistent with its determination that GGAM is the rightful owner of the Shares, the Tribunal finds that dividends paid by BRC shall be released and paid to GGAM. The Parties have both confirmed that Deutsche Bank A.G., Hong Kong Branch holds the Shares and the dividends. Therefore, as requested by the Claimants as part of their request for relief,[411] the Tribunal directs the Respondents to submit a certified letter from their affiliate BRC addressed to Deutsche Bank AG, Hong Kong Branch to release all dividends paid by BRC (in the sum of **PHP 193,448,652**) for the account of Global Gaming Philippines LLC. If the dividends are released to the Claimants within twenty-one (21) days from the date of this Award, then the amount of GGAM Philippines' damages for the Shares shall be reduced by the value of the dividends. If the Respondents fail to do so within 21

---

[406]   Transcript of Hearing on May 28, 2018 ("**Day 1 Transcript**"), page 83 line 15 to page 85 line 22.
[407]   Day 1 Transcript, page 23 lines 8 to 17, and page 84 lines 5 to 14.
[408]   Day 1 Transcript, page 217, lines 11 to 14, and page 220 line 11 to page 221 line 3
[409]   Claimants' Letter of June 29, 2018.
[410]   *See* Respondents' Letter of July 10, 2018, para. 3.15 of Appendix A. There are minor differences in figures / whether dividends should be immediately converted to US dollars.
[411]   *See* above at para. 168(b)(iv).

days, then the amount of the damages awarded for obstruction of the sale of the Shares shall not be reduced but shall remain as 10,169,871,978.24 PHP.

**XIII.      INTEREST**

481.    The Claimants have claimed interest at the rate of 0.5% per month compounded monthly for (i) pre-Award interest on the unpaid fees and expenses incurred before the termination of the MSA, (ii) pre-Award interest on the amount of lost management fees after termination of the MSA, and (iii) post-Award interest for each day payment in full of the Award is past due and compounded monthly at the interest rate of 6% per annum.

482.    The Tribunal considers that, on fees and expenses due for work performed or incurred before the termination of the MSA, the interest rate of 6% per annum compounded monthly provided in Section 4.8 of the MSA shall apply as from 30 days after payment was due to the date of payment.

483.    As already set out above, the Tribunal has determined that no pre-award interest will be granted on the MSA management fees or on the value of the Shares. On the other hand, the Tribunal disagrees that no interest rate should accrue after the issuance of this Award.

484.    Based on the discretion permitted by Philippine law and Article 20 of the IAA of Singapore, the Tribunal decides that post-Award interest on the  amounts awarded to the Claimants shall accrue at the annual interest rate of 6% compounded annually beginning thirty (30) days after the date of this Award until payment, except that, in the case of the fees and expenses referred to in paragraphs 371 and 373, interest shall be compounded monthly as required by Section 4.8 of the MSA beginning thirty (30) days after the date they became due.

**XIV.**    **ISSUES RAISED BY THE RESPONDENTS' REQUEST FOR RELIEF**

485.    It remains for the Tribunal to consider certain questions raised by the relief requested by the Respondents.

486.    In their request for relief, the Respondents requested, *inter alia*, that the Tribunal revisit the Liability Award and annul the MSA on grounds of causal fraud or find that Respondents rightfully ended the MSA.[412] The Respondents requested reconsideration of the Liability Award by way of their Request for Reconsideration on the same day they submitted their Sur-Rejoinder on Damages. The Tribunal denied the Respondents' Request for Reconsideration on November 7, 2017. That decision is re-affirmed here.

487.    The Respondents also requested, *inter alia*, that the Tribunal "*Find that Claimants and their counsel failed to conduct themselves in good faith in the taking of evidence, and pursuant to Article 9(7) of the IBA Rules on the Taking of Evidence in International Arbitration, deny Claimants' request for attorney's fees, costs, and expenses.*"[413] This request for relief is, in the Tribunal's view, related to the Request for Reconsideration. The Tribunal denied the Respondents' request, and it does so again here.

---

[412]    Respondents' Sur-Rejoinder on Damages, para. 269(i).
[413]    *Ibid.*, para. 269 (iii).

## XV.  COSTS

488.  In the Claimants' Costs Submissions, the Claimants submit that, pursuant to section 19.2(h) of the MSA, the Tribunal has the authority, and shall designate, the party whose position is substantially upheld, which shall recover from the other party all of its reasonable attorneys' fees, costs and expenses incurred in connection with the arbitration. The Claimants submit that they are "*entitled to an award ordering the Respondents to pay all of their reasonable attorneys' fees, costs, and expenses incurred in connection with this arbitration.*"[414] The Claimants submit that this is because:

(a)  the Tribunal has the authority to designate the party whose position is substantially upheld and award that party all of its reasonable costs incurred in connection with the arbitration;

(b)  the Tribunal substantially upheld their position in the arbitration by deciding in their favour that the Respondents wrongfully terminated and breached the MSA, deciding in GGAM's favour that GGAM could exercise its rights in relation to the Shares, including the right to sell them, and denying the Respondents' Request for Reconsideration in its entirety;

(c)  all the costs claimed in the Claimants' Costs Submissions were incurred in connection with the arbitration (including costs incurred in the ancillary proceedings in the courts of the Philippines, Hong Kong, and Singapore); and

(d)  their costs of **US$ 28,403,374.99** are reasonable given the amount in dispute, complexity of the legal issues involved, extent of factual discovery, substantial necessity for experts, the multiple phases and hearings of the arbitration, and the ancillary actions in the Philippine, Hong Kong, and Singapore Courts.

489.  In the Respondents' Costs Submissions, the Respondents argue that the Claimants' conduct throughout the arbitration, including repeated "sandbagging," withholding of critical evidence, and their other misrepresentations and concealments, "*warrants apportionment of costs such that GGAM should pay at least a portion of Bloomberry's costs and the entirety of its own costs.*" In their Costs Submissions, the Respondents make repeated reference to alleged instances of such "sandbagging," withholding of critical evidence, and other misrepresentations and

---

[414] Claimants' Costs Submissions, para. 1.

concealments. The Respondents also argue that the degree of the Claimants' success "*separately warrants that GGAM should pay at least a portion of Bloomberry's costs and the entirety of its own costs, as (i) GGAM was not successful on all of the issues (e.g., its claim for defamation), (ii) GGAM's "success" was facilitated by its "sandbagging" tactics, withholding of evidence, and other misrepresentations and concealments in the Arbitration, and (iii) the Partial Award on Liability cannot be permitted to stand as a matter of Singapore law.*"

490.    The Respondents' costs, as set out in their costs schedules, come up to **US$ 15,164,766.23**.

491.    Clause 19.2(h) of the MSA states:

> "*19.    DISPUTES*
>
> ### *19.2    Arbitration*
>
> *Except as required by Annex I with respect to Expert Disputes, any dispute required to be settled in accordance with this Clause 19.2 shall be settled by arbitration in Singapore under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules in force at the date of this Agreement (the "Rules"), except that to the extent the then current Rules are inconsistent with the provisions of this Clause 19.2, in which event the terms hereof shall control.*
>
> ...
>
> *(h) During the pendency of the arbitration, the Parties shall share equally the fees and expenses of the arbitrator. As part of the award, the arbitrator shall designate the Party whose position is substantially upheld, who shall recover from the other Party all of its reasonable attorneys' fees, costs and expenses, including its share of the fees and costs paid to the arbitrator, expert witness fees, compensation for in-house counsel, and all other fees and expenses incurred in connection with the arbitration. The arbitrator may determine that neither Party's position was substantially upheld or otherwise allocate the fees and expenses in accordance with the relative extent to which either Party's position was upheld.*"

492.     As part of the Parties' agreement, this provides the starting point for the Tribunal to consider the apportionment of costs between the Parties.

493.     Article 40 of the UNCITRAL Rules provides:

*1. The arbitral tribunal shall fix the costs of arbitration in the final award and, if it deems appropriate, in another decision.*

*2. The term "costs" includes only:*
*(a) The fees of the arbitral tribunal to be stated separately as to each arbitrator and to be fixed by the tribunal itself in accordance with article 41;*
*(b) The reasonable travel and other expenses incurred by the arbitrators;*
*(c) The reasonable costs of expert advice and of other assistance required by the arbitral tribunal;*
*(d) The reasonable travel and other expenses of witnesses to the extent such expenses are approved by the arbitral tribunal;*
*(e) The legal and other costs incurred by the parties in relation to the arbitration to the extent that the arbitral tribunal determines that the amount of such costs is reasonable;*
*(f) Any fees and expenses of the appointing authority as well as the fees and expenses of the Secretary-General of the PCA.*

494.     Article 42 of the 2010 UNCITRAL Rules provides:

*1. The costs of the arbitration shall in principle be borne by the unsuccessful party or parties. However, the arbitral tribunal may apportion each of such costs between the parties if it determines that apportionment is reasonable, taking into account the circumstances of the case.*

*2.The arbitral tribunal shall in the final award or, if it deems appropriate, in any other award, determine any amount that a party may have to pay to another party as a result of the decision on allocation of costs.*

495.     According to Article 42, the costs of the arbitration "shall in principle be borne by the unsuccessful party or parties." This article grants the Tribunal discretionary power to apportion costs based on what is reasonable in the circumstances of the case. There is some variation in tribunals' practices, but the prevailing approach of international arbitral tribunals is to order costs to follow the event.

496.    The following amounts have been paid to the fees and expenses of each member of the Tribunal as well as the Secretary to the Tribunal ("**Tribunal Secretary**"):[415]

| Item | Amount Paid | Bank Charges Incurred |
|---|---|---|
| Dr. Andrés Rigo | US$ 783,596.75 | US$ 1,064.64 |
| Mr. Doak Bishop, *Esq* | US$ 496,007.53 | US$ 767.02 |
| Dr. Michael Hwang *S.C.* | US$ 588,805.34 | US$ 954.72 |
| Tribunal Secretary | US$ 215,021.04 | |
| **Total** | **US$ 2,083,430.66** | **US$ 2,786.38** |

497.    The following amounts have been paid to the fees of the SIAC (transaction fees and fundholding fees):

**SIAC Transaction Fees (SGD 100 per transaction requested by Tribunal):[416]**

| | Item | Amount deducted by SIAC |
|---|---|---|
| 1. | 1 Payment Transactions processed in 2014 | US$ 75.55 |
| 2. | 7 Payment Transactions processed in 2015 | US$ 502.92 |
| 3. | 5 Payment Transactions processed in 2016 | US$ 356.87 |
| 4. | 5 Payment Transactions processed in 2017 | US$ 369.22 |
| 5. | 11 Payment Transactions processed in 2018 | US$ 815.03 |
| 6. | 6 Payment Transactions processed in 2019 | US$ 441.20 |
| | **Total:** | **US$ 2,560.79** |

*\*amount varies due to different conversion period*

**SIAC Fundholding Fees (SGD 1,200.00 per annum):**

| | Item | Amount deducted by SIAC |
|---|---|---|
| 1. | Period Jun 2014 – May 2015 | US$ 959.49 |
| 2. | Period Jun 2015 – May 2016 | US$ 888.39 |

---

[415]    This does not include pending bank charges for the last transactions.
[416]    This does not include SIAC transaction fees for the last transactions.

|     | Item | Amount deducted by SIAC |
|-----|------|-------------------------|
| 3.  | Period Jun 2016 – May 2017 | US$ 884.34 |
| 4.  | Period Jun 2017 – May 2018 | US$ 866.48 |
| 5.  | Period Jun 2018 – May 2019 | US$ 881.04 |
| 6.  | Period Jun 2019 – May 2020 | US$ 886.10 |
|     | **Total:** | **US$ 5,365.84** |

*amount varies due to different conversion period*

498.   The Parties have equally contributed to the costs of the fees and expenses of the members of the Tribunal and of the Tribunal Secretary, as well as to the fees of the SIAC (the "**costs of the arbitration**"). In total, the costs of the arbitration amount to **US$ 2,094,143.67** (plus any further bank charges and transaction fees for the last tranche of payments requested by the Tribunal and Tribunal Secretary). Each side's contribution to the costs of the arbitration so far is thus US$ 1,047,071.835). In total, the Claimants' share of the deposits with the SIAC amounts to US$ 1,054,751.97 while the Respondents' share of the deposits with the SIAC amounts to US$ 1,054,962.94 (for a total of **US$ 2,109,714.91** in deposits). There will thus be US$ 15,571.24 left in deposits held by the SIAC (minus further bank charges and transaction fees), of which US$ 7,891.135 represents the Respondents' share and US$ 7,680.135 represents the Claimants' share. These amounts (less any further transaction fees and bank charges, which shall be borne equally by the Parties) shall be returned to the respective Parties after the issuance of this Award in the proportion that each party advanced the funds.

499.   In terms of costs, each Party has requested as relief that the Tribunal award costs from the other side. As set out above, the total costs of the Claimants come up to **US$ 28,403,374.99**, while those of the Respondents' come up to **US$ 15,164,766.23**.

500.   The proceedings have been lengthy with frequent procedural incidents initiated by both sides.

501.   The Claimants prevailed substantially in the Liability Award. Therefore, the Tribunal designates the Claimants as the "Party whose position is substantially upheld" pursuant to clause 19.2(h) of the MSA. However, the Tribunal's ultimate decision on quantum eventually awarded less than half of the Claimants' claims.

Accordingly, the Tribunal considers that not all of the Claimants' costs fall within the ambit of "reasonable" costs, and that the Claimants are in any event not entitled to their full costs. The Tribunal sets out its reasons and its allocation of costs below.

502.   First, the Tribunal does not consider that the Claimants' costs and expenses in relation to the court proceedings in the Philippines, Hong Kong, and Singapore fall within the definition of costs, fees and expenses "*incurred in connection with the arbitration,*" nor the meaning of "*costs*" as set out at Article 40(2) of the 2010 UNCITRAL Rules (set out at paragraph 493 above). Such proceedings are applications to national courts, which themselves have the jurisdiction to award costs in respect of the proceedings before them. The Tribunal considers that the award of these costs to the Claimants would present a double risk: (a) of double recovery (since the Claimants, if they prevail in those proceedings, may recover their costs in those proceedings; or (b) of unjustifiably indemnifying the Claimants from averse costs orders in those national courts. The Tribunal would therefore disallow all costs, fees, and expenses in connection with this part of the Claimants' costs (this is the sum of **US$ 3,406,620.73**).[417]

503.   Second, the Tribunal notes that the Claimants did not succeed on all of their claims in the Liability Phase, and did not succeed on various issues at the Remedies Phase. For example, the Tribunal has largely preferred the Respondents' experts' quantification of lost management fees over the Claimants' experts' quantification. The Tribunal has also rejected the Claimants' use of the HIVT, preferring instead to value the Shares as a block at December 9, 2014.

504.   Third, the length and complexity of the present arbitration was due, in part, to the Claimants, although it was also due in part to the Respondents.

505.   Fourth, the Claimants' costs after removing the costs incurred due to the ancillary proceedings in Singapore, the Philippines, and Hong Kong, come up to **US$ 24,996,754.26**.[418] This figure is still substantially higher than the Respondents' costs of **US$ 15,164,766.23**. The Tribunal notes that the Claimants retained two international law firms at various stages of this arbitration, which may have contributed to the much higher costs incurred by the Claimants.

506.   Based on these considerations, the Tribunal finds that:

---

[417]   1,240,591.55 + 1,404,495.8 + 761,533.38. Numbers taken from the Claimants' Costs Schedule.
[418]   Claimants' total costs of US$ 28,403,374.99 less the sum of US$ 3,406,620.73 (being the costs of the ancillary court proceedings in Hong Kong, Philippines, and Singapore).

(a)    the Respondents shall be responsible for all of their own costs and expenses, which includes their counsel fees, costs, and their deposits in respect of the costs of the arbitration;

(b)    the Claimants shall bear their own costs in respect of the ancillary proceedings in Singapore, Philippines, and Hong Kong; and

(c)    the Respondents shall bear 60% of the remainder of the Claimants' costs and expenses of US$ 24,996,754.26 (which includes the Claimants' counsel fees, costs, as well as the Claimants' deposits in respect of the costs of the arbitration). The Respondents shall thus pay the Claimants costs in the sum of **US$ 14,998,052**. In the Tribunal's view, this is a fair proportion of costs to order the Respondents to pay to the Claimants, especially as the Respondents' own reported costs are in the region of US$15 million.

## XVI.     DECISION

507.   For the reasons set forth above, the Tribunal **AWARDS**, **DECIDES** and **ORDERS** as follows.

(a)   The Respondents shall pay a total of **US$ 85.2 million** as damages for lost management fees to the Claimants, GGAM Philippines and/or GGAM Netherlands.

(b)   The Respondents shall pay to the Claimants **US$ 391,224** as damages for pre-termination fees and expenses, which are comprised of:

1.   **US$ 148,750** on account of the February Invoice; and

2.   **US$ 242,474** on account of travel expenses.

(c)   In relation to the damages for the Respondents' wrongful interference with the Shares:

1.   the Respondents shall pay to GGAM Philippines, within thirty (30) days from the date of this Final Award, **PHP 10,169,871,978.24** (ten billion, one hundred sixty-nine million, eight hundred seventy-one thousand, nine hundred seventy-eight, and twenty-four hundredths Philippine pesos), representing the full value of the Shares;

2.   As a condition for this payment, the Claimants shall take all necessary steps to release all ownership or other interests in the Shares to the Respondents and transfer all such ownership to the Respondents or their designee within five (5) business days from the date of such payment by the Respondents;

3.   If the Respondents do not pay GGAM Philippines for the Shares within thirty (30) days from the date of this Final Award, GGAM Philippines may sell its Shares on the market (the "**Share Sale**"). If the sale nets more than 10,169,871,978.24 PHP, then GGAM Philippines may retain the damages amount and pay the excess (the remainder) to the Respondents. If the sale nets less than this amount, then GGAM may retain all proceeds and the Respondents shall owe GGAM the difference.

(d)     If the Respondents do not pay the amount set out in (c) above within thirty (30) days from the date of this Final Award:

1.     The Respondents shall take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to file a motion to withdraw the original Petition seeking the writs of preliminary injunction and attachment in the Regional Trial Court within thirty-seven (37) days from the date of this Final Award.

2.     The Respondents shall take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to issue the joint press release in substantially the same form set forth in Annex A to the Claimants' Supplemental Submission within thirty-seven (37) days from the date of this Final Award.

3.     The Respondents shall, within thirty-seven (37) days from the date of this Final Award, take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to instruct the Philippine Depository & Trust Corporation, the Philippine Stock Exchange, Deutsche Bank and the market that GGAM has free and clear title to the Shares and the absolute right to sell the Shares, and to instruct Deutsche Bank to transfer the Shares to an unrestricted trading account.

(e)     The Respondents shall take all steps necessary to facilitate the release of the dividends on the Shares in the amount of PHP 193,448,652 to GGAM Philippines within twenty-one (21) days from the date of this Final Award. In particular, the Respondents shall submit a certified letter from their affiliate Bloomberry Resorts Corporation addressed to Deutsche Bank that states as follows:

> *"Bloomberry Resorts Corporation, Bloomberry Resorts and Hotels, Inc., Sureste Properties, Inc. and Prime Metroline Holdings, Inc. have no objection to Deutsche Bank AG's immediate release of all dividends paid by Bloomberry Resorts Corporation for the account of Global Gaming Philippines LLC."*

If these dividends are released to GGAM Philippines within the twenty-one (21) days, then the amount of damages for the shares (PHP 10,169,871,978.24) shall be reduced by the value of the dividends (PHP

193,448,652).  If the Respondents fail to timely facilitate the release of the dividends, then the amount of damages owed by the Respondents for the Shares shall remain PHP 10,169,871,978.24.

(f)        The Respondents shall pay **US$14,998,052** to the Claimants as costs (*see* paragraph 506 above).

(g)        To grant post-award interest at the annual rate of 6%, compounded annually, beginning 30 days after the date of this Final Award on each of the amounts set forth above, except for the amounts in (b) above.

(h)        To award interest on the amounts in (b) above beginning thirty (30) days after the dates the pertinent invoices became due, compounded monthly, at the interest rate of 50 basis points per month or 6% per annum, as per the terms of Article 4.8 of the MSA.

(i)        To reject all other claims and requests for relief.

[signature page follows]

Made in Singapore on this  27th  day of  SEPTEMBER 2019.


Mr R Doak Bishop, *Esq.*
Arbitrator

Dr Michael Hwang *S.C.*
Arbitrator


Dr Andrés Rigo Sureda
Presiding Arbitrator