Aug. 1, 2022

**VIA ECF**

The Honorable Sarah Netburn
United States District Court for the Southern District of New York
40 Foley Square
New York, NY 10007

Re:   *Global Gaming Philippines, LLC v. Razon Jr., et al.*, No. 21-cv-2655 (LGS) (SN)

Dear Judge Netburn:

On behalf of Defendants Bloomberry Resorts and Hotels Inc. ("BRHI"), Sureste Properties, Inc. ("SPI" and, together with BRHI, the "Bloomberry Defendants"), Enrique K. Razon, Jr. (together with the Bloomberry Defendants, the "Defendants") and pursuant to Rules 36(a)(6) and 37(a)(5) of the Federal Rules of Civil Procedure, we write to request an order compelling Plaintiff Global Gaming Philippines, LLC ("GGP") to respond to Defendants' First Set of Requests for Admission (the "RFAs").[1]

Plaintiff's refusal to respond to most of Defendants' RFAs is baseless.[2]  Here, Plaintiff did not make an effort to fairly respond to the substance of the requests, as required by Federal Rule 36(a)(4), and its objections are without merit.  For the reasons set forth herein, Defendants respectfully request that the Court order Plaintiff to amend its responses to the RFAs.

**BRHI/SPI RFA Nos. 3-4, 7-18, 21-22, 25-26, 31-32**

With respect to BRHI/SPI RFA Nos. 3-4, which seek admissions on whether Plaintiff ever informed BRHI/SPI that it disagreed with or contradicted their view that the MSA "had no connection with New York at all," Plaintiff claims that these RFAs provide "insufficient information to properly respond."  *See* Exhibit C.  Notwithstanding the fact that the correspondence at issue was produced ***by Plaintiff***, we provided additional information.  *See* Exhibit A (July 6, 2022 letter).  Specifically, on June 9, 2011, Benny Tan wrote to Kevin Russell, copying, among others, Bill Weidner, Garry Saunders, Brad Stone, and Jon Rein, regarding GGP's June 2011 draft MSA.  Mr. Tan observed that GGP had changed the governing law of the draft MSA from Philippine law to New York law and responded that "[t]his does not make sense because this contract has no connection with New York law at all."  *See* GGAM-SDNY-0046583 (Exhibit D – filed under seal).  Despite receiving this additional information, Plaintiff still refuses to answer these RFAs.

---

[1] On July 6, 2022, Defendants wrote to Plaintiff regarding its insufficient responses to the RFAs and to Defendants' Second Set of Interrogatories (attached hereto as Exhibit A).  On July 14, 2022, Plaintiff agreed to amend some of its responses and objections ("R&Os"), and served those amended R&Os on July 21, 2022.  Plaintiff did not agree to amend its responses to the RFAs currently in dispute.

[2] Plaintiff's R&Os to Razon's and BRHI/SPI's RFAs are attached hereto as Exhibits B and C, respectively.

The Honorable Sarah Netburn
Aug. 1, 2022 Page 2

With respect to the remaining above-referenced RFAs, they seek admissions regarding whether key personnel, despite being officers or employees of Cantor, also held positions at GGP, and whether Plaintiff compensated Cantor for services provided to it pursuant to an agreement between GGP and Cantor. Plaintiff has refused to respond to these RFAs on relevance grounds, arguing that the Court has denied the Bloomberry Defendants' discovery requests concerning their public policy / fraud defense. *See* Exhibit C. But these RFAs do not concern the Bloomberry Defendants' public policy / fraud defense; they go directly to the Bloomberry Defendants' defense of lack of personal jurisdiction.

Plaintiff has repeatedly sought to rest personal jurisdiction over BRHI/SPI on baseless assertions that New York-based Cantor Fitzgerald was effectively BRHI/SPI's counterparty given Cantor's relationship with GGP as a 50/50 investor in GGP.[3] Yet discovery in this case thus far has confirmed that almost the entirety of services provided to manage Solaire were either provided in the Philippines by employees selected by GGP and hired by BRHI/SPI or by GGP principals Brad Stone and Garry Saunders from Nevada.[4] The ***only*** services being performed by Cantor in New York were legal services, banking services, and back-office services pursuant to a Support Services Agreement, under which Cantor personnel were to be compensated for these services.[5]

---

[3] *See, e.g.*, Second Am. Compl. (the "SAC") (ECF No. 218), ¶¶ 50-51, 65, 75, 87, 129; Mem. Opp. Mot. to Dismiss (ECF No. 134) at 1-2, 7-11; Plaintiff's May 10, 2021 Letter to Judge Schofield (ECF No. 47).

[4] *See* Saunders Dep. Tr. (Exhibit E) 55:20-56:8 ("Q. And the management of [Solaire] occurred, at least in part, in the Philippines; right? A. Yes. . . . Q. And you and Mr. Stone and Mr. Weidner provided management services from Nevada as well; right? A. Yes. Q. And at times you provided management services abroad, for example, in Asia; right? A. Yes."); *id.* 57:24-60:16 (testifying that "15 to 20 percent would have been the amount of time we [Saunders, Stone, and/or Weidner] would have spent on the ground in the Philippines," and confirming that "[t]o the extent we were not physically in Manila, we communicated on a daily or near-daily basis with the executives on the Management Team, primarily through Mr. French, regarding the most pressing issues requiring our input or resolution.").

[5] *See* Kaplan Dep. Tr. (Exhibit F – filed under seal) 127:25-128:7 ("[D]id you perform any services under the MSA? . . . A. Arguably, yes. Q. When you say 'Arguably, yes,' what do you mean by that? A. I provided back-office services to GGAM, legal services."); *id.* 172:6-10 ("Q. So what services did Cantor provide to BRHI and SPI in New York? A. There were a number of back-office services that were provided by Cantor which allowed GGAM to provide its services."); *id.* 182:14-17 ("Q. What types of services were performed in the United States under the MSA? . . . A. All of the back-office backbone services provided by Cantor were performed in the United States other than some meetings that Jon Rein had in Manila."); Rein Dep. Tr. (Exhibit G – filed under seal) 79:13-24 ("I think the key take-away is that it's the fulfilment of the obligations that, you know, GGAM did those things. Cantor did support and administrative things that would have been helpful to GGAM, but GGAM fulfilled the obligations. Q. Would you agree that Cantor did not control GGAM's performance under the MSA? A. Except to the extent that there is some legal definition of control that I'm not aware of, I think that that's accurate, Cantor did not control."); *id.* 81:20-82:18 ("Q. [W]ere you providing services under the MSA in 2012? A. We were providing support to GGAM. . . . We were providing administrative and other support services to GGAM, and some of those support services were involved in allowing GGAM to perform. Q. And is it fair to characterize those support services as back-office support? A. . . . I would say yes if we use a definition of back-office support that seems logical here, which is to say these items that constitute support were not done facing the end client, facing Bloomberry, they were not being delivered directly to Bloomberry, they were back-office in the sense that, you know, that Bill, Brad, and

The Honorable Sarah Netburn
Aug. 1, 2022                                                                                                          Page 3

We intend to make jurisdictional arguments that Cantor acted as a service provider. Instead of hiring a law firm (like New York-based Paul Weiss) and an investment bank (like New York-based Citigroup), GGP hired Cantor and agreed to compensate it for services provided to GGP (and not Bloomberry).[6]

Much of the discovery taken to date by the Bloomberry Defendants has focused on the services provided by these Cantor employees. In presenting its jurisdictional defense, the Bloomberry Defendants are entitled to know exactly what GGP's position is regarding the Cantor officers and employees at issue in the RFAs, what their roles were or are at GGP, and what hats they were wearing when they purportedly provided services to GGP. *See* Exhibit C (RFA Nos. 7-18, 20-22, 24-26). Plaintiff should be ordered to admit or deny, for example, whether Howard Lutnick, Chairman and CEO of Cantor, also is or was Co-Chairman and/or an officer, director, and/or senior executive of GGP, and whether Stephen Merkel, the Executive Managing Director, General Counsel and Secretary of Cantor, also is or was Corporate Secretary of and counsel to GGP. This should not be hard for Plaintiff to do.[7] Similarly, GGP should be compelled to admit or deny whether it paid Cantor for services Cantor provided to GGP under the Shared Services Agreement. *See* Exhibit C (RFA Nos. 31-32).

Each of these RFAs should be easy for Plaintiff to cleanly either admit or deny. There is no burden on Plaintiff, and Plaintiff's relevance objections do not withstand scrutiny. Plaintiff should be compelled to answer.

---

Garry acting on behalf of GGAM were the ones delivering these services facing Bloomberry, and that the services being provided by Cantor, at least the ones I'm aware of, would have been of assistance to GGAM, enabling GGAM to perform its services under the MSA.").

[6] Notably, this argument would be consistent with GGP's position in the arbitration. *See, e.g.*, BLOOM_0103128, Supp. Rein Decl. (Oct. 5, 2015) (Exhibit H – filed under seal), ¶ 12 ("The SSA relates to back-office administrative functions, such as GGAM's accounting, tax, legal, HR/payroll administration and similar functions. . . . But **Cantor did not perform work in fulfillment of GGAM's obligations under the MSA**, whether under the SSA or otherwise.") (emphasis added); *id.* at ¶ 14 ("Cantor provides the same or similar services to other companies in which it is a joint venture partner: 'Cantor provides admin services to Global Gaming (and several other businesses).' The Cantor-GGAM SSA is a similar, commonplace arrangement between **one JV partner and the JV itself**, to provide back-office support more efficiently than if the JV had to procure such services on its own, and nothing more.") (emphasis added); BLOOM_0100634, Decl. of Weidner (June 14, 2015) (Exhibit I – filed under seal), ¶ 8 ("Within the overall GGAM framework, Cantor Fitzgerald would provide the joint venture with a source of capital and various support services, including financial, advisory, legal, tax, and administrative support."); BLOOM_0104872, Supp. Weidner Decl. (Oct. 5, 2015) (Exhibit J – filed under seal), ¶ 24 ("Under the SSA, Cantor personnel provided services for activities internal to the relationship with GGAM only, and GGAM paid for those services. There is nothing in the SSA under which GGAM disclaims or transfers its obligations or its rights under the MSA.").

[7] In the arbitration, for example, GGP argued that key people, such as Lutnick and Merkel, were also GGP employees or providing services on behalf of GGP. *See* Claimants' Reply Letter to Tribunal (Nov. 21, 2014) (Exhibit K – filed under seal) (explaining why certain Cantor employees, such as Lutnick and Merkel, should have access to confidential information in arbitration).

The Honorable Sarah Netburn
Aug. 1, 2022                                                                                                            Page 4

**Razon RFA Nos. 3-6, 8-9, 10, 28-30, 32, 34**

These RFAs seek basic admissions regarding the terms of, and Plaintiff's knowledge regarding, the Equity Option Agreement ("EOA"). The EOA is the subject of numerous allegations in the SAC. *E.g.*, SAC ¶¶ 58, 75, 77-80, 82, 90, 105, 108, 233. Plaintiff refuses to answer these RFAs based on, among other meritless boilerplate objections, the Court's Order at ECF No. 157, which limited *document* discovery into Plaintiff's due diligence to the time period preceding execution of the *MSA*. Plaintiff's insistence on using that Order to limit discovery into the period after the MSA was signed but *before the EOA was signed* relies on the false premise that the only relevant contract here is the MSA. In fact, the EOA is linked to the MSA—so much so that *Plaintiff* seeks to use the EOA to bolster personal jurisdiction. SAC ¶¶ 82, 87, 90.

Having injected the EOA into this litigation, Plaintiff cannot simply refuse to respond to basic RFAs regarding it. In fact, under Plaintiff's own arguments to the Court, which led to the ruling in ECF No. 157, information that Plaintiff learned *before contracting* with Defendants is relevant. *See* ECF No. 125 at 10-11. Plaintiff's other boilerplate objections fare no better. Plaintiff should be compelled to respond to these RFAs.

**Razon RFA Nos. 11-12**

Plaintiff refuses to respond to these RFAs, which seek admissions about whether Razon could have been sued in the arbitration, on the ground that they seek a legal conclusion (in addition to meritless boilerplate objections). But a party may not object to an RFA "simply because it requires 'the application of law to fact.'"[8] Plaintiff's boilerplate objections to vagueness and breadth are equally meritless. Plaintiff must respond to these RFAs.

**Razon RFA Nos. 14-18, 21, and 22**

These RFAs seek straightforward admissions regarding legal proceedings in the Philippines. Instead of responding to the requests, Plaintiff has volunteered admissions that documents not even mentioned in the requests are genuine, and otherwise denies these requests. Plaintiff's denials are wholly without merit and unless Plaintiff revises its responses to the RFAs, Defendant Razon reserves all rights to seek fees and costs associated with proving these facts at summary judgment or trial.[9]

---

[8] *See U.S. Bank Nat'l Ass'n v. Triasxx Asset Mgmt. LLC*, 2020 WL 9549505, at *6 (S.D.N.Y. Nov. 30, 2020) (RFA seeking admission that funds in an escrow account were not "contractually owed or pledged to any party or third party" did not seek a legal conclusion).

[9] *See* Fed. R. Civ. P. 37(c)(2); *see also Wang,* 2021 WL 59044021, at *10 (finding defendant's responses to plaintiff's requests for admission insufficient, ordering plaintiff to amend its objections and/or responses by directly addressing the facts posed, and reminding plaintiff that, pursuant to Fed. R. Civ. P. 37, "[i]f a party fails to admit what is requested under Rule 36 and if the requesting party later proves . . . the matter true, the requesting party may move that party who failed to admit to pay the reasonable expenses, including attorney's fees, incurred in making that proof").

The Honorable Sarah Netburn  
Aug. 1, 2022                                                                                                                Page 5

****

      For the foregoing reasons, Defendants respectfully request that the Court compel Plaintiff to respond to these RFAs.

Respectfully Submitted,

| WALFISH & FISSELL PLLC | MILBANK LLP |
|---|---|
| */s/ Rachel Penski Fissell* <br>Rachel Penski Fissell<br>Daniel R. Walfish<br>405 Lexington Ave 8th floor<br>New York, NY 10174<br>Telephone: 212-672-0523<br>rfissell@walfishfissell.com<br><br>*Attorneys for Defendant Enrique K. Razon, Jr.* | */s/ Daniel M. Perry*<br>Daniel M. Perry<br>55 Hudson Yards<br>New York, NY 10001<br>Telephone: (212) 530-5000<br>Facsimile: (212) 530-5219<br>dperry@milbank.com<br><br>Erin M. Culbertson<br>Brett P. Lowe (admitted pro hac vice)<br>1850 K Street, NW<br>Suite 1100<br>Washington, DC 20006<br>Telephone: (202) 835-7500<br>Facsimile: (202) 263-7586<br>eculbertson@milbank.com<br>blowe@milbank.com<br>*Attorneys for Defendants Bloomberry Resorts And Hotels Inc. and Sureste Properties, Inc.* |

cc: All counsel of record (via ECF)