# Exhibit E

```
 1  UNITED STATES DISTRICT COURT

 2  SOUTHERN DISTRICT OF NEW YORK

 3  - - - - - - - - - - - - - - - - - - x
                                        :
 4  GLOBAL GAMING PHILIPPINES, LLC,     :
                                        :
 5          Plaintiff,                  :
                                        :
 6      v.                              : Case No.
                                        : 21 Cv. 2655
 7  ENRIQUE K. RAZON, JR.;              : (LGS)(SN)
    BLOOMBERRY RESORTS AND HOTELS INC.; :
 8  SURESTE PROPERTIES INC.;            :
                                        :
 9          Defendants.                 :
                                        :
10  - - - - - - - - - - - - - - - - - - x

11          REMOTE VIDEOTAPED DEPOSITION OF
                   GARRY W. SAUNDERS
12                  April 22, 2022

13      REMOTE VIDEOTAPED DEPOSITION OF GARRY W.
    SAUNDERS, produced as a witness at the instance of
14  the Defendants, and duly sworn remotely, was taken
    in the above-styled and numbered cause on April 22,
15  2022, from 9:05 a.m., (PST) to 12:58 p.m., (PST),
    remotely before Dawn K. Larson, RDR, CRR, reported
16  by machine shorthand, pursuant to the Rule 30 of the
    Federal Rules of Civil Procedure and the provisions
17  stated on the record.
```

1    Do you recall any dialogue during the
2  negotiations of the MSA about whether and to what
3  extent Cantor would be included in the agreement, or
4  given personality in the agreement?
5            MR. PASCUCCI:  Object to the form.
6       A.   No, I don't.  I don't recall specifics.
7            (Comments off microphone.)
8            BY MR. PERRY:
9       Q.   Before you is Deposition Exhibit 2008, and
10 if you look to the -- this is another lengthy email
11 from Mr. Tan.
12      Q.   If you flip to Item 17, it
13 states:  "Cantor Fitzgerald has been given
14 personality in this agreement by being identified as
15 a party entitled to any communications that will be
16 sent to GGAM, but we are supposed to contract only
17 with GGAM."
18           Do you see that?
19      A.   Yes.  Umm-hmm.
20      Q.   Do you have any recollection -- does this
21 refresh your recollection about any dialogue of
22 whether and to what extent Cantor would be named in
23 the MSA?
24      A.   I can't recall specifics in terms of the
25 negotiations of that.

1    Q.   Okay.
2    A.   And it -- yes, it kind of -- there's a --
3  there's a -- the flavor of it I kind of remember but
4  not the details.
5    Q.   Okay.  And do you recall -- well, what do
6  you recall of the flavor of it?  Anything more than
7  what's written on the page?
8    A.   That's right.  And you pull out another
9  paragraph I might remember that too, but no.  No.
10   Q.   Okay.  Okay.  And I take it you don't
11 recall anybody on the GGAM side registering an
12 objection or arguing about this particular point?
13   A.   I don't recall the interactions on that.
14   Q.   Now, would you agree with me that the MSA
15 was a contract where GGAM would provide management
16 services for a resort and casino in the Philippines?
17        MR. PASCUCCI:  Object to the form.
18   A.   Yes.
19        BY MR. PERRY:
20   Q.   And the management of that resort and
21 casino occurred, at least in part, in the
22 Philippines; right?
23   A.   Yes.
24        MR. PASCUCCI:  Object to the form.
25

1      BY MR. PERRY:
2      Q.   And you and Mr. Stone and Mr. Weidner
3  provided management services from Nevada as well;
4  right?
5      A.   Yes.
6      Q.   And at times you provided management
7  services abroad, for example, in Asia; right?
8      A.   Yes.
9      Q.   And did you -- did there come a time where
10 you had your assistant Ms. Parker attempt to create
11 a calendar that detailed the management services
12 provided?
13     A.   A calendar to show when things took place?
14          (Overlapping speakers.)
15     Q.   Yeah.  It'll be easier.  Let me just get
16 the document rather than asking questions.
17     A.   Okay.
18          (Comments off microphone.)
19          (Defendants' Exhibit 2025 was marked.)
20     Q.   Before you is Deposition Exhibit 25.  It's
21 a color copy of a calendar that was presented in the
22 arbitration.  There's a reference at the top, says:
23 "The calendar was prepared by Claimants' counsel
24 based on a review of, one, the travel dates of GGAM
25 principals and other GGAM personnel, as recorded and

1  documented by GGAM's administrative assistant, Kathy
2  Parker."
3          Do you recall Ms. Parker undertaking that,
4  that project?
5      A.   Yes.  Yes, I do.
6      Q.   And if you could take a moment to review
7  the document, my question to you is, does this
8  represent GGAM's best effort to memorialize its
9  physical presence in Manila and its work for Solaire
10 on behalf of BRC outside of Manila and Las Vegas?
11          MR. PASCUCCI:  Object to the form.
12     A.   Yes.  I think the intention was to show
13 specific days that we were there, physically, and
14 then also to show days where there is the
15 communications and activities taking place that
16 could be related to their -- to GGAM and Solaire
17 business.
18          BY MR. PERRY:
19     Q.   Do you believe GGAM performed a
20 substantial portion of its services under the MSA in
21 the Philippines?
22     A.   What do you mean by "substantial"?
23     Q.   More than 15 percent.
24     A.   Probably that the 15 to 20 percent would
25 have been the amount of time we would have spent on

1  the ground in the Philippines.
2       Q.   And when you say "on the ground," you mean
3  you, Mr. Stone, Mr. Weidner, Mr. Rein?  You --
4  strike that.
5            You mean -- for on the ground, you mean
6  you, Mr. Stone, and Mr. Weidner?
7       A.   Generally.  Generally, yes.
8       Q.   Okay.  And then, Mr. French, as I
9  understand it, was the COO of the property?
10      A.   Yes.
11      Q.   And Mr. French is somebody that GGAM
12 hired?
13      A.   We had nominated him for the position.
14 Mr. Razon liked him and agreed, and he was part of
15 the -- he's on the payroll of the property.
16      Q.   Okay.  But he is somebody that you would
17 communicate with regularly about what was going on
18 at Solaire?
19      A.   Yes.
20      Q.   And about how frequently would you talk to
21 Mr. French when he was in his role as COO?
22      A.   Talked specifically, quite often, quite
23 often, and also email traffic, texts, Skype.
24      Q.   Okay.  Is it fair to say Mr. French was
25 GGAM's eyes and ears on the site on a daily basis?

```
 1        A.    He was the --
 2              MR. PASCUCCI:  Object to the form.
 3        A.    He was the primary person, the most senior
 4   person that we had nominated for the Property.
 5              BY MR. PERRY:
 6        Q.    Would you characterize him as GGAM's eyes
 7   and ears?
 8              MR. PASCUCCI:  Object to the form.
 9        A.    I would characterize him as GGAM's in
10   Mr. Razon's eyes and ears.
11              (Comments off microphone.)
12              BY MR. PERRY:
13        Q.    Why don't you go back to your declaration,
14   Paragraph 48.  In the second sentence, you
15   write:  "We were to perform all of our services
16   under the MSA through the Management Team and
17   through the COO.  It was effectively our eyes and
18   ears on-site on a daily basis."
19              Was that true and correct testimony when
20   you provided it?
21        A.    Yes.
22        Q.    And just going to Paragraph 73 of the
23   document.  Last sentence, you write:  "To the extent
24   we were not physically in Manila" --
25        A.    I'm sorry.  Which paragraph here?
```

1  Q. Paragraph 73, last sentence.

2  A. Okay. Thank you.

3  Q. "To the extent we were not physically in
4  Manila, we communicated on a daily or near-daily
5  basis with the executives on the Management Team,
6  primarily through Mr. French, regarding the most
7  pressing issues requiring our input or resolution."
8  Is that true and correct testimony when
9  you gave it?

10 A. Yes.

11 Q. And to be clear, Mr. French was living and
12 working in Manila; right?

13 A. Yes.

14 Q. And Mr. French was someone that GGAM --
15 the GGAM principals had confidence in; right?

16 A. Correct.

17 Q. Mr. French was somebody that the GGAM
18 principals supported throughout the Management
19 Services Agreement period with Bloomberry; right?

20 MR. PASCUCCI: Object to the form.

21 A. Yes.

22 BY MR. PERRY:

23 Q. If you -- I'm going to put before you
24 Exhibit 2007, which is a copy of the Management
25 Services Agreement.

1    A.    Okay.

2    Q.    And directing your attention to

3  Section 2.4(f), which is on Page 4., you see it

4  says:  "GGAM shall designate" --

5         MR. PASCUCCI:  Dan, will you wait a

6  second.  I want to catch up to you.  What section

7  did you say?

8         MR. PERRY:  2.4(f).  It's on Page 4 of the

9  Management Services Agreement.  Just let me know

10 when you're there, Dan.

11        MR. PASCUCCI:  I'm there.

12        MR. PERRY:  Okay.

13        BY MR. PERRY:

14   Q.    It reads:  "GGAM shall designate the COO

15 as its Management Team leader who shall have full

16 responsibility to represent GGAM in all matters

17 connected with the performance of the agreement."

18        Do you see that?

19   A.    Yes.

20   Q.    And that person was Mr. French; right?

21   A.    That's correct.

22   Q.    And directing your attention to Annex A to

23 the contract, which is -- if you're looking at the

24 blue numbers at the top of the page, Annex A isn't

25 numbered itself, but it's the blue numbers, 38.

REPORTER'S CERTIFICATE

I, Dawn K. Larson, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Realtime Captioner, and Notary Public, do hereby certify that previous to the commencement of the examination, the deponent was duly sworn by me to testify to the truth.

I further certify this deposition was taken in shorthand by me at the time and place herein set forth and thereafter reduced to typewritten form, that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

Dawn K. Larson, MBA, RDR, CRR, CRC
Notary Public