# EXHIBIT E

IN THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

**[2020] SGHC 113**

Originating Summons No 1385 of 2019

Between

(1) Bloomberry Resorts and
     Hotels Inc.
(2) Sureste Properties, Inc.

… *Plaintiffs*

And

(1) Global Gaming Philippines
     LLC
(2) GGAM Netherlands B.V.

… *Defendants*

Originating Summons No 1257 of 2019
(Summons No 6218 of 2019)

Between

(1) Global Gaming Philippines
     LLC
(2) GGAM Netherlands B.V.

… *Plaintiffs*

And

(1) Bloomberry Resorts and
     Hotels Inc.
(2) Sureste Properties, Inc.

… *Defendants*

---

# **JUDGMENT**

---

[Arbitration] — [Enforcement] — [Singapore-seated award]
[Arbitration] — [Award] — [Recourse against award] — [Setting aside]

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................... 1

THE AWARDS ......................................................................................... 2

THE PARTIES' ARGUMENTS ....................................................................... 6

BACKGROUND FACTS LEADING TO THE DISPUTE OVER
THE SHARES ............................................................................................. 8

    BLOOMBERRY TERMINATES THE MSA ........................................................ 10

    GGAM'S INITIAL ATTEMPT TO SELL THE SHARES ....................................... 10

    PROCEEDINGS IN THE PHILIPPINES ............................................................ 11

    GGAM'S SUBSEQUENT ATTEMPTS TO SELL THE SHARES ............................. 15

ISSUES TO BE DETERMINED ................................................................... 19

ISSUE 1: WHETHER THE CONSTRUCTIVE REMEDY
SHOULD BE SET ASIDE OR, IN THE ALTERNATIVE,
REFUSED ENFORCEMENT BECAUSE IT RELATES TO
MATTERS FALLING OUTSIDE THE SCOPE OF THE
SUBMISSION TO ARBITRATION ............................................................. 21

    WHETHER THE WRONGFUL INTERFERENCE CLAIM FALLS OUTSIDE THE
    SCOPE OF THE MSA .................................................................................. 25

    WHETHER THE TRIBUNAL'S PURPORTED EXERCISE OF ITS POWER TO
    MAKE ORDERS TO REDRESS NON-COMPLIANCE WITH THE IM ORDER
    ENABLES THE TRIBUNAL TO ENFORCE ITS OWN ORDERS AND THEREBY
    DEPRIVE BLOOMBERRY OF ITS PASSIVE REMEDY TO CHALLENGE
    ENFORCEMENT OF AN AWARD ................................................................... 32

    WHETHER THE CONSTRUCTIVE REMEDY IS PUNITIVE AND
    TRANSGRESSES CL 19.2(C) OF THE MSA .................................................. 35

    MISCELLANEOUS ARGUMENTS ................................................................. 41

**ISSUE 2: WHETHER THE FINAL AWARD SHOULD BE SET ASIDE OR, IN THE ALTERNATIVE, REFUSED ENFORCEMENT BECAUSE OF A BREACH OF NATURAL JUSTICE, BLOOMBERRY'S INABILITY TO PRESENT ITS CASE, AND/OR THE ARBITRAL PROCEDURE WAS NOT IN ACCORDANCE WITH THE AGREEMENT OF THE PARTIES .........43**

**ISSUE 3: WHETHER THE GRANT OF DAMAGES TO GGAM NETHERLANDS SHOULD BE SET ASIDE OR, IN THE ALTERNATIVE, REFUSED ENFORCEMENT BECAUSE IT IS CONTRARY TO PUBLIC POLICY .............................................................53**

**CONCLUSION ...............................................................................57**

This judgment is subject to final editorial corrections approved by the court and/or redaction pursuant to the publisher's duty in compliance with the law, for publication in LawNet and/or the Singapore Law Reports.

**Bloomberry Resorts and Hotels Inc and another**
**v**
**Global Gaming Philippines LLC and another**

**[2020] SGHC 113**

High Court — Originating Summons Nos 1385 of 2019 and 1257 of 2019 (Summons No 6218 of 2019)
Belinda Ang Saw Ean J
4, 5, 7 February 2020

29 May 2020                                              Judgment reserved.

**Belinda Ang Saw Ean J:**

**Introduction**

1        Originating Summons No 1385 of 2019 ("OS 1385") is an application by the plaintiffs, Bloomberry Resorts and Hotels Inc ("BRHI") and Sureste Properties Inc ("Sureste") (collectively, "Bloomberry"), to set aside an award on quantum dated 27 September 2019 (the "Final Award") that was issued in favour of the defendants, Global Gaming Philippines LLC ("GGAM Philippines") and GGAM Netherlands BV ("GGAM Netherlands"). GGAM Philippines and GGAM Netherlands are hereafter referred to collectively as "GGAM".

2        In the alternative, Bloomberry challenges the enforcement of the Final Award in Singapore under Summons No 6218 of 2019 ("SUM 6128") that was filed in Originating Summons No 1257 of 2019 ("OS 1257"). On 9 October

2019, GGAM sought leave to enforce the Final Award in OS 1257 and the court granted leave on 10 October 2019. In SUM 6128, Bloomberry seeks to set aside the leave order to enforce the Final Award in Singapore ("the Leave Order").

3       For context, the Final Award follows an earlier award on liability dated 20 September 2016 (the "Partial Award"). Bloomberry's applications to set aside and resist enforcement of the Partial Award in Singapore were dismissed. The High Court's decision can be found in *Bloomberry Resorts and Hotels Inc and another v Global Gaming Philippines LLC and another* [2020] SGHC 1 (the "2020 Judgment"). Notwithstanding the High Court's decision in the 2020 Judgment, Bloomberry argues that there are additional grounds for setting aside the Final Award and, to this end, relies on the same grounds for both its application to set aside the Final Award and its application to set aside the Leave Order. I elaborate on these further grounds at [8] below.

**The awards**

4       It is helpful to begin with a brief summary of the Partial Award, which a three-member arbitral tribunal (the "Tribunal") issued in a Singapore-seated arbitration (the "Arbitration") governed by the UNCITRAL Arbitration Rules (as revised in 2010) ("UNCITRAL Rules"). After the liability hearing, the Tribunal (in the Partial Award) found in favour of GGAM (the claimants in the Arbitration) for wrongful termination of a Management Services Agreement dated 9 September 2011 (the "MSA"). The MSA pertained to the provision of management and technical services in the development, construction and operation of the Solaire Resort & Casino ("Solaire") in the Philippines. Relevant to the current applications is the Tribunal's rejection (in the Partial Award) of Bloomberry's claims that: (a) GGAM should return to Bloomberry shares that GGAM had acquired in Bloomberry Resorts Corporation ("BRC") on 20

December 2012 (the "Shares"); and (b) GGAM would be unjustly enriched if permitted to sell the Shares. In the Partial Award, the Tribunal ordered that Bloomberry had no grounds to challenge GGAM's title to the Shares and that GGAM could exercise its rights in relation to the Shares, including the right to sell them. It was on the basis of these findings on the legal and beneficial ownership of the Shares in the Partial Award that the Tribunal consequently granted GGAM relief in the Final Award.

5        The hearing on remedies took place from 28 May 2018 to 1 June 2018 and the Tribunal issued the Final Award on 27 September 2019. Among other points of contention, the dispute concerning Bloomberry's purported obstruction of the sale of the Shares was contested strenuously: see [374]–[474] of the Final Award. In essence, GGAM argued that Bloomberry blocked the sale of the Shares, while Bloomberry responded that it did so because the MSA had been validly terminated. Bloomberry also contended that a "Philippine preliminary injunction and attachment" (see [17] below) over the Shares remained in place and continued to restrain the disposal of the Shares.

6        In the Final Award, the Tribunal ordered Bloomberry to pay GGAM the following: (a) US$85.2m as damages for lost management fees; (b) US$391,224 as damages for pre-termination fees and expenses; (c) US$14,998,052 as costs; and (d) interest. Moreover, at [507(c)] of the Final Award, the Tribunal granted GGAM's further request for a "Constructive Remedy" in respect of Bloomberry's continued interference with GGAM's sale of the Shares. Pursuant to the Constructive Remedy, the Tribunal ordered Bloomberry to buy the Shares based on their value as of 9 December 2014. The Constructive Remedy is set out in [507(c)]–[507(e)] of the Final Award and is reproduced below:

        ...

(c) In relation to the damages for [Bloomberry's] wrongful interference with the Shares:

>1.  [Bloomberry] shall pay to GGAM Philippines, within thirty (30) days from the date of this Final Award, **PHP 10,169,871,978.24** ..., representing the full value of the Shares;
>
>2.  As a condition for this payment, [GGAM] shall take all necessary steps to release all ownership or other interests in the Shares to [Bloomberry] and transfer all such ownership to [Bloomberry] or their designee within five (5) business days from the date of such payment by [Bloomberry];
>
>3.  If [Bloomberry] do not pay GGAM Philippines for the Shares within thirty (30) days from the date of this Final Award, GGAM Philippines may sell its Shares on the market (the '**Share Sale**'). If the sale nets more than 10,169,871,978.24 PHP, then GGAM Philippines may retain the damages amount and pay the excess (the remainder) to [Bloomberry]. If the sale nets less than this amount, then GGAM may retain all proceeds and [Bloomberry] shall owe GGAM the difference.

(d) if [Bloomberry] do not pay the amount set out in (c) above within thirty (30) days from the date of this Final Award:

>1.  [Bloomberry] shall take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to file a motion to withdraw the original Petition seeking the writs of preliminary injunction and attachment in the Regional Trial Court within thirty-seven (37) days from the date of this Final Award.
>
>2.  [Bloomberry] shall take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to issue the joint press release in substantially the same form set forth in Annex A to [GGAM's] Supplemental Submission within thirty-seven (37) days from the date of this Final Award.
>
>3.  [Bloomberry] shall, within thirty-seven (37) days from the date of this Final Award, take all steps necessary (including directing their agent and controlling shareholder PMHI to cooperate) to instruct the Philippine Depository & Trust Corporation, the Philippine Stock Exchange, Deutsche Bank and the market that GGAM has free and clear title to the Shares and the absolute right to sell the Shares, and to instruct

> Deutsche Bank to transfer the Shares to an unrestricted trading account.
>
> (e)      [Bloomberry] shall take all steps necessary to facilitate the release of the dividends on the Shares in the amount of PHP 193,448,652 to GGAM Philippines within twenty-one (21) days from the date of this Final Award. In particular, [Bloomberry] shall submit a certified letter from their affiliate Bloomberry Resorts Corporation addressed to Deutsche Bank that states as follows:
>
>> '[BRC], [BRHI], [Sureste] and Prime Metroline Holdings, Inc. have no objection to Deutsche Bank AG's immediate release of all dividends paid by [BRC] for the account of [GGAM Philippines].'
>
> If these dividends are released to GGAM Philippines within the twenty-one (21) days, then the amount of damages for the shares (PHP 10,169,871,978.24) shall be reduced by the value of the dividends (PHP 193,448,652). If [Bloomberry] fail to timely facilitate the release of the dividends, then the amount of damages owed by [Bloomberry] for the Shares shall remain PHP 10,169,871,978,24.
>
> ...
>
> [emphasis in original]

7      Clearly, the Tribunal made "such orders as [were] reasonably necessary to give effect to [the Constructive Remedy]": see Final Award at [472]. For instance, the alternative relief "[would] become effective only if [Bloomberry] refuse[d] to comply with the damages award for the Shares within thirty (30) days of the date of [the Final Award]" and "[would] only have the effect of enabling [GGAM] to sell the Shares to remedy the damages they suffered": see Final Award at [474]. In the event, Bloomberry were required to take all steps necessary to enable GGAM to sell the Shares such as directing Bloomberry's agent and controlling shareholder Prime Metroline Holdings Inc ("PMHI") to cooperate.

**The parties' arguments**

8       Bloomberry argues that even though the Partial Award was not set aside in the 2020 Judgment, there are further grounds to set aside the Final Award under s 24 of the International Arbitration Act (Cap 143A, Rev Ed 2002) ("IAA") and Art 34 of the UNCITRAL Model Law on International Commercial Arbitration (the "Model Law") as set out in the First Schedule to the IAA:

> (a)       First, the "Constructive Remedy" ordered in the Final Award relates to matters outside the scope of the parties' submission to arbitration because: (i) it causes a non-party to the MSA to effectuate the Final Award; and (ii) it is a punitive remedy expressly disallowed by the terms of the arbitration agreement in the MSA.

> (b)       Second, there was a breach of natural justice because: (i) the Tribunal refused to consider evidence material to remedies on the basis that it could not revisit liability; (ii) the Tribunal refused to apply its mind to Bloomberry's demonstration that GGAM had committed procedural fraud; and (iii) GGAM made deliberate concealments in document production that were relevant for assessing damages arising from termination of the MSA.

> (c)       Third, the grant of damages to GGAM Netherlands is contrary to the public policy of Singapore because it upholds tax evasion fraud in the Philippines.

9       In the alternative, Bloomberry relies on the same further grounds for resisting enforcement of the Final Award, citing analogous articles in Art 36 of the Model Law. Counsel for Bloomberry, Mr Alvin Yeo SC ("Mr Yeo"),

clarified in oral submissions that Bloomberry's breach of natural justice grounds are directed at the Tribunal's relief in [507(a)] and [507(b)] of the Final Award. These grounds, which are relevant to the assessment of both liability and damages for the termination of the MSA, relate to the findings made by the US Department of Justice and US Securities and Exchange Commission against Las Vegas Sands (collectively, the "FCPA Findings") described in [10(b)], GGAM's purported concealment of critical information, as well as GGAM's representations to Bloomberry and the Tribunal.

10      Counsel for GGAM, Mr Cavinder Bull SC ("Mr Bull") argues that Bloomberry continues to raise matters and arguments already decided in the Partial Award and in the 2020 Judgment. Mr Bull also argues that Bloomberry's further grounds raised to either set aside or resist enforcement lack merit for the following reasons:

> (a)      First, the "Constructive Remedy" ordered in the Final Award is entirely within the scope of the parties' submission to arbitration because: (i) Bloomberry had applied to the Regional Trial Court of Makati City (the "RTC") in Manila, Philippines, informing that the issue concerning the Shares would be decided by the Tribunal; (ii) the dispute falls within the language of cl 19.1 of the MSA (the arbitration clause); (iii) the parties actively submitted the issue concerning the Shares to the Tribunal through their pleadings and submissions; and (iv) the damages awarded are compensatory rather than punitive in nature.

> (b)      Second, there was no breach of natural justice because: (i) the Tribunal considered all evidence that was material to the Final Award, particularly on the question of reasonable certainty of damages *vis-à-vis* the FCPA Findings; and (ii) the High Court's findings in Originating

Summons No 1432 of 2017 ("OS 1432") (*ie*, the 2020 Judgment) on the concealment of documents and the probative value of the FCPA Findings, which are *res judicata* in OS 1385, confirm that the purported additional evidence would not have had a material impact on the Tribunal's decision in the Final Award.

(c)     Third, the grant of damages to GGAM Netherlands is not contrary to the public policy of Singapore because: (i) there is no evidence of tax evasion fraud; and (ii) GGAM Netherlands is entitled to the benefits of the Philippines-Netherlands Tax Treaty.

**Background facts leading to the dispute over the Shares**

11     The facts material to the dispute are set out in the 2020 Judgment. For present purposes, I will narrate the background events relating to the Shares, including GGAM's acquisition of the Shares, Bloomberry's injunction to restrain GGAM's disposal of the Shares, and the Tribunal's decision pertaining to the aforementioned injunction.

12     The first plaintiff, BRHI, is Solaire's casino operator. The second plaintiff, Sureste, wholly owns BRHI and manages the hotel and non-gaming aspects of Solaire. Sureste is wholly owned by BRC, a listed company in the Philippines. BRC's chairman and chief executive officer is Mr Enrique K Razon, Jr ("Mr Razon") and its majority shareholder is PMHI. PMHI is wholly-owned by Mr Razon.

13     The first defendant, GGAM Philippines, is a wholly-owned subsidiary of Global Gaming Asset Management L.P., a firm that develops, invests, and advises hospitality companies, projects and casinos. Mr William P. Weidner

("Mr Weidner") is one of the firm's management principals. GGAM Philippines wholly owns GGAM Netherlands, the second defendant.

14      On 16 March 2011, Mr Razon and Mr Weidner met to negotiate GGAM's role in designing, operating and managing Solaire. Eventually, on 9 September 2011, GGAM Philippines and Bloomberry signed the MSA, under which GGAM Philippines agreed to provide management and technical services for the development of Solaire and to supervise its operation for ten years (the "Post-Opening Services"). Clause 18.3 of the MSA granted GGAM the option to purchase up to 10% of the shares in BRC for US$15m plus 10% of the equity that Bloomberry had infused into the Solaire project. On 16 April 2012, GGAM Philippines signed the Equity Option Agreement ("EOA") with BRC and Prime Metroline Transit Corp ("PMTC", the predecessor in interest to PMHI), in accordance with cl 18.3 of the MSA. Under the EOA, PMTC granted GGAM Philippines an option to purchase 921,184,056 of PMTC's shares in BRC at PHP 1.67 per share (the "Option"). While the MSA provided the framework for the grant of the Option, the EOA granted the Option itself and set out the terms for exercising the Option. Clause 18.3 of the MSA states:

> …
>
> The Parties shall execute a mutually acceptable Option Agreement (the "Option Agreement") to embody the share purchase option under this Clause within sixty (60) days (or such extended periods as the parties may mutually agree) from the date of this Agreement. In the event the Parties are unable or fail to execute the Option Agreement within such period, GGAM shall have the right to terminate this Agreement by sending a notice of termination to [Bloomberry] within six (6) months from the expiration of such 60 day (or extended) period. GGAM's right to terminate this Agreement under this Clause 18.3 shall expire if it is not exercised within such 6 months period.
>
> …

15      BRC launched its initial public offering in 2012 with an issue price of PHP 7.50 per share. On 20 December 2012, GGAM Philippines exercised the Option and purchased PMTC's shares in BRC (*ie*, the Shares) for US$37.43m. On 8 March 2013, GGAM Philippines assigned to GGAM Netherlands, pursuant to cl 16.2 of the MSA, its rights under the MSA with respect to the Post-Opening Services.

### Bloomberry terminates the MSA

16      Solaire opened on 16 March 2013. However, shortly thereafter on 12 July 2013, Bloomberry sent a letter to GGAM listing GGAM's alleged breaches of contract and stating its intention to terminate the MSA. GGAM denied the allegations and the parties could not arrive at a settlement. On 12 September 2013, Bloomberry issued to GGAM a notice of termination. That same day, GGAM commenced the Arbitration against Bloomberry for, *inter alia*, Bloomberry's material breach and wrongful termination of the MSA.

### GGAM's initial attempt to sell the Shares

17      After its removal from Solaire's operations, GGAM Philippines sought to sell the Shares. By 16 January 2014, GGAM Philippines' agents had confirmed the sale of the Shares to over fifty institutional investors at a price of PHP 8.05 per share and the transaction was scheduled to take place on 21 January 2014. However, on 16 January 2014, the Philippine Stock Exchange (the "PSE") suspended all trading in respect of BRC shares at BRC's request the day before. Then, on 17 January 2014, Bloomberry and PMHI filed with the RTC a petition seeking writs of preliminary injunction and attachment with regard to GGAM's sale of the Shares and requesting a temporary restraining order to preserve the status quo of the Shares. In this petition, Bloomberry and

PMHI argued that the Shares were the subject of Bloomberry's Counterclaim in the Arbitration under the MSA. On 20 January 2014, the RTC granted a temporary order restraining the disposition of the Shares for a 20-day period. On 25 February 2014, the RTC issued a preliminary injunction order (the "RTC Order") restraining GGAM from selling or transferring the Shares.

18      On 27 February 2014, the RTC issued writs of preliminary injunction and attachment pursuant to the RTC Order. In response, on 11 March 2014, GGAM applied to the Philippine Court of Appeals to reverse the RTC Order and to cancel the preliminary injunction and preliminary attachment.

19      The Tribunal was constituted on 28 March 2014. On 9 December 2014, the Tribunal issued the Interim Measures Order (the "IM Order") to supersede the RTC Order and vacate the RTC's writs of preliminary injunction and attachment. The IM Order resolved that GGAM would be free to deal with the Shares, including the right to sell or dispose of the Shares. The Tribunal then directed the parties to "bring this resolution before the Philippine Court of Appeals … and to the Regional Trial Court of Makati City, Philippines … and to assure its implementation". Following the issuance of the IM Order, Bloomberry renewed, on an annual basis, the preliminary injunction and preliminary attachment bonds ordered by the RTC pursuant to the RTC Order.

***Proceedings in the Philippines***

20      Besides GGAM's petition to the Philippine Court of Appeals on 11 March 2014 for review on *certiorari* to reverse the RTC Order (see [18] above), on 15 December 2014, GGAM filed with the RTC a manifestation (a document notifying the Philippine court of an event or factual development) drawing attention to the IM Order and asking the court to implement it. Bloomberry

responded on or around 19 December 2014 by filing a counter-manifestation before the RTC to block the implementation of the IM Order on the basis that GGAM failed to: (a) comply with the Philippines Rules of Court requiring every written motion to be set for hearing by the applicant (*ie*, GGAM); (b) provide verification of the manifestation; and (c) provide an authenticated or original copy of the IM Order.

21      Also on 15 December 2014, GGAM filed a manifestation and motion in the Philippine Court of Appeals seeking to annul the RTC Order. GGAM requested the Philippine Court of Appeals to render a judgment confirming the IM Order and to remand the case to the RTC. In response, Bloomberry filed an opposition to this manifestation and motion with the Philippine Court of Appeals on 29 January 2015.

22      On 29 May 2015, the Philippine Court of Appeals held that GGAM's 11 March 2014 appeal for review was "rendered moot and academic by the Arbitral Tribunal's Order" (*ie*, the IM Order). The Court of Appeals further recognised that the RTC Order was no longer valid. In addition, the Philippine Court of Appeals held that the RTC was the proper venue for recognition and enforcement of arbitral awards under Alternative Dispute Resolution Act of 2004, Philippines Republic Act No. 9285 (the "ADR Act"), section 3(f) (RE-2) and Rule 13 of the Special Rules of Court on Alternative Dispute Resolution (RL-3) (the "Special ADR Rules"), holding that:

> … the recognition and enforcement of a foreign arbitral award properly pertains to the Regional Trial Court. Hence, there is a need to remand the case to the RTC, Branch 66 in order to conduct further proceedings for the recognition and enforcement of the Arbitral Tribunal's Order dated December 9, 2014…

23　　　On 4 June 2015, Bloomberry filed a motion to the Philippine Court of Appeals seeking clarification on a statement in the resolution dated 29 May 2015 providing that "[c]onsidering that the Arbitral Tribunal's Order dated December 9, 2014 not only superseded the assailed February 25, 2014 Order but also vacated and lifted the writs of preliminary injunction and attachment, then nothing is left for this Court to annul or act upon". Bloomberry took the view that the statement could be misinterpreted to mean that the lifting of the writs of preliminary injunction and attachment were *ipso facto* consequences of the IM Order. Subsequently, the Philippine Court of Appeals issued a second resolution on 27 November 2015 reiterating its resolution dated 29 May 2015. In the second resolution, the Philippine Court of Appeals stated:

> Furthermore, Our May 29, 2015 Resolution is clear and explicit that the recognition and enforcement of a foreign arbitral award properly pertains to the RTC pursuant to Sections 42 and 47 of R.A. No. 9285 and Rule 13 of the Special ADR Rules. In line with this, the Arbitral Tribunal's Order dated December 9, 2014 is an 'Award' as defined under Section 3 (f) of R.A. No. 9285, thus:
>
> > '(f) 'Award' means **any partial or final decision by an arbitrator in resolving the issue in a controversy**;'
>
> > *(Emphasis Added)*
>
> Petitioner's averment that the applicable provisions are Section 28 of R.A. No. 9285 and Rule 5 of the Special ADR Rules is unmeritorious because such provisions refer to the RTC's jurisdiction to hear and grant interim measures to protect the vested rights of the parties.
>
> In fact, the RTC's jurisdiction to review foreign arbitral awards has been exhaustively discussed by the Supreme Court in *Korea Technologies Co., Ltd. vs. Hon. Lerma, et. al.*, as follows:
>
> > '**(2) Foreign arbitral awards must be confirmed by the RTC**
>
> > Foreign arbitral awards while mutually stipulated by the parties in the arbitration clause to be final and binding are not immediately enforceable or cannot be implemented immediately. Sec. 35 of the UNCITRAL

> Model Law stipulates the requirement for the arbitral award to be recognized by a competent court for enforcement, which court under Sec. 36 of the UNCITRAL Model Law may refuse recognition or enforcement on the grounds provided for. RA 9285 incorporated these provisos to Secs. 42, 43 and 44 relative to Secs. 47 and 48, thus:

>> SEC. 42. *Application of the New York Convention.* – The New York Convention shall govern the recognition and enforcement of arbitral awards covered by said Convention.

>> The recognition and enforcement of such arbitral awards shall be filed with the **Regional Trial Court** in accordance with the rules of procedure to be promulgated by the Supreme Court. Said procedural rules shall provide that the party relying on the award or applying for its enforcement shall file with the court the original or authenticated copy of the award and the arbitration agreement. If the award or agreement is not made in any of the official languages, the party shall supply a duly certified translation thereof into any of such languages.

>> …'

> …

> Thus, it can be gleaned that the concept of a final and binding arbitral award is similar to judgments or awards given by some of our quasi-judicial bodies, like the National Labor Relations Commission and Mines Adjudication Board, whose final judgments are stipulated to be final and binding, but not immediately executory in the sense that they may still be judicially reviewed, upon the instance of any party. Therefore, the final foreign arbitral awards are similarly situated in that they need first to be confirmed by the RTC.

> …

The law cannot be any clearer. Effect must be given to it as written. Thus, we remain firm with our May 29, 2015 Resolution remanding the case to the RTC, Branch 66 for the conduct of further proceedings for the recognition and enforcement of the Arbitral Tribunal's Order dated December 9, 2014.

[emphasis in original]

14

On 17 May 2016, the Philippine Court of Appeals issued a judgment making final the 29 May 2015 resolution.

### *GGAM's subsequent attempts to sell the Shares*

24     On 20 September 2016, the Tribunal issued the Partial Award, deciding that Bloomberry's termination of the MSA constituted a breach of the MSA. Notably, the Tribunal stated "[t]hat there [was] no basis for Bloomberry] to challenge … [GGAM's] title to the Shares in … [BRC] on the grounds pleaded, and thus GGAM can exercise its rights in relation to the Shares, including the right to sell them". The Tribunal also reserved the matter of remedies such as damages to the remedies phase of the Arbitration. On 28 September 2016, following the issuance of the Partial Award, BRC disclosed to the PSE the following information:

> [Bloomberry] were advised by Philippine counsel that an award of the Arbitral Tribunal can only be enforced in the Philippines through an order of a Philippine court of proper jurisdiction after appropriate proceedings taking into account applicable Philippine law and public policy.

25     On 10 October 2016, GGAM's counsel in the Arbitration asked Bloomberry's counsel for their response to Deutsche Bank's question "[d]oes Bloomberry have any objection to Deutsche Bank unfreezing the BRC shares held by GGAM and releasing the dividends paid by BRC on those shares?". Bloomberry's counsel replied on 11 October 2016:

> … We are disappointed to have learned, after reading a footnote in your October 6 submission to the Tribunal, that [GGAM] have been engaged for weeks in proceedings in Singapore without having provided notice to us. We do not have authority from Bloomberry Resorts and Hotels Inc. and Sureste Properties Inc. to accept service in connection with the case [GGAM] have filed in Singapore.

> As we have repeatedly conveyed, including during the hearing in Singapore, we have been advised that there is no objection to the release of the dividend that Bloomberry Resorts Corporation paid to [GGAM's] stockbroker, Deutsche Bank, on May 5, 2015. It is disappointing that over the past 18 months, instead of simply resolving this matter, as to which there is not actual disagreement, [GGAM] have chosen instead to raise repeatedly this manufactured issue before the Tribunal. We do not see it as productive for you to now try to link the unobjectionable release of the dividend to the 'unfreezing' of the Shares, as you do in your letter of October 10. As you know, for example, [Bloomberry] are not parties to the Equity Option Agreement. Moreover, Mr. Razon has repeatedly indicated, including at the very outset and again before the October 2015 hearing in Singapore, that there would be no objection regarding the Shares if your clients were not demanding excessive and unwarranted 'compensation' in addition to the Shares.

> ...

26     In February 2017, Bloomberry renewed the bonds ordered in February 2014 by the RTC in connection with the RTC Order. GGAM's custodian of the Shares, Deutsche Bank, relied on this renewal of bonds to assert that the RTC Order and the writs of preliminary injunction and attachment remained in place. On 17 March 2017, GGAM's counsel wrote to Bloomberry's counsel:

> On behalf of GGAM, we write to request that [Bloomberry] take action to assure that GGAM can sell its shareholdings in Bloomberry Resort Corporation ('BRC').

> Deutsche Bank has informed GGAM that, without Respondents' permission for it to 'unfreeze' GGAM's shares, it will not release those shares to GGAM. Accordingly, we request that [Bloomberry] immediately assure implementation of the Arbitral Tribunal's December 9, 2014 Interim Measures Order and the September 20, 2016 Partial Award on Liability (the 'Liability Award') by (i) withdrawing [Bloomberry's] January 17, 2014 petition filed with the Regional Trial Court of Makati City, Philippines seeking a writ of preliminary attachment, a writ of preliminary injunction and a temporary restraining order and (ii) confirming in writing to Deutsche Bank, the Philippine Stock Exchange and the Philippine Depository & Trust Corp. that Respondents have no objection to GGAM's sale of its BRC shares.

There is also evident confusion in the marketplace regarding GGAM's right to sell its BRC shares resulting from BRC's September 28 and November 14, 2016 disclosures to the Philippine Stock Exchange. Accordingly, we also request that [Bloomberry] issue the following joint press release with GGAM to resolve any marketplace confusion concerning GGAM's right to sell its BRC shares:

> On February 25, 2014 - before the Arbitral Tribunal hearing the dispute between Bloomberry Resorts and Hotels Inc. ('BRHI') and Sureste Properties Inc. ('SPI') and Global Gaming Philippines, LLC ('GGAM') in Singapore was duly constituted - the Regional Trial Court of Makati City, Philippines ordered the issuance of a preliminary attachment and injunction restraining GGAM from selling its shares of Bloomberry Resorts Corporation (BRC). By its terms, the Regional Trial Court's order provided that the preliminary attachment and injunction 'issued without prejudice to subsequent grant, modification, amendment, revision or revocation by the arbitral tribunal in Singapore, once the same [was] duly constituted.'

> On December 9, 2014, the Arbitral Tribunal revoked the Regional Trial Court's February 25, 2014 order. The Arbitral Tribunal's December 9 order declared GGAM 'free to deal with the Shares, and this includes, out of an abundance of caution the right to sell or dispose of the Shares at their discretion.' The Arbitral Tribunal also expressly stated that its December 9 order 'is deemed to have superseded' the Regional Trial Court's order, and the preliminary attachment and injunction 'shall now be deemed to be vacated and lifted.' The Arbitral Tribunal further stated that its order 'is in all respects substituted for and replaces' the Regional Trial Court's order.

> On September 20, 2016, the Arbitral Tribunal issued its Partial Award on Liability, in which it decided, among other things, that 'there is no basis for [BRHI and SPI] to challenge GGAM's title to the Shares in BRC … and thus GGAM can exercise its rights in relation to the Shares, including the right to sell them.'

> By the parties' agreement, the Arbitral Tribunal's decision 'is final and binding on the Parties, without right of appeal,' and is 'enforceable in all jurisdictions.'

> As a result of the Arbitral Tribunal's decision, GGAM is free to sell its shares in BRC.

> Respondents' failure to take these straightforward actions will
> constitute further interference with GGAM's share rights and
> impede GGAM's efforts to mitigate its damages resulting from
> Respondents' conduct.

27     Bloomberry's counsel replied on 27 March 2017 with the following
letter:

> I write with respect to your letter of March 17, 2017, which
> regrettably is an attempt to make a distorted record for the
> Tribunal, as opposed to a serious attempt to address any actual
> issue. Bloomberry did not object when [GGAM] disclosed the
> Partial Award on Liability (the 'Partial Award') months ago to
> the Regional Trial Court, Makati City, Branch 66 (the 'RTC
> Makati'), the Philippine Stock Exchange, and Deutsche Regis
> Partners Inc. Bloomberry also assumes that pursuant to
> Procedural Order No. 16, [GGAM] have since disclosed the
> Partial Award to Deutsche Bank A.G.
>
> Respondents'     parent     company,     Bloomberry     Resorts
> Corporation ('BRC'), made careful and accurate disclosures,
> consistent with Philippine Law and Procedural Order No. 3, of
> the Tribunal's Interim Measures Order and the Partial Award.
> BRC's disclosures have previously been raised more than once
> with the Tribunal, and the disclosures are in no way inaccurate
> or misleading. In this context, and in light of [GGAM's] own
> disclosures of the Partial Award described above to which our
> clients did not object, it is regrettable that you included in the
> letter a self-serving and wholly-unsupported statement about
> 'evident confusion in the marketplace.'
>
> I do not think it would serve a useful purpose to address in any
> detailed way in this letter the 'joint press release' you propose,
> which, among other things, fails to take into account the Equity
> Option Agreement (to which [Bloomberry] are not a party) and
> rights as a matter of municipal law, including Philippine law,
> with respect to enforcement, issues that your side cannot
> simply ignore. Of course, outside of the context of settlement, it
> is not to be expected at an intermediate stage of legal
> proceedings that adversaries will make joint communications
> to the press. In this particular dispute, at every stage,
> Bloomberry's position has been that if your side were not
> demanding unreasonable 'compensation' in addition to the

Shares, objections to the sale of the Shares could be put aside
as part of a compromise to resolve the Parties' dispute.

28      On 3 April 2017, the share price for BRC shares on the PSE reached a

19.5-month high. That day, GGAM renewed its request that Bloomberry allow

GGAM to sell the Shares.

We renew our request in our March 17 letter that Respondents
take action to assure that GGAM can sell its BRC shares by (i)
withdrawing Respondents' January 17, 2014 petition filed with
the Regional Trial Court of Makati City, Philippines seeking a
writ of preliminary attachment, a writ of preliminary injunction
and a temporary restraining order and (ii) confirming in writing
to Deutsche Bank, the Philippine Stock Exchange and the
Philippine Depository & Trust Corp. that Respondents have no
objection to GGAM's sale of its BRC shares.

Allowing GGAM to sell its BRC shares now will permit GGAM to
mitigate its damages at a 19 ½ -month high in the value of those
shares. Respondents' failure to do so will constitute further
interference with GGAM's share rights and again impede
GGAM's efforts to mitigate its damages. GGAM will hold
Respondents responsible for that result.

29      By a letter dated 10 April 2017, Bloomberry responded as follows:

I am writing in response to your letter of April 3, 2017. It seems
to be in substance the same as your letter of March 17, 2017,
to which we provided Respondents' positions in our letter of
March 27, 2017. I am happy to discuss further by phone, if that
would be helpful to you and [GGAM].

30      Throughout this period, Deutsche Bank (Bloomberry's custodian)

declined to release the Shares because it did not receive written consent from

Bloomberry.

**Issues to be determined**

31      The issues to be determined are as follows:

(a)　　whether the Constructive Remedy should be set aside under Art 34(2)(*a*)(iii) of the Model Law or, in the alternative, refused enforcement under Art 36(1)(*a*)(iii) of the Model Law because it relates to matters falling outside the scope of the submission to arbitration;

(b)　　whether the Final Award should be set aside under s 24(*b*) of the IAA, Arts 34(2)(*a*)(ii) and 34(2)(*a*)(iv) or, in the alternative, refused enforcement under Arts 36(1)(*a*)(ii) and 36(1)(*a*)(iv) of the Model Law because of GGAM's purported concealment of documents (see [8(b)] above) and the Tribunal's alleged refusal to consider material evidence (*ie,* the FCPA Findings) and the issue of procedural fraud; and

(c)　　whether the grant of damages to GGAM Netherlands should be set aside under Art 34(2)(*b*)(ii) of the Model Law or, in the alternative, refused enforcement under Art 36(1)(*b*)(ii) of the Model Law because it is a tax evasion scheme contrary to public policy.

32　　As mentioned, Bloomberry's complaint of breach of natural justice relates to the FCPA Findings and the purported concealment of documents. These matters were raised in arguments in OS 1432 as evidence of conduct that compromised the arbitral process and outcome of the Partial Award. Bloomberry continues to raise these issues in written arguments tendered in these proceedings "for assessing liability for a purported wrongful termination, but also for determining damages arising from such termination". In so far as the facts and written arguments coincide with those in OS 1432, reference is made to the reasons and rulings by which the 2020 Judgment decided OS 1432. The 2020 Judgment is pending appeal and it is improper to traverse the same matters. As such, this judgment will focus on the further grounds to set aside the Final Award or refuse enforcement of the same. On this aspect, Mr Bull

disagrees that the further grounds are substantially a different challenge and instead views OS 1385 as an unmeritorious attempt to delay enforcement of the Final Award. I should add here that Bloomberry accepts, and rightly so, that its reasons for the application to set aside the Final Award correspond to the reasons for the application to resist enforcement of the Final Award. Where Bloomberry relies on and applies the same reasons to both applications, an unsuccessful application to set aside the award would also lead to an unsuccessful challenge to enforcement.

**Issue 1: whether the Constructive Remedy should be set aside or, in the alternative, refused enforcement because it relates to matters falling outside the scope of the submission to arbitration**

33      It is appropriate to begin with GGAM's claim for damages against Bloomberry for wrongful interference with the Shares. Specifically, the issue that GGAM put to the Tribunal at the liability hearing was that Bloomberry, having obtained the RTC Order to prevent the sale of the Shares and having hindered the sale of the Shares after the IM Order, are liable in damages in an amount to be determined in a later hearing. The Tribunal decided to deal with the claim for wrongful interference at the remedies phase of the Arbitration. During the remedies phase, the Tribunal was told that Bloomberry's acts in blocking GGAM's sale of the Shares on various occasions continued even after the issuance of the Partial Award. Bloomberry's refusal to abide by the IM Order and the Partial Award (the cumulative effect of both decisions being that GGAM is the rightful owner of the Shares and that GGAM can exercise its rights, including the right to sell, in relation to the Shares) effectively denied GGAM's access to the Shares including the sale thereof. The Tribunal was therefore asked to award damages to GGAM for Bloomberry's obstruction of the sale of the Shares.

34     The Tribunal's ruling on Bloomberry's non-compliance with the IM Order and the Partial Award (at [449] of the Final Award) rested on analysis that non-compliance in all respects ran contrary to Bloomberry's legal obligations under the MSA and the UNCITRAL Rules to adhere to the Tribunal's IM Order and Partial Award. Put simply, Bloomberry's acts of non-compliance with the IM Order and Partial Award gave rise to liability under Articles 20 and 2176 of the Civil Code of the Philippines to pay compensation for damage caused to GGAM Philippines as the rightful owner of the Shares. Given the Tribunal's analysis and approach on the issue of the wrongful interference claim, there was no need for the Tribunal to decide on whether the RTC Order was improvident in order to award damages for the wrongful interference with the property rights of GGAM (at [449] of the Final Award). As an aside, the Tribunal did not find that the RTC acted improvidently at the time that it issued the RTC Order (at [437] of the Final Award).

35     In arriving at the rulings outlined above, the Tribunal dealt with the following question (at [437] of Final Award) and made several findings of fact:

> … The question for the Tribunal is whether [Bloomberry's] continuing non-compliance with this Tribunal's IM Order and the [Partial Award], the resulting interference with the right of GGAM to dispose of the Shares, and [Bloomberry's] stated intent to continue to interfere, constitute grounds for a finding of liability by this Tribunal.

36     On the evidence, the Tribunal found that Bloomberry had wilfully or at least negligently caused damage to GGAM by interfering with and blocking the exercise of ownership rights in the Shares especially the right to sell the Shares (at [450] of Final Award). From January 2014 to March 2017, GGAM had tried to sell or initiate the process of selling the Shares, only to be prevented by Bloomberry in each instance ([446] of the Final Award). A flavour of

Bloomberry's obstructive stance can be gleaned from the correspondence set out in [25]–[29] above. Following the Tribunal's finding that Bloomberry was liable under Articles 20 and 2176 of the Civil Code of the Philippines from the time of the IM Order, the Tribunal, in determining the value of the Shares for the purpose of computing damages, chose to take reference from the date of the IM Order. The Tribunal explained that 9 December 2014 was the first date on which the Tribunal confirmed GGAM's right to sell the Shares (at [453] of the Final Award). Further, the Tribunal accepted that a block sale discount to the price of the Shares on 9 December 2014 should apply and adopted Bloomberry's expert's calculation of 10.8%, which was close to the figure originally agreed by GGAM in January 2014 and not specifically disputed by GGAM (at [463] of the Final Award). To determine the share price, the Tribunal adopted the calculations (dated 10 July 2018) of Bloomberry's expert as the basis for ascertaining the value of the Shares as of 9 December 2014. And, applying the block sale discount of 10.8% to the closing price on 9 December 2014 (PHP 12.38 per share), the Tribunal arrived at a discounted price of PHP 11.04 per share. Thus, the total value of the Shares as of 9 December 2014 amounted to PHP 10,169,871,978.24 (at [466] of the Final Award). In other words, the damages awarded for the obstruction of the sale of the Shares totalled PHP 10,169,871,978.24.

37     Having awarded GGAM damages, the Tribunal then granted the Constructive Remedy to put into effect its award of damages. In exchange for GGAM's transfer of the Shares to Bloomberry, the Tribunal made such orders as were reasonably necessary to give effect to this decision. I pause here to mention that the Constructive Remedy was a relief intended to serve two purposes:

(a)     first, the payment of damages (being equivalent to the full value of the Shares as of 9 December 2014) in exchange for the Shares shifted the risk of price fluctuations in the Shares onto Bloomberry, whose stated intention was to continue to obstruct GGAM's access to the Shares (at [447] of the Final Award); and

(b)     second, the remedy avoided the prospect of double recovery on the part of GGAM ( at [469] and [470] of the Final Award).

38     With the background narrative and the findings of the Tribunal in mind, it is common ground that a *de novo* review is available only if the challenges raised by Bloomberry are jurisdictional. Mr Yeo first attacks the Constructive Remedy for being a relief granted in excess of the Tribunal's jurisdiction in two respects:

(a)     the wrongful interference claim is a dispute that has nothing to do with the MSA, meaning that PMHI, a party with interests in the Shares, a non-party to the MSA, was not heard in the Arbitration in connection with GGAM's claim; and

(b)     the Tribunal does not have power to make orders to redress non-compliance with the IM Order and the Partial Award and, by the grant of the Constructive Remedy, the Tribunal has enforced its own orders, thereby depriving PMHI/Bloomberry of its passive remedy to challenge enforcement of an award.

Mr Yeo's second prong of attack is the punitive nature of the Constructive Remedy. I will start with the first prong of attack.

39        Before I proceed, I note that the parties ostensibly accepted that the MSA arbitration agreement is governed by Philippine law. While the MSA does not stipulate the governing law of the arbitration agreement, cl 19.3 states that the substantive law governing the agreement is Philippine law. Both parties also adduced expert evidence expounding on Philippine law and proceeded on the basis that Philippine law governed the arbitration agreement.

### *Whether the wrongful interference claim falls outside the scope of the MSA*

40        In the present proceedings, the complaint that the wrongful interference claim has nothing to do with the MSA takes its colour from the same arguments raised before the Tribunal. It is clear from the Final Award (at [422]–[435]) that the Tribunal rejected the contention that it lacked jurisdiction to deal with the claim and to award GGAM damages arising from Bloomberry's interference on the basis that PMHI was not a party to the MSA. In relation to the assertion that PMHI was not heard in disregard of its rights and interests in the Shares, the Tribunal highlighted that Bloomberry had affirmed to the Tribunal that PMHI was its agent in the context of its Counterclaim for damages. Ultimately, the Tribunal rejected Bloomberry's Counterclaim. In considering its authority to grant the Constructive Remedy, the Tribunal observed that Bloomberry did not dispute the Tribunal's jurisdiction to grant the Constructive Remedy and make such a relief in the light of s 12(5) of the IAA. As the Tribunal noted, Bloomberry's specific objections at the remedies phase were as follows (at [468] of the Final Award):

> Rather, [Bloomberry argues] that '[t]*his constructive remedy conveniently would allow GGAM to avoid the difficulties of trying to enforce an award that was rendered against the rights and interests of a party that is not present in these proceedings, Prime Metroline. [GGAM's] constructive remedy is barred not only due to Prime Metroline's rights as party to the EOA but also by both*

> *Parties' contractual disavowal of punitive damages and the*
> *equitable doctrine of laches.'*
>
> [emphasis in original]

Save for the doctrine of laches, which was dropped, the other objections were repeated in the proceedings before me.

41     Focusing on the Constructive Remedy, Mr Yeo argues that the Shares covered in the Constructive Remedy were issued pursuant to a different contract which contains its own arbitration agreement (*ie*, the EOA which was signed by PMHI and BRC) and PMHI (a non-party to the MSA and a non-party in the Arbitration) was not heard in the Arbitration in connection with GGAM's claim concerning the Shares. Mr Yeo relies on *Tomolugen Holdings and another v Silica Investors Ltd and other appeals* [2016] 1 SLR 373 ("*Tomolugen*") at [97] for the proposition that there are "boundaries to an arbitral tribunal's power to grant relief even if the parties agree to it; these include public policy considerations and situations which engage the rights of third parties who are not bound by the arbitration agreement in question". Here, Mr Yeo argues that the ill-effect of the Constructive Remedy is that it binds a non-party to the Arbitration (*ie*, PMHI) or affects this non-party's interests in the Shares. The Constructive Remedy was therefore granted in excess of the Tribunals' power.

42     Bloomberry's assertion, properly analysed, is that the Tribunal should not have ordered the Constructive Remedy. I make three points. First, the Constructive Remedy reflected the orders sought by GGAM in the Arbitration and Bloomberry was fully aware of the relief that GGAM was seeking. Bloomberry opposed them on the same grounds which are now put forward. Second, as mentioned in [40] above, it was never suggested to the Tribunal that it lacked the power or that it would exceed its authority to do what it was being

asked to do. As underscored at [448] of the Final Award, Bloomberry only objected to the characterisation of the relief but not the Tribunal's power to deal with GGAM's proposed "Constructive Remedy". Bloomberry never suggested that the Tribunal would be acting beyond its powers in making the orders or granting the relief sought. Having failed to persuade the Tribunal on the remedies ordered, Bloomberry cannot turn around to challenge the Tribunal's power. Third, Bloomberry resisted the granting of the Constructive Remedy based on the facts as it contended them to be.

43     With these three points in mind, the question is whether Bloomberry's assertion that the Tribunal should not have ordered the Constructive Remedy has satisfied the 1egal principles underlying the application under Art 34(2)(*a*)(iii) of the Model Law and articulated in *CRW Joint Operation v PT Perusahaan Gas Negara (Persero) TBK* [2011] 4 SLR 305 ("*Persero*") at [31]– [33]. After making findings of fact and arriving at conclusions on liability and quantum in respect of the claim for obstruction to the sale of the Shares – and for the two reasons set out in [37] above – the Tribunal regarded the Constructive Remedy as the appropriate order to make. In the context of its application to set aside the Final Award on the ground of the Tribunal "exceeding its powers or authority", even taking Bloomberry's case at its highest (*ie*, that the Constructive Remedy affects the rights of non-parties and is hence beyond the Tribunal's remit), the reality is that its contention has to do with the erroneous exercise by the Tribunal of an available power (*ie,* constituting a mere error of law or even fact) as opposed to the Tribunal's exercise of a power that it did not possess. In the circumstances, there is no excess of power to ground an application under Art 34(2)(*a*)(iii): see *Persero* at [33].

44     Contrary to Bloomberry's case, on the plain reading of the relief ordered, the Constructive Remedy does not bind or impose an obligation on a non-party (*ie*, PMHI) to the Arbitration. Neither does it affect the rights or interests of PMHI. Rather, it awards GGAM damages for which Bloomberry is liable. The Tribunal itself explained the context and rationale of the Constructive Remedy at [448]–[449] of the Final Award that "[Bloomberry] have acted contrary to [its] legal obligations under the MSA and the UNCITRAL Rules to be bound by the Tribunal's IM Order and Liability Award, and this act has caused damage to GGAM Philippines, the rightful owner of the Shares." Consequently, Bloomberry is required to take all steps necessary to enable GGAM to sell the Shares. That PMHI may have to undertake certain actions is incidental. Seen in this light, the Constructive Remedy directs *Bloomberry* to pay GGAM the value of the Shares as of 9 December 2014 (after applying a block sale discount) in exchange for GGAM's transfer of the Shares to Bloomberry.

45     Separately, Bloomberry's reliance on *Tomolugen* ([41] *supra*) is misguided because that case is distinguishable. The appellate court in that case noted that an arbitral tribunal "would not have available to it the full arsenal of remedies which the court was vested with under s 216(2) of the Companies Act": see *Tomolugen* at [96]. There, the court was concerned with a minority oppression scenario and remarked that an arbitral tribunal would not have the power to make awards *in rem* that bound third parties. That is quite different from the case before this court.

46     In considering the arguments that PMHI was not heard and that the Tribunal lacked jurisdiction in respect of non-parties to the MSA and the Arbitration, the Tribunal itself considered in detail the parties' positions at the various stages of the Arbitration, namely the interim measures phase, the

liability phase and the remedies phase. During the first two phases, the substantive jurisdiction of the Tribunal to deal with the subject matters in the Arbitration were not in issue. At the remedies phase, GGAM argued that Bloomberry had no basis to challenge the Tribunal's jurisdiction to determine the claim for damages for wrongful interference with GGAM's Shares because Bloomberry had, in the Counterclaim, put damages related to the Shares well within the scope of the parties' submission to arbitration. GGAM asked the Tribunal to reject Bloomberry's argument that the Tribunal lacked jurisdiction to award GGAM damages arising from GGAM's sale of the Shares on the basis that PMHI was not a party to the Arbitration. GGAM pointed out that Bloomberry had acknowledged PMHI as its agent and that PMHI had acted on Bloomberry's behalf.

47     It is not controversial that the scope of the Tribunal's jurisdiction is governed by the precise wording of the arbitration agreement. As Mr Bull argues, the claim for wrongful interference falls within the language of the arbitration agreement in cl 19.1 of the MSA, which states that "any dispute that cannot be settled by mutual agreement within 30 days and such dispute relates to the interpretation, carrying out of obligations, breach, termination or enforcement of this agreement, or in any way arises out of or is related to this agreement … shall be settled exclusively in accordance with Clause 19.2". Clause 19.2 of the MSA states that "any dispute required to be settled in accordance with this Clause 19.2 shall be settled by arbitration in Singapore under [the UNCITRAL Rules]…". Mr Bull cites *Tjong Very Sumito and others v Antig Investments Pte Ltd* [2009] 4 SLR(R) 732 for the proposition that the court will interpret the word "dispute" broadly and "will readily find that a *dispute exists unless the defendant has unequivocally admitted* that the claim is due" [emphasis in original] (at [69(c)]). I doubt Bloomberry can seriously deny

the broad terms of the dispute resolution provision since it adopted the very same argument in urging the Tribunal to take into consideration the interconnection between the MSA and the EOA, especially with regard to the Option (see [14] above).

48      The existence of a separate EOA does not change the fact that the parties were engaged in the Arbitration by virtue of cl 19.1 of the MSA. Given that Bloomberry contended in the Arbitration that it blocked the sale of the Shares because the MSA had been validly terminated (and it therefore sought an award in the Counterclaim for mutual restitution by ordering GGAM to transfer the Shares to Bloomberry on behalf of its agent PMHI in exchange for approximately US$37m), it cannot now deny that the obstruction of the sale of the Shares was a dispute relating to and arising out of the MSA within the meaning of cl 19.1 of the MSA. Therefore, in my view, the dispute fell within the scope of the submission to arbitration.

49      In the Partial Award, the Tribunal decided that Bloomberry had no basis to challenge GGAM's title to the shares in BRC and thus GGAM could exercise its rights in relation to the Shares, including the right to sell them. Moreover, the Tribunal was fully alive to the issues to be decided at the remedies phase in respect of GGAM's wrongful interference claim, namely: (a) whether Bloomberry blocked the sale to the Shares after the IM Order and the issuance of the Partial Award; and (b) in the event that liability was established, the appropriate remedies to be ordered. The Final Award relates to the Tribunal's findings on issues (a) and (b). As Mr Bull correctly points out, the wrongful interference claim in the Final Award is not a dispute over the rights to the Shares. To be clear, the issue of wrongful interference arose after the rights to the Shares had been established, and the claim and award of damages for

obstructing GGAM extended the dispute in respect of the Shares to the remedies phase.

50       Besides expressly submitting the matter to arbitration pursuant to cl 19.1 of the MSA (which demarcated the Tribunal's jurisdiction), Mr Bull also argued that the parties actively submitted the Shares dispute to the Tribunal through their pleadings and submissions. He pointed out that Bloomberry was content for the Shares dispute to remain in the Tribunal's hands until it lost. For example, Bloomberry's Response to the Notice of Arbitration, its Amended Counterclaim, its pleadings, and its RTC application to preserve the *status quo* of the Shares all indicate that Bloomberry submitted every facet of its arguments to the Tribunal.

51       Mr Bull's alternative argument is that Bloomberry had waived its objection to jurisdiction. Art 16(2) of the Model Law provides that a plea that the arbitral tribunal has exceeded its scope of its authority must be raised promptly during the arbitral proceedings. Having accepted Mr Bull's main argument on the construction of cl 19.1 of the MSA, it is unnecessary for me to reach a conclusion on the argument that Bloomberry must be taken to have waived its jurisdictional objection having not objected promptly as required by Art 16(2) of the Model Law. I note, however, that it was only much later, on 31 August 2017 – more than one year after the Tribunal had issued the Partial Award rejecting Bloomberry's arguments on the rights to the Shares – that Bloomberry began objecting to the Tribunal's jurisdiction. The Tribunal also noted this change of position at [434] of the Final Award.

52       Related to the point on submission to arbitration is the additional fact that Bloomberry had actually applied to the RTC informing that the issue

concerning the Shares would be decided by the Tribunal. When Bloomberry made its application to the RTC under Rule 5 of the Special ADR Rules (which recognises that the Tribunal would have the final say on whether the injunction is revoked or amended), Mr Bull argues that Bloomberry was submitting to the Tribunal the issue of damages that arose from halting the sale of the Shares. In doing so, Bloomberry had positively submitted to the Tribunal's jurisdiction. In the present proceedings, Bloomberry's arguments on PMHI's right to be heard take on a different flavour, which I address in the next section.

### Whether the Tribunal's purported exercise of its power to make orders to redress non-compliance with the IM Order enables the Tribunal to enforce its own orders and thereby deprive Bloomberry of its passive remedy to challenge enforcement of an award

53     Bloomberry asserts that GGAM blamed its "inability" to enforce the IM Order and the Partial Award on Bloomberry's obstructive behaviour and proposed that the Tribunal grant the "Constructive Remedy" as a means of redress. Mr Yeo contends that the Constructive Remedy, as a redress, bypasses the need to implement the IM Order as it is not self-executing (contrary to Mr Bull's suggestion that the RTC Order automatically fell away upon the Tribunal's issuance of the IM Order), thereby depriving PMHI/Bloomberry of the right to be heard before the RTC as regards the sale of the Shares. Under the Special ADR Rules, PMHI and Bloomberry had a right to be heard upon GGAM's application to implement the IM Order (defined as an "award" under section 3(f) of the ADR Act) before the RTC. Mr Yeo takes the view that the Constructive Remedy wrongly allows the Tribunal to intrude into the arena of enforcement and enable GGAM to circumvent difficulties associated with enforcing the IM Order in the Philippines. To allow the Constructive Remedy would violate Bloomberry's right to resist enforcement before the RTC, which

is a passive remedy and an inalienable right inherent in the IAA, the 1958 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, and international arbitration practice: see generally *PT First Media TBK (formerly known as PT Broadband Multimedia TBK) v Astro Nusantara International BV and others and another appeal* [2014] 1 SLR 372.

54      I am not persuaded that the Constructive Remedy has the effect argued for by Mr Yeo. Neither the terms and effect of the Constructive Remedy nor the basis for the Tribunal's grant of the Constructive Remedy support these contentions, for the reasons (both cumulatively and alternatively) below.

55      First, the terms of the Constructive Remedy are clear. As a matter of interpretation, the Tribunal's order in respect of the Constructive Remedy is "bifurcated". On the first part of the remedy, Bloomberry is required to "pay to GGAM Philippines, within thirty days from the date of the Final Award, PHP 10,169,871,978.24 representing the full value of the Shares". The second part of the remedy arises in consequence of Bloomberry's decision not to comply with the first part of the remedy, and states that "[i]f the Defendants do not pay GGAM Philippines for the Shares within thirty days from the date of the Final Award, GGAM Philippines may sell its Shares on the market". To be precise, Bloomberry's complaint that the Tribunal attempted to enforce its own orders targets the second part of the Constructive Remedy. Yet Bloomberry retains the opportunity to resist enforcement of first part of the remedy. No evidence was placed before me that GGAM had sold the Shares or that GGAM had invoked the second part of the Constructive Remedy. The Constructive Remedy has not yet taken effect, and it remains open for Bloomberry to challenge the first part of the Constructive Remedy. As such, there has been no true denial of a passive remedy. Indeed, in the present proceedings, Bloomberry is exercising both its

active and passive remedies in Singapore before the curial and enforcement court.

56     Second, the purpose of the Constructive Remedy has little to do with aiding the Tribunal to enforce its own orders. The Tribunal regarded the Constructive Remedy as the appropriate order to be made for the two reasons set out at [37] above. Bloomberry's contention – that GGAM mistakenly blames Bloomberry for its inability to enforce the IM Order (*ie*, the non-compliance of the IM Order argument) and thereby seeks to "bypass" the enforcement of the RTC Order – coheres with the notion of causation rather than jurisdiction (*ie,* in terms of excess of power or authority). As Mr Bull puts it, Mr Yeo's convoluted arguments appear little more than a challenge on a point of causation dressed up in a jurisdictional challenge. Bloomberry argued that GGAM should have returned to the RTC and that GGAM's failure to do so was the real cause for the change in share price; GGAM was hence responsible for its own losses. However, a challenge on causation cannot form the grounds to set aside under Art 34(2)(*a*)(iii).

57     Third, Mr Yeo's conception of the Constructive Remedy's effect is farfetched. The Tribunal's ruling on the wrongful interference claim was not in any way contingent on the RTC Order (see [34] above). In arriving at this ruling, the Tribunal disagreed with Bloomberry that GGAM had to first establish that the RTC Order was improvidently granted as a pre-requisite to its damages claim for wrongful interference with the Shares. By extension, the debate on whether the IM Order was self-executing (*ie*, automatically superseded the RTC Order) also takes a back seat. In any event, the Tribunal was entitled to treat the IM Order as binding on the parties in the Arbitration. The IM Order made by the Tribunal in a Singapore-seated arbitration was self-executing in Singapore

in the sense that it could not be challenged under s 24 of the IAA or Art 34 of Model Law as these provisions extend only to an "award": see *PT Pukuafu Indah & Ors v Newmont Indonesia Ltd & Anor* [2012] 4 SLR 1157 at [10] and David Joseph QC and David Foxton QC, *Singapore International Arbitration: Law & Practice* (LexisNexis, 2nd Ed, 2018) ("*Singapore International Arbitration*") at p 231. On the other hand, the IM Order operated as an interim measure of protection and, if required, was capable of being enforced with leave of court as if it were an order of the court. In this regard, "judgment may be entered in terms of the order or direction … and the consequence of enforcement is contempt of court rather than a substantive decision against the defaulter": see *Singapore International Arbitration* at p 313.

## *Whether the Constructive Remedy is punitive and transgresses cl 19.2(c) of the MSA*

58      Clause 19.2(c) of the MSA states that "the award may not include, and the parties specifically waive any right to an award of multiple, exemplary or *punitive damages*" [emphasis added]. It is worth pointing out at the outset that Bloomberry's complaint before the Tribunal that GGAM's damages sought at the remedies phase were "punitive" and outside the scope of the Tribunal's authority is quite different from what is being advanced in these proceedings. The significance of this difference lies in the losing party's attempt to re-package and re-characterise the merits of its case before this court. Not only is this attempt impermissible, it also cannot give rise to a right to set aside an award as the real issue lies with the Tribunal's findings of fact and law.

59      I begin with Bloomberry's contention before the Tribunal. Bloomberry objected to the damages claim for obstructing the sale of the Shares on the footing that GGAM was entitled only to actual damages that could be proved to

have arisen from the RTC Order. However, GGAM's claim for damages arising
from its inability to sell the Shares was exorbitant beyond what would be
claimable under Philippine law even if the RTC Order had been improvidently
granted. Specifically, GGAM calculated its damages based on the "Highest
Intermediate Value" theory ("HIVT" or "HIDT"), a quantification of damages
that was intended to deter future bad conduct. As such, Bloomberry argued that
GGAM's proposed Constructive Remedy based on the HIVT amounted to a
grant of punitive damages and, consequently, the Constructive Remedy fell
outside the scope of cl 19.

60      It is important to remember, however, that the Tribunal did not accept
the HIVT (or HIDV) as the basis to determine damages. The Tribunal held at
[471] of the Final Award:

> …Finally, as the Tribunal has rejected the HIDV, [Bloomberry's]
> objection that the Constructive Remedy (based on the HIDV) is
> a form of punitive damages falls away. There is nothing
> 'punitive' in valuing the Shares as of the date the GGAM clearly
> had the right to sell those Shares pursuant to the IM Order and
> on which date [Bloomberry] should have started to facilitate the
> implementation of the IM Order.

In these proceedings, Mr Yeo maintains that the Constructive Remedy is
punitive and contravenes cl 19.2(c). As stated, the challenge is directed at the
Tribunal's valuation of the Shares as of 9 December 2014.

61      At [470] of the Final Award, the Tribunal held that Bloomberry's
"recalcitrance justifies ordering that [Bloomberry] pay the full value of the
Shares". By crafting the Constructive Remedy, the Tribunal was "exercising its
power to fashion appropriate relief in the face of [Bloomberry's] transparent
recalcitrance to allow GGAM to sell its Shares … [and] shift the risk of
fluctuations in the price of the Shares to [Bloomberry]": see the Final Award at

[471]. In Mr Yeo's view, this was clearly ordered as a form of correction and was all the more egregious given that Bloomberry did not accept the factual premise that it obstructed the sale of the Shares mandated by the IM Order and the Partial Award. Mr Yeo noted that it would have been reasonable for the Tribunal to draw adverse inferences or to penalise Bloomberry by way of a cost order, but to transform the interim relief obtained under the IM Order into a breach giving rise to a Constructive Remedy was unwarranted and outside the scope of the agreement to arbitrate.

62     Another reason why the Corrective Remedy is "punitive" in nature and thereby transgressed cl 19.2(c) is, according to Mr Yeo, the Tribunal's arbitrary and speculative valuation of the Shares. Although GGAM had argued for the HIVT approach, the Tribunal departed from this approach and calculated the "full value" of the Shares nearly five years earlier at the date of the IM Order (9 December 2014). Even if it is accepted that the "full value" of the BRC Shares in December 2014 was connected to GGAM's actual loss, Mr Yeo's argument is that the specification of an arbitrary date for the valuation of BRC Shares was at odds with well-accepted principles relating to valuation of shares. By imposing a remedy that compelled Bloomberry to *either* enter into a contract of sale for a sum based on the assumption that the sale of the Shares had been conducted on an arbitrary date *or* to otherwise facilitate or refrain from impeding a sale of the Shares, Mr Yeo asserted that the Tribunal had effectively "punished" Bloomberry. In Mr Yeo's view, the Tribunal had no basis to award GGAM a disproportionate windfall by applying an unprincipled test to value the Shares.

63     I disagree with Mr Yeo's suggestion that the Constructive Remedy was "punitive". To begin, the language of the Final Award itself indicates that the

Tribunal fashioned the Constructive Remedy to compensate GGAM's losses. For example, the Constructive Remedy was "necessary so that GGAM is not forced to bear the risk of price fluctuations on its Shares and also to compensate GGAM fully for the value of its Shares" (at [470] of the Final Award). To the extent that the Tribunal utilised language critical of GGAM's conduct, however, this does not automatically thrust the Constructive Remedy into the realm of the "punitive". Specifically, the use of the word "recalcitrance" does not *ipso facto* entail that a remedy is "punitive", for it is within the Tribunal's remit to criticise a party for unscrupulous conduct. But more importantly, the Tribunal's own reasoning indicates that it was preoccupied with compensating GGAM damages equivalent to the full value of the Shares as of 9 December 2014 (at [469]–[471] and [474] of the Final Award):

> 469    While the Tribunal has declined to apply the HIDV/HIVT methodology to determine the share price, it decides that [Bloomberry] must pay the full value of the Shares as of December 9, 2014 as damages to [GGAM], in exchange for GGAM's transfer of the Shares to [Bloomberry], for the reasons it explains below. Primarily, such a remedy would shift the risk of price fluctuations in the Shares to [Bloomberry] while avoiding the prospect of double recovery by [GGAM].

> 470    While the Tribunal does not use the HIDV, it accepts that [Bloomberry's] recalcitrance justifies ordering that [Bloomberry] pay the full value of the Shares as of December 9, 2014 as damages to [GGAM], in exchange for GGAM's transfer of the Shares to [Bloomberry]. In particular, [Bloomberry's] statement that it would not allow GGAM to sell its Shares despite the IM Order and Liability Award signals to the Tribunal that the exercise of such relief … is necessary so that GGAM is not forced to bear the risk of price fluctuations on its Shares and also to *compensate GGAM fully for the value of its Shares.*

> 471    … Finally, as the Tribunal has rejected the HIDV, [Bloomberry's] objection that the Constructive Remedy (based on the HIDV) is a form of punitive damages falls away. There is nothing 'punitive' in valuing the Shares as of the date that GGAM clearly had the right to sell those Shares pursuant to the IM Order (and on which date [Bloomberry] should have started to facilitate the implementation of the IM Order).

...

> 474     ... This relief will become effective only if [Bloomberry]
> refuse to comply with the damages award for the Shares within
> thirty (30) days of the date of this Award, and will only have the
> effect of enabling [GGAM] to sell the Shares to remedy the
> damages they suffered.

64     In any event, the semantics of particular comments (*eg*, the word
"recalcitrance") made in the Final Award cannot displace the proper
interpretation of "punitive damages" under Philippine law, which I deal with in
turn. In this regard, Bloomberry's expert, the retired Philippine Justice Jose
Vitug, offered the view that punitive or exemplary damages under Philippine
law are imposed "by way of example or correction for the public good". He
noted that this remedy is generally available only if the party in breach acted in
a "wanton, fraudulent, reckless, oppressive, or malevolent manner". On the
other hand, GGAM's expert, the retired Philippine Supreme Court Chief Justice
Reynato Puno ("Justice Puno"), explained that a remedy is compensatory if it
arises as a "natural and probable consequence" of conduct that is the subject of
the contractual claim. Although the experts arrived at different conclusions in
support of the respective parties' positions, I find that their expositions of
Philippine law are not irreconcilable and merely represent two sides of the same
coin. I also note in passing that the approach under Philippine law on "punitive
damages" is not dissimilar from the approach in Singapore. As the Court of
Appeal in *PH Hydraulics & Engineering Pte Ltd v Airtrust (Hong Kong) Ltd*
[2017] 2 SLR 129 ("*PH Hydraulics*") at [62]–[63] observed, "compensatory
damages ... are assessed by reference to the plaintiff's pecuniary loss", while
"punitive damages ... are awarded against a wrongdoer as a form of
punishment".

65      In my judgment, the Tribunal's valuation of the Shares as of 9 December 2014 did not amount to or include "punitive damages". Any error on the choice of valuation date on the part of the Tribunal is not a matter within the exclusion in cl 19.2(c) of the MSA. I am also mindful that such matters are the Tribunal's findings of fact. Further, as GGAM observed, the Tribunal was careful not to double count the share value or to overcompensate GGAM. Indeed, the Tribunal was satisfied to apply a block sale discount of 10.8% in assessing the value of the Shares and declined to award pre-award interest on the value of the Shares. Even if I were to accept Bloomberry's argument that the Tribunal's choice of valuation date and percentage discount are wrong given that the injunction should have been lifted and that Bloomberry should not be prejudiced for the delay, that was at best an error of fact on the part of the Tribunal going to the merits of the decision. The court will not interfere where there is no basis for a *de novo* review.

66      Mr Yeo also appears to rely on the points made at [53] above to assert that the Constructive Remedy possessed a "punitive" nature when viewed as a whole. Not only does this argument fail in light of the reasons articulated at [55]–[57] above, but I also question whether Philippine law allows Mr Yeo to cast the "punitive" net so wide as to include punitive *orders*. The main thrust of Mr Yeo's submission was that the remedy had a "punitive" nature as distinct from "punitive damages". However, the word "punitive" under cl 19.2(c) of the MSA is not stated in the abstract. Instead, it has particularised and specified content as elaborated on by both parties' experts, and the expression is a term of art referring to "damages". Here, I agree with GGAM's expert, Justice Puno, that it is insufficient to allege that a clause is a punitive penalty in a general sense. As Justice Puno explained, the notion of a "punitive" remedy in Philippine law has been applied narrowly in the context of *quantum* of damages.

One has to demonstrate what specifically about the term is punitive. Accordingly, to read "punitive damages" in the way that Bloomberry does stretches the expression. Since Bloomberry's only remaining challenge against the Constructive Remedy was predicated on this notion of a "punitive" nature (and given my finding at [65] above that the share valuation was compensatory and not punitive), Bloomberry's contention must fail. This disposes of the entirety of Bloomberry's arguments on jurisdiction.

*Miscellaneous arguments*

67     In respect of the broader contention that the wrongful interference claim falls outside the MSA, Mr Yeo makes a series of arguments based on agency. Mr Yeo argues that by application of Philippine law, no agency relationship existed between PMHI and Bloomberry. Neither was there a specific agency relationship by which PMHI submitted to have its own rights and interests in the BRC Shares determined by the Tribunal. Even accepting that PMHI was a special/limited agent of Bloomberry in executing the EOA, Mr Yeo contends that this role expired after the execution of the EOA and the sale of the Shares. PMHI had its own rights and interests separate from Bloomberry's, and it sold a significant proportion of its own shares in BRC to GGAM for seven times less than the actual value of the Shares. Finally, even assuming for the sake of argument that PMHI was Bloomberry's general agent, Mr Yeo argues that it did not follow that PMHI was bound by the arbitration agreement: Gary Born, *International Commercial Arbitration* (Wolters Kluwer, 2nd ed, 2014) ("*International Commercial Arbitration*") at p 1422. Under Philippine law, PMHI would not be bound by the arbitration agreement on the basis of agency and under Singapore law, Mr Yeo observes, an agent cannot be bound by an

arbitration agreement signed by the principal: *Manuchar Steel Hong Kong Ltd v Star Pacific Line Pte Ltd* [2014] 4 SLR 832 at [76], [98]–[99], and [101].

68     Another strand of argument emerges from the foregoing discussion on agency. Mr Yeo stressed that GGAM took positions inconsistent with those in the liability proceedings. For example, GGAM ignored the fact that it had refuted arguments on agency as part of the Defence to the Counterclaim (*ie*, that Bloomberry had effected valid termination of the MSA). During the arbitration proceedings, GGAM took the position that PMHI was not a party to the Arbitration (with the Tribunal acknowledging that "it is beyond the Tribunal's remit to protect the rights of non-parties in this Arbitration"). On Mr Yeo's view, GGAM could not now rely on agency to establish jurisdiction for wrongful interference with shares when it had in the liability phase argued that PMHI was not Bloomberry's agent. Moreover, Bloomberry notes that GGAM had, in its reply in support of its request for interim measures, contended that the EOA ought to be distinguished from the MSA.

69     Nevertheless, I find these arguments to be an unnecessary distraction for several reasons. First, the Tribunal accepted that PMHI was Bloomberry's agent at [434]–[435] of the Final Award and this premise, even if erroneous, cannot be challenged here. Second, the Tribunal in the Partial Award held that the Shares belonged to GGAM. Third, it is not clear that GGAM had in fact performed a *volte-face* since GGAM does not need to argue that PMHI is a party to the MSA or its agent. In the Defence to the Counterclaim, GGAM had argued that there was no merit to Bloomberry's Counterclaim because the Tribunal could not enforce PMHI's rights, if any, since PMHI was not a party to the MSA. But now, the issue concerns the terms of the Constructive Remedy. As a matter of interpretation, the terms of the Constructive Remedy make clear that

the obligation is on Bloomberry to take all steps necessary to enable GGAM to sell the Shares. Where PMHI's assistance is required in order to discharge this obligation, it is for Bloomberry to secure it.

70     For all the reasons set out above, Bloomberry's claim that the Constructive Remedy falls outside the scope of submission to arbitration does not succeed.

**Issue 2: whether the Final Award should be set aside or, in the alternative, refused enforcement because of a breach of natural justice, Bloomberry's inability to present its case, and/or the arbitral procedure was not in accordance with the agreement of the parties**

71     Bloomberry argues that the Final Award should be set aside under s 24(*b*) of the IAA and Art 34(2)(*a*)(ii) of the Model Law on the basis of three breaches of natural justice:

> (a)     First, Bloomberry argues that the Tribunal's refusal to revisit liability notwithstanding Bloomberry's submission of extensive evidence in relation to the MSA terms (such as documentary evidence, testimonial evidence and expert reports) meant that it failed to apply its mind to the arguments put to it. Any analysis of the FCPA Findings was cursory (*eg*, "the FCPA Findings, while raising question, do not appear on their face to actually find any illegal conduct by those persons", at [274] of the Final Award), and the Tribunal's conclusion that there was no evidence that the Philippine Amusement and Gaming Corporation ("PAGCOR") would have made a "final order" that GGAM was unsuitable to manage Solaire contradicted the evidence on record.

(b)     Second, Bloomberry argues that the Tribunal refused to apply its mind to Bloomberry's demonstration that GGAM had committed procedural fraud in the Arbitration, despite recognising that such arguments were relevant to the determination of damages. In the Final Award, the Tribunal did not consider Bloomberry's arguments connecting the FCPA Findings to the conduct of GGAM executives at Solaire owing to the three-month time bar for set-aside applications under s 24 of the IAA, but the Tribunal's mandate was to simply apply the evidence to the determination of damages.

(c)     Third, relying on *Dongwoo Mann+Hummel Co Ltd v Mann+Hummel GmbH* [2008] 3 SLR(R) 871 at [76]–[77], Bloomberry argues that the concealment and non-disclosure of documents in respect of Mr Chiu's direct communications (being evidence of GGAM's allegedly corrupt conduct at Solaire) deprived Bloomberry of the opportunity to present its case, especially with respect to whether Bloomberry was entitled to terminate the MSA under cl 15.1(f) of the MSA.

72     In the alternative, Bloomberry challenges the enforcement of the Final Award on substantially the same grounds. The main complaint, as indicated in oral submissions, is referable to the FCPA Findings at [274] and the relief outlined in [507(a)] and [507(b)] of the Final Award:

(a)     The Respondents shall pay a total of **US$ 85.2 million** as damages for lost management fees to the Claimants, GGAM Philippines and/or GGAM Netherlands.

(b)     The Respondents shall pay to the Claimants **US$ 391, 224** as damages for pre-termination fees and expenses, which are comprised of:

> 1.    **US$ 148,750** on account of the February Invoice; and
>
> 2.    **US$ 242, 474** on account of travel expenses.
>
> [emphasis in original]

73     GGAM argues that the Tribunal considered all evidence material to the award on damages in the Final Award, including (at [274] of the Final Award) evidence on whether the FCPA Findings would have entitled Bloomberry to terminate the MSA within the initial 5-year term and whether GGAM's damages should be reduced to nil due to GGAM's breaches of the MSA (at [345] of the Final Award). In any event, GGAM contends that the evidence that Bloomberry adduced (*ie*, the FCPA Findings) was not material and that this would not have prejudiced Bloomberry or made a difference to the decision.

74     The principles governing the rules of natural justice are not in dispute. Recently, the Court of Appeal in *China Machine New Energy Corp v Jaguar Energy Guatemala LLC and another* [2020] 1 SLR 695 clarified the principles governing s 24(*b*) of the IAA and Art 34(2)(*a*)(ii) of the Model Law:

> (a)    the applicant must establish (i) which rule of natural justice was breached, (ii) how it was breached, (iii) in what way the breach was connected to the making of the award, and (iv) how the breach did or could prejudice its rights (at [86]);
>
> (b)    the threshold for finding a breach of natural justice is a high one, and it is only in exceptional cases that a court will find that threshold crossed (at [87]);

(c)    setting aside is permitted on this basis where the procedural protections in Art 18 of the Model Law have not been duly accorded to the award-debtor (at [89]); and

(d)    the *travaux préparatoires* of Art 18 of the Model Law reveal that the "full opportunity of presenting one's case" under Art 18 is not an untrammelled right (at [94]–[96]).

Although these principles were set out in a setting aside context, they apply equally to an application to resist enforcement of an award under Art 36(1)(*a*)(ii) of the Model Law.

75     For a fuller appreciation of Mr Yeo's arguments at [71(a)] and [71(b)] above, it is necessary to mention that on the same day that Bloomberry submitted its Sur-Rejoinder on Damages to the Tribunal on 31 August 2017, it also submitted, at this late stage of the Arbitration, the Request for Reconsideration of the Partial Award: see [486] of the Final Award. As can be seen at [170] of the Final Award, Bloomberry sought remedies in either the scenario where the Tribunal "reversed" the Partial Award to find that the MSA was rightly terminated or, in the event that it did not revisit the Partial Award, the scenario where the Tribunal maintained its ruling in this regard. The Tribunal denied Bloomberry's Request for Reconsideration of the Partial Award as it did not have the power to revisit and reopen the issue of liability under Singapore law: see [67] of the 2020 Judgment. Accordingly, the Tribunal turned to deal with the alternative relief sought at [170(b)] of the Final Award. Against this backdrop, Bloomberry's criticisms of the Tribunal's failings summarised at [71(a)] and [71(b)] above are baseless. For Mr Yeo to now latch on to remarks made in the Final Award restating the Tribunal's position on

liability in the Partial Award as indication that the Tribunal refused to apply its mind to the matter of damages is astonishing. The Tribunal was right to reject matters that would effectively cause the Tribunal to revisit and reconsider the issue of liability in the Partial Award.

76     Furthermore, the Tribunal did consider the FCPA Findings for the purpose of assessing damages. The FCPA Findings were issued after the liability hearing and the Partial Award. As stated at [273] of the Final Award, the Tribunal limited its consideration of the FCPA Findings to the assessment of damages. The Tribunal's reasoning from [273]–[283] of the Final Award is reproduced here (in the Final Award, GGAM is referred to as "Claimants" and Bloomberry, "Respondents"):

> 273.    The Tribunal turns to address the Respondents' concern in relation to the findings made by the DOJ and SEC (together the '**FCPA Findings**') (*see* paragraph 229 above). While the majority of the Respondents' submissions on this issue were made in the context of their request to the Tribunal to reconsider the Liability Award (which the Tribunal denied on the basis that it could not do so under Singapore law), the Tribunal will address this issue insofar as it is relevant to the question of damages (and, in this section, to the issue of reasonable certainty of damages). The Parties will recall that, while the Tribunal rejected the Respondents' Request for Reconsideration on the basis that it could not reconsider the Liability Award under Singapore law, it did not consider the merits of the Request. As to the relevance of these findings vis-à-vis the reasonable certainty of damages, the Respondents primarily pitch their arguments on two possibilities: (a) that the Respondents would have terminated the MSA in light of the FCPA Findings before the second five-year term could start; or (b) that GGAM would have resigned or agreed not to renew the MSA in order to 'save face' (*see* paragraph 229 above).

> 274.    At the outset, the Tribunal observes that the FCPA Findings were made in relation to a different entity (*i.e.*, LVS), and not in relation to GGAM. Moreover, they do not on their face name either Mr. Weidner or Mr. Chiu, although their identities seem to be conceded by Claimants. Further, the most that the FCPA Findings could mean is that the US DOJ and

SEC have come to certain conclusions about the actions of certain persons (who have not apparently been given the opportunity to personally answer the allegations against them by those authorities). Moreover, the FCPA Findings, while raising questions, do not appear on their face to actually find any illegal conduct by these persons, except possibly for LVS to have a sufficient internal monitoring and compliance system in place. Facially, the DOJ Non-Prosecution Agreement, which attaches the Findings, seems aimed at requiring that such a system be put in place for the future of LVS. In the context of the present arbitration, these findings clearly do not bind the Tribunal as to their correctness. What the Tribunal considers relevant is the possibility that these findings may have influenced PAGCOR (if and when it became aware of such findings) to institute its own investigations. This, however, is not in itself sufficient for the Tribunal to find that there is a probability that the situations envisaged at 273(a) and (b) above would have materialised. Even if the Tribunal accepts the Respondents' identification of Messrs Weidner and Chiu in the FCPA Findings at face value (over which there does not seem to be serious dispute), the Respondents have not shown how exactly the FCPA Findings would have entitled them to terminate the MSA prematurely (i.e., at the time the FCPA Findings came to light, or before the commencement of the second five-year term, or at any time after that). In the Tribunal's view, there is a missing link between the FCPA Findings and the Respondents' position that the MSA would have been terminated after (at most) the first five-year term of the MSA (or that GGAM would resigned or not renewed the MSA).

275.    In this regard, the Tribunal's view is that the Respondents have not presented a convincing case showing how exactly the SEC and DOJ findings would have led to an event or sequence of events that would have culminated in a contractually recognised even entitling the Respondents to terminate the MSA. The most relevant provisions of the MSA are clauses 15.1(f) and 15.1(g) of the MSA – neither of which, on their face, would be triggered by the mere fact that (even accepting the Respondents' case at its highest) Mr Weidner and Mr Chiu were necessarily 'tainted' by the FCPA Findings.

...

277.    At the Remedies Hearing, counsel for Bloomberry sought to argue that Bloomberry '*would have had the ability to rely on* [Clause 15.1(f)]' to terminate the MSA. Based on the evidence submitted, the Tribunal disagrees. On a plain reading, the engagement of Clause 15.1(f) clearly requires an affirmative

act or failure to act by GGAM which results in a final order by PAGCOR that GGAM is unsuitable to participate in the management of the Solaire. Even if the Tribunal took the FCPA Findings at face value, there is no mention of GGAM in those Findings, much less any act or failure to act by GGAM. Even if Mr Weidner and Mr Chiu's acts while they were working for LVS could somehow be attributed to GGAM, there is no evidence (besides the Sarmiento Declaration and Mr Sarmiento's testimony, in which Mr Sarmiento made important concessions (*see* paragraph 278 below)) that PAGCOR would have made 'a final order' that GGAM itself is unsuitable to participate in the management of the Solaire.

278.    Further, while the Sarmiento Declaration makes the assertions that that the FCPA Findings and the hiring of Mr French were '*reasons enough for PAGCOR to disqualify GGAM from being involved in gaming in the Philippines,*' that PAGCOR would have required that Bloomberry '*disassociate itself from Mr. Weidner, Mr. Chiu and Mr. French,*' and that PAGCOR '*would have required the immediate termination of the MSA if its continuation would not be possible without the involvement of Mr. Weidner, Mr. Chiu and Mr. French,*' there is no reference to, or evidence of, any previous case where any disqualification was based on similar reasons, nor any reference to, or evidence of, any specific regulation to support these statements. While the Respondents made some reference to the revelation that Mr Stone had previously fired Mr French for his role in rigging a drawing while he worked for LVS, there appears to be nothing in the FCPA Findings implicating Mr Stone. Any suggestion that Mr Stone would have been somehow disqualified by reason of the FCPA Findings, or his connection with Mr French, would thus appear to be speculative. Further, even if the Tribunal were to assume *arguendo* that Mr Stone would somehow be disqualified by PAGCOR from being involved in the management of the Solaire, Mr Sarmiento conceded in cross-examination during the Remedies Hearing that he did not know of any reason to disqualify Mr Saunders (one of the key personnel under the MSA and a senior officer named in Clause 15.1(g) of the MSA) from running the Solaire through GGAM. The Tribunal also does not see any reason why (even if, *arguendo*, it assumed for the Respondents' benefit that Mr Weidner and Mr Stone (through his connection with Mr French) would be 'disqualified' by PAGCOR from being involved in the management of the Solaire) Mr Saunders would not have continued as a senior officer of GGAM actively involved in the performance of GGAM's obligations under the MSA. This would effectively take the present scenario out of the ambit of the Respondents' right to terminate under Clause 15.1(g) of the MSA.

> 279. The Tribunal's view, therefore, is that the evidence is simply not strong enough to show that there was any likelihood that PAGCOR would have ordered GGAM to be dismissed as the manager under the MSA, nor that any other clause in the MSA would have entitled the Respondents to terminate the MSA simply by reason of the FCPA Findings.
>
> 280.　　Following from the reasoning above, the Tribunal is even less convinced by the Respondents' argument that GGAM would have resigned or that the Parties would have brought the MSA to a mutual end by the end of the first five year term to 'save face.' ...
>
> 281.　　Accordingly, the Tribunal does not consider that the FCPA Findings would have entitled the Respondents to terminate the MSA. ...
>
> ...
>
> 283.　　In conclusion, the Tribunal finds that Claimants would have been entitled, and indeed probably would have, exercised its option to renew the MSA beyond the Initial Term, and hence that it is reasonably certain that they would have been in a position to earn the lost management fees beyond the Initial Term. Therefore, for purposes of the calculation of the lost fees, the Tribunal finds that the MSA would likely have been renewed for a second term and will thus assess GGAM's lost management fees over a period of 10 years.
>
> [emphasis in original]

77　　The Tribunal also considered Bloomberry's submission that GGAM's damages ought to be reduced to nil given the multiple breaches of the MSA and the existence of the FCPA Findings. At [345] of the Final Award, the Tribunal stated:

> 345.　　In any event (and as already foreshadowed in the Tribunal's analysis at paragraphs 273 to 283 above), the FCPA Findings on their face do not establish or imply that GGAM did not perform its obligations under the MSA. In fact, those Findings do not refer to GGAM at all, much less address GGAM's performance under the MSA. Just as the Tribunal has found that the Respondents did not show how the FCPA Findings could, or would, have impacted the reasonable certainty of the Claimants exercising their unilateral right to renew the MSA, so the Respondents have not shown how the FCPA Findings (which deal with another entity altogether, and

> do not deal with GGAM at all) could justify the equitable
> reduction of damages to which the Claimants are entitled.

78     In short, the Tribunal interpreted the evidence, made factual findings, and found evidential gaps. After considering the evidence, the Tribunal concluded that the FCPA Findings would not have entitled Bloomberry to terminate the MSA for the initial five-year term, holding that there was no causal link between the FCPA Findings and the termination of the MSA. Furthermore, the Tribunal held that the FCPA Findings would not have affected the renewal of the MSA for the subsequent five-year term. Since the Tribunal found that the MSA would likely have been renewed for the second five-year term, it assessed GGAM's lost management fees over a period of ten years. It is clear that the Tribunal applied its mind to the evidence presented before it for the purpose of assessing damages. The Tribunal examined the evidence and held that the FCPA Findings did not permit GGAM's damages to be reduced to nil. According to the Tribunal, the FCPA Findings were not material evidence to either inquiry.

79     It is therefore clear from the foregoing that Bloomberry had the opportunity to be heard. The Tribunal's conclusion that the FCPA Findings did not assist Bloomberry's case is the result of the Tribunal's analysis and evaluation of that evidence. It is the Tribunal's prerogative to determine the relevance of evidence. At worst, this had everything to do with an error in the exercise of fact-finding powers that the Tribunal undoubtedly possessed and nothing to do with a breach of natural justice. To reiterate, the Tribunal's factual findings, even if mistaken, are not to be revisited now, for the court is not to intervene to set aside an award on the basis of mere errors of law or fact: *BLC and others v BLB and another* [2014] 4 SLR 79 at [53].

80     Additionally, Bloomberry cannot argue that it "never had an opportunity to address the facts and/or relevance of the Tribunal's finding that there was a lack of evidence of PAGCOR having previously disqualified someone for similar reasons". In this regard, I agree with Mr Bull's submission that Bloomberry ought to have brought the relevant evidence to the Tribunal's attention during the remedies hearing. Consequently, I do not see how Bloomberry suffered prejudice or would have likely obtained a significantly different outcome by reason of the breach: see *L W Infrastructure Pte Ltd v Lim Chin San Contractors Pte Ltd* [2013] 1 SLR 125 at [54]. Given these reasons, there is no need to deal with the element of prejudice required under s 24(*b*) of the IAA.

81     Finally, related to the claims in respect of natural justice is Mr Yeo's argument in writing that the Tribunal's failure to address concealments in document production concomitantly resulted in an arbitral procedure that deviated from the arbitration agreement pursuant to Art 34(2)(*a*)(iv) of the Model Law. However, apart from a brief allusion to Art 34(2)(*a*)(iv), Mr Yeo did not, either in written or oral submissions, develop this argument. Nor did he identify precisely which aspect of the agreed procedure GGAM had purportedly breached. To the extent that this submission pertains to GGAM's alleged non-compliance with the Tribunal's order to produce documents (*ie*, concealment), I make two points. First, I rely on the reasons articulated at [150] of the 2020 Judgment where I expressed doubt whether GGAM actually concealed documents in violation of the Tribunal's orders. Second, at [274] of the Final Award, the Tribunal evaluated the FCPA Findings and concluded that there was an evidential gap. *A fortiori*, Mr Yeo cannot overcome the causal gap between the concealment of documents and the termination of the MSA. If Mr Yeo's submission relates to other matters, then this ought to have been taken up with

the Tribunal. In any event, only significant rather than minor departures from the parties' agreed arbitral procedure are captured by this limb of Art 34(2)(*a*)(iv): *International Commercial Arbitration* at pp 3264–3267; *Singapore International Arbitration* at p 399. Even if there had been a departure from the Tribunal's procedure, there is no evidence to suggest that this was material to the Tribunal's final determination.

82     In light of the foregoing, the Final Award cannot be set aside or, in the alternative, refused enforcement on the grounds that there was a breach of natural justice, that Bloomberry was unable to present its case or that the arbitral procedure was not in accordance with the agreement of the parties.

### Issue 3: whether the grant of damages to GGAM Netherlands should be set aside or, in the alternative, refused enforcement because it is contrary to public policy

83     Finally, Mr Yeo argues that the grant of damages to GGAM Netherlands should be set aside on the basis that the assignment of the MSA to GGAM Netherlands is contrary to the public policy of Singapore under Art 34(2)(*b*)(ii). In the alternative, Bloomberry relies on the same grounds under Art 36(1)(*b*)(ii) of the Model Law to challenge enforcement. The relevant relief concerns the payment of lost management fees at [507(a)] of the Final Award:

> (a)     The Respondents shall pay a total of **US$ 85.2 million** as damages for lost management fees to the Claimants, GGAM Philippines and/or GGAM Netherlands. [emphasis in original]

84     The principles concerning this public policy ground of resisting enforcement and set aside are trite. A court will not uphold a contract or transaction entered into for the object and purpose that would involve breaching the law in a foreign and friendly state: *BCBC Singapore Pte Ltd and another v*

*PT Bayan Resources TBK and another* [2016] 4 SLR 1 at [174]–[178]. This is a narrow ground that requires an outcome that would "shock the conscience" or would be contrary to "the forum's most basic notion of morality and justice": *BAZ v BBA* [2018] SGHC 275 at [159].

85     Bloomberry objects to damages being awarded to GGAM Netherlands because the latter is a sham entity incapable of complying with the MSA's obligations or performing the Post-Opening Services. In this regard, Bloomberry argues that GGAM Philippines' assignment of the MSA to GGAM Netherlands, a sham entity, was established for no purpose other than to evade both US and/or Philippine taxes. In the remedies phase, Bloomberry also contended that the Tribunal should deny GGAM Netherlands' requests for monetary damages for management fees and for a "gross-up" of damages to account for Philippine withholding tax.

86     In the Final Award, the Tribunal found that the sham entity argument was unmeritorious and that any relief granted on account of lost management fees would be payable by Bloomberry to both GGAM Philippines and GGAM Netherlands, with full payment to one or the other sufficient to discharge Bloomberry's liability to pay such damages. Specifically, the Tribunal made the following findings at [178]–[180] of the Final Award:

> 178.     It is evident that since the beginning of their relationship the parties to the MSA had contemplated that a Dutch affiliate may be established exclusively for tax purposes. The only condition was that the constituent owners and controlling individuals must be the same as those owning and controlling GGAM. It has not been contended in the proceedings that this condition was not met.
>
> 179.     Furthermore, Article 16.3 of the MSA shows the preoccupation of BRHI and Sureste to maintain GGAM Philippines as their partner and obligated party under the MSA. It provides that '*Any assignment to an Affiliate and/or any sub-*

> *contracting* [sic] *shall not in any way relieve GGAM from any liability or obligation under or in connection with this Agreement.*' Thus, GGAM Philippines' obligations continue in effect notwithstanding the corporate structures it sets up or to whomever GGAM sub-contracts services required under the MSA.

> 180.    Given these provisions of the MSA, the Tribunal finds that the sham entity argument of the Respondents lacks merit. This notwithstanding, and, as noted above, Article 16.3 of the MSA shows the preoccupation of BRHI and Sureste to maintain GGAM Philippines as their partner and obligated party under the MSA irrespective of the corporate structures GGAM may set up. For these reasons, the Tribunal determines that any relief granted by the Tribunal on account of lost management fees shall be payable by the Respondents to both Claimants, with full payment to one or the other (or some combination of both) sufficient to discharge the Respondents' liability to pay such damages.

> …

> [emphasis in original]

87    Given the Tribunal's finding that GGAM Netherlands is not a sham entity, Bloomberry's contention that GGAM Netherlands was incorporated for the purpose of evading taxes falls away. As such, Mr Yeo's contention (premised on the sham entity argument) that payment of US$85.2m to GGAM Netherlands would give effect to a tax evasion scheme to avoid payment of Philippine tax is unfounded and does not raise any public policy concern. I agree with Mr Bull that the Tribunal's findings of fact are binding on Bloomberry and cannot be reopened by this court: see *Rakna Arakshaka Lanka Ltd v Avant Garde Maritime Services (Pte) Ltd* [2019] 2 SLR 131 at [100].

88    Further, the Tribunal, in rejecting GGAM Netherlands' claim for a "gross-up" of damages to account for Philippine withholding tax, made the following findings:

> 361.    The Tribunal has already considered and rejected the Respondents' contention that GGAM Philippines is a sham

entity (*see* paragraph 180 above). In addressing the gross-up claim, the key question is whether the Respondents were obliged under the MSA to issue the certificates in question and, failing to issue them, be responsible for the payment of the taxes of the Claimants. The MSA is clear in stating that '*[t]axes accruing on fees payable to GGAM shall be for the account of GGAM.*' The arguments of the Claimants are based on the general statement that '*the fees payable to GGAM shall be structured in the most tax effective methodology.*' The plain reading of this sentence does not support the Claimants' position. First, the issuance of the certificates is not related to the structure of the fees but to the fulfilment of the requirement under the Philippines-Netherlands Tax Treaty. Second, even if the fee structure could be understood to fall within the terms of Section 4.6 of the MSA, this section does not impose any specific obligation on the Respondents to take any action to assist the Claimants before the tax authorities. Third, Section 4.6 needs to be read as a whole. The Claimants' understanding of this clause contradicts the clearly stated obligation of GGAM to pay the taxes that accrue on fees payable to GGAM. There is no record of what the Parties meant when they used the phrase 'tax effective methodology' and no such evidence has been offered in the extensive exchanges on the tax gross up issue. Therefore, the Tribunal concludes that the Respondents are not responsible for any tax gross up and have no obligation to indemnify the Claimants for any taxes due on their fees or damages awarded by the Tribunal.

362.    The Tribunal notes that there were two further rounds of expert reports submitted by the Parties after the Parties made their respective supplemental submissions for the Remedies Phase (*see* paragraphs 70, 81, 82, and 83 above). These expert reports focused primarily on the issue of whether or not GGAM Netherlands qualified for treaty benefits under the Netherlands-Philippines Tax Treaty. In view of the Tribunal's conclusion at paragraph 361 above, it is unnecessary for the Tribunal to consider this issue as well as the other issues raised by the Parties' arguments.

[emphasis in original]

89      The Tribunal's ruling is clear. GGAM has to pay its own taxes on the Tribunal's award to GGAM of US$85.2m, a sum that the Tribunal arrived at after giving due consideration to [180] and [361] of the Final Award. Mr Bull also accepts that GGAM does not seek damages in excess of the US$85.2m

under [507(a)] of the Final Award. This is reflected in Bloomberry's own submissions and it did not, before the Tribunal, raise the issue that withholding tax should be applied as regards the figure of US$85.2m. As Mr Bull points out, Bloomberry does not provide any evidence to support the argument that GGAM's interpretation of the Final Award would violate the tax laws of the Philippines.

90     Accordingly, Bloomberry's claim that the grant of damages to GGAM Netherlands is contrary to public policy does not succeed.

**Conclusion**

91     For these reasons, Bloomberry's application in OS 1385 to set aside the Final Award under s 24(*b*) of the IAA, Art 34(2)(*a*)(ii), Art 34(2)(*a*)(iii), Art 34(2)(*a*)(iv) and Art 34(2)(*b*)(ii) of the Model Law is dismissed. Likewise, Bloomberry's application in SUM 6218 (as filed in OS 1257) to resist enforcement of the Final Award under Art 36(1)(*a*)(ii), Art 36(1)(*a*)(iii), Art 36(1)(*a*)(iv) and Art 36(1)(*b*)(ii) of the Model Law is also dismissed. As costs follow the event, the costs of both applications are granted in GGAM's favour, such costs are to be taxed if not agreed.

Belinda Ang Saw Ean
Judge

Alvin Yeo SC, Lionel Leo and Daryl Wong (WongPartnership LLP) for the plaintiffs in HC/OS 1385/2019 and the defendants in HC/OS 1257/2019;
Cavinder Bull SC (Drew & Napier LLC) (instructed), Aaron Lee Teck Chye and Marc Malone (Allen & Gledhill LLP) for the

> defendants in HC/OS 1385/2019 and the plaintiffs in HC/OS 1257/2019.

———————————————

Certified True Copy

Private Secretary to Judge
Supreme Court Singapore