# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLOBAL GAMING PHILIPPINES, LLC,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>ENRIQUE K. RAZON, JR.,<br>BLOOMBERRY RESORTS AND<br>HOTELSINC., and SURESTE<br>PROPERTIES, INC.,<br><br>　　　　　*Defendants*. | No. 21-CV-2655 (LGS) (SN) |

**EXPERT REPORT OF FREDRIC GUSHIN AND DANIEL REEVES**

Dated: September 16, 2022

# TABLE OF CONTENTS

Page

I.    Executive Summary ............................................................................... 1

II.   Background and Qualifications of Experts ............................................ 4

III.  Spectrum's Opinion on GGAM's "Government-Led, Top-Down Junket
      Approach" Strategy ............................................................................... 8

IV.   Spectrum's Opinion on GGAM's "Cross-Border Trading Platform"
      Strategy ............................................................................................... 14

V.    GGAM's Refusal to Produce Critical Documents in the Arbitration that Would
      Have Corroborated the Existing Circumstantial Evidence of Illegal and Unethical
      Conduct ............................................................................................... 20

VI.   Conclusion ........................................................................................... 21

APPENDIX A ...................................................................................... A-1

APPENDIX B ...................................................................................... B-1

APPENDIX C ...................................................................................... C-1

APPENDIX D ...................................................................................... D-1

APPENDIX E ...................................................................................... E-1

## I.     EXECUTIVE SUMMARY

1.     We have been retained by Bloomberry Resorts and Hotels Inc. and Sureste Properties, Inc. (together, "Bloomberry") as experts on international gaming standards, Chinese currency controls and restrictions on gambling, and international money laundering schemes.  For purposes of this opinion, Bloomberry sought our expertise specifically with respect to two "strategies" Plaintiff Global Gaming Philippines LLC ("GGAM"), and in particular GGAM's Chief Executive Officer William "Bill" Weidner, had for Bloomberry's Solaire Resort & Casino ("Solaire") in Manila: the "Government-Led, Top-Down" strategy, and the "Cross-Border Trading Platform" strategy.

2.     Based on Spectrum Gaming Group's ("Spectrum")[1] review of materials from the arbitration underlying this case (the "Arbitration"),[2] our own research, and our experience, we conclude that when GGAM was functioning as the management services provider for Solaire between 2011 and 2013, it likely engaged or was attempting to engage in illegal and unethical conduct in connection with implementing two strategies:  (1) a "Government-Led, Top-Down Junket Approach" strategy, and (2) a "Cross-Border Trading Platform" strategy. The strategies were being pursued by Bill Weidner, and GGAM's President for Asia, Eric Chiu (the only one of the four GGAM executives who speaks Mandarin and the GGAM executive Weidner identified as being "instrumental" to his strategies), with Chiu taking the lead in directly interacting with Chinese government officials and businessmen who were central to these illegal and unethical strategies.

---

[1] Spectrum Gaming Group is an international gaming consultancy focusing on regulatory and law enforcement issues relating to the gaming industry.  We have worked in Asia since the formation of the company in 1993 and have undertaken multiple investigations relating to the junket industry, anti-money laundering issues, and corporate governance/compliance matters in various Asian countries.

[2] Spectrum submitted an expert report in the Arbitration on August 31, 2017 (BLOOM_0093070 (ECF No. 30-1)), and a summary of expert opinions in the Arbitration on May 16, 2018 (GGAM-SDNY-0311509).

3.    <u>First</u>, the Government-Led, Top-Down Junket Approach strategy involved a Chinese government official in the Chinese Liaison Office (the "<u>CLO</u>") in Macau, named Dr. Chen Xiang ("<u>Dr. Chen</u>"), exerting influence over Macanese junket operators to cause them to bring their highly sought-after and extremely valuable business to casinos managed by GGAM, including Solaire, likely in exchange for remuneration.  That GGAM was engaged in this strategy, which centered on utilizing the influence of Chinese government officials, is demonstrated by Weidner's testimony during the Arbitration, as well as email communications between Weidner and Chiu that refer to Dr. Chen (or other Chinese government officials) using code words (e.g., "Dr. C" and "xxx").[3]  This strategy is, on its face, unethical, and to the extent that GGAM made payments to Dr. Chen (or other Chinese government officials) in connection with this strategy, it is also illegal.  Spectrum is aware of evidence indicating that GGAM may have made such corrupt payments, including emails indicating that (i) GGAM made two unexplained transfers of $25,000 to Chiu's office in Macau during the same time period that Dr. Chen was meeting with Chiu in Macau to confer valuable benefits to GGAM, (ii) GGAM's Vice President, Garry Saunders, stated in an email to Weidner that he was reviewing GGAM's books and did not understand the purpose of these unexplained payments, (iii) Weidner then forwarded that email to Chiu and said "We need to talk.  Call?", and (iv) Weidner never responded in writing to Saunders's inquiry about the purpose of the unexplained payments.[4] This evidence alone is circumstantial evidence of corrupt conduct.

4.    <u>Second</u>, the Cross-Border Trading Platform strategy involved GGAM working with wealthy Chinese businessmen to establish a "trading platform" whereby they could manipulate and/or misdocument commodity trade settlements in order to secretly send cash offshore from China for personal use, including gambling.  That GGAM was engaged in this

---

[3] *See infra* ¶¶ 22-29.

[4] *See infra* ¶¶ 29-35.

strategy is also demonstrated by Weidner's testimony during the Arbitration.[5]  This strategy is illegal, as it is against Chinese law for Chinese citizens to send more than $50,000 per year offshore.[6]  This strategy is also, on its face, a platform for trade-based money laundering.

5.    The existing evidence that GGAM—via Weidner and Chiu—engaged in illegal and unethical conduct while managing Solaire in connection with these two strategies is bolstered by averred facts and factual findings of the U.S. Department of Justice ("DOJ") and Securities and Exchange Commission ("SEC"), which were not both publicly available until 2017 and resulted in nearly $20 million in fines.  Specifically, the DOJ and SEC found that while Weidner and Chiu were working at Las Vegas Sands Corporation ("LVSC") immediately prior to forming GGAM, they engaged in illegal and unethical conduct that paralleled aspects of their two strategies for Solaire—including misrepresenting and mis-documenting transfers of funds in order to receive benefits from Chinese government officials—and engaged in such conduct with many of the same Chinese individuals and agencies that were involved in GGAM's two strategies (including the Chinese Liaison Office in Macau, China International Travel Service, and Chu Kong Shipping).[7]  While at LVSC, Weidner and Chiu also engaged in unethical conduct in order to conceal their ongoing illegal and unethical conduct, including hiding incriminating conduct and information from auditors, firing a compliance employee and outside counsel who threatened to expose and stop Weidner and Chiu, and making a presentation to LVSC's board of directors that hid incriminating conduct and information. These attempts at concealment appear to parallel in many respects Weidner's and Chiu's attempts to hide the illegal and unethical nature of their two strategies while at Solaire, including hiding incriminating information from Bloomberry and other GGAM personnel, such as the true of nature of their two strategies (which they never put in writing to

---

[5] *See infra* ¶¶ 36-37, 40-42.

[6] *See infra* note 43.

[7] *See infra* ¶ 40; Appendix A.

Bloomberry), lying to Solaire's executives and counsel about the existence and extent of U.S. government investigations into their past conduct at LVSC, and refusing to produce in the Arbitration direct communications between Chiu and the Chinese government officials and businessmen involved in the two strategies, in violation of a tribunal order.

6.      In sum, and as will be elaborated upon below, the evidence we have reviewed indicates that GGAM—via Weidner and Chiu—likely engaged in and/or was attempting to engage in illegal and unethical conduct while implementing their two strategies in connection with their performance of management services for Solaire.  Further, if GGAM had produced evidence in the Arbitration of, for example, Chiu's direct communications with the Chinese government officials and businessmen involved in GGAM's strategies, as Spectrum understands it was ordered to do, such evidence would likely have identified substantial additional support for the conclusion that GGAM was engaged in illegal and unethical conduct while managing Solaire.

## II.      BACKGROUND AND QUALIFICATIONS OF EXPERTS

### Fredric Gushin, Managing Director, Spectrum Gaming Group[8]

7.      Fredric Gushin founded Spectrum in 1993 after working 13 years for the New Jersey Division of Gaming Enforcement ("DGE"), where he was promoted to Assistant Director and Assistant Attorney General.  At the DGE, Gushin oversaw the openings of 12 Atlantic City casino hotels and managed civil and administrative litigation before the New Jersey Casino Control Commission. He personally argued more than 50 cases before the Commission.[9]

8.      Gushin has worked with a variety of private-sector and governmental clients since founding Spectrum. He has advised private casino developers on operational and

---

[8] A copy of Gushin's curriculum vitae, which includes publications within the past 10 years, is attached hereto as Appendix D.

[9] A copy of Gushin's curriculum vitae, which includes publications within the past 10 years, is attached hereto as Appendix D.

management issues and provided gaming expertise to a number of gaming jurisdictions over the years. He also served as a Commissioner with the Oneida Indian Nation Gaming Commission that regulates the Turning Stone Resort Casino near Syracuse, New York. Gushin also served as an Interim Advisor to the US Department of Treasury from 1999 to 2009 on casino-related anti-money laundering ("AML") matters.

9.     Gushin leads Spectrum's Asian gaming engagements, including gaming regulatory and licensing investigations and renewal investigations for the Singapore Ministry of Home Affairs and the Casino Regulatory Authority of Singapore since 2005. He has also overseen numerous investigations of junket operators in Macao and Southeast Asia. Gushin has undertaken work in the Philippines since the establishment of Spectrum and provided advice to the gaming regulator PAGCOR during his tenure with DGE. Beginning in or around 2006, Spectrum has provided consulting services to Bloomberry.

10.     Gushin has worked with private sector clients throughout the United States, the Caribbean, South America, Asia, and Europe on a wide range of issues. As Assistant Director and Assistant Attorney General of New Jersey's Division of Gaming Enforcement, he oversaw all compliance-related issues regarding New Jersey's multibillion-dollar gaming industry, including security and surveillance, development and compliance with accounting and internal control procedures, and development of emergency plans to respond to incidents occurring in casino.

11.     With Spectrum, Gushin has led engagements evaluating casino operations for compliance (including AML) for private sector and governmental clients.

12.     While serving as Assistant Director for New Jersey's Division of Gaming Enforcement, he worked on a task force to implement amendments to the Bank Secrecy Act after casinos were considered financial institutions in 1986 to 1988. Additionally, as an Assistant Attorney General at the New Jersey DGE, Gushin led a four-person team that worked

with the US Treasury to draft the first and second set of casino regulations from 1987 to 1990. Gushin currently serves as an Interim Advisor to US Treasury on AML issues related to gaming, including casino gaming.

13.    Gushin has provided three confidential briefings to the Financial Crimes and Enforcement Network (FinCEN), one confidential briefing to the UK Gambling Commission, and one confidential briefing to the US Attorney's office in Guam and the Commonwealth of the Northern Marianas Islands (CNMI) concerning Asian gaming practices, with a focus on VIP play, junket operations, and money laundering in Macao.

14.    Gushin received his Bachelor of Arts and Masters of Arts degrees from the American University School of Government and Public Administration in 1970 and 1979 (respectively), and his Juris Doctorate from Rutgers University in 1973.

15.    In the last four years, Gushin has testified as an expert witness in one matter, an arbitration in Singapore entitled *Donaco Int'l Ltd. v. Somboon Sukcharoenkraisri*, SIAC ARB 32/18/PLN, in which Gushin prepared expert reports and testified before the arbitral tribunal.

16.    The fee for Gushin's work on this case is $600/hour.

**Daniel Reeves, Senior AML Associate, Spectrum Gaming Group[10]**

17.    Daniel Reeves retired from the United States Internal Revenue Service ("IRS") in 2012 after 35 years of service as an IRS Agent.  While at the IRS, Reeves specialized in offshore tax and anti-money-laundering investigations.  At the time of his retirement, he held the position of Senior Advisor on offshore matters within the IRS's Large Business & International Division, where he guided the creation, design and development of the IRS's Offshore Compliance Initiative, a program that develops projects, methodologies, and techniques for identifying US persons who use offshore structures and financial arrangements for tax evasion, money laundering, and other illicit financial purposes.

---

[10] A copy of Reeves's curriculum vitae, which includes publications within the past 10 years, is attached hereto as Appendix E.

18.    Reeves developed many of the investigative projects and techniques that the IRS currently uses to identify US persons with secret offshore bank accounts and financial structures.  Those projects and techniques focus on how financial secrecy laws, foreign entities, complex structures, and secret accounts are exploited by tax evaders and money launderers to covertly move funds across international borders and hide financial assets in foreign countries. He also led high-profile international John Doe summons investigations into the cross-border banking practices of UBS AG of Switzerland, HSBC India, the Stanford Financial Group in Antigua, and others that identified many thousands of US taxpayers with secret offshore bank accounts.

19.    Prior to his work on offshore tax evasion, Reeves specialized in AML investigations and Bank Secrecy Act compliance matters involving the US casino gaming industry.  He led the first AML investigations ever conducted in the United States of gambling casinos, and developed many of the investigative techniques and procedures the IRS uses to identify casino customers who engage in reportable currency transactions and suspicious activities.  Reeves also served for more than 10 years as a subject matter expert on the casino gaming industry to the US Financial Crimes Enforcement Network (FinCEN), where he assisted in the development of AML regulations and programs for casinos, card clubs, and other gaming entities nationwide.

20.    For his work in addressing offshore tax evasion and money laundering, Reeves has received numerous awards and citations, including two IRS Commissioner Awards (the highest award the IRS can bestow), a Secretary of the Treasury Award, and a Department of Justice Attorney General Tax Division Award.  He is internationally recognized as an expert on international financial secrecy laws, offshore tax evasion, and casino AML issues, and he has frequently spoken as a subject matter expert at national and international conferences.

21.    The fee for Reeves's work on this case is $500/hour.

### III.    SPECTRUM'S OPINION ON GGAM'S "GOVERNMENT-LED, TOP-DOWN JUNKET APPROACH" STRATEGY

22.    According to Weidner's sworn declaration and testimony in the Arbitration, he had planned to implement a "sophisticated and unique government-led, top-down junket approach" as a specific strategy to drive junkets[11] and thus VIP players[12] to Solaire in Manila.[13] Notably, Weidner testified that he would never put in writing or disclose publicly, particularly to his client, Bloomberry, the true nature of this and other strategies, a betrayal of Weidner's knowledge that his strategies were illegal.[14]

23.    Based on the evidence reviewed, it is apparent that neither Weidner, despite representations to Bloomberry to the contrary,[15] nor the GGAM principals actually had any pre-existing relationships with junkets, much less relationships with Macao's seven largest junket operators, despite contrary representations to Bloomberry[16] and boasts by Weidner to potential investors in Bloomberry—a boast that resulted in an enhanced fee structure for GGAM for revenue generated by foreign junkets/VIP players.[17]

24.    Specifically, the little evidence that GGAM produced in the Arbitration shows that Weidner's "Government-Led, Top-Down Junket Approach" involved exploiting a pre-existing relationship with Dr. Chen, then Deputy Director of the Economic Affairs Department

---

[11] In the casino industry, the term "junket" refers to the arrangement for travel and complimentary services for patrons who have been selected for their propensity to gamble to visit a casino for the purpose of gambling.  In addition, in Asia, especially in Macao, junkets also issue credit to players directly and also collect outstanding debts from these players.

[12] VIP players are those that bet very large amounts at a casino.

[13] Oct. 19, 2015 Hr'g Tr. at 147:6-149:14 (BLOOM_0119059, at -9315-9316); Decl. of William P. Weidner in Support of Claimants' Reply Memorial, June 14, 2015, at ¶ 7 (BLOOM_0100634) ("Third Weidner Decl.").

[14] *See* Oct. 19, 2015 Hr'g Tr. at 217:20-25 (BLOOM_0119059, at -9333).

[15] Such representations are included in the following documents: Bloomberry Resorts Corp., Management Presentation (April 2012) (BLOOM_0076267, at -6286); Third Weidner Decl. at ¶ 6 (BLOOM_0100634).

[16] Such representations are included in, *inter alia*, the following documents: Bloomberry Resorts Corp., Management Presentation (April 2012) (BLOOM_0076267, at -6286); Third Weidner Decl. at ¶ 6 (BLOOM_0100634).

[17] *See* Third Weidner Decl. at ¶ 31 (BLOOM_0100634).

of the CLO in Macao.[18]  Weidner first met Dr Chen in his role as President of LVSC.  Weidner noted that Dr. Chen possessed "significant and unique visibility and influence over each and every aspect of Macanese junket activity."[19]  Hence Weidner's decision to invite Dr. Chen to the signing ceremony in Manila for the Management Services Agreement ("MSA") between Bloomberry and GGAM in the hope that "the presence of Macao's most senior Chinese economic liaison representatives at the Solaire signing ceremony would provide major Macanese junket operators with confidence that it was politically and socially acceptable for them to bring significant numbers of Chinese gamblers to Manila."[20]

25.     What is even more alarming than Weidner's deception of Bloomberry—to whom he never disclosed the Government-Led Top-Down Junket Approach—is the bribery and corruption inherent in the proposed strategy, which Weidner acknowledged centered on utilizing Chinese government officials, who were in place in Macao to regulate and oversee junkets, to facilitate illegal gaming activities outside of the then-accepted junket structure.[21]  Moreover, Weidner was launching the strategy amid China's crackdown on corruption, which began in 2012.

26.     Under Chinese law, all forms of gambling in mainland China (with the exception of certain state-run lotteries) are illegal.[22]  A main focus of the crackdown on

---

[18] Third Weidner Decl. at ¶¶ 26-28 (BLOOM_0100634).  China's Liaison Office in Macao (now known as the Macao Liaison Office) is the representative office in Macao of the State Council of the People's Republic of China ("PRC").  It monitors all political, social and economic activity in Macao and acts as a liaison between the Macao and PRC governments.

[19] Third Weidner Decl. at ¶ 27 (BLOOM_0100634).

[20] Id.

[21] See, e.g., Oct. 19, 2015 Hr'g Tr. at 197:7-9 ("Q. And I believe you previously testified to that CLO office being part of this unique and sophisticated government-led, top-down junket approach, right?") (BLOOM_0119059, at -9328); id. at 149:10-14 ("Q. So it's a strategy that involves – and we will come to this too – utilising relationships with government people in connection with junket business, is that fair? A. Yes, correct. Junket operators, fair.") (BLOOM_0119059, at -9316).

[22] See Laws of the People's Republic of China, (Adopted by the Second Session of the Fifth National People's Congress on July 1, 1979 and amended by the Fifth Session of the Eighth National People's Congress on March 14, 1997), https://www.fmprc.gov.cn/ce/cgvienna/eng/dbtyw/jdwt/crimelaw/t209043.htm.

corruption in China, which continues today, has been exposing and prosecuting government officials who receive illicit payments and/or laundering money through Macao. This fact is critical when considering Weidner's statement that "Our relationships with CLO officials opened doors for Mr. Chiu to speak with, liaise, and negotiate directly with the head executives at several of the top Macanese junkets."[23] The coordination with Dr. Chen was undertaken by GGAM's President for Asia, Eric Chiu—who, like Weidner, had been central to the wrongdoing at LVSC between 2006-2009 (as detailed in **Appendix A**).[24] Starting in April 2013—more than a year and a half after signing the MSA, more than a year after Bloomberry's "top-up offering," and one month *after* Solaire opened—Dr. Chen of the CLO in Macao introduced GGAM to some of Macao's largest junket operators for what appears to be the very first time.[25]

27.     The emails below illustrate an agreement between GGAM and a senior Chinese government official, Dr. Chen, whereby the government official is taking actions for the financial benefit of GGAM as manager of Solaire:

- March 31, 2013 email from Chiu to Weidner: "Dr. C said meetings with junket owners will start next week."[26]

- April 3, 2013 email from Chiu to Weidner: "Dr. C just called me, in order for him to fully facilitate Macau junkets to operate in the Philippines and other of our future project locations, from now on all Macao junket liaisons must be done thru me to avoid confusions."[27]

- April 7, 2013 email from Chiu to Weidner: "Tonight was really a 'real deal' socializing with the number 1 persons of 2 major Macao junkets

---

[23] Third Weidner Decl. at ¶ 32 (BLOOM_0100634).

[24] This wrongdoing, described in more detail in Appendix A, can be summed up as the willful failure of Chiu, Weidner and other LVSC executives and managers under Weidner's direction to implement adequate internal accounting controls in connection with the unexplained transfer of tens of millions of dollars to companies associated with a Chinese consultant who was introduced to Weidner and Chiu by the CLO in a region known to be high-risk for corruption without conducting appropriate due diligence, consistent monitoring of or justification for payments, and proper approvals and documentation.

[25] *See, e.g.*, Email from E. Chiu to B. Weidner, March 31, 2013 (BLOOM_0142890) ("Dr. C said meetings with junket owners will start next week.").

[26] *Id.*

[27] Email from E. Chiu to B. Weidner, April 3, 2013 (BLOOM_0142725).

namely Mr. [Alvin] Chau of Suncity and Sister Mei of Macau Golden Group. . . . I have already successfully entered the core of Macao junket circle with strong introduction and supports at my back. We need to carefully and skillfully capture this golden opportunity."[28]

- April 27, 2013 email from Chiu to Weidner: "I just talked with xxx."[29]

28. These emails raise serious questions about corruption and bribery:[30]

- Why would a senior government official in China help Weidner and GGAM secure junkets and thus Chinese high-value patrons to visit the Philippines?

- Did Dr. Chen, an official with the CLO in Macao, receive any compensation directly or indirectly for assisting GGAM and Weidner?

- Alternatively, did Dr. Chen receive anything of value from the junkets for the introduction to GGAM?

---

[28] Email from E. Chiu to B. Weidner, April 7, 2013 (BLOOM_0142889). Notably, Weidner recognized that this "golden opportunity" likely involved illegal activity, but he planned to use the CLO as a "get out of jail free" card. *See* Oct. 19, 2015 Hr'g Tr. at 173:23-174:9 ("So if you wanted to find out anything about any junket rep, to see if you knew Dr Chen, if you knew the CLO, he had a spreadsheet of every junket room, every junket operator, what his volume was and the key thing about the CLO is the CLO is the junkets' get out of jail free card. Alvin's organisation has 3,500 agents all over China and what are they doing? They are granting credit, they are collecting China and in a controlled economy where it's illegal to move money or move the RMB out, they were committing illegal acts every day.") (BLOOM_0119059, at -9322). Alvin Chau was arrested on November 28, 2021 and remains in detention awaiting trial that was scheduled to begin on September 2, 2022. *See* Gary Cheung, Sammy Heung and Raquel Carvalho, *Junket king Alvin Chau's arrest signals end of winning streak for Macao casinos as Beijing cracks down on gambling*, South China Morning Post (Nov. 30, 2021), https://www.scmp.com/news/hong-kong/law-and-crime/article/3158397/junket-king-alvin-chaus-arrest-signals-end-winning; *Alvin Chau indicted for illegal gaming, money laundering*, GGR Asia (May 26, 2022), https://www.ggrasia.com/alvin-chau-indicted-for-illegal-gaming-money-laundering/.

[29] Email from E. Chiu to B. Weidner, April 27, 2013 (GGAM-SDNY-0278838, at -8879). Weidner testified that Chiu wrote "xxx" "because he's not going to mention the Chinese name of the government official who is going to join us." *See* Oct. 19, 2015 Hr'g Tr. at 180:18-181:1.

[30] Additionally, GGAM's testimony in the Arbitration raises serious questions about ethics. For example, Brad Stone had no concerns about doing business with a known triad (organized crime) leader Tai Gor (Cheung Chi-tai)—notwithstanding the fact that LVSC had been forced to cut ties with Tai Gor after a publication identified the relationship as one of the first documented examples of organized crime involvement in a US-owned casino in Macao. *Compare* May 29, 2018 Hr'g Tr. at 32-33, 44-45 (B. Stone testifying) (BLOOM_0116782, at -6791, -6794) (throughout the transcript, "Tai Gor," the nickname of Cheung Chi-tai, is spelled as "Tigor"), *with* Matt Isaacs, *Special Report: High rollers, triads and a Las Vegas giant*, Reuters (March 29, 2010), https://www.reuters.com/article/us-casinos-macau-sands/special-report-high-rollers-triads-and-a-las-vegas-giant-idUSTRE62S34020100329, and Chris McGreal and Matt Isaacs, *Sheldon Adelson faces new scrutiny as documents challenge his testimony*, The Guardian (May 9, 2015), https://www.theguardian.com/us-news/2015/may/09/sheldon-adelson-macau-testimony-las-vegas-sands.

- How could Dr. Chen "work" with GGAM in this regard and not violate his own responsibilities as a public servant in accordance with "The Law of the People's Republic of China on Public Servants"[31]?

29.     In our experience, this is the type of scenario where government officials often receive a kickback (either immediately or at some later point in time). Of particular interest are two extraordinary and as yet unexplained payments, each in the amount of $25,000, that were made by Weidner (on behalf of GGAM) between April and June 2013—at the same time that Dr. Chen was introducing Chiu to junket operators—without the knowledge or authorization of his business partners—to "Sahara ASF Asia," a company located at the very same address as GGAM's Macao Office where Eric Chiu worked as GGAM's President for Asia.

30.     An email from Garry Saunders to Bill Weidner, copying Brad Stone, dated June 7, 2013,[32] states, in relevant part, as follows: *". . . Separately, looking at the last P&L, I noticed the second month of a $25,000 charge to Sahara ASF Asia (Andy Fonfa?) for a Macau Office. Is this for Eric? How is Andy involved?"*

31.     The issue of the two monthly charges of $25,000 to the company Sahara ASF Asia appears to be pertinent to the way in which Weidner conducted his business dealings. Saunders indicates in the same email that Sahara ASF Asia, Ltd. is a company that is owned by and/or connected to Andrew S. Fonfa, the Las Vegas property developer and founder of the real estate brokerage ASF Realty & Investments, Inc.[33] Clearly, Saunders had not approved

---

[31] Law of the People's Republic of China on Public Servants, (promulgated by the Standing Comm. Nat'l People's Cong., Jan. 1, 2006), P.R.C. Law 35, http://www.npc.gov.cn/zgrdw/englishnpc/Law/2007-12/13/content_1384101.htm.

[32] *See* Email from G. Saunders to B. Weidner, June 7, 2013 (GGAM-SDNY-0124176).

[33] Fonfa also was the CEO of the Las Vegas Economic Impact Regional Center ("LVEIRC") and the failed Lucky Dragon Casino, neither of which is in operation but both of which were previously located on Sahara Avenue, Las Vegas. Weidner was a Senior Adviser to LVEIRC and the Lucky Dragon Casino. It remains unclear why this account was used and whether Fonfa had any knowledge about the use of these funds. *See* Muhummad Cohen, *Asian-Funded Las Vegas Casino Courts New Type Of Chinese Clientele*, Forbes (Nov. 1, 2016), https://www.forbes.com/sites/muhammadcohen/2016/11/01/asian-funded-las-vegas-casino-courts-new-type-of-chinese-clientele/; Buck Wargo, *Lucky Dragon to cater to Asian Americans*, Las Vegas Business Press (Nov. 27, 2016), https://businesspress.vegas/gaming-hospitality/lucky-dragon-to-cater-to-asian-americans/.

or been informed beforehand about the purpose of these charges, which were made from GGAM's account.

32.    Weidner forwarded Saunders's email to Chiu on June 7, 2013, stating: "*We need to talk. Call*?"  Chiu then responded on June 7, 2013, stating: "*Having lunch with china state in Macau They can invest in lanqui too I will call u after 30 mins*." [34]  There are no other emails on this email chain.  We have been instructed that GGAM did not produce in the Arbitration any other email in which Weidner responded to Saunders's questions about the unexplained payments.

33.    If the two payments were indeed meant for Chiu—and they were not for his salary, as Chiu, GGAM's President for Asia, was surprisingly not on GGAM's payroll during the time that GGAM managed Solaire[35]—then it begs the question of how and for what purpose Chiu might have received and then disbursed of these funds?  We note that the Singapore High Court also opined that "the circumstances surrounding the Sahara Payments along with Mr Weidner's and Mr Chiu's behaviour, are arguably suspicious."[36]

34.    Moreover, the time period in which these two payments of $25,000 were made from GGAM to Sahara ASF Asia—between April and early June 2013—corresponds precisely to the period of time when Dr. Chen, the senior Chinese government official working at the CLO in Macao, was actively assisting GGAM in its efforts to develop relationships with junket operators in Macao.

35.    This circumstantial evidence raises the critical question as to whether these funds might have been used in any way to remunerate or reimburse Dr. Chen for his efforts on

---

[34] *See* Email from E. Chiu to B. Weidner, June 7, 2013 (GGAM-SDNY-0124176).

[35] According to Brad Stone, Chiu worked for Weidner and was paid by "Weidner's companies, not through GGAM." *See* May 29, 2018 Hr'g Tr. at 17-18 (BLOOM_0116782, at -6787).

[36] *See Bloomberry Resorts and Hotels Inc. v. Global Gaming Philippines LLC*, [2020] SGHC 01, at ¶ 199 (Singapore High Court, Jan. 3, 2020) (Dkt. 125-2) (Judgment re: Partial Award on Liability).

behalf of GGAM.[37]  As Weidner and Chiu have a history of making payments to intermediaries in China without any supporting and/or misrepresented documentation (see **Appendix A**), and no other reasons for the payments have been put forth by GGAM, the circumstantial evidence indicates that the payments were used for illicit purposes.

## IV.    SPECTRUM'S OPINION ON GGAM'S "CROSS-BORDER TRADING PLATFORM" STRATEGY

36.    According to Weidner's sworn testimony in the Arbitration, Weidner proposed implementing a two-step technique he termed a "Cross-Border Trading Platform" as a specific strategy to "… direct VIP play, by helping establish a cross-border trading platform to promote business and gaming visitation between China and the Philippines" in order to facilitate Chinese VIP play at Solaire.[38]  The "Cross-Border Trading Platform" strategy proposed by Weidner consisted of two separate and distinct steps.  First, GGAM proposed to reach out to Mainland Chinese clientele by creating a pretext of a non-gaming business purpose when the actual purpose of the outreach was to promote illegal gaming visits to Solaire in the Philippines. Second, GGAM proposed the creation of a financial mechanism and structure by which funds intended for use in gaming could be secretly and illegally moved out of Mainland China and into the Philippines disguised as legal "business" transactions by misrepresenting them or bundling them with other legitimate transfers.  Once on deposit at a bank in the Philippines, the funds (or excess funds) could then be forwarded to player-owned casino accounts at Solaire for their actual intended purpose—gambling.

---

[37] Dr. Chen left his position with the CLO in Macao in 2016, and Spectrum has not been able to locate any reasons for his departure or his current position.  Given that his actions appear to be at variance with stated Chinese law and policy, however, he very well could have left for reasons related to the crackdown on corruption.  It should be noted that Li Gang, the head of the CLO in Macao from 2013-2016 was removed and subsequently punished for "serious disciplinary violations", the common term used in China for corruption.  *See* Racquel Cavalho, *Macau liaison office director Li Gang moved out, to be replaced by Wang Zhiming*, South China Morning Post (July 1, 2016),  https://www.scmp.com/news/hong-kong/politics/article/1984053/macau-liaison-office-director-li-gang-moved-out-be-replaced.

[38] Oct. 19, 2015 Hr'g Tr. at 148:12-15 (BLOOM_0119059, at -9315).

37.    Specifically, and according to his testimony in the Arbitration, Weidner and GGAM were proposing to:

a.    Travel to China under false pretenses by pretending to be there to market legal business travel to the Philippines when the actual purpose was to promote illegal travel to the Philippines for gaming;[39]

b.    Secretly market Solaire's gaming services to potential Chinese VIP customers while within China's national borders;[40]

c.    Use business cards and documentation that intentionally avoided any references to gaming to avoid detection by Chinese authorities;[41] and

d.    Assist Chinese VIP customers in illegally moving funds out of China in large amounts that GGAM knew violated China's currency control laws, so they could be used for illegal gambling, all while knowing that doing so was in violation of China's anti-gambling laws.[42]

38.    In short, the "Cross-Border Trading Platform" Weidner described as one of his two key strategies for Solaire had a clear purpose: the placement of funds from China into the Philippines' financial systems through secretive means intended to disguise its true character, the layering of those transactions through foreign entities and accounts to further obscure their original source, and the subsequent integration of those funds into accounts at Solaire where the Chinese originator of the transactions could then personally enjoy and use the funds for gaming in violation of China's laws.

39.    The "Cross-Border Trading Platform", if implemented, would have circumvented China's criminal laws and facilitated illegal international monetary transfers by potential Chinese VIP players.[43]  Such a mechanism is, on its face, one that is all too familiar

---

[39] *Id.* at 209:3-17.

[40] *Id.* at 206:13-17.

[41] *Id.* at 208:7-11.

[42] *Id.* at 210:14-25.

[43] As noted above, gambling is illegal in mainland China and the promotion of gambling to its citizens in mainland China is a clear violation of Chinese criminal law.  *See supra* note 22.  Furthermore, China's currency control laws strictly limit outbound cross-border fund transfers by individual Chinese citizens to US$50,000 per calendar year.  Reuters Staff, *China's new rules on yuan transfers are not capital controls: Xinhua*, Reuters (Jan. 3, 2017), https://www.reuters.com/article/us-china-yuan-idUSKBN14M032.

to governments and financial investigators around the world:  the creation and use of controlled foreign entities and false transactions to obfuscate funds by creating the false appearance of legitimacy.   The use of foreign entities and false transactions as devices for money laundering,[44] tax evasion, and other financial crimes is a well-known and common component of many such schemes.  One of the more common examples of such a money laundering scheme involves the use of phony business transactions to surreptitiously transfer money, including personal funds, across national borders through false invoicing, inflated pricing structures, and phony investments.  This is often accomplished by establishing foreign business entities in offshore financial centers that can issue phony invoices for fabricated goods and services, or by inflating or deflating the true cost of legitimate goods and services.  Sometimes referred to as "trade-based money laundering," it is commonly practiced by tax evaders and money launderers throughout the world.

40.     And it is clear that Weidner was planning to engage in trade-based money laundering.  In his sworn testimony, Weidner describes the cross-border trading platform as being "simply a technique … I don't want to use the term 'front,' but as the way of reaching out to Chinese without being a gambling person."[45]  He further stated: "I wanted legitimate business. I didn't want to just do beards."[46]  Notwithstanding Weidner's reluctance to use the

---

[44] Money Laundering involves the conversion or transfer of property, knowing that the property is the proceeds of crime, for the purposes of concealing or disguising the illicit origin of the property.  *See About APG*, The Asia/Pacific Group on Money Laundering, , http://www.apgml.org/about-us/page.aspx?p=91ce25ec-db8a-424c-9018-8bd1f6869162 (last visited Sept. 14, 2022).  The definition is incorporated directly from Article 6 of the United Nations Convention Against Transnational Organized Crime defines Money Laundering.  While Spectrum has no information regarding the original source of the funds that would have been transferred, and does not allege they are derived from the proceeds of criminal activities, it does note that the sole and clearly stated purpose of the "Cross-Border Trading Platform" was to facilitate and enable Mainland Chinese nationals to illegally circumvent Chinese currency control laws so as to engage in gaming, an activity that *by definition* amounted to illegal activities on their part.  Therefore, while the original source of the funds transferred may not have involved criminal proceeds, the subsequent use of illegal devices and subterfuge to transfer the funds out of the country would have clearly cast a taint of illegality over the funds.

[45] *Id.* at 216:19-24.

[46] *Id.* at 292:4-6.  Notably, the SEC Cease-and-Desist Order Related to LVSC Operations in Macao and China also referred to LVSC, during Weidner's tenure, as using "an intermediary or 'beard'" to obscure LVSC's role in certain transactions."  *See* SEC Order, at ¶ 15 (GGAM-SDNY-0122376).

word "front"  nor his stated desire to not "just do beards," those are precisely the nature of the platform that he was proposing to establish with the involvement of many of the same Chinese businessman and state-owned entities that were involved in the FCPA investigations involving Weidner and Chiu's conduct at LVSC—namely, the CLO in Macau, China International Travel Service,[47] and Chu Kong Shipping.[48]

41.     In fact, Weidner acknowledges as much in his testimony wherein he states:

> "Understand, I can't – you can't promote gaming in China, so if you're going to directly promote people, you will promote business, not gamble, and both business (*sic*) give them a portal to be able to legally transfer RMB for their business activities and gives them a reason that they can get their visa and go to the Philippines.  So they will gamble and I will find people that will gamble, and they can use the excuse of doing business in the Philippines.[49]
>
> . . .
>
> . . . And I was setting up with them banking relationships so that when the trade guys -- when these guys went to be at Solaire in Manila and they needed money to be able to conduct their trading exercises, they generally over-send money for trading exercises so they have liquidity to gamble with.
>
> So they were the other piece of, call it the sophistication of a process, of building a way for Chinese businessmen to be able to come and gamble and have money to gamble with.
>
> But by the way, to the Chinese, gambling and business is just the way they breathe. ***So there is nothing wrong with it*** but it was the idea of setting a platform up to be able to do business and to be able to enjoy themselves and gamble."[50]

---

[47] China International Travel Service was the company that owned the building in Beijing that LVSC paid tens of millions of dollars to purchase for no apparent reason, and whose chairman had political connections on Hengqin Island, the location where Weidner wanted to develop a multi-billion-dollar resort but needed government approvals.  *See* Appendix A.

[48] Chu Kong Shipping was indirectly owned by the Consultant and the chairman of China International Travel Service.  *See* Appendix A.

[49] Oct. 19, 2015 Hr'g Tr. at 206:15-24 (BLOOM_0119059, at -9330).

[50] *See* Oct. 19, 2015 Hr'g Tr. at 213:22-214:11 (BLOOM_0119059, at -9332).  Notably, Weidner testified that "Brother 8" and other members of the Ma family, a prominent Chinese family with significant political and business connections, were going to play a critical role in his "Cross-Border Trading Platform" strategy.  *See* Weidner Hr. Tr. at 210:14-211:3 ("So I was involved in Macau with the Ma family, one cousin, one brother, a very famous Chinese family.  Relatives had . . . set up Citic and Poly Group.  So Citic and Poly Group, through Brother 8 . . . were going to help me figure out how to be able to transfer money for trading purposes.  So it was my Macau contacts, my CLO contacts, my Beijing contacts that all came into play for what I would say [is] a

. . .

As long as he registered a business there and was in trading you can't – it's hard to trace did he lose in the transaction, make money in a transaction, or whatever? That's why the trading platform – as long as he was making widgets, you can count widgets and send them. If you're trading commodities, which were the metals or whatever you were trading, oil, price goes up and down every day, so it's just a more, call it fluid way of being able to transact cash."[51]

42.     Significantly, Weidner acknowledges in his testimony that manipulation of trade transactions was a key component of his proposal, as the registered business used to move money out of China could not be one that involved fixed goods that could be counted (e.g., "widgets"), but rather should be one where prices were "fluid" (e.g., metals, oils, etc.) and therefore harder to trace.[52] Thus, in effect, the "Cross-Border Trading Platform" described by Weidner was a classic example of a trade-based money-laundering scheme whereby money, including personal funds, is transferred across national borders through the overpricing and/or under-invoicing of goods and services. The essential component of such schemes is the intentional misrepresentation of the value of trade-based goods and services in order to transfer value or settle accounts between trading parties. In the case of Weidner's "Cross-Border Trading Platform," further obfuscation would have been added by limiting the trading activities

---

unique and sophisticated way of reaching directly into individual Chinese high-end business people who were most of the very high-end gamblers there.") (BLOOM_0119059, at -9331); *id.* at 213:20-214:6 ("[B]rother 8 is in Macau. And brother 8's family relate[s] to Citic and Poly Group and I was setting up with them banking relationships so that when the trade guys . . . went to be at Solaire in Manila and they needed money to be able to conduct their trading exercises, they generally over-send money for trading exercises so they have liquidity to gamble with. So they were the other piece of, call it the sophistication of a process, of building a way for Chinese businessmen to be able to come and gamble and have money to gamble with.") (BLOOM_0119059, at -9332). Weidner expressed no concern whatsoever that "Brother 8" played a "crucial role" in the Macao underworld, as he was acquainted with many triad (organized crime) bosses and served as a "referee" for their disputes. *See* Sonny Lo Shiu-hing, *The Politics of Cross-border Crime in Greater China: Case Studies of Mainland China, Hong Kong, and Macao*, Routledge, p. 139.

[51] Oct. 19, 2015 Hr'g Tr. at 291:17-292:2 (BLOOM_0119059, at -9351); *see also* Oct. 19, 2015 Hr'g Tr. at 209:3-17 (BLOOM_0119059, at -9331) ("Well, you can't draw money in China and say 'I'm going to the Philippines to gamble.' It's illegal. When you're talking to a Chinese businessman, you're talking to him about business, you're talking to him about perhaps coming to a leisure thing. . . . so you can't promote gambling in China, particularly when you're dealing with high level government officials. I am Weidner Lou Trading or Weidner Resorts when I'm in China.").

[52] *Id.*

to commodities transactions, which can dramatically fluctuate in price in the short term thereby making it difficult, if not impossible, to determine actual gains and losses.[53]  As such, the "Cross-Border Trading Platform" bears a striking resemblance to many of the abusive schemes and techniques developed by money launderers, offshore bankers, financial service providers and others in assisting customers to circumvent national tax and anti-money laundering laws that have been the subject of significant media coverage around the world.[54]

43.    In his testimony, Weidner euphemistically referred multiple times to terms such as "sophisticated," "excuses," "techniques," "legal," and "fronts," but the clear inference of his statements is that he intended to put in place a structure that was designed to appear legitimate when in actuality he was illegally promoting gambling to Chinese nationals and assisting them in illegally getting funds out of China.  His unwillingness to put any information about his "Cross-Border Trading Platform" or his "Government-led Top-Down Junket Approach" in writing further underscores that he knew what he was doing was wrong.[55]  And we understand that, once again, GGAM did not produce any documents in the Arbitration concerning this strategy, leading us to the inescapable conclusion that GGAM and Weidner were likely fully aware that both aspects of what he was proposing were illegal.

---

[53] Jean B. Weld, *Current International Money-Laundering Trends and Anti-Money Laundering Co-Operation Measures*, UN Asia and Far East Institute for the Prevention of Crime and the Treatment of Offenders (July 2010), https://www.unafei.or.jp/publications/pdf/RS_No83/No83_08VE_Weld3.pdf ("Red flag indicators of trade-based money laundering include: . . . false invoicing and customs documents: such as commodity misclassification or commodity over-valuation or under-valuation[.]").

[54] Examples include U.S. Dep't of Justice, *HSBC Holdings Plc. and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement* (Dec. 11, 2012), https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations; U.S. Dep't of Justice, *UBS Enters into Deferred Prosecution Agreement* (Feb. 18, 2009), https://www.justice.gov/opa/pr/ubs-enters-deferred-prosecution-agreement; U.S. Dep't of Justice, *United States Asks Court to Enforce Summons for UBS Swiss Bank Account Records* (Feb. 19, 2009), https://www.justice.gov/opa/pr/united-states-asks-court-enforce-summons-ubs-swiss-bank-account-records.

[55] *See* Oct. 19, 2015 Hr'g Tr. at 215:15-216:19 (BLOOM_0119059, at -9332).

**V.    GGAM'S REFUSAL TO PRODUCE CRITICAL DOCUMENTS IN THE ARBITRATION THAT WOULD HAVE CORROBORATED THE EXISTING CIRCUMSTANTIAL EVIDENCE OF ILLEGAL AND UNETHICAL CONDUCT**

44.    We note that that there was a suspicious lack of documentation produced in the Arbitration related to GGAM's relationship with Dr. Chen, as well as other Chinese government officials and businessmen.  We were informed by counsel that GGAM had been ordered by the Arbitration tribunal to produce Chiu's files, who was GGAM's President of Asia, "instrumental" and "key" to GGAM's strategies, and acted as a liaison between Weidner and Dr. Chen.  Such files seemingly would have included direct communications with government officials and junket operators, such as emails or text messages (a more common form of immediate communication in Asia).[56]  We also note that GGAM's former attorney, Charles A. Patrizia of Paul Hastings LLP, admitted that Paul Hastings did not search or review Chiu's personal email files, claiming, among other things, that "it would have been disproportionately time-consuming and expensive to obtain, search and review any separate personal files that Mr. Chiu might have possessed."[57]  *Such secrecy is damning*.  If GGAM's utilization of these strategies, and Chinese government officials and businessmen to advance such strategies, was above-board and central to any legitimate strategies for Solaire, then there would be no reason to hide it.

45.    We also understand that GGAM did not produce any documents related to Weidner Resorts, Weidner Lou Trading, or any other Weidner businesses, on the basis that these entities were not "parties" to the Arbitration.[58]  Yet Weidner later testified that he used

---

[56] We are instructed that the only documents that GGAM produced in the Arbitration that were sent to or received by Eric Chiu were those documents that were also sent to or received by other custodians, such as Weidner.

[57] *See* Affidavit of Charles A. Patrizia, March 13, 2018, ¶ 36 (GGAM-SDNY-0152569).

[58] *See* Claimants' Objections and Responses to Respondents' Requests to Produce Documents, January 14, 2015 (GGAM-SDNY-0264742), at request no. 45 ("Claimants additionally object to this request on the ground that it seeks the disclosure of a *non- party's* confidential, commercial, technical, sensitive, privileged, and/or proprietary information.") (emphasis added); *see also* Decision of the Tribunal on Respondents' Requests for Documents, February 16, 2015 (GGAM-SDNY-0378511), at request no. 45 ("Objection upheld. Weidner Resorts is a third

these businesses as "fronts" to conduct GGAM or casino-related business while visiting the Chinese mainland, where it is illegal to gamble and to market for a casino.[59] And, as noted above, it was later revealed that Chiu, GGAM's President for Asia, was not on GGAM's payroll, but rather was on the payroll of Weidner Resorts and Weidner Holdings.[60] Therefore, it is possible that Chiu's emails also would have been in the possession, custody, and/or control of Weidner Resorts and Weidner Holdings, but were not produced in the Arbitration.

## VI.    CONCLUSION

46.    Weidner and Chiu have a long history of disregarding compliance measures and of engaging in unethical and illegal activities in China and Macao during Weidner's time as President of LVSC and as the leader of LVSC's "China strategy." (See **Appendix A** for details). They appeared to be consistently willing and ready to engage in casino marketing activities that were specifically designed to circumvent national and international laws, currency controls, and money laundering regulations and guidelines when those laws interfere or impede his financial interests.

47.    GGAM's proposed "Government-Led, Top-Down Junket Approach," which amounted to utilization of Chinese government officials to secure benefits from junket operators, appears to have involved corruption, including the implicit *quid pro quo* dynamic typically occasioned by such relationships.

48.    GGAM's proposed "Cross-Border Trading Platform" strategy for moving money illegally out of China to the Philippines for the purpose of engaging in illegal overseas gambling amounted to utilization of a common and well-known form of illegal money laundering known as "Trade Based Money Laundering."

---

party to these proceedings.").

[59] *See, e.g.*, Oct. 19, 2015 Hr'g Tr. at 208:7-11 ("But I was using – I travel with business cards that don't have 'gambling' on them. I don't travel with GGAM business in China, I travel with Weidner Resorts and another one called Weidner Lou Trading.") (BLOOM_0119059, at -9330).

[60] *See supra* ¶ 33.

49.     The secrecy employed by GGAM with respect to their "strategies" and relationships with Dr. Chen and other Chinese officials and businessmen, the lack of formal documentation and correspondence, Weidner's apparent lack of any moral or ethical qualms about the nature of these relationships, and Weidner's and Chiu's prior and similar misconduct at LSVC all further underscore these conclusions.

Executed this 16th day of September 2022

_____
Frédric Gushin

_____
Daniel Reeves

## APPENDIX A

## US Government Investigations  involving Las Vegas Sands Corporation (LVSC) during Weidner's Tenure

1.     Spectrum has undertaken a review of enforcement actions taken by US government agencies against Las Vegas Sands Corporation ("LVSC") during the period from 2002 to 2009 when William Weidner ("Weidner") was COO and President of LVSC.

2.     The information identified reveals a troubling pattern of malfeasance by Weidner and Eric Chiu, including disregarding laws, regulations, and internal company policies.  It should further be noted that none of this information was known to the management of Bloomberry at the time that they retained GGAM and Weidner to manage Solaire.

**SEC Cease-and-Desist Order Related to LVSC Operations in Macao and China**

3.     On April 7, 2016, the U.S. Securities and Exchange Commission ("SEC") issued a Cease-and-Desist Order (the "SEC Order") against LVSC concerning LVSC's failure to develop and maintain a reasonable system of internal accounting controls over its operations in China and Macao from 2006 through at least 2011.  This failure resulted in more than $62 million being transferred from LVSC to a consultant in China over a series of transactions that lacked supporting documentation and proper authorizations.[1]

4.     The SEC Order states:  "Until March of 2009, LVSC's operations in Macao and China were overseen by its President and Chief Operating Officer who worked in close concert with LVSC's President of Asian Development."[2]

5.     Although not named directly and identified only by position in the SEC Order, Weidner was the President of LVSC during the material time while Eric Chiu ("Chiu") was President of Asian Development at LVSC. Consequently, most of the controversial

---

[1] SEC Order in the Matter of Las Vegas Sands Corp. at ¶ 7 (Apr. 7, 2016) (GGAM-SDNY-0122376).

[2] *Id.* at ¶ 10.

transactions took place while Weidner was in charge of LVSC's business operations in Macao. It should also be noted that after Weidner left LVSC in 2009 and formed GGAM in 2010, he continued to work closely with Chiu, who from 2012 to 2017 served as GGAM's President for Asia.[3]

6.     In 2006 Chiu was introduced to Saixin Yang, a Chinese consultant (the "Consultant"), through "a high-level person with the PRC's China Liaison Office in Macao"[4] to assist LVSC with its activities in China.  The Consultant claimed to be a former Chinese government official with political connections in the Chinese government.  Weidner personally approved the hiring of the Consultant, whose stated role was "to liaise with government bodies, provide advice and assistance, and serve as an intermediary or "beard" to obscure LVSC's role in certain transactions."[5]

7.     The following violations were cited involving the Consultant, all of which were initiated or supported by Weidner:  LVSC used the Consultant as an intermediary or "beard" to buy and sponsor a Chinese professional basketball team on behalf of LVSC where ownership of such teams by gaming companies was not allowed by law.  According to the SEC Order, Weidner wanted to buy the team with the "purported purpose being to improve LVSC's image in China and to bring customers to the casinos because the team could play in the Venetian Macao's sports arena."[6]

---

[3] Chiu's Linked-in bio states he has been a freelance consultant since 2017. *See* Eric Chiu, Linkedin, https://www.linkedin.com/in/eric-%E5%8A%9B%E4%BA%BA-chiu-%E7%84%A6-0a30b29a/?originalSubdomain=hk (last visited Sept. 14, 2022).

[4] Dep't of Justice, Criminal Division, Las Vegas Sands Corp. Non-Prosecution Agreement   Statement of Facts, Jan. 19, 2017, A-2 (GGAM-SDNY-0122436) ("DOJ NPA").  There is no further information about the identity of the "high-level person with the PRC's China Liaison Office in Macao" in the DOJ NPA, but it is possible that this referred to Dr Chen Xiang given the fact he had known Weidner since Weidner's time at LVSC and the close relationship he had with Weidner and Chiu, as described in the accompanying Expert Report.

[5] SEC Order at ¶ 15.

[6] *Id.* at ¶¶ 17-18.

8.      In September 2007, the LVSC Senior Director of Finance raised concerns about the basketball transaction to the CFO of LVSC.  Of particular concern was the repeated transfer of funds to the Consultant without any supporting documentation for the team's need for or use of the funds.  The LVSC Senior Director of Finance also learned that the Consultant had used LVSC funds to make a payment to a senior Chinese Basketball Association official in connection with the basketball team.[7]  Within months, Weidner as President and COO of LVSC arranged to have the LVSC Senior Director of Finance placed on administrative leave and eventually terminated.  Meanwhile, Weidner approved the ongoing payments to the Consultant, which were made through Chinese subsidiaries of LVSC.[8]

9.      Referencing the inability of LVSC to track the funds that it had transferred to the Consultant, among other things, the CFO wrote in October 2007:  "My . . . concern is how to deal with this from a Sarbanes-Oxley perspective. The manner in which this has transpired is not indicative of a sound control environment."[9]

10.      Due to lack of accountability of funds provided to the Consultant, in late 2007 LVSC engaged an international accounting firm (the "Firm") to review the basketball transaction.  When the Firm was instructed to cease its investigation in February 2008, it had already identified over $700,000 in unaccounted-for funds that had been transferred to the Consultant.  Nonetheless, more than $5 million in additional payments were subsequently made to the Consultant ostensibly in connection with the basketball team.[10]

11.      In total, approximately $14.8 million was paid to the Consultant between March 2007 and January 2009 in connection with a series of sponsorship and advertising contracts relating to the basketball team.  Over one-third of these funds were paid after the Firm had

---

[7] SEC Order at ¶ 20.

[8] *Id.* at ¶ 21.

[9] *Id.* at ¶ 22.

[10] *Id.* at ¶ 23.

identified significant funds that had not been accounted for, and approximately $6.9 million was transferred without proper authorizations or supporting documentation.[11]

12.    LVSC used the Consultant as an intermediary or "beard" to purchase a residential-office building in Beijing from a Chinese state-owned enterprise ("SOE").  Weidner decided that the property would be named the Adelson Center after Sheldon Adelson, the company's founder and CEO, and that it would be developed as a business center to help U.S. companies seeking to do business in China.  No research or analysis was conducted to determine whether there actually was a need for such a business center, the amount of any profit or loss that it would likely generate, or whether it would help improve the image of LVSC in China.[12]

13.    Numerous employees were concerned that the purchase of the property was intended solely for political purposes.  Nevertheless, approximately $43 million was transferred to one of the Consultant's entities between July 2007 and February 2008 for the purchase of the building.  None of the payments was approved by an LVSC employee with sufficient authorization to approve the amounts paid.  LVSC also spent approximately $14 million on renovations and miscellaneous expenses, of which approximately $13.7 million lacked proper authorization.[13]

14.    In April 2008, approximately $1.4 million was paid to an entity associated with the Consultant, which was recorded in LVSC's books and records as "arts and crafts."  In February 2009, an LVSC accountant raised questions about the payment because the entity had not obtained any artwork for the Adelson Center.  The accountant was told by Chiu that the

---

[11] SEC Order at ¶ 25.

[12] *Id.* at ¶¶ 29-31.

[13] *Id.* at ¶ 31.

payment actually related to Hengqin Island. No adjustment was made to how the payment was recorded.[14]

15.    Sometime around September 2008, and after additional transfers of funds had occurred without proper authorizations, LVSC decided to shutter the Adelson Center project— but not before the company had already transferred a total of approximately $61 million in connection with the real estate transaction.[15]

16.    In 2007, LVSC decided to establish a high-speed ferry service that would transport LVSC customers from China and Hong Kong to Macao. Under pressure from Weidner, LVSC employees awarded the contract to a newly formed ferry company that was jointly owned by an established state-owned ferry company (SOE) and a shipping company that was indirectly owned by the Consultant and the SOE's Chairman. Weidner stated in an email to a LVSC executive that the selection of the newly formed ferry company would be politically advantageous to LVSC.[16]

17.    Each year, and as part of its contract, the new ferry company submitted a detailed budget to LVSC for expenses that included a line item for "Business Entertainment" for business partners and Chinese government officials. In addition to giving these government officials free meals, the ferry company would also give them "red envelopes" containing cash at the Chinese New Year. During an audit conducted by Sands China Limited's Internal Audit department in 2010, after Weidner had left LVSC, auditors were told by employees of the ferry company that it was necessary to provide meals and entertainment to government officials to secure routes for the ferries.[17]

---

[14] SEC Order at ¶ 35.

[15] *Id.* at ¶ 36.

[16] *Id.* at ¶¶ 37-38.

[17] *Id.* at ¶ 39.

18.     LVSC had policies and procedures in place at Venetian Macao Ltd. ("VML") regarding purchasing, but they were not enforced.  Employees were able to use cash advances and expense reimbursements to circumvent those policies and procedures.  For example, in September 2006, Chiu used a cash advance of approximately $28,000 from VML to pay for a topographic map of Hengqin.  In another instance, in October 2006, Chiu arranged a forum at the Great Hall of the People in Beijing.  Afterward, Chiu submitted a personal expense report for which he was reimbursed approximately $86,000.[18]

19.     As a result of these facts, LVSC was ordered to cease and desist from committing or causing future violations of the Foreign Corrupt Practices Act ("FCPA"), to retain the services of an SEC-approved Independent Consultant to review, evaluate and recommend improvements to LVSC's policies and procedures regarding compliance with the FCPA, and to pay a civil monetary penalty of $9 million to settle the government's investigation into these violations of the FCPA.[19]

**DOJ FCPA Penalty against LVSC Related to Operations in Macao and China**

20.     On January 19, 2017, the U.S. Department of Justice ("DOJ") announced that LVSC had agreed to pay a $6.96 million criminal penalty to resolve FCPA charges (related to the same facts outlined in the SEC Order (discussed above).[20]

21.     According to admissions by LVSC made in connection with the resolution, "certain Sands executives knowingly and willfully failed to implement a system of internal accounting controls to adequately ensure the legitimacy of payments to a business consultant who assisted Sands in promoting its brand in Macao and the PRC, and to prevent the false recording of those payments in its books and records."[21]

---

[18] SEC Order at ¶ 40.

[19] *Id.* at p. 10.

[20] Dep't of Justice, Office of Public Affairs press release, January 19, 2017, p.1 ("DOJ Press Release")..

[21] *Id.*

22.     Specifically, the DOJ NPA refers to Weidner in the following terms:  "Sands Executive 1 was a senior executive of LVSC and led Sands' "China strategy," which included promotion of Sands' gaming operations in Macao and Sands' brands in the PRC.  Sands Executive 1 left Sands in 2009."  Whereas the NPA refers to Chiu in these terms:  "VML Executive was a manager of VML and was responsible for Sands' Asian business development.  VML Executive 1 also managed and served as the legal representative for several of Sands' WFOEs.  VML Executive left Sands in 2009."[22]

23.     LVSC continued to make payments to the Consultant despite warnings from its finance staff and an outside auditor that the business consultant had failed to account for portions of these funds.  LVSC terminated the finance department employee who raised concerns about the payments.[23]  And Weidner later presented a summary of findings of the outside auditor to the LVS board, stating that no illegal payments were made.[24]

24.     LVSC admitting having paid approximately $5.8 million from 2006 through 2009 to the Consultant without any discernable legitimate business purpose.[25]

25.     The DOJ press release makes clear that a mitigating factor in its judgment was that LVSC "no longer employs or is affiliated with any of the individuals implicated in the conduct described in the agreement, and it engaged in extensive remedial measures, including revamping and expanding its compliance and audit functions and programs and making significant personnel changes, such as the retention of new leaders of its legal, compliance, internal audit and financial gatekeeper functions."[26]

---

[22] DOJ NPA at A-2.

[23] DOJ Press Release at 1.

[24] *Id.* at A-6, para**.** 22

[25] *Id.*

[26] *Id.* at 1.

**Conclusion**

26.    In August of 2012, the *Wall Street Journal* and the *New York Times* reported that the DOJ and SEC had initiated investigations into transactions conducted in China and Macao by LVSC during the mid- to late-2000s, a period of time during which Weidner served as President and COO of LVSC.[27]  The transactions under investigation involved potential illegal activity under the FCPA.

27.    After becoming aware of the news reports, Bloomberry's CFO Estela Tuason-Occeña contacted Weidner by email and specifically asked whether and/or to what extent he was involved in the transactions and misconduct being investigated.  In response, Weidner provided a statement approved by his attorneys that was evasive and did not respond directly to the question.[28]

28.    After consulting with Bloomberry's counsel, Occeña sent a second email to Weidner requesting clarification of the statement as to whether or not he was involved in the transactions.  In response, Weidner stated he would have his attorneys "coordinate a more formal response."[29]  On August 18, 2012, Weidner sent Occeña a third email stating:

> During my more than 13 years at [LVS], I believe I played an important role in guiding the company to successful growth and expansion, and to the creation - and preservation - of significant shareholder value. In the course of that work, I participated at a strategic level in many transactions, including certain transactions you may have read about in recent Wall Street Journal and New York Times articles. My participation in those transactions was consistent with the role of any Chief Operating Officer and President of a large public company. The transactions were presented to and reviewed thoroughly by the board of directors of LVS to ensure the company was complying with both U.S. and foreign law. I was not

---

[27] Kate O'Keeffe, Alexandra Berzon, Justin Scheck and James V. Grimaldi, *Sands Probed in Money Moves*, *Wall Street Journal*, (Aug. 7, 2012). https://www.wsj.com/articles/SB10000872396390444320704577566803521121134; Michael Luo, Neil Gough and Edward Wong, *Scrutiny for Casino Mogul's Frontman in China*, New York Times, (Aug. 13, 2012). https://www.nytimes.com/2012/08/14/us/politics/sheldon-adelsons-dealings-in-china-are-under-investigation.html.

[28] Email from B. Weidner to E. Occeña, August 15, 2012 (GGAM-SDNY-0122540).

[29] Email from B. Weidner to E. Occeña, August 16, 2012 (GGAM-SDNY-0122653).

> involved in the transfer or accounting of funds related to those
> transactions and the subsequent course of events at the company
> ended with my resignation from [LVS] in March 2009. **While I was
> a [LVS], I was not aware nor was I complicit in any alleged
> wrongdoing regarding the referenced transactions.**[30]

29.     Not only was this statement  false and misleading, but Weidner then tried to

impose on Bloomberry what appear to be strategies similar to those that he pursued at LVSC—

strategies for which LVSC was fined a total of almost US$18 million by three separate US

government agencies:  SEC ($9 million), DOJ ($6.96 million) and NGCB ($2 million).[31]

30.     Although neither the SEC nor the DOJ took action against Weidner or Chiu

personally, an objective analysis of the facts of the case demonstrates that Weidner was in fact

personally responsible for or otherwise materially involved in nearly all of the wrongful

conduct described in the DOJ NPA and SEC Order regarding the transactions investigated.  It

is inconceivable that transfers totaling in excess of $50 million – whether receiving a signature

of formal approved or not – would have been made to a consultant in China by LVSC staff in

Macao without the knowledge and/or approval of Weidner as President and COO of LVSC.

Moreover, as Peter Clark noted in his report: "It is meaningful that LVS, the former employer

of Mr. Weidner and Mr. Chiu, acknowledged and admitted to the facts set forth in the DOJ

NPA which clearly implicates Mr. Weidner and Mr. Chiu in the conduct that violated the

FCPA."[32]

31.     The management of Bloomberry had no knowledge about the prior illegal

conduct and non-compliance by Weidner and Chiu over a period of several years that resulted

in extensive legal investigations and multimillion dollar fines imposed on LVSC by three US

government agencies.  Moreover, when Bloomberry management heard about the SEC and

---

[30] Email from B. Weidner to E. Occeña, August 18, 2012 (GGAM-SDNY-0122656) (emphasis added).

[31] J.D. Morris, *Las Vegas Sands agrees to $2 million fine from Nevada gaming regulators*, Las Vegas Sun, (May 11, 2016). https://vegasinc.lasvegassun.com/business/gaming/2016/may/11/las-vegas-sands-2-million-fine-nevada-gaming/.

[32] *See* Report of Peter B. Clark, Esq., April 25, 2018, ¶ 21 (BLOOM_0044771).

DOJ investigations and queried Weidner about them, he obfuscated and then clearly misled Bloomberry, all while attempting to put into place equally illegal and unethical "strategies" for Solaire.

# APPENDIX B

# Trade Based Money Laundering

Trade-based money laundering has been the subject of numerous government studies and media articles, some dealing explicitly with its use in illegally moving RMB out of Mainland China.  Examples include:

1.      In 2006, the Financial Action Task Force ("FATF") published a study in which it concluded that the international trade system is subject to enormous risks and vulnerabilities that can be exploited to illegally move and hide monies by using large volume of transactions, the complexities of multiple foreign exchanges, and the commingling of legitimate and illicit funds to obscure individual transactions from detection.[1]

2.      In a 2007 FATF mutual evaluation report on China, FATF evaluators and Chinese officials agreed that trade-based money laundering is one of the four primary methods used to move funds out of China.[2]

3.      A 2012 article published by *Quartz Business News* describes a scheme whereby RMB can easily be moved out of China by simply pretending to pay a foreign supplier for goods or services based on a false invoice.  According to an unidentified tax accountant at a Big Four accounting firm in Hong Kong:  "This is the most common way of getting renminbi turned into something else and sent abroad.  It is virtually un-detectable."[3]

---

[1] [1]  Financial Action Task Force, *Trade Based Money Laundering* (June 23, 2006), https://www.fatf-gafi.org/media/fatf/documents/reports/Trade%20Based%20Money%20Laundering.pdf

[2] Financial Action Task Force, *First Mutual Evaluation Report On Anti-Money Laundering And Combating The Financing Of Terrorism: People's Republic of China* (June 29, 2007), https://www.fatf-gafi.org/media/fatf/documents/reports/mer/MER%20China%20full.pdf

[3] Naomi Rovnick, *Poker Chips, Fake Invoices and Art: How China's Elite Illicitly Move Money out of the Country*, *Quartz*, (Oct. 25, 2012), https://qz.com/19712/how-chinas-elite-illicitly-move-their-money-offshore/

4.      A 2014 article published in *Money Laundering Bulletin-UK* titled "The Chinese Way – Via Macau and Hong Kong" describes how Chinese nationals are increasingly turning to trade-based money laundering in China as a way to move funds out of the country.[4]

5.      A 2018 FATF report titled "Professional Money Laundering" described the tools and techniques commonly used by professional money launderers and concluded that one of the most significant mechanisms used is Trade-Based Money Laundering, including where funds falsely purported to be related to trade are transferred cross-border and where the price, quantity and/or value of goods on invoices is over or under stated.  The report included a case study of a major international investigation conducted by Canadian and Chinese authorities where professional money launderers used these and other techniques to assist wealthy Chinese gamblers illegally move millions of dollars from China to Canada for purposes of gambling.[5]

6.      A 2020 study published jointly by FATF and the Egmont Group, an international association of government Financial Intelligence Units, titled "Trade-Based Money Laundering Trends and Developments," further defined Trade-Based Money Laundering as including so-called Services-Based Money Laundering (SBML) schemes, where services and intangibles are used to disguise and justify the movement of illicit funds, rather than tangible trade goods.  In its analysis, the report concluded that gambling, online gambling, gaming related software providers, and financial services are particularly vulnerable to Services-Based Money Laundering.[6]

---

[4] Christine Duhaime, *The Chinese Way – the Impact of China's Anticorruption Campaign on Trade-based Money Laundering and Macau Casinos*, Duhaime's Anti-Money Laundering Law in Canada (November 29, 2014), http://www.antimoneylaunderinglaw.com/2014/11/the-chinese-way-the-impact-of-chinas-anti-corruption-campaign-on-trade-based-money-laundering-and-macau-casinos.html

[5] Financial Action Task Force, *Professional Money Laundering* (July, 2018), https://www.fatf-gafi.org/media/fatf/documents/Professional-Money-Laundering.pdf

[6] Financial Action Task Force, Trade-Based Money Laundering: Trends and Developments, (December 2020), p. 35https://www.fatf-gafi.org/media/fatf/content/Trade-Based-Money-Laundering-Trends-and-Developments.pdf

## APPENDIX C

## List of Materials Reviewed

| # | Date | Document Description | Record Cite |
|---|------|---------------------|-------------|
| 1. | 2009 | Sonny Lo Shiu-hing, *The Politics of Cross-border Crime in Greater China: Case Studies of Mainland China, Hong Kong, and Macao*, Routledge | Publicly available |
| 2. | 1997-03-14 | Laws of the People's Republic of China, (Adopted by the Second Session of the Fifth National People's Congress on July 1, 1979 and amended by the Fifth Session of the Eighth National People's Congress on March 14, 1997), https://www.fmprc.gov.cn/ce/cgvienna/eng/dbtyw/jdwt/crimelaw/t209043.htm | Publicly available |
| 3. | 2006-01-01 | Law of the People's Republic of China on Public Servants, (promulgated by the Standing Comm. Nat'l People's Cong., Jan. 1, 2006), P.R.C. Law 35, http://www.npc.gov.cn/zgrdw/englishnpc/Law/2007-12/13/content_1384101.htm | Publicly available |
| 4. | 2006-06-23 | Financial Action Task Force, *Trade Based Money Laundering* (June 23, 2006), https://www.fatf-gafi.org/media/fatf/documents/reports/Trade%20Based%20Money%20Laundering.pdf | Publicly available |
| 5. | 2007-06-29 | Financial Action Task Force, *First Mutual Evaluation Report On Anti-Money Laundering And Combating The Financing Of Terrorism: People's Republic of China* (June 29, 2007),  https://www.fatf-gafi.org/media/fatf/documents/reports/mer/MER%20China%20full.pdf | Publicly available |
| 6. | 2009-02-18 | U.S. Dep't of Justice, *UBS Enters into Deferred Prosecution Agreement* (Feb. 18, 2009), https://www.justice.gov/opa/pr/ubs-enters-deferred-prosecution-agreement | Publicly available |
| 7. | 2009-02-19 | U.S. Dep't of Justice, *United States Asks Court to Enforce Summons for UBS Swiss Bank Account Records* (Feb. 19, 2009), https://www.justice.gov/opa/pr/united-states-asks-court-enforce-summons-ubs-swiss-bank-account-records. | Publicly available |
| 8. | 2010-03-29 | Matt Isaacs, *Special Report: High rollers, triads and a Las Vegas giant*, Reuters (March 29, 2010), https://www.reuters.com/article/us-casinos-macau-sands/special-report-high-rollers-triads-and-a-las-vegas-giant-idUSTRE62S34020100329 | Publicly available |
| 9. | 2010-07-01 | Jean B. Weld, *Current International Money-Laundering Trends and Anti-Money Laundering Co-Operation* | Publicly available |

| # | Date | Document Description | Record Cite |
|---|---|---|---|
| | | *Measures*, UN Asia and Far East Institute for the Prevention of Crime and the Treatment of Offenders, (July 2010), https://www.unafei.or.jp/publications/pdf/RS_No83/No83_08VE_Weld3.pdf | |
| 10. | April 2012 | Bloomberry Resorts Corp., Management Presentation (April 2012) | BLOOM_0076267 |
| 11. | 2012-08-07 | Kate O'Keeffe, Alexandra Berzon, Justin Scheck and James V. Grimaldi, *Sands Probed in Money Moves*, *Wall Street Journal*, (Aug. 7, 2012). https://www.wsj.com/articles/SB10000872396390444320704577566803521121134 | Publicly available |
| 12. | 2012-08-13 | Michael Luo, Neil Gough and Edward Wong, *Scrutiny for Casino Mogul's Frontman in China*, New York Times, (Aug. 13, 2012). https://www.nytimes.com/2012/08/14/us/politics/sheldon-adelsons-dealings-in-china-are-under-investigation.html | Publicly available |
| 13. | 2012-08-15 | Email from B. Weidner to E. Occeña, . | GGAM-SDNY-0122540 |
| 14. | 2012-08-16 | Email from B. Weidner to E. Occeña | GGAM-SDNY-0122653 |
| 15. | 2012-08-18 | Email from B. Weidner to E. Occeña | GGAM-SDNY-0122656 |
| 16. | 2012-10-25 | Naomi Rovnick, *Poker Chips, Fake Invoices and Art: How China's Elite Illicitly Move Money out of the Country*, *Quartz*, (October 25, 2012), https://qz.com/19712/how-chinas-elite-illicitly-move-their-money-offshore/ | Publicly available |
| 17. | 2012-12-11 | U.S. Dep't of Justice, *HSBC Holdings Plc. and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement* (Dec. 11, 2012), https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations | Publicly available |
| 18. | 2013-03-31 | Email from E. Chiu to B. Weidner | BLOOM_0142890 |
| 19. | 2013-04-03 | Email from E. Chiu to B. Weidner | BLOOM_0142725 |
| 20. | 2013-04-07 | Email from E. Chiu to B. Weidner | BLOOM_0142889 |
| 21. | 2013-04-27 | Email from E. Chiu to B. Weidner | GGAM-SDNY-0278838, at -8879 |

| # | Date | Document Description | Record Cite |
|---|---|---|---|
| 22. | 2013-06-07 | Email from E. Chiu to B. Weidner | GGAM-SDNY-0124176 |
| 23. | 2013-06-21 | Email from E. Chiu to B. Weidner | BLOOM_0142777 |
| 24. | 2013-07-01 | Email from E. Chiu to B. Weidner | BLOOM_0142879 |
| 25. | 2014-11-29 | Christine Duhaime, *The Chinese Way – the Impact of China's Anticorruption Campaign on Trade-based Money Laundering and Macau Casinos*, Duhaime's Anti-Money Laundering Law in Canada (November 29, 2014), http://www.antimoneylaunderinglaw.com/2014/11/the-chinese-way-the-impact-of-chinas-anti-corruption-campaign-on-trade-based-money-laundering-and-macau-casinos.html | Publicly available |
| 26. | 2015-01-14 | Claimants' Objections and Responses to Respondents' Requests to Produce Documents, January 14, 2015 | GGAM-SDNY-0264742 |
| 27. | 2015-02-16 | Decision of the Tribunal on Respondents' Requests for Documents, February 16, 2015 | GGAM-SDNY-0378511 |
| 28. | 2015-05-09 | Chris McGreal and Matt Isaacs, *Sheldon Adelson faces new scrutiny as documents challenge his testimony*, The Guardian (May 9, 2015), https://www.theguardian.com/us-news/2015/may/09/sheldon-adelson-macau-testimony-las-vegas-sands | Publicly available |
| 29. | 2015-06-14 | Decl. of William P. Weidner in Support of Claimants' Reply Memorial | BLOOM_0100634 |
| 30. | 2015-10-19 | Oct. 19, 2015 Hr'g Tr. | BLOOM_0119310 |
| 31. | 2016-04-07 | SEC Order | GGAM-SDNY-0122376 |
| 32. | 2016-05-11 | J.D. Morris, *Las Vegas Sands agrees to $2 million fine from Nevada gaming regulators*, Las Vegas Sun, (May 11, 2016). https://vegasinc.lasvegassun.com/business/gaming/2016/may/11/las-vegas-sands-2-million-fine-nevada-gaming/ | Publicly available |
| 33. | 2016-07-01 | Racquel Cavalho, *Macau liaison office director Li Gang moved out, to be replaced by Wang Zhiming*, South China Morning Post (July 1, 2016), https://www.scmp.com/news/hong-kong/politics/article/1984053/macau-liaison-office-director-li-gang-moved-out-be-replaced | Publicly available |
| 34. | 2016-11-01 | Muhummad Cohen, *Asian-Funded Las Vegas Casino Courts New Type Of Chinese Clientele*, Forbes (Nov. 1, 2016), | Publicly available |

| # | Date | Document Description | Record Cite |
|---|------|---------------------|-------------|
| | | https://www.forbes.com/sites/muhammadcohen/2016/11/01/asian-funded-las-vegas-casino-courts-new-type-of-chinese-clientele/ | |
| 35. | 2016-11-27 | Buck Wargo, *Lucky Dragon to cater to Asian Americans*, Las Vegas Business Press (Nov. 27, 2016), https://businesspress.vegas/gaming-hospitality/lucky-dragon-to-cater-to-asian-americans/ | Publicly available |
| 36. | 2017-01-03 | Reuters Staff, *China's new rules on yuan transfers are not capital controls: Xinhua*, Reuters (Jan. 3, 2017), https://www.reuters.com/article/us-china-yuan-idUSKBN14M032 | Publicly available |
| 37. | 2017-01-19 | Dep't of Justice, Criminal Division, Las Vegas Sands Corp. Non-Prosecution Agreement Statement of Facts, Jan. 19, 2017 | GGAM-SDNY-0122436 |
| 38. | 2017-01-19 | Dep't of Justice, Office of Public Affairs press release, January 19, 2017 | Publicly available |
| 39. | 2017-08-31 | Expert Report of Fredric Gushin and Daniel Reeves | Dkt. 30-1 |
| 40. | 2018-03-13 | Affidavit of Charles A. Patrizia, March 13, 2018 | GGAM-SDNY-0152569 |
| 41. | 2018-04-25 | Report of Peter B. Clark, Esq., April 25, 2018 | BLOOM_0044771 |
| 42. | 2018-05-16 | Summary of Expert Opinions of Fredric Gushin and Daniel Reeves | GGAM-SDNY-0311509 |
| 43. | 2018-05-28 – 2018-05-29 | May 29, 2018 Hr'g Tr. | BLOOM_0116576 (May 28); BLOOM_0116782 (May 29) |
| 44. | 2018-07-01 | Financial Action Task Force, *Professional Money Laundering* (July, 2018), https://www.fatf-gafi.org/media/fatf/documents/Professional-Money-Laundering.pdf | Publicly available |
| 45. | 2020-01-03 | *Bloomberry Resorts and Hotels Inc. v. Global Gaming Philippines LLC*, [2020] SGHC 01 (Singapore High Court, Jan. 3, 2020) | Dkt. 125-2 |
| 46. | 2020-12-01 | Financial Action Task Force, Trade-Based Money Laundering: Trends and Developments, (December 2020), https://www.fatf-gafi.org/media/fatf/content/Trade-Based-Money-Laundering-Trends-and-Developments.pdf | Publicly available |
| 47. | 2021-11-30 | Gary Cheung, Sammy Heung and Raquel Carvalho, *Junket king Alvin Chau's arrest signals end of winning streak for Macao casinos as Beijing cracks down on gambling*, South China Morning Post (Nov. 30, 2021) | Publicly available |
| 48. | 2022-05-26 | *Alvin Chau indicted for illegal gaming, money laundering*, GGR Asia (May 26, 2022), | Publicly available |

| # | Date | Document Description | Record Cite |
|---|------|---------------------|-------------|
| | | https://www.ggrasia.com/alvin-chau-indicted-for-illegal-gaming-money-laundering/ | |
| 49. | Accessed 9/14/2022 | *About APG*, The Asia/Pacific Group on Money Laundering, , http://www.apgml.org/about-us/page.aspx?p=91ce25ec-db8a-424c-9018-8bd1f6869162 (last visited Sept. 14, 2022) | Publicly available |
| 50. | Accessed 9/14/2022 | Eric Chiu, Linkedin, https://www.linkedin.com/in/eric-%E5%8A%9B%E4%BA%BA-chiu-%E7%84%A6-0a30b29a/?originalSubdomain=hk (last visited Sept. 14, 2022) | Publicly available |

# APPENDIX D

# FREDRIC GUSHIN CV

---

**Fredric Gushin**
**Managing Director**
**Spectrum Gaming Group**
200 Lakeside Drive, Suite 250
Horsham, PA 19044 USA
gushin@spectrumgaming.com

---

Fredric Gushin founded Spectrum Gaming Group in 1993 after working 13 years for the New Jersey Division of Gaming Enforcement, where he was promoted to Assistant Director and Assistant Attorney General. While serving the state of New Jersey, he was instrumental in the successful openings of 12 major gaming properties.

At Spectrum, his track record in providing gaming advisory services to public regulatory agencies, both domestically and internationally, is unmatched. He is responsible for Spectrum being widely considered the foremost organization in the world in providing these specific resource-intensive services in a high quality and timely manner.

Gushin's background in providing specific expertise in advising governments about the gaming industry and gaming-related start-up issues, including assisting in the preparation of strategic plans or frameworks for the initial operations of gaming regulatory bodies is unmatched. He has served as Project Manager for Spectrum's major gaming investigative, AML and regulatory engagements in Ohio, Massachusetts, Florida, West Virginia, Maryland, Maine, Kansas, Delaware, Singapore, Australia, Puerto Rico and the U.S. Virgin Islands.

With Spectrum, Gushin has led engagements evaluating casino operations for compliance (including AML Services) for private sector and governmental clients for over 30 years. He is a former US Treasury Interim Advisor. Additionally, while serving as Assistant Director for New Jersey's Division of Gaming Enforcement, he worked on a task force to implement amendments to the Bank Secrecy Act when it determined that casinos were considered financial institutions in 1986 to 1988. As an Assistant Attorney General at the New Jersey Division of Gaming Enforcement, Gushin led a four-person team that worked with US Treasury to draft the first and second set of casino regulations from 1987 to 1990.

He has directed all of Spectrum's prior engagements including Spectrum's 17-year regulatory association with the Ministry of Home Affairs and Casino Regulatory Authority (CRA) in Singapore. From 2010 through 2014, Gushin led Spectrum's engagement with the CRA to conduct due diligence investigations of all applicants who applied for a junket promoter license. In many cases the applicant investigations required a comprehensive examination of AML compliance and currency-conversion issues in Macau and throughout Asia. Gushin also served a 14-month consultancy for the Tinian Casino Gaming Control Commission as gaming advisor.

Gushin has provided three confidential briefings to the Financial Crimes and Enforcement Network (FinCEN), one confidential briefing to the UK Gambling Commission and one confidential briefing to the US Attorney's in Guam and Saipan relative to Asian gaming practices with a focus on VIP play, junket operations and money laundering in Macau.

Gushin has testified before multiple government legislative and administrative hearings. He has also been an expert witness at several arbitration proceedings involving gaming and regulatory issues. In 1992, he testified at the Asian Organized Crime hearing conducted by the US Senate Permanent Subcommittee on Investigations. Most recently, in May 2022, Gushin gave a presentation to the Parliamentary Committee for Gaming, Kingdom of Thailand regarding strategic planning of gaming regulatory agencies, AML and regulatory compliance issues as well as several other key gaming regulatory public policy considerations.

## MANAGING DIRECTOR, SPECTRUM GAMING GROUP (1993 to Present)
- Founding partner in global consultancy. Oversees many core functions of rapidly growing international firm, including:
    - Establishing frameworks, strategic plans, goals and objectives for regulatory agencies
    - Drafting, evaluating and reviewing gaming legislation
    - Preparing regulations and developing compliance systems for government agencies
    - Conducting due diligence and licensing investigations
    - Coordinating multi-faceted entity licensing investigations
    - Preparing operating budgets

## GAMING REGULATOR
- 1978 – 1991 New Jersey Department of Law and Public Safety, Trenton, NJ Division of Gaming Enforcement
    - 1987-1991 Assistant Attorney General
    - 1985-1992 Assistant Director, Bureau of Compliance
    - 1978-1985 Deputy Attorney General, Supervising Attorney:
      Casino Operations (1980-1986)
      Casino Entity Section (1979-1983)
      Employee Licensing Section (1978 to 1981)
- Coordinated Department review for 12 of 13 casino start-up operations in New Jersey. Every facet of operating controls (accounting, game rules, security/surveillance, and gaming equipment) was directly investigated under my management
- Confirmed allegations of discrimination alleged against two casinos in Atlantic City. Filed and successfully prosecuted two major complaints. Fined $150,000 and $200,000 respectively, the industry was served notice that such practices would not be tolerated.
- Prepared a plan to consolidate all gaming industries' regulatory agencies into one agency within the Department of Law and Safety. This plan addressed duplication of effort. Recommendation contained in a 1988 Report to the Governor.
- Directed investigative team of State Police, financial agents and engineers to determine Department approach to slot machine integrity. Created state-of-the art laboratory to test, seal and certify computerized slots. This lab is the model for slot machine technology and enforcement around the world.
- Combined five sections (audit, casino operations, casino enforcement,

electronic games, and Equal Employment Opportunity) into a single Bureau of Compliance. Millions of dollars were saved in reducing staffing and increasing efficiency

## US DEPARTMENT OF COMMERCE, PATENT AND TRADEMARK OFFICE 1973 to 1978

1973 to January 1975 Trademark Attorney
January 1975 to June 1976 – Presidential Clemency Board, The White House
    Deputy Assistant Attorney General
    Researched and wrote a chapter of the Final Report to the
President
June 1976 to October 1978, Special Assistant to the Assistant Commissioner, Patent and Trademark Office

## EDUCATION
- Juris Doctor, Rutgers Law School, New Jersey, 1973
- Master of Arts, School of Government and Public Administration, American University, Washington, D.C., 1979
- Bachelor of Arts, The American University School of Government and Public Government Administration, Washington, D.C. 1970

## BAR ADMISSIONS
- New Jersey
- New York
- District of Columbia

## BAR ASSOCIATIONS
- New Jersey Bar Association
  - Casino Law Committee
- New York Bar Association
- District of Columbia Bar Association

## PROFESSIONAL ASSOCIATIONS
Member: International Masters of Gaming Law

## PUBLICATIONS
- SE Asia needs to step up AML actions, focus on junkets (December 2021) for publication in Asian Gaming Brief
- Regulatory tweaks needed to ensure Japan ROI: Video Interview with Fred Gushin (June 2021) for publication in Asia Gaming Brief
- Japan's VIP Challenge, Fredric Gushin for publication in Asian Gaming Brief (March 2021)
- Understanding Anti-money laundering Efforts Worldwide, Fredric Gushin for publication in Asian Gaming Brief (May 2016)
- Casino Industry in Asia Pacific – Development, Operations and Impact – edited by Cathy Hsu, PhD, Published by Haworth Press - Chapter 6 – Essentials of Effective

Regulation: Suggestions for Asian Gaming Jurisdictions (2006)
- The California Gambling Act and Regulation of Cardrooms, Fredric E. Gushin and Michael Wozniak, Gaming Law Review, Vol 3, Number 1 (December 2006)
- The Compliance Department – Key to Protecting Gaming Companies Domestically and Internationally by Fredric Gushin and William Kisby, Gaming Law Review, Vol 7, Number 2 (2003)

## SPEECHES / PRESENTATIONS

- Presentation for the Parliamentary Committee for Gaming, Kingdom of Thailand; S*trategic Planning and Gaming Regulatory Advisory Services* (May 2022)
- Brazilian Gaming Congress, Brasilia, Brazil (2016)
- Juegos - Miami, Coral Gables, Miami (June 2016)
- International Casino Exposition London – Totally Gaming January (2016)
- Macau Gaming Show (November 2015)
- International Masters of Gaming Law, AML - St. Thomas AML (April 2015)
- KMPG Partners Meeting, Montego Bay, Jamaica (May 2014)
- Japan Gaming Conference, Chair and Speaker, Tokyo, Japan (May 2014)
- International Association of Gaming Regulators, Singapore (October 2013)
- International Association of Gaming Advisors, Singapore (October 2013)

## APPENDIX E

## DANIEL REEVES CV

| |
|---|
| **Daniel Reeves** |
| **Senior AML Associate** |
| **Spectrum Gaming Group** |
| **200 Lakeside Drive, Suite 250** |
| **Horsham, PA 19044 USA** |
| dreeves@spectrumgaming.com |

Daniel Reeves retired from the United States Internal Revenue Service ("IRS") in 2012 after 35 years of service as an IRS Agent. While at the IRS, Reeves specialized in offshore tax and anti-money-laundering investigations. At the time of his retirement, he held the position of Senior Advisor on offshore matters within IRS's Large Business & International Division where he guided the creation, design and development of IRS's Offshore Compliance Initiative, a program that develops strategies, methodologies, and techniques for identifying US persons who use offshore structures and financial arrangements for illegal tax evasion, money laundering and other illicit financial purposes. Reeves also represented IRS on various international task forces and worked closely with federal and state law enforcement agencies including the US Department of Justice, Federal Bureau of Investigations ("FBI"), US Senate Permanent Subcommittee on Investigations, New Jersey State Police, New Jersey Division of Gaming Enforcement and more.

Reeves developed many of the investigative projects and techniques currently being used by IRS to identify US persons with secret offshore bank accounts and financial structures. Those projects and techniques focus on how financial secrecy laws, foreign entities, complex structures and secret accounts are exploited by money launderers, tax evaders and others to covertly move funds across international borders through banks, casinos and other financial institutions and hide financial assets in foreign countries. He also led high-profile international John Doe summons investigations into the cross-border private banking practices of UBS AG of Switzerland, HSBC India, the Stanford Financial Group in Antigua and others that identified many thousands of US taxpayers with secret offshore bank accounts and the recovery of more than ten billion in US dollars to date.

Prior to his work on offshore tax evasion, Reeves specialized in Anti-Money Laundering ("AML") investigations and Bank Secrecy Act ("BSA") compliance matters involving the US casino gaming industry. He led the first BSA AML investigations ever conducted in the United States of gambling casinos, developed many of the investigative techniques and procedures IRS uses to identify reportable currency transactions and suspicious activities, and developed IRS's first casino AML training programs for BSA investigators. Reeves also served more than 10 years as the primary subject matter expert on AML and the casino gaming industry detailed to the US Treasury Department's Financial Crimes Enforcement Network (FinCEN), where he assisted in the development of AML regulations and programs for casinos, card clubs and other gaming entities nationwide.

For his work in addressing offshore tax evasion and money laundering, Reeves has received numerous awards and citations including two IRS Commissioner Awards (the highest award IRS can bestow), a Secretary of the Treasury Award, an Assistant Secretary of the Treasury (Enforcement) Award, and a Department of Justice Attorney General Tax Division Award. He

is internationally recognized as an expert on international financial secrecy laws, offshore investigations and casino AML issues and frequently speaks as a subject matter expert at national and international conferences.

**Sampling of Articles Written About Reeves Career**

- Financial Times (February 04, 2014) – "*One Man's Role in Exposing Secrets of Swiss Banking*" by Nick Kochan
- Tax Notes (May 27, 2013) – "*Former IRS Agent Reeves Tells His Tale*" by Lee Sheppard
- Wall Street Journal (July 14, 2009) – "*Behind UBS Case, a Dogged IRS*" by Carrick Mollenkamp
- IPS News Service (April 30, 2009) "*IRS on the Track of Tax-Cheating 'John Does'*" by Lucy Komisar

**Sampling of Conference Speeches and Presentations Made**

- *Financial Secrecy, Tax Evasion and the Financial Community that Facilitates and Enables Them*, Silence is Golden, PWYP Norway (2013-04)
- *Beating the IRS*, The American Interest, Vol. 09, Nbr. 31 (2013-12-19)
- *On 2013, An Extraordinary Year in Offshore Enforcement*, OffshoreAlert.com (2014-02-07)
- *On Credit Suisse Pleading Guilty to Criminal Charges of Tax Evasion*, OffshoreAlert.com (2014-05-21)
- *On Weglin Bank Pleading Guilty to Criminal Charges of Tax Evasion and What it Means*, OffshoreAlert.com (2013-01-08)
- *On Correspondent Bank Accounts . . . The Achilles Heel of Offshore Banking*, OffshoreAlert.com (2013-03-12)
- *On Blogging for Offshore Alert*, OffshoreAlert.com (2012-10-12)
- *On Bradley Birkenfeld's $104 Million Whistleblower Award*, OffshoreAlert.com (2012-10-12)
- *Whistleblowers and What Really Motivates Them*, OffshoreAlert.com (2012-12-19).
- OffshoreAlert Conferences, Miami, FL, USA (May 03, 2016) "*IRS Whistleblower Program 10 Years On: What Works, What Doesn't & What Must Change*"
- OffshoreAlert Conferences, Miami, FL, USA (May 04, 2015) "*The IRS vs. Offshore Tax Evaders – An Update*"
- OffshoreAlert Conference Europe, London, England, UK (November 10, 2014) "*The Hunt for Offshore Tax Evaders and Those Who Assist Them*"
- OffshoreAlert Conferences, Miami, FL, USA (May 04, 2014) "*In an Age of Transparency & Automatic Tax Information Exchange, Can OFCs Survive?*"
- OffshoreAlert Conference Europe, London, England, UK (November 15, 2013) "*Cross-Border Law Enforcement Meets Cross-Border Banking*"
- International Financial Crimes Investigators Conference, Toronto, Canada (May 14, 2013) "*Investigating Offshore Tax Structures and The UBS Case*"
- OffshoreAlert Conference, Miami, FL, USA (May 06, 2013) "*My Experiences Leading the IRS Investigation into Offshore Tax Structures*"

- PWYP Silence is Golden Presentation, Norwegian House of Literature, Oslo, Norway (April 08, 2013) "*Financial Secrecy, Tax Evasion and the Financial Community that Facilitates and Enables Them*"
- Yale University, The Structural Roots of Global Poverty – Illicit Financial Flows, New Haven, Connecticut, USA (February 14, 2013) "*The Business of Offshore Tax Evasion*"
- PWYP Conference on Financial Secrecy, Society and Vested Interests, Norwegian School of Economics, Bergen, Norway (November 21, 2012) "*Offshore Tax Havens and the Financial Community that Promotes, Facilitates and Enables Them*"
- OffshoreAlert Conference, Miami, FL, USA (April 30, 2012) "*Taxing Avoiders & Evaders: An Update*"