# EXHIBIT H

*CONFIDENTIAL*

**IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010)**

**BETWEEN**

### GLOBAL GAMING PHILIPPINES LLC

**and**

### GGAM NETHERLANDS B.V.

(*CLAIMANTS*)

**- versus -**

### BLOOMBERRY RESORTS AND HOTELS INC.

**and**

### SURESTE PROPERTIES, INC.

(*RESPONDENTS*)

---

### RESPONDENTS' STATEMENT OF DEFENSE AND AMENDED COUNTERCLAIMS

---

February 2, 2015

MILBANK TWEED HADLEY & MCCLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
United States of America
Telephone: +1 (202) 835-7500
Facsimile: +1 (202) 835-7586

PICAZO BUYCO TAN FIDER & SANTOS
Penthouse Liberty Center
104 H.V. dela Costa St., Salcedo Village
1227 Makati City, Metro Manila
Telephone:  (632) 888-0999
Facsimile:  (632) 888-1011

*CONFIDENTIAL*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ....................................................................................... 1

II.    STATEMENT OF FACTS ........................................................................ 6

    A.    Genesis of the Solaire Project ................................................................. 6

    B.    From the Beginning of the Parties' Relationship, GGAM Presented Itself as Having Expertise and Qualifications as a "Las Vegas Sands" Management Company. ....................................................................................................... 8

    C.    Based on these Representations, the Parties Entered into a Contractual Framework that Memorialized GGAM's Obligations and Compensation. ............................ 11

        1.    GGAM's Counsel Materially Changed the Negotiated Contractual Language, Thereby Delaying the Execution of the MSA. ........................ 14

        2.    Having Delayed the Execution of the MSA, GGAM Pressed Bloomberry for Execution of the Equity Option Agreement. ....................................... 18

    D.    In Light of GGAM's Misrepresentations and Substantial Breaches of the MSA That Altered the Fundamental Nature of the Parties' Agreement, Bloomberry Was Left with No Choice but To Extinguish the Parties' Relationship. ...................... 22

III.    GGAM'S OBLIGATIONS UNDER THE MSA INCLUDED, AMONG OTHER THINGS, ASSISTANCE WITH THE SOLAIRE'S DEVELOPMENT AND CONSTRUCTION, AND GGAM WAS COMPENSATED FOR THIS ASSISTANCE. ....................................................................................................... 24

    A.    GGAM Was Obligated to Provide Services Related to the Construction of the Solaire. ..................................................................................................... 25

        1.    GGAM's Sporadic Visits to the Solaire Construction Site Often Detracted from the Construction Process. ................................................................. 27

        2.    GGAM's Alleged Contributions to the Solaire's Construction Are Exaggerated and Unsupported. ................................................................. 30

    B.    GGAM Was Obligated to Maximize Value for Bloomberry's Shareholders, and GGAM Was Expected to Participate in the Top-Up Offering "Road Show" as the Management Services Provider for the Solaire. ................................................... 31

IV.    BLOOMBERRY PROPERLY TERMINATED THE MSA DUE TO GGAM'S
BREACHES OF ITS OBLIGATIONS UNDER MSA, WHICH WERE MATERIAL
AND INCAPABLE OF BEING CURED......................................................................... 35

A.    Claimants Failed to Provide an Adequate Business Plan, as Required under
Clauses 2.2 and 2.10 of the MSA, that was Capable of Being Implemented. ...... 37

B.    Claimants Failed to Develop an Adequate Marketing Plan, as Required Under
Clauses 2.2 and 2.10 of the MSA, that Conformed to Industry Standards. .......... 42

1.    The Customer Loyalty Program Developed by GGAM Was Confusing
and Ineffective. ........................................................................................ 46

2.    Despite Repeated Requests, GGAM Was Unwilling (or Perhaps Unable)
to Provide an Adequate Marketing Plan. .................................................. 47

3.    GGAM Misleadingly Describes the "Mass Market" as "Local" or
"Philippine" Customers in an Inappropriate Attempt to Blame Bloomberry
for the Low Mass Revenue. ...................................................................... 50

C.    CONTRARY TO GGAM'S REPRESENTATIONS AND THE MSA'S
REQUIREMENTS, GGAM FAILED TO DEVELOP A STRATEGY FOR
SUCCESSFUL MANAGEMENT AND OPERATIONS, INCLUDING A FAILURE TO
PREPARE AND DELIVER REQUIRED POLICIES. .................................................... 52

D.    Contrary to GGAM's Representations and the MSA's Requirements, GGAM
Failed to Contribute or Utilize Guest Data to Attract VIP Players and Junket
Operators to the Solaire. ............................................................................................ 54

E.    Contrary to GGAM's Representations and the MSA's Requirements, GGAM's
Principals Failed to Provide "Hands On" Management, and Their Absence Led to
a Disjointed Management Team. ................................................................................. 59

1.    Ultimately, GGAM Can Point Only to Certain People It Identified for
Management Positions as Evidence of GGAM's Performance of its
Obligations under the MSA. ..................................................................... 61

F.    Bloomberry Had a Fiduciary Duty to Intervene Once Bloomberry Became Aware
of GGAM's Inability to Perform Its Obligations as the Management Company. 64

1.    GGAM Uses the Phrase "Through the Management Team" as Both a
Sword and a Shield. .................................................................................. 65

V.    GGAM'S OTHER CLAIMS ARE FRIVOLOUS AND BASELESS, AND THUS
SHOULD BE DISMISSED. ............................................................................................. 67

A.   The Presence of an Arbitration Clause in the MSA Does Not Negate
     Bloomberry's Ability to Terminate the MSA. ..................................................... 67

B.   GGAM Baselessly Describes Bloomberry As Having Made "False" and
     "Defamatory" Statements. ..................................................................................... 67

VI.  AMENDED COUNTERCLAIMS ................................................................................. 70

A.   Bloomberry and Sureste Assert Claims Against the Equity Interests in the Solaire
     GGAM Purchased Pursuant to an Option Granted to GGAM by Bloomberry and
     Sureste. ................................................................................................................... 70

     1.   The Management Services Agreement and the Equity Option Agreement
          Are Two Components of the Same Deal. .................................................. 72

     2.   Changes in Bloomberry's Corporate Structure Did Not Alter the Overall
          Deal. .......................................................................................................... 75

     3.   Prime Metroline, Acting as Bloomberry's Agent, Entered into the Equity
          Option Agreement on April 16, 2012. ...................................................... 78

B.   GGAM's Promise to Perform as the Management Services Provider for the
     Solaire Was the Consideration for the Equity Option Grant. ............................... 82

C.   GGAM's Misrepresentations and Breaches of Its Promise to Perform as the
     Management Services Provider for the Solaire Constitute a Failure to Provide
     Consideration for the Equity Option. .................................................................... 85

D.   Several Legal Theories Allow Bloomberry and Sureste to Claim Against the
     Shares. .................................................................................................................... 86

     1.   Bloomberry and Sureste Have a Claim for the Value of the Shares as
          Damages ..................................................................................................... 86

     2.   Bloomberry and Sureste Are Entitled to Resolution of the MSA and
          Restitution of the Shares, or the Value of the Shares. .............................. 88

     3.   Bloomberry and Sureste Have a Claim to Annul the MSA, Including the
          Equity Option Granted Therein, Due to GGAM's Causal Fraud. ............ 92

     4.   Unjust Enrichment and Restitution of the Value of the Shares ................ 93

E.   Damages .................................................................................................................. 96

VII. REQUEST FOR RELIEF .............................................................................................. 97

*CONFIDENTIAL*

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Statutes and Rules**

Philippine Civil Code
    Article 22 ...................................................................................................94

    Article 1159 ................................................................................................90

    Article 1191 ......................................................................................88, 89, 90

    Article 1236 ................................................................................................87

    Article 1306 ................................................................................................80

    Article 1307 ................................................................................................80

    Article 1324 ..........................................................................................74, 83

    Article 1338 ................................................................................................93

    Article 1390 ................................................................................................93

    Article 1397 ................................................................................................92

    Article 1398 ................................................................................................93

    Article 1479 ..........................................................................................74, 83

    Articles 1338 ..............................................................................................93

    Article 1869 ................................................................................................79

Philippine Republic Act No. 9285
    § 28(b)(2) ...................................................................................................76

Philippine Stock Exchange, Revised Disclosure Rules, Penalties and Fines and
    Implementing Guidelines on Article XVI, Section 2(f) ...........................72

UNCITRAL Arbitration Rules
    Article 20(4) .................................................................................................5

    Article 21 ......................................................................................................1

    Article 21(4) .................................................................................................1

## Philippine Cases and Decisions

*Benguet Corporation v. Department of Environment and Natural Resources-*
*Mines Adjudication Board,*
G.R. No. 163101, February 13, 2008 ........................................................................94

*Casiño, Jr. v. Court of Appeals*
G.R. No. 133803, September 16, 2005 ......................................................................89

*Korea Technologies Co. Ltd v. Hon. Alberto A. Lerma,*
GR No. 143581, January 7, 2008 ..............................................................................67

*Cool Car Philippines, Inc. v. Ushio Realty and Development Corporation,*
G.R. No. 138088, January 23, 2006 ..........................................................................94

*Diamante v. Court of Appeals,*
G.R. No. L-51824, February 7, 1992 .........................................................................83

*Equitable PCI-Bank v. Ku*
G.R. No. 142950, March 26, 2001 ............................................................................79

*Goldloop Properties, Inc. v. Gov't Serv. Ins. Sys,.*
G.R. No. 171076, Aug. 1, 2012 ..........................................................................67, 90

*Huibonhoa vs. Court of Appeals*
G.R. No. 95897, December 14, 1999 .........................................................................92

*Int'l Hotel Corp. v. Joaquin Jr.,*
G.R. No. 158361, April 10, 2013 ..............................................................................36

*Johnlo Trading Co. v. Flores*
G.R. No. L-3987, May 18, 1951 ...............................................................................79

*Korea Technologies Co. Ltd v. Hon. Alberto A. Lerma, et al.*
GR No. 143581, January 7, 2008 ..............................................................................67

*Maxwell Heavy Equipment Corp. v. Yu*
G.R. No. 179395, Dec. 15, 2010 ..............................................................................88

*Dominion Ins. Corp. v. Guevarra,*
G.R. No. 129919, Feb. 6, 2012 .................................................................................88

*Prime White Cement Corporation v. Intermediate Appellate Court,*
G.R. No. L-68555, March 19, 1993 ..........................................................................64

*Pryce v. PAGCOR,*
G.R. No. 157480, May 6, 2005 ...........................................................................90, 91

*Republic v. Court of Appeals,*
　　G.R. No. 160379, 14 August 2009, 596 SCRA 57 ................................................94

*Reyes v. Lim,*
　　G.R. No. 134241, August 2003 ..........................................................................94

*Tuazon v. Del Rosario-Suarez*
　　G.R. No. 168325, December 8, 2010 ..................................................................83

*Universal Food Corporation v. Court of Appeals,*
　　G.R. No. L-29155, May 13, 1970 .......................................................................89

**United States Cases and Decisions**

*Countryside Orthopaedics, P.C. v. Peyton,*
　　261 Va. 142 (2001) .............................................................................................81

*Ford v. Williams,*
　　62 U.S. 287 (1858) ..............................................................................................88

*Hollinger Inc. v. Hollinger Int'l, Inc.,*
　　858 A.2d 342 (Del. Ch. 2004) ............................................................................82

*Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research and Engineering*
　　*Co., et al.,* 1977 U.S. Dist. LEXIS 17851 (S.D.N.Y. 1977) ...............................81

*Katzenmoyer v. Tr'bl Marketing, Ltd.,*
　　2012 U.S. Dist. LEXIS 139011 (S.D. Ohio Sept. 27, 2012) ...............................88

*P.C. Javier & Sons, Inc. v. Court of Appeals,*
　　500 Phil. 419 (2005) ...........................................................................................95

*Palmieri v. Estefan,*
　　793 F. Supp. 1182, 1193 (S.D.N.Y. 1992) .........................................................80

*Pieco, Inc. v. Atlantic Computer Sys. (In re Atlantic Computer Sys.),*
　　173 b.R. 844 (S.D.N.Y. 1994) ...........................................................................84

*Steiner v. Thexton,*
　　226 P.3d 359, 365 (Cal. 2010) ...........................................................................74

*United States v. Watchmakers of Switzerland Information Center, Inc.,*
　　133 F. Supp. 40, reh'g denied, 134 F. Supp. 710 (S.D.N.Y. 1955) ....................81

*CONFIDENTIAL*

**Secondary Sources**

Arturo M. Tolentino, 4 Commentaries and Jurisprudence on the Civil Code of the Philippines, (1986) ........................................................................................................... *passim*

Cesar Lapuz Villanueva, Philippine Corporate Law (2001) ........................................................ 64

Jose Campos Jr. and Maria Clara L. Campos, The Corporation Code, Volume I (1990) .................................................................................................................................... 64

Luis B. Reyes, The Revised Penal Code, Book Two (2001) (excerpts) at art. 353 ....................... 69

*CONFIDENTIAL*

## RESPONDENTS' STATEMENT OF DEFENSE AND AMENDED COUNTERCLAIMS

1.    Pursuant to Rule 21 of the UNCITRAL Rules, and in accordance with the Tribunal's Procedural Order No. 2, dated June 23, 2014, Respondent Bloomberry Resorts and Hotels Inc. ("Bloomberry") and Respondent Sureste Properties Inc. ("Sureste," together with Bloomberry, "Bloomberry" or "Respondents") respectfully submit this Statement of Defense in response to the Statement of Claim filed by Claimant Global Gaming Philippines LLC ("GGAM") and Claimant GGAM Netherlands B.V. (together with GGAM, "Claimants")[1] Additionally, Respondents respectfully submit their Statement of Counterclaims against Claimants in accordance with Rule 21(4) of the UNCITRAL Rules.

## I.    INTRODUCTION

### A.    Overview of the Dispute and the Parties

2.    In the past decade, Asia, mainly through Macau and Singapore, has emerged as the world's largest and fastest-growing gaming market.  The recently liberalized gaming market in the Philippines provided a real opportunity for businesses and the country to benefit from the seemingly boundless interest in integrated casino-resorts in Asia.  In efforts to capitalize on this opportunity, Bloomberry obtained one of four highly-sought-after provisional licenses to construct and operate the Solaire Resort & Casino (the "Solaire"), the first integrated resort in Entertainment City.

3.    Enrique K. Razon Jr., the CEO and Chairman of Bloomberry, is one of the leading industrialists in the Philippines and the visionary and driving force behind the Solaire. With Mr. Razon's experience and business acumen, he recognized that he needed an experienced manager, specifically a Chief Operating Officer ("COO"), for the Solaire to be primely positioned in the Philippine integrated resort landscape.  Garry Saunders, who had recently

---

[1]    As stated in Respondents' Response to the Notice of Arbitration on October 12, 2013, the Respondents reserve their position on the validity and effect of the purported partial assignment of the Management Services Agreement by GGAM to GGAM Netherlands B.V.  *See* Response to Notice of Arbitration, October 12, 2013, § 5.2 (Claimants' Ex. 24).  In any event, pursuant to Clause 16.3 of the MSA, an assignment "shall not in any way relieve GGAM from any liability or obligation under or in connection with [the MSA]."  *See id.* (quoting MSA, Clause 16.3).

formed the management company Global Gaming Asset Management, was recommended to Mr. Razon by a headhunter as a possible COO candidate.

4.      Mr. Saunders and his partners, Messrs. Weidner and Stone, made a strong first impression on Mr. Razon, presenting themselves as the masterminds behind the Las Vegas Sands Corp. ("Las Vegas Sands"), one of the world's leading companies for developing integrated resort destinations.  With this "Las Vegas Sands" brand came promises and assurances of a management company with operating policies and procedures, "100 years of collective experience" in preparing effective business and marketing plans, a "hands-on management" style, and valuable information for and relationships with VIP "high rollers" and junket operators—the keys to a successful gaming venture in Asia.

5.      The representations Messrs. Weidner, Stone, and Saunders inveigled Mr. Razon to embark on what he thought was to be a mutually-beneficial, long-term relationship.  Global Gaming Asset Management formed a new entity, Global Gaming Philippines LLC or GGAM, to do business in the Philippines, and over the course of months, the Parties negotiated and executed the Management Services Agreement (the "MSA"), an atypical arrangement in which GGAM was to receive fees based on a sliding scale of revenue and a right to purchase approximately 10% of Mr. Razon's holdings in the Solaire Project.

6.      The unexpectedly lengthy negotiations of the MSA delayed getting a management team in place for the Solaire project.  The Parties agreed to execute the MSA and memorialize the executory terms of the equity option in a later document.  That document, the Equity Option Agreement (the "EOA"), also resulted in protracted negotiations during the time GGAM should have been focusing on its management obligations.  GGAM wielded its leverage with respect to Bloomberry's capital-raising efforts by refusing to participate in those efforts as the Solaire's management services provider until the EOA was signed.

7.      With the equity option now guaranteed, it became apparent to Bloomberry that GGAM was not providing hands-on, in-person management of the Solaire, and the principals were instead making it their priority to find and pursue other opportunities.  When Bloomberry approached GGAM about what was wanted, needed, and expected from GGAM, as the management services provider for the Solaire, GGAM resorted to denials, blame-shifting, and

*CONFIDENTIAL*

lawyerly maneuvering. GGAM's approach to the Parties' relationship was the opposite of what Bloomberry had desired and expected.

8.　　Bloomberry now knows that GGAM cannot live up to its hype. Not only did GGAM misrepresent itself as the Las Vegas Sands, it also misrepresented its ability as a management company. GGAM operated under an assumption that the Solaire would succeed simply because it was a "superior" product, and thus, little to no effort was needed on GGAM's part to lay the foundation for the Solaire's success. GGAM approached the project from the perspective that whatever worked in Macau and in Las Vegas would work in the Philippines; yet, GGAM did not spend the time or effort to truly understand the Philippine market.

9.　　On July 12, 2013, Bloomberry served its Notice of Intent to Terminate the MSA and GGAM as the management services provider. GGAM did not need more time to "cure" its management deficiencies, which constituted a material, willful breach of the MSA. GGAM had 2 years to perform its obligations under the MSA. At most, GGAM served as an "executive search firm," which is not what it was hired to be. GGAM's principals had represented that they would provide management services to the Solaire—but they failed to do so.

10.　　Moreover, GGAM had no basis to retain the Shares it purchased pursuant to the equity option. The equity option was a key component of the Parties' relationship, which Bloomberry later learned had been formed on the basis of misrepresentations. Bloomberry has been denied the benefit of its bargain with GGAM, and these Shares should be returned to Bloomberry under theories of rescission, causal fraud, and unjust enrichment.

## B.　　Overview of the Witness Statements and Expert Reports

11.　　Bloomberry's Statement of Defense and Statement of Counterclaims are supported by the following new witness statements and expert reports:

**Witness Statements:**

- *Donato C. Almeda* – Member of the Boards of Directors of Bloomberry Resorts Corporation and Bloomberry Resorts and Hotels, Inc. Declaration dated December 5, 2014 ("<u>D. Almeda Decl.</u>").

- *Lorraine Koo Mann Loo* – Senior Vice President of VIP Services, Solaire Resort & Casino. Declaration dated December 4, 2014 ("<u>L. Koo Decl.</u>").

*CONFIDENTIAL*

- *Fritz Lacap* – Vice President of Finance, Gaming, Solaire Resort & Casino. Declaration dated December 5, 2014 ("F. Lacap Decl.").

- *Arcan L. Lat* — Vice President for Controllership, Solaire Resort & Casino. Declaration dated December 5, 2014 ("A. Lat Decl.")

- *Enrique K. Razon, Jr.* – Chairman, CEO and majority shareholder of Bloomberry Resorts Corporation. Declaration dated December 7, 2014 ("E. Razon Decl.")

- *Cyrus Sherafat* – Senior Vice President of Casino Marketing, Solaire Resort & Casino. Declaration dated December 5, 2014 ("C. Sherafat Decl.").

- *Jose Oscar O. Salvacion* – President of Design Coordinates, Inc. Declaration dated December 7, 2014 ("J. Salvacion Decl.").

- *Anthony See Toh* – Vice President of Finance for Casino Credit & Collections, Solaire Resort & Casino. Declaration dated December 5, 2014("A. Toh Decl.").

- *Leo Venezuela* – Director for Investor Relations, Bloomberry Resorts Corporation. Declaration dated December 7, 2014 ("L. Venezuela Decl.")

**Expert Reports:**

- *Jim Kilby* – Independent Consultant. Expert Report dated December 6, 2014 ("J. Kilby Report").

- *Ben Lee* – Managing Partner, IGAMIX Management and Consulting Ltd. Expert Report dated December 7, 2014 ("B. Lee Report").

- *Roy Wheatley* – CEO, Global Consulting & Development Pty Ltd. Expert Report dated December 7, 2014 ("R. Wheatley Report").


12.    Bloomberry also relies on the following witness statements, expert report and legal opinions that were submitted in connection with its responses to Claimants' Request for Interim Measures of Protection:

**Witness Statements:**

- *Jose Eduardo J. Alarilla* – Vice-Chairman of the Boards of Directors for Bloomberry Resorts Corporation and Bloomberry Resorts and Hotels, Inc. Declaration dated July 14, 2014 ("J. Alarilla Decl.").

- *Gerard Angelo Emilio J. Festin* – Corporate Controller, Bloomberry Resorts and Hotels, Inc. Declaration dated July 15, 2014 ("G. Festin Decl.").

**Expert Report:**

- *Carl Braunlich* – Associate Professor, William F. Harrah College of Hotel Administration, University of Nevada, Las Vegas. Expert Opinion dated August 14, 2014 ("C. Braunlich Report").

**Legal Opinions:**

- *Steven Davidoff Solomon* – Professor of Law, The University of California, Berkeley, School of Law. Expert Opinion dated July 15, 2014 ("S. Davidoff Solomon Op."). Supplemental Expert Opinion dated August 14, 2014 ("S. Davidoff Solomon Supp. Op.").

- *Jose C. Vitug* – former Associate Justice of the Supreme Court of the Philippines. Expert Opinion dated July 15, 2014 ("J. Vitug Op."). Supplemental Expert Opinion dated August 14, 2014 ("J. Vitug Supp. Op.").

13.      In contrast, Claimants' Statement of Claim is littered with wholly unsupported statements regarding the Parties' negotiations, GGAM's alleged performance, and Respondents' purported actions.[2] More than ***40 paragraphs*** of the Statement of Claim are replete with unsupported factual assertions regarding facts that are germane to this dispute—***without a single evidentiary citation***.[3] Groundless accusations are untenable as a foundation for a Statement of Claim,[4] and deprive Respondents of their opportunity to respond meaningfully to claims asserted against them.

14.      Additionally, in support of Claimants' argument that the breaches of the MSA were "pretextual" and part of a "wrongful scheme to terminate GGAM," Claimants rely solely on an August 2, 2013 email from Michael French, the former Chief Operating Officer of the Solaire. Claimants cite to this email ***18 times***.[5] In this email, Mr. French "recounts" a meeting with Mr. Razon during which Mr. Razon purportedly "admitted" to various transgressions,

---

[2]      Bloomberry reserves the right to supplement its Statement of Defense and Counterclaim to respond to these unsupported statements to the extent that Claimants provide any documentary support in the future.

[3]      *See* Claimants' S.O.C. ¶¶ 47, 51, 52, 60, 62, 63, 66, 67, 68, 68 n.88, 69, 72, 73, 74, 78, 81, 82, 100, 103, 106, 108, 114, 126, 127, 132, 137, 138, 139, 141, 142, 143, 167, 175, 189, 190, 197 n.303, 197 n.304, 197 n.305, 197 n. 306, 200 n.311, 200 n.314, 227.

[4]      *See, e.g.*, UNCITRAL Rules (2010), art. 20(4) (RL-4) ("The statement of claim should, as far as possible, be accompanied by all documents and other evidence relied upon by the claimant, or contain references to them.").

[5]      *See* Claimants' S.O.C. ¶¶ 102, 104, 107, 109, 114, 116, 126, 134, 136, 139, 140, 200, 226, 228. Notably, Claimants do not submit a witness statement from Mr. French.

including "manufactured complaints" about GGAM.[6]  More than 3 weeks after GGAM received Bloomberry's Notice of Intent to Terminate on July 12, 2013, Mr. French, who was hand-selected by GGAM and well aware that he was about to be fired, sends a pages-long email to GGAM to recount his recollection.  The self-serving nature of this email cannot be over-stated, and it should be afforded no consideration as "evidence" in support of GGAM's claims.

15.     Bloomberry is a Respondent in this Arbitration only because Claimants filed a Notice of Arbitration the same day Bloomberry terminated the MSA due to GGAM's willful, material breaches and other wrongs.  In substance, however, Bloomberry is the Party that has been wronged.  Rather than filing a Statement of Claim as soon as the Tribunal was constituted and accepting an orderly proceeding, GGAM pursued the tactical gambit of trying to achieve a sale of the Shares—the disputed subject matter of this Arbitration—on a purportedly preliminary and "interim" basis.  The Statement of Claim, which was not filed until the Tribunal ordered Claimants to do so, is largely unsupported by any evidence and demonstrates Claimants' comparative lack of interest in the determination of the Parties' dispute in accordance with their agreement to arbitrate.

## II.     STATEMENT OF FACTS

### A.     Genesis of the Solaire Project

16.     In 2007, the Philippine Government decided to liberalize gaming by establishing "Entertainment City," a special economic zone to be developed into a gaming and entertainment area.[7]  In connection with this liberalization, four provisional gaming licenses were issued to private entities, selected out of multiple applications, to establish integrated tourism resorts.[8]  On

---

[6]     Claimants' S.O.C. ¶¶ 136-140, 228.

[7]     Bloomberry Resorts Corp. Offering Circular ("Offering Circular") at 6 (Claimants' Ex. 22).

[8]     Offering Circular at 6 (Claimants' Ex. 22); *see also* Research Report of CLSA—Asia Pacific Markets, April 5, 2012 ("April 5, 2012 CLSA Report") at 60 (RE-43).

April 8, 2009, the Philippine Amusement and Gaming Corporation ("PAGCOR") granted Bloomberry one of the four provisional licenses.[9]

17.     Enrique K. Razon, Jr., one of the leading industrialists in the Philippines, is the visionary for the Solaire Resort & Casino.  Mr. Razon and his family own 100% of Bloomberry Resorts and Hotels Inc. and Sureste Properties Inc., making the Solaire the only purely Philippine-owned integrated resort.[10]  Mr. Razon brought to the table his business acumen and reputation, his detailed knowledge of the local economy, and his extensive business network.[11] Additionally, he contributed US$ 200 million of his own money to the Solaire project, a venture of unprecedented scale in the Philippines.[12]

18.     On April 22, 2010, Bloomberry hired Steelman Partners, LLC ("Steelman")—an architecture, planning, and design firm with vast experience in designing gaming resort projects throughout the world—to design the Solaire, in addition to providing other services.[13]  For the first phase of the Solaire Project, Steelman designed an 18,500-square-meter (200,000-square-foot) integrated resort, with 1,200 slot machines, 300 gaming tables, a VIP area, and approximately 500 hotel rooms, suites, and villas.

19.     On May 7, 2010, Bloomberry secured prime real estate in Entertainment City, which became the site of the Solaire.[14] The Solaire sits on an ideal location along the edge of the

---

[9]     Offering Circular at 6 (Claimants' Ex. 22).  More information about the PAGCOR license can be found in the Offering Circular.  *See* Offering Circular at 87-88 (Claimants' Ex. 22).  Bloomberry owns the casino component of the integrated resort, and Sureste owns the hotel component.  *See also* April 5, 2012 CLSA Report at 3 (RE-43).

[10]     G. Festin Decl. ¶ 6 ("Mr. Razon owned Sureste, which, in turn, owned Bloomberry, and it was effectively Mr. Razon, through Sureste and Bloomberry, who granted GGAM the equity option."); Hr'g Tr. at 390:7-15 (Festin) ("Q: So you testified that Mr. Razon was 100 percent owner of Sureste; correct?  A.  That's correct.  Q.  And Sureste was the 100 percent owner of Bloomberry; correct?  A.  That's correct.").

[11]     *See* April 5, 2012 CLSA Report at 3 (RE-43); *see also* Offering Circular at 7 (Claimants' Ex. 22).

[12]     *See* Netty Ismail, "Billionaire Razon Jumps to Casinos from Containers," BLOOMBERG MARKETS MAGAZINE, November 7, 2013 (RE-59).

[13]     *See* Offering Circular at 6, 83-84, F-43 (Claimants' Ex. 22).  Steelman's projects include the Sands Macau, The Four Seasons Macau, JW Marriott (Las Vegas), MGM Foxwoods (Connecticut), Harrah's Atlantic City (New Jersey); Caesar's Gauteng (South Africa), Monte Carlo Historic (Monaco), The Plaza Hotel and Casino (Las Vegas), Ho Tram I (Vietnam), Hengqin (China), and the Desert Butterly (United Arab Emirates).  *See id.*

[14]     *See* Offering Circular at F-40 (Claimants' Ex. 22).

Manila Bay, which is more favorable than an inland location away from the water.[15]
Construction began in July 2010, with general pile-driving work completed in January 2011.[16]

20.    On January 1, 2010, Bloomberry hired Design Coordinates, Inc. ("DCI")—a
leading Philippine project management specialist—as the general contractor responsible for
managing all phases of the Solaire's structural and interior development.[17] On January 18, 2011,
Bloomberry hired D.M. Consunji Inc. ("DMCI")—one of the Philippines' premier construction
contractors responsible for some of the country's largest construction projects, including the
Mall of Asia—to perform the major construction for the Solaire's hotel and casino facilities.[18]

21.    By 2011, the Solaire was on target to be the first integrated resort to open in
Entertainment City.[19] From the beginning of the Solaire Project, Mr. Razon recognized the
enormous growth potential of the Philippine gaming market and sought to capitalize on this
promising resource. He had grand plans for the Solaire, including providing a first-class gaming
experience to all customers, dominating the mass-market gaming segment, and capturing the
underdeveloped VIP gaming segment.[20]

**B.    From the Beginning of the Parties' Relationship, GGAM Presented Itself as
Having Expertise and Qualifications as a "Las Vegas Sands" Management
Company.**

22.    With the PAGCOR license secured and construction underway, in early 2011, Mr.
Razon began searching for a Chief Operating Officer ("COO") for the Solaire. Mr. Razon hired
SpencerStuart, one of the world's leading executive search firms, which recommended and
arranged a number of interviews with highly-qualified candidates for the COO position,

---

[15]    *See* April 5, 2012 CLSA Report at 6 (RE-43) (describing site of Solaire as the "best location").

[16]    *See* Offering Circular, at 69 (Claimants' Ex. 22).

[17]    *See id.* at 9, 84, F-43 (Claimants' Ex. 22). DCI has managed numerous projects for some of the
Philippines' most well-known companies, such as the Glorietta mixed-use development and Serendra condominium
complexes for Ayala Corp., the Robinsons Cybergate Towers for Robinsons Land Corporation, and SM Cyberzone
Two for the Shoemart group of companies. *See id.* at 83.

[18]    *See* Offering Circular at 9, 84, F-43 (Claimants' Ex. 22). In addition to the Mass of Asia, DMCI has
handled other large-scale and well-known projects, including the Ayala Triangle Tower I, the Philippine Stock
Exchange Plaza, Citibank, SM Megamall, Shangri-la Mactan Resort & Spa, Makati Shangri-la Hotel, the Westin
Philippine Plaza, and the Hyatt Hotel. *See id.* at 83.

[19]    *See* April 5, 2012 CLSA Report at 6 (RE-43).

[20]    *See id.* at 12.

including Mr. Garry Saunders, the former COO of Melco Crown Entertainment.[21]  Mr. Razon
was informed that Mr. Saunders had recently formed a new management company, Global
Gaming Asset Management with Bill Weidner and Brad Stone, his former colleagues at Las
Vegas Sands.  The headhunter suggested that Mr. Razon should consider speaking with Mr.
Saunders, because he had experience in start-up companies and managing gaming operations in
Las Vegas and Asia.[22]  Mr. Razon agreed to meet with Mr. Saunders and his colleagues in Las
Vegas in March 2011.

23.    Prior to the meeting, Bloomberry was provided a presentation regarding Global
Gaming Asset Management, and this presentation listed examples of "GGAM's Past Projects."[23]
All of the listed examples were actually of Las Vegas Sands properties—The Venetian, Sands
Macau, Venetian Macau, The Palazzo, Four Seasons (Cotai Masterplan), Sands Bethlehem, and
Marina Bay Sands (Singapore).[24]  Messrs. Weidner, Stone, and Saunders projected an image
equating their management company with the Las Vegas Sands, one of the leading global
developers of destination casino and resort properties.  They presented their management
company as a company with "unparalleled expertise in integrated resort development," and a
"track record of generating returns on invested capital on integrated resort developments."[25]
Further, their company's website touted its principal's collective "100 years of experience" in
establishing, constructing, and managing large integrated tourism and gaming resorts.[26]

---

[21]    *See* Email from F. Gaspar to E. Razon, January 21, 2011, attaching presentation (RE-39).

[22]    *See id.*

[23]    *See id.* at 13-15.  In this initial presentation, Cantor Fitzgerald was described as providing "backing" and a
"significant capital commitment" to Global Gaming Asset Management's activities.  *See id.*at 7-8.

[24]    *Compare id.* at 4 *with* All Properties, Sands.com, accessed on November 24, 2014 (RE-64) (listing The
Venetian, Sands Macao, Venetian Macao, The Palazzo, Four Seasons Hotel Macao, Sands Cotai Central, Sands
Bethlehem, and Marina Bay Sands as Las Vegas Sands properties).

[25]    *See* Email from F. Gaspar to E. Razon, January 21, 2011, attaching presentation, at 4-5 (RE-39).

[26]    *See, e.g.*, Home, GGAM.com, accessed on October 1, 2014 (RE-62); *see also* Claimants' Statement of
Claim ("Claimants' S.O.C.") ¶ 38.  Yet, GGAM is a new management company without an operating property. *See*
Letter from B. Weidner to E. Razon, August 19, 2013 at 16 (Claimants' Ex. 95) ("Solaire was GGAM's first
standalone project.").  Nonetheless, Claimants continue to imply, both implicitly and explicitly, that the
accomplishments of Las Vegas Sands are Claimants' accomplishments .  *See, e.g.*, Claimants' S.O.C. ¶ 14
("Claimants are global leaders in the development, operation, management, direction and supervision of world-class
resorts, hotels, casinos, and related facilities.").  As recently as November 2014, GGAM continued to present itself
to the world as Las Vegas Sands. *See, e.g.*, Sarah Danckert, "Global Gaming Assets Management of Las Vegas
commits to Gold Coast casino," THE AUSTRALIAN, November 8, 2014 (RE-63) ("The company [GGAM] is behind
the famous Venetian and Palazzo resorts in Las Vegas, the Four Seasons in Macau and the Marina Bay Sands in

24.     During this initial meeting in Las Vegas, Messrs. Weidner, Stone, and Saunders strongly assured Mr. Razon that they could deliver for the Solaire the same services and expertise that they had delivered for numerous other casino-resorts in Asia that they had developed, opened, and operated.[27]  This included putting in place policies and procedures for operating the Solaire, bringing in VIPs and junket operators, and crafting a marketing plan and other rewards and incentive programs using their "best practices" for casino operations adjusted to the specifics of the Philippine market.[28]

25.     When Mr. Razon explained that a large, foreign VIP business was necessary for the success of the Solaire, Messrs. Weidner, Stone, and Saunders assured him that, through their collective experience at the Las Vegas Sands, they had strong relationships with "junket operators"[29] in Asia who would bring VIP players to the Solaire.[30]  Additionally, they claimed to have data regarding individual foreign VIP players, who they would bring into the Solaire.[31]  As Claimants repeatedly remind the Tribunal, Mr. Razon did not have specific experience in the gaming industry.[32]  Based on the size and reputation of Las Vegas Sands Corp., the multiple casinos Messrs. Weidner, Stone and Saunders proclaimed to have opened throughout Asia, and the high-ranking positions they had previously held at Las Vegas Sands and Melco Crown, Mr. Razon had no reason to second-guess their representations that they had the data for and connections with VIP players and junket operators.[33]

---

Singapore.").  The caption in the accompanying photo in the article states "The Venetian hotel and casino in Las Vegas, owned by GGAM."  *See id.*

[27]     E. Razon Decl. ¶ 8.

[28]     *Id.*; *see also* Claimants' S.O.C. ¶ 40.

[29]     *See* Offering Circular at 3 (Claimants'' Ex. 22) (defining "junket operators" or "independent gaming promoters" as "individuals or corporations that promote casino games and activities to patrons, through the arrangement of certain services, including the provision of credit, transportation, accommodation, dining and entertainment").

[30]     E. Razon Decl. ¶ 9; *see also* Offering Circular at 51, 61 (Claimants' Ex. 22) ("GGAM has strong relationships with independent gaming promoters who the Company believes will be a key component in attracting VIP customers to the Philippines, and Solaire Manila, in particular.").

[31]     E. Razon Decl. ¶ 9; *see also* Claimants' S.O.C ¶ 80 ("As the Parties recognized during their negotiations, and as Respondents subsequently presented to the public, GGAM was uniquely positioned to establish a pipeline of foreign VIP patrons by leveraging its experience and contacts from years of doing business in Asia.").

[32]     *See, e.g.,* Claimants' S.O.C. ¶¶ 2, 34, 163.

[33]     E. Razon Decl. ¶ 9.

26.     The Parties' principals conducted their negotiations after this Las Vegas meeting. Mr. Razon made clear that he expected "as close to full-time management" as possible, with Mr. Weidner as the "main driver."[34]  Mr. Weidner assured him that he, along with Messrs. Stone and Saunders, would provide a "hands-on approach to management" of the Solaire.[35]  Moreover, Mr. Weidner assured Mr. Razon that he would "personally oversee" the management activities, spending "significant time in Manila with the team."[36]

## C.     Based on these Representations, the Parties Entered into a Contractual Framework that Memorialized GGAM's Obligations and Compensation.

27.     On the basis of these representations and promises, Mr. Razon decided to enter into a management services agreement with GGAM,[37] which was formed specifically for the Solaire Project in the Philippines.[38]  Both Parties recognized that the negotiated arrangement was atypical.[39]  In recognition of this arrangement, GGAM was to be remunerated in two ways—first, based on pre-opening fees and post-opening fees (*i.e.*, a heavily negotiated sliding scale of fees based on foreign VIP contribution to EBITDA and VIP performance),[40] and second, through

---

[34]     *See* Email from E. Razon to B. Weidner, March 17, 2011 (RE-1) (requesting "as much of your time as we can get").

[35]     *See* Email from B. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104).

[36]     *See* Email from B. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104); *see also* E. Razon Decl. 8. Yet now, GGAM tries to present itself as an "asset manager."  *Cf.* Hr'g Tr. at 200:21-24 (Weidner) ("Global Gaming Asset Management is an asset manager that seeks to both manage actively casinos and the gaming space and to position assets to have them have a high multiple."); *see also* Hr'g Tr. at 78:20-24 (Profaizer) ("[Respondents] needed to represent to the world that someone with credibility, with 100 years of experience on a team that had that kind of deep investment and commitment in an equity as an investor in the Project."); Hr'g Tr. at 93:6-10 (Profaizer) ("And the answer is, what Mr. Weidner does is, he obtains investments; right?  Just like we've all seen in other contexts.  That's what Mr. Weidner and GGAM do.  They obtain investments from investors.").

[37]     GGAM was hired to be the management services provider of the Solaire.  *Contra* Claimants' S.O.C. ¶ 37 (describing the provision of management services to the Solaire as only a "component" of the Parties' relationship).

[38]     *See, e.g.*, Hr'g Tr. at 4-7("HWANG:  Was GGAM incorporated specifically for the purposes of the Philippine project?  PROFAIZER:  Yes.").

[39]     *See, e.g.*, Email from B. Weidner to E. Razon, April 11, 2011 (RE-3) (describing the compensation scheme as "radically different from 'the norm' in the industry," "unorthodox," and "unlike what is traditionally found in the hospitality industry."); *see also* Hr'g Tr. at 453:18-21 (Braunlich) (discussing lack of reports and research "in the area of gaming management contracting.  It is extremely new and extremely unique").

[40]     *See* MSA, Clauses 4.1-4.5 (Claimants' Ex. 1); *see also* Claimants' S.O.C. ¶ 44.

an option to purchase a block of Bloomberry's shares (approximately 10%) at a strike price that was equivalent to the founder's cost plus a proportion of the value of the license.[41]

28.     The contemporaneous email exchanges between Mr. Razon and Mr. Weidner during the Parties' negotiations reflect their mutual understanding that GGAM's management responsibilities and the equity option were intertwined, and that the equity option was designed to incentivize GGAM's management performance.  From the earliest stages of the negotiations, Mr. Razon communicated his desire that equity be used to align interests:

> I am not keen on a management contract but on an arrangement that aligns our interests. . . . We can come up with a formula to accommodate this, which as an example would be that I would make up to ten percent of the company available to you and your group with a buy in formula.[42]

Mr. Weidner acknowledged and endorsed this view of an alignment of interests between the parties, noting that the "equity risk" represents "an extraordinary commitment to [Mr. Razon] and to the concept of being rewarded for value-added operating results and enhanced equity value, thus being fully aligned with your interests."[43]  As the negotiations progressed, Mr. Weidner informed Mr. Razon that he and Mr. Saunders were working on a proposal to encapsulate the agreement, one that would "align interests and be based on value derived from ou[r] performance."[44]

29.     In a March 21, 2011 email to Mr. Razon, Mr. Weidner wrote that

> "[t]o ***further explore*** how we might cooperate in making Solaire the premiere destination in the Manila Bay tourism redevelopment district, we would like to share our thoughts on the principles of alignments." [45]

---

[41]     *See* MSA, Clause 18.3.

[42]     Email from E. Razon to B. Weidner, March 17, 2011 (RE-1); *See also* Email from B. Weidner to E. Razon, March 19, 2011 (RE-1); Email from B. Weidner to E. Razon, April 11, 2011 (agreeing to a formula-based "alignment of interests" approach) (RE-3).

[43]     Email from B. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104).

[44]     Email from B. Weidner to E. Razon, March 19, 2011 (RE-1).

[45]     Email from B. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104) (emphasis added).

*CONFIDENTIAL*

Mr. Weidner attached an initial draft term sheet to this email, which he described as "an initial overview summary of our thoughts of various terms related to our involvement," and stated "We look forward to further discussion on terms and conditions that will work for both of us in making this a successful endeavor."[46]  The attached document to that email, dated March 20, 2011 and entitled "Bloombury[47] Investments Holdings Inc. – Global Gaming Asset Management *(GGAM) Draft Term Sheet*,"[48] clearly memorialized GGAM's intended role as a manager of the Solaire in the primary bullet-point heading:

> Global Gaming Asset Management LLC (GGAM) is proposing to Bloombury Investments Holdings Inc. that it retain GGAM's services as a management company to provide all necessary oversight of the development and operations of Solaire Manila.[49]

Underneath that overarching heading, GGAM proceeded to set forth various categories of terms, such as the activities of the Solaire that GGAM would be responsible for, GGAM management staffing, and critically, "GGAM Equity participation."  This term sheet, drafted by GGAM, sets forth the deal structure for GGAM's services—namely, that the Shares would serve as consideration for GGAM's performance obligations—a structure which was maintained and eventually agreed to in the Parties' executed contracts.

30.    Subsequently, in April, Mr. Weidner's U.S. lawyer, Anthony Cabot, sent a draft of the management agreement to Mr. Razon's Philippine lawyer, Benny Tan.  In this communication, on which Mr. Weidner was copied, Mr. Cabot referred to the attached draft as "the proposed management agreement" and noted that he had "been requested to send a copy of the draft of this agreement."[50]

---

[46]    Email from B. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104), attaching "GGAM Draft Term Sheet," dated March 20, 2011 (Claimants' Ex. 105).

[47]    "Bloombury" was the former name of Bloomberry.

[48]    GGAM Draft Term Sheet, March 20, 2011 (Claimants' Ex. 105) (emphasis added).

[49]    GGAM Draft Term Sheet, March 20, 2011 (Claimants' Ex. 105).

[50]    Email from A. Cabot to B. Tan, E. Occeña, April 6, 2011, attaching a third version of "Preliminary Agreement – Bloomberry Solera Project 4-6-11" (RE-2).  Contrary to Mr. Weidner's post-hac attempt to undercut the state of the Parties' negotiations, the contemporaneous record evidence makes clear that, at the time of the April 6, 2011 email attaching the 19-page draft of the MSA, the Parties had moved well beyond one-page bulleted term sheets and memorializing conversations.  *See, e.g.*, Hr'g Tr. 182:23-25 (Weidner) (describing draft MSA as merely "an outline of the discussions"); Hr'g Tr. 183:12-13 (Weidner) ("It is a- - it is a term sheet that fleshes out issues that were gating issues.");  *compare* Email from B. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104)

31.     In the first draft of the proposed management agreement, the option to purchase 10% of Bloomberry's shares and the sliding fee structure were both located in the section titled "Fees."[51]  This draft demonstrates that from the beginning of the Parties' relationship, the principals understood that the option to purchase a portion of Bloomberry's shares was granted in consideration of GGAM's performance as the Solaire's management services provider. Additionally, this initial draft of the MSA is consistent with the March 20, 2011 GGAM term sheet, as both documents demonstrate that the equity option was part of the MSA.[52]

32.     Mr. Weidner followed-up with an email confirming his understanding of the Parties' arrangement, which included the equity option in the incentive-based compensation scheme:

> It is with this trust in mind that we have designed our compensation structure—a structure that is radically different from 'the norm' in the industry. We have sought to link the bulk of our compensation to an incentive-based formula, which rewards us when you (the sponsor & primary equity backer) make money— including our equity co-investment. This structure we have proposed facilities the formation and growth of the mutual trust which is so important to us both making this project a success. . . we have agreed to an unorthodox compensation scheme, unlike what is traditionally found in the hospitality industry.[53]

**1.      GGAM's Counsel Materially Changed the Negotiated Contractual Language, Thereby Delaying the Execution of the MSA.**

33.     The Parties intended that the full equity option agreement would be embodied in the MSA.  Both GGAM's initial term sheet, sent by Mr. Weidner in March 2011, and GGAM's draft MSA, sent by Mr. Cabot in April 2011, demonstrate that GGAM's  performance

---

(describing the draft term sheet as an effort "[t]o **further explore** how we might cooperate in making Solaire the premiere destination . . .) (emphasis added) *with* Hr'g Tr. 184:20-21 (Weidner) (describing draft MSA as "a memorialization of a conversation that I had with Mr. Razon.").

[51]     Email from A. Cabot to B. Tan, April 6, 2011, and attachment (RE-2).

[52]     GGAM Draft Term Sheet, March 20, 2011 (Claimants' Ex. 105) (listing "GGAM Equity Participation" under the overarching heading describing GGAM's proposal that Bloomberry retain its "services as a management company.").

[53]     Email from B. Weidner to E. Razon, April 11, 2011 (agreeing to a formula-based "alignment of interests" approach) (RE-3).

obligations under the MSA was consideration for the equity option.[54]  Indeed, as of June 2011, GGAM was still attempting to include the equity option within the four corners of the MSA, despite the Parties' lack of agreement regarding the option grant.[55]

34.     The Parties continued to negotiate the provisions of the MSA over the course of six months, and by June 2011, the Parties had "an agreement on the business terms."[56]  This original intention of the Parties was thwarted, however, after Paul Hastings appeared in the negotiations.  When the draft MSA was returned to Bloomberry in early June 2011, Bloomberry was shocked to find that it was materially different from the agreement the Parties had reached after 3 months of negotiations and in-person meetings in Manila:

> The MSA draft we currently have is a product of compromise and about 3 months of negotiations . . . I was shocked when I saw your draft because I relied on your assurances that you will just tweak certain provisions for sake of clarity.  Instead, we saw a new draft as if our negotiations and face-to-face meetings in Manila never took place.  It is very sad and disappointing.[57]

35.     Bloomberry had been assured by GGAM's principals that the Parties had "an agreement on the business terms."[58]  Nonetheless, once Paul Hastings took control of the drafting, Bloomberry and its local counsel discovered that GGAM's lawyers had deviated from the Parties' agreed-upon concepts and added substantive new provisions.[59]  Mr. Tan replied by creating a list, "by no means exhaustive," of 25 ways in which "the new GGAM draft

---

[54]     GGAM Draft Term Sheet, March 20, 2011 (Claimants' Ex. 105); Email from A. Cabot to B. Tan, E. Occeña, April 6, 2011, attaching a third version of "Preliminary Agreement – Bloomberry Solera Project 4-6-11" (RE-2).

[55]     *See* Email from B. Tan to K. Russell, June 9, 2011 (RE-21) (noting that GGAM's counsel sought to include a draft Option Agreement as an attachment to the MSA). .

[56]     *See* Email from B. Tan to K. Russell, June 9, 2011 (RE-21).

[57]     *See* Email from E. Occeña to G. Saunders*, et al.*, June 10, 2011 (RE-22); *see also* Email from B. Tan to K. Russell (Cantor Fitzgerald), copying others, including J. Myers (Paul Hastings), June 9, 2011 (RE-21) (including a non-exhaustive list of 25 ways in which Paul Hastings and Cantor Fitzgerald had altered the basic terms of the agreement and noting that "Our draft reflected that agreement that we have reached in the exchange of communications and emails and various meetings between Mr. Razon and Mr. Weidner, and between your team and ours.").

[58]     *See* Email from B. Tan to K. Russell (Cantor Fitzgerald), copying others, including J. Myers (Paul Hastings), June 9, 2011 (RE-21).

[59]     *See* Email from B. Tan to K. Russell (Cantor Fitzgerald), copying others, including J. Myers (Paul Hastings), June 9, 2011 (RE-21).

Agreement" sent by Paul Hastings "is very different from the one that we have agreed in principle in Manila."[60]  This new draft altered the basic terms of the agreement, including but not limited to the following instances:

- Management Role:  Deleting Bloomberry's language that "GGAM must act through the Management Team" and instead giving GGAM (1) status as a separate organization within the Facilities and (2) authority over the Facilities without reference to the Management Team.

- Guest Data:  Despite previous agreement that patron or casino database generated from the operation of the Facilities shall be the property of the owner, GGAM added a new provision (1) stating that "any Guest Data developed for foreign and junket VIP play shall remain the sole property of Global Gaming," and then (2) limiting Bloomberry's data to "Guest Data generated from residents of the Philippines visiting the Facilities."

- Cantor Fitzgerald:  Giving Cantor Fitzgerald "personality" in the contract by being identified as a party entitled to any communications that will be sent to GGAM, notwithstanding the fact that Bloomberry was only entering into a contract with GGAM.[61]

- Non-Compete:  Changing previously agreed-upon non-compete provision from "GGAM or any of its directors, partners, officers or affiliates" to only "Global Gaming, and any of its Affiliates directly controlled by William Weidner."

- Governing Law:  Changing governing law from "Philippine law" to "New York law," despite (1) the contract having no connection with New York, and (2) the contract regards "a Philippine operation of a Philippine corporation subject to strict regulation by a Philippine Regulator."

- Venue:  Rejecting Bloomberry's suggestion of a neutral venue, such as Singapore, for dispute resolution, and inserting "New York courts."[62]

As Mr. Tan made clear upon receiving the newly overhauled draft, "this will delay the signing of this Management Services Agreement."[63]

---

[60]      *See* Email from B. Tan to K. Russell (Cantor Fitzgerald), copying others, including J. Myers (Paul Hastings), June 9, 2011 (RE-21).

[61]      *See* Email from B. Tan to K. Russell (Cantor Fitzgerald), copying others, including J. Myers (Paul Hastings), June 9, 2011 (RE-21).  Cantor Fitzgerald previously had been presented as providing "backing" to GGAM.  *See supra* note 23; *see also* Claimants' S.O.C. ¶ 38 (describing "strategic financial partnership" with Cantor).

[62]      *See* Email from B. Tan to K. Russell (Cantor Fitzgerald), copying others, including J. Myers (Paul Hastings), June 9, 2011 (RE-21).

36.    At this time in 2011, construction of the Solaire was well under-way, and Bloomberry needed to get a management team in place to prepare for the Solaire's opening.[64] To facilitate this, Bloomberry agreed to include a "placeholder" provision in the MSA regarding the executory terms of the equity option. This provision made clear that Bloomberry was granting the equity option to GGAM, but reserved the specific executory terms for a later agreement. Mr. Razon described this arrangement to Mr. Weidner as a "two-part agreement," reaffirming that the equity option was ***not*** distinct from GGAM's performance and obligations under the MSA.[65]

37.    This provision in the MSA, Clause 18.3, memorialized the explicit grant of the enforceable equity option. The first paragraph of Clause 18.3 of the MSA reads: "***GGAM is hereby granted the right to purchase*** up to ten percent (10%) ownership in the Facilities and the gaming license by purchasing up to 10% of the shareholdings of the Owners."[66] The MSA provided that a subsequent agreement, the Equity Option Agreement (the "EOA"), was to "embody the share purchase option under" Clause 18.3.[67]

38.    Simply put, the Parties' negotiation of certain provisions of the MSA was at a more advanced stage than their negotiation of the executory terms relating to the equity option. When it became apparent that the Parties needed more time to finalize the specific terms and details that would govern the execution of the option,[68] the Parties included a deliberate

---

[63]     *See id.*

[64]     *See infra* II.A.1.

[65]     Email from E. Razon to B. Weidner, August 20, 2011 ("The structure as it stands is a two-part agreement and we are still working on the first part.") (RE-4).

[66]     MSA, Clause 18.3 (Claimants' Ex. 1) (emphasis added); *see also* S. Davidoff Solomon Op. ¶ 34 ("The MSA was the primary transaction document and specifically granted the option on the GGAM Option Shares to GGAM. By its terms the MSA states that 'GGAM is hereby granted the right to purchase up to ten percent (10%) ownership in Facilities and the gaming license by purchasing 10% of the shareholdings of the Owners.' (MSA at § 18.3) . . . The Option Agreement was thus not the grant of the GGAM shares which was instead made under the MSA. Rather, the Option Agreement merely documented the existing grant."); S. Davidoff Solomon Supp. Op. ¶¶ 5-6 ("It is a basic rule of contract interpretation that contracts should be read for their plain and ordinary meaning. . . . The plain meaning of 'hereby granted' is 'to give (something) legally or formally.'") (quoting Merriam Webster's On-line Dictionary).

[67]     MSA, Clause 18.3 (Claimants' Ex. 1).

[68]     *See, e.g.* Email from E. Razon to B. Weidner, August 20, 2011 (RE-4) ("We cannot negotiate every possible contingency and there is no perfect agreement."). As evidenced by the very terms of the EOA, the EOA merely provided the mechanics necessary to effectuate the equity transfer. *See, e.g.*, EOA, § 2.3 ("Manner of

placeholder in the MSA outlaying critical aspects of the Parties' agreement. This multiple-agreement contractual structure of the MSA and the EOA is typical of complex business transactions,[69] especially in circumstances where parties may have agreed to the terms of the operative agreement, but are still negotiating aspects of the implementing agreement."[70]

39.    Importantly, GGAM had the right to terminate the MSA if the Parties were unable or failed to execute the EOA.[71] If GGAM chose not to exercise the equity option, either party would have continuing obligations under the EOA.[72] Moreover, GGAM could terminate the MSA if there was a material breach of the EOA.[73]

### 2.    Having Delayed the Execution of the MSA, GGAM Pressed Bloomberry for Execution of the Equity Option Agreement.

40.    After the MSA was signed and while the EOA was being negotiated, GGAM continued to attempt to involve Cantor Fitzgerald, by, for example, wanting the right to assign the equity option to Cantor Fitzgerald. Bloomberry continued to reaffirm its belief that the equity option was compensation for GGAM's role as the management service provider, not as an investor. Bloomberry made it clear that "the option to purchase 10% in the Project was granted

---

Exercising Option"); EOA, § 2.5 ("Effect of Exercise and Failure to Exercise"); EOA, § 3.1 ("Sale and Transfer of Option Shares").

[69]    *See* S. Davidoff Solomon Op. ¶ 29 ("For example, in a transaction which contains multiple parts such as a services component and an option grant or a share grant, the common practice would be to separate those parts into different agreements, namely a services agreement and an option or share grant agreement.").

[70]    S. Davidoff Solomon Op. ¶ 31.

[71]    *See* MSA, Clause 18.3 (Claimants' Ex. 1) ("In the event the Parties are unable or fail to execute the Option Agreement within such period, GGAM shall have the right to terminate this Agreement [MSA] by sending a notice of termination to the Owners within six months from the expiration of such 60 day (or extended) period.").

[72]    *See* EOA, Clause 2.2 (Claimants' Ex. 3) ("If Grantee [GGAM] does not duly exercise the Option on or prior to the Required Exercise Date, then this Agreement [the EOA] shall automatically terminate, the Option shall be deemed to have been cancelled and revoked and neither party shall have any further continuing obligations under this Agreement."), Clause 2.5 ("If Grantee does not exercise the Option within the Option Term in accordance with the terms of this Agreement, Grantee shall be deemed to have forfeited, relinquished and irrevocably waived any and all right, title and/or interest in and to the Option and the Option Shares; and neither party shall have any further or continuing rights or obligations under this Agreement."). Contrary to GGAM's argument, these clauses do not demonstrate the Shares were not intended to be compensation under the MSA. Rather, the clauses merely acknowledge that GGAM could choose not to purchase the Shares. *Compare* Claimants' Request for Interim Measures of Protection ("Claimants' Request") ¶ 154 *with* EOA, § 2.2 (Claimants' Ex. 3).

[73]    *See* MSA, Clause 15.2(f) (Claimants' Ex. 1) ("GGAM may . . . give prior notice of intention to terminate the Services, in whole or in part if any of the following have occurred: . . . a material breach under the Option Agreement."). Both Parties' legal experts have agreed that Bloomberry was bound by the option granted under Clause 18.3 of the MSA. *See* Hr'g Tr. 513:4-24.

to the party rendering the Management Services under the MSA."[74]  Bloomberry granted the equity option to GGAM in the MSA, an agreement to which Cantor Fitzgerald was not a party.

41.    Claimants and its lawyers understood that this was Bloomberry's position, and they included it in a chart of the open points of negotiation.  The entry reads:

> Effectiveness of MSA does not dictate GGAM's rights as a shareholder in Bloomberry. Absolutely not acceptable to us. <u>EKR granted the option to GGAM as an incentive to the management team and not because of the capital investment of Cantor (which is a big discount to the current and future market price)</u>. **The price of the Option was determined as part of GGAM's compensation as manager, not as an investor**. Since the Option was granted because of the MSA, GGAM cannot treat the Option as a stand-alone transaction. [75]

42.    In response to Bloomberry's position (as understood and commented upon by Paul Hastings), GGAM did not say that it disagreed with the statement that "the price of the Option was determined as part of GGAM's compensation as manager, not as an investor." Rather, GGAM's position was presented neutrally, as follows:

> GGAM is flexible on its position; however, GGAM needs to see the revised Equity Option Agreement and Participation Agreement in order to move the document into a position that both Owner and GGAM can mutually agree upon.[76]

43.    The EOA was being negotiated during a critical and busy time for Bloomberry, which was undertaking the backdoor listing and the top-up offering.[77]  GGAM figured

---

[74]    *See* Email from E. Occeña to G. Saunders, B. Stone, and J. Rein, October 24, 2011 (RE-5) ("The option to purchase 10% interest in the Project under the MSA was granted to "GGAM" only.").  In the executed version of the EOA, Bloomberry required a guarantee from GGAM that if GGAM assigned the equity option to another investor (such as GGAM Netherlands B.V., a special-purpose vehicle), the investor must provide a guarantee to Bloomberry that guaranteed GGAM's performance of its obligations under the MSA.  *See* EOA, § 8.3 (Claimants' Ex. 3) ("In the event [Global Gaming Philippines LLC] designates Investor to exercise the Option, Investor has submitted to [Bloomberry] a guarantee agreement in form and substance acceptable to Grantor under which Investor <u>guarantees the performance by Grantee of its obligations under the MSA[.]</u>") (emphasis added).

[75]    Email from G. Saunders to E. Occeña, April 5, 2012 (attaching chart prepared by J. Myers (Paul Hastings) (RE-7) (emphasis added).

[76]    Email from G. Saunders to E. Occeña, April 5, 2012 (attaching chart prepared by J. Myers (Paul Hastings) (RE-7).

[77]    *See* G. Festin Decl. ¶¶ 7-10.  Mr. Razon granted GGAM the option to purchase up to 10% of his shareholdings in Bloomberry.  At the time the Parties signed the MSA, Bloomberry's unlisted shares were all wholly owned by Mr. Razon and members of his family through corporate facilities.  In order to facilitate the public listing

predominately into the preparations for the top-up offering "road show," as it is axiomatic that managers of an enterprise would be fundamental, active participants in the road show leading up to the backdoor listing and the top-up offering.[78] For example, Messrs. Weidner and Stone both participated in the Las Vegas Sands' road show in their capacity as managers.[79]

44.     Fully aware of its leverage, on the eve of the Solaire road show, when the Parties were still negotiating numerous substantive open points in the EOA, GGAM blackmailed Bloomberry by refusing to participate in the upcoming top-up offering road show unless Bloomberry signed the agreement. On April 12, 2012, four days before the road show, Mr. Saunders wrote to Ms. Occeña, "we are unable to participate in meetings with potential investors and represent GGAM *as your manager* until we have concluded these agreements."[80] Mr. Razon "concede[d] the major point to get the deal done," but GGAM's handling of the EOA caused Mr. Razon to question GGAM's dedication to the Solaire:

> Your timing on this ultimatum is obviously blackmail. To preserve my reputation in the financial and business community we can concede major points to get the deal done which I have relayed to Estella. But if this is the way you want to deal we

---

of Bloomberry's shares, Mr. Razon acquired a publicly listed company that was renamed Bloomberry Resorts Corporation. *See* G. Festin Decl. ¶¶ 6-9; *see also* April 5, 2012 CLSA Report (RE-43). Thus, although the corporate structure of Respondents changed in the interim period of the execution of the MSA and the EOA, the deal itself remained the same—GGAM still had the option to purchase approximately 10% of *Mr. Razon's* shareholdings. *See* G. Festin Decl. ¶¶ 6-9; Hr'g Tr. 390:10-19 (Festin).

[78]     *See* Craig F. Arcella, Cravath, Swaine & Moore LLP, The Nuts and Bolts of Road Shows, Practical Law Company (2010) (RE-36) ("Road shows are presentations that are made by an issuer's senior management"; "Road shows are designed to provide prospective investors with . . . a more personal opportunity to evaluate the issue, its management team . . ."; "By allowing investors to interact with management in a live setting, . . . investors can personally assess the character and commitment of management.").

[79]     *See* Rod Smith, "Inside Gaming Column - Sands Execs Revved Up For IPO -The Tour," Gaming Wire, November 29, 2004 (RE-32).

[80]     Email from G. Saunders to O. Occeña, April 12, 2012 (RE-8) (emphasis added); Email from E. Razon to G. Saunders, B. Stone, and B. Weidner, April 12, 2012 (RE-8). After threatening to withhold their participation "as your manager" from Bloomberry's road show in order to finalize quickly the EOA—on GGAM's terms—GGAM now recasts its role as that of an "investor" or as an "asset manager." *Compare* www.ggam.com ("[W]e believe GGAM is uniquely situated to be the premiere developer and operator of such properties worldwide") *with* Hr'g Tr. at 200:21-24 (Weidner) ("Global Gaming Asset Management is an asset manager that seeks to both manage actively casinos and the gaming space and to position assets to have them have a high multiple."); *see also* Hr'g Tr. at 78:20-24 (Profaizer) ("[Respondents] needed to represent to the world that someone with credibility, with 100 years of experience on a team that had that kind of deep investment and commitment in an equity as an investor in the Project."); Hr'g Tr. at 93:6-10 (Profaizer) ("And the answer is, what Mr. Weidner does is, he obtains investments; right? Just like we've all seen in other contexts. That's what Mr. Weidner and GGAM do. They obtain investments from investors.").

*CONFIDENTIAL*

should rethink whether we can even work together. I do not take kindly to people trying to hold a gun to my head when we have only been dealing with you in good faith and what I thought was mutual respect.[81]

45.    The EOA was eventually signed on April 16, 2012, with GGAM's performance as a management service provider serving as the consideration for the equity option.[82]  Eight months after the EOA was signed, GGAM executed the option at the Php 1.67 per share strike price and paid approximately US$ 37 million for more than 900 million shares in Bloomberry Resorts Corporation.[83]  Once GGAM exercised the equity option, the Parties' relationship was then governed by the MSA and the Participation Agreement.[84]  Importantly, the Participation Agreement made clear that once the MSA terminated, the Participation Agreement—and likewise, certain of GGAM's rights as a shareholder—would terminate as well.[85]

---

[81]    Email from E. Razon to G. Saunders, B. Stone, and B. Weidner, April 12, 2012 (RE-8).

[82]    *See* EOA, §2.1 (consideration).  After the signing of the EOA, Bloomberry made it publicly known that GGAM was granted the equity option under the MSA and could choose to execute the option under the MSA.  In a letter to the Philippine Stock Exchange, dated four days after the signing of the EOA, Bloomberry stated:  "Under the MSA, GGAM was granted the option, from the date of execution of the MSA, to purchase up to 10% of PMTC's ownership in Bloomberry from PMTC[.]"  *See* Letter from Bloomberry to The Philippine Stock Exchange (attaching Bloomberry's Audited Financial Statements), April 20, 2012 (RE-44); *cf.* Email from B. Tan to G. Festin, April 20, 2012 (Claimants' Ex. 108) (explaining that the execution of the equity option would be governed by the EOA).  Bloomberry also described the equity option as granted under the MSA in the offering circular for its top-up offering.  *See* Offering Circular at 68 (Claimants' Ex. 22) ("Under the MSA and the Equity Option Agreement, GGAM was also granted the option to purchase . . . Shares . . . from Prime Metroline").  GGAM never refuted any of these public statements.

[83]    Letter from B. Weidner to E. Razon, December 20, 2012 (CE-4) ("Notice of Exercise"); Letter from B. Tan to Philippine Stock Exchange, December 21, 2012 (CE-5) ("Further to BLOOM's disclosures on 4 April 2012, 20 April 2012 and 22 October 2012, Global Gaming Philippines LLC ("GGAM"), the management services provider in BLOOM's Solaire Manila casino hotel project, exercised today its option to purchase 921,184,056 shares in BLOOM. The subject shares will be sold by Prime Metroline Holdings Inc. to GGAM at a price equivalent to US$15 million plus 10% of PMHI's cost of investment in the Solaire Manila Project which is equivalent to a price of Php1.67 per share.").

[84]    For example, pursuant to both the MSA and the Participation Agreement, GGAM was granted the right to "co-invest" in competing projects in the Philippines—only so long as GGAM also would be the manager of that competing project.  *See* MSA, Clause 18.3; Participation Agreement, § 6.2.

[85]    *See* Participation Agreement, § 9.1.

**D.    In Light of GGAM's Misrepresentations and Substantial Breaches of the MSA That Altered the Fundamental Nature of the Parties' Agreement, Bloomberry Was Left with No Choice but To Extinguish the Parties' Relationship.**

46.    Not long into the Parties' relationship and after GGAM forced Bloomberry's hand in signing the EOA, the involvement of Messrs. Weidner and Stone in managing the Solaire quickly diminished, as their focus shifted to the pursuit of other ventures.[86]    Bloomberry suffered the disconnect between the idealized sales pitch of GGAM's principals, and the reality of what they could deliver.  GGAM did not provide the "hands-on" involvement in the management of the Solaire, which was central to Bloomberry's expectations when hiring them.[87] Instead, GGAM's three principals left the disjointed team without support.  Contrary to GGAM's statements that it needed more time to perform,[88] GGAM had 2 years—from September 9, 2011 to September 12, 2013—to perform its obligations under the MSA and deliver upon its principals' promises.  As shown below, GGAM failed to fulfill its obligations under the MSA in a manner to be expected of a professionally qualified and competent management company—let alone a management company with "100 years of collective experience."[89]

47.    After GGAM repeatedly refused to take steps to address the substantive deficiencies in its performance, Bloomberry realized that the problem was much larger than GGAM's refusal to address its management problems.  Rather, the problem was that GGAM had misrepresented its ability to manage the Solaire and to deliver on its promises.  In Bloomberry's July 12, 2013 Notice of Intent to Terminate, Bloomberry reiterated that it had hired GGAM as

---

[86]     *See, e.g.*, J. Alarilla Decl. ¶ 13; *see, e.g.*, C. Hsu, "Weidner seeks rapid approval of Matsu casino," TAIPEI TIMES, July 10, 2012 (RE-45) (discussing Bill Weidner's plan to invest about US$ 2 billion to build a casino resort in Taiwan and quoting Weidner as saying "As a gaming expert, I'm confident of turning Matsu into a successful casino resort after those we built in Macau and Singapore"); *see also* S. Stradbrooke, "Weidner Significantly Upgrades Matsu Casino Plan, but Tone of Campaign Irks Some," CALVINAYRE.COM, January 23, 2013 (RE-48) (describing Bill Weidner's unveiling of a dramatically expanded version of the plan for an integrated resort casino complex on Matsu Island); *see also* K. O'Keefe, "Ex-Sands Executives to Help Manage Bahamas Casino," WALL STREET JOURNAL, May 22, 2013 (RE-67); *see also* S. Stradbrooke, "Melco International's Lawrence Ho confirms Russia casino deal," CALVINAYRE.COM, July 10, 2013 (RE-68) (mentioning that GGAM was reportedly negotiating deals with a Russian state-owned firm overseeing the development of a Russian entertainment area).

[87]     *See, e.g.*, J. Alarilla Decl. ¶¶ 12-13.

[88]     *See, e.g.*, Claimants' S.O.C. ¶ 169.

[89]     *See* Email from E. Razon to B. Weidner, B. Stone and G. Saunders, July 12, 2013 (Claimants' Ex. 94), attaching letter indicating intent to terminate due to GGAM's failed execution of the MSA ("Bloomberry's July 12, 2013 Notice of Intent to Terminate ") (Claimants' Ex. 81).

the management service provider for the Solaire based on GGAM's "representation that [they] are the industry experts with years of experience in the development and start-up of world-class integrated casino hotel entertainment facilities."[90]  Despite this representation, GGAM's substandard performance led Bloomberry to conclude that GGAM's execution of the MSA had "failed."[91]  Accordingly,  Bloomberry exercised its right under Clause 15.1(a) of the MSA to terminate GGAM's services under the MSA due to GGAM's material breach of its obligations.[92]  Yet Bloomberry expressed its belief that "an amicable parting of ways" between the Parties was in "everyone's interest."[93]

48.     Under Clause 15.1 of the MSA, Bloomberry was permitted, at any time, to give prior notice of intention to terminate the MSA if GGAM committed a material breach of the MSA.[94]  Pursuant to the MSA, however, a "cure" period is not required if the material breach is incapable of remedy.[95]  If the breach is capable of remedy (which here, it was not), then GGAM was entitled to 30 days to remedy the breach.[96]  Nonetheless, Bloomberry continued to work with GGAM over the subsequent 60 days in an attempt to reach an amicable parting of ways.[97]

49.     GGAM did not use this 60-day period to address its deficient performance or to develop constructive ways to salvage the Parties' relationship.  Rather, GGAM sent Bloomberry "lawyers' letters" filled with excuses and devoid of any real willingness to find an amicable

---

[90]     Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81).

[91]     *See* Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81).

[92]     *See* Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81).  In Bloomberry's Notice of Termination, Bloomberry noted that the Revenue Memo, if implemented, would provide an alternative justification to terminate the MSA pursuant to Clause 15.3(b), because the extreme tax would make operating the Solaire materially burdensome.  *See* MSA, Clause 15.3(b) (Claimants' Ex. 1).  The Bureau of Internal Revenue, through its April 17, 2013 Revenue Memorandum Circular No. 33-2013 ("Revenue Memo"), declared that PAGCOR licensees were subject to 30% corporate income tax on its gaming revenue.  PAGCOR has granted temporary administrative relief to its licensees, including Bloomberry, in order to allow the licensees to maintain their respective businesses notwithstanding the Revenue Memo.  *See, e.g.,* B. Bernal, "Bloomberry wants income tax exemption in PAGCOR ops," RAPPLER.COM, June 8, 2014 (RE-61); *see also* "Pagcor cuts casino license fees in Entertainment City," RAPPLER.COM, May 12, 2014 (RE-60).

[93]     *See* Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81).

[94]     MSA, Clause 15.1 (Claimants' Ex. 1).

[95]     *Compare* MSA, Clause 15.1 (Claimants' Ex. 1) *with* Claimants' S.O.C. ¶ 125 (asserting, inaccurately, that Respondents had an obligation to provide GGAM with an opportunity to cure any alleged material breaches.).

[96]     MSA, Clause 15.1 (Claimants' Ex. 1).

[97]     *See, e.g.,* Email from E. Occeña to B. Weidner, *et al.*, September 9, 2013 (RE-23) ("We earnestly hope for a fair settlement here.  We agree to meet with you one last time to hammer this settlement.").

solution.[98]  And those very same "lawyers' letters" are quoted wholesale in the Statement of Claim,[99] illustrating that GGAM immediately adopted a litigious position rather than a cooperative position that could have led to an amicable parting of the ways.

### III.   GGAM'S OBLIGATIONS UNDER THE MSA INCLUDED, AMONG OTHER THINGS, ASSISTANCE WITH THE SOLAIRE'S DEVELOPMENT AND CONSTRUCTION, AND GGAM WAS COMPENSATED FOR THIS ASSISTANCE.

50.    As GGAM admits, "Under the MSA, GGAM undertook to provide specific services relating to the development, construction and operation of the Solaire."[100]  The MSA generally provides that GGAM "has the right, authority, obligation, and discretion, and is instructed to take all such pre-opening (and post-opening) actions for and on behalf of the Owners to operate all aspects of the Facilities."[101]  The MSA then provides a ***non-exhaustive list*** of what these actions include.[102]

51.    Nonetheless, GGAM takes a narrow and restrictive view of its obligations as the management services provider.  GGAM asserts that its efforts to assist with the construction of the Solaire, as well as its participation in Bloomberry's capital-raising efforts, were offered in

---

[98]    *See, e.g.*, Letter from B. Weidner to E. Razon, August 19, 2013 (Claimants' Ex. 85) ("Of course, not every operational or management issue at Solaire constitutes a breach of the MSA, and not every breach of a contract constitutes a material breach (which is required under the MSA for there to be breach of that Agreement).").

[99]    *See, e.g.*, Claimants' S.O.C. ¶¶ 144-150.

[100]    *See* Claimants' S.O.C. ¶1; *see also id.* ¶ 39 ("GGAM would provide specific management, operational, and technical Services in the development, construction and operations of Solaire").  Notably, this is in contrast to Claimants' Request for Interim Measures of Protection, where Claimants attempted to present GGAM's construction-related services as services rendered as an "investor," and not as a manager under the terms of the MSA.  *See, e.g.*, Claimants' Request ¶ 190 ("***As an equity investor***, GGAM possessed a direct interest in the timely opening and reputation of the Project.  Undeniably, GGAM's efforts contributed, and continue to contribute, both quantifiable and unquantifiable value to Solaire, which included s***uccessful restoration of the Project schedule and timely completion of the Facilities' construction***.  For example, in mid-2012, when the contractors notified the Owners that the Project would likely miss the planned completion date by six months, ***Bloomberry looked to GGAM, as its active partner***, to leverage substantial new resources ***to restore the construction schedule*** and thereby ensure the First Quarter 2013 opening.") (emphasis added).

[101]    *See* MSA, Annex A (Claimants' Ex. 1).

[102]    *Id.*  In light of GGAM's responsibilities and obligations as the management services provider of the Solaire, GGAM's facile argument that it provided "important oversight and advisory services" with respect to "Phase 1-A of the Facilities" (which, according to GGAM, was "[b]eyond the scope of its Pre-Opening and Post-Opening Services"), but did not "demand independent payment from the Owners for these efforts" should be disregarded.  *See* Claimants' S.O.C. ¶ 84.

*CONFIDENTIAL*

addition to its obligations under the MSA.[103]  GGAM also takes credit for "negotiating agreements on behalf of the facilities" even though the MSA did not expressly require them to negotiate those specific agreements.[104]  GGAM appears to misunderstand the nature of their general and specific obligations under the MSA.  GGAM's assistance with the construction of the Solaire, its participation in the top-up offering "road show," and its negotiations of agreements for the Solaire are not charitable acts.  These acts fall within GGAM's general and specific obligations under the MSA.[105]

**A.    GGAM Was Obligated to Provide Services Related to the Construction of the Solaire.**

52.    Under the MSA, GGAM was obligated to provide technical assistance and management services with respect to the construction of the Solaire.[106]  This assistance included:

- Provide technical assistance on <u>all</u> aspects of planning, design, layout, and construction of the hotel, casino, food & beverage facilities, convention services, entertainment programs (where applicable), and other facilities and amenities;[107]

- Advise on design and layout of the casino to include operational and functional criteria, layout of the casino floor, selection and ordering of gaming equipment, in conjunction with key employees hired during pre-opening;[108]

- Advise contractors and consultants in the selection, purchase, design, layout, and installation of all equipment and facilities necessary or desirable for the efficient and economical operation of the Facilities;[109] and

---

[103]    *See* Claimants' S.O.C. ¶¶ 60, 92.

[104]    Claimants' S.O.C. ¶¶ 70, 84.

[105]    *See* MSA, Annex A, Number 5 ("Advise contractors and consultants in the selection, purchase design, layout and installation of all equipment…"), Number 7 ("Recommend the selection and order FF&E [defined as "furniture, furnishings, fixtures and equipment (including Gaming Equipment), interior and exterior signs, as well as other non-real property improvements and personal property used to operate the Facilities"] in accordance with the pre-opening plan and budget."); *see also* Clause 2.5(c) ("[GGAM] will at all times act in the best interests of the shareholders of the Casino Owner and the Hotel Owner, and to maximize such shareholders value in the performance of its obligation under this Agreement and in all dealings carried out by it in its capacity under this Agreement.").

[106]    MSA, Annex A.

[107]    *See id.*, Annex A, Pre-Opening Services – Item 1 (Claimants' Ex. 1).

[108]    *See id.* at Annex A, Pre-Opening Services – Item 2.

[109]    *See id.* at Annex A, Pre-Opening Services – Item 5.

- Review and monitor construction expenditures and progress of construction, including the right to attend all meetings with contractors and consultants involved in the development, planning, design, and construction of the Facilities.[110]

In light of the above pre-opening services expressly required from GGAM in the MSA, it is disingenuous for GGAM to assert that it was "not yet obligated" to provide Bloomberry with input and assistance regarding the construction, design, and layout of the Solaire.[111]

53.     As explained above, the Solaire's construction efforts began long before Bloomberry and GGAM's principals first met in early 2011.[112]  When the Parties' negotiations began in March 2011, construction was well underway, and by the time the Parties finally signed the MSA in September 2011, the main structure of the casino had already been built.[113]  As is typical with any large construction project, by this point the Solaire project had experienced some delays and obstacles, none of which were likely to impact the scheduled completion date of October 2012.[114]

54.     Given the undertakings of Bloomberry's construction contractors and what had already been accomplished by the time GGAM became involved in the Solaire project, GGAM's construction-related obligations were minimal.  Indeed, GGAM was paid fees for its pre-opening and construction-related obligations commensurate with the services it provided.[115]  Under the MSA, GGAM received "a planning, oversight, and development base fee" of US$ 100,000 per month, terminating upon the issuance of a permanent certificate of occupancy for the Phase I

---

[110]     *See id.* at Annex A, Pre-Opening Services – Item 6.

[111]     *See* Claimants' S.O.C. ¶ 60 ("***Although not yet obligated to do so***, months prior to the execution of the MSA, GGAM began providing the Owners with exigent input and assistance regarding the ongoing construction of the Facilities, as well as their planned design and layout.")  (emphasis added).

[112]     *See supra* ¶¶ 18-21.

[113]     J. Salvacion Decl. ¶ 7; *see also* Offering Circular at 69, F-43 (Claimants' Exhibit 22).

[114]     J. Salvacion Decl. ¶ 7; Letter from J. Salvacion to DMCI, December 29, 2011 (J. Salvacion Decl., Exhibit A) ("We are concerned that this is the first intimation of a potential delay, notwithstanding numerous recent statements from yourselves that the completion date of 10th October 2012 is achievable."); Hr'g Tr. at 251:9-11 (Alarilla) ("But in terms of construction problems, I know we had a few, but nothing really that will delay the Project that much.").

[115]     *See* Philippine Court Hr'g Tr. at 89-90 (January 28, 2014) (Claimants' Ex. 28) (estimating payment of US$3.5 million dollars to GGAM).

Facilities.[116]  GGAM also received a "Pre-Opening Operations" fee of US$ 75,000 per month, terminating upon the opening of the Solaire (the "Start Date").[117]  Although GGAM now complains that this agreed-upon compensation "did not fully reflect the value" of its contributions,[118] GGAM offers no support for this self-serving assertion.

### 1.    GGAM's Sporadic Visits to the Solaire Construction Site Often Detracted from the Construction Process.

55.    Contrary to GGAM's presentation of the facts, GGAM was not asked to participate in the construction process as a result of "substantial construction problems"[119] or "under-performing construction efforts."[120]  One of the reasons why Bloomberry wanted GGAM's assistance during the construction process was to ensure that the Solaire was being built in a manner that was compatible with GGAM's plans for how it would manage and operate the casino.[121]  Indeed, GGAM represented that, like with the Venetian Macau and numerous other major resort-casinos,[122] it would assist with the design and development of the Solaire to

---

[116]    MSA, Clause 4.1 (Claimants' Ex. 1).

[117]    MSA, Clause 4.2. (Claimants' Ex. 1).

[118]    Claimants' S.O.C. ¶ 51.

[119]    Claimants' S.O.C. ¶ 165.

[120]    Claimants' S.O.C. ¶ 64; *see also* Claimants' S.O.C. ¶ 60 (taking credit for addressing problems such as "construction [falling] behind schedule," "Respondents' general contractor and construction management team [ ] not performing," and "certain crucial hires [having] been delayed.").  In support of its allegations, GGAM cites to only one document, an email from Mr. Alarilla to Mr. Stone, dated June 3, 2011.  *See* Claimants' S.O.C. ¶ 60, n.80. This email only confirms that delays in construction efforts were a result of waiting for the MSA to be signed, and that GGAM was asked to assist in order to ensure that the construction and design of the Solaire would be compatible with GGAM's plans as manager and operator of the Solaire's facilities.  *See* E-mail from J. Alarilla to B. Stone, June 3, 2011 (Claimants' Ex. 12).  If anything, delays were a result of the months GGAM spent renegotiating the terms of the MSA, while the construction team waited for the manger and operator of the Solaire to provide its expected input.

[121]    D. Almeda Decl. ¶ 17; *see also* Hr'g Tr. at 247:16-25 (Alarilla) ("We have brought the Project to a certain level where we thought we--we had gotten the expertise in different areas.  But an operator, maybe an experienced one, would have their way of doing things in terms of payout in the sizes of offerings.  And we thought that, if we were to work with GGAM, they might as well put their input early enough so that we can consider it in our construction.  That's the context of why I mentioned that we should have engaged them much earlier."); *id. at* 248:5-12 (Alarilla) ("As I said, we needed their inputs because they are going to be the operators, and operators would have their way of doing things and defining the layouts and the structure of the gaming floor. That's why, before getting more advanced to the construction and for them to change it later, they might as well be there at the time when we can take into consideration the inputs that they will give us.").

[122]    Email from F. Gaspar to E. Razon, attaching presentation, January 21, 2011 at 5 (RE-39) ("Responsible for the efficient design, development and operation of 6 mega-resorts, including 3 of the 10 largest buildings in the world.").

ensure that it included the necessary "operational and functional criteria."[123]  Bloomberry wanted to avoid the possibility that something would be built and then subsequently altered because it was inconsistent or incompatible with GGAM's vision for the casino's operations.[124]

56.     GGAM misrepresents the context in which it was asked to participate in the construction process, and it exaggerates the need and extent of its contributions.  As GGAM implicitly acknowledges, only one of GGAM's principals, Mr. Stone, had any involvement in the construction process itself.[125]  Mr. Stone, however, would visit the Solaire for a few days every month or two.[126]  In a construction environment, this is simply not enough time to make a useful contribution.[127]  Moreover, Mr. Stone's sporadic appearances often would detract from the construction process by creating confusion and delays.[128]  The construction contractors for the Solaire would have to re-arrange their schedules to perform walk-throughs with Mr. Stone, who was out of touch with what had been accomplished during his time away.[129]  Frequently, Mr. Stone would become fixated on and disagree with certain aspects of the construction, the history and development of which he knew nothing.[130]  This would force the construction contractors to engage in the time-consuming process of determining whether they actually needed to make any

---

[123]     *See* MSA, Annex A, Pre-Opening Services – Item 1 (Claimants' Ex. 1) ("Provide technical assistance on all aspects of *planning, design, layout, and construction of the hotel, casino* . . . .") (emphasis added); *id.* at Annex A, Pre-Opening Services - Item 2 ("*Advise on design and layout of the casino to include operational and functional criteria, layout of casino floor*, selection and ordering of gaming equipment, in conjunction with key employees hired during pre-opening.") (emphasis added), *id.* at Annex A, Pre-Opening Services - Item 5 ("*Advise* contractors and consultants *in the selection, purchase, design, layout, and installation of all equipment and facilities necessary or desirable for the efficient and economic operation of the Facilities*.") (emphasis added).

[124]     D. Almeda Decl. ¶ 17; *see also* Hr'g Tr. at 251 (Alarilla) ("I would not say--I think the problems would be normal in the construction industry.  But what I remember most in terms of being a situation that we should really address is the fact that as an operator they really want to have the input in the project.  And if they come in a bit late and we continue in the construction, then we might have to tear down what we have built, which would be more expense for us.").

[125]     *See* Claimants' S.O.C. ¶¶ 60-64 (identifying only Mr. Stone as a GGAM principal involved in the Solaire's construction efforts); *see also* D. Almeda Decl. ¶ 17; J. Salvacion Decl. ¶ 9; E. Razon Decl. ¶ 33.

[126]     J. Salvacion Decl. ¶ 9; D. Almeda Decl. ¶ 17; E. Razon Decl. ¶¶ 32-33.

[127]     E. Razon Decl. ¶ 33; D. Almeda Decl. ¶ 17.

[128]     J. Salvacion Decl. ¶ 13; D. Almeda Decl. ¶ 18.

[129]     J. Salvacion Decl. ¶ 13.

[130]     J. Salvacion Decl. ¶ 13.

changes, and if so, how they should go about doing it.[131]  Because Mr. Stone was rarely on site, however, major design-related decisions were frequently made without his input.[132]

57.     Mr. Razon was heavily involved in the construction process and was frequently on site to supervise and make key decisions.[133]  Mr. Razon agreed with and approved some of Mr. Stone's recommendations, while rejecting other of Mr. Stone's recommendations.[134]  In some instances, Mr. Stone's recommendations actually detracted from the value of the Solaire. For example, Mr. Stone recommended a costly change to the Solaire's hotel kitchen in order to prepare for large numbers of room service orders.  As room service is not customary for Asian players generally, and Philippine players specifically, this change turned out to be an inordinate waste of money.[135]

58.     Additionally, Mr. Stone possessed little to no knowledge of Philippine construction practices, which would often result in Mr. Stone making impractical or unattainable recommendations, and inevitably resulted in clashes with local contractors.[136]  For example, DMCI utilized certain materials and techniques common for the Philippines, such as using hollow blocks for building interior walls that could withstand the climate.[137]  Despite these "tried and true" local practices, Mr. Stone would insist on using "American" materials, such as fiber boards for building interior walls, which could not similarly stand up to the wet weather conditions in the Philippines.[138]  In another example, Mr. Stone, not appreciating the extent to which Manila experiences power surges and losses, recommended against keeping all of the slot machines on uninterrupted power supply.[139]  Three days before the Solaire's grand opening, there was a power failure and all of the slot machines died.[140]  When the power eventually came

---

[131]     D. Almeda Decl. ¶ 17; *see also* J. Salvacion Decl. ¶¶ 11-13.

[132]     D. Almeda Decl. ¶ 17.

[133]     J. Salvacion Decl. ¶ 9; D. Almeda Decl. ¶¶ 16-17.

[134]     J. Salvacion Decl. ¶ 11; D. Almeda Decl. ¶ 17.

[135]     D. Almeda Decl. ¶ 19.

[136]     D. Almeda Decl. ¶ 20; J. Salvacion Decl. ¶ 13.

[137]     J. Salvacion Decl. ¶ 13.

[138]     J. Salvacion Decl. ¶ 13.

[139]     D. Almeda Decl. ¶ 20.

[140]     D. Almeda Decl. ¶ 20.

back on, some of the slot machines did not work.[141]  Ultimately, Bloomberry had to hire a local expert to set up uninterrupted power supply devices to keep the Solaire's casino operations up and running.[142]

### 2.    GGAM's Alleged Contributions to the Solaire's Construction Are Exaggerated and Unsupported.

59.    GGAM did not "salvage" an "out-of-control construction project."[143]  Again contrary to GGAM's characterizations, GGAM was not individually responsible for correcting construction delays and getting the Solaire Project back on schedule.  GGAM provides only one document in support of this assertion—an email referencing a December 2011 presentation by the general contractor (DMCI) to the Owners (Bloomberry), where the general contractor estimated an eight-month delay to the contract completion date.[144]  Extrapolating from this email, GGAM then states, without support, that its principals "reviewed the presentation, advised the Owners on the inconsistencies in the contractor's explanation, and identified immediate steps needed to recover the project schedule."[145]  This statement not only misrepresents the status of the Solaire's construction progress at the time, but it is factually incorrect.

60.    Part of the dynamic of any construction project is the "give and take" between (1) the general contractor, who works directly with the construction team and often seeks approval of construction delays; and (2) the project manager, who is responsible for the timely and cost-effective completion of the construction project.[146]  Accordingly, when DMCI asked for an eight-month extension in its December 2011 presentation, this by no means meant that the delay was warranted or would have been approved by DCI, the project manager.[147]  On the contrary, as is typical in these circumstances, DCI planned to address all of the issues raised in DMCI's

---

[141]    D. Almeda Decl. ¶ 20.

[142]    D. Almeda Decl. ¶ 20.

[143]    *See* Letter from B. Weidner to E. Razon, August 19, 2013 at 19 (Claimants' Ex. 95).

[144]    Claimants' S.O.C. ¶ 61 (citing Email from M. Palaroan to B. Stone, December 21, 2011 (attaching PowerPoint presentation dated December 19, 2011) (S.O.C. Ex. 13)).

[145]    Claimants' S.O.C. ¶ 61.

[146]    J. Salvacion Decl. ¶ 7.

[147]    J. Salvacion Decl. ¶ 7.

CONFIDENTIAL

presentation, and work with DMCI to identify and take whatever steps were necessary to keep the Solaire Project on schedule.[148]  That is exactly what happened.

61.    In response to DMCI's presentation, DCI wrote two letters to DMCI, dated December 29, 2011 and January 3, 2012.[149]  The first letter noted that DMCI's presentation was their first indication of a potential delay, and that it conflicted with recent statements by DMCI that the scheduled completion date was achievable.[150]  The letter also emphasized that DMCI did not follow proper procedures in presenting the delay, and that notwithstanding, there was "nothing which would reasonably lead the Project Manager to an opinion that an event has ensued relevant to and causing of a delay to the works for which the Contractor is entitled to an extension of time."[151]  The second letter provided a more detailed response, including point-by-point comments and directions on how to progress with the construction and keep the Solaire Project on schedule.[152]  As demonstrated by these letters, DCI—not GGAM—was responsible for addressing DMCI's presentation and taking the steps necessary to keep the Solaire Project on schedule.

### B.    GGAM Was Obligated to Maximize Value for Bloomberry's Shareholders, and GGAM Was Expected to Participate in the Top-Up Offering "Road Show" as the Management Services Provider for the Solaire.

62.    Taking a narrow, restrictive interpretation of its obligations under the MSA, GGAM implausibly alleges that it was not compensated for its participation in the "top-up offering" road show.[153]  Clause 2.5 of the MSA required GGAM to take such actions as manager of the Solaire that would maximize value for Bloomberry's shareholders.[154]  It is fundamental

---

[148]    J. Salvacion Decl. ¶¶ 7-8.

[149]    *See* J. Salvacion Decl. ¶ 8; *see also id.* Annex B.

[150]    Letter from J. Salvacion to DMCI, December 29, 2011 (J. Salvacion Decl., Exhibit A) ("We are concerned that this is the first intimation of a potential delay, notwithstanding numerous recent statements from yourselves that the completion date of 10th October 2012 is achievable.").

[151]    Letter from J. Salvacion to DMCI, December 29, 2011 (J. Salvacion Decl., Exhibit A).

[152]    Letter from J. Salvacion to DMCI, January 3, 2012 (J. Salvacion Decl., Exhibit B).

[153]    *See, e.g.*, B. Stone Supp. Decl. ¶ 21 ("When GGAM went out on the Roadshow (which we were not compensated for under the MSA) . . . .").

[154]    MSA, Clause 2.5 (Claimants' Ex. 1) ("[GGAM] will at all times act in the best interest of the shareholders of the Casino Owner and the Hotel Owner, and to maximize such shareholders value in the performance of its obligations under this Agreement and in all dealings carried out by it in its capacity under this Agreement.").

that managers participate in road shows, including presenting to and interacting with potential investors.[155] GGAM claims that its participation in the road show was "integral to the success of the IPO,"[156] but this would have been the case for any manager that Bloomberry hired to manage and operate the Solaire. GGAM, as the management service provider of the Solaire, was a part of the top-up offering story, and it would have been unusual, and perhaps alarming, for potential investors not to meet the very people that would be in charge of executing the Solaire's business plan and ensuring a return on their investment.[157]

63. The top-up offering raised more than US$ 126 million and was considered a major success by Bloomberry and financial commentators alike.[158] The price for the shares issued under the top-up offering was set at Php 7.5 per share, and at that price it was more than 6 times "oversubscribed"—meaning that investors who purchased shares issued under the top-up offering would have purchased more than 6 times as many shares had there been that many available to purchase.[159]

64. The Solaire offered a unique opportunity for investors to participate in Asia's booming gaming market. At the time of the offering, Macau and Singapore had emerged as the world's largest and fastest growing gaming markets.[160] The Philippines, just a short flight away from both, was experiencing significant increases in its per capita GDP[161] and had recently

---

[155]    *See* Craig F. Arcella, Cravath, Swaine & Moore LLP, *The Nuts and Bolts of Road Shows*, Practical Law Company (2010) (RE-36) ("Road shows are presentations that are made by an issuer's senior management (often accompanied by representatives of the lead underwriters) to market an upcoming securities offering to prospective investors. . . .By allowing investors to interact with management in a live setting, and by allowing question and answer sessions . . . investors can personally assess the character and commitment of management.").

[156]    Claimants' S.O.C ¶ 94.

[157]    E. Razon Decl. ¶ 18; D. Almeda Decl. ¶ 12. Moreover, GGAM was a brand-new company at the time of the top-up offering, and the Solaire was their first project. *See* Letter from B. Weidner to E. Razon, August 19, 2013 (Claimants' Ex. 95) ("Solaire was GGAM's first standalone project."). If anything, GGAM was "piggybacking" off of Mr. Razon's name and reputation in order to publicize its new management company during the road show. *Cf.* B. Stone Supp. Decl. ¶ 20. Indeed, Mr. Stone appeared to be using the road show as an opportunity to promote GGAM as a new company, not necessarily to promote Bloomberry or the Solaire. *See* E. Razon Decl. ¶ 25; D. Almeda Decl. ¶ 21.

[158]    "Finance Asia Achievement Awards 2012-Day 1," December 10, 2013 (Claimants' Ex. 65); D. Almeda Decl. ¶ 8; E. Razon Decl. ¶ 21.

[159]    L. Venezuela Decl. ¶ 5.

[160]    Offering Circular at 7 (Claimants' Ex. 22).

[161]    April 5, 2012 CLSA Report at 51 (RE-43) ("We expect the increasing wealth level in the Philippines to continue to drive growth in leisure spend (including gaming). Over the past decade, per capita GDP has increased

liberalized gambling.[162] One casino in Manila, ResortsWorld International, demonstrated tremendous untapped potential, but it had not conducted any kind of public or private offering.[163]

65. The creation of "Entertainment City"—a special economic zone located on Manila Bay—offered an even better opportunity for investors given its location, reduced tax rates, and objective of hosting four-integrated casino-resorts to create a "critical mass" that would make the Philippines an international gaming destination.[164] Not only was the Solaire expected to be the first of these four integrated casino-resorts, but it was the best located along the waterfront.[165] Moreover, the Solaire was Bloomberry's only major asset, and thus investors knew that they would be directly investing in Asia's booming gaming market, and not in some other competing interest, such as real estate.[166]

66. These fundamentals contributed to the success of the top-up-offering, but the importance of Mr. Razon's involvement as CEO and majority shareholder of BRC cannot be discounted. Mr. Razon is a highly respected and successful businessman and entrepreneur. With Mr. Razon at the helm, ICTSI became a truly global enterprise with 30 ports in 22 countries.[167] In March 2007, ICTSI initiated a private share placement where investors were permitted to purchase shares in ICTSI at a pre-set purchase price.[168] The investors in ICTSI's 2007 share placement experienced an enormous return on their investment—at the time of the top-up offering, ICTSI had delivered a 22.9% net profit—a strong financial performance that doubled its share price in only 5 years.[169]

---

from US$1,495 in 2001 to US$1,945 in 2011. With increased income, Filipino families have gradually increased their budget on discretionary leisure spend, with leisure as a percentage of total consumer spend increasing from 5.9% in 2001 to 6.7% in 2011."); D. Almeda Decl. ¶ 8.

[162]    D. Almeda Decl. ¶ 8; E. Razon Decl. ¶ 21; *see also* Offering Circular at 92 (Claimants' Ex. 22).

[163]    April 5, 2012 CLSA Report (RE-43).

[164]    *Id.* at 28; Offering Circular at 91; D. Almeda Decl. ¶ 8; E. Razon Decl. ¶ 21.

[165]    E. Razon Decl. ¶ 21; April 5, 2012 CLSA Report at 4 (RE-43).

[166]    D. Almeda Decl. ¶ 9; *see also* April 5, 2012 CLSA Report (RE-43) ("Of all the players in the Philippines gaming space, Bloomberry Resorts is set to be the only pure play gaming company in the Philippines. This allows investors a direct way to participate in what we believe will be one of the strongest growth sectors in the Philippine market over the next three to four years.").

[167]    E. Razon Decl. ¶ 2.

[168]    E, Razon Decl. ¶ 22; L. Venezuela Decl. ¶ 7.

[169]    April 5, 2012 CLSA Report at 4 (RE-43); D. Almeda Decl. ¶ 11; E. Razon Decl. ¶ 22.

*CONFIDENTIAL*

67.    Hoping to once again capitalize on the track record of Mr. Razon, many of those same investors who invested in ICTSI's 2007 share placement lined up to participate in the top-up offering.[170]  Indeed, these investors were willing to purchase more than 165% of the shares that were available to purchase under the top-up offering, making it more than 1.6 times oversubscribed.[171]  Among the investors that participated in ICTSI's 2007 share placement was Capital Research Global Investors (a subsidiary of Capital Group), the "anchor" or largest investor in the top-up offering.[172]  Capital Research Global Investors offered to purchase over 21% of the available shares under the top-up offering, and was ultimately allocated 10% of the shares, which is more than twice as many shares as the next largest investors.[173]

68.    Significantly, Mr. Razon held "1-on-1" meetings in Hong Kong and London with six of the biggest investors in the top-up offering.[174]  Additionally, Mr. Razon made many of the key decisions leading to the top-up offering's ultimate success, such as setting the issue price, determining the share allocation, and deciding the recipients of that allocation.[175]  Although Mr. Razon could have allocated all the shares to investors in ICTSI, he decided it would be in the best interest of BRC to allocate those shares to a larger and more diverse pool of investors.[176]

69.    GGAM, as the management services provider for the Solaire, also contributed to the top-up offering; yet, GGAM exaggerates its role and contribution to the exclusion of others. For example, given the efforts of Mr. Razon, the members of the Bloomberry team, UBS and CLSA (the underwriters for the top-up offering), GGAM certainly did not "lead" the top-up

---

[170]    L. Venezuela Decl. ¶ 8; E. Razon Decl. ¶ 22; G. Festin Decl. ¶ 11; Hr'g Tr. at 278:13-23 (Alarilla) ("We had a good record about ICTSI.  In fact, when all the people were out in the road show, investors would come to the office, and I would have the chance to sit down with them.  And one comment I distinctly remember is that they want to invest in the companies that Mr. Razon would put up because in his four corporations, he's one of the few century markers that could go from a par value of 1 peso, it goes up to more than 100.  So, I would say they are a fan of Mr. Razon and so far as growing an investment is concerned over a long period of time.").

[171]    L. Venezuela Decl. ¶ 8; E. Razon Decl. ¶ 22.

[172]    L. Venezuela Decl. ¶ 9; E. Razon Decl. ¶ 22.

[173]    L. Venezuela Decl. ¶ 9; E. Razon Decl. ¶ 22.  In contrast, Marsico, the one investor suggested by GGAM, declined to invest.  *See* D. Almeda ¶ 10.

[174]    E. Razon Decl. ¶ 23.

[175]    E. Razon Decl. ¶ 23; L. Venezuela Decl. ¶¶ 6-10.

[176]    L. Venezuela Decl. ¶ 6; E. Razon Decl. ¶ 22.

*CONFIDENTIAL*

offering.[177]  The tireless efforts of members of the Bloomberry team cannot be overlooked as they, in coordination with UBS and CLSA , were able to quickly orchestrate and execute the top-up offering.[178]

## IV.    BLOOMBERRY PROPERLY TERMINATED THE MSA DUE TO GGAM'S BREACHES OF ITS OBLIGATIONS UNDER MSA, WHICH WERE MATERIAL AND INCAPABLE OF BEING CURED.

70.    Under the MSA, Bloomberry and Sureste engaged GGAM to provide management and technical services in the development and construction of the casino and hotel facilities (the "Facilities"), and then to manage the operation of the Facilities, once constructed, for an initial term of 5 years.[179]  There is a prescribed set of activities and a timeframe in which to open an integrated resort successfully.[180]  These activities, as well as Bloomberry's reasonable expectations of GGAM's performance, were memorialized in the MSA, and included identifying a management team, developing a business plan, developing a marketing plan, developing VIP services, and implementing policies and procedures.[181]  Pursuant to Clause 2.2 of the MSA, GGAM was required to carry out these services (the "Services") upon the terms and conditions of the Parties' agreement.[182]

---

[177]    *See* Claimants' S.O.C., ¶ 90 ("GGAM agreed to assume the main lead for this offering."); *see also* Claimants' Request ¶ 169 (stating that GGAM played an "essential role" in "promoting and leading the successful equity raising efforts"); *see also* Hr'g Tr. at 106:14-15 (Profaizer) ("Respondents benefited from GGAM's engagement.  We took the company public.").  GGAM engages in misdirection by quoting Ms. Occeña's email on January 27, 2012 to Brad Stone out of context.  *See* Claimants' S.O.C. ¶ 90 (quoting Claimants' Ex. 53).  A closer read of this email reveals nothing to support a finding that Mr. Razon, "recognizing his lack of experience," sought GGAM's guidance, let alone their leadership, in the top-up offering road show.  Rather, the email merely extends an invitation to GGAM, as the management service provider for the Solaire, and not some other entity unrelated to the Solaire Project, to participate in the road show.

[178]    *See* Email from M. French to E. Occeña, February 5, 2013 (RE-49) ("Congratulations on the [Best IPO Award for Bloomberry]!  You certainly deserve for the way you pulled it together and got it done so quickly.  Well done."); *Finance Asia Achievement Awards 2012-Day 1*, December 10, 2013 (Claimants' Exhibit 65) ("Such a tight time frame was possible thanks in part to the use of an old-for-new top-up placement that CLSA and UBS had pioneered on a deal for Metro Pacific Investments in 2009.").

[179]    *See* MSA, Clause 1 (Claimants' Ex. 1).  This term was renewable for a subsequent five-year term.  *Id.*

[180]    J. Kilby Report at 1; B. Lee Report at 3.

[181]    *See generally* MSA, Annex A (Claimants' Ex. 1).

[182]    *See* MSA, Clause 2.2 (Claimants' Ex. 1) ("GGAM shall carry out the Services enumerated in Annex A upon the terms and conditions contained in this agreement").

71.     The terms and conditions of the MSA required GGAM to use "commercially reasonable efforts" to comply with an agreed-upon "Standard of Care" when performing the Services.[183] The Standard of Care required GGAM to:

- "exercise all the skill and care reasonably to be expected of a professionally qualified and competent manager of casino and hotel facilities experienced in performing work of similar nature and scope as the Services ("Prudent Industry Practice")";[184]

- "act[] in the highest standards of business ethics";[185]

- "act in the best interests of the shareholders of [Bloomberry] and [Sureste], and to maximize such shareholders' value in the performance of its obligation[s]";[186] and

- "comply with applicable Philippine law in the performance of the Services under this Agreement."[187]

72.     Claimants' breaches of their obligations under the MSA—individually and collectively—demonstrated that GGAM simply did not have the ability to perform its obligations as expected.   As Claimants acknowledge, Philippine courts have recognized that "[a] contractual breach is material if it will adversely affect the nature of the obligation that the obligor promised to deliver, the benefits that the obligee expects to receive after full compliance, and the extent that the non-performance defeated the purposes of the contract."[188] Claimants' breaches of the MSA were so fundamental to the nature of the Parties' agreement—the agreement that Claimants would fulfill their obligations as the management services provider of the Solaire—that these breaches were incurable.

---

[183]     *See* MSA, Clause 2.5 (Claimants' Ex. 1).

[184]     *See* MSA, Clause 2.5(a) (Claimants' Ex. 1).

[185]     *See* MSA, Clause 2.5(b) (Claimants' Ex. 1).

[186]     *See* MSA, Clause 2.5(c) (Claimants' Ex. 1).

[187]     *See* MSA, Clause 2.5(d) (Claimants' Ex. 1).

[188]     *Int'l Hotel Corp. v. Joaquin Jr.*, G.R. No. 158361, April 10, 2013 (S.O.C. Auth. 2) (citing *Corbin on Contracts*, Section 709 at 661 (One Volume Ed. 1952)); *see also* J. Vitug Op. at ¶¶ 30-31.

A.  **Claimants Failed to Provide an Adequate Business Plan, as Required under Clauses 2.2 and 2.10 of the MSA, that was Capable of Being Implemented.**

73.     The MSA required GGAM to provide, among others, "Business plan and marketing plans."[189]  The business plan for a new casino is the roadmap for its successful opening and operations.  Under the MSA, the Business Plan had to include the following:  (a) projected estimates of revenues, expenses, and cash flow associated with the Facilities; (b) estimated results of Facilities operations; (c) anticipated capital expenditure projects; (d) furniture, fixture, and equipment ("FF&E") improvement; (e) replacement plans; and (f) marketing plans.[190]

74.     In addition to these specific requirements, under Clause 2.5 of the MSA, GGAM was to discharge its obligations under the MSA with "the skill and care reasonably to be expected of a professionally qualified and competent manager of a casino and hotel facilities experienced in performing work of similar mature and scope."[191]  Thus, the MSA required GGAM to deliver a business plan that satisfied the professional standard of care in the industry, as well as the specific requirements of the MSA.  GGAM's haphazard "Business Plan" failed with respect to both of these requirements.

75.     Casino management and operations is a unique and complex business, and casinos operate in very competitive environments.[192]  The preparation and delivery of an adequate business plan was of critical importance for the successful operations of the Solaire.  The Solaire was to compete not only with the other planned integrated casino resorts in the Philippines (City of Dreams, Manila Bay Resorts, and ResortsWorld Bayshore),[193] but also with well-established international integrated resorts in Singapore and Macau.[194]  It was thus critical for the Solaire to have a robust and structured business plan that could be successfully executed.

---

[189]     *See* MSA Clause 2.2, Clause 2.10(a), and Annex A (Claimants' Ex. 1).

[190]     *See* MSA, Annex A (Claimants' Ex. 1), and Annex H (definition of "Business Plan").  Although GGAM produced a combined "business plan" and "marketing plan," the marketing plan will be addressed in IVB.

[191]     MSA, Clause 2.5(a) (Claimants' Ex. 1).

[192]     Andrew M. Klebanow, *Developing the Casino Marketing Plan*, UNLV Gaming Research & Review Journal 63 (2012) (RE-42).

[193]     *See, e.g.*, April 5, 2012 CLSA Report at 6 (RE-43).

[194]     Solaire Business Plan, January 28, 2013 at 31 (Claimants' Ex. 119).

76.    Bloomberry began requesting a business plan from GGAM as early as December 2011.[195]  Yet a business plan was not presented to the Executive Committee until January 2013,[196] and even then, it was not distributed to the key directors and members of the management team who were supposed to implement it.[197]

77.    GGAM admits that the preparation of the Solaire's Business Plan was a "major task" it undertook to perform.[198]  Claimants boast about having prepared a "307 page" Business Plan,[199] but the sheer size of the document alone is not indicative of its quality.  The Business Plan is rife with errors and demonstrates questionable business experience and judgment:[200]

- GGAM continually drew comparisons to the U.S. market—the market they knew—without tailoring the Business Plan to the Philippine market.  For example, page 60 boldly states that the "wants and needs" of the Manila mass market gaming customer are "nearly identical" to those of a U.S. gaming customer.

- GGAM's observations on the gaming industry in Asia, prepared for a Philippine-owned company, include the following:  "With the dramatic growth of casinos in Macau, Singapore and other Asian markets, *gaming companies have come to recognize the importance of Asians*, in particular those of Chinese descent, as an important and growing segment of the gaming population."[201]

---

[195]    *See* Email from E. Occeña to B. Stone and G. Saunders, December 18, 2011 (RE-41) ("As BDO correctly pointed out, we signed up with you last September 9 and yet the business/marketing plan we have is still the one prepared by Spectrum/Harvey Perkins.  We need an updated business plan, most specially our marketing plan as to how we will be able to attract Chinese high rollers.  I need this by next month.").

[196]    *See* Memorandum from B. Stone to Executive Committee and Board of Directors Bloomberry Resorts and Hotels Inc., January 31, 2013 (Claimants' Ex. 120).

[197]    *See* Email from B. Tan to B. Weidner (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 2 (Claimants' Ex. 96).  GGAM claims that "the Owners reviewed and never objected" to the Business Plan.  *See* Claimants' S.O.C. ¶ 76.  Yet GGAM fails to reconcile this statement with the fact that it handed an inexperienced Owner an extensive 300-page document less than 6 weeks before the Solaire was set to open. *Compare* Claimants' S.O.C. ¶ 34 *with* Claimants' S.O.C. ¶ 75.  Bloomberry only realized the deficiencies in the "Business Plan" after it was incapable of being implemented.

[198]    Claimants' S.O.C. ¶ 72.

[199]    *See* Hr'g Tr. 578:24-25 (Profaizer) ("It's a 300-page business plan."); Hr'g Tr. 600:22-24 (Profaizer) ("[A]ll they can show is a 300-page business plan that they contend never materialized, but actually did."); Hr'g Tr. 673:4 (Patrizia) ("[W]e have submitted a 300-page Business Plan."); Hr'g Tr. 281:11-13 (Profaizer) ("It's a pretty big document, isn't it?").

[200]    *See* B. Lee Report at 12; J. Kilby Report at 4; R. Wheatley Report at 2.

[201]    *See, e.g.*, Solaire Business Plan, January 29, 2013 at 74 (Claimants' Ex. 119).

*CONFIDENTIAL*

- Complimentary services and "random acts of appreciation" are the main focus to entice new customers to the Solaire.[202]

- Portions of the Business Plan were wholesale copied from other documents.[203] Extensive portions parrot basic information that could have been gleaned from a textbook[204] or the Internet.[205]

- Aspirational statements abound, with very little detail:  "Best management team in the gaming industry."[206]

- The Business Plan contains an analysis of the Solaire's strengths, weaknesses, opportunities and threats (a "<u>SWOT Analysis</u>").  The SWOT Analysis is accompanied by a "specific action plan."[207]  The specific actions recommended by GGAM include:

  - "Treat every player well, regardless if they are locals, tourists, mass or premium mass players;"[208]

  - "Utilize advertising, digital marketing, sponsorships, partnerships and public relations to make the market aware of the brand;"[209]

  - "Create an exciting, sexy gaming experience that does not resemble anything else in Asia."[210]

  - "Own the luxury brand position."[211]

78.    The Business Plan, which was not provided to Bloomberry until approximately 6 weeks before the Solaire was scheduled to open,[212] was largely a boilerplate template business

---

[202]     *See, e.g.*, *id.* at 68, 69, 70.

[203]     For example, pages 71 through 74 contain a copy of an article written in 2009 by Andrew Klebanow, a marketing consultant.  *Compare id.* at 71-74 (Claimants' Ex. 119) *with* A. Klebanow, "A Psychographic Approach to Customer Segmentation," Urbino.net, February 20, 2009 (RE-INSERT).

[204]     *See* Solaire Business Plan, January 29, 2013 at 82-97 (Claimants' Ex. 119) (Branding & Advertising section)

[205]     *See* Solaire Business Plan, January 29, 2013 at 98-110 (Claimants' Ex. 119) (Niche marketing of Chinese, Japanese, and Koreans residing in the Philippines).

[206]     *See* Business/Marketing Plan, January 29, 2013 at 128 (Claimants' Ex. 119)

[207]     *See* Business/Marketing Plan, January 29, 2013 at 78-81 (Claimants' Ex. 119).

[208]     *See id.* at 79 ("Strengths").

[209]     *See id.* at 80 ("Weaknesses").

[210]     *See id.* at 80 ("Opportunities").

[211]     *See id.* at 80 ("Threats").

plan copied and pasted from other casinos.[212]  The Business Plan included a compilation of "motherhood statements" and general descriptions largely lifted from previous reports commissioned for the Solaire.[214]  It did not provide the required business road map; rather, it contained over-broad "strategies" and "action plans" that did not fit within the requirements of the MSA.[215]  The noted deficiencies of the Business Plan, in combination and in the aggregate, rendered the Plan substantially inadequate and inoperable.[216]  Simply put, the Solaire could not be successfully operated under GGAM's "Business Plan."[217]

79.    One striking example of the inadequacy of the Business Plan is GGAM's failure to discuss the specifics of the Philippine gaming market.  The Business Plan completely ignores the specifics of the domestic Philippine market.  GGAM states that the Philippine market is more similar to the U.S. market than to the Macau market without investigating or researching the Philippine market.[218]  It was essential that the Philippine market be specifically and rigorously assessed so that a business model based on that research could be developed.[219]  GGAM also failed to analyze Bloomberry's competitors properly.  For example, GGAM's Business Plan failed to give real consideration to the actual experience of Solaire's nearest competitor,

---

[212]    *See* Email from E. Occeña to N. Mirasol, *et al.*, April 13, 2013 (RE-52) ("Chito and I were asking for the business plan since June last year.  We got it last February, so superficially done.").

[213]    Email from J. Valdes to G. Saunders, July 10, 2012 (RE-46) ("Here is the story with the business plan. We have made virtually no progress on it since Dave left, focusing instead on the marketing initiatives. Russ is here to pick-up the ball on this w/ working Mike in my absence. Dave has taken as much template and boiler plate language from other business plans (Venetian, Galaxy, COD) that he could and organized them in separate word documents. These documents are in a single Dropbox share folder that Dave, Russ, Fritz, Mike and I have access to. I have just added you to this folder as well so that you can review our work in progress.").

[214]    *See, e.g.* Economic Study of the Gaming Industry in the Philippines, Spectrum Gaming Group, LLC, June 22, 2007 (RE-33); Preliminary Marketing and Business Plan, created for Bloomberry Investment Holdings, Inc., July 10, 2010 (RE-37).

[215]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 (Claimants' Ex. 96).

[216]    *See, e.g.*, Email from E. Occeña to N. Mirasol, *et al.*, April 13, 2013 (RE-52) ("The concept of open and worry about efficiency and profitability later was the prevailing mindset among Solaire executives.").

[217]    *See* B. Lee Report at 2-3, 10-11.

[218]    *See* Solaire Business Plan, January 29, 2013 at 60 (Claimants' Ex. 119).

[219]    *See* B. Lee Report at 5-9, 11.

*CONFIDENTIAL*

ResortsWorld, with respect to international players, facilities tailored for the local market, and player retention.[220]  This imparts a false impression of the competitive landscape.[221]

80.    The Business Plan failed to provide important financial information and five-year projections, some of which was expressly required by the MSA:[222] annual budgets, revenue market share, expenses, results of operations, cash flow, capital expenditure projects (such as facilities, and FF&E), profit margins (total and by department), number of employees (total and by department), EBITDA, and casino bankroll.

81.    Additionally, the Business Plan failed to establish an appropriate business infrastructure for the Solaire.[223]  For example, it fails to address the following essential functions: (1) Accounting, Payroll, Accounts Payable; (2) Casino Cashier Cage & Credit; (3) Convention Services; (4) Engineering & Maintenance; (5) Entertainment Management and F&B Inventory Control; (6) Finance; (7) Gaming Revenue Count; (8) Human Resources; (9) Information Technology Management; (10) Internal Audit; (11) Purchasing; (12) Receiving; (13) Safety, Security, and Surveillance Management; (14) Spa, Health Club, and Pool Management; (15) Tenant leases; and (16) Concessions.[224]

82.    Moreover, GGAM failed to put in place any way to measure whether it was managing the Solaire effectively.  Integrated resorts typically have in place Key Performance Objectives ("KPOs") and Key Performance Indicators ("KPIs") to measure the performance of employees, as well as the overall operation.[225]  GGAM's Business Plan failed to identify the Solaire's business objectives or to establish a method in which to measure whether these

---

[220]    *See* R. Wheatley Report at 8-9.

[221]    *Id.* at 3.

[222]    MSA, Clause 2.10(a), Annex H – Definitions, "Business Plan" (Claimants' Ex. 1).

[223]    J. Kilby Report at 8-9.

[224]    *See, e.g.*, MSA (Claimants' Ex. 1); *see also* J. Kilby Report at 8-9.

[225]    For example, a job advertisement by the Las Vega Sands, Mr. Weidner and Mr. Stone's former employer, includes clearly delineated KPOs and KPIs.  *See* Job Advertisement - Sr. Manager, Corporate Business Intelligence & Direct Marketing, Careers.Sands.com, November 28, 2014 (RE-65).

objectives were being met.[226]  The Business Plan quite plainly did not satisfy general industry standards, much less the more specific standards laid out in the MSA.

**B.    Claimants Failed to Develop an Adequate Marketing Plan, as Required Under Clauses 2.2 and 2.10 of the MSA, that Conformed to Industry Standards.**

83.    A casino marketing plan is "a working document that the gaming enterprise develops each year in order to plan its marketing and advertising activities for the next twelve months."[227]  A typical marketing plan includes 4 sections:  (1) Situation Analysis, (2) Goals and Objectives, (3) Action Plans, and (4) Marketing Budget.[228]  Importantly, action plans define the specific tasks[229] that must be completed for each marketing activity,[230] including describing specifically what each member of the team will do, how much each marketing activity will cost, what are the anticipated returns of these activities, and how the success of each activity will be measured.[231]

84.    A sophisticated marketing and advertising plan, including both domestic and international marketing, is necessary to develop a mass gaming market.[232]  The term "mass market" refers to non-VIP customers who play slot machines and table games.[233]  Thus, the

---

[226]    *See*  B. Lee Report at 3, 11; R. Wheatley Report at 8-9; J. Kilby Report at 3.

[227]    *See* A. Klebanow, Developing the Casino Marketing Plan at 64 (RE-42).

[228]    *See id.* at 65; *see also id.* at 64 (explaining that a marketing plan is supposed to "clearly define the casino's goals and objectives for the upcoming year, the strategies it will employ to achieve them and the specific action plans that will carry out those strategies."); *see also* F. Lacap Decl. ¶ 9.

[229]    A "punch list" of specific tasks must be detailed, including, for example, creation of collateral material, ordering premiums, buying computer hardware/software to manage the promotion, etc.  *See* Klebanow, Developing the Casino Marketing Plan at 70 (RE-42).

[230]    Marketing activities include promotions plans, direct mail, advertising, special events, public relations, player development, website, email, entertainment, and market research.  A detailed to-do list is needed for all of these marketing activities.  *See id.*

[231]    *See id.* at 69.  This level of detail is required for each marketing activity for the year.  For example, each promotion must have its own plan, including "a clear description of how it will work, how customers qualify, how they participate and how they can earn premiums," as well as "costs associated with implementing the promotion." *See id.* at 70.

[232]    *See* B. Lee Report 4-11; Kilby Report at 10.

[233]    *See* Offering Circular at 3 (Claimants' Ex. 22) ("Mass Market": "one of the two primary casino customer segments (the other being VIP) comprising customers playing in non-rolling chip program table games and slots"); *see also* at 58 ("The Company expects the mix of VIP table games, Mass Market table games, and slot machines at Solaire Manila to change from time to time as a result of marketing and operating strategies in response to

"mass market" includes local/domestic players, as well as foreign players.[234]  As Bloomberry's Top-Up Offering Circular clearly explained "The Company's Mass Market customers will comprise all Solaire Manila customers who do not engage in a rolling chip program and who therefore do not fall under the VIP customer segment."[235]

85.     Non-VIP players located in China, Japan, Singapore, and Southeast Asia are willing to travel to play at casinos located in nearby Asian countries.[236]  For this reason, it is vital that casinos located near these countries concentrate their mass marketing efforts on these international mass players.  It is necessary to advertise and run promotions in order to attract these international non-VIP players, particularly if the casino is not a member of a well-known brand, such as the Las Vegas Sands.[237]

86.     During the Parties' initial meeting in Las Vegas in March 2011, GGAM's principals assured Mr. Razon that they could create a marketing plan and other rewards and incentive programs using GGAM's "best methods," as well as Philippine-specific methods.[238]  For example, they presented that GGAM had "deep experience in developing and designing automated systems for incentivizing, monitoring and rewarding customer loyalty that has proven results in competitive local markets."[239]

87.     The MSA expressly required Claimants to develop, implement, and manage a marketing plan for the Solaire:[240]  "GGAM and the Management Team shall develop, implement

---

changing market demand and industry competition."); *id.* at 73 (discussing the design of the Mass Market gaming area and the VIP gaming areas); *id.* at 74-75 (describing the Mass Market gaming floor).

[234]     *See, e.g.* Offering Circular at 6 (Claimants' Ex. 22) ("The Company believes that Solaire Manila will be able to take advantage of this strong demand by providing an attractive gaming option for Philippine and regional Mass Market and VIP players. . . ."); *see id.*at 9, 50, 61.

[235]     *See* Offering Circular at 77 (Claimants' Ex. 22).

[236]     *See* C. Sherafat Decl. ¶ 6.

[237]     *See* C. Sherafat Decl. ¶ 6.

[238]     E. Razon Decl. ¶ 8; *see also* Claimants' S.O.C. ¶ 40.

[239]     *See* Email from F. Gaspar to E. Razon, January 21, 2011, attaching GGAM presentation at 2 (RE-39).

[240]     *See* MSA, Clause 2.10(a) (Claimants' Ex. 1) ("GGAM acting through the Management Team shall prepare . . . marketing plans for discussion with the Owners and approval by the Board."); *see also id.* ("GGAM's Pre-Opening Services"), Item 12 ("Develop marketing and operation plans, including junkets and similar arrangements, in conjunction with key employees"); *id.* (Claimants' Ex. 1) ("GGAM's Post-Opening Services"); *id.* ("Establish and implement a marketing plan for the Facilities including advertising, promotions, joint marketing and

and manage a marketing program for the Facilities, which may include utilization of brands, centralized services, affiliate programs, or other programs of GGAM, its affiliates, or third parties."[241]

88.    Moreover, the Offering Circular described the targeted strategies that Bloomberry, with GGAM as the management services provider, planned to adopt to attract Mass Market[242] customers.[243]  Marketing strategies targeting the mass market were particularly important pre-opening.  As the Offering Circular detailed,

> [T]he Company plans to employ pre-opening marketing including an extensive public relations campaign across print, television, radio and digital media leading up to Solaire Manila's opening. These campaigns will focus on building product awareness, focusing in particular on Mass Market patronage, which the Company expects to be its primary customer base upon opening of Solaire Manila.[244]

89.    GGAM did not prepare a marketing plan that reflected the skill and care to be expected in the industry,[245] let alone a plan that was capable of being implemented.  The purported "marketing plans" contained within the Business Plan were merely strategic overview documents.  For example, the Business and Marketing Plan refers vaguely to marketing for the premium player and junket operators, but the details are scant, even though these should have been key areas of the Solaire's marketing strategy.[246]  Additionally, the "Casino Mass Marketing Strategic Overview" was a PowerPoint presentation delivered to the Executive Committee on

---

sponsorships, engagement of advertising agency/ies for the promotion of the Facilities, preparation of marketing materials, and direction of all public relations events and efforts for the Facilities.").

[241]    *See* MSA, Clause 6 (Claimants' Ex. 1).

[242]    *See* Offering Circular at 3 (Claimants' Ex. 22) (Defining "Mass Market" as "one of the two primary casino customer segments (the other being VIP) comprising customers playing in non-rolling chip program table games and slots").

[243]    *See* Offering Circular at 10 (Claimants' Ex. 22) ("The Company expects to market Solaire Manila to Mass Market customers through a broad range of strategies to increase and retain membership and the frequency of visits, including pre-opening brand building, marketing campaigns and promotions specifically tailored to Mass Market customers. . .").  Additionally, GGAM promoted the idea that the Solaire would attract the mass market because of its superior product.  *See, e.g.*, Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 36 (Claimants' Ex. 96).

[244]    *See* Offering Circular at 78 (Claimants' Ex. 22).

[245]    *Cf.* MSA, Clause 2.5(a) (Claimants' Ex. 1).

[246]    *See* B. Lee Report at 3; R. Wheatley Report at 3.

*CONFIDENTIAL*

February 14, 2013, approximately one month before the Solaire opened.[247]  Similar to the "marketing plans" located within the "business plan," this overview contained statements of intent (*i.e.*, "Solaire shall . . .") with no details or mechanics of what actually needed to be done.[248]  It was a conceptual presentation.[249]  For example, a slide labeled "Mass Marketing Strategies" included the following graphic:



90.     The "marketing plans" submitted by GGAM did not contain any timelines, a promotions calendar, a marketing budget, action plans, or contingency plans.[250]  GGAM failed to develop a comprehensive advertising or media plan after opening day, and there were no agreed-upon metrics to measures success or to ensure efficient spending.[251]

---

[247]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 2 (Claimants' Ex. 96).

[248]    *See* Casino Mass Marketing Strategic Overview, February 14, 2013 (RE-50).

[249]    *See id.* (For example, the presentation presented a casino customer lifecycle, and discussed defining one's target market).

[250]    *See generally* Solaire Business Plan, January 29, 2013 (Claimants' Ex. 119); *see also* F. Lacap Decl. ¶¶ 10-11.

[251]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4 (Claimants' Ex. 96).

91.     Rather, the "marketing plan" was simply a disorganized assembly of data and previously-drafted marketing plans without meaningful evaluation of the local conditions or the specifics of the Solaire project.[252]  GGAM assumed, without foundation, that the "Vegas" model would work.[253]  Moreover, it is perplexing why GGAM, as the experts with "100 years of collective experience," felt it necessary to hire a consultant to draft the marketing plan. Consultants were hired to make up for GGAM's lack of time and attention at the Solaire,[254] confirming that GGAM acted more like an executive search firm, not a management company.

### 1.     The Customer Loyalty Program Developed by GGAM Was Confusing and Ineffective.

92.     One of GGAM's critical marketing failures was the establishment of the Solaire's customer loyalty program.  Often, the most significant marketing expense is a customer loyalty program, sometimes referred to as the players reward program.[255]  These programs are used in an effort to "create, strengthen, and personalize long-term relationships with players to keep them coming back and spending more."[256]

93.     GGAM created the "Solaire Rewards Club," which was a hybrid points-rewards system.  Not only did the system generate complaints from customers, who did not understand the dual-points system,[257] but even Mr. Stone admitted, notwithstanding his experience, that he did not understand the system either.[258]

94.     The complicated and confusing system resulted in a loss of goodwill among new patrons.[259]  For example, during the Solaire's grand opening, the "Solaire Rewards Club"

---

[252]     *See generally* Wheatley Report.

[253]     *See, e.g.*, B. Lee Report at 2.3.1.a

[254]     *See, e.g.*, Email from B. Tan to B. Weidner, September 3, 2013 at 20.

[255]     *See* Klebanow, Developing the Casino Marketing Plan at 67 (RE-42).

[256]     *See* C. Crofts, "An Exploratory Study of Casino Customer Loyalty Programs," UNLV 2011 (RE-38)

[257]     *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4-5 (Claimants' Ex. 96).

[258]     *See* Email from E. Occeña to J. Alarilla, D. Almeda, B. Stone, G. Saunders, and M. French, May 4, 2013 (RE-56).

[259]     *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4-5 (Claimants' Ex. 96); *see also* E. Razon Decl. ¶ 39; *see also* Email from E. Occeña to J. Alarilla, D. Almeda, B. Stone, G. Saunders, and M. French, May 4, 2013 (RE-56).

*CONFIDENTIAL*

complications and inefficiencies resulted in countless people waiting in line at the Rewards Club, rather than gambling.[260]  While this was happening, instead of attempting to remedy the situation, Todd Chandler, the GGAM-selected Vice President of Marketing, walked out of the casino and went home.[261]

95.    The Solaire Rewards Club fiasco is but one illustrative example of GGAM's disconnectedness from managing the Solaire.  First, the Rewards Club used "Solaire Dollars," even though the Philippine currency is the peso, not the dollar.  Second, GGAM operated on the assumption, without any foundation, that a rewards system that had been successful in the U.S. and Macau would be successful in the Philippines.[262]  As the collapse of the Solaire Rewards Club demonstrated, this assumption was flawed.  Third, GGAM was detached from the player feedback, and it was only at Bloomberry's insistence that the program was overhauled.[263]  Bloomberry has subsequently devoted much time and effort to win back customers who were alienated by this program.[264]

## 2. Despite Repeated Requests, GGAM Was Unwilling (or Perhaps Unable) to Provide an Adequate Marketing Plan.

96.    It quickly became apparent that GGAM's marketing "plan" was ineffectual.  Shortly after the Solaire opened, the mass market numbers after the Solaire's Opening Day plummeted.[265]  In the absence of a workable marketing plan, GGAM developed promotions and

---

[260]    *See* E. Razon Decl. ¶ 40; *see also* Minutes of Executive Committee Meeting, March 18, 2013 ("ETO said that we didn't see a lot of action because people were lining up first to have their cards prior to playing.").

[261]    *See* E. Razon Decl. ¶ 40.

[262]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4-5 (Claimants' Ex. 96)

[263]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4-5 (Claimants' Ex. 96); *see also* Email from E. Occeña to J. Alarilla, D. Almeda, B. Stone, G. Saunders and M. French, May 4, 2013 (RE-56) (requesting that Brad Stone and Garry Saunders not leave without fixing the Solaire rewards system); *see also* Email from E. Occeña to E. Razon and J. Alarilla, May 8, 2013 (RE-57) ("They put the program in place without much analysis because it was done hastily. GGAM left Mike all to himself.  Even Brad and Garry did not understand how our Solaire $/point system works and yet they implemented it.").

[264]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4-5 (Claimants' Ex. 96).

[265]    *See, e.g.*, Email from E. Occeña to B. Stone, April 23, 2013, re: Market Strategy (RE-55) ("I'm so alarmed at our financial performance. The mass table games drop have been consistently low ranging between P28M to P36M daily. Even our slot performance is lagging. Our average daily revenue in March is P30M (excluding opening day) and from April 1 to 22, it is down to P15M. Our break even daily revenue is about P5OM.")

events on the fly, on a week-by-week basis.  At Executive Committee meetings, Mr. French would acknowledge that he did not have any marketing promotions for the month; rather, he would present last-minute ideas to the Executive Committee and insist on immediate approval because time was of the essence.[266]  This method was not tied to an overarching promotional strategy based on consumer insights,[267] and it gave little if any thought to how the promotion or event would be implemented, who would implement it, how much it would cost, or what returns were to be expected.[268]  For example, one of the promotions, a "Table Games Free Play" promotion, was reported to the Executive Committee only ***after*** the promotion took place.[269]  Mr. French resorted to mimicking the promotions of the Solaire's local competitor, ResortsWorld Manila, had planned for that week.[270]  Under GGAM's management, mass market players were being notified of promotions the same week of the promotion.[271]  Such short notice rendered the promotions valueless.

97.    Under GGAM's management, Bloomberry had few, if any, campaigns in place to market to international mass players.[272]  The marketing team had only ever been tasked with marketing to local mass players—they were simply unaware that there was an international mass market.[273]  For example, brochures targeting foreign non-VIPs and VIPs were not prepared until Bloomberry became active in management.[274]  Bloomberry's new marketing director has focused

---

[266]    *See* F. Lacap Decl. ¶ 11; *see also* E. Razon Decl. ¶ 41.

[267]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4 (Claimants' Ex. 96).

[268]    *See* F. Lacap Decl. ¶ 11.

[269]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4 (Claimants' Ex. 96).

[270]    *See* F. Lacap Decl. ¶ 10); *see also* Klebanow, Developing the Casino Marketing Plan at 64 (RE-42) ("Too often casinos allow competitors to determine the marketing playing field.  An aggressive promotion by a competitor that targets a particular market segment is often followed by other competitors attempting to match or exceed that offer.").

[271]    *See* C. Sherafat Decl. ¶ 10 (explaining that promotions should be communicated to mass players—via email, text messages, or other indirect advertising—weeks, if not months in advance).

[272]    *See* C. Sherafat Decl. ¶ 7 (explaining that the large marketing team had only a few people who spoke another language, and there was no outside sales people located in nearby countries to promote the Solaire to non-VIP players).

[273]    *See* C. Sherafat Decl. ¶ 7.

[274]    *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 4 (Claimants' Ex. 96).

efforts on international mass market players.[275]  For example, external sales representatives have been hired or will soon be hired to market the Solaire in Singapore and countries throughout Asia.[276]  Bloomberry also now has a sophisticated, detailed process by which to analyze the success of various programs and promotions.[277]

98.     Bloomberry informed GGAM that it was alarmed at and upset by the absence of a marketing plan, contrary to GGAM's self-serving statement that "[a]t no time throughout that process did Respondents indicate in any way that their expectations regarding the Business Plan or marketing plans were not being met."[278]  On April 19, 2013, Ms. Occeña emailed Mr. French, the COO, asking for documents to evaluate all the marketing program policies (with pro forma statements), because none had yet been presented to the Executive Committee.[279]  On April 23, 2013, Ms. Occeña wrote to Mr. Stone as follows:

> If you recall, around June last year [2012] . . . I asked you if we have a marketing plan in place to make sure we know how we are going to achieve our projected revenues.  You said that will be the objective of your then trip to Manila, to meet the marketing team and solidify our marketing plan . . . I'm so upset and disappointed that we have no marketing strategy and almost two months after opening, the marketing program, promotions and events are still in the formulation stage.  The mechanics are still in the drawing board . . . How the hell do we know what to put in those marketing paraphernalia without any marketing strategy?  I'm so alarmed at our financial performance.[280]

---

[275]     *See* C. Sherafat Decl. ¶ 8.

[276]     *See* C. Sherafat Decl. ¶ 8.

[277]     *See* C. Sherafat Decl. ¶ 14.

[278]     *See* Claimants' S.O.C. ¶ 176.

[279]     *See* Email from E. Occeña to M. French, April 19, 2013 (RE-53) ("What I want to see is the marketing program implementation policy not just the title of the program or a brief description.  I want to see the implementing rules and guidelines with the proforma FS.").

[280]     *See* Email from E. Occeña to B. Stone, April 23, 2013, re: Marketing Strategy (RE-54); *see also* Email from E. Occeña to E. Razon, April 23, 2013, re: Dennis and Lorraine – Slots meeting (RE-55) ("How can we have those marketing paraphernalia when we have no idea what to put in there because there is no marketing strategy.  It is still in the formulation stage when this should have been their sole focus—how to achieve the revenues they projected . . . I told Mike [French] that we should have prepared our marketing strategy before opening and that it is more difficult to rectify our situation.  He just shrugged and admitted their shortcoming. . . .").

99.    GGAM's principals did not rectify the situation.[281]  Confronted with the reality that GGAM had misrepresented its expertise in marketing, and that it was either unwilling, unable, or both, to develop a marketing plan for the Solaire that was up to industry standards, Mr. Razon notified GGAM that it had failed to abide by its contractual obligations of preparing a formal marketing plan:

> GGAM was caught completely off-guard when the business volume slumped the day after the successful opening of the Facilities. GGAM and the Management Team that it had established for the Facilities did not anticipate the drop in traffic and business and they did not know how to address the problem. There was no advertising plan, no promotional strategies, the marketing materials were not prepared, and there were no collaterals and brochures to promote the Facilities.[282]

None of these items—despite being standard industry practice—was contemplated, let alone put in place, by GGAM, despite GGAM's representations that it had the expertise and knowledge necessary to create a marketing plan that would attract VIP and non-VIP gamblers to the Solaire. GGAM's failure to provide a marketing plan is another incurable breach of its obligations under the MSA.

### 3.    GGAM Misleadingly Describes the "Mass Market" as "Local" or "Philippine" Customers in an Inappropriate Attempt to Blame Bloomberry for the Low Mass Revenue.

100.    In the Statement of Claim, GGAM repeatedly and misleadingly describes the mass market as "local" or "Philippine" customers.[283]  As noted above, the term "mass market"

---

[281]    *See* F. Lacap Decl. ¶ 11.  For example, when pressed for ideas about promotions, the COO Michael French suggested a "Golden Ball" "multi-month" promotion, during which players would receive a sports ball, such as a tennis ball, physically made of gold.  *See* Minutes of Executive Committee Meeting, June 13, 2013 (RE-58).  This idea, understandably, was never implemented.

[282]    *See* Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81).  Tellingly, GGAM did not did not rebut the statements made by Bloomberry, instead opting not to "provide an item-by-item response."  *See* Letter from B. Weidner to E. Razon, September 8, 2013 (CE-97).

[283]    Each time, Claimants inappropriately add the word "local" in front of the term "mass market."  *Compare* Claimants' S.O.C. ¶¶ 49, 52, 74; *with* Offering Circular at 9 (Claimants' Ex. 22) ("The Company believes Solaire Manila will provide a world-class gaming experience to both Mass Market and VIP customers . . . This will allow Solaire Manila to appeal to Mass Market and VIP customers seeking a premium gaming experience in the Philippines while operating with maximum efficiency.").  The Offering Circular at times used the term "Philippine Mass Market players" to distinguish domestic Mass Market players from regional Mass Market players, but it more

refers to non-VIP customers who play slot machines and table games, and it includes domestic and foreign players.[284]  GGAM's misleading tactic is not a new one.  As one member of the Executive Committee noted in April 2013,

> Just so you know where I'm coming from, the impression I got when I first joined the ExCom was that GGAM, Mike, Dennis and his organization were (and still are) <u>only</u> focused on Junkets and VIP.  They appeared to expect that Mass Tables and Slots would just happen.  I think this is because they are driven by the lucrative GGAM fees associated with those segments.  As you know, Mass Gaming and Slots don't generate a lot of GGAM fees but they provide the bulk of the profits that underlie the Solaire business plan.[285]

101.    Bloomberry's insights into and recommendations for the mass gaming segment were brushed off or "shot down" by GGAM, the gaming "experts."[286]  Yet, when Bloomberry brought this to GGAM's attention, GGAM characterized the mass market as "local" and blamed Bloomberry for the weak numbers.[287]  In the Statement of Claim, GGAM continues—inaccurately—to describe the mass market as the "local" market in a repeated attempt to blame Bloomberry, its local "inexperienced" partner,[288] for GGAM's failure to attract and retain mass market clientele.[289]

---

frequently used the all-encompassing term "Mass Market."  *See* Offering Circular at 9, 10, 50, 58, 63-65 (Claimants' Ex. 22).

[284]    *See supra* ¶ 84.

[285]    *See* Email Chain from E. Occeña to N. Mirasol, *et al.*, April 13, 2013 (RE-52).  Incredibly, GGAM extends this misrepresentation to its description of its fees.  It is blatantly incorrect for GGAM to state that "GGAM would share in **local mass market revenues**—customers that Respondents believed would be attracted by the world-class facilities and services—but the MSA's management fee structure focused primarily on EBITDA from the foreign VIP segment."  *See* Claimants' S.O.C. ¶ 52; *see also id.* at ¶ 49.  In reality, GGAM's fees were to be calculated on a base fee (*i.e.*, 2% of mass market EBITDA), a local VIP fee, and a foreign VIP/junket fee.  *See* MSA, Clauses 4.3, 4.4, 4.5 (Claimants' Ex. 1).  Thus, the base fee was to be calculated on both local and foreign mass market customers, not merely local customers, as GGAM presents.

[286]    *See, e.g.*, Email Chain from E. Occeña to N. Mirasol, *et al.*, April 13, 2013 (RE-52).

[287]    *See* Letter from B. Weidner to E. Razon, August 19, 2013 at 6 (Claimants' Ex. 95) ("[B]oth GGAM and Bloomberry were surprised by the extent of the mass market volume drop-off (particularly, from our perspective, as you had expressed such confidence in your ability to deliver the mass market . . . .").

[288]    *See, e.g.*, Claimants' S.O.C. ¶¶ 2, 34 ("The Owners, however, lacked hotel and gaming experience . . . .").

[289]    *See, e.g.*, Claimants' S.O.C. ¶ 49 ("The Owners believed that the local mass-market would 'show up' simply because of the superiority and uniqueness of the Solaire product offering."); *see also id.* at ¶¶ 90, 146.

**C. CONTRARY TO GGAM'S REPRESENTATIONS AND THE MSA'S REQUIREMENTS, GGAM FAILED TO DEVELOP A STRATEGY FOR SUCCESSFUL MANAGEMENT AND OPERATIONS, INCLUDING A FAILURE TO PREPARE AND DELIVER REQUIRED POLICIES.**

102.     GGAM was hired based on, among other things, its promises that it had operating policies, procedures, and systems ready to be implemented. Under the MSA, GGAM was required to "establish, implement, and monitor all operating systems."[290] Specifically, pre-opening GGAM was required to

- Establish, implement, and monitor the pre-operating accounting, internal controls, security, human resources, marketing and regulatory compliance systems in accordance with the pre-operating plan and key employees;[291] and

- Recommend the selection and order the gaming facilities' data processing equipment and software, surveillance and security systems.[292]

After the Solaire opened, GGAM continued to have obligations with respect to operating policies and procedures:

- Establish, implement, and monitor all operating systems (*e.g.*, sales, marketing, reservations services, quality assurance), establishment of rates and charges for guest rooms, food, beverages, entertainment and other services or facilities, and to manage the day-to-day affairs of the Facilities;[293]

- Establish, implement, and monitor gaming systems, management information systems, [ ] surveillance and other monitoring activities, floor and entrance security, cage operations, casino accounting, slot and table operations, and the management of the day-to-day affairs of the casino.[294]

103.     Claimants acknowledge their obligations under the MSA to develop and implement policies and procedures for Solaire's successful operations, as well as acknowledge the fact that such policies had to comply with standard industry practice.[295] The preparation and implementation of policies and procedures is critical for the successful operation of an integrated

---

[290]     *See* MSA, Annex A (Claimants' Ex. 1).

[291]     *See* MSA, Annex A, Pre-Opening Services – Item 4 (Claimants' Ex. 1).

[292]     *See*  MSA, Annex A, Pre-Opening Services – Item 8 (Claimants' Ex. 1).

[293]     *See* MSA, Annex A, Post-Opening Services – Item 1 (Claimants' Ex. 1).

[294]     *See* MSA, Annex A, Post-Opening Services – Item 3 (Claimants' Ex. 1).

[295]     Claimants' S.O.C. ¶ 179.

casino, and these policies and procedures need to be in place ***prior to*** the casino opening.[296]
Having policies and procedures that are already drafted, and which can be implemented with
certain minor adjustments, creates enormous efficiencies and is one of the major benefits of
hiring a management company.[297]  Certain components of these policies and procedures, such as
those relating to local tax laws, have to be tailored to the location of the property being
managed.[298]  For the most part, however, these policies and procedures can be universally
applied.[299]

      104.    Indeed, during the negotiations of the MSA, GGAM made the representation that
there would be "proprietary documentations prepared by GGAM in connection with the
performance of Services and furnished to the Owner."[300]  GGAM even demanded that it retain
the intellectual property rights over these "proprietary documents."[301]  The reality, however, was
that GGAM, despite its "100 years of experience," did not have ready the operating policies,
systems, and procedures which are required of an operator of an integrated casino hotel
entertainment facility.[302]

      105.    Even though GGAM was expected to have already, or at the very least prepare,
these policies and procedures prior to the casino opening, it failed to do so.[303]  Instead, Solaire
personnel had to develop "from scratch" the policies, systems, and procedures in-house to be

---

[296]     *See* A. Lat Decl. ¶ 5.

[297]     *See* J. Kilby Report at 12-13; B. Lee at 4.

[298]     *See* A. Lat Decl. ¶ 5.

[299]     *See* A. Toh Decl. ¶ 9; *see also* Email from B. Tan to B. Weidner, September 3, 2013 at 5-6 ("HR, credit,
warehousing, purchasing, treasury, audit, cage, accounting and finance, food and beverage outlet operations, hotel
operations, including housekeeping, marketing, etc., retail operations, banquets are essentially the same in any
casino hotel of the same size and standards regardless of location.  Some tweaking and modification may be required
to suit local conditions and regulations, but the basic principles, systems, policies and procedures will essentially be
the same in all casino hotels of the same size and standards.").

[300]     *See, e.g.*, MSA, Clause 14.1 ("The copyright and all other intellectual property rights in respect of all
proprietary documentations prepared by GGAM in connection with the performance of the Services and furnished to
the Owner under the terms of this Agreement shall remain vested in GGAM . . .").

[301]     *See id.*

[302]     *See, e.g.*, Email from B. Tan to B. Weidner, September 3, 2013 at 5-6 ("In fact all hotel management
companies have ready 'operating manuals' and 'standard operating procedures' which carry their respective
brands."); *see also See* A. Lat Decl. ¶ 6 (listing following policies prepared by CFO: (1) Business Expense
Reimbursement; (2) Petty Cash Fund; (3) Expatriate Initial Hotel Stay;  (4) Purchasing Procedure; (5) Staffing
Compendium Change; (6) Travel Policy; (7) Policy Management; and (8) Supply Chain Policy.)

[303]     *See, e.g.*, Hr'g Tr. at 276:9-24 (Alarilla).

able to operate the Facilities, with little to no input from GGAM.[304]  For example, 5 months prior to the casino grand opening, GGAM still had not provided policies and procedures in place for the credit and collections department.[305]  Mr. Toh, Bloomberry's Vice President of Finance for Casino Credit & Collections, undertook the task of drafting those policies, which were critical to the casino operations.  As Mr. Toh explains, assessing credit applications and extending credit to VIP players and junket operators necessitates detailed policies and procedures that must be carefully followed in order to ensure, among other things, that: (1) credit is only extended to creditworthy individuals, (2) credit is only extended in amounts consistent with each individual's level of creditworthiness, and (3) all extensions of credit are appropriately accounted for.[306] Failing to follow these policies and procedures had the potential to drastically impact the profitability of the Solaire.[307]

**D.    Contrary to GGAM's Representations and the MSA's Requirements, GGAM Failed to Contribute or Utilize Guest Data to Attract VIP Players and Junket Operators to the Solaire.**

106.    VIP junket operators act as facilitators for integrated resorts in Asia, guaranteeing a certain amount of revenue from wealthy gamblers, particularly gamblers from China, enticing them with free accommodation, travel, and other perks.[308]  Integrated resorts provide gaming facilities, dealers, chips, and a monthly commission to VIP junket operators in return for a minimum guaranteed rolling chip turnover per month.[309]

107.    During the Parties' initial meeting in Las Vegas, Mr. Razon explained that it was critical to develop a large VIP business at the Solaire.[310]  Developing a VIP business required relationships and contact information about various "high rollers" and "junket operators." Messrs. Weidner, Stone, and Saunders touted their strong relationships with "junket operators"

---

[304]    *See* A. Toh Decl. ¶ 8; A. Lat Decl. ¶¶ 6-7; F. Lacap Decl. ¶ 6.

[305]    A. Toh Decl. ¶ 8.

[306]    A. Toh Decl. ¶ 6.

[307]    A. Toh Decl. ¶ 6.
[308]    Farah Master, "Factbox - How Macau's casino junket system works," REUTERS, October 21, 2011 (RE-40).

[309]    *See id.*

[310]    *See* E. Razon Decl. ¶ 9.

in Asia (particularly in Macau), whom they claimed to communicate with regularly.[311]  They explained to Mr. Razon that they would use these relationships to bring VIP players ("high rollers") into the Solaire.[312]  They also claimed to have a database of foreign (*i.e.*, non-Filipino) VIP players, who they would bring into the Solaire.[313]  Based on the size of Las Vegas Sands, the multiple casinos they had recently opened throughout Asia, and the high ranking positions that the GGAM principals held at Las Vegas Sands, Mr. Razon believed their representations that they had these connections.

108.    The MSA defines "Guest Data" as "any and all guest or customer profiles, contact information (*e.g.*, addresses, phone numbers, facsimile numbers and email addresses), histories, preferences, and any other information from guests or customers of a casino or hotel."[314]  The ownership of Guest Data was a heavily negotiated point between the Parties.  For example, on June 9, 2011, Bloomberry's attorney, Benny Tan, wrote to GGAM and others and stated:

> We had previously agreed that in marketing, the patron or casino database of GGAM shall remain to be its property.  But the patron or casino database generated from the operation of the Facilities shall be the property of the Owner.  But in this new draft of yours, you added a provision stating that "any Guest Data developed for foreign and junket VIP play shall remain the sole property of Global Gaming.  And then you limited the data the Owner will own to "Guest Data generated from residents of the Philippines visiting the Facilities."  This is a distortion of what was agreed.[315]

109.    Ultimately, notwithstanding GGAM's attempts to maintain ownership of the Guest Data it previously had, as well as new VIP Guest Data generated by the Solaire, the Parties agreed to the following language:

> The Guest Data of GGAM shall remain to be its property.  The Guest Data generated from the operation of the Facilities shall be the property of the Owner and shall be used only for the Facilities.[316]

---

[311]    *See id.*

[312]    *See id.*

[313]    *See id.*

[314]    *See* MSA, Annex H, Definitions, "Guest Data" (Claimants' Ex. 1).

[315]    *See* Email from B. Tan to K. Russell, *et al.*, June 9, 2011 (RE-21).

[316]    *See* MSA, Clause 6 (Claimants' Ex. 1).

*CONFIDENTIAL*

110.     As GGAM acknowledges,[317] the sentence "The Guest Data of GGAM ***shall remain***[318] to be its property," indicates that GGAM's Guest Data was already in existence.  In contrast, the proceeding sentence provides that additional Guest Data would be generated in the future from the operation of the Solaire.  That Guest Data would become the property of Bloomberry, and was separate from the pre-existing Guest Data of GGAM.

111.     In the development and pre-opening phase of the Solaire, GGAM continued to represent that it had direct access to high rollers.[319]  For example, during the top-up offering "road show," when asked how they planned to bring in VIP players to the Philippines, Mr. Weidner said that it would only take "7 phone calls."[320]  Indeed, the Statement of Claim posits that "GGAM was uniquely positioned to establish a pipeline of foreign VIP patrons by leveraging its experience and contacts from years of doing business in Asia."[321]

112.     Notwithstanding these representations, GGAM did not utilize its purported connections or Guest Data to bring in VIP players.  During GGAM's tenure at the Solaire, none of GGAM's purported contacts with junket operators brought their business to the Solaire.[322]  GGAM was not directly responsible for successfully bringing in individual VIP players[323] or

---

[317]     *See* Claimants' S.O.C. ¶ 185 ("At most, MSA Clause 6 recognizes that any Guest Data possessed by GGAM would remain GGAM's property, and any Guest Data generated through Solaire's operation would remain the Owners' property.")

[318]     For example, "remain" is defined as "to stay in the same place or with the same person or group."  *See* "Remain," MerriamWebster.com, accessed on December 4, 2014 (RE-66).

[319]     The pre-top-up offering materials, for example, discussed "GGAM's direct customer relationship, as well as existing relationship with regional junket operators.").  *See* April 5, 2012 CLSA Report at 12 (RE-43).

[320]     *See* E. Razon Decl. ¶ 45.

[321]     *See* Claimants' S.O.C ¶ 80.

[322]     *See* D. Almeda Decl. ¶ 23.

[323]     *See* A. Toh Decl. ¶ 15

putting in place large junket operators.[324]  Bloomberry's management team and employees were never privy to a "list" of customer contacts that could be used.[325]

113.     The Business Plan relied heavily on Bloomberry employees to recruit VIP players, making no mention of GGAM's purported contacts.[326]  Several Bloomberry employees—including Don Almeda and Lorraine Koo—utilized their pre-existing contacts, connections, and customer information to recruit VIP players and some of the top junket operators in Macau, including XTD (XinTianDi), International Club, MF (MingFa), Tak Chun, and EEG (Empire Entertainment Group).[327]  More than just a phone call (or 7 phone calls) are required to attract these highly-sought after players.  Frequent travel, to places such as Macau, Singapore and Hong Kong, is required to meet with, make presentations to, and recruit VIP players and junket operators.[328]  To Bloomberry's knowledge, GGAM's principals did not undertake such efforts on the Solaire's behalf.[329]

114.     Bloomberry could only conclude that GGAM had misrepresented it had its own Guest Data.  After Bloomberry had threatened to terminate the MSA, GGAM admitted that it did not have any pre-existing "Guest Data" from which they could connect VIP players or junket operators with the Solaire.[330]  Despite this admission, GGAM continues to represent to other clients that they have the direct personal connections to bring in the high rollers:  when asked

---

[324]     *Compare* L. Koo Decl. ¶¶ 8-9 *with* B. Stone Supp. Decl. ¶ 27 ("[W]e also assisted in engaging several large reputable junket operators, including the largest junket operator in Macau.").  GGAM signed one junket operator, Sun City, but the contact soon thereafter had to be terminated.  *See* L. Koo Decl. ¶ 8; *compare* MSA, Annex A, Post Opening Services - Item 4 (Claimants' Ex. 1) ("Make all decisions regarding junkets, granting of complimentaries and extensions of credit and collections . . .").

[325]     *See* L. Koo Decl. ¶ 9.

[326]     *See* Solaire Business Plan, January 29, 2013 at 117 (Claimants' Ex. 119) ("All Player Development Team and Operations Team to remain in contact with Players thru phone calls and visitation so as to maintain the positive relationship and players do not feel as if they were forgotten.").

[327]     *See* D. Almeda Decl. ¶ 22; *see also* L. Koo Decl. ¶¶ 7-8; A. Toh Decl. ¶ 13.

[328]     *See, e.g.*, B. Lee Op. § 2.3.2 (discussing the importance of awareness campaigns to attract VIP gamblers and recognizing "[t]he key element to success in this field is to establish a good working relationship with these junket operators.").

[329]     *See supra* note 86.

[330]     *See* Letter from B. Weidner to E. Razon, August 19, 2013 (Claimants' Ex. 95) ("[**T**]*here was no GGAM Guest Data at the opening of Solaire*—nor does the MSA require that there be.").

about bringing Chinese customers to the Baha Mar, another property managed by GGAM, Mr. Weidner said that he "**plans to reach out to high-rollers directly**."[331]

115.    Moreover, GGAM did not guide or oversee the development of the Solaire's "robust" customer database.[332]  Customer databases, such as Bloomberry's current database, typically are created from the personal lists of various managers.  For example, the role of a Director of International VIP Marketing is to convince individual VIP players and junket operator managers to come to the Solaire by leveraging existing personal connections with those players, operators, and/or other casino managers.[333]  Once the Director is successful in bringing in VIP players and junket operators, the Solaire then collects and tracks the players' and operators' information.[334]

116.    GGAM defends its inability to attract VIP players by saying that the plan was to "ramp up" the VIP business.[335]  Nonetheless, there must be a foundation from which one can "ramp up."  The Business Plan provided that agreements would be signed with all junket operators by January 2013.[336]  GGAM had one and a half years prior to Opening Day on March 16, 2013 to reach out to their contacts and establish a foundation for VIP gaming.  This did not happen.[337]  It appears that GGAM's sole basis for attempting to take credit for the Solaire's VIP and junket players is GGAM's hiring of certain individuals, who then created the databases.[338]

---

[331]    *See* K. O'Keefe, "Ex-Sands Executives to Help Manage Bahamas Casino," Wall Street Journal, May 22, 2013 (RE-67) (emphasis added).  (also stating that "he plans to engage junket operators—the middlemen who extend credit to high-stakes players that account for around 70% of Macau's gambling revenue—to bring Chinese customers to Baha Mar.").

[332]    *Compare* Claimants' S.O.C. ¶ 82 *with* L. Koo Decl. ¶ 9.

[333]    *See, e.g.*, B. Lee Op. § 2.3.2 ("One of the most noticeable features about the junket operators is that the business is done based on trust, and any outsider particularly one with a short term business outlook is highly unlikely to earn that trust and have a real relationship with these tightly bound groups.").

[334]    In contrast, the Business Plan proposed collecting "name cards" from players in order to form a core database.  *See* Solaire Business Plan, January 29, 2013 at 118 (Claimants' Ex. 119).

[335]    *See, e.g.*, Claimants' S.O.C. ¶¶ 86-87.

[336]    *See* Solaire Business Plan, January 29, 2013 at 119 (Claimants' Ex. 119).  The Business Plan neglected to provide detail as to what junkets were being targeted and whether progress had been made.  *See id.*

[337]    D. Almeda Decl. ¶ 23; A. Toh Decl. ¶¶ 12-13.

[338]    *Compare* Claimants' S.O.C. ¶ 81 ("GGAM commenced these efforts shortly after the MSA was executed in September 2011 by identifying and recruiting certain key management personnel based on their knowledge and existing relationships with premium direct customers and junket operators in the region.") *with* L. Koo Decl. ¶¶ 7-9.

In this respect, GGAM is no different from an executive search firm—which is not what GGAM was hired to be.

> **E.    Contrary to GGAM's Representations and the MSA's Requirements, GGAM's Principals Failed to Provide "Hands On" Management, and Their Absence Led to a Disjointed Management Team.**

117.    During the Parties' initial discussions, Mr. Razon made clear that he expected "as close to full-time management" as possible, with Mr. Weidner as the "main driver."[339]  Mr. Weidner assured him that GGAM would provide a "hands-on approach to management" of the Solaire.[340]  Moreover, Mr. Weidner assured Mr. Razon that he would "personally oversee" the management activities, spending "significant time in Manila with the team."[341]

118.    Despite these promises, Mr. Weidner only came to Manila three times.[342] GGAM's principals did not heed Bloomberry's requests for in-person leadership.  For example, in December 2011, Ms. Occeña asked Mr. Saunders to be in Manila full-time, because, according to Ms. Occeña, "[w]e urgently need a leader who can provide strategic direction to be able to produce our business plan for the property."[343]  Yet Mr. Stone and Mr. Saunders spent little time at the Solaire, only a few days each month.[344]  Flying in and out, rather than being on-

---

[339]    *See* Email from E. Razon to B. Weidner, March 17, 2011 (RE-1) (requesting "as much of your time as we can get").

[340]    *See* Email from B. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104).

[341]    *See* Email from B. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104); *see also* E. Razon Decl. ¶ 8; *Cf.* Hr'g Tr. at 200:21-24 (Weidner) ("Global Gaming Asset Management is an asset manager that seeks to both manage actively casinos and the gaming space and to position assets to have them have a high multiple.").

[342]    *See* E. Razon Decl. ¶ 32.

[343]    *See, e.g.*, Email from E. Occeña to B. Stone and G. Saunders, December 18, 2011 (RE-41) ("Given all the things we need to achieve in a very short time, can Garry be in Manila until Michael is with us full-time?  I had this conversation with you Garry last November.  We urgently need a leader who can provide strategic direction to be able to produce our business plan for the property.")

[344]    *See, e.g.*, Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81) ("In fact, except for a once a month visit lasting for a few days, GGAM was not involved in the management and operation of the Facilities.  Bill Weidner was in Solaire only in [*sic*] a handful of times.  Brad Stone and Garry Saunders would spend some 5 days in a month in Solaire but would spend more time complaining about the allocation of costs in the computation of EBITDA for the GGAM fees rather than understanding what was going on and finding solutions to the problems facing the Facilities.  The absence of GGAM in the Facilities was noticed by industry analysts.  In fact one of them asked:  If GGAM is not around most of the times, why are you paying them a Management Services Fee?").

site for a significant amount of time, was often more disruptive than helpful.[345]  Moreover, GGAM's principals did not increase the frequency of their visits to the Solaire, even when Bloomberry specifically requested their presence to address problems and issues that were not being competently addressed by Mr. French, the COO selected by GGAM.[346]

119.    GGAM's self-serving, unsupported statement that it spent "significant time and effort performing its responsibilities under the MSA, both inside and outside the Philippines"[347] should be rejected.  This assertion is without any foundation, and as the facts show, demonstrably false.  Moreover, GGAM proffers the unprofessional defense that the MSA does not require them to be on-site for a specific number of days.[348]  Bloomberry's expectations— which were made clear to GGAM—were that the management company for the Solaire would be physically present when managing the Solaire.  Therefore, Bloomberry did not anticipate needing to mandate a specific number of "man-hours" on the ground.

120.    GGAM's absence not only contributed to disorganization[349] and a dysfunctional management team,[350] but also led to a host of problems, some of which, perhaps taken alone

---

[345]    *See, e.g.*, J. Salvacion Decl. ¶ 13.

[346]    *See, e.g.*, Email from E. Occeña to J. Alarilla, D. Almeda, B. Stone, G. Saunders and M. French, May 4, 2013 (RE-56) (requesting that Mr. Stone and Mr. Saunders remain in Manila until they rectified the problems with the customer loyalty program); *see also* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 16 (Claimants' Ex. 96) ("The best example of GGAM's attitude here is when Ms. Estela Occeña requested Brad Stone to stay to help fix the problems at the height of Solaire's crisis when gaming volume was in a free-fall in April 2013.  But Brad left anyway without addressing the myriad problems.").

[347]    *See* Claimants' S.O.C. ¶¶ 235-36.

[348]    *See* Claimants' S.O.C. ¶ 85.

[349]    For example, Bloomberry relied on GGAM's recommendation when approving the organizational structure in the MSA.  It later became apparent that the organizational structure was highly flawed—there was no clear segregation of duty between marketing and operations, which caused overlapping duties, instability, and demoralization of senior officers.  *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 10 (Claimants' Ex. 96).

[350]    For example, there was no coordination among the marketing, credit and operations departments with respect to the junket operator business.  Therefore, the various departments acted independently and without coordination, which led to conflicts in policies and implementation.  *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013), September 3, 2013 at 9 (Claimants' Ex. 96); *see also id.* at 24 ("There was no coordination among the various departments in the organization.  Each department is run as a turf, doing its thing independently of the other departments.  This is a direct result of GGAM not spending enough time on the ground and its lack of oversight and absence of leadership.").

would be relatively minor, but, cumulatively became substantial examples of mismanagement.[351] In the integrated resort and casino industry, such "trifles" add up quickly.[352]  Nonetheless, GGAM adopts a cavalier attitude in asserting that it was in a "superior position" to understand what was best for the Solaire.[353]

> **1.  Ultimately, GGAM Can Point Only to Certain People It Identified for Management Positions as Evidence of GGAM's Performance of its Obligations under the MSA.**

121.    Under the MSA, GGAM was required to "recruit, select, and hire employees for the Facilities."[354]  GGAM makes much of this obligation, asserting that "recruiting and hiring an entire Management Team" was "an accomplishment" "that the Owners could not have achieved without GGAM's involvement."[355]  GGAM's over-reaching, unsupported statement is as flawed as it is self-serving.

122.    First, it cannot be overlooked that GGAM makes yet another contradictory argument, this time with respect to identifying and hiring key members of the Management Team.  GGAM asserts that the "Owner had control over hiring and firing,"[356] but GGAM then attempts to take credit for hiring several employees at the Solaire.[357]  It is apparent that when GGAM does not want to take credit for an employee, the hiring of that employee was solely the

---

[351]     GGAM's lack of oversight, planning and mismanagement transformed arguable "immaterial" problems into cumulatively material issues.  For example, GGAM over-ordered on food and beverage items.  *See* Email from B. Tan to W. Weidner, G. Sanders, and B. Stone (attaching chart of allegations dated September 2, 2013) at 22 (Claimants' Ex. 96) (listing supplies that will last for thousands of days based on actual turnover, notwithstanding expiration dates).

[352]     *Cf.* Claimants' S.O.C. ¶ 198.

[353]     *See* Claimants' S.O.C. ¶ 163.

[354]     *See* MSA, Annex A, Pre-Opening Services – Item 9 (Claimants' Ex. 1) (additionally, GGAM was to implement necessary procedures, techniques, and training programs to obtain and evaluate qualified applicants); *see also id.* at Annex A, Post-Opening Services – Item 7 ("Recruit, select, terminate, train, manage, promote, and establish compensation and benefit plans for all personnel necessary . . ."); *id.* at Clause 2.4(a) ("GGAM shall perform its Services through the Management Team composed of the officers that GGAM will nominate.").

[355]     *See* Claimants' S.O.C. ¶ 66.

[356]     *Compare* Claimants' S.O.C. ¶ 45 *with* MSA, Clause 2.4(b) (Claimants' Ex. 1) ("GGAM shall have the sole discretion to nominate the officers [that comprise the Management Team] . . .") *and* MSA, Clause 7.1.

[357]     *See, e.g.*, Claimants' S.O.C. ¶ 68, n. 88; *see also* B. Stone Supp. Decl.

Owners' responsibility,[358] but when GGAM does want to take credit for an employee, or the fruits of that employee's labor (*i.e.,* VIP connections), the hiring of that employee was solely GGAM's responsibility.[359]  GGAM cannot have its cake and eat it too.  Although Bloomberry, as the Owner of the Solaire, retained control over hiring and firing personnel,[360] GGAM was obligated under the MSA to establish the Management Team—an obligation for which GGAM was compensated.

123.    Second, GGAM provides no support for its statements that, without GGAM, Bloomberry would have been unable to "convince [the appropriate personnel] to accept a position with a new untested venture," and that "GGAM's reputation was critical in attracting most of the candidates to the Solaire."[361]  Of course prospective employees would want to see that Bloomberry had hired a COO or a manager for the Solaire.  But that does not mean that prospective employees came to work at the Solaire only due to GGAM's reputation,[362] or that these employees should be branded as "GGAM" recruits.[363]  For example, Lorraine Koo, the Vice President of Business Development and VIP Services; Fritz Lacap, Director of Financial Planning and Analysis; and Anthony See Toh, Director of Credit, have all continued to work for the Solaire under the direction of the new COO, Tom Arasi.[364]  These employees recognized the unique opportunity to be involved with the first integrated resort in the Philippines, regardless of GGAM's involvement.[365]

---

[358]    *See, e.g.,* Claimants' S.O.C. ¶ 103 ("Many of the problems that originated in the Finance Department stemmed from Respondents' hiring and retention of Ed Chen as CFO.")  .

[359]    *See, e.g.,* Claimants' S.O.C. ¶ 187 ("After identifying and recruiting select key management personnel who had extensive relationships with premium direct customers and junket operators throughout Asia, GGAM oversaw the development of robust, functional, and rapidly growing customer databases . . . .").

[360]    *See, e.g.,* MSA, Clause 2.4(d)-(e) (Claimants' Ex. 1).

[361]    *See* Claimants' S.O.C. ¶ 68.

[362]    *Compare* A. Toh Decl. ¶ 2 ("GGAM's connection to the Solaire did not factor into my decision to accept a position at the Solaire, because I actually knew very little about GGAM or Mr. Weidner, Mr. Stone or Mr. Saunders. I recognized that being hired to help launch the first integrated resort in the Philippines was a tremendous opportunity.") *with* Claimants' S.O.C. ¶ 68 ("the reluctance of many proficient expatriates in the industry to relocate to the Philippines.").

[363]    *See, e.g.,* A. Toh Decl. ¶ 2 ("Although I was hired by Mr. Andreaci (who I understand was hired by GGAM), I do not believe that this equates to me being a GGAM "find" or "hire.").

[364]    *See* L. Koo Decl. ¶ 3; F. Lacap Decl. ¶ 2; and A. Toh Decl. ¶ 2.

[365]    *See, e.g.,* A. Toh Decl. ¶ 2.

124.    <u>Third</u>, few of the employees recruited by GGAM are still employed by Bloomberry.[366]  Many of the key people alleged (without any supporting documentation) to be members of the "GGAM-recruited" or "GGAM-selected" Management Team have been fired or encouraged to resign for failure to perform.[367]  The employees remaining at Bloomberry include, for example, the Vice President of Information Technology and the Director of Security.[368]  In comparison, the employees who were fired or encouraged to resign include the Chief Operating Officer, the Senior Vice President of Gaming Operations, the Vice-President of Development and Planning, the Vice President of Non-Gaming and Hotel Operations, Senior Vice President of VIP Marketing, and the Director of Strategic Marketing.[369]  GGAM fails to acknowledge that most of these individuals were fired or encouraged to resign for their poor performance after GGAM was terminated as the management services provider for the Solaire.[370]

125.    Ultimately, GGAM trumpets that it fulfilled its obligations under the MSA because it hired certain executives; this is consistent with Bloomberry's assessment that GGAM was merely "a glorified executive-search firm."[371]  Yet recommendations for whom to hire cannot be a substitute for providing the tangible services and deliverables required under the MSA.[372]  GGAM was not hired to be an executive search firm—GGAM was hired to manage the Solaire, and it failed to do so.

---

[366]    *Cf.* Claimants' S.O.C. ¶ 66 ("In fact, the Management Team was so effective in ensuring the Project's success that the Owners still employ many of the key personnel that GGAM recruited. . . .").

[367]    *Compare* Claimants' S.O.C. ¶¶ 66, 68 *with*  Hr'g Tr. at 270:12-22 (Alarilla) (listing the employees who are still employed by Bloomberry).

[368]    *Compare* Claimants' S.O.C. ¶ 68, n. 88 *with* Hr'g Tr. at 270:12-22 (Alarilla).

[369]    *Compare* Claimants' S.O.C. ¶ 68, n. 88 *with* Hr'g Tr. at 270:12-22 (Alarilla).

[370]    *Compare* Claimants' S.O.C. ¶ 66 ("although certain members of the GGAM-recruited Management Team resigned voluntarily after GGAM's termination") *with* Hr'g Tr. at 271:6-272:1-18 (Alarilla).

[371]    *See* M. Cohen, *Solaire Shines Light on Philippine Casino Ambitions*, Forbes Asia, April 23, 2014 (S.O.C. Ex. 110).

[372]    Similarly, GGAM points to its identification of Matthew Pryor as a potential construction manager as a significant contribution.  *See* Claimants' S.O.C. ¶ 62.  GGAM was obligated to identify consultants for the project, and yet, this contribution is hardly distinctive or unique.  *See* MSA, Annex A, Pre-Opening Services – Item 1. Bloomberry already had commenced a search to identify a consultant with expertise in integrated resorts to oversee the construction progress; thus, it is likely that Bloomberry would have identified Mr. Pryor or another consultant with similar experience.[372] *See*  J. Salvacion Decl. ¶ 10; E. Razon Decl. ¶ 33; D. Almeda Decl. ¶ 15.

### F.   Bloomberry Had a Fiduciary Duty to Intervene Once Bloomberry Became Aware of GGAM's Inability to Perform Its Obligations as the Management Company.

126.   Once it became apparent that Bloomberry was dealing with incompetent and uncommitted management, and that continued retention of GGAM as the management services provider for the Solaire would jeopardize the success of the Solaire, Bloomberry's officers and directors had a fiduciary duty to act in the best interest of the corporation and avoid future harm.[373]  Among other duties, the directors of a corporation are "expected to manage the corporation with reasonable diligence, care and prudence" and "should exercise reasonable care in the supervision of officers and employees appointed by them."[374]  Thus, not only does the board of directors have the power to remove a corporate officer or manager, but where the continued engagement of an officer would be inimical to the corporation, the board of directors is behooved to terminate such engagement in the exercise of its duties to the corporation.

127.   Bloomberry communicated its concerns regarding GGAM's inability to fulfill its obligations post-opening of the Solaire.[375]  Rather than acknowledging its mistakes, GGAM made, and continues to make, wholly unsupported *ad hominem* remarks regarding "usurpation," "poor decision-making," "poor judgment," and "ineptitude."[376]  Such statements have no place in this Arbitration.  Bloomberry wanted the Solaire to be managed successfully.  Bloomberry was paying GGAM to do just that, and there is no sense in which Bloomberry would thwart GGAM from delivering on its obligations.[377]  Yet, when GGAM failed to deliver, Bloomberry was left

---

[373]   Cesar Lapuz Villanueva, Philippine Corporate Law  (2001) (excerpts) at 318 (RL-42).  The Philippine Supreme Court in *Prime White Cement Corporation v. Intermediate Appellate Court,* G.R. No. L-68555, March 19, 1993 (RL-40) characterized the position of a director as one of trust and that the primary obligation of the directors of a corporation is to seek the maximum amount of profits for the corporation:  "As corporate managers, directors are committed to seek the maximum amount of profits for the corporation. This trust relationship 'is not a matter of statutory or technical law.  It springs from the fact that directors have the control and guidance of corporate affairs and property and hence of the property interests of the stockholders.'"

[374]   Jose Campos Jr. and Maria Clara L. Campos, The Corporation Code, Volume I (1990) (excerpts) at 642 (RL-41).

[375]   *See, e.g.*, Email from E. Occeña to B. Stone, re Marketing Strategy, April 23, 2013 (RE-54); *see also* Email from E. Occeña to J. Alarilla, D. Almeda, B. Stone, G. Saunders, and M. French, May 4, 2013(RE-56).

[376]   *See* Claimants' S.O.C. ¶¶ 97, 98, 102, 103, 108.

[377]   *See* E. Razon Decl. ¶ 42.

with no choice but to step in and begin managing the Solaire.  Bloomberry's direct involvement was necessitated by GGAM's absence and lack of attention.[378]

128.    For example, GGAM makes much of the fact that the CFO was to report to the CEO, rather than the COO.[379]  Yet, it is typical in an integrated resort for the finance department to be separate and distinct from the operations department.[380]  This is important because the owners' interests and the management's interests are not inherently aligned—the owner is interested in the bottom line, whereas the manager is willing to spend more money in order to attract more clients.  Despite the fact that separating the finance department from the operations department is standard industry practice, GGAM improperly uses this normal structure to shift all blame for its own mismanagement of the Solaire to Bloomberry.[381]

### 1.    GGAM Uses the Phrase "Through the Management Team" as Both a Sword and a Shield.

129.    GGAM was to perform the services required under the MSA "through the Management Team,"[382] but that does not mean that GGAM had no authority over the Management Team.  The MSA expressly provides that "GGAM acting through the COO shall supervise, instruct and direct the members of the Management Team."[383]  Moreover, the MSA repeatedly notes that GGAM was engaged to "manage the operation of the facilities"[384] and that the required services in the MSA were the "responsibilities" of GGAM.[385]

---

[378]    *Cf.* Claimants' S.O.C. ¶¶ 97-118.

[379]    *See, e.g.*, Claimants' S.O.C. ¶¶ 103-107.

[380]    *See* A. Lat Decl. ¶ 8.

[381]    *See* Claimants' S.O.C. ¶¶ 97-118.

[382]    *See* MSA, Clause 2.4 (Claimants' Ex. 1).

[383]    *Compare* MSA, Clause 7.3 (Claimants' Ex. 1) *with* Claimants' S.O.C. ¶ 194.

[384]    *See* MSA, Recital C (Claimants' Ex. 1) ("The parties agree for the Owners to engage GGAM for management and technical services in the development and construction, and to manage the operation of the Facilities.").

[385]    *See* MSA, Clause 2.2 (Claimants' Ex. 1) ("GGAM shall carry out the Services enumerated in Annex A upon the terms and conditions contained in this Agreement.  The Services shall constitute as rights as well as responsibilities of GGAM under this Agreement.").

130.    The phrase "through the management team" was intended to ensure that the interests of the owner and the manager were aligned.[386]  Bloomberry wanted to develop the capacity of its staff to manage and operate an integrated resort.[387]  GGAM protested the inclusion of this phrase, because GGAM wanted to maintain exclusive control of managing the Solaire.[388] GGAM recognized that, notwithstanding its requirement to work "through the management team," it was ultimately the responsibility of the COO to execute its management strategy effectively.[389]

131.    Now, GGAM uses the phrase "through the management team" both as a sword and a shield.  When it is convenient for GGAM, the phrase "through the management team" absolves GGAM of any fault and places the blame on Bloomberry.  For example, GGAM takes credit for VIP customers brought into the Solaire by Bloomberry employees by stating that these customers were brought in "through the Management Team."[390]  Yet when faced with glaring failures, GGAM attempts to evade any responsibility by stating that it could "only perform the MSA Services by 'acting through the Management Team.'"[391]

---

[386]    *See, e.g.*, Email from B. Tan to K. Russell, June 9, 2011 (RE-21) ("In our draft we have carefully stated that 'GGAM must act through the Management Team.'  GGAM is not suppose [*sic*] to be a separate organization within our Facilities.  This concept has been swept aside in the many provisions inserted by GGAM which gives it authority over the Facilities without reference to the Management Team."); *see also* E-mail from B. Tan to E. Occeña (Claimants' Ex. 44) ("The statement that GGAM 'will manage the operations of' Bloomberry is not accurate. Under the Management Services Agreement, GGAM 'acting through the Management Team' will provide the management services to the Facilities.").

[387]    *See* Email from B. Tan to B. Weidner, September 3, 2013, attaching chart of breaches at 7 (Claimants' Ex. 96) ("The 'acting through the Management team' . . . was intended to ensure effective transfer of knowhow and technology from GGAM to the Management Team.").

[388]    *See, e.g.*, Email from B. Weidner to E. Razon, April 11, 2011 (RE-3) ("We, as the Manager, must be confident that we can control the elements of operations to achieve our profit objectives in order to share in the rewards established that form the basis of our compensation.").

[389]    *See, e.g.*, Email from E. Occeña to J. Alarilla, D. Almeda, B. Stone, G. Saunders and M. French, May 4, 2013 (RE-56) ("ETO said we are very poor in execution.  That execution is our primary weakness.  Brad said it is Mike's job as COO to execute our strategy properly.").

[390]    *See, e.g.,* Claimants' S.O.C. ¶ 122 ("GGAM, acting through the Management Team, in fact developed and implemented robust customer databases and the requisite policies and procedures for Solaire's successful operations"); *see also id.* ¶¶ 4, 39, 41, 43, 65, 85.

[391]    *See also* Claimants' S.O.C. ¶ 194; *see also id.* ¶¶ 41, 182.

## V.    GGAM'S OTHER CLAIMS ARE FRIVOLOUS AND BASELESS, AND THUS SHOULD BE DISMISSED.

### A.    The Presence of an Arbitration Clause in the MSA Does Not Negate Bloomberry's Ability to Terminate the MSA.

132.    Claimants offer an absurd argument that "Respondents wrongfully terminated the MSA before the legality or propriety of the termination was confirmed by an arbitral tribunal."[392]  This argument is belied by the MSA, Philippine law and general principles of arbitration.

133.    Bloomberry was entitled to terminate the MSA without prior determination of an arbitral tribunal.  Clause 15.1 of the MSA entitled specifically allowed Bloomberry to terminate the MSA prior to any determination of a tribunal, as nothing in Clause 15 required an arbitral determination prior to such termination.[393]  Indeed termination provisions are common in contracts, such as the MSA, that also contain dispute resolution provisions.[394]  That is not to suggest that termination can only be effectuated by determination of an arbitral tribunal.

134.    Clause 19.1 further provides that "any dispute" may be settled by arbitration, including disputes regarding the contract breach or propriety of termination.[395]  If the Parties intended for termination to be effectuated only after the determination of an arbitral tribunal, then the Parties could have specified as much in the MSA.  They did not, and GGAM should not be permitted now to insert extra-contractual language inconsistent with the Parties' agreement.

### B.    GGAM Baselessly Describes Bloomberry As Having Made "False" and "Defamatory" Statements.

135.    Claimants set forth a frivolous claim for damages based on "the additional economic harm to GGAM as a result of Respondents' unauthorized, false and defamatory

---

[392]    Claimants' S.O.C. ¶¶ 204-205.

[393]    *See* MSA, Clause 15.1 (Claimants' Ex. 1).

[394]    *Compare Korea Technologies Co. Ltd v. Hon. Alberto A. Lerma, et al.*, GR No. 143581, January 7, 2008 (S.O.C. Claimants' Auth. 3) (discussing unilateral, extrajudicial rescission) *with Goldloop Properties, Inc. v. Gov't Serv. Ins. Sys,*. G.R. No. 171076, Aug. 1, 2012 (RL-17) (recognizing that parties may validly stipulate the unilateral rescission of a contract).

[395]    *See* MSA, Clause 19.1 (Claimants' Ex. 1).

statements in the press and to the Philippine Stock Exchange about GGAM and its principals in violation of the MSA."[396]  When Bloomberry terminated the MSA and removed GGAM as the management services provider, Bloomberry was required by the Philippine Stock Exchange to make a prompt disclosure of this event.[397]  Notably, the Philippine Stock Exchange Disclosure Rules require prompt disclosure not only of the removal of senior management, but also the reasons for such removal.[398]  Thus, Bloomberry's disclosures, required by the Philippine Stock Exchange, would have been permitted under the MSA (had the MSA still been in existence at the time of the statements).[399]

136.    The statements at issue reflect Bloomberry's reasons for terminating GGAM as the management services provider for the MSA.  GGAM's frivolous claim that the statements are "defamatory" and "factually incorrect" is supported only by GGAM's self-serving, unsupported statements that these press reports are "false."[400]  GGAM's principals have themselves made similar statements regarding the dispute.  For example, GGAM's spokesman Spence Johnson is quoted as saying that the allegations made by Bloomberry were false and that GGAM had "***performed all of its obligations***."[401]

137.    There is nothing sinister or suggestive of the fact that an owner of a project with the visibility of the Solaire reports to the press that a management agreement is signed or terminated.  This indeed is common practice in the industry.  For example, when Mr. Weidner's employment agreement with the Las Vegas Sands ended in 2009, news reports indicated that Mr.

---

[396]    *See* Claimants' S.O.C. ¶ 238(4); *see also id.* at ¶¶ 157-160, 231-236.

[397]    *See* Philippine Stock Exchange, Revised Disclosure Rules, Penalties and Fines and Implementing Guidelines on Article XVI, Section 2(f), October 2, 2013 at § 4.1 (RL-39) ("Disclosure of Material Information: . . . Issuers are hereby required to disclose to the Exchange once they become aware of any material information or corporate act, development or event, within ten minutes from the receipt of such information or the happening or occurrence of said act, development or event."); *id.* at § 4.4(d) ("Events Mandating Prompt Disclosure:  resignation or removal of directors, officers or senior management and their replacements ***and the reasons for such***.") (emphasis added).

[398]    *See id.*; *contra* Claimants' S.O.C. ¶ 231-32.

[399]    *See* MSA, Clause 14.2 (Claimants' Ex. 1) ("Notwithstanding the foregoing, the Receiving Party may disclose such confidential information (i) as required by law or by the court of any competent jurisdiction or by an [*sic*] government or regulatory body having jurisdiction over the Receiving Party including gaming, tax, financial regulators . . . .")

[400]    *See* Claimants' S.O.C. ¶¶ 234-36.

[401]    *See* Claimants' November 14, 2014 Letter to the Tribunal, Exhibit A.

*CONFIDENTIAL*

Weidner was "fired."[402]  Mr. Adelson, the Chairman of Las Vegas Sands was quoted as saying to the press in regards to Mr. Weidner departure from the firm:  "We just sort of helped him out a little bit. . . . We helped him resign a little bit."[403]  But, to Bloomberry's knowledge, Mr. Weidner did not sue Mr. Adelson for defamation.

138.    Under Philippine law, statements made in self-defense or with respect to a mutual controversy are not considered libelous.[404]  In particular, "an expression of opinion by one affected by the act of another and based on actual fact is not libelous."[405]  With regard to the statements attributed to Mr. Razon, it cannot be denied that these statements were expressions of his opinion arising from the mutual controversy with GGAM.   These statements were merely made as an incident to the questions surrounding Bloomberry and the termination of the MSA.

139.    GGAM makes no attempt to quantify the purported vague "additional economic harm" resulting from these statements.[406]  Claimants' insertion of manufactured "defamation claims" in its Statement of Claims is yet another example of Claimants' "say anything" strategy and the manner in which they have chosen to conduct themselves in this Arbitration.  This strategy is reflected in the improper and prolonged "interim measures" request, as well as the barrage of extensive letters on all sorts of non-pressing issues that Claimants generated in the eve of Bloomberry's preparation of its Statement of Defense and Counterclaims.[407]

---

[402]    Howard Stutzlas, "Weidner quit before he could be formally fired," VEGAS REVIEW-JOURNAL, March 10, 2009 (RE-35).

[403]    *Id.*

[404]    *See, e.g.*, Luis B. Reyes, The Revised Penal Code, Book Two (2001) (excerpts) at art. 353 (RL-43).

[405]    *See id.*

[406]    *See* Claimants' S.O.C. ¶ 238.

[407]    *See, e.g.*, Claimants' Request for Interim Measures of Protection, April 14, 2014 (130 pages long); *see also, e.g.*, Claimants' Letter to the Tribunal re BRC's Top-Up Placement, November 12, 2014; Claimants' Letter to the Tribunal re GGAM's Request for Disclosure of Confidential Information to Cantor Fitzgerald, November 12, 2014; Claimants' Letter to the Tribunal re Anonymous Statement in *The Australian*, November 14, 2014; Claimants' Letter to the Tribunal re Confidentiality, November 21, 2014; Claimants' Email to Respondents re Claimants' Unilateral, Untimely *Errata* Sheet, December 3, 2014; Claimants' Email to Respondents' re Notification of Intended Disclosure of Confidential Information and Request for Waiver of Notice Period, December 4, 2014.

## VI.    AMENDED COUNTERCLAIMS

### A.    Bloomberry and Sureste Assert Claims Against the Equity Interests in the Solaire GGAM Purchased Pursuant to an Option Granted to GGAM by Bloomberry and Sureste.

140.    In December 2012, GGAM executed the option that had been granted to it by Bloomberry and Sureste and purchased more than 900 million shares in Bloomberry Resorts Corporation for approximately US $37 million—a "sweetheart" deal with a strike price set at essentially the founder's cost.[408]  The Parties' negotiations and agreements make clear that (1) the equity option to purchase the Shares, which was granted by Bloomberry in the MSA, was compensation for GGAM's performance; and (2) GGAM's performance under the MSA was consideration for the option.[409]  As detailed above, GGAM failed to fulfill its obligations under the MSA or its principals' promises,[410] and on July 12, 2013, Bloomberry filed its Notice of Intent to Terminate.[411]

141.    During the Parties' pre-termination negotiations in 2013, Bloomberry expressly reserved the right to claim against the Shares.[412]  Bloomberry's Notice of Termination provided

---

[408]    *See supra* ¶ 45.

[409]    *See supra* ¶¶ 27-35.

[410]    *See supra* Section IV.  When Bloomberry hired GGAM as the management services provider for the Solaire, Bloomberry was led to believe that GGAM's principals were Bill Weidner, Brad Stone, and Garry Saunders, gaming executives with substantial property management experience.  *See* Email from F. Gaspar to E. Razon, January 21, 2011, attaching presentation (RE-39); *see also* http://ggam.com/principals/management.  In the course of this Arbitration, Bloomberry has learned that, according to GGAM, Cantor Fitzgerald personnel have continuously participated in Claimants' internal corporate decision-making processes.  *See, e.g.*, Claimants' Letter to Tribunal, Dec. 22, 2014 at 3; *see also* Claimants' Request for Interim Measures of Protection, n. 76 ("Pending the formation of GGAM Philippines and GGAM Netherlands, the GGAM activities were conducted by their principals and upstream parent on their behalf.").  Thus, it is no longer clear to Bloomberry who are GGAM's actual "principals."

[411]    *See supra* ¶ 47; *see also* Claimants' Ex. 81.

[412]    *See, e.g.*, Email from E. Occeña to B. Weidner, *et al.*, September 9, 2013 (RE-23) ("we reserve the right to get back the Bloomberry Resorts shares that we granted to GGAM under the option because GGAM has not rendered the Services that were the consideration for the grant of those option shares.").  Repeatedly throughout the Parties' negotiations, Bloomberry also stated that it believed it was entitled to claim for and against the Shares (which were intended as compensation under the MSA), but if GGAM were willing to end the relationship amicably, Bloomberry was willing to let GGAM keep the Shares. *See, e.g.*, Email from E. Razon to W. Weidner, B. Stone, G. Saunders, July 12, 2013 (Claimants' Ex. 94); Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81); K. O'Keefe, "Casino Rift Surfaces in Manila," WALL STREET JOURNAL, September 13, 2013 (Claimants' Ex. 6); J. Alarilla Decl. ¶ 14.

*CONFIDENTIAL*

that the Participation Agreement, which governed GGAM's rights to the Shares, was also terminated.[413]  Bloomberry's October 12, 2013 Response to the Notice of Arbitration further stated that

> The Respondents reserve the right to claim against the 921,184,056 shares in Bloomberry Resorts Corporation that were granted under an option provided under Clause 18.3 of the MSA as part of GGAM's compensation for services that it was to render to the Respondents under the MSA.[414]

142.    Nonetheless, GGAM attempted to sell the Shares in January 2014, and consequently, Bloomberry, Sureste, and Prime Metroline Holdings Inc. ("Prime Metroline") asked the Philippine Courts to preserve the *status quo*.[415]  After this Tribunal was constituted, GGAM filed a Request for Interim Measures of Protection on April 14, 2014, asking permission permit them to sell the Shares immediately, notwithstanding the pendency of the Arbitration. After months of briefing, as well as a hearing on Claimants' Request, on December 9, 2014,[416] the Tribunal entered its Order in Respect of Claimants' Interim Measures Application (the "Interim Measures Order").  In the Interim Measures Order, the Tribunal explained that, on the face of the record at that stage, the Tribunal was not provisionally convinced that Respondents (as opposed to their related companies) had any proprietary, as opposed to contractual, rights to protect with respect to the Shares.[417]  The Tribunal gave Bloomberry and Sureste leave to amend their counterclaims as they deemed necessary.[418]

---

[413]    *See* Letter from E. Razon to B. Weidner, September 12, 2013 (Claimants' Ex. 23) ("By this termination of the MSA for cause, the Participation Agreement with GGAM relating to the shares in Bloomberry Resorts Corporation is also terminated.").

[414]    *See* Response to Notice of Arbitration, October 12, 2013, § 7.3 (Claimants' Ex. 24).

[415]    *See* Philippine Petitioners' Petition, Jan. 17, 2014 (CE-7).  The Philippine Court found that ownership of the Shares was in dispute and warned against disposing of the Shares before the Tribunal's final determination.  *See* Order of the Regional Trial Court of Makati City, Spec. Proc. No. 7567, February 25, 2014 at 9 (JCB-57).  Before issuing the injunction and attachment, the Philippine Court required Bloomberry to post a bond equivalent to US$ 18 million. *See id.* Bloomberry immediately posted the bond.  *See* Order of the Republic of the Philippines, Spec. Proc. No. 7576, February 27, 2014 (JCB-59) (approving the posting of the bond).

[416]    Bloomberry's Statement of Defense and Counterclaim was filed two days earlier, on December 7, 2014.

[417]    *See* Interim Measures Order at ¶ 136; *see also id.* at ¶ 127.

[418]    *See id.* at ¶ 140.  Bloomberry's Statement of Defense and Counterclaim had been filed two days prior, on December 7, 2014.

143.    Accordingly, Bloomberry now asserts amended counterclaims for (1) monetary damages equivalent to the value of the Shares, (2) rescission of the equity option grant and restitution of the Shares on behalf of its agent, Prime Metroline; (3) annulment of the MSA on the basis of causal fraud and restitution of the Shares on behalf of its agent, Prime Metroline; and (4) equitable relief from GGAM's unjust enrichment.

### 1.    The Management Services Agreement and the Equity Option Agreement Are Two Components of the Same Deal.

144.    During the Parties' negotiations, Mr. Razon made clear that he expected "as close to full-time management" as possible,[419] and Mr. Weidner assured him that he, along with Messrs. Stone and Saunders, would provide "hands-on approach to management" of the Solaire.[420]  Moreover, Mr. Weidner assured Mr. Razon that he would "personally oversee" the management activities at the Solaire by spending "significant time in Manila with the team."[421] Mr. Weidner expressed his interest in managing the Solaire Resort & Casino and assisting Bloomberry to create a new "Solaire" brand in the Philippines and elsewhere.[422]

145.    Based on these representations, the Parties' relationship was memorialized on September 9, 2011 in the MSA.  The MSA was an atypical management agreement, pursuant to which GGAM was to be compensated handsomely by substantial fees generated from foreign VIP performance and a nearly 10% equity stake in the Solaire at a substantial discount.[423]  The Parties intended for the equity option to be a component of one overall deal.[424]  Because Bloomberry needed to have a management team in place for the Solaire, the Parties agreed to execute the MSA and continue negotiating the mechanics of exercising the option in a separate

---

[419]    *See* Email from E. Razon to B. Weidner, March 17, 2011 (RE-1) (requesting "as much of your time as we can get").

[420]    *See* Email from B.. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104).

[421]    *See id.*; *see also* E. Razon Decl. at ¶ 8.

[422]    *See, e.g.*, Email from W. Weidner to E. Razon, March 16, 2011 (JCB-1) ("I just wanted to express my interest and excitement to be involved in realizing your vision.").

[423]    *See, e.g.*, MSA, Clauses 4.1-4.5 and Clause 18.3 ("GGAM is hereby granted the right to purchase up to ten percent (10%) ownership in the Facilities and the  gaming license by purchasing 10% of the shareholdings of Owners.") (Claimants' Ex. 1).

[424]    *See supra* ¶¶ 27-35.

agreement.[425]  Clause 18.3, which set forth the equity option grant,[426] specified that the Parties would document the grant, including the terms to effectuate it, in another agreement that would "embody the share purchase option under this clause."[427]  The key material terms of the option, such as the price[428] and the ability to co-invest in future projects,[429] were memorialized in the MSA,[430] and it was understood that the EOA would elaborate on the mechanics necessary to facilitate the exercise of the option.[431]  As Respondents' expert Professor Davidoff Solomon explained, the mere fact that the EOA provided the mechanics necessary to effectuate the equity transfer hardly renders the EOA a contract wholly unrelated to the MSA—in contrast, such a contractual structure is the industry norm.[432]

---

[425]     *See supra* ¶¶ 33-38; *see also* Email from E. Razon to B. Weidner, August 20, 2011 (RE-4) ("We as well want to get this done. I believe the reason that this has not happened yet is that the on [*sic*] items that have been agreed to the draft language keeps coming back inconsistent with the agreement on some items . . . The structure as it stands is a two-part agreement and we are still working on the first part.  We cannot negotiate every possible contingency and there is no perfect agreement.").

[426]     *See* Clause 18.3 of the MSA ("***GGAM is hereby granted the right*** to purchase up to ten percent (10%) ownership in the Facilities and the gaming license by purchasing 10% of the shareholdings of Owners.") (emphasis added).

[427]     *See id.* ("The Parties shall execute a mutually acceptable Option Agreement to embody the share purchase option under this Clause within sixty (60) days (or such extended periods as the parties may mutually agree) from the date of this Agreement.").

[428]     *See id.* ("The purchase price for this 10% interest shall be US$ 15 Million (representing 10% of the value of the license) plus 10% of the equity that the Owners have infused to the Project at the time GGAM exercises its option to purchase the 10% shares.").

[429]     *See id.* ("The Parties shall negotiate in the Option Agreement a provision which will protect the equity invested by GGAM (when it exercises the option to purchase 10% ownership interest referred to under the Option Agreement) after the Agreement is terminated under the terms of the Agreement."); *see also id.* ("In addition, the Parties covenant and agree the Option Agreement shall grant GGAM certain co-investment rights (such rights subject to the mutual agreement of the Parties) in such competing facilities and/or casinos permitted under Clause 18.8, provided that such rights shall be in the same proportion of ownership as provided for in this Clause 18.3 and upon no worse economic terms than those enjoyed by the Owners (or their affiliates or any of their respective officers, directors, partners, or shareholders) in making their investment in such competing facilities and/or casinos.").

[430]     *See* Davidoff Solomon Op. at ¶¶ 34-35.

[431]     *See id.*; *see also e.g.*, EOA, §§ 2.2 (Term of Option), 2.3 (Manner of Exercising Option), 2.5 (Effect of Exercise or Failure to Exercise), 3.1 (Sale and Transfer of Option Shares).

[432]     *See* Davidoff Solomon Opp. ¶ 35 ("Consistent with customary practice, the Option Agreement also included mechanics for the exercise of the option, closing conditions, and representations and warranties . . . . The additional provisions in the Option Agreement and which were not in the MSA were simply mechanical and designed to implement the actual option grant made in the MSA.  These terms were not material to the business bargain of the parties reached in the MSA"); *see also Steiner v. Thexton*, 226 P.3d 359, 365 (Cal. 2010) ("An option based on consideration contemplates two separate [contracts], *i.e.*, the option contract itself, which for something of value gives to the optionee the irrevocable right to buy under specified terms and conditions, and the mutually enforceable agreement to buy and sell into which the option ripens after it is exercised.") (RL-54)

146.     The phrase "GGAM is hereby granted the right to purchase . . ." in Clause 18.3 plainly indicates that the equity option was granted to GGAM in the MSA.[433]  Claimants ensured that they had the right to terminate the MSA if the Parties failed to finalize the documentation for the equity option agreement.[434]  Both Parties' Philippine legal experts agree that, under Philippine law, the option in Clause 18.3 was enforceable against and binding on Bloomberry and Sureste.[435]

147.     An alternative explanation, as noted by the Tribunal,[436] is that Clause 18.3 could be viewed as a condition to Claimants' performance.  In the event that the Parties were unable or failed to execute the Option Agreement within a certain time period, then GGAM had the right to terminate the MSA.[437]  Ultimately, it is a distinction without a difference:  regardless of whether Clause 18.3 is viewed as an enforceable grant or a condition subsequent, Bloomberry and Sureste fulfilled their obligations under the MSA—they caused the Equity Option Agreement to be executed.[438]

---

[433]     *See, e.g.*, Solomon Davidoff Supp. Op. at ¶¶ 6-11 (explaining that "had the parties wanted to grant the option at a later date they would have not used the language "hereby granted" but rather the plain and ordinary language "will grant" or "at [a later date] cause to grant". This was not done.").  Moreover, the MSA contained a clause clarifying that Bloomberry and Sureste had the right and authority to grant the rights to GGAM recited in the MSA.  *See* MSA, Clause 10.1(E) ("Owners have the right and authority to grant the rights to GGAM as recited herein necessary to perform under this Agreement.").

[434]     MSA, Clause 18.3 ("In the event the Parties are unable or fail to execute the Option Agreement within such period, GGAM shall have the right to terminate this Agreement by sending a notice of termination to the Owners within six (6) months from the expiration of such 60 day (or extended) period.").

[435]     *See* Hr'g Tr. at 513:4-24 (Justice Feliciano and Justice Vitug agree that, absent the EOA, the Parties were bound by the MSA); *see also* Philippine Civil Code, art. 1324 ("When the offeror has allowed the offeree a certain period to accept, the offer may be withdrawn at any time before acceptance by communicating such withdrawal, except when the option is founded upon a consideration, as something paid or promised."); *see also* Philippine Civil Code, art. 1479 ("A promise to buy and sell a determinate thing for a price certain is reciprocally demandable.  An accepted unilateral promise to buy or to sell a determine thing for a price certain is binding upon the promissor if the promise is supported by a consideration distinct from the price.").

[436]     *See* Hr'g Tr. at 655:17-656:5 (Hwang) ("Because if it you analyze it as a condition subsequent, then when the condition subsequent has been fulfilled by the execution of the EOA . . . it seems to fade away.  It seems to be of no importance because it has fulfilled its purpose.  And, therefore, from those spectacles, you might think that the EOA then becomes the source of the entitlement to the Shares.").

[437]     MSA, Clause 18.3.

[438]     *See, e.g.*, MSA, Clause 3.9 ("all actions of the CEO (or his authorized representatives) shall be considered as actions of Owners.").

## 2.    Changes in Bloomberry's Corporate Structure Did Not Alter the Overall Deal.

148.    At the time Bloomberry and Sureste, the owners of the Solaire, granted GGAM the option to purchase up to 10% of the ownership interests in the Solaire, these ownership interests were unlisted and wholly owned by Mr. Razon and members of his family.[439]  Prior to signing the MSA, GGAM was notified that Bloomberry's and Sureste's equity funds, which were identified as "deposits for future subscription," were being converted into shares of stock.[440] Bloomberry and Sureste then embarked on a process called a "backdoor listing" in order to facilitate a public listing of the equity in the Solaire while providing immediate access to the Philippine equity markets.[441]  To initiate the backdoor listing, Mr. Razon transferred his shareholdings in Bloomberry and Sureste to a holding company, Prime Metroline, on September 30, 2011.[442]

149.    On November 22, 2011, Prime Metroline, which now owned the equity interests of Bloomberry and Sureste, signed a definitive agreement with the controlling stockholders of Active Alliance Incorporated ("Active Alliance"), a publicly-listed company, pursuant to which Prime Metroline agreed to acquire approximately 75% of the total outstanding shares of Active Alliance from the controlling stockholders.[443]  Prime Metroline formally acquired control of

---

[439]    *See* Respondents' Closing Presentation, Interim Measures Hearing, October 22, 2014 at Slide 60 (organizational chart of BRHI and SPI at the time the MSA was signed); *see also* Hr'g Tr. at 390:7-19 (Festin) (explaining corporate structure of BRHI and SPI at the time the MSA was signed); *see also* G. Festin Decl. at ¶ 6 ("When the Management Services Agreement (MSA) was executed on September 9, 2011, Solaire was owned by Sureste and Bloomberry. Mr. Razon owned Sureste, which, in turn, owned Bloomberry, and it was effectively Mr. Razon, through Sureste and Bloom berry, who granted GGAM the equity option.").

[440]    *See, e.g.*, Email from B. Tan to B. Stone, G. Saunders, B. Weidner, *et al.*, August 3, 2011, attaching Disclosure Letter (RE-70) ("The capitalization of Bloomberry and Sureste are still in the process of being formalized to convert the equity funds currently identified in their books as "Deposit for Future Subscription" into shares of stock.").  Initially, Bloomberry and Sureste's capitalization was insufficient to support the expenses being incurred during the construction of the Solaire.  An application for an increase in the entities' authorized capital stock was pending, but in the interim, Mr. Razon made advances to Bloomberry and Sureste, and the advances were recorded in their books as "deposits for future subscription."

[441]    *See* Festin Decl. at ¶ 7.

[442]    *See* Festin Decl. at ¶ 6.  GGAM had been notified prior to entering into the MSA that Mr. Razon was contemplating such a transfer.  *See supra* note 440 (RE-70).

[443]    *See, e.g.*, Festin Decl. at ¶ 8 ("After our due diligence Mr. Razon approved the acquisition of Active Alliance, Incorporated.  Mr. Razon's Prime Metroline acquired approximately 75% of the total outstanding shares of Active Alliance . . .").

Active Alliance on January 26, 2012.[444]  Shortly thereafter, on February 6, 2012, Active

Alliance's articles of incorporation were amended to, *inter alia*, change its name to Bloomberry

Resorts Corporation ("BRC") and its primary purpose to that of a holding company for a hotel,

gaming, and entertainment business—namely, the Solaire.[445]  On the same day, the newly

renamed BRC acquired all the Sureste shares from Prime Metroline,[446] and thus, Sureste and

Bloomberry became wholly-owned direct and indirect subsidiaries of BRC, for which Prime

Metroline remained the controlling stockholder.[447]  As a result of this backdoor listing, the

ownership interests of Bloomberry and Sureste were now publicly listed.[448]  A provision in the

MSA, however, clarified that a "back-door" listing of Bloomberry, Sureste, or Prime Metroline

would not constitute a "Change of Control" of Bloomberry and Sureste.[449]

150.    The Parties were still negotiating the terms of the EOA during the back-door

listing process, and GGAM was well aware that the corporate structure of BRHI and SPI was

evolving.[450]  As Respondents' expert Professor Davidoff Solomon explained, a "single, complex

business transaction" might be documented in multiple agreements for several reasons:

> The parties may desire that a specific part of the transaction be
> capable of later assignment to another party or an affiliate of one of
> the initial parties . . . Additionally, it may be contemplated that

---

[444]     In accordance with the rules of the SEC and PSE, before formally acquiring Active Alliance, Prime Metroline first had to conduct a mandatory tender offer, which was completed in January 2012.  *See* Section 19 of Republic Act No. 8799 (the "Securities Regulation Code"); *see also* Amended Implementing Rules and Regulations of the Securities Regulation Code, ¶ 2.

[445]     *See, e.g.*, Festin Decl. at ¶ 8 ("Mr. Razon's Prime Metroline acquired approximately 75% of the total outstanding shares of Active Alliance and then changed its name to Bloomberry Resorts Corporation and increased its authorized capital stock to accommodate the infusion of the new investment.  Its primary purpose was amended to that of a holding company for the hotel gaming and entertainment businesses.").  These changes were approved by the SEC on February 27, 2012.  *See, e.g.*, Amended Articles of Incorporation of BRC (RE-71).

[446]     *See* Festin Decl. at ¶ 9.

[447]     *See id.*

[448]     The new BRC shares were listed on the PSE on March 9, 2012.  *See* Festin Decl. at ¶ 9.  The transfer and ownership of publicly traded shares had many benefits to privately held shares.  *See, e.g.*, Email from B. Tan to Paul Hastings, *et. al*, February 15, 2012 (CE-107) (explaining, *inter alia*, the ease and speed in which the title for publicly listed shares can be transferred).

[449]     *See* MSA, Clause 16.1(c) ("An initial public offering (IPO) or a back-door listing of the Owners or of the holding companies which owns or controls the Owners in the Philippine Stock Exchange or in other stock exchanges shall not constitute a trigger of a Chang of Control of Owners where Enrique K. Razon Jr. continues to own or control, directly or indirectly, the Owners following such IPO or back-door listing.").

[450]     *See, e.g.*, *supra* notes 440, 442.

*CONFIDENTIAL*

additional persons would become a party to a specific part of the transaction, but not another part of the transaction, necessitating a different agreement.[451]

151.    On February 14, 2012, GGAM's lawyers at Paul Hastings sent Bloomberry and Sureste a list of open issues regarding the EOA, including a section focused on the back-door listing and the "structure of documents."[452]  GGAM's position was described as follows:

> GGAM and Sureste to discuss ensuring that the agreements provide for what will happen if the back-door listing is not successful or completed as intended by Mr. Razon.  The Equity Option and Purchase Agreement must still provide for GGAM's **right to acquire 10% of the project** and the Shareholder Agreement must address certain rights **in the event that the ultimate company is not a public company**.[453]

152.    Similarly, on March 20, 2012, GGAM's lawyers at Paul Hastings circulated another chart of issues for GGAM, Bloomberry, and Sureste to discuss regarding the EOA.[454]  In this chart, Sureste stated that GGAM could rely on the representations and warranties in the MSA, rather than requiring new representations and warranties in the EOA.[455]

153.    The Parties understood that, notwithstanding the new corporate structure, the equity option had been granted by Bloomberry and Sureste to GGAM as the management services provider under the MSA.  For example, Bloomberry continued to emphasize in contemporaneous documents that the equity option had been granted as an incentive to the management team, the price of the option was determined "as part of GGAM's compensation as manager, not as investor," and that "[s]ince the Option was granted because of the MSA, GGAM

---

[451]    *See* Davidoff Solomon Op. at ¶ 31.

[452]    *See* Email from J. Myers (Paul Hastings) to B. Tan, *et al.*, February 14, 2012 (RE-72) (attaching charts of open issues).

[453]    *See id.* (emphasis added).

[454]    *See* Email from J. Myers (Paul Hastings) to E. Occeña and B. Tan , March 20, 2012 (RE-73) (attaching chart of open issues).

[455]    *See id.*

cannot treat the Option as a stand-alone transaction."[456]  Neither GGAM nor its lawyers disagreed with those statements.[457]

### 3.    Prime Metroline, Acting as Bloomberry's Agent, Entered into the Equity Option Agreement on April 16, 2012.

154.    Bloomberry and Sureste committed under Clause 18.3 of the MSA to grant GGAM the right to purchase "10% of the shareholdings of the Owners"—that is, 10% ownership in the Solaire project and the PAGCOR license.  As noted above, the successful backdoor listing resulted in Bloomberry and Sureste being owned by a listed company, BRC.  Thus, Bloomberry and Sureste offered to GGAM listed shares in BRC, in place of the illiquid, unlisted shares in Bloomberry and Sureste, and GGAM gladly accepted the offer.

155.    Bloomberry and Sureste caused Prime Metroline to be the grantor under the EOA because, Prime Metroline, as the majority shareholder of BRC, was the appropriate entity in Bloomberry's corporate structure to enter into the EOA and sell the Shares to GGAM (if and when GGAM chose to exercise the equity option).[458]  The Parties' contemporaneous negotiations confirm that the identity of the "Grantor" that would be a party to the EOA was a mere formality and did not alter the Parties' relationship or their overall deal.[459]  The EOA and the Participation Agreement repeatedly reference and build from the MSA,[460] making it clear that the EOA was

---

[456]    Email from G. Saunders to E. Occeña, April 5, 2012 (attaching chart prepared by J. Myers (Paul Hastings)) (RE-7); *see supra* S.O.D. ¶¶ 40-42.

[457]    *See id.*

[458]    *See* EOA, §§ 5.5-5.10 (explaining the corporate structure and resulting ownership of the Facilities and the PAGCOR License:  Prime Metroline is the majority Shareholder of Bloomberry Resorts Corporation, which indirectly owns the Facilities and the PAGCOR License through its ownership and control of Sureste, which owns and controls Bloomberry).

[459]    *See, e.g.*, Email from J. Myers (Paul Hastings) to E. Occeña and B. Tan , March 20, 2012 (RE-73) (attaching chart of open issues) (describing Sureste as the "shareholder of the option shares").

[460]    *See, e.g.*, EOA, *id. at* §1.1 (certain defined terms, such as "Facilities," "Phase I Facilities," and "Start Date," all refer to the MSA); *id.* at §2.1 ("As contemplated by Section 18.3 of the MSA, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Grantor hereby grants to Grantee an option to purchase some or all of the Option Shares from Grantor."); *id.* at § 2.6 ("as contemplated by Section 18.8 of the MSA" preface, refers to defined terms within the MSA, and grants GGAM the right to enter into Competing Project Opportunities only "during the validity of the MSA."); *id.* at § 5.9 (" . . . Bloomberry's other assets and properties and to conduct the businesses in which it is now engaged including, without limitation, the ownership of the Casino (as defined in the MSA)."); *id.* at § 8.3 ("In the event [Global Gaming Philippines LLC] designates Investor to exercise the Option, Investor has submitted to [Bloomberry] a guarantee agreement in form and substance acceptable to Grantor under which Investor guarantees the performance by Grantee of its obligations under the MSA. . . .").

*CONFIDENTIAL*

entered into purely to effectuate rights granted to GGAM by Bloomberry and Sureste in the MSA:

> Whereas, Sureste and Bloomberry, as Owners, have agreed under the Management Services Agreement, dated September 9, 2011 and entered into by and among the **Sureste, Bloomberry and [Global Gaming Philippines LLC] to grant or cause to be granted to [Global Gaming Philippines LLC] an option to purchase the Option Shares**, which option shall be exercisable solely in accordance with and pursuant to the terms and conditions set forth herein.[461]

156.    As the Grantor, Prime Metroline acted on behalf of, and as agent for, Bloomberry and Sureste to comply with their enforceable obligation under the MSA to grant GGAM the right to purchase up to 10% ownership rights in the Solaire.  Under Philippine law, agency may be implied from the words and conduct of the parties, as well as the circumstances of a particular case.[462]  Although there was not a separate written agreement between Bloomberry, Sureste and Prime Metroline,[463] the Parties' actions make clear that Prime Metroline was acting as the agent of Bloomberry and Sureste.  The EOA plainly states that it was entered into because of Clause 18.3 of the MSA (even though Prime Metroline was not a party to the MSA).[464]  The EOA then goes on to imply that the agreement was being entered to satisfy the obligations of Bloomberry and Sureste, which had granted the equity option in the MSA and were causing Prime Metroline

---

[461]    *See* EOA, Recitals (Claimants' Ex. 3).

[462]    Philippine Civil Code, art. 1869 ("Agency may be express, or implied from the acts of the principal, from his silence or lack of action, or his failure to repudiate the agency, knowing that another person is acting on his behalf without authority."); *see also Equitable PCI-Bank v. Ku* (G.R. No. 142950), March 26, 2001 (RL-51) (explaining that agency may be implied from the acts of the principal, and "acceptance by the agent may be implied from his acts which carry out the agency"); *see also Johnlo Trading Co. v. Flores* (G.R. No. L-3987) May 18, 1951 (RL-45) (communications between agent and plaintiff during the parties' negotiations led plaintiff to believe that the agent acted as the representative of the defendant company).

[463]    The quasi-principal and agent relationship between Bloomberry, Sureste, and Prime Metroline is most accurately described as an innominate contract closely akin to an agency relationship.  *See, e.g.*, Philippine Civil Code, art. 1307 ("Innominate contracts shall be regulated by the stipulations of the parties, by the provisions of Titles I and II of this Book, by the rules governing the most analogous nominate contracts, and by the customs of the place.").  The fact that it is not a strict agency relationship does not detract from its validity under Philippine law.  *See, e.g.*, Philippine Civil Code, art. 1306 ("The contracting parties may establish such stipulations, clauses, terms and conditions as they may deem convenient, provided they are not contrary to law, morals, good customs, public order, or public policy.").

[464]    *See, e.g.*, EOA, §§ 2.1 ("As contemplated by Section 18.3 of the MSA, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Grantor hereby grants to Grantee an option to purchase some or all of the Option Shares from Grantor . . ."), 2.6 ("[A]s contemplated by Section 18.8 of the MSA . . .").

*CONFIDENTIAL*

to act as their agent in the equity transaction.[465]  GGAM was well aware of the relationship between Bloomberry, Sureste, and Prime Metroline.  For example, even when GGAM chose to exercise the equity option, it could not effectively close the transaction until the boards of directors for Bloomberry and Sureste had approved the sale.[466]

157.    The common ownership and interrelatedness of corporations may "give rise to a valid inference as to the broad scope of agency." [467]  In the corporate context, it is not unusual to see situations where an affiliate will facilitate performance of another affiliate's obligation, particularly when the affiliates are owned and controlled by the same corporate parent.  Courts recognize the possibility that a parent corporation may act as the agent of its subsidiary.[468]  For example, when a parent company acts as an agent for its subsidiary for a particular purpose, the parent has necessarily acquiesced to the subsidiary's control, albeit only for the particular purpose.[469]

158.    The MSA, the EOA, and the Participation Agreement should be regarded as components of one overall deal.[470]  Here, Bloomberry, Sureste, BRC, Prime Metroline and

---

[465]    *See* EOA, Recitals (Claimants' Ex. 3) ("Whereas, Sureste and Bloomberry, as Owners, have agreed under the Management Services Agreement, dated September 9, 2011 and entered into by and among the Sureste, Bloomberry and [Global Gaming Philippines LLC] to grant or ***cause to be granted to [Global Gaming Philippines LLC] an option to purchase the Option Shares***, which option shall be exercisable solely in accordance with and pursuant to the terms and conditions set forth herein") (emphasis added).

[466]    EOA, § 4.2(c) ("At the Closing, Grantor shall deliver (iii) a certificate executed by the corporate secretary of Sureste confirming the adoption of a resolution by the board of directors of Sureste; and (iv) a certificate executed by the corporate secretary of Bloomberry confirming the adoption of a resolution by the board of directors of Bloomberry, in each case authorizing the Transactions and the due execution, delivery and performance of the Closing documents contemplated hereby by the applicable signatories.").

[467]    *See, e.g.*, *Palmieri v. Estefan*, 793 F. Supp. 1182, 1193 (S.D.N.Y. 1992) (discussing agency principles in the context of jurisdiction) (RL-48).

[468]    *See, e.g.*, *United States v. Watchmakers of Switz. Inform. Ctr, Inc.*, 133 F. Supp. 40, reh'g denied, 134 F. Supp. 710 (S.D.N.Y. 1955) (agency in the context of jurisdiction) (RL-46), *see also Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co., et al.*, 1977 U.S. Dist. LEXIS 17851 (S.D.N.Y. 1977) ("Though hardly commonplace, it would appear that a parent corporation has the capacity to act as an agent for its subsidiary, and likewise, an agency relationship can develop between affiliated companies.") (RL-47).

[469]    *See, e.g.*, P. Chestek, "Control of Trademarks by the Intellectual Property Holding Company, " 41 J.L. & TECH. 1 (2001), *available at* http://ipmall.info/hosted_resources/IDEA/1.Chestek01.pdf ("In limited situations, courts recognized that a subsidiary can control the behavior of its parent for a specific purpose.  One occasion is based on the subsidiary's leverage over a parent, while a second is where the parent is the acknowledged agent of the subsidiary."); *see also id.* ("a parent voluntarily acquiesces to restrictions set by the subsidiary, to the benefit of the corporate entity as a whole.").

[470]    *See, e.g.*, *Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142 (2001) (finding that four agreements, executed between different parties, were "part of a single transaction to accomplish an agreed purpose"—that is, to

*CONFIDENTIAL*

GGAM all were aware of the three contracts (the MSA, the EOA and the Participation Agreement) and executed them as part of a single transaction to accomplish an agreed purpose—that is, to effect GGAM's agreement to provide management services for the Solaire, in which GGAM would be permitted to purchase ownership interests.  Bloomberry and Sureste would have been in breach of their obligations under Clause 18.3 of the MSA if their agent, Prime Metroline, failed to comply with its obligations under the EOA.  Similarly, GGAM cannot deny that it deemed Bloomberry's and Sureste's obligation under Clause 18.3 of the MSA as having been fulfilled by the execution of the EOA.  GGAM was not prejudiced in any way by the fact that Prime Metroline, and not Bloomberry or Sureste, was the entity in the Bloomberry corporate family that signed the EOA:  GGAM was entitled to purchase the Shares and did, in fact, purchase the Shares.  The Parties' actions are indicative of an agency relationship between Prime Metroline, as agent, and Bloomberry and Sureste, as principals—a relationship which has been recognized by all parties to the controversy, including GGAM.

159.    GGAM should not now be permitted to obscure the substance and economics of the Parties' deal through formalism.  The EOA, and subsequent sale of the Shares to GGAM, was, "as a matter of obvious reality" directed and controlled by Bloomberry and Sureste.[471]  For example, a prerequisite to the option closing was delivery of certificates executed by both Sureste and Bloomberry confirming that their respective boards of directors had authorized GGAM's execution of the option.[472]  Thus, a stark, binary approach to the MSA and the EOA has no basis in the contracts and their negotiation history.  The Shares ultimately sold to GGAM by Prime Metroline should be understood for what they represent—substantial ownership

---

effect one party's (Dr. Peyton's) purchase of stock in another party (Countryside) and to structure the employment relationship between the three parties.) (RL-50).

[471]    *See, e.g., Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342 (Del. Ch. 2004) (deciding to treat the assets of an indirect, wholly-owned subsidiary as the assets of the parent company) (RL-53).  In *Hollinger*, for example, the parent company entered into an agreement to sell the assets of its indirect, wholly-owned subsidiary.  The court decided to treat the subsidiary's assets as the assets of the parent company, because "as a matter of obvious reality," the sale process was directed and controlled by the parent company.  In reaching this conclusion, the court noted that the subsidiary did not engage independent financial or legal advisors, and all of the directors of the subsidiary were officers of the parent company.  In addition, the terms of the relevant contract evidenced the fact that the parent company directed the sale process.  The parent company's legal advisors negotiated the terms of the contract, pursuant to which the parent company agreed to cause the subsidiary to perform its obligations under the contract.  Based on these facts, the court reasoned that, although the law recognizes the separate existence of corporate entities, it does not necessarily mean that the law should recognize their separate existence for all purposes.

[472]    *See supra* note 466.

interests in the Solaire Resort & Casino, the resort Bloomberry and Sureste own and that GGAM was hired to manage.[473]  Therefore, for the purposes of evaluating Bloomberry's and Sureste's counterclaims against GGAM, this Tribunal must consider the economics of the deal and the inter-related nature of the corporate entities.

### B.    GGAM's Promise to Perform as the Management Services Provider for the Solaire Was the Consideration for the Equity Option Grant.

160.    The equity option was enforceable because it was supported by consideration separate and distinct from the strike price for the option shares.[474]  The change in Respondents' corporate structure did not alter the reality of the Parties' bargain—GGAM was given the equity option in exchange for its agreement to perform management services for the Solaire.[475]  The EOA references the consideration that Bloomberry and Sureste received in exchange for the equity option grant.  Section 2.1 of the EOA reads:

> As contemplated by Section 18.3 of the MSA, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Grantor hereby grants to Grantee an option (the "Option") to purchase some or all of the Option Shares from Grantor, subject to and upon the terms and conditions set forth in this Agreement.

Notably, even if GGAM designated another entity to exercise the equity option,[476] that entity was required to guarantee GGAM's performance of its obligations under the MSA[477]—because those obligations were the consideration for the EOA.

---

[473]    *See, e.g.*, EOA, §§ 5.6-5.8 (representations and warranties regarding Sureste and the ownership and possession of its Shares), 5.9-5.10 (representations and warranties regarding Bloomberry and the ownership and possession of its Shares, including the representation that "[n]one of BRC, Sureste, Grantor or any Affiliate has granted any other Person an option to purchase or a right of first refusal or offer with respect to any Shares, or shares in Bloomberry").

[474]    Philippine Civil Code, art. 1324.

[475]    *See supra* ¶¶ 27-45.

[476]    Such designation could be made only to an entity fulfilling the specific requirements laid out in the EOA. *See* EOA, § 8.3(a) and definition of "Investor."

[477]    EOA, § 8.3(a) ("In the event Grantee designates Investor to exercise the Option, Investor has submitted to Grantor a guarantee agreement in form and substance acceptable to Grantor under which Investor guarantees the performance by Grantee of its obligations under the MSA [ ]; provided, however, the parties acknowledge and agree that Investor's liability under such Investor Guarantee shall be expressly limited to the value of the common shares of BRC held by Investor.").

161.    Pursuant to the classic definition of consideration, the "reason, motive, or inducement, by which a man is moved to bind himself to an agreement," a contract can be terminated if the consideration is not paid.[478]  Under Philippine law, an option grant must have consideration separate and distinct from the consideration for the price of fulfilling the option.[479]

162.    GGAM has not shown and cannot show that the equity option was granted to GGAM independent of its role as management services provider under the MSA.  GGAM also has not pointed to any contemporaneous document of its own, or of its lawyers, describing the equity option as unrelated to the MSA.[480]  GGAM has never put forward any evidence that it separately negotiated with Prime Metroline for the equity option,[481] and GGAM has failed to present any economically plausible explanation as to what consideration it gave Prime Metroline (separate from Bloomberry and Sureste) for the equity option, the exercise of which enriched GGAM by more than US$ 200 million.[482]  The absence of separate consideration from GGAM,

---

[478]    *See* Arturo M. Tolentino, 4 COMMENTARIES AND JURISPRUDENCE ON THE CIVIL CODE OF THE PHILIPPINES (1986) at 534 (RL-31); *see also* Philippine Republic Act No. 386, art. 1324 (RL-1) ("When the offeror has allowed the offeree a certain period to accept, the offer may be withdrawn at any time before acceptance by communicating such withdrawal, except when the option is founded upon a consideration, as something paid or promised").

[479]    Philippine Civil Code, art. 1479 (RL-1) ("A promise to buy and sell a determinate thing for a price certain is reciprocally demandable.  An accepted unilateral promise to buy or to sell a determinate thing for a price certain is binding upon the promissor if the promise is supported by a consideration distinct from the price."); *see also Tuazon v. Del Rosario-Suarez*, G.R. No. 168325, December 8, 2010 (RL-24) ("There is no question that under Article 1479 of the new Civil Code "an option to sell," or "a promise to buy or to sell," as used in said article, to be valid must be "supported by a consideration distinct from the price"; *see also Diamante v. Court of Appeals*, G.R. No. L-51824, February 7, 1992 (RL-16) ("The contract of option is a separate and distinct contract from the contract which the parties may enter into upon the consummation of the option, and a consideration for an optional contract is just as important as the consideration for any other kind of contract.  ***Thus, a distinction should be drawn between the consideration for the option to repurchase, and the consideration for the contract of repurchase itself.***") (emphasis added).

[480]    For example, GGAM's position that it was granted the equity option in exchange for an arrangement other than the MSA is untenable.  *See, e.g.,* Claimants' Reply at ¶ 28 (describing the consideration for the equity option as "GGAM's agreement to enter into a partnership with Mr. Razon's business, both in the Solaire Project and elsewhere.").  Neither the EOA nor the Participation Agreement reference any agreement other than the MSA.  Moreover, GGAM retained the right to terminate the ***MSA*** due to the occurrence of a material breach of the ***EOA***.  *See* MSA, Clause 15.2(f) ("GGAM may at any time . . . give prior notice of intention to terminate the Services, in whole or in part if any of the following have occurred . . . (f) a material breach under the Option Agreement.").

[481]    *See, e.g.*, Claimants' Request for Interim Measures at ¶ 157 ("the Strike Price was subject to increase as Prime Metroline's (or, more accurately, Mr. Razon's) equity contribution increased").

[482]    Contrary to logic, GGAM alleges that its promise to pay the strike price was consideration for the equity option.  *See* Claimants' Request ¶ 151 ("GGAM's promises set forth in the EOA . . . and the performance of which, (*i.e.,* payment of the approximately US$37 million Strike Price) Bloomberry received at GGAM's exercise of its Option, were the only consideration for the Option and Shares.").  In reality, the payment of US$ 37 million was consideration for the Shares themselves, ***not*** the option to purchase the shares.  GGAM's inconsistent arguments with respect to consideration make their positions all the more unconvincing.  *Compare* Claimants' Request ¶ 151

other than GGAM's promise to perform as the management services provider for the Solaire, means that the EOA does not have an identity independent of the MSA.[483]

---

*with* Claimants' Reply ¶ 28 (describing the consideration for the equity option as "GGAM's agreement to enter into a partnership with Mr. Razon's business, both in the Solaire Project and elsewhere").

[483]     *See, e.g.*, Davidoff Solomon Op. at ¶ 34 (describing the MSA as the main agreement and primary transaction document); *see also* J. Vitug Op. at  ¶¶ 22-26 (describing MSA, EOA and Participation Agreement as inter-related contracts that must be construed together); *see also  Pieco, Inc. v. Atlantic Computer Sys. (In re Atlantic Computer Sys.)*, 173 b.R. 844 (S.D.N.Y. 1994) (finding no economically plausible consideration flowing to defendant that may be found (i) solely within the confines of related leases and (ii) without reference to the other instruments of the transaction) (RL-49).

C.    **GGAM's Misrepresentations and Breaches of Its Promise to Perform as the Management Services Provider for the Solaire Constitute a Failure to Provide Consideration for the Equity Option.**

163.    As explained in detail in the Statement of Defense, Bloomberry granted GGAM the option to purchase shares under Section 18.3 of the MSA at a pre-agreed price lower than its market value[484] in consideration of, and as incentive for, GGAM to enter into and perform its services under the MSA, and so that the interests of GGAM will be aligned with that of an owner.    GGAM persuaded Bloomberry to enter into the MSA and to grant it the right to purchase the Shares based on GGAM's promises that Messrs. Weidner and Stone could deliver foreign VIPs, share their Guest Data, and work with Bloomberry's staff to develop operating policies, systems, and procedures that would catapult the Solaire into the league of the Las Vegas Sands.[485]

164.    Yet GGAM's failed performance did not live up to the proffered expertise of its principals in managing integrated resorts.    GGAM did not fulfill its obligations as a "partner," and failed to deliver a business plan, a marketing plan, or operating policies and procedures.[486] For example, with respect to the foreign VIPs, GGAM ultimately admitted that it did not have the data or information for VIPs, and that Messrs. Weidner and Stone anticipated that such critical information would have to be developed by Bloomberry.[487]    GGAM's performance—or lack thereof—under the MSA demonstrated that GGAM had fundamentally misrepresented its capabilities as a management company.[488]

---

[484]    The Parties agreed in the EOA that the strike price for the shares would be Php 1.67 per share.  In comparison, the price that investors were initially willing to pay for Bloomberry's shares in the top-up offering was Php 7.50 per share—an increase of **449%**.  *See* January 17, 2014 Philippine Court Petition at 4.04 (RE-10) ("Respondent GGAM got the Shares at Php 1.67 per share which is way below the market price of the Shares, which at that time was about Php 13.00 per share.").  At the time that GGAM executed the option, the shares were trading around Php 13.00 per share

[485]    *See* Email from E. Razon to W. Weidner, B. Stone, G. Saunders, July 12, 2013 (Claimants' Ex. 94); Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81).

[486]    *See* Email from E. Occeña to B. Stone, April 23, 2013, re: Marketing Strategy (RE-54); Bloomberry's July 12, 2013 Notice of Intent to Terminate (Claimants' Ex. 81).

[487]    *Compare* MSA, Clause 6 (Claimants' Ex. 1) ("The Guest Data of GGAM shall remain to be its property") *with* Letter from W. Weidner to E. Razon, August 19, 2013 (Claimants' Ex. 25) ("there was no GGAM Guest Data at the opening of the Solaire").

[488]    *See supra* Section IV.

165.    Moreover, as the Parties' relationship unfolded, Bloomberry realized that GGAM's principals were not operating as managers and their focus was not on the Solaire.[489] Bloomberry saw repeatedly that the Solaire Project was not receiving the time and attention needed from GGAM's principals.  Rather, once GGAM had its equity interests in the Solaire in hand, it turned its time and attention to the next investment opportunity and engaged in unilateral advantage-seeking,[490] as opposed to devoting its promised effort and focus on the Solaire and the aggregate value of the business.  Now, finally, in this Arbitration, Bloomberry is seeing GGAM for what it actually is (but never disclosed itself to be)—a vehicle to find and secure new investment opportunities for the deployment of Cantor Fitzgerald's capital.  Such an investment vehicle is not what Bloomberry was seeking—nor what GGAM represented itself to be—when it contracted with GGAM.

### D.    Several Legal Theories Allow Bloomberry and Sureste to Claim Against the Shares.

#### 1.    Bloomberry and Sureste Have a Claim for the Value of the Shares as Damages

166.    In its Interim Order, the Tribunal acknowledged that Bloomberry and Sureste may have contractual rights with respect to the Shares that Bloomberry and Sureste may need to protect if the Shares are sold by GGAM.[491]  Bloomberry and Sureste—as the Parties to the MSA, the quasi-principals in this overall agency relationship, and the real parties in interest as owners of the Solaire—initially gave GGAM a right to own a proportion of the Solaire in consideration for GGAM's performance under the MSA.  Prime Metroline performed a ministerial role in

---

[489]    *See,* E. Razon Decl. at ¶¶ 34, 36-37; Respondents' Statement of Defense and Counterclaims at ¶¶ 46-47.

[490]    *See, e.g.,* Hr'g Tr. at 93:6-10 (Profaizer) ("And the answer is, what Mr. Weidner does is, he obtains investments, right? Just like we've all seen in other contexts. That's what Mr. Weidner and GGAM do. They obtain investments from investors."); *see, e.g.,* Email from E. Razon to G. Saunders, B. Stone and W. Weidner, April 12, 2012 (RE-8) ("Your timing on this ultimatum is obviously blackmail. To preserve my reputation in the financial and business community we can concede major points to get the deal done . . .");

[491]    *See* Interim Measures Order at ¶ 136 ("[T]he Respondents have not sufficiently persuaded the Tribunal that they (as opposed to their related companies) have any proprietary (as opposed to contractual) rights to protect.").

transferring the Shares to GGAM, but Bloomberry and Sureste are the Parties who have been harmed by GGAM's violation of its obligations under the MSA.[492]

167.    GGAM's  failure to fulfill its obligations and representations has resulted in a failure of consideration, thereby entitling Bloomberry and Sureste to recover the value of the benefit conferred—that is, the value of the Shares.[493]  The Parties had envisioned that if GGAM failed to perform its obligations under the MSA, the liability for such performance could be equivalent to the value of the Shares.[494]

168.    Moreover, while it was Bloomberry and Sureste which had the contractual obligation under Clause 18.3 of the MSA to grant GGAM the Shares, it was Prime Metroline which, on behalf of Bloomberry and Sureste, parted with and delivered the Shares to GGAM. That is, Prime Metroline paid Bloomberry and Sureste's debt.  Under Philippine law, Prime Metroline can demand payment for the value of the Shares from Bloomberry and Sureste. Article 1236 of the Civil Code provides that "whoever pays for another may demand from the debtor what he has paid . . ."[495]  Thus, Bloomberry and Sureste have rights to claim for the value of the Shares to account for future liability if the Shares are sold.

---

[492]    For example, Bloomberry and Sureste could have offered an option to purchase approximately 10% of the ownership interests in the Solaire to another management company.

[493]    The value of the Shares inherently includes Bloomberry's contributions.  For example, the strike price for the option was calculated using a formula involving a multiple of a percentage of "Grantor's Equity Contribution" to the Solaire Project.  "Grantor's Equity Contribution" represents the aggregate amount of equity that the Grantor ***and its Affiliates*** infused to the Facilities.  *See* EOA, §§ 3.2 ("as the Closing of the Option, Investor shall pay . . . the sum of (a) the Applicable Percentage multiplied by US \$150 million plus (b) the Applicable Percentage multiplied by Grantor's Equity Contribution.); 5.11 ("Grantor's Equity Contribution represents the aggregate amount of equity that the Grantor and its Affiliates have infused to the Facilities.").

[494]    *See, e.g.*, EOA, § 8.3(a) ("In the event Grantee designates Investor to exercise the Option, Investor has submitted to Grantor a guarantee agreement in form and substance acceptable to Grantor under which Investor guarantees the performance by Grantee of its obligations under the MSA [ ]; provided, however, the parties acknowledge and agree that Investor's ***liability under such Investor Guarantee shall be expressly limited to the value of the common shares of BRC held by Investor***.") (emphasis added).

[495]    Philippine Civil Code, art. 1236 ("The creditor is not bound to accept payment or performance by a third person who has no interest in the fulfillment of the obligation, unless there is a stipulation to the contrary.  Whoever pays for another may demand from the debtor what he has paid, except that if he paid without the knowledge or against the will of the debtor, he can recover only insofar as the payment has been beneficial to the debtor."); *see also Maxwell Heavy Equipment Corp. v. Yu* (G.R. No. 179395, Dec. 15, 2010) (finding that, pursuant to Article 1236 of the Civil code, the defendant, who was "indisputably benefited" by the plaintiff's payment in full of defendant's loan obligation to a third-party, must reimburse the plaintiff the same amount of money) (RL-55); *see also Dominion Ins. Corp. v. Guevarra* (G.R. No. 129919, Feb. 6, 2012) ("to the extent that the obligation of the petitioner has been extinguished, respondent may demand for reimbursement from his principal.  To rule otherwise would result in unjust enrichment of petitioner.") (RL-52).

2.    **Bloomberry and Sureste Are Entitled to Resolution of the MSA and Restitution of the Shares, or the Value of the Shares.**

169.    Bloomberry is entitled to rescind (or "resolve") the MSA, including the equity option grant therein.  A principal, including a quasi-principal, can maintain an action on a written contract made by the principal's agent in the agent's own name.[496]  Bloomberry and Sureste caused Prime Metroline, as their agent, to enter into the EOA and sell GGAM the Shares.  As explained above, the EOA is not an independent unrelated contract; rather, it grew out of Clause 18.3 of the MSA and the obligations of Bloomberry and Sureste.  Consequently, in the face of GGAM's substantial and material breach of its obligations, as well as its failure to provide the consideration promised in exchange for the right to purchase the Shares, Bloomberry and Sureste have standing to maintain actions to remedy GGAM's breach.[497]

170.    Pursuant to Article 1191 of the Philippine Civil Code and Philippine jurisprudence, and in compliance with the necessary notice requirements,[498] Bloomberry asserts its claim for resolution of the MSA, including the equity option therein, and restitution of the Shares purchased under that option.[499]  Bloomberry has rights to the Shares under Article 1191

---

[496]    *See, e.g.*, *Ford v. Williams*, 62 U.S. 287 (1858) (RL-44); *see also Katzenmoyer v. Tr'bl Marketing, Ltd.*, 2012 U.S. Dist. LEXIS 139011 (S.D. Ohio Sept. 27, 2012) ("it is generally held that an undisclosed principal is a party to, and may bring suit to enforce, contracts entered into by its agents.") (listing cases) (RL-56).

[497]    Additionally, under Philippine law, an exception to the privity doctrine exists in which

> parties who have not taken part in a contract may show that they have a real interest affected by its performance or annulment.  In other words, those who are not principally or subsidiarily obligated in a contract, in which they had no intervention, may show their detriment that could result from it.

*See Oco v. Limbaring*, G.R. No. 161298, 31 January 2006.

[498]    *See* J. Vitug Op. ¶¶ 50-53 ("Philippine law does not require any specific formality as to a claim or notice of a claim for rescission.  All that is required is that said claim or notice of rescission be made known to the other party. . . . Such notice requirement may be deemed complied with given that in the Notice of Termination of the MSA, BRHI and SPI stated that the termination of the MSA also terminated the Participation Agreement involving shares in BRC and in their Response to the Notice of Arbitration, BRHI and SPI also made a reservation to raise as a counterclaim against GGAM the return of the shares in BRC."); *see also* J. Vitug Supp. Op. ¶¶ 28-30; Claimants' Reply ¶ 91.

[499]    *See, e.g.*, Response to Notice of Arbitration, October 12, 2013 (Claimants' Ex. 24); *see also supra* note 412.

of the Philippine Civil Code, which permits resolution when a party—here, GGAM—fails to fulfill its contractual obligations.[500]

171.    Article 1191 of the Philippine Civil Code provides that

> The power to rescind obligations is implied in reciprocal ones, in case one of the obligors should not comply with what is incumbent upon him. The injured party may choose between the fulfillment and the rescission of the obligation, with the payment of damages in either case. He may also seek rescission, even after he has chosen fulfillment, if the latter should become impossible. The court shall decree the rescission claimed, unless there be just cause authorizing the fixing of a period.[501]

172.    In order to justify resolution, the breach must be substantial enough to defeat the parties' purpose in entering into the agreement.[502]  Whether a breach shall be considered "substantial" depends on the attendant circumstances of the case.[503]  As explained above, GGAM was hired on the basis of certain representations with respect to its "collective 100 years of experience" managing integrated resorts and its "hands-on" management style.[504]  GGAM's failure to manage the Solaire demonstrated that GGAM had fundamentally misrepresented its capabilities as a management company, concealed its true purpose as an investment vehicle, and misled Bloomberry in order to gain a monetary advantage.  GGAM's breaches and misrepresentations go directly to the fundamental nature of the Parties' agreement, and[505] thus, Bloomberry and Sureste may seek resolution of the MSA, including the equity option contained therein.[506]

173.    Under the Philippines' legal system, parties can insert a special clause allowing one party to rescind the contract if the other party does not comply with his contractual

---

[500]    Philippine Civil Code, art. 1191 (RL-1); *see* J. Vitug Op. at ¶¶ 32-33 (explaining that the term resolution is appropriate to understanding article 1191); *see also* J. Feliciano Op. at ¶ 17 (same).

[501]    Philippine Civil Code, art. 1191 (RL-1).

[502]    *See* J. Vitug Op. ¶¶ 30-31 (citing *Universal Food Corporation v. Court of Appeals*, G.R. No. L-29155, May 13, 1970  and *Casiño, Jr. v. Court of* Appeals, G.R. No. 133803, September 16, 2005; *see also* J. Feliciano Op. ¶ 24.

[503]    *See* J. Vitug Op. ¶ 31; *see also* J. Feliciano Op. ¶ 24.

[504]    *See supra* ¶¶ 23-26.

[505]    *See supra* Section II.B-C.

[506]    *See* J. Vitug Op. ¶ 54.

obligations.[507]   This is called a "resolution clause" or "clause résultoire."  The justification of a *clause résultoire* finds its origins in Article 1159 of the Philippine Civil Code, which affirms that a contract "has the effect of law" between the parties.[508]

174.    Here, the MSA provides for an express contractual remedy of termination.[509]  As such, termination of the MSA did not need to undergo judicial intervention—both Bloomberry and GGAM had the right to unilaterally terminate the contract under certain circumstances.[510]  Regardless of the inclusion of a termination clause, the Parties' rights to resolution, pursuant to Article 1191 of the Philippine Civil Code, still exists.[511]  Nothing in the contract displaces general principles of contract law under the Philippine Civil Code.[512]  The Parties have a distinct right to the remedies of resolution and restitution, which they can now seek from the arbitrators, notwithstanding the existence of the termination clause.[513]  The general principles of contract law under the Philippine Civil Code require this to be the case.

175.    To determine whether a party is seeking the remedy of resolution or termination, a tribunal should look to the party's intent.[514]  Philippine law does not require any specific

---

[507]    *See, e.g.*, *Goldloop Properties, Inc. v. Gov't Serv. Ins. Sys.*, G.R. No. 171076,  Aug. 1, 2012 at 98 (RL-17) (holding that "parties may validly stipulate the unilateral rescission of a contract").

[508]    Philippine Civil Code, art. 1159 (RL-1) ("Obligations arising from contracts have the force of law between the contracting parties and should be complied with in good faith.").

[509]    MSA, Clause 15, Termination (Claimants Ex. 1).

[510]    *See, e.g.*, *Pryce v. PAGCOR*, G.R. No. 157480, May 6, 2005 (RL-21) ("termination of a contract need not undergo judicial intervention").

[511]    *See* J. Vitug Op. ¶ 40 ("The invocation of termination provision in a contract as was done by BRHI and SPI in their Notice of Termination of the MSA is not inconsistent with the remedy of rescission under Article 1191.").

[512]    *See, e.g.*, MSA, Clause 15.5(a) (Claimants' Ex. 1) ("Termination of this Agreement howsoever arising shall be without prejudice to the rights and remedies of either Party in relation to any negligence, omission or default of the other prior to such termination."); *see also Goldloop* at 98-99 (RL-17). The fact that Bloomberry and GGAM did not include a clause in the MSA permitting express resolution of the contract is of no moment and certainly does not mean that the Parties forsook their right to seek the remedy of resolution.

[513]    *See* J. Vitug Op. ¶ 41 ("it is evident that to send a notice of termination does not necessarily preclude the remedy of rescission as rescission is actually one of the modes by which an obligation is terminated or extinguished under the Civil Code."). Similarly, it was necessary to include a "put right" in Clause 5.4 of the Participation Agreement, because no such provision exists under the Philippine Civil Code.  In contrast, Bloomberry's right of resolution is protected under the Philippine Civil Code.

[514]    *See, e.g.*, J. Vitug Op. ¶ 47 ("In determining whether or not BRHI and SPI retained the right to rescind the agreement which is provided to them by law, the Tribunal must look to the intent and contemporaneous acts of BRHI and SPI when it sent the Notice of Termination of the MSA."); *see also Pryce v. PAGCOR*, G.R. No. 147480, May 6, 20015 (RL-21).

formality in providing notice of a claim for resolution.[515]  Here, Bloomberry's September 12, 2013 Notice of Termination, which included a sentence regarding the cancellation of the Participation Agreement, was adequate to put GGAM on notice that Bloomberry was terminating the MSA[516] and would be seeking resolution of the MSA and Participation Agreement, as well as restitution of the Shares.[517]  Moreover, Bloomberry reserved its right to counterclaim for resolution of the MSA and restitution of the Shares in its Response to the Notice of Arbitration.[518]

176.    Case law has consistently held that resolution abrogates a contract from the beginning and restores the parties to their relative positions before the contract was entered into.[519]  Thus, when resolution is granted, mutual restitution is required, as far as practicable.[520]  Therefore, if this Tribunal determines that Bloomberry has a right to resolution of the MSA, the Shares and the strike price of US$ 37 million may be recovered in order for the Parties to return, as far as practicable, to their original positions before the contract was made.[521]

177.    Philippine law does not prevent the Shares from being returned directly to Bloomberry and Sureste.  All of the corporate entities involved—Bloomberry, Sureste, and Prime Metroline—are wholly owned and controlled by the same principal, Mr. Razon.  The Shares ultimately sold to GGAM by Prime Metroline should be understood for what they represent—substantial ownership interests in the Solaire Resort & Casino, the resort Bloomberry

---

[515]    *See* J. Vitug Op. at ¶¶ 50-52.

[516]    *See* Notice of Termination of the MSA, September 12, 2013 (Claimants' Ex. 23) ("we hereby affirm the termination of the MSA with GGAM because of material breach of the MSA under Clause 15.1(a) of the MSA").

[517]    *See* Notice of Termination of the MSA, September 12, 2013 (Claimants' Ex. 23) ("By this termination of the MSA for cause, the Participation Agreement with GGAM relating to the shares in Bloomberry Resorts Corporation is also terminated."); *see also* J. Vitug Op. at ¶¶ 47, 53; Email from E. Occeña to W. Weidner, *et al.*, September 9, 2013 (RE-23).

[518]    *See* Response to Notice of Arbitration, October 12, 2013 at §8.1 (f) (Claimants' Ex. 24) ("The Respondents seek the following relief . . . such further or alternative relief to which the Respondents are entitled to in accordance with the MSA and Philippine law as the Tribunal deems fit."); *see id.* at § 9.2 ("For the avoidance of doubt and in accordance with the UNCITRAL Rules, the Respondents reserve the right to include any plea as to the arbitral tribunal's jurisdiction, assert additional defences and counterclaims and/or seek further or alternative relief as appropriate, in their Statement of Defence.")

[519]    *See* J. Vitug Op. ¶ 54 (citing *Gracepark Engineering Co., Inc. vs. Dimaporo*, G.R. No. L-27482, September 20, 1981); *Huibonhoa vs. Court of Appeals*, G.R. No. 95897, December 14, 1999) .

[520]    *See* J. Vitug Op. ¶¶ 54-57.

[521]    *See* J. Vitug Op. ¶ 54.

*CONFIDENTIAL*

and Sureste own and that GGAM was hired to manage. Returning the Shares to Bloomberry and Sureste achieves the same result as returning the Shares to Prime Metroline, and Prime Metroline would not suffer any prejudice from this scenario. Alternatively, as recognized by the Tribunal, a contractual measures of damages, albeit a less complete way of addressing the harm of GGAM's misrepresentation and substantial breach, is available to Bloomberry and Sureste.[522]

### 3. Bloomberry and Sureste Have a Claim to Annul the MSA, Including the Equity Option Granted Therein, Due to GGAM's Causal Fraud.

178.    Pursuant to the Philippine Civil Code, Bloomberry and Sureste also are entitled to annul the MSA and seek restitution of the Shares as a result of GGAM's causal fraud. The action for the annulment of a contract may be instituted by all who are thereby obliged principally or subsidiarily.[523]  Under Clause 18.3, Bloomberry had the principal obligation to grant GGAM the equity option.[524]  Even if Clause 18.3 were interpreted to be a condition, Bloomberry had a subsidiary obligation to ensure, for example, that the Option Agreement, once entered into, was not breached.[525]

179.    Articles 1338 and 1390 of the Civil Code respectively provide:

> There is fraud when, through insidious words or machinations of one of the contracting parties, the other is induced to enter into a contract which, without them, he would not have agreed to.[526]

> The following contracts are voidable or annullable, even though there may have been no damage to the contracting parties: . . . . Those where the consent is vitiated by mistake, violence, intimidation, undue influence or fraud.[527]

---

[522]    *See supra* ¶ 168; *see also* Interim Measures Order at ¶ 140.

[523]    *See* Philippine Civil Code, art. 1397.

[524]    *See, e.g.*, Hr'g Tr. at 513:4-24 (Justice Feliciano and Justice Vitug agree that, absent the EOA, the Parties were bound by the MSA").

[525]    For example, GGAM still had the right to terminate the MSA based on breach of the Equity Option Agreement. *See* MSA, Clause 15.2(f) (permitting GGAM to terminate its services due to a material breach under the Option Agreement); *see also Restatement (Third) of Agency § 6.01* (providing that a disclosed principal is liable for contracts entered into on its behalf by agents acting with actual or apparent authority).

[526]    Philippine Civil Code, art. 1338 (RL-1); *see* J. Vitug Op. ¶¶ 58-60.

[527]    Philippine Civil Code, art. 1390 (RL-1); *see also* J. Vitug Op. ¶ 59.

*CONFIDENTIAL*

180.    Here, GGAM's misrepresentations, such as its misrepresentation that it would provide "hands-on" management and that its principals had the contact information for foreign VIP "high rollers" and junket operators, induced Bloomberry to enter into the contract.  As noted above, Bloomberry later learned that GGAM had fundamentally misrepresented its capabilities as a management company, concealed its true purpose as an investment vehicle, and misled Bloomberry in order to gain a monetary advantage.[528]  GGAM's misrepresentations, indicative of causal fraud, make the MSA, including the grant of the equity option, annullable and/or voidable. Under Article 1398 of the Philippine Civil Code

> An obligation having been annulled, the contracting parties shall
> restore to each other the things which have been the subject matter
> of the contract, with their fruits, and the price with its interest,
> except in cases provided by law.[529]

181.    The effect of annulment of the contract is to wipe it out of existence, and to restore the parties, in so far as legally and equitably possible, to their original situation before the contract was entered into.[530] Consequently, the Shares must be returned or the value of the Shares should be paid over to Bloomberry and Sureste.  As discussed above,[531] there is nothing under Philippine law that prevents the Shares from being returned directly to Bloomberry and Sureste.

### 4.    Unjust Enrichment and Restitution of the Value of the Shares

182.    Pursuant to Philippine law and principles of equity therein, GGAM is not entitled to retain the value of the Shares. Unjust enrichment exists "when a person unjustly retains a benefit to the loss of another, or when a person retains money or property of another against the fundamental principles of justice, equity and good conscience."[532]  The principle of unjust

---

[528]    Had Bloomberry known that GGAM would be unable to deliver on its promises, Bloomberry would not have engaged GGAM as the management services provider of the Solaire.  *See* January 17, 2014 Philippine Court Petition at 13 (RE-10).

[529]    Philippine Civil Code, art. 1398 (RL-1); *see also* J. Vitug. Op. ¶ 59.

[530]    *See id.*

[531]    *See supra* ¶ 177.

[532]    Philippine Civil Code, art. 22 (RL-1); *see also* J. Vitug Op. ¶¶ 63-64; *see also Republic v. Court of Appeals*, G.R. No. 160379, 14 August 2009, 596 SCRA 57 (RL-22) (citing *Benguet Corporation v. Department of Environment and Natural Resources-Mines Adjudication Board*, G.R. No. 163101, February 13, 2008,  545 SCRA

*CONFIDENTIAL*

enrichment requires two conditions: (1) a person is benefitted without a valid basis or justification and (2) such benefit is derived at the expense of another.[533]

183.    Because GGAM not only failed to render the required services under the MSA, but also misrepresented what GGAM, as a management company, not an investment vehicle, was able to offer Bloomberry and Sureste, equitable principles necessitate that GGAM should not retain the value of the option.[534]

184.    Currently, and throughout the duration of this dispute, the Shares have been trading between Php 8.28 to Php l5.82.[535] Thus, GGAM has already earned a book gain of about Php 8.2 billion (nearly US$ 200 million) after walking away from the partnership merely six months after the Solaire opened, and failing to deliver on its many promises and obligations. Such compensation would be beyond extreme in any context, given the Parties' agreement, Bloomberry's unrealized expectations, and the minimal work performed by GGAM.  In the instant circumstances—with a standalone "upstart" integrated resort, the first of its kind in the emerging Filipino market—it would be unjust to allow GGAM to sell the Shares and enrich itself at Bloomberry's expense.[536]

---

196 and *Cool Car Philippines, Inc. v. Ushio Realty and Development Corporation*, G.R. No. 138088, January 23, 2006, 479 SCRA 404).

[533]    *See id.* GGAM attempts to argue that unjust enrichment is only applicable in situations where there is no contract expressly entered into by the parties. *See* J. Feliciano Op. ¶ 81.  GGAM cites no case law in support of this argument, however, and ignores instances where courts will extend the application of unjust enrichment.  *See* J. Vitug Supp. Op. ¶ 38.  Regardless, GGAM's argument relies on the validity of the MSA, EOA and Participation Agreement.  Because Bloomberry demands rescission of the MSA, it is clear that the principal against unjust enrichment applies.  *See* J. Vitug Supp. Op. ¶ 39.

[534]    *See* J. Vitug Op. ¶¶ 62-63 ("'[e]quity jurisdiction aims to do complete justice in cases where a court of law is unable to adapt its judgments to the special circumstances of a case because of the inflexibility of its statutory or legal jurisdiction. Equity is the principle by which substantial justice may be attained in cases where the prescribed or customary forms of ordinary law are inadequate.'") (quoting *Reyes v. Lim*, G.R. No. 134241, August 2003 at 11); *see also* J. Vitug Supp. Op. ¶¶ 38-39 ("As [Respondents] actually demand rescission of the MSA, then it is clear that the principle against unjust enrichment applies given its main objective which is to prevent one from enriching himself at the expense of another without just cause or consideration.") (citing *P.C. Javier & Sons, Inc. v. Court of Appeals*, 500 Phil. 419 (2005)); Hr'g Tr. 551:13-554:13 (Vitug) (explaining that common law principles of equity apply even where parties are bound by a contract).

[535]    *See* Bloomberry Stock Chart, The Philippine Stock Exchange, Inc., as of December 5, 2014 (RE-69).

[536]    *See generally* Respondents' Memorial in Opposition to Claimants' "Request for Interim Measures of Protection," July 15, 2014; Respondents' Sur-Reply Memorial in Opposition to Claimants' "Request for Interim Measures of Protection," August 14, 2014; Bloomberry Letter to Tribunal, October 29, 2014.

*CONFIDENTIAL*

185.     GGAM suggests that it is entitled to the Shares, notwithstanding its failure to perform its obligations under the MSA and its termination as the management services provider for the Solaire, because of its (1) contributions to the construction of the Solaire, and (2) its contributions to Bloomberry's top-up offering.  Neither of these arguments (1) is separate from GGAM's obligations under the MSA, (2) is expressly referenced in the EOA, or (3) justifies the extraordinary result of permitting GGAM to sell the block of Shares for more than US$200 million profit.

186.     <u>First</u>, as mentioned above, given GGAM's intended role as manager and operator of the Solaire, Bloomberry needed GGAM's assistance early in the process in order to ensure that the construction and design of the Solaire was compatible with GGAM's plans for operating the casino.[537]  GGAM's sporadic visits to the construction site often detracted from the project's progress by creating confusion and delays.[538]  Some of Mr. Stone's suggestions were approved by Mr. Razon, and others were not.[539]  Overall, Mr. Stone's approach demonstrated that he did not take the time to understand the Philippine market in which the Solaire was being constructed and would be operated.[540]

187.     <u>Second</u>, as noted above, there were many factors contributing to the success of the top-up offering.[541]  These factors included Mr. Razon's business acumen and reputation,[542] the unique opportunity for investors to participate in Asia's booming gaming market,[543] the status and location of the Solaire,[544] and the progress Bloomberry had made on the project prior to the

---

[537]     *See supra* Section III.

[538]     *See supra id*.

[539]     *See supra id*.

[540]     *See supra id*.  Ultimately, GGAM is left to point to its identification of Matthew Pryor as a potential construction manager as a significant contribution.  Surely, the identification of a project manager—more in line with the duties of an executive search firm rather than a management services provider—is hardly justification for more than $200 million windfall.

[541]     *See generally* April 5, 2012 CLSA Report (RE-43) (discussing five company strengths making Bloomberry a favorable investment: (1) the alliance between Mr. Razon and GGAM, (2) first-mover advantage, (3) favorable location, (4) premium positioning, and (5) strong execution capability).

[542]     *See supra* Section III.B.

[543]     *See supra id*.

[544]     *See supra id*.

top-up offering.[545]  Importantly, the increase in Bloomberry's share price following the termination of the MSA demonstrates that, in the eyes of the investors, GGAM was not critical to the success of the Solaire as an investment.[546]

188.    In consideration for a long and fruitful partnership between Bloomberry and Sureste, the owners of the Solaire, and GGAM, the management services provider, GGAM was provided the opportunity to purchase more than 900 million shares in Bloomberry at essentially the founder's cost.  GGAM's substantial breaches defeated Bloomberry's purpose in entering into the MSA.  GGAM's justifications as to why it deserves to walk away with more than US\$ 200 million of undeserved profit—while also asserting substantial claims for damages[547]—fall flat.

### E.    Damages

189.    As a result of GGAM's substantial and material breaches of the MSA, as set forth above, Respondents have suffered damages in an amount to be determined at the final hearing on this matter.  Notably, the MSA's limitation on liability clause does not apply in cases of willful breach[548] or non-contractual liability.

---

[545]    *See supra* Section III.B.

[546]    *See* RE-69 (listing a 52-week high).

[547]    *See* S.O.C. ¶ 238.

[548]    *See* MSA, Clause 12.3(b) ("The liability of GGAM to the Owner shall in no event exceed the total amount of fees that GGAM has received during the Term that such liability is incurred under this Agreement, provided that this limit shall not apply where the liability in question is incurred as a result of the willful misconduct of GGAM.")

*CONFIDENTIAL*

## VII.    REQUEST FOR RELIEF

190.    Respondents respectfully request that the Tribunal issue an award:

a.    Declaring that Respondents rightfully ended the Management Services Agreement due to GGAM's material breach of its obligations thereunder;

b.    Declaring that Respondents rightfully rescinded the Management Services Agreement, including the equity option granted therein, due to GGAM's substantial breach of the Parties' agreement;

c.    Annulling the Management Services Agreement, including the equity option granted therein, due to GGAM's causal fraud;

d.    Declaring that GGAM will be unjustly enriched if it is permitted to sell the Shares, and enjoining GGAM from pursuing such a sale;

e.    Awarding Respondents monetary damages equivalent to the value of the Shares, and/or awarding mutual restitution in the form of ordering GGAM to transfer the block of Shares to Respondents in exchange for approximately US$ 37 million;

f.    Awarding Respondents damages for GGAM's willful and material breaches and non-contractual wrongs in an amount to be determined at the final hearing in this Arbitration;

g.    Designating Respondents as the Party whose position has been substantially upheld pursuant to Clause 19.2(h) of the Management Services Agreement, and awarding Respondents (1) all reasonable attorneys' fees, costs and expenses, (2) its share of the fees and costs paid to the Tribunal; and (3) all other fees and expenses incurred in connection with this Arbitration the Tribunal deems appropriate; and

h.    Awarding such other and further relief as may be found appropriate.

*CONFIDENTIAL*

Respectfully submitted,

_____
Michael D. Nolan
Elitza K. Popova-Talty
Erin M. Culbertson
MILBANK TWEED HADLEY & MCCLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
United States of America
Telephone: +1 (202) 835-7500
Facsimile: +1 (202) 835-7586

Purisimo S. Buyco
Robel C. Lomibao
PICAZO BUYCO TAN FIDER & SANTOS
Penthouse Liberty Center
104 H.V. dela Costa St., Salcedo Village
1227 Makati City, Metro Manila
The Philippines
Telephone:  (632) 888-0999
Facsimile:  (632) 888-1011

*Counsel for Bloomberry Resorts & Hotels Inc. and
Sureste Properties Inc.*

February 2, 2015 (as amended)