

**RACHEL PENSKI FISSELL**  rfissell@walfishfissell.com  +1.212.672.0523
405 Lexington Avenue, 8th Floor  New York, NY 10174  www.walfishfissell.com

December 12, 2022

**VIA ECF**

Hon. Lorna G. Schofield
United States District Court for the Southern District of New York
40 Foley Square
New York, NY 10007

Re:   *Global Gaming Philippines, LLC v. Razon, et al.*, No. 21-cv-2655 (LGS)

Dear Judge Schofield:

This letter is submitted on behalf of Defendant Enrique K. Razon, Jr. pursuant to the Court's December 2, 2022 Order (Dkt. 311). Razon intends to file (1) a motion for summary judgment dismissing Counts I-III of the Second Amended Complaint, which seek to hold Razon jointly and severally liable with the Bloomberry Defendants[1] for an as-yet unpaid arbitration award issued against the Bloomberry Defendants arising from their termination of a Management Services Agreement ("MSA"), an agreement to which Razon was neither party nor guarantor, and (2) a motion to exclude Plaintiff's expert Troy Dahlberg.[2] Razon seeks to make the latter motion now because we expect that Plaintiff will rely heavily on Dahlberg in opposing Razon's motion for summary judgment or in support of a motion for summary judgment in *Plaintiff*'s favor on the alter ego issue (a motion that would be meritless and bordering on frivolous).

With respect to his summary judgment brief, Razon does not seek any enlargement of the Court's page limits as set forth in § III.B.1 of the Court's Individual Rules and Procedures for Civil Cases[3] except that Razon reserves the right to make an application to exceed the limitation of exhibits and/or affidavits (set forth in § III.B.3 of the Court's Individual Rules) no later than two weeks before the deadline for submission. On his motion related to Dahlberg, Razon seeks only 15 pages for his opening brief, 15 pages for Plaintiff's response, and an 8-page reply brief. Because we do not yet know which motions Plaintiff intends to file against Razon, we will propose a schedule (and also attempt to reach an agreement with Plaintiff on such schedule) in our response letter due to the Court on December 19, 2022.

---

[1] Bloomberry Defendants refers to Bloomberry Resorts and Hotels Inc. ("BRHI") and Sureste Properties Inc. ("SPI").
[2] Razon also joins in the Bloomberry Defendants' motion to exclude any evidence related to the settlement meeting and reserves his right to object to any inadmissible evidenced offered by Plaintiff in the course of summary judgment briefing.
[3] If the motion to dismiss the trespass claim (ECF No. 232) were to be decided and denied before summary judgment briefing begins, then Razon would respectfully request an enlargement of the page limits to seek summary judgment on that claim.

**Razon's Motion for Summary Judgment**

This is not an alter ego case. There is *no basis* and *no precedent whatsoever* for piercing the veil of a series of bona fide companies – companies that honor corporate separateness, are well capitalized, operate a multi-billion-dollar business, and include a publicly traded, listed company in full compliance with local stock exchange requirements – simply because one is not happy that the corporations have declined to comply with arbitral awards in one's favor. *Nothing remotely like that has ever happened – not in American law and not in Philippine law*. Razon intends to advance the following grounds[4] for a summary judgment of dismissal on the alter ego claim:

*First*, to hold Razon liable for the debts of BRHI and SPI, Plaintiff would need to set up a chain of three "veil-piercings or findings of alter ego liability" – the first to reach the Bloomberry Defendants' direct parent BRC, the second to reach Prime Strategic Holdings, Inc. ("Prime") as the majority owner of BRC, and the third to reach Razon as the owner of Prime. *In re Tronox Inc.*, 855 F.3d 84, 106 n.27 (2d Cir. 2017). Plaintiff does not argue – and there are no facts in the record to support – that BRC is an alter ego of BRHI and SPI, that Prime is an alter ego of BRC, or that Razon is an alter ego of Prime. Compounding the outlandishness of Plaintiff's theory is that BRC is a publicly traded company in good standing on the Philippine Stock Exchange (the "PSE"), with widely dispersed shareholders. Of necessity, BRC complies with a range of legal requirements (independent directors, regular public reports, annual audits, and so on) that are flatly incompatible with alter ego status. We have not been able to locate (nor has Plaintiff identified) any case, in the U.S. or the Philippines, in which any listed company in good standing (or any subsidiary of such a company) anywhere in the world had its veil pierced or was deemed an alter ego.

*Second*, Plaintiff cannot show a *fraud or other wrong*, as is required to prevail on an alter ego claim. *See, e.g.*, *Maricalum Mining Corp. v. Florentino*, G.R. No. 22183 (Phil. July 23, 2018) (alter ego liability requires, *inter alia*, "fraud or fundamental unfairness imposed on the plaintiff"); *see also Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (purported domination of corporation has to have been used "to commit a fraud or wrong"). Plaintiff has identified the following as supposed wrongful acts perpetrated by the Bloomberry Defendants: (a) the termination of the MSA, which was later found by the arbitrators to be a breach; (b) the obtaining of writs of attachment and preliminary injunction in the Philippines (the "Writs") that prevented Plaintiff from disposing of shares it had been awarded (the "Option Shares") under the MSA and that were the subject of a counterclaim in the arbitration[5]; and (c) the decision not to comply with the arbitral awards.

As to breach of the MSA: it is black-letter law that a breach of contract, without more, is not sufficient for alter ego liability. *E.g.*, *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 716 Fed. App'x 23, 28 (2d Cir. Nov. 16, 2017). So Plaintiff is left arguing that the breach was meant to serve only Razon's interests, as if his interests had somehow diverged from and taken

---

[4] Razon reserves the right to assert other grounds in his formal motion papers.

[5] Plaintiff has also pointed to a short-lived January 2014 trading suspension that BRC requested from the PSE after learning that Plaintiff planned to sell the Option Shares before the panel had been seated. The undisputed facts show that, whether warranted or not, the suspension did not harm Plaintiff (and therefore cannot ground alter ego liability) because, among other reasons, *prior to the planned sale date* the suspension was lifted and a temporary injunction precluding any sale was imposed. To the extent that Plaintiff intends to rely on its putative expert Talis J. Putnins to argue that the suspension was somehow improper, Razon reserves the right to move to exclude Putnins because (a) the suspension is irrelevant, (b) Putnins is not qualified as to the practices at the PSE, and (c) his report does little more than apply the PSE's written rulebook to facts in this case, an exercise that a court could just as easily perform.

precedence over those of the Bloomberry Defendants. The difficulty with this argument is not just that it would require the Court to retread much of the arbitration record to probe the underlying *reasons* for the Bloomberry Defendants' decision to part ways with Plaintiff. This argument *also* would require the Court to ignore the undisputed corporate formalities that were followed and the separate corporate existence of the Bloomberry Defendants – entities that were separate from their corporate parents BRC and Prime, and also separate from Razon.

As to the Writs: Plaintiff does not dispute the truism that a valid, lawfully imposed judicial restraint cannot be an "injustice" or "wrong," let alone ground an alter ago claim. Instead Plaintiff argues that the Writs *were supposed to be lifted* because the arbitral tribunal, in an interim award, purported to supersede them. But this fails as a matter of law: the *Philippine courts* entertained – and rejected – *this very argument*, concluding that under Philippine law, the interim award would need to be recognized and enforced in the Philippines in order to override the Writs. Plaintiff is now issue-precluded from arguing otherwise. Even if that were not enough, this Court is not in a position to second-guess the Philippine courts as to whether those courts' own remedies (i) were validly imposed and (ii) are displaced by an arbitral ruling.

As to the entities' decision to resist arbitral enforcement: an arbitral award is not self-executing, and the entities are entitled to assert legal defenses to enforcement without transforming themselves into alter egos of their indirect majority shareholder. Further, award enforcement *is* the claim here, and the "claimed injustice" on an alter ego claim "must consist of more than merely" the "underlying cause of action" grounding the lawsuit. *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008). Additionally, just as with the Writs and the adjudicated breach of the MSA, Plaintiff lacks any basis in the record for arguing that Razon and the Bloomberry Defendants have divergent interests regarding compliance with the arbitral award.

Plaintiff seems to believe it can show that these three acts are somehow sufficient to pierce the corporate veil by asserting, in essence, that breaches of fiduciary duty occurred. Plaintiff repeatedly suggests that these Philippine corporate boards were somehow ill-informed or ill-advised on each action and that Razon had some personal stake in each action that somehow put him at odds with entities in which he is the indirect majority shareholder. Set aside that crediting Plaintiff's theory would require the Court (or the factfinder) to undo valid corporate acts by second guessing decisions based in part on Philippine legal advice; on top of that, a breach of fiduciary duty, even if found, and even if it supposedly benefits an indirect majority shareholder, is a far cry from and not remotely sufficient to create alter ego liability.

*Finally*, there is no evidence that Plaintiff has been harmed *by any supposed abuse of the corporate form*. Under Philippine law, an alter ego claim is not available where, as here, the debtor entities are perfectly capable of paying any judgment. *E.g.*, *Maricalum Mining Corp. supra*; *WPM Int'l Trading, Inc. v. Labayen*, G.R. No. 182770 (Phil. Sept. 17, 2014). U.S. law is materially the same: alter ego liability simply is not available where the alleged debtors are well capitalized, solvent, and there is zero evidence of siphoning of assets away from the debtors to the alleged alter egos. *E.g.*, *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979); *James v. Loran Realty V Corp.*, 20 N.Y.3d 918, 919 (2012). We have been unable to uncover *one case* in the United States where a court found alter ego liability without some evidence that the debtor entity was insolvent, undercapitalized, or otherwise had had its assets diverted. And it is beyond genuine dispute that there is no undercapitalization, insolvency, or siphoning of assets here. This alone warrants dismissal of Plaintiff's claim.

## Razon's Motion to Exclude Expert Testimony from Troy Dahlberg

Razon seeks to exclude Plaintiff's so-called alter ego expert Dahlberg, who submitted a 120-page opening report that can best be described as a summary judgment brief. Relying solely on a handbook for accountants called the Litigation Services Handbook,[6] **Dahlberg (i) simply cherry picks which of the supposed "indicia" of an alter ego relationship to consider**[7] (while ignoring the undisputed *absence* of key indicia and offering no opinion (other than rampant speculation) on whether the Bloomberry Defendants are undercapitalized, insolvent, able to operate as independent profit centers, or have *diverted funds* to Razon), *see generally* Dahlberg Report, and (ii) **then offers "an opinion about how much evidence there is to support the existence of [his cherry-picked] indicia,"** *see, e.g.,* Dahlberg Depo. (Rough) Tr. ("Tr."), 282:11-283:15, while dismissing any evidence that *refute* his selected indicia.

Time and again, courts in this District have excluded an expert from doing just this. *See, e.g., S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013) (Where an expert acts "as a narrator of the facts," the expert does not "convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology"—as such, in addition to "invad[ing] the province of the jury," "[m]ere narration thus fails to fulfill *Daubert's* most basic requirements."). Indeed, the only federal court to consider an alter ego opinion from Dahlberg in recent years reached the same conclusion (in "tentative thoughts" before the case settled) about Dahlberg when his testimony was proffered by the same attorneys representing Plaintiff here. *See Tatung Co. v. Shu Tze Hsu*, No. 13-cv-01743, Nov. 28, 2016 Hr'g Tr. at 37-38 (ECF No. 989) (C.D. Cal. Nov. 28, 2016) (finding that Dahlberg's testimony on the alter ego issue was "misleading," "lacked credible foundation," and "argumentative," and because alter ego "is a jury question with proper instructions by the Court," Dalberg's opinions would have "intrude[d] on the jury with impermissible opinions [and] legal conclusions . . .").

A non-exhaustive list of additional issues with Dahlberg's report[8] includes the following:

*First,* for each one of his supposed "indicia," **Dahlberg ignores plainly relevant evidence that is inconsistent with his conclusion**. When asked why he focused on certain evidence and not other, seemingly contrary, evidence, Dahlberg (a) frankly acknowledged that he was looking only for evidence supporting an alter ego relationship,[9] and (b) claimed not that he was *ignoring* contrary evidence, but rather just " *weighing*" the evidence.[10] But an expert cannot rely on evidence "when it suits his analysis and ignore [it] when it does not," *see, e.g., ECD Inv'r Grp. v.*

---

[6] As one federal court has observed, "[t]here is no evidence" that the alter ego chapter of the Handbook "has been subjected to peer review and/or that it has been generally accepted to support the expert's alter-ego analysis." *Muniz v. Rexnord Corp.*, 2006 WL 5153078, at *1-2 (N.D. Ill. Nov. 2, 2006) (finding opinion was unreliable where expert's "primary resource" was the Litigation Services Handbook).

[7] Struggling to find evidence that supports one factor ("financial dependence"), Dahlberg goes so far as to reinvent this factor as "financial *inter*dependence" – creating a whole new test that is not even in the Handbook (and has no other basis). *See, e.g.,* Report of Troy A. Dahlberg, dated September 16, 2022 ("Dahlberg Report") ¶ 258.

[8] We intend to include in our exclusion motion other problems with Dahlberg that, in the interest of brevity, are not discussed herein.

[9] *See, e.g.,* Tr. 40:3-18.

[10] Tr. 59:13-62:9 (emphasis added); *id.* at 150:15-20 (When confronted with testimony that appeared to undermine his conclusions: "Q. And you're saying I'm going to ignore what Mr. Razon said here and only credit what Mr. Lat said here? . . . A. No I think I'm going [to] **_weigh the evidence_**, okay." (emphasis added)).

*Credit Suisse Int'l*, 2017 WL 3841872, at *14 (S.D.N.Y. Sept. 1, 2017) – let alone usurp the role of the trier of fact, which is *precisely* to weigh the evidence.

*Second*, **Dahlberg offers impermissible testimony regarding witnesses' states of mind.**[11] *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (expert could not testify about "defendants' 'real purpose,' their true motivation, in engaging in the transactions"); *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 545-547 (S.D.N.Y. 2004) ("Plaintiffs' experts propose improperly to assume the role of advocates for the plaintiffs' case by arguing as to the intent or motives underlying the conduct of [defendants and individual witnesses], a transgression that has resulted in the exclusion of 'expert' testimony as to the 'real motive' behind certain business transactions."). At deposition, Dahlberg claimed that he was only "offering an opinion that [certain evidence] indicates that [Razon] thought [something]." Tr. 50:6-15. For instance: "I'm not saying [Razon] thinks it was important to him. I'm saying he said it was important to him." *Id*. 51:6-8. Another example (there are many): "Q. So you're offering an opinion as to [a witness'] overall thoughts about where her loyalties lie? A. I'm offering an opinion about where the evidence indicates her overall loyalties lie." *Id*. at 111:22-25. This is as improper as it gets. *E.g.*, *Rezulin*, 309 F. Supp. 2d at 546 (excluding expert testimony that "merely repeated facts or opinions stated by other potential witnesses or in documents produced in discovery" and/or made inferences about motives from such documents). Juries can perform such an exercise themselves. *See id.* ("The testimony is improper also because it describes 'lay matters which a jury is capable of understanding and deciding without the expert's help.'") (citation omitted).

*Third,* **Dahlberg is not qualified to offer any of his purported opinions**. Dahlberg is a forensic accountant. But Dahlberg does not use that expertise in this case (there is nothing wrong with the Bloomberry Defendants' accounting, precisely because they are bona fide companies, *not* alter egos). *See, e.g., Ponca Tribe v. Cont'l Carbon Co.*, 2008 WL 7211982, at *3 (W.D. Okla. Nov. 21, 2008) ("It is clear that some of [the expert's] proposed testimony, as reflected in his list of Indicia of Corporate Separateness, is nothing more than his attempt to apply the law as he understands it to the facts of this case . . . Other items on this list, however, could be categorized as falling within his expertise as a forensic accountant and experience in examining complex financial transactions. . . . For example, [the expert's] opinion that [defendant] is adequately capitalized is clearly within his field of expertise and appropriate expert testimony."); *see also Tatung*, at Tr. 37-38 (finding that Dahlberg's opinion was "outside [his] area of expertise" and "outside [his] realm"). Instead, Dahlberg so broadly defines the field of forensic accounting that he claims to be an expert in (i) just about anything that someone in a corporate environment does, including "corporate culture," Tr. 13:2-15:2, (ii) corporate governance, *id.* 19:12-20:2, (iii) corporate disclosures, *id.* 32:18-20, (iv) legal ethics, *id.* 75:8-9, and (v) employee loyalty, *id*. 124:9-125:19. Even if it were somehow plausible (and it is not) that Dahlberg was an expert in these areas, he is certainly not an expert on any of these issues *in the Philippine context*. He has *zero* experience with Philippine corporate culture, Philippine corporate governance or disclosures, or Philippine legal ethics. *See, e.g.,* Tr. 16:16-17:8, 28:24-29:6, 30:9-15, 36:4-7.

---

[11] *See, e.g.,* Dahlberg Report at 23 (header: "The Importance of Control over BRHI and SPI to Razon"); ¶ 265 ("Razon's testimony indicates that *in his mind*, BRHI, SPI, BRC and Prime were interchangeable and all under his control . . .")

Respectfully submitted,

Rachel Penski Fissell