**Kaitlyn A. Crowe**
212 692 6715
kacrowe@mintz.com



919 Third Avenue
New York, NY 10022
212 935 3000
mintz.com

December 19, 2022

Hon. Lorna G. Schofield
United States District Judge
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: *Global Gaming Philippines, LLC, v. Enrique Razon et al.*, No. 21-cv-2655 (LGS) (SN)

Dear Judge Schofield:

As directed by the Court's December 2, 2022 Order (ECF No. 311) ("Order"), plaintiff Global Gaming Philippines, LLC ("Plaintiff" or "Global Gaming") provides this letter in response to the letters filed on December 12, 2022 by Bloomberry Resorts and Hotels Inc. ("BRHI") and Sureste Properties, Inc. ("SPI" and, collectively with BRHI, the "Debtor Defendants") and Enrique K. Razon, Jr. ("Razon") (ECF Nos. 314 & 315).

Plaintiff's December 12 letter (ECF No. 313) included a proposed briefing schedule and explanation for its proposed motion sequencing. Defendants provided Plaintiff a proposed schedule on December 16, and requested Plaintiff's response today, which Plaintiff provided. Plaintiff's proposal was intended to accept what it could of Defendants' terms and provide for full briefing of all issues raised in a manner that is consistent with the Court's rules and stated preferences. The parties were unable to reach an agreement. Based on that exchange, plaintiff revises its proposed briefing schedule to the following:



| Motions | Event | Due Date |
|---|---|---|
| Plaintiff's motions to exclude Debtor Defendants' experts, Rogers & Spectrum | Motion[1] | (already filed) |
| | Opposition | 1/30/23 |
| | Reply | 2/23/23 |
| Plaintiff's Motion for Recognition and Enforcement of Arbitral Awards[2] | Motion | 1/9/23 |
| | Opposition | 2/6/23 |
| | Reply | 2/27/23 |
| Razon's Motion *in Limine* to Exclude Testimony of Dahlberg | Motion | 1/9/23 |
| | Opposition | 1/30/23 |
| | Reply | 2/13/23 |
| Plaintiff and Razon's Simultaneous Motions for Summary Judgment re veil piercing | Movants' briefs due | 2/13/23 |
| | Opposition Briefs due | 3/13/23 |

---

[1] Global Gaming objects to Debtor Defendants' suggestion that it be required to refile and shorten its motions to exclude the testimony of Debtor Defendants' proffered expert witnesses, Rogers and Spectrum. Judge Netburn previously ordered Defendants to file a single opposition to both motions, not to exceed a total of 45 pages and Plaintiff to file a single reply not to exceed 20 pages. (ECF No. 306.) Plaintiff suggests continuing to use that approach.

[2] Debtor Defendants have proposed a motion for summary judgment on personal jurisdiction to be briefed in addition to Plaintiff's motion for enforcement and recognition. This is unnecessary as a stand-alone motion, as the Court will need to find personal jurisdiction to grant Global Gaming's motion for recognition and enforcement. All relevant arguments can be addressed as part of the opposition to that motion without additional briefing or motion practice.



## I. Debtor Defendants' Proposed Motions

### A. <u>The Court Has Personal Jurisdiction Over the Debtor Defendants</u>

The Debtor Defendants are subject to personal jurisdiction on four independent grounds, any of which on its own is sufficient: (1) the Debtor Defendants expressly consented to jurisdiction; (2) they transacted business in New York, within the meaning of New York's long-arm statute (CPLR 302(a)(1)); (3) they are alter egos of Razon, who is admittedly subject to jurisdiction; and (4) Federal Rule of Civil Procedure 4(k)(2).

#### 1. The Debtor Defendants Expressly Consented to Jurisdiction

In the Management Services Agreement ("MSA"), the Debtor Defendants consented to jurisdiction for purposes of enforcing an arbitral award. The MSA expressly provides that "the decision of the arbitration panel shall be binding upon both Parties and *enforceable in all jurisdictions*." MSA, ECF No. 218-4, § 19.2(b) (emphasis added). This clause alone supports jurisdiction for the purpose of confirming the Award. *See Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1276 (2d Cir. 1971) (affirming exercise of personal jurisdiction based on similar contract clause stating, "judgment upon an [arbitration] award may be entered in *any court of competent jurisdiction*" (emphasis added)); *Copenhagen Reinsurance Co. (UK) v. Sargeant Marine, Inc.*, No. 98 CIV. 1476 (HB), 1998 WL 323489, at *1-2 (S.D.N.Y. Jun. 17, 1998) (holding that a contractual "right to commence an action in any court of competent jurisdiction in the United States of America" confers personal jurisdiction in SDNY).

#### 2. Personal Jurisdiction Exists Under CPLR 302(a)(1)

The Debtor Defendants are subject to jurisdiction under CPLR 302(a)(1) because they projected themselves into New York in numerous ways over two-and-a-half years related to their contractual relationship with Plaintiff and availed themselves of the benefits and privileges of "transact[ing] . . . business" in New York. *See* CPLR 302(a)(1). Under CPLR 302(a)(1), a "single act" is enough to constitute "transact[ing] business" and "proof of one transaction . . . is sufficient to invoke jurisdiction, even though the defendant never enters New York." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169-71 (2d Cir. 2010). The Court previously found that Plaintiff had sufficiently alleged facts supporting the exercise of such jurisdiction. The evidence proves the allegations true.

At the first meeting between Razon and Global Gaming's principals (in Las Vegas), Global Gaming explained that New York-based Cantor Fitzgerald, L.P. ("Cantor"), which owns Global Gaming through its parent Global Gaming Asset Management, L.P., was its joint-venture partner for its potential involvement in the Solaire project. They discussed Cantor's role as the financial partner to provide Global Gaming's considerable investment in Solaire. Razon's team recognized Cantor's involvement and, over the ensuing six months, negotiated the MSA, including by email and phone to Cantor's New York headquarters, with Cantor directing the diligence process. Razon admitted in his Amended Answer that he conducted negotiations of the MSA with Global Gaming while in New York. (Am. Answer, ECF No. 253 ¶54.) Additionally, the Debtor Defendants


purposely availed themselves of the protections of New York law when Razon executed a confidentiality agreement concerning negotiations of the MSA; that confidentiality agreement was governed by New York law. After months of negotiations over what Razon and the Debtor Defendants labeled as Cantor issues, Cantor emailed the Global Gaming-signed MSA from New York to the Debtor Defendants, and the Debtor Defendants emailed the executed MSA to Global Gaming at Cantor's offices in New York.

The Debtor Defendants understood that a portion of Global Gaming's services under the MSA would be performed in New York and, in fact, Global Gaming spent extensive hours performing its MSA obligations from New York in Cantor's offices. Cantor personnel in New York also provided back-office and logistics support for activities that the Global Gaming team performed at Solaire in Manila. In addition, Cantor provided tens of millions of U.S. dollars for Global Gaming's exercise of the option to purchase shares of Debtor Defendant's "intermediate parent company," Bloomberry Resorts Corporation ("BRC"), which were part of the compensation to Global Gaming pursuant to the MSA.

Additionally, the Debtor Defendants and Global Gaming traveled to New York to hold investor conferences to raise capital to take Solaire public. While the IPO resulted in BRHI and SPI becoming subsidiaries of BRC, the issuer, like all IPOs the transaction was designed to raise capital for an operating business, the business of BRHI and SPI. By Razon's own admission, Global Gaming's participation in the IPO investor conferences was "a basic, anticipated component" and "fundamental part" of its role as managers of Solaire. At these meetings, the Debtor Defendants solicited more than $32 million in investment into the IPO from New York-based investors. These contacts are more than sufficient to establish jurisdiction over the Debtor Defendants under CPLR 302(a)(1).

3. **The Court Also Can Exercise Personal Jurisdiction Over the Debtor Defendants Because They Are Alter Egos of Defendant Razon, or Under Federal Rule 4(k)(2)**

As the Court has recognized, the allegations in the complaint, if shown to be true, would establish jurisdiction over the Debtor Defendants as alter egos of Razon. (ECF No. 216 at 8-9.) There is ample evidence of the alter ego relationship. The standard for determining personal jurisdiction of an alter ego is lower than the standard to determine alter ego liability. (ECF No. 216 at 8.) "[A] plaintiff need only show that one entity was subject to the 'complete domination of the other' to establish an alter ego relationship for the purpose of personal jurisdiction." *Id.* (citations omitted). As Global Gaming will show in its motion for summary judgment, discussed below, there is no question regarding Razon's complete domination of the Debtor Defendants sufficient to extend the Court's jurisdiction over Razon to BRHI and SPI.[3]

---

[3] Federal Rule of Civil Procedure 4(k)(2) provides an alternate basis for jurisdiction, but courts do not reach jurisdiction under Rule 4(k)(2) until determining that no other basis exists. *See Freeplay Music, LLC v. Nian Infosolutions Private Ltd.*, 16 Civ. 5883 (JGK) (RWL), 2018 WL 3639929, at *13, 17 (S.D.N.Y. July 10, 2018), *report and recommendation adopted,* 2018 WL 3632524 (S.D.N.Y. July 31, 2018). The Debtor



B. **Debtor Defendants' Motion to Exclude ▄▄▄▄▄▄▄▄▄▄▄▄▄▄ Is Unnecessary**

The Debtor Defendants' proposed motion to exclude evidence regarding statements made by Razon in 2015 is unnecessary because Global Gaming has no intention of offering such evidence in its case-in-chief in the Summary Proceeding against the Debtor Defendants.

While Razon's statements in 2015 are relevant to Global Gaming's veil piercing claim against Razon, Razon's counsel did not state that he intends to move to exclude evidence regarding his own statements, and there is no basis to resolve this issue out of the ordinary sequence for motions *in limine* on the triable claims against Razon.



Such statements are not of a type intended to be precluded by Federal Rule of Evidence 408, which "is not a blanket rule of inadmissibility for any and all statements in the settlement context. If evidence is offered for another purpose, apart from liability for (or damages resulting from) the claim under settlement discussion"—in this case the arbitrated claims—that evidence may be admitted. *Carr v. Health Ins. Plan of Greater N.Y.*, 99 Civ. 3706 (NRB), 2001 WL 563722, at *13 (S.D.N.Y. May 23, 2001) (internal quotations omitted); *see also* Fed. R. Evid. 408 advisory committee's note (Rule 408 excludes statements during settlement meetings "only when the purpose is proving the validity or invalidity of the claim or its amount"). Moreover, because Razon's statements were not made in the current proceeding, they are not precluded by Rule 408. *See e.g.*, *id.* at *4 (allowing statements from settlement negotiations concerning different claim). Global Gaming will not offer Razon's statements to prove the Debtor Defendants' liability or

---

Defendants have sufficient aggregate contacts with the United States as a whole to justify the exercise of personal jurisdiction under Rule 4(k)(2).

4 ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

5 ▄▄▄▄▄▄▄▄



Global Gaming's damages in the arbitration during which the statements were made. That liability and those damages were already determined by the arbitral Tribunal.

A trial judge has broad discretion regarding whether to admit evidence of even good-faith settlement communications offered for another purpose. *See Starter Corp. v. Converse, Inc.* 170 F. 3d 286, 293-94 (2nd Cir. 1999). Here, the testimony of Razon's statements directly bears on ███████████████████████████████████████████████████████████████████████████████ *See Telenor Mobile Comms. v. Storm LLC*, 587 F. Supp. 2d 594, 620-21 (S.D.N.Y. 2008) (finding the "wrongs attributable to [the defendant's] domination are obvious" and "sufficient to justify piercing the corporate veil" when defendant's actions "effectively prevent[ed]" plaintiff from enforcing its arbitral award in the Ukraine where defendant's "operations and assets are located").

II. **Razon's Proposed Motions**

A. <u>Razon Is Alter Ego of Debtor Defendants</u>

Razon's proposed motion for summary judgment would be futile, as the evidence clearly supports piercing the veil of the Debtor Defendants. His arguments re-hash his motion to dismiss that the Court denied, holding: "The Complaint sufficiently pleads both dominion and control, and a wrong against Plaintiff, which are independently a basis to pierce the corporate veil under Philippine law, and collectively a basis for doing so under New York law." ECF No. 216 at 12.

Discovery has confirmed the truth of these allegations and the lack of any genuine dispute over Razon's domination and control. He is the chairman and CEO of the Debtor Defendants and their "intermediate parent company," BRC, as well as the controlling shareholder through his "Razon Group of Companies." He admittedly owns, directly or indirectly, controlling interest of the Debtor Defendants and all of the Razon Group of Companies that hold interests in them. He votes virtually all ownership shares of the Debtor Defendants at shareholder meetings. He admits that, of the roughly 64,000,000 shares outstanding of SPI and 60,000,000 shares of BRHI, he votes all but five shares of each company held by five individuals. He admits that his management style is "[n]ot democratic. Things filter up to me and I make decisions right away." His domination over the Debtor Defendants and his entire "Group of Companies" is amply demonstrated by the ease with which he substituted his companies in and out of transactions for each other. For example, after the *Debtor Defendants* agreed in the MSA to compensate Global Gaming via stock options, Razon transferred his *personal* shares of SPI to *Prime Metroline* (an entity wholly owned by Razon and not a party to the MSA), and caused *Prime* to provide Global Gaming with the negotiated option to satisfy the *Debtor Defendants'* contractual obligations—all without any contract or consideration between his companies for that transaction. Moreover, in the underlying arbitration,


Razon expressly disavowed any meaningful distinction between his companies, freely admitting they were all just instrumentalities of him:

> The equity option was something I offered to Bill [William Weidner of Global Gaming] as consideration for the management relationship . . . . I am appalled by GGAM's position that the option shares were given by Prime Metroline which is not a party to the Management Services Agreement and it therefore cannot get back the Shares . . . . Everyone knew what the deal in substance was, and the vehicles by which the deal would be brought about weren't important from a business perspective and shouldn't be given some exaggerated importance in the arbitration.

There also is no genuine dispute that Razon, through his domination of Debtor Defendants, committed wrongs that injured Global Gaming. The Tribunal awarded Global Gaming US$300 million for those wrongs, which were not limited to merely a breach of contract. For example, when Global Gaming sought to sell its block of BRC shares, Razon caused his companies to petition the Philippine Stock Exchange – in BRC's name without its board's approval – to suspend trading in *all* shares of BRC. He then caused Prime to join with BRHI and SPI in a Philippine court action to seek restraining orders ("Writs") to prevent Global Gaming from selling its BRC shares pending the arbitration. The Tribunal determined that Global Gaming is allowed to sell the shares, expressly vacated the Writs, found Razon's interference (including arguments made by Debtor Defendants and Prime in Philippine courts) wrongful, awarded Global Gaming damages for such interference, and directed Debtor Defendants to take steps to allow Global Gaming to sell the BRC shares. (ECF No. 218-1, Final Award ¶ 507(c).) Razon admits that blocking the sale of the shares was done to protect his interests:

> The 921 Million Shares held by GGAM, as a block, have a unique value to me. For one thing, I would like to have the ability to offer the block to a new manager of the Solaire, just as I offered the block to GGAM. For another, the Shares represent a significant portion of Bloomberry's outstanding shares. If these shares were bought by an investor that already has a significant stake in Bloomberry, that investor could begin to impact Bloomberry's corporate voting and undermine my control over the company. Alternatively, if the shares were bought by an investor with no prior stake in Bloomberry, that investor could join with other investors of Bloomberry to impact voting and other corporate governance decisions. Such a scenario would be especially problematic for me if the investors had an opposing vision for the company.

Given the ample evidence of Razon's domination and control, and the Tribunal's findings that Debtor Defendants acted wrongfully in terminating the MSA and in interfering with Global Gaming's rights to the BRC shares, there is sufficient basis for piercing the corporate veil.



There is no merit to Debtor Defendants' argument that BRC's status as a publicly listed company shields Razon from alter ego liability. In fact, in *Lakah v. UBS AG*, No. 07-CV-2799 (LAP), 2017 WL 7245365, at *37 (S.D.N.Y. Feb. 14, 2017), this court pierced the corporate veil of Holding Company for Financial Investments (Lakah Group) S.A.E., which had been publicly listed. There also is no merit to the argument that Global Gaming must pierce the veil of each company in the Razon Group of Companies between Debtor Defendants and Razon's holding company, Prime. Veil piercing is an *equitable* concept, and "New York courts have recognized for veil-piercing purposes the doctrine of equitable ownership, under which an individual who exercises sufficient control over the corporation may be deemed an 'equitable owner,' notwithstanding the fact that the individual is not a shareholder of the corporation." *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1051 (2d Cir. 1997); *see also Network Enters. v. APBA Offshore Prods., Inc.*, No. 01 CIV. 11765 (CSH), 2002 WL 31050846, at *3 (S.D.N.Y. Sep. 12, 2002) ("New York law provides for piercing the veil 'when the corporation has been so dominated by an individual . . . .'"); *Badian v. Elliot*, 165 F. App'x 886, 889 (2d Cir. 2006). Undisputed facts prove decisively that Razon is the equitable owner of the Debtor Defendants and cannot benefit from the veil between him and the companies in light of his routine disregard of that veil.

### B. Dahlberg's Expert Testimony Is Admissible

Razon's proposed motion to preclude the testimony of Troy Dahlberg is baseless and premature. Dahlberg's testimony, as summarized in his reports, properly adhered to the limitations on expert testimony and is admissible.

At the outset, Razon's proposed motion is disingenuous, as the arguments made by Razon apply with greater force to the report of his purported alter-ego expert, Teresita Herbosa. Dahlberg gave opinions within the bounds of permissible expert witness testimony, but Razon's expert Herbosa did not.

As Global Gaming will show at the motion *in limine* stage, the standards for admissibility of experts on alter ego issues allow for presentation of forensic analysis of company operations, which is a valuable process to streamline trial and make complex accounting and transactional history manageable and understandable to a trier of fact. By contrast, experts are prohibited from testifying to the ultimate conclusion that a defendant is or is not liable under an alter ego claim because it intrudes on the role of the jury. Likewise, experts (across fields) are not permitted to testify to the interpretation of law, which intrudes on the role of the court. Dahlberg's report and testimony adhered to these standards, while Razon's expert, Herbosa, unabashedly testified to ultimate conclusions of law and her view regarding the outcome of the veil piercing analysis. At this point, there is no reason either of these motions should be briefed, as those motions will affect only what a jury gets to hear at trial.[6]

---

[6] This stands in contrast to Global Gaming's motions to exclude testimony of the experts identified by the Debtor Defendants. As noted in Plaintiff's December 12 letter, the case against those defendants is not subject to trial and the final proceeding to determine that case on the merits is Global Gaming's Motion for

**MINTZ**


Hon. Lorna G. Schofield
December 19, 2022
Page 9

In light of the above, Razon's *Daubert* motion as to Dahlberg should not be scheduled at this time. If the Court disagrees and schedules it now, however, Global Gaming requests leave to file its *Daubert* motion as to Razon's alter ego expert, Teresita Herbosa, on the same schedule.

Razon's criticisms of Dahlberg's qualifications and reliability also lack merit. Dahlberg is highly qualified by knowledge, training, education, and experience. He has 35 years of experience as a forensic accountant, is certified in Financial Forensics (CFF), American Institute of Certified Public Accountants (AICPA), and is a senior partner in HKA's Forensic Accounting and Commercial Damages practice group and the national leader in HKA's post-acquisition disputes practice. For more than 11 years prior to joining HKA, he led KPMG LLP's forensic advisory disputes practice for the Northeast, and also served as the national lead partner for KPMG's post-acquisition disputes practice. He has provided forensic accounting, auditing, and consulting services to companies in many industries, and has extensive experience interacting with external auditors and individuals in government agencies such as the Chairman of the SEC, the head of the SEC enforcement division, U.S. Attorneys, the Chief Accountant of OFHEO, and the head of the California Department of Insurance. During the course of his career, he has performed numerous complex investigations relating to accounting irregularities and reporting violations, including serving as an expert witness on issues relating to veil-piercing.

Dahlberg examined a complex body of evidence and offered a 120-page report analyzing and summarizing transactions and procedures (or lack thereof) in this case as they relate to topics that courts find relevant to a veil-piercing analysis. Dahlberg did not offer legal conclusions and did not opine on the ultimate issues. Instead, relying on his extensive knowledge and experience, he examined the evidence to understand and opine on whether it evidences any of the numerous factors that courts consider when deciding whether an alter ego relationship may exist. An expert witness may testify regarding facts relevant to veil-piercing, including "corporate structure and evidence of dominance." *Rochester Gas & Elec. Corp. v. GPU, Inc.*, 355 F. App'x 547, 551 (2d Cir. 2009).

Importantly, and in contrast to Razon's own experts, Dahlberg's analysis and conclusions do not impose on the factfinder's purview by offering an opinion on the ultimate question – whether imposition of alter ego liability on Razon in this case would be appropriate. Instead, Dahlberg applies his extensive experience to the complex record and provides educated, well-supported opinions about whether various indicia of an alter ego relationship may be present, but leaves for the factfinder (and the Court) to determine which of the veil-piercing factors relevant under the applicable law in this case should ultimately be considered.

Finally, Dahlberg appropriately cited to Roman L. Weil, Daniel G. Lentz and Elizabeth A. Evans, Litigation Services Handbook: The Role of the Financial Expert (6th ed. 2017) ("Litigation Services Handbook"), as a guide for the framework of factors that courts generally consider in connection with a veil-piercing analysis. "[T]he Litigation Services Handbook" is "a tool commonly used by experts." *Avco Corp. v. Turn & Bank Holdings, LLC*, No. 4:12-CV-01313,

---

Recognition and Enforcement. Thus, the Summary Proceeding is now at a stage analogous to the immediate pre-trial stage in the case against Razon.



2020 WL 3412659, at *5 (M.D. Pa. June 22, 2020) (emphasis omitted); *see, e.g.*, *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs.*, 546 F. Supp. 2d 155, 172 (D.N.J. 2008) (declining to exclude expert testimony and favorably citing that Handbook). In fact, Razon's own damages expert, Marc J. Brown, CFA, cites to the same treatise. In any event, there is no real dispute about the factors courts have historically considered in analyzing veil-piercing, and Razon's criticism of Dahlberg's use of the Litigation Services Handbook as a guide demonstrates the weakness of Razon's position.

Respectfully submitted,


*Kaitlyn A. Crowe*
Kaitlyn A. Crowe


cc: All Counsel of Record (via ECF)