**MANAGEMENT SERVICES AGREEMENT**

This Management Services Agreement (this "Agreement") is made this 9 th day of September 2011, by and between:

**BLOOMBERRY RESORTS AND HOTELS INC.** (formerly known as "Bloombury Investments Holdings, Inc.), a corporation organized and existing under the laws of the Republic of the Philippines with address at Unit 601, 6th Floor Ecoplaza Building, Pasong Tamo Extension, Makati City, Philippines (the "Casino Owner"), and

**SURESTE PROPERTIES, INC.**, a corporation organized and existing under the laws of the Republic of the Philippines with address at 26th Floor, 139 Corporate Center Building, Valero Street, Salcedo Village, Makati City, Philippines (the "Hotel Owner"), and

(The Casino Owner and the Hotel Owner are collectively referred to herein as "Owners").

**GLOBAL GAMING PHILIPPINES LLC,** , a limited liability company organized and existing under the laws of the State of Delaware, U.S.A., with address at c/o Global Gaming Management L.P. 3575 West Post Road, Las Vegas, Nevada, U.S.A. ( "GGAM").

**RECITALS**

A. Casino Owner has a Provisional License issued by the Philippine Amusement and Gaming Corporation ("PAGCOR") to develop, construct and operate a world class integrated casino hotel entertainment facilities (the "Facilities" or "Project") at PAGCOR's Bagong Nayong Pilipino Entertainment City Manila located at the Manila Bay reclamation area in Parañaque City, Metro Manila, Philippines, and Casino Owner has enlisted its parent company, the Hotel Owner to own the hotel and non-gaming component of the Facilities. But for purposes of this Agreement the casino and hotel shall be operated as one integrated business.

B. GGAM, together with its affiliates, is knowledgeable and experienced in developing, operating, managing, directing, and supervising world-class resorts, hotels, casinos and other related facilities.

C. The parties agree for the Owners' to engage GGAM for management and technical services in the development and construction, and to manage the operation of the Facilities.

9.5 The Owner acknowledges that GGAM's affiliate, Cantor G&W (Nevada) L.P. (doing business as Cantor Gaming) is an operator of mobile gaming, race books and sports pools, and its Affiliates own a proprietary mobile gaming system, a proprietary race book and sports pool wagering system. Subject to a permit/consent from PAGCOR, and the written approval of the Owners, GGAM may engage Cantor Gaming for the operation of Cantor Gaming's or its Affiliates' proprietary mobile gaming and race book or sports pool in the Facilities, provided that the terms and conditions of such engagement shall be commercially reasonable and arms length.

## 10. REPRESENTATIONS, WARRANTIES AND COVENANTS

### 10.1 Owners

Owners jointly and severally represent, warrant, and covenant as of the Effective Date that: (A) they are duly formed, validly existing, and in good standing under the laws of the Republic of the Philippines; (B) they have all the requisite rights, power, and authority to enter into this Agreement and perform all their obligations hereunder; (C) this Agreement constitutes the valid and legally binding obligation of Owners, enforceable in accordance with its terms and conditions; (D) neither the execution of this Agreement, nor Owner's performance of the transactions contemplated hereby, will: (i) violate any constitution, statute, regulation, rule, injunction, judgment, order, decree, ruling, charge, or other restriction of any government, governmental agency, or court to which Owners are subject, or (ii) conflict with, result in a breach of, or constitute a default under any agreement to which any Owner is a party; (E) Owners have the right and authority to grant the rights to GGAM as recited herein necessary to perform under this Agreement; (F) Owners (i) directly holds all rights, title, and interest in the Facilities and the PAGCOR license and (ii) shall not transfer their rights, title, and interest without first notifying GGAM; (G) the Facilities are being constructed on land under lease from PAGCOR; (H) the Facilities being constructed are owned by the Owners free from liens and encumbrances, except for the lien of BDO under the BDO Loan; (I) the Casino Owner is the sole owner of the PAGCOR License, it is not in default under the PAGCOR License, and it is not aware of any threatened or possible default under the PAGCOR License, except as disclosed in the Disclosure Letter; (J) the directors, officers and stockholders of the Owners are listed in the Disclosure Letter; (K) the Facilities shall be developed, constructed and maintained as a 5-star international casino-hotel; (L) Owners have not engaged any broker, investment banker, advisor, or any other party to act for the Owners in this transaction where GGAM is liable for their fees; (M) there is no litigation or proceedings pending or threatened against the Owners or the Facilities that could adversely affect the validity of this Agreement or the completion of the Project; (N) Owners have secured the Environmental Compliance Certificate (ECC) and have complied with applicable Philippine environmental laws for the construction and development of the Facilities; (O) the Project Cost prepared by Davis Langdon and Seah attached to the Disclosure Letter is the current best estimate of the



Ben

Email EOccena@ictsi.com

GGAM: c/o Global Gaming Asset Management, L.P. 3575 West Post Road
Las Vegas, Nevada, U.S.A. 89118
Attention: William Weidner
President
Telephone No. (702) 897-5600
Fax No. (702)635-0202
Email weidner@gmail.com

18.3 **Purchase of Shares Option**

GGAM is hereby granted the right to purchase up to ten percent (10%) ownership in the Facilities and the gaming license by purchasing 10% of the shareholdings of the Owners. The purchase price for this 10% interest shall be US$15 Million (representing 10% value of the license) plus 10% of the equity that the Owners have infused to the Project at the time GGAM exercises its option to purchase the 10% shares. This right to purchase 10% interest will expire if it is not exercised by Start Date.

The Parties shall execute a mutually acceptable Option Agreement (the "Option Agreement") to embody the share purchase option under this Clause within sixty (60) days (or such extended periods as the parties may mutually agree) from the date of this Agreement. In the event the Parties are unable or fail to execute the Option Agreement within such period, GGAM shall have the right to terminate this Agreement by sending a notice of termination to the Owners within six (6) months from the expiration of such 60 day (or extended) period. GGAM's right to terminate this Agreement under this Clause 18.3 shall expire if it is not exercised within such 6 months period.

The Parties shall negotiate in the Option Agreement a provision which will protect the equity invested by GGAM (when it exercises the option to purchase 10% ownership interest referred to under the Option Agreement) after the Agreement is terminated under the terms of the Agreement.

In addition, the Parties covenant and agree the Option Agreement shall grant GGAM certain co-investment rights (such rights subject to the mutual agreement of the Parties) in such competing facilities and/or casinos permitted under Clause 18.8, provided that such rights shall be in the same proportion of ownership as provided for in this Clause 18.3 and upon no worse economic terms than those enjoyed by the Owners (or their affiliates or any of their respective officers, directors, partners, shareholders) in making their investment in such competing facilities and/or casinos.





18.12 **Entire Agreement**

This Agreement and the Disclosure Letter and GGAM Disclosure Letter constitute the entire agreement between the Parties hereto pertaining to the subject matter hereof and fully supersedes any and all prior oral or written agreements or understanding between the Parties pertaining to the subject matter hereof.

18.13 **Counterparts**

This Agreement may be executed in several counterparts and all such executed counterparts shall constitute a single agreement, binding on all of the Parties, their successors and assigns. The signature of all of the Parties need not appear on the same counterpart, and delivery of an executed counterpart signature by electronic communications is as effective as executing and delivering this Agreement in the presence of the other Party to this Agreement.

**19. DISPUTES**

19.1 **Mutual Agreement**

The Parties agree to act in good faith to resolve any and all disputes between them at the working group level. Any dispute that cannot be settled by mutual agreement within 30 days and such dispute relates to the interpretation, carrying out of obligations, breach, termination or enforcement of this Agreement or in any way arises out of or is related to this Agreement (except the disputes covered by Annex I) shall be settled exclusively in accordance with Clause 19.2.

19.2 **Arbitration**

Except as required by Annex I with respect to Expert Disputes, any dispute required to be settled in accordance with this Clause 19.2 shall be settled by arbitration in Singapore under the United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules in force at the date of this Agreement (the "Rules"), except that to the extent the then current Rules are inconsistent with the provisions of this Clause 19.2, in which event the terms hereof shall control.

(a) If either Party asserts that a dispute has arisen which is required to be settled in accordance with this Clause 19.2, such asserting Party shall give prompt written notice (or notice as otherwise provided herein) to the other Party. The arbitration shall be administered by a panel of three arbitrators appointed in accordance with the following provision: One arbitrator shall be appointed by each Party (the Owners being considered one Party), and one arbitrator shall be jointly agreed and appointed by the two arbitrators chosen by the Parties. Arbitration proceedings shall take place in English.



Beny

(b) The decision of the arbitration panel shall be final and binding on the Parties, without right of appeal. The Parties agree in advance that if one Party initiates arbitration, the other Party shall be bound to participate, and the decision of the arbitration panel shall be binding upon both Parties and enforceable in all jurisdictions.

(c) The arbitrators may consolidate proceedings with respect to any dispute under this Agreement with proceedings with respect to any related controversy under this Agreement. However, except as specifically set forth in the preceding sentence: (i) arbitration only will be conducted on an individual, not class-wide, basis; (ii) only GGAM and Owners (and their Affiliates and their respective officers, directors, owners, employees, agents and representatives) may be parties to any arbitration proceeding described in this Clause 19.2; and (iii) no such arbitration proceeding shall be consolidated with any other arbitration proceeding involving GGAM or Owners and/or any other Person. Except in connection with claims by third-parties for which a Party is entitled to indemnification pursuant to this Agreement (including claims where such third-party is seeking multiple, exemplary or punitive damages), the award may not include, and the parties specifically waive any right to an award of multiple, exemplary or punitive damages.

(d) The Parties agree that, in connection with any arbitration proceeding, each Party must submit or file any claim which would constitute a compulsory counterclaim within the same proceeding as the claims to which it relates. Any such claim which is not submitted of files will be forever barred unless written notice specifying such claim is provided to the other Party within twenty-four (24) calendar months after the later of (i) the date of such breach or violation; and (ii) the date of discovery of the facts (or the date the facts could have been discovered, using commercially reasonably diligence) giving rise to such breach or violation. Such written notice shall not toll any applicable statute of limitations.

(e) Notwithstanding anything to the contrary contained in this Agreement, the Parties shall each have the right in the proper case to obtain temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction, provided that, each Party must contemporaneously submit their dispute for arbitration on the merits, if required herein.

(f) The provisions of this Clause 19.2 are intended to benefit and bind third-party non-signatories and shall continue in full force and effect subsequent to and withstanding the expiration or termination or this Agreement.

(g) In addition to the Rules, the Parties agree that the arbitration shall be conducted according to the International Bar Association Rules of Evidence as current on the date of the commencement of the arbitration. The arbitration panel shall order each Party to submit within a specified

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed on the date stated above, in the place indicated below.

**BLOOMBERRY RESORTS AND HOTELS INC.**
By:

Name: Enrique K. Razon, Jr.
Designation: Chairman and CEO
Place Signed:

**SURESTE PROPERTIES, INC.**

By:

Name: Enrique K. Razon, Jr.
Designation: Chairman and CEO
Place Signed:

**GLOBAL GAMING PHILIPPINES LLC**

By:

Name: William Weidner
Designation: CEO
Place Signed:

[Signature Page to Management Services Agreement]

EXHIBIT A




*Certain other parties hold non-economic interests