IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010)

BETWEEN

GLOBAL GAMING PHILIPPINES LLC

and

GGAM NETHERLANDS B.V.

(*CLAIMANTS*)

- versus -

BLOOMBERRY RESORTS AND HOTELS INC.

and

SURESTE PROPERTIES, INC.

(*RESPONDENTS*)

---

DECLARATION OF ENRIQUE K. RAZON, JR.

---

December 7, 2014

Subject to Arbitration Confidentiality Orders                                                              BLOOM_0097178

where casino revenue outstripped the casino revenue in Las Vegas just 3 years after the Macau government opened up the issuance of gaming licenses. I was confident that the Philippines would be able to develop a robust gaming industry once gaming licenses are issued to private operators.

### Initial Contact with GGAM

6. In early 2011, we decided to hire SpencerStuart, an executive search firm, to identify a Chief Operating Officer for the Solaire—the position that would be responsible for the daily operations of the Solaire. It was important for us to engage a COO far enough in advance of the Solaire's opening so that he or she could begin hiring members of the management team and putting into place the necessary policies and procedures to run the Solaire's hotel and casino operations.

7. SpencerStuart arranged for me to interview a number of highly qualified candidates for the COO position. Among them was Tom Arasi, the former CEO of Marina Bay Sands, whom we would later end up hiring to replace Michael French as the COO of the Solaire. SpencerStuart also suggested that I speak with Garry Saunders, the former COO of Melco Crown, because he had experience in start-up casinos and managing gaming operations in Las Vegas and Asia. I received a document containing background information on both Mr. Saunders and Global Gaming Asset Management or GGAM, the management company that Mr. Saunders had formed with Bill Weidner and Brad Stone, his former colleagues at Las Vegas Sands Corp. I agreed to meet with Mr. Saunders, along with the other two GGAM principals, in Las Vegas in March 2011.

8. During my initial meeting with Messrs. Weidner, Stone and Saunders, they presented themselves essentially as Las Vegas Sands Corp, with their "100 years of collective experience." They told me that that they were the reason for the success of Las Vegas Sands Corp. and that Sheldon Adelson, the CEO of Las Vegas Sands Corp., was actually just an impediment to their success. They assured me that they could deliver for the Solaire the same things that they delivered for the numerous other casino-resorts in Asia that they developed, opened and operated. This included putting in place policies and procedures for operating the Solaire and crafting a marketing plan that would utilize tried and true methods as well as Philippine-specific aspects, among other things. Messrs. Weidner, Stone and Saunders also assured me that they would be extremely "hands-on" in their management of the Solaire, and that all three of them, specifically Mr. Weidner, would spend a significant amount of time on the ground at the Solaire.

9. When I explained that I wanted to develop a large VIP business at the Solaire, they assured me that if they were retained this would not be an issue. They touted their strong relationships with "junket operators" in Asia (particularly in Macau), whom they claimed to communicate with regularly, and explained to me that they would use these relationships to bring VIP players ("high rollers") into the Solaire. They also claimed to have a database of foreign (*i.e.*, non-Filipino) VIP players, and that they would bring these VIP players into the Solaire. Based on the size of Las Vegas Sands Corp., the multiple casinos they had recently opened throughout Asia, and the high ranking

Subject to Arbitration Confidentiality Orders BLOOM_0097180

positions that the GGAM principals held at Las Vegas Sands Corp., I believed them when they told me that they had these connections.

10. Essentially, GGAM was offering me all the benefits of having Las Vegas Sands Corp. as a management company, without having to have the Las Vegas Sands brand attached to the Solaire. This was a major selling point for me, as I did not want the Solaire to be a location for another brand—I wanted the Solaire to be my own brand. I had already been approached by Caesars Palace and MGM to partner with me and offer their management services under their respective brands, but I refused because I did not want another brand attached to the Solaire. With GGAM, I thought I would be getting the best of both worlds: a top shelf management company equivalent to or better than Las Vegas Sands Corp., and my own brand.

<u>Equity Option Offer and Negotiations of the MSA</u>

11. Based on GGAM's representations that they could essentially bring Las Vegas Sands Corp. management to Manila, I offered GGAM an arrangement that was as close to full-time management as possible, with GGAM also being the main driver of the Solaire Project. For these services, I proposed something that was more than just a typical, fee-for-services management contract in terms of compensation.

12. In addition to management fees, we discussed granting GGAM an option to purchase equity in the Solaire as an additional compensation component. The option would be equivalent to 10% of my shareholdings in the Solaire at essentially owner's cost plus a corresponding portion of the value of the PAGCOR license. I intended this equity option component to incentivize GGAM to perform as managers. I thought that if they had equity stake in the business, then our interests, as owner and manager, could be aligned. A typical management contract would not be sufficient for the arrangement I envisioned.

13. Mr. Weidner promised that they would draw up a proposal for our agreement. I received a draft term sheet from them describing their proposal to serve as the management company for the Solaire Project. They would provide all necessary oversight for the development and operations of the Solaire. This term sheet was followed by a longer draft "Management Facilities Services Preliminary Agreement" from their lawyer, Mr. Tony Cabot. I am told that in this arbitration Mr. Weidner has referred to this draft as just a "fleshed-out term sheet." That was not my understanding. Mr. Cabot's draft was a detailed contract that was consistent with my understanding that this management agreement would be the governing document of our partnership. At that point in time, we did not envision or negotiate two separate agreements. This draft from Mr. Cabot presented the sliding scale of VIP fees based on EBITDA and the equity option as compensation. This is exactly the concept that I had discussed with the GGAM principals.

14. It is absurd to suggest that the equity option was anything but compensation for GGAM as managers of the Solaire. Why else would I have given them the Shares? I was not looking for investors—if I wanted investors, I would have gone to any one of the numerous institutional investors, such as Capital Group, that had invested in ICTSI.

Subject to Arbitration Confidentiality Orders

BLOOM_0097181

They would have been more than willing to invest a substantial amount of money in the Solaire Project.

15. After numerous exchange of emails with the GGAM principals to reach agreement on the basic concepts and terms of the agreement, I turned over the negotiation of the management services agreement to our finance team under Estella Occefia and our legal team under Benny Tan. But they reported to me regularly and final decision was always mine. We had several meetings with Gary and Brad, and we thought that we had the management services agreement ready to sign. But then Cantor Fitzgerald came in and raised new issues which pushed the signing of the agreement back.

16. Ultimately, after negotiating what would become the Management Services Agreement ("MSA") for several months, we had to execute a "two-part" agreement. The concept of a separate Equity Option Agreement was introduced by GGAM. I needed GGAM to begin providing its management services for the Solaire, so we agreed to execute the MSA. The MSA explicitly granted the equity option to GGAM, however we left the specific terms relating to the exercise of the equity option in a separate agreement. GGAM sent a draft of the Equity Option Agreement and Shareholders Agreement (later called "Participation Agreement") but it was not acceptable to us.

17. The negotiations for the Equity Option Agreement ("EOA") and the Participation Agreement continued for a few more months, leading up to the "road show" for the top-up offering of shares in BRC. Cantor Fitzgerald had no role in the management of the Solaire, or any other aspect of the Solaire Project, yet Cantor Fitzgerald had asked for provisions in the Shareholders Agreement to be involved in fund raising for the project, but we rejected their request. It appeared to me that Cantor Fitzgerald was trying to leverage GGAM's agreement with Bloomberry in a way to advance its own interests. The negotiation was also delayed because my finance and legal teams were busy in the acquisition of a listed company for the back-door listing of the Solaire project.

18. A few days prior to the start of the road show, GGAM threatened to withhold their participation unless we conceded certain negotiation points and signed the version of the EOA that GGAM wanted. GGAM's participation in the road show as managers of the Solaire was such a basic, anticipated component that I was surprised and disappointed that they would try to use their participation as leverage. GGAM knew that as the managers of the Solaire, the GGAM management team was a fundamental part of the top-up offering story—investors would expect to meet the people managing their investment. Ultimately, because we did not want to proceed with the road show without their participation, we gave in to GGAM's demands.

19. More than anything, GGAM's last-minute threat to back out of the road show demonstrated to me the way that GGAM was prepared to do business. I had given them a huge stake in the Solaire, but, instead of acting like true partners, GGAM was interested in protecting and pursuing their own interests. Their attempt to blackmail me at the last minute shows that they were not focused on the long-term relationship. Rather, they were attempting to get all of their performance incentives up-front.

Subject to Arbitration Confidentiality Orders

BLOOM_0097182

## Top-up Offering and Road Show

20. I have been told that GGAM claims to be responsible for the success of the top-up offering and for "taking Bloomberry public." These statements completely distort the top-up offering process. It is true that GGAM's principals participated in the road show as managers, but the way GGAM now tries to present itself as having "taken us public" is pure fantasy.

21. To return to reality, the top up offering was a success because the Solaire had solid business fundamentals and offered a unique opportunity to investors. At the time, the gaming industry in Asia was booming, and the Philippines, which had recently liberalized gaming, was positioning itself to become the next big Asian gaming market. Resorts World Manila, a casino run by Genting Group located near Manila's airport, had already proved that gaming in the Philippines could be highly profitable. The creation of "Entertainment City," with its lower tax rates and superior waterfront location, offered an even better opportunity to capitalize on this recently liberalized gaming market. We had one of four licenses to build an integrated casino-resort in Entertainment City, and invested over US$ 200 million of my own capital to launch the Solaire Project. Not only would the Solaire be the first of the four integrated casino-resorts in Entertainment City, but it would have the best location.

22. Another important contributor to the success of the top-up offering was my personal involvement in Bloomberry as CEO and majority shareholder, and the confidence that this inspired in investors. In March 2007, another one of my companies, ICTSI, held a private share placement for a select group of investors. Over the course of the next 5 years, ICTSI's revenues and profits increased dramatically, and the investors in ICTSI's 2007 share placement reaped enormous returns on their investments. Many of the investors we met on the road show were people who were known to me from ICTSI's 2007 share placement, and who were eager to invest in another one of my companies. This included Capital Group, our "anchor investor" that ultimately purchased more than 10% of the shares issued under BRC's top-up offering—more than twice as many shares as any other investor. I ended up allocating a major portion of the shares issued under BRC's top-up offering to ICTSI investors. I could have allocated all of the shares to ICTSI investors—they wanted to purchase more shares than we were offering. But I decided to allocate the shares among a larger and more diverse pool of investors.

23. Six of our biggest investors in the top-up offering I met with in "1-on-1" meetings held in Hong Kong and London. On the whole, I received lots of feedback from investors I met with (both ICTSI and non-ICTSI investors) who were very excited about new gaming opportunities in Asia generally and the Philippines specifically.

24. GGAM's principals, unlike me, did not add any value by bringing potential investors to the table. I recall that there were two investors that Brad Stone arranged for us to meet on the road show; however neither of those investors ended up investing with us.

25. During the road show, I was disappointed to find that GGAM, Brad Stone in particular, was using the road show as a way to promote GGAM as a new company, not necessarily

Subject to Arbitration Confidentiality Orders  BLOOM_0097183

41. Unfortunately, this did not solve GGAM's marketing problem. Over the next few months it became painfully apparent that there was little to nothing in place in the form of an actionable marketing plan—Mr. French was coming up with marketing campaigns and promotions on the fly.

42. Because GGAM was not managing or operating the Solaire effectively, the Bloomberry team had to become more involved. I had no interest in or plan to run a casino, and the last thing I wanted to do was to fire GGAM. But the writing was on the wall—they were not up to the task.

43. GGAM's fundamental problem was not only a failure to perform; it was also an inability or perhaps unwillingness to perform. It became apparent that GGAM could not or would not fulfill their promises and my reasonable expectations in hiring them. I decided to send a notice of my intention to terminate GGAM as the management services provider, because I had limited time to improve the Solaire's performance, and GGAM's breaches were so fundamental to the MSA.

44. For example, one of the ways GGAM misled me was with respect to their promise to provide highly sought-after "Guest Data"—which included the GGAM database of foreign VIP players they claimed they would use to bring VIP players into the Solaire. During my initial meeting with GGAM's principals, they represented to me that they had personal relationships with junket operators and access to VIP players. During the negotiations of the MSA, GGAM heavily negotiated the language regarding "Guest Data." Ultimately, we agreed that GGAM would maintain ownership of their Guest Data, Bloomberry would maintain ownership of the new Guest Data developed at the Solaire, and each of us was free to use the other's Guest Data. GGAM sold themselves as having this Guest Data, which they caused us to believe was extremely valuable. GGAM's failure to deliver this Guest Data was just one of many examples of GGAM overselling what they could offer as the management services provider for the Solaire.

45. In addition to their claims about connections to foreign VIP players, Mssrs. Weidner, Stone and Saunders also indicated they had direct contacts with junket operators in Asia, particularly in Macau. They claimed that they were in frequent contact with these junket operators and could easily get them to come to the Solaire. I recall that during a road show presentation at the St. Regis Hotel in New York, one of the institutional investors that we were presenting to asked Mr. Weidner how he would get junket operators to come to the Solaire. Mr. Weidner gave a short and matter of fact response: "7 phone calls."

46. Contrary to what I have been told about Mr. Weidner's testimony in this arbitration, he did not have to teach me about the importance of junket operators and VIP players to a casino's operations. It is well known that junket operators and VIP players are critical for gaming success in Asia. In fact, this was one of the issues I raised with Mr. Weidner during our initial discussion in Las Vegas. A main reason I hired GGAM was because they caused me to believe that they had relationships with junket operators and VIP players who would come to the Solaire.

Subject to Arbitration Confidentiality Orders

BLOOM_0097187

there was a chance that Bloomberry and GGAM could go their separate ways without negative publicity and years of lengthy and expensive litigation.

53. I stand by my other statement that, in my opinion, GGAM was just a glorified executive search firm. Rather than fulfilling their obligations under the MSA, they sought to identify other people who could do that job for them. Clearly, GGAM was not up to the task and the hype.

54. After GGAM was fired, certain other of their Management Team hires were let go or encouraged to resign. For example, I had known for quite some time that Mr. French was ineffective as the COO.

55. I was recently shown an email that Mr. French sent to one of GGAM's principals, Mr. Saunders, on August 2, 2013. This email, which is over four pages long, says it offers a summary of a meeting I had with Mr. French on that date. This "summary" is not an accurate description of my statements during that meeting. It was obviously crafted as a self-serving document for the benefit of GGAM and Mr. French in the event that either or both were fired. The email demonstrates the gossiping, indirection and internal politicking that did not give me faith in the ability of Mr. French—or GGAM, for that matter—to manage the Solaire.

56. Although I expected and hoped for a long and fruitful partnership with GGAM, their misrepresentations ultimately made that partnership impossible. Examples are that GGAM could not or would not deliver the Guest Data, policies and procedures, Business Plan, marketing plans, VIP players, junket operators and "hands on" management services that they promised. Simply put, they promised to deliver the benefits of having Las Vegas Sands Corp. as a management company. I was and remain extremely disappointed that they were unable to live up to their hype.

I attest to the truth of the foregoing.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of December 2014 in New York, USA.

ENRIQUE K. RAZON, JR.

Subject to Arbitration Confidentiality Orders

BLOOM_0097189