IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010) BETWEEN:

GLOBAL GAMING PHILIPPINES LLC

and

GGAM NETHERLANDS B.V.

(CLAIMANTS)

- versus -

BLOOMBERRY RESORTS AND HOTELS INC.

and

SURESTE PROPERTIES, INC.

(RESPONDENTS)

---

DECLARATION OF GARRY W. SAUNDERS IN SUPPORT OF CLAIMANTS' REPLY MEMORIAL

---



EXHIBIT
Saunders
2023
4/22/22  DL

Subject to Arbitration Confidentiality Orders                                             BLOOM_0099006

Hong told me that the Project, which would later be named Solaire, was owned by Mr. Enrique Razon, a wealthy entrepreneur who had made his fortune in the port industry. The Project, which would be the first integrated resort in a specially-designated area of Manila known as Entertainment City, was also Mr. Razon's first gaming venture. I was intrigued by the opportunity but declined to consider the position. I told Ms. Hong, that in my experience and judgment, it would be a risky proposition for an owner unfamiliar with this industry to hire a single person and depend upon them to successfully manage the development, pre-opening activities including all hiring, and successfully open a project that is already under construction. This is particularly true for a sophisticated gaming resort product in a nascent market like the Philippines. I made Ms. Hong aware of our newly-formed company and she suggested that Mr. Razon consider meeting with us to discuss possibilities of working together. While she said that she still had an engagement to hire a COO, she agreed that this project and the owner needed additional and broader support for what lies ahead.

14. I have read Mr. Razon's declaration filed in this Arbitration. My recollection of the Parties' initial meeting is quite different than Mr. Razon's, including who was even present. Mr. Stone did not attend the meeting; it was just Mr. Weidner, Mr. Razon, and I. We met for about one hour at the location of his choosing—a cocktail lounge in the Encore resort in Las Vegas.

15. This initial discussion covered a number of topics and Mr. Weidner and I discussed a number of issues with Mr. Razon. First, we described GGAM's organizational structure and its business objectives, which included building a diverse, global portfolio of gaming investments and management opportunities. We explained the respective backgrounds and roles of the three principals as well as what each brought to the table. Mr. Weidner as CEO was primarily responsible for identifying business opportunities, negotiating the principal deal terms, and for leveraging his network of contacts, especially in Asia, to generate patronage of high net worth individuals. Brad Stone and I would focus on pre-Opening and operating issues, with more direct involvement in the day-to-day strategies and activities of the project. In addition, Mr. Stone, who for years had overseen the construction and development of some of the largest and most impressive resort properties in the world, would provide critical guidance and assistance to the construction phase of the project. Of course, we (and Mr. Razon) recognized that there is substantial overlap among our three roles because each of us would contribute substantial value in terms of positioning, marketing, and operating the property successfully based on our experience and expertise in the industry generally, and Asia specifically. We also explained to Mr. Razon that GGAM was not just comprised of Mr. Weidner, Mr. Stone, and I, but that it was also a 50/50 partnership with Cantor Fitzgerald, one of the largest

financial institutions in the world, whose role was to provide the GGAM venture with investment capital, support services, and additional stability and credibility in the financial markets.

16. It was clear that Mr. Razon had read about our backgrounds and was familiar with our reputations and the properties that we had developed while at LVS and Melco Crown. I think that was one of the major attributes that drew him to us, as it was his goal to position his resort to have a similar "wow" factor as those properties. In fact, Mr. Razon told us that he wanted his property to look like and operate like a Wynn property, but that he did not want to spend the sort of money that Steve Wynn does to achieve those results. Mr. Razon used the phrase "Wynn-like", or possibly "Wynn-lite". I did not understand exactly which he said given the sound environment of the cocktail lounge we were, in but either alternative is roughly the same given his comment about wanting to spend less money. It made sense why Mr. Razon was not seeking to obtain the expertise and know-how that he needed from a brand-name casino operator, such as a Wynn, MGM, or LVS: Doing so would have required that he surrender significant financial control of his property and his own brand name (which he was trying to establish).

17. Mr. Razon told us that because Solaire would be the first luxury casino of this kind in the Philippines, he was confident that his property would be able to attract the local Philippine gaming market without much difficulty.

18. By contrast to the demand he expected from the local mass market, Mr. Razon seemed less confident in his ability to generate a large VIP business at his resort. Based on our experience in Macau and in Singapore over the past decade, we assured Mr. Razon that we were well suited to seek and to capture that market segment. We acknowledged that we had existing relationships in Asia, and we stated that would be able to leverage those connections to build a marketing team for Solaire's benefit.

19. There was absolutely no discussion of our having existing policies and procedures that could be transferred to Solaire, nor was there any discussion regarding an existing database of foreign VIP customers. It is absurd to even consider that Mr. Razon would have gone into that level of detail during an introductory meet and greet session (that lasted approximately one hour in a noisy cocktail lounge). And it is also absurd that we or he would not recognize the inherent confidentiality of such materials. Mr. Weidner and I certainly did not promise anything like that to him.

20. We did suggest to Mr. Razon that, if engaged, we would oversee a range of activities necessary for a successful opening and subsequent operations, such as advising and assisting with the oversight of construction, identifying and hiring the talent needed to manage the various functional

4

105. Based on the submitted invoices, I understand that the total amount of GGAM's outstanding reimbursable out-of-pocket expenses incurred from July 2012 through June 2013, equals approximately US$288,031.

106. Of this total amount, US$242,474 reflect expenses we incurred performing work related to the MSA Services, and US$45,557 reflect expenses we incurred performing work on behalf of Bloomberry Resorts Corp., but outside the scope of the MSA, e.g., attending investor conference in November 2012 and December 2012 and traveling to Buenos Aires, Argentina to investigate and evaluate Mr. Razon's potential business opportunity in February 2013.

### The Owners' Defamatory Statements Have Harmed and Continue to Harm GGAM

107. The false and damaging public statements made by Mr. Razon and Respondents in their filings before the Philippine Stock Exchange and in the media are addressed in virtually every one of my external interactions, whether they are with colleagues, potential business partners, potential investors, regulators, or with potential employees. I am repeatedly asked whether there is any validity to the Owners' statements characterizing GGAM's performance under the MSA, including, for example, GGAM allegedly being a "glorified executive search firm" and allegedly failing to dedicate "any time and attention to the Solaire." Moreover, these statements, and not just the fact that there is a pending Arbitration between GGAM and the Owners, are published in nearly every widely-circulated industry periodical.

108. These defamatory statements have created a negative cloud that hangs over GGAM and its business pursuits. The statements are particularly harmful to GGAM, as a new investment and management entity trying to gain traction in the industry, because the Solaire was GGAM's first project. If the Owners had published these statements prior to our management agreement with the Baha Mar project, we probably would not have been able to consummate that deal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: June 14, 2015

_____
Garry W. Saunders

Subject to Arbitration Confidentiality Orders

BLOOM_0099039