Case 1:21-cv-02655-LGS-SN   Document 329-16   Filed 01/26/23   Page 1 of 8
CONFIDENTIAL - Attorneys' Eyes Only
Deposition of William P. Weidner                     Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - - - - x
 3                                       :
     GLOBAL GAMING PHILIPPINES, LLC,      :
 4                                       :
               Plaintiff,                :
 5                                       :
         v.                               : Case No.
 6                                       : 21-CV-2655
     ENRIQUE K. RAZON, JR.;              : (LGS)(SN)
 7   BLOOMBERRY RESORTS AND HOTELS INC.; :
     SURESTE PROPERTIES INC.;            :
 8                                       :
               Defendants.               :
 9                                       :
     - - - - - - - - - - - - - - - - - - x
10
                 REMOTE VIDEOTAPED DEPOSITION OF
11
                        WILLIAM P. WEIDNER
12
          **** Confidential - Attorneys' Eyes Only ****
13
                        April 20, 2022
14

15       REMOTE VIDEOTAPED DEPOSITION OF WILLIAM P.
     WEIDNER, produced as a witness at the instance of
16   the Plaintiff, and duly sworn remotely, was taken in
     the above-styled and numbered cause on April 20,
17   2022, from 9:04 a.m. (PST) to 4:35 p.m. (PST),
     remotely before Dawn K. Larson, RDR, CRR, reported
18   by machine shorthand, pursuant to the Rule 30 of the
     Federal Rules of Civil Procedure and the provisions
19   stated on the record.

20

21

22

23

24

25
```

Case 1:21-cv-02655-LGS-SN Document 329-16 Filed 01/26/23 Page 2 of 8
CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 9

Q. Who are the other employees now?
A. Brad Stone, Garry Saunders, and my son James.
Q. Anyone else?
A. No.
Q. When did you first meet Enrique Razon?
A. Early 2011.
Q. Okay. And how did it come to be that you met Mr. Razon?
A. Garry Saunders had -- I think an executive recruiter had talked to Garry Saunders and said that Razon was developing a casino in the Philippines.
Q. And did -- and did that reach-out from the executive recruiter ultimately result in a meeting between yourself, Mr. Saunders, and Mr. Razon?
A. Yes.
Q. And how was the meeting arranged?
A. I don't recall.
Q. Where was the meeting?
A. It was in the "bar lounge" of the Wynn Resort here in Las Vegas.
Q. About how long did the meeting last?
A. I would say an hour or so.
Q. This was meeting in a cocktail lounge; right?

Page 10

A. Correct.
Q. Not a private meeting. There were other people around drinking and enjoying the cocktail lounge; right?
A. It's a rather subdued cocktail lounge. We were at a low table. It wasn't a raucous bar. It was a daytime meeting in a cocktail lounge.
Q. Okay. Not a private meeting. You weren't in a private room or anything like that?
A. No.
Q. Okay. Did you have any understanding of why Mr. Razon was in the U.S.?
A. No.
Q. Do you know whether he was coming to meet just with you or he had other business on that trip?
A. I don't know.
Q. And did you do any research on Mr. Razon before you met with him?
MR. PASCUCCI: To the extent that -- I object to the extent that question may call for attorney-client communications.
So you can answer the question to the extent that you can provide your answer without referring to any communications you were having with your counsel at the time.

Page 11

A. I had not.
BY MR. PERRY:
Q. Did you -- just a yes-or-no question.
Did you meet with counsel in advance of your meeting with Mr. Razon?
A. No.
Q. Did -- what did you understand Mr. Razon's background to be when you met with him in 2011?
A. I knew he was a Filipino businessman. I was told by Garry that he was developing a casino hotel in the Bay project area there, the new development project there. I didn't know much beyond that.
Q. Okay. And is it fair to say that he was looking for someone or a team to manage that project in Manila?
A. I understood that that's what he was looking for, yes.
Q. Do you recall any discussion of Cantor Fitzgerald at the first meeting?
A. I do.
Q. What do you recall about that?
A. That we discussed that we were -- we had an entity, which was a joint venture, or whatever you would call it, a company, that was a combination

Page 12

of Gaming Asset Management, GAM, and Cantor Fitzgerald.
Q. Okay. And was that something you brought up or something that he raised?
A. I believe we brought it up.
Q. Okay. And you didn't understand him to be looking for investment banking or financial advisory services when he met with you; right?
A. There were ranging discussion as the meet-and-greet session went on.
Q. But you would agree with me that the purpose of the meeting was to discuss what GGAM could do, not what Cantor could do; right?
MR. PASCUCCI: Objection. Vague and ambiguous.
A. When?
BY MR. PERRY:
Q. The first meeting at the cocktail lounge.
A. So any of the -- oh, the first meeting.
Anytime during the discussion of the first meeting?
Q. Yeah.
A. My recollection was that the first meeting started as just a kind of meet-and-greet and then grew into a discussion of what Mr. Razon wanted to

Case 1:21-cv-02655-LGS-SN Document 329-16 Filed 01/26/23 Page 3 of 8
CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 13

1  do with his development of his casino hotel.
2      Q. And you would agree with me that the -- at
3  least from your observations of Mr. Razon, he was
4  looking to GGAM to provide management services for
5  that hotel; correct?
6      A. My recollection was it was at that
7  conversation where the first suggestion of alignment
8  of interest, which would include what he called and
9  what most people call "having skin in the game."
10     Q. Okay. So that's a reference to what
11 ultimately became the Equity Option Agreement? Yes?
12         MR. PASCUCCI: Objection. Ambiguous.
13     A. It was a colloquial business term that
14 said, "I don't really just want management. I want
15 someone that has "skin in the game," that has money
16 in the future of the potentiality of the business.
17         BY MR. PERRY:
18     Q. Okay. So just broad-brush, what did you
19 understand, based on this first meeting, Mr. Razon
20 was looking to GGAM potentially to do?
21     A. To both manage and bring investment to the
22 table.
23     Q. And the investment to the table, did you
24 have -- did you discuss how the investment would
25 work at the initial meeting?

Page 14

1      A. I believe that the discussion related to
2  Cantor's role as our partner, as our -- call it
3  merchant bank; a merchant banking relationship as
4  our partner.
5      Q. Okay. Well, you just used the words "skin
6  in the game." Is that a term Mr. Razon or you used
7  during the first meeting?
8      A. I think I said Mr. Razon talked of "skin
9  in the game."
10     Q. Okay. Is it your testimony that there was
11 discussion about Cantor making an investment at this
12 first meeting in the Overlook Lounge?
13     A. Yes.
14     Q. And you believe that that is the "skin in
15 the game" that you were discussing, an investment by
16 Cantor in the project at the first meeting?
17         MR. PASCUCCI: Objection. Argumentative.
18     A. Whether the Cantor investment was
19 discussed as being the source of capital for "skin
20 in the game" or whether the relationship between
21 GAM -- my recollection was GAM/Cantor was discussed,
22 about what we are.
23         BY MR. PERRY:
24     Q. Right.
25     A. GGAM is the combination of the two. The

Page 15

1  role of Cantor, in our arrangement, that is, the
2  GGAM, Global Gaming Asset Management, that joint
3  venture was a merchant banking to back what we would
4  be doing. That may have been totally separate from
5  talking with "skin in the game," but I don't know.
6  I just don't recall the detail, but the concept was
7  Cantor is our partner. We have a merchant banking
8  relationship with Cantor.
9          He was the one who said he wanted "skin in
10 the game." So I can't -- my understanding -- I know
11 what his understanding was. You're asking me his.
12 My understanding was he clearly understood that to
13 have their merchant banking side of GGAM, and he
14 wanted "skin in the game." So I don't know what he
15 was thinking -- well, I know what I was thinking.
16     Q. Okay. So you were thinking -- well,
17 strike that.
18         During this first meeting, was there any
19 discussion specifically about how an equity
20 investment would be structured?
21     A. "Structured" is a long word. Two
22 businessmen sitting around saying, I'll sell you up
23 to 10 percent of it -- I'm using a hypothetical now.
24 That's not a structure. That's a discussion of
25 "skin in the game." So I don't know that I would

Page 16

1  adopt the term "structure."
2          He wanted money on our side of the table
3  to make sure our interests were aligned, and Cantor
4  is a very sophisticated organization. But I
5  wouldn't call it "structure." I would call it a
6  discussion, and the source of funds, being the
7  merchant bank, would be Cantor. That was my
8  understanding.
9      Q. Okay. Were there any Cantor officials at
10 the meeting?
11     A. No.
12     Q. Did you present any Cantor pamphlets or
13 materials at the meeting?
14     A. Not that I recall, no.
15     Q. What was the next step, as you understood
16 it, leaving the meeting?
17     A. I don't recall.
18     Q. Okay. Did you subsequently engage in
19 negotiations over the terms of a business
20 arrangement between GGAM and Bloomberry?
21     A. At some point.
22        (Comments off microphone.)
23        (Defendants' Exhibit 2001 was marked.)
24     A. I want to make sure. Give me a minute.
25     Q. Go ahead. I'm just going to introduce the

Case 1:21-cv-02655-LGS-SN Document 329-16 Filed 01/26/23 Page 4 of 8
CONFIDENTIAL - Attorneys' Eyes Only
Deposition of William P. Weidner                Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 21

1  A. Yes.
2  Q. And you respond above: "Ricky, Garry and
3 I are working on a simple outline of a proposal for
4 you."
5      Do you see that?
6  A. Yes.
7  Q. And do you recall preparing such a
8 proposal?
9  A. Yes.
10 Q. And how was it prepared?
11 A. I don't recall. Just discussions among
12 Brad, Garry, myself and the people at Cantor about
13 what we were pursuing.
14 Q. Okay. And who prepared -- well --
15     (Defendants' Exhibit 2002 was marked.)
16 Q. Before you is Deposition Exhibit 2002.
17 It's an email chain starting on March 2, 2011. It's
18 Bates-labeled BLOOM_76859, and I just direct your
19 attention to your email at the bottom.
20     Let me know when you're done with this
21 review, sir.
22 A. Of this very first document?
23 Q. Yes.
24 A. Yes. Okay.
25 Q. Just directing your attention to the email

Page 22

1 at the bottom, you write to Mr. Razon on March 21.
2 You -- there's extensive discussion about management
3 of the project and supervision of construction, and
4 the concept was you, along with your colleagues and
5 people that would be appointed, would manage that
6 process; correct?
7     That's what you are proposing here.
8  A. I don't understand the question.
9     Would you repeat?
10 Q. Okay. You write at the start of the
11 fourth paragraph: "We will dedicate a significant
12 part of our time supervising construction and
13 pre-opening activities."
14     What did you mean by that?
15    MR. PASCUCCI: Just going to note for the
16 record that there was an ellipsis in there. You
17 skipped some text. I just want it in the record so
18 we have that clear.
19 A. You're looking at the same sentence: "We
20 will dedicate" --
21    BY MR. PERRY:
22 Q. Yeah, "We will dedicate" --
23 A. -- "part of our time."
24 Q. Okay. What did you mean when you wrote:
25 "We will dedicate a significant part of our time

Page 23

1 supervising construction"?
2  A. The supervision of construction, even for
3 a project in Manila would have been done from the
4 U.S. I mean, the expertise of Brad and Garry and
5 myself, even though we built properties in Asia,
6 much of the time was spent in the U.S -- and as the
7 parenthesis says after that statement, putting a
8 trusted, tested person, we have experience with
9 full-time on the ground in the Manila.
10    Only that person was our liaison, and so a
11 significant portion of the work is done from our
12 experience in the U.S. We periodically visit. So
13 we would dedicate a significant part of our time,
14 but that wouldn't necessarily mean it's in Manila.
15 We want to be clear that we'd put a trusted, tested
16 person full-time on the ground who was walking in
17 the mud, but we would be doing the overall
18 supervision from the U.S. or wherever it is that we
19 were.
20 Q. And you would be doing that from Nevada;
21 right?
22 A. We would be doing it in Nevada, we would
23 be doing things in New York because we would be
24 liaison with our back-of-house -- accounting, tax,
25 legal, et cetera -- that was Cantor. So we would

Page 24

1 have activities going on relating to financing, or
2 we would have someone assigned from Cantor to us.
3 So the activities are in the U.S., in Nevada, New
4 York or other places that may relate to the actual
5 construction itself.
6  Q. Okay. Cantor doesn't have any expertise
7 in the supervising construction projects in Manila,
8 do they, sir?
9     MR. PASCUCCI: Objection. Calls for
10 speculation.
11 A. If they are our backbone, if they are
12 processors of accounting -- and they are involved
13 with us in backing us up in our support. So we
14 wanted to be clear that we would supervise
15 certainly, but we would have a person on the ground
16 that would have a full-time responsibility.
17    BY MR. PERRY:
18 Q. But you would agree with me, there's
19 nothing in this email about Cantor; right?
20 A. I'm not -- I'm telling you what we are
21 doing and how we are doing it. Okay. And so I'm
22 just saying that we wanted to be clear that we would
23 not be on the ground, and the support needed to
24 perform the work would be multifaceted. There would
25 be a person on the ground full-time. That's all I'm

Case 1:21-cv-02655-LGS-SN Document 329-16 Filed 01/26/23 Page 5 of 8
CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner                                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 37

1  You have no -- is it a fact that you have
2 no independent recollection, as you sit here today,
3 of working with Cantor personnel assigned to GGAM on
4 this term sheet?
5     A.  I do not recall.  I worked with Garry
6 Saunders, who did most of the paperwork aspects of
7 GGAM, and he would be then working with our folks at
8 GGAM or at Cantor for GGAM.
9     Q.  So we'll ask Mr. Saunders about it as
10 well.  And then I understood you to say it's based
11 on the fact that it had the GGAM name.  You believe
12 someone would have run this by Cantor just in the
13 normal course of business, but you don't
14 specifically recall that one way or another.
15     Did I get that right?
16     A.  You can never say never.  Okay.  You can
17 never say never.  You can never say it absolutely
18 happened.  You can't -- I wouldn't know, so I can't.
19 It would normally happen.  It would normally happen
20 that, if you're talking to your partner and your
21 entity, people would be discussing back and forth
22 and keeping them up to speed.  So it probably
23 happened.  I just can't testify.
24     Q.  Okay.  It's totally clear.  I'm not -- I'm
25 not suggesting one thing or another.  I'm just

Page 38

1 trying to understand your testimony, sir.
2     So you also made a reference to "GAM" and
3 "GGAM."  Am I correct that "GAM" refers to the
4 entity that you and Mr. Saunders and Mr. Stone held
5 an interest in?
6     A.  Yes.  It was our entity that we then
7 entered into the relationship with Cantor --
8     Q.  Okay.
9     A.  -- as GGAM.
10     Q.  So a reference to GGAM is a reference to
11 the joint venture between GAM and the Cantor entity;
12 right?
13     MR. PASCUCCI:  Objection.  Calls for
14 speculation.
15     A.  I can't say with certainty because, you
16 know, you're using terms closely.  Most everything
17 spoke of GGAM.
18     BY MR. PERRY:
19     Q.  Okay.
20     A.  But in this circumstance, we were talking
21 about management degree, management itself, and
22 investment, equity investment.  So you would have a
23 reference to GAM relating to management and then a
24 reference to GGAM relating to the relationship with
25 Cantor.

Page 39

1     Q.  Okay.  And so, just when you're making a
2 distinction between "GAM" and "GGAM," that
3 distinction is GAM involves you, Mr. Stone,
4 Mr. Saunders; GGAM involves the three of you and
5 Cantor; right?
6     MR. PASCUCCI:  Objection.  Misstates
7 testimony.
8     A.  I don't know.  I just -- you're
9 characterizing something.  It is commingled.
10 Services that support GAM also support its execution
11 of what I was required to provide the management
12 services.  So...
13     BY MR. PERRY:
14     Q.  I'm just trying -- what do you understand
15 the difference between "GAM" and "GGAM" to be?
16     A.  GAM being the company that then joined
17 with Cantor to become GGAM, to be GGAM.
18     Q.  Okay.  If you go into the third bullet,
19 it's entitled "GGAM equity participation."  The
20 first bullet reads:  "As part of an alignment of
21 interests, GGAM will purchase up to 10 percent
22 equity at a price determined by total development
23 costs."
24     Do you see that?
25     A.  Yes.

Page 40

1     Q.  No reference to Cantor doing any of the
2 purchasing; right?  In this document?
3     A.  GGAM is GAM and Cantor.  And if GAM is
4 defined as us -- Garry, Brad, and me -- GGAM would,
5 by extension, refer to Cantor and Garry, Brad, and
6 me.
7     Q.  Right.  It's the joint venture that would
8 purchase up to 10 percent equity at a price
9 determined by total development costs; right?
10     A.  Yes.
11     Q.  And then the next bullet says:  "It is
12 contemplated that GAM interest ownership of equity
13 and responsibility for the development and
14 management of operations will provide a positive
15 enhancement of the project's construction and
16 permanent financing terms as well as to any
17 potential initial public offering."
18     Do you see that?
19     A.  Yes.
20     Q.  Do you know why "GAM" was used in the
21 second bullet instead of "GGAM"?
22     A.  The second bullet?
23     Q.  The one I just read to you.
24     A.  Oh, as a matter of fact, it is probably a
25 typo.

Case 1:21-cv-02655-LGS-SN Document 329-16 Filed 01/26/23 Page 6 of 8
CONFIDENTIAL - Attorneys-Eyes Only
Deposition of William P. Weidner                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 57

1  became subject to the Equity Option Agreement?
2      MR. PASCUCCI: Objection.
3      A. I don't know that.
4      BY MR. PERRY:
5      Q. Just directing your attention back to
6  2005, if you look at the -- if you look at the --
7  the letter's addressed to "Dear Prime Metroline
8  Transit Corporation." And in the second line,
9  "Prime Metroline Transit Corporation" is identified
10 as the grantor.
11     Do you know, one way or another, that
12 Prime Metroline was the entity that owned the shares
13 that were transferred pursuant to the Equity Option
14 Agreement?
15     A. This is written by lawyers for me to sign,
16 so I don't know.
17     Q. And just -- my question is -- it is not
18 really related to the formality of who the grantor
19 of the shares was. I'm just looking for the
20 concept, the transfer of shares. That was first in
21 the negotiations and the discussions. That was
22 first suggested by Mr. Razon; right?
23     A. He verbalized it at the meeting as "skin
24 in the game." That's my recollection. And then he
25 wrote it and solicited our investment in writing.

Page 58

1      Q. Yeah, you had picked up a document. What
2  document are you referring to, just for the record.
3      A. Razon's letter after that meeting.
4      Q. And that's --
5      MR. PASCUCCI: It is 2001, Dan.
6      A. 2001.
7      BY MR. PERRY:
8      Q. You're looking at Deposition Exhibit 2001.
9  Okay. Did Cantor personnel participate in the
10 negotiation of the Master Services Agreement, the
11 MSA?
12     A. You said "master"? Did you mean
13 "management"?
14     Q. Management Services Agreement. I'm sorry.
15     A. Yes. Yes, they did.
16     Q. Master is a different agreement.
17     And who were the Cantor personnel that
18 participated in the negotiation of the MSA?
19     A. I can't recall.
20     Q. Would you agree that Cantor -- well,
21 strike that.
22     Did any Cantor attorneys participate in
23 the negotiation of the MSA?
24     MR. PASCUCCI: I'm going to object just
25 because the ambiguity of the question may call for

Page 59

1  attorney-client communications and instruct the
2  witness that, to the extent you are testifying about
3  an attorney's participation in the presence of
4  Bloomberry personnel or other third parties, it is
5  totally appropriate. But if any part of your answer
6  would relate to the communications between counsel
7  for GGAM or any of the parties behind GGAM and you
8  or other employees of that party in private, outside
9  of the presence of Mr. Razon's personnel, that is
10 privileged and should not be disclosed.
11     A. What was the question again, please?
12     BY MR. PERRY:
13     Q. Let me try it again.
14     Did any Cantor attorneys participate in
15 the negotiation of the MSA?
16     A. Yes.
17     Q. And who were those attorneys?
18     A. I don't recall.
19     Q. And would you agree that those Cantor
20 attorneys acted as GGAM's counsel in the MSA
21 negotiation?
22     MR. PASCUCCI: Objection.
23     A. I don't know.
24     BY MR. PERRY:
25     Q. So if you go back to your declaration --

Page 60

1      MR. PASCUCCI: It is Number 2003.
2      BY MR. PERRY:
3      Q. I stole it from you, Mr. Weidner.
4      A. He just took it, yeah. I'm trying to
5  change it.
6      Q. Just directing your attention to
7  Paragraph 23 in that document. I'm interested in
8  the sentence that starts "Second" on Page 9. It's
9  the third line down from the top.
10     Are you with me?
11     A. Give me a minute to find this.
12     (Pause.)
13     A. So I just wanted to read the whole thing,
14 and then you can bring me back to what you're
15 pointing at here.
16     Q. Sure. Just let me know when you've
17 completed your review.
18     A. Okay.
19     Q. So I'm interested in the sentence that
20 says: "Second, the Bloomberry negotiating team
21 could not have been surprised about Cantor's role as
22 they dealt with several Cantor attorneys who acted
23 as our counsel in the negotiations, and with
24 Mr. Rein, who was a Cantor employee working for and
25 eventually seconded to GGAM."

Case 1:21-cv-02655-LGS-SN Document 329-16 Filed 01/26/23 Page 7 of 8
CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 61

1  A.  Yes.
2  Q.  Does the reference here to "Cantor
3 attorneys who acted as our counsel in the
4 negotiations" refresh your recollection in any way
5 that Cantor lawyers represented GGAM in the
6 negotiations of the MSA?
7  A.  Cantor lawyers did.  Your question was --
8 I don't think -- I think you said Cantor did or -- I
9 was confused by your initial question.
10  Q.  I'm just saying you had told me --
11  A.  What they -- what I was -- or what they
12 acted in.  I don't know what you meant.  They were
13 acting on behalf of Cantor as lawyers.  They're the
14 partner.  I guess they represent GGAM.  I just don't
15 know.  I don't know enough about -- the way you
16 asked the question was kind of asking me to
17 understand what they represented.
18  Okay.  Well, they represented Cantor, the
19 joint-venture partner.  I don't know technically
20 enough about how to answer your question, so that's
21 why I said I don't know technically.
22  They are Cantor lawyers.  This is a
23 joint-venture Cantor entity.  So when they are doing
24 their work, are they representing GGAM, or are they
25 representing Cantor on behalf of GGAM?

Page 62

1  I don't know, I don't know technically
2 enough how to answer your question, so that's why I
3 couldn't -- Cantor lawyers were involved.  So...
4  Q.  I totally understand as a layman your
5 confusion, and I'm not -- I'm just struggling to
6 square your confusion here today with your statement
7 in your declaration in 2015 where you specifically
8 said that "several Cantor attorneys who acted as our
9 counsel in negotiations."  That would suggest to me
10 that you were, at least back in 2015, held to
11 believe that Cantor attorneys acted as GGAM's
12 counsel in the negotiation.
13  Do you see that text?
14  MR. PASCUCCI:  Objection.
15  A.  Yes.  But I think both can be true.  Both
16 answers can be true.
17  BY MR. PERRY:
18  Q.  And do you recall --
19  A.  Even in this sentence, I don't know what
20 Cantor asked in Cantor's interest, even though they
21 may be representing GGAM.  I mean --
22  Q.  You will agree with me here, at least,
23 you're suggesting the Cantor lawyers were acting on
24 behalf of, representing GGAM; right?
25  MR. PASCUCCI:  Objection.

Page 63

1  A.  Again, as a layman, yes.
2  BY MR. PERRY:
3  Q.  Do you have any recollection of a dispute
4 in the arbitration over the privilege of
5 communications between Cantor and GGAM about a
6 variety of subjects?
7  Do you have a recollection of that?
8  A.  No.
9  Q.  And is it fair to say, as you sit here
10 today, as a layman, you don't have an opinion on
11 whether the Cantor lawyers participating in the
12 negotiation were representing Cantor, GGAM, or both?
13  A.  I wouldn't know enough to know how a
14 lawyer who is trained in understanding what his
15 fiduciary, what his representation is, and so forth,
16 I can't -- as a layman, I say, if Cantor lawyers are
17 negotiating on behalf GGAM, that they are working
18 within the context of the joint venture, but I don't
19 know enough to know as a lawyer, if I'm a Cantor
20 lawyer and I'm within that, what are my
21 responsibilities?  Is my representation Cantor first
22 and foremost, GGAM secondly?  I don't know enough.
23  Q.  Okay.
24  A.  So I'm expressing things in layman terms.
25  Q.  Totally fair.  Thank you.

Page 64

1  Would you agree with me that Cantor itself
2 never entered into any contractual relationship with
3 BRHI and SPI?
4  MR. PASCUCCI:  Objection.  Calls for
5 speculation.
6  A.  I think I have the same issue that I just
7 expressed.  If they are Cantor lawyers and they are
8 working within the joint venture, doesn't that -- I
9 think their primary responsibility would be to
10 Cantor, even though they are working in the joint
11 venture.  So I don't know how to answer that.  As a
12 layman, I would think, well, they could be both.
13  BY MR. PERRY:
14  Q.  But so just --
15  A.  I don't know.
16  Q.  I'm not talking about the lawyers anymore.
17 I'm talking about the agreements between the
18 parties.
19  There was an MSA; right?
20  A.  Yeah.
21  Q.  There was an Equity Option Agreement;
22 right?
23  A.  EOA, yes.
24  Q.  And there was an NDA at some point as
25 well; right?

Case 1:21-cv-02655-LGS-SN Document 329-16 Filed 01/26/23 Page 8 of 8
CONFIDENTIAL - Attorney-Eyes Only
Deposition of William P. Weidner          Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

| | |
|---|---|
| 1 | REPORTER'S CERTIFICATE |
| 2 | |
| 3 | I, Dawn K. Larson, Registered Diplomate |
| 4 | Reporter, Certified Realtime Reporter, Certified |
| 5 | Realtime Captioner, and Notary Public, do hereby |
| 6 | certify that previous to the commencement of the |
| 7 | examination, the deponent was duly sworn by me to |
| 8 | testify to the truth. |
| 9 | I further certify this deposition was |
| 10 | taken in shorthand by me at the time and place |
| 11 | herein set forth and thereafter reduced to |
| 12 | typewritten form, that the foregoing constitutes a |
| 13 | true and correct transcript. |
| 14 | I further certify that I am not related |
| 15 | to, employed by, nor of counsel for any of the |
| 16 | parties or attorneys herein, nor otherwise |
| 17 | interested in the result of the within action. |
| 18 | |
| 19 | |
| 20 | _____ |
| 21 | Dawn K. Larson, MBA, RDR, CRR, CRC<br>Notary Public |
| 22 | |
| 23 | |
| 24 | |
| 25 | |