```
 1   UNITED STATES DISTRICT COURT

 2   SOUTHERN DISTRICT OF NEW YORK

 3   - - - - - - - - - - - - - - - - - - x
                                         :
 4   GLOBAL GAMING PHILIPPINES, LLC,     :
                                         :
 5           Plaintiff,                  :
                                         :
 6       v.                              : Case No.
                                         : 21 Cv. 2655
 7   ENRIQUE K. RAZON, JR.;              : (LGS)(SN)
     BLOOMBERRY RESORTS AND HOTELS INC.; :
 8   SURESTE PROPERTIES INC.;            :
                                         :
 9           Defendants.                 :
                                         :
10   - - - - - - - - - - - - - - - - - - x

11              REMOTE VIDEOTAPED DEPOSITION OF
                       GARRY W. SAUNDERS
12                     April 22, 2022

13        REMOTE VIDEOTAPED DEPOSITION OF GARRY W.
     SAUNDERS, produced as a witness at the instance of
14   the Defendants, and duly sworn remotely, was taken
     in the above-styled and numbered cause on April 22,
15   2022, from 9:05 a.m., (PST) to 12:58 p.m., (PST),
     remotely before Dawn K. Larson, RDR, CRR, reported
16   by machine shorthand, pursuant to the Rule 30 of the
     Federal Rules of Civil Procedure and the provisions
17   stated on the record.
```

Page 8

international business.

After Caesars, I took a job with Playboy Enterprises. I was the President of the Gaming Division for Playboy Enterprises. After that, I joined Bill and Brad. I reunited with Bill and Brad at the Sands, Las Vegas Sands, and I joined them at the time that they were going into Macau, and we were opening up the first western casino in Macau, and I headed up international operations based out of Las Vegas and spent a lot of time, obviously, in Macau also as a result of that.

After LVS, I took a job in Macau with Melco, what is now Melco Entertainment, which was a company that did the IPO right at the time that I joined them as one of the six concessionaires that operate in Macau, that have a license to do casinos.

We had one casino under construction -- actually two under construction, and so I lived in -- I moved and lived in Hong Kong for almost 2.5 years. And after that, after coming back from Asia, Bill and Brad were just leaving LVS at that time, and the three of us formed a venture that we did, along with Cantor Fitzgerald as our 50/50 partner, to pursue gaming opportunities.

Q. And are you still -- are you employed by

Page 9

or a partner with GGAM?

A. Well, I'm a partner in G-A-M, in GAM. So the legal entity that we have is the one that basically we're members of the LLC, and we're not on a payroll. And so we're partners and there are our shares in that.

Q. Okay.

A. And then that interest flows into what GGAM is, where it's a 50/50 partnership with Cantor.

Q. Understood. And so you -- since leaving Melco and going to GAM or GGAM, you've been there ever since? You haven't taken a new job since?

A. That's correct. I have had board of director-type jobs.

Q. I see. And just focusing on the first Sands go around when you worked with Mr. Weidner, Mr. Stone, what was the time period for that employment?

A. That was '80 to '93, I believe.

Q. Okay.

A. And just for one clarification, it's a different Sands.

Q. Right.

A. Totally different companies. They licensed the name "Sands" from the one in Las Vegas,

Page 10

though --

Q. I see.

A. -- so it was just by crazy coincidence that they ended up also in Las Vegas.

Q. Different company operating --
   (Overlapping speakers.)
   (Interruption.)

Q. Totally different company operating out of Atlantic City?

A. Yes.

Q. Okay.

A. It was part of Pratt Hotel Corporation.

Q. Understood.

And what were your duties and responsibilities at Sands in Atlantic City?

A. I started as a director of administration. A lot of the type of work that it is a consultant with Resorts World -- not Resorts world. I'm sorry. Resorts International, as a consultant with Pricewaterhouse. I somewhat formed an analytical group and consulting group somewhat inside of the company and had other administrative responsibilities.

I was Director of Administration in a fairly short period of time, to Vice President of

Page 11

Administration, which also brought in Human Resources, and after that came a Senior Vice President, which included the hotel operations of the casino and eventually had casino operations.

And pretty much between myself and the President, there was -- many of the departments that we -- in terms of direct reporting that we swapped over a number of years also, where marketing would report to me at one point in time, then it would report to the President, CFO would report to me at one point and then would report to the President.

So it was a mix between us at times in terms of what that would be. And I was Executive VP for the last probably for the last five years I was there, roughly.

Q. And did you report to Mr. Weidner, Mr. Stone at any point in time?

A. Reported to Bill Weidner at the very beginning. He originally was the President of the Property, and then he became President of Pratt Corp., and when he made that move to that particular promotion, then Brad became President, and I reported to Brad.

Q. Okay.

A. The vast majority of the time it was Brad.

Page 16

 1   A.  If looking -- and that was part of the
 2  role with Cantor also.
 3       BY MR. PERRY:
 4   Q.  Right.
 5   A.  They -- Cantor is comprised of investment
 6  bankers, many of which, the ones that were closely
 7  associated with us, had been long-term, very
 8  successful investment bankers focusing on the casino
 9  industry.  So in terms of the financing of them,
10  understanding the business and -- and then -- and
11  also willing to invest in them, which was the role
12  we had with Cantor, that they were willing to.
13       It is somewhat of a unique role to, first,
14  to be able to have a partnership with a firm like
15  them that was willing to also invest in the business
16  to do that.
17       I've lost my way here a bit in terms of
18  where I was at.
19   Q.  I just asked you to expand on development,
20  and I think you did that.
21   A.  Okay.  I'm sorry.  So it was a matter of
22  new opportunities.
23       MR. PASCUCCI:  Sorry.  Is there a question
24  pending?  I'm not sure there is.
25

Page 17

 1       BY MR. PERRY:
 2   Q.  He was answering a question, and he lost
 3  his way, and I helped him and he continued his
 4  answers is how I would interpret that, so ...
 5       MR. PASCUCCI:  Is there a question
 6  pending?
 7       MR. PERRY:  Yeah.  The question is, can
 8  you expand on development?  He was doing that.
 9       MR. PASCUCCI:  All right.
10   A.  Okay.  And, well, it's, essentially,
11  acquire -- looking for -- we looked at properties
12  that we could possibly acquire, and we looked at
13  new projects -- potential new projects in markets.
14       BY MR. PERRY:
15   Q.  And just so I can try and delineate a
16  little bit, is it the case that -- strike that.
17       Is it fair to say that Cantor was not
18  involved in the actual operations and management
19  side of the Solaire project?
20       MR. PASCUCCI:  Objection.
21   A.  Well, Cantor was our 50/50 partner, so --
22  and they actually had the money that went into the
23  projects.  So the relationship between us was quite
24  close, quite involved.  We had three people in the
25  offices of Cantor that were full-time devoted to us.

Page 18

 1  So we interacted with those people daily, literally.
 2       So between the three of us, I'm pretty
 3  sure it probably -- because I know, myself, it would
 4  be -- could be two, three, interactions a week,
 5  easily.
 6       BY MR. PERRY:
 7   Q.  Who were the three people?
 8   A.  John Rein, Christine Levett, and they had
 9  another position that turned over a number of times,
10  an analyst.
11   Q.  And what was John Rein's role?
12   A.  John Rein would work very closely with us
13  in identifying opportunities and doing the due
14  diligence around.  I mean, coming from the
15  investment side, they are quite skilled at the due
16  diligence of looking at projects and being able to
17  evaluate whether or not a project makes financial
18  sense.
19   Q.  And how about Ms. Levett?
20       MR. PASCUCCI:  Objection.
21   A.  She was a support for him, with some of
22  the same skill sets and particularly strong on the
23  analytical side.
24       BY MR. PERRY:
25   Q.  And Ms. Levett reporting to Mr. Rein?

Page 19

 1   A.  To John, yes.
 2   Q.  And --
 3       (Interruption.)
 4   Q.  Ms. Levett was reporting to Mr. Rein?
 5   A.  Correct.
 6   Q.  And I take it the analyst was also -- who
 7  is the individual who changed, that person reported
 8  to Mr. Rein as well?
 9   A.  I'm not sure if it was to both of them
10  directly or more a subordinate to Christine.  I'm
11  not sure.
12   Q.  Okay.  And would you --
13   A.  Which isn't material in terms of anything
14  that ...
15   Q.  Okay.  And would you agree with me that
16  John Rein didn't perform management services for
17  Solaire?
18       MR. PASCUCCI:  Object to the form.
19   A.  John would not necessarily take a job, for
20  example, in operations in a casino, but he's very
21  familiar with a lot of the activities.  So as a
22  partner with us, in understanding what we do and
23  evaluating what we do -- because, I mean, if we have
24  a partner that has capital invested in us, and they
25  were very close to discussions with us about the

Page 20

1  status of things and the approach to things, ideas
2  that might come from them.
3       Keep in mind that, the work that we would
4  do with those people that were directly attached to
5  us, that were part of Cantor and worked in the
6  building with Cantor, they had the entire back
7  office of legal, accounting, human resources,
8  insurance, things like that, functions that we did
9  not have in terms of that.
10      And that was their responsibility.  And
11 also, we had Mike -- Michael Lehrman was another
12 person who had a reasonably decent profile of
13 involvement with us, at times, and I believe John
14 may have directly reported to him, but I'm not sure
15 about that.  But John kept both him as well as
16 Howard Lutnick apprised -- the Chairman -- apprised
17 of the activities that we were involved with.
18      BY MR. PERRY:
19   Q.  But just as to Mr. Rein himself, he didn't
20 perform management services with respect to the
21 Solaire, did he, sir?
22      MR. PASCUCCI:  Object to the form.
23   A.  Well, as an example, we had contractual
24 obligations with BRC that John -- I know there were
25 occasions that we would talk through details of that

Page 21

1  where he was somewhat auditing, perhaps if you'd use
2  that word, how we're doing on the status of that.
3       So there was a -- when you say "management
4  services," I think that certainly proved a value to
5  us in doing our job, perhaps, but also in us doing
6  our job, that was -- so would you call that a
7  management service or not?  I'm not sure.
8       MR. PERRY:  Okay.  Before you is -- 22?
9       (Defendants' Exhibit 2022 was marked.)
10      MR. PERRY:  Deposition Exhibit 2022.  It's
11 a transcript of testimony you gave in the
12 international arbitration proceeding, directing your
13 attention to Page 38 of your testimony.  There's
14 some questions and answers.  And I'll just read the
15 question, Page 38, Line 20.
16      "Question:  But John" --
17      Well, let me do a little more.  So I'm going
18 to start at Line 13.
19      "Question:  Just to be clear, GGAM is
20 Mr. Weidner, Mr. Stone, you, Mr. French is an
21 employee.  Any other employees?
22      "Answer:  Yes.
23      "Question:  Who?
24      "Answer:  We have administrative staff on
25 hand, several administrative staff and analysts, and

Page 22

1  we have John Rein and several analysts that work for
2  him.
3       "Question:  But John Rein doesn't provide
4  management services, does he?
5       "Answer:  No.  John is in the development
6  side of our business."
7       Is that true and correct testimony when you
8  gave it, sir?
9       MR. PASCUCCI:  Object to the form.
10  A.  Yes, that was true.  And what I just gave
11 you, I said I'm not sure if you would call that a
12 management service, but I was describing the type of
13 involvement that he had with us, that in this
14 particular case, specifically related to Solaire.
15      BY MR. PERRY:
16  Q.  When was the first time that you met
17 Enrique Razon?
18  A.  We met him in Las Vegas at Encore, Wynn --
19 Encore, and we had a meeting with him in a cocktail
20 lounge for about an hour, I would say.
21  Q.  Fair to say the cocktail lounge was noisy
22 when you met with him?
23  A.  Was the cocktail lounge, it was -- well,
24 it's a quieter type of cocktail lounge in the
25 afternoon.  There was ambient sound, but we were

Page 23

1  able to, you know, have a discussion.
2   Q.  Was it noisy?
3       MR. PASCUCCI:  Objection.
4   A.  Well, I would describe it as it wasn't in
5  a quiet meeting room where there were other sounds
6  taking place.
7       BY MR. PERRY:
8   Q.  And did you, at times, have difficulty
9  understanding what Mr. Razon was saying during the
10 meeting?
11  A.  In an environment like that, I would say
12 that, you know, at times you might ask somebody to
13 repeat something.  I remember -- there was one thing
14 that he did talk about that I remember.  I didn't
15 recall exactly how he said it, but it was a matter
16 of -- I don't think I asked him to clarify it.  I
17 don't think it was that important.
18  Q.  Did -- how did it come to be that you had
19 this meeting with Mr. Razon at the cocktail lounge?
20  A.  I got a call from an executive recruiter
21 that told them they had the perfect job for me.
22 Then they described the COO job for Solaire, and I
23 wasn't interested in taking a job, but at the same
24 time, I gave her a bit of an update of what I was
25 doing.  And I, at the time, talking with her, said

Page 24

 1  that something like that could be interesting for us
 2  as a team to do something, but I, individually,
 3  wouldn't want to take that job.
 4       And she followed up apparently with
 5  Mr. Razon and talked to him about that, gave him
 6  background on myself, Bill Weidner and Brad Stone,
 7  and he asked for a meeting.
 8     Q.  And Mr. Razon chose the location of the
 9  meeting?
10     A.  Yes.  I was told where to show up.
11     Q.  And did you have any understanding of why
12  he happened to be in the U.S.?
13     A.  No.
14     Q.  Was it your impression that he was coming
15  just to meet and you Mr. Weidner, or he had other
16  business in the states?
17     A.  I didn't know any other details about it.
18     Q.  Okay.  And did you later learn that he met
19  with Tom Arasi on that trip?
20     A.  Yes, I believe I did.
21     Q.  How'd you learn that?
22     A.  I don't recall.
23     Q.  But at least when he was there, you
24  weren't -- and meeting -- at the time of the meeting
25  in the cocktail lounge, you weren't aware that he

Page 25

 1  was meeting with other people in Las Vegas during
 2  that trip; is that correct?
 3     A.  I wasn't aware.  It wouldn't be surprising
 4  that he wouldn't be.
 5     Q.  But you don't know one way or another?
 6     A.  I don't know.
 7     Q.  Okay.  And just so I'm clear, this -- was
 8  it your impression that Mr. Razon -- well, strike
 9  that.
10       Based on the meeting, what was your
11  impression about what Mr. Razon was looking for with
12  respect to the Solaire?
13       MR. PASCUCCI:  Object to the form.
14     A.  He had mentioned he talked to some gaming
15  companies about potentially doing management, and he
16  didn't feel satisfied with the companies because of
17  a bigger company having their own priorities and
18  their own properties also and the branding piece of
19  it.  He wasn't -- a lot of times people would choose
20  a particular company because of a brand that they
21  carry and that they may want that brand.
22       And he said he was not looking for that,
23  which we totally agree.  Our theory has always been
24  if you spend multiple billion dollars for a project,
25  why would you enhance somebody else's brand?  Why

Page 26

 1  don't you create a brand off of that?
 2       So we both shared a consistent view of
 3  that, and the discussion had given him an overview
 4  of what we -- you know, of some of our background.
 5  He appeared to know much more about our background,
 6  I think, then we knew, so he had done some homework,
 7  and we talked about our relationship with Cantor,
 8  and the important part of that being that we had
 9  capital to do the types of things that we were
10  planning on doing -- and anything else?
11       BY MR. PERRY:
12     Q.  Yeah.  I was going to ask about the Cantor
13  piece and what the discussion was with respect to
14  Cantor.  Anything else that you can recall about
15  dialogue concerning Cantor at that meeting?
16       MR. PASCUCCI:  Object to the form.
17     A.  Well, we definitely talked about Cantor
18  because, in particular, we talked about the access
19  to capital to do projects, and Cantor was the
20  element of our business that we were extremely proud
21  of also.  So we would have been -- we would have
22  been obviously boasting about that particular
23  relationship.
24       Cantor is a very prominent company, and I
25  said it was a pretty unique situation that we had

Page 27

 1  this opportunity with them.  So -- again, I don't
 2  think I can recall anything else we may have said
 3  about Cantor.  It was just a -- it was a very
 4  social, friendly, get-to-know-each-other type of
 5  conversation also.
 6       BY MR. PERRY:
 7     Q.  Well, fair to say it was a one-hour
 8  initial meet-and-greet where you were starting a
 9  process of getting to know a potential future
10  client?
11     A.  Getting to know and at the same time,
12  within a very short window of time, we were -- they
13  would leave the meeting with the plan to follow up
14  and see if there was a way to make something work.
15     Q.  Okay.
16     A.  And he, you know, the thing that he was
17  looking for, to a degree, is somebody that could
18  fully align their interest with him, which was part
19  of a conversation about potentially investing, which
20  was a particular interest to us.
21     Q.  Did the -- that part come up at the first
22  meeting or in emails subsequent to the meeting?
23     A.  There was -- as I said, he talked about
24  having aligned goals, and I believe that, from a
25  financial standpoint, there was some suggestions of

Page 40

1  participation, did you have any understanding at
2  this point in time of how that would be done?
3      A.  To the extent -- to the extent that we
4  would put equity into this particular project?
5         That's your question?
6      Q.  Yeah.  Well, no.  As of this point in time
7  as you're writing this document, you engage in some
8  initial discussions, you send a one-page proposal
9  over.
10        Did you have an understanding or a belief
11 of how that 10 percent would be funded, if it were
12 funded?
13     A.  Okay.  Yes.  Because this is early stages
14 of trying to form what a deal could look like and it
15 would have been proposed -- if we are suggesting it,
16 it would have been Cantor that would have provided
17 it.
18     Q.  Okay.  And so there --
19     A.  That was the nature of our group.
20     Q.  So it's a 50/50 partnership, but as I'm
21 understanding your testimony, if there's a large
22 capital outlay that would be required for the
23 pursuit of your business, it would be Cantor that
24 would provide that capital infusion, not a
25 combination of Cantor on the one side and GAM on the

Page 41

1  other side; is that right?
2         MR. PASCUCCI:  Object to form.
3      A.  That's correct.
4         BY MR. PERRY:
5      Q.  Okay.  After these initial exchanges, how
6  did the negotiation of the MSA proceed?
7      A.  There would have been additional emails, I
8  presume, that would have been the trail of the
9  discussions that we did have.  I don't recall a lot
10 of the specifics about that.
11     Q.  Was there a negotiating session in Manila
12 at a certain point in time?
13     A.  Yes.
14     Q.  What do you recall about that?
15     A.  The first one was a trip that John Rein,
16 Brad Stone and myself took, and that was to meet
17 them and then to start talking in general terms
18 about the contract.
19     Q.  Was there a -- at that point in time, was
20 there a draft contract that was being circulated?
21     A.  I can't remember.  I can't remember if we
22 had -- I can't remember the sequence of that.
23     Q.  And was there literally a sit-down at a
24 conference table where economic terms were being
25 negotiated in Manila?

Page 42

1      A.  I believe everything was fair game in the
2  discussion of what -- of the type of things that
3  ultimately ended up in the contract at that point.
4      Q.  And who do you recall participating in the
5  negotiations in Manila on the Solaire side?
6      A.  That was -- Estella is the more prominent
7  person that had a substantive role, I guess, in
8  these conversations, and I believe that Don Almeda
9  was in those conversations, and I believe that Chito
10 Alarilla was in the conversations.
11     Q.  Was Mr. Razon present?
12     A.  No.
13     Q.  And what about -- there's a --
14        (Overlapping speakers.)
15     A.  We saw him.
16        (Overlapping speakers.)
17     Q.  But just in terms of the negotiation, was
18 he present at the negotiation?
19     A.  Not during that initial meeting or
20 meetings that we held over a couple of days.
21     Q.  And was -- there's an attorney, Benny Tan,
22 who -- was Benny there?
23     A.  I think he was.
24     Q.  And did your side have an attorney
25 present?

Page 43

1      A.  I don't believe we did.
2      Q.  We spoke with Mr. Weidner earlier in the
3  week, and he testified that he had retained a
4  Nevada-based lawyer with expertise in hotel and
5  casino management agreements.
6         Was that person at the meeting in Manila
7  or no?
8         MR. PASCUCCI:  Object to the form.
9      A.  I don't believe so.
10        BY MR. PERRY:
11     Q.  And so during that period, the initial
12 negotiations in Manila, who would you describe as
13 the primary negotiator on the Solaire side?
14     A.  Could you repeat that again?  Are you
15 talking about that, that meeting --
16        (Overlapping speakers.)
17        (Interruption.)
18     Q.  At these initial -- the first set of
19 meetings in Manila, the face-to-face negotiations,
20 who would you describe as the primary negotiator on
21 the Solaire side?
22     A.  Well, I think that it would probably have
23 been Estella.
24     Q.  And what did you understand Ms. Occeña's
25 role to be with the organization?

Page 64

BY MR. PERRY:
Q. Okay.
A. That was a specific phrasing that they continued to use and wanted that used.
Q. Okay. And ultimately whoever required the phrasing, it was Mr. French who had day-to-day responsibility with supervision from GGAM personnel; correct?
MR. PASCUCCI: Object to the form.
A. That answer -- I'm sorry. Yes. That's true.
BY MR. PERRY:
Q. Okay.
A. He had two reports: He had a dual reporting relationship to us and also to Mr. Razon.
Q. Okay. And you would frequently -- I think you testified this -- about this earlier.
You would frequently communicate with Mr. French about the goings-on on the property; right?
MR. PASCUCCI: Objection.
A. Yes.
MR. PASCUCCI: You have to verbalize the answers. The head nod and "uh-huh" is hard for the Court Reporter to pick up.

Page 65

MR. PERRY: He's actually been very good about that.
BY MR. PERRY:
Q. So as I understand it, there were a series of investor conferences for BRC that you and other GGAM folks attended; is that right?
A. Are you speaking about one-off investor conferences, or are you speaking of the roadshow?
Q. Well, let's start with the roadshow. That's a good clarification.
What roadshow conferences did you attend on behalf of BRC?
A. Over 100, all of them. Practically all of them with the exception, at the end Brad and I split. He went to Boston, and I went to New York.
Q. Okay. And where else did you go in terms of roadshow conferences?
A. We started -- it was very important to have a good profile in the United States, so we started in the United States and we ended in the United States. And in the United States we did Washington -- meetings in Washington, Kansas City, Denver, San Francisco, Hong Kong, Singapore, Philippines -- twice, I think -- Hong Kong was twice, different days, different flights in to do

Page 66

additional meetings -- the U.K., Austin, and New York. I don't think I missed any.
Q. When you were at the New York conference, do you recall a closing dinner at Wolfgang's?
A. I don't recall Wolfgang's, but I recall a closing dinner.
Q. Who do you recall being at the closing dinner?
A. The bankers that were involved with the roadshow, Ricky Razon, Estella, Don -- Don Almeda, myself, Brad, John, Bill, possibly Michael Lehrman. I think that was about it. A number of people that were related to CLSA on the roadshow from the investor banker side of it.
Q. CLSA was the banker for the roadshow; right?
A. They were one of two bankers.
Q. Do you recall who the other firm was?
A. I've got to guess, but I'm not going to say. It would be a guess.
Q. Don't guess.
It is not Cantor; right?
A. No.
Q. Okay. Do you recall there being Mr. Razon or -- strike that.

Page 67

Do you recall anybody from the BRC side directing that they did not want Cantor involved in the roadshow process?
A. I think so.
Q. What do you recall about that?
A. Not much.
Q. Okay. Cantor provides investment banking services; right?
A. Yes.
Q. And they didn't provide any investment banking services to BRC here; right?
A. They had a preferred banker that they wanted to work with.
Q. So the answer to my question is no; right?
A. No.
Q. And you said -- so at the closing dinner Mr. Rein was there.
Anybody else from Cantor?
A. Like I said, possibly Michael Lehrman.
Q. You don't recall one way or another about Mr. Lehrman?
A. I have kind of an impression that he was, but I'm not sure.
Q. Okay. Anybody else from Cantor?
A. I don't recall. Possibly -- I think

```
 1                REPORTER'S CERTIFICATE

 2

 3         I, Dawn K. Larson, Registered Diplomate

 4   Reporter, Certified Realtime Reporter, Certified

 5   Realtime Captioner, and Notary Public, do hereby

 6   certify that previous to the commencement of the

 7   examination, the deponent was duly sworn by me to

 8   testify to the truth.

 9              I further certify this deposition was

10   taken in shorthand by me at the time and place

11   herein set forth and thereafter reduced to

12   typewritten form, that the foregoing constitutes a

13   true and correct transcript.

14              I further certify that I am not related

15   to, employed by, nor of counsel for any of the

16   parties or attorneys herein, nor otherwise

17   interested in the result of the within action.

18

19                              [signature]

20                        Dawn K. Larson, MBA, RDR, CRR, CRC
                          Notary Public
21

22

23

24

25
```