```
                    UNITED STATES DISTRICT COURT

                   SOUTHERN DISTRICT OF NEW YORK



    GLOBAL GAMING PHILIPPINES,       )
    LLC,                             )
                   Plaintiff(s),     )
                                     )
                                     )      Case Number
         VS.                         )      21-CV-2655 (LGS)
                                     )
                                     )
    ENRIQUE K. RAZON, JR.; BLOOMBERRY)
    RESORTS AND HOTELS, INC.; SURESTE)
    PROPERTIES, INC.; COLLINGWOOD    )
    INVESTMENT COMPANY LIMITED;      )
    COLLINGWOOD OIL & GAS HOLDINGS,  )
    LLC; COLLINGWOOD USA, INC.;      )
    COLLINGWOOD BROOKSHIRE USA, INC.;)
    COLLINGWOOD APPALACHIAN MINERALS,)
    LLC; ASIA ARROW LIMITED; RIZOLINA)
    LLC; ENSARA LLC; NOZAR LLC;      )
    BOWERY BAY LLC; CAMPANILLA LLC;  )
    FESARA LLC; AND 11 ESSEX STREET  )
    REALTY LLC,                      )
                   Defendant(s).     )
    _____)


                 DEPOSITION OF BRADLEY H. STONE

                  WEDNESDAY, APRIL 27, 2022

                         AT 9:04 A.M.

                      LAS VEGAS, NEVADA




       Reported by:  Laurie Miller, RPR, CLR, NV CCR NO. 971,
                     CA CSR NO. 6457
    _____
```

Page 16

1  MR. DUNN: Objection to form.
2  THE DEPONENT: You know, my memory is sketchy
3  on this, but basically that there was perhaps an
4  interesting opportunity for us to pursue in the
5  Philippines.
6  BY MR. PERRY:
7  Q   And did you become involved in the negotiation
8  of the Management Services Agreement thereafter?
9  MR. DUNN: Objection.
10  THE DEPONENT: Yes.
11  BY MR. PERRY:
12  Q   Okay.
13    And, just generally, if I'm thinking about the
14  GGAM organization, what are your roles and
15  responsibilities as contrasted with Mr. Saunders and
16  Mr. Weidner?
17  A   I think there's a lot of crossover. I don't
18  think we had what we would call "designated
19  responsibilities."
20    We have more involved responsibilities. Let's
21  say mine would be construction, for example.
22    You know, I did a lot of the financial
23  presentations and such. So I was kind of -- as we did
24  the Solaire project, the spokesperson.
25    Garry and I both are operations people, as is

Page 17

1  Bill, so we all had experience running and operating
2  facilities. We all had experience in financial markets.
3    Garry was stronger in, let's say, the human
4  resources side in recruiting, finding talent. And
5  that's, you know, primarily it.
6  Q   Okay. So you'd just given an answer.
7    Were you answering just generally as respects
8  the GGAM organization or specifically with respect to
9  the Solaire project?
10  A   No. I think that's a general statement across,
11  you know -- we all bring certain skill sets, but a lot
12  of us share the same skill sets.
13  Q   And you were -- how were you -- how were your
14  -- what was your focus with respect to the Solaire
15  development?
16  A   My focus was several-fold. Design, you know.
17  What were they building and did we feel that met the
18  market?
19    Eventually the construction organization,
20  getting it done. They were under construction, but they
21  asked me to review and be involved in that.
22    I was involved in the financial end as far as
23  raising money eventually. Did the backdoor listing.
24    And I was involved in the development of both
25  the operating and marketing plans.

Page 18

1  Q   Did you participate in the negotiation of the
2  MSA?
3  MR. DUNN: Objection to form.
4  THE DEPONENT: Yes, I did.
5  BY MR. PERRY:
6  Q   And there's been some testimony about an
7  exchange of initial proposals by email between Mr. Razon
8  and Mr. Weidner and then the preparation of a one-page
9  outline.
10    Do you have any recollection of that outline?
11  MR. DUNN: Objection to form.
12  THE DEPONENT: I know it occurred. I don't
13  have any recollection of the outline itself.
14  BY MR. PERRY:
15  Q   Okay.
16    And who would you describe as the primary
17  negotiators of the MSA on the GGAM side and on the
18  Bloomberry side?
19  A   On the GGAM side was the Cantor lawyers. It
20  was Rick Kirkbride who was with Paul Hastings, myself,
21  Bill and Garry, Jon Rein.
22    And on the Bloomberry side would have been
23  Razon, Estela, Chito. I can never pronounce his last
24  name.
25  Q   Is it Alarilla?

Page 19

1  A   Yeah. Mr. Alarilla.
2    Benny Tan. And I'm not sure about Don Almeda.
3  I don't remember how much involvement he had.
4  Q   Do you know -- who did Paul Hastings represent
5  in the negotiations?
6  MR. DUNN: Objection to form.
7  THE DEPONENT: I'm not sure.
8  BY MR. PERRY:
9  Q   Who were the Cantor lawyers involved?
10  A   The two primary ones I remember are Kevin
11  Russell, and I think it's John Jones. And there were
12  others, but I can't remember who they were.
13  Q   Were there in-person negotiations that
14  occurred?
15  A   What do you mean by "in person"?
16  Q   Anybody fly to Manila that negotiated the MSA?
17  A   Yes.
18  Q   Okay.
19    Who -- how many in-person negotiations do you
20  recall taking place in Manila?
21  A   We had a couple. I can't remember how many.
22  Q   Okay.
23    Did you attend any of them?
24  A   Yes.
25  Q   How many?

Page 24

1    we are supposed to contract only with
2    GGAM!"
3        Do you see that?
4    A   Yes.
5    Q   Do you recall there being any disagreement
6    among the parties about whether and to what extent
7    Cantor would be referenced in the MSA?
8        MR. DUNN:  Objection to form.
9        THE DEPONENT:  I don't remember that issue.
10   BY MR. PERRY:
11   Q   Okay.
12       And I take it you don't recall one way or
13   another how this particular comment was resolved?
14   A   No.  Again, I don't recall this being an issue
15   at least that I was involved in.
16   Q   If you go down to 22, it says (reading):
17       "You have changed the governing
18       law from 'Philippine law' to 'New
19       York law.'  This does not make sense
20       because this contract has no
21       connection with New York at all.  I'm
22       not even sure if gambling is legal
23       under New York law.  But the point is
24       all material links relating to this
25       Agreement are in the Philippines,

Page 25

1        e.g. this is a Philippine operation
2        of a Philippine corporation subject
3        to strict regulation by a Philippine
4        Regulator (PAGCOR)."
5        Do you see that?
6    A   Yes.
7    Q   Do you recall the issue of governing law being
8    Philippine law or New York law coming up?
9    A   Yes.
10   Q   Okay.
11       What do you recall about that issue?
12       MR. DUNN:  Objection to form.
13       THE DEPONENT:  Well, exactly what is stated
14   here.  That the Bloomberry parties -- and, again, I use
15   Bloomberry as generic, just too many acronyms, don't
16   want to be incorrect on that -- but seeking, you know,
17   Philippine law and jurisdiction as far as -- or New York
18   law.
19       And I believe we ended up under Philippine law,
20   but there was an issue as far as arbitration later on
21   and resolving issues and whether that would be in the
22   Philippines or New York.
23   BY MR. PERRY:
24   Q   Uh-huh.
25       And am I correct that arbitration in Singapore

Page 26

1    was the compromise position as between New York courts
2    or Philippine courts resolving disputes?
3    A   Yes.
4    Q   And as to governing law, am I correct that
5    Philippine law was ultimately chosen law for the MSA?
6    A   Again, I'm not a lawyer so I'm not 100 percent
7    sure, but I know in the arbitration it was under
8    Philippine law.
9    Q   And as to Mr. Tan's observation that this
10   contract has no connection with New York at all, do you
11   recall any further dialogue about that statement?
12       MR. DUNN:  Objection to form.
13       THE DEPONENT:  No.
14   BY MR. PERRY:
15   Q   Now, ultimately the MSA was signed and GGAM
16   began providing management services I think even before
17   the MSA was signed; is that correct?
18   A   That's correct.
19   Q   And would you agree with me that those
20   management services were provided largely in the
21   Philippines, elsewhere in Asia and in Las Vegas, Nevada,
22   out of GGAM's offices?
23       MR. DUNN:  Objection to form.
24       THE DEPONENT:  A lot of that was, yes, in those
25   areas.

Page 27

1        We also were working out Cantor in New York
2    with particularly the contract and questions about the
3    MSA and interpretations, et cetera, so -- and some
4    analysis and budgets we worked out of -- you know,
5    Christine Levett and Jon Rein.  I remember sitting in
6    their office working on budgets not relating to the
7    construction but to FF&E and preopening expenses, et
8    cetera.  Other costs of the operation that we had to
9    budget for.
10   BY MR. PERRY:
11   Q   Cantor didn't provide any management services
12   under the MSA, did it?
13       MR. DUNN:  Objection to form.
14       THE DEPONENT:  What do you -- define
15   "management services."
16   BY MR. PERRY:
17   Q   So couple things.
18       Mr. Rein, Ms. Levett, they seconded to GGAM;
19   right?
20   A   Yes.
21   Q   And as I understand it, Mr. Rein was seconded
22   to GGAM full-time; right?
23   A   Yes.
24   Q   Was Ms. Levett seconded full-time to your
25   recollection?

Page 36

1 Q Okay.
2 And can you -- what was your role in that
3 process?
4 A My role was several-fold. I was involved in
5 putting together the presentation to take to the
6 markets, the flip -- the deck.
7 I was involved in assisting with the filings
8 that were required as far as, you know, things that were
9 operational: Marketing plans, risk factors,
10 et cetera. So I was involved in dealing with the
11 lawyers and underwriters in that document.
12 And then I did the -- I did the majority of the
13 road show. Not just presentations but discussions.
14 BY MR. PERRY:
15 Q And you referred to a "filing."
16 Is that the Offering Circular?
17 A Yeah. I believe -- again, I'm familiar with an
18 FCC filing in the U.S. I can't remember -- but there
19 was some type of filing in the Philippines.
20 Q Okay.
21 Lengthy document with descriptions of financial
22 background, operation background, and legal and
23 regulatory boilerplate; right?
24 MR. DUNN: Objection to form.
25 THE DEPONENT: When you say "boilerplate," it

Page 37

1 was I guess the equivalent to what would be a
2 Registration Statement in the United States.
3 BY MR. PERRY:
4 Q Okay.
5 And you had made a referencing earlier, I
6 believe, to Cantor employees participating in some way
7 in that process.
8 Can you tell me how Cantor participated in that
9 process?
10 A Well, they were involved in reviewing, you
11 know, that that was their business, the Registration
12 Statements and gave comments. I believe Jon Rein used
13 resources up there.
14 And certainly they helped in terms of creating
15 flip charts and the like. And that's what they did.
16 Q They commented on the Offering Circular?
17 A That's my understanding, yes.
18 Q And when you say "created flip charts and the
19 like," what do you mean by that?
20 A Well, some of the graphical things that would
21 go into the flip chart.
22 I remember Christy Levett working on some of
23 those, some of the charts. I'm not saying all of them.
24 Q And this was work that was not done under the
25 MSA; right?

Page 38

1 A I don't know.
2 Q Do you -- the -- you recall the Bloomberry side
3 having sensitivity about Cantor being involved with the
4 road show?
5 MR. DUNN: Objection to form.
6 THE DEPONENT: I don't remember that.
7 BY MR. PERRY:
8 Q Okay.
9 In terms of -- let's just talk about the road
10 show.
11 What cities do you -- well, strike that.
12 Who was the primary presenter in the road show
13 presentations?
14 A I was.
15 Q And who else participated generally?
16 I know different road shows had different
17 people, different places had different people, but as a
18 general matter, who was the primary --
19 A I'm sorry, sir. Let me understand your
20 question.
21 When you say primary participants, do you mean
22 from our side or you mean who were the investors?
23 Q Oh. From the Bloomberry GGAM side. As I
24 understand it, there were presentations made to
25 potential investors. I had understood that you were the

Page 39

1 primary presenter.
2 Is that fair?
3 A Yes.
4 Q Okay.
5 And there were also Bloomberry employees who
6 attended; correct?
7 A Yes.
8 Q And who were the primary Bloomberry presenters?
9 A It was Don Almeda and Estela.
10 Q Okay.
11 And was there anybody else on the GGAM side
12 that would present at these road shows?
13 A Garry was there and would participate in
14 questions and answers -- and I'll distinguish between
15 present and questions and answers.
16 Q Sure.
17 A You can present, but he was -- he was
18 participating through answering questions. He didn't
19 present.
20 Q Is it fair to say he was a resource, and if
21 there was a particular question that called on Garry's
22 expertise, Garry was available and in fact did respond?
23 A Yeah. Or if I, you know, forgot something or
24 somebody else, he -- when you do 60 meetings in 10 days,
25 you don't always -- or every participant wants a

Page 40

1  different form of the road show. Some just want to go
2  through the deck; some just want to go the Q
3  and A.
4      So he would just remind me or the others to
5  mention something if it was material, if it was
6  important enough.
7    Q   Okay.
8      And what about on the Bloomberry side? Primary
9  presenters were Ms. Occeña and Mr. Almeda.
10     Anybody else who would answer questions or
11 respond?
12   A   I think there was a guy named Leo Venezuela,
13 who was investor relations. He was there. I don't
14 really remember him ever participating or even answering
15 questions, but he may have.
16   Q   And do you recall Bloomberry had investment
17 banks that assisted it in the process?
18     MR. DUNN: Objection to form.
19     THE DEPONENT: That leading -- yes.
20 BY MR. PERRY:
21   Q   And who were those banks?
22   A   CLSA and UBS.
23   Q   And was there ever a time where a Cantor
24 employee participated in one of the road shows either by
25 presenting or answering questions?

Page 41

1    A   You know, the only -- I wasn't at the New York
2  presentations, I was in Boston that day.
3      So with the exception of not being sure of New
4  York where Cantor is located, they may have been there
5  and sat in and participated. The ones I was in, no.
6    Q   Okay.
7      Did Mr. Rein attend any of the road show
8  presentations that you were in?
9    A   I can't remember. He may have. I just -- you
10 know, especially the U.S. ones.
11   Q   You recall where the presentations abroad took
12 place?
13   A   Yes.
14   Q   Where was that?
15   A   London, Hong Kong, Singapore, Manila, I get
16 certain road shows mixed up. I think that was it.
17   Q   I think you got them.
18     Was there a pre-road show meeting in Bangkok as
19 well?
20   A   Yes.
21   Q   Before you is an email chain that I've marked
22 Deposition Exhibit 2029 (indicating).
23     (Exhibit 2029 was marked; attached
24   hereto.)
25   ///

Page 42

1  BY MR. PERRY:
2    Q   It's an email to you from Ms. Occeña date
3  January 26, 2012, and she forwards a string of emails
4  below.
5      If you can just take a moment to familiarize
6  yourself with the document.
7    A   (Reviewing document.)
8      Okay.
9    Q   Okay.
10     So directing your attention to Ms. Occeña's
11 email to Mr. Razon which follows some email
12 correspondence between her and Mr. Rein, she writes
13 (reading):
14     "Brad called me about the
15   business plan this morning so I took
16   the opportunity to speak with him
17   about Jon Rein of Cantor. He wanted
18   to communicate directly with CLSA and
19   attend the kick-off on the 8th. I
20   declined both his requests. I told
21   Brad that I do not have to ask you to
22   know whether you are fine with Cantor
23   taking an active role in the equity
24   placement because I know you will say
25   no as well.  I reiterated to Brad

Page 43

1    that you want to deal with him, Bill
2    and Garry and we are just tolerating
3    Cantor because they are their
4    partners. Brad fully understands and
5    supports our position. My email
6    below to Jon for your referencing."
7      Do you have any recollection of this exchange?
8    A   Not really, no.
9    Q   Okay.
10     And do you ever recall being told in words or
11 in substance that Bloomberry just wanted to deal with
12 you, Mr. Weidner, Mr. Saunders, rather than the Cantor
13 folks?
14   A   Again, I don't remember this. It's obvious --
15 I mean, she's saying she spoke to me about this, and,
16 you know, to me this would have been an issue not to
17 throw ourselves on the sword for, so...
18   Q   Right.
19   A   It wasn't that important.
20   Q   What wasn't? Cantor's participation wasn't
21 that important?
22   A   No. Them attending a meeting.
23   Q   And Mr. Razon writes back (reading):
24     "No Cantor. They only
25   participate thru GGAM."

Page 52

1  Macao market.
2      And to be able to adjust our operations -- what
3  commission structures worked, for example, in Macao;
4  what we had to be sensitive to in Manila.
5      So we spent a reasonable amount of time there.
6  BY MR. PERRY:
7    Q   Okay.
8      And then just directing your attention to the
9  post-opening period, when you were not on the ground at
10 the site, how would you perform the management oversight
11 under the Management Services Agreement?
12   A   Well, Garry in particular spent a lot of time
13 on the phone with Mike French. I would spend time more
14 with, like, Matthew Pryor in terms of -- because when we
15 opened the property, it wasn't finished.
16   Q   Uh-huh.
17   A   We still had work to do, contracts. And we had
18 also started the next phase. That was under
19 construction.
20     So I'd spend a lot of time with that and that's
21 who I would communicate a lot with on the phone.
22     And sometimes we would have conference calls.
23 We'd talk to people in New York, and that was it.
24   Q   And what did you talk to the folks in New York
25 about?

Page 53

1    A   Performance. Some analysis. Things like that.
2    Q   Analysis -- an analysis of the performance of
3  the property?
4    A   Yes.
5    Q   Okay.
6    A   We'd ask them to look at some of the financial
7  statements.
8    Q   And who would do that in New York?
9    A   It would be between Jon Rein and -- primarily,
10 probably, Christine Levett.
11   Q   And what sorts of analysis would they provide?
12   A   I don't remember specifically.
13   Q   And did they have people in the management team
14 in the Philippines that they interacted with, to your
15 recollection?
16   A   Did they -- I'm sorry. Could you --
17   Q   Did they have people -- so --
18   A   "They"? First of all, who is --
19   Q   Strike that. I didn't mean to cut you off.
20   A   I didn't mean to cut you off.
21   Q   So, did -- in performing the analysis, to your
22 recollection was Mr. Rein, Mr. Levett -- Ms. Levett
23 typically interacting with you and Mr. Saunders or you
24 on the ground in the Philippines?
25   A   It would be myself and Mr. Saunders.

Page 54

1    Q   Okay.
2      And can you give me a little bit more detail on
3  the types of financial analyses that they were
4  performing?
5      MR. DUNN: Objection to form.
6      THE DEPONENT: No. It was 10 years ago. I
7  can't remember what we asked them to look at.
8  BY MR. PERRY:
9    Q   Do you recall whether any of that analyses was
10 shared with Bloomberry?
11   A   No. I don't recall.
12   Q   Fair to characterize that as back office
13 support?
14     MR. DUNN: Objection to form.
15     THE DEPONENT: Yeah. I mean, that was -- I
16 don't know if the term "back office" was -- that's what
17 that is. It's not front-of-the-house operations.
18 BY MR. PERRY:
19   Q   Okay.
20     So, Mr. Stone, directing your attention to the
21 last page of the document --
22   A   Yes.
23   Q   -- is that your signature?
24   A   Yes.
25     MR. PERRY: And, for the record, before you is

Page 55

1  Deposition Exhibit 2031 (indicating). It's a document
2  entitled, "Declaration of Bradley Stone in Support of
3  Claimant's Request for Interim Measures of Protection"
4  dated April 13th, 2014.
5      (Exhibit 2031 was marked; attached
6      hereto.)
7  BY MR. PERRY:
8    Q   Just a small point, Mr. Stone, but if you look
9  at Paragraph 29 --
10   A   Okay.
11   Q   -- there's a description of some of the -- some
12 of your activity on behalf of Bloomberry with respect to
13 the road show.
14   A   Uh-huh.
15   Q   And you write (reading):
16       "Although it was outside the
17       scope of GGAM's responsibilities and
18       manager and operator under the MSA,
19       we agreed to undertake these
20       efforts."
21     Does that refresh your recollection that work
22 on behalf of the road show was outside the scope of the
23 MSA?
24     MR. DUNN: Objection to form.
25     THE DEPONENT: No, I don't think that's what it

1    I, LAURIE MILLER, Certified Court Reporter of
2    the State of Nevada, do hereby certify:
3    That the foregoing proceedings were taken
4    before me at the time and place herein set forth; with
5    all participants appearing remotely; that the witness
6    was duly sworn or affirmed; that the testimony of the
7    witness and all objections made by counsel at the time
8    of the examination were recorded stenographically by me,
9    and were thereafter transcribed under my direction and
10   supervision; and that the foregoing pages contain a
11   full, true and accurate record of all proceedings and
12   testimony to the best of my skill and ability.
13   I further certify that I am neither financially
14   interested in the action nor a relative or employee of
15   any attorney or any of the parties.
16   IN WITNESS WHEREOF, I have subscribed my name
17   this 12th of May, 2022.

_____

LAURIE MILLER, CCR No. 971, RPR, CLR