```
 1
 2                    UNITED STATES DISTRICT COURT
 3                    SOUTHERN DISTRICT OF NEW YORK
 4       -----------------------------------X    *
                                                 *
 5       GLOBAL GAMING PHILIPPINES, LLC,         *
                                                 *
 6                          PLAINTIFF,           *
                                                 *
 7                  vs                           *     INDEX NO:
                                                 *     21-cv-2655
 8       ENRIQUE K RAZON, JR.; BLOOMBERRY        *       (LGS)
         RESORTS AND HOTELS, INC, SURESTE        *
 9       PROPERTIES, INC; COLLINGWOOD            *
         INVESTMENT COMPANY LIMITED;             *
10       COLLINGWOOD OIL & GAS HOLDINGS,         *
         LLC; COLLINGWOOD USA, INC;              *
11       COLLINGWOOD BROOKSHIRE USA, INC;        *
         COLLINGWOOD APPALACHIAN MINERALS,       *
12       LLC; ASIA ARROW LIMITED; RIZOLINA       *
         LLC; ENSARA LLC; NOZAR LLC; BOWERY      *
13       BAY LLD; CAMPANILLA LLC; FESARA         *
         LLC; and 11 ESSEX STREET REALTY         *
14       LLC,                                    *
                                                 *
15                          DEFENDANTS.          *
         -----------------------------------X    *
16
17                  *** HIGHLY CONFIDENTIAL ***
18                     VIDEOTAPED DEPOSITION
19                              of
20                        JONATHAN REIN
21                     New York, New York
22
23                  Tuesday, May 17, 2022
24
25       Mary Agnes Drury, RPR
```

Page 27

JONATHAN REIN - HIGHLY CONFIDENTIAL

standpoint, Estella Occena, which I believe is O-c-c-e-n-a, and Don Almeda, and Chito Alarilla I believe is how you pronounce it.

Q. Did you ever negotiate directly with Mr. Razon?

A. To the best of my recollection I did not negotiate directly with Mr. Razon.

Q. Who on the GGAM side was negotiating directly with Mr. Razon, to your recollection?

A. So I can only be aware of what I am aware of.

I am aware that Mr. Weidner and Mr. Razon would on one or two occasions meet for a separate high-level discussion to make determinations based on or have negotiations around issues that the working group had not been able to resolve.

Q. Where do you believe those -- do you have any knowledge of where those meetings occurred?

A. The ones between Mr. Weidner and Mr. Razon?

Q. Yes.

A. No, I do not.

Page 28

JONATHAN REIN - HIGHLY CONFIDENTIAL

Q. Did you travel to Manila for purposes of negotiating the MSA?

A. Yes. The bulk of my work was done in New York, but, yes, I did travel to Manila.

Q. How many times did you travel to Manila for purposes of negotiating the MSA?

A. I don't recall. I would have to estimate.

Q. Well, was it more than once?

A. It was probably twice, but it could have been only once, or it could have been three times.

Q. Okay. Did you travel to Manila for a signing ceremony for the MSA?

A. Not that I recall.

Q. Was there any -- did you travel to Manila for any event that went along with the signing and execution of the MSA?

A. Not that I recall.

Q. Do you recall doing anything at the Shangri-La Hotel in Manila?

A. I recall staying at the Shangri-La in Manila on multiple occasions, which may have been -- likely were occasions related to MSA

Page 29

JONATHAN REIN - HIGHLY CONFIDENTIAL

negotiation at least one time that I stayed there. I also had meals there.

Q. But you don't recall an event where Chinese government officials, and Mr. Weidner and Mr. Razon attended to celebrate the signing of the MSA?

A. I don't recall being at that event.

Q. Now, this was a period of time I believe before you had been formally seconded to GGAM that you were negotiating the MSA; is that right?

A. The MSA negotiations took place during 2011, and I was not seconded until 2012.

Q. And so how would you characterize your role with GGAM in 2011 when you were participating in the negotiation of the MSA?

A. I was an investment banker providing advice and service to a client.

Q. Who was that client?

A. Global Gaming Asset Management and its affiliates.

Q. And did you make that clear to the Bloomberry folks that you were negotiating with?

Page 30

JONATHAN REIN - HIGHLY CONFIDENTIAL

MR. AINSWORTH: Objection.

THE WITNESS: I made it abundantly clear, as did others. And I recall testifying to a reasonably big extent to that in the arbitration.

Q. You recall that the issue of Cantor's involvement with the GGAM businesses was a point of contention in the arbitration?

A. Many things were points of contention on your side, but I'm not privy to all the things you may have -- your clients may have thought were relevant to discuss or explore at the hearing.

Q. Sure. But do you recall the issue of Cantor's involvement in the GGAM business was, in fact, a point of contention in the arbitration?

A. I recall that my testimony, in part, refuted an assertion that the fulfilment of the MSA obligations had been assigned to Cantor.

Q. Do you mean the MSA obligations or the ECA obligations?

A. I was referring to MSA obligations. There was an assertion that was made that the

Case 1:21-cv-02655-LGS-SN    Document 329-20    Filed 01/26/23    Page 3 of 6
HIGHLY CONFIDENTIAL
Deposition of Jonathan Rein                                Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 71

JONATHAN REIN - HIGHLY CONFIDENTIAL

1  say what Mr. Subramanian meant or to answer --
2  frankly, I don't think I'm qualified to answer
3  your question.
4      I don't know what he was opining on
5  specifically. I don't know what his remit was
6  specifically. I don't know what he means by
7  certain things both because I'm not him, and
8  because I'm not a lawyer.
9      So I don't know that he's more
10 authoritative on anything other than a specific
11 question of law that has been put to him, and I
12 don't know that we're even trying to answer the
13 same question. So that is my answer.
14     Q. Okay. What is your understanding as
15 you sit here today about whether the shares
16 granted pursuant -- well, the shares at issue
17 in this litigation were granted pursuant to the
18 MSA or the EOA?
19     MR. AINSWORTH: Objection. Calls
20 for legal conclusion.
21     THE WITNESS: I don't think that I
22 am qualified to answer that question.
23     Q. What was the role of Cantor in the
24 negotiation of the MSA?

Page 72

JONATHAN REIN - HIGHLY CONFIDENTIAL

1      A. I can answer what my role was and my
2  team's role as opposed to Cantor at large.
3      Q. Well, let's do that. What was your
4  role and your team's role in the negotiation of
5  the MSA?
6      A. So we helped the management team, by
7  which I mean Bill, Brad, and Garry, organize
8  and prioritize terms and conditions that they
9  thought were important, to provide perspective
10 on things that they thought were either on or
11 off market, and that did or did not have
12 business consequence.
13     We sought to take elements of our
14 due diligence exercise and think about how
15 those integrate into the contract language. We
16 thought about the financial implications of the
17 terms of the MSA. We negotiated directly for
18 terms that we thought were important to us and
19 considered where to make trades for things that
20 might have been less important or that we were
21 willing to live with.
22     And those would be examples, though
23 certainly not an exhaustive list, of things
24 that my team at Cantor would have done on our

Page 73

JONATHAN REIN - HIGHLY CONFIDENTIAL

1  own and in conjunction with counsel.
2      Q. And in doing so working in all of
3  those activities that you just listed, were you
4  doing so as a Cantor employee working for
5  providing services to GGAM?
6      A. So if we're talking about the
7  timeframe of the MSA and the MSA negotiations,
8  right, prior to execution of the MSA in
9  September 2011, it would have been as a Cantor
10 employee, because that was a time where I was a
11 Cantor investment banker and was not seconded
12 to GGAM.
13     Q. Okay. And were you, in providing
14 those services as a Cantor employee, providing
15 those services to GGAM?
16     A. Yes, that is how I thought of it.
17     Q. In other words, you're not providing
18 services to Cantor, you're providing services
19 to GGAM, right?
20     MR. AINSWORTH: Objection.
21     THE WITNESS: I don't know if there
22 is a legal distinction or a meaningful
23 distinction.
24     I suppose I could engage in some

Page 74

JONATHAN REIN - HIGHLY CONFIDENTIAL

1  semantic jujitsu and say that I was
2  providing my services as an investment
3  banker to my firm, and my firm was
4  providing those services to GGAM; I just
5  don't know if that's a distinction with a
6  difference.
7      But I viewed GGAM as the client.
8  BY MR. PERRY:
9      Q. And did you identify yourself
10 clearly to Bloomberry, the Bloomberry team
11 members negotiating that you were a Cantor
12 investment banker providing advisory services
13 to GGAM?
14     MR. AINSWORTH: Asked and answered.
15     THE WITNESS: Yes, I did. I
16 testified to it previously today, and I
17 testified to it extensively in the
18 arbitration that I identified myself, my
19 colleagues at Cantor identified themselves,
20 our written record identified Cantor, and
21 at times, me and the Cantor counsel as
22 providing services to GGAM and its
23 affiliates.
24 BY MR. PERRY:

Case 1:21-cv-02655-LGS-SN   Document 329-20   Filed 01/26/23   Page 4 of 6
HIGHLY CONFIDENTIAL
Deposition of Jonathan Rein                                Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 87

JONATHAN REIN - HIGHLY CONFIDENTIAL

Q. Were you involved in the due diligence process prior to entering the MSA?

A. I was involved in the due diligence process including prior to entering into the MSA.

Q. Do you recall looking at certain risk factors in connection with entering into the MSA?

A. Yes. Generally, I recall looking into risk factors, yes.

(Whereupon, Defendant Exhibit 2042, Rein Declaration, Bates Stamped BLOOM_0100021 to '035, 15-Pages was marked for identification.)

BY MS. FISSELL:

Q. I'm going to mark as Exhibit 2042 the document Bates stamped Bloom 100201.

I'll draw your attention to -- let's start -- this is your "Declaration in Support of Claimant's Reply Memorial" in the arbitration proceedings, correct?

A. That is the title.

Q. And the last page of this has your signature, correct?

Page 88

JONATHAN REIN - HIGHLY CONFIDENTIAL

A. It appears to be my signature.

Q. And this was true and accurate at the time that you wrote it?

A. I believe it to be true and accurate at the time I wrote it.

Q. So if you'll go to paragraph 12, which starts on the bottom of page three, I'd like to draw your attention to the last bullet point.

A. Sorry, I don't believe there are bullet points on page three.

Q. Oh, page four; paragraph 12 continues on page four. The last bullet point says that -- well, starting before the bullet points it says, "GGAM took the following steps, among many others to give ourselves confidence that under GGAM's management, that Solaire will be profitable in the long term."

And if you jump down to the last bullet point one of those steps says, "Considered Risk Factors."

Do you see that?

A. I do.

Q. And you see in that list of risk

Page 89

JONATHAN REIN - HIGHLY CONFIDENTIAL

factors there's, "The reputation of the Philippines in general," it's sort of in the middle of those?

A. Yes.

Q. What do you understand the reputation of the Philippines in general to mean?

MR. AINSWORTH: Objection.

THE WITNESS: Well, you have to -- you actually have to read between the semicolons.

It says, "The reputation of the Philippines, in general, and Manila, in particular, for being unsafe for foreign tourists."

So taken together, the reputation of the Philippines and Manila for being an unsafe place for foreign tourists.

BY MS. FISSELL:

Q. And other than reading that sentence, do you have any recollection of analyzing that particular risk factor?

MR. AINSWORTH: Objection.

THE WITNESS: As I sit here today, I

Page 90

JONATHAN REIN - HIGHLY CONFIDENTIAL

don't recall specifically what we did to analyze that risk factor, but generally, these were things that we considered.

Q. And was it just the reputation in the Philippines for -- and the safety of foreign tourists, or was there any other reputational aspect of the Philippines that GGAM was looking into?

A. Well, within the litany here. I mean, in the first bullet we talk about certain elements, the Philippine economy towards the hospitality industry, gaming sector, political considerations, and legal and regulatory considerations. So those would all be ones.

And then there are some project-specific bullet points as to property design, as to the area where it's being built, as to projections.

And then we talk about the relevant potential geographic customer markets, and then some benchmarking.

And then we get back to the Philippines talking about differing gaming tax rates compared to other jurisdictions and the

Case 1:21-cv-02655-LGS-SN Document 329-20 Filed 01/26/23 Page 5 of 6
HIGHLY CONFIDENTIAL
Deposition of Jonathan Rein · · · · · · · · · · · · · · · · · · · · · · · · · · · Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 95
JONATHAN REIN - HIGHLY CONFIDENTIAL
2  Q. Were you involved in the negotiation
3 of the MSA?
4  A. I had a role.
5  Q. What was your role?
6  A. I was the main negotiator from the
7 Cantor side and I -- advising GGAM and working
8 with GGAM, and probably the main or co-main
9 negotiator of the document altogether along
10 with Mr. Stone, Brad Stone.
11      So that would have been my role.
12  Q. And what about your role in
13 negotiating the EOA?
14  A. So with respect to the EOA, I also
15 had a role as a significant negotiator. I
16 probably had a greater role than Mr. Stone or
17 Mr. Saunders would have on that document;
18 however, that document was largely negotiated
19 by the lawyers including Cantor's internal
20 counsel and external counsel, both of whom were
21 working on behalf of GGAM and its affiliates
22 and subsidiaries, because a lot of the economic
23 terms had already been negotiated and agreed
24 upon and codified in the MSA, so it was really
25 more about the language and legal protections

Page 96
JONATHAN REIN - HIGHLY CONFIDENTIAL
2 in that document.
3      So I think it's fair to say that the
4 lawyers did more of lifting on a relative basis
5 on the EOA than they did on the MSA, where the
6 MSA involved more business people touching it.
7      (Whereupon, Defendant Exhibit 2043,
8      Rein E-mail Dated 6/25/11, Bates Stamped
9      GGAM-SDNY-0059560 to '632, 73-Pages was
10      marked for identification.)
11 BY MS. FISSELL:
12  Q. I'm going to mark as Exhibit 2043, a
13 document stamped GGAM SDNY 0059560.
14      And this is an e-mail that you sent
15 to Estella, Benny, and Chito attaching a markup
16 -- a clean and a markup of the MSA, correct?
17  A. That is what it says.
18  Q. Do you believe this document is
19 anything other than that?
20  A. I have no reason to believe that the
21 document is anything other than that.
22  Q. And would you agree that the markup,
23 which starts at Bates page GGAM SDNY 0059597 is
24 -- reflects a markup from the GGAM side?
25  A. I don't know that.

Page 97
JONATHAN REIN - HIGHLY CONFIDENTIAL
2      MR. AINSWORTH: Counsel, if you will
3      make a representation that he can take into
4      consideration; either that or give him time
5      to look through it.
6  Q. Well, if you look at the cover
7 e-mail, it says "attached, please find a
8 blackline and a clean copy of the MSA."
9  A. And, counsel, if you are telling me
10 that this is the blackline that was attached to
11 this e-mail, then I will accept that it was the
12 blackline attached to this e-mail, but I don't
13 recall sending this e-mail.
14      I certainly wouldn't know what
15 documents were attached to an e-mail that I
16 sent 11 years ago.
17  Q. Okay. Well, your counsel produced
18 this document; this Bates stamp shows that --
19 or, I should say, GGAM's counsel produced this
20 document; the Bates stamp reflects this.
21      You see that the Bates numbers are
22 sequential from the e-mail through to the
23 attachments.
24      I think it's fair to say that this
25 is likely the blackline that was attached to

Page 98
JONATHAN REIN - HIGHLY CONFIDENTIAL
2 this e-mail, given the Bates numbering and the
3 production from GGAM?
4  A. I know of no reason to assert
5 otherwise.
6  Q. Okay. So if you'll turn to Bates
7 page ending 59631.
8  A. (Witness complies.)
9  Q. Would you agree these appear to be
10 additions from GGAM to the MSA?
11  A. Given how I understand blacklines to
12 work and given that I think I have no reason to
13 doubt this is anything but the blackline
14 attached to my e-mail, it would follow that
15 these would be insertions; aside from the top
16 two lines from the page, which appear to be a
17 deletion.
18  Q. So if you'll look at subsection (c),
19 and the second sentence begins "However, except
20 as specifically set forth in the preceding
21 sentence," which I guess I'll read the
22 preceding sentence.
23      "The arbitrators may consolidate
24 proceedings with respect to any dispute under
25 this agreement with proceedings with respect to

Case 1:21-cv-02655-LGS-SN   Document 329-20   Filed 01/26/23   Page 6 of 6
HIGHLY CONFIDENTIAL
Deposition of Jonathan Rein                Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

C E R T I F I C A T E

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF ONONDAGA   )

        I, Mary Agnes Drury, a Notary Public within and for the State of New York, do hereby certify:

        That JONATHAN REIN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

        I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

        IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of May, 2022.

_____
Mary Agnes Drury