Case 1:21-cv-02655-LGS-SN  Document 329-21  Filed 01/26/23  Page 1 of 9
HIGHLY CONFIDENTIAL - Attorney's Eyes Only
Deposition of Binyomin Kaplan V.1                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2

     - - - - - - - - - - - - - - - - - - x
 3                                       :
     GLOBAL GAMING PHILIPPINES, LLC,      :
 4                                       :
            Plaintiff,                    :
 5                                       :
        v.                                : Case No.
 6                                       : 21 Cv. 2655
     ENRIQUE K. RAZON, JR.;               : (LGS)(SN)
 7   BLOOMBERRY RESORTS AND HOTELS INC.;  :
     SURESTE PROPERTIES INC.;             :
 8                                       :
            Defendants.                   :
 9                                       :
     - - - - - - - - - - - - - - - - - - x
10

11       **HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

12

13              VIDEOTAPED DEPOSITION OF
14              BINYOMIN AVROHOM KAPLAN
15                  MAY 19, 2022

16

17          VIDEOTAPED DEPOSITION OF BINYOMIN AVROHOM
18   KAPLAN, produced as a witness at the instance of the
19   Plaintiff, and duly sworn remotely, was taken in the
20   above-styled and numbered cause on MAY 19, 2022, at the
21   offices of Milbank LLP, 55 Hudson Yards, New York, New
22   York, from 9:44 a.m. to 4:46 p.m., before Bridget
23   Lombardozzi, CSR, RMR, CRR, and Notary Public of the
24   State of New York, pursuant to the Federal Rules of
25   Civil Procedure and the provisions stated on the record.
```

Case 1:21-cv-02655-LGS-SN Document 329-21 Filed 01/26/23 Page 2 of 9
LGS-SN CONFIDENTIAL - Attorney's Eyes Only
Deposition of Binyomin Kaplan V.1                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 124

1 allegations concerning Mr. Razon's alleged
2 relationship with Mr. Sicat. It has not come up
3 yet this morning.
4     So I'd like know what --
5  A.  Correct.
6  Q.  Right.
7     So what are the factual bases,
8 nonprivileged if you like, that support the
9 allegations about Mr. Razon's purported
10 relationship with Mr. Sicat?
11  A.  Nothing that's nonprivileged other than
12 the point I made earlier about the letter to the
13 Philippine Stock Exchange being immediately acted
14 upon.
15  Q.  But paragraphs 154 and 155 don't say
16 anything about a letter to the Philippine Stock
17 Exchange, do they?
18  A.  No.
19  Q.  They make very serious allegations about
20 some sort of financial relationship that
21 Mr. Razon, according to the complaint, supposedly
22 knew about. Very serious allegations.
23     You would agree with me, right?
24  A.  I agree.
25  Q.  Okay. And you were produced by GGP to

Page 125

1 testify on certain topics, one of which is the
2 factual bases, to the extent nonprivileged, of
3 those allegations.
4     Wouldn't you agree with me?
5  A.  The factual bases for those allegations
6 is privileged.
7  Q.  There are no nonprivileged factual bases
8 for the allegation that Mr. Razon and Mr. Sicat
9 had a supposed improper relationship?
10     MR. AINSWORTH: Counsel,
11   you're argumentative. Objection.
12   He's asked -- he's answered the
13   question multiple times. He's acting
14   on my instructions at this point. If
15   you want to have an argument with me
16   about whether my instruction's
17   appropriate, that's one thing. You
18   don't need to argue with the witness.
19     MR. WALFISH: Kevin, are you
20   finished? I'll take that as a yes.
21     Bridget, could you please
22   read the question back?
23     And, Mr. Kaplan, could you
24   please answer to the best of your
25   ability?

Page 126

1     MR. AINSWORTH: Mr. Walfish
2   -- Mr. Walfish, I had to take a minute
3   there to remember your last name so I
4   wouldn't stoop to using informalities.
5   I'm finished.
6     (Whereupon, the record was
7   read back.)
8     MR. AINSWORTH: Again, asked
9   and answered. Same instruction.
10  A.  Yeah, I believe I did answer that.
11  Q.  Well, I don't remember getting an
12 answer, so if you could please just answer the
13 question.
14     MR. AINSWORTH: Objection.
15   Asked and answered. Same instruction.
16  A.  I'm not aware of any.
17  Q.  Thank you, Mr. Kaplan.
18     Can you please give me a minute to see
19 whether I have anything else?
20  A.  Sure.
21     MR. WALFISH: Let's go off
22   the record.
23     THE VIDEOGRAPHER: The time
24   right now is 12:26 p.m. We're off the
25   record.

Page 127

1     (Pause)
2     THE VIDEOGRAPHER: The time
3   right now is 12:27 p.m. We're back on
4   the record.
5     MR. WALFISH: Mr. Kaplan,
6   thank you. I have no further
7   questions at this time.
8     THE VIDEOGRAPHER: The time
9   right now is 12:27 p.m. We're off the
10   record.
11     (Whereupon, a luncheon recess
12   is taken.)
13    A F T E R N O O N   S E S S I O N
14     THE VIDEOGRAPHER: The time
15   right now is 1:19 p.m. We're back on
16   the record.
17 CROSS-EXAMINATION
18 BY MR. LOWE:
19  Q.  All right. Good afternoon, Mr. Kaplan.
20  A.  Good afternoon.
21  Q.  So I believe you testified earlier that
22 you had no involvement in the negotiation of the
23 MSA, is that correct?
24  A.  Correct.
25  Q.  Okay. And did you perform any services

Page 128

1 under the MSA?
2   MR. AINSWORTH: Objection.
3   A. Arguably, yes.
4   Q. When you say "Arguably, yes," what do
5 you mean by that?
6   A. I provided back-office services to GGAM,
7 legal services. And one of the clauses in the MSA
8 was to negotiate and execute an equity option
9 agreement, which I was involved in negotiating and
10 coordinating.
11   Q. Okay. So -- so other than providing
12 back-office services and your -- and your role in
13 the -- in negotiating the equity op -- negotiating
14 and executing the equity option agreement, was
15 there anything else you did that arguably was a
16 performance of services under the MSA?
17   A. I don't think so.
18   Q. Okay. Did you ever communicate directly
19 with -- with anyone from BRHI and SPI?
20   A. I believe so.
21   Q. Do you recall who you communicated with?
22   A. I believe Estela and Benny and I was on
23 a number of calls when the equity option agreement
24 was being negotiated.
25   Q. Okay. And were those -- were those

Page 129

1 communications all about the -- the -- if I call
2 it the "EOA," do you understand me to refer to the
3 equity options agreement?
4   A. I do.
5   Q. Were those calls all about the -- the
6 EOA?
7   A. I -- I wouldn't know now. I didn't
8 prepare for that line of questioning, but I would
9 assume a majority of them would be in that regard.
10   Q. Okay. Do you know -- do you know how
11 many times you had contact with BRHI or SPI?
12   A. I do not.
13   Q. If you had to guess, would -- would you
14 say more than five?
15   A. It -- it was ten years ago.
16   Q. Mm-hmm.
17   A. I don't know.
18   Q. Okay.
19     (Whereupon, exhibit is
20     received and marked Kaplan Deposition
21     Exhibit 2048 for identification.)
22 BY MR. LOWE:
23   Q. I'm handing you -- I'm handing you --
24 sorry. Let me get this microphone on.
25     Okay. So I'm handing you a letter from

Page 130

1 plaintiff's counsel to Judge Schofield dated May
2 10, 2021, with docket number 47 at the top.
3     Do you see that?
4   A. I do.
5   Q. And I've marked this as Exhibit Number
6 2048.
7     Did -- did you review this letter in
8 connection with your preparations for this
9 deposition?
10   A. I don't recall.
11   Q. Do you recall re -- reviewing this
12 letter before your -- your preparations for this
13 deposition?
14   A. No.
15   Q. All right. If you'd turn to page 2 of
16 the let -- of the letter and look at paragraph
17 2.b. And -- are you there?
18   A. I am.
19   Q. And you see it says "The debtor
20 defendants, through their many volitional acts,
21 purposefully availed themselves of the privilege
22 of doing business in New York and invoked the
23 benefits and protections of New York's laws. They
24 traveled to New York to negotiate the management
25 services agreement ('MSA') that is the subject of

Page 131

1 the arbitral awards."
2     Do you see that?
3   A. I do.
4   Q. And -- and do you understand that
5 statement to mean that representatives of -- from
6 BR -- BRHI and SPI traveled to New York for the
7 purpose of meeting in person with representatives
8 of GGAM to negotiate the MSA?
9     MR. AINSWORTH: Objection.
10       To the extent you can answer
11     that without disclosing
12     attorney-client communications, you
13     may.
14   A. I'm not sure -- I'm reading English,
15 right? "They traveled to New York to negotiate
16 the" MSA. That's what I understand it to mean.
17   Q. Yes. So -- and my -- my question was,
18 when you say that's -- that's what you understand
19 it to mean, do you mean that to say that they did
20 that for the purpose of -- of meeting with
21 representatives of GGAM in person in New York to
22 negotiate the MSA?
23     MR. AINSWORTH: Objection.
24       To the extent you can answer
25     without disclosing attorney-client

Case 1:21-cv-02655-LGS-SN Document 329-21 Filed 01/26/23 Page 4 of 9
HIGHLY CONFIDENTIAL - Attorney's Eyes Only
Deposition of Binyomin Kaplan V.1    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 148

1 with Cantor and GGAM and Cantor's outside counsel
2 to negotiate the specific terms of the EOA and the
3 participation agreement?
4        MR. AINSWORTH: Objection.
5    A.  The meeting happened.
6    Q.  And is there any -- and -- and what is
7 your basis for your allegation that the meeting
8 happened?
9        MR. AINSWORTH: Objection.
10   A.  I don't remember which of the
11 people that --
12       THE WITNESS: Bless you.
13       THE REPORTER: Thank you.
14   A.  -- the people that I spoke with
15 referenced it.
16   Q.  But you weren't --
17   A.  It was -- it was in my diligence to
18 prepare for this.
19   Q.  You weren't personally at any meeting
20 in -- in Las Vegas in October of 2011, correct?
21   A.  I was not.
22   Q.  Okay.  And so I think you just said
23 that -- that you became aware of this meeting
24 based on some people that you spoke with?
25   A.  Correct.

Page 149

1    Q.  And do you recall who -- who told you
2 about this meeting?
3    A.  I don't.  It was one of the four people
4 that I prepared with that I disclosed this
5 morning.
6    Q.  One of Brad Stone, Garry Saunders, Bill
7 Weidner or Jon Rein?
8    A.  Correct.
9    Q.  Okay.  And are -- are you aware of -- of
10 any email communications indicating that -- that
11 this meeting actually -- that a meeting in Las
12 Vegas in -- in October of 2011 where the -- where
13 the EOA and participation agreement were discussed
14 took place?
15   A.  Not off the top of my head, but I'm sure
16 that that would be something that would be there.
17   Q.  So you're sure that there's emails
18 indicating that this -- that -- that that meeting
19 took place?
20   A.  I shouldn't say that.  I'm not sure that
21 there are emails, but it's hard for me to imagine
22 that this would have been coordinated without some
23 sort of discussion or coordination.
24   Q.  Well, do you understand why
25 Ms. Occeña and Mr. Almeda traveled to Las Vegas in

Page 150

1 October of 2011?
2    A.  To negotiate the EOA.
3    Q.  It's your understanding that's the
4 reason they traveled to Las Vegas in October 2011?
5    A.  I don't know why they traveled.  I know
6 that they did.
7    Q.  Okay.  Do you have any reason to believe
8 that Ms. Occeña and Mr. Almeda attended the Global
9 Gaming Expo or -- or G2E conference in Las Vegas
10 in October 2011?
11   A.  I don't know what that is.
12   Q.  All right.  Can you please turn to -- to
13 page 17 of the complaint, the second amended
14 complaint that's in front of you?  And let me know
15 when you're there.
16   A.  I'm there.
17   Q.  All right.  And if you look at page --
18 sorry, paragraph 51 on page 17, you see the third
19 sentence of that paragraph starts with "Razon
20 recognized..."?
21   A.  Yes.
22   Q.  And it says "Razon recognized that
23 Cantor's involvement as the 50/50 joint venture
24 partner with Global Gaming provided an avenue to
25 access significant financial resources and to

Page 151

1 associate with a proven, credible name in the U.S.
2 capital markets."
3        Do you see that?
4    A.  Yes.
5    Q.  What's the basis for that allegation?
6        MR. AINSWORTH: Objection.
7    A.  I seem to recall that there were
8 statements made at the roadshow or various
9 roadshow meetings with regard to Cantor's
10 involvement.
11   Q.  And do you recall who made those
12 statements?
13   A.  Maybe Estela.
14   Q.  Anyone else?
15   A.  I mean, it was discussed by everyone at
16 the roadshow, but I'm specifically thinking of
17 things that I believe Estela said.
18   Q.  Okay.  Other than things that -- that
19 you believe Estela said at the -- at the roadshow,
20 is -- is there any other basis for this
21 allegation?
22   A.  I'm not aware of any right now.
23   Q.  Okay.  All right.  Let's -- could you
24 turn to page 18 of the complaint?  And let me know
25 when you're there.

Case 1:21-cv-02655-LGS-SN Document 329-21 Filed 01/26/23 Page 5 of 9
HIGHLY CONFIDENTIAL - Attorney's Eyes Only
Deposition of Binyomin Kaplan V.1　　　　Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 152

1  A. I'm there.
2  Q. Okay. If you look at paragraph 52 and
3 you go to the third sentence, it starts with
4 "Razon recognized..."
5     Do you see that?
6  A. Yes.
7  Q. And it says "Razon recognized the
8 importance of Cantor's role and successful
9 negotiations with Cantor in New York, and caused
10 the debtor defendants to expressly agree that New
11 York law would govern the confidentiality
12 agreement and the exchange of information during
13 the negotiation and diligence process."
14     Do you see that?
15  A. I do.
16  Q. And you see there's a Footnote 4 at the
17 end of that sentence?
18  A. Yes.
19  Q. And if you go down, that Footnote 4 says
20 "The terms of the confidentiality agreement were
21 negotiated between Razon (directly and through
22 agents) and Cantor's legal team in New York."
23     Do you see that?
24  A. I do.
25  Q. What is the basis for the allegation

Page 153

1 that Razon recognized the importance of Cantor's
2 role in successful negotiations with Cantor in New
3 York?
4  A. The ultimate NDA being executed with New
5 York law.
6  Q. Other than an NDA being executed with
7 New York law, is there anything else?
8  A. I mean, the -- the statement I made
9 earlier about what was said at the roadshow would
10 also recognize the importance of Cantor's role.
11  Q. Okay. So other than the NDA having New
12 York law and the statements that Estela may have
13 made at the roadshow, is there anything else?
14  A. I don't know.
15  Q. What is the -- what is the basis for the
16 allegation that Razon caused the debtor defendants
17 to expressly agree that New York law would govern
18 the confidentiality agreement and exchange of
19 information during the information negotiation and
20 diligence process?
21  A. The NDA itself.
22  Q. Other than the NDA itself, is there
23 anything else?
24  A. I don't know.
25  Q. Footnote 4 states that the terms of the

Page 154

1 confidentiality agreement were negotiated with
2 Cantor's legal team, correct?
3  A. Correct.
4  Q. And what's meant by "Cantor's legal
5 team"?
6  A. The individuals at Cantor that were
7 providing services to GGAM and coordinating with
8 GGAM.
9  Q. So am I correct that that refers to
10 Cantor lawyers advising GGAM as a client or Cantor
11 lawyers advising Cantor as a client?
12  A. Cantor lawyers --
13     MR. AINSWORTH: Objection.
14     THE WITNESS: Go ahead.
15     MR. AINSWORTH: Objection.
16     You can answer.
17     THE WITNESS: Okay.
18  A. Cantor lawyers advising GGAM as a joint
19 venture partner with an ownership stake in the end
20 result.
21  Q. So not as -- so it does not -- strike
22 that.
23     MR. LOWE: Our next exhibit
24  is -- is 250, correct? Is that...?
25     MR. AINSWORTH: Is it 2050?

Page 155

1     Is that what you mean?
2     MR. LOWE: Sorry, yes. I
3  believe we're on 2050.
4        (Whereupon, exhibit is
5      received and marked Kaplan Deposition
6      Exhibit 2050 for identification.)
7 BY MR. LOWE:
8  Q. All right. Mr. Kaplan, I'm showing
9 you -- I just handed you a document that I've
10 marked as Exhibit 2050. And this is "Plaintiff
11 Global Gaming Philippines, LLC's Memorandum of Law
12 in Opposition to Defendants' Motion to Dismiss,"
13 Docket Number 134.
14     Do you see that?
15  A. I do.
16  Q. Did you review this document in
17 connection with your preparation for this
18 deposition?
19  A. I did.
20  Q. Had you reviewed it prior to your
21 preparation for your deposition?
22  A. No.
23  Q. Could you turn to page 9 and let me know
24 when you're there?
25  A. I'm there.

Case 1:21-cv-02655-LGS-SN Document 329-21 Filed 01/26/23 Page 6 of 9
HIGHLY CONFIDENTIAL - Attorney's Eyes Only
Deposition of Binyomin Kaplan V.1    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 156

1  Q. Do you see that there's a -- there's a
2 number of bullet points on page 9?
3  A. I do.
4  Q. If you go down to the third bullet
5 point, it states "The debtor defendants and Cantor
6 executed a confidentiality agreement governed by
7 New York law, which governed their dealings before
8 the MSA was executed."
9     Do you see that?
10  A. I do.
11  Q. So what's the basis for the assertion in
12 this bullet point that BRHI and SPI executed a
13 confidentiality agreement with Cantor?
14     MR. AINSWORTH: Objection.
15  A. The NDA.
16  Q. BRHI and SPI entered into a
17 confidentiality agreement with Global Gaming Asset
18 Management, L.P., correct?
19  A. Correct, a joint venture that was -- of
20 which Cantor was a significant member.
21  Q. Okay. So when you say that -- so -- so
22 the -- the confidentiality agreement you're
23 referring -- that's being referred to in this
24 bullet point is the one that's between BRHI and
25 SPI and Global Gaming Asset Management, L.P.,

Page 157

1 correct?
2     MR. AINSWORTH: To the extent
3     you can answer without disclosing
4     attorney-client communications, you
5     may.
6  A. I don't know.
7  Q. All right. Maybe it would be helpful if
8 I showed you a document.
9     (Whereupon, exhibit is received and
10     marked Kaplan Deposition Exhibit 2051 for
11     identification.)
12     THE WITNESS: Thank you.
13 BY MR. LOWE:
14  Q. I've just handed you a document that
15 I've marked as Exhibit 2051. And do you see that
16 this is an email and it has Bates number
17 GGAM-SDNY-0059178? And do you see that this is an
18 email from Kevin Russell to Jon Rein and a number
19 of other people dated May 25, 2011?
20  A. Yes.
21  Q. And -- and some of the other people
22 included on the "To" line are sjtan@picazolaw.com
23 and eoccena@ictsi.
24     Do you understand those -- those two
25 emails to be the emails of Benny Tan -- Benny Tan

Page 158

1 and Estela Occeña?
2  A. Looks that way.
3  Q. And you see the subject line is
4 "Bloomberry NDA," correct?
5  A. Correct.
6  Q. Then there's an attachment with a
7 document labeled "Bloomberry NDA."
8     Do you see that?
9  A. Yes.
10  Q. And then the email says "Signed NDA
11 attached."
12     Do you see that?
13  A. Yes.
14  Q. And if you flip over to the next page,
15 you'll see it shows -- it's labeled
16 "Confidentiality Agreement."
17     Do you see that?
18  A. Yes.
19  Q. And then you'll see in the -- in the
20 first paragraph it says "In connection with the
21 interest expressed by Global Gaming Asset
22 Management, L.P. (GGAM), to manage the
23 construction, pre-opening and commercial operation
24 of the entertainment city project for Bloomberry
25 Resorts and Hotels, Inc. (BRHI) and Sureste

Page 159

1 Properties, Inc. (SPI), the parties hereby agree
2 as follows."
3     Do you see that?
4  A. Yes.
5  Q. And if you flip to the back page, the
6 second-to-last -- the last page, it says "Signed
7 by the parties as of March 1, 2011."
8     Do you see that?
9  A. Yes.
10  Q. And you see there's a -- a line for
11 Global Gaming Asset Management, L.P. and it's
12 signed by William P. Weidner.
13     Do you see that?
14  A. Yes.
15  Q. So is this the confidentiality agreement
16 or the nondisclosure agreement that you were
17 referring to?
18     MR. AINSWORTH: Objection.
19  A. I think so.
20  Q. Was -- and you'll see that -- strike
21 that.
22     Was -- was Cantor Fitzgerald a party to
23 this agreement?
24  A. Not directly.
25  Q. Do you know if -- if anyone was a party

Case 1:21-cv-02655-LGS-SN Document 329-21 Filed 01/26/23 Page 7 of 9
HIGHLY CONFIDENTIAL - Attorney's Eyes Only
Deposition of Binyomin Kaplan V.1                Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 160

1  to this agreement other than Bloomberry Resorts
2  and Hotels, Inc., Sureste Properties, Inc., and
3  Global Gaming Asset Management, L.P.?
4      A.  I don't.
5      Q.  And you said -- you said that -- when I
6  asked if Cantor was a part -- a signatory to this
7  agreement, you said "Not directly."
8          MR. AINSWORTH:  Objection.
9      Q.  Is that correct?
10         MR. AINSWORTH:  It
11     mischaracterizes the testimony.
12     A.  I'm sorry, is there a question for me?
13     Q.  So -- so earlier I asked "Was Cantor
14 Fitzgerald a party to the agreement?"  And you
15 said "Not directly."
16         Do you recall that?
17     A.  Yes.
18     Q.  Did -- did Cantor execute this
19 agreement?
20     A.  Cantor's lawyers negotiated it and Bill
21 Weidner executed it.
22     Q.  So when -- when you say "Cantor's
23 lawyers negotiated it," are you saying that GGAM's
24 lawyers negotiated it?
25     A.  Cantor's lawyers, providing services to

Page 161

1  a joint venture, negotiated it and specifically
2  contemplated Cantor-related clauses.
3      Q.  Okay.  Did -- did Cantor execute this
4  agreement?
5          MR. AINSWORTH:  Objection.
6      Asked and answered.
7      A.  Not directly.
8      Q.  So are you unable to give a yes-or-no
9  answer to the question of whether Cantor executed
10 this agreement?
11         MR. AINSWORTH:  Objection.
12     Asked and answered.
13     A.  I am able to give a yes-or-no answer.
14     Q.  Okay.  And so did Cantor execute this
15 agreement?  Yes or no?
16         MR. AINSWORTH:  Objection.
17     Asked and answered.
18     A.  No.  Cantor's joint venture executed it.
19         MR. AINSWORTH:  Counsel,
20     can -- can we take a break in the next
21     five minutes or so?
22         MR. LOWE:  Yeah.  One second.
23     Q.  So would you agree that BRHI and SPI
24 never entered into a confidentiality agreement
25 with Cantor?

Page 162

1          MR. AINSWORTH:  Objection.
2      A.  I don't know.
3          MR. LOWE:  I think now's a
4      good time for a break.
5          Can we go off the record?
6          THE VIDEOGRAPHER:  The time
7      right now is 2:03 p.m.  We're off the
8      record.
9          (Whereupon, a recess is
10     taken.)
11         THE VIDEOGRAPHER:  The time
12     right now is 2:17 p.m.  We're back on
13     the record.
14 BY MR. LOWE:
15     Q.  You might have it in front of you,
16 but -- but can you -- can you pull up the second
17 amended complaint, Exhibit 2009?  Let me know when
18 you have it.
19     A.  I got it.
20     Q.  All right.  And can you turn to page 18
21 of the complaint?  And let me know when you're
22 there.
23     A.  I'm there.
24     Q.  And if you look down at paragraph 54, it
25 says "At all times, Razon and the debtor

Page 163

1  defendants knew that Cantor's agreement to the
2  terms of the relationship, including the economic
3  terms, would be necessary if the parties were to
4  reach a deal."
5          Do you see that?
6      A.  I do.
7      Q.  What's -- what's the basis for that
8  allegation?
9      A.  Statements that were made by Bill, Brad,
10 Garry, and Jon at various times.
11     Q.  So other than statements by them, are --
12 are there any other bases for that allegation?
13         MR. AINSWORTH:  Objection.
14     A.  I believe there were emails as well that
15 delivered the message that Cantor's approval was
16 required.
17     Q.  Do you recall which emails in
18 particular?
19     A.  I do not.
20     Q.  Do you recall who -- who sent or
21 received the emails?
22     A.  I do not.
23     Q.  So other than those statements from
24 Bill, Brad, Garry, and Jon and some emails that
25 you -- that you just referenced, is there anything

Case 1:21-cv-02655-LGS-SN Document 329-21 Filed 01/26/23 Page 8 of 9
HIGHLY CONFIDENTIAL - Attorney's Eyes Only
Deposition of Binyomin Kaplan V.1    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 172

1    Q. And that email is relevant to -- to --
2 to whether he understood that GGAM would perform
3 services under the MSA in New York? Is that what
4 you're saying?
5    A. Correct. In part, among other things.
6    Q. So what services did Cantor provide to
7 BRHI and SPI in New York?
8    A. There were a number of back-office
9 services that were provided by Cantor which
10 allowed GGAM to provide its services.
11    Q. Did Cantor directly provide any services
12 for BRHI and SPI that you're aware of?
13    A. I don't know what that means, "directly
14 provide."
15    Q. Outside of providing back-office
16 services for GGAM, did -- did Cantor provide any
17 services for BRHI and SPI?
18    A. I think that --
19       MR. AINSWORTH: Objection.
20    A. I think that is services to BRHI and --
21 and SPI because how do you separate out one part
22 of a joint venture from another part of a joint
23 venture? There's the front-facing part, which --
24 let's use this deposition as an example. I'm sure
25 that there are a lot of other lawyers, paralegals,

Page 173

1 administrative assistants, word -- word
2 processors, mailroom attendants that were all part
3 of you doing what you do right now. Would you say
4 that they're not involved? They didn't do it?
5 You did it? I think that that's a difficult
6 distinction.
7    Q. So I'm asking other than Cantor
8 providing the back-office services to GGAM -- and
9 I understand what -- what you're saying about
10 that. Other than that, were there any other
11 services that Cantor provided to BRHI or SPI?
12    A. I negotiate --
13       MR. AINSWORTH: Objection.
14       THE WITNESS: Sorry.
15       MR. AINSWORTH: Go ahead.
16    A. I negotiated an equity option agreement.
17 As we discussed earlier, that was a specific
18 clause under the MSA that required something to
19 get done. So we were involved in performing under
20 the MSA.
21    Q. And when you say you negotiated that
22 EOA, did you do that on behalf of GGAM?
23    A. I did that on behalf of Cantor and GGAM
24 caring about their joint venture.
25    Q. So you did that on behalf of GGAM and

Page 174

1 you did it -- so you negotiated that -- you're
2 saying you negotiated the EOA on behalf of GGAM
3 and on behalf of Cantor, is that right?
4       MR. AINSWORTH: Objection.
5       Asked and answered.
6    A. I do feel that I kind of answered that
7 already. But, yes, I -- I negotiated it on behalf
8 of the counterparty that signed it and its joint
9 venture partners.
10    Q. And when you say you negotiated it on
11 behalf of the joint venture partners, who are the
12 joint venture partners?
13    A. Cantor and Bill, Brad, and Garry who
14 referred to themselves as "GAM."
15    Q. And does GAM stand for Gaming Asset
16 Management?
17    A. It might.
18    Q. And so you were -- you acted as counsel
19 for GAM, is that correct?
20    A. No, I acted as counsel for Global Gaming
21 Philippines in negotiating the equity option
22 agreement and its joint venture partners.
23    Q. All right. And if you look at -- do you
24 still have paragraph 64 of the complaint in front
25 of you?

Page 175

1    A. I do.
2    Q. And if you go down to the third
3 sentence, it says "In fact, approximately 85
4 percent of the services provided by GGAM under the
5 MSA were performed outside of the Philippines,
6 including in the United States."
7       Do you see that?
8    A. Yes.
9    Q. What -- what's the basis for the
10 allegation that approximately 85 percent of the
11 services provided by GGAM under the MSA were
12 actually performed outside the Philippines?
13    A. Information provided by Bill, Brad,
14 Garry, and Jon.
15    Q. Did GGAM keep track of the specific
16 amount of time it spent providing services under
17 the MSA?
18       MR. AINSWORTH: Objection.
19    A. I think some of that was disclosed in
20 the arbitration.
21       MR. AINSWORTH: Thank you.
22       What's the exhibit number for this?
23 BY MR. LOWE:
24    Q. So I just handed you a document that was
25 previously marked in this case as Exhibit Number

Case 1:21-cv-02655-LGS-SN Document 329-21 Filed 01/26/23 Page 9 of 9
HIGHLY CONFIDENTIAL - Attorney's Eyes Only
Deposition of Binyomin Kaplan V.1     Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1   STATE OF NEW YORK        )
 2                            ) ss:
 3   COUNTY OF NEW YORK       )
 4            I hereby certify that the witness in the
 5   foregoing deposition, BINYOMIN KAPLAN, by me was duly
 6   sworn (affirmed) to testify to the truth, the whole
 7   truth and nothing but the truth, in the within-entitled
 8   cause; that said deposition was taken at the time and
 9   place herein named; and that the deposition is a true
10   record of the witness's testimony as reported by me, a
11   duly certified shorthand reporter and a disinterested
12   person, and was thereafter transcribed into typewriting
13   by computer.
14            I further certify that I am not interested in
15   the outcome of the said action, nor connected with nor
16   related to any of the parties in said action, nor to
17   their respective counsel.
18            IN WITNESS WHEREOF, I have hereunto set my
19   hand this 2nd day of May 2022.
20            Reading and Signing was:
21    _X__ requested    ___ waived    __ not requested.
22
23
24   _____
25            BRIDGET LOMBARDOZZI, CSR, RMR, CRR
```