```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    - - - - - - - - - - - - - - - - - - x
 3                                      :
    GLOBAL GAMING PHILIPPINES, LLC,     :
 4                                      :
            Plaintiff,                  :
 5                                      :
        v.                              : Case No.
 6                                      : 21 Cv. 2655
    ENRIQUE K. RAZON, JR.;              : (LGS)(SN)
 7  BLOOMBERRY RESORTS AND HOTELS INC.; :
    SURESTE PROPERTIES INC.;            :
 8                                      :
            Defendants.                 :
 9                                      :
    - - - - - - - - - - - - - - - - - - x
10
                REMOTE VIDEOTAPED DEPOSITION OF
11              ENRIQUE K. RAZON, JR., VOLUME I
                       May 26, 2022
12
        REMOTE VIDEOTAPED DEPOSITION OF ENRIQUE K.
13  RAZON, JR., produced as a witness at the instance of
    the Plaintiff, and duly sworn remotely, was taken in
14  the above-styled and numbered cause on May 26, 2022,
    from 8:08 a.m.(KST) to 2:17 p.m.(KST), remotely
15  before Dawn K. Larson, RDR, CRR, reported by machine
    shorthand, pursuant to the 30(b)(6) Federal Rules of
16  Civil Procedure and the provisions stated on the
    record.
17
```

Page 130

Q. Are you still 100 percent owner of Prime?
A. Yes.
Q. What is it currently called, Prime? It changed names; correct?
A. Prime Strategic Holdings.
MR. PASCUCCI: Let's put up Tab 28, which we'll mark as Exhibit 135.
(Plaintiff's Exhibit 135 was marked.)
Q. Mr. Razon, this a long document. I'm not going to ask you to read the whole thing.
MR. PASCUCCI: But, Dan, if you could scroll down -- well, actually, you're fine where you are.
I'll note for the record, this is a document identified as Bates number BLOOM_0077381. This is an Offering Circular.
BY MR. PASCUCCI:
Q. Mr. Razon, you've seen the Offering Circulars relating to the top-up offering of BRC; correct?
A. Yes, which we referred to as a follow-on offering, yeah.
Q. I'm sorry. You said a follow-on -- what was that?
A. Offering.

Page 131

Q. Offering. Okay?
A. Your "top-up" is -- the term here is "follow on."
Q. Happy to use your terminology. We can call it a "follow-on offering."
Let's go to Page 41 of this document. We'll have to blow that up a little bit.
So this is a section -- can you see all of that, sir?
A. Yes.
Q. This is a section called "Use of Proceeds," and I want to focus your attention on the fourth paragraph, which reads: "The company intends to use the proceeds of the subscription to fund Phase 1 of Solaire Manila, including construction, FF&E, and other various day-to-day expenses, such as pre-opening costs and working capital, as well as for general corporate purposes."
Do you see that?
A. Yes.
Q. So was the purpose of the follow-on offering to raise capital to support construction and operation of Solaire?
A. Yes. To complete Solaire, finish it.
Q. This was a true representation to

Page 132

potential investors of the intended use of funds to be raised in the follow-on offering; correct?
A. Yes. And the funds were used exactly for that purpose.
Q. So your goals -- among your goals, one of your goals in forming BRC and publicly listing it on the follow-on offering was to raise capital to complete the Project and fund its operations?
A. That's right.
MR. PASCUCCI: Let's put up Tab 30, which we'll mark as 136.
(Plaintiff's Exhibit 136 was marked.)
BY MR. PASCUCCI:
Q. Mr. Razon, I've put in front of you an affidavit that you submitted in the arbitration in this case. It's titled "Affidavit of Enrique Klar Razon, Jr."
MS. FISSELL: Dan, this isn't an affidavit from the arbitration.
MR. PASCUCCI: I'm sorry. I misstated that. This is an affidavit submitted in the Hong Kong High Court. Apologies for that.
BY MR. PASCUCCI:
Q. Do you recall signing this affidavit?
A. No, I would have to read it first. Can we

Page 133

see the signature?
Q. Yeah, let's go down to the signature line. It's up higher.
A. That's my signature.
Q. Okay. Let's go to Paragraph 6.
Paragraph 6 reads: "I am a director and Controlling Shareholder in the sense that I hold or control the voting shares of BRC, BRHI, Sureste, and Prime Metroline."
You submitted this declaration with that testimony in the Hong Kong proceedings; correct?
A. Correct.
Q. And that statement was true when you made it?
A. Yes.
Q. It's still true today?
A. Still true today.
MR. PASCUCCI: Let's mark as Exhibit 137 Tab 31.
(Plaintiff's Exhibit 137 was marked.)
BY MR. PASCUCCI:
Q. This is testimony -- again, we've seen a couple excerpts from this -- October 28, 2015.
Let's go down to the next page. Let's go one more page.

Page 146

1  A. As much as possible, yes.
2  Q. So I want to switch topics and just be
3  clear on what I'm doing here, that we talked about
4  earlier you were designated as the corporate
5  representative of BRHI and SPI on Topic Number 2,
6  which is written: "Mr. Razon's role and
7  responsibilities as Chief Executive Officer and
8  Chairman of the Boards of Directors of SPI and
9  BRHI."
10     You understand that you're the corporate
11 designee to testify on that topic; correct?
12  A. Yes, and Razon here -- there is no "E" in
13 my name. It is just Razon.
14  Q. I apologize. I didn't create that, but
15 that's just a transcript from --
16  A. It's a transcript of what?
17  Q. An investor conference in 2012.
18     So on the Topic 2 that we just read, you
19 understand you are the corporate designee on that
20 topic; correct?
21  A. In what company?
22  Q. You are the corporate designee to testify
23 about your role and responsibilities as CEO and
24 Chairman of the Boards of SPI and BRHI.
25     You understand that; right?

Page 147

1  A. Right.
2  Q. Let's --
3  A. And BRC.
4     MS. FISSELL: They are not interested.
5     BY MR. PASCUCCI:
6  Q. Let's put up Tab 32. We will mark this as
7  140.
8     (Plaintiff's Exhibit 140 was marked.)
9     BY MR. PASCUCCI:
10  Q. This is a bio from your ICTSI website,
11 your ICTSI bio. Why don't you take a minute and
12 review that?
13  A. That's a terrible picture.
14  Q. Apologies for that. I don't make your
15 website, either --
16  A. No, but somebody's got to --
17     (Overlapping speakers.)
18  A. This has to be changed.
19  Q. You may have to talk to your marketing
20 department about that.
21  A. I will.
22     MS. FISSELL: Can you guys make it a
23 little bigger? The font is still pretty small here.
24     MR. PASCUCCI: Yeah, we can make it
25 bigger. You have the ability to slide it to the

Page 148

1  left. He doesn't need to see his picture, and he
2  apparently doesn't want to. The text is important,
3  and the right of screen might still be cut off.
4     THE DEPONENT: That's too big now. Yeah,
5  it looks like --
6     MS. FISSELL: There's no question pending.
7     BY MR. PASCUCCI:
8  Q. So this is a -- do you recognize this
9  document?
10  A. No, I don't. But it looks like it's from
11 one of the annual reports.
12  Q. Does this document list your current roles
13 at the Razon companies listed here?
14     MS. FISSELL: Note that, on Mr. Razon's
15 screen, you can't see all of the text.
16     BY MR. PASCUCCI:
17  Q. Okay. So --
18  A. What document is this?
19     MR. PASCUCCI: Let's go a little smaller,
20 Dan Cotilla. Yeah. And now scroll it as far to the
21 far to the right as you can. He has something
22 covering his right edge.
23     BY MR. PASCUCCI:
24  Q. Can you see it? Can you see --
25  A. It's all our faces covering it.

Page 149

1     MS. FISSELL: You have to slide it so the
2  picture is offscreen and the text is further.
3     MR. PASCUCCI: Let's go off the record a
4  minute.
5     EVEREST TECHNICIAN: The time is 11:39.
6  We're off the record.
7     (Brief recess.)
8     EVEREST TECHNICIAN: The time is
9  11:40 a.m. We are on the record.
10     BY MR. PASCUCCI:
11  Q. All right. So, Mr. Razon, take a
12 moment -- Dan, you have to scroll a little to the
13 right because now it's cut off for everyone.
14     What I wanted to ask you is: Does this
15 document that's in front of you now, Exhibit 140,
16 accurately describe your current roles at the Razon
17 Group companies identified on this document?
18  A. Yes, with one qualification: That some of
19 these entities are no longer -- no longer exist or
20 are no longer owned by me.
21  Q. Which ones?
22  A. Xcell Property; I have no more holdings
23 there. CLSA Exchange Capital, no more.
24  Q. Any others?
25  A. Pentland International. I don't know what

Page 150

that is in which Pentland International Holdings.
 Q. Okay. So that's the last three listed in the third paragraph, you don't have an interest in at this point?
 A. But this looks like it was accurate at the time it was published.
 Q. So it was accurate when it was published, and as of today, other than those three -- Pentland, CLSA, and Xcell -- are there any other listings here that are no longer accurate?
 A. Not that I can see anymore. But this looks fairly new because the --
     (Interruption.)
 A. It's accurate.
 Q. All right. Let's put up Tab 33, which we'll mark as 141.
     (Plaintiff's Exhibit 141 was marked.)
     BY MR. PASCUCCI:
 Q. Let's go down -- well, first of all, for the record, this is a copy of a declaration of Enrique Razon, Jr., dated December 7, 2014, in the arbitration in this matter. And let's go to Paragraph 2.
     It describes there that you are Chairman, CEO, and Controlling Shareholder of ICTSI, a global

Page 151

port business in Manila. You were executive VP of ICTSI when it was established in 1987 to operate the Manila International Container Terminal. In 1992, it says you listed ICTSI shares on the PSE.
     Is that all accurate?
 A. Yes.
 Q. It goes on to say you "became Chairman and CEO of ICTSI, succeeding my father, who died in 1995." You then led the transformation of ICTSI from a local company to a global enterprise with 30 ports in 22 countries.
     Is that accurate?
 A. A few more ports now, but that's accurate.
 Q. It was accurate when you wrote it and now your numbers have expanded?
 A. Yes.
 Q. Take a look at Paragraph 3. You can just go ahead and read it to yourself.
 A. Umm-hmm.
 Q. Was that paragraph accurate when you offered that testimony?
 A. Yes.
 Q. Have any facts in Paragraph 3 changed since you submitted it?
 A. No.

Page 152

 Q. In addition to being Chairman and CEO of BRC, you are also Chairman of BRHI; correct?
 A. Yeah, I am. Yeah.
 Q. And as Chairman of the Board of BRHI, you attend Board meetings; correct?
 A. Yes.
 Q. You preside over Board meetings?
 A. I am presiding also, yes.
 Q. I'm sorry. Say that again.
 A. Yes. I'm the presiding officer, as we call it here, yes.
 Q. You are the presiding officer of BRHI's Board meetings; correct?
 A. Yes.
 Q. And are there regularly rescheduled meetings of Board, apart from the special meetings we've seen?
 A. Yes. We have regular meetings, and, every so often, a few special meetings if something important comes up and needs to be taken up to the Board.
 Q. How frequent are the regular meetings?
 A. There are at least ten, ten a year regular, plus one during the annual shareholders' meeting.

Page 153

 Q. You set the agenda for Board meetings at BRHI; correct?
 A. Pardon me?
 Q. As Chairman, do you set the agenda for Board meetings at BRHI?
 A. Well, I go over the agenda and discuss it with the corporate secretary, what to include in the agenda, based on what management has elevated up for Board approval.
 Q. But, ultimately, it's your decision what goes on the agenda; correct?
     MS. FISSELL: Objection.
 A. No -- well, ultimately, it's the corporate secretary's.
     BY MR. PASCUCCI:
 Q. Has there ever been a time when you wanted something on the agenda and the corporate secretary didn't put it on?
 A. No. No.
 Q. Has there ever been a time when the corporate secretary wanted something on the agenda that you didn't want on there?
 A. No.
 Q. So is it fair to say the agendas are consistent with what you want on the agenda?

Page 170

without an equity portion, whether there's an 80/20 loan equity to debt or 70/30 or 60/40.

Q. Whatever the ratio is, the banks wanted to know that you had your money in, in the form of equity, before they would lend; correct?

A. Yes. Having that equity is a requirement by the banks to lend the money.

Q. Let's talk about the negotiations of the MSA.

Let's go ahead and put up Exhibit 77, which we'll mark as 144. I'm sorry. It's Tab 77, which we will mark as Exhibit 144.

(Plaintiff's Exhibit 144 was marked.)

BY MR. PASCUCCI:

Q. This is, again, the 2015 declaration. Let's go to Paragraph 12.

So you can -- well, let's scroll down a little bit. A little smaller. Yeah.

So you see where there's a section called "Equity option offer and negotiations of the MSA," and this is your declaration. You're talking about some of the initial contacts with GGAM. And in Paragraph 12 in your declaration, you testified that: "In addition to Management Fees, we discussed granting GGAM an option to purchase equity in the

Page 171

Solaire as an additional compensation component. The option would be equivalent to 10 percent of my shareholdings in the Solaire at essentially owner's cost plus a corresponding portion of the value of the PAGCOR license. I intended this equity option component to incentivize GGAM to perform as managers."

And it goes on to say: "I thought that if they had an equity stake in the business, then our interests, as owner and manager, could be aligned."

That testimony was true at the time you submitted this declaration under oath; correct?

A. It was true at the time.

Q. And you haven't learned anything that makes it less true today; correct?

It is still true?

A. It was true at the time, yeah.

Q. The initial discussion you had with GGAM, with the GGAM principals, that was at an initial meeting in Las Vegas; correct?

A. The meeting in Las Vegas was to interview Garry Saunders --

Q. And --

A. -- the CEO.

Q. But Bill Weidner attended as well;

Page 172

correct?

A. I think that's where Garry Saunders introduced Bill Weidner.

Q. I have additional documents that might help refresh your recollection, so don't worry.

A. Yeah, I think that -- because I only met him once in Las Vegas.

Q. Okay. And this goes on. In Paragraph 13, it says: "Mr. Weidner promised that they would draw up a proposal for our agreement."

So this was the one meeting that you had with him where he made the promise; correct?

A. Yes.

Q. So in the original meeting in Las Vegas with Mr. Weidner and Mr. Saunders, you talked about the option to purchase equity in Solaire at 10 percent of your shareholdings at owner's cost plus. You talked about a -- interest, and Mr. Weidner then promised they would draw up a proposal for your consideration; correct?

A. We didn't talk about any option yet. He made a pitch that he would submit that. I just met him. So he made a pitch about the capabilities and what they wanted to propose, and I told him to make a proposal.

Page 173

Q. The last document --

THE DEPONENT: Where'd he go?

MS. FISSELL: He's getting a document.

(Comments off microphone.)

MR. PASCUCCI: So let's switch over. This is just an excerpt. I want to go to the whole document, which is previously marked Exhibit 134 -- oh, I'm sorry. It is Tab 134. So let's pull up 134, and we will mark that as Exhibit 145.

(Plaintiff's Exhibit 145 was marked.)

EVEREST TECHNICIAN: Just a moment, Counsel. I do not have a 134.

MR. PASCUCCI: Well, we'll submit that to you right away. Dan, let me know when you receive that.

BY MR. PASCUCCI:

Q. So this is the entirety of the document. So let's go ahead to -- and go down one page.

All right. So we have marked your entire declaration as Exhibit 145.

Let's go down another page, please.

Okay. So, this talks about -- in Paragraph 6, you'll see it states that in early 2011, you hired Spencer Stuart to identify a COO. That's true; correct?

Page 202

1  Q. And you recognize this email?
2     You have seen this before?
3  A. I recognize that I'm on the email, but I
4  don't remember when or when this was.
5  Q. So does this refresh your recollection
6  that initially Mr. French did not report directly to
7  you in the original organization of Solaire?
8  A. That's not what this email is saying.
9  Q. It states that you decided to correct an
10 oversight in your organizational structure and that,
11 consistent with management of all your companies,
12 financing operations are always separately managed
13 by the CEO. So effective May 15, 2012, the CFO
14 shall report to the CEO.
15    Oh, I apologize. I --
16 A. Yeah. You said the COO. The CFO shall
17 report.
18    (Comments off microphone.)
19 Q. Yeah, I apologize. Let me clean this up.
20    Prior to this email, Ed Chen, who was the
21 CFO of Solaire, did not report to you directly;
22 correct?
23 A. No, he did not. Yes.
24 Q. And you decided, upon learning of that,
25 you made the unilateral decision to change the

Page 203

1  reporting structure so that Ed Chen would report
2  directly to you; correct?
3     MS. FISSELL: Objection.
4  A. I don't know if it was a unilateral
5  decision, but it was a decision.
6     BY MR. PASCUCCI:
7  Q. Ms. Occeña says Mr. Razon has noticed and
8  decided to immediately correct the oversight.
9     Was that a true and accurate statement?
10 A. Yes. Because the common practice at the
11 time was that the CFO reports to the CEO.
12 Q. So you agree with her statement that it is
13 "consistent with customary practice and Mr. Razon's
14 management of all his companies that finance and
15 operations are always separately managed by the
16 CEO"; correct?
17 A. I think in this instance there was some
18 background to it, that they didn't get along, but,
19 yeah, it is general practice that the CFO reports to
20 the CEO.
21 Q. In the Razon group of companies, you're
22 always the CEO; correct?
23 A. No, I'm not always.
24 Q. Which Razon Group companies -- well,
25 strike that.

Page 204

1     In the Bloomberry companies, you've always
2  served as CEO; correct?
3  A. Well, there is only one company. But the
4  other companies, like Manila Water, I'm not the CEO;
5  prime Infra, I'm not the CEO.
6  Q. You were CEO of BRHI, SPI, and then when
7  they were rolled up to BRC, you became CEO of BRC?
8  A. Yes -- yes.
9  Q. You've always been the CEO of BRC since
10 then; correct?
11 A. Of BRC, yes.
12 Q. Did you need anyone else's approval to
13 make this decision and instruct Ms. Occeña to make
14 this change?
15 A. If the Board approves the organizational
16 chart, then this would have had to be confirmed at
17 least by the Board.
18 Q. Do you recall -- do you recall ever taking
19 this change reflected in Exhibit 80 to the Board?
20 A. I don't recall, but it most likely would
21 have.
22 Q. But you have no recollection of bringing
23 it to the Board?
24 A. I have no recollection of this whole
25 thing.

Page 205

1  Q. If Ms. Occeña testified that you made the
2  decision to change the reporting structure and
3  didn't consult with anyone else to correct this
4  oversight, would that testimony be incorrect?
5     MS. FISSELL: Objection.
6  A. I don't know what her testimony was.
7     MR. PASCUCCI: Let's put up Tab 42. We
8  will mark this as Exhibit 152.
9     (Plaintiff's Exhibit 152 was marked.)
10    BY MR. PASCUCCI:
11 Q. And let's go to the -- is it Page 92?
12    Just to give you some context, Ms. Occeña,
13 starting on Line 13, is talking about Ed Chen being
14 interviewed by you and reporting directly to Michael
15 Chen.
16    Let's scroll down. It's a long answer.
17 Keep going. Keep going. Stop. Please go back up.
18 All right.
19    So we talk about the email that you just
20 looked at. She asked the question: "My question
21 was, "You sent this email after a discussion with
22 Mr. Razon; correct?
23    "Answer: Yes. I discussed the problem
24 with Ed Chen and with Mr. Razon.
25    "Question: And Mr. Razon made the

Page 218

1  hire these guys and offer Brad or Garry a
2  compensation package he cannot refuse," what did you
3  understand her to be referring to when she says "if
4  Cantor stick to their guns"?
5     A.  I don't know.  I wasn't dealing with
6  Cantor.
7     Q.  By this time was Cantor involved in the
8  negotiations over the MSA?
9     A.  No.
10    Q.  At some point you came to the view that
11 Cantor was a problem in the negotiations; correct?
12    A.  I think that was more Estella and Benny
13 because I never dealt with Cantor.
14    Q.  So even after looking at this, it doesn't
15 refresh your memory as to when you first learned
16 about Cantor's involvement with GGAM?
17    A.  Yeah.  At this point, the whole thing, to
18 me, at least -- I was focused on setting up
19 management.  Cantor was irrelevant for me.
20    Q.  So let's scroll down to the last email in
21 this thread.  There we go.
22        This is from you -- earlier than the ones
23 that we just looked at, but on July 7, 2011 --
24 writing to Mr. Alarilla, and you state:  "What is
25 the issue with Cantor?  If it's the equity, we can

Page 219

1  drop that, no problem.  They will want all kinds of
2  minority rights, which we can't give because it's
3  only 10 percent."
4         So at this point, did you have issues with
5  Cantor?
6     A.  Somebody had issues and reported it to me.
7     Q.  So you were aware, at least by this point,
8  that Cantor was involved in the negotiations?
9     A.  At this point, obviously somebody has
10 pointed it out to me.
11        MR. PASCUCCI:  Let's put up Tab 53 and
12 mark it as 156.  What's the full version of this?
13 136.
14        Dan, instead of this one, let's put up 136
15 and go to Page 64; give Mr. Razon a little more
16 context because I think he's going to need it.
17        EVEREST TECHNICIAN:  Will this be marked
18 as 156?
19        MR. PASCUCCI:  I think it's already
20 marked.  No, we won't mark anything as 156 yet.  We
21 don't need it.
22        Okay.  So we are on 136.  Let's go to
23 Page 64 please.
24        BY MR. PASCUCCI:
25    Q.  Okay.  All right.  So you can see there's

Page 220

1  a little bit of context there.  This is in the
2  arbitration.  You are talking about the same email
3  we just reviewed.
4         Do you see that?  On Line 12 and 13, it's
5  the same -- so you are being asked about the same
6  email we just went over.
7     A.  Yes, I see that.
8     Q.  So let's scroll down a bit.  Right there.
9     A.  Which one?
10    Q.  And you're asked the question on Line 21:
11 "And they would then try to take Mr. Stone or
12 Mr. Saunders away from GGAM?"
13        And you answer:  "Yeah, because this is
14 what you'd call a contingency plan, and Cantor had
15 stuck their nose in the negotiations and didn't
16 even -- we were not dealing with Cantor when they
17 started."
18        "Question:  But you certainly understood
19 this time that Cantor was involved; correct?"
20        And you state:  "Well, Bill originally
21 mentioned that Cantor was one of the funders or
22 backers of GGAM, but when the negotiations started,
23 it seemed as if -- at least I was informed that
24 Cantor had taken over the show."
25        Was this accurate testimony when you gave

Page 221

1  it?
2     A.  Yes, because from the beginning, we didn't
3  feel that Cantor added any value to this, so they
4  weren't in the casino side.
5     Q.  But by July of 2011, you were aware of
6  Cantor's participation in the negotiations?
7     A.  I was aware, but I never negotiated with
8  Cantor.
9     Q.  Understood.
10        And when you say "Bill originally
11 mentioned that Cantor was one of the funders or
12 backers of GGAM," where was it that he mentioned
13 that?  Was that in --
14    A.  He mentioned it, but I don't know where he
15 mentioned it; if it was verbally when we met or --
16 you know.
17        (Overlapping speakers.)
18    A.  Mr. Weidner liked to talk, so he
19 mentioned --
20    Q.  So it could -- based on your current
21 recollection, it could have been when you met with
22 him in Las Vegas in March 2011, but you don't
23 specifically recall?
24    A.  I don't recall.  At some point it did.
25 The Las Vegas meeting was just a sidebar meeting

Page 222

that I had because I just left a meeting to --
   Q.  Okay.
   A.  It was just to make an assessment of the guys themselves.  But subsequently, at some point he mentioned it.
       MR. PASCUCCI:  All right.  And I don't believe we have actually marked this.  I thought it was Exhibit 136, but it is on Tab 136.  So let's go ahead and mark this as Exhibit 156.
       (Plaintiff's Exhibit 156 was marked.)
       BY MR. PASCUCCI:
   Q.  All right.  So while we're talking about 2011, I want to pin down a little bit more specifics about the negotiations.
       Let's go ahead and pull up Tab -- sorry -- Tab 159 and mark it as Exhibit 157.
       (Plaintiff's Exhibit 157 was marked.)
       BY MR. PASCUCCI:
   Q.  So, Mr. Razon, I have in front of you what has been marked as Exhibit 157.  This is a document recently filed in this case by your lawyers titled "First Amended Answer of Enrique K. Razon, Jr."
       Have you seen this document before?
   A.  Yes.
   Q.  And did you approve and sign this document

Page 223

before it was signed -- sorry -- before it was filed?
   A.  Did I sign this document?
   Q.  No.  It would be signed by lawyers, it's a pleading, but I'm asking if you reviewed it and approved it before it was submitted, before it was filed in court?
   A.  I'm pretty sure I read it.
   Q.  If you saw something inaccurate, you would have called attention to it?
   A.  I believe so, yes.
   Q.  Let's go to Paragraph 54.
   A.  This document is from the recent case?
   Q.  It is -- yeah, your lawyers just filed it in the case very recently.  I don't recall which state, but somewhere in the past week or two, I think in the past couple days.
       So in Paragraph 54, you are denying allegations that were in our Complaint, in Paragraph 54 of our Complaint, except that it admits the following facts.  It says: "(i), the Bloomberry defendants sent responses to document requests and diligence checklists by email to Cantor Fitzgerald employees acting on behalf of GGAM; and, (ii), Razon had email and/or telephonic communications with

Page 224

Weidner, Occeña, Alarilla, and Tan, none of whom is based in New York, relating to the negotiating the GGP relationship during one or more trips that Mr. Razon made in New York in the April-June 2011 time frame (during which he would have stayed at The Plaza residence in Manhattan), and respectfully refers the Court to his flight logs and to the contemporaneous emails for the most accurate reconstruction of his whereabouts and communications."
       That admission, under number (ii), to the best of your knowledge, is a true and correct admission; correct?
   A.  On number (ii), Razon had email and/or telephonic -- all I could say is it's possible.
   Q.  You have no reason to believe that that admission lawyers made on your behalf is inaccurate, do you?
   A.  By email, it is not -- I can't say it is inaccurate, but I didn't have any meetings with anyone in New York.
   Q.  But while you were in New York, you were emailing your team regarding the GGP relationship, and you were emailing regarding the negotiations of the MSA?

Page 225

   A.  If I had received an email regarding that, I would have answered wherever I was.
   Q.  And if you did that while you were in New York, it would have been at your Plaza residence in Manhattan?
   A.  That would depend because at this time frame, I think it was under renovation.
   Q.  So during April-June of 2011, where did you stay when you were in New York?
   A.  When I would go to New York while it was under the renovations, I would stay at the Four Seasons.
   Q.  To the best of your recollection, when exactly was the residence at The Plaza under renovation?
   A.  It was around this time somehow.  I'll have to -- it could be 2012, 2013, 2011.  I'll have to check.
   Q.  So you don't specifically --
   A.  2014 is possible as well.
   Q.  All right.  You're not telling me specifically that in April-June of 2011 --
   A.  No.  No.
   Q.  It wasn't available.  Okay.
       So it could be entirely true what your

Page 226

1 lawyers put here, that during that time frame you
2 stayed at The Plaza?
3   A.  Yes, sir.
4       MR. PASCUCCI:  Let's go to Tab 17, please.
5 17, not 117.  And we'll mark this as Exhibit 158.
6       (Plaintiff's Exhibit 158 was marked.)
7       BY MR. PASCUCCI:
8   Q.  So, Mr. Razon, while that's being pulled
9 up.
10      (Comments off microphone.)
11  A.  I think it is somewhere else except here.
12  Q.  What's been marked as Exhibit 158 is a
13 disclosure from the FAA flight records regarding
14 what we have been calling the 818 plane of BRHI, and
15 this is marked with Bates Number GGAM-SDNY-0446906.
16 This document has been produced in this litigation.
17 It is created by the FAA records, and it purports to
18 show flight logs of the BRHI 818 plane.
19      And if you look at the fourth column, they
20 are dated roughly -- well, entirely chronological.
21 And I want you to go down about a third of the way
22 on that first page, you'll see an entry on -- it is
23 Line -- Row 16.  You'll see an entry on April 19,
24 2011 --
25  A.  Umm-hmm.

Page 227

1   Q.  -- showing that the plane went from
2 San Francisco to Teterboro and immediately before
3 that arrived in San Francisco the day before.
4       Do you recognize the airport code UHPP?
5   A.  I recognize as the one for Teterboro.
6 What is UHPP?
7   Q.  I believe that is one of Manila's
8 airports.
9   A.  Teterboro is the East Coast.  What is
10 UHPP?
11  Q.  UHPP is over Russia and --
12  A.  It is where?
13  Q.  It is in Russia.
14  A.  That would be Petropavlovsk.  That's a
15 fuel, just to refuel.
16  Q.  A fuel stop.  So this -- according to the
17 FAA records, though, the plane -- the BRHI plane
18 landed in Teterboro on April 19.  And then you'll
19 see it leaves Teterboro on the 26th of April.  I can
20 walk through some additional documents, but I just
21 want to ask you, do you -- well, let me walk through
22 a little bit more of this.
23      It leaves Teterboro and returns to
24 Teterboro two days later and then doesn't leave
25 again until April 30.

Page 228

1       Were you in New York in 2011 between
2 April 19 and April 30?
3   A.  Yes, to spend Easter with my children who
4 were going to school in Boston.
5       MR. PASCUCCI:  All right.  And let's put
6 up Tab 124 and mark that as Exhibit 159.
7       (Plaintiff's Exhibit 159 was marked.)
8       BY MR. PASCUCCI:
9   Q.  So Katrina Razon is your daughter; right?
10  A.  Yes.
11  Q.  So on April 24, she tweets that it's the
12 last day in New York.  She's going to miss the
13 family.
14      Do you recall during this trip her leaving
15 and going somewhere else while you and the family
16 stayed in New York?
17  A.  No.  We would -- she would go back to
18 school in Boston.
19  Q.  Well, so according to the flight records,
20 the plane left from New York on the day after this
21 tweet, the day after what Katrina describes as her
22 last day on April 25, it left and stopped in Zagreb
23 and then went on to Marseille.
24      Do you have any recollection at that time
25 of your daughter to flying to Marseille?

Page 229

1   A.  No.  That was me.  That was a business
2 trip.
3   Q.  That was you.  And then you returned to
4 New York immediately after that?
5   A.  I went to Zagreb, a business trip.  We
6 operate the port in Croatia.  Marseille was a
7 business trip, and then I probably went back to New
8 York to pick up wife and -- my wife.
9   Q.  Okay.  And so the plane, if we -- that
10 helps.  I appreciate you clarifying it.
11      So the plane, if you look at the flight
12 record -- let's go back to the prior exhibit -- it
13 leaves Teterboro, goes to Zagreb on the 26th, goes
14 on to Marseille and returns to Teterboro the 28th,
15 stays in Teterboro from the 28th to 30th.
16      So would it be fair to say from the 19th
17 through the 26th, you were in New York, and from the
18 28th through the 30th, you were in New York?
19  A.  Stayed in Zagreb.
20  Q.  LDZA.
21  A.  Yeah.  If it says Teterboro, I would be in
22 New York in this time frame, no.  This must have
23 been Easter holiday, Holy Week, I mean.
24  Q.  And during this time while you were in New
25 York, you were negotiating the MSA with GGAM and

Page 230

1  Cantor; correct?
2     A.  No, not correct.  I didn't negotiate the
3  MSA.
4     Q.  Or you were instructing your people on
5  negotiations?
6     A.  They were only -- I gave them the
7  parameters early on, and they negotiated.
8     Q.  You were in New York on April 20, 2011;
9  correct?
10    A.  If that's what the flight log says.
11    Q.  And if your penthouse at The Plaza was not
12 under renovation, that's where you would conduct
13 your affairs; correct?
14       MS. FISSELL:  Objection.
15    A.  I was there on holiday.
16       BY MR. PASCUCCI:
17    Q.  But if did you any business while you were
18 in New York, you would have done it from your
19 penthouse at The Plaza; correct?
20    A.  Do you mean by email?
21    Q.  Yeah.  By email or phone call, however you
22 would have done it.
23    A.  Yeah, I would be at -- thinking back now,
24 I'm pretty sure this was not the time it was being
25 renovated.

Page 231

1     Q.  So it's -- so your best recollection as we
2  go through this is that at this time frame, in April
3  of 2011, you were stay at the penthouse in --
4     A.  Yes.
5     Q.  And at any point, from 2011 through
6  present day, did you ever have other Bloomberry
7  employees -- whether it was BRHI, SPI, or BRC --
8  stay at The Plaza?
9     A.  No.
10    Q.  Did any Bloomberry employees ever meet
11 with you at The Plaza?
12    A.  Never.
13    Q.  Did you ever hold any meetings, any
14 business meetings, whatsoever at The Plaza?
15    A.  Never.
16       MR. PASCUCCI:  Let's put up Tab 65 and
17 mark this as Exhibit 160.
18       (Plaintiff's Exhibit 160 was marked.)
19       BY MR. PASCUCCI:
20    Q.  While that's being pulled up -- oh, there
21 we are.  I'll note for the record this is an
22 April 2011 email.  There's two emails here.  There
23 is one from Bill Weidner to Jon Rein, and below it
24 on the same date -- April 20, 2011 -- is an email
25 from Benny Tan to Bill Weidner, copying you,

Page 232

1  Mr. Razon.
2        Have you seen this email before?
3     A.  I don't -- I'll have to read through it.
4     Q.  Can you read it?
5     A.  Okay.
6     Q.  So you've seen this before?
7        You received this in 2011?
8     A.  What I can say is that I see I was copied
9  in.
10    Q.  And you don't remember --
11    A.  It is too long ago for me to remember.
12    Q.  In the beginning of the email, Mr. Tan --
13 well, let's skip that question.  Let me start over.
14       At this time, Mr. Tan was your personal
15 attorney; correct?
16    A.  He's our corporate attorney, law firm.
17    Q.  He also represented you individually?
18    A.  Yes.
19    Q.  And at this point -- April 20, 2011 --
20 other than you individually, what -- what businesses
21 of the Razon group of companies did Mr. Tan
22 represent?
23    A.  The law firm represented most of the legal
24 work of most of the companies.
25    Q.  So Mr. Tan and his colleagues were counsel

Page 233

1  for most companies of the Razon group of companies?
2     A.  Yes.  Not the only counselor.  We have
3  many foreign law firms as well.
4     Q.  So Mr. Tan writes to Mr. Weidner and
5  starts by saying "Mr. Razon requested us to send you
6  the following response to your email of April 18,
7  2011."
8        Was that an accurate statement?  You asked
9  Mr. Tan to send this response?
10    A.  I cannot say, one way or another.
11    Q.  Do you recall discussing the issues listed
12 below that language I just read with Mr. Tan
13 sometime --
14    A.  I cannot recall.
15    Q.  Sorry, I wasn't done with the question.
16       Sometime around April of 2011?
17    A.  I can't recall.
18    Q.  Do you have any reason to believe Mr. Tan
19 would be inaccurate in stating that Mr. Razon asked
20 him to send this response?
21    A.  No, no real reason.  I just can't recall.
22    Q.  Okay.  But in your experience, you
23 wouldn't expect Mr. Tan to say that if it wasn't
24 true, would you?
25    A.  I wouldn't -- that would be quite

Page 234

1 upsetting if that really happened.
2    Q.  That would be quite upsetting if he did
3 that without your authorization?
4    A.  But I don't believe I would have relayed
5 anything this detailed.  Can I explain something?
6    Q.  Please, please.
7    A.  How this would work is he would give me
8 the issues, then I would say what -- that he was
9 correct and he should respond that way.  That's how
10 this works.
11    Q.  So you wouldn't have written this and
12 scripted what he was going to write, but he would --
13    A.  No.
14    Q.  -- but you wouldn't expect him to send
15 this without your approval?
16    A.  Yes.  But he would tell me what he wanted
17 to say, not the other way around, that I would draft
18 this in great detail.
19    Q.  And you would listen to him and give him
20 your input on what he was recommending and shape
21 with him the response before he sent it?
22    A.  Well, I would say yay or nay to --
23       (Overlapping speakers.)
24       MS. FISSELL:  Let me just interject.  I
25 just want to be careful that we don't start treading

Page 235

1 into ground where you are answering with specifics
2 of any conversations that you had with Mr. Tan,
3 possibly as your counsel.
4       THE DEPONENT:  Yeah.
5       MS. FISSELL:  But I think you can answer
6 to the extent it is just talking generally how we
7 interact with Mr. Tan.
8    A.  This is probably input of several people,
9 including Mr. Tan, Mr. Alarilla, and Estella, and
10 it's framed this way.
11       BY MR. PASCUCCI:
12    Q.  All right.  So this response by Mr. Tan
13 came together between April 18, when Mr. Weidner
14 wrote, and April 20, when Mr. Tan wrote back;
15 correct?
16    A.  Correct.
17    Q.  And sometime in that time period, did you
18 have a discussion with Mr. Tan regarding what it
19 says in Paragraph 1, where he tells Mr. Weidner:
20 "Your understanding is correct that the CEO intends
21 to contravene management only if the business is not
22 going according to plan or if it is absolutely
23 necessary."
24       MS. FISSELL:  Objection.  Dan, I don't
25 think you are intending to do this, but the way you

Page 236

1 phrased that question, you basically asked him to
2 confirm the discussion he had with counsel.  So
3 perhaps you could rephrase it --
4       MR. PASCUCCI:  I'll rephrase it.  I'll
5 rephrase it.
6       This email, Paragraph 1, where it states
7 that Bill Weidner's understanding is correct that the
8 CEO intends to contravene management only if the
9 business is not going according to plan or is
10 absolutely necessary, that was an accurate reflection
11 of your position as CEO; correct?
12    A.  I could not -- I cannot recall.
13    Q.  Was it true that you had no interest in
14 convening the Management Team if things were going
15 well?
16    A.  Well, why would I?
17    Q.  I'm asking whether that second sentence
18 where Mr. Tan represents that --
19    A.  If things were going well, I wouldn't
20 contravene.
21    Q.  So this paragraph is an accurate
22 reflection of your position?
23    A.  I think it is an older statement.
24    Q.  Without telling me anything you said
25 specifically to Benny Tan, though, it's fair, based

Page 237

1 on the testimony you gave to say that you had some
2 kind of communication with Benny Tan before he sent
3 this email; correct?
4       MS. FISSELL:  Objection.
5    A.  Yes, but I don't know when.
6       BY MR. PASCUCCI:
7    Q.  Okay.  But it would have been after
8 April 18 and before April 20, or by April 20;
9 correct?
10    A.  It could have been end of March, and he
11 only responded then.
12    Q.  Well, it says in the beginning that this
13 is a response to Bill's email of April 18.  So you
14 couldn't have discussed responding to Bill's email
15 before you got it; right?
16    A.  No.
17    Q.  So this -- whenever you -- without telling
18 me what you discussed with Benny Tan, whatever input
19 you gave him going into this email happened sometime
20 shortly before he sent it on April 20, 2011?
21       MS. FISSELL:  Objection.
22    A.  Well, the -- what's clear here is this
23 email was sent by Benny Tan to Bill Weidner.
24       BY MR. PASCUCCI:
25    Q.  Right.  Let's -- we talked about earlier

Page 238

1 on April 24 you were in New York; right?
2     A. You would have to go and show me back the
3 logs.
4     Q. Sure. Let's go back to the flight log,
5 158.
6     MS. FISSELL: Dan, I just want to note, I
7 think we only have about five minutes left for
8 today.
9     MR. PASCUCCI: Understood.
10     A. April 24.
11     BY MR. PASCUCCI:
12     Q. Yeah. You were in New York?
13     A. I could have been in Pennsylvania, in Long
14 Island. I could have been in New Jersey. So on the
15 East Coast.
16     Q. Okay. But to the best of your
17 recollection, your plane was in Teterboro, and based
18 on what you said earlier, to the best of your
19 recollection, you were staying at The Plaza at that
20 time; correct?
21     A. Yeah. That would have been my base, yeah,
22 at the time.
23     Q. And on April 24 -- let's put up Tab 56.
24 We will mark this as 161.
25     (Plaintiff's Exhibit 161 was marked.)

Page 239

1     BY MR. PASCUCCI:
2     Q. For the record, this is an email with
3 Bates Number GGAM-SDNY-0095866. This is an email
4 from you to Bill Weidner responding to an email from
5 Bill Weidner to you. And you wrote an email -- it
6 captures the whole thread as accepting to the way
7 forward.
8     Did you send this Mr. Weidner on Sunday,
9 April 24, 2011?
10     A. Yeah, it looks like it came from me.
11     Q. And you were in New York or somewhere on
12 the East Coast when you sent this?
13     A. Somewhere, yeah.
14     Q. You don't recall at this time being
15 anywhere other than staying at The Plaza Hotel?
16     MS. FISSELL: Objection.
17     A. East Coast.
18     BY MR. PASCUCCI:
19     Q. Is it fair to say that while you were
20 there, you spent the night at The Plaza Hotel?
21     A. Unless I was in Boston. I used to -- this
22 summer I could have been in the Hamptons, which is
23 still New York.
24     Q. So but you're speculating you could have
25 been somewhere else?

Page 240

1     The best of your recollection is you
2 stayed at The Plaza on this trip?
3     A. 13 years ago, I'm speculating to anywhere
4 I was.
5     Q. Do you have any reason to believe that you
6 didn't send this email to Mr. Weidner from The Plaza
7 Hotel in New York?
8     MS. FISSELL: Objection. Asked and
9 answered.
10     A. I have no reason to believe I sent it from
11 anywhere, but I sent it on that date. I could have
12 been in the airplane when I sent it.
13     BY MR. PASCUCCI:
14     Q. Your plane was on the ground at that
15 point, though. So if you were -- it would have been
16 at Teterboro in a plane; right?
17     A. Yeah. That would be in New Jersey.
18     Q. Did you ever go over to New Jersey without
19 getting on the plane to leave and just do work from
20 the plane and then go back into New York?
21     A. Yes. I play golf quite a bit in New
22 Jersey.
23     Q. And would you use the plane as an office
24 when it was in Teterboro?
25     A. No. No. No. I would be at the golf

Page 241

1 course or somewhere.
2     Q. But you wouldn't have gone to your plane
3 if you weren't planning on taking off?
4     A. No, I would not. Yes.
5     MR. PASCUCCI: All right. We are at
6 5 hours on the nose. Why don't we stop there, and
7 we will resume tomorrow.
8     EVEREST TECHNICIAN: The time is 2:17 p.m.
9 We are off the record.
10     WHEREUPON, the within proceedings were
11 adjourned at the approximate hour of 2:17 p.m. (KST)
12 on the 25th day of May, 2022.
13     *   *   *   *   *

REPORTER'S CERTIFICATE

I, Dawn K. Larson, Registered Diplomate Reporter, Certified Realtime Reporter, Certified Realtime Captioner, and Notary Public, do hereby certify that, previous to the commencement of the examination, the deponent was remotely duly sworn by me to testify to the truth.

I further certify this deposition was taken remotely in shorthand by me and thereafter reduced to typewritten form, that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have hereunto affixed my hand and seal. My commission expires: January 31, 2023.

_____
Dawn K. Larson, MBA, RDR, CRR, CRC
Notary Public