CONFIDENTIAL

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010)

BETWEEN

GLOBAL GAMING PHILIPPINES LLC

and

GGAM NETHERLANDS B.V.

(*CLAIMANTS*)

- versus -

BLOOMBERRY RESORTS AND HOTELS INC.

and

SURESTE PROPERTIES, INC.

(*RESPONDENTS*)

---

SUPPLEMENTAL DECLARATION OF ENRIQUE K. RAZON

---

September 4, 2015

license. But we did want a different form than what was reflected in the first draft – where the owner builds, equips and funds the facility and steps back after giving the key to the manager, to one where the manager must work with the management team and the owner has the ability to step in when he sees something goes wrong.

10. Bill now questions why a "sophisticated businessman" like myself could believe that this first draft would be the "governing document of our partnership." As I previously explained, at the beginning of our negotiations, we did not envision that we would enter into two separate agreements, one with respect to management of Solaire and one with respect to the equity option. Instead, we envisioned one governing document.

11. The equity option was something I offered to Bill as consideration for the management relationship. We did not need a US$ 37 million investment. We had already raised hundreds of millions of dollars through a BDO loan facility and were prepared to embark on a top-up offering. GGAM waited until construction of Solaire was finished and Solaire was ready to open before they exercised the option. They incurred no risk.

I am appalled by GGAM's position that the option shares were given by Prime Metroline which is not a party to the Management Services Agreement and it therefore cannot get back the Shares. The reality was different, as everyone on the GGAM side was well aware. We were in a business deal that was ongoing and fluid, as business deals often are. We anticipated in the MSA that the specific corporate entities that might be involved with the option would be different than the parties to the MSA, but we hadn't at that time worked out all those details. This is usual. Everyone knew what the deal in substance was, and the vehicles by which the deal would be brought about weren't important from a business perspective and shouldn't be given some exaggerated importance in the arbitration. There never would have been any option for GGAM to purchase shares without the MSA, and there are reasons why Prime Metroline was ultimately used, but none of that should obscure the deal that was struck. If we want to be legalistic here, the GGAM that signed the Management Services Agreement is a shell company with nominal capital and was established to provide services only to Solaire. As such, GGAM cannot claim the "reputation" that Bill, Brad and Garry are now claiming were tarnished by our terminating the Management Services Agreement here.

12. The absence of any real risk to GGAM is even more apparent now that I know that Cantor Fitzgerald fully funded the strike price for the Shares as a "capital contribution" to GGAM. I recall that Cantor and its lawyers continued to try to get involved in the negotiations of the project agreements, in particular the equity option agreement and the participation agreement. We were informed at the time that Cantor provided some funding and administrative services, but it was never said that Cantor was the "parent" of GGAM or anything like that, though I know that is now said in the arbitration. I would not have had an interest in a deal with GGAM had I understood the company that way, instead of the way that GGAM was presented to me.

Subject to Arbitration Confidentiality Orders

BLOOM_0077976

collective experience, collected valuable contacts and relationships with players who they would and could bring to Solaire.

27. I do not think it is naïve to expect that when three people who told me they had spent their careers dealing personally with VIP gamblers in Asia form a new company, one of the first things they would do would be to sit down and compile their customer contacts into a list or "database." Bill subsequently represented to me that he, Brad, and Garry had "Guest Data" for the major junkets and players. In reality, however, GGAM appeared to lack the critical contacts and relationships necessary to bring these VIPs to Solaire, and they did not seem to have a VIP strategy in place, at least not a strategy that was communicated to me. I and other Bloomberry employees had to pursue our own contacts to try to attract VIPs and junkets to Solaire.

### GGAM's Desire to Participate with Construction Efforts and in the Road Show

28. GGAM's principals did not have any real enthusiasm as managers, as compared to their enthusiasm in using Solaire to promote themselves and their other ventures. For example, I expected GGAM to participate on the road show because they were the management services provider for Solaire, and it was important to present to investors that Solaire had a credible and experienced management company. Yet Bill and Garry were largely absent from the road show, and Brad's presentations seemed to focus on their past experiences at Las Vegas Sands and GGAM's ambitions as a new management company.

29. Similarly, Brad was the only one of the three GGAM principals who was involved in the construction and design phase of the project. It was apparent that he enjoyed the construction and design aspect of casinos, and I have heard that he participated more energetically in design conversations than he did in operating and management conversations. His temporary and infrequent visits were insufficient, however, to allow him to have a real impact on construction and design, which often can change daily, if not hourly.

30. It is true that Brad recommended a consultant, Matthew Pryor of Tenman Associates, as the project manager. Bloomberry ultimately hired and paid Tenman more than US$ 2.5 million for project management services. The fact that GGAM points to identifying Tenman as GGAM's definitive contribution to Solaire's development is indicative of their approach to the entire project.

31. Simply, GGAM was expected to provide input to the construction and development of Solaire. The MSA detailed the pre-opening and development services they would provide, including technical assistance with the design and construction of the project. For these services, they would be paid approximately US$ 175,000 per month prior to opening, on top of being reimbursed for their expenses.

Subject to Arbitration Confidentiality Orders

BLOOM_0077980

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of August 2015 in Makati City.

ENRIQUE K. RAZON, JR.

SUBSCRIBED AND SWORN to before me, this 28th day of August 2015, by Enrique K. Razon, Jr., who exhibited to me his Passport with No. EB8438728 expiring on 19 June 2018.

Doc. No. 71 ;
Page No. 16 ;
Book No. IV ;
Series of 2015.

VAL CHRISTIAN T. SULTAN
Appointment No. M-520
Notary Public for Makati City
Until December 31, 2015
Penthouse, Liberty Center
104 H.V. dela Costa Street, Makati City
Roll of Attorneys No. 63638
PTR No. 4754667 / Makati City / 01-06-2015
IBP No. 979433 / Makati City / 01-05-2015

- 9 -

Subject to Arbitration Confidentiality Orders

BLOOM_0077982