**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<div style="border:1px solid black;">
Fissell Decl.
Ex. 1
</div>

---

GLOBAL GAMING PHILIPPINES, INC.,

*Plaintiff,*

v.                                        No. 21-CV-2655 (LGS) (SN)

ENRIQUE K. RAZON, JR.,
BLOOMBERRY RESORTS AND HOTELS
INC., and SURESTE PROPERTIES, INC.,
*Defendants.*

---

**EXPERT REPORT OF TERESITA J. HERBOSA**

Dated: September 16, 2022

## I.    INTRODUCTION

### A.    Assignment

1.     I have been retained by one of the Defendants, Mr. Enrique K. Razon, Jr. (hereinafter, "Mr. Razon"), to provide expert analysis and testimony related to: (a) veil-piercing under Philippine law, particularly, on the application of the alter ego principle in the Philippine setting; (b) the validity and existence of certain restraints, known as writs, issued by the Philippine courts against the so-called Option Shares (the "Writs"); and (c) proper corporate formalities under Philippine law and permissible Philippine corporate governance standards and practices.

2.     In preparing this report, I have relied upon my education, knowledge, and understanding of, and over more than forty-four (44) years of experience in, corporate law and commercial litigation in the Philippines.

3.     The current hourly rate for my work is PhP8,500.00. My compensation is not affected by my findings or the outcome of this litigation.

4.     My work in this matter is ongoing, and I reserve the right to supplement my analysis and opinions should more information become available to me and/or any report submitted on behalf of Plaintiff Global Gaming Philippines, LLC ("GGAM" or "Plaintiff") in response to my analysis and opinions. Some of the analysis underlying my conclusions was performed by colleagues of mine working under my direction and supervision.

### B.    Qualifications

5.     I had been a commercial litigation lawyer for thirty-three (33) years, until I was appointed as the Chairperson of the Securities and Exchange Commission ("SEC") in April 2011 for a seven (7) year term which ended in June 2018.

securities and other instruments. It endeavors to protect the interest of the investing public and maintain an efficient, fair, orderly, and transparent market. The PSE thus serves as a regulator (or to be more precise, a private self-regulatory organization) for publicly-listed companies ("PLCs") in the Philippines.

41.    From the foregoing, it must be understood that Philippine law on corporations traces its roots back to both civil and common law, meaning that statutory provisions and jurisprudential doctrines both govern corporations. Moreover, these corporations are regulated by the Philippine government, particularly the SEC, as the chief regulator of corporations, and the PSE, as a self-regulatory organization for PLCs.

**C.    Philippine law expressly recognizes and adheres to the concept of separate juridical personality of each corporation**

42.    In Philippine law, the principle of corporate separateness is known as the principle of separate juridical personality. This principle is well-established in statutes. Section 2 of the RCC affirms the juridical capacity of a corporation by defining it as "an artificial being created by operation of law, having the right of succession and the powers, attributes, and properties expressly authorized by law or incidental to its existence."[19] Relatedly Republic Act No. 386, or the Philippine Civil Code, expressly provides that corporations are juridical persons "to which the law grants a juridical personality, separate and distinct from that of each shareholder, partner, or member."[20]

---

[19]    Rep. Act No. 11232 (2019), Sec. 2.

[20]    Rep. Act No. 386 (1959), Art. 44(3).

43.    Every corporation registered with the SEC, whether stock corporation, non-stock corporation, corporation vested with public interest, close corporation, or one person corporation, thus has a separate juridical personality.

44.    Private corporations commence their corporate existence and juridical personality from the time the SEC issues a certificate of incorporation in their favor.[21] Hence, upon the issuance by the SEC of the corporation's certificate, such corporation enjoys a separate juridical personality from the individual members composing the same.

45.    In the case at bar, BRHI, SPI, and BRC, upon the issuance by the SEC of their certificates of incorporation and signifying their SEC registration, were vested with a separate juridical personality from the people comprising and/or heading them.[22]

46.    The rationale for recognizing a corporation's separate juridical personality is to facilitate ease of doing business. Otherwise, corporations would be greatly prejudiced by the inefficiency of having to act through individuals, which will ultimately defeat the very purpose of the creation of a corporation. In *Filipinas Port Services, Inc. v. Go*,[23] it was explained that (emphasis supplied):

> "The *raison d'etre* behind the conferment of corporate powers on the board of directors is not lost on the Court. Indeed, **the concentration in the board of the powers of control of corporate business and of appointment of corporate officers and managers is necessary for efficiency in any large organization**. Stockholders are too numerous, scattered and unfamiliar with the business of a

---

[21]    Rep. Act No. 11232 (2019), Sec. 18.

[22]    China Banking Corporation v. Dyne-Sem Electronics Corporation, G.R. No. 149237, 11 June 2006, 494 SCRA 493, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/41566, last accessed 2 August 2022; Bustos v. Millians Shoe, Inc., G.R. No. 185024, 4 April 2017, 824 SCRA 67, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/63009, last accessed 2 August 2022.

[23]    G.R. No. 161886, 16 March 2007, 518 SCRA 453, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/45295, last accessed 7 August 2022.

corporation to conduct its business directly. And so the plan of corporate organization is for the stockholders to choose the directors who shall control and supervise the conduct of corporate business."

47.     It bears stressing that separate juridical personality is not only the general rule, but is most often the only rule, for corporations. In *Philippine National Bank v. Hydro Resources Contractors Corporation*,[24] the Philippine Supreme Court pertinently explained that:

> "A corporation is an artificial entity created by operation of law. It possesses the right of succession and such powers, attributes, and properties expressly authorized by law or incident to its existence. It has a personality separate and distinct from that of its stockholders and from that of other corporations to which it may be connected. As a consequence of its status as a distinct legal entity and as a result of a conscious policy decision to promote capital formation, a corporation incurs its own liabilities and is legally responsible for payment of its obligations. In other words, by virtue of the separate juridical personality of a corporation, the corporate debt or credit is not the debt or credit of the stockholder. This protection from liability for shareholders is the principle of limited liability."

### D.     Veil-piercing is an exceptional equitable remedy

48.     An exception to the doctrine of separate juridical personality is the doctrine of piercing the veil of corporation. The Philippine Supreme Court has called the doctrine of piercing the corporate veil "an equitable doctrine developed to address situations where the separate corporate personality of a corporation is abused or used for wrongful purposes."[25]

---

[24]     G.R. No. 167530, 13 March 2013, 693 SCRA 294, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/55813, last accessed 2 August 2022.

[25]     Philippine National Bank v. Ritratto Group, Inc., G.R. No. 142616, 31 July 2001, 362 SCRA 216, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/52382, last accessed 2 August 2022.

49.     Veil-piercing remains an exceptional equitable remedy in the Philippine setting, which, in the words of the Philippine Supreme Court, "has to be done with caution."[26] The Court has further explained:

> "A court should be mindful of the milieu where it is to be applied. It must be certain that the corporate fiction was misused to such an extent that injustice, fraud, or crime was committed against another, in disregard of rights. The wrongdoing must be clearly and convincingly established; it cannot be presumed. Otherwise, an injustice . . . may result from an erroneous application."[27]

50.     Being a rare exception to the longstanding principle of separate juridical personality, veil-piercing is heavily disfavored and must be done only with caution and in compelling circumstances.[28]

51.     Indeed, the Philippine Supreme Court will only pierce the veil of corporate fiction when there are extraordinary circumstances that result in fraud and injustice on the claimant. As such, the Philippine Supreme Court in recent years has applied the exceptional doctrine of veil piercing only sparingly and in extreme cases where there is existence of fraud or illegality, or for reasons of public policy, or where unfairness would otherwise result. From 2002-2022, out of the 138 cases that were found to have piercing the corporate veil as an issue, the Philippine Supreme Court only applied the piercing doctrine in 39 cases. Out of these 39 cases, only 12 were alter ego cases (one type of veil-piercing case as explained below).[29]

---

[26]   Vda. de Roxas v. Our Lady's Foundation, Inc., G.R. No. 182378, 6 March 2013, 692 SCRA 578, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/55626, last accessed 2 August 2022.

[27]   *Ibid.*

[28]   *See* Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

[29]   My colleagues at ACCRALAW conducted this analysis at my direction.

E.   **Theories under which Philippine jurisprudence analyzes whether veil-piercing is appropriate**

52.   The Philippine Supreme Court has stated that veil-piercing may be applied in one of three scenarios:

   a.   defeat of public convenience as **when the corporate fiction is used as a vehicle for the evasion of an existing obligation ("defeat of public convenience")**;

   b.   fraud cases or **when the corporate entity is used to justify a wrong, protect fraud, or defend a crime ("fraud cases")**; or

   c.   **alter ego cases**, where a corporation is merely a farce since it is a mere alter ego or business conduit of a person, or where the corporation is so organized and controlled and its affairs are so conducted as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation or individual.[30]

53.   In its *Opinion and Order*,[31] the New York Court cited the case of *Rivera v. United Laboratories, Inc.*[32] to support the conclusion that Philippine law does not apply a conjunctive test in analyzing whether a corporation is an alter ego of another, but rather,

---

[30]   Pantranco Employees Association v. National Labor Relations Commission, G.R. No. 170689, 17 March 2009, 581 SCRA 598, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/48981, last accessed 2 August 2022; Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

[31]   Opinion & Order, pp. 11-12.

[32]   G.R. No. 155639, 22 April 2009, 586 SCRA 269, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/49091, last accessed 2 August 2022.

only an alternative test. *Rivera*, however, merely enumerated the three theories when corporate veil-piercing may be applied, namely:

> "[i] when such corporate fiction is used to defeat public convenience, [ii] justify wrong, protect fraud, or defend crime, or when it is made as a shield to confuse the legitimate issues, or [iii] where a corporation is the mere alter ego or business conduit of a person, or where the corporation is so organized and controlled and its affairs are so conducted as to make it merely an instrumentality, agency, conduit or adjunct of another corporation."[33]

54.      Both before *Rivera*, including in *Pantranco Employees Association v. National Labor Relations Commission*[34] (also cited by the New York Court),[35] and as recently as 2018, the Philippine Supreme Court has discussed these three alternate theories.[36]

55.      GGAM expressly claims to proceed solely according to the third theory.[37] GGAM claims that Mr. Razon completely dominated, controlled, and otherwise governed the Bloomberry Defendants, including their policies and business practices, such that a declaration of the liability of Mr. Razon, as their alter ego, is necessary to allow GGAM to recover from Mr. Razon the unpaid amount of what it terms the "Alter Ego Debt."[38] To establish alter-ego under Philippine law, the plaintiff must meet a stringent three-part test. The test is conjunctive, *i.e.*, all conditions must be met. *See* Section F below.

---

[33]      *Ibid*.

[34]      G.R. No. 170689, 17 March 2009, 581 SCRA 598, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/48981, last accessed 2 August 2022.

[35]      Opinion & Order, p. 12.

[36]      Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

[37]      SAC ¶¶ 205-210.

[38]      SAC ¶¶ 205-210; Plaintiff's Interrogatory Responses, pp. 29-34; Opinion and Order, p. 12.

56.    Even if GGAM attempted to proceed under a defeat of public convenience or fraud theory, my opinion is that the Philippine courts would not find those theories applicable or their requirements met here. The Philippine Supreme Court has not clearly delineated when it is applying each of the three theories and oftentimes, any combination of the three theories is applied. Adding an additional layer of complexity is that many veil-piercing cases involve labor disputes to which the Philippine Supreme Court applies extra scrutiny to ensure there has not been an abuse of the corporate form due to public policy considerations afforded to labor.[39]

57.    For instance, *Total Petroleum Philippines Corporation v. Lim and Tyreplus Industrial Sales, Inc.*[40] involved a company president who was held personally liable for damages arising from commercial distributorship agreements entered into by two supposed separate and distinct entities.[41] Relying on the president's misrepresentations to the plaintiff-distributor (Total) that Tyreplus (the first entity with which the distributor contracted) merely changed its name to Superpro, when in truth, the two companies were distinct entities, Total entered into a second commercial distributorship agreement with Superpro. [42] Such misrepresentations were found to have been made with the intention of defrauding Total and evading Tyreplus' obligations under the first distributorship

---

[39]    See, e.g., Virata v. Ng Wee, G.R. No. 220926, 5 July 2017, 830 SCRA 271, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/63192, last accessed 9 August 2022 (Corporate personality may be disregarded when a corporation's separateness is used "as device to defeat the labor laws."). This case, of course, is not a labor case. It concerns arm's length dealings between Plaintiff and the Bloomberry Defendants in which there was no apparent imbalance of power. The Court therefore would likely be far more reluctant to pierce the veil than it has been in the labor cases, since sophisticated commercial actors can take care of themselves, unlike workers deprived of a salary by their employer's malfeasance.

[40]    G.R. No. 203566, 23 June 2020, 939 SCRA 372, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/66300, last accessed 3 August 2022.

[41]    Total Petroleum Philippines Corporation v. Lim and Tyreplus Industrial Sales, Inc., G.R. No. 203566, 23 June 2020, 939 SCRA 372, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/66300, last accessed 3 August 2022.

[42]    *Ibid*.

agreement. The Philippine Supreme Court, using language from both the defeat of public convenience and the fraud theories, held the president personally liable because he had "dealt in bad faith when he knowingly misled Total into executing the new Agreement with Superpro" and had "misuse[d] Tyreplus as a corporation to perpetuate breach of contractual obligations."[43]

58.     *Total Petroleum* is distinguishable from what I understand to be the facts here. The liability of the officer there arose from the fact that the officer created the second corporation precisely to avoid the contractual obligation. Here, I understand there not to be any dispute that BRHI and SPI were created long before any of the asserted wrongful acts were committed, are duly organized, existing, and operating a legitimate business to this date, and clearly were not organized for the purpose of avoiding the enforcement of the Award. Furthermore, I have been informed that GGAM conducted due diligence on Mr. Razon, BRHI, and SPI, contracted with BRHI and SPI, but has not initiated recovery directly from BRHI and SPI.

59.     Another example of a case where the Philippine Supreme Court mixed theories (defeat of public convenience and fraud), and did so in a labor case, is *Esico v. Alphaland Corporation*.[44] In that case, the Philippine Supreme Court pierced the veil of a company to award payment of an unpaid salary to an employee after the company had transferred the employee's payroll to an affiliate to avoid payment of the salary.[45] The Court found that "the totality of circumstances evince **fraud** on the part of the [employers'] group of companies to **evade an existing obligation**. Undoubtedly,

---

[43]     *Ibid*.

[44]     G.R.     No.     216716,     17     November     2021,     accessible     through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/67906, last accessed 2 August 2022.

[45]     *Ibid*.

[employers'] group of companies availed [themselves of employee's] services . . . for which he was not properly compensated."[46]

60.    Likewise, *in Pamplona Plantation Company v. Tinghil*,[47] another labor case, the Philippine Supreme Court discussed both the fraud and alter ego theories. It rejected a defendant corporation's argument (raised for the first time on appeal) that its affiliated company, rather than the defendant, was the actual employer of plaintiffs and so needed to be a party to the dispute.[48] The Philippine Supreme Court, without expressly referencing the three-part test for alter ego cases, took note of typical alter ego factors (*e.g.,* that the corporations "use only one office and one payroll," defendant corporation's name was on the "weekly payrolls," "there is only one management which the laborers deal with regarding their work," and plaintiffs "all received their pay from the same person"), while also using fraud language when it concluded that defendant's "attempt to make the two corporations appear as two separate entities, *insofar as the workers are concerned*, should be viewed as a ***devious*** but obvious means to defeat the ends of the law. Such ***a ploy*** should not be permitted to clod the truth and perpetuate an injustice."[49]

61.    *Rivera*, cited by the New York Court,[50] was also a putative fraud (the second theory) veil-piercing case.[51] In that case, Rivera commenced employment with United Laboratories, Inc. ("UNILAB") as senior manufacturing pharmacist and later became Director of UNILAB's Manufacturing Division. Rivera completed 30 years of service and

---

[46]    *Ibid*. (emphases added).

[47]    G.R. No. 159121, 3 February 2005, accessible through https://lawphil.net/judjuris/juri2005/feb2005/gr_159121_2005.html, last access 2 August 2022.

[48]    *Ibid*.

[49]    *Ibid*. (first emphasis in original; second emphases added).

[50]    Opinion & Order, pp. 11-12, 13.

[51]    G.R. No. 155639, 22 April 2009, 586 SCRA 269, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/49091, last accessed 2 August 2022.

UNILAB retired her pursuant to the terms of its retirement plan. However, at Rivera's request, UNILAB allowed her to continue working for the company; she was even promoted to the position of Assistant Vice-President. Rivera also served as a personal consultant under contract with UNILAB's sister companies, which assigned Rivera to render service involving UNILAB. Rivera claimed that her retirement pay from UNILAB should include pay for her consultancy services for UNILAB's sister companies. The Philippine Supreme Court rejected Rivera's argument, explaining "we see no basis in the present case to conclude that UNILAB committed any fraud or illegality in employing a retired employee whose knowledge, experience and expertise the company recognized, as an employee or as a consultant. . . . and we see no need to engage in piercing the veil of these corporate entities that she advocates."[52]

62.    This case is similar to *Kukan International Corporation v. Reyes,*[53] a case also cited by the New York Court,[54] where the court declined to pierce the corporate veil on a fraud theory. In that case, Kukan, Inc. ("Kukan") conducted a bidding for the supply and installation of signage in a building. Morales tendered the winning bid, but despite his compliance with his contractual undertakings, he was not paid the full amount of the contract price. Morales filed a complaint for sum of money, and thereafter secured a writ of execution against Kukan. The sheriff executed the judgment against various personal properties found at what was supposed to be Kukan's office. However, Kukan International Corporation ("KIC") asserted that it owned the properties so levied and that it was a different corporation from Kukan even though KIC was incorporated shortly after Kukan had stopped participating in Morales' civil case for sum of money. The

---

[52]    *Ibid.*

[53]    Kukan International Corporation v. Reyes, G.R. No. 182729, 29 September 2010, 631 SCRA 596, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/54563, last accessed 2 August 2022.

[54]    Opinion & Order, p. 13.

Philippine Supreme Court ultimately found that the doctrine of piercing the corporate veil found no application to the case, as "there is no showing that the incorporation, and the separate and distinct personality, of KIC was used to defeat Morales' right to recover from Kukan, Inc. Judging from the records, ***no serious attempt was made to levy on the properties of Kukan, Inc.***"[55]

63.     In conclusion, GGAM's theory of veil-piercing liability pertains to the third theory for piercing the corporate veil, i.e., an alter ego case. And, even if it did not, the Philippine courts still would likely insist on satisfaction of the conjunctive three-part test that applies to alter ego claims (discussed in Section G. below). GGAM's inability to satisfy that test tends to suggest that the Philippine courts would *also* deem the other two theories, even if not expressly couched as conjunctive, unsatisfied here.

**F.     Veil-piercing on the basis of an alter ego theory requires application of a conjunctive three-pronged test**

64.     For alter ego cases, jurisprudence requires the concurrence of **<u>ALL</u>** of the following elements:

> a.     **Control**, not mere majority or complete stock control, but **complete domination**, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;

> b.     **Such control must have been used by the defendant to commit fraud or wrong**, to perpetuate the violation of a statutory or other

---

[55]     *Ibid.*

positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights; **AND**

c.     The aforesaid **control and breach of duty must proximately cause the injury** or unjust loss complained of.[56]

65.     Indeed, as recently as 2018, the Philippine Supreme Court reiterated:

"Piercing the corporate veil based on the alter ego theory requires the **concurrence of three elements**: control of the corporation by the stockholder or parent corporation, fraud or fundamental unfairness imposed on the plaintiff, and harm or damage caused to the plaintiff by the fraudulent or unfair act of the corporation. **The absence of <u>any</u> of these elements prevents piercing the corporate veil**. Again, all these three elements must concur before the corporate veil may be pierced under the alter ego theory."[57]

**G.     Jurisprudential guidelines dictate that the three-pronged test in alter ego cases is not satisfied in the case at bar**

1.     **The control, or instrumentality, test is not met here**

66.     The first test to be established in alter ego cases is the "instrumentality" or "control" test. [58] The control test: (a) requires complete control and domination of the

---

[56]   Yamamoto v. Nishino Leather Industries, Inc., G.R. No. 150283, 16 April 2008, 551 SCRA 447, *accessible* through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/45043, last accessed 2 August 2022; Philippine National Bank v. Hydro Resources Contractors Corporation, G.R. No. 167530, 13 March 2013,693 SCRA 294; Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022..

[57]   Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

[58]   Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022; *Pantranco Employees Association v. National Labor Relations Commission*, G.R. No. 170689, 17 March 2009, 581 SCRA 598, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/48981, last accessed 2 August 2022

100.     Given that the actions taken by the Bloomberry Defendants are within the bounds of law, my opinion is that the same could not be viewed as "wrongdoing" which would warrant piercing the veil of corporate fiction.

### 3.     **The harm test is not met here**

101.     The last element to establish an alter ego case is that the **injury complained of has to have been proximately caused by the control exercised by and fraud / injustice committed by the parent corporation (or putative controlling individual)**. [97] Philippine courts utilize the "harm" test in determining the existence of this element. The "harm" element requires "[a] causal connection between the fraudulent conduct committed through the instrumentality of the [corporation] and the injury suffered or the damage incurred by the plaintiff should be established. The plaintiff must prove that, unless the corporate veil is pierced, it will have been treated unjustly by the defendant's exercise of control and improper use of the corporate form and, thereby, suffer damages."[98]

102.     *First*, I believe that GGAM cannot show that Mr. Razon has caused it any "harm" because GGAM has not filed any action for recognition and enforcement of the Award in the Philippines, which is where I understand the Bloomberry Defendants have their assets. That GGAM has not attempted to recover from the Bloomberry Defendants, much less definitively establish that they do not have sufficient assets against which GGAM can recover, is fatal to their claim of having supposedly suffered "harm" as a consequence of the alleged acts of Mr. Razon.

---

[97]     Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

[98]     *Ibid*.

103.    The Philippine Supreme Court in *Maricalum* denied veil piercing in similar circumstances (emphasis added):

> "In the case at bench, complainants have not yet even suffered any monetary injury. **They have yet to enforce their claims against Maricalum Mining. It is apparent that complainants are merely anxious that their monetary awards will not be satisfied because the assets of Maricalum Mining were allegedly transferred surreptitiously to G Holdings**. . . ."[99]

104.    Likewise, in another recent case, *WPM International Trading, Inc. v. Labayen*,[100] the Philippine Supreme Court:

> "[O]bserved that the [Court of Appeals] failed to demonstrate how the separate and distinct personality of [a company] was used by [defendant] to defeat the respondent's right for reimbursement.
>
> Neither was there any showing that [the company] attempted to avoid liability or **had no property against which to proceed**. Since no harm could be said to have been proximately caused by [defendant] for which the latter could be held solidarily liable with [the company], and **considering that there was no proof that the company had insufficient funds**, there was no sufficient justification for the RTC and the [Court of Appeals] to have ruled that [defendant] should be held jointly and severally liable to the respondent . . . ."

105.    Similarly, in *Kukan*, cited by the New York Court, the court declined to pierce the veil where "*no serious attempt was made to levy on the properties of Kukan, Inc.*"[101]

---

[99]    G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022 (emphasis added).

[100]    G.R. No. 182770, September 17, 2014, 735 SCRA 297, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/57767, last accessed 9 August 2022.

[101]    *Ibid.*

106.     _**Second**_, as mentioned above, it appears to me that the acts complained of are, for the most part, legally available remedies to BRHI and SPI. As such, any consequences of the exercise of said remedies could not be considered as the "harm" contemplated in the context of corporate veil piercing.

107.     _**Third**_, as discussed above, many of the complained-of acts that supposedly brought _general_ harm to the Bloomberry Defendants (_e.g._, the Boards' decision to indemnify Mr. Razon, or their supposed failure to inform themselves before approving Mr. Razon's use of personnel and facilities of the Bloomberry Defendants) are more properly challenged in a derivative action brought on behalf of the Bloomberry Defendants, rather than in an action for corporate veil- piercing.[102] As discussed above, the harm to _**GGAM**_ must be _**directly**_ caused by the alleged wrongful act. It is not enough that GGAM is harmed _indirectly_ and _derivatively_ as a mere shareholder of BRC.

108.     Furthermore, let me reiterate that both a derivative suit and a suit for corporate veil piercing are remedies of last resort. In this case, GGAM is not without relief. GGAM admits that the Bloomberry Defendants posted an injunction bond in the Philippine proceedings. In _Limitless Potentials, Inc. v. Court of Appeals_,[103] the Philippine Supreme Court held that "the injunction bond is intended as a security for damages in case it is finally decided that the injunction ought not to have been granted." Section 20 of Rule 57 of the Rules of Court, "which is similarly applicable to a preliminary injunction, has outlined the procedure for the filing of a claim for damages against an injunction bond. The aforesaid provision of law pertinently provides:

> 'Section. 20. _Claim for damages on account of improper, irregular or excessive attachment._ - An application for damages on account of improper, irregular or excessive attachment must be filed before the

---

[102]     For a more thorough discussion on the difference between an individual suit and a derivative suit _see_ Ching v. Subic Bay Golf and Country Club, Inc., G.R. No. 174353, 10 September 2014.

[103]     G.R. No. 164459, 24 April 2007.

trial or before appeal is perfected or before the judgment becomes
executory, with due notice to the attaching party and his surety or
sureties, setting forth the facts showing his right to damages and the
amount thereof. Such damages may be awarded only after proper
hearing and shall be included in the judgment on the main case.'"[104]

109.    In addition, if the bond were not sufficient to cover GGAM's damages,
GGAM, as the beneficiary, could proceed directly against the companies that obtained
the bond or the parties in whose favor the injunction was issued.[105]

110.    To reiterate, assuming the alleged harm to GGAM stems from supposed
cases of corporate mismanagement, such as when the acts are committed by the directors
or trustees themselves, the proper remedy is a derivative suit by a stockholder on behalf
of the allegedly mismanaged corporation.[106]

### 4.    Additional considerations

111.    *First*.  Fraud should be clearly and convincingly proved.[107]  As the
Philippine Supreme Court has explained:

"This standard of proof is derived from American common law. It is
less than proof beyond reasonable doubt (for criminal cases) but
greater than preponderance of evidence (for civil cases). The degree
of believability is higher than that of an ordinary civil case. Civil
cases only require a preponderance of evidence to meet the required
burden of proof. However, when fraud is alleged in an ordinary civil
case involving contractual relations, an entirely different standard of
proof needs to be satisfied. The imputation of fraud in a civil case
requires the presentation of clear and convincing evidence. Mere

---

[104]    *Ibid.*

[105]    See Rule 5.9 of the Special ADR Rules. See also Section 20 of Rule 57 and Section 8 of Rule 58 of the
Rules of Court.

[106]    Cua, Jr. v. Tan, G.R. No. 181455-56, 4 December 2009, 607 SCRA 645.

[107]    Kukan International Corporation v. Reyes, G.R. No. 182729, 29 September 2010, 631 SCRA 596,
accessible  through  https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/54563,  last
accessed 2 August 2022.

allegations will not suffice to sustain the existence of fraud. The burden of evidence rests on the part of the plaintiff or the party alleging fraud. The quantum of evidence is such that fraud must be clearly and convincingly shown."[108]

112. **_Second_**. A party may not resort to veil-piercing if it was in estoppel. Under the equitable doctrine of estoppel, "an admission or representation is rendered conclusive upon the person making it and cannot be denied or disproved as against the person relying thereon. A party may not go back on his own acts and representations to the prejudice of the other party who relied upon them."[109] Accordingly, if a party conducted due diligence before binding itself to the terms and conditions of its contract with another corporation, said party should have been put on notice regarding the corporation's financial capability, creditworthiness, and corporate governance. The party should not be allowed to claim from the corporation's parent (or anyone else) on the sole basis that the corporation cannot make good on its obligations.

113. **_Third_**. The fact that the Bloomberry Defendants are associated with BRC, a PLC in good standing, should also be considered. PLCs are subject of heavy regulatory requirements (see below Section VI.C.). If a PLC has never been delisted from the PSE, has no outstanding penalties, and has maintained a good share value, it is unlikely that the PLC would be deemed a mere "instrumentality, agency, conduit, or adjunct"[110] of a subsidiary or stockholder so as to justify disregarding the corporate form. In fact, it would be difficult to conclude that a PLC is an "alter ego" of its controlling shareholder because a PLC is mandated to maintain a "minimum public float" of at least 15% to 20%.

---

[108]   Tankeh v. Development Bank of the Philippines, G.R. No. 171428, 11 November 2013.

[109]   Caltex (Philippines), Inc. v. Court of Appeals, G.R. No. 97753, August 10, 1992, 212 SCRA 448; Philippine National Bank v. Court of Appeals, G.R. No. L-30831, 21 November 1979, 94 SCRA 368.

[110]   Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

## V.   THE WRITS ISSUED AS INTERIM MEASURES OF PROTECTION REMAIN IN FULL FORCE AND EFFECT

114.   I understand that GGAM has taken the position that the Writs do not remain in place.[111]

115.   I disagree. Philippine Courts have already conclusively and finally held that the Writs *do* remain in place and *are* valid.

116.   Based on the documents that have been shown to me, I understand that GGAM's theory is as follows:

"(1) Rule 5.13 of the Philippine Special Rules of Court on Alternative Dispute Resolution Rules expressly provides that:

[a]n interim measure of protection issued by the arbitral tribunal *shall, upon its issuance be deemed to have ipso jure modified, amended, revised or revoked an interim measure of protection previously issued by the court* to the extent that it is inconsistent with the subsequent interim measure of protection issued by the arbitral tribunal; (emphasis added);

(2) on December 9, 2014, the Arbitral Tribunal issued the Interim Measures Award which expressly vacated the 'Injunction,' stating:

this Order of the Tribunal on Interim Relief issued in the instant arbitration proceeding in regard to the "Claimants' Request For Interim Measures of Protection Pursuant to Article 26 of the UNCITRAL Arbitration Rules" is *deemed to have superseded the final Order dated February 25, 2014 of the Regional Trial Court of Makati City, Philippines*. Accordingly, the Writs of Preliminary Injunction and Attachment issued pursuant to the final Order dated February 25, 2014 of the Regional Trial Court of Makati City, Philippines *shall now*

---

[111]   SAC ¶ 253 (referring to "the fiction that the preliminary writs remain in place and [are] valid"); SAC ¶ 115 & 240 (alleging that the tribunal's Interim Measures Award "expressly vacated and superseded the [] preliminary writs").

> *be deemed to be vacated and lifted. This Order of the Tribunal on Interim*
> *Relief is in all respects substituted for and replaces that Order and the Writs*
> *of Preliminary Injunction and Attachment.*
>
> . . .
>
> (3) therefore, as a matter of Philippine law (Rule 5.13 of the Special
> Court Rules on ADR), *upon the issuance* of the Tribunal's "Order In
> Respect Of Claimants' Interim Measures' Application," the
> "Injunction" ceased to have any legal effect."[112]

117.    GGAM's view, in other words, is that the Interim Measures Award is self-executing, that it required no further legal proceedings to become effective, and that the Interim Measures Award itself dissolved the Writs issued by the Philippine court. But this exact position has already been presented to and rejected by the Philippine courts, which, relying on different provisions of the Special ADR Rules, have held that the tribunal's Interim Measures Award is not self-executing, but rather is a foreign arbitral award that must be presented to the Regional Trial Court for recognition and enforcement. Because Plaintiff has not done so, the Award has not nullified the Writs, which remain in place.

118.    The Writs were issued pursuant to a February 25, 2014 Order of the RTC-Makati. In a Resolution dated May 29, 2015 and affirmed on November 27, 2015, the Court of Appeals: (a) rejected GGAM's argument that the Interim Measures Award should be considered to have automatically, or "ipso jure," lifted the Writs; (b) denied GGAM's prayers that "judgment be rendered confirming the [Interim Measures Award]" and that "Judgment be rendered annulling the RTC 'Order' of February 25, 2014"; and (c) instead held that the Interim Measures Award is in the nature of a foreign arbitral award that, under Rule 13 of the Special ADR Rules, requires recognition and/or enforcement proceedings before it may be given legal effect.

---

[112]     Plaintiff's Interrogatory Responses, p. 19.

119.     From representations made to me, I understand that GGAM did not seek review in the Philippine Supreme Court of these Resolutions of the Court of Appeals dated May 29, 2015 and affirmed on November 27, 2015 referenced above in paragraph 118. Those rulings thereby attained finality.

120.     By the principle of conclusiveness of judgment, also known as collateral estoppel or issue preclusion, a right, fact, or matter in issue is deemed to have been conclusively settled by a final decision of a court and can no longer be relitigated in subsequent proceedings between the parties.[113]

121.     The requirements for the issue preclusion bar appear to be satisfied here. The questions whether the Interim Measures Award was self-executing and whether the Writs remain in place were fully and finally settled in proceedings between GGAM and the Bloomberry Defendants. That Mr. Razon (unlike GGAM) was not formally a party to those proceedings is of no moment. The Philippine Supreme Court has explained that, for purposes of *res judicata*, "only substantial identity of parties is required and not absolute identity" and that "[t]here is substantial identity of parties when there is a community of interest between a party in the first case and a party in the second case even if the latter was not impleaded in the first case."[114] Put another way: "**shared identity of interest is sufficient to invoke the coverage of this principle.**"[115] Based on GGAM's own claims that Mr. Razon has sole control and dominant ownership of Prime (a party to the RTC-Makati proceedings), I believe this standard is satisfied here.

122.     The matter of the continued existence of the Writs has again been put to issue when Deutsche Bank filed a *Motion for Clarification and/or Set Clarificatory Hearing*

---

[113]     E.g., Degayo v. Magbanua-Dinglasan, G.R. No. 173148 (Apr. 6, 2015); see also 1997 Rules of Civil Procedure, Rule 39, Sec. 47(c).

[114]     Sendon v. Ruiz, G.R. No. 136834 (Aug. 15, 2001).

[115]     Degayo v. Magbanua-Dinglasan, G.R. No. 173148 (Apr. 6, 2015) (emphasis in original).

*Ad Cautelam*[116] with the RTC-Makati on the validity of the injunction, attachment and garnishment. The RTC-Makati stated anew in an Order dated November 23, 2017 that the Interim Measures Award "require[s] recognition and enforcement by this Court"[117] and "affirm[ed] the continuing validity of its Order February 25, 2014 and the writs of preliminary injunction and preliminary attachment issued pursuant thereto."[118] The Court of Appeals likewise denied GGAM's appeal of this Order.

## VI.   PHILIPPINE LAW AND PRACTICE ON CORPORATE GOVERNANCE, AND BLOOMBERRY'S COMPLIANCE THEREWITH

### A.   Overview of Corporate Formalities

#### 1.   Board actions

123.   **The Board**. Under Philippine law, a corporation's board of directors ("Board") is its governing body. By default, the Board is vested with and exercises all powers of the corporation.[119] Where a corporation's bylaws allow for it, the Board can delegate duties to an executive committee of the Board.[120] A Board elects officers who "manage the corporation and perform such duties as may be provided in the bylaws and/or as resolved by the board of directors."[121] A decision is a valid corporate act if the decision is reached by a majority of the directors that constitute the quorum at a given meeting (except that the election of officers requires a majority vote of all members of the Board).

---

[116]   See *Motion for Clarification and/or Set Clarificatory Hearing Ad Cautelam* filed by DB-Manila.

[117]   Page 6 of Order dated November 23, 2017 of the RTC-Makati in SP. Proc. No.M-7567.

[118]   Page 7 of Order dated November 23, 2017 of the RTC-Makati in SP. Proc. No.M-7567.

[119]   Rep. Act No. 11232 (2019) (the "RCC" or "Revised Corporation Code"), Sec. 22 ("Unless otherwise provided in this Code, the board of directors or trustees shall exercise the corporate powers, conduct all business, and control all properties of the corporation"); *see also* B.P. 68, Sec. 23.

[120]   *Ibid*. Sec. 34; *see also* B.P. 68, Sec. 35.

[121]   *Ibid*. Sec. 24; *see also* B.P. 68, Sec. 25.

124.    The principle that oversight and governance is centralized in the Board has been recognized by the Philippine Supreme Court. For example, in *Filipinas Port Services, Inc. v. Go*,[122] the Court noted that the Board "has the sole authority to determine policies, enter into contracts, and conduct the ordinary business of the corporation within the scope of its charter, *i.e.*, its articles of incorporation, by-laws and relevant provisions of law" and held that the Board "has the power to create positions not provided for in [a corporation's] bylaws since the board is the corporation's governing body."

125.    The most common way in which a Board exercises its corporate powers is through the issuance of a Board resolution. However, in *Board of Liquidators v. Heirs of Maximo M. Kalaw*,[123] the Philippine Supreme Court said that the Board's exercise of powers may be implied where the board collectively and knowingly allows the President to enter into important contracts in the pursuit of the corporate business. The Court concluded that the board need not have a special meeting to approve or ratify contracts being entered into by the general manager when, by custom, he contracts alone on behalf of the corporation.

126.    **Ratification.** A resolution may ratify previous acts. Ratification is when the corporation (through the Board) voluntarily adopts, confirms, and sanctions an otherwise unauthorized act after the fact.[124] Nevertheless, ratification may involve not only a formal resolution, but may also be implied from silence, implied acquiescence, or even estoppel, evinced by participation in the implementation of the corporate act.[125] The result is that

---

[122]    G.R. No. 161886, 16 March 2007, 518 SCRA 453, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/45295, last accessed 7 August 2022.

[123]    G.R. No. L-18805, 14 August 1967, 20 SCRA 987.

[124]    Yasuma v. Heirs of De Villa, G.R. No. 150350, 22 August 2006, 499 SCRA 466, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/43105, last accessed 2 August 2022.

[125]    *Ibid.*

the said act becomes authorized as if it had been performed with corporate imprimatur from the start.

### 2. Procedural requirements

127. **Stockholder meetings** can be regular or special. Regular stockholder meetings occur annually, and must be preceded by at least 21 days of notice. Special meetings may happen "at any time deemed necessary or as provided in the bylaws," and must be preceded by at least one week of notice.[126] The notice for stockholder meetings must be accompanied by the agenda for the meeting, a proxy form, and, if the meeting is for the election of directors, "the requirements and procedure for nomination and election."[127]

128. **Election of directors.** The members of the Board – that is, the directors – are elected at a meeting of the shareholders.[128] The election must be attended, either in person or through a representative authorized by proxy, by the owners of a majority of the outstanding capital stock. Each voting stockholder effectively holds votes equal to the number of shares of stock owned (as shown in the stock and transfer books of the corporation) multiplied by the number of directors to be elected, and may cast those votes for only one candidate or distribute those votes among two or more of the candidates as

---

[126]   Rep. Act No. 11232 (2019), Sec. 49; see also B.P. 68, Sec. 50. The 2019 legislation effected the following changes: (a) 21 days' notice instead of 2 weeks; (b) provision of notice through electronic means; (c) prescribed contents of minutes of meetings of stockholders; (c) requirements for presenting specific matters during regular meetings of stockholders.

[127]   Rep. Act No. 11232 (2019), Sec. 50; see also B.P. 68, Sec. 51. Prior to 2019, there was no prescribed content for notices of meetings.

[128]   Rep. Act No. 11232 (2019), Secs. 22, 23; see also B.P. 68, Secs. 23, 24.

the stockholder sees fit.[129] The nominees for director receiving the highest number of votes are declared elected.[130]

129.    The law in effect allows corporations to have interlocking directors by virtue of a provision recognizing the same and requiring for certain conditions for contracts involving corporations with interlocking directors.[131] It is a usual practice to have common directors and officers especially among member-companies of a conglomerate.

130.    A PLC, such as BRC, is duty bound to have at least 20% of its Board consist of independent directors. An independent director is defined as a "person who, apart from shareholdings and fees received from the corporation, is independent of management and free from any business or other relationship which could, or could reasonably be perceived to materially interfere with the exercise of independent judgment."[132] Independent directors are also "subject to rules and regulations governing their qualifications, disqualifications, voting requirements, duration of term and term limit, maximum number of board memberships and other requirements that the Commission will prescribe to strengthen their independence and align with international best practices."[133]

131.    **Board meetings**. A corporation's Board has regular meetings monthly, or as otherwise specified in the corporation's bylaws.[134] The bylaws of SPI provide for

---

[129]    *E.g.*, Rep. Act No. 11232 (2019), Sec. 23; see also B.P. 68, Sec. 24.

[130]    *Ibid.*

[131]    *See* Rep. Act No. 11232 (2019), Sec. 32; see also B.P. 68, Sec. 33.

[132]    Rep. Act No. 11232 (2019), Sec. 22.

[133]    *Ibid.*

[134]    Rep. Act No. 11232 (2019), Sec. 52; see also B.P. 68, Sec. 53.

meetings each quarter; BRHI's do not vary from the statutory default.[135] Special meetings may be held at any time as provided in the bylaws or on the call of the president.[136]

132.   A meeting of the Board requires a quorum. Unless otherwise specified in the bylaws or articles of incorporation, a quorum consists of a majority of the number of directors set forth in the articles of incorporation.[137] As a general rule, a majority of those present and constituting a quorum may decide on matters brought to the Board for consideration, on a one vote per one director basis, regardless of the number of shares owned or controlled by a director.

133.   **Notice of board meetings**. Unless a longer time is specified in a corporation's bylaws (which is not the case for BRHI or SPI[138]), notice of a regular or special meeting of the Board "must be sent to every director . . . at least two (2) days prior to the scheduled meeting."[139] However, a director "may waive this requirement, either expressly or impliedly."[140] Being present in a board meeting without objecting to the lack of notice will constitute a waiver of the notice requirement.[141] In addition, the notice may not be required if there is an established usage to the contrary, or it is useless, impossible or impracticable to provide the notice.

134.   **Appointment of officers**.  Immediately after being elected, a corporation's board of directors must elect a president (who must be a director), a treasurer (who must be a resident of the Philippines), a secretary (who must be a citizen and resident of the

---

[135]   SPI Bylaws (contained in BLOOM_0041070) Art. III, Sec. 4; Amended BRHI bylaws (BLOOM_0041027) Art. III, Sec. 4.

[136]   Rep. Act No. 11232 (2019), Sec. 52; see also B.P. 68, Sec. 53.

[137]   Rep. Act No. 11232 (2019), Sec. 52; see also B.P. 68, Sec. 53.

[138]   SPI bylaws Art. III, Sec. 5; Amended BRHI bylaws (BLOOM_0041027) Art. III, Sec. 5.

[139]   Rep. Act No. 11232 (2019), Sec. 52; see also B.P. 68, Sec. 53.

[140]   *Ibid*.

[141]   Conpharm Industries, Inc. v. Santillana, SEC-SICD Case No. 3210, 29 January 1992.

Philippines) and such other officers as may be provided in the bylaws.[142] SPI's bylaws also provide for the election of a Chairman and one or more Vice Presidents.[143] BRHI's bylaws provide for the election of a Vice-President.[144] BRHI's and SPI's bylaws each state that "[t]he Board may, from time to time, appoint such other officers as it may determine to be necessary or proper."[145]

135.   **Separate operations**. A holding company and its operating subsidiaries maintaining separate operations is an indicia of the observance of corporate formalities and/or separateness sufficient to defeat veil-piercing.

### 3.   **Maintenance of corporate records**

136.   **Minutes**. Meetings are documented through minutes. The Philippine Supreme Court has declared that the corporate secretary has the duty to record and prepare the minutes of Board meetings.[146] The signature of the corporate secretary gives the minutes of the meeting probative value and credibility.[147] Under the RCC, the minutes of meetings of the Board and of the stockholders are among the corporate records that must be kept by a corporation. The minutes must "set forth in detail, among others: the time and place of the meeting held, how it was authorized, the notice given, the agenda therefor, whether the meeting was regular or special, its object if special, those present

---

[142]   Rep. Act No. 11232 (2019), Sec. 24; see also B.P. 68, Sec. 25.

[143]   SPI Bylaws Art.IV, Sec. 1.

[144]   Amended BRHI Bylaws Art. IV, Sec. 1.

[145]   SPI Bylaws Art. IV, Sec. 1; Amended BRHI Bylaws Art. IV, Sec. 1.

[146]   See also SPI bylaws Art. IV Sec. 5(a) (providing that Secretary is responsible for "the proper recording of the minutes and transactions of all meetings of the directors and the stockholders" and for "maintain[ing] minute books of such meetings in the forma and manner required by law"); Amended BRHI bylaws Art. IV Sec. 5(a) (substantially similar provision).

[147]   People v. Dumlao, G.R. No. 168918, 2 March 2009, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/48920, last accessed 9 August 2022; Virata v. Ng Wee, G.R. No. 220926, 21 March 2018, 830 SCRA 271, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/63889, last accessed 9 August 2022.

and absent, and every act done or ordered done at the meeting."[148] Further, "the protest of a director [or] stockholder . . . on any action or proposed action must be recorded in full upon their demand."[149]

137.   However, the SEC has opined that the absence of the required details in the minutes will not nullify the minutes if the basic information on when the meeting was held, who were present, the presence of a quorum and the corporate action or resolution approved appears in the minutes, and it is duly signed by the corporate secretary. Such minutes, despite deficiencies in details, will be valid minutes and records of corporate action, especially if the corporation acts on the resolution approved.[150] The directors, by signing the minutes of a Board meeting, essentially approve and ratify the minutes and waive any formal or procedural deficiency in the Board meeting covered by the approved and signed minutes.[151]

138.   **Financial statements.** BRC, BRHI, and SPI are required to keep as corporate records and to file with the SEC annual financial statements duly prepared by corporate finance officers and audited by independent external auditors accredited by the SEC.

g.   All corporations whose total assets or liabilities exceed PhP600,000 are required to file financial statements with the SEC under Section 177 of the RCC.[152]

---

[148]   Rep. Act No. 11232 (2019), Sec. 73; see also B.P. 68, Sec. 74. Prior to 2019, there was no prescribed contents of minutes of meetings.

[149]   *Ibid*.

[150]   See SEC Opinion dated 29 January 1992 -*Conpharm Industries Inc. v. Santillana, SEC-SICD Case No. 3210*

[151]   *Ibid.;* see also Lopez Realty, Inc. v. NLRC, G.R. No. 76801, 11 August 1995.

[152]   Sec. 141 of B.P. 68.

h.   BRHI's and SPI's independent auditors are also subject to rules promulgated by the SEC regarding their qualifications and accreditations required, and other reportorial requirements for independent auditors.[153]

i.   Section 73 of the RCC states that "[c]opies of Reportorial Requirements submitted to the SEC" are required to be kept as corporate records. Audited annual financial statements are one of the reportorial requirements submitted by corporations to the SEC.

139.   Upon request, the SEC may issue a certification that a corporation has complied with the filing of its Annual Financial Statements ("AFS") and General Information Sheet ("GIS") for any given year one year after registration of their Articles of Incorporation ("AOI") with the SEC. The SEC imposes a fine for every non-filing of the AFS and/or GIS. Further, the SEC requires the settlement of such penalty(ies) before any application for approval of a major corporate act may be processed.[154]

140.   The RCC mandates that non-filing of reportorial requirements may cause a corporation to be placed on delinquent status. Failure of the corporation to lift such status within the prescribed period of time may warrant revocation of its registration.[155]

**B.   Bloomberry has complied with applicable corporate formalities**

141.   Based on my reading of certain minutes of Board and stockholder meetings, some Board resolutions, the bylaws for BRHI and SPI, which were furnished to me by counsel, Bloomberry has complied with corporate formalities.

---

[153]   Securities Regulation Code ("SRC") Implementing Rules and Regulations, Rule 68.

[154]   SEC Memorandum Circular No. 6, Series of 2005.

[155]   Rep. Act No. 11232 (2019), Sec. Secs. 177, 179, 158, 21.

1. **Bloomberry has complied with applicable procedural requirements**

142. **Meetings**. Based on a list of BRHI/SPI meetings held[156] and certain minutes I have read, the Boards of the Bloomberry Defendants duly met, quorums existed, at least a majority of the quorum voted on the matters put before them, and the minutes appear to have ably recorded what transpired in those meetings.[157]

143. I understand that Plaintiff has asserted that "proper corporate formalities related to notice and conduct of [the Bloomberry Defendants'] Board meetings were disregarded."[158] However, none of the minutes that I read indicated that the Board ignored these procedural requirements. The RCC even allows the Board to call a meeting on shorter notice if urgent circumstances warrant and all directors have waived any objection to any defect in the notice and the holding of the meeting.[159]

144. **Election of directors**. I have been asked to assume as true, for purposes of this report, that, consistent with each respective corporations' bylaws, members of the Board of BRC, BRHI, and SPI were typically elected at annual meetings by each corporation's shareholders.  Such practice is in compliance with the RCC.

145. Plaintiff complains that "[a]t shareholder meetings of BRC and [the Bloomberry] Defendants, Razon controls the voting rights for tens of millions of shares, while other shareholders have a single vote, such that he can control the outcome of all votes at these meetings."[160] There is nothing unlawful about holding majority or even

---

[156]   Plaintiff's Exhibit ("PX") 168, BLOOM_0148666 (list of BRHI board meetings between 2011 to 2022); PX 169, BLOOM_0148670 (list of SPI meetings between 2011 to 2022).

[157]   *See infra* VI.B.4. for a list of Board minutes that I have read.

[158]   Plaintiff's Interrogatory Responses, p. 43.

[159]   Rep. Act No. 11232 (2019), Sec. 50; B.P. Blg. 68, Sec. 51.

[160]   Plaintiff's Interrogatory Responses, p. 26.

the minutes of the audit committee's meetings. These record maintenance practices are in compliance with the RCC.[177]

153.    I have been asked to assume as true that BRHI, SPI, and BRC are separately audited on an annual basis and have separate books and records that are separately maintained. This is in conformity with the requirements of the RCC, which requires a corporation to separately review and approve its financial statements and, beyond a threshold amount (which is met here), to be independently audited by SEC-accredited external auditors.[178]

### 3.    BRHI and SPI, on the one hand, and BRC, on the other hand, operate separately

154.    Plaintiff asserts that Mr. Razon has ultimate control and ultimate management authority over each of BRHI, SPI, and BRC, suggesting that they are under his thumb such that they have no independent personalities.[179] But, if anything, the separation of the operating subsidiaries (BRHI and SPI) from the holding company (BRC) is indicative that the entities have independent personalities from each other – and Razon.

155.    As mentioned previously, the separation of BRHI and SPI, on the one hand, and BRC, on the other, is demonstrated by their separate boards, separate meetings including for the elections of directors, and separate corporate records. Additionally, the following are positive indications of separateness:

        a.    There are separate individuals that perform similar functions at the holding company as compared to the operating subsidiaries, rather

---

[177]    Rep. Act No. 11232 (2019), Sec. 73, BP 68, Corporation Code of the Philippines, Sec. 74.

[178]    B.P. 68, Corporation Code of the Philippines, Sec. 75; Rep. Act No. 11232, Revised Corporation Code, Sec. 177(a).

[179]    *E.g.*, Plaintiff's Interrogatory Responses, at 32.

than the companies being operated as a single unit, e.g, the operational personnel of BRC, on the one hand, and of BRHI and SPI, on the other, such as the Chief Financial Officers and Human Resources Heads, are different (these are facts I have been asked to assume are true) [180]; and

b.      BRC employees work in offices on a separate floor of the Solaire casino from BRHI and SPI employees (another fact that I have been asked to assume is true); and

c.      BRC holds shares in other subsidiaries separate from BRHI and SPI, which entities also appear to have separate operations. [181]

### 4.      The at-issue actions were valid corporate acts

156.    As noted above, a decision is a valid corporate act if the decision is reached by a majority of the directors that constitute the quorum at a given meeting. After reading the minutes referenced below, I have noted the following approvals by the Board, which indicate adherence to corporate formalities. Given that each act discussed below was approved by a majority of the Board where a quorum was present, each act is a valid *corporate* action.

| At-issue action/event | Date of Board Meeting | Defendant Company | Board Resolution or Corporate Action Approved |
|---|---|---|---|
| Termination of the MSA | September 12, 2013 | BRHI & SPI | 1.   Resolution that "the Corporation be hereby authorized to terminate the MSA;" |

---

[180]   In addition, Bloomberry's website refers to "Management Team," "Corporate Management," which presumably are groups of  individuals who are employed and paid by BRC, and a "Solaire Resort & Casino Property Management," that is comprised of individuals employed by BRHI and/or SPI.  https://bloomberry.ph/our-company/board-directors-and-management-team.

[181]   See pages 25-26 of the 2021 Annual Report of BRC referencing the businesses of its other subsidiaries apart from SPI and BRHI such as Bloom Capital B.V., Solaire de Argentina S.A., Solaire Korea and its subsidiaries, Bloomberry Cruise Terminals, Inc. and Bloomberry Resorts, Japan, Inc.

| At-issue action/event | Date of Board Meeting | Defendant Company | Board Resolution or Corporate Action Approved |
|---|---|---|---|
| | | | 2.  "Management was directed to prepare for arbitration" with GGAM.<br><br>BRHI Minutes, BLOOM_0041157<br>SPI Minutes, BLOOM_0041301 |
| **Suspension of trading in BRC shares**<br><br>**Filing of lawsuits to protect BRHI's and SPI's interests against GGAM**<br><br>**Obtaining bonds in support of injunction** | January 13, 2014 | BRHI | 1.  "Board instructed Atty. Tan to seek a voluntary trading suspension of BRC shares with the PSE";<br>2.  "The Board also authorized the filing of suits and actions as necessary to protect the interest of the Corporation against GGAM."<br>3.  Resolution that Ms. Estella Tuason-Occena be appointed with the power to, among other things, "cause the filing, commencement, and/or prosecution of any action, petition, appeal, pleading and/or motion for and on behalf of the Corporation to attach and prevent the disposition of shares of stocked owned by [GGAM] in [BRC]."<br>4.  Resolution that "the Corporation be authorized to apply for any and all kinds of bonds that may be necessary in connection with any proceedings involving the Corporation."<br><br>BRHI Minutes, BLOOM_0147651<br>SPI Minutes, BLOOM_0148454[182] |
| **Non-payment of arbitral awards** | December 29, 2017 | BRHI & SPI | "The Board resolved to approve, ratify and confirm the action to set aside the arbitral award and/or to oppose their implementation."<br><br>BRHI Minutes, BLOOM_0148481<br>SPI Minutes, BLOOM_0148461 |
| **Non-payment of arbitral awards** | November 20, 2019 | BRHI & SPI | "[T]he Board approved, confirmed and ratified the appeal and petitions to challenge the Final Award."<br><br>BRHI Minutes, BLOOM_0148486<br>SPI Minutes, BLOOM_0148535 |

---

[182]   In addition, I was informed that BRC's board met in February 2014, after being duly noticed in writing, and ratified the actions taken by BRC and BRHI with respect to the voluntary suspension of trading in BRC's shares. As noted above, proceeding by ratification is permissible under Philippine law.

| At-issue action/event | Date of Board Meeting | Defendant Company | Board Resolution or Corporate Action Approved |
|---|---|---|---|
| **Non-payment of arbitral awards** | March 4, 2021 | BRHI & SPI | The Board "resolved to continue the present course of action to oppose the enforcement of the Arbitral Award."<br><br>BRHI Minutes, BLOOM_0148318<br>SPI Minutes, BLOOM_0148641 |
| **Indemnification of Razon**<br><br>**Razon's use of BRHI-leased aircraft and facilities, resources, and employees** | April 27, 2021 | BRHI & SPI | 1. Resolution to "indemnify and hold harmless Mr. Enrique K. Razon, Jr. [and the Dismissed Defendants]" in connection with at-issue litigation;<br>2. Resolution to "approve, ratify and confirm the Related Party Transactions of [BRHI/SPI] as disclosed in the audited Financial Statements and in the reports of the Parent Company Bloomberry Resorts Corporation";<br>3. Resolution to "approve, ratify and confirm [i] the occasional use of the aircraft of the Company by Chairman Enrique K. Razon, Jr. and his family for his personal use or for the use of his other business, noting that Chairman Razon receives no compensation from the Company for his services as Chairman and CEO of the Company, and [ii] the value of his use of the facilities, resources and employees of the Company shall be considered as his fair 'compensation'"<br>4. "[T]he Board approved the Support Services Agreement between the Company and BRC." [BRHI only]<br><br>BRHI Minutes, BLOOM_0148489<br>SPI Minutes, BLOOM_0148635 |

157. **Dividends.** SEC rules permit dividends to be issued at the board's complete discretion.[183] In addition, Section 42 of the RCC provides that the Board has the power to declare cash dividends for as long as unrestricted retained earnings exist. According to BRC's disclosures,[184] as well as factual assumptions I have been asked to make, the

---

[183]   SEC Opinion Dated October 9, 1992 re: query of Mrs. Virginia Maghuyop.

[184]   *E.g.*, BRC Annual Report for 2020 on Form 17-A (Mar. 24, 2021), Sec. 5.3; BRC Annual Report for 2019 on Form 17-A (Mar. 4, 2020), Sec. 5.3; BRC Annual Report for 2018 on Form 17-A (Mar. 5, 2019), Sec. 5.3.

164.    Considering that conditions (a), (b), and (c) of Section 31 of the RCC were all satisfied, the benefits extended to Mr. Razon are valid and far from being voidable by the corporation. Even assuming that one of these conditions was not satisfied, these benefits are not necessarily rendered void, or prevented from being a valid corporate action.

165.    Condition (d) on approval by at least two-thirds of the entire membership of the board, with at least a majority of the independent directors voting to approve the material contract, is not applicable because BRHI and SPI are not PLCs. Condition (e) on previous authorization by the Board is not applicable because Mr. Razon is a director and not just an officer of BRHI and SPI.

## C.    BRC has complied with all requirements applicable to a PLC

166.    Bloomberry Defendants are owned by a publicly listed company (a PLC). PLCs are subject of heavy regulatory requirements imposed by laws and regulations. Such companies are mandated to comply with disclosure rules and policies of the government and with standards of quality and operations which aim to protect a PLC's dispersed shareholders and prevent fraudulent practices on the part of PLCs.[194]

167.    In addition to the requirement that the board include independent directors (discussed above), PLCs are required to have audit committees and compliance officers[195] in order to help them comply with the SRC provisions on disclosure and other reportorial requirements under the PSE Rules. Principle 3 of the Code of Corporate Governance provides that board committees should be set up to the extent possible to support the effective performance of the board's functions, particularly with respect to audit, risk management, related party transactions, and other key corporate governance concerns,

---

[194]    Philippine Stock Exchange, Inc. Consolidated Listing and Disclosure Rules, Article I, Sec. 3.

[195]    *See* Rep. Act No. 11232 (2019), Sec. 24; SEC Memo Circular No. 19-2016.

such as nomination and remuneration. The composition, functions and responsibilities of all committees established should be contained in a publicly available Committee Charter.

168.    Conglomerates which have PLCs as parent companies are bound to observe transparency by submitting, on a regular basis, disclosures, integrated annual corporate governance reports, and annual financial statements to the SEC. These statements must be prepared by SEC-accredited auditors and must undergo quality reviews through the SEC Oversight Assurance Review.[196]

---

[196]    *See* Special Rule on Financial Statements of Reporting Companies under Section 17.2 of the Securities Regulation Code, Rule 68.1.