STRICTLY CONFIDENTIAL

Fissell Decl.
Ex. 8



# Bloomberry Resorts Corporation

*(incorporated with limited liability in the Republic of the Philippines)*

### Offer of 1,179,963,700 Common Shares

### Offer Price of ₱7.50 per Share

This Offering Circular relates to the offer and sale (the "Offer") of 1,179,963,700 existing common shares (the "Offer Shares"), par value of ₱1.00 per share (the "Shares"), of Bloomberry Resorts Corporation, a corporation organized under Philippine law (the "Company"). The Offer Shares are being offered by Prime Metroline Holdings, Inc. (the "Selling Shareholder" or "Prime Metroline"). The offer price for the Offer Shares is ₱7.50 per Offer Share (the "Offer Price"). The Company will not directly receive any proceeds from the Offer or the exercise of the Over-Allotment Option (as defined below), but the Selling Shareholder has agreed to subscribe for, and the Company has agreed to issue new Shares in an amount equal to the aggregate number of Offer Shares to be sold by the Selling Shareholder in the Offer and in accordance with the Over-Allotment Option (as defined below) (the "Subscription" and such Shares, the "Subscription Shares") at a price equal to the Offer Price. See "Sale and Subscription of Shares by the Selling Shareholder."

The Offer Shares are being offered and sold by CLSA Limited and UBS AG (the "Joint Lead Managers"), to persons outside the United States in reliance on Regulation S ("Regulation S") under the United States Securities Act of 1933, as amended (the "U.S. Securities Act"), and within the United States by U.S. registered broker-dealer affiliates of the Joint Lead Managers to qualified institutional buyers ("QIBs") in reliance on Rule 144A under the U.S. Securities Act ("Rule 144A"). The Offer Shares are being offered and sold in the Philippines to qualified buyers and to not more than 19 non-qualified buyers in reliance on Sections 10.1(l) and 10.1(k) of the Securities Regulation Code of the Philippines, as amended (the "SRC").

The Offer Shares, (as defined below) are listed on The Philippine Stock Exchange, Inc. (the "PSE") under the symbol "BLOOM." On April 30, 2012, the closing price of the Shares on the PSE was ₱12.00 per Share. The Offer Price was determined by the Company, the Selling Shareholder and the Joint Lead Managers through a book building process and not by reference to the historical trading price of the Shares on the PSE. Investors should not rely on the historical market price of the Shares on the PSE as an indicator of the value of the Shares. The Offer Shares are expected to be ready for delivery in book-entry form through the Philippine Depositary & Trust Corporation (the "PDTC") against payment on or about May 7, 2012 (the "Closing Date").

**See "Risk Factors" beginning on page 20 to read about risk factors that investors should consider before making an investment decision concerning the Offer Shares.**

In connection with the Offer, the Selling Shareholder has granted CLSA Limited, in its role as stabilizing agent (the "Stabilizing Agent"), an option, exercisable in whole or in part for a period of 30 days from and including May 2, 2012, to purchase up to 10% of the total number of Offer Shares at the Offer Price, on the same terms and conditions as the Offer Shares as set forth in this Offering Circular, to cover over-allotments, if any (the "Over-Allotment Option"). See "Plan of Distribution—Over-Allotment Option."

**The Offer Shares have not been and will not be registered under the U.S. Securities Act and are being offered and sold within the United States only to QIBs in reliance on Rule 144A and to persons outside the United States in reliance on Regulation S. Prospective purchasers are hereby notified that the seller of the Offer Shares may be relying on the exemption from the provisions of Section 5 of the U.S. Securities Act provided by Rule 144A. The Offer Shares offered hereby are not transferable except in accordance with the restrictions described under "Plan of Distribution" and "Transfer Restrictions."**

*Joint Global Coordinators, Joint Bookrunners and Joint Lead Managers*

    

The date of this Offering Circular is May 1, 2012.

## PRESENTATION OF FINANCIAL INFORMATION

Unless otherwise stated, all financial information relating to the Company and each of the Company's business segments contained herein is stated in accordance with Philippine Financial Reporting Standards ("PFRS"), which differ from accounting principles generally accepted in other countries.

In this Offering Circular, references to "2011" refer to the year ended December 31, 2011. SyCip Gorres Velayo & Co. ("SGV & Co."), a member practice of Ernst & Young Global, has audited and rendered an unqualified audit report on the Company's consolidated financial statements as of February 29, 2012 and December 31, 2011 and for the two months ended February 29, 2012 and February 28, 2011 and the year ended December 31, 2011, prepared in accordance with PFRS. The December 31, 2011 consolidated financial statements were recast to take into account the consolidation of Sureste (which was acquired in February 2012) in accordance with the principles of PFRS 3, *Business Combination*.

Unless otherwise indicated, the description of the Company's business activities in this Offering Circular is presented on a consolidated basis. For further information on the Company's corporate structure, see "Business— Corporate Organization and Management Service Provider."

Figures in this Offering Circular have been subject to rounding adjustments. Accordingly, figures shown for the same item of information may vary and figures which are totals may not be an arithmetic aggregate of their components.

## INDUSTRY AND MARKET DATA

Market data used throughout this Offering Circular, including the report entitled "The Philippine Gaming Industry" prepared by The Innovation Group and appended to this Offering Circular and summarized in the section entitled "Industry", has been obtained from market research, publicly available information and industry publications. Industry publications generally state that the information that they contain has been obtained from sources believed to be reliable but that the accuracy and completeness of that information has not been independently verified and is not guaranteed. Similarly, industry forecasts and market research, while believed to be reliable, have not been independently verified, and none of the Company, the Selling Shareholder nor the Joint Lead Managers make any representation as to the accuracy of that information.

## ENFORCEMENT OF CIVIL LIABILITIES

The Company and the Selling Shareholder are each organized under the laws of the Philippines. All of the Company's and the Selling Shareholder's assets are located in the Philippines. It may be difficult for investors to effect service of process within the United States upon the Company or the Selling Shareholder with respect to claims pertaining to the Offer Shares, including claims based on the civil liability provisions of the federal securities laws of the United States. Moreover, it may be difficult for investors to enforce outside the United States judgments against the Company or the Selling Shareholder obtained in the United States in any actions pertaining to the Offer Shares, particularly with respect to actions to which the Company and the Selling Shareholder have not consented to service of process in the United States. In addition, all of the directors and a majority of the officers of the Company and the Selling Shareholder are residents of the Philippines, and a substantial portion of the assets of such persons are or may be located outside the United States. As a result, it may be difficult for investors to effect service of process upon such persons within the United States or enforce against such persons, judgments obtained in United States courts.

The Philippines is not a party to any international treaty in relation to the recognition or enforcement of foreign judgments but is a signatory to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Moreover, the Philippines enacted Republic Act No. 9285, otherwise known as the Alternative Dispute Resolution Act of 2004, to facilitate the enforcement of arbitral awards in the Philippines. The enforceability of foreign judgments in the Philippines is specifically provided for in the 1997 Rules of Civil Procedure. Section 48 of Rule 39 of the Rules of Civil Procedure provides that a judgment or final order of a tribunal of a foreign country having jurisdiction to give the judgment or final order: (a) in case of a judgment or final order upon specific property, is conclusive upon the title to that property; and (b) in case of a judgment or final order against a person, is presumptive evidence of a right between the parties and their successors in interest by a subsequent title. In either case, the judgment or final order may be repelled if there is a defect relating to jurisdiction or notice to the other party, collusion, fraud or clear mistake of law or fact. In addition, Article 17 of the Civil Code of the Philippines provides that the judgment must not be contrary to laws that have for their

There is no assurance that the Philippines, China and other countries in Asia will not experience future economic downturns. The Philippine and Asian economies may be adversely affected by various factors, including:

- decreases in business, industrial, manufacturing or financial activity in the Philippines, in Asia or globally;

- scarcity of credit or other financing, resulting in lower demand for products and services provided by companies in the Philippines or in the Asian or global markets;

- exchange rate fluctuations;

- a prolonged period of inflation or increase in interest rates;

- changes in the taxation policies and laws; and

- other regulatory, political or economic developments in or affecting the Philippines and other Asian countries. See "—Risks relating to the Philippines."

Any deterioration in economic and political conditions in the Philippines or elsewhere in Asia could materially and adversely affect the Company's business, prospects, financial condition and results of operations.

**The Company's gaming business is vulnerable to global and regional economic downturns.**

The demand for gaming activities and related services and luxury amenities is dependent on discretionary consumer spending and, as with other forms of entertainment, is susceptible to downturns in global and regional economic conditions such as the recent global financial crisis.

An economic downturn may reduce consumers' willingness to travel and reduce their spending overseas, which would adversely impact Solaire Manila as it anticipates that foreign visitors will generate a substantial portion of its revenues. Changes in discretionary consumer spending or consumer preferences could be driven by factors such as perceived or actual general economic conditions; high energy and food prices; the increased cost of travel; weak segments of the job market; perceived or actual disposable consumer income and wealth; fears of recession and changes in consumer confidence in the economy; or fears of armed conflict or future acts of terrorism. There is no guarantee that economic downturns will not occur in the future, that they will not be protracted and that governments will respond adequately to control and reverse such conditions, any of which could materially and adversely affect the Company's business, financial condition and results of operations.

**The BDO Loan Facilities contain covenants that may restrict the ability of the Company's subsidiaries to engage in certain transactions.**

The Company is partially funding construction of Solaire Manila's Phase 1 with an aggregate ₱14.6 billion in loan facilities provided by BDO to Sureste and BRHI, each of which contains certain financial covenants that restrict the respective borrower's ability to engage in certain transactions and may impair its ability to respond to changing business and economic conditions. For example, each of Sureste and BRHI are required to comply with certain financial ratios and financial covenants each quarter, such as the maintenance of specified Debt Service Coverage Ratios and Debt to Equity Ratios for the life of the BDO Loan Facilities. See "Management's Discussion and Analysis of Financial Condition and Results of Operation—Indebtedness." The ability of the Company's subsidiaries to comply with these covenants in the future may be affected by events beyond the Company's control, including prevailing economic, financial and industry conditions. As a result, the Company may not be able to comply with these covenants, including with respect to making required payments due to insufficient cash flow. The failure of any of the Company's subsidiaries to comply with any of these covenants could result in an event of default and the ability of BDO to accelerate the indebtedness, which could materially and adversely affect the Company's operating results and financial condition.

**The Company's Chairman may exert significant control over the Company and its interests may conflict with those of other stockholders.**

The Company's Chairman, Mr. Enrique K. Razon, Jr. will own approximately 80% of the Company's outstanding Shares through Prime Metroline and other affiliated companies upon completion of the Subscription

33

(assuming full exercise of the Over-Allotment Option). As a result, for the foreseeable future, through his voting control and position as Chairman of the Company's Board, Mr. Razon will exercise substantial influence over the Company's operations and business strategy, such as matters related to composition of the Board, the selection of the Company's executive officers, the amount and timing of dividends and other distributions, the overall strategic and investment decisions, the issuance of securities and adjustment to the Company's capital structure, amendments to the Company's articles of incorporation and by-laws, and other corporate actions requiring approval of stockholders, including a merger, consolidation or sale of the Company's assets, or any other change of control event that may benefit the Company's other stockholders generally. Certain of these actions are permitted to be taken without the approval of independent directors or other stockholders. Such voting control may discourage certain types of transactions, including those involving an actual or potential change of control. In the event that there is a divergence of the Company's strategic and other interests from those of Mr. Razon in the future, Mr. Razon may exercise control over the Company in ways that conflict with the interests of its other stockholders, particularly minority stockholders.

**The Company is a holding company and its ability to pay dividends is dependent upon the earnings of, and distributions by, its subsidiaries.**

The Company is a holding company incorporated under the laws of the Philippines. All of its business operations are conducted through its subsidiaries. The Company's principal assets are its direct 100% interest in Sureste and its indirect 100% beneficial interest in BRHI, which holds the Provisional License for Solaire Manila. The Company is entirely dependent upon Solaire Manila for all of its cash flow. The Company's ability to pay dividends is dependent upon the earnings of its subsidiaries and their distribution of funds to it, primarily in the form of dividends. The ability of the Company's subsidiaries to make distributions to it depends upon, among other things, their distributable earnings, their ability to service their debt obligations and compliance with covenants under their debt agreements, including the BDO Loan Facilities. As advised by the Company's Philippine legal advisors, under Philippine law, payment of dividends is permitted only out of accumulated unrestricted retained earnings, and is not subject to any tax if paid to resident corporate stockholders. Cash dividend payments to resident individual stockholders are subject to 10% tax. Non-resident stockholders are subject to varying tax rates depending on whether there are tax treaties between the Philippines and the domicile of the shareholder concerned. Other factors such as cash flow conditions, restrictions on distributions contained in the Company's subsidiaries' articles of association, restrictions contained in their debt instruments, withholding tax and other arrangements will also affect the Company's subsidiaries' ability to make distributions to the Company. These restrictions could reduce the amount of distributions that the Company receives from its subsidiaries, which in turn would restrict the Company's ability to pay dividends on the Shares.

**The Company's insurance coverage may be inadequate.**

The Company currently has construction insurance in relation to events which may affect the completion of Solaire Manila, as well as professional indemnity insurance for its directors and executive officers and workmen's compensation and personal accident and group hospitalization and surgical insurance for its employees, and the Company expects to obtain other insurance consistent with industry standards, as well as all-risk property insurance for Solaire Manila covering damage caused by a casualty loss (such as fire, natural disasters or certain acts of terrorism). However, each policy will likely have certain exclusions. The Company's property insurance coverage could also be in an amount that may be less than the expected full replacement cost of rebuilding the facilities if there were a total loss. The Company's level of insurance coverage may be inadequate to cover all possible losses if an event occurs causing loss of life, injury or significant property damage. In addition to the damage caused to the Company's properties by such a loss, the Company may suffer business disruption as a result of these events or be subject to claims by third parties who were injured or harmed. While the Company expects to carry general liability insurance and limited business interruption insurance, this insurance may not continue to be available on commercially reasonable terms and, in any event, may not be adequate to cover all losses.

**The Company may periodically be involved in legal and other proceedings.**

The Company and its operating subsidiaries Sureste and BRHI may, from time to time, be involved in disputes with various parties involved in the construction and operation of its properties, including contractual disputes with contractors, suppliers, construction workers and retailers or property damage or personal liability claims. Regardless of the outcome, these disputes may lead to legal or other proceedings and may result in substantial costs, delays in the Company's development schedule, and the diversion of resources and management's attention. In addition, litigation is often necessary to enforce intellectual property rights,

publicly called for President Arroyo's ouster. Senator Trillanes and his troops later surrendered. On November 23, 2009, in the southern island of Mindanao's Maguindanao province, approximately 100 armed men allegedly affiliated with the Ampatuan political family murdered 58 persons, including members of the Mangudadatu family (the Ampatuans' political rivals in the province), lawyers, journalists and aides accompanying them, and motorists whose vehicles were behind the Mangudadatus' vehicles. This was the bloodiest incident of political violence and of violence directed at journalists in the Philippines' recent history and President Arroyo sent hundreds of troops to and declared martial law over Maguindanao after the incident.

Most recently, on December 12, 2011, the Philippine House of Representatives initiated impeachment proceedings against Renato Corona, Chief Justice of the Supreme Court of the Philippines. The impeachment complaint accused Corona of improperly issuing decisions that favored former President Arroyo, as well as failure to disclose certain properties, in violation of rules applicable to all public employees and officials. The trial of Chief Justice Corona began in January 2012 and remains ongoing.

There is no guarantee that future events will not cause political instability in the Philippines. Such instability may disrupt the country and its economy, discourage travel to Metro Manila and could materially and adversely affect the Company's business, financial position and results of operations.

**Corporate governance and disclosure standards in the Philippines may be less stringent than those in other countries.**

There may be less publicly available information about Philippine public companies than is regularly made available by public companies in certain other countries. Philippine SEC and PSE requirements with respect to corporate governance standards may also be less stringent than those applicable in certain other jurisdictions. For example, the SRC requires publicly listed companies to have at least two independent directors or such number of independent directors as is equal to 20.0% of its board of directors, out of a total of seven directors, whichever is lower, but in no case less than two. The Company currently has two independent directors. Many other countries require significantly more independent directors. Further, rules against self-dealing and those protecting minority stockholders may be less stringent or developed in the Philippines. Such potentially lower standards in certain areas of disclosure and corporate governance may materially and adversely affect the interests of the Company's stockholders, particularly those of minority stockholders.

**Overseas stockholders may find it more difficult than Philippine stockholders to exercise their voting rights at the Company's stockholders' meetings.**

There are no provisions under Philippine law or under the Company's by-laws that will limit the exercise by foreign holders of their voting rights of the Shares. However, there are practical, geographic and logistical limitations on foreign holders' ability to receive notice of regular or special meetings of the Company's stockholders on a timely basis. All stockholders of record may attend the Company's stockholder meetings in person or by proxy. The SRC's implementing rules require the Company to send all stockholders of record notice of the annual meeting at least two weeks before the meeting unless (and this also applies to special meetings) the Company has already distributed an information statement and proxy form (in case of proxy solicitation) relating to a stockholders' meeting at least 15 business days before the stockholders' meeting. There can be no assurance that foreign stockholders will receive such notices in a timely manner or at all.

**Stockholders may be subject to limitations on minority stockholders' rights.**

The obligation under Philippine law of majority shareholders and directors with respect to minority shareholders may be more limited than those that are available in certain other countries, such as the United States or United Kingdom. Consequently, minority shareholders may not be able to protect their interests under current Philippine law to the same extent as in certain other countries.

*Batas Pambansa Bilang 68*, also known as the Corporation Code of the Philippines (the "Corporation Code"), provides for minimum minority shareholders protection in certain instances wherein a vote by the shareholders representing at least two-thirds of the Company's outstanding capital stock is required. The Corporation Code also grants shareholders an appraisal right allowing a dissenting shareholder to require the corporation to purchase his shares in certain instances. Derivative actions, while permitted under the Corporation Code and governed by the Interim Rules of Procedure Governing Intra-Corporate Controversies (A.M. No. 01-2-04-SC), are rarely brought on behalf of Philippine companies. Accordingly, there can be no

36