**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLOBAL GAMING PHILIPPINES, LLC,<br><br>    *Plaintiff*,<br><br>  v.<br><br>ENRIQUE K. RAZON, JR.;<br>BLOOMBERRY RESORTS AND HOTELS<br>INC.; SURESTE PROPERTIES, INC.<br><br>    *Defendants*. | No. 21-CV-2655 (LGS) (SN) |

**DEFENDANT ENRIQUE K. RAZON, JR.'S**
**STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF HIS**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

Enrique K. Razon, Jr. ("Razon") submits this Statement of Undisputed Material Facts pursuant to Local Rule 56.1 in support of his Motion for Summary Judgment:

**The parties.**

1.     Plaintiff Global Gaming Philippines, LLC ("GGAM") is an affiliate of Global Gaming Asset Management, LLC, whose three-member senior executive team – Bill Weidner, Brad Stone, and Gary Saunders – were involved in operating the Las Vegas Sands, the Marina Bay Sands in Singapore, and the Venetian Las Vegas. Second Amended Complaint ("SAC") (Dkt. No. 218) ¶¶ 11, 48.

2.     Defendants Bloomberry Resorts and Hotels Inc. ("BRHI") and Sureste Properties, Inc. ("SPI") (together with BRHI, "the Bloomberry Defendants") are Philippine corporations. BRHI is a wholly owned subsidiary of SPI and SPI is owned by BRHI (9.34%) and Bloomberry Resorts Corporation ("BRC") (90.66%), a publicly listed company in the Philippines. SAC ¶¶ 13-14, 76(iii); Razon's Amended Answer (Dkt. No. 253) ("Razon Answer") ¶¶ 13-14, 76(iii).

3.     The Bloomberry Defendants together operate a world-class integrated resort consisting of a hotel and casino named Solaire, and employ over 6,000 people. Lat Decl.[1] ¶ 3. The hotel and non-gaming facilities are owned and operated by SPI while the casino facilities are owned and operated by BRHI under a license from the Philippine Amusement and Gaming Corporation. *Id.* The property occupies approximately 468,445 square feet of space. *Id.* ¶ 3. For the year 2022, Solaire generated revenues of ███████████, *id.* ¶ 4, or approximately ██████████.[2]

4.     Each of the Bloomberry Defendants has a board of directors that regularly meets, votes, and adopts resolutions in compliance with Philippine law. *See, e.g.*, Fissell Decl.[3] Exs. 2, 3, 10-21

---

[1] "Lat Decl." refers to the Declaration of Arcan Lat, dated January 23, 2023, filed concurrently herewith.
[2] On January 23, 2023, we used the website, https://www.xe.com/, to convert PHP into USD.
[3] "Fissell Decl." refers to the Declaration of Rachel Penski Fissell, dated January 25, 2023, filed concurrently herewith.

(board minutes); Fissell Decl. Ex. 1 [Herbosa Report[4]] ¶¶ 123-125, 131-132, 136-137, 141-43, 153, 156. BRC's board of directors meets and operates separately from BRHI and SPI, although there is overlap between BRC's directors and BRHI's and SPI's directors. Tan Decl.[5] ¶ 4.

5.     Defendant Enrique K. Razon is a Philippine national and is the beneficial owner of Prime Strategic Holdings, Inc. (formerly known as Prime Metroline Holdings, Inc.) ("Prime"), Razon & Co. Inc. (formerly known as Falcon Investco Holdings) ("Razon & Co"), and Quasar Holdings, Inc. ("Quasar"). Fissell Decl. Ex. 4 [BRC 2021 Annual Report] at BLOOM_0037817. As of December 31, 2020, Prime held 53.80% of BRC's common stock, Razon & Co. held 2.04% of BRC's common stock, and Quasar held 8.35% of BRC's common stock. *Id*. at BLOOM_0037782.

**The Bloomberry Defendants are wholly-owned Philippine subsidiaries of a publicly traded Philippine company in good standing on the Philippine Stock Exchange.**

6.     BRC is a "publicly listed corporation," or "PLC," in the Philippines, the stock of which is traded on, and in good standing with, the Philippine Stock Exchange ("PSE"). Fissell Decl. Ex. 4 [BRC 2021 Annual Report] at BLOOM_0037765; Tan Decl. ¶ 3. PLCs must comply with Philippine disclosure rules and policies which aim to protect a PLC's dispersed shareholders and prevent fraudulent practices on the part of PLCs. Fissell Decl. Ex. 1 [Herbosa Report] ¶ 166.

7.     As a PLC, BRC regularly files reports with the Philippine Securities and Exchange Commission ("SEC"), *see, e.g.*, Fissell Decl. Ex. 4 [BRC 2021 Annual Report] at BLOOM_0037822-23, is audited annually by an affiliate of Ernst & Young, *see, e.g.*, *id*. at BLOOM_0037827-28, and, at all relevant times, has had two independent directors that met the qualifications for independence required by the Philippine Code of Corporate Governance. Tan

---

[4] "Herbosa Report" refers to the Expert Report of Teresita J. Herbosa, dated September 16, 2022.
[5] "Tan Decl." refers to the Declaration of Silverio Benny J. Tan, dated January 24, 2023, filed concurrently herewith.

Decl. ¶ 11 & Exs. A, A-1, B, B-1, C & C-1. BRC also has an Audit Committee that is composed of a majority of independent directors and monitors BRC's risk management, control, and governance processes. Fissell Decl. Ex. 4 [BRC 2021 Annual Report] at BLOOM_0037820. Since 2019, BRC also has had a Related Party Transaction Committee (which includes an independent director). Tan Decl. ¶ 8; Fissell Decl. Ex. 36 at 424:2-16.

**GGAM conducted extensive due diligence of the Bloomberry Defendants, fully understood that its counterparties were the Bloomberry Defendants and not Razon, and was aware of the risks associated with enforcing arbitral awards in the Philippines.**

8.   In March 2011, Razon met with Messrs. Weidner and Saunders in Las Vegas to discuss a potential relationship related to Solaire. SAC ¶ 50; Razon Answer ¶ 50.

9.   The terms of the parties' contractual relationship were negotiated over a six-month period in 2011. SAC ¶ 53; Razon Answer ¶ 53. During the negotiation process, GGAM was represented by both U.S. and Philippine counsel. Fissell Decl. Ex. 34 at 17:4-15.

10.   GGAM conducted "extensive diligence . . . regarding the economic and operational terms under which GGAM would manage *Solaire* and the management fees and equity interest GGAM would receive as compensation," SAC ¶ 52; Fissell Decl. Ex. 5 at 10, 66 ("in depth due diligence"), with the Bloomberry Defendants responding to document requests and diligence checklists from GGAM's agents. SAC ¶ 54; Razon Answer ¶ 54.

11.   GGAM's due diligence team included, among others, GGAM's three main principals (Bill Weidner, Brad Stone, and Gary Saunders), four outside counsel firms, Ernst & Young, and a consultant to perform a background check on Razon. Fissell Decl. Ex. 5 at 10.

12.   The due diligence process included, among other things, site visits, team interviews, and model review. Fissell Decl. Ex. 5 at 10. GGAM met with key Bloomberry personnel including two Bloomberry directors. Fissell Decl. Ex. 38 at 70:4-71:5.

13. GGAM reviewed "a variety of diligence documents with Bloomberry management." Fissell Decl. Ex. 5 at 66.

14. From these documents and meetings, among other things, GGAM was able to assess the financial condition and level of capitalization of BRHI and SPI. Fissell Decl. Ex. 34 at 19:23-20:13; *see also, e.g.*, Fissell Decl. Ex. 5 at 28-32.

15. GGAM was also aware that the corporate structure was such that, at that time, Razon was the sole shareholder of SPI, which wholly owned BRHI. Fissell Decl. Ex. 5 at 67.

16. Other than dissatisfaction with the progress of the then on-going construction of the casino, after completion of the due diligence process, GGAM was satisfied with the results of its diligence. Fissell Decl. Ex. 38 at 71:6-18.

17. When negotiating the Management Services Agreement ("MSA"), no one from GGAM believed, or was ever told, that Razon would provide a personal or corporate guarantee or otherwise be "on the hook" for the obligations of BRHI and SPI under the MSA or the Equity Option Agreement ("EOA"). Fissell Decl. Ex. 40 at 105:12-109:5; *id*. Ex. 38 at 72:9-18; *id*. Ex. 34 at 26:7-29:5.

18. GGAM never requested, nor negotiated for, a guarantee from Razon under the MSA. Fissell Decl. Ex. 40 at 121:5-8; *see generally* MSA (Dkt. 218-4).

19. Before entering into the MSA, GGAM understood, including from U.S. State Department reporting, that in the Philippines, "the performance of good companies can be impaired by political corruption, with the courts often providing limited scope for recourse." Fissell Decl. Ex. 40 at 120:4-25; Ex. 5 at 41, 43 (State Department cited as source at bottom of page).

20.  GGAM also knew Razon had significant personal wealth. Fissell Decl. Ex. 40 at 121:1-4; *id*. Ex. 5 at 4, 20.

21.  Before it entered into the MSA, GGAM had concluded that Razon was "influential in corporate and political circles in the country." Fissell Decl. Ex. 5 at 9.

22.  GGAM believed that Razon's "strong ties and relationships throughout the business and government communities in the Philippines" made him an "excellent local partner." *Id*. Ex. 5 at 20.

23.  Following "in depth due diligence," Fissell Decl. Ex. 5 at 66, GGAM and the Bloomberry Defendants executed the MSA on or about September 9, 2011. MSA (Dkt. No. 218-7) at 1.

**GGAM, Prime, and BRC enter into the EOA.**

24.  GGAM initially requested that Razon personally guarantee the Bloomberry Defendants' obligations under the EOA. Fissell Decl. Ex. 34 at 24:6-15. Razon declined to do so, *id.* Ex. 6, and GGAM dropped the request upon learning that the grantor under the EOA was "a corporate entity with substance," *i.e.* Prime. *Id*. Ex. 34 at 25:19-22.

25.  On or around April 16, 2012, Prime, BRC, and GGAM executed the EOA. Fissell Decl. Ex. 7 [EOA] at BLOOM_0082033, BLOOM_0082055. Pursuant to the EOA, GGAM was granted an option to purchase 921,184,056 shares in BRC (the "Option Shares"). *Id*. at BLOOM_0082035; BLOOM_0082039-40.

**Prior to exercising the option under the EOA, GGAM was aware, among other things, that all of Bloomberry's assets were located in the Philippines and that Razon, through his voting power, might exercise significant control over the Bloomberry Defendants.**

26.  Around the same time, BRC offered additional BRC shares to the public in a "top up" equity offering (the "Public Offering"). SAC ¶ 82; Razon Answer ¶ 82.

27. As part of the Public Offering, BRC published an Offering Circular, Fissell Decl. Ex. 8, which was reviewed by GGAM. *Id.* Ex. 37 at 109:20-110:21.

28. The introductory section of the Offering Circular disclosed:

> The Company and the Selling Shareholder are each organized under the laws of the Philippines. *All of the Company's and the Selling Shareholder's assets are located in the Philippines.* It may be difficult for investors to effect service of process within the United States upon the Company or the Selling Shareholder with respect to claims pertaining to the Offer Shares, including claims based on the civil liability provisions of the federal securities laws of the United States. Moreover, *it may be difficult for investors to enforce outside the United States judgments against the Company or the Selling Shareholder obtained in the United States in any actions pertaining to the Offer Shares, particularly with respect to actions to which the Company and the Selling Shareholder have not consented to service of process in the United States.* In addition, all of the directors and a majority of the officers of the Company and the Selling Shareholder are residents of the Philippines, and a substantial portion of the assets of such persons are or may be located outside the United States. As a result, it may be difficult for investors to effect service of process upon such persons within the United States or enforce against such persons, judgments obtained in United States courts.

Fissell Decl. Ex. 8 at iii (emphasis added).

29. In addition, the Offering Circular included as Risk Factors:

**The Company's Chairman may exert significant control over the Company and its interests may conflict with those of other stockholders.**

> The Company's Chairman, Mr. Enrique K. Razon, Jr. will own approximately 80% of the Company's outstanding Shares through Prime Metroline and other affiliated companies upon completion of the Subscription . . . . *As a result, for the foreseeable future, through his voting control and position as Chairman of the Company's Board, Mr. Razon will exercise substantial influence over the Company's operations and business strategy, such as matters related to* <u>*composition of the Board*</u>*,  the selection of the Company's executive officers, the amount and timing of dividends and other distributions, the overall strategic and investment decisions,* the issuance of securities and adjustment to the Company's capital structure, amendments to the Company's articles of incorporation and by-laws, *and other corporate actions requiring approval of stockholders*, including a merger, consolidation or sale of the Company's assets, or any other change of control event that may benefit the Company's other stockholders generally. *Certain of these actions are permitted to be taken without the approval of independent directors or other stockholders*. Such voting control may discourage certain types of transactions, including those involving an actual or potential change of control. *In the event that there is a divergence of the Company's strategic and other interests*

> *from those of Mr. Razon in the future, Mr. Razon may exercise control over the Company in ways that conflict with the interests of its other stockholders, particularly minority stockholders.*
>
> \*   \*   \*
>
> **Corporate governance and disclosure standards in the Philippines may be less stringent than those in other countries.**
>
> There may be less publicly available information about Philippine public companies than is regularly made available by public companies in certain other countries. Philippine SEC and PSE requirements with respect to corporate governance standards may also be less stringent than those applicable in certain other jurisdictions. *For example, the SRC requires publicly listed companies to have at least two independent directors or such number of independent directors as is equal to 20.0% of its board of directors, out of a total of seven directors, whichever is lower, but in no case less than two. The Company currently has two independent directors. Many other countries require significantly more independent directors.* Further, rules against self-dealing and those protecting minority stockholders may be less stringent or developed in the Philippines. Such potentially lower standards in certain areas of disclosure and corporate governance may materially and adversely affect the interests of the Company's stockholders, particularly those of minority stockholders.

Fissell Decl. Ex. 8 at 33-34, 36 (headers bolded in original; other emphasis added).

30. In December 2012, GGAM decided to exercise the equity option and purchase the Option Shares. SAC ¶ 90; Razon Answer ¶ 90.

**The Bloomberry Defendants' boards approved the decision to terminate the MSA.**

31. Solaire opened on March 16, 2013. SAC ¶ 92; Razon Answer ¶ 92.

32. [intentionally omitted]

33. At the meetings at which the Bloomberry Defendants' boards of directors authorized termination of the MSA, the directors were provided with a copy of a Notice to Terminate that BRHI and SPI had jointly sent to GGAM and that catalogued what BRHI and SPI viewed as GGAM's failures to perform. Fissell Decl. Exs. 10 & 11 [BRHI Minutes 9/12/13; SPI Minutes 9/12/13]. At the BRHI meeting, three directors (other than Razon) agreed "that the reasons raised in the Notice of Intent to Terminate are all true based on their own experience, being present on

the ground in Solaire." *Id*. Ex. 10. The board of each Bloomberry Defendant duly adopted a resolution that "the Corporation be hereby authorized to terminate the Management Services Agreement with Global Gaming Philippines LLC." *Id*. Exs. 10 & 11.

34.  These board meetings adhered to all necessary corporate formalities under Philippine law: a quorum was present, a majority of the directors voted to approve the decision, and the minutes of the meeting were recorded and maintained by the corporate secretary. Fissell Decl. Ex. 1 [Herbosa Report] ¶¶ 131-133, 136-137, 142-43, 156.

35.  The BRC board, including its two independent directors, also approved BRHI's and SPI's resolution to terminate the MSA. Tan Decl. ¶ 6.a.

36.  On September 12, 2013, the Bloomberry Defendants sent GGAM a formal Notice of Termination of the MSA. Compl. ¶ 102; Razon Answer ¶ 102.

37.  On September 13, 2013, GGAM submitted a Notice of Arbitration in accordance with Clause 19.2 of the MSA and Article 3 of the UNCITRAL Rules. SAC ¶ 103; Razon Answer ¶ 103.

38.  On October 12, 2013, the Bloomberry Defendants submitted a Response to the Notice of Arbitration pursuant to Article 4 of the UNICITRAL Rules. In the Response, the Bloomberry Defendants submitted counterclaims seeking "damages in respect of their losses and all other relief to which they are entitled in accordance with the MSA and Philippine law." Fissell Decl. Ex. 22 ¶ 7.3. They also "reserve[d] the right to claim against the 921,184,056 shares in Bloomberry Resorts Corporation that were granted under an option provided under Clause 18.3 of the MSA as part of GGAM's compensation for services that it was to render to the Respondents under the MSA." *Id*.

**The Bloomberry Defendants' boards approved the decisions to seek a voluntary trading suspension and obtain an injunction that prevents GGAM from selling the Option Shares.**

39.  In October 2013, GGAM began making plans to sell the Option Shares. Fissell Decl. Ex. 37 at 124:8-125:13.

40.  On or around January 13, 2014, the Bloomberry Defendants learned that GGAM was planning to sell the Option Shares. Fissell Decl. Ex. 35 at 167:4-8; *id*. Ex. 25 at 2-3.

41.  The Bloomberry Defendants held a joint board meeting that day. Fissell Decl. Exs. 12 & 13 [BRHI Minutes 1/13/14; SPI Minutes 1/13/14]; *id.* Ex. 39 at 58:5-60:16.

42.  At the meeting, "[a]fter a discussion of the options and the reasons for our proposed actions the Board instructed Atty [Silverio 'Benny'] Tan to seek a voluntary trading suspension of the BRC shares with the PSE. The Board also authorized the filing of suits and actions as necessary to protect the interest of the Corporation against GGAM." Fissell Decl. Ex. 12 (emphasis added). In that regard, the Boards of each entity also adopted resolutions authorizing Ms. Estella Tuason-Occeña as its authorized representative, with full and necessary authority or powers to, among other things:

> cause the filing, commencement, and/or prosecution of any action, petition, appeal, pleading and/or motion for and on behalf of the Corporation to attach and prevent the disposition of shares of stock owned by [GGAM] in [BRC] . . . and any other action to prevent the disposition of those share or its proceeds pending the resolution of the arbitration case between GGAM and [the Bloomberry Defendants] . . . .

Fissell Decl. Exs. 12 & 13 [BRHI Minutes 1/13/14; SPI Minutes 1/13/14].

43.  This joint board meeting held on January 13, 2014 adhered to all necessary corporate formalities under Philippine law: a quorum was present, a majority of the directors voted to approve the decision, and the minutes of the meeting were recorded and maintained by the corporate secretary. Fissell Decl. Ex. 1 [Herbosa Report] ¶¶ 131-133, 136-137, 142-43, 156.

44.   On January 15, 2014, GGAM entered into a Placing Agreement with Credit Suisse, Deutsche Bank ("DB"), and Cantor Fitzgerald to sell the Option Shares via a block trade that was scheduled to close on January 21, 2014 (the "Placing Agreement"). SAC ¶ 107; Interim Award[6] (Dkt. 218-3) ¶ 40.

45.   On January 15, 2014, BRC, through its corporate secretary, wrote to the PSE to request a voluntary suspension of the trading of BRC shares from January 16, 2014 to January 23, 2014. SAC ¶ 110; Razon Answer ¶ 110; Interim Award (Dkt. 218-3) ¶ 41; Tan Decl. ¶ 10.

46.   On January 16, 2014, the PSE approved BRC's request. Fissell Decl. Ex. 23; Interim Award (Dkt. 218-3) ¶ 42.

47.   On January 16, 2014, GGAM submitted a letter to the PSE requesting that the PSE lift the suspension and allow trading to continue. Fissell Decl. Ex. 24; Interim Award (Dkt. 218-3) ¶ 43.

48.   On January 17, 2014 at 8:20 am, BRHI and SPI along with Prime filed a petition in the Regional Trial Court of Makati ("RTC") seeking a writ of preliminary attachment and/or a writ of preliminary injunction to prevent the sale and/or transfer of the Option Shares. Fissell Decl. Ex. 25 at 3; Interim Award (Dkt. 218-3) ¶ 44; Tan Decl. ¶ 10.

49.   Also on January 17, 2014, the PSE reversed its decision granting the voluntary trading suspension in BRC stock and issued a directive, effective 1:40 pm that day, lifting the suspension. Fissell Decl. Ex. 26.

50.   On January 20, 2014, the RTC granted BRHI, SPI, and Prime's "application for the issuance of an immediately executory 20-day temporary order of protection" which temporarily

---

[6] "Interim Award" refers to the interim award rendered by the arbitral tribunal on December 9, 2014 (Dkt. 218-3).

restrained GGAM, DB, and the PSE from disposing or permitting the disposition of the Option Shares. Fissell Decl. Ex. 25 at 3.

51.   [intentionally omitted].

52.   On February 5, 2014, the BRC board met and ratified BRHI's and SPI's decisions to seek the voluntary suspension and file suit with the RTC seeking the writs. Tan Decl. ¶ 6.b.

53.   Ratification is permitted by Philippine law. Fissell Decl. Ex. 1 [Herbosa Report] ¶ 126.

54.   On February 25, 2014, the RTC granted BRHI's, SPI's, and Prime's application for interim measures of protection in the form of writs of preliminary attachment and preliminary injunction (the "February 2014 Order"). Fissell Decl. Ex. 25 at 10-11. Pursuant to the February 2014 Order, the RTC issued the Writs of Attachment and Preliminary Injunction on February 27, 2014 (the "Writs"). Fissell Decl. Ex. 28 at GGAM-SDNY-0188370.

55.   Thereafter, DB, as custodian, placed the Option Shares into a restricted, non-trading account where they remain today. SAC ¶ 112; Razon Answer ¶ 112; Serrano Decl.[7] ¶ 5. DB has not refused to release the Option Shares from that account "because of the opposition or at the direction of" Razon. Serrano Decl. ¶ 8. "The singular and simple reason why Deutsche Bank has been and is unable to act on GGAM's instructions to release the Shares is the Injunction" issued pursuant to the February 2014 Order. *Id.*

**Despite numerous appeals and extensive litigation in the Philippines, the Writs remain in place today.**

56.   On March 11, 2014, GGAM appealed the February 2014 Order to the Court of Appeals, Special 10th Division, Manila (the "Court of Appeals"). Fissell Decl. Ex. 28 at GGAM-SDNY-0188370.

---

[7] "Serrano Decl." refers to the Declaration of Jose Lorenzo Kristian Serrano, dated May 30, 2022, filed concurrently herewith.

57.  Before the Court of Appeals could hear that appeal, on December 9, 2014, the arbitral panel issued the Interim Award granting GGAM's request to restore the parties to the *status quo ante* as of January 15, 2014 and to permit GGAM to sell or otherwise dispose of the Shares. Interim Award (Dkt. No. 218-3) ¶ 138. The Interim Award also purported to "vacate[] and lift[]" the February 2014 Order and directed the parties to "bring this resolution" to both the Court of Appeals and the RTC "to assure its implementation." *Id*. ¶ 141.

58.  Following the Interim Award, on December 15, 2014, GGAM filed a motion before the Court of Appeals arguing that "the tenor and language of the [Interim Award] is self-executing" and that its appeal had "become moot and academic." Fissell Decl. Ex. 28 at GGAM-SDNY-0188373.

59.  In a Resolution dated May 29, 2015, the Court of Appeals agreed with GGAM that its appeal had been rendered "moot and academic" by the Interim Award, but otherwise denied GGAM's requested relief. Fissell Decl. Ex. 28 (the "May 2015 Resolution") at - GGAM-SDNY-0188374, GGAM-SDNY-0188377-78. The Court of Appeals held that the Interim Award was a foreign arbitral award that, under Rule 13 of the Special ADR Rules, required its remand "to the RTC . . . in order to conduct further proceedings for the recognition and enforcement of the [Interim Award]," noting that "[s]uch remand [was] also in accordance with the Arbitral Tribunal's directive for the parties to bring the resolution before the RTC . . . and to assure its implementation." *Id*.

60.  Following competing motions from the parties, the Court of Appeals affirmed its May 2015 Resolution in a Resolution, dated November 27, 2015 (the "November 2015 Resolution"), reiterating that the court "remain[ed] firm with [Its] May 29, 2015 Resolution remanding the case to the RTC, Branch 66 for the conduct of further proceedings for the recognition and enforcement

of the [Interim Award]." Fissell Decl. Ex. 29 at BLOOM_0101224-25, BLOOM_0101235. In so holding, the Court *rejected* GGAM's argument that the Interim Award was "an Interim Measure of Protection covered by . . . Rule 5 of the Special ADR Rules." *Id*. at BLOOM_0101225. The Court similarly rejected GGAM's request to modify the May 29, 2015 Resolution (a) to state that the February 2014 Order had "been superseded, vacated and lifted, by" the Interim Award and (b) to direct the RTC to "recall all writs of injunction and attachment it issued . . . as void and of no legal effect," *id*. at BLOOM_0101226, BLOOM_0101230-35. Specifically, the Court of Appeals held that Rule 5 of the Special ADR Rules refers "to the RTC's jurisdiction to hear and grant interim measures to protect the vested rights of the parties," and not to foreign arbitral awards, which require recognition and enforcement by the RTC. *Id*. at BLOOM_0101230.

61.   GGAM never appealed the May 2015 or November 2015 Resolutions. Tan Decl. ¶ 10.

62.   Because they were never appealed, under Philippine law, the May 2015 and November 2015 Resolutions are now final decisions that can no longer be litigated between the parties. Fissell Decl. Ex. 1 [Herbosa Report] ¶¶ 119-121; *see also id.* Ex. 31 at 3-4; *id.* Ex. 30 at GGAM-SDNY-0190216.

63.   GGAM conceded at the deposition of its corporate representative that the injunctions remain in place in the Philippines. Fissell Decl. Ex. 34 at 96:5-16.

64.   In 2017, DB filed a Motion *for Clarification and/or Set Clarificatory Hearing Ad Cautelam* with the RTC asking the Court to rule on (a) whether the February 2014 Order, injunction, attachment, and/or garnishment "remain valid," and (b) whether the Option Shares and/or dividends may be released to GGAM. Fissell Decl. Ex. 30 at GGAM-SDNY-0190211.

65.  In November 2017, after the Partial Award[8] had been issued, the RTC held that "[t]his issue boils down as to whether or not the Interim [Award] and the Partial Award are self-executing and thus, do not need recognition and enforcement by the Court. The answer is in the negative." Fissell Decl. Ex. 30 at GGAM-SDNY-0190212 (the "Nov 2017 Order"). The RTC then reviewed the November 2015 Court of Appeals' Resolution and concluded that:

> It is clear from the foregoing disquisitions by the Court of Appeals that the awards made by the Arbitral Tribunal (whether the same be the Interim Measures Order or the Partial Award) require recognition and enforcement by this Court. . . .
>
> To date, no such action for recognition and enforcement has been initiated by Respondent GGAM with this Court. *As such, the Order of this Court dated February 25, 2014 and the corollary writs of injunction and attachment subsist subject to compliance by the Petitioners with the provision of preliminary injunction and preliminary attachment bonds to answer for any such damage that Respondent may incur as a result of said writs*. A perusal of the records of this case shows that the Petitioners have valid and updated bonds as directed by this Court.
>
> This Court is duty-bound to review any awards by foreign arbitral bodies. However, it can only do so when the same is presented for recognition and enforcement in accordance with the prescribed procedure under the ADR Act and the Special ADR Rules. To short-cut the proceedings and declare as binding foreign arbitral awards without a hearing is to deprive the other party of due process.
>
> The necessity of a hearing is all the more evident in the case at bar where allegations of fraud are made by the Petitioners against Respondent GGAM and where there are claims that there are third parties to the arbitration which may be affected if the Interim Measures Order and the Partial Award were to be enforced.

*Id*. at GGAM-SDNY-0190216 (citations omitted and emphasis added).

66.  GGAM again appealed the Nov 2017 Order to the Court of Appeals, again arguing that the RTC erred in disregarding "(i) the Special ADR Rules 5.9 and 5.13, which provide that the [Interim Award] *ipso jure* revoked and superseded the February 25, 2014 Order and vacated and lifted the preliminary writs and (ii) [the May 2015 Resolution] that [the Interim Award] not only superseded the assailed [February 2014 Order] but also vacated and lifted the [Writs]." Fissell

---

[8] "Partial Award" refers to the Partial Award on Liability, dated September 20, 2016 (Dkt. 218-2).

Decl. Ex. 31 at 5. The Court of Appeals, however, rejected GGAM's appeal, holding on November 10, 2018 that the November 2017 order was not an appealable decision and that it would be "improper" for the Court to assess the merits of the appeal. *Id.* at 7-8. The Court of Appeals nevertheless did note that the February 2014 Order had been the subject of a previous appeal, with the appellate court "remanding [the] said case back to the [RTC] for the proper recognition and enforcement of the [Interim Award]." *Id.* at 7-8.

67. GGAM has never initiated recognition and enforcement of any of the Interim Award, Partial Award, or Final Award[9] in the Philippines. Fissell Decl. Ex. 34 at 95:15-18.

68. In meetings held on December 29, 2017, November 20, 2019, and March 4, 2021, following a report from outside counsel and discussion among the directors, the boards of the Bloomberry Defendants determined to oppose enforcement of the arbitral award. Fissell Decl. Exs. 14-19 [BRHI Minutes 12/29/17; SPI Minutes 12/29/17; BRHI Minutes 11/20/19; SPI Minutes 11/20/19; BRHI Minutes 3/4/21; SPI Minutes 3/4/21].

69. These board meetings adhered to all necessary corporate formalities under Philippine law: a quorum was present, a majority of the directors voted to approve the decision, and the minutes of the meeting were recorded and maintained by the corporate secretary. Fissell Decl. Ex. 1 [Herbosa Report] ¶¶ 131-133, 136-137, 142-43, 156.

70. The BRC Board has approved, confirmed, and ratified the decisions of BRHI and SPI to oppose implementation of the arbitral award and otherwise pursue the legal actions that BRHI and SPI have taken related to GGAM in board meetings held on December 5, 2017, December 13, 2019, March 4, 2021, and May 25, 2022. Tan Decl. ¶ 6.c.

---

[9] "Final Award" or "Award" refers to the arbitral tribunal's Final Award, dated September 27, 2019 (Dkt. 218-1).

**BRC's public disclosures were true.**

71. BRC's public filings with the PSE have included the following language or language substantially similar to it:

> Counsel for Respondents has advised that the arbitration award is not self-executing and must be confirmed by a court for it to be enforceable and to have the legal effect of a judgment. Thus, counsel for Respondents has advised that, as a matter of Philippine law, this Final Remedies Award of the arbitration tribunal may be enforced in the Philippines only through an order of a Philippine court of proper jurisdiction, after appropriate proceedings taking into account applicable Philippine law and public policy.
>
> BRC believes the Final Remedies Award is fundamentally flawed in numerous respects, and counsel for the Respondents is considering its options in Singapore and elsewhere with respect to the Final Award on Remedies.
>
> Relatedly, Respondents have filed a petition with Singapore courts to vacate the prior Partial Award on Liability of the arbitration tribunal because the award was procured by fraud and is in violation of public policy. This petition arose from the fraudulent concealment and misrepresentations by GGAM, which are apparent in light of the outcome of two U.S. federal investigations regarding violations of the Foreign Corrupt Practices Act involving two of GGAM's four executives during their time at Las Vegas Sands. That case is docketed as HS/OS 1432/2017, and the proceedings are on-going. If Singapore courts decide that petition in favor of Respondents, the Partial Award on Liability, which is a predicate for the Final Award on Remedies, will be vacated. At this time, Respondents are not able to predict when the Singapore courts will issue a decision.

Tan Decl. ¶ 12 & Ex. D.

72. The language in the first paragraph above is accurate: Philippine counsel for BRHI and SPI have in fact advised those companies and BRC that the arbitration award is not self-executing, that it must be confirmed by a court for it to be enforceable and to have the legal effect of a judgment, and that in the Philippines, the Final Award rendered in the arbitration may be enforced only through an order of a Philippine court of proper jurisdiction, after appropriate proceedings taking into account applicable Philippine law and public policy. Tan Decl. ¶ 13.

73. [intentionally omitted]

74.  As to the second and third paragraph in ¶ 71 above, this accurately describes BRHI's and SPI's beliefs as to the Final Award as well as their petition in the Singapore proceedings. Fissell Decl. Ex. 32.

**The Bloomberry Defendants are (i) solvent; (ii) capable of paying the Final Award today; (iii) have never commingled funds with Razon, BRC, Prime, or any other entity, and (iv) maintain separate financial records and finance staff from BRC, Prime, and Razon.**

75.  The Bloomberry Defendants are solvent, i.e. they have the ability to pay their debts as they become due. Lat Decl. ¶ 5.

76.  If the Final Award were recognized and enforced today, the Bloomberry Defendants could pay it. Lat Decl. ¶¶ 6-8.

77.  The remedies in the Final Award consist of (a) US$85,200,000 in lost management fees, (b) approximately US$15,389,276 in fees and costs, (c) the value of the Option Shares as of December 9, 2014 (or, PHP 10,169,871,978.24),[10] (d) the value of dividends paid on the Option Shares through the date of the Final Award, or PHP 193,448,652, and (e) interest at the annual rate of 6%, compounded annually, beginning 30 days after September 27, 2019. Final Award (Dkt. No. 218-1) ¶¶ 472, 507(a), (b), (c), (f), (g).

78.  GGAM estimates the total amount due, as of May 2022, to be approximately US$340 million. Fissell Decl. Ex. 35 at 211:20-24, 212:5-9. As of January 15, 2023, the Bloomberry

---

[10] Payment of this value to GGAM is conditioned upon the Option Shares being conveyed to the Bloomberry Defendants. Final Award (Dkt. 218-1) ¶¶ 507(c). Specifically, the Final Award instructed the Bloomberry Defendants to pay PHP 10,169,871,978.24 to GGAM within 30 days of the date of the Final Award and "as a condition for this payment," GGAM had to transfer its ownership interest in the Shares to the Bloomberry Defendants (the "Constructive Remedy"). *See id.* ¶ 507(c). That is, the Tribunal instructed the Bloomberry Defendants to buy the Option Shares from GGAM at a set price. If the Bloomberry Defendants did not do so within 30 days of the Final Award, GGAM would have the right to sell the Option Shares on the market, and the Bloomberry Defendants were instructed to take certain steps to assist with the sale of the Shares. *Id.* ¶ 507(c)-(d). If GGAM received in excess of PHP 10,169,871,978.24 from selling the Option Shares on the open market, then GGAM was to return any excess recovery to the Bloomberry Defendants; if GGAM received less than PHP 10,169,871,978.24 from a sale of the Option Shares, GGAM could seek to recover the delta from the Bloomberry Defendants. *Id.* ¶ 507(c). The Tribunal expressly stated that it granted the Constructive Remedy as a form of equitable, not monetary, relief. *Id.* ¶ 471.

Defendants' CFO estimated the maximum cash value of the Final Award to be approximately PHP 19.17 billion, Lat Decl. ¶ 7, or approximately US$350 million.[11]

79.  In May 2022, at the time of her deposition, BRC's CFO and the Bloomberry Defendants' Treasurer, Estella Tuason-Occeña, testified that the Bloomberry Defendants had a combined cash balance of approximately ██████████, which would be more than sufficient to pay the Final Award, including interest. Fissell Decl. Ex. 35 at 211:20-212:21, 214:7-10. BRC's Controller corroborated this testimony. *Id*. Ex. 33 at 191:25-192:8.

80.  As of December 31, 2022, BRHI and SPI's combined balance sheet is even stronger, with a cash balance of approximately ██████████, Lat Decl. ¶ 8, or approximately ████ ████.[12]

81.  None of BRC, BRHI, or SPI, has ever made a monetary transfer to Razon personally. Lat Decl. ¶ 9; Festin Decl.[13] ¶ 4.

82.  BRC has occasionally paid dividends pro rata in the ordinary course to all of its shareholders, which includes entities beneficially owned by Razon. Festin Decl. ¶ 3.

83.  BRC's issuance of dividends was approved by its board based on the availability of unrestricted retained earnings. Tan Decl. ¶ 6(f); Fissell Decl. Ex. 36 at 386:22-387:17.

84.  The only other payments or transfers that any of BRC, BRHI, or SPI has ever made to any entity beneficially owned by Razon was BRHI's payments associated with its leasing and maintenance of an airplane owned by a company in which Razon has a controlling interest (known as Eaglesight). Lat Decl. ¶ 10.

---

[11] On January 23, 2023, we used the website, https://www.xe.com/, to convert PHP into USD.
[12] On January 23, 2023, we used the website, https://www.xe.com/, to convert PHP into USD.
[13] "Festin Decl." refers to the Declaration of Gerard Angelo Emilio J. Festin, dated January 23, 2023, filed concurrently herewith.

85. These lease payments are disclosed in BRC's publicly-filed financial statements with the PSE as related-party transactions. Festin Decl. ¶ 10. Since 2019, the Related Party Transaction Committee has approved these transactions. Tan Decl. ¶ 8. In addition, every year the Audit Committee (a majority of which are independent directors) and the full BRC board approve the audited financial statements, which include a report on related party transactions. *Id*. ¶ 7.

86. The only other payment or transfer that BRC, BRHI, or SPI has made on behalf of Razon are to his counsel (and vendors retained by them) for legal fees and expenses in this action pursuant to a board-approved indemnification resolution. Lat Decl. ¶ 11; Festin Decl. ¶ 5; Tan Decl. ¶¶ 6.e., 9; Fissell Decl. Exs. 20-21 (BRHI and SPI Board minutes, dated April 27, 2021).

87. None of Razon, Prime, BRC, or any other entity has ever guaranteed a loan on behalf of BRHI or SPI. Lat Decl. ¶ 12; Festin Decl. ¶ 6.

88. BRHI and SPI have never relied on the assets or collateral of any of Razon, Prime, BRC, or any other entity when seeking or obtaining loans, or for any other type of financing arrangements. Lat Decl. ¶ 13.

89. Each of BRHI, SPI, and BRC has its own financial statements that are annually audited. Lat Decl. ¶ 14; Festin Decl. ¶ 7.

90. BRHI/SPI Chief Financial Officer Arcan Lat, along with a team of employees from BRHI/SPI, is responsible for preparing BRHI's and SPI's financial statements. Lat Decl. ¶ 15. Neither BRC employees nor Razon are involved in the preparation of BRHI's and SPI's financial statements. *Id*. Ms. Occeña has played no role in the preparation of BRHI's and SPI's financial statements since at least January 1, 2018 when Mr. Lat became Chief Financial Officer of BRHI and SPI. *Id*. ¶ 15.

91.  BRC controller Gerard Festin, with assistance from BRC employees only, separately prepares BRC's financial statements. Fissell Decl. Ex 33 at 30:4-31:24; *see also* 34:3-25. He does not receive any assistance from BRHI or SPI employees in this process (other than Mr. Lat providing him with BRHI/SPI's audited financials) and Razon has not played any role in the preparation of BRC's financial statements. Festin Decl. ¶ 8.

92.  BRC, on the one hand, and BRHI and SPI, on the other hand, maintain separate bank accounts. Lat Decl. ¶ 16; Festin Decl. ¶ 9. Razon is one of eight signatories on the BRHI and SPI bank accounts and one of four signatories on the BRC bank accounts. *Id*.

Dated:   January 25, 2023           WALFISH & FISSELL PLLC
       New York, New York

By:   */s/ Rachel Penski Fissell*
      Rachel Penski Fissell
      Daniel R. Walfish
      405 Lexington Ave 8th floor
      New York, NY 10174
      Telephone: 212-672-0521
      dwalfish@walfishfissell.com

      *Attorneys for Defendant Enrique K. Razon, Jr.*