**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLOBAL GAMING PHILIPPINES, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> ENRIQUE K. RAZON, JR.; <br> BLOOMBERRY RESORTS AND HOTELS <br> INC.; SURESTE PROPERTIES, INC. <br><br> *Defendants*. | No. 21-CV-2655 (LGS) (SN) |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANT ENRIQUE K. RAZON, JR.'S**
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

I.     RAZON IS NOT AN ALTER EGO OF THE BLOOMBERRY DEFENDANTS ............... 3

  A.  Philippine and Federal law require a conjunctive test for alter ego liability. .................... 3

  B.  Plaintiff must establish, at a minimum, that BRC and Prime are each alter egos to hold Razon liable for the Award, but Plaintiff cannot do so....................................................... 4

  C.  The Bloomberry Defendants are the antithesis of alter ego corporations.......................... 6

     1.  Alter ego law is uniformly concerned with whether the debtor corporation has been rendered judgment-proof or otherwise plundered. ..................................................... 6

     2.  It is beyond genuine dispute that there is no judgment proofing/plunder here. .......... 9

  D.  The Bloomberry Defendants observed corporate formalities. .......................................... 10

  E.  Plaintiff cannot show a separate injustice that has harmed Plaintiff. .............................. 11

  F.  Alter ego liability is also unavailable because Plaintiff investigated the Bloomberry Defendants before agreeing to the MSA........................................................................... 14

II.    THE TRESPASS CLAIM MUST BE DISMISSED ......................................................... 16

  A.  The Pre-Final Award Conduct is time barred and claim-precluded. ............................... 17

  B.  BRC's public statements did not interfere with the Option Shares. ................................ 19

  C.  The Bloomberry Defendants' renewal of the Writs is not a trespass. ............................. 19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*,
   241 F. Supp. 3d 461 (S.D.N.Y. 2017)......................................................................12

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
   126 F. Supp. 3d 388 (S.D.N.Y. 2015)....................................................................14

*Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*,
   716 Fed. App'x 23 (2d Cir. 2017)...........................................................................15

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
   122 F.3d 130 (2d Cir. 1997)...................................................................................14

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
   1996 WL 396131 (S.D.N.Y. July 16, 1996) ...........................................................13

*Badgerow v. Walters*,
   142 S. Ct. 1310 (2022).............................................................................................20

*Brunswick Corp. v. Waxman*,
   599 F.2d 34 (2d Cir. 1979).........................................................................14, 15, 16

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
   491 B.R. 335 (S.D.N.Y. 2013)...................................................................................5

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
   316 F. Supp. 3d 635 (S.D.N.Y. 2018).............................................................4, 8, 10

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
   850 F.3d 58 (2d Cir. 2017).........................................................................................4

*Ching v. San Pedro College of Bus. Administration*,
   G.R. 213197 (Phil. Oct. 21, 2015) .....................................................................12, 21

*de Borja v. Razon*,
   2019 WL 4724317 (D. Or. Aug. 16, 2019), *R&R adopted*, 2019 WL 4723070,
   (Sept. 25, 2019), *aff'd*, 835 F. App'x 184 (9th Cir. Nov. 3, 2020)..........................21

*E. Hampton Union Free Sch. Dist. v. Sandpebble Bldrs., Inc.*,
   16 N.Y.3d 775 (2011) ..............................................................................................14

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
   343 F.3d 189 (2d Cir. 2003).....................................................................................18

*Essar Steel Algoma Inc. v. Nevada Holdings, Inc.*,
    2020 WL 2539031 (S.D.N.Y. May 18, 2020) ........................................................8

*Esso Exploration and Production Nigeria Ltd. v. Nigerian Nat'l Petr. Corp.*,
    40 F.4th 56 (2d Cir. 2022) ...............................................................................21

*Fantazia Int'l Corp. v. CPL Furs New York, Inc.*,
    67 A.D.3d 511 (1st Dep't 2009) ........................................................................7

*Florasynth, Inc. v. Pickholtz*,
    750 2d 171 (2d Cir. 1984)................................................................................20

*Ford Motor Co. v. Hickey Ford Sales Inc.*,
    62 N.Y.2d 291 (1984) .....................................................................................20

*Fotochrome, Inc. v. Copal Co.*,
    517 F.2d 512 (2d Cir. 1975)............................................................................13

*Gartner v. Snyder*,
    607 F.2d 582 (2d Cir. 1979).............................................................................6

*Interocean Shipping Co. v. Nat'l Shipping & Trading Corp.*,
    523 F.2d 527 (2d Cir. 1975)..............................................................................3

*James v. Loran Realty V Corp.*,
    20 N.Y.3d 918 (2012) ......................................................................................8

*Katsoolis v. Liquid Media Grp., Ltd.*,
    2019 WL 4735364 (S.D.N.Y. Sept. 27, 2019)....................................................3

*Kiobel v. Royal Dutch Petroleum Co.*,
    621 F.3d 111 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013) ................................7, 10

*Kukan Int'l Corp. v. Reyes*,
    G.R. No. 182729 (Phil. Sept. 29, 2010)..............................................................8

*LaCourte v. JP Morgan Chase & Co.*,
    2013 WL 4830935 (S.D.N.Y. Sept. 4, 2013).......................................................3

*Lakah v. UBS AG*,
    2017 WL 7245365 (S.D.N.Y. Feb. 14, 2017).......................................................7

*Lakah v. UBS AG*,
    996 F. Supp. 2d 250 (S.D.N.Y. 2014)............................................................3, 14

*Lawlor v. Nat'l Screen Service Corp.*,
    349 U.S. 322 (1955).......................................................................................18

*Maricalum Mining Corp. v. Florentino*,
  G.R. No. 22183 (Phil. July 23, 2018) ...............................................................3, 4, 8

*McKee v. Intermediate Appellate Ct.*,
  G.R. No. L-68102 (Phil. July 16, 1992)..................................................................18

*Mobil Oil Corp. v. Linear Films, Inc.*,
  718 F. Supp. 260 (D. Del. 1989)..................................................................8, 12, 13

*Mount v. PulsePoint, Inc.*,
  2016 WL 5080131 (S.D.N.Y. Aug. 17, 2016), *aff'd*, 684 F. App'x 32 (2d Cir.
  2017) ........................................................................................................................19

*NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,
  537 F.3d 168 (2d Cir. 2008)......................................................................................12

*Next Invs, LLC v. Bank of China*,
  12 F.4th 119 (2d Cir. 2021) ...............................................................................21, 22

*Noto v. Cia Secula di Armanento*,
  310 F. Supp. 639 (S.D.N.Y. 1970)..................................................................5, 7, 10

*O'Brien v. Alexander*,
  101 F.3d 1479 (2d Cir. 1996)....................................................................................20

*Outokumpu Eng. Enter., Inc. v. Kvaerner Enviropower Inc.*,
  685 A.2d 724 (Del. Super. Ct. 1996) .......................................................................13

*Presbyterian Church of Sudan v. Talisman Energy, Inc.*,
  453 F. Supp. 2d 633 (S.D.N.Y. 2006)........................................................................5

*Shaoxing Daqin Import & Export Co. Ltd. v. Notations, Inc.*,
  2019 WL 6498397 (S.D.N.Y. Dec. 3 2019) .............................................................11

*Siegel v. N. Blvd. & 80th St. Corp.*,
  31 A.D.2d 182 (1st Dep't 1968) ...............................................................................20

*Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*,
  146 A.D.3d 1 (1st Dep't 2016) .................................................................................15

*In re Snyder*,
  939 F.3d 92 (2d Cir. 2019).......................................................................................21

*Sporn v. MCA Records*,
  58 N.Y.2d 482 (1983) ...............................................................................................17

*Sutton 58 Assocs. LLC v Pilevsky*,
  189 A.D.3d 726 (1st Dept. 2020)................................................................................8

*TradeWinds Airlines, Inc. v. Soros*,
    101 F. Supp. 3d 270 (S.D.N.Y. 2015), *aff'd*, 637 Fed. Appx. 53 (2d Cir. 2016) ...................11

*In re Tronox Inc.*,
    855 F.3d 84 (2d Cir. 2017).............................................................................................4, 5, 6

*Tycoons Worldwide Group (Thailand) Pub. Co. Ltd. v. JBL Supply Co.*,
    721 F. Supp. 2d 194 (S.D.N.Y. 2010)......................................................................................11

*Weisman v. Rosenker*,
    1985 WL 182 (S.D.N.Y. Jan. 10, 1985) ................................................................................17

*William Wrigley Jr. Co. v. Waters*,
    890 F.2d 594 (2d Cir. 1989)..............................................................................................7, 10

*WPM Int'l Trading, Inc. v. Labayen*,
    G.R. No. 182770 (Phil. Sept. 17, 2014)...................................................................................8

**Other Authorities**

CPLR § 214(3) & (4).........................................................................................................17

Fed. R. Civ. P. 44.1..............................................................................................................3

Restatement (Third) of Foreign Relations Law § 403 ..................................................22

Plaintiff wants an arbitration award against the Bloomberry Defendants[1] paid. The Bloomberry Defendants, with more than sufficient assets *in the Philippines* to pay the Award, believe that they have a basis for resisting the Award's enforcement. Instead of pursuing the ordinary remedy of recognition and enforcement of the Award against these companies in the *only* location where they have assets (the Philippines), Plaintiff asks this Court to hold Razon, the companies' Chairman and indirect majority shareholder, *personally* liable for the Award. Holding Razon liable under Plaintiff's first theory (alter ego) would make this case a history-making outlier. Its second theory (tort liability) would hold Razon responsible for the companies' exercise of legal remedies, repeatedly sustained by Philippine courts. There is no basis for personal liability here.

Alter ego liability is an extraordinary remedy. It is a *rare exception* to the general rule of corporate separateness and limited liability. Under the undisputed facts here, Plaintiff does not come close to showing an entitlement to the remedy. For starters, this Court would have to ignore not only the separate corporate existence of the two award debtors, but numerous other entities that stand between them and Razon. This is a tall order for any plaintiff, but it is an impossibility here: among the many entities that would have to be disregarded is BRC, a publicly traded, exchange-listed corporation in good standing on the PSE. We are unaware of any case that has ever found – at any stage, including summary judgment – that a shareholder was an alter ego of a listed corporation like BRC. Public corporations like BRC are subject to a panoply of rules and regulations that are intended to protect their dispersed shareholders and are flatly inconsistent with alter ego status. Plaintiff's obvious inability to set aside *BRC*'s separate corporate existence means that Razon (who is separated from BRC by yet other companies with their own separate existence) cannot possibly be held liable as the *Bloomberry Defendants'* alter ego.

---

[1] All terms not defined herein have the meaning ascribed to them in the Statement of Undisputed Material Facts in Support of Defendant Enrique K. Razon, Jr.'s Motion for Summary Judgement ("SOF").

Even beyond that hurdle, there is no such thing as alter ego liability where a defendant has not rendered judgment-proof or otherwise plundered the debtor corporation. It is beyond reasonable dispute that the Bloomberry Defendants are fully capable of paying the Award. And there is *zero* evidence that Razon has siphoned assets from the companies or otherwise impaired their financial capacity to pay the Award. The alter ego inquiry can end there. But there is more: the Bloomberry Defendants and BRC undeniably observed the corporate formalities required for Philippine corporations. Plaintiff also fails to identify a wrong that is sufficiently separate from their underlying award-enforcement claim. Plus, Plaintiff, a sophisticated commercial actor, actually investigated BRHI and SPI before contracting with them. Plaintiff specifically did *not* bargain for a personal guarantee from Razon, and yet would now have a jury or this Court judicially conjure that non-existent contract term – an inequitable result. At the end of the day, this is not an alter ego case – the theory is as far-fetched as it is unsupported – and it is time to dismiss the claim.

Finally, Plaintiff's attempt to create multiple trespass claims against Razon based on the companies' use of legal processes in the Philippines must be dismissed. Under the antiquated tort, each act of interference is treated as a separate cause of action with its own statute of limitations. The statute of limitations is long expired on most of the alleged interferences. And, as this Court has already ruled, the pre-Final Award interferences cannot result in damages due to res judicata. The challenged post-Final Award public statements (which consist of mostly subjective *and* entirely true statements) also are not trespasses; they did not interfere with a property right, much less cause harm to Plaintiff. As to the injunction restraining the Option Shares, Plaintiff's claim is essentially for wrongful attachment and/or malicious prosecution. But the injunction remains in place in the Philippines, a fact that Plaintiff is estopped from challenging, and so no such claim is available. And even if Plaintiff could ask this Court to revisit an injunction issued by a Philippine

court (and repeatedly affirmed by Philippine appellate courts), comity requires this Court to defer to the Philippine courts on the validity and propriety of their own injunction. This result would be required if the courts of Nevada or England had entered the injunction, and the result should be no different because it is a Philippine court that did so.

## ARGUMENT

## I.     RAZON IS NOT AN ALTER EGO OF THE BLOOMBERRY DEFENDANTS

### A.     Philippine and Federal law require a conjunctive test for alter ego liability.

There is no meaningful difference between Philippine, federal, or New York law on alter ego liability. All three jurisdictions require (1) total domination of a debtor corporation by a shareholder or parent corporation; (2) a fraudulent or other wrongful act that abuses the corporate form; ***and*** (3) the abuse of the corporate form *causes* harm to the plaintiff. *Maricalum Mining Corp. v. Florentino*, G.R. No. 22183 (Phil. July 23, 2018).[2] As explained in uncontroverted expert testimony of Teresita Herbosa,[3] a Philippine attorney with over 33 years of experience and the former chairwoman of the Philippine SEC (Fissell Decl. Ex. 1 ¶ 5), a conjunctive test is required for alter ego liability in the Philippines. *Id*. Ex. 1 ¶¶ 52-65. The Philippine Supreme Court unambiguously held:

> Piercing the corporate veil based on the alter ego theory ***requires the concurrence of three elements***: control of the corporation by the stockholder or parent corporation, fraud or fundamental unfairness imposed on the plaintiff, and harm or damage caused to the plaintiff by the fraudulent or unfair act of the corporation. ***The absence of any of these elements prevents piercing the corporate veil***. Again,

---

[2] As this Court previously held, New York courts apply a conjunctive test for alter ego. Dkt. 216 at 12 And the "Second Circuit's common law standard [for piercing the veil] is taken directly from New York law." *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014) (federal and New York law are the same); *see also Interocean Shipping Co. v. Nat'l Shipping & Trading Corp*., 523 F.2d 527, 539 (2d Cir. 1975) (conjunctive test for federal cases like this one). Also, "New York and Delaware veil-piercing law do not materially differ." *LaCourte v. JP Morgan Chase & Co.*, 2013 WL 4830935, at *6 n.2 (S.D.N.Y. Sept. 4, 2013). This Motion therefore cites cases decided under New York, Delaware, and Philippine law. Further, as this Court has noted, "New York law will guide the analysis where Philippine law is not readily available." Dkt. 216 at 11.

[3] The Court is permitted to rely on Ms. Herbosa's testimony pursuant to Fed. R. Civ. P. 44.1. *See Katsoolis v. Liquid Media Grp., Ltd.*, 2019 WL 4735364, at *3, n.2 (S.D.N.Y. Sept. 27, 2019) (Schofield, J.).

all these three elements must concur before the corporate veil may be pierced under the alter ego theory.

*Maricalum Mining*, G.R. No. 221813 (emphasis in original, internal citations omitted).[4]

> **B.    Plaintiff must establish, at a minimum, that BRC and Prime are each alter egos to hold Razon liable for the Award, but Plaintiff cannot do so.**

Alter ego liability is an exception to the ordinary rule that the liability of a corporation is *limited*, and it exists to hold owners responsible, in very limited circumstances, for the obligations of the business they own. It is not intended to hold managers of a business personally responsible for the conduct of their businesses. One of Plaintiff's many problems here is that Razon does not own the Bloomberry Defendants. They are, rather, subsidiaries of a publicly traded company (BRC) with hundreds if not thousands of stockholders. SOF ¶ 2. And Razon's beneficial ownership of BRC's stock is further removed still, as that stock is held by three other corporations. *Id.* ¶ 5. At each level, the corporation is legally entitled to order its affairs with its stakeholders, relying on concepts of limited liability to protect those stakeholders.

As a result, the Second Circuit and courts in this district (applying law from a variety of jurisdictions) are universally clear that recovering against an indirect stockholder of a debtor on an alter-ego theory "requires establishing a chain of liability from the original tortfeasors to [the alleged alter ego]." *See In re Tronox Inc.*, 855 F.3d 84, 106 n.27 (2d Cir. 2017) (plaintiff "would need two veil-piercings or findings of alter-ego liability—the first to get to . . . the former direct parent of [the debtor], and the second to get to . . . the non-debtor ultimate parent."). In other words, "[w]hen a plaintiff attempts to hold a parent liable for the acts of a subsidiary separated by one or

---

[4] To the extent the Court disagrees that the Philippines applies a conjunctive three-part test and finds a conflict with U.S. law, federal law would control. *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 75 (2d Cir. 2017) (theories of alter ego liability are governed by "the law of the enforcing jurisdiction."); *see also CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 646-47 (S.D.N.Y. 2018) (applying federal law to alter ego issue on remand). However, the Court does not need to resolve the choice of law issue because the law of each jurisdiction is substantially the same. *See supra* note 2.

more intermediate companies, the plaintiff must justify the piercing of the corporate veil of each separate corporation." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 633, 689 (S.D.N.Y. 2006) (granting summary judgment where plaintiff did not present evidence sufficient to ignore separate existence of the series of corporations needed to reach defendant); *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 346 (S.D.N.Y. 2013) (dismissing alter ego claims where "Plaintiffs have not pled facts that would permit the multiple corporate veils separating the Goldman Lenders, the PIA Funds, and The Goldman Sachs Group to be disregarded."); *Noto v. Cia Secula di Armanento*, 310 F. Supp. 639, 645 n.12 (S.D.N.Y. 1970) (refusing to allow alter ego plaintiff "to bypass the subsidiary corporations through which defendants owned shares").[5]

Here, Plaintiff cannot hold Razon personally liable for the debts of BRHI and SPI without disregarding *multiple* entities. *First*, Plaintiff would need to establish that BRC is somehow the alter ego of the Bloomberry Defendants. *See In re Tronox Inc.*, 855 F.3d at 106 n.27. But Plaintiff has never argued that and there is no evidence to suggest that it is. BRC, on the one hand, and BRHI and SPI, on the other hand, have separate boards of directors, separate books and records, separate teams of finance employees that draft their financial statements, and separate bank accounts. SOF ¶¶ 4, 89-92. BRHI and SPI also do not rely on BRC to obtain loans from banks. *Id*. ¶¶ 87-88. In other words, BRHI and SPI are completely financially independent from BRC. Further, there is no evidence that BRC has somehow *caused* BRHI or SPI to commit some fraud or injustice, much less one to Plaintiff – a requirement of any alter ego analysis. *See supra* § I.A.

---

[5] Philippine courts would reach the same result. In *Presbyterian Church*, the Court applied English and Dutch law when it held that the plaintiff had to pierce the corporate veils of each entity in a corporate ownership chain. 453 F. Supp. 2d 633 at 686-89. The Court reasoned that multi-level piercing is required because English and Dutch law "recognizes each company in a group of companies as a separate legal entity with separate rights and liabilities." *Id.* So too here. The principle of corporate separateness is well engrained in Philippine law. Fissell Decl. Ex. 1 ¶¶ 42-51.

*Second*, Plaintiff would need to – but cannot – establish that Prime and the other Razon-owned entities that hold shares of BRC (SOF ¶ 5) are the alter egos of BRC. *See In re Tronox Inc.*, 855 F.3d at 106 n.27. BRC is a publicly traded company, with widely dispersed shareholders, and is in good standing on the PSE. SOF ¶ 6. It complies with a host of rules and regulations governing its disclosures and operations. *Id* ¶ 7. These requirements (including independent directors, regular public reports, annual audits, and an audit committee majority-composed of the two independent directors, *id*.) are flatly incompatible with alter ego status. We have not been able to locate any case, in the U.S. or the Philippines, in which any exchange-listed company in good standing (or any subsidiary of such a company) anywhere in the world was deemed an alter ego.

*Third*, even if Plaintiff could somehow accomplish the impossible (though it has made no effort to do so) and show that BRC's corporate separateness should be disregarded, Plaintiff still would need to – and cannot – establish that Razon is the alter ego of Prime and the other entities under Razon's control that actually hold shares in BRC. *See In re Tronox Inc.*, 855 F.3d at 106 n.27. Plaintiff has taken almost no discovery of Prime, Razon & Co., and Quasar Holdings, Inc. Beyond asserting that Razon is the controlling equity owner of those entities, Plaintiff has no basis for disregarding their corporate separateness.

Because Plaintiff cannot show that the separate existence of BRC, Prime, and the other entities standing between Razon and the Bloomberry Defendants should be disregarded, Counts I-III of the Complaint, as against Razon, must be dismissed.

### C.     The Bloomberry Defendants are the antithesis of alter ego corporations.

#### 1.     Alter ego law is uniformly concerned with whether the debtor corporation has been rendered judgment-proof or otherwise plundered.

The *sine qua non* of alter ego liability is that the debtor has been rendered judgment-proof or been plundered by the alter ego defendant. *See e.g.*, *Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir.

1979) (courts "generally consider whether the corporation was adequately capitalized in determining whether to disregard the corporate form"); *Fantazia Int'l Corp. v. CPL Furs New York, Inc.*, 67 A.D.3d 511, 513 (1st Dep't 2009) (dismissing alter ego claims where "plaintiff has offered no evidence whatsoever that [subsidiary defendant] is either judgment-proof, or that it was put in that position by [parent defendant's] domination").

The necessity of judgment-proofing or plunder to a finding of alter ego liability is apparent from their discussion in nearly every alter ego case, albeit in different ways. First, the list of "complete domination" factors always includes at least several factors focused on judgment-proofing/plunder. *See, e.g.*, *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 195 (2d Cir. 2010), *aff'd*, 569 U.S. 108 (2013) (list of alter ego factors included "the intermingling of corporate and [shareholder] funds, undercapitalization of the corporation, . . . , failure to pay dividends, insolvency at the time of a transaction, siphoning off of funds by the dominant shareholder"); *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600–01 (2d Cir. 1989) (courts focus on "(1) the intermingling of corporate and personal funds; (2) undercapitalization of the corporation, . . ." as well as "failure to pay dividends, insolvency at the time of a transaction, siphoning of corporate funds by the dominant shareholder and nonfunctioning of other officers and directors") (citations omitted); *Noto*, 310 F. Supp. at 646 (granting summary judgment for alleged alter ego because, among other things, "the solvency of the subsidiaries is unquestioned"); *Lakah v. UBS AG*, 2017 WL 7245365, at *92 (S.D.N.Y. Feb. 14, 2017) ("Inadequate capitalization of a company is a classical and weighty factor supporting piercing the corporate veil"; "The tenuous economic condition of a corporation weighs in favor of veil-piercing"; "If a controlling shareholder strips the assets of a corporation so it cannot satisfy its obligations to its creditors, sufficient grounds exist to pierce the corporate veil.").

Second, under the second prong of the alter ego test – whether there was a wrongful act or "injustice" (or abuse of the corporate form) that harmed the plaintiff – courts almost universally find that the wrongfulness *is* the rendering of the corporation judgment-proof. *See, e.g.*, *James v. Loran Realty V Corp.*, 20 N.Y.3d 918, 919 (2012) (Plaintiffs did not meet burden "inasmuch as they failed to produce evidence that the individual defendants took steps to render the corporate defendant insolvent in order to avoid plaintiffs' claim for damages or otherwise defraud plaintiffs"); *accord Sutton 58 Assocs. LLC v Pilevsky*, 189 A.D.3d 726, 730 (1st Dept. 2020); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 269 (D. Del. 1989) (summarizing cases and noting that courts typically find wrongfulness where a corporation's assets are stripped "in anticipation of impending legal liability" or a corporation is manipulated "so as to thwart plaintiff's recovery of its judgment"). Similarly, courts in this District routinely zero in on "[a]llegations of undercapitalization and siphoning of funds" in assessing "the 'injustice or unfairness' element." *Essar Steel Algoma Inc. v. Nevada Holdings, Inc.*, 2020 WL 2539031, at *4 (S.D.N.Y. May 18, 2020) (collecting cases); *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 650 (S.D.N.Y. 2018) (defendants "attempt[ed] to make [debtor] judgment proof to evade [debtor's] obligations under the Contracts"; collecting cases).[6] Consistent with these pronouncements, we have been unable to locate any case sustaining alter ego claims at the summary judgment stage where the debtor entity was capable of satisfying the underlying liability, or the alleged alter ego had not plundered the debtor corporation in some way.

---

[6] Philippine law is more direct in arriving at the same result: alter ego liability is simply unavailable where, as here, the plaintiff has not even attempted to collect from the debtor. *See, e.g.*, *Maricalum Mining*, *supra* (denying alter ego liability where "***complainants have not yet even suffered any monetary injury. They have yet to enforce their claims against [the debtor].*** It is apparent that complainants are merely anxious that their monetary awards will not be satisfied.") (emphasis in original); *Kukan Int'l Corp. v. Reyes*, G.R. No. 182729 (Phil. Sept. 29, 2010) (declining to pierce veil where "no serious attempt was made to levy on the properties of [the debtor corporation]"); *see also WPM Int'l Trading, Inc. v. Labayen*, G.R. No. 182770 (Phil. Sept. 17, 2014) (declining to pierce veil where there was no evidence that the debtor entity had "attempted to avoid liability or had no property against which to proceed" and "there was no proof that the [debtor] company had insufficient funds"); Fissell Decl. Ex. 1 ¶¶ 101-110.

**2. It is beyond genuine dispute that there is no judgment proofing/plunder here**.

The Bloomberry Defendants run a world-class hotel and casino in Manila, generated revenues last year of over ███████, and employ over 6,000 people. SOF ¶ 3. They are solvent and well-capitalized. *Id*.¶ 75. If the Award were recognized and enforced today, the Bloomberry Defendants would be fully capable of paying it. *Id*. ¶¶ 77-80. Further, the Bloomberry Defendants are not in any way dependent upon Razon, Prime, or BRC for their existence as going concerns. *Id*. ¶¶ 87-88.

There is also no siphoning or commingling of funds. The Bloomberry Defendants have not made any payouts (let alone improper ones) to BRC, Prime, or Razon, save dividends approved by the BRC board in the ordinary course and paid pro rata to all shareholders. *Id.* ¶¶ 81-86. The Bloomberry Defendants and BRC have never made a monetary transfer to Razon. *Id.* ¶ 81. BRHI makes payments to companies affiliated with Razon for the lease and maintenance of an aircraft used to ferry guests to the Solaire casino. *Id.* ¶ 84. These payments are disclosed as related party transactions in BRC's financial statements, which are approved by BRC's Audit Committee and the full board (and since 2019 have been also approved by the Related Party Transactions Committee). *Id.* ¶ 85. BRHI and SPI are also covering Razon's litigation costs in this matter pursuant to board resolutions authorizing such payments. *Id.* ¶ 86. Setting aside the express board authorizations for all these payments, none of these payments, alone or together, has in any way (or could in any way) impact the Bloomberry Defendants' ability to operate as going concerns.

The Bloomberry Defendants' separate financial existence is further demonstrated by their maintenance of separate financial statements from even their parent corporation BRC. SOF ¶ 89. As noted above, separate personnel prepare BRHI's and SPI's financial statements, on the one

hand, and BRC's on the other, and on top of that, each of BRHI, SPI, and BRC is separately audited on an annual basis by an Ernst & Young affiliate. *Id*. ¶¶ 89-91.

### D.     The Bloomberry Defendants observed corporate formalities.

Beyond judgment-proofing and plunder, the other factor that courts universally evaluate in alter ego cases is the observance of corporate formalities. *See, e.g.*, *Kiobel*, 621 F.3d at 195 ("failure to observe corporate formalities such as the maintenance of separate books and records"); *William Wrigley Jr.*, 890 F.2d at 600–01 ("failure to maintain separate books and records or other formal legal requirements for the corporation"); *Noto*, 310 F. Supp. at 646 (granting summary judgment for defendant where, among other things, "the outward indicia of the corporate form have been carefully maintained"). "[W]hen determining whether a foreign corporation has observed the proper corporate formalities, courts apply the law of the country of incorporation." *CBF Indústria de Gusa*, 316 F. Supp. 3d at 648 (citation omitted).

The board minutes, financial records, public filings with the SEC, and Ms. Herbosa's testimony leave no genuine dispute about observance of corporate formalities. SOF ¶¶ 41-43, 52-53, 68-70, 89-92. The companies complied not just in *general*; they complied with respect to each of the *specific* decisions that Plaintiff challenges here as a supposed "wrongful" act. The Bloomberry Defendants' boards duly approved each of these decisions, and observed all required formalities in doing so. *Id*. ¶¶ 32-35 (termination of MSA), 41-43 (trading suspension and application for the writs), 68-69 (decision to resist enforcement of the arbitral awards). And BRC's board – including its two independent directors – approved, confirmed, and ratified all decisions of the BRHI and SPI boards relating to the dispute with GGAM. *Id*. ¶¶ 35, 52-53, 70.

In sum, (i) the complete *absence* of any evidence that the Bloomberry Defendants have been placed in an economically tenuous position or that Razon has treated those entities as his personal

piggy bank, *plus* (ii) the *presence* of abundant evidence of the Bloomberry Defendants' robust financial health, separate financial existence from BRC (let alone Prime or Razon), and observance of corporate formalities means that no reasonable factfinder could conclude that Razon is somehow the alter ego of the Bloomberry Defendants. *See TradeWinds Airlines, Inc. v. Soros*, 101 F. Supp. 3d 270, 281-83 (S.D.N.Y. 2015), *aff'd*, 637 Fed. Appx. 53 (2d Cir. 2016) (granting summary judgment where there was no evidence of commingling and siphoning of funds to alleged alter egos, even though the debtor was undercapitalized and consistent board minutes were lacking); *see also Shaoxing Daqin Import & Export Co. Ltd. v. Notations, Inc.*, 2019 WL 6498397, at *7 (S.D.N.Y. Dec. 3 2019) (summary judgment granted: "minor evidence of a lack of formalities, undercapitalization in one year, and some intermingling of personal and corporate funds is not enough evidence to allow a reasonable jury to find that [alleged alter ego] exercised complete domination over [the debtor]"); *Tycoons Worldwide Group (Thailand) Pub. Co. Ltd. v. JBL Supply Co.*, 721 F. Supp. 2d 194, 206-07 (S.D.N.Y. 2010) (granting summary judgment in absence of evidence "that [the owner] and [debtor] intermingled personal and corporate funds, or that [the owner] siphoned off corporate funds for his own purposes, failed to maintain adequate books and records for the corporation, or otherwise used the corporation to further personal rather than corporate ends").

### E.   Plaintiff cannot show a separate injustice that has harmed Plaintiff.

As reviewed above, for alter ego liability under Philippine or U.S. law, a plaintiff must show an abuse of the corporate form (*i.e.,* a fraud or injustice that relates to the corporate form itself) used to harm the plaintiff, which universally translates to some form of judgment-proofing and/or plunder – and that is not present here. *See* §§ I.A., I.C, *supra*. But even wrongly assuming that a corporation's separate existence *could* be disregarded without judgment-proofing/plunder, none of

Plaintiff's' alleged injustices – (1) the breach of the MSA; (2) the trading suspension; (3) obtaining the Writs; (4) the noncompliance with the Award; and (5) the maintenance of the Writs by renewing the bonds, *see, e.g.*, Dkt. 218 [Second Amended Complaint ("SAC")] ¶ 205(d) – satisfies the requirement of a "wrongful" act for purposes of alter ego liability.

As an initial matter, none is sufficiently separate from the underlying award-enforcement claim. The alter ego test requires a plaintiff to identify "an injustice separate and apart from the causes of action" that is the subject of the lawsuit. *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 241 F. Supp. 3d 461, 476 (S.D.N.Y. 2017); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 183 (2d Cir. 2008) ("[T]he claimed injustice must consist of more than merely the tort or breach of contract that is the basis of the plaintiff's lawsuit."). "To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *Mobil Oil*, 718 F. Supp. at 268 ("[a]ny breach of contract and any tort . . . is in some sense an injustice. Obviously this type of 'injustice' is not what is contemplated by the common law rule that piercing the corporate veil is appropriate only upon a showing of fraud or something like fraud."). Here, all of Plaintiff's complained-of wrongs, at least before the Final Award was issued, culminated in and were incorporated into and subsumed by the Final Award. These acts cannot now suddenly spring back to life as a *separate* wrong or injustice to hold Razon personally liable for the Final Award.[7]

---

[7] Plaintiff, which made a determination not to sue Razon in the arbitration, is also barred under Philippine principles of res judicata from claiming that any actions from before the Final Award (granted pursuant to Philippine law) can form the basis of an alter ego claim here. *See, e.g.*, *Ching v. San Pedro College of Bus. Administration*, G.R. 213197 (Phil. Oct. 21, 2015) (The "concept of conclusiveness of judgement . . . finds application when a fact or question has been squarely put in issue, judicially passed upon, and adjudged in a former suit by a court of competent jurisdiction. The fact or question settled by final judgment or order binds the parties to that action (and persons in privity with them or their successors-in-interest), and continues to bind them while the judgment or order remains standing and unreversed by proper authority on a timely motion or petition. *The conclusively settled fact or question furthermore cannot again be litigated in any future or other action between the same parties or their privies and successors-in-interest, . . . either for the same or for a different cause of action*.").

As to the post-Final Award conduct, the Bloomberry Defendants have elected not to voluntarily comply with the Award. But a foreign arbitral award, unlike a court judgment, is not "self-executing," *Fotochrome, Inc. v. Copal Co.*, 517 F.2d 512, 519 (2d Cir. 1975) – as Plaintiff knew when it agreed to the arbitration clause in the MSA. Plaintiff does not explain how or why it would be inappropriate to assert legal defenses to arbitral enforcement that are specifically provided for in the New York Convention (to which the Philippines is party). Moreover, it is indisputably in the Bloomberry Defendants' interest to assert these lawful defenses: it may prevent them from incurring an over $300 million liability. Given that the decision to assert these lawful defenses actually *benefits* the corporations, BRC, and BRC's shareholders, there is no conceivable way in which the corporate form has been *abused*.

The reality is that Plaintiff is seeking to hold Razon personally liable as a short-cut around enforcing the Final Award against the Bloomberry Defendants in the Philippines. But having to enforce the Final Award against solvent award debtors in the Philippines (which, if successful, would also cause the Writs to be lifted) "is not the kind of injustice—if, indeed, it is an injustice at all—which warrants piercing the corporate veil." *Mobil Oil*, 718 F. Supp. at 270 (citing *Luckett v. Bethlehem Steel Corp.*, 618 F.2d 1373, 1379 (10th Cir. 1980)); *Outokumpu Eng. Enter., Inc. v. Kvaerner Enviropower Inc.*, 685 A.2d 724, 729 (Del. Super. Ct. 1996) ("The 'injustice' must be more than . . . the burden of bringing the action in another forum.").

Indeed, the Second Circuit has made this perfectly clear. In *American Fuel Corp. v. Utah Energy Development Co.*, the district court held that "an unfair avoidance of arbitration is a cognizable wrong that can justify piercing the corporate veil." 1996 WL 396131, at *6 (S.D.N.Y. July 16, 1996). The Circuit reversed: "We fail to see how" pursuing a lawsuit instead of an arbitration "constitutes the kind of fraudulent or wrongful conduct that calls for piercing the

corporate veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 135 (2d Cir. 1997); *see also Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 126 F. Supp. 3d 388, 412-13 (S.D.N.Y. 2015) (decision to pursue unsuccessful lawsuit and other legal actions that "may well have been weak on the merits" and "ended unfavorably" for the companies was not "deceptive or intentionally unjust corporate conduct"). Thus, the Bloomberry Defendants' decisions to resist enforcement of the Award and maintain the Writs, which have been repeatedly upheld by the Philippine courts in multiple litigations that GGAM actively pursued (SOF ¶¶ 58-66), is not the type of wrong or injustice that calls for alter ego liability.

Further, as the New York Court of Appeals has pointed out, to satisfy the "wrongfulness" prong, a plaintiff "must do more than merely allege that the individual [shareholder] engaged in improper acts or acted in 'bad faith' while representing the corporation." *E. Hampton Union Free Sch. Dist. v. Sandpebble Bldrs., Inc.*, 16 N.Y.3d 775, 776 (2011). Here, even wrongly assuming that Razon dominated and controlled the Bloomberry Defendants *and* caused them to take a series of "bad faith" or improper acts, GGAM still has not shown some *additional*, much less *separate and independent*, abuse of the corporate form. *See id*. at 776.

### F. Alter ego liability is also unavailable because Plaintiff investigated the Bloomberry Defendants before agreeing to the MSA.

Given that alter ego liability is deployed specifically (and only) to remedy a fraud or other injustice, courts carefully consider a plaintiff's sophistication, along with its knowledge and understanding of who its contractual counterparty really was (and was not). "[C]ourts are especially reluctant to find sufficient evidence of wrongdoing where the party seeking to pierce the veil had the opportunity to investigate the financial records and structure of the relevant corporation ahead of time." *Lakah*, 996 F. Supp. 2d at 268 (discussing *Brunswick Corp. v. Waxman*, 599 F.2d 34 (2d Cir. 1979)).

Courts therefore conclude that it would not accomplish "justice or equity" to impose alter ego liability where, following due diligence, a sophisticated plaintiff knowingly fails to bind the alter ego defendant as a contract counterparty or guarantor to the underlying transaction. *See, e.g.*, *Brunswick*, 599 F.2d at 36 (sophisticated plaintiff had an opportunity to conduct diligence and was aware that its contractual counterparty was created specifically to avoid the liability that plaintiff was seeking; plaintiff "obtained precisely what it bargained for, and it did not bargain for or contemplate the individual liability . . . which it now seeks to enforce."); *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 716 Fed. App'x 23, 29 (2d Cir. 2017) (sophisticated plaintiff's "full knowledge of [its counterparty's supposed "dummy"] status" confirmed correctness of district court's conclusion that veil piercing was not warranted); *Skanska USA Bldg. Inc. v. Atl. Yards B2 Owner, LLC*, 146 A.D.3d 1, 12-13 (1st Dep't 2016) (dismissing veil piercing claim where sophisticated "[p]laintiff could have negotiated for such [contractual] rights. Having failed to do so, plaintiff cannot now claim that it was tricked . . . and thus should be allowed to assert" alter ego theories of liability). As Magistrate Judge Netburn noted in this case, *Brunswick* and its progeny look askance at attempts to "tak[e] the extraordinary veil-piercing step when 'the party seeking to pierce the veil had the opportunity to investigate the financial records and structure of the relevant corporation ahead of time.'" Dkt. 157 at 4 (quoting *Lakah*, 996 F. Supp. 2d at 268).

Here, it is undisputed that Plaintiff is highly sophisticated (SOF ¶ 1) and was fully aware that its counterparties were the Bloomberry Defendants, not Razon. *Id*. ¶¶ 10-23. Plaintiff admits that before entering into the contracts at issue here, Plaintiff and its team of four outside counsel firms conducted "extensive diligence." *Id*. ¶¶ 10-16. Through its review of documents and meetings with Bloomberry management, Plaintiff was able to assess the financial condition and level of capitalization of BRHI and SPI, and examine the enterprise – which at that time was structured

with Razon at the top. *Id*. GGAM also was aware that Razon supposedly had influence within the Philippines – even believing that this was an asset in a potential partner. *Id*. ¶¶ 19-22. Despite all of this, Plaintiff contracted only with BRHI and SPI, not Razon, and elected to agree to a deal without any provision for Razon to be personally liable for the debts and obligations of BRHI and SPI. *Id*. ¶¶ 17-18. In fact, GGAM initially requested that Razon personally guarantee obligations under the EOA, but Razon declined to do so, and Plaintiff quickly dropped the request upon learning that the grantor under the EOA was "a corporate entity with substance." *Id*. ¶¶ 24-25.[8]

The Court should follow *Brunswick* and put an end to Plaintiff's efforts to rewrite the heavily negotiated MSA to inequitably obtain a benefit that Plaintiff knowingly failed to bargain for.

## II.      THE TRESPASS CLAIM MUST BE DISMISSED

In this Court's recent description, "[t]he basis of the trespass claim is Razon's alleged interference with Plaintiff's exercise of its ownership rights in the Option Shares, including [1] his leveraging of personal relationships to halt trading of all BRC shares on the Philippine Stock Exchange, [2] his misuse of Philippine court proceedings to enjoin the sale of the shares, [3] his causing the Debtor Defendants to deny permission to [DB] to release the Option Shares, and [4] his public statements and [5] renewal of the writs of attachment following the issuance of the Final Award." Dkt. 322 ("Op.") at 15. The actions in [1]-[3] (the "Pre-Final Award Conduct"), are addressed in Section A. below, the public statements in Section B., and the renewal of the Writs in Section C.

---

[8] Further, before exercising the option to purchase the Option Shares, GGAM reviewed an Offering Circular that disclosed to prospective investors in BRC (including GGAM) that, among other things, (1) all of BRC's and Prime's assets were located in the Philippines; (2) Razon would "exercise substantial influence over the Company's operations and business strategy" including the composition of the board and its executive officers; and (3) Philippine corporate governance standards could be less stringent than in other jurisdictions. SOF ¶¶ 26-30. Aware of these risks, GGAM chose to purchase shares in BRC.

**A.       The Pre-Final Award Conduct is time barred and claim-precluded.**

The very nature of a continuing trespass like the one alleged here is that *each act of interference* gives rise to its *own* "successive cause[] of action." *Sporn v. MCA Records*, 58 N.Y.2d 482, 487-88 (1983). This feature of trespass triggers both time bars and res judicata bars. It was only by grouping multiple trespass causes of action under the rubric of a single count in its complaint that Plaintiff avoided these bars. If Plaintiff had pled one count for trespass based on the Pre-Final Award Conduct, and another for other acts, the former would have been dismissed.

For statute of limitations purposes, each distinct act of trespass must be analyzed separately, as each interference is subject to its *own* three-year bar under CPLR § 214(3) & (4). *Sporn*, 58 N.Y.2d at 487-88 (with a "continuing trespass," relief is allowed only "for interferences occurring within three years of the commencement of the action."); *Weisman v. Rosenker*, 1985 WL 182, at *2 (S.D.N.Y. Jan. 10, 1985) ("A new claim accrues each day the rightful possessor's use and enjoyment of the chattel is impaired[.]"). This action was filed on March 29, 2021, and so any conduct prior to March 29, 2018 (which includes all of the Pre-Final Award Conduct) is clearly time-barred. The voluntary suspension and filing for the Writs both occurred in January 2014. SOF ¶¶ 45-51. The supposed direction to DB not to release the Option Shares occurred in 2016 and 2017, if at all. *See* Dkt. 218-1 ¶¶ 382-386. The trespass claim accordingly must be dismissed as time-barred to that extent it arises from the alleged "interferences" arising from this Pre-Final Award Conduct. *See Sporn*, 58 N.Y.2d at 487-88.

In addition, this Court recognized that the Pre-Final Award Conduct alleged in support of the trespass claim was "incorporated" into the Final Award and cannot be a basis for recovery in trespass. Dkt. 322 (Op.) at 6, 10; *see also* Dkt. 218-1 [Final Award] ¶¶ 379-86. Although the Court appeared to sustain the entirety of the trespass claim, the Court held that Plaintiff is not permitted

to recover from Razon any damages that are "represented by the Final Award." Dkt. 322 (Op.) at 10.[9] Given this holding, the Court should dismiss the claim insofar as it arises from such conduct. *See Lawlor v. Nat'l Screen Service Corp.*, 349 U.S. 322, 327-328 (1955) (a prior judgment precludes "claims arising prior to its entry").

There are other problems with the Pre-Final Award Conduct that independently require dismissal. Plaintiff cannot show that the trading suspension caused any harm to it. The suspension was lifted, at *Plaintiff's* request, less than a day after it was imposed and four days *before* the block sale was to take place. SOF ¶¶ 44, 47, 49. And then, *before* the scheduled sale date and *after* the suspension was lifted, the injunction was granted, preventing the sale. *Id*. ¶ 50. In other words, the injunction would have prevented the sale with or without the trading suspension. That judicial restraint remains in place to this day. It is black-letter law that an independent intervening event breaks the chain of causation and destroys proximate cause for purposes of tort law. *E.g.*, *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *McKee v. Intermediate Appellate Ct.*, G.R. No. L-68102 (Phil. July 16, 1992).

With respect to the supposed direction to DB not to release the Option Shares, the record is clear that DB has not been "refusing to release the [Option] Shares to GGAM because of the opposition or at the direction of [Razon]." SOF ¶ 55. Rather, the "singular reason" why DB cannot release the Option Shares "is the Injunction" issued by the Philippine Court. *Id*. Thus, allegedly denying permission to DB (even if it were not time-barred and claim-precluded) would collapse into the renewal of the attachment/injunction analysis.

---

[9] We understand that statement to refer to the damages and remedies awarded in the Final Award (whether or not the Award is ever enforced against Razon personally as an alleged alter ego). To the extent that we have not correctly understood the Court's ruling, we respectfully request an opportunity to move for appropriate relief, including to preclude damages for Pre-Final Award Conduct.

In sum, the Court at a minimum should enter a partial summary judgment dismissing the trespass claim to the extent that it rests on the Pre-Final Award Conduct.

### B.    BRC's public statements did not interfere with the Option Shares.

BRC's public statements are easily dispensed with. Plaintiff's complaint is that BRC, in public filings after the Final Award,[10] has supposedly "contest[ed] the binding conclusions of the arbitral tribunal and misrepresent[ed] that the arbitral tribunal's awards are enforceable only in the Philippine courts." SAC ¶ 250. At the time that each of these statements was made, the Option Shares were sitting unharmed in DB's restricted trading account. SOF ¶ 55. It is impossible to see how any sort of a public statement could have *interfered* with the Option Shares, much less caused Plaintiff harm in any way. *See Mount v. PulsePoint, Inc.*, 2016 WL 5080131, at *9 (S.D.N.Y. Aug. 17, 2016), *aff'd*, 684 F. App'x 32 (2d Cir. 2017), as amended (May 3, 2017) (trespass plaintiff must show "a *resulting harm* to 'the possessor's materially valuable interest in the physical condition, quality, or value of the chattel'" or that it was deprived of its use). The public *statements* neither harmed the condition, quality, or value of the chattel nor deprived Plaintiff of their use.

What's more, Plaintiff cannot show that any of the public statements (the actual contents of which are inaccurately characterized in the SAC) was even false or misleading. The statements boil down to BRC's statements about its legal position, legal advice received, and subjective beliefs regarding the arbitration process, all of which were completely true. SOF ¶¶ 71-72, 74. The "public statements" component of the claim must be dismissed.

### C.    The Bloomberry Defendants' renewal of the Writs is not a trespass.

Plaintiff's theory that renewing the Writs in seeming disregard of the Final Award is a trespass also fails to state a claim. First, it is nothing more or less than a complaint about non-

---

[10] Any pre-Final Award statements are also not actionable for the reasons noted in Section A above.

compliance with an arbitral award. Not complying with an arbitral award – even one with an injunctive-style remedy – is not trespass, it is not a tort at all, and the remedy for it is to *judicially enforce the award*. As both the U.S. Supreme Court and the Second Circuit have explained, an unconfirmed arbitral award is "a *contract* right," *Florasynth, Inc. v. Pickholtz*, 750 2d 171, 176 (2d Cir. 1984); *see also Badgerow v. Walters*, 142 S. Ct. 1310, 1316-17 (2022) (unenforced award "is no more than a contractual resolution of the parties' dispute"). Unsurprisingly, we have been unable to locate any case in which (i) an arbitral award was treated as "chattels" for purposes of trespass to chattels, or (ii) arbitral non-compliance was deemed to be a trespass or any other tort. And this makes sense: if an arbitral award were a "chattel" that could be trespassed upon, or if mere non-compliance with an arbitral award were tortious, then every arbitral enforcement action would include pendent trespass or other tort claims arising from the non-compliance.

At the end of the day, what Plaintiff really complains of is wrongful attachment or malicious prosecution. *See Ford Motor Co. v. Hickey Ford Sales Inc.*, 62 N.Y.2d 291, 303-04 (1984). But it is black-letter law that such a claim cannot lie unless the attachment has been set aside (*e.g.*, *Siegel v. N. Blvd. & 80th St. Corp.*, 31 A.D.2d 182, 184 (1st Dep't 1968) (even if an attachment is voidable, it "will, nevertheless, protect the attachment plaintiff, acting under it, *until it is set aside*," at which point the attachment plaintiff becomes a trespasser) (emphasis added)), or (among other prerequisites not present here) the prosecution has "terminated in favor of the" plaintiff, *O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996).[11] Here the Writs have not been lifted, nor have the proceedings in the RTC terminated in GGAM's favor. SOF ¶¶ 58-66.

---

[11] This argument is even stronger under Philippine law (which controls here to whatever extent there is a conflict with New York law, *see* Dkt. 235 at 5-8; Dkt. 279 at 8-9). No Philippine court would award tort damages for wrongful attachment based on Writs that have been repeatedly sustained by its own judicial system. Dkt. 233 ¶¶ 12-18; Dkt. 278 ¶ 11.

Next, it is important to remember that Plaintiff's theory that renewing the Writs is tortious presumes that the arbitrators themselves *vacated the Writs*. *See* Dkt. 322 (Op.) at 3 ("[T]he arbitral panel issued an order, binding on [BRHI and SPI], vacating and superseding the writs"); *see also* SAC ¶ 253 (calling it a "fiction" that the Writs "remain in place and [are] valid"). But in discovery Plaintiff admitted that the Writs in fact are in place. SOF ¶ 63. More critically, the arbitral panel's power to vacate the Writs has been extensively litigated in the Philippines – at GGAM's initiative. SOF ¶¶ 56-66. And the *Philippine courts* have repeatedly rejected the proposition that the arbitrators had the power to, or did, vacate the Writs. *Id*. These decisions are now final. *Id* ¶ 62; Fissell Decl. Ex. 1 ¶¶ 114-22. Having litigated and lost this precise issue in the Philippines, Plaintiff is now estopped from arguing a contrary position here.[12]

In reality, Plaintiff asks this Court to do what the Philippine courts have repeatedly refused to do: override Philippine-imposed judicial restraints. Even if Plaintiff were not collaterally estopped from making this request, Plaintiff may not ask this Court to second-guess the Philippine courts as to the propriety of the Writs. The doctrine of international comity – "'the recognition which one nation allows within its territory to legislative, executive ***or judicial*** acts of another nation," *Next Invs, LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021) (emphasis added) – requires this Court to defer to the judgment of the Philippine courts. *See Esso Exploration and Production Nigeria Ltd. v. Nigerian Nat'l Petr. Corp.*, 40 F.4th 56, 63 (2d Cir. 2022).

Plaintiff's theory here is that the Writs are illegitimate and that Razon, through Bloomberry, has transformed the Philippine courts into the tortious instruments of his will. But Philippine courts have not shown any bias in favor of Razon and have been repeatedly viewed by U.S. courts as fully capable of administering justice. *See, e.g., de Borja v. Razon*, 2019 WL 4724317, at *6 (D.

---

[12] *See, e.g.*, *In re Snyder*, 939 F.3d 92, 100 (2d Cir. 2019) (reviewing the requirements for issue preclusion, all satisfied here); *Ching v. San Pedro College of Business Administration*, G.R. 213197 (Phil. Oct. 21, 2015) (same).

Or. Aug. 16, 2019), *R&R adopted*, 2019 WL 4723070, at *1 (Sept. 25, 2019), *aff'd*, 835 F. App'x 184 (9th Cir. Nov. 3, 2020). Further, the factors for a comity analysis, drawn from Restatement (Third) of Foreign Relations Law § 403 (*see, e.g.*, *Next*, 768 F.3d at 139 & n.20), overwhelmingly point towards dismissal of the trespass claim insofar as it relies upon the renewal of the Writs. For example, all activity took place in the Philippines, the Philippines has the primary interest in regulating the activity, the character of the activity – use of Philippine judicial processes – quintessentially implicates Philippine sovereign interests and has no importance to the U.S., the parties had no expectation that U.S. courts would intervene in a dispute over Philippine judicial restraints, and it would create a conflict with Philippine court decisions which have, to this day, maintained the Writs.

In sum, the trespass claim should be dismissed in its entirety.

Dated:   January 25, 2023          WALFISH & FISSELL PLLC
         New York, New York

                         By:   */s/ Rachel Penski Fissell*
                               Rachel Penski Fissell
                               Daniel R. Walfish
                               405 Lexington Ave 8th floor
                               New York, NY 10174
                               Telephone: 212-672-0523
                               rfissell@walfishfissell.com

                               *Attorneys for Defendant Enrique K. Razon, Jr.*