Respondent Bloomberry Resorts and Hotels Inc. ("Bloomberry") and Respondent Sureste Properties, Inc. ("Sureste," together with Bloomberry, "Bloomberry" or "Respondents") respectfully submit this Sur-Rejoinder on Damages and Other Remedies (the "Sur-Rejoinder") in response to the Supplemental Submission on Matters Reserved for the Remedies Phase filed by Claimant Global Gaming Philippines LLC ("GGAM Philippines" or "GGAM")) and Claimant GGAM Netherlands B.V. ("GGAM Netherlands," and together with GGAM Philippines, "Claimants").[1]

### I.  INTRODUCTION

1. Much has transpired since Claimants first put forward their request for damages in June 2015 and the Tribunal subsequently bifurcated these proceedings. Bloomberry alerts the Tribunal to five critical developments which should inform the Tribunal's consideration of questions of liability and remedies in this Arbitration:

   a.  <u>First</u>, at the Liability Hearing, Mr. Weidner testified about his cryptic "strategies" for Solaire, which he "would never put" in writing[2] and never informed Mr. Razon or anyone else at Bloomberry about in any detail.[3] He explained that Eric Chiu, GGAM's President for Asia and Mr. Weidner's "right hand man,"[4] would be instrumental in executing GGAM's specific strategies."[5]

   i.  With respect to his first strategy of a "government-led, top-down junket approach," Mr. Weidner testified that Dr. Chen Xiang, a government official in the China Liaison Office with whom he and Mr. Chiu had a close relationship,[6] was critical to influencing junket operators on GGAM's behalf and for GGAM's benefit.[7]

---

[1]  As Bloomberry has previously noted and will discuss in further detail below, Bloomberry believes that GGAM Philippines' attempted assignment of the MSA to GGAM Netherlands, a shell entity, was improper under the MSA. *See, e.g.*, Bloomberry's Rejoinder Memorial, September 4, 2015, at n. 459; *id*. at n. 1. For ease of reference, however, Bloomberry uses from time to time the collective term "Claimants."

[2]  *See* October 19, 2015 Hr'g Tr. at 215:18-22 (Weidner).

[3]  *See id*. at 217:13-25 (Weidner).

[4]  *See id*. at 279:13-17 (Weidner); *id*. at 280:13-14 (Weidner).

[5]  *See id*. at 147:16-25 (Weidner).

[6]  *See, e.g.*, *id*. at 279:25-11 (Weidner).

[7]  *See, e.g.*, *id*. at 180:18-184:5 (Weidner); *id*. at 277:12-280:14 (Weidner).

GGAM-SDNY-0140013

      ii.    With respect to his second strategy of a "cross-border trading platform," Mr. Weidner testified that in order to facilitate this strategy, he brought to Solaire's grand opening in March 2013 several Chinese state-owned entities, including China International Travel Service (CITS) and Chu Kong Shipping.[8] Mr. Weidner insisted that he did not want to just set up "beards"[9] that would trade commodities and move cash from the Chinese mainland by manipulation and/or misrepresentation of commodity trade settlements.[10]

      iii.    When Bloomberry expressed concerns about these "strategies" and tried to explore them further, Bloomberry was accused of raising "red herrings" without "direct concrete evidence."[11]

b.    <u>Second</u>, the U.S. Securities and Exchange Commission ("<u>U.S. SEC</u>") found that Messrs. Weidner and Eric Chiu willfully violated the U.S. Foreign Corrupt Practices Act (the "<u>FCPA</u>"), while they were employed by Las Vegas Sands Corp. ("<u>LVS</u>") immediately prior to the formation of GGAM.[12]

c.    <u>Third</u>, the U.S. Department of Justice ("<u>U.S. DOJ</u>") similarly found that Messrs. Weidner and Eric Chiu willfully violated the U.S. Foreign Corrupt Practices Act (the "<u>FCPA</u>"), while they were employed by Las Vegas Sands Corp. ("<u>LVS</u>") immediately prior to the formation of GGAM.[13] Read together with the U.S. SEC Order and informed by evidence in this Arbitration and publicly available information, the FCPA Orders demonstrate Mr. Weidner's two "strategies" for delivering VIPs and junkets to Solaire involved the same types of wrongful conduct with many of the very same individuals and entities with whom the U.S. DOJ and SEC found Messrs. Weidner and Chiu to have violated the FCPA while at LVS.

d.    <u>Fourth</u>, Claimants' current lead Arbitration counsel has confirmed that GGAM's counsel has not in this Arbitration searched for and produced documentary evidence from Eric Chiu, Weidner Resorts, personal email accounts of the three senior executives of GGAM, and GGAM's "Co-Chairman" Howard Lutnick— which Bloomberry contends to have violated the Tribunal's orders and GGAM's obligations as a party to an international arbitration.

---

[8]    October 19, 2015 Hr'g Tr. at 269:24-270:3 (Weidner).

[9]    *See id.* at 292:2-6 (Weidner).

[10]    *See id.* at 291:17-292:2 (Weidner).

[11]    *See id.* at 6:12-14 (Profaizer); October 24, 2015 Hr'g Tr. at 29:4-14 (Patrizia); *id.* at 2:10-15 (Patrizia); *id.* at 3:8-15 (Patrizia); *id.* at 25:22-26:3 (Patrizia).

[12]    The FCPA violations are detailed in the SEC's April 7, 2016 Order Instituting Cease-and-Desist Proceedings against LVS (RE-374) (the "<u>U.S. SEC Order</u>").

[13]    The FCPA violations are detailed in the DOJ's January 17, 2017 Non-Prosecution Agreement with LVS (RE-371) (the "<u>U.S. DOJ NPA</u>" together with the U.S. DOJ NPA, the "<u>FCPA Orders</u>").

3

    e.    <u>Fifth</u>, Bloomberry has learned that Claimant GGAM Netherlands—the Claimant to which the MSA's Post-Opening Services were assigned and which is claiming approximately US$ 363 million in "grossed-up" Management Fees—is a sham entity, or a "beard," established for no other purpose than to evade GGAM's obligations.

2.    In light of the serious misconduct on the part of Claimants that these five developments reveal, Bloomberry has made an application for reconsideration (the "<u>Request for Reconsideration</u>") of the Partial Award on Liability (the "<u>Partial Award</u>"). That application should be given full consideration before the Tribunal turns to Claimants' requests for exorbitant monetary damages and extraordinary other types of relief. Nonetheless, Bloomberry will address in this Sur-Rejoinder Claimants' requests, which are based on flawed valuation methodologies and punitive damages theories and must, under Philippine law, be denied.

## II.    EXECUTIVE SUMMARY

### A.    <u>Neither Claimant is Entitled to An Award of Damages</u>

3.    It is Bloomberry's position that no damages should be awarded to either Claimant. Claimant GGAM Philippines is not entitled any damages because Bloomberry's termination was justified in light of the FCPA Orders and what can now be understood about GGAM's misconduct during its tenure as the management services provider of Solaire and during these proceedings. Claimant GGAM Netherlands is not entitled to any damages because, as a sham entity with no employees, no revenue, and essentially no capitalization, it was incapable of performing the MSA's Post-Opening Services which it had been assigned. Therefore, GGAM Netherlands is not entitled to any post-termination Management Fees,[14] let alone to a "gross-up" of such fees to avoid paying Philippines taxes.

### B.    <u>Claimant GGAM Netherlands' Calculation of Management Fees is Divorced from the Parties' Expectations, Market Realities, and Actual Casino Operations</u>

4.    If the Tribunal chooses to overlook GGAM's use of "beards" to evade its contractual and tax obligations, Claimant GGAM Netherlands' request for more than US$ 260 million in

---

[14]    Only Claimant GGAM Netherlands has put forward a request for Management Fees. *See* Claimants' Letter to Tribunal, October 6, 2016 at 2 (RE-378) ("Pursuant to the Assignment and Assumption Agreement, GGAM Netherlands is the entity entitled to damages resulting from Respondents' breach of the MSA for unpaid Pre-Termination Management Fees and Post-Termination Management Fees, as well as unpaid Post-Opening Reimbursable Expenses.").

GGAM-SDNY-0140015

could not have), Claimants would only be entitled to damages in the range of U.S. $35 million to U.S. $47.4 million.

24. The below charts show Claimants' pre-tax lost management fees at various cutoff dates: August 15, 2012, the date on which Mr. Weidner lied to Bloomberry about his involvement in the transactions being investigated by U.S. authorities;[21] April 7, 2016, the release date of the U.S. SEC Order finding Messrs. Weidner and Chiu to have violated the FCPA while at LVS;[22] January 17, 2017, the release date of the U.S. DOJ NPA finding Messrs. Weidner and Chiu to have violated the FCPA while at LVS;[23] March 16, 2018, the date on which GGAM would not have been permitted to renew the MSA;[24] and March 16, 2023, ten years from the date on which Solaire opened:[25]

Table 2-5: Claimants' pre-tax lost management fees today up to various cut-off dates

| USDm | Preferred calculation basis | Alternative calculation basis |
|---|---|---|
| August 15, 2012 | 0.0 | 0.0 |
| April 7, 2016 | 15.8 | 17.9 |
| January 17, 2017 | 19.8 | 23.6 |
| March 16, 2018 (5-year contract period) | 23.5 | 29.3 |
| March 16, 2023 (10-year contract period) | 35.0 | 47.4 |

Source: Table 5-13; Table 5:15.

### D. Pursuant to Philippine Law, the Tribunal Should Equitably Reduce Any Award of Damages to Claimants

25. Philippine equitable principles prevent unjust enrichment and manifest injustice. Here, equity necessitates that the Tribunal substantially reduce any award of damages to Claimants on a number of grounds:

---

[21] See Bloomberry's Request for Reconsideration of the Partial Award on Liability ("Request for Reconsideration"), August 31, 2017, at ¶ 42.

[22] See Bloomberry's Request for Reconsideration at ¶ 1, n. 1.

[23] See Bloomberry's Request for Reconsideration at ¶ 1, n. 1.

[24] See infra ¶ 161.

[25] See Expert Report of James Searby ("Searby Report"), August 31, 2017, ¶¶ 2.40, 5.51, 5.54.

11

are doing here, it is imperative that the basis of the alleged unearned profits is not speculative and conjectural but shows the actual damages which may be suffered in a future period.[187] Here, Claimants' extraordinary demand for more than U.S. $260 million in management fees is based on speculation and conjecture and should be denied.

### 1. *Claimants' Assumption that the MSA Would Be Renewed for a 5-year Term Had the MSA Not Been Terminated Is Not Only Speculative, It Is Highly Unlikely in Light of Their Wrongful Conduct and Repeated Acts of Deception*

105.  Claimants contend that because GGAM had a unilateral renewal right to extend the five-year initial term of the MSA for a second-five year term, it was a essentially a foregone conclusion that they would have exercised that right, and thus their damages should be assessed for a 10-year management term.[188] This position is to be expected, given that under Claimants' interpretation of the MSA, once the Management Team was in place at Solaire, GGAM's executives did not actually have to do anything because anything the Management Team did would be attributed to GGAM.[189] Further, Claimants' witnesses have testified that they would have manipulated the budget to ensure that performance standards were met and the MSA would be renewed.[190]

106.  This position is contrary to law and is not supported by the facts established in this Arbitration. Under Philippine law, as Justice Vitug has previously explained,[191] it cannot be

---

[187] *Nat'l Power Corp. v. Philipp Bros. Oceanic, Inc.*, G.R. No. 126204 (Phil. November 20, 2001) (RL-138); *see also Lufthansa German Airline v. Court of Appeals*, G.R. No. 108997 (Phil. April 21, 1995) (RL-139) (rejecting claim for damages on lost profits as claim was speculative because the realization of profits was not a certainty but dependent on a number of factors).

[188] *See* Claimants' Supplemental Submission, May 15, 2017, at ¶¶ 44-50.

[189] *See, e.g.*, Partial Award on Liability, September 20, 2016, at ¶ 190 ("The Claimants submit that '*the Tribunal must assess its performance under the MSA in light of the Management Team (taken with the GGMA management principals' advice and under their direction).*'") (emphasis in original); *id.* at ¶ 193 ("The Tribunal finds that what the Management Team did under Mr. French is to be attributed to GGAM for purposes of performing its obligations under Clauses 2.2, 2.5 and 2.10 of the MSA, read together with Annexes A and H to the MSA.").

[190] Rein Decl., May 15, 2017, at ¶ 17(b).

[191] Third Supplemental Opinion of Justice Jose C. Vitug, December 15, 2015, ¶ 29 ("[U]nless and until the five year period has elapsed, and, in accordance with the MSA, GGAM gives notice to BRHI and SPI that it wishes to continue the performance of the services under the MSA for another five years, BRHI and SPI cannot be held accountable for the additional five year term. To consider it, as if GGAM would have exercised its right to continue the MSA, would appear to be speculative."); *see also* Vitug Fourth Supp. Op. at ¶ 35.

48

inferred that a party would have exercised an option to renew a contract.[192] Therefore, Claimants' self-serving statement that they had fully expected to renew the MSA for another five-year period at the time the Parties executed the MSA is not sufficient under Philippine law.[193] Claimants seemingly anchor their statement that they fully expected that they will exercise the option to renew the MSA for another five years on the current *profitability* and *performance* of Solaire.[194] It follows that if Solaire turned out to be an unprofitable venture, then Claimants would not have any incentive to renew the MSA. Thus, this argument only underscores that Claimants, prior to termination of the MSA, had not really decided yet whether they would renew the MSA for another term at the end of the original period.

107. Claimants and their experts fail to consider the real possibility that GGAM would be terminated prior to renewing the MSA, or that GGAM would decide not to exercise their right to renew the MSA in light of the prospect of termination. Numerous potential events, *i.e.,* change of control in the company, bankruptcy proceedings, change in the terms and conditions of the PAGCOR license, etc., make the MSA's renewal speculative.[195]

108. Moreover, at least one such event has come to fruition. During the Liability Hearing, it was revealed through cross-examination that Mr. Stone had previously fired Mr. French for his role in rigging a drawing[196]—an act for which Mr. Weidner would subsequently sign an agreement on behalf of LVS to pay a $1 million penalty.[197] Not only did GGAM and Mr. French

---

[192] *See, e.g., Dioquino vs. Intermediate Appellate Court,* G.R. Nos. 68580-81, (Phil. November 7, 1989) (RL-69) ("[a] lessor's covenant or agreement to renew gives a privilege to the tenant, but is nevertheless an executory contract, and until the tenant has exercised the executory contract, and until the tenant has exercised the privilege by way of some affirmative act, he cannot be held for the additional term."); *see also Estate of Llenado vs. Llenado,* G.R. No. 145736 (Phil. March 4, 2009) (RL-143) (holding that it cannot be inferred that the lessees, who were given the option to renew the lease contract, would have exercised such option where there was never any *positive act* on the part of said lessees, *before or after* the termination of the original period, showing their exercise of such option).

[193] Under Philippine law, self-serving statements are not a sufficient basis for an award of actual damages. *See* Vitug Fourth Supp. Op. at ¶ 36; *see also Oceaneering Contractors (Phils), Inc. v. Barretto,* G.R. No. 184215 (Phil. February 9, 2011) (RL-79); *PNOC Shipping and Transport Corporation v. Court of Appeals,* G.R. No. 107518 (Phil. October 8, 1998) (RL-81).

[194] *See* Claimants' Supplemental Submission, May 15, 2017, at ¶¶ 47-50.

[195] *See* Respondents' Rejoinder Memorial on Damages and Other Remedies, December 15, 2015, at ¶ 72.

[196] *See* October 18, 2014 Hr'g Tr. at 115:7-24 (French); Partial Award on Liability, September 20, 2016, at ¶ 243; *see also* "Venetian settles complaint over rigging of contest, Las Vegas Sun, February 25, 2004 (RA-191).

[197] *See* Settlement Stipulation between State Gaming Control Board and LVS, dba Venetian Casino Resort, February 25, 2004 (RE-344) (Mr. Weidner's signature is on page 6); *see also* Complaint by the State Gaming

GGAM-SDNY-0140060

fail to disclose this material fact to Bloomberry, but Mr. French failed to disclose this material fact on his Gaming Employment License ("GEL") application to PAGCOR.[198] This is sufficient basis to revoke his license in the Philippines,[199] particularly in light of the recently-discovered additional instances of GGAM's misconduct.

109. Further, following the Liability Hearing and the issuance of the Partial Award, U.S. federal authorities found that two of GGAM's four executives, Messrs. Weidner and Chiu, had willfully violated the FCPA while working for LVS just prior to forming GGAM.[200] This finding exposed Mr. Weidner's lies and concealments to Bloomberry with respect to his and Mr. Chiu's involvement in the conduct being investigated by U.S. federal authorities.[201] It also revealed that while GGAM was managing Solaire, they were continuing to engage in the same types of wrongful conduct with the same Chinese individuals and entities that were also being investigated by U.S. federal authorities.[202]

110. In light of these recently-discovered facts, it is certain that had Bloomberry not terminated GGAM in September 2013, either Bloomberry would have terminated GGAM after the release of these findings by U.S. federal authorities,[203] or GGAM would have resigned or agreed not to renew the MSA to save face. Indeed, the former President and Chief Operating Officer of PAGCOR from 2014 to January 2016 has opined that the findings of U.S. federal authorities with respect to Weidner and Chiu's conduct, combined with Mr. Weidner's repeated

---

Control Board against LVS, dba Venetian Casino Resort, February 25, 2004 (RE-369); "Venetian settles complaint over rigging of contest," Las Vegas Sun, February 25, 2004 (RA-191).

[198] *See, e.g.*, October 18, 2015 Hr'g Tr. at 152:2-155:14 (French); *see also* Partial Award on Liability, September 20, 2017, at ¶ 243.

[199] Declaration of Jorge V. Sarmiento, August 28, 2017, at ¶ 11 ("The violation of FCPA of the nature set forth by the U.S. authorities by William Weidner and Eric Chiu who are senior officers of GGAM, and GGAM's hiring Michael French as President and Chief Operating Officer of Solaire, a person whom they have previously fired for rigging a drawing, and Mr. French's failure to disclose this in his GEL application are, to my mind, reasons enough for PAGCOR to disqualify GGAM from being involved in gaming in the Philippines.").

[200] *See* Bloomberry's Request for Reconsideration of the Partial Award on Liability, August 31, 2017, at ¶ 15, *et seq.*

[201] *See id.* at ¶ 39 *et seq.*

[202] *See id.* at 67 *et seq.*

[203] *See id.*

GGAM-SDNY-0140061

deceptions to Bloomberry, are reasons enough to disqualify GGAM from being involved in gaming in the Philippines.[204]

111.    In addition to the above, given the crackdown in China that began ramping up in 2013 and continues to this day, it is likely that any continued implementation of Mr. Weidner's "strategies" for Solaire could have embroiled GGAM in further criminal investigations by U.S., Chinese or Philippine authorities.[205]  Once again, such further investigations would likely have resulted in either Bloomberry terminating GGAM, or GGAM resigning or agreeing not to renew the MSA to save face.

112.    Thus, in direct contrast to Claimants' self-serving contention, it is much more likely that they would not have been permitted to renew the MSA for a second 5-year term.  It thus goes beyond speculation for Claimants' experts to calculate damages on the unchecked assumption that GGAM would have earned 10-years of management fees, and not to even consider the possibility that GGAM would have earned only 5-years of management fees, had they not been terminated by Bloomberry in September 2013.

### 2. *Claimants' Projected Management Fees Are Based on Highly Speculative Counterfactuals about GGAM's Contributions to EBITDA*

113.    Remarkably, Claimants contend that Mr. Oaten's calculation of EBITDA, which supports Claimants' outrageous demand for over U.S. $260 million in management fees, "inevitably understates the EBITDA, particularly from Foreign VIP EBITDA, that Solaire would have achieved under GGAM's leadership (as well as the Management Fee that GGAM would have earned) had GGAM still managed the property."[206]  Indeed Claimants, without grounding in reality, suggest that had GGAM continued managing Solaire, they "reasonably could have earned" an additional $35 million in undiscounted management fees.[207]  Claimants' EBITDA projections, particularly their Foreign VIP EBITDA projections, are highly speculative in that they are based on counterfactuals about GGAM's performance had they continued managing

---

[204]    *See* Declaration of Jorge V. Sarmiento, August 28, 2017, at ¶ 11.

[205]    *See* Spectrum Report at ¶¶ 50, 56, 63, 127.

[206]    Claimants' Supplemental Submission, May 15, 2017, at ¶ 100.

[207]    *Id.*

51

GGAM-SDNY-0140062

are considered an "exemplary" or "corrective" damages under Philippine law,[569] which can only be awarded, in cases involving breach of contract, if the defendant acted in a "wanton, fraudulent, reckless, oppressive, or malevolent manner."[570] Awarding punitive damages outside of these circumstances would be, at the very least, questionable as a matter of Philippine public policy. There is simply nothing in GGAM's papers to suggest that punitive damages would be appropriate, as a matter of parties' agreement or law, to the case at hand. Indeed, as Justice Vitug explains, it has no basis in Philippine law.[571]

268. Simply put, the pattern of greed-driven, dishonest behavior displayed by GGAM and its executives, from the early days of its fraudulently induced-contractual relationship with Bloomberry to its impermissible and unjustifiable withholding of responsive documents in this Arbitration, finds yet another outlet in GGAM's outlandish constructive remedy request. GGAM uses legal concepts that apply only in the most severe of circumstances – i.e., securing a court order through malice, exercising wrongful dominion and control over someone else's property, acting malevolently in breaching a contract – to conjure up its inflated damages request for alleged "improvidently granted" court orders. Bloomberry urges the Tribunal to recognize GGAM's request for what it is: an attempt at judicial extortion against Bloomberry. There is little doubt that the Philippine courts would.

## IX. REQUEST FOR RELIEF

269. Respondents respectfully request that the Tribunal award the following remedies:

    (i)    If the Tribunal annuls the Management Services Agreement (the "MSA"), including the equity option granted therein, due to GGAM's causal fraud; or, in the alternative, finds that Respondents rightfully ended the MSA due to GGAM's material breach of its obligations thereunder:

        a.    Deny Claimant GGAM Netherland's request for monetary damages for Management Fees;

---

[569] See Philippine Civil Code, art. 2229 (RL-1).

[570] See Philippine Civil Code, art. 2232 (RL-1)

[571] See Vitug Fourth Supp. Op. at ¶ 108. Notably, Justice Puno fails to opine on the question of punitive remedy under Philippine law. Instead, Claimants cite Singapore cases where the Singapore High Court has upheld arbitral awards ordering injunctive or declaratory relief – not punitive relief – under circumstances at odds with the circumstances of the present dispute. See Claimants' Supplemental Submission at ¶ 294-95.

GGAM-SDNY-0140144

    b.  Deny Claimant GGAM Netherland's request for a "gross-up" of damages to account for Philippine withholding tax;

    c.  Deny Claimant GGAM Philippines' request for monetary damages for Pre-Termination Fees;

    d.  Deny Claimant GGAM Philippines' request for monetary damages related to the Shares;

    e.  Grant Respondents monetary damages for all pre-opening and post- opening management fees and reimbursable expenses previously paid by Respondents to GGAM and further as the Tribunal deems fit; and

    f.  Order GGAM to transfer the 921, 184,056 shares in Bloomberry Resorts Corporation (the "Shares") to Respondents on behalf of Prime Metroline;

    g.  Order GGAM to direct its stockbroker, Deutsche Bank, to return the dividend paid in May 2015 by Bloomberry Resorts Corporation to Bloomberry Resorts Corporation.

(ii)  If the Tribunal does not revisit the Partial Award on Liability and maintains its finding that the MSA was wrongfully terminated:

    a.  Deny Claimant GGAM Netherlands' request for monetary damages for Management Fees and a "gross-up" of damages because GGAM Netherlands is a sham entity.

    b.  Award Claimant GGAM Philippines monetary damages for Management Fees in an amount no greater than one of the following:

        i.  US$ 15.8 million to account for the April 7, 2016 release of the U.S. Securities and Exchange Commission's finding that William P. Weidner and Eric Chiu violated the Foreign Corrupt Practices Act;

        ii.  US$ 19.8 million to account for the January 17, 2017 release of the U.S. Department of Justice's finding that William P. Weidner and Eric Chiu violated the Foreign Corrupt Practices Act;

        iii.  US$ 23.5 million to account for the end of the five-year term of MSA.

        iv.  US$ 35 million to account for the end of a second, optional five-year term of the MSA.

    c.  Award Claimant GGAM Philippines US$ 148,750 plus interest in unpaid Pre-Opening and Development Fees;

    d.  Deny Claimant GGAM Philippines a "gross-up" of damages to account for Philippine withholding tax;

GGAM-SDNY-0140145