```
 1   UNITED STATES DISTRICT COURT
 2   SOUTHERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - - x
                                         :
 4   GLOBAL GAMING PHILIPPINES, LLC,     :
                                         :
 5        Plaintiff,                     :
                                         :
 6        v.                             : Case No.
                                         : 21 Cv. 2655
 7   ENRIQUE K. RAZON, JR.;              : (LGS)(SN)
     BLOOMBERRY RESORTS AND HOTELS INC.; :
 8   SURESTE PROPERTIES INC.;            :
                                         :
 9        Defendants.                    :
                                         :
10   - - - - - - - - - - - - - - - - - - x
11            REMOTE VIDEOTAPED DEPOSITION OF
                     GARRY W. SAUNDERS
12                   April 22, 2022
13        REMOTE VIDEOTAPED DEPOSITION OF GARRY W.
     SAUNDERS, produced as a witness at the instance of
14   the Defendants, and duly sworn remotely, was taken
     in the above-styled and numbered cause on April 22,
15   2022, from 9:05 a.m., (PST) to 12:58 p.m., (PST),
     remotely before Dawn K. Larson, RDR, CRR, reported
16   by machine shorthand, pursuant to the Rule 30 of the
     Federal Rules of Civil Procedure and the provisions
17   stated on the record.
```

---

Perry Decl. Ex. 63

Page 44:

```
 1        A.   I knew she worked in the financial area of
 2   ICTSI, the port company.
 3        Q.   And did you have any understanding of
 4   Mr. Alarilla or Mr. Almeda's role?
 5        A.   I don't recall knowing much specifically
 6   other than the fact that he would have had them to
 7   participate.
 8        Q.   And what were the -- after you left Manila
 9   and came back, what were the next steps in the
10   negotiation?
11        A.   The next meeting that was held after that,
12   I burst an eardrum on the plane flight back. So on
13   the follow-up trip, I still couldn't travel. So the
14   next time there was a trip, it was between -- it was
15   with Brad and John.
16        Q.   And you recall when in time that was,
17   relative to the first trip?
18        A.   No, I don't.
19        Q.   So two meetings in Manila to negotiate.
20             Any additional in-person, face-to-face
21   negotiations that you recall before the MSA was
22   signed?
23        A.   I can't recall. There could have been a
24   third meeting, but I can't recall.
25        Q.   Okay. You recall any meetings in the
```

---

Page: 45

```
 1   United States between GGAM personnel and the Solaire
 2   side to negotiate the MSA?
 3        A.   There were -- over the course of time,
 4   there were phone calls, and I can't remember how
 5   many, but there was a -- it was a reasonably long
 6   period, I think, to finalize the contract.
 7        Q.   Right.
 8        A.   And so there was a lot of ongoing activity
 9   with John and Brad probably taking the stronger lead
10   on our side.
11        Q.   Okay. So on your side, the primary
12   negotiators were John -- and he was based in New
13   York; right?
14        A.   Correct.
15        Q.   And Mr. Stone. He was based in Las Vegas;
16   right?
17        A.   Yes.
18        Q.   Okay. And who were the primary
19   negotiators on the other side in this, the
20   subsequent negotiations, to your recollection?
21             MR. PASCUCCI: Objection. Asked and
22   answered.
23        A.   I would say that the people that were more
24   visible were Estella and Benny, Benny Tan.
25
```

---

Page: 46

```
 1             BY MR. PERRY:
 2        Q.   There was a -- you recall that there was a
 3   signing ceremony in Manila?
 4        A.   Yes.
 5        Q.   Did you attend the signing ceremony?
 6        A.   Yes.
 7        Q.   Was it at the Shangri-La Hotel?
 8        A.   I don't recall which hotel.
 9        Q.   Who else, on the GGAM side, to your
10   recollection, attended the signing ceremony?
11        A.   I think Brad did, but I can't say that for
12   sure. And Bill. I'm pretty sure Bill was there.
13        Q.   Was Mr. Rein there?
14        A.   I can't recall.
15        Q.   Do you recall during the negotiations the
16   issue of whether GGAM could assign the option to
17   purchase an interest in Solaire to Cantor coming up
18   or being negotiated?
19             MR. PASCUCCI: Object to the form.
20        A.   I'm sorry. Could you repeat that?
21             BY MR. PERRY:
22        Q.   Do you recall -- during the negotiations,
23   do you recall the issue of whether GGAM could assign
24   the option to purchase a 10 percent interest in
25   Solaire to Cantor coming up or being negotiated?
```

```
 1              BY MR. PERRY:
 2      Q.   And you and Mr. Stone and Mr. Weidner
 3   provided management services from Nevada as well;
 4   right?
 5      A.   Yes.
 6      Q.   And at times you provided management
 7   services abroad, for example, in Asia; right?
 8      A.   Yes.
 9      Q.   And did you -- did there come a time where
10   you had your assistant Ms. Parker attempt to create
11   a calendar that detailed the management services
12   provided?
13      A.   A calendar to show when things took place?
14           (Overlapping speakers.)
15      Q.   Yeah.  It'll be easier.  Let me just get
16   the document rather than asking questions.
17      A.   Okay.
18           (Comments off microphone.)
19           (Defendants' Exhibit 2025 was marked.)
20      Q.   Before you is Deposition Exhibit 25.  It's
21   a color copy of a calendar that was presented in the
22   arbitration.  There's a reference at the top, says:
23   "The calendar was prepared by Claimants' counsel
24   based on a review of, one, the travel dates of GGAM
25   principals and other GGAM personnel, as recorded and
```

```
 1   documented by GGAM's administrative assistant, Kathy
 2   Parker."
 3           Do you recall Ms. Parker undertaking that,
 4   that project?
 5      A.   Yes.  Yes, I do.
 6      Q.   And if you could take a moment to review
 7   the document, my question to you is, does this
 8   represent GGAM's best effort to memorialize its
 9   physical presence in Manila and its work for Solaire
10   on behalf of BRC outside of Manila and Las Vegas?
11           MR. PASCUCCI:  Object to the form.
12      A.   Yes.  I think the intention was to show
13   specific days that we were there, physically, and
14   then also to show days where there is the
15   communications and activities taking place that
16   could be related to their -- to GGAM and Solaire
17   business.
18           BY MR. PERRY:
19      Q.   Do you believe GGAM performed a
20   substantial portion of its services under the MSA in
21   the Philippines?
22      A.   What do you mean by "substantial"?
23      Q.   More than 15 percent.
24      A.   Probably that the 15 to 20 percent would
25   have been the amount of time we would have spent on
```

```
 1   the ground in the Philippines.
 2      Q.   And when you say "on the ground," you mean
 3   you, Mr. Stone, Mr. Weidner, Mr. Rein?  You --
 4   strike that.
 5           You mean -- for on the ground, you mean
 6   you, Mr. Stone, and Mr. Weidner?
 7      A.   Generally.  Generally, yes.
 8      Q.   Okay.  And then, Mr. French, as I
 9   understand it, was the COO of the property?
10      A.   Yes.
11      Q.   And Mr. French is somebody that GGAM
12   hired?
13      A.   We had nominated him for the position.
14   Mr. Razon liked him and agreed, and he was part of
15   the -- he's on the payroll of the property.
16      Q.   Okay.  But he is somebody that you would
17   communicate with regularly about what was going on
18   at Solaire?
19      A.   Yes.
20      Q.   And about how frequently would you talk to
21   Mr. French when he was in his role as COO?
22      A.   Talked specifically, quite often, quite
23   often, and also email traffic, texts, Skype.
24      Q.   Okay.  Is it fair to say Mr. French was
25   GGAM's eyes and ears on the site on a daily basis?
```

```
 1      A.   He was the --
 2           MR. PASCUCCI:  Object to the form.
 3      A.   He was the primary person, the most senior
 4   person that we had nominated for the Property.
 5           BY MR. PERRY:
 6      Q.   Would you characterize him as GGAM's eyes
 7   and ears?
 8           MR. PASCUCCI:  Object to the form.
 9      A.   I would characterize him as GGAM's in
10   Mr. Razon's eyes and ears.
11           (Comments off microphone.)
12           BY MR. PERRY:
13      Q.   Why don't you go back to your declaration,
14   Paragraph 48.  In the second sentence, you
15   write:  "We were to perform all of our services
16   under the MSA through the Management Team and
17   through the COO.  It was effectively our eyes and
18   ears on-site on a daily basis."
19           Was that true and correct testimony when
20   you provided it?
21      A.   Yes.
22      Q.   And just going to Paragraph 73 of the
23   document.  Last sentence, you write:  "To the extent
24   we were not physically in Manila" --
25      A.   I'm sorry.  Which paragraph here?
```

Deposition of Garry W. Saunders                           Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1     Q.   Paragraph 73, last sentence.
 2     A.   Okay.  Thank you.
 3     Q.   "To the extent we were not physically in
 4  Manila, we communicated on a daily or near-daily
 5  basis with the executives on the Management Team,
 6  primarily through Mr. French, regarding the most
 7  pressing issues requiring our input or resolution."
 8          Is that true and correct testimony when
 9  you gave it?
10     A.   Yes.
11     Q.   And to be clear, Mr. French was living and
12  working in Manila; right?
13     A.   Yes.
14     Q.   And Mr. French was someone that GGAM --
15  the GGAM principals had confidence in; right?
16     A.   Correct.
17     Q.   Mr. French was somebody that the GGAM
18  principals supported throughout the Management
19  Services Agreement period with Bloomberry; right?
20          MR. PASCUCCI:  Object to the form.
21     A.   Yes.
22          BY MR. PERRY:
23     Q.   If you -- I'm going to put before you
24  Exhibit 2007, which is a copy of the Management
25  Services Agreement.
```

Deposition of Garry W. Saunders                           Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1     A.   I don't think it was required by the MSA,
 2  but I'd have to read what you're going to show me.
 3          BY MR. PERRY:
 4     Q.   Why don't you go back to your Declaration,
 5  Paragraph 106.
 6     A.   Okay.  It's even me saying it.
 7     Q.   So Paragraph 106 reads:  "This total
 8  amount, 242,474, reflect expenses we incurred
 9  performing work related to the MSA services, and
10  45,557 reflect expenses we incurred performing work
11  on behalf of Bloomberry Resorts Corp. but outside
12  the scope of the MSA, e.g., attending investors
13  conference in November and December -- November 2012
14  and December 2012 and traveling to Buenos Aires,
15  Argentina, to investigate and evaluate Mr. Razon's
16  potential business opportunity in February of 2013."
17          Was that true and correct testimony when
18  you gave it?
19     A.   I believe so.
20     Q.   Okay.  There's a reference to some travel
21  to Buenos Aires.
22          What do you recall about that project?
23     A.   Mr. Razon has a port operation in
24  Argentina.  It is one.  So it's a place where he
25  already was doing business, and he had a particular
```

Deposition of Garry W. Saunders                           Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1              REPORTER'S CERTIFICATE
 2
 3          I, Dawn K. Larson, Registered Diplomate
 4  Reporter, Certified Realtime Reporter, Certified
 5  Realtime Captioner, and Notary Public, do hereby
 6  certify that previous to the commencement of the
 7  examination, the deponent was duly sworn by me to
 8  testify to the truth.
 9          I further certify this deposition was
10  taken in shorthand by me at the time and place
11  herein set forth and thereafter reduced to
12  typewritten form, that the foregoing constitutes a
13  true and correct transcript.
14          I further certify that I am not related
15  to, employed by, nor of counsel for any of the
16  parties or attorneys herein, nor otherwise
17  interested in the result of the within action.
18
19                    [signature]
20                    Dawn K. Larson, MBA, RDR, CRR, CRC
                      Notary Public
21
22
23
24
25
```