```
              UNITED STATES DISTRICT COURT

              SOUTHERN DISTRICT OF NEW YORK                 Perry Decl.
                                                              Ex. 64

GLOBAL GAMING PHILIPPINES,      )
LLC,                            )
              Plaintiff(s),     )
                                )
       VS.                      )   Case Number
                                )   21-CV-2655 (LGS)
                                )
ENRIQUE K. RAZON, JR.; BLOOMBERRY )
RESORTS AND HOTELS, INC.; SURESTE )
PROPERTIES, INC.; COLLINGWOOD   )
INVESTMENT COMPANY LIMITED;     )
COLLINGWOOD OIL & GAS HOLDINGS, )
LLC; COLLINGWOOD USA, INC.;     )
COLLINGWOOD BROOKSHIRE USA, INC.; )
COLLINGWOOD APPALACHIAN MINERALS, )
LLC; ASIA ARROW LIMITED; RIZOLINA )
LLC; ENSARA LLC; NOZAR LLC;     )
BOWERY BAY LLC; CAMPANILLA LLC; )
FESARA LLC; AND 11 ESSEX STREET )
REALTY LLC,                     )
              Defendant(s).     )
_____)


                  DEPOSITION OF BRADLEY H. STONE

                   WEDNESDAY, APRIL 27, 2022

                         AT 9:04 A.M.

                       LAS VEGAS, NEVADA




       Reported by: Laurie Miller, RPR, CLR, NV CCR NO. 971,
                          CA CSR NO. 6457
       _____
```

---

Page 20:

```
 1   A   Again, I -- it's a blur, but probably two,
 2   maybe three.
 3   Q   And who do you recall -- understanding that
 4   it's a blur and you can't distinguish the two or the
 5   three, generally who do you recall on the GGAM side
 6   attending, and who do you recall on the Bloomberry side
 7   attending?
 8       MR. DUNN: Objection to form.
 9       THE DEPONENT: Attending personally -- and,
10   again, I want to be clear that even though we had the
11   in-person, we usually had telephonic people involved as
12   well or else available to go through issues.
13       But on the GGAM side it would have been myself,
14   Garry Saunders, Jon Rein from Cantor, and on the other
15   side it was primarily Estela, Chito, Benny Tan and at
16   least one of the meetings Razon himself.
17   BY MR. PERRY:
18   Q   Do you recall any in-person meetings in the
19   United States to negotiate the MSA?
20   A   No.
21   Q   Do you recall that there was a signing ceremony
22   for the MSA?
23   A   Yes.
24   Q   Did you travel to -- where do you recall that
25   occurred?
```

---

Page 21:

```
 1   A   In Manila.
 2   Q   Okay.
 3       Did you travel to Manila for the signing
 4   ceremony?
 5   A   Well, I traveled there not for the signing
 6   ceremony. I traveled there to be there and did one of
 7   my trips around it. That was one day of, you know, four
 8   or five days being there.
 9   Q   Okay. That's a fair clarification.
10       But you were in Manila for the signing
11   ceremony; correct?
12   A   Yes.
13   Q   And who do you recall being in Manila for the
14   signing ceremony on the GGAM side?
15   A   I know Bill was there, Garry was there. I
16   don't remember if Jon Rein was there. He may have been.
17       That's what I remember.
18   Q   Was there actually like a ceremonial signing of
19   a document that occurred, or was it just a party, a
20   celebration to celebrate a new business arrangements?
21   A   Well, I actually didn't make it down to the
22   ceremony.
23   Q   Okay.
24   A   I got into the hotel. I cut myself shaving. I
25   couldn't stop the bleeding. And by the time I was able
```

---

Page 22:

```
 1   to -- because I was on, at the time, Plavix and aspirin,
 2   and I couldn't stop it, so I kind of missed the
 3   ceremony, so...
 4   Q   Okay.
 5   A   I was there, but I was up in a hotel room at
 6   the Shangri-La.
 7   Q   Sounds unpleasant, although memorable, I guess.
 8   A   That, I remember, yes.
 9   Q   There -- you recall that there was a separate
10   negotiation of the Equity Option Agreement? We
11   sometimes call it the EOA in the case.
12       You recall that that -- there was a separate
13   negotiation for that agreement?
14   A   Yeah. I mean, I stated that, you know, the EOA
15   was always part of the negotiation of the MSA.
16       And, yes, there were details behind -- the MSA
17   was signed, as we know, first, and then there was
18   continued discussion about the terms of the EOA.
19       But the EOA was part of the MSA.
20   Q   Okay.
21       And when you say "the EOA was part of the MSA,"
22   what do you mean?
23   A   I mean, it was understood in the MSA that part
24   of the deal with signing the MSA is that there would be
25   an Equity Option Agreement.
```

```
 1            That was right from the beginning one of the
 2   things that was put before I think Bill and Garry even
 3   perhaps at the initial meeting, the ability to buy
 4   equity.
 5       Q    And just to be clear, the ability to buy equity
 6   was granted to GGAM, not Cantor, not anybody else;
 7   right?
 8       A    Again, I can't answer that.  That's a technical
 9   question.
10       Q    Okay.
11            MR. PERRY:  This is a document that's been
12   previously marked as Exhibit 2008 (indicating).
13            It's an email chain.  The top email is dated
14   June 9th, 2011.  It's from Mr. Tan to Mr. Razon, copying
15   others internally at Bloomberry, and it forwards a
16   substantive email that Mr. Tan wrote to Mr. Russell.  If
17   you'll look, you'll see you're a copy on that email.
18       A    Yes.
19       Q    If you go down to Paragraph 17 of Mr. Tan's
20   lengthy communication, he writes (reading):
21                "Cantor...has been given
22            personality in this Agreement by
23            being identified as a party entitled
24            to any communications that will be
25            sent to GGAM.  But we are only -- but
```

```
 1       A    I don't remember.
 2       Q    And in terms of managing the properties,
 3   there's a Management Services Agreement; right?
 4       A    Well, again --
 5            MR. DUNN:  Objection to form.
 6            Is there a pending question?
 7   BY MR. PERRY:
 8       Q    Yeah.
 9            There's a Management Agreement.  In terms of
10   managing the property, there's a Management Services
11   Agreement?
12       A    Well, that's such a broad question.  "Managing
13   a property."  There's so many things -- you talking
14   about operating the laundry or the food or are you
15   talking about financials?
16            I mean, it's such a broad question that I don't
17   know how to answer it.
18       Q    Do you recall there being an attempt in the
19   arbitration to minimize Cantor's role in the management
20   of the properties?
21            MR. DUNN:  Objection the form.
22            THE DEPONENT:  Yes.
23   BY MR. PERRY:
24       Q    Okay.
25            And what do you recall about the effort to
```

```
 1   because I don't -- it doesn't identify the speaker in
 2   the transcript.
 3            MS. FISSELL:  I think if you go back to page --
 4   let me find it.
 5            MR. PERRY:  Yeah.
 6            MR. DUNN:  I see.
 7            MR. PERRY:  Yeah.  I believe it is Mr. Stone's
 8   testimony.  Let me ask some questions about -- well,
 9   let's just make sure first.
10            If you --
11            MS. FISSELL:  Go to page -- the BLOOM page
12   ending 131, and look at Page 4 of the October 16
13   transcript, it says, "Good morning, Mr. Stone."
14            MR. PERRY:  You with us, Joe?
15            MR. DUNN:  Yes.  I see that.
16   BY MR. PERRY:
17       Q    So directing your attention, Mr. Stone, to Page
18   128, Line 17.
19       A    Uh-huh.
20       Q    Mr. Bishop asks (reading):
21                "With respect to Cantor
22            Fitzgerald, did they have any control
23            over performing the responsibilities
24            of GGAM under
25            the MSA?"
```

```
 1            I, LAURIE MILLER, Certified Court Reporter of
 2   the State of Nevada, do hereby certify:
 3            That the foregoing proceedings were taken
 4   before me at the time and place herein set forth; with
 5   all participants appearing remotely; that the witness
 6   was duly sworn or affirmed; that the testimony of the
 7   witness and all objections made by counsel at the time
 8   of the examination were recorded stenographically by me,
 9   and were thereafter transcribed under my direction and
10   supervision; and that the foregoing pages contain a
11   full, true and accurate record of all proceedings and
12   testimony to the best of my skill and ability.
13            I further certify that I am neither financially
14   interested in the action nor a relative or employee of
15   any attorney or any of the parties.
16            IN WITNESS WHEREOF, I have subscribed my name
17   this 12th of May, 2022.
18
19
20
21            /s/ Laurie Miller
22            _____
23            LAURIE MILLER, CCR No. 971, RPR, CLR
24
25
```