**III. SPECTRUM'S OPINION ON GGAM'S "GOVERNMENT-LED, TOP-DOWN JUNKET APPROACH" STRATEGY**

22. According to Weidner's sworn declaration and testimony in the Arbitration, he had planned to implement a "sophisticated and unique government-led, top-down junket approach" as a specific strategy to drive junkets[11] and thus VIP players[12] to Solaire in Manila.[13] Notably, Weidner testified that he would never put in writing or disclose publicly, particularly to his client, Bloomberry, the true nature of this and other strategies, a betrayal of Weidner's knowledge that his strategies were illegal.[14]

23. Based on the evidence reviewed, it is apparent that neither Weidner, despite representations to Bloomberry to the contrary,[15] nor the GGAM principals actually had any pre-existing relationships with junkets, much less relationships with Macao's seven largest junket operators, despite contrary representations to Bloomberry[16] and boasts by Weidner to potential investors in Bloomberry—a boast that resulted in an enhanced fee structure for GGAM for revenue generated by foreign junkets/VIP players.[17]

24. Specifically, the little evidence that GGAM produced in the Arbitration shows that Weidner's "Government-Led, Top-Down Junket Approach" involved exploiting a pre-existing relationship with Dr. Chen, then Deputy Director of the Economic Affairs Department

---

[11] In the casino industry, the term "junket" refers to the arrangement for travel and complimentary services for patrons who have been selected for their propensity to gamble to visit a casino for the purpose of gambling. In addition, in Asia, especially in Macao, junkets also issue credit to players directly and also collect outstanding debts from these players.

[12] VIP players are those that bet very large amounts at a casino.

[13] Oct. 19, 2015 Hr'g Tr. at 147:6-149:14 (BLOOM_0119059, at -9315-9316); Decl. of William P. Weidner in Support of Claimants' Reply Memorial, June 14, 2015, at ¶ 7 (BLOOM_0100634) ("Third Weidner Decl.").

[14] *See* Oct. 19, 2015 Hr'g Tr. at 217:20-25 (BLOOM_0119059, at -9333).

[15] Such representations are included in the following documents: Bloomberry Resorts Corp., Management Presentation (April 2012) (BLOOM_0076267, at -6286); Third Weidner Decl. at ¶ 6 (BLOOM_0100634).

[16] Such representations are included in, *inter alia*, the following documents: Bloomberry Resorts Corp., Management Presentation (April 2012) (BLOOM_0076267, at -6286); Third Weidner Decl. at ¶ 6 (BLOOM_0100634).

[17] *See* Third Weidner Decl. at ¶ 31 (BLOOM_0100634).

of the CLO in Macao.[18] Weidner first met Dr Chen in his role as President of LVSC. Weidner noted that Dr. Chen possessed "significant and unique visibility and influence over each and every aspect of Macanese junket activity."[19] Hence Weidner's decision to invite Dr. Chen to the signing ceremony in Manila for the Management Services Agreement ("MSA") between Bloomberry and GGAM in the hope that "the presence of Macao's most senior Chinese economic liaison representatives at the Solaire signing ceremony would provide major Macanese junket operators with confidence that it was politically and socially acceptable for them to bring significant numbers of Chinese gamblers to Manila."[20]

25. What is even more alarming than Weidner's deception of Bloomberry—to whom he never disclosed the Government-Led Top-Down Junket Approach—is the bribery and corruption inherent in the proposed strategy, which Weidner acknowledged centered on utilizing Chinese government officials, who were in place in Macao to regulate and oversee junkets, to facilitate illegal gaming activities outside of the then-accepted junket structure.[21] Moreover, Weidner was launching the strategy amid China's crackdown on corruption, which began in 2012.

26. Under Chinese law, all forms of gambling in mainland China (with the exception of certain state-run lotteries) are illegal.[22] A main focus of the crackdown on

---

[18] Third Weidner Decl. at ¶¶ 26-28 (BLOOM_0100634). China's Liaison Office in Macao (now known as the Macao Liaison Office) is the representative office in Macao of the State Council of the People's Republic of China ("PRC"). It monitors all political, social and economic activity in Macao and acts as a liaison between the Macao and PRC governments.

[19] Third Weidner Decl. at ¶ 27 (BLOOM_0100634).

[20] *Id.*

[21] *See, e.g.*, Oct. 19, 2015 Hr'g Tr. at 197:7-9 ("Q. And I believe you previously testified to that CLO office being part of this unique and sophisticated government-led, top-down junket approach, right?") (BLOOM_0119059, at -9328); *id.* at 149:10-14 ("Q. So it's a strategy that involves – and we will come to this too – utilising relationships with government people in connection with junket business, is that fair? A. Yes, correct. Junket operators, fair.") (BLOOM_0119059, at -9316).

[22] *See* Laws of the People's Republic of China, (Adopted by the Second Session of the Fifth National People's Congress on July 1, 1979 and amended by the Fifth Session of the Eighth National People's Congress on March 14, 1997), https://www.fmprc.gov.cn/ce/cgvienna/eng/dbtyw/jdwt/crimelaw/t209043.htm.

corruption in China, which continues today, has been exposing and prosecuting government officials who receive illicit payments and/or laundering money through Macao. This fact is critical when considering Weidner's statement that "Our relationships with CLO officials opened doors for Mr. Chiu to speak with, liaise, and negotiate directly with the head executives at several of the top Macanese junkets."[23] The coordination with Dr. Chen was undertaken by GGAM's President for Asia, Eric Chiu—who, like Weidner, had been central to the wrongdoing at LVSC between 2006-2009 (as detailed in **Appendix A**).[24] Starting in April 2013—more than a year and a half after signing the MSA, more than a year after Bloomberry's "top-up offering," and one month *after* Solaire opened—Dr. Chen of the CLO in Macao introduced GGAM to some of Macao's largest junket operators for what appears to be the very first time.[25]

27. The emails below illustrate an agreement between GGAM and a senior Chinese government official, Dr. Chen, whereby the government official is taking actions for the financial benefit of GGAM as manager of Solaire:

- March 31, 2013 email from Chiu to Weidner: "Dr. C said meetings with junket owners will start next week."[26]

- April 3, 2013 email from Chiu to Weidner: "Dr. C just called me, in order for him to fully facilitate Macau junkets to operate in the Philippines and other of our future project locations, from now on all Macao junket liaisons must be done thru me to avoid confusions."[27]

- April 7, 2013 email from Chiu to Weidner: "Tonight was really a 'real deal' socializing with the number 1 persons of 2 major Macao junkets

---

[23] Third Weidner Decl. at ¶ 32 (BLOOM_0100634).

[24] This wrongdoing, described in more detail in Appendix A, can be summed up as the willful failure of Chiu, Weidner and other LVSC executives and managers under Weidner's direction to implement adequate internal accounting controls in connection with the unexplained transfer of tens of millions of dollars to companies associated with a Chinese consultant who was introduced to Weidner and Chiu by the CLO in a region known to be high-risk for corruption without conducting appropriate due diligence, consistent monitoring of or justification for payments, and proper approvals and documentation.

[25] *See, e.g.*, Email from E. Chiu to B. Weidner, March 31, 2013 (BLOOM_0142890) ("Dr. C said meetings with junket owners will start next week.").

[26] *Id.*

[27] Email from E. Chiu to B. Weidner, April 3, 2013 (BLOOM_0142725).

- namely Mr. [Alvin] Chau of Suncity and Sister Mei of Macau Golden Group. . . . I have already successfully entered the core of Macao junket circle with strong introduction and supports at my back. We need to carefully and skillfully capture this golden opportunity."[28]

- April 27, 2013 email from Chiu to Weidner: "I just talked with xxx."[29]

28. These emails raise serious questions about corruption and bribery:[30]

- Why would a senior government official in China help Weidner and GGAM secure junkets and thus Chinese high-value patrons to visit the Philippines?

- Did Dr. Chen, an official with the CLO in Macao, receive any compensation directly or indirectly for assisting GGAM and Weidner?

- Alternatively, did Dr. Chen receive anything of value from the junkets for the introduction to GGAM?

---

[28] Email from E. Chiu to B. Weidner, April 7, 2013 (BLOOM_0142889). Notably, Weidner recognized that this "golden opportunity" likely involved illegal activity, but he planned to use the CLO as a "get out of jail free" card. *See* Oct. 19, 2015 Hr'g Tr. at 173:23-174:9 ("So if you wanted to find out anything about any junket rep, to see if you knew Dr Chen, if you knew the CLO, he had a spreadsheet of every junket room, every junket operator, what his volume was and the key thing about the CLO is the CLO is the junkets' get out of jail free card. Alvin's organisation has 3,500 agents all over China and what are they doing? They are granting credit, they are collecting China and in a controlled economy where it's illegal to move money or move the RMB out, they were committing illegal acts every day.") (BLOOM_0119059, at -9322). Alvin Chau was arrested on November 28, 2021 and remains in detention awaiting trial that was scheduled to begin on September 2, 2022. *See* Gary Cheung, Sammy Heung and Raquel Carvalho, *Junket king Alvin Chau's arrest signals end of winning streak for Macao casinos as Beijing cracks down on gambling*, South China Morning Post (Nov. 30, 2021), https://www.scmp.com/news/hong-kong/law-and-crime/article/3158397/junket-king-alvin-chaus-arrest-signals-end-winning; *Alvin Chau indicted for illegal gaming, money laundering*, GGR Asia (May 26, 2022), https://www.ggrasia.com/alvin-chau-indicted-for-illegal-gaming-money-laundering/.

[29] Email from E. Chiu to B. Weidner, April 27, 2013 (GGAM-SDNY-0278838, at -8879). Weidner testified that Chiu wrote "xxx" "because he's not going to mention the Chinese name of the government official who is going to join us." *See* Oct. 19, 2015 Hr'g Tr. at 180:18-181:1.

[30] Additionally, GGAM's testimony in the Arbitration raises serious questions about ethics. For example, Brad Stone had no concerns about doing business with a known triad (organized crime) leader Tai Gor (Cheung Chi-tai)—notwithstanding the fact that LVSC had been forced to cut ties with Tai Gor after a publication identified the relationship as one of the first documented examples of organized crime involvement in a US-owned casino in Macao. *Compare* May 29, 2018 Hr'g Tr. at 32-33, 44-45 (B. Stone testifying) (BLOOM_0116782, at -6791, -6794) (throughout the transcript, "Tai Gor," the nickname of Cheung Chi-tai, is spelled as "Tigor"), *with* Matt Isaacs, *Special Report: High rollers, triads and a Las Vegas giant*, Reuters (March 29, 2010), https://www.reuters.com/article/us-casinos-macau-sands/special-report-high-rollers-triads-and-a-las-vegas-giant-idUSTRE62S34020100329, and Chris McGreal and Matt Isaacs, *Sheldon Adelson faces new scrutiny as documents challenge his testimony*, The Guardian (May 9, 2015), https://www.theguardian.com/us-news/2015/may/09/sheldon-adelson-macau-testimony-las-vegas-sands.

11

- How could Dr. Chen "work" with GGAM in this regard and not violate his own responsibilities as a public servant in accordance with "The Law of the People's Republic of China on Public Servants"[31]?

29. In our experience, this is the type of scenario where government officials often receive a kickback (either immediately or at some later point in time). Of particular interest are two extraordinary and as yet unexplained payments, each in the amount of $25,000, that were made by Weidner (on behalf of GGAM) between April and June 2013—at the same time that Dr. Chen was introducing Chiu to junket operators—without the knowledge or authorization of his business partners—to "Sahara ASF Asia," a company located at the very same address as GGAM's Macao Office where Eric Chiu worked as GGAM's President for Asia.

30. An email from Garry Saunders to Bill Weidner, copying Brad Stone, dated June 7, 2013,[32] states, in relevant part, as follows: "*. . . Separately, looking at the last P&L, I noticed the second month of a $25,000 charge to Sahara ASF Asia (Andy Fonfa?) for a Macau Office. Is this for Eric? How is Andy involved?*"

31. The issue of the two monthly charges of $25,000 to the company Sahara ASF Asia appears to be pertinent to the way in which Weidner conducted his business dealings. Saunders indicates in the same email that Sahara ASF Asia, Ltd. is a company that is owned by and/or connected to Andrew S. Fonfa, the Las Vegas property developer and founder of the real estate brokerage ASF Reality & Investments, Inc.[33] Clearly, Saunders had not approved

---

[31] Law of the People's Republic of China on Public Servants, (promulgated by the Standing Comm. Nat'l People's Cong., Jan. 1, 2006), P.R.C. Law 35, http://www.npc.gov.cn/zgrdw/englishnpc/Law/2007-12/13/content_1384101.htm.

[32] *See* Email from G. Saunders to B. Weidner, June 7, 2013 (GGAM-SDNY-0124176).

[33] Fonfa also was the CEO of the Las Vegas Economic Impact Regional Center ("LVEIRC") and the failed Lucky Dragon Casino, neither of which is in operation but both of which were previously located on Sahara Avenue, Las Vegas. Weidner was a Senior Adviser to LVEIRC and the Lucky Dragon Casino. It remains unclear why this account was used and whether Fonfa had any knowledge about the use of these funds. *See* Muhummad Cohen, *Asian-Funded Las Vegas Casino Courts New Type Of Chinese Clientele*, Forbes (Nov. 1, 2016), https://www.forbes.com/sites/muhammadcohen/2016/11/01/asian-funded-las-vegas-casino-courts-new-type-of-chinese-clientele/; Buck Wargo, *Lucky Dragon to cater to Asian Americans*, Las Vegas Business Press (Nov. 27, 2016), https://businesspress.vegas/gaming-hospitality/lucky-dragon-to-cater-to-asian-americans/.

or been informed beforehand about the purpose of these charges, which were made from GGAM's account.

32. Weidner forwarded Saunders's email to Chiu on June 7, 2013, stating: "*We need to talk. Call?*" Chiu then responded on June 7, 2013, stating: "*Having lunch with china state in Macau They can invest in lanqui too I will call u after 30 mins*." [34] There are no other emails on this email chain. We have been instructed that GGAM did not produce in the Arbitration any other email in which Weidner responded to Saunders's questions about the unexplained payments.

33. If the two payments were indeed meant for Chiu—and they were not for his salary, as Chiu, GGAM's President for Asia, was surprisingly not on GGAM's payroll during the time that GGAM managed Solaire[35]—then it begs the question of how and for what purpose Chiu might have received and then disbursed of these funds? We note that the Singapore High Court also opined that "the circumstances surrounding the Sahara Payments along with Mr Weidner's and Mr Chiu's behaviour, are arguably suspicious."[36]

34. Moreover, the time period in which these two payments of $25,000 were made from GGAM to Sahara ASF Asia—between April and early June 2013—corresponds precisely to the period of time when Dr. Chen, the senior Chinese government official working at the CLO in Macao, was actively assisting GGAM in its efforts to develop relationships with junket operators in Macao.

35. This circumstantial evidence raises the critical question as to whether these funds might have been used in any way to remunerate or reimburse Dr. Chen for his efforts on

---

[34] *See* Email from E. Chiu to B. Weidner, June 7, 2013 (GGAM-SDNY-0124176).

[35] According to Brad Stone, Chiu worked for Weidner and was paid by "Weidner's companies, not through GGAM." *See* May 29, 2018 Hr'g Tr. at 17-18 (BLOOM_0116782, at -6787).

[36] *See Bloomberry Resorts and Hotels Inc. v. Global Gaming Philippines LLC*, [2020] SGHC 01, at ¶ 199 (Singapore High Court, Jan. 3, 2020) (Dkt. 125-2) (Judgment re: Partial Award on Liability).

behalf of GGAM.[37]  As Weidner and Chiu have a history of making payments to intermediaries in China without any supporting and/or misrepresented documentation (see **Appendix A**), and no other reasons for the payments have been put forth by GGAM, the circumstantial evidence indicates that the payments were used for illicit purposes.

IV.  **SPECTRUM'S OPINION ON GGAM'S "CROSS-BORDER TRADING PLATFORM" STRATEGY**

36.  According to Weidner's sworn testimony in the Arbitration, Weidner proposed implementing a two-step technique he termed a "Cross-Border Trading Platform" as a specific strategy to "… direct VIP play, by helping establish a cross-border trading platform to promote business and gaming visitation between China and the Philippines" in order to facilitate Chinese VIP play at Solaire.[38]  The "Cross-Border Trading Platform" strategy proposed by Weidner consisted of two separate and distinct steps.  First, GGAM proposed to reach out to Mainland Chinese clientele by creating a pretext of a non-gaming business purpose when the actual purpose of the outreach was to promote illegal gaming visits to Solaire in the Philippines.  Second, GGAM proposed the creation of a financial mechanism and structure by which funds intended for use in gaming could be secretly and illegally moved out of Mainland China and into the Philippines disguised as legal "business" transactions by misrepresenting them or bundling them with other legitimate transfers.  Once on deposit at a bank in the Philippines, the funds (or excess funds) could then be forwarded to player-owned casino accounts at Solaire for their actual intended purpose—gambling.

---

[37] Dr. Chen left his position with the CLO in Macao in 2016, and Spectrum has not been able to locate any reasons for his departure or his current position.  Given that his actions appear to be at variance with stated Chinese law and policy, however, he very well could have left for reasons related to the crackdown on corruption.  It should be noted that Li Gang, the head of the CLO in Macao from 2013-2016 was removed and subsequently punished for "serious disciplinary violations", the common term used in China for corruption.  *See* Racquel Cavalho, *Macau liaison office director Li Gang moved out, to be replaced by Wang Zhiming*, South China Morning Post (July 1, 2016), https://www.scmp.com/news/hong-kong/politics/article/1984053/macau-liaison-office-director-li-gang-moved-out-be-replaced.

[38] Oct. 19, 2015 Hr'g Tr. at 148:12-15 (BLOOM_0119059, at -9315).

14

37. Specifically, and according to his testimony in the Arbitration, Weidner and GGAM were proposing to:

   a. Travel to China under false pretenses by pretending to be there to market legal business travel to the Philippines when the actual purpose was to promote illegal travel to the Philippines for gaming;[39]

   b. Secretly market Solaire's gaming services to potential Chinese VIP customers while within China's national borders;[40]

   c. Use business cards and documentation that intentionally avoided any references to gaming to avoid detection by Chinese authorities;[41] and

   d. Assist Chinese VIP customers in illegally moving funds out of China in large amounts that GGAM knew violated China's currency control laws, so they could be used for illegal gambling, all while knowing that doing so was in violation of China's anti-gambling laws.[42]

38. In short, the "Cross-Border Trading Platform" Weidner described as one of his two key strategies for Solaire had a clear purpose: the placement of funds from China into the Philippines' financial systems through secretive means intended to disguise its true character, the layering of those transactions through foreign entities and accounts to further obscure their original source, and the subsequent integration of those funds into accounts at Solaire where the Chinese originator of the transactions could then personally enjoy and use the funds for gaming in violation of China's laws.

39. The "Cross-Border Trading Platform", if implemented, would have circumvented China's criminal laws and facilitated illegal international monetary transfers by potential Chinese VIP players.[43] Such a mechanism is, on its face, one that is all too familiar

---

[39] *Id.* at 209:3-17.

[40] *Id.* at 206:13-17.

[41] *Id.* at 208:7-11.

[42] *Id.* at 210:14-25.

[43] As noted above, gambling is illegal in mainland China and the promotion of gambling to its citizens in mainland China is a clear violation of Chinese criminal law. *See supra* note 22. Furthermore, China's currency control laws strictly limit outbound cross-border fund transfers by individual Chinese citizens to US$50,000 per calendar year. Reuters Staff, *China's new rules on yuan transfers are not capital controls: Xinhua*, Reuters (Jan. 3, 2017), https://www.reuters.com/article/us-china-yuan-idUSKBN14M032.

15

to governments and financial investigators around the world: the creation and use of controlled foreign entities and false transactions to obfuscate funds by creating the false appearance of legitimacy. The use of foreign entities and false transactions as devices for money laundering,[44] tax evasion, and other financial crimes is a well-known and common component of many such schemes. One of the more common examples of such a money laundering scheme involves the use of phony business transactions to surreptitiously transfer money, including personal funds, across national borders through false invoicing, inflated pricing structures, and phony investments. This is often accomplished by establishing foreign business entities in offshore financial centers that can issue phony invoices for fabricated goods and services, or by inflating or deflating the true cost of legitimate goods and services. Sometimes referred to as "trade-based money laundering," it is commonly practiced by tax evaders and money launderers throughout the world.

40. And it is clear that Weidner was planning to engage in trade-based money laundering. In his sworn testimony, Weidner describes the cross-border trading platform as being "simply a technique … I don't want to use the term 'front,' but as the way of reaching out to Chinese without being a gambling person."[45] He further stated: "I wanted legitimate business. I didn't want to just do beards."[46] Notwithstanding Weidner's reluctance to use the

---

[44] Money Laundering involves the conversion or transfer of property, knowing that the property is the proceeds of crime, for the purposes of concealing or disguising the illicit origin of the property. *See About APG*, The Asia/Pacific Group on Money Laundering, , http://www.apgml.org/about-us/page.aspx?p=91ce25ec-db8a-424c-9018-8bd1f6869162 (last visited Sept. 14, 2022). The definition is incorporated directly from Article 6 of the United Nations Convention Against Transnational Organized Crime defines Money Laundering. While Spectrum has no information regarding the original source of the funds that would have been transferred, and does not allege they are derived from the proceeds of criminal activities, it does note that the sole and clearly stated purpose of the "Cross-Border Trading Platform" was to facilitate and enable Mainland Chinese nationals to illegally circumvent Chinese currency control laws so as to engage in gaming, an activity that ***by definition*** amounted to illegal activities on their part. Therefore, while the original source of the funds transferred may not have involved criminal proceeds, the subsequent use of illegal devices and subterfuge to transfer the funds out of the country would have clearly cast a taint of illegality over the funds.

[45] *Id.* at 216:19-24.

[46] *Id.* at 292:4-6. Notably, the SEC Cease-and-Desist Order Related to LVSC Operations in Macao and China also referred to LVSC, during Weidner's tenure, as using "an intermediary or 'beard' to obscure LVSC's role in certain transactions." *See* SEC Order, at ¶ 15 (GGAM-SDNY-0122376).

word "front" nor his stated desire to not "just do beards," those are precisely the nature of the platform that he was proposing to establish with the involvement of many of the same Chinese businessman and state-owned entities that were involved in the FCPA investigations involving Weidner and Chiu's conduct at LVSC—namely, the CLO in Macau, China International Travel Service,[47] and Chu Kong Shipping.[48]

41.   In fact, Weidner acknowledges as much in his testimony wherein he states:

> "Understand, I can't – you can't promote gaming in China, so if you're going to directly promote people, you will promote business, not gamble, and both business (*sic*) give them a portal to be able to legally transfer RMB for their business activities and gives them a reason that they can get their visa and go to the Philippines. So they will gamble and I will find people that will gamble, and they can use the excuse of doing business in the Philippines.[49]
>
> . . .
>
> . . . And I was setting up with them banking relationships so that when the trade guys -- when these guys went to be at Solaire in Manila and they needed money to be able to conduct their trading exercises, they generally over-send money for trading exercises so they have liquidity to gamble with.
>
> So they were the other piece of, call it the sophistication of a process, of building a way for Chinese businessmen to be able to come and gamble and have money to gamble with.
>
> But by the way, to the Chinese, gambling and business is just the way they breathe. **So there is nothing wrong with it** but it was the idea of setting a platform up to be able to do business and to be able to enjoy themselves and gamble."[50]

---

[47] China International Travel Service was the company that owned the building in Beijing that LVSC paid tens of millions of dollars to purchase for no apparent reason, and whose chairman had political connections on Hengqin Island, the location where Weidner wanted to develop a multi-billion-dollar resort but needed government approvals. *See* Appendix A.

[48] Chu Kong Shipping was indirectly owned by the Consultant and the chairman of China International Travel Service. *See* Appendix A.

[49] Oct. 19, 2015 Hr'g Tr. at 206:15-24 (BLOOM_0119059, at -9330).

[50] *See* Oct. 19, 2015 Hr'g Tr. at 213:22-214:11 (BLOOM_0119059, at -9332). Notably, Weidner testified that "Brother 8" and other members of the Ma family, a prominent Chinese family with significant political and business connections, were going to play a critical role in his "Cross-Border Trading Platform" strategy. *See* Weidner Hr. Tr. at 210:14-211:3 ("So I was involved in Macau with the Ma family, one cousin, one brother, a very famous Chinese family. Relatives had . . . set up Citic and Poly Group. So Citic and Poly Group, through Brother 8 . . . were going to help me figure out how to be able to transfer money for trading purposes. So it was my Macau contacts, my CLO contacts, my Beijing contacts that all came into play for what I would say [is] a

17

> . . .
>
> As long as he registered a business there and was in trading you can't – it's hard to trace did he lose in the transaction, make money in a transaction, or whatever? That's why the trading platform – as long as he was making widgets, you can count widgets and send them. If you're trading commodities, which were the metals or whatever you were trading, oil, price goes up and down every day, so it's just a more, call it fluid way of being able to transact cash."[51]

42. Significantly, Weidner acknowledges in his testimony that manipulation of trade transactions was a key component of his proposal, as the registered business used to move money out of China could not be one that involved fixed goods that could be counted (e.g., "widgets"), but rather should be one where prices were "fluid" (e.g., metals, oils, etc.) and therefore harder to trace.[52] Thus, in effect, the "Cross-Border Trading Platform" described by Weidner was a classic example of a trade-based money-laundering scheme whereby money, including personal funds, is transferred across national borders through the overpricing and/or under-invoicing of goods and services. The essential component of such schemes is the intentional misrepresentation of the value of trade-based goods and services in order to transfer value or settle accounts between trading parties. In the case of Weidner's "Cross-Border Trading Platform," further obfuscation would have been added by limiting the trading activities

---

unique and sophisticated way of reaching directly into individual Chinese high-end business people who were most of the very high-end gamblers there.") (BLOOM_0119059, at -9331); *id.* at 213:20-214:6 ("[B]rother 8 is in Macau. And brother 8's family relate[s] to Citic and Poly Group and I was setting up with them banking relationships so that when the trade guys . . . went to be at Solaire in Manila and they needed money to be able to conduct their trading exercises, they generally over-send money for trading exercises so they have liquidity to gamble with. So they were the other piece of, call it the sophistication of a process, of building a way for Chinese businessmen to be able to come and gamble and have money to gamble with.") (BLOOM_0119059, at -9332). Weidner expressed no concern whatsoever that "Brother 8" played a "crucial role" in the Macao underworld, as he was acquainted with many triad (organized crime) bosses and served as a "referee" for their disputes. *See* Sonny Lo Shiu-hing, *The Politics of Cross-border Crime in Greater China: Case Studies of Mainland China, Hong Kong, and Macao*, Routledge, p. 139.

[51] Oct. 19, 2015 Hr'g Tr. at 291:17-292:2 (BLOOM_0119059, at -9351); *see also* Oct. 19, 2015 Hr'g Tr. at 209:3-17 (BLOOM_0119059, at -9331) ("Well, you can't draw money in China and say 'I'm going to the Philippines to gamble.' It's illegal. When you're talking to a Chinese businessman, you're talking to him about business, you're talking to him about perhaps coming to a leisure thing. . . . so you can't promote gambling in China, particularly when you're dealing with high level government officials. I am Weidner Lou Trading or Weidner Resorts when I'm in China.").

[52] *Id.*

to commodities transactions, which can dramatically fluctuate in price in the short term thereby making it difficult, if not impossible, to determine actual gains and losses.[53] As such, the "Cross-Border Trading Platform" bears a striking resemblance to many of the abusive schemes and techniques developed by money launderers, offshore bankers, financial service providers and others in assisting customers to circumvent national tax and anti-money laundering laws that have been the subject of significant media coverage around the world.[54]

43.     In his testimony, Weidner euphemistically referred multiple times to terms such as "sophisticated," "excuses," "techniques," "legal," and "fronts," but the clear inference of his statements is that he intended to put in place a structure that was designed to appear legitimate when in actuality he was illegally promoting gambling to Chinese nationals and assisting them in illegally getting funds out of China. His unwillingness to put any information about his "Cross-Border Trading Platform" or his "Government-led Top-Down Junket Approach" in writing further underscores that he knew what he was doing was wrong.[55] And we understand that, once again, GGAM did not produce any documents in the Arbitration concerning this strategy, leading us to the inescapable conclusion that GGAM and Weidner were likely fully aware that both aspects of what he was proposing were illegal.

---

[53] Jean B. Weld, *Current International Money-Laundering Trends and Anti-Money Laundering Co-Operation Measures*, UN Asia and Far East Institute for the Prevention of Crime and the Treatment of Offenders (July 2010), https://www.unafei.or.jp/publications/pdf/RS_No83/No83_08VE_Weld3.pdf ("Red flag indicators of trade-based money laundering include: . . . false invoicing and customs documents: such as commodity misclassification or commodity over-valuation or under-valuation[.]").

[54] Examples include U.S. Dep't of Justice, *HSBC Holdings Plc. and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement* (Dec. 11, 2012), https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations; U.S. Dep't of Justice, *UBS Enters into Deferred Prosecution Agreement* (Feb. 18, 2009), https://www.justice.gov/opa/pr/ubs-enters-deferred-prosecution-agreement; U.S. Dep't of Justice, *United States Asks Court to Enforce Summons for UBS Swiss Bank Account Records* (Feb. 19, 2009), https://www.justice.gov/opa/pr/united-states-asks-court-enforce-summons-ubs-swiss-bank-account-records.

[55] *See* Oct. 19, 2015 Hr'g Tr. at 215:15-216:19 (BLOOM_0119059, at -9332).

these businesses as "fronts" to conduct GGAM or casino-related business while visiting the Chinese mainland, where it is illegal to gamble and to market for a casino.[59] And, as noted above, it was later revealed that Chiu, GGAM's President for Asia, was not on GGAM's payroll, but rather was on the payroll of Weidner Resorts and Weidner Holdings.[60] Therefore, it is possible that Chiu's emails also would have been in the possession, custody, and/or control of Weidner Resorts and Weidner Holdings, but were not produced in the Arbitration.

## VI.   CONCLUSION

46.  Weidner and Chiu have a long history of disregarding compliance measures and of engaging in unethical and illegal activities in China and Macao during Weidner's time as President of LVSC and as the leader of LVSC's "China strategy." (See **Appendix A** for details). They appeared to be consistently willing and ready to engage in casino marketing activities that were specifically designed to circumvent national and international laws, currency controls, and money laundering regulations and guidelines when those laws interfere or impede his financial interests.

47.  GGAM's proposed "Government-Led, Top-Down Junket Approach," which amounted to utilization of Chinese government officials to secure benefits from junket operators, appears to have involved corruption, including the implicit *quid pro quo* dynamic typically occasioned by such relationships.

48.  GGAM's proposed "Cross-Border Trading Platform" strategy for moving money illegally out of China to the Philippines for the purpose of engaging in illegal overseas gambling amounted to utilization of a common and well-known form of illegal money laundering known as "Trade Based Money Laundering."

---

party to these proceedings.").

[59] *See, e.g.*, Oct. 19, 2015 Hr'g Tr. at 208:7-11 ("But I was using – I travel with business cards that don't have 'gambling' on them. I don't travel with GGAM business in China, I travel with Weidner Resorts and another one called Weidner Lou Trading.") (BLOOM_0119059, at -9330).

[60] *See supra* ¶ 33.

49. The secrecy employed by GGAM with respect to their "strategies" and relationships with Dr. Chen and other Chinese officials and businessmen, the lack of formal documentation and correspondence, Weidner's apparent lack of any moral or ethical qualms about the nature of these relationships, and Weidner's and Chiu's prior and similar misconduct at LSVC all further underscore these conclusions.

Executed this 16th day of September 2022

_____
Fredric Gushin

_____
Daniel Reeves

23