With respect to recognition and enforcement of awards, courts and scholars around the world generally hold that awards whose enforcement would require payment of the proceeds of corruption would be subject to nonrecognition.[178] The rationale is obvious—a party guilty of corruption or bribery should not be richly rewarded by an arbitral tribunal for the same misconduct that would cause a court to impose criminal sanctions.[179]

Corruption is notoriously difficult to prove. By definition it happens behind closed doors, under the table, or—in the case of GGAM—through elaborate subterfuge. As the Second Circuit has recently explained, "bribery is rarely conducted in explicit terms; instead, the language of bribery is one of implication and innuendo."[180] To compensate for this, many courts allow proving corruption through indirect evidence. For example, the Second Circuit explained in *United States v. Silver*, that "in some circumstances, a wink and a nod, an exchange of monies, and a subsequent vote on a bill likely will be sufficient" proof of corruption.[181]

Here, notwithstanding the usual difficulty in proving corruption, there appears to be ample evidence—both direct and indirect—that GGAM engaged in corrupt and illegal activities in implementing Weidner's two "strategies" for Solaire in order to perform its key obligations under

---

[178] *See, e.g.*, *Judgment of 12 March 1998*, XXIX Y.B. Comm. Arb. 663, 669 (Oberlandesgericht Hamburg) (2004) ("enforcement ought to be denied for violation of public policy if the award awarded corruption money"); *Bad Ass Coffee Co. of Haw. Inc. v. Bad Ass Enters., Inc.*, XXXIV Y.B. Comm. Arb. 430, 437 (Alberta Q.B. 2007) (2009) (corruption, bribery, or fraud would constitute grounds for non-recognition under Article V(2)(b): "It was understood that the term 'public policy,' which was used in the 1958 New York Convention and many other treaties, covered fundamental principles of law and justice in substantive as well as procedural respects. Thus, instances such as corruption, bribery or fraud and similar serious cases would constitute a ground for setting aside [sic].").

[179] *Enron Nigeria Power Holding Ltd v. Nigeria*, 844 F.3d 281, 287 (D.C. Cir. 2016) (recognizing "the fundamental equitable principle that 'no one shall be permitted to profit by his own fraud'") (quoting *Stone v. Freeman*, 298 N.Y. 268, 271 (N.Y. 1948)). There is some debate among jurisdictions whether the public policy exception under the New York Convention requires proof that enforcement of the award "would *itself* violate applicable public policy or compel conduct that would violate a public policy" or whether it is sufficient to demonstrate that the underlying claim itself is violations of public policy. In this debate, I share the view of Gary Born, that when corruption is involved, requiring proof that enforcement itself violates public policy "would render the public policy exception largely meaningless – because the payment of money, in and of itself, is very seldom contrary to public policy or mandatory law." Born, *supra* note 177 at 3608.

[180] *United States v. Silver*, 948 F.3d 538, 563 (2d. Cir. 2020).

[181] *See id.*

The tribunal's failure to consider the issue of GGAM's corruption and illegality does not mean that an enforcing court cannot consider such conduct under the public policy exception contained in Article V(2)(b) of the New York Convention. On the contrary, it means that enforcing courts must consider these issues to determine whether, by enforcing the Award, they would be rewarding corrupt and illegal activity, and thereby violate basic notions of morality and justice that are ingrained in the policies of most all modern justice systems.

### C.    Failure to Produce Documents Ordered by Tribunal as Grounds for an Arbitral Procedure Not in Accordance with the Agreement of the Parties Under Article V(1)(d) of the New York Convention

In addition to the public policy challenge based on corruption, the Award is also subject to challenge on the ground that the arbitration did not comport with the parties' agreement on applicable procedures. Article V(1)(d) of the New York Convention provides for non-recognition of an award, "where the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place."

The Second Circuit case *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc*[215] is often regarded as the one of the leading cases on the interpretation of Article V(1)(d). In *Encyclopaedia*, the Second Circuit explained that despite a "a strong public policy in favor of international arbitration," the Second Circuit has "never held that courts must overlook agreed-upon arbitral procedures in deference to that policy."[216] Instead, courts in the Second Circuit have emphasized that "[w]here the parties have agreed to submit their disputes to an arbitral panel

---

[215] 403 F.3d 85, 91 (2d Cir. 2005) (affirming non-enforcement of an award because the arbitral procedure specified in the arbitration clause was not followed).
[216] *Id.*

selected according to specific, bargained-for guidelines, failure to adhere to those guidelines may affect the legitimacy of the entire arbitration proceeding."[217]

In this case, GGAM and its lawyers deviated from the parties' bargained-for procedures under the IBA Rules of Evidence. That deviation, however, was not (and could not have been) corrected by the tribunal because it came to light only after the Liability Award and the tribunal determined it was unable to reopen discovery at that time.

This uncorrected deviation from the parties' agreed upon procedures then combined with concerns under Article V(1)(b), analyzed below, that prevented Bloomberry from having access to important evidence that was necessary for it to be able to present its case.[218]

### 1.    Document Production Ordered by Tribunal

The tribunal ordered document production in accordance with the IBA Rules as the parties specified in their arbitration agreement. Under the tribunal's order that the parties prepare a Redfern Schedule, GGAM and its attorneys were obliged to produce documents "reflecting GGAM's efforts to deliver to the Solaire junket operators in Asia, including any documents supporting Mr. Stone's statement that GGAM provided access to and delivered to Solaire foreign VIP customers and Chinese junket operators" and "reflecting GGAM's efforts to deliver foreign VIP premium direct customers to the Solaire."[219] Bloomberry sought these documents to put together its case on the core issue of the case: could and did GGAM satisfy its obligations under the MSA to provide Solaire with foreign VIP customers, Chinese junket operators, and premium direct customers?

---

[217] *Deiulemar Compagnia Di Navigazione v. Transocean Coal Co,* 2004 WL 2721072, * 12 (S.D.N.Y. Nov. 29, 2004).
[218] *Karaha Bodas Co. LLC,* 364 F.3d at 300-01 ("It is appropriate to [deny recognition of] an arbitral award if the exclusion of relevant evidence deprives a party of a fair hearing").
[219] *See* Feb. 16, 2015 Tribunal Decision, Req. Nos. 2 and 3, columns 1 and 2.

As described in the Statement of Facts above, on February 16, 2015, the tribunal ordered GGAM to produce documents consistent with the IBA Rules of Evidence and pursuant to a Redfern Schedule. As analyzed in greater detail below, despite the order, no documents in Mr. Chiu's possession were produced by GGAM at that time.

### 2.    Background on the IBA Rules of Evidence and the Redfern Schedule

The custom and practice related to document production in international arbitration differs significantly from rules of civil procedure that apply in US courts. In the United States, like other common law countries, rules of procedure facilitate as a matter of right extensive pre-trial document production directly between the parties. Typically, a court only becomes involved when there is a dispute regarding relevancy of a request or some assertion of privilege.

In civil law countries, by contrast, procedural rules permit only very narrow document production, usually based on specific identification of individual documents. In some civil law countries, document production is either not permitted at all or does not exist as a practical matter. More importantly, in civil law countries documents are not exchanged directly between the parties. Instead, document production requests are presented to and ordered by the judge.

### a.    The IBA Rules of Evidence

In international arbitration, parties often come from different countries that involve a combination of civil- and common-law traditions. The IBA Rules and a tool called a "Redfern Schedule" were specifically developed for use in international arbitration to harmonize the distinct approaches to document production and to promote fair and efficient evidence gathering and presentation.

The IBA Rules are a detailed set of rules that provide uniform evidentiary standards for conducting international arbitration proceedings. The IBA Rules represent a hybrid of common law and civil law evidentiary standards that are considered by the arbitration community to

constitute best practices in the field. Because they represent best practices in international arbitration, the IBA Rules are almost ubiquitous. Even if the parties have not expressly incorporated them or agreed to their use, tribunals regularly consult the IBA Rules as "soft law" authority to provide structure and consistency to their evidentiary rulings.

As one scholar has observed, "[i]n today's practice, the [IBA Rules] occupy an outstanding position. They are widely accepted by the arbitration community and are considered to be 'best practices' by several authors. Indeed, procedural rules established by arbitral tribunals very often refer to the IBA Rules or contain rules that are inspired by them."[220]

As a harmonization of common law and civil law traditions, the IBA Rules aim to facilitate document production but minimize the kind of "discovery wars" that sometimes characterize document exchange in U.S. litigation.

For example, paragraph 3 of the Preamble of the IBA Rules that "[t]he taking of evidence shall be conducted on the principles that each Party shall act in good faith." The official Commentary to the IBA Rules also underscore that "[P]aragraph 3 of the Preamble . . . includes a requirement that each Party shall act 'in good faith' in the taking of evidence pursuant to the IBA Rules."[221]

If a party has been ordered to produce documents, the responding party is obliged to produce the documents, as well as identify documents that are responsive to the order but that the party has a basis (such as attorney-client privilege) not to produce. Moreover, their counsel have an obligation to affirmatively assist them in undertaking this obligation.

In international arbitration, such a reasonable search would typically involve the following steps:

---

[220] *Document Production in International Arbitration* (Marghitola; Jan 2015).
[221] Official Commentary of the 2010 Rules.

1.      Identifying custodians who are likely to have documents responsive to the requests

2.      In the case of electronically stored information, creating targeted search terms to search the records of those custodians

3.      In the case of searching hard copy documents, performing a review of files or documents likely to be responsive to the requests

4.      Reviewing the documents for responsiveness

5.      Applying appropriate redaction of any information which may be privileged

6.      Timely producing the documents to the requesting party

The focus on good faith in the IBA Rules is also intended to limit sharp practice that can be common in U.S. litigation, such as springing evidence on an opposing party at the last minute. In this respect, the IBA Rules' Preamble expands on the basic concept of good faith by specifying that each party is "entitled to know, reasonably in advance of any Evidentiary Hearing or any fact or merits determination, the evidence on which the other Parties rely."

Almost by definition, parties in an international arbitration often speak different languages and/or evidence relevant to their underlying transactions occur in different languages. For this reason, the IBA Rules require production in documents in other languages. Moreover, it would be inequitable to excuse a party from producing documents solely because those documents were in a language different from the language of the arbitration.

The IBA Rules also contemplate that when a party is obliged to search for and produce documents ordered by the tribunal, it will include in that production documents that are in a language other than English or a language that is different from the arbitral proceedings.[222]

---

[222] *A Guide to the IBA Rules on the Taking of Evidence in International Arbitration* (Khodykin, Mulcahy and Fletcher; Aug 2019) at para. 6.379 ("The provision of translations is a common practice in international arbitration where very often documents submitted or produced will include documents in a language other than the language of the arbitration.").

Specifically, article 3(12)(d) of the 2010 IBA Rules states that documents produced in another language "shall be submitted together with the originals and marked as translations with the original language."[223]

### b.    The Redfern Schedule

A Redfern Schedule pertains only to document production, not other evidentiary issues. Like the IBA Rules, the Redfern Schedule was developed to harmonize common-law and civil-law traditions and to make document production more structured and efficient.

In form, a Redfern Schedule is a chart with five columns. In the first column, the party requesting documents indicates narrow categories of requested documents. In the second column, the requesting party provides a short description of each category of document's relevance to the case and the materiality of its outcome. The second column may also provide an explanation of why the documents sought are "*more than likely*" not in "*possession, custody or control*" of the requesting party and that it would not be "*unreasonably burdensome*" for the requesting party to produce them.

In the third column of the chart, the party from whom documents are requested provides its replies and/or objections, and in the fourth column the requesting party replies to any objections raised.

Finally, in the fifth column, the tribunal provides its decision regarding whether the requested documents must be produced. Under this procedure, and in contrast to pre-trial discovery in US litigation, all document production in an international arbitration is overseen and expressly ordered by the tribunal. In fact, the final version of a Redfern Schedule is often published as an order by the tribunal.

---

[223] 2010 IBA Rules, art. 3(12)(d).  In amendments to the 2020 IBA Rules, documents in a foreign language must still be produced, but such documents no longer need to be accompanied by a translation. *See* 2020 IBA Rules, art. 3(12)(d).

### 3.    GGAM's Failure to Produce Documents Ordered by Tribunal

In their arbitration agreement, Bloomberry and GGAM agreed to incorporate the 2010[224] IBA Rules in the MSA. Their inclusion was part of a bargained-for exchange. In correspondence during negotiations about the MSA, Mr. Weidner himself insisted on "mutual rights of evidence/discovery which are clearly set out in the referenced language" in the arbitration agreement.[225]

The "referenced language" referred to in these negotiations was Clause 19.2(g) of the MSA, which states that

> In addition to the [UNCITRAL] Rules, the Parties agree that the arbitration shall be conducted according to the International Bar Association Rules of Evidence as current on the date of the commencement of the arbitration. The arbitration panel shall order each Party to submit within a specified.

In light of this language, rather than being a source of soft authority for the arbitral tribunal to consider, the parties contractually agreed that the tribunal was bound by the IBA Rules of Evidence.

As discussed above in the Statement of Facts, based on the IBA Rules and a Redfern Schedule prepared by the parties, Bloomberry requested, the tribunal ordered, and GGAM agreed to provide documents responsive to two categories:

1.    "[d]ocuments, communications and information reflecting GGAM's efforts to deliver to the Solaire junket operators in Asia, including any documents supporting Mr. Stone's statement that GGAM provided access to and delivered to Solaire foreign VIP customers and Chinese junket operators;"[226] and

---

[224] As noted *supra*, the IBA Rules were updated in 2020 after the arbitration had concluded.
[225] *See* Email from B. Weidner to E. Razon dated August 21, 2011 (GGAM-SDNY-0277865). The full text provided: "As for law, let us be clear where we are. Despite institutional desires not to, we absolutely have agreed to Philippine law and Arbitration in Asia.  We request only that, in the event of arbitration, we have the mutual rights of evidence/discovery which are clearly set out in the referenced language."
[226] Feb. 16, 2015 Tribunal Decision, Req. No. 2, columns 1 and 2.

2.    "[d]ocuments, communications and information reflecting GGAM's efforts to "deliver foreign VIP premium direct customers to the Solaire."[227]

Based on the tribunal's order, pursuant to the IBA Rules, GGAM was required to make a good faith effort to produce the above documents. "Good faith" in the context of discovery would entail performing a reasonable search for relevant documents in a party's possession that are responsive to a request for production that a party has volunteered to produce or been ordered to produce by a tribunal.[228]

As explained above in the Statement of Facts, the tribunal ordered the parties to use a Redfern Schedule to organize the parties' requests for production of documents. In its reply to these requests, GGAM confirmed that it would search for and produce such documents.[229]

Again, as noted above in the Statement of Facts, GGAM never objected either to Bloomberry or to the tribunal that there were aspects of what was ordered that GGAM considered either irrelevant or unduly burdensome to produce.

Bloomberry sought these documents to put together its case on the core issue of the case: could and did GGAM satisfy its obligations under the MSA to provide Solaire with foreign VIP customers, Chinese junket operators, and premium direct customers?

---

[227] Feb. 16, 2015 Tribunal Decision, Req. No. 3, columns 1 and 2.
[228] *See, e.g.*, Khodykin, *supra* n. 222 at para. 2.71. ("Likewise, a bad faith violation of an express positive obligation must amount to a breach of the corresponding obligation of good faith. For example, the failure to identify all expert witnesses on whose testimony the party intends to rely with the intention to ambush or surprise the other party at a later date, raising objections to produce documents under Article 3.5 without a reasonable and good faith basis for doing so, and deliberately withholding production of documents that are known to exist and that fall within an order for production by a tribunal. Any other interpretation would undermine effective application of the good faith principle. Indeed, it has been rightly pointed out that the duty of good faith is perhaps most easily expressed in the negative.").
[229] *Id.*

Despite the tribunal's order, GGAM's promise to produce, and the absence of any contemporaneous excuse, GGAM did not produce any documents or communications that were in Mr. Chiu's possession, including any emails between Mr. Chiu and third parties.

### 4.    Consequences of GGAM's Failure to Produce

Without these documents from Mr. Chiu, Bloomberry was forced to present its case in the Liability Hearing solely on the documents produced to date by GGAM.

As discussed above in the Statement of Facts, Bloomberry explained in its Request for Reconsideration of the Liability Award and its related briefing that after the Liability Hearing, when both FCPA Orders became public, Bloomberry deduced that Mr. Weidner and Mr. Chiu were the two individuals whose activities were described in the FCPA Orders.[230] Bloomberry explained that its concerns raised by the FCPA Orders compounded its concerns from the Liability Hearing regarding GGAM's strategies.[231] Bloomberry also explained that it did not learn until the Liability Hearing the nature of Weidner's two strategies and how it was that Mr. Chiu had an "instrumental" role in implementing those strategies as Mr. Weidner's "right-hand top man."[232]

One reason Mr. Chiu was necessarily pivotal to Mr. Weidner's top-down government-led junket strategy and its cross-border trading platform strategy is that he was the only Mandarin-speaking GGAM executive. As such, Mr. Chiu was the only GGAM executive who communicated directly (in person and in writing) with the Chinese and Macanese businessmen and government

---

[230] *See* Feb. 16, 2015 Tribunal Decision, Req. Nos. 2 and 3, column 3 .

[231] *See generally* Bloomberry's Request for Reconsideration of the Liability Award at paras. 70-84, 93-103 (GGAM-SDNY-0319872); Bloomberry Reply in Support of Request for Reconsideration at paras. 65-67 (GGAM-SDNY-0313358).

[232] *See* Bloomberry's Request for Reconsideration of the Liability Award at paras. 73-84 (GGAM-SDNY-0319872); *see also* October 19, 2015 Hr'g Tr. at 279:13-17 (Weidner); *id.* at 280:13-14 (Weidner).

officials that were central to Mr. Weidner's two strategies.[233] Mr. Weidner had testified that GGAM fulfilled its obligations under the MSA by implementing its two China-related strategies.

According to Bloomberry's Request for Reconsideration of the Liability Award and related briefing, based on this new information from the Liability Hearing about how GGAM purported to have performed under the MSA, and after deducing that Mr. Weidner and Mr. Chiu were the two individuals who were implicated in the illegal conduct described in the FCPA Orders, Bloomberry re-reviewed the documents that GGAM had produced pursuant to the Redfern Schedule. [234] According to Bloomberry, in this review, Bloomberry noticed that, while GGAM had produced some emails between Mr. Chiu and GGAM's principals, GGAM had not produced any emails between Mr. Chiu and any third parties.[235]

According to Bloomberry, in follow up, Bloomberry reviewed the metadata of documents produced pursuant to the Redfern Schedule and noticed that Mr. Chiu was not identified as a custodian for any of the documents produced by GGAM. [236] Based on this research, it appeared to Bloomberry that none of the documents produced pursuant to the Redfern Schedules were from Mr. Chiu's electronic files or email accounts.[237]

As a defense to the claim that GGAM breached its obligation to produce documents under the IBA Rules, Mr. Patrizia asserted in his declarations that Bloomberry did not identify Mr. Chiu

---

[233] October 19, 2015 Hr'g Tr. at 142:9-12 (Weidner); 280:7-14 (Weidner) ("Eric – Dr Chen speaks a little bit of English, not English really well, but Eric talks to Dr Chen when I have dinner with him because he's my interpreter and then Eric has a very good relationship with Dr Chen and brother 8 and Carson Ma and others there in Macau, and we use them as our relationship builders and Eric is my right-hand guy, GGAM's right-hand guy, in my office in Macau."); *see also id.* at 142:6-12 (Weidner) ("Now, we knew some of these junkets, we knew of some of these junkets, some of them don't speak English so we have to use people that can speak the language.  And when I say I have relationship with junket reps, I do, I can't speak to them.  Some of them speak some English, some of them speak no English, so I use Eric Chiu.").

[234] *See generally* Bloomberry's Request for Reconsideration of the Liability Award at paras. 93-103 (GGAM-SDNY-0319872); Bloomberry Reply in Support of Request for Reconsideration at paras. 65-67 (GGAM-SDNY-0313358).

[235] *See id.*

[236] *See id.*

[237] *See id.*

as a custodian whose records should be searched when it submitted its Redfern Schedule, and that Bloomberry did not raise a concern regarding the failure to search Mr. Chiu's emails until after the document production phase had finished.[238] It seems to me somewhat disingenuous for GGAM to argue that Bloomberry raised the relevance of Mr. Chiu late when, as noted above in the Statement of Facts, GGAM did not mention Mr. Weidner's two strategies or Mr. Chiu's "instrumental" role with respect to them in any of its pleadings or witness declarations until *after* discovery was complete.

In its Request for Reconsideration of the Partial Award on Liability, Bloomberry argued that the newly discovered evidence in the FCPA Orders—along with additional evidence that the FCPA Orders allowed Bloomberry to appreciate—was relevant to its claims that GGAM breached and fraudulently induced the MSA and revealed that the document production in the arbitration was incomplete in material respects and constituted procedural fraud.[239]

### 5.    GGAM's Failure to Produce as Violations of the Parties' Agreement

In responding to Bloomberry's Request for Reconsideration, GGAM provided several declarations by Mr. Patrizia, an attorney at Paul Hastings. In his declarations, Mr. Patrizia conceded that GGAM did not search the records of Mr. Eric Chiu in response to tribunal-ordered document production.[240] None of these proffered explanations[241] are legally justifications under the applicable rules agreed to by the parties for not searching for or producing Mr. Chiu's emails.

---

[238] *See* First Patrizia Declaration at paras. 56-57.
[239] *See generally* Request for Reconsideration of the Partial Award on Liability (GGAM-SDNY-0139872).
[240] *See* First Patrizia Declaration at para. 27.
[241] This concession was made after GGAM's counsel originally represented to Bloomberry, in response to a direct inquiry regarding whether they had searched Mr. Chiu's records, that "[GGAM] searched for and produced all non-privileged documents responsive to Respondents' document requests in the possession of Jonathan Rein, Michael Lehrman *and Eric Chiu*." Email from GGAM counsel to Bloomberry counsel dated June 19, 2017 (GGAM-SDNY-0419635) (emphasis added). GGAM later corrected this assertion and expressly acknowledged that it did not search Eric Chiu's records.

Mr. Patrizia confirmed that the GGAM team had not searched the documents and communications generated by or among the documents in possession of Mr. Chiu.

Mr. Patrizia proffered several reasons why GGAM did not produce, or even attempt to locate, any documents authored by Mr. Chiu. Those reasons are detailed in the Statement of Facts, *infra*, but may be summarized as the result of the following:

- The Paul Hastings made several assumptions about the unlikelihood they would find many emails if they did look for emails authored by Chiu;[242]

- GGAM used an "English search term review database" and could not search for documents written in Chinese;[243]

- "Even if collected, [Mr. Chiu's] Chinese language communications could not have been reviewed, translated and produced without substantial and disproportionate time and expense[;]"[244] and

- "[I]t would have been disproportionately time-consuming and expensive to obtain, search and review any separate personal files that Mr. Chiu might have possessed."[245]

Mr. Patrizia also acknowledged in his declarations that he and the Paul Hastings team knew that Mr. Chiu communicated through his private email address.[246] Mr. Patrizia did not, in his declarations, deny that Mr. Chiu had a central role in GGAM's strategies as described by Mr. Weidner—the evidence adduced in the Liability Hearing made clear that Mr. Chiu was

---

[242] Third Patrizia Declaration at para. 35.
[243] *Id.* at para. 35.
[244] *Id.* at para. 34.
[245] *Id.* at para. 36.
[246] *Id.* at paras. 31-33.

"instrumental" in executing GGAM's purported strategies to drive junket operators and VIPs to Solaire.

For Bloomberry to have had a reasonable opportunity to rebut GGAM's line of argument that it performed under the MSA by implementing its two strategies (much less understand whether and to what extent such strategies were illegal), it would have needed information about how Mr. Chiu and other GGAM principals worked or did not work with the junket operators, Chinese businessmen and Chinese Government officials. Such information would be in the possession of Mr. Chiu—the individual that was "instrumental" to GGAM's strategies and that directly interacted and communicated with these individuals.

As explained above, the FCPA Orders made factual conclusions that, while employed at LVS, Mr. Chiu acted on behalf of Mr. Weidner in engaging in conduct that violated the FCPA through his interactions with Chinese businessmen and Chinese Government officials. The DOJ investigation that ultimately resulted in the FCPA Orders was ongoing when GGAM chose not to search Mr. Chiu's records. Moreover, Paul Hastings represented Mr. Weidner (but not Mr. Chiu) in connection with that DOJ investigation and GGAM in the arbitration. The firm appears to have been well aware of the degree of collaboration between Mr. Chiu and Mr. Weidner in their activities regarding entities in China.

Mr. Patrizia's articulated reasons are not legal justifications under the IBA Rules of Evidence agreed to by the parties (or under custom and practice in international arbitration) for deviating from the tribunal's document production order. Instead, they suggest an intentional, systematic, and highly strategic noncompliance with the tribunal's document production order and the IBA Rules of Evidence agreed to by the parties. This conduct also appears to be a violation of

the IBA Rules' admonition of good faith and various applicable attorney ethical obligations to ensure that their clients produce documents as ordered.

While a party can object in a Redfern Schedule to a request for production as being too burdensome, it is the tribunal that weighs the burden of production of documents against the potential probative value of those documents to determine whether conducting a search for those records would be reasonable. To the extent a party unilaterally determines, after submission of a Redfern Schedule, that it is unable or unwilling to make an ordered document production, the requirement under the IBA Rules (and the custom and practice in international arbitration) is to inform the tribunal and opposing counsel—not bury the decision.

In short, because the tribunal ordered GGAM to search for and produce responsive documents, GGAM was obligated to search for and produce those documents regardless of the associated costs.  GGAM admitted not having made any attempt to search for those documents, and instead purportedly assumed that they did not exist.

Based on the Mr. Patrizia's own description of GGAM's treatment of the document production process, it would be difficult to not conclude that GGAM either deliberately or recklessly failed to search Mr. Chiu's records for responsive documents, and that such a failure constitutes a breach of GGAM's obligation to comply with the IBA Rules and the orders of the tribunal. Because these violations only came to light after the close of document production and after the tribunal rendered the Liability Award and the Singapore High Court summarily recognized and confirmed the Liability Award, the tribunal was unable to rectify these apparent violations of the procedures agreed to by the parties.  Indeed, the tribunal specifically ruled in its Decision for Reconsideration of the Liability Award that it lacked competence to do so.[247]

---

[247] Decision on Request for Reconsideration of the Partial Award on Liability at paras. 71-74 (Dkt. 141-1).

**D.    Failure to Produce Documents as Grounds for Bloombery Not Being Able to Present Its Case Under Article V(1)(b) of the New York Convention**

Another basis for refusing recognition of the Award is Article V(1)(b) of the New York Convention, which provides for non-recognition of an award where "the party against whom the award is invoked was . . . unable to present his case."

In evaluating challenges that arbitral procedures violated this ground, courts apply their national standards,[248] which in the United States has been interpeted to mean the due process and the "opportunity to be heard at a meaningful time and in a meaningful manner."[249]

In interpeting this standard, the Fifth Circuit in *Karaha Bodas Co. LLC v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*[250] determined that "[i]t is appropriate to [deny recognition of] an arbitral award if the exclusion of relevant evidence deprives a party of a fair hearing." Meanwhile, the Second Circuit in *Iran Aircraft Indus. v. Avco Corp*[251] refused recognition and enforcement of an award because the party had been misled as to what evidence was needed to sustain its case.

**1.    Procedural Fairness in This Case**

As already discussed above, corruption is notoriously difficult to prove.[252] In this case, Mr. Weidner testified to efforts by both himself and Mr. Chiu to obscure their communications regarding apparently corrupt activities. For example, Mr. Weidner testified that he "would never

---

[248] *See Telenor Mobile Commc'ns AS v. Storm LLC,* 584 F.3d 396, 405 (2d Cir. 2009).

[249] *See, e.g., Iran Aircraft Indus. v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992) (Article V(1)(b) "basically corresponds to the due process defense that a party was not given 'the opportunity to be heard at a meaningful time and in a meaningful manner'") (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

[250] 364 F.3d 274, 299-300 (5th Cir. 2004).

[251] 980 F.2d 141 (2d Cir. 1992).

[252] *See supra* Section IV.B.

put [his government-led, top-down strategy] in writing"[253] and that Mr. Chiu would never spell out the name of the Chinese Government official that was his contact.[254]

Given the challenges in proving corruption, and the questionable reasons GGAM provided for not producing (or even searching for) documents authored by a key witness, GGAM's failure to produce documents in this case I believe effectively prevented Bloomberry of a meaningful opportunity to present its case.

## 2.    Ethics Issues Raised by GGAM Lawyers' Role in Document Production

As noted above in the section on my background and qualifications, I have written a book entitled ETHICS IN INTERNATIONAL ARBITRATION, which was published by Oxford University Press in 2014, and frequently speak and write on the responsibilities of lawyers (and arbitrators) when an arbitration implicates corrupt or potentially corrupt conduct. I focus on this section on whether GGAM's lawyers' conduct complied with relevant rules governing attorney ethics in international arbitration and the impact on any violations of the rules that created procedural unfairness in this case. Violations of ethical rules are particularly important here given the challenges in proving corruption.

In addition to being violations of the tribunal-ordered procedures, GGAM's failure to produce documents also raises concerns about the ethical conduct of its lawyers. The fact that the document production deficiencies in this case might also constitute ethical misconduct underscores how the procedural deficiencies raise due process concerns. Violations of governing ethics rules also helps rule out that the failure to produce documents was the innocent result of confusion.

---

[253] October 19, 2015 Hr'g Tr. at 215:18-22 (Weidner).
[254] *Id.* at 180:18-181:1 (Weidner).

Though the applicable ethics rules are a useful point of reference, a reviewing court does not need to find actual ethical misconduct to find that an award is not enforceable.

By way of background, there are some jurisdictions and situations in which attorneys' professional and ethical obligations regarding document production are unclear. For example, lawyers trained in civil law systems generally unfamiliar with document production because it does not exist as a procedure or practice in their civil law countries. Similarly, in some countries like Brazil, attorneys are ethically prohibited from complying even with tribunal-mandated document production. There is little ambiguity about attorney obligations in this case, however.

The rules of professional conduct of the District of Columbia bar, where Mr. Patrizia is admitted to practice, or of the New York bar, of which some of GGAM's former legal team were members, are clear that attorneys have affirmative obligations to ensure that their clients comply with discovery orders.[255] The ethics rules of Singapore,[256] the seat of the arbitration, impose similar obligations. There are some complexities about which of these rules disciplinary authorities for either the DC or New York Bar disciplinary authorities would apply if they were ever to consider the propriety of GGAM's counsel's conduct.[257]

In addition to national bar rules, the IBA has developed special guidance to help harmonize the different national ethics rules. In this case, the IBA Guidelines on Party Representatives in

---

[255] *See* N.Y. Rules Pro. Conduct R. 3.3(f); DC Rules Pro. Conduct R. 3.4(c)-(d).

[256] *See* Article 8(A)(3-5) of the Legal Profession (Professional Conduct) Rules [Singapore].

[257] Under both New York and DC rules of professional responsibility, Rule 8.5(a) of each code confirms that the respective bar association has global disciplinary power over the conduct of attorneys licensed in each jurisdiction wherever that conduct occurs. *See* N.Y. Rules Pro. Conduct R. 8.5(a); DC Rules Pro. Conduct R. 8.5(a). Meanwhile, Rule 8.5(b) of each code then confirms which rules each bar association will apply in the event of discipline that occurs outside of their respective jurisdictions. *See* N.Y. Rules Pro. Conduct R. 8.5(b); DC Rules Pro. Conduct R. 8.5(b). In this case, applying its Rule 8.5, DC would apply Singapore Rules and potentially the IBA Guidelines on Party Representation, while New York would formally apply New York Rules. For reasons I have explored extensively as a scholar, ultimately which rules are technically applied will not likely lead to a different outcome. If New York directly applies its own ethics rules, Singapore (and potentially the IBA Guidelines on Party Representatives).

International Arbitration.[258]  These Guidelines have not been expressly agreed to by the parties or formally imposed by the tribunal in this case. The IBA Guidelines, however, provide meaningful guidance about expectations in the field of what constitutes appropriate attorney conduct in international arbitration.

Finally, the new Restatement suggests that the IBA Guidelines may be considered appliable to some U.S. counsel. Specifically, Section 3.9(c) provides that the "professional conduct of an attorney appearing in an international arbitration may be governed by a range of sources" and that the applicability of and relationship among these sources may vary depending on where the attorney is licensed and where the arbitration is seated." The Restatement elaborates that the sources that may apply to such professional conduct include:[259]

> (1) the ethical rules, including the choice-of-law provisions, of the jurisdiction or jurisdictions in which the attorney is licensed;
> (2) the ethical rules of the place where the attorney's conduct occurs; and
> (3) other ethical or conduct rules and guidelines imposed by the arbitral tribunal or through party agreement.[260]

Some complexities exist regarding which source a disciplinary authority might apply in particular circumstances.[261] In this case, however, these complexities do not matter because all three possibly applicable sources prohibit an attorney's wrongful interference with or failure to be reasonably diligent in document production and all three sources include an obligation for attorneys to assist

---

[258] As noted in the introduction, I was a member of the IBA Task Force that produced these Guidelines. While the Guidelines have been subject to some debate within the field, objections have been by civil law lawyers, who object that the Guidelines are to common-law focused and designed for the kind of document production that occurs in the United States. *See, e.g.,* Felix Dasser, *A Critical Analysis of the IBA Guidelines on Party Representatives*, ASA SPECIAL SERIES NO. 37 (2015). Given that all attorneys implicated in this analysis are licensed in the United States, those critiques do not apply here.
[259] Restatement, § 3.9(c).
[260] Restatement, § 3.9(c)(1)-(3).
[261] *See* Catherine A. Rogers, *Lawyers Without Borders*, 30 U. PENN. INT'L L. REV. 1035 (2009); *see also* Catherine A. Rogers, *When the Bad Guys Are Wearing White Hats*, 1 STANFORD J. COMPLEX LIT. 487 (2013).

their clients in understanding and complying with tribunal orders regarding document production.[262]

Bar ethics rules are not generally applied directly by courts. However, the consistency among the range of potentially applicable ethics sources here are relevant to confirm that counsel obligations were clear and unambiguous, whichever rules might ultimately be deemed to apply. As analyzed above,[263] unlike U.S. discovery, document production in international arbitration pursuant to the IBA Rules of Evidence and the Redfern Schedule is only required after an arbitral tribunal has evaluated the request and ruled expressly that the documents should be produced.

As analyzed above, GGAM's own evidence suggests that it intentionally decided not to produce documents requested by Bloomberry and ordered by the tribunal. GGAM itself seems to concede that these documents are relevant and does not deny the tribunal ordered them to be produced. None of GGAM's counsel's explanations constitute legally cognizable reasons for non-production under any of the potentially applicable ethics rules.

Sophisticated, experienced international arbitration counsel either knew or should have known that it could be unethical if its actions are deemed to be an intentional violation of the tribunal's order to produce documents and a willful denial of evidence an opposing party needs to prove its case.

In this case, it also seems implausible that experienced counsel could legitimately decide that Mr. Chiu was unlikely to have any relevant documents that were not already produced. Mr. Weidner described Mr. Chiu as his "right hand" and as "instrumental" to Mr. Weidner's activities

---

[262] For example, even if New York or DC ethics rules do not apply directly, their definitions of "misconduct" likely still apply. *See* N.Y. Rules of Pro. Conduct R. 8.4 (violation of Rules constitute misconduct); DC Rules of Pro. Conduct R. 8.4 (same). Both the DC and the New York Rule 3.4 prohibit an attorney from obstructing another party's access to evidence. *See* N.Y. Rules of Pro. Conduct R. 3.4; DC Rules of Pro. Conduct R. 3.4.

[263] *See supra* Section IV.C.

in China in connection with the MSA. Mr. Weidner also testified that Mr. Chiu was the only person who spoke Chinese, which implies that all communications with Chinese officials and businessmen would necessarily have been authored by Mr. Chiu. Under these circumstances, it strains credulity that experienced counsel could rationally decide it was patently implausible that Mr. Chiu would have relevant documents.

As noted above, corruption is notoriously difficult to prove. To the extent that Bloomberry sought to argue that GGAM's corrupt activities in China were a violation of the MSA, it seems imminently reasonable to assume that primary communications from GGAM's President for Asia (Eric Chiu) with the Chinese Government officials who were central to GGAM's business strategies would be a useful and important resource.

Finally, GGAM's counsel had a particularly bird's-eye view of Mr. Weidner's working relationship with Mr. Chiu. As noted above, Paul Hastings not only represented GGAM in the arbitration, but also Mr. Weidner personally during the pendency of the SEC and DOJ investigations underlying the FCPA Orders.[264]

In sum, it is ethically inappropriate for counsel, either on their own or in deference to clients, to make  unilateral self-serving decisions not to comply with tribunal orders to produce documents. Instead, the appropriate response by counsel would have been to raise a formal objection based on its beliefs that the search and production of ordered documents would have been too burdensome or otherwise unwarranted.

### E.    Failure to Produce Documents as Procedural Fraud and Ground for Violation of Public Policy Under Article V(2)(B) of the New York Convention

Flagrant breaches of basic procedural guarantees that taint the entire arbitral process are another category of public policy violations that justify refusing recognition and enforcement to

---

[264] I am informed that Paul Hastings no longer represents GGAM for unknown reasons.

the email a communication that he had separately sent to the representative of a junket operator in which he used "xxx" to  mask the name of the Chinese Government official that they would be meeting and/or transacting with.[281] This email is compelling indirect proof of corruption. Additional correspondence may have confirmed the identity of this Chinese Government official, as well as details about their meetings or transactions. These additional details surely would have boosted Bloomberry's ability to prove to the tribunal in the Liability Hearing that GGAM's "strategies" involved corrupt and illegal activities that warranted Bloomberry's termination of the MSA.

## V.    CONCLUSION

For the reasons analyzed above, in my expert opinion, this Award should be denied recognition and enforcement

Executed this 16th day of September 2022

_____

Catherine A. Rogers

---

[281] *See* Email from E. Chiu to B. Weidner dated April 27, 2013 (GGAM-SDNY-0278838 at p. 42); October 19, 2015 Hr'g Tr. at 180:18-181:1 (Weidner).