**Page 41**

1 These were special board meetings; correct?
2   A.  This one was a special board meeting.
3   Q.  And by "this one," you're referring to
4 both the BRHI and the SPI meetings; correct?
5   A.  I believe so.
6   Q.  And who called them?
7   A.  That would have been the corporate
8 secretary or several Board Members.
9   Q.  You didn't call these meetings?
10  A.  No.  No.  I wasn't involved in any part of
11 these meetings.
12  Q.  What's your understanding of why these
13 meetings were called?
14  A.  I understand --
15      MS. FISSELL:  Objection.
16      THE DEPONENT:  I can answer?
17      MS. FISSELL:  You can answer.
18  A.  My understanding is because GGAM filed a
19 case involving me personally, which is very unfair,
20 since these are corporate matters.
21      BY MR. PASCUCCI:
22  Q.  And so this meeting or these meetings,
23 what was it that the Board ratified?
24      MS. FISSELL:  Objection.
25  A.  I wasn't participating in these meetings.

**Page 46**

1   Q.  Was there a time prior to this where you
2 believe that the company had ratified your use of
3 one of the two corporate aircraft, but not both?
4   A.  No.
5       MS. FISSELL:  Objection.
6   A.  Nothing was clear.
7       BY MR. PASCUCCI:
8   Q.  When did you first learn that this Board
9 meeting was being held?
10  A.  I only learned that there was a Board
11 meeting after the fact.
12  Q.  So prior to this Board meeting being held,
13 did you speak with anyone in or connected with BRHI
14 about the need for the Board to ratify your use of
15 corporate aircraft?
16      MS. FISSELL:  Objection.
17      I'll just again caution the witness not to
18 disclose any privileged communications he may have had
19 on the subject.
20  A.  The answer is no.  I have no idea.
21      BY MR. PASCUCCI:
22  Q.  Did anything change with respect to your
23 use of company planes as a result of this
24 resolution?
25  A.  No.

**Page 59**

1   A.  That was a "no."  I'm not aware.  Not
2 that -- that doesn't mean there isn't one, but I'm
3 just not aware.
4   Q.  Are there any limits on the BRC policy
5 that directors can use company facilities?
6   A.  I think for a director it's -- to the best
7 of my recollection, it's 2 million pesos a year.
8   Q.  So they can use up to 2 million pesos a
9 year in value as a director?
10  A.  Yes.  That's signing privileges,
11 restaurants, rooms.
12  Q.  Can they use the company jets?
13  A.  If it was below 2 million pesos, they
14 could, yes.
15  Q.  And you have a different limit than the
16 directors?
17  A.  I have no limit.
18  Q.  You can use -- under this BRC policy, you
19 are entitled to use company facilities without
20 limit?
21  A.  Yes.
22      MS. FISSELL:  Objection.
23  A.  Well, the facilities.
24      BY MR. PASCUCCI:
25  Q.  Does that include the company jets?

**Page 60**

1   A.  That would include the company jets.
2   Q.  To the best of your knowledge, has this
3 policy ever been disclosed to BRC's Shareholders in
4 its public filings?
5   A.  Yes.  That would have been disclosed in
6 the annual meeting by the Board minutes, if we were
7 listed already at the time.
8   Q.  Since BRC has been listed, to your best of
9 your knowledge, has BRC ever in its public filings
10 disclosed the existence of a policy under which you
11 are entitled to use company facilities, including
12 its corporate jets, without any limit?
13  A.  I don't know the specifics.
14  Q.  Have you ever seen that in any of the
15 company's public disclosures?
16  A.  Not personally, no.
17  Q.  How is this policy administered?
18      MS. FISSELL:  Objection.
19  A.  You'll have to ask the people who monitor
20 it.
21      BY MR. PASCUCCI:
22  Q.  Who are the people who monitor it?
23  A.  It would be either the CFO's office or the
24 property CFO.
25  Q.  So did you say it would be either the

**Page 120**

1  that your current net worth is at least $5 billion?
2  A.  Would be that, minus some debt.
3  Q.  Would it be fair --
4  A.  They only put the asset value. They don't
5  minus any debt.
6  Q.  Do you have over a billion dollars in
7  debt?
8  A.  No.
9  Q.  So is it fair to say that your net worth
10 is somewhere above USD 4 billion?
11 A.  I would say that that's accurate, yeah.
12 Q.  In the past 10 years, you've worked as an
13 officer or director at several companies; correct?
14 A.  Correct.
15 Q.  What is your understanding of the
16 fiduciary duties an officer of a publicly traded
17 company in the Philippines owes to its shareholders?
18     MS. FISSELL:  Objection.
19     BY MR. PASCUCCI:
20 Q.  Duty as CEO would be to look after the
21 interest of the company, thereby looking after the
22 interest of the shareholders that you have,
23 especially in listed companies, and running the
24 company as transparent and to the benefit of the
25 stakeholders, aside from shareholders, employees,

**Page 121**

1  the community that we serve.
2      We operate in many communities in Africa,
3  Latin America, Europe, Australia. We have to make
4  sure that the companies run efficiently, clearly,
5  and transparently.
6  Q.  You just said that you operate in many
7  countries.
8      Are you referring to ICTSI or some other
9  companies?
10 A.  I'm referring to the ICTSI group and every
11 company that I'm tasked to run.
12 Q.  So that would include BRC -- let's
13 define -- you've used a phrase, "the Razon Group of
14 companies." I've seen it in numerous
15 communications.
16     Is that a phrase that you're familiar
17 with?
18 A.  Yes.
19 Q.  And when you refer to the Razon Group of
20 companies, that includes ICTSI; correct?
21 A.  That's correct, yeah.
22 Q.  It includes BRC?
23 A.  It includes BRC.
24 Q.  And BRHI?
25 A.  Well, it includes Solaire.

**Page 122**

1  Q.  Okay. So that's -- BRHI and SPI are both
2  included in the Razon Group of companies?
3  A.  There's 400 companies that are in the
4  group.
5  Q.  That's a yes; right? They are part of the
6  group?
7  A.  Yes.
8  Q.  What other companies are in the Razon
9  Group of companies?
10 A.  Apex Mining, MORE Electric, Prime
11 Infrastructure Holding, Prime Infrastructure
12 Capital, Manila Water, to name a few operating
13 companies.
14     There will be many holding companies or
15 subsidiaries to those companies. Like, Manila Water
16 would have 50, 60 subsidiaries. ICTSI has 30-plus.
17 Q.  Do you, directly or indirectly, hold a
18 majority interest in all of the companies you would
19 consider to be part of Razon Group of companies?
20 A.  Indirectly would be yes.
21 Q.  You listed your understanding of the
22 duties that a CEO of a company owes to its
23 shareholders. Was that list complete? Are there
24 any other duties that you're aware of that a CEO of
25 a company owes to its shareholders?

**Page 131**

1  Q.  Offering. Okay?
2  A.  Your "top-up" is -- the term here is
3  "follow on."
4  Q.  Happy to use your terminology. We can
5  call it a "follow-on offering."
6      Let's go to Page 41 of this document.
7  We'll have to blow that up a little bit.
8      So this is a section -- can you see all of
9  that, sir?
10 A.  Yes.
11 Q.  This is a section called "Use of
12 Proceeds," and I want to focus your attention on the
13 fourth paragraph, which reads: "The company intends
14 to use the proceeds of the subscription to fund
15 Phase 1 of Solaire Manila, including construction,
16 FF&E, and other various day-to-day expenses, such as
17 pre-opening costs and working capital, as well as
18 for general corporate purposes."
19     Do you see that?
20 A.  Yes.
21 Q.  So was the purpose of the follow-on
22 offering to raise capital to support construction
23 and operation of Solaire?
24 A.  Yes. To complete Solaire, finish it.
25 Q.  This was a true representation to

**Page 132**

1  potential investors of the intended use of funds to
2  be raised in the follow-on offering; correct?
3      A.  Yes.  And the funds were used exactly for
4  that purpose.
5      Q.  So your goals -- among your goals, one of
6  your goals in forming BRC and publicly listing it on
7  the follow-on offering was to raise capital to
8  complete the Project and fund its operations?
9      A.  That's right.
10         MR. PASCUCCI:  Let's put up Tab 30, which
11 we'll mark as 136.
12         (Plaintiff's Exhibit 136 was marked.)
13         BY MR. PASCUCCI:
14     Q.  Mr. Razon, I've put in front of you an
15 affidavit that you submitted in the arbitration in
16 this case.  It's titled "Affidavit of Enrique Klar
17 Razon, Jr."
18         MS. FISSELL:  Dan, this isn't an affidavit
19 from the arbitration.
20         MR. PASCUCCI:  I'm sorry.  I misstated
21 that.  This is an affidavit submitted in the Hong
22 Kong High Court.  Apologies for that.
23         BY MR. PASCUCCI:
24     Q.  Do you recall signing this affidavit?
25     A.  No, I would have to read it first.  Can we

**Page 145**

1      Q.  Okay.  If you change the word "control"
2  that Ms. Occeña used to "majority shareholder
3  ownership" or "share ownership," was this statement,
4  "Mr. Razon doesn't want to relinquish majority
5  ownership," an accurate reflex of your views?
6      A.  Yes.  It's always majority.  She misstated
7  that.
8      Q.  It was important to you to maintain
9  majority control -- it was important to you to
10 maintain control over a majority of the shares of
11 BRC at all times?
12     A.  Yes, majority ownership of Prime.
13     Q.  And it was important for you to maintain
14 majority ownership over Solaire and the entities
15 through which you held Solaire, even after the IPO
16 and follow-on offering?
17     A.  Yes.  That's a matter of corporate policy
18 and strategy.
19     Q.  Is that corporate policy in all your
20 companies?
21     A.  Yes, unless they are passive investments
22 or it's too big a company to have a majority of.
23 That sort of thing.
24     Q.  But the companies you consider the Razon
25 Group of companies, that's your policy throughout?

**Page 146**

1      A.  As much as possible, yes.
2      Q.  So I want to switch topics and just be
3  clear on what I'm doing here, that we talked about
4  earlier you were designated as the corporate
5  representative of BRHI and SPI on Topic Number 2,
6  which is written:  "Mr. Razon's role and
7  responsibilities as Chief Executive Officer and
8  Chairman of the Boards of Directors of SPI and
9  BRHI."
10         You understand that you're the corporate
11 designee to testify on that topic; correct?
12     A.  Yes, and Razon here -- there is no "E" in
13 my name.  It is just Razon.
14     Q.  I apologize.  I didn't create that, but
15 that's just a transcript from --
16     A.  It's a transcript of what?
17     Q.  An investor conference in 2012.
18         So on the Topic 2 that we just read, you
19 understand you are the corporate designee on that
20 topic; correct?
21     A.  In what company?
22     Q.  You are the corporate designee to testify
23 about your role and responsibilities as CEO and
24 Chairman of the Boards of SPI and BRHI.
25         You understand that; right?

**Page 147**

1      A.  Right.
2      Q.  Let's --
3      A.  And BRC.
4         MS. FISSELL:  They are not interested.
5         BY MR. PASCUCCI:
6      Q.  Let's put up Tab 32.  We will mark this as
7  140.
8         (Plaintiff's Exhibit 140 was marked.)
9         BY MR. PASCUCCI:
10     Q.  This is a bio from your ICTSI website,
11 your ICTSI bio.  Why don't you take a minute and
12 review that?
13     A.  That's a terrible picture.
14     Q.  Apologies for that.  I don't make your
15 website, either --
16     A.  No, but somebody's got to --
17        (Overlapping speakers.)
18     A.  This has to be changed.
19     Q.  You may have to talk to your marketing
20 department about that.
21     A.  I will.
22         MS. FISSELL:  Can you guys make it a
23 little bigger?  The font is still pretty small here.
24         MR. PASCUCCI:  Yeah, we can make it
25 bigger.  You have the ability to slide it to the

Deposition of Enrique K. Razon, Jr. V.1                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1      A.   The agendas are consistent with what is
 2  required by the management.
 3      Q.   Do you decide when and where board
 4  meetings will be held?
 5      A.   Well, it depends.  Sometimes not all
 6  directors are available, so it's a compromise.  We
 7  propose; corporate secretary proposes.
 8      Q.   Prior to BRHI becoming a subsidiary of
 9  BRC, you were the owner of BRHI, 100 percent;
10  correct?
11      A.   Before Active Alliance?
12      Q.   Yes.
13      A.   It was Prime.
14      Q.   All right.  And you owned 100 percent of
15  Prime?
16      A.   Yes.
17      Q.   So, as owner of BRHI indirectly through
18  Prime, did you appoint yourself to the roles of
19  Chairman and CEO of BRHI prior to the BRC roll-up?
20      A.   Well, it was based on organization
21  committee of the stockholders.
22      Q.   You were -- but your company, Prime, was
23  the only stockholder?
24      A.   Correct.
25      Q.   So was there a meeting -- did Prime meet
```

```
 1  with itself to decide who would be Chairman and CEO?
 2      A.   Well, there was a Prime board meeting.
 3      Q.   Was anyone other than you considered to be
 4  the Chairman and CEO of BRHI at that meeting?
 5      A.   No.
 6      Q.   Did you propose that you be Chairman and
 7  CEO?
 8      A.   Well, I don't do the proposal.  That was
 9  somebody else.
10      Q.   As the ultimate owner of BRHI prior to
11  Active Alliance, you didn't need anyone else's
12  approval to appoint yourself to those positions,
13  though, did you?
14      A.   No, but for formality and requirements'
15  sake, you need somebody to make a motion and
16  somebody to second.
17      Q.   And who made the motion and seconded your
18  nomination to be Chairman of BRHI?
19      A.   One of the directors of BRHI.
20      Q.   Were there directors of BRHI before you
21  were named Chairman?
22      A.   There's always directors from the -- from
23  when a company is incorporated.  They just change.
24  You cannot incorporate a company in the Philippines
25  without directors.
```

Deposition of Enrique K. Razon, Jr. V.1                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1  the minutes are done.  If not, usually it's dropped,
 2  rediscussed informally, and if there's really strong
 3  objections, then it's dropped completely.
 4      Q.   Is that also true for Sureste?
 5      A.   Yes.
 6      Q.   Has there ever been a time where you
 7  wanted the Board to approve an action and, through
 8  the process you just described, the Board failed to
 9  approve it?
10      A.   I would say that there are times when
11  management wrote up -- sent a recommendation, I
12  supported it, and one or two directors said, "Maybe
13  it's not such a good idea.  Let's restudy it."  So
14  it's sent back.
15      Q.   And in those instances, you agreed with
16  those dissenting Board Members that it should be
17  studied further or sent back?
18      A.   Well, yeah.  Normally -- because, you
19  know, we like to keep harmonious meetings.  It's --
20  really, anyone can object, and we wouldn't override
21  an objection.
22      Q.   Has there ever been a time at the BRHI
23  Board when, after discussion, you felt strongly that
24  a measure should be passed and the Board still
25  didn't agree with your position and didn't approve
```

```
 1  it?
 2           MS. FISSELL:  Objection.
 3      A.   No -- sorry.
 4           No.  It would not get to that stage.
 5           BY MR. PASCUCCI:
 6      Q.   Would your answer be different for SPI?
 7      A.   It would be the same for -- well, it all
 8  depends on the actual issue, no?  But it will be the
 9  same for all the companies.
10      Q.   Where is your BRHI office, your personal
11  office?
12      A.   My office is in the port.
13      Q.   So you don't have an office at Solaire?
14      A.   I do.  Since the pandemic, I have been
15  using my Solaire office, because there -- in the
16  port, which is a very public place, there were so
17  many infections and stuff, so we had to close the
18  building for many months.
19      Q.   Let's talk about before the pandemic.
20           Before the pandemic, did you have an
21  office at Solaire?
22      A.   I had an office, but I used my port
23  office.
24      Q.   So you didn't regularly work out of the
25  Solaire office?
```

**Page 181**

1  Q. And the option provided GGAM the right to
2  purchase a portion of the Shares you held through
3  Prime; correct?
4  A. Correct.
5  Q. Shares in BRC; correct?
6  A. Correct.
7  Q. And you were 100 percent owner of Prime at
8  that time; correct?
9  A. Correct.
10 Q. Did BRHI or SPI ever compensate you or
11 reimburse you or Prime for granting that equity
12 option to GGAM?
13 A. No.
14 MR. PASCUCCI: Let's put up Tab --
15 Exhibit 143. This is already marked Exhibit 143.
16 And let's go up to Paragraph 11.
17 BY MR. PASCUCCI:
18 Q. So, again, this is your declaration in the
19 arbitration, one of them.
20 Do you see Paragraph 11 is split into two
21 paragraphs, but they are not separately numbered?
22 So I'm looking now at the second paragraph of
23 Paragraph 11. Do you see where it starts with "I am
24 appalled."
25 Are you with me?

**Page 189**

1  twisting and changing, trying to change the
2  perception or the -- what was really -- in other
3  words, they were trying to change the story.
4  Q. Okay. And in your view, Prime, as the
5  grantor of the option, was a formality in the
6  substance of the deal; and the reality, as you put
7  it, was that you were granting GGAM the option, and
8  it was consideration for the management
9  relationship; correct?
10 A. Yes. It is only Prime who could have
11 granted the option because they owned the Shares.
12 Q. And in your perspective, these
13 formalities, these vehicles, as you described them,
14 weren't important from a business perspective and
15 shouldn't be given exaggerated importance in the
16 arbitration?
17 MS. FISSELL: Objection.
18 A. I would have to guess. So...
19 BY MR. PASCUCCI:
20 Q. I'm not asking you to guess.
21 During the time when you were negotiating
22 the MSA and the option terms of GGAM, all of the
23 money that had been invested to that date into BRHI
24 and SPI was your money, $200 million; right?
25 A. Yes. It was all my money, our money,

**Page 200**

1  A. At BRC.
2  Q. At BRC. Okay.
3  But she did report to you at BRHI?
4  A. I don't know.
5  Q. Pardon?
6  A. I don't know. I don't know. If she was
7  the CFO in BRHI, then she reported to me.
8  Q. Do you recall any time when you asked
9  Ms. Occeña to take action on behalf of either SPI or
10 BRHI and she refused?
11 A. That she what?
12 Q. Refused.
13 A. No, I don't recall.
14 Q. Mr. Arasi, Thomas Arasi, reported to you
15 at SPI and BRHI as well; correct?
16 A. Yes.
17 Q. Do you recall asking Mr. Arasi to take any
18 action on behalf of either company, which he refused
19 to do?
20 A. I don't recall asking him to take action
21 that he refused.
22 Q. Michael French was the CEO at Solaire in
23 2013; correct?
24 A. Yes.
25 Q. And he reported to you while he was still

**Page 208**

1  Q. And you made the decision to hire Michael
2  Aquino as Assistant Director of Security; correct?
3  A. That's correct.
4  Q. He was in jail at the time you hired him
5  for that position?
6  A. He was in detention.
7  Q. You didn't need anyone else's approval to
8  hire Mr. Aquino, did you?
9  A. At that level in the organization, I'm
10 authorized to hire.
11 Q. You testified earlier that you were the
12 controlling shareholder of BRHI, SPI, Prime, and
13 BRC; correct?
14 A. Yes. Prime, yes. Yeah.
15 Q. So at annual shareholder meetings for
16 BRHI, you vote the stock of the parent company SPI
17 shares as the controlling shareholder for SPI;
18 correct?
19 A. Yes. That proxy is always given to the
20 Chairman.
21 Q. And that's you; correct?
22 A. That's me, yes.
23 Q. And are there any -- when there's an
24 annual stockholders meeting for BRHI, are there any
25 other shareholders of SPI present other than you?

```
 1    A.    There is no other shareholder.
 2    Q.    Prior to the formation of BRC, at the
 3  annual stockholders meeting for SPI, you would vote
 4  on behalf of SPI's parent company Prime as the
 5  Controlling Shareholder of Prime; correct?
 6    A.    Yes.  As the only shareholder.
 7    Q.    And so you didn't consult with any other
 8  shareholders because there were none; correct?
 9    A.    There weren't any.
10    Q.    Following the formation of BRC, after BRC
11  was formed and publicly listed, at the annual
12  stockholders meetings for SPI, you vote on behalf of
13  SPI's parent company BRC, as the Controlling
14  Shareholder of BRC; correct?
15    A.    Correct.
16    Q.    And you also vote on behalf of BRHI's
17  shares at those meetings?
18    A.    There's no other shareholder.
19          MR. PASCUCCI:  Let's put up Exhibit 123 --
20  I'm sorry, Tab 123 and mark it as Exhibit 153.
21          (Plaintiff's Exhibit 153 was marked.)
22          BY MR. PASCUCCI:
23    Q.    So this is minutes of an annual meeting of
24  the shareholders of Sureste Properties, and it has a
25  list of shareholders present or represented, and it
```

```
 1  shows 58 million shares held by BRC in Sureste and
 2  6 million shares held by Bloomberry Resorts and
 3  Hotels, BRHI, and Sureste.
 4          You vote both of those blocks; right?
 5    A.    Yes.
 6    Q.    Does anyone else ever vote those shares,
 7  either in person or by proxy?
 8    A.    Well, the proxy is typically given to the
 9  Chairman of the meeting, although these other
10  shareholders are present, and they have their own
11  one qualifying share.
12    Q.    They have one vote each, and you have
13  64 million and change; correct?
14    A.    Which I'm voting for on behalf of BRC.
15    Q.    Are any other BRC shareholders ever
16  present at the SPI annual meeting of stockholders?
17    A.    No, because BRC is the stockholder and not
18  the stockholders of BRC.
19          MS. FISSELL:  Do you need a break,
20  Mr. Razon, or do you want to just go on?
21          MR. PASCUCCI:  Do you want to take a
22  break?
23          MS. FISSELL:  Do you want to keep going or
24  should we take a break now?  It has been about an
25  hour.
```

```
 1  Mr. Razon.
 2          Have you seen this email before?
 3    A.    I don't -- I'll have to read through it.
 4    Q.    Can you read it?
 5    A.    Okay.
 6    Q.    So you've seen this before?
 7          You received this in 2011?
 8    A.    What I can say is that I see I was copied
 9  in.
10    Q.    And you don't remember --
11    A.    It is too long ago for me to remember.
12    Q.    In the beginning of the email, Mr. Tan --
13  well, let's skip that question.  Let me start over.
14          At this time, Mr. Tan was your personal
15  attorney; correct?
16    A.    He's our corporate attorney, law firm.
17    Q.    He also represented you individually?
18    A.    Yes.
19    Q.    And at this point -- April 20, 2011 --
20  other than you individually, what -- what businesses
21  of the Razon group of companies did Mr. Tan
22  represent?
23    A.    The law firm represented most of the legal
24  work of most of the companies.
25    Q.    So Mr. Tan and his colleagues were counsel
```