**Page 18**

1 company. We do not have a retainer with Mr. Razon
2 as a person, separate from the company.
3 　　　　BY MR. AINSWORTH:
4 　Q.　Which company is that?
5 　A.　Well, it started with ICTSI, and, later
6 on, as they expanded, several subsidiaries. And
7 when Sureste was established, then Sureste, and so
8 on and so forth, whenever a new company is
9 established.
10 　Q.　And do you use the phrase "Razon Group of
11 companies" to refer to those companies?
12 　A.　Yeah. That's a loose term to refer to
13 several companies where Mr. Razon is a stockholder
14 or is a director or is an officer, Mr. Razon and his
15 family.
16 　Q.　And what companies do you consider to be
17 part of the Razon Group of companies?
18 　A.　So we have the ICTSI, and it's a listed
19 company, so it has a lot of subsidiaries.
20 　　　　We have Bloomberry Resort, likewise a
21 listed company, with subsidiaries such as BRHI and
22 Sureste.
23 　　　　We have Apex Mining, also a listed
24 company, and it has its own set of subsidiaries.
25 　　　　We have Manila Water, also a listed

**Page 19**

1 company with its own sets of subsidiaries.
2 　　　　We have Prime Strategic, which is his
3 holding company.
4 　　　　There is also Prime Infrastructure, which
5 has its own set of subsidiaries.
6 　　　　Then there are a couple of companies
7 owning real estate.
8 　　　　So, essentially, those broadly are the
9 companies in what we call "the Razon Group."
10 　Q.　For Prime Strategic Holdings, Inc., you
11 said that's his holding company?
12 　A.　That's correct, yes.
13 　Q.　And would you --
14 　A.　His family. It's owned by his family.
15 　Q.　And what does it hold?
16 　A.　Prime Strategic holds Bloomberry Resorts
17 Corporation. It holds shares in Apex Mining. It
18 holds shares in Prime Infrastructure. It also holds
19 the share in MORE Electric and Power Corporation.
20 　　　　MR. AINSWORTH: Let's put up Exhibit 5.
21 That's the list of companies.
22 　　　　(Comments off microphone.)
23 　　　　BY MR. AINSWORTH:
24 　Q.　Mr. Tan, Tab 117 in your binder is a copy
25 of Exhibit 5.

**Page 21**

1 　A.　Well, our firm is legal counsel, so I get
2 consulted once in a while as part of the team in the
3 law firm handling ICTSI account.
4 　Q.　Is your law firm counsel for all of these
5 companies on this list?
6 　A.　Yes. Our law firm gets consulted by these
7 companies, so I can say that our law firm, Picazo
8 Buyco Tan Fider & Santos, is counsel to these
9 companies.
10 　Q.　So I'm going to go through and ask for
11 each of these if you personally have been or are an
12 officer of these.
13 　　　　So, for number two, Bloomberry Resorts
14 Corporation, have you been or are you an officer of
15 that?
16 　A.　I am the corporate secretary and
17 compliance officer of Bloomberry Resorts
18 Corporation.
19 　Q.　And are you an officer of BRHI?
20 　A.　I am the corporate secretary of BRHI.
21 　Q.　Is that the same for Sureste?
22 　A.　I am the corporate secretary of Sureste.
23 　Q.　Have you held an officer position at
24 Manila Water Company Inc.?
25 　A.　I am the corporate secretary of Manila

**Page 22**

1 Water Company.
2 　Q.　Have you held an officer position at Apex
3 Mining?
4 　A.　I am the corporate secretary of Apex
5 Mining Company.
6 　Q.　Have you held an officer position at Prime
7 Strategic Holdings?
8 　A.　I am the corporate secretary of Prime
9 Strategic.
10 　Q.　Are you a corporate secretary for all of
11 these companies?
12 　A.　Not all. There are some companies that
13 I'm not corporate secretary, and my other partners
14 in the law firm hold the corporate secretary
15 position.
16 　Q.　Have you held a position other than
17 corporate secretary in any of these companies?
18 　A.　Yes. I am a director of Razon & Company
19 Inc. I'm also a director in Prime Strategic
20 Holdings, Inc.
21 　Q.　Have you held an officer position with
22 Prime Metro Infrastructure Holdings?
23 　A.　No. It's my other partners holding the
24 corporate secretary position there.
25 　Q.　Are you corporate secretary for Prime

Infrastructure Holdings?

A. I am corporate secretary of one of the Prime Infrastructure Holding -- yeah, Prime Infrastructure Holding Inc., I am the corporate secretary.

Q. Have you held an officer position for Prime BMD Corporation?

A. No, I have not.

Q. Have you held an officer position for Prime Infrastructure Capital Inc.?

A. No, I have not.

Q. Have you held an officer position with Trident Water Company Holdings, Inc.?

A. Yes. I am the corporate secretary of Trident Water. I am also a director of Trident Water.

Q. Have you held a position at Wawa JVCo, Inc.?

A. I used to be corporate secretary there, but I have been replaced.

Q. How long ago was that?

A. Maybe two years ago.

Q. Have you held a position at Terra Solar Philippines Inc.?

A. No, I have not. Another partner does

Q. Have you held a position at Sparkelectric Distribution and Power Corporation?

A. Yes. I am the corporate secretary of this company.

Q. Have you held a position at Emitter Utility and Power Corporation?

A. Yes. I am the corporate secretary of this company.

Q. Have you held a position at Electrify Utility Corporation?

A. Yes. I am the corporate secretary of this company.

Q. Have you held a position at Lakeland Village Holdings, Inc.?

A. Yes. I am the corporate secretary of this company.

Q. Have you held a position at Devoncourt Estates Inc.?

A. Yes. I am the corporate secretary of this company.

Q. Have you held a position at MORE Power Barge Inc.?

A. No. This is handled by another partner.

Q. Have you held a position at Filcomtel Holdings, Inc.?

A. I think I am an incorporator of this company.

Q. Have you held any other position there?

A. No.

Q. What do you mean by "an incorporator of" that company?

A. A person who signs the incorporation paper.

Q. How long ago was that incorporated?

A. I think just last year, I think.

Q. For Number 34, Philprimetech Telecommunications Holdings?

A. Same thing: I am an incorporator of this company.

Q. Have you held a position at Quasar Holdings Inc.?

A. I think I am the corporate secretary of this company.

Q. Is there a document that would say whether or not you are the corporate secretary of that company?

A. Yes. The general information sheet of this company should indicate so.

Q. Is that a document that you maintain?

A. I don't have it with me now.

A. That's correct.

MR. AINSWORTH: Counsel, we call for the production of those minutes.

MR. PERRY: Okay. You can write us a letter afterwards, and we'll evaluate it.

BY MR. AINSWORTH:

Q. Did Prime have any agreement with BRHI regarding entering into the Equity Option Agreement?

A. I cannot recall any particular agreement between Prime and BRHI and SPI.

Q. Did Prime have an agreement with BRC regarding entering into the Equity Option Agreement?

A. I am not aware. I cannot recall a particular agreement between Prime and BRC on entering the Equity Option Agreement.

Q. Prime entered into the Equity Option Agreement in fulfillment of an obligation of BRC -- I'll withdraw that.

Prime entered into the Equity Option Agreement in fulfillment of an obligation of BRHI and Sureste; correct?

A. That's correct.

Q. And there was no agreement between Prime and BRHI and Sureste regarding the Equity Option Agreement?

## Page 50

A. Yeah, I cannot recall a particular agreement.

Q. If such an agreement existed, would your firm have been involved in drafting it?

A. That would be a logical assumption, yes.

Q. Would that agreement be the subject of board minutes for BRC, BRHI, Sureste, or Prime?

A. Yes, it would be logical to assume that it should be taken up by the Board.

Q. Do you recall it being taken up by the Board of any of those companies?

A. I cannot recall if the Board of these companies have taken them up.

Q. If the Board of any of those companies addressed that issue, it would be in the minutes of those Board meetings?

A. That's correct, yes.

Q. Did Prime receive any compensation from BRHI, Sureste, or BRC regarding its transfer of shares to GGAM?

A. I am not aware if Prime received compensation from BRHI and SPI for its transferring shares to GGAM.

Q. Did Prime receive any compensation from BRC regarding its transfer of shares to GGAM?

## Page 51

A. I am not aware that Prime received compensation from BRC in connection with the -- its transfer of shares to GGAM.

Q. Do you know whether BRHI is subject to personal jurisdiction anywhere in the United States?

A. Do I know if BRHI is subject to jurisdiction in the U.S.?

MR. PERRY: I'm going to object to -- hold on, Benny.

I'm going to object to the question. And I think, given that it's -- that it's a legal question, I'm going to object. I'll allow the witness to answer this question to the extent he knows, but we're not going to have lawyer testimony on things like jurisdiction and claims and the like.

I'll allow him to answer this, although I don't know what the basis is for the answer, but we're not going to go into extensive questioning that calls for him to render legal opinions, Kevin.

A. BRHI has no business in the United States, so it is my opinion that U.S. courts do not have jurisdiction over BRHI.

BY MR. AINSWORTH:

Q. Is your answer the same with regard to Sureste?

## Page 58

A. I am not aware of any.

Q. Do you know whether Mr. Sicat held any equity interest in any Razon Group company?

A. I am not aware of any.

Q. In January 2014, you learned that GGAM was planning to sell a block of BRC's shares; correct?

A. I learned that from Mr. Razon.

MR. AINSWORTH: We can take this exhibit down.

BY MR. AINSWORTH:

Q. You learned that from Mr. Razon?

A. Yeah, that's correct.

Q. Do you recall how he learned it?

MR. PERRY: Objection.

Yes or no.

A. No. I don't know how he learned it. Well, during the -- we had a Board meeting on it. He explained that GGAM was selling shares, and I think it was Estella who said that some investment bankers informed them about it.

BY MR. AINSWORTH:

Q. Did you call that Board meeting?

A. It was Mr. Razon who called for that Board meeting.

Q. You were the secretary at the time;

## Page 59

correct?

A. That's correct.

Q. Did you deliver notice of the Board meeting to other directors?

A. Yeah. We called everybody up to join the meeting.

Q. Was it telephonic or in person?

A. I believe it was by phone. It was an urgent meeting.

Q. Did you call all the other directors to join the meeting, or did Mr. Razon?

A. I called the other directors.

Q. Who participated in that meeting?

A. All the directors of BRHI and of SPI.

Q. There was one meeting with all directors?

A. Yes, that's correct. It was a joint meeting, but I documented it as a separate meeting.

Q. Have you done that for other joint meetings?

A. That's correct, yes.

Q. Do the Boards of BRHI and Sureste always meet in joint meeting?

A. Not always.

Q. Do they typically meet in joint meetings?

A. Not typically.

## Page 60

Q. Was there a reason this was a joint meeting?

A. Yes, because this particular issue about GGAM selling the shares was common to both BRHI and SPI, so it was logical and efficient to have a joint meeting.

Q. Was that joint meeting -- I'll withdraw that.

Did the Boards at that joint meeting decide to ask PSE to halt trading on the BRC shares?

A. The Board instructed me to file for voluntary trading suspension of the BRC shares in the -- with the Philippine Stock Exchange.

Q. That's the Boards of BRHI and Sureste; correct?

A. Correct.

Q. Did the Board of BRC instruct you to reach out to the Philippine Stock Exchange?

A. The Board of BRC took this matter up later and approved -- ratified the actions taken by BRC and BRHI on the suspension, voluntary suspension, of trading of BRC shares.

Q. When did they take that up?

A. It was already in February. I think February 5, 2014, something like that.

## Page 75

meeting of Sureste Property Inc., on 13 January 2014.

Q. And this is the joint meeting you described earlier; correct?

A. That's correct, yes.

Q. Is there anything in these minutes of either BRHI or Sureste that indicate this was a joint meeting?

A. No, there is none.

Q. When the companies have joint board meetings, do the minutes typically reflect that?

A. No. I would typically document them as separate meetings.

Q. Was there discussion among the Boards about the impact of blocking the sale of BRC's share trade?

A. No. There was -- I don't know what you mean by "impact," but the discussion focused on number one, that there is an outstanding arbitration between the parties which have not -- that the arbitration tribunal was not duly constituted yet. And GGAM was selling the shares. And today it is imperative to protect the interest of the company to prevent GGAM from selling those shares because there is a counterclaim on those shares.

## Page 86

A. Yes, that's correct.

Q. When did you make this list?

A. This list is April 30, so shortly before April 30, 2022.

Q. Looking still at 2011, it shows two, apparently, regular meetings in January; a special meeting on February 22; a special meeting on February 17; a special meeting on March 16; a special meeting on March 31; a special meeting on August 5; and then, again, a special meeting on December 16; with an organizational meeting on September 30 of 2011; correct?

A. That's correct, yes.

Q. So these are denoted special meetings because they had not been planned in advance; is that correct?

A. That's correct, yes.

Q. How much notice has to be given for special meeting?

A. Well, I think the bylaws requires two weeks' notice, but we don't really follow that.

Q. What is meant by organizational meeting of the Board of Directors on 30 September 2011?

A. An organizational meeting is a meeting held immediately after the annual stockholders'

## Page 87

meeting when the Board of Directors are elected. So the organizational meeting is a meeting of the new Board of Directors to elect the officers for the ensuing term.

Q. So on 30 September 2011, an organizational meeting of the Board was held; correct?

A. Correct.

Q. And at that meeting, they did not schedule a subsequent meeting; is that correct?

A. Yes, that's correct.

Q. In 2012, the Board held no regular meetings; correct?

A. On the basis of this list, yes, correct.

Q. Is this list accurate?

A. Yes, this list is accurate.

Q. Were you responsible for giving notice to the other directors of each of these special meetings?

A. Yes, that's correct. That is my responsibility as corporate secretary.

Q. And does the notice for each of those meetings indicate the purpose of the meeting?

A. Yes. Sometimes I designated what the meeting is for; sometimes no. In the ordinary course of business items, as a matter of practice,

## Page 92

Q. What in your judgment would prompt you to raise minutes of a prior meeting for approval by the Board?

A. Actually, our rule here is the minutes of meeting do not need to, you know, be signed or approved by the Board. So, technically, documenting Board meeting with the signature of the Board or with the minutes having been approved by the Board is really intended to protect the corporate secretary.

So, well, I cannot -- there is no particular reason why it needs to be approved in the next Board meeting. Yeah, I mean, that's my answer.

Q. Okay. Let's go back to the exhibit that was a list of the Board meetings for BRHI, Exhibit 168.

A. Okay.

Q. Tab 11 in your binder.

A. Yes.

MR. AINSWORTH: I'd like, James, to please scroll up. Okay. Good. Let's scroll down to 2013, please.

BY MR. AINSWORTH:

Q. So in 2013, each meeting other than the June 11 meeting was a special meeting of the Board;

## Page 93

correct?

A. Yes, according to this list.

MR. AINSWORTH: Scroll down.

BY MR. AINSWORTH:

Q. And in 2014, other than the organizational meeting held May 7, 2014, the company held no regular meetings; correct?

A. According to this list, yes.

MR. AINSWORTH: I'd like you to scroll back, please.

BY MR. AINSWORTH:

Q. Do you recall whether the topic of terminating the MSA was brought up at any Board meeting?

A. The termination of the MSA was taken up in the Board meeting of September 12, 2013.

Q. Do you recall what the topic of the September 16, 2013, meeting was?

A. September 16, 2013. I cannot recall what the subject of the meeting was.

Q. GGAM had filed an arbitration against BRHI and Sureste on September 12, 2013; correct?

A. That's correct, yes.

Q. Was there a special meeting of the Board called as a result of that arbitration filing?

## Page 94

A. No. We anticipated that in our September 12 Board meeting.

Q. You expected the arbitration would be filed that day?

A. Well, honestly, we were surprised it was filed an hour after we sent the Notice of Termination, but it was expected that GGAM will initiate arbitration. So the Board has authorized management to retain counsel for the arbitration. It authorized me to coordinate the legal groups to defend the company.

Q. Okay. So let's please scroll down to 2014.

Other than the May 17, 2014, organizational meeting, there were no regular meetings held by the Board in 2014; correct?

A. Yes.

Q. And in 2015, other than the organizational meeting held August 18, 2015, there were no regular meetings; correct?

A. Yes.

Q. And in 2016, other than the organizational meeting of the Board held July 1, there were no regular meetings that year; correct?

A. Yes.

## Page 95

Q. And in 2017, other than the organizational meeting held August 30, 2017, there were no regular meetings of the Board of Directors; correct?

A. Yes.

Q. The organizational meeting is held in different months each year, according to this list.

A. That's correct.

Q. What is the reason for that?

A. That means the annual stockholders' meeting were also held in different months of the year.

Q. So the organizational meeting is tied directly to the annual stockholders' meeting?

A. Well, there are many factors on calling the organizational meeting. There are, well, three different companies here: BRHI, SPI, and BRC. The BRC meeting is separate. Usually the Board meeting of the two subsidiaries would come after the BRC Board meeting.

Well, there are also availability of directors, readiness of the audited financial statements, factors like that which affect after the date of the annual stockholders' meeting.

Q. Did you say the readiness of the audited financial statements?

## Page 98

A. Yes, that's correct.

Q. Do you recall whether that was a special meeting?

A. I don't recall.

Q. Do you recall the meeting held April 27, 2021?

A. April 27. Yeah. Yes, I believe this was a regular meeting.

Q. Did you attend this meeting?

A. Yes, I attended this meeting.

Q. There is nothing on this chart that indicates whether any of these meetings were joint with Sureste; correct?

A. That's correct.

Q. Okay. Let's pull up Tab 12, Plaintiff's Exhibit 169.

A. This is the list of Board meetings of Sureste.

Q. Did you make this list?

A. That's correct, I made this list.

Q. And did you make it in the same manner you made the list of BRHI's meetings?

A. That's correct, yes.

Q. So the title under "Nature of Meeting" reflects what the minutes shows for that meeting; is

## Page 99

that correct?

A. That's correct, yes.

Q. Were you at each of these meetings listed here?

A. Most of the meetings. There are a couple of meetings that I'm not around and so another lawyer takes the minutes.

Q. This indicates that the bylaws require a meeting once per quarter; correct?

A. That's correct, yes.

Q. Does -- well, withdrawn.

In 2011, it looks like every meeting -- six meetings held that year were regular meetings, and one meeting on September 30 was an organizational meeting of the Board of Directors; correct?

A. Yes, that's correct.

Q. And in 2012, there's roughly 10 or so special meetings, no regular meetings, and one organizational meeting held in December; correct?

A. That's correct, yes.

Q. So here the organizational meeting in 2012 was in December, but in 2011 it was in September.

Is there a reason why it was off by three months?

## Page 100

A. I cannot remember the reason.

Q. And in 2013, there's an organizational meeting held in June; correct?

A. That's correct.

Q. And all the rest of the meetings held that year were special meetings?

A. Yes.

Q. And so this organizational meeting in 2013 was less than six months after the one in 2012; correct?

A. That's correct, yes.

Q. Is there a reason why it was held so quickly?

A. There's nothing wrong with having it in the middle of the year. The problem was the prior meeting of 2012, why it was -- it took, you know, so late to have the annual meeting. We do not match the meeting, you know, it's approved middle of the year. The next annual stockholders' meeting does not have to be in the middle of the year. There is no such requirement.

MR. PERRY: Can we take the lunch break soon?

MR. AINSWORTH: Yeah, we can break now. We will pick up this after that.

## Page 112

think the third column refers to officers, senior management. I think the fourth column refers to employees.

First column simply identifies the principle. So in this context, the duties of the directors with respect to the use of company funds, assets, and information is prudent use.

Q. The Board authorized payment of an injunction bond to keep the interim order in place; correct?

A. That's correct, yes.

Q. That authorization was in 2014?

A. Yes, when the Board authorized filing of the suit against GGAM. That Board authorization includes the authority to issue bonds that may be required to keep the injunction in place.

Q. Has the Board revisited the bond issue at any time since then?

A. Yes, that's correct. There were a couple of subsequent Board meetings where the Board reiterated the authority to renew the injunction bond and the attachment bond required to keep the injunction and the attachment and the GGAM shares in place.

Q. When were those meetings?

1  A.  There should be one 2016, 2019.  I'm not
2  sure, but it's the minutes that we submitted to GGAM
3  the proposal of discovery 2021.
4  Q.  Did the Board revisit the bond issue --
5  I'll withdraw that.
6      After the Singapore Court of Appeals'
7  decision last October, did the Board consider
8  whether to continue paying a bond for the
9  injunction?
10     MR. PERRY:  Yes or no.
11 A.  Yes.  The Board discussed it.
12     BY MR. AINSWORTH:
13 Q.  And did the Board authorize the continued
14 payment of the bond at that time?
15 A.  That's correct, they did.
16 Q.  What meeting was that?  When did that
17 happen?
18 A.  The decision in 2019, so it should be
19 later 2019 or early 2020.
20 Q.  I think we are talking about two different
21 events.  So my question is:  After the Singapore
22 Court of Appeals issued its decision in October of
23 last year, 2021--
24 A.  Yeah, 2021.
25 Q.  Did the Board take up the issue of the

1  bond payment?
2  A.  I believe so, yes.
3  Q.  And when was that?
4  A.  I recall two meetings in 2021.  There was
5  a March one and an April 1.
6  Q.  Was there any --
7  A.  The Singapore Court of Appeals' decision
8  came after that.  And then it should be after that
9  meeting.  So it's not in 2021.  It should be in this
10 year, 2022.
11 Q.  Were minutes kept of that meeting?
12 A.  That's correct, yes.
13 Q.  And those would be stored by you?
14 A.  That's correct, yes.
15     MR. AINSWORTH:  Let's turn to Tab 31,
16 please.  We will mark this as Exhibit 199.
17     (Plaintiff's Exhibit 199 was marked.)
18     EVEREST TECHNICIAN:  Counsel, Tab 139,
19 that wasn't previously marked as Exhibit 199.
20     MR. AINSWORTH:  So at 200, you mean?
21     EVEREST TECHNICIAN:  Yes.
22     MR. AINSWORTH:  All right.
23     (Plaintiff's Exhibit 200 was marked.)
24     BY MR. AINSWORTH:
25 Q.  Was this document prepared by your firm?

1  A.  He's chairman of the anti-money laundering
2  committee of BRHI.  He's also in the related party
3  transaction committee of BRC.
4  Q.  Any other roles?
5  A.  Those are the only roles I know.
6  Q.  How did Mr. Peralta become the member of
7  the Board of BRC?
8  A.  He was nominated and asked the audit
9  committee -- the nomination committee approved his
10 nomination, and the Board approved his appointment
11 into the Board of BRC.
12 Q.  Who nominated him?
13 A.  I think it was Mr. Razon who nominated
14 him.
15 Q.  Had BRHI had any lawsuits that were heard
16 by Justice Peralta?
17 A.  BRHI.  I'm not aware of any.
18 Q.  Did ICTSI have any cases that were heard
19 before Justice Peralta?
20 A.  I am not aware of any case of ICTSI before
21 Justice Peralta.
22 Q.  Did Manila Water Company have any cases
23 before Justice Peralta?
24 A.  I am not sure.  We just came in Manila
25 Water, so I am not familiar with the cases.  And if