*CONFIDENTIAL*

**IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010)**

**BETWEEN**

### GLOBAL GAMING PHILIPPINES LLC

and

### GGAM NETHERLANDS B.V.

(*CLAIMANTS*)

- versus -

### BLOOMBERRY RESORTS AND HOTELS INC.

and

### SURESTE PROPERTIES, INC.

(*RESPONDENTS*)

---

### RESPONDENTS' STATEMENT OF DEFENSE AND AMENDED COUNTERCLAIMS

---

February 2, 2015

MILBANK TWEED HADLEY & MCCLOY LLP
1850 K Street, NW, Suite 1100
Washington, D.C. 20006
United States of America
Telephone: +1 (202) 835-7500
Facsimile: +1 (202) 835-7586

PICAZO BUYCO TAN FIDER & SANTOS
Penthouse Liberty Center
104 H.V. dela Costa St., Salcedo Village
1227 Makati City, Metro Manila
Telephone:  (632) 888-0999
Facsimile:  (632) 888-1011

CONFIDENTIAL

### 2.     Changes in Bloomberry's Corporate Structure Did Not Alter the Overall Deal.

148.     At the time Bloomberry and Sureste, the owners of the Solaire, granted GGAM the option to purchase up to 10% of the ownership interests in the Solaire, these ownership interests were unlisted and wholly owned by Mr. Razon and members of his family.[439]  Prior to signing the MSA, GGAM was notified that Bloomberry's and Sureste's equity funds, which were identified as "deposits for future subscription," were being converted into shares of stock.[440] Bloomberry and Sureste then embarked on a process called a "backdoor listing" in order to facilitate a public listing of the equity in the Solaire while providing immediate access to the Philippine equity markets.[441]  To initiate the backdoor listing, Mr. Razon transferred his shareholdings in Bloomberry and Sureste to a holding company, Prime Metroline, on September 30, 2011.[442]

149.     On November 22, 2011, Prime Metroline, which now owned the equity interests of Bloomberry and Sureste, signed a definitive agreement with the controlling stockholders of Active Alliance Incorporated ("Active Alliance"), a publicly-listed company, pursuant to which Prime Metroline agreed to acquire approximately 75% of the total outstanding shares of Active Alliance from the controlling stockholders.[443]  Prime Metroline formally acquired control of

---

[439]     See Respondents' Closing Presentation, Interim Measures Hearing, October 22, 2014 at Slide 60 (organizational chart of BRHI and SPI at the time the MSA was signed); see also Hr'g Tr. at 390:7-19 (Festin) (explaining corporate structure of BRHI and SPI at the time the MSA was signed); see also G. Festin Decl. at ¶ 6 ("When the Management Services Agreement (MSA) was executed on September 9, 2011, Solaire was owned by Sureste and Bloomberry. Mr. Razon owned Sureste, which, in turn, owned Bloomberry, and it was effectively Mr. Razon, through Sureste and Bloom berry, who granted GGAM the equity option.").

[440]     See, e.g., Email from B. Tan to B. Stone, G. Saunders, B. Weidner, et al., August 3, 2011, attaching Disclosure Letter (RE-70) ("The capitalization of Bloomberry and Sureste are still in the process of being formalized to convert the equity funds currently identified in their books as "Deposit for Future Subscription" into shares of stock."). Initially, Bloomberry and Sureste's capitalization was insufficient to support the expenses being incurred during the construction of the Solaire. An application for an increase in the entities' authorized capital stock was pending, but in the interim, Mr. Razon made advances to Bloomberry and Sureste, and the advances were recorded in their books as "deposits for future subscription."

[441]     See Festin Decl. at ¶ 7.

[442]     See Festin Decl. at ¶ 6. GGAM had been notified prior to entering into the MSA that Mr. Razon was contemplating such a transfer. See supra note 440 (RE-70).

[443]     See, e.g., Festin Decl. at ¶ 8 ("After our due diligence Mr. Razon approved the acquisition of Active Alliance, Incorporated. Mr. Razon's Prime Metroline acquired approximately 75% of the total outstanding shares of Active Alliance . . .").

GGAM-SDNY-0370562

Active Alliance on January 26, 2012.[444]  Shortly thereafter, on February 6, 2012, Active Alliance's articles of incorporation were amended to, *inter alia*, change its name to Bloomberry Resorts Corporation ("BRC") and its primary purpose to that of a holding company for a hotel, gaming, and entertainment business—namely, the Solaire.[445]  On the same day, the newly renamed BRC acquired all the Sureste shares from Prime Metroline,[446] and thus, Sureste and Bloomberry became wholly-owned direct and indirect subsidiaries of BRC, for which Prime Metroline remained the controlling stockholder.[447]  As a result of this backdoor listing, the ownership interests of Bloomberry and Sureste were now publicly listed.[448]  A provision in the MSA, however, clarified that a "back-door" listing of Bloomberry, Sureste, or Prime Metroline would not constitute a "Change of Control" of Bloomberry and Sureste.[449]

150.    The Parties were still negotiating the terms of the EOA during the back-door listing process, and GGAM was well aware that the corporate structure of BRHI and SPI was evolving.[450]  As Respondents' expert Professor Davidoff Solomon explained, a "single, complex business transaction" might be documented in multiple agreements for several reasons:

> The parties may desire that a specific part of the transaction be capable of later assignment to another party or an affiliate of one of the initial parties . . . Additionally, it may be contemplated that

---

[444]    In accordance with the rules of the SEC and PSE, before formally acquiring Active Alliance, Prime Metroline first had to conduct a mandatory tender offer, which was completed in January 2012.  *See* Section 19 of Republic Act No. 8799 (the "Securities Regulation Code"); *see also* Amended Implementing Rules and Regulations of the Securities Regulation Code, ¶ 2.

[445]    *See, e.g.*, Festin Decl. at ¶ 8 ("Mr. Razon's Prime Metroline acquired approximately 75% of the total outstanding shares of Active Alliance and then changed its name to Bloomberry Resorts Corporation and increased its authorized capital stock to accommodate the infusion of the new investment.  Its primary purpose was amended to that of a holding company for the hotel gaming and entertainment businesses.").  These changes were approved by the SEC on February 27, 2012.  *See, e.g.*, Amended Articles of Incorporation of BRC (RE-71).

[446]    *See* Festin Decl. at ¶ 9.

[447]    *See id.*

[448]    The new BRC shares were listed on the PSE on March 9, 2012.  *See* Festin Decl. at ¶ 9.  The transfer and ownership of publicly traded shares had many benefits to privately held shares.  *See, e.g.*, Email from B. Tan to Paul Hastings, *et. al*, February 15, 2012 (CE-107) (explaining, *inter alia*, the ease and speed in which the title for publicly listed shares can be transferred).

[449]    *See* MSA, Clause 16.1(c) ("An initial public offering (IPO) or a back-door listing of the Owners or of the holding companies which owns or controls the Owners in the Philippine Stock Exchange or in other stock exchanges shall not constitute a trigger of a Chang of Control of Owners where Enrique K. Razon Jr. continues to own or control, directly or indirectly, the Owners following such IPO or back-door listing.").

[450]    *See, e.g.*, *supra* notes 440, 442.

GGAM-SDNY-0370563

interests in the Solaire Resort & Casino, the resort Bloomberry and Sureste own and that GGAM was hired to manage.[473]  Therefore, for the purposes of evaluating Bloomberry's and Sureste's counterclaims against GGAM, this Tribunal must consider the economics of the deal and the inter-related nature of the corporate entities.

### B.    GGAM's Promise to Perform as the Management Services Provider for the Solaire Was the Consideration for the Equity Option Grant.

160.    The equity option was enforceable because it was supported by consideration separate and distinct from the strike price for the option shares.[474]  The change in Respondents' corporate structure did not alter the reality of the Parties' bargain—GGAM was given the equity option in exchange for its agreement to perform management services for the Solaire.[475]  The EOA references the consideration that Bloomberry and Sureste received in exchange for the equity option grant.  Section 2.1 of the EOA reads:

> As contemplated by Section 18.3 of the MSA, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Grantor hereby grants to Grantee an option (the "Option") to purchase some or all of the Option Shares from Grantor, subject to and upon the terms and conditions set forth in this Agreement.

Notably, even if GGAM designated another entity to exercise the equity option,[476] that entity was required to guarantee GGAM's performance of its obligations under the MSA[477]—because those obligations were the consideration for the EOA.

---

[473]    *See, e.g.*, EOA, §§ 5.6-5.8 (representations and warranties regarding Sureste and the ownership and possession of its Shares), 5.9-5.10 (representations and warranties regarding Bloomberry and the ownership and possession of its Shares, including the representation that "[n]one of BRC, Sureste, Grantor or any Affiliate has granted any other Person an option to purchase or a right of first refusal or offer with respect to any Shares, or shares in Bloomberry").

[474]    Philippine Civil Code, art. 1324.

[475]    *See supra* ¶¶ 27-45.

[476]    Such designation could be made only to an entity fulfilling the specific requirements laid out in the EOA. *See* EOA, § 8.3(a) and definition of "Investor."

[477]    EOA, § 8.3(a) ("In the event Grantee designates Investor to exercise the Option, Investor has submitted to Grantor a guarantee agreement in form and substance acceptable to Grantor under which Investor guarantees the performance by Grantee of its obligations under the MSA [ ]; provided, however, the parties acknowledge and agree that Investor's liability under such Investor Guarantee shall be expressly limited to the value of the common shares of BRC held by Investor.").

GGAM-SDNY-0370569

formality in providing notice of a claim for resolution.[515]  Here, Bloomberry's September 12, 2013 Notice of Termination, which included a sentence regarding the cancellation of the Participation Agreement, was adequate to put GGAM on notice that Bloomberry was terminating the MSA[516] and would be seeking resolution of the MSA and Participation Agreement, as well as restitution of the Shares.[517]  Moreover, Bloomberry reserved its right to counterclaim for resolution of the MSA and restitution of the Shares in its Response to the Notice of Arbitration.[518]

176.    Case law has consistently held that resolution abrogates a contract from the beginning and restores the parties to their relative positions before the contract was entered into.[519]  Thus, when resolution is granted, mutual restitution is required, as far as practicable.[520]  Therefore, if this Tribunal determines that Bloomberry has a right to resolution of the MSA, the Shares and the strike price of US$ 37 million may be recovered in order for the Parties to return, as far as practicable, to their original positions before the contract was made.[521]

177.    Philippine law does not prevent the Shares from being returned directly to Bloomberry and Sureste.  All of the corporate entities involved—Bloomberry, Sureste, and Prime Metroline—are wholly owned and controlled by the same principal, Mr. Razon.  The Shares ultimately sold to GGAM by Prime Metroline should be understood for what they represent—substantial ownership interests in the Solaire Resort & Casino, the resort Bloomberry

---

[515]    *See* J. Vitug Op. at ¶¶ 50-52.

[516]    *See* Notice of Termination of the MSA, September 12, 2013 (Claimants' Ex. 23) ("we hereby affirm the termination of the MSA with GGAM because of material breach of the MSA under Clause 15.1(a) of the MSA").

[517]    *See* Notice of Termination of the MSA, September 12, 2013 (Claimants' Ex. 23) ("By this termination of the MSA for cause, the Participation Agreement with GGAM relating to the shares in Bloomberry Resorts Corporation is also terminated."); *see also* J. Vitug Op. at ¶¶ 47, 53; Email from E. Occeña to W. Weidner, *et al.*, September 9, 2013 (RE-23).

[518]    *See* Response to Notice of Arbitration, October 12, 2013 at §8.1 (f) (Claimants' Ex. 24) ("The Respondents seek the following relief . . . such further or alternative relief to which the Respondents are entitled to in accordance with the MSA and Philippine law as the Tribunal deems fit."); *see id.* at § 9.2 ("For the avoidance of doubt and in accordance with the UNCITRAL Rules, the Respondents reserve the right to include any plea as to the arbitral tribunal's jurisdiction, assert additional defences and counterclaims and/or seek further or alternative relief as appropriate, in their Statement of Defence.")

[519]    *See* J. Vitug Op. ¶ 54 (citing *Gracepark Engineering Co., Inc. vs. Dimaporo*, G.R. No. L-27482, September 20, 1981); *Huibonhoa vs. Court of Appeals*, G.R. No. 95897, December 14, 1999) .

[520]    *See* J. Vitug Op. ¶¶ 54-57.

[521]    *See* J. Vitug Op. ¶ 54.

GGAM-SDNY-0370578

and Sureste own and that GGAM was hired to manage. Returning the Shares to Bloomberry and Sureste achieves the same result as returning the Shares to Prime Metroline, and Prime Metroline would not suffer any prejudice from this scenario. Alternatively, as recognized by the Tribunal, a contractual measures of damages, albeit a less complete way of addressing the harm of GGAM's misrepresentation and substantial breach, is available to Bloomberry and Sureste.[522]

### 3. Bloomberry and Sureste Have a Claim to Annul the MSA, Including the Equity Option Granted Therein, Due to GGAM's Causal Fraud.

178. Pursuant to the Philippine Civil Code, Bloomberry and Sureste also are entitled to annul the MSA and seek restitution of the Shares as a result of GGAM's causal fraud. The action for the annulment of a contract may be instituted by all who are thereby obliged principally or subsidiarily.[523] Under Clause 18.3, Bloomberry had the principal obligation to grant GGAM the equity option.[524] Even if Clause 18.3 were interpreted to be a condition, Bloomberry had a subsidiary obligation to ensure, for example, that the Option Agreement, once entered into, was not breached.[525]

179. Articles 1338 and 1390 of the Civil Code respectively provide:

> There is fraud when, through insidious words or machinations of one of the contracting parties, the other is induced to enter into a contract which, without them, he would not have agreed to.[526]
>
> The following contracts are voidable or annullable, even though there may have been no damage to the contracting parties: . . . . Those where the consent is vitiated by mistake, violence, intimidation, undue influence or fraud.[527]

---

[522]  *See supra* ¶ 168; *see also* Interim Measures Order at ¶ 140.

[523]  *See* Philippine Civil Code, art. 1397.

[524]  *See, e.g.*, Hr'g Tr. at 513:4-24 (Justice Feliciano and Justice Vitug agree that, absent the EOA, the Parties were bound by the MSA").

[525]  For example, GGAM still had the right to terminate the MSA based on breach of the Equity Option Agreement. *See* MSA, Clause 15.2(f) (permitting GGAM to terminate its services due to a material breach under the Option Agreement); *see also  Restatement (Third) of Agency § 6.01*  (providing that a disclosed principal is liable for contracts entered into on its behalf by agents acting with actual or apparent authority).

[526]  Philippine Civil Code, art. 1338 (RL-1); *see* J. Vitug Op. ¶¶ 58-60.

[527]  Philippine Civil Code, art. 1390 (RL-1); *see also* J. Vitug Op. ¶ 59.

GGAM-SDNY-0370579