IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE
UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010)

BETWEEN

GLOBAL GAMING PHILIPPINES LLC

and

GGAM NETHERLANDS B.V.

(*CLAIMANTS*)

- versus -

BLOOMBERRY RESORTS AND HOTELS INC.

and

SURESTE PROPERTIES, INC.

(*RESPONDENTS*)

---

DECLARATION OF ENRIQUE K. RAZON, JR.

---

December 7, 2014

Ainsworth Decl. Ex. 25
GGAM-SDNY-0366126

positions that the GGAM principals held at Las Vegas Sands Corp., I believed them when they told me that they had these connections.

10. Essentially, GGAM was offering me all the benefits of having Las Vegas Sands Corp. as a management company, without having to have the Las Vegas Sands brand attached to the Solaire. This was a major selling point for me, as I did not want the Solaire to be a location for another brand—I wanted the Solaire to be my own brand. I had already been approached by Caesars Palace and MGM to partner with me and offer their management services under their respective brands, but I refused because I did not want another brand attached to the Solaire. With GGAM, I thought I would be getting the best of both worlds: a top shelf management company equivalent to or better than Las Vegas Sands Corp., and my own brand.

### Equity Option Offer and Negotiations of the MSA

11. Based on GGAM's representations that they could essentially bring Las Vegas Sands Corp. management to Manila, I offered GGAM an arrangement that was as close to full-time management as possible, with GGAM also being the main driver of the Solaire Project. For these services, I proposed something that was more than just a typical, fee-for-services management contract in terms of compensation.

12. In addition to management fees, we discussed granting GGAM an option to purchase equity in the Solaire as an additional compensation component. The option would be equivalent to 10% of my shareholdings in the Solaire at essentially owner's cost plus a corresponding portion of the value of the PAGCOR license. I intended this equity option component to incentivize GGAM to perform as managers. I thought that if they had equity stake in the business, then our interests, as owner and manager, could be aligned. A typical management contract would not be sufficient for the arrangement I envisioned.

13. Mr. Weidner promised that they would draw up a proposal for our agreement. I received a draft term sheet from them describing their proposal to serve as the management company for the Solaire Project. They would provide all necessary oversight for the development and operations of the Solaire. This term sheet was followed by a longer draft "Management Facilities Services Preliminary Agreement" from their lawyer, Mr. Tony Cabot. I am told that in this arbitration Mr. Weidner has referred to this draft as just a "fleshed-out term sheet." That was not my understanding. Mr. Cabot's draft was a detailed contract that was consistent with my understanding that this management agreement would be the governing document of our partnership. At that point in time, we did not envision or negotiate two separate agreements. This draft from Mr. Cabot presented the sliding scale of VIP fees based on EBITDA and the equity option as compensation. This is exactly the concept that I had discussed with the GGAM principals.

14. It is absurd to suggest that the equity option was anything but compensation for GGAM as managers of the Solaire. Why else would I have given them the Shares? I was not looking for investors—if I wanted investors, I would have gone to any one of the numerous institutional investors, such as Capital Group, that had invested in ICTSI.

GGAM-SDNY-0366129

They would have been more than willing to invest a substantial amount of money in the Solaire Project.

15. After numerous exchange of emails with the GGAM principals to reach agreement on the basic concepts and terms of the agreement, I turned over the negotiation of the management services agreement to our finance team under Estella Occefia and our legal team under Benny Tan. But they reported to me regularly and final decision was always mine. We had several meetings with Gary and Brad, and we thought that we had the management services agreement ready to sign. But then Cantor Fitzgerald came in and raised new issues which pushed the signing of the agreement back.

16. Ultimately, after negotiating what would become the Management Services Agreement ("MSA") for several months, we had to execute a "two-part" agreement. The concept of a separate Equity Option Agreement was introduced by GGAM. I needed GGAM to begin providing its management services for the Solaire, so we agreed to execute the MSA. The MSA explicitly granted the equity option to GGAM, however we left the specific terms relating to the exercise of the equity option in a separate agreement. GGAM sent a draft of the Equity Option Agreement and Shareholders Agreement (later called "Participation Agreement") but it was not acceptable to us.

17. The negotiations for the Equity Option Agreement ("EOA") and the Participation Agreement continued for a few more months, leading up to the "road show" for the top-up offering of shares in BRC. Cantor Fitzgerald had no role in the management of the Solaire, or any other aspect of the Solaire Project, yet Cantor Fitzgerald had asked for provisions in the Shareholders Agreement to be involved in fund raising for the project, but we rejected their request. It appeared to me that Cantor Fitzgerald was trying to leverage GGAM's agreement with Bloomberry in a way to advance its own interests. The negotiation was also delayed because my finance and legal teams were busy in the acquisition of a listed company for the back-door listing of the Solaire project.

18. A few days prior to the start of the road show, GGAM threatened to withhold their participation unless we conceded certain negotiation points and signed the version of the EOA that GGAM wanted. GGAM's participation in the road show as managers of the Solaire was such a basic, anticipated component that I was surprised and disappointed that they would try to use their participation as leverage. GGAM knew that as the managers of the Solaire, the GGAM management team was a fundamental part of the top-up offering story—investors would expect to meet the people managing their investment. Ultimately, because we did not want to proceed with the road show without their participation, we gave in to GGAM's demands.

19. More than anything, GGAM's last-minute threat to back out of the road show demonstrated to me the way that GGAM was prepared to do business. I had given them a huge stake in the Solaire, but, instead of acting like true partners, GGAM was interested in protecting and pursuing their own interests. Their attempt to blackmail me at the last minute shows that they were not focused on the long-term relationship. Rather, they were attempting to get all of their performance incentives up-front.

GGAM-SDNY-0366130

to promote Bloomberry or the Solaire. This seemed inconsistent with my early discussions with GGAM in which the principals had described GGAM as a management company, not as an "asset manager."

26. From the outset, I had a vision that Blooomberry would use the Solaire as a springboard to gaming opportunities in other countries—replicating the business model I adopted to make ICTSI a global enterprise. I asked GGAM, as the Solaire's management services provider, to assess business opportunities outside of the Philippines. At the beginning of our relationship, I envisioned that GGAM could be the management service provider of new properties I acquired. GGAM was eager to participate in these "fact-finding" missions, and they even brought other opportunities to my attention. I recall that GGAM was particularly excited about a project I was pursuing in Argentina, and they pushed hard to become involved. I also recall a project in Macau that GGAM brought to my attention. I viewed it as a "win-win" situation for them—GGAM, as a start-up management company, needed more projects, and I, with my global connections, could facilitate that. I considered GGAM as a potential participant in these projects as a manager—I never considered them as an investor.

### GGAM'S Purchase of the Shares

27. I expected GGAM to be a long-term partner, so I did not think that the EOA needed a lock-up or some other protection. I buy and sell shares all the time, and, yes, of course, GGAM owned the Shares and could have done the same. But I considered it very unlikely that GGAM would choose to sell most of their shares. They had acknowledged that the equity option was a key component of their unusual compensation structure. In my experience, lock-up requirements or vesting periods are used in Stock Incentive Plans, which I offer to some of the executives at Bloomberry. But I did not hire GGAM to be mid-level employees. As the management services provider for the Solaire, I wanted to treat them more like a business partner.

28. The 921 Million Shares held by GGAM, as a block, have a unique value to me. For one thing, I would like to have the ability to offer the block to a new manager of the Solaire, just as I offered the block to GGAM. For another, the Shares represent a significant portion of Bloomberry's outstanding shares. If these shares were bought by an investor that already has a significant stake in Bloomberry, that investor could begin to impact Bloomberry's corporate voting and undermine my control over the company. Alternatively, if the shares were bought by an investor with no prior stake in Bloomberry, that investor could join with other investors of Bloomberry to impact voting and other corporate governance decisions. Such a scenario would be especially problematic for me if the investors had an opposing vision for the company.

### Lack of the Personal, Hands-On Involvement that Was Promised to Me

29. In-line with what GGAM had promised me, I was seeking personal, hands-on involvement from GGAM in managing the Solaire. Although GGAM would hire the COO and other executives, I expected them to be physically present and fully committed to help run the property, especially at the beginning stages. I made clear that I wanted to

- 6 -

GGAM-SDNY-0366132