IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010) BETWEEN:

GLOBAL GAMING PHILIPPINES, LLC

and

GGAM NETHERLANDS B.V.

*(CLAIMANTS)*

- versus -

BLOOMBERRY RESORTS AND HOTELS INC.

and

SURESTE PROPERTIES, INC.

*(RESPONDENTS)*

---

# DECLARATION OF JONATHAN D. REIN
## IN SUPPORT OF
## CLAIMANTS' REPLY MEMORIAL

---

Subject to Arbitration Confidentiality Orders

Ainsworth Decl. Ex. 67
BLOOM_0100021

## Timeline of GGAM's Attempt to Sell Its Shares
## From October 10, 2013 to January 15, 2014

18. Before Bloomberry's wrongful termination of the MSA, GGAM did not have an intention to sell the entirety of the Shares in a single block. Instead, GGAM identified and discussed a number of potential alternatives that might be used to monetize the value of the Shares. These alternatives included but were not limited to selling small amounts from time-to-time and over time, borrowing against all or some of the value of the Shares, issuing a convertible bond, engaging in one or more derivatives transactions, using the Shares as an asset in a parent-level GGAM equity-offering, as well as a number of other alternatives. But GGAM is not a hedge fund or a private equity firm; we do not make or hold passive investments in gaming companies, but rather only consider equity investments in properties and assets that we actively manage. At no time before Bloomberry's termination of the MSA did GGAM expect that it would have to sell the Shares in a single block and at a substantial discount.

19. After Bloomberry's September 2013 termination of the MSA, GGAM recognized it was inconsistent with GGAM's business model to have a passive investment in a business over which GGAM had no influence, and therefore moved to sell the Shares. I led the process of selling the Shares on GGAM's behalf.

20. In early October 2013, I initiated a process of formally selecting "placing agents" to assist GGAM with the sale of the Shares. I contacted Credit Suisse on or before October 10, 2013 and Deutsche Bank on or before October 21, 2013. From approximately October 10, 2013 to January 9, 2014, Credit Suisse conducted its Know Your Customer ("KYC") due diligence with respect to GGAM. KYC due diligence arises out of a series of anti-money laundering, anti-terrorism and other regulations that require a placing agent to confirm the identity of its prospective customer before opening a trading account. The KYC due diligence process is more rigorous with gaming entities

7

than other types of businesses, because of a heightened risk of money laundering in the gaming sector. Each placing agent requested detailed information and documentation relating to GGAM, its organization and business. The process was lengthy because the compliance department of each placing agent needed to review and evaluate the contents and authenticity of the documentation that GGAM submitted. It took several rounds of requests and responses to complete the KYC process for each placing agent.

21. In parallel with the KYC process, GGAM held separate discussions with each of the potential placing agents to discuss the proposed structure and timing of the block sale. GGAM held those discussions beginning in November and continuing into January.

22. The placing agents also conducted ordinary course legal and business due diligence in preparation for the transaction. The placing agents conducted their initial due diligence from December 17, 2013 until early January 2014.

23. After consulting with their equity capital market desks, the investment banks advised us to sell the shares as a single block following an accelerated marketing process, which is commonly referred to as an "overnight block trade" because shares are sold outside of regular market trading hours. Although the key advantage of an overnight block trade is to sell a large number of shares at one time, the trade-off for speed and efficiency is to offer the shares at a substantial discount. The discount in this context – commonly referred to as a "block sale discount" – is the difference between the sale price and closing price of the shares on the relevant stock exchange immediately before the commencement of the marketing process. The investment banks ultimately advised GGAM to sell all of its Shares at the same time, because to hold on to any of our

8

Shares after selling some of the Shares would create market overhang.[2] In fact, Deutche Bank and Credit Suisse advised GGAM that the overhang effect from any unsold Shares would be so substantial that some buyers were unlikely to want to acquire any shares at all unless GGAM's entire holdings were sold at once in a so-called "clean-up" trade, thereby eliminating any further overhang.

24. On Monday, January 13, 2014 (Asia time), the placing agents began a pre-marketing process known as "wall-crossing," during which the placing agents contacted a small number of prospective investors on a confidential basis to gauge how many shares the investors were interested in purchasing, and at what price. The wall-crossing period continued into Wednesday, January 15, 2014.

25. On January 15, 2014 (Asia time), after the close of trading on the Philippine Stock Exchange, GGAM approved the formal launch of the block sale transaction, and the placing agents began contacting prospective investors (other than those already "wall-crossed") to inform them of the proposed sale and to take orders from the investors to purchase shares.

26. Beginning in the evening (Asia time) of January 15 and continuing into the early morning hours (Asia time) of January 16, 2014, the placing agents engaged in "book-building," which involved receiving orders from investors and preparing a compilation of orders (or "book of demand") from investors for specific numbers of shares at designated prices.

27. By way of example, one investor might place an order for two million shares at purchase price of no more than Philippine Pesos ("Php") 8.00 per share, while another investor might place an order for one million shares at no more than Php 8.10 per share. The placing agents'

---

[2] "Market overhang" here means that BRC shares would trade at prices lower than a price that reflected the fundamental value of the business because investors would expect GGAM to sell more shares into the market at any time, thereby creating downward pressure on the trading price of the shares.

9

objective is to determine a clearing price for all of the shares for sale. In this example, for a book of demand consisting of two orders, the clearing price would be Php 8.10 to sell one million shares or Php 8.00 to sell three million shares.

28. Late on January 15, 2014 or early on January 16, 2014 (Asia time), the placing agents "closed the book," meaning that the placing agents stopped taking orders from prospective investors. The placing agents and GGAM evaluated the book and, after extensive discussions, agreed upon the final size and price per share for the transaction. Following the determination of the commercial terms of the sale, the placing agents commenced "allocation," which involved contacting the investors to whom they decided to allocate shares and confirming the specific number of shares that each investor would buy at the final price of Php 8.05 per share. The allocation process resulted in confirmed sales to over 50 institutional investors (also referred to as "accounts"). The final price of Php 8.05 per share represented a 10.4% discount to the January 15, 2014 closing price of the Shares on the Philippine Stock Exchange of Php 8.98 per share.

29. As I understand to be customary in the Philippines, the settlement was scheduled to occur on the third trading day after allocation, which was Tuesday, January 21, 2014.

30. But on January 15, 2014 (Asia time), BRC wrote to the Philippine Stock Exchange requesting a suspension of trading in all BRC shares for one week. The next day, on January 16, the Philippine Stock Exchange suspended trading in BRC shares, effectively preventing settlement of the transaction. GGAM learned of Bloomberry's request to suspend trading of its shares on January 16, 2014 (Asia time), at the same time as the rest of the market. Shortly after that, GGAM received word that Bloomberry had filed an "Urgent Petition for Issuance of Interim Measures of Protection" in the Philippine courts. In its Petition, Bloomberry claimed that GGAM should be prevented from

10

39. Fourth, aside from not being able to monetize the Shares at a time and in a manner of our choosing, GGAM has been starved of capital that it might otherwise have used to fund operations and to pursue other opportunities.

40. Of course, there have been other types of harm to GGAM arising from Bloomberry's actions. Most significantly, GGAM has not received the management fees to which we are entitled under the MSA. Those fees would be substantial.

41. Further, the reputational harm from Bloomberry's wrongful termination, the frustrated sale process, and Respondents' press statements, is significant and ongoing. Investment bankers, casino owners, competitors, regulators, members of the press and other industry participants all over the world raise the topic and question my colleagues and me about it continually. Of course, these are just the instances I know about; I cannot know with certainty about the opportunities that have not arisen as a result of the negative perceptions of GGAM that Bloomberry has created and perpetuated. As Mr. Razon correctly noted in his cover email of July 12, 2013 to Mr. Weidner, Bloomberry is "conscious that [GGAM is] trying to build a business in Gaming management and may not welcome the publicity that would accompany [] a disclosure" from Bloomberry regarding GGAM.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: June 13, 2015

_____
JONATHAN D. REIN

LEGAL_US_W # 82252479.1

14