**Page 40**

1  A   Yes.
2  Q   Who gave that to you?
3  A   The HR.
4  Q   And when you were promoted again in 2018 to CFO,
5      were you -- did you entered into a new employment
6      agreement with BRHI?
7  A   No. As I mentioned earlier, it's just a letter of
8      promotion.
9  Q   And the letter of promotion states that all of the
10     terms of the existing -- excuse me, let me strike
11     that.
12             The letter of promotion states that
13     all the terms of the original employment agreement
14     continue to apply?
15 A   Yes, that's my understanding, because you cannot
16     take out something from the original because it's
17     against the law. And if there's addition, that will
18     be based on the wrong thing. That applies to
19     everyone.
20 Q   Okay. So let's talk about other entities. Let's
21     start with Sureste Properties Inc. When were you
22     first employed by Sureste Properties Inc.?
23 A   Same with the BRHI. Because I could see that is all
24     just one property, although two different entities.
25 Q   What was your first position with SPI?

**Page 41**

1  A   It's the same. It's whatever is stated in the BRHI,
2      that also applies to SPI.
3  Q   So your understanding is that your employment
4      agreement with BRHI also effectually appointed you
5      as director of finance for SPI?
6  A   Correct.
7  Q   When you were promoted in 2014 to vice president of
8      controllership for BRHI, did you understand that you
9      were also being promoted to vice president of
10     controllership for SPI?
11 A   Yes.
12 Q   Did anyone explain that to you?
13 A   You know, Solaire Resort and Casino, this is the
14     property, and this property is consist of two
15     entities. These are now Bloomberry Resorts and
16     Hotels, Inc. and Sureste Properties Inc., and I am
17     the property CFO, so that means to say I am the
18     property CFO of BRHI and SPI.
19 Q   And so, just to clarify, when you were promoted
20     effective January 1st, 2018 to property CFO for
21     BRHI, you were also promoted to property CFO for SPI
22     at that same time, correct?
23 A   Yes.
24 Q   And does your letter of promotion explain that?
25 A   It was not -- it was not specifically mentioned.

**Page 58**

1      agreement.
2  Q   So are you referring to BRHI and SPI charging back a
3      certain amount to BRC periodically for use of the
4      space?
5  A   Yes.
6  Q   Is that charged on a monthly basis?
7  A   Yes.
8  Q   Is that an accrued charge or is there an actual cash
9      that changes hands?
10 A   Usually it's an accrued charge then at the end of
11     the day all of the advances are as part of the
12     settlement.
13 Q   When you were first employed by BRHI in July 2012,
14     how were you compensated for your work? Did you
15     receive direct compensation from BRHI?
16 A   Yes.
17 Q   Did you receive any compensation from SPI at that
18     time?
19 A   No. Only one.
20 Q   And has that changed over time; have you always been
21     compensated directly by BRHI?
22 A   Yes.
23 Q   Have you ever been compensated by BRC?
24 A   No.
25 Q   By any other entity?

**Page 77**

1  A   Not that I am aware of.
2  Q   Prior to April of 2021 were you aware of any formal
3      policy at BRHI, SPI or BRC of reimbursing any of
4      those entities for services rendered by their
5      employees for another company?
6  A   No.
7  Q   Any informal policies that you're aware of?
8  A   No. No.
9              MR. DUNN: Brett, we have been going a
10     little while.
11             MR. LOWE: Yeah, I was just going to
12     suggest a break. What do you think, like, 11:30.
13             MR. DUNN: Yeah. We can go off the
14     record.
15             VIDEO TECHNICIAN: Going off the
16     record at 11:21 a.m.
17             (Off the record at 11:21 a.m.)
18             VIDEO TECHNICIAN: Going back on the
19     record at 11:32 a.m.
20             (Back on the record at 11:32 a.m.)
21             MR. DUNN: Let's bring up what's been
22     previously marked as Plaintiff's Exhibit 17.
23 BY MR. DUNN:
24 Q   Mr. Lat?
25 A   Yes.

**Page: 112**

1  Q   Have you ever performed an analysis or asked anyone
2      else to perform an analysis of whether you can pay
3      the award and --
4  A   No.
5  Q   Let me -- let me finish.
6  A   Sorry.  Sorry.
7  Q   I'll start over.
8          Have you ever performed an analysis or
9      asked anyone to perform an analysis of whether BRHI
10     and Sureste can pay the award and -- without
11     triggering a -- default covenants on their term loan
12     with the banks?
13 A   No.
14 Q   Why haven't you, as the CFO?
15 A   Well, in the first place I don't see any documents
16     that can tell me or would be my basis for doing such
17     analysis.
18         So if I can have a document, let's
19     say, coming from the court or whatever, or from our
20     legal counsel, then I think that's a time that I
21     can.  But taking the initiative of doing it, is no.
22 Q   So what documents would you need to see to trigger
23     your feeling that you needed to perform that
24     analysis?
25 A   Well, if we have --

**Page: 115**

1      was 296 million in 2019 and is accruing interest at
2      six percent per annum, correct?
3          MR. LOWE:  Objection.
4          THE WITNESS:  No.
5  BY MR. DUNN:
6  Q   What is your understanding?
7  A   I'll wait for the final figures once the disclosure
8      is revised.
9  Q   Is that -- is that a statement that you don't have
10     an understanding of how much was adjudicated to be
11     owed under the arbitration award?
12 A   I do not know exactly the amount involved, because I
13     know there's a number -- there are number of shares
14     involved and I do not know about that.  So, I just
15     wait for the final numbers, you know, so that I
16     would know who's whose story, and that's what
17     happened.
18 Q   And if you were to try to find the final numbers,
19     who would you go to and ask for those?
20 A   For the final number?  Once I have the document that
21     this is what I'm going to pay then that's when I
22     start asking the COO, my boss.
23 Q   Has BRHI ever entered a reserve in its books related
24     to payment in the arbitration award?
25 A   No.

**Page: 116**

1  Q   What is the basis for that decision?
2  A   I think it was more of a discussion between our
3      external auditors and our legal counsel.
4  Q   And did you have that discussion with the external
5      auditors?
6  A   During that meeting, we were present, but we were
7      just, you know --
8          MR. LOWE:  Again, here, Arcan, you can
9      answer if you had a discussion, but don't reveal the
10     contents of any --
11         THE WITNESS:  Yes.
12         MR. LOWE:  -- discussions you had with
13     attorneys if there were attorneys present with the
14     auditors.
15 BY MR. DUNN:
16 Q   Were you present during the discussion that you
17     referenced between the auditors and your legal
18     counsel?
19 A   There were occasions because there were a number
20     during the year-end audit, there were a number of
21     occasions that our external auditors need to meet
22     with legal counsel and of course from the finance
23     side I am -- I was present.  So, one of those
24     meetings.
25 Q   So, on behalf of BRHI, as the CFO, you ultimately

**Page: 117**

1      make the determination of whether a reserve is
2      appropriate or not, correct?
3  A   No.
4  Q   Who makes that determination?
5  A   We rely on the opinion of the legal counsel.
6  Q   Who at BRHI makes the decision as to whether a
7      reserve is appropriate or not?
8  A   Me and Tom Arasi.  We concur with the opinion of the
9      legal counsel.
10 Q   And is Mr. Razon involved in that discussion about
11     whether to ultimately reserve as the chairman and
12     CEO of BRHI?
13         MR. LOWE:  Again, Arcan, do not -- if
14     an answer would involve revealing the contents of
15     privileged communications, don't reveal the content
16     of any such communications, but you can answer the
17     question --
18         THE WITNESS:  No.  No.  My answer is
19     no.
20 BY MR. DUNN:
21 Q   So you and Tom Arasi jointly decided whether a
22     reserves was appropriate based on consultations with
23     legal counsel; is that correct?
24         MR. LOWE:  Objection.
25         THE WITNESS:  That's our evaluation.

**Page 118**

```
 1       That's our -- that -- you know, that's our decision.
 2  BY MR. DUNN:
 3  Q    And has SPI ever entered a reserve on its books
 4       related to payment of the arbitration award?
 5  A    No.
 6  Q    And the discussions that we have just talked about,
 7       and analyses, were there separate analyses done for
 8       SPI as opposed to BRHI?
 9  A    No.
10  Q    And to your knowledge, BRC has never entered a
11       reserve on its books related to payment on the
12       arbitration award, correct?
13  A    I was not involved in the preparation of the
14       financial statements of BRC.
15  Q    That wasn't my question.  My question was:  To your
16       knowledge, BRC has never made a provision for the
17       payment of the arbitration award?
18  A    If that's what stated in the audited financial
19       statements, then --
20  Q    Right.  I'm just asking in your knowledge Mr. Lat.
21       To your knowledge, they have not made a provision,
22       you're not aware of it?
23  A    I saw it in the audited financial statements because
24       it's a public document.
25  Q    You saw what in the audited financial statement?
```

**Page 146**

```
 1       trying to get at.  I'm just saying I'm going to keep
 2       objecting if that's where we're going and he can
 3       answer "yes" or "no" if it's not something that's
 4       going to reveal attorney/client privileged
 5       communications.
 6              MR. DUNN:  I'm going to proceed.  As I
 7       said, you can continue to interpose objections if
 8       you think they're appropriate.
 9  BY MR. DUNN:
10  Q    Mr. Lat, prior to this board meeting in April 2021,
11       did you personally engage in any analysis of whether
12       indemnifying Mr. Razon and the entities listed on
13       this document is in the best interest of BRHI and
14       SPI?
15  A    No.
16  Q    Did anyone ask you to personally engage in any
17       analysis in whether indemnifying Mr. Razon and these
18       entities listed on this document were in the best
19       interest of BRHI or Sureste?
20  A    No.
21              MR. DUNN:  And while I'm thinking
22       about it, I don't think we've introduced this
23       document.  Let's go ahead and mark this as
24       Plaintiff's Exhibit 104.
25              (Plaintiff's Exhibit No. 104 was
```

**Page 157**

```
 1       only 5,000, 3,000, then the 25,000 will be charged
 2       to his board of directors allowance.
 3  Q    Great.  So those are instances where it's actually
 4       charged as opposed to uncharged.  Is there a record
 5       that BRHI and SPI have kept of Mr. Razon and his
 6       family's use of the facilities that they did not pay
 7       for?
 8  A    No.
 9  Q    Is there --
10  A    Nothing.
11  Q    Sorry.  During your time at BRHI and SPI, have the
12       companies kept a record of all of the instances
13       where the employees of either company have been used
14       or Mr. Razon or his family's personal use or for his
15       other businesses?
16              MR. LOWE:  Objection.
17              THE WITNESS:  I cannot remember of any
18       employees that were used by Mr. Razon, their
19       personal use.
20  BY MR. DUNN:
21  Q    I'm not asking you whether you personally recall
22       their use.  I'm asking whether BRHI and SPI have any
23       practice of keeping records of such use?
24              MR. LOWE:  Objection.
25              THE WITNESS:  I do not know because
```

**Page 158**

```
 1       I'm not aware of such a practice.
 2  BY MR. DUNN:
 3  Q    Have you been aware at any time of anyone raising
 4       any concern within BRHI or SPI about Razon's use of
 5       corporate assets?
 6  A    About?
 7  Q    Have you --
 8  A    Use of --
 9  Q    Yes, let me -- let me state it again.
10              Have you been aware at any time of
11       anyone raising any concern within BRHI and SPI about
12       Mr. Razon's use of corporate assets?
13  A    No.
14  Q    Prior to the April 27th board meetings for BRHI and
15       SPI, did anyone communicate with you about the
16       intention of ratifying Mr. Razon and his family's
17       prior use of the facilities resources and employees
18       of the company?
19  A    No.
20  Q    At any time has anyone asked you to perform any
21       analysis or to have someone else perform any
22       analysis of Mr. Razon or his family's use of the
23       BRHI or SPI's facilities resources or employees?
24  A    No.
25  Q    Are you aware of any audit or investigation that has
```

## Page 159

1   been done internally by BRHI or SPI of Mr. Razon's
2   use of corporate assets for personal use?
3 A   Not that -- not that I am aware of.
4 Q   Are you aware of anyone at BRHI -- excuse me, BRHI
5   or SPI requesting any third party conduct any
6   analysis of Mr. Razon's use of corporate assets for
7   personal use?
8 A   None.
9 Q   As the CFO of these two companies, would it concern
10   you to learn of Mr. Razon's use of corporate assets
11   for personal use?
12 A   No.
13 Q   Why not?
14 A   Because on the use of SPI facilities, just like what
15   I mentioned, their using of hotel and restaurants is
16   within the allowance, the annual allowance and it's
17   based on selling price and there are no other uses
18   that are unrecorded, something like that, for SPI.
19 Q   Great.  So setting aside the allowance, and the use
20   of the facilities and resources of the company that
21   -- that Mr. Razon pays for using his allowance, as
22   the CFO of BRHI and SPI, would it concern you to
23   learn that Mr. Razon and his family used corporate
24   assets for their personal use without reimbursing
25   the company?

## Page 162

1 Q   But does it concern you that this compensation to an
2   executive of the company was not being reported in
3   the financial statements that you were preparing
4 A   Well, it is -- it was not -- the cost is there
5   actually so it's just a matter of reclassifying the
6   expenses.
7 Q   And so, now that the board has ratified the prior
8   use of company facilities, resources and employees,
9   including the aircraft by Mr. Razon and his family
10   for personal use, as fair compensation, does that
11   require you to then restate the financial statements
12   for those years in which he was paid the
13   compensation?
14 A   No.  The big thing -- okay, for the use of SPI,
15   Sureste Properties, there is nothing to add on the
16   expenses because everything is recorded, as I
17   mentioned earlier.  The use of the restaurants and
18   hotel that is covered by the annual allowance
19   extended to the members of the board and Mr. Razon
20   is included a part of it.
21          On the use of the aircraft, there will
22   be no material distortion on the financial
23   statements because everything has been charged to
24   expense already on the -- you know, on the cost, on
25   the (indecipherable), on the jet fuel, the salaries

## Page 172

1 Q   And why is that, that the stand-alone financial
2   statements are issued after the consolidated group
3   has completed its financial statements?
4 A   I cannot answer for the whole -- for the auditors.
5 Q   And so, you're saying that's a function of the audit
6   and the auditor's involvement?
7 A   Yes.
8 Q   Mr. Lat, going back to the ratification of Mr. Razon
9   and his family's personal use of corporate assets,
10   based on your experience with any other company that
11   you've worked for our audited or consulted through
12   your over 40 years of experience, have you ever
13   encountered a situation where the board of directors
14   ratified a CEO's personal use of corporate assets
15   without an investigation?
16          MR. LOWE:  Objection.
17          THE WITNESS:  No.  That's -- here in
18   the Philippines, that's normal.
19 BY MR. DUNN:
20 Q   It's normal to ratify a CEO's use of corporate
21   assets without compensation, without investigating
22   the use of those assets?
23          MR. LOWE:  Objection.
24          THE WITNESS:  No.
25 BY MR. DUNN:

## Page 207

1   not sure when Jeju Hotel and Casino opened, but for
2   some employees of BRHI that were temporary assigned
3   to Solaire Korea, I think a portion of this
4   represents that account.
5 Q   So in general I'm asking about really the policies
6   and practices when there are advances being paid
7   between BRHI and SPI and other entities in the
8   Bloomberry umbrella other than BRC.  Is there a
9   specific process that BRHI and SPI undertake when a
10   request for advance is made?
11 A   We follow the approval matrix because we do have
12   approval matrix for approval for payments and then
13   for approval of purchases.  So, if I remember it
14   right, my authority as CFO I am -- my authority is
15   up to 8 million pesos, and then over 8 million, up
16   to 50 million, that needs the core (ph) approval, me
17   and the COO, Tom Arasi; and over 50 million requires
18   the approval of the CEO, Mr. Razon.  So we follow
19   that approval matrix.
20 Q   And is that -- approval matrix applies even when
21   it's a transaction with a related party?
22 A   Yes.
23 Q   And so if it's a large transaction with a related
24   party, that is related party by virtue of Mr. Razon,
25   he's still part of the approval matrix?

Deposition of Arcan Lat
CONFIDENTIAL
Case 1:21-cv-02655-LGS-SN   Document 384-9   Filed 03/06/23   Page 5 of 5
Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al.

```
 1   A   Yes.
 2               MR. LOWE:  Objection.
 3   BY MR. DUNN:
 4   Q   If you can zoom out a little bit on the document,
 5       please.
 6               The next line down is for Eaglesight
 7       Investments Limited.  Does that refresh your
 8       recollection as to which Eaglesight entity leases
 9       the plane to BRHI?
10   A   Yes.
11   Q   And the description of the related party transaction
12       is aircraft lease and maintenance reimbursements.
13               Do you see that?
14   A   Yes.  But actually we're not paying any maintenance
15       reimbursement.
16   Q   Okay.  So that's not accurate?
17   A   I would say that represents only for the real
18       property, because for the maintenance, BRHI takes
19       care of the maintenance.
20   Q   BRHI pays those expenses directly?
21   A   Yes.  That's part of the operational expenses.
22   Q   And for that transaction, whereby related party Mr.
23       Razon's Eaglesight Company leased the aircraft to
24       BRHI, what was the approval matrix -- strike that --
25       what was the process that was followed to analyze
```