CONFIDENTIAL
Deposition of Gerard Angelo Emilio Festin    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al
Case 1:21-cv-02655-LGS-SN   Document 384-10   Filed 03/06/23   Page 1 of 3

**Page 25**

1  and in the afternoon we spend time at Solaire.
2     Q.   Okay.  And how did that change during the
3  pandemic for you?
4     A.   Since the pandemic started, we have not
5  gone to the office in ICTSI because the office is
6  basically closed.
7     Q.   Okay.  Are your Solaire offices open?
8     A.   Yes.  Well, for a time we were working at
9  home.
10    Q.   Okay.  And do you have sort of a computer
11 and phone set up in your home now because of the
12 pandemic?
13    A.   I have a laptop, so I can always bring my
14 laptop at home.
15    Q.   Got it.  And is that a laptop that was
16 provided to you by ICTSI?
17    A.   No.  This one is Bloomberry.
18    Q.   Okay.
19    A.   But prior to that, it was ICTSI who
20 provided the laptop.
21    Q.   When you say "Bloomberry," I just want to
22 be clear who you are talking about.
23    A.   BRC, Bloomberry Resorts Corporation.
24    Q.   Okay.  And you have an ICTSI email
25 address?

**Page 26**

1     A.   Correct, yes.
2     Q.   Do you have a BRC or Bloomberry email
3  address?
4     A.   I have two.
5     Q.   Okay.  Do you always only use your ICTSI
6  email address for ICTSI business?
7     A.   I use only ICTSI email for everything.
8     Q.   Okay.  Do you ever use your Bloomberry
9  email address for work?
10    A.   No.
11    Q.   Okay.  So we talked a little bit before
12 about your responsibilities as accounting manager
13 for the Chairman of the Board, and you told me that
14 you help prepare the budget for the office and
15 monitor expenses.
16         Do you remember that?
17    A.   Yeah.
18    Q.   What type of expenses are you talking
19 about when you say you monitored expenses?
20    A.   The expenses of the office, meaning the
21 things that you buy for the office.  There are
22 certain things that needs to be -- to buy.  That's
23 basically the requirements of the office basically.
24    Q.   When you say that, what are we talking
25 about?  Office supplies and salaries and things like

**Page 89**

1  for Mr. Razon and his family.
2     Q.   What exactly did Ms. Occeña say to you?
3     A.   That the trust company is for the family,
4  of Mr. Razon's immediate family.  That's about it.
5  That's the information I got from her.
6     Q.   Okay.  So these investments are for the
7  benefit of Mr. Razon and his family.  Can we agree
8  on that?
9     A.   Yes.
10    Q.   What's your understanding of Mr. Razon's
11 role with respect to the Collingwood entities?
12    A.   I think he's the president.
13    Q.   Is he the ultimate decision-maker for the
14 Collingwood entities?
15    A.   As the president, he makes decisions for
16 these companies.
17    Q.   Are you the controller for any of these
18 companies reflected on the organizational chart?
19    A.   No.
20    Q.   Do you have any formal role with any of
21 the entities reflected on this organizational chart?
22    A.   I don't have any formal roles in these
23 companies.
24    Q.   So you don't have any titles with respect
25 to these companies?

**Page 90**

1     A.   No.  I don't have any formal title for
2  these companies.
3     Q.   Okay.  Do you receive any compensation
4  from any of these companies?
5     A.   No, I don't receive any compensation.
6     Q.   Do you have an employment agreement with
7  any of these companies?
8     A.   No, I don't have any employment agreement.
9     Q.   How about a secondment agreement with any
10 of these companies?
11    A.   No, as well.
12    Q.   A consulting agreement?
13    A.   None.
14    Q.   So let's look towards the left side of the
15 organizational chart where it says "Collingwood
16 Brookshire USA, Inc."
17         Do you see that?
18    A.   Yes.
19    Q.   And it has a 100 percent ownership in the
20 Salt Dome Project; correct?
21    A.   Brookshire USA, yes.  It is not labeled.
22 Collingwood Brookshire owns Salt Dome Project, but
23 it's not labeled.
24    Q.   Okay.  Well, what's your understanding of
25 the ownership structure?

**Page 97**

1  Q.  But you did have some involvement with
2  these acquisitions and with these entities; correct?
3  A.  Yes.
4  Q.  And how would you -- I'm sorry.
5  A.  Yes. Prior to the opening of the office
6  in Houston.
7  Q.  And when was that?
8  A.  I'm not exact. 2018.
9  Q.  So is it your position that your
10 involvement in these Collingwood entities was
11 limited to pre-2018?
12 A.  Yes.
13 Q.  And how would you characterize your
14 involvement in these entities?
15 A.  Well, basically, we just compiled
16 information regarding the acquisition of these
17 entities with the purpose of transferring those
18 information to those that are -- to the office that
19 we planned to set up.
20 Q.  When you say "compiled information," could
21 you be more specific?
22 A.  Compiled meaning you take note of all the
23 transactions, payments to the lawyers, payment to
24 the consultants, payment to Ahmad and, of course,
25 payment to the seller. So we just compile it.

**Page 150**

1  today?
2  A.  That's one time. Actually, he is the one
3  who set up the subaccounts.
4  Q.  So your testimony today is that he's only
5  come to you one time to seek information?
6  A.  No. I'm not saying that.
7  Q.  Okay.
8  A.  From time to time he seek information but
9  it's rarely that he seeks information from us. It
10 mostly from him giving information to us.
11 Q.  Okay. Is this organizational chart, does
12 it accurately reflect that Mr. Razon is the ultimate
13 decision-maker here?
14 A.  Well, it doesn't -- it's just an
15 organizational chart. Doesn't say that he makes all
16 the decision. Robert, as a controller, he makes
17 daily decisions. He recommends things. So...
18 Q.  Okay. When you were sending these emails
19 and engaging in any sort of work for Collingwood, do
20 you have a Collingwood office that you go to?
21 A.  No. I'm holding office in ICTSI and in
22 Solaire.
23 Q.  Do you have a separate email address that
24 you use for Collingwood business?
25 A.  No.

**Page 194**

1  A.  It was drafted by the lawyers with, of
2  course, input from us, from our team in BRC, in
3  discussion with Ms. Occeña.
4  Q.  So what is your understanding of why this
5  agreement was put into place?
6  A.  Well, to formalize the practice that
7  certain BRHI employees are seconded to BRC or its
8  subsidiary and then -- and, of course, to compensate
9  BRHI in the same manner that, of course, BRC
10 employees or officers doing services for BRHI.
11 Q.  So this Support Services Agreement is
12 effective as of the first day of April 2021.
13     Do you see that?
14 A.  Yes. I -- as far as this agreement is
15 concerned, but the practice has been done in the
16 past.
17 Q.  What do you mean "the practice has been
18 done in the past"?
19 A.  The practice of using BRHI employees, to
20 use to subsidiary of BRC, and BRHI is reimbursed, or
21 BRHI bill BRC for the use of these employees
22 seconded.
23 Q.  So you're telling me that prior to this
24 Support Services Agreement being signed, there was
25 reimbursement for services provided by BRHI for --

**Page 195**

1  to BRC or vice versa?
2  A.  Mostly from BRHI employees, BRHI get
3  reimbursed. But for us, let's say, officers of BRC,
4  doing services for BRHI, BRC don't get reimbursed.
5  Q.  Umm-hmm. So again, it's your position
6  that this reimbursement was occurring prior to the
7  Support Services Agreement being signed?
8  A.  Yes.
9  Q.  Okay. Are there any documents that would
10 show that that's the case?
11 A.  There are -- there will be -- there are
12 documents, on a monthly basis BRHI submit the
13 statement of account to BRC for the use of employees
14 seconded.
15 Q.  And how far back do those documents go?
16 A.  Since the time that officers are seconded
17 to that subsidiary.
18 Q.  You keep saying they are "seconded." Are
19 there seconded agreements -- secondment agreements?
20 A.  Their employment in the BRHI allows them
21 to be seconded to a subsidiary of BRC or affiliate.
22 So there are people seconded, for example, with JeJu
23 Sun, is a subsidiary of BRC.
24 Q.  Right. But this policy doesn't have
25 anything to do with JeJu Sun; correct?

**Page 198**

BY MS. CROWE:

Q. Mr. Festin, during that break, did you speak with anybody other than your attorney?

A. Nobody.

Q. Are you still alone in your office -- sorry, I didn't mean to interrupt you.

A. Yes. I am still alone.

Q. Okay. So we were talking before the break about the Support Services Agreement.

Do you recall that?

A. Yes.

Q. And you said it was to formalize the practice of using BRHI employees at BRC or a subsidiary of BRC and then BRHI is reimbursed.

Is that an accurate description of what this agreement is intended to do?

A. Yes, and also for BRC to be reimbursed for services provided to BRHI.

Q. Okay. And those services that BRC is providing to BRHI, what types of services are we talking about this?

A. Like funding services, like arranging for the funding of BRHI, and also includes tax services.

Q. I'm not sure I understand what you mean by "funding services."

**Page 199**

A. For example, it is the BRC team who would task the funding process, would talk to the banks for funding for BRHI and SPI. So we do the financial -- we do the financial projection, the presentation to the banks, the negotiations to the bank that is being handled by BRC team as well as tax services.

Q. All right. Let's just stay on the funding for a second. When you say the "funding process," you mean facilitating loans or lines of credit from this bank -- these banks?

A. Yes.

Q. Okay. Is there anything else that you mean when you say "funding" other than that?

A. Yeah. Basically the funding and, of course, the monetary compliance with the loan agreements.

Q. Okay. Are you part of the BRC team that speaks to the banks and obtains funding for its -- the BRC subsidiaries?

A. Yes. I am part of that team which, of course, speaks or communicates with the local banks.

Q. Is there another team that speaks with international banks?

A. There is no international bank involved.

**Page 200**

Q. Okay. So this funding facilities of lines of credits are all with local Philippine banks; is that correct?

A. Yes, all local Philippine banks.

Q. Okay. When you talk about compliance of the loan agreements, are you part of the BRC team that monitors that?

A. Yes. We make sure that we comply with -- with the loans, provision of the loans, loan agreements.

Q. So as we sit here today, what loan agreements does BRHI have with local banks that you're actively monitoring?

A. It's -- there is a 73 billion facility, there is the 40 billion facility, and there is the 20 billion facility.

Q. Okay. And the 73 billion facility, what financial institution is that with?

A. There are several financial institutions involved.

Q. Okay.

A. I could name a couple: Banco De Oro, China Bank, Philippine National Bank.

Q. Any others that you remember?

A. What else? That is the top three that

**Page 224**

A. Yes. For business.

Q. And what did you do when you were in Houston during those three trips?

A. Well, we met with -- we met with the accountants when we hired this Solomon and Edwards, and it's the first time also to meet Mr. Hadlow.

Q. Okay. So these three trips to Houston were to conduct business on behalf of Collingwood entities; is that correct?

A. Yes.

Q. You said "we." Who else was traveling with you during these trips?

A. Ms. Occeña.

Q. Anybody else?

A. For a time, there was Fritz, Fritz Lacap.

Q. Okay. And about how long were each of these trips?

A. Short trip, maybe less than a week in Houston.

Q. And do you recall around what time these trips took place?

A. I could not recall exactly the time.

Q. Okay. And for these trips to Houston, did you pay for your travel expenses?

A. I don't pay for my travel expenses.