**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLOBAL GAMING PHILIPPINES, LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>ENRIQUE K. RAZON, JR.;<br>BLOOMBERRY RESORTS AND HOTELS<br>INC.; AND SURESTE PROPERTIES, INC.,<br><br>*Defendants*. | No. 21-CV-2655 (LGS)-(SN) |

**BRHI'S AND SPI'S (1) RESPONSE TO PLAINTIFF'S LOCAL RULE 56.1
STATEMENT AND (2) FURTHER STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF BRHI'S AND SPI'S CROSS-MOTION FOR SUMMARY
JUDGMENT FOR LACK OF PERSONAL JURISDICION AND OPPOSITION TO
PLAINTIFF'S MOTION TO ENFORCE ARBITRAL AWARD**

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56.1(b), Defendants

Bloomberry Resorts and Hotels Inc. ("BRHI") and Sureste Properties, Inc. ("SPI", and together

with BRHI, "BRHI/SPI"), by and through their undersigned counsel, hereby submit the following

(1) response to Plaintiff Global Gaming Philippines, LLC's ("GGAM" or "GGP") Local Civil

Rule 56.1 Statement in Support of Motion to Recognize and Enforce Foreign Arbitral Award

Against Defendants Bloomberry Resorts and Hotels Inc. and Sureste Properties, Inc. (Dkt. 330)

(the "GGAM SOF"), and (2) further statement of undisputed material facts in support of

BRHI/SPI's cross-motion for summary judgment for lack of personal jurisdiction and opposition

to Plaintiff's motion to enforce arbitral award (the "Opposition").[1]

---

[1] Unless otherwise specified, capitalized terms used herein have the same meaning given to them in the Opposition.

BRHI/SPI dispute and object to each paragraph of the GGAM SOF to the extent that it contains conclusions of law.

BRHI/SPI further object to and dispute each of the headings used in the GGAM SOF, to the extent they purport to reflect undisputed material facts or contain conclusions of law.

Any facts admitted, disputed, qualified, or stated herein are solely for purposes of supporting BRHI/SPI's Opposition, and are based on the information available to BRHI/SPI as of the date hereof, and shall not be construed as limiting or altering BRHI/SPI's ability to assert different or additional facts in the future as proceedings develop.

### BRHI/SPI'S RESPONSE TO GGAM'S STATEMENT OF UNDISPUTED MATERIAL FACTS

**1. SPI owns and operates the real property, hotel, and restaurant operations of Solaire Resort and Casino ("Solaire") and wholly owns BRHI. Debtor Defs.' Am. Answer[2] ¶¶13, 14.**

**RESPONSE:** Undisputed.

**2. BRHI owns and operates the casino at Solaire. Debtor Defs.' Am. Answer ¶13.**

**RESPONSE:** Undisputed.

**3. In 2011, Defendants sought out GGAM for its expertise in developing and launching casino-related properties. Declaration of Kevin N. Ainsworth, executed on January 25, 2023 ("Ainsworth Decl."), Ex. 7; *id.* Ex. 26 ¶¶6-8.**

**RESPONSE:** Disputed in part. Undisputed that in 2011, (i) BRHI/SPI "hire[d] SpencerStuart, an executive search firm, to identify a Chief Operating Officer for the Solaire—the position that would be responsible for the daily operations of the Solaire," (ii) "SpencerStuart arranged for [Razon] to interview a number of highly qualified candidates for the COO position,"

---

[2]    Debtor Defendants' Amended Answer is on the docket as ECF No. 273.

(iii) "SpencerStuart also suggested that [Razon] speak with Garry Saunders, the former COO of Melco Crown, because he had experience in start-up casinos and managing gaming operations in Las Vegas and Asia," (iv) Razon "received a document containing background information on both Mr. Saunders and Global Gaming Asset Management or GGAM," and (v) Razon agreed to meet with Mr. Saunders in Las Vegas. Ainsworth Decl., Ex. 26 (Razon Decl., Dec. 7, 2014) ¶¶ 6-8; *see id.* Ex. 7. Disputed as to GGAM's characterization of the exhibits cited in support of the statement. BRHI/SPI respectfully refer the Court to Ex. 7 and Ex. 26 ¶¶ 6-8 of the Ainsworth Decl. for the full text of the exhibits cited in support of the statement.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**4.    In 2011, Defendant Enrique K. Razon Jr. ("Razon")—the Chairman and CEO of Defendants—approached Global Gaming Asset Management, LLC, which, together with Cantor Fitzgerald, L.P. ("Cantor"), owns Plaintiff GGAM through GGAM's parent company, Global Gaming Asset Management, L.P. Ainsworth Decl. Ex. 29 at 38; *id.* Ex. 30 at 8-9; *id.* Ex. 26 ¶¶6-8, 15.**

**RESPONSE:** Disputed.    <u>First</u>, there is no entity called "Global Gaming Asset Management, LLC" in the chain of ownership of Global Gaming Philippines, LLC ("<u>GGAM</u>"). *See* Ainsworth Decl., Ex. 2 (MSA), Ex. A.

<u>Second</u>, GGAM's parent company, Global Gaming Asset Management, L.P., is not directly or indirectly owned by any entity that contains "Global Gaming" as part of its name. Rather, Global Gaming Asset Management, L.P., is owned 50% by "Gaming Asset Management, LLC" and "Gaming Equity Group Series LLC", and 50% by "Cantor GGAM, L.P. *Id.* Cantor GGAM, L.P., in turn, is owned 99.75% by Cantor Fitzgerald, L.P. and 0.25% by Cantor GGAM Holdings,

LLC.  *Id.*  Cantor GGAM Holdings, LLC, in turn, is owned 100% by Cantor Fitzgerald, L.P.  *Id.*

A chart of GGAM's ownership structure is included below:



*Id.*

Third, at no point did Razon approach the entities that directly or indirectly own Global Gaming Asset Management, L.P.—that is, Gaming Asset Management, LLC, Gaming Equity Group Series LLC, Cantor GGAM, L.P., Cantor Fitzgerald, L.P., or Cantor GGAM Holdings, LLC.  Rather, Razon initially interacted with Global Gaming Asset Management, L.P., and then subsequently interacted with Global Gaming Asset Management, L.P.'s 100% owned subsidiary, GGAM.  *Id.*; *see also* Ainsworth Decl., Ex. 7 (referring to "***GG***AM") (emphasis added); *id.* at Ex. 26 ¶¶ 6-8, 15 (referring to "***Global Gaming*** Asset Management" or "***GG***AM") (emphasis added). Razon was not aware of the specifics of Cantor Fitzgerald's indirect ownership interest in Global Gaming Philippines, LLC until after the MSA was signed.  *See* Declaration of Daniel M. Perry, dated February 22, 2023 ("Perry Decl."),[3] Ex. 43 ¶¶ 13-14.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**5.   In early March 2011, Razon traveled to Las Vegas to meet with Mr. William Weidner and Mr. Garry Saunders, two of GGAM's principals, regarding Defendants' Solaire Resort & Casino project. Ainsworth Decl. Ex. 35 at 171-172; Debtor Defs.' Am. Answer ¶50.**

**RESPONSE:** Disputed in  part.  Undisputed that in March 2011, while in Las Vegas, Razon met with Weidner and Saunders for an introductory meeting that lasted approximately one hour, and that during that meeting they discussed Solaire.  *See* Ainsworth Decl., Ex. 30 (Saunders Dep. Tr. Excerpts) at 22:16-27:20; Ainsworth Decl., Ex. 27 (Saunders Decl., June 14, 2015, Excerpts) ¶¶ 14-19.  Disputed that Razon traveled to Las Vegas for the purposes of meeting with Weidner and Saunders.  *See* Perry Decl., Ex. 47 at 30:14-22 (explaining that Razon was in Las

---

[3] The Perry Declaration is filed concurrently herewith.

Vegas in March 2011 for a global management meeting related to International Container Terminal Services, Inc. ("ICTSI")).

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**6.     At their first meeting, Mr. Weidner and Mr. Saunders explained to Razon that Cantor was their joint-venture partner for a potential involvement in the project; the parties discussed their shared interest in GGAM "having skin in the game" via an investment in Razon's planned casino, and they discussed the fact that Cantor would be the financial partner to provide GGAM's investment. Ainsworth Decl. Ex. 29 at 11-16; _id._ Ex. 30 at 26, 40-41; _id._ Ex. 35 at 220-21; _id._ Ex. 27 ¶15.**

**RESPONSE:** Disputed.  First, contemporaneous email communications that were sent shortly after this initial one-hour meeting in a noisy cocktail lounge in Las Vegas do not indicate that Weidner and Saunders explained anything to Razon about the role of any Cantor entity with respect to Global Gaming Asset Management, L.P., much less that any Cantor entity would have any involvement in any investment made by Global Gaming Asset Management, L.P.; rather, these emails and documents discuss Global Gaming Asset Management, L.P. potentially making an investment to "align interests" between the owners and managers of Solaire and make no mention of Cantor.  _See_ Perry Decl., Ex. 2 at BLOOM_0148254 ("I am not keen on a management contract but on an arrangement that aligns our interests. Which in effect means you would come in as an investor with a real stake in our success. We can come up with a formula to accommodate this, which as an example would be that I would make up to ten percent of the company available for you and your group with a buy in formula."); _id._ Ex. 3 at BLOOM_0076860 ("This structure, in addition to the equity risk that we would undertake represents an extraordinary commitment to you

and to the concept of being rewarded for value-added operating results and enhanced equity value, thus being fully aligned with your interests.").

Second, Weidner testified in his deposition that these contemporaneous emails captured what was discussed with Razon during the initial meeting in Las Vegas.  *See* Perry Decl., Ex. 62 at 17:5-21:1 ("Q. So just on the investment portion, the concept was an investment by GGAM? . . . A. That's my understanding. . . .  Q. To be fair, he says: 'We can come up with a formula to accommodate this, which, as an example, would be that I would make up to 10 percent of the company available for you and your group with a buy-in formula.' Do you see that? A. Yes. Q. And that -- to the best of your recollection, does that generally summarize the conversations that you had had Saturday at the cocktail lounge?  A. Yes.").

Third, Saunders testified during his deposition that the only thing he recalled discussing during this initial meeting about Cantor was that Cantor generally provided "access to capital to do projects."  Ainsworth Decl., Ex. 30 at 26:12-27:5.

Fourth, Razon testified during his deposition that at some point in time Weidner mentioned that Cantor was "one of the funders or backers of GGAM," but he could not recall whether this was said at the initial meeting or at a later point in time.  Ainsworth Decl., Ex. 35 at 221:9-222:5. Razon separately testified in a sworn declaration in the underlying arbitration ("Arbitration") as follows:

> The equity option was something **I offered to Bill as consideration for the management relationship**. We did not need a US$ 37 million investment. We had already raised hundreds of millions of dollars through a BDO loan facility and were prepared to embark on a top-up offering. GGAM waited until construction of Solaire was finished and Solaire was ready to open before they exercised the option. They incurred no risk. . . .  **We were informed at the time that Cantor provided some funding and administrative services, but it was never said that Cantor was the 'parent' of GGAM or anything like that, though I know that is now said in the arbitration. I would not have had an interest in a deal with GGAM had I understood the company that way, instead of the way that GGAM was**

**presented to me. . . .   I had no desire to get involved with a New York investment bank**. If it had been explained during our first meeting that GGAM was influenced by Cantor's pursuit of gaming investments, I would have looked elsewhere for a management company. I certainly would not have entered into an agreement with a corporate entity that viewed Solaire as an "asset" that could be "flipped."  Ainsworth Decl., Ex. 38 (Razon Decl., Sept. 4, 2015) ¶¶ 11-12; Perry Decl., Ex. 43 ¶ 14.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**7.   On May 4, 2011, Razon's CFO Estela Occeña-Tuason ("Occeña") emailed Razon stating: "I researched the backgrounds of the 3 guys who are coming tomorrow. Jonathan Rein is Managing Director at Cantor Fitzgerald"; her email further identified Jonathan Rein as "Managing Director at Cantor Fitzgerald, Greater New York City Area Financial Services." Ainsworth Decl. Ex. 9.**

**RESPONSE:** Undisputed that the email referenced in the above statement contains the quoted text.  BRHI/SPI respectfully refer the Court to Ex. 9 of the Ainsworth Decl. for the full list of recipients and the full text of the email.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**8.   During negotiations of the Master Services Agreement ("MSA"), Defendants were aware that Global Gaming was a 50/50 joint venture partner with New York-based Cantor, that Cantor's involvement provided GGAM the ability to fund its equity investment, and that Cantor's signoff would be needed on any final agreement. Ainsworth Decl. Ex. 30 at 17-19, 25-27, 40-41; *id.* Ex. 29 at 14-15; *id.* Ex. 28 at 64-65; *id.* Ex. 35 at 218-22; *id.* Ex. 14; *id.* Ex. 16; *id.* Ex. 26 ¶15.**

**RESPONSE:** Disputed.  <u>First</u>, there is no entity that contains "Global Gaming" in its name that is a 50/50 joint venture partner with any entity affiliated with Cantor Fitzgerald, L.P.  Rather, Gaming Asset Management, LLC and Gaming Equity Group Series LLC, on the one hand, and Cantor GGAM, L.P., on the other hand, are joint venture partners in that they each own a 50%

interest in Global Gaming Asset Management, L.P., which, in turn, owns a 100% interest in Global

Gaming Philippines, LLC.  Ainsworth Decl., Ex. 2 (MSA), Ex. A.

Second, Cantor GGAM, L.P., unlike its direct and indirect parent company, Cantor

Fitzgerald, L.P., is not a "New York-based" entity.  It is a Delaware partnership that is not

registered to do business in New York. See Perry Decl. ¶¶ 2-3.

Third, GGAM does not cite any contemporaneous document from the time period in which

the parties negotiated the MSA that indicates that BRHI/SPI were aware that Global Gaming Asset

Management, L.P. and/or Global Gaming Philippines, LLC needed to rely on Cantor Fitzgerald,

L.P. to provide the funding necessary for its equity investment; the documents cited do not support

this proposition. Moreover, Razon's testimony emphasizes that during the negotiations of the MSA

he did not understand that Cantor Fitzgerald, L.P. had an ownership interest in GGAM.  See

Ainsworth Decl., Ex. 38 (Razon Supp. Decl. dated Sept. 4, 2015) ¶¶ 10-12; Perry Decl., Ex. 43 ¶¶

13-14.  The document setting forth the ownership structure for GGAM was sent to BRHI/SPI for

the first time the day before the MSA was signed.  See id. at ¶ 13.

Fourth, GGAM does not cite any contemporaneous document from the time period in

which the parties negotiated the MSA that indicates that BRHI/SPI were aware that Cantor

Fitzgerald, L.P.'s signoff would be needed for any final agreement; the documents cited do not

support this proposition.  On the contrary, contemporaneous documents show that BRHI/SPI were

informed that Cantor's involvement in the negotiations of the MSA was in its capacity of

"provid[ing] services to Global Gaming, including but not limited to legal and financial advisory

services," not as a counterparty to the MSA.  Perry Decl., Ex. 9 at BLOOM_0001273.  BRHI/SPI

rejected an attempt by GGAM to give Cantor Fitzgerald, L.P. "personality" in the MSA "by being

identified as a party entitled to any communications that will be sent to GGAM," and emphasized

that "we are suppose to contract only with GGAM!"  Dkt. 281-1 at GGAM-SDNY-0046585.
Tellingly, other contracts between GGAM and third parties indicate that when GGAM wants a
contractual counterparty to know that the sign-off of a Cantor Fitzgerald entity is required, it
expressly includes such a requirement in the contract. *See* Perry Decl., Ex. 29 at GGAM-SDNY-
0463314 (section (ii)).  The MSA contains no such requirement.  *See generally* MSA (Dkt. 218-
4).

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**9.   The last page of the MSA (its Exhibit A) shows Cantor's role in the ownership
structure of Plaintiff.  Ainsworth Decl. Ex. 2, Ex. A.**

**RESPONSE:** Disputed in part.  Undisputed that Exhibit A to the MSA shows the
ownership structure of Global Gaming Philippines, LLC, including that (i) Global Gaming
Philippines, LLC is 100% owned by Global Gaming Asset Management, L.P.; (ii) Global Gaming
Asset Management, L.P. is 50% owned by Cantor GGAM, L.P.; (iii) Cantor GGAM, L.P. is
99.75% owned by Cantor Fitzgerald, L.P. and .025% owned by Cantor GGAM Holdings, LLC;
and (iv) Cantor GGAM Holdings, LLC is 100% owned by Cantor Fitzgerald, L.P.  Disputed to the
extent that this statement suggests that Cantor Fitzgerald, L.P. has a direct or even once removed
ownership interest in Global Gaming Philippines, LLC.  The MSA makes clear the nature of
Cantor Fitzgerald, L.P.'s ownership interest, and the testimony of BRHI/SPI's and GGAM's
witnesses could not be clearer that Cantor Fitzgerald, L.P. had no role with respect to the MSA.
*See* Ainsworth Decl., Ex. 2 (MSA), Ex. A; *id.* Ex. 26 (Razon Decl., Dec. 7, 2014) ¶ 17 ("**Cantor
Fitzgerald had no role in the management of the Solaire, or any other aspect of the Solaire
Project** . . . .") (emphasis added); *see also* Dkt. 281-4 ¶ 12 ("**Cantor did not perform work in
fulfillment of GGAM's obligations under the MSA**, whether under the SSA or otherwise.")

(emphasis added); Dkt. 281-6 ¶ 24 ("**Cantor personnel provided services for activities internal to the relationship with GGAM only**, and GGAM paid for those services.") (emphasis added), ¶ 16 ("**For the Services that it was contracted to provide, GGAM would <u>not</u> be expected to have in-house back-office support, such as a team of accountants, interior designers or other overhead**.") (emphasis added).

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**10.  Between May and September 9, 2011, Defendants negotiated the MSA, including by email and phone to Cantor's New York headquarters, with Razon directing the negotiations, including from his residence at the Plaza in Manhattan. Razon Am. Answer (ECF No. 253) ¶54; Debtor Defs.' Am. Answer ¶¶54, 55; Ainsworth Decl. Ex. 29 at 59-63; *id.* Ex. 33 at 27-28, 71-74, 95-96; *id.* Ex. 31 at 18-19; *id.* Ex. 15; *id.* Ex. 18.**

**RESPONSE:** Disputed in part.  Undisputed that in negotiating the MSA, BRHI/SPI communicated by email and phone with legal and/or financial advisors to GGAM that were based around the world, including in Las Vegas (Lewis & Roca), Los Angeles (Paul Hastings), the Philippines (Puno & Puno) and New York (Cantor).  *See, e.g.*, Perry Decl., Ex. 4 at GGAM-SDNY-0441023; *id.* Ex. 13 at GGAM-SDNY-0058560; *id.* Ex. 19 (EOA) at BLOOM_0082050 (listing Kirkbride's Paul Hastings/Los Angeles address); Declaration of Rachel Penski Fissell dated January 25, 2023 ("<u>Fissell Decl.</u>"), Ex. 34 (Kaplan Dep. Tr. Excerpts) at 17:9-15 (testifying that Puno & Puno was GGAM's counsel in the Philippines for negotiation of the MSA).

Disputed as to the remainder of the statement.  <u>First</u>, at no point did BRHI/SPI negotiate the MSA with any Cantor entity as a potential or actual counterparty to the MSA.  Rather, from early on BRHI/SPI were informed that while BRHI/SPI were "dealing with GGAM, not Cantor," "Cantor provides services to Global Gaming, including but not limited to legal and financial

advisory services."  Perry Decl., Ex. 9 at BLOOM_0001273, -1275.  And when GGAM attempted to give Cantor Fitzgerald, L.P. "personality" in the MSA "by being identified as a party entitled to any communications that will be sent to GGAM," BRHI/SPI rejected this attempt and emphasized that "we are suppose to contract only with GGAM!"  Dkt. 281-1 at GGAM-SDNY-0046585. Accordingly, to the extent BRHI/SPI negotiated the MSA with personnel from Cantor, it was in their capacity as legal and/or financial advisors to GGAM.

 <u>Second</u>, Razon did not "direct[] the negotiations of the MSA" between May and September 9, 2011.  GGAM's testimony in this matter confirms that individuals *other* than Razon directed the MSA negotiations.  For example, Rein testified that the primary negotiators from the BRHI/SPI side were Tan, Occeña, Almeda and Alarilla.  *See* Perry Decl., Ex. 65 at 26:9-25; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 27:1-4.  And Rein, despite referring to himself as the lead negotiator, further testified that "to the best of [his] recollection [he] did not negotiate directly with Mr. Razon."  Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 27:7-8.  Saunders testified that Occeña was the primary negotiator at the "first set of meetings in Manila," Ainsworth Decl., Ex. 30 (Saunders Dep. Tr. Excerpts) at 43:22-23, with Almeda and Alarilla also present (but not Razon), *id.* at 42:4-12, and Saunders further testified that during the "subsequent negotiations," "the people that were more visible were Estela [Occeña] and Benny [Tan]."  Perry Decl., Ex. 63 at 45:18-24.  Razon also confirmed that he did not direct the negotiation of the MSA during this time period.  *See* Ainsworth Decl., Ex. 35 (Razon Dep. Tr. (vol. 1) Excerpts) at 229:24-230:7 ("Q. And during this time while you were in New York [April 19-26th, 28-30th, 2011], you were negotiating the MSA with GGAM and Cantor; correct? A. **No, not correct. I didn't negotiate the MSA**. Q. Or you were instructing your people on negotiations? A. They were only – **I gave them the parameters early on, and they negotiated**.") (emphasis added).

<u>Third</u>, while BRHI/SPI do not dispute that Razon had email and/or telephonic communication with Weidner, Estella Occeña, Jose Alarilla and Benny Tan (none of whom are based in New York) relating to negotiating the GGAM relationship during one or more trips that Razon made to New York in the April-June 2011 time frame, it is unclear whether such communications occurred while Razon was at his residence at the Plaza in Manhattan as opposed to at some other location in New York or in the surrounding states such as New Jersey (where Razon's private jet is parked during such trips and where he plays golf) or Pennsylvania or Massachusetts (where he has traveled to during such trips).  *See* Ainsworth Decl., Ex. 35 (Razon Dep. Tr. (vol. 1) Excerpts) at 228:1-4, 238:4-241:1; *see also* Defs.' Am. Answer ¶ 54 ("[BRHI/SPI] deny the allegations in Paragraph 54 of the Complaint, except admit so much of Paragraph 54 as seeks to allege that (i) [BRHI/SPI] sent responses to document requests and diligence checklists by email to Cantor employees acting on behalf of GGAM, and (ii) Razon had email and/or telephonic communication with Weidner, Occeña, Alarilla, and Tan (none of which are based in New York) relating to negotiating the GGP relationship during one or more trips that Mr. Razon made to New York in the April-June 2011 time frame (during which he would have stayed at the Plaza residence in Manhattan), and respectfully refer the Court to his flight logs and to the contemporaneous emails for the most accurate reconstruction of his whereabouts and communications.").

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**11. The parties entered into a confidentiality agreement concerning their negotiations to the MSA and specifically agreed it would be governed by New York law. Ainsworth Decl. Ex. 8 (Confidentiality Agreement); *id.* Ex. 11 at BRHI_0001277 (Defendants' counsel stating "I am fine with New York law as governing of this**

Confidentiality Agreement" and reflecting New York contact information); *id.* Ex. 34 at 152-153; Defs.' Am. Answer ¶52.

    **RESPONSE:** Disputed.  The parties to the MSA—that is, GGAM, BRHI and SPI—did not enter into the Confidentiality Agreement, effective as of March 1, 2011; rather non-party Global Gaming Asset Management, L.P., BRHI and SPI, entered into the Confidentiality Agreement.  BRHI/SPI refer the Court to Ex. 8 of the Ainsworth Decl. for the complete and accurate terms thereof.  BRHI/SPI further note that in a portion of the email chain that was excluded from Ex. 11 of the Ainsworth Decl., BRHI/SPI's counsel emphasized that "This Confidentiality Agreement will apply only during this period when GGAM is evaluating whether it will sign up with Bloomberry or not. **If GGAM signs the Management Services Agreement with Bloomberry, the confidentiality clause in that Agreement will supersede and replace this one**."  Perry Decl., Ex. 9 at BLOOM_0001274 (emphasis added).  The MSA was governed by Philippine law, not New York law.  *See* MSA (Dkt. 218-4) § 19.3.

    This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

    **12.  Communications between the representatives of Defendants, GGAM, and Cantor reflected that GGAM and Cantor were operating from New York during the negotiations. *See, e.g.*, Ainsworth Decl. Ex. 10 (email reflecting Cantor's New York address); *id.* Ex. 14 ("We had lunch at 2:30pm and you can imagine what time the NY guys hit the sack."); *id.* Ex. 17 ("I am just confirming you are requesting a call at 2PM Manila time on Wednesday? . . . That would be 2am in New York . . . .").**

    **RESPONSE:** Disputed in part.  Undisputed that in negotiating the MSA, BRHI/SPI communicated with legal and/or financial advisors to GGAM who were based around the world, including in Las Vegas (Lewis & Roca), Los Angeles (Paul Hastings), the Philippines (Puno &

Puno), and New York (Cantor).  *See, e.g.*, Perry Decl., Ex. 4 at GGAM-SDNY-0441023; *id.* Ex. 13 at GGAM-SDNY-0058560; *id.* Ex. 19 (EOA) at BLOOM_0082050 (listing Kirkbride's Paul Hastings address); Fissell Decl., Ex. 34 (Kaplan Dep. Tr. Excerpts) at 17:9-15 (testifying that Puno & Puno was GGAM's counsel in the Philippines).  Disputed as to the remainder of the statement, including the suggestion that BRHI/SPI negotiated the MSA with personnel from Cantor who were functioning as representatives of Cantor Fitzgerald, L.P., not GGAM.  As previously noted, BRHI/SPI were informed that although BRHI/SPI were "dealing with GGAM, not Cantor," "Cantor provides services to Global Gaming, including but not limited to legal and financial advisory services."  Perry Decl., Ex. 9 at BLOOM_0001273, -1275.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**13.  Razon negotiated the MSA on behalf of Defendants from his New York residence throughout spring of 2011. Razon Am. Answer (Dkt No. 253) ¶54 (admitting: "Razon had email and/or telephonic communication with Weidner, Occeña, Alarilla, and Tan . . . relating to negotiating the GGP relationship during one or more trips that Mr. Razon made to New York in the April-June 2011 time frame . . . ."); *see also* Ainsworth Decl. Ex. 35 at 239; *id.* Ex. 13 ("EKR (Mr. Razon) said his schedule in New York is still fluid at this time. He will be going in and out of NY so he will revert when he has free time to meet with [Cantor CEO] Howard Lutnick").**

**RESPONSE:** Disputed in part.  BRHI/SPI do not dispute that Razon had email and/or telephonic communication with Weidner, Estella Occeña, Jose Alarilla and Benny Tan (none of whom are based in New York) regarding negotiating the GGAM relationship during one or more trips that Razon made to New York in the April-June 2011 time frame (during which he would have stayed at his Plaza residence in Manhattan).

Disputed as to the remainder of the statement.  <u>First</u>, as discussed above in BRHI/SPI's response to paragraph no. 10, it is unclear whether such email and/or telephonic communications occurred while Razon was at his residence at the Plaza in Manhattan as opposed to at some other location in New York or in the surrounding states, *see* Ainsworth Decl., Ex. 35 (Razon Dep. Tr. (vol. 1) Excerpts) at 228:1-4, 238:4-241:1, and Razon confirmed that he "didn't negotiate the MSA" during his April (*i.e.*, Spring) 2011 trip to New York.  *Id.* at 229:24-230:7 ("Q. And during this time while you were in New York [April 19-26th, 28-30th, 2011], you were negotiating the MSA with GGAM and Cantor; correct? A. **No, not correct. I didn't negotiate the MSA**. Q. Or you were instructing your people on negotiations? A. They were only – **I gave them the parameters early on, and they negotiated**.") (emphasis added).

<u>Second</u>, contrary to GGAM's suggestion that Razon met with Howard Lutnick in New York in connection with the negotiation of the MSA, it is undisputed that such meeting never took place, and it is likewise undisputed that (i) neither Razon nor any other personnel or representative of BRHI/SPI ever traveled to New York to meet with GGAM personnel or representatives (including representatives at Cantor Fitzgerald, L.P. or its affiliates) in connection with the negotiation of the MSA, and (ii) BRHI/SPI personnel or representatives never attended any meetings in New York in connection with the negotiation of the MSA.  *See* Perry Decl., Ex. 62 at 50:12-51:18; *id.* Ex. 64 at 20:18-22:8; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 27:9-19; Perry Decl., Ex. 65 at 31:13-21; *id.* Ex. 66 at 134:1-136:19, 165:18-24; *id.* Ex. 63 at 44:25-45:6; *see also* Ainsworth Decl., Ex. 35 (Razon Dep. Tr. (vol. 1) Excerpts) at 223:14-224:21, 231:13-15; Perry Decl., Ex. 68 at 45:24-46:1.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**14.  By June 2011, Plaintiff (including representatives from Cantor) and Razon were approaching a final agreement, but negotiations became strained, resulting in several more months of heavy negotiating over what Razon and Defendants saw as Cantor issues. Ainsworth Decl. Ex. 35 at 218-19; *Id.* Ex. 16; *Id.* Ex. 26 ¶15; *id.* Ex. 28 at 64-65.**

**RESPONSE:** Disputed in part.  Undisputed that in June 2011, negotiations between BRHI/SPI and GGAM became strained when GGAM's attorneys at Cantor Fitzgerald, L.P. representing GGAM in connection with the MSA negotiations attempted to change material terms of the MSA that had previously been agreed upon by BRHI/SPI and GGAM during in-person negotiations in Manila, and that the MSA negotiations continued for several months thereafter until it was signed in September 2011.  *See, e.g.*, Dkt. 281-1 at GGAM-SDNY-0046583 (BRHI/SPI's counsel stating to GGAM's counsel at Cantor Fitzgerald in a January 9, 2011 email that "your draft Management Services Agreement (marked as 'GGAM Draft June 2011') is materially different from the draft Agreement that we had agreed to in Manila. We do not want to negotiate terms and conditions which the parties have previously negotiated and agreed to. We were assured by Brad, Gary and Jon that we had an agreement on the business terms. We were told that your lawyers will only put in the definitions and other details which will not deviate from what has been agreed. But this is not to be so.").

Disputed as to the remainder of the statement.  <u>First</u>, contrary to GGAM's suggestion, BRHI/SPI were never seeking to enter into any agreement with Cantor Fitzgerald, L.P.  Indeed, in the above email from BRHI/SPI's counsel to GGAM's counsel at Cantor Fitzgerald, L.P., BRHI/SPI rejected an attempt by GGAM to give Cantor Fitzgerald, L.P. "personality" in the MSA "by being identified as a party entitled to any communications that will be sent to GGAM," and

emphasized that "we are suppose to contract only with GGAM!"  Dkt. 281-1at GGAM-SDNY-0046585.

Second, GGAM misleadingly suggests that BRHI/SPI understood the "Cantor issues" to be issues raised by Cantor Fitzgerald, L.P., as a counterparty to the MSA, when, in fact, BRHI/SPI understood these to be issues raised by Cantor Fitzgerald, L.P. solely in its role as counsel and/or financial advisor to GGAM.  That Cantor Fitzgerald, L.P. was functioning only as counsel and/or a financial advisor to GGAM in connection with the MSA negotiations is demonstrated by GGAM's witness testimony.  For example:

- Weidner testified that "the Bloomberry negotiating team . . . dealt directly with several Cantor attorneys who **acted as our counsel in the negotiations**, and with Mr. Rein who was a Cantor employee working for and eventually seconded to GGAM," and that "attorneys delegated from Cantor Fitzgerald t̲o **represent GGAM**" were involved in negotiating the MSA." Dkt. 281-6 ¶¶ 23-24 (emphasis added).

- Rein similarly testified that

  o "Throughout the course of the negotiations of the [MSA] . . . I provided advice and guidance to GGAM in my capacity as the senior gaming sector investment banker at Cantor. . . .  Bloomberry representatives were informed and understood that I was an employee of Cantor Fitzgerald, **providing services to GGAM**." Perry Decl., Ex. 40 ¶ 9 (emphasis added);

  o "**[W]orking on behalf of GGAM** under support arrangements, Cantor personnel engaged directly with Bloomberry personnel in negotiating the MSA. . . .  I identified myself clearly to the Bloomberry negotiating team members as a Cantor investment banker, which was my role at that time, **providing advisory services to GGAM** in respect of both the MSA and GGAM's potential investment in the Solaire project." Dkt. 281-4 ¶ 7 (emphasis added);

  o "Cantor is identified in and carved out of certain provisions of the MSA, such as the non-compete clause and the conflict of interest clause. Bloomberry representatives discussed, debated and negotiated these provisions with GGAM and its advisors, including me, before the parties enshrined them in the executed MSA." Dkt. 281-4 ¶ 8 (emphasis added); and

  o "There were also email exchanges identifying **Cantor's role in providing certain services, including legal services, to GGAM**, such as the exchange among Cantor in-house lawyer Kevin Russell, Bloomberry representative (and later CFO) Estela

Occena and Bloomberry Secretary and outside counsel Benny Tan dated May 17-25, 2011." Dkt. 281-4 ¶ 9 (emphasis added).

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**15. As of July 2011, Razon and Defendants' personnel acting at Razon's direction were focused on resolving issues raised by Cantor concerning the MSA.** *See* **Ainsworth Decl. Ex. 16;** *Id.* **Ex. 26 ¶15.**

**RESPONSE:** Disputed in part. Undisputed that in June 2011, negotiations between BRHI/SPI and GGAM became strained, as detailed in BRHI/SPI's above response to paragraph no. 14.

Disputed as to the remainder of the statement. <u>First</u>, GGAM misleadingly suggests that BRHI/SPI understood the "Cantor issues" to be issues raised by Cantor Fitzgerald, L.P., as a counterparty to the MSA, when BRHI/SPI understood these to be issues raised by Cantor Fitzgerald, L.P. in its role as counsel to GGAM. As discussed in BRHI/SPI's above response to paragraph no. 14, Cantor Fitzgerald, L.P. was functioning only as counsel and/or financial advisor to GGAM in connection with the MSA negotiations.

<u>Second</u>, GGAM misleadingly suggests that Razon was directing the negotiations of the MSA between July and September 2011. This suggestion is plainly contradicted by GGAM's testimony in this matter, which confirms that individuals *other* than Razon directed the MSA negotiations. For example, Rein testified that the primary negotiators from the BRHI/SPI side were Tan, Occeña, Almeda and Alarilla. *See* Perry Decl., Ex. 65 at 26:9-25; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 27:1-4. And Rein, despite referring to himself as the lead negotiator, further testified that "to the best of [his] recollection [he] did not negotiate directly with Mr. Razon." Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 27:7-8. Saunders testified that Occeña was the primary negotiator at the "first set of meetings in Manila," Ainsworth Decl., Ex.

30 (Saunders Dep. Tr. Excerpts) at 43:22-23, with Almeda and Alarilla also present (but not Razon), *id.* at 42:4-12, and Saunders further testified that during the "subsequent negotiations," "the people that were more visible were Estela [Occeña] and Benny [Tan]." Perry Decl., Ex. 63 at 45:18-24. Razon also confirmed that he did not direct the negotiation of the MSA beyond giving "the parameters early on" to the BRHI/SPI individuals responsible for negotiating the MSA. Ainsworth Decl., Ex. 35 at 229:24-230:7.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**16.  In September 2011, Cantor emailed the GGAM-signed MSA from New York to the Defendants, and the Defendants emailed the executed MSA to Cantor in New York. Debtor Defs' Am. Answer ¶59; Ainsworth Decl. Ex. 19; *Id.* Ex. 20 at GGAM-SDNY-0100848.**

**RESPONSE:** Disputed in part.  Undisputed that the MSA was executed on or around September 9, 2011, a Cantor employee on behalf of GGAM emailed GGAM's MSA signature page to Occeña in the Philippines, and (iii) Occeña emailed the fully executed MSA to the Cantor employee on behalf of GGAM.  Disputed as to the remainder of the statement.  BRHI/SPI respectfully refer the Court to Ex. 20 of the Ainsworth Decl. for the full list of recipients and the full text of these emails.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**17.  In the MSA, the Defendants agreed that "the decision of the arbitration panel shall be binding upon both Parties and enforceable in all jurisdictions." Ainsworth Decl. Ex. 2 ¶19.2(b).**

**RESPONSE:** Undisputed that Clause 19.2(b) of the MSA states, in part, that "the decision of the arbitration panel shall be binding upon both Parties and enforceable in all jurisdictions."

BRHI/SPI respectfully refer the Court to the MSA (Dkt. 218-4) for the complete and accurate terms thereof.

**18. The MSA explicitly recognized the role of New York-based Cantor in the arrangement. Ainsworth Decl. Ex. 2 ¶9.5 (allowing GGAM to use affiliates of Cantor to provide certain services), and Ex. A (showing Cantor's role in the ownership structure of GGAM).**

**RESPONSE:** Disputed in part. Undisputed that Exhibit A to the MSA shows the ownership structure of Global Gaming Philippines, LLC, including that (i) Global Gaming Philippines, LLC is 100% owned by Global Gaming Asset Management, L.P.; (ii) Global Gaming Asset Management, L.P. is 50% owned by Cantor GGAM, L.P.; (iii) Cantor GGAM, L.P. is 99.75% owned by Cantor Fitzgerald, L.P. and .025% owned by Cantor GGAM Holdings, LLC; and (iv) Cantor GGAM Holdings, LLC is 100% owned by Cantor Fitzgerald, L.P.

Disputed as to the remainder of the statement. First, contrary to GGAM's suggestion, Cantor Fitzgerald, L.P. does not have a direct or even once removed ownership interest in Global Gaming Philippines, LLC. *See* Ainsworth Decl., Ex. 2 (MSA), Ex. A.

Second, while Section 9.5 of the MSA contemplated that, with BRHI/SPI's approval, GGAM could engage "Cantor G&W (Nevada) L.P. (doing business as Cantor Gaming)" to operate at Solaire, Cantor Gaming was a Nevada-based entity, not a New York-based entity. *See, e.g.*, Perry Decl., Ex. 62 at 42:13-25. Regardless, it is undisputed that GGAM never retained Cantor Gaming to operate at Solaire. *Id.* at 43:1-4.

Third, Razon gave sworn testimony that "**Cantor Fitzgerald had no role in the management of the Solaire, or any other aspect of the Solaire Project** . . . ." Ainsworth Decl., Ex. 26 (Razon Decl., Dec. 7, 2014) ¶ 17. GGAM's witnesses gave similar testimony. *See* Dkt.

281-4 ¶ 12 ("**Cantor did not perform work in fulfillment of GGAM's obligations under the MSA**, whether under the SSA or otherwise.") (emphasis added); Dkt. 281-6 ¶ 24 ("**Cantor personnel provided services for activities internal to the relationship with GGAM only**, and GGAM paid for those services.") (emphasis added), ¶ 16 ("**For the Services that it was contracted to provide, GGAM would <u>not</u> be expected to have in-house back-office support, such as a team of accountants, interior designers or other overhead**.") (emphasis added).

<u>Fourth</u>, the fact that Cantor Fitzgerald, L.P. had no "role" with respect to the MSA is further demonstrated by the fact that BRHI/SPI rejected an attempt by GGAM to give Cantor Fitzgerald, L.P. "personality" in the MSA "by being identified as a party entitled to any communications that will be sent to GGAM," and emphasized that "we are suppose to contract only with GGAM!"  Dkt. 281-1 at GGAM-SDNY-0046585.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**19.  Defendants understood that a substantial portion of GGAM's services under the MSA would be performed in New York, and GGAM spent extensive hours performing its MSA obligations from New York in Cantor's offices. Ainsworth Decl. Ex. 33 at 27-30; *Id.* Ex. 30 at 17-21; *Id.* Ex. 31 at 26-27, 52-53; *Id.* Ex. 29 at 22-24; *id.* Ex. 38 ¶12.**

**RESPONSE:** Disputed.  <u>First</u>, the testimony cited by GGAM shows only that BRHI/SPI understood that Cantor Fitzgerald, L.P. provided certain "funding and administrative services" for GGAM, not that BRHI/SPI understood that GGAM performed any, much less a "substantial portion," of GGAM's services under the MSA in New York in Cantor's offices, or that GGAM in fact did spend extensive hours performing its MSA obligations from New York in Cantor's offices. *See, e.g.*, Ainsworth Decl., Ex. 38 (Razon Decl., Sept. 4, 2015) ¶ 12 ("We were informed at the time that Cantor provided some funding and administrative services, but it was never said that

Cantor was the 'parent' of GGAM or anything like that, though I know that is now said in the arbitration.  I would not have had an interest in a deal with GGAM had I understood the company that way, instead of the way that GGAM was presented to me.").  Razon's other Arbitration testimony demonstrates BRHI/SPI's understanding that "**Cantor Fitzgerald had no role in the management of the Solaire, or any other aspect of the Solaire Project** . . . ."  Ainsworth Decl., Ex. 26 (Razon Decl., Dec. 7, 2014) ¶ 17 (emphasis added).

Second, GGAM does not point to any contemporaneous document demonstrating that it performed any of its MSA obligations from New York in Cantor's offices, much less "extensive hours" performing such obligations.  It is undisputed that GGAM's principals with responsibility for providing management services under the MSA—Weidner, Stone and Saunders—were all based in Nevada, and the resort and casino for which they were providing management services was in the Philippines.  *See generally* MSA (Dkt. 218-4).

Third, during the Arbitration, GGAM sought to "minimize Cantor's role in the management of the properties."  *See* Perry Decl., Ex. 64 at 28:18-22.  During the liability phase, in response to BRHI/SPI's argument that GGAM had failed to perform under the MSA because of pressure from Cantor to pursue other business, GGAM's witnesses testified that although Cantor performed certain advisory and administrative services for GGAM for which GGAM paid Cantor pursuant to a Support Services Agreement, **Cantor did _not_ perform any services under the MSA**.  For example:

- Weidner testified that:

  - "At the time the MSA was signed, Cantor Fitzgerald had already been providing support services to GGAM. As I noted above, attorneys delegated from Cantor Fitzgerald to represent GGAM were involved in negotiating the MSA. The SSA was not created for any purpose related to the MSA, and in no way was an "assignment." Under the SSA, **Cantor personnel provided services for activities internal to the relationship with GGAM only**, and GGAM paid for those services. There is nothing

in the SSA under which GGAM disclaims or transfers its obligations or its rights under the MSA." Dkt. 281-6 ¶ 24 (emphasis added); and

- o "**For the Services that it was contracted to provide, GGAM would not be expected to have in-house back-office support, such as a team of accountants, interior designers or other overhead**." Dkt. 281-6 ¶ 16 (emphasis added).

- Rein likewise testified that:

  - o "Cantor and GGAM executed the SSA as contemplated in GGAM's organizational documents. The SSA relates to back-office administrative functions, such as GGAM's accounting, tax, legal, HR/payroll administration and similar functions. As already noted above, I and others specifically informed Bloomberry during the MSA negotiations that Cantor provided GGAM such services. But **Cantor did not perform work in fulfillment of GGAM's obligations under the MSA**, whether under the SSA or otherwise." Dkt. 281-4 ¶ 12 (emphasis added).

During the damages phase of the Arbitration, BRHI/SPI sought to reduce GGAM's damages by arguing that because the MSA was terminated early, GGAM potentially saved costs that it would have otherwise paid to Cantor as part of a Support Services Agreement for back-office services (*e.g.*, accounting, finance, and legal).  *See* Final Award[4] (Dkt. 218-1) ¶¶ 261-63. GGAM successfully opposed BRHI/SPI's argument—and therefore avoided a reduction in damages—by arguing that Cantor did not perform any services under the MSA, and as such, as a result of the termination of the MSA, GGAM did not avoid costs of paying Cantor for providing any such services.  *See* Final Award (Dkt. 218-1) ¶¶ 261-263, 313-314.  GGAM is thus estopped from taking the factual position that Cantor performed services under the MSA.  *See, e.g.*, *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6-8 (2d Cir. 1999) ("Judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by that party in a prior legal proceeding.") (cleaned up); *Faiveley Transp. USA, Inc. v.*

---

[4] "Final Award" refers to the award issued by the arbitral tribunal ("Tribunal") on September 27, 2019 (Dkt. 218-1). "Liability Award" refers to the partial award on liability rendered by the Tribunal on September 20, 2016 (Dkt. 218-2). "Interim Measures Award" refers to the interim award rendered by the Tribunal on December 9, 2014 (Dkt. 218-3).

*Wabtec Corp.*, 758 F. Supp. 2d 211, 218 (S.D.N.Y. 2010) (holding that judicial estoppel barred a litigant from taking a position inconsistent with a position successfully taken related to damages in arbitration).

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**20. After execution of the MSA, Defendants and GGAM began negotiating an Equity Option Agreement ("EOA"). Ainsworth Decl. Ex. 26 ¶¶16-17; *id.* Ex. 34 at 149-150.**

**RESPONSE:** Disputed in part. Undisputed that after the execution of the MSA, there were negotiations for the EOA. Disputed that BRHI/SPI, which were not parties to the Equity Option Agreement, negotiated the EOA. *See, e.g.*, Liability Award (Dkt. 218-2) ¶ 49 ("By an Equity Option Agreement dated April 16, 2012 (the 'EOA') between and among Prime Metroline Transport Corp. ('PMTC,' the predecessor in interest to Prime Metroline Holdings, Inc., or 'PMHI'), BRC and GGAM (the 'EOA Parties'). Under the EOA, PMTC, as Grantor, granted GGAM an option to purchase (the 'Option'), at an agreed-upon strike price of PHP 1.67 per share, 921,184,056 shares (the 'Shares') in BRC.").

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**21. The negotiation and execution of the EOA were part of Defendants' performance of the MSA, in which they promised to provide an equity option right to GGAM as compensation. Ainsworth Decl. Ex. 26 ¶¶14-17; *id.* Ex. 2 ¶18.3; Debtor Defs.' Am. Answer ¶57.**

**RESPONSE:** Disputed in part. Undisputed that Clause 18.3 of the MSA stated, among other things, that "[t]he parties shall execute a mutually acceptable option agreement (the "Option Agreement") to embody the share purchase option . . . ." BRHI/SPI respectfully refer the Court to the MSA (Dkt. 218-4) for the complete and accurate terms thereof.

Disputed to the extent that this statement intends to aver obligations owed by BRHI/SPI under the MSA, which is a legal conclusion.

Further disputed, on judicial estoppel grounds, to the extent that GGAM now states, as a matter of fact, that BRHI/SPI promised to provide an equity option right to GGAM as part of GGAM's "compensation" under the MSA.  GGAM's witnesses testified that the equity option was **_not_** part of GGAM's "compensation" under the MSA.  For example:

- Weidner testified that:

  o "GGAM's equity investment in Bloomberry Resorts Corp. was distinct from the MSA services . . . ." Perry Decl., Ex. 30 ¶ 20; and

  o "[W]e never discussed—let alone agreed to—an arrangement whereby the shares GGAM would acquire upon exercise of its option (the terms of which were agreed to in the EOA) would be tied to or treated as compensation for GGAM's performance under the terms of the separate MSA." Perry Decl., Ex. 32 ¶ 7.

- Saunders likewise testified that:

  o "The fact that Mr. Razon and his advisors were still trying to change key terms in the EOA so late in the process shows that all parties understood the MSA and EOA to be distinct arrangements." Perry Decl., Ex. 41 ¶ 26; and

  o "If, in fact, [BRHI/SPI] had granted us our equity option at the time of the MSA . . . then there would be no reason not to complete the agreement before making representations to the public about the terms." Perry Decl., Ex. 41 ¶ 29.

Based in part on GGAM taking this position in its Request for Interim Measures, which was contrary to BRHI/SPI's position, the Tribunal issued the Interim Measures Award in GGAM's favor.  *See* Interim Measures Award (Dkt. 218-3) ¶ 131; *see also id.* ¶ 136.  GGAM is thus estopped from now taking the opposite factual position that BRHI/SPI promised to provide an equity option right to GGAM as part of GGAM's "compensation" under the MSA.  *See Molecular Dynamics Ltd. V. Spectrum Dynamics Med. Ltd.*, 2022 WL 2901559, at *2 (S.D.N.Y. July 22, 2022) (estopping plaintiff from taking position that contradicted an argument it had made during its "successful mid-arbitration application for an *ex parte* freezing order of [defendant's] assets");

*Dapelo v. Banco Nacional de Mexico*, 1993 WL 159943, at *1, 3-4 (S.D.N.Y. May 11, 1993) ("If plaintiff's arbitration testimony is true, she would clearly be unqualified for the position she held at Banco Nacional and her claim would have to be dismissed. The question presented here is whether plaintiff should now be able to change her version of the 'truth' and be allowed to attempt to persuade a jury that, despite her prior testimony in the arbitration, she is, in fact, a college educated financial accountant. The answer to that question is 'no'.").

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**22. Defendants negotiated directly with in-house counsel at Cantor and GGAM's personnel in New York to reach agreement regarding the EOA. Ainsworth Decl. Ex. 33 at 95-96; *id.* Ex. 34 at 127-129; 147-150, 173-174; *id.* Ex. 10.**

**RESPONSE:** Disputed in part.  Undisputed that Bloomberry Resorts Corp.'s ("BRC") and Prime Metroline Transit Corp.'s (which was later renamed to Prime Metroline Holidngs Inc.) ("Prime") personnel and/or representatives had email and/or telephonic communications with GGAM's personnel and/or representatives, including GGAM's counsel and advisors from Cantor Fitzgerald, L.P. or its affiliates, concerning the negotiation of the EOA.  Disputed as to the remainder of the statement.

First, to the extent that GGAM suggests that in-person negotiations of the EOA occurred in New York, GGAM cites no evidence that supports such a suggestion—because none exists.

Second, BRHI/SPI, as non-parties to the EOA, could not and did not negotiate the EOA; rather, it was BRC and Prime, which were parties to the EOA, that negotiated the EOA. *See, e.g.*, Liability Award (Dkt. 218-2) ¶ 49 ("By an Equity Option Agreement dated April 16, 2012 (the 'EOA') between and among Prime Metroline Transport Corp. ('PMTC,' the predecessor in interest to Prime Metroline Holdings, Inc., or 'PMHI'), BRC and GGAM (the 'EOA Parties'). Under the

EOA, PMTC, as Grantor, granted GGAM an option to purchase (the 'Option'), at an agreed-upon strike price of PHP 1.67 per share, 921,184,056 shares (the 'Shares') in BRC.").

Third, GGAM does not cite any evidence that supports its statement that the GGAM principals, as opposed to GGAM representatives/advisors, were in New York while the EOA was being negotiated.  Moreover, it is undisputed that GGAM and all three of its principals (Weidner, Stone, and Saunders) were based in Nevada.  *See, e.g.*, MSA (Dkt. 218-4) at 1; Perry Decl., Ex. 63 at 56:2-5; *id.* Ex. 17 at 1.  And although Rein purports to have been "effectively seconded to GGAM" in "spring of 2012," his sworn testimony is clear that in connection with negotiating the EOA, he was "an employee of Cantor Fitzgerald, providing services to GGAM." *See* Perry Decl., Ex. 40 ¶¶ 9-10 ("I also participated in discussions with Bloomberry representatives, including Ms. Occeña, regarding the MSA and the separate Equity Option Agreement. In those discussions, the Bloomberry representatives were informed and understood that I was an employee of Cantor Fitzgerald, providing services to GGAM.  In spring of 2012, I was effectively seconded to GGAM on a full-time basis, taking the role as GGAM's Head of Business Development and Corporate Finance.").

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**23.  The EOA was entered into on April 16, 2012, between GGAM and (a) Razon's holding company Prime Metroline Transit Corp. (which was later renamed to Prime Metroline Holidngs Inc.) ("Prime"), and (b) Prime's subsidiary (which was then the parent of Defendants) Bloomberry Resorts Corp. ("BRC"). Ainsworth Decl. Ex. 1, Final Award at 10, ¶¶433, 507; Defs.' Am. Answer ¶¶58, 67, 77.**

**RESPONSE:** Disputed in part. Undisputed that on April 16, 2012, GGAM, Prime, and BRC entered into the EOA. Disputed as to the remainder of the statement. *See* Defs.' Am. Answer ¶¶ 58, 67, 77; Liability Award (Dkt. 218-2) ¶ 49.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**24. After signing the MSA, Razon caused Prime to acquire a shelf company listed on the Philippine Stock Exchange, and renamed it as BRC. Defs.' Am. Answer ¶76.**

**RESPONSE:** Disputed in part. Undisputed that after September 9, 2011, Prime acquired a shelf company listed on the Philippine Stock Exchange and renamed it as BRC. Disputed as to the remainder of the statement. *See* Defs.' Am. Answer ¶ 76.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**25. Prime then transferred to BRC all of its equity interest of SPI. Defs.' Am. Answer ¶¶14, 67, 76.**

**RESPONSE:** Disputed in part. Undisputed that on February 6, 2012, BRC acquired Prime's shares in SPI. Disputed as to the remainder of the statement. *See* Defs.' Am. Answer ¶¶ 14, 67, 76.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**26. Although Defendants had agreed, in the MSA, to give GGAM an option to buy their shares, Razon instead caused Prime to enter into the EOA granting GGAM an option to purchase some of its shares of BRC (the "Option Shares"). Ainsworth Decl. Ex. 1, Final Award at 10, ¶¶433, 507; Defs.' Am. Answer ¶75**

**RESPONSE:** Disputed in part. Undisputed that (i) Clause 18.3 of the MSA stated, among other things, that "[t]he parties shall execute a mutually acceptable option agreement (the "Option Agreement") to embody the share purchase option," (ii) on April 16, 2012, GGAM, Prime, and

BRC entered into the EOA, and (iii) Clause 2.1 of the EOA stated, among other things, that "As contemplated by Section 18.3 of the MSA, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Grantor hereby grants to Grantee an option (the 'Option') to purchase some or all of the Option Shares from Grantor, subject to and upon the terms and conditions set forth in this Agreement."   BRHI/SPI respectfully refer the Court to the MSA (Dkt. 218-4) for the complete and accurate terms thereof.   BRHI/SPI separately note that the best evidence of the provisions of the EOA is the EOA itself, and GGAM has not submitted the EOA into the record.  Disputed as to the remainder of this statement.  *See* Defs.' Am. Answer ¶ 75.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**27.  When GGAM exercised the option under the EOA, Cantor notified Prime from New York via email that GGAM was exercising its option to purchase those Option Shares. Ainsworth Decl. Ex. 24.**

**RESPONSE:** Disputed.  The undisputed facts show that on or around December 20, 2012, Weidner sent Prime a fax from his Montana residence that notified Prime that GGAM was exercising the option under the EOA.  *See* Ainsworth Decl., Ex. 24 at BLOOM_0002283 (showing a fax number of 4069932319 at the top of the page); Perry Decl., Ex. 62 at 54:5-55:9 (confirming that Weidner faxed GGAM's notice of exercise of the option to Prime from his Montana residence).  BRHI/SPI do not dispute that after Weidner sent a fax from his Montana residence notifying Prime that GGAM was exercising the option under the EOA, a Cantor employee on behalf of GGAM emailed a copy of Weidner's fax to Occeña and Tan in the Philippines.  *See* Ainsworth Decl., Ex. 24 at BLOOM_0002281.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**28.  Cantor also wired tens of millions of U.S. dollars for GGAM's investment in the Option Shares. Ainsworth Decl. Ex. 25 (email confirmation of wire transfer from Cantor).**

**RESPONSE:** Disputed in part.  Undisputed that (i) in connection with GGAM executing the option under the EOA, GGAM paid Prime approximately $37.43 million, *see* Defs.' Am. Answer ¶ 90, and (ii) based on Ex. 25 to the Ainsworth Decl., it appears that on or about December 21, 2012, Cantor Fitzgerald., L.P. caused a bank account in New York to transfer $37,950,000.00 (approximately $520,000 more than the amount GGAM paid to Prime) to a bank account in the Philippines.  Disputed as to the remainder of this statement, as Ex. 25 to the Ainsworth Decl. was produced to BRHI/SPI on July 27, 2022, which was after the close of fact discovery, and thus BRHI/SPI have not had an opportunity to explore the meaning of this document through deposition testimony, including whether and/or how it purportedly supports the statement that "Cantor also wired tens of millions of U.S. dollars for GGAM's investment in the Option Shares."

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**29. In the underlying Arbitration, Defendants "characterize[d] GGAM as 'an investment vehicle for a New York-based financial institution' ...." Ainsworth Decl. Ex. 12 ¶98.**

**RESPONSE:**  Disputed in part.  Undisputed that in the Arbitration, BRHI/SPI "characterize[d] GGAM as '*an investment vehicle for a New York-based financial institution*', and submit[ed] that **this was '*not what Bloomberry was seeking—and not what GGAM represented itself to be—when it entered into its agreement*.**'" Ainsworth Decl., Ex. 12 at ¶ 98 (emphasis added).  Disputed to the extent that GGAM takes this statement out of context to suggest that prior to the Arbitration, GGAM represented and BRHI/SPI understood, that GGAM was an investment vehicle for a New York-based financial institution; this statement, read in context, supports the

exact opposite proposition—that prior to the Arbitration, GGAM did not represent itself to be, nor did BRHI/SPI understand GGAM to be, an investment vehicle for a New York-based financial institution.  *Id.*

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**30.  In the arbitration, Razon submitted a declaration, executed Sept. 4, 2015, stating: "The absence of any real risk to GGAM is even more apparent now that I know that Cantor Fitzgerald fully funded the strike price for the Shares as a 'capital contribution' to GGAM. I recall that Cantor and its lawyers continued to try to get involved in the negotiations of the project agreements, in particular the equity option agreement and the participation agreement. We were informed at the time that Cantor provided some funding and administrative services, …." Ex. 38 ¶12.**

**RESPONSE:** Disputed in part.  Undisputed that in the Arbitration, Razon submitted a declaration, executed September 4, 2015, stating, among other things:

> From my perspective, this was a deal with Bill. I offered him an option to purchase up to 10% of the equity in the casino and license in order to demonstrate my commitment to our contemplated partnership. **In my mind, I thought if GGAM had a significant ownership stake in Solaire, <u>our interests would be aligned</u> as we embarked upon a mutually beneficial partnership to develop a Solaire brand**. . . . **The equity option was something I offered to Bill as consideration for the management relationship**. We did not need a US$ 37 million investment. We had already raised hundreds of millions of dollars through a BDO loan facility and were prepared to embark on a top-up offering. GGAM waited until construction of Solaire was finished and Solaire was ready to open before they exercised the option. They incurred no risk. . . . The absence of any real risk to GGAM is even more apparent now that I know that Cantor Fitzgerald fully funded the strike price for the Shares as a 'capital contribution' to GGAM. I recall that Cantor and its lawyers continued to try to get involved in the negotiations of the project agreements, in particular the equity option agreement and the participation agreement. We were informed at the time that Cantor provided some funding and administrative services, **but <u>it was never said that Cantor was the 'parent' of GGAM or anything like that,</u> though I know that is now said in the arbitration. <u>I would not have had an interest in a deal with GGAM had I understood the company that way, instead of the way that GGAM was presented to me</u>**.

Perry Decl., Ex. 43 ¶¶ 8-9 (emphasis added); Ainsworth Decl., Ex. 38 (Razon Decl., Sept. 4, 2015) at ¶¶ 10-12 (emphasis added)].   Disputed to the extent that GGAM takes these statements from Razon out of context to suggest that prior to the Arbitration, BRHI/SPI understood that Cantor Fitzgerald, L.P. or any of its affiliates, as opposed to GGAM's principals (Weidner, Saunders and Stone) stood to reap the benefits or endure the losses associated with any increases or decreases in the value of the shares that GGAM purchased pursuant to the EOA.  This statement from Razon, read in context, supports the exact opposite proposition—that prior to the Arbitration, BRHI/SPI understood that, in order for the interests of those managing Solaire (Weidner, Saunders and Stone) to have their interests fully aligned with the owners of Solaire (BRHI/SPI), only those managing Solaire stood to reap the benefits or endure the losses associated with any increases or decreases in the value of the shares that GGAM purchased pursuant to the EOA.  *See* Perry Decl., Ex. 43 ¶¶ 8-9; Ainsworth Decl., Ex. 38 (Razon Decl., Sept. 4, 2015) at ¶¶ 10-12; *see also* Perry Decl., Ex. 2 at BLOOM_0148254 ("I am not keen on a management contract but on **an arrangement that aligns our interests. Which in effect means you would come in as an investor with a real stake in our success**. We can come up with a formula to accommodate this, which as an example would be that I would make up to ten percent of the company available for you and your group with a buy in formula.") (emphasis added); *id.* Ex. 3 at BLOOM_0076860 ("This structure, in addition to the **equity risk that we would undertake** represents an extraordinary commitment to you and to the concept of being rewarded for value-added operating results and enhanced equity value, **thus being fully aligned with your interests**.") (emphasis added).

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**31.  Defendants' representatives traveled to New York in May 2012 as part of a "road show" to attract potential investors for Defendants' intermediate parent company, BRC.**

**Ainsworth Decl. Ex. 21;** *Id.* **Ex. 22;** *Id.* **Ex. 23;** *Id.* **Ex. 26 ¶¶18, 45;** *id.* **Ex. 36 at 263;** *id.* **Ex. 32 at 263;** *id.* **Ex. 3; Defs.' Am. Answer ¶64.**

      **RESPONSE:** Disputed.  Representatives of ***BRC***, not BRHI/SPI, traveled to destinations around the world, including New York, in April and May 2012 as part of a "road show" to attract investors to invest in ***BRC***.  *See* Ainsworth Decl., Ex. 21; *Id.* Ex. 22; *Id.* Ex. 23; *Id.* Ex. 6 (Declaration of Leo. D. Venezuela, Dec. 7, 2014) ¶ 3 ("**When I joined *BRC*** in April of 2012, the company was in the middle of its 'road show' for the top-up offering of BRC shares (the 'BRC Offering') **I immediately began participating in the BRC Offering process, and attended several road show presentations to investors located in Asia**.") (emphasis added); *see also* Perry Decl., Ex. 35 ¶ 8 ("From April 16 to May 2, 2012, **representatives of BRC**, the parent corporation of Bloomberry and Sureste, **embarked on an international "road show" to drum up interest for BRC's 'top-up offering**.'") (emphasis added); *id.* Ex. 21 at BLOOM_0055482 (listing Razon, Occeña, and Almeda as roadshow participants from "**Bloomberry Resorts Corp**"); Ainsworth Ex. 30 (Saunders Dep. Tr. Excerpts) at 65:11-15 ("Q. What roadshow conferences did you attend **on behalf of BRC**? A. Over 100, all of them.  Practically all of them with the exception, at the end Brad and I split. He went to Boston, and I went to New York.") (emphasis added), *id.* 67:1-6 ("Q. Do you recall anybody from the **BRC** side directing that they did not want Cantor involved in the roadshow process?  A. I think so.  Q. What do you recall about that?  A. Not much.") (emphasis added).  BRC representatives met with potential BRC investors in New York on May 1, 2012.  *See* Perry Decl., Ex. 21 at BLOOM_0055485 (summary of N.Y. meeting schedule).

      This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**32. The purpose of the road show was to raise support for a follow-on offering of BRC shares to raise funds for Defendants' construction of Solaire. Ainsworth Decl. Ex. 35 at 131-132.**

**RESPONSE:** Disputed in part.  Undisputed that the purpose of the road show was to raise support for a follow-on offering of BRC shares, and that the proceeds of the follow-on offering would be used "'to fund Phase 1 of Solaire Manila, including construction, FF&E, and other various day-to-day expenses, such as pre-opening costs and working capital, as well as for general corporate purposes.'"  Ainsworth Decl., Ex. 35 at 131-132.  Disputed as to the remainder of the statement.  *Id.*

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**33. Razon considered GGAM's participation in the investor meetings "a basic, anticipated component" and "fundamental part" of GGAM's role. In his view, "GGAM knew that as the managers of the Solaire, the GGAM management team was a fundamental part of the top-up offering story—investors would expect to meet the people managing their investment." Ainsworth Decl. Ex. 26 ¶¶18, 20.**

**RESPONSE:** Disputed in part.  Undisputed that in the arbitration, Razon submitted a declaration, executed December 7, 2014, stating, among other things, as follows:

> A few days prior to the start of the road show, GGAM threatened to withhold their participation unless we conceded certain negotiation points and signed the version of the EOA that GGAM wanted. GGAM's participation in the road show as managers of the Solaire was such a basic, anticipated component that I was surprised and disappointed that they would try to use their participation as leverage. GGAM knew that as the managers of the Solaire, the GGAM management team was a fundamental part of the top-up offering story-investors would expect to meet the people managing their investment. Ultimately, because we did not want to proceed with the road show without their participation, we gave in to GGAM's demands.
>
> More than anything, GGAM's last-minute threat to back out of the road show demonstrated to me the way that GGAM was prepared to do business. **I had given**

> them a huge stake in the Solaire, but, **instead of acting like true partners,**
> **GGAM was interested in protecting and pursuing their own interests**. Their
> attempt to blackmail me at the last minute shows that they were not focused on the
> long-term relationship. Rather, they were attempting to get all of their performance
> incentives up-front.
>
> I have been told that GGAM claims to be responsible for the success of the top-up
> offering and for 'taking Bloomberry public.' These statements completely distort
> the top-up offering process. It is true that GGAM's principals participated in the
> road show as managers, but the way GGAM now tries to present itself as having
> 'taken us public' is pure fantasy.

Ainsworth Decl., Ex. 26 at ¶¶ 18-20 (emphasis added).  Disputed to the extent that GGAM is

suggesting that GGAM attended the road show and/or investor meetings as part of its obligations

under the MSA, or that the claims in the Arbitration arose from the road show or such meetings.

GGAM itself recognized, and the Tribunal found, that GGAM's participation in the roadshow and

investor conferences fell "**outside the scope of the MSA**."  Dkt. 218-1 (Final Award) ¶¶ 366(b),

367, 372 (emphasis added); *see* Perry Decl., Ex. 53 ¶ 136; Ainsworth Decl., Ex. 27 (Saunders

Decl., June 14, 2015, Excerpts) ¶ 106 (distinguishing between "expenses we [GGAM] incurred

performing work related to the MSA Services" and "**expenses we incurred performing work on**

**behalf of Bloomberry Resorts Corp., but outside the scope of the MSA**, *e.g.*, attending investor

conference in November 2012 and December 2012 . . . .") (emphasis added); Perry Decl., Ex. 63

at 69:4-19 ("Q. Was that [paragraph 106 of Saunders' Arbitration declaration] true and correct

testimony when you gave it? A. I believe so.").  Because the Tribunal decided the issue of whether

the roadshow was within or outside the scope of the MSA, GGAM is collaterally estopped from

relitigating the issue in this case.  *See, e.g.*, *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,

850 F.3d 58, 77-78 (2d Cir. 2017).

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**34.  Razon "expected GGAM to participate on the road show because they were the management services provider for Solaire, and it was important to present to investors that Solaire had a credible and experienced management company." Ainsworth Decl. Ex. 38 ¶28.**

**RESPONSE:** Disputed in part.  Undisputed that in the Arbitration, Razon submitted a declaration, executed September 4, 2015, stating, among other things, as follows:

> GGAM's principals did not have any real enthusiasm as managers, as compared to their enthusiasm in using Solaire to promote themselves and their other ventures. For example, I expected GGAM to participate on the road show because they were the management services provider for Solaire, and it was important to present to investors that Solaire had a credible and experienced management company. Yet Bill and Garry were largely absent from the road show, and Brad's presentations seemed to focus on their past experiences at Las Vegas Sands and GGAM's ambitions as a new management company.

Ainsworth Decl., Ex. 38 (Razon Supp. Decl., Sept. 4, 2015) ¶ 28.  Disputed to the extent that GGAM is suggesting that GGAM attended the road show and/or investor meetings as part of its obligations under the MSA, or that the claims in the Arbitration arose from the road show or such meetings.  As noted above in response to paragraph no. 33, GGAM itself recognized, and the Tribunal specifically found, that GGAM's participation in the roadshow and investor conferences fell "**outside the scope of the MSA**."  Dkt. 218-1 (Final Award) ¶¶ 366(b), 367, 372; Perry Decl., Ex. 53 ¶ 136; Ainsworth Decl., Ex. 27 (Saunders Decl., June 14, 2015, Excerpts) ¶ 106; Perry Decl., Ex. 63 at 69:4-19.  GGAM is thus estopped from now arguing otherwise.  *See, e.g.*, *CBF*, 850 F.3d at 77-78.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**35.  As a result of the road show, New York-based investors invested more than $30 million in BRC. Ainsworth Decl. ¶4; *id*. Ex. 6 ¶4, Annex A.**

**RESPONSE:** Disputed in part.  Undisputed that the "final book" for the BRC top-up offering shows that 130 investors invested approximately $228.9 million in BRC, and that the

following 14 investors (which are listed in Ainsworth Decl. ¶ 4) invested approximately $31.7 million in BRC: Morgan Stanley Investment Management Company (further discussion related to this entity *infra*); Och-Ziff Capital Management LLC, New York; TIAA CREF Investment Management LLC; AllianceBernstein LP; Asian Century Quest Capital LLC; Kingdon Capital Management LLC; Soros Fund Management LLC; Moon Capital Management LP; Tudor Investment Corp; Highbridge Capital Management LLC; Pinz Capital Management, LLC; Pinebridge Investments LLC; Union Avenue Advisors LP; John Locke Capital Management LP. Ainsworth Decl. Ex. 6 ¶ 4, Annex A.

Disputed as to the remainder of the statement. First, GGAM cites to no evidence indicating that each of these 14 investors attended a road show meeting, much less that each of these investors invested in BRC "[a]s a result of the road show," as opposed to "as a result of" other factors. Moreover, there is evidence indicating that investors invested in BRC due to other factors. *See, e.g.*, Ainsworth Decl., Ex. 26 ¶¶ 21-22 (Razon Decl., Dec. 7, 2014) ("To return to reality, the top up offering was a success because the Solaire had solid business fundamentals and offered a unique opportunity to investors. . . . Another important contributor to the success of the top-up offering was my personal involvement in Bloomberry as CEO and majority shareholder, and the confidence that this inspired in investors. In March 2007, another one of my companies, ICTSI, held a private share placement for a select group of investors. Over the course of the next 5 years, ICTSI's revenues and profits increased dramatically, and the investors in ICTSI's 2007 share placement reaped enormous returns on their investments.").

Second, GGAM has not submitted evidence demonstrating that these 14 investors were "New York-based investors;" instead GGAM relies on the affirmation of an attorney that these investors "were based in New York at the time," and that "[t]heir presence in New York was

confirmed through a review of public information, including SEC filings and company websites." Ainsworth Decl. ¶ 4.  Even if these investors or their affiliates have offices in New York or were headquartered there, that does not mean that they do not have offices elsewhere, or that their investments did not come from one of those other non-New York affiliates and/or offices. Additionally, paragraph no. 4 of the Ainsworth Decl. does not refer to the accurate entity name for all companies listed—for example, it refers to "Morgan Stanley Investment Management" where the investing entity was "Morgan Stanley Investment Management Company"—a non-New York entity.  *See* Perry Decl. ¶ 2; *id.* Ex. 20 at GGAM-SDNY-0089099 (Hong Kong/Singapore roadshow schedule showing April 20, 2012 meeting was scheduled in Singapore with "Morgan Stanley Investment Mgmt Co," located at "23 Church Street, #16-01 Capital Square," a Singapore address); *see also* Morgan Stanley Investment Company Website, https://www.morganstanley.com/im.sg.html (last accessed February 21, 2023) ("The contents presented herein are provided in Singapore by Morgan Stanley Investment Management Company (Unique Entity Number 199002743C), which is regulated by the Monetary Authority of Singapore. **Any asset management or other services are provided in Singapore** by Morgan Stanley Investment Management Company . . . .") (emphasis added).

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**36. BRC also held investor conferences in New York in September and November 2012, in which GGAM participated. Ainsworth Decl. Ex. 4; *id.* Ex. 5.**

**RESPONSE:** Disputed in part.  Undisputed that (i) BRC representatives met with various investment companies during the UBS Global Emerging Markets Conference in New York in November 2012, and that Bradley Stone spoke during at least one of those meetings, and (ii) BRC representatives met with various investment companies during the Deutsche Bank Global

Emerging Markets Conference in New York in September 2012. *See* Ainsworth Decl., Ex. 5 and Ex. 23. Disputed as to the remainder of the statement. The evidence that GGAM cites does not support the statement that GGAM or any of its principals participated in any meetings in New York in September 2012. *See* Ainsworth Decl. Ex. 4 and Ex. 5.

Further disputed to the extent that GGAM is suggesting that GGAM attended the road show and/or investor meetings as part of its obligations under the MSA or that the claims in the Arbitration arose from the road show or such meetings. As noted above in response to paragraph nos. 33-34, GGAM itself recognized, and the Tribunal found, that GGAM's participation in the roadshow and investor conferences fell "**outside the scope of the MSA**." Dkt. 218-1 (Final Award) ¶¶ 366(b), 367, 372; Perry Decl., Ex. 53 ¶ 136; Ainsworth Decl., Ex. 27 (Saunders Decl., June 14, 2015, Excerpts) ¶ 106; Perry Decl., Ex. 63 at 69:4-19. GGAM is thus estopped from now arguing otherwise. *See, e.g.*, *CBF*, 850 F.3d at 77-78.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**37. At the road show and at least one investor conference, the Defendants explained Cantor's involvement as GGAM's joint venture partner. Ainsworth Decl. Ex. 22;** *id.* **Ex. 34 at 151;** *id.* **Ex. 5.**

**RESPONSE:** Disputed in part. Undisputed that in the Offering Circular for BRC's top-up offering, dated May 1, 2012, it states, among other things that

> The Company has entered into a Management Services Agreement with GGAM for the provision of management and other advisory services in relation to the design, construction and operations of Solaire Manila. GGAM's principals, William Weidner, Garry Saunders and Bradley Stone, have extensive experience in developing and operating some of the world's largest gaming resorts. **GGAM's U.S. parent entity, Global Gaming Asset Management, LP, is 50% owned by its three principals and 50% owned by Cantor Fitzgerald LP**, a leading global financial services firm. The three principals of GGAM focus on both the broad parameters and detailed execution of design, efficient and cost-effective

> construction, top-tier staffing, budgeting, strategic direction and monitoring and
> oversight of all aspects of Solaire Manila's operations and results.

Ainsworth Decl. Ex. 22 (emphasis added). Also undisputed that during an investor conference

dated November 16, 2012, Occeña described Cantor Fitzgerald, L.P. as the "bank account" for

GGAM's three principals, who were the ones with the relevant management experience.

Ainsworth Decl. Ex. 5 (emphasis added); *see also id.* Ex. 35 at 151. Disputed as to the remainder

of the statement. *See* Ainsworth Decl. Ex. 22; *id.* Ex. 34 at 151; *id.* Ex. 5. BRHI/SPI respectfully

refer the Court to Ex. 5 of the Ainsworth Decl. for the relevant portion of the investor conference

dated November 16, 2012.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**38. The Court has personal jurisdiction over Razon. Aff. of Service on Razon (ECF No. 17); Defs' Mem. in support of Mot. to Dismiss (ECF No. 118) at 14, n.16; Razon's Am. Answer to SAC (ECF No. 253) (waiving defense of lack of personal jurisdiction).**

**RESPONSE:** Undisputed.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

**39. In a Singapore Arbitration between GGAM and Defendants, the tribunal issued (a) a Partial Award on Liability, dated September 20, 2016 ("Liability Award"); and (b) a Final Award, dated September 27, 2019 ("Final Award"), which are attached to the Second Amended Complaint ("SAC") as Appendices 1 (Final Award) and 2 (Liability Award). SAC ¶197 and Appendices 1 and 2 (ECF Nos. 218, 218-1, 218-2); Defs.' Am. Answer ¶193.**

**RESPONSE:** Disputed in part. Undisputed that in an Arbitration seated in Singapore

between Global Gaming Philippines LLC and Global Gaming Netherlands B.V., as Claimants,

and BRHI and SPI, as Respondents, the tribunal issued (a) the Liability Award; and (b) the Final

Award, which are attached to the SAC as Appendices 1 (Final Award) and 2 (Liability Award).

SAC at Appendices 1 and 2 (Dkt. 218-1 and 218-2).  Disputed to the extent that GGAM suggests that Global Gaming Netherlands B.V. was not a party to the Singapore Arbitration.  *Id.*  BRHI/SPI respectfully refer the Court to the Liability Award (Dkt. 218-2) and the Final Award (Dkt. 218-1) for the complete and accurate portions thereof.

This statement is immaterial to BRHI/SPI's Cross-Motion for Summary Judgment.

## BRHI/SPI'S FURTHER STATEMENT OF UNDISPUTED MATERIAL FACTS

I.     **The Parties to the MSA and Their Affiliates**

    A.     **None of the Parties to the MSA (and None of Their Direct Parent Companies) Are Based in New York, Incorporated or Organized Under the Laws of New York, or Registered to Do Business in New York**

40.   Defendants BRHI and SPI are Philippine corporations, and together they own and operate the Solaire Resort & Casino located in Metro Manila, Philippines.  *See* SAC (Dkt. 218) ¶¶ 13-14; Defs.' Am. Answer (Dkt. 273) ¶¶ 13-14.  BRHI and SPI have no assets in the United States and conduct no business in the United States.  *See* Perry Decl., Ex. 67 at 356:5-8; *id.* Ex. 68 at 51:20-52:3.

41.   BRHI is 100% directly owned by SPI, and SPI is 100% directly and indirectly owned by BRC, which is a Philippine corporation that is publicly traded on the Philippine Stock Exchange.  *See* Final Award (Dkt. 218-1) at 9; SAC (Dkt. 218) ¶ 76; Defs.' Am. Answer (Dkt. 273) ¶ 76.  Razon is the Chairman and CEO of BRC and the Chairman of BRHI and SPI.  *See* SAC ¶ 72; Defs.' Am. Answer ¶ 72.  Razon directly and indirectly controls a majority of BRC's common stock.  *See* SAC ¶ 135; Defs.' Am. Answer ¶ 135.

42.   Razon has ownership interests in and executive positions with other companies in the Philippines, including ICTSI, which is a global port management company that is headquartered in Manila and publicly traded on the Philippine Stock Exchange.  Perry Decl., Ex. 36 at ¶ 2.

43.   Plaintiff Global Gaming Philippines LLC ("GGAM") is a Delaware company that is based in Las Vegas, NV.  *See* MSA (Dkt. 218-4) at 1.  GGAM has never been registered to do business in New York.  *See* Perry Decl. ¶ 2.

44.   GGAM has a direct subsidiary, Global Gaming Netherlands B.V. ("GGAM Netherlands"), which is incorporated in the Netherlands.  *See* Final Award (218-1) ¶¶ 350-52; *cf.*

MSA (Dkt. 218-4) § 16.2.  GGAM Netherlands is not registered to do business in New York.  *See* Perry Decl. ¶ 2.

45.  GGAM is 100% owned by Global Gaming Asset Management L.P. ("GGAM L.P."), which is a Delaware limited partnership based in Las Vegas, NV.  *See* MSA (Dkt. 218-4) at 1; Perry Decl. ¶ 3.  GGAM L.P. is not registered to do business in New York.  *See* Perry Decl. ¶ 2. The managing partner of GGAM L.P. is Global Gaming Asset Management Holdings, LLC, *see* Ainsworth Decl. Ex. 2 (MSA), Ex. A, which is also a Delaware company, Perry Decl. ¶ 3, and is also not registered to do business in New York.  *Id.* ¶ 3.

46.  GGAM's management principals are William P. Weidner, Bradley H. Stone, and Garry W. Saunders.  *See* SAC ¶ 48.  Between January 2011 and September 2013, Weidner, Stone, and Saunders were all based in Las Vegas, Nevada.  *See e.g.*, MSA (Dkt. 218-4) at 1; Perry Decl., Ex. 63 at 56:2-5; *id.* Ex. 17 at 1.

47.  GGAM's direct parent company, GGAM L.P., is owned 50% by Gaming Asset Management, LLC ("GAM")/Gaming Equity Group Series LLC, and 50% by Cantor GGAM, L.P. ("Cantor GGAM").  *See* Ainsworth Decl. Ex. 2 (MSA), Ex. A. GAM is a Nevada company, Perry Decl. ¶ 4, and is not registered to do business in New York. *Id.* ¶ 2.  Cantor GGAM is a Delaware limited partnership, *id.* ¶ 3, and is also not registered to do business in New York. *Id.* ¶ 2.

**B.     Cantor Fitzgerald L.P. Has a 50% Indirect Interest in GGAM, and It or One of its Affiliates Provided Legal, Financial Advisory, and "Back Office" Services to GGAM in Exchange for Payment Pursuant to an Agreement**

48.  Cantor GGAM is directly and indirectly owned 100% by Cantor Fitzgerald L.P., *see* Ainsworth Decl. Ex. 2 (MSA), Ex. A, which is a Delaware limited partnership, Perry Decl. ¶ 3, that is registered to do business in New York.  *Id.* ¶ 2.  Cantor Fitzgerald L.P. has numerous affiliates in which it holds a majority or 100% ownership interest (such affiliates, together with Cantor Fitzgerald L.P., "Cantor").

49. Pursuant to a Support Services Agreement that commenced as of January 27, 2011 (the "SSA"), Cantor provided legal, financial advisory, and "back office" services to GGAM, *see* Perry Decl., Ex. 23 at GGAM-SDNY-0279150-52; *id.* Ex. 9 at BLOOM_0001273, and GGAM paid for those services. *See* Dkt. 281-6 ¶ 24.

## II. The Negotiation, Execution and Assignment of the MSA

### A. The Parties Had a One-Hour Meet-and-Greet in a Cocktail Lounge in Las Vegas

50. In late 2010 and early 2011, Razon was looking for a President or Chief Operating Officer to run the day-to-day operations of Solaire, which was then under construction. Perry Decl., Ex. 41 ¶ 13. In January 2011, a headhunter recommended that Razon meet with Saunders. Ainsworth Decl., Ex. 7. In early March 2011, Razon flew to Las Vegas, Nevada for a global management meeting related to ICTSI. Perry Decl., Ex. 47 at 30:14-22. While in Las Vegas, Razon met with Weidner and Saunders for an introductory meeting that lasted approximately one hour and during which they discussed the possibility of working together. *See, e.g.*, Ainsworth Decl., Ex. 30 (Saunders Dep. Tr. Excerpts) at 22:16-27:20.

### B. The Preliminary Negotiations of the MSA Began Via Email, with GGAM Promising to Be on the Ground in Manila to Provide "Hands On" Management Services for Solaire

51. Following the parties' one-hour meeting in Las Vegas, on or about March 16, 2011, the parties began negotiations. *See* Liability Award (Dkt. 218-2) ¶ 46. Weidner sent Razon an email stating, *inter alia*, that he "[e]njoyed our talk on your visit to Las Vegas" and "[l]ook[ed] forward to [Razon's] thoughts on how we may cooperate." Perry Decl., Ex. 2 at BLOOM_0148255. On or about that same day, Razon replied to say he would "come up with some ideas by the end of the week and get back to you [Weidner]," and that he was "confident we can work something out." *Id.* at BLOOM_0148254. Weidner responded that he was "[l]ooking

forward to seeing your proposal and you again soon." *Id.* On or about March 17, 2011, Razon followed up with "[s]ome preliminary points on principle that [he thought] we should get out of the way," including, *inter alia*, that he was "envisioning an arrangement that is as close to full time management as possible." *Id.* Razon told Weidner that he envisioned "hav[ing] two phases," one for "construction and start up," and the other for "management, operations and marketing," and said he "[w]ould like to get your [Weidner's] ideas on how the two phases will be handled and the senior executives who will be assigned full time to carry about both." *Id.* Razon also told Weidner that he is "not keen on a management contract but on an arrangement that aligns our interests. Which in effect you would come in as an investor with a real stake in our success. We can come up with a formula to accommodate this, which as an example would be that I would make up to ten percent of the company available for you and your group with a buy in formula." *Id.* On or about March 19, 2011, Weidner told Razon that "Garry [Saunders] and I are working on a simple outline of a proposal for you." *Id.*

52. On or about March 21, 2011, Weidner sent an email to Razon to "share [GGAM's] thoughts on principles of alignment" including, *inter alia*: (i) GGAM's "add[ition] [of] significant value in every phase of constructing, staffing, operating and marketing Solaire;" (ii) GGAM's "dedicat[ion] [of] a significant part of [its] time [to] supervising construction (putting a trusted, tested person we have experience with full time on the ground in Manila) and pre-opening activities (again with a hand selected person on the ground in Manila);" and (iii) GGAM's ability to offer, "[u]nlike traditional management companies . . . unique experience in Asia, [and] a 'hands on approach to management.'" Perry Decl., Ex. 3 at BLOOM_0076859. Weidner proposed that Saunders and Stone would "'tag team' [GGAM's] initial on the ground supervisory presence until our full time people are fully up to speed," and that Weidner would "personally oversee these

activities, initially spending significant time in Manila with the team, then traveling about once a month to both be in Manila and in the region to set up a high end marketing network for Solaire Manila." *Id.*

### C.   As Preliminary Negotiations of the MSA Continued Via Written Communications, GGAM's Las Vegas-Based Attorney Became Involved

53.   Following a further exchange of emails between Weidner and Razon, on or about April 6, 2011, Anthony Cabot, a partner in the Las Vegas office of the law firm of Lewis & Roca who introduced himself as "the attorney for Bill Weidner and his company in relationship to the proposed management agreement, emailed Estella Tuason-Occeña and Silverio "Benny" Tan, copying Weidner and Razon, and attached a document entitled "Preliminary Agreement." Perry Decl., Ex. 4 at GGAM-SDNY-0441023. At the time, Occeña led BRHI's and SPI's finance team, Tan led BRHI's and SPI's legal team, and both were heavily involved in the negotiations with GGAM. *See, e.g.*, Ainsworth Decl., Ex. 26 ¶ 15.

54.   Over the course of the next few weeks, the parties exchanged multiple written communications in connection with negotiating the terms of a potential agreement. *See, e.g.*, Perry Decl., Ex. 5 at GGAM-SDNY-0441081-82. On or about April 28, 2011, Tan emailed Weidner and Cabot a draft of the MSA. *Id.* Ex. 6 at GGAM-SDNY-0058537. Tan and Cabot continued to negotiate this draft of the MSA through the end of May 2011. *See id.* Ex. 8 at BLOOM_0079623.

### D.   GGAM's Principals and a GGAM Advisor from Cantor Traveled to Manila to Meet with BRHI and SPI Personnel Regarding the MSA

55.   While these negotiations between Tan and Cabot were ongoing, in early May 2011, Stone and Saunders traveled to Manila to, among other things, meet in person with BRHI/SPI personnel "to start talking in general terms about the contract" (*i.e.*, negotiate the MSA), and to conduct due diligence. Ainsworth Decl., Ex. 30 at 41:5-42:3; Perry Decl., Ex. 7; *id.* Ex. 41 ¶¶ 30-34.

56. Jon Rein, an investment banker at Cantor, accompanied Stone and Saunders on this trip to Manila. *See* Ainsworth Decl., Ex. 30 (Saunders Dep. Tr. Excerpts) at 41:11-17; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 28:2-13; Ainsworth Decl., Ex. 9 at BLOOM_0012841. At this point in time, Rein provided advisory services to GGAM, Dkt. 281-4 ¶¶ 7-9; Perry Decl., Ex. 65 at 38:22-39:11; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 71:24-74:24, and Cantor was paid by GGAM for those services pursuant to the SSA. Dkt. 281-6 ¶ 24. In that capacity, Rein assisted GGAM in conducting due diligence and negotiating the MSA. Perry Decl., Ex. 40 ¶¶ 12-13; Dkt. 281-4 ¶¶ 7, 38; Ainsworth Decl., Ex. 30 (Saunders Dep. Tr. Excerpts) at 41:11-42:3; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 71:24-74:24.

**E. In Negotiating a Confidentiality Agreement that Would Govern Due Diligence Efforts in Connection with the MSA Negotiations, It Was Made Clear that BRHI/SPI Were Contracting with GGAM (Not Cantor), but that Cantor Provided Administrative, Legal and Financial Advisory Services to GGAM**

57. After returning from this trip to Manila, on or about May 17, 2011, Rein sent an email to Occeña that attached a mark-up of a "Confidentiality Agreement" between GGAM L.P. and BRHI and SPI, which was to govern documents provided by BRHI/SPI to GGAM in connection with GGAM conducting due diligence for the MSA. *See* Perry Decl., Ex. 10. Rein's email copied Kevin Russell, who Rein described as "the key point-person in Cantor's legal department." *Id.*.

58. Between May 24-25, 2011 (on or about), Tan and Russell exchanged comments on various terms of the Confidentiality Agreement. *See* Ainsworth Decl., Ex. 11 at BLOOM_0001271, -1276-1277; Perry Decl., Ex. 9 at BLOOM_0001272-75. Among other things, Tan and Russell exchanged comments about (i) the period during which the agreement would apply, including whether it would be superseded by the MSA should the MSA be executed, Perry Decl., Ex. 9 at 0001274; (ii) the extent to which (and circumstances under which) confidential information could be shared with "potential investors," *id.* at 0001274-1275; Ainsworth Decl., Ex.

11 at 0001276; and (iii) the extent to which Cantor's "provi[sion] [of] admin services to Global

Gaming" impacted certain "regulatory language" in the draft. Perry Decl., Ex. 9 at 0001272.

Specifically, with respect to issue (i) above (duration of agreement), Tan and Russell exchanged

the following statements, among others:

> <u>Tan Comments</u>: "**This Confidentiality Agreement will apply only during this period when GGAM is evaluating whether it will sign up with Bloomberry or not. If GGAM signs the Management Services Agreement with Bloomberry, the confidentiality clause in that Agreement will supersede and replace this one**. . . . Please note that if GGAM does not sign up with Bloomberry, GGAM would have no legitimate interest in all the confidential, proprietary and non-public information that Bloomberry will provide to GGAM. On the other hand, **if GGAM signs up with Bloomberry, then this provision will be replaced by the confidentiality clause in that Agreement**." Perry Decl., Ex. 9 at BLOOM_0001274 (emphasis added).

> <u>Russell Response</u>: "Ok." *Id.* at BLOOM_0001273.

With respect to issue (ii) above (disclosure of information to potential investors), Tan and Russell

exchanged the following statements, among others:

> <u>Tan Comments</u>: "**Our confidential information is intended only for GGAM not for GGAM's potential investors**," Ainsworth Decl., Ex. 11 at 0001276; "[t]his Confidentiality Agreement is for the sole purpose of allowing GGAM access to our confidential information to allow GGAM to evaluate whether it wants to sign up with Bloomberry or not. **Bloomberry is not asking GGAM to raise capital for the Project**. If GGAM signs up with Bloomberry, another Agreement with a separate confidentiality clause will apply. GGAM is therefore not allowed to disclose the information it obtained under this ad hoc Confidentiality Agreement to 'potential investors'." Perry Decl., Ex. 9 at 0001275 (emphasis added).

> <u>Russell Response</u>: "It is important that we have the ability to discuss this project with potential LPs and investors.  Thus we have kept the reference to 'potential investors,' however, we have added language stating that (a) we'll notify Bloomberry if we disclose info to potential LPs and (b) such partners will agree to the confidentiality agreement's terms." Perry Decl., Ex. 9 at 0001272.

With respect to issue (iii) above (Cantor's "admin services"), Tan and Russell exchanged the

following statements, among others, with respect to proposed provisions that would give GGAM

"the ability to disclose [BRHI/SPI's] confidential information to 'any governmental, regulatory or

self regulatory agency or authority having or asserting jurisdiction over' [GGAM], without notice

to or consent from [BRHI/SPI]." Ainsworth Decl., Ex. 11 at 0001276-1277:

> Russell Comments: "We are subject to many regulatory regimes, both in the gaming and financial services sectors. We need the ability to disclose confidential information to our regulators and are required to do so upon their request." Perry Decl., Ex. 9 at 0001275.

> Tan Response: "**We are dealing with GGAM, not Cantor. Why are we being subjected to the regulations applicable to Cantor?** If laws and regulations applicable to GGAM will require disclosure of our confidential information obtained here (for GGAM's evaluation of whether it wants to sign up with Bloomberry or not), then GGAM needs to inform us as soon as possible and it should allow and assist us in obtaining a court order to contest or limit such disclosure of our confidential information." *Id.* at 0001275.

> Russell Reply: "You are not being subjected to regulations that impact [C]antor, however, **Cantor provides services to Global Gaming, including but not limited to legal and financial advisory services (as a Representative of the NDA)**." *Id.* at 0001273. "With respect to the regulatory language, **Cantor provides admin services to Global Gaming (and several other businesses). Some of your confidential information will hit Cantor's servers in connection with Global Gaming's evaluation of this opportunity.** In the ordinary course of our business, various regulatory agencies review our tape. They do not tell us what they are reviewing and unfortunately we can't control them. We have never had an issue on this point and we are hopeful that you can get comfortable with it as well." *Id.* at 0001272.

59.   Following this exchange, GGAM L.P. and BRHI and SPI executed the Confidentiality

Agreement, which was backdated to March 1, 2011. *See* Ainsworth Decl., Ex. 8 (excerpts of

agreement); Dkt. 119-1 (full). Neither Cantor Fitzgerald L.P. nor any of its affiliates (other than

GGAM L.P.) is a signatory to the Confidentiality Agreement. *Id.*

**F.     GGAM's Principals and a GGAM Advisor from Cantor Again Traveled to Manila to Meet with BRHI and SPI Personnel Regarding the MSA**

60.   On or around May 23, 2011, Stone and Saunders again traveled to Manila to meet with

BRHI and SPI personnel to conduct due diligence and negotiate the MSA. Perry Decl., Ex. 7.

61.   On or about May 26, 2011, Tan emailed Cabot and stated that "[t]he GGAM and

Bloomberry teams have reached agreement on the incentive fee of GGAM for foreign high rollers

and junket," and attached "the latest draft of the Agreement."  Perry Decl., Ex. 11 at GGAM-SDNY-0063569.  The draft MSA attached to this email provided that (i) the MSA is "made under and shall be governed by and construed in accordance with the laws of the Republic of the Philippines," (§ 19.3) and (ii) disputes are to "be settled by arbitration in Singapore" (§ 19.2).  *Id.* at GGAM-SDNY-0063592.

62. On or about May 26, 2011, Cabot responded to Tan's email by stating that he "just spoke with Jon [Rein] and [Jon] had a few items that needed adjustment based on the business meetings and discussions with their outside counsel."  Perry Decl., Ex. 12 at GGAM-SDNY-0100729. Cabot's reference to "their outside counsel" was a reference to GGAM's outside counsel at the law firm of Paul Hastings, which functioned as counsel to GGAM in connection with negotiating the MSA.  Fissell Decl., Ex. 34 (Kaplan Dep. Tr. Excerpts) at 17:4-13.

**G.     BRHI and SPI Stated Unequivocally that the MSA Is an Agreement with GGAM (Not Cantor) that Has Nothing to Do With New York, and Rejected GGAM's Proposals to Give Cantor Personality in the MSA, for New York Law to Govern the MSA, and for New York Courts to Settle Disputes and Enforce Awards**

63. On or about June 9, 2011, Russell sent Tan an email attaching a revised draft of the MSA.  Perry Decl., Ex. 13 at GGAM-SDNY-0058560.  This email copied, among others, Rick Kirkbride, an attorney in the Los Angeles office of Paul Hastings.  *Id.*; *see* Perry Decl., Ex. 19 (EOA) at BLOOM_0082050 (listing Kirkbride's Paul Hastings address).  The draft of the MSA attached to Russell's email (i) required that **Cantor** receive a copy of all notices sent to GGAM, Perry Decl., Ex. 13 at 0058592 (§ 18.2), (ii) provided that the MSA is "governed by and construed in accordance with the Laws of the **State of New York**," *id.* at 0058601 (§ 19) (emphasis added), and (iii) provided that the parties would "unconditionally and irrevocably consent to the non-exclusive jurisdiction of the state or federal courts sitting in Manhattan, New York, United States (the 'Specified Court') in any action, suit, or proceeding" related to "enforcement of [the MSA],

and the non-exclusive jurisdiction of the Specified Court with respect to the enforcement of any

award." *Id.*

64.  On or about June 9, 2011, Tan responded to Russell's June 9, 2011 email:

I have discussed your draft with the Bloomberry team. It is our conclusion that your draft Management Services Agreement (marked as "GGAM Draft June 2011") is materially different from the draft Agreement that we had agreed to in Manila. We do not want to negotiate terms and conditions which the parties have previously negotiated and agreed to. We were assured by Brad, Gary and Jon that we had an agreement on the business terms. We were told that your lawyers will only put in the definitions and other details which will not deviate from what has been agreed. But this is not to be so.

The draft that you sent has changed the following basic concepts which we have previously agreed on: . . .

**17. Cantor Fitzgerald has been given personality in this Agreement by being identified as a party entitled to any communications that will be sent to GGAM. <u>But we are suppose to contract only with GGAM!</u>**
. . .

**22. You have changed the governing law from "Philippine law" to "New York law". <u>This does not make sense because this contract has no connection with New York at all.</u> I am not even sure if gambling is legal under New York law. But <u>the point is all material links relating to this Agreement are in the Philippines,</u> e.g. this is a Philippine operation of a Philippine corporation subject to strict regulation by a Philippine Regulator (PAGCOR).**

**23. We had suggested a neutral venue for dispute resolution like Singapore. In your draft you have New York courts.**
. . .

This list is by no means exhaustive, but it clearly shows that the new GGAM draft Agreement that you sent is very different from the one that we have agreed in principle in Manila.

I am authorized to say that we decline to negotiate the whole agreement again. Our draft reflected that agreement that we have reached in the exchange of communications and emails and various meetings between Mr. Razon and Mr. Weidner, and between your team and ours. We have no inclination or patience to negotiate again based on your new draft.

We therefore urge you to go back to our draft.

Dkt. 281-1 at GGAM-SDNY-0046583, -6585-86 (emphasis added).  Occeña similarly expressed in an email to Saunders dated June 10, 2011 that she was "shocked when [she] saw" the revised draft because it was "as if our negotiations and face-to-face meetings in Manila never took place." Perry Decl., Ex. 14 at GGAM-SDNY-0096130.

65.  GGAM and/or its advisors never expressed to BRHI and SPI in writing or otherwise that they disagreed with Tan's statements about the MSA having "no connection with New York at all" or about BRHI and SPI contracting "only with GGAM" and not Cantor.  *See, e.g.*, Perry Decl., Ex. 64 at 23:11-25; Ainsworth Decl., Ex. 31 (Stone Dep. Tr. Excerpts) at 24:1-26:13; Perry Decl., Ex. 62 at 83:5-86:33; *id.* Ex. 14 at GGAM-SDNY-0096130.

66.  In the executed MSA, (i) Cantor was **_not_** entitled to receive a copy of all notices sent to GGAM, *see* MSA § 18.2 (Dkt. 218-4), (ii) the MSA was **_not_** governed by the laws of New York (rather, it was governed by the laws of the Republic of the Philippines), *id.* § 19.3, and (iii) disputes were to be resolved through arbitration in Singapore, and BRHI and SPI did **_not_** "consent to the non-exclusive jurisdiction of the state or federal courts sitting in Manhattan, New York, United States (the 'Specified Court') in any action suit, or proceeding with respect to the enforcement of this Agreement, and the non-exclusive jurisdiction of the Specified Court with respect to the enforcement of any award[.]" *Id.* § 19.2.

### H.     Both GGAM and BRHI and SPI Were Represented by Philippine Counsel in Connection with the MSA Negotiations

67.  During the MSA negotiations, BRHI and SPI were represented by Tan, a partner at the Philippine law firm of Picazo Buyco Tan Fider & Santos.  *See* Perry Decl., Ex. 68 at 44:9-46:11.

68.  During the MSA negotiations, GGAM was represented by the Philippine law firm of Puno & Puno. *See, e.g.*, Fissell Decl., Ex. 34 (Kaplan Dep. Tr. Excerpts) at 17:9-15. As noted above, GGAM was also represented by attorneys from the Las Vegas office of Lewis & Roca,

attorneys from the Los Angeles office of Paul Hastings, and attorneys from Cantor. *See supra* ¶ 63; BRHI/SPI's Response to GGAM's Fact No. 12.

**I.     GGAM Attended a Signing Ceremony for the MSA in Manila**

69.   Following further negotiations, on or about September 9, 2011, the parties executed the MSA, with Razon signing on behalf of BRHI and SPI in the Philippines, Weidner signing on behalf of GGAM, and the parties exchanging the signed executed version via email. *See* Perry Decl., Ex. 16; *id.* Ex. 15 ("Benny has sent the MSA execution soft copy for Bill's signature. We look forward to receive [sic] the executed MSA **so we can have EKR sign it before he leaves the country again**.") (emphasis added); MSA (signature page) (Dkt 218-4). Cantor is not a party to the MSA. *See* MSA at 1 (Dkt 218-4). Cantor is not a signatory to any agreement with BRHI and SPI. *See* Perry Decl., Ex. 66 at 211:4-6.

70.   After the parties exchanged the executed MSA via email, Weidner and other GGAM personnel traveled to Manila to attend a formal signing ceremony for the MSA, which was held on or about October 17, 2011. *See* Perry Decl., Ex. 63 at 46:2-14.

**J.     The Parties Negotiated the MSA in Person in Manila; They Never Negotiated the MSA in New York or Anywhere Else in the United States**

71.   BRHI/SPI's personnel and/or advisors never traveled to New York or anywhere else in the United States to meet with GGAM's personnel and/or advisors to negotiate the MSA, and BRHI/SPI's personnel and/or advisors never attended any meetings in New York or anywhere else in the United States in connection with the negotiation of the MSA. *See, e.g.*, Perry Decl., Ex. 62 at 50:12-51:18; *id.* Ex. 64 at 20:18-22:8; *id.* Ex. 65 at 31:13-21; *id.* Ex. 66 at 134:1-136:19, 165:18-24; Ainsworth Decl., Ex. 35 (Razon Dep. Tr. (vol. 1) at 223:14-224:21; Perry Decl., Ex. 68 at 45:24-46:1.

72. To the extent that any BRHI and SPI personnel and/or advisors (*e.g.*, Razon) were in New York, the surrounding states (*e.g.*, New Jersey, Pennsylvania or Massachusetts), or anywhere else in the United States during the time period that the MSA was being negotiated, his/her/their presence there was unrelated to the negotiations of the MSA.  Ainsworth Decl., Ex. 35 (Razon Dep. Tr. (vol. 1) Excerpts) at 222:17-225:23, 228:1-241:4.

### K. The Terms of the MSA Make Clear that Its Center of Gravity Is the Solaire in Manila, and that It Has No Connection to New York

73. The MSA is governed by Philippine law, does not require that notices be sent to New York (rather, notices were to be sent to GGAM in Nevada), and does not provide for payments into New York.  MSA (Dkt. 218-4) §§ 4.6 (payments), 18.2 (notices), 19.3 (applicable law). The MSA also contemplates that GGAM would maintain a branch office in the Philippines. Ainsworth Decl. Ex. 2, Ex. A.

74. The MSA required GGAM to perform significant services on the ground in Manila in relation to the development, pre-opening, and operation of Solaire.  *See* MSA (Dkt. 218-4) at Annex A (listing GGAM's Pre- and Post-Opening Services).  As discussed *infra* in Section V.A., GGAM performed its services under the MSA "through the Management Team," which consisted of individuals located on the ground at Solaire in Manila, including Michael French, who GGAM hand-picked to be the Chief Operating Officer of Solaire.

### L. Before Solaire Opened, GGAM Assigned the MSA to a Netherlands Entity

75. On or about March 8, 2013, GGAM assigned the MSA to GGAM Netherlands, a Netherlands entity.  *See* Final Award (218-1) ¶¶ 350-52; *cf*. MSA (Dkt. 218-4) § 16.2.  Thus, after the opening of Solaire, it was a Netherlands entity that was to provide services and receive compensation and notices under the MSA.  *See id.*; *see also* Perry Decl., Ex. 24 at 1 ("[GGAM] hereby assigns, transfers and conveys to [GGAM Netherlands] the MSA and all of its rights, title

and interest in, to and under the MSA, solely with respect to the Post-Opening Services. . . . [GGAM Netherlands] agrees that it will observe and perform all of the duties, obligations, terms, provisions and covenants relating to the MSA, and will become liable for all liabilities related thereto . . . .").

76. Solaire's grand opening occurred on or about March 16, 2013. *See* Liability Award ¶ 55 (Dkt. 218-2).

## III.   BRC's Public Offering of Shares and Related Roadshow

### A.   GGAM's Meetings with Potential BRC Investors in the United States and Other Countries Did Not Constitute Performance of Services Under the MSA

77. In April and May 2012 (which was after the parties executed the MSA but before Solaire opened), GGAM's principals and BRC representatives participated in a "roadshow" in advance of a "top-up" equity offering of shares of BRC to the public (the "Roadshow"). *See* Ainsworth Decl., Ex. 6 at 1 (Venezuela Decl.). The Roadshow was led by the investment banks CLSA and UBS, and involved meetings with potential investors around the world, including in Asia, North America and Europe. *See, e.g.*, Perry Decl., Ex. 35 ¶¶ 8-10.

78. In the Arbitration, GGAM requested that the Tribunal order BRHI/SPI to reimburse GGAM for certain travel expenses, including US$45,557 in travel expenses "related to the GGAM principals' **efforts with respect to the BRC roadshow**, representing **BRC** at investor conferences, and investigating and evaluating a potential business opportunity for **BRC** in Argentina." Perry Decl., Ex. 53 ¶¶ 133-37 (emphasis added). GGAM represented that it incurred the $45,557 amount "**outside the scope of the MSA**." *Id.* ¶ 136 ("While GGAM incurred these expenses outside the scope of the MSA, GGAM is entitled to reimbursement of these expenses as well."); *see also* Ainsworth Decl., Ex. 27 (Saunders Decl., June 14, 2015, Excerpts) ¶ 106 (explaining that of the US$288,031 in expenses for which it sought reimbursement, "US$242,474 **reflect expenses**

**we incurred performing work related to the MSA Services,** and US$45,557 **reflect expenses we incurred performing work on behalf of Bloomberry Resorts Corp., but outside the scope of the MSA**, *e.g.*, attending investor conference in November 2012 and December 2012 and traveling to Buenos Aires, Argentina" in 2013 to investigate/evaluate the potential business opportunity) (emphasis added); Final Award (Dkt. 218-1) ¶¶ 366-367, 372.

79. The Tribunal declined to order BRHI/SPI to reimburse GGAM for the $45,557 in expenses related to the Roadshow and other BRC investment-related activities because such expenses were incurred "outside the scope of the MSA."  Final Award ¶ 372 ("As the Claimants themselves recognize, [such expenses] were incurred outside the scope of the MSA. For that reason, the Tribunal will not order that Respondents pay them.").

80. GGAM's participation in the Roadshow and in subsequent meetings with potential BRC investors did not constitute the performance of services under the MSA, as such participation was "outside the scope" of GGAM's obligations under the MSA.  Final Award (Dkt. 218-1) ¶¶ 366-367, 372; *see also* Ainsworth Decl., Ex. 27 (Saunders Decl., June 14, 2015, Excerpts) ¶ 106.

### B.   BRC Refused to Allow Cantor to Be Involved in BRC's Public Offering of Shares

81. Rein attempted to involve Cantor in BRC's equity offering and the Roadshow, including by requesting to communicate with CLSA and attend the "kick-off" meeting for the Roadshow.  *See* Perry Decl., Ex. 18 at GGAM-SDNY-0078938.  These attempts were rejected.  *See generally* Perry Decl., Ex. 65 at 85:18-86:13.  On or about January 26, 2012, Occeña emailed Rein and stated, "[w]e would prefer that only Brad [Stone] and Garry [Saunders] attend the kick-off meeting on the 8th. I spoke with Brad about this. Please talk to him. Thanks." Perry Decl., Ex. 18 at GGAM-SDNY-0078937.  Occeña then forwarded this email to Razon and stated:

Brad called me about the business plan this morning so I took the opportunity to speak to him about Jon Rein of Cantor. He wanted to communicate directly with CLSA and attend the kick-off on the 8th. I declined both his request. **I told Brad that I do not have to ask you to know whether you are fine with Cantor taking an active role in the equity placement because I know you will say no as well. I reiterated to Brad that you want to deal with him, Bill and Garry and we are just tolerating Cantor because they are their partners**. Brad fully understands and supports our position. My email below to Jon for your reference.

*Id.* (emphasis added).  Razon responded "**No Cantor**. They only participate thru GGAM."  *Id.*

(emphasis added).  Occeña then forwarded Razon's email to Stone, who did not respond.  *Id.*

## IV.   GGAM's Purchase of Shares in BRC Pursuant to the EOA

### A.    The EOA Has Different Parties than the MSA and Its Own Arbitration Clause

82.  On April 16, 2012, GGAM entered into the EOA with BRC and Prime, pursuant to which GGAM was granted the option to purchase some or all of 921,184,056 shares of BRC from Prime at a strike price calculated based on a formula.   Fissell Decl., Ex. 7 (EOA) at BLOOM_0082035 ("'Option Shares' means 921,184,056 shares of BRC"); *id.* § 3.2 (BLOOM_0082039) (strike price formula).

83.  "[A]ll parties understood the MSA and EOA to be distinct arrangements."  Perry Decl., Ex. 41 ¶ 26; *see also* Dkt. 281-5 ¶ 19.

84.  The EOA is governed by Philippine law.  *See* Perry Decl., Ex. 19 (EOA) § 11.8 (at BLOOM_0082051).

85.  The EOA provides for the resolution of disputes by arbitration in Singapore, *id.* § 11.9(b) (at BLOOM_0082051), and further provides that arbitrations under the EOA may not to be merged with arbitrations under the MSA or any other agreement.  *Id.* § 11.9(b)(iii) (at BLOOM_0082052).

86.  Cantor is not a party to the EOA.  *See* Fissell Decl., Ex. 7 (EOA) at BLOOM_0082033.

### B.      GGAM, Not Cantor, Purchased Shares of BRC Pursuant to the EOA

87.   On or about December 20, 2012, while in Montana, Weidner faxed to Prime a copy of a letter from GGAM that provided notice of GGAM's exercise of its option to purchase 921,184,046 shares of BRC (the "Option Shares") pursuant to Section 2.3 the EOA.  *See* Ainsworth Decl. Ex. 24 at BLOOM_0002282-83.  This letter also noted that GGAM's Philippine counsel would be in touch with Tan and Occeña to discuss logistics for the closing of GGAM's exercise of this option.  *Id.*

88.   GGAM, not Cantor, purchased the Option Shares.  *See* Dkt. 281-4 ¶¶ 31, 34; Perry Decl., Ex. 65 at 55:15-18.

89.   Cantor directly and/or indirectly made capital contributions and/or loans to GGAM that provided GGAM with some or all of the cash it used to purchase the Option Shares.  *See* Dkt. 281-4 ¶ 31; Perry Decl., Ex. 62 at 93:8-97:2; *id.* Ex. 65 at 55:15-57:15.

90.   GGAM is required to repay Cantor, with interest, for the capital contributions and/or loans it made to GGAM that GGAM used to purchase the Option Shares.  *See* Dkt. 281-5 ¶ 40; Dkt. 281-6 ¶ 25; Perry Decl., Ex. 46 at 250:9-17; *see also id.* Ex. 62 at 93:8-97:2.

## V.      The MSA Was Performed in the Philippines

### A.      GGAM Performed Its Services Under the MSA Through Solaire's Management Team that Was Based in Manila

91.   GGAM performed its services under the MSA through the individuals on the ground at Solaire in Manila who comprised the Management Team, including Michael French, who GGAM hand-picked to be the Chief Operating Officer of Solaire.  *See* Perry Decl., Ex. 63 at 57:19-60:16.   GGAM did this by either being on-site with the Management Team at Solaire or communicating with the Management Team via email, telephone or Skype.  *Id.* at 58:16-23, 60:3-10.

**B.    GGAM Did Not Perform Any Services Under the MSA In New York**

92.    The MSA says nothing about GGAM supervising or performing its services in the United States, much less in New York.  *See generally* MSA (Dkt. 218-4).  The MSA does not contain the words "New York."  *See id.*

93.    While GGAM "spent extensive time in Manila" to perform its services under the MSA, Perry Decl., Ex. 33 ¶ 34, there is no evidence that GGAM performed any services under the MSA in New York.

**C.    Cantor Did Not Perform Any Services Under or in Support of the MSA**

94.    "Cantor did not perform work in fulfillment of GGAM's obligations under the MSA, whether under the SSA or otherwise."  Dkt. 281-4 ¶ 12; *see also* Perry Decl., Ex. 45 at 252:18-22; *id.* Ex. 44 at 128:17-129:4; Dkt. 281-6 ¶ 24.

95.    Cantor also did not perform any services for GGAM that supported GGAM's performance of services under the MSA.  Although GGAM paid Cantor for the legal, financial advisory and administrative (or "back office") services that it performed for GGAM under the SSA, Dkt. 281-6 ¶ 24, GGAM did not pay any third parties (including Cantor) for any services rendered in connection with GGAM's performance of services under the MSA.  *See* Final Award (Dkt. 218-1) ¶¶ 223, 262, 313-14; *see also* Perry Decl., Ex. 54 ¶¶ 46-47; Dkt. 281-6 ¶ 16 ("**For the Services that it was contracted to provide, GGAM would <u>not</u> be expected to have in-house back-office support, such as a team of accountants, interior designers or other overhead**.") (emphasis added).

96.    Additionally, although GGAM has entered into at least one agreement with third parties that (i) stated that GGAM's power to enter into the agreement was "subject to the execution" of the agreement by GGAM's two direct parent companies, Cantor GGAM and GAM, Perry Decl., Ex. 29 at GGAM-SDNY-0463314, and (ii) was "[a]cknowledged" and signed by

Cantor GGAM (with Howard Lutnick signing in his capacity as Chairman, President and CEO), *id.* at GGAM-SDNY-0463310, and GAM (with Mr. Weidner signing in his capacity as Manager), *id.* at GGAM-SDNY-0463309, the MSA contains no such terms, acknowledgements or signatures. Rather, the MSA expressly states that GGAM has "the requisite rights, power and authority" to enter into the MSA, without any qualification that Cantor GGAM or any other affiliate of Cantor execute the MSA.  MSA § 10.2(b) (Dkt. 218-4).

### D.    After the MSA Was Executed, BRHI and SPI Never Traveled to New York in Connection with the MSA

97.  There is no evidence in the record that after the MSA was executed any BRHI/SPI representatives ever traveled to New York in connection with GGAM's performance of services under the MSA or to otherwise meet about the MSA.

## VI.    <u>The Arbitration</u>

98.  On or about September 12, 2013, BRHI and SPI terminated the MSA.  *See* Liability Award ¶ 58 (Dkt. 218-2).  On or about that same date, GGAM and GGAM Netherlands initiated the Arbitration. *Id.* ¶ 59.

### A.    The Arbitration Proceedings Had No Connection to New York

99.  Pursuant to the terms of the MSA, the seat of the Arbitration was Singapore.  *See* SAC (Dkt. 218) ¶ 196; Defs.' Am. Answer (Dkt. 273) ¶ 192.

100.    During the Arbitration, GGAM and GGAM Netherlands were represented by the international law firms of Paul Hastings (out of its Washington, D.C. office) and Hughes Hubbard (out of its New York office).  BRHI and SPI were represented by the international law firm of Milbank LLP (out of the Washington, D.C. office) and the Philippine law firm of Picazo Buyco Tan Fider & Santos. *See, e.g.*, Liability Award (Dkt. 218-2) ¶¶ 1-4; Final Award (Dkt. 218-1) ¶¶ 1-4.

101.     The Tribunal issued confidentiality orders that prohibited nearly all Cantor personnel—including Cantor's CEO (Howard Lutnick), Chief Litigation Counsel (Michael Lampert), and VP and Assistant General Counsel (Binyomin Kaplan)—from receiving confidential information exchanged in connection with the Arbitration (e.g., arbitral filings) and from attending arbitral hearings.  *See* Perry Decl., Ex. 37 at BLOOM_0073714, 3718; *id.* Ex. 31 at BLOOM_0073755, 3757-58. These confidentiality orders did not apply to Rein, who had been seconded from Cantor to GGAM and who was designated by GGAM as its "party representative" in the Arbitration.  Perry Decl., Ex. 37 at BLOOM_0073718; *id.* Ex. 31 at BLOOM_0073757-58.

102.     A three-day interim measures hearing was initially scheduled to take place in Singapore; however, it was ultimately held in Washington, D.C. on or around October 20-22, 2014 because BRHI/SPI's lead counsel had an unexpected surgery that prevented him from flying to Singapore.  Interim Measures Award ¶¶ 21-23 (Dkt. 218-3).  The Tribunal ordered that Cantor's chief litigation counsel be ***removed*** from this hearing when he arrived in person notwithstanding the Tribunal's order that prohibited Cantor personnel from attending arbitral hearings.  Perry Decl., Ex. 34 at 23:17-25.

103.     A two-week merits hearing was held in Singapore on or around October 15-24, 2015.  *See* Liability Award ¶ 14 (Dkt. 218-2).

104.     A one-week remedies hearing was scheduled to take place in Singapore; however, it was ultimately held in Washington, D.C. on or around May 28-June 1, 2018 due to health reasons of a member of the Tribunal.  *See* Final Award (Dkt. 218-1) ¶¶ 68, 87, 122.

105.     No arbitration proceedings took place in New York.

**B.      During the Arbitration, GGAM Emphasized Its Separateness from Cantor and the MSA's Separateness from the EOA and Option Shares**

106.      During the Arbitration, GGAM sought to minimize its relationship with Cantor, including an effort to "minimize Cantor's role in the management of the properties."  *See* Perry Decl., Ex. 64 at 28:18-22.

107.      During the liability phase of the Arbitration, in response to BRHI/SPI's argument that GGAM had failed to perform under the MSA because of pressure from Cantor to pursue other business, GGAM took the position that although Cantor performed certain advisory and administrative services for GGAM for which GGAM paid Cantor pursuant to a Support Services Agreement, **Cantor did _not_ perform any services under the MSA**.  *See* Dkt. 281-6 ¶¶ 16, 24; Dkt. 281-4 ¶ 12; *see also* BRHI/SPI SOF ¶ 96 *supra*; BRHI/SPI's Response to GGAM's Fact No. 19 *supra*.

108.      During the damages phase of the Arbitration, BRHI/SPI sought to reduce GGAM's damages by arguing that because the MSA was terminated early, GGAM potentially saved (avoided) costs that it would have otherwise paid to Cantor as part of the SSA for back-office services (*e.g.*, accounting, finance, and legal).  *See* Final Award (Dkt. 218-1) ¶¶ 262-63; *see also* BRHI/SPI's Response to GGAM's Fact No. 19 *supra*.  GGAM argued that it did not avoid any such costs because Cantor did not perform services under the MSA, and therefore, its damages should not be reduced.  *See id.* ¶¶ 261-62.  The Tribunal adopted GGAM's position when it ruled that GGAM would not have avoided any costs (*e.g.*, payments to Cantor for services in connection with the performance of the MSA) as a result of the termination of the MSA, and therefore GGAM's damages for lost management fees would not be reduced to account for such avoidance of costs.  *See* Final Award (Dkt 218-1) ¶¶ 313-14.

**C.      During the Arbitration, GGAM Did Not Allege that the MSA Had Any Connection to New York**

109.      On or about December 9, 2014, the Tribunal issued its Interim Measures Award. *See* Interim Measures Award (Dkt. 218-3).  On or about September 20, 2016, the Tribunal issued its Liability Award.  *See* Liability Award (Dkt. 218-2).  On or about September 27, 2019, the Tribunal issued its Final Award. *See* Final Award (Dkt. 218-1).  Across the 353 pages of arbitral rulings, "New York" appears exactly twice: (1) in the address of GGAM's arbitration counsel, and (2) in a quotation from BRHI/SPI's submissions reiterating that they did not contract with a New York-based financial institution.  *See* Liability Award (Dkt. 218-2) ¶ 98 (stating that GGAM is "an investment vehicle for a New York-based financial institution [i.e. Cantor]", which was "***not*** what Bloomberry was seeking—and ***not*** what GGAM represented itself to be—when it entered into its agreement") (emphasis added).

Dated:  February 22, 2023           MILBANK LLP
        New York, New York

By:   */s/ Daniel M. Perry*
        Daniel M. Perry
        55 Hudson Yards
        New York, NY 10001
        Telephone: (212) 530-5000
        Facsimile: (212) 530-5219

        Erin M. Culbertson
        Brett P. Lowe (admitted *Pro Hac Vice*)
        1850 K Street, NW
        Suite 1100
        Washington, DC 20006
        Telephone: (202) 835-7500
        Facsimile: (202) 263-7586
        *Counsel to Defendants Bloomberry Resorts*
        *and Hotels Inc. and Sureste Properties, Inc.*