and worked in Gleacher Partners LLC's London office from 2000 to 2003, ultimately as a Director.[1] I then worked for Montgomery & Co., LLC, an investment banking boutique focused on the technology, healthcare and media industries, from 2004 to 2005, as a Vice President based in Los Angeles.

6. In 2005 I joined CIBC World Markets Corp. ("CIBC"), based in Los Angeles, as a Director focused on the gaming industry. In 2006, I was among a number of senior bankers that were recruited from CIBC by Credit Suisse Securities (USA) LLC to launch that firm's gaming industry sector coverage. From 2008 to 2009 I was a Principal of Global Leisure Partners, LLC ("Global Leisure"), a UK-based merchant bank focused on the gaming, lodging and leisure industries.

7. In 2009, I joined Cantor Fitzgerald & Co. ("Cantor") as a Director in investment banking, with responsibility for heading the gaming coverage effort. In 2010 I was promoted to Managing Director.

8. During my career in investment banking, I advised on and/or financed roughly $100 billion in transactions, approximately half of which volume was in the gaming industry. I have held and/or currently hold the Series 7 and 63 licenses from FINRA, and the UK Financial Services Authority (FSA) Corporate Finance Advisor (CF23) designation.

9. In 2010, Cantor formed Global Gaming Asset Management, L.P. with William Weidner, Bradley Stone, and Garry Saunders to advise, invest in, acquire, develop, and manage hospitality and gaming assets globally. Throughout the course of the negotiations of the

---

[1] Gleacher Partners in 1996 was known as Gleacher NatWest Inc. In 1999, the employees of Gleacher NatWest repurchased the firm from the National Westminster Bank Plc. The re-acquired business was renamed Gleacher & Co. LLC and, subsequently, Gleacher Partners LLC. All of these entities were helmed by Eric J. Gleacher, founder of Lehman Brothers' M&A department in 1978 and global head of Morgan Stanley's M&A group from 1985-1990.

2

Management Services Agreement between Bloomberry and GGAM (the "MSA") from March 2011 to September 2011, I provided advice and guidance to GGAM in my capacity as the senior gaming sector investment banker at Cantor. I also participated in discussions with Bloomberry representatives, including Ms. Occena, regarding the MSA and the separate Equity Option Agreement. In those discussions, the Bloomberry representatives were informed and understood that I was an employee of Cantor Fitzgerald, providing services to GGAM.

10. In spring of 2012, I was effectively seconded to GGAM on a full-time basis, taking the role as GGAM's Head of Business Development and Corporate Finance. I now work exclusively for GGAM and its subsidiaries, focused on matters of developing and evaluating new business opportunities and attending to corporate finance and capital markets matters on those entities' behalf.

### GGAM's Expectations Regarding the Solaire Project

11. GGAM saw the management of and investment in Solaire as substantial opportunities for Bloomberry and GGAM to combine their distinctive resources and skills to generate significant economic benefits to each party over the long term. For instance, Bloomberry and its principal had one of the four relevant gaming licenses, and its principal, Enrique Razon, had experience doing business generally in the local Philippine market, while GGAM and its principals had relevant experience, expertise and credibility with respect to the development of complex integrated resort projects, related capital markets activities and casino management worldwide.

12. Based on my experience in the gaming industry, I believed at the time that the MSA was negotiated, and I continue to believe today, that an integrated casino resort like Solaire in Southeast Asia can expect long-term profitability. Before deciding to enter into the MSA and to

3

purchase the Shares, GGAM took the following steps, among many others, to give ourselves confidence that, under GGAM's management, Solaire would be profitable in the long term:

- Researched certain elements of the Philippine economy, tourism/hospitality industry, gaming sector, political considerations, and legal and regulatory considerations;

- Reviewed initial property designs for Solaire and the proposed eventual multi-property Entertainment City concept;

- Reviewed the work performed by Spectrum, the gaming consultancy hired by Bloomberry, to produce initial financial projections of Solaire's revenue and profits;

- Analyzed the relevant potential geographic customer markets with respect to population, accessibility and disposable income;

- Performed competitive benchmarking of financial and key performance metrics with respect to both local casinos and those in other relevant jurisdictions;

- Considered the impact of differing gaming tax rates in the Philippines as compared to other jurisdictions with respect to implications for commission rates and junket/VIP incentives in order to attract junkets and thereby junket players, with a resultant impact on Solaire's performance;

- Evaluated the opportunity for GGAM to position Solaire to attract premium mass and international VIP clientele; and

- Considered risk factors (and potential mitigating factors) for Solaire's operation, including, without limitation: lack of adequate infrastructure in Metro Manila and prospects of improvement in Metro Manila's infrastructure; the reputation of the Philippines, in general, and Manila, in particular, for being unsafe for foreign tourists; lack of amenities at Solaire before the completion of Phase I-A; lack of critical mass in Entertainment City upon opening; potential change in the Philippine tax regime; possible geopolitical tensions, particularly with respect to Sino-Filipino relations; and the prevalence of corruption in the Philippines.

Based on this analysis, we formed a view that, under GGAM's management, Solaire would be a substantially profitable enterprise. Accordingly, GGAM decided to pursue the opportunities to manage and invest in the Solaire project.

4

Subject to Arbitration Confidentiality Orders

13. Since performing our initial due diligence on the Solaire project, I have continued to monitor the above factors and considerations. Although I do not expect that Solaire will be as profitable in the future as it would have been under GGAM's management, I do expect that it will generally remain profitable in the future.

14. The Solaire project also presented a significant opportunity for GGAM – one that GGAM cannot easily replicate. Unlike the hotel sector, in which there may be many comparable properties, lighter regulation, and lower barriers to entry, the casino sector is generally characterized by a finite number of licenses, greater regulatory oversight and hurdles, and considerable barriers to entry. From the time of the wrongful termination of our relationship with Bloomberry until now, the Philippine Amusement and Gaming Corporation – the Philippine national governmental entity that regulates the gaming industry – has issued only four licenses for integrated resorts in Entertainment City, including the one for Solaire. In each case, the license is held by an entity that either has an existing management team in place or is not suitable as a partner for GGAM for regulatory or other reasons. In any event, the non-compete clause in the MSA would have made securing other resort management arrangements in the Philippines nearly impossible: While the non-compete clause's prohibition on GGAM managing another Philippine casino is not operative while (as here) Bloomberry is in breach of the MSA, Bloomberry's denial of any breach in this Arbitration and in its public filings and statements have created sufficient uncertainty that in my view no casino owner would risk contracting with GGAM in the Philippines during the pendency of this Arbitration.

15. In my role as head of business development for GGAM, I have also investigated and pursued other opportunities for GGAM throughout East Asia. Because of a variety of factors such as the slow pace of legislative and regulatory enactment of gaming-enabling laws and infrastructure development in East Asia, the substantial cost necessary to invest in these markets, the particulars of

5

39. Fourth, aside from not being able to monetize the Shares at a time and in a manner of our choosing, GGAM has been starved of capital that it might otherwise have used to fund operations and to pursue other opportunities.

40. Of course, there have been other types of harm to GGAM arising from Bloomberry's actions. Most significantly, GGAM has not received the management fees to which we are entitled under the MSA. Those fees would be substantial.

41. Further, the reputational harm from Bloomberry's wrongful termination, the frustrated sale process, and Respondents' press statements, is significant and ongoing. Investment bankers, casino owners, competitors, regulators, members of the press and other industry participants all over the world raise the topic and question my colleagues and me about it continually. Of course, these are just the instances I know about; I cannot know with certainty about the opportunities that have not arisen as a result of the negative perceptions of GGAM that Bloomberry has created and perpetuated. As Mr. Razon correctly noted in his cover email of July 12, 2013 to Mr. Weidner, Bloomberry is "conscious that [GGAM is] trying to build a business in Gaming management and may not welcome the publicity that would accompany [] a disclosure" from Bloomberry regarding GGAM.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  June 13, 2015

_____
JONATHAN D. REIN

LEGAL_US_W # 82252479.1

14