Perry Decl. Ex. 41

Resorts International located in New Jersey, the first casino hotel that opened in the United States outside of Nevada. Based upon this experience, I decided to join the startup property in Atlantic City that became the Sands Hotel and Casino in 1980 during its preopening. Starting as Director of Administration, I held various job positions over a 13-year period, serving for the last 7 years as Executive Vice President.

9. From 1994 to 1997, I served as the Executive Vice President in ITT Corporation's Sheraton gaming group and its Caesars World division when acquired at the end of 1994. From 1997 to 2001, I served as President of Playboy Enterprises Gaming division.

10. From 2004 to 2005, I served as Vice President of International Operations for Las Vegas Sands Corp. ("LVS"), where I had principal responsibility for LVS's operations during the company's historic entry as the first foreign-owned property in the Macau gaming market. During this time I worked with Mr. William ("Bill") P. Weidner, who at the time was the President of LVS, and with Bradley H. Stone, who at the time was Executive Vice President of LVS.

11. From 2006 to 2009, I joined Melco Crown Entertainment, a US$10.5 billion publicly-listed casino operator that held one of the six concessions or sub-concessions in Macau, as their Chief Operating Officer. During this time, I oversaw the development of construction and operations for Melco Crown's start up and entry into the Macau market, which included Altira Macao, City of Dreams integrated resort, and eight Mocha Slot Club locations. From 2002, I also served as a Director of Shuffle Master, Inc. (Nasdaq: SHFL), including the last 4 years as the Chairman of its Board of Directors until the November 2013 sale of the company to Bally Technologies for US$1.3 billion.

12. In 2010, I was approached by my two former LVS colleagues, Bill Weidner and Brad Stone, with the opportunity to join a start-up gaming asset investment and management company. We formed our new company later that year as a 50/50 joint venture with an affiliate of Cantor Fitzgerald L.P. At its inception in 2010, GGAM's primary objective was to leverage the collective experience and expertise of its principals in the gaming and resort industry, in order to identify, invest in, and manage distressed or fledgling resort and gaming assets around the world.

### GGAM's Introductory Meeting with Mr. Razon

13. In early 2011, I was contacted by Soo Hong, an Executive Recruiter for Spencer Stuart, who had been given the search assignment for finding a candidate to serve as President or COO of an under-construction integrated resort property along Manila Bay in the Philippines. Ms.

Subject to Arbitration Confidentiality Orders

BLOOM_0099008

Hong told me that the Project, which would later be named Solaire, was owned by Mr. Enrique Razon, a wealthy entrepreneur who had made his fortune in the port industry. The Project, which would be the first integrated resort in a specially-designated area of Manila known as Entertainment City, was also Mr. Razon's first gaming venture. I was intrigued by the opportunity but declined to consider the position. I told Ms. Hong, that in my experience and judgment, it would be a risky proposition for an owner unfamiliar with this industry to hire a single person and depend upon them to successfully manage the development, pre-opening activities including all hiring, and successfully open a project that is already under construction. This is particularly true for a sophisticated gaming resort product in a nascent market like the Philippines. I made Ms. Hong aware of our newly-formed company and she suggested that Mr. Razon consider meeting with us to discuss possibilities of working together. While she said that she still had an engagement to hire a COO, she agreed that this project and the owner needed additional and broader support for what lies ahead.

14. I have read Mr. Razon's declaration filed in this Arbitration. My recollection of the Parties' initial meeting is quite different than Mr. Razon's, including who was even present. Mr. Stone did not attend the meeting; it was just Mr. Weidner, Mr. Razon, and I. We met for about one hour at the location of his choosing—a cocktail lounge in the Encore resort in Las Vegas.

15. This initial discussion covered a number of topics and Mr. Weidner and I discussed a number of issues with Mr. Razon. First, we described GGAM's organizational structure and its business objectives, which included building a diverse, global portfolio of gaming investments and management opportunities. We explained the respective backgrounds and roles of the three principals as well as what each brought to the table. Mr. Weidner as CEO was primarily responsible for identifying business opportunities, negotiating the principal deal terms, and for leveraging his network of contacts, especially in Asia, to generate patronage of high net worth individuals. Brad Stone and I would focus on pre-Opening and operating issues, with more direct involvement in the day-to-day strategies and activities of the project. In addition, Mr. Stone, who for years had overseen the construction and development of some of the largest and most impressive resort properties in the world, would provide critical guidance and assistance to the construction phase of the project. Of course, we (and Mr. Razon) recognized that there is substantial overlap among our three roles because each of us would contribute substantial value in terms of positioning, marketing, and operating the property successfully based on our experience and expertise in the industry generally, and Asia specifically. We also explained to Mr. Razon that GGAM was not just comprised of Mr. Weidner, Mr. Stone, and I, but that it was also a 50/50 partnership with Cantor Fitzgerald, one of the largest

3

Subject to Arbitration Confidentiality Orders

BLOOM_0099009

time that is required to get a property up and running. In recognition of the anticipated ramp-up period and the mutual expectations that it would perhaps take several years before Solaire's operations would stabilize, the Parties also agreed that GGAM's performance under the MSA, the Performance Standards (MSA Annex B), would not be measured against the Facilities' actual financial results until the fourth year of commercial operations. Beginning with the fourth Fiscal Year after the Opening, but not before then, the Owners could terminate the MSA if the Facilities' financial performance failed to meet specified EBITDA thresholds—such thresholds being projected in the Annual Budget for that same year. The fact that there was a four-year lag before the objective financial performance test applied, reflects our mutual understanding of the need for a ramp-up and stabilization period. The fact the objective threshold against which we would be judged would not even be determined for three years post-Opening reflects the difficulty in forecasting revenue and profit for a new gaming venture in a relatively new jurisdiction.

## Allegation of Blackmail

26. Mr. Razon continues to make accusations that we somehow "blackmailed" him into signing the EOA. These accusations are false, and simply fail to account for the realities at the time. First, by April 2012, we had been negotiating the EOA for many months—the concept and parameters of which had been discussed prior to the MSA negotiations in the spring of 2011. However, the Parties had not reached an agreement despite an understanding of the fundamental business terms such as the buy-in formula and certain ancillary shareholder rights, because Mr. Razon sought to change the legal parameters of the agreement in a way that was disadvantageous to us. Most notably, Mr Razon insisted that the Philippines be the venue for arbitration in the EOA, even though the Parties had agreed that Singapore would be the venue for resolution of disputes under the MSA, and there was no reason to change to a different venue for the EOA. The fact that Mr. Razon and his advisors were still trying to change key terms in the EOA so late in the process shows that all parties understood the MSA and EOA to be distinct arrangements.

27. Second, by this time, the Owners and GGAM were on the eve of commencing the roadshow for Bloomberry Resorts Corporation's public offering. As part of the strategy for the public offering, the GGAM principals were required to not only describe our management services agreement but also our potential investment in Bloomberry Resorts Corp., and thus that our interests would be aligned with Mr. Razon and with the public investors. Our legal advisors made clear to us that we could not truthfully make that representation without the EOA actually in place. In addition,

7

Subject to Arbitration Confidentiality Orders

BLOOM_0099013

because our only remedy if we did not agree to the EOA was to terminate the MSA, we did not feel comfortable representing to the investing public that we would be the managers of the Solarize until the EOA was completed. As long-time executives of publicly listed companies, and longtime holders of gaming licenses, we understood that it was essential that statements being made to investors be truthful and not misleading.

28. Indeed, it was not just our counsel providing these warnings, but Respondents' own underwriters and lawyers were saying the same thing. In the weeks prior to the Roadshow, they were concerned that the market would be confused and potentially misled regarding the scope and degree of GGAM's involvement in the Project without the EOA in place.

29. Mr. Razon's reaction to our good-faith position was unprofessional and wholly unwarranted. If, in fact, Respondents had granted us our equity option at the time of the MSA (as they have previously alleged in these proceedings) then there would be no reason not to complete the agreement before making representations to the public about the terms. Perhaps in the end we should have understood the reality of Mr. Razon's ominous threat that although GGAM was looking forward to working with him, he was not looking forward to working with us. In a conversation with Ms. Occena as we began the roadshow, I expressed relief that we had this behind us and we could move on and work together to make the Project a success. Ms. Occena responded that Mr. Razon was very unhappy about our negotiations and that he has a long memory. It is notable that only two weeks after GGAM's critical participation in the highly successful roadshow, Mr. Razon unilaterally altered the contractual reporting line to ensure that the CFO reported to him directly rather than to the COO (and GGAM).

### Initial Impressions of Solaire and Expectations Regarding Profitability

30. I first visited the Solaire project site in May 2011, approximately four months before we signed the MSA. At that time, significant design and construction foundation elements were already in place, so we knew we would be limited when it came to making major design or structural modifications. We had a lot of respect for Paul Steelman—the architect the Owners had selected—as we had worked with him in the past on numerous other projects. Mr. Steelman is particularly well known in the industry for innovative projects in many markets around the world. The level of quality and luxury of the designs seemed to mesh well with Mr. Razon's vision for the property. As we began to review the property's design, however, we realized that Mr. Razon's high-end design for Phase 1 did

8

Subject to Arbitration Confidentiality Orders

BLOOM_0099014

not contain certain amenities geared toward the mass market, relative to the existing resort complex in Metro Manila, Resorts World Manila.

31. Nonetheless, we accepted Mr. Razon's view that the property would be well positioned to generate mass market business for several reasons. First, the existing competitor, Resorts World, was not close to the same quality level, even though it provided far more amenities for the mass market. Second, there were plans underway to build an expressway between the Manila airport and Entertainment City, which would greatly alleviate the existing traffic concerns. Third, within a couple years after Opening, the other licensed Entertainment City integrated resorts would come online, thereby generating a critical mass of gaming patrons in the area.

32. Most importantly, we understood that the existing superstructure was only the first of what was expected to be two or perhaps even three separate phases of the overall Solaire project. The Philippine gaming regulatory agency, PAGCOR, had approved Solaire's initial implementation plan before certain other guidelines went into effect, and therefore Solaire was allowed to open provisionally in March 2013 with fewer rooms than the regulatory minimum of 800 rooms. Because Phase 1 contained fewer than 500 rooms, Solaire's subsequent expansion, Phase 1A, which was slated to open in late 2014, was required to include enough rooms to reach the 800 minimum room threshold. In addition to an additional hotel tower (which at our suggestion was redesigned to include only suites and villas to cater to the VIP market), Phase 1A was designed to include a number of additional features and amenities that would help attract the mass market segment, including additional restaurant outlets, an expansive retail space, a theater, a nightclub, and approximately 3,500 parking spaces.

33. Around the time of our first visit to Solaire in May 2011, Ms. Estella Occena, who quickly became the point person for Mr. Razon on nearly all Solaire-related matters, presented us with some preliminary financial analyses and business plans that Spectrum Gaming, a well-known gaming consultancy, had prepared for the Mr. Razon prior to his discussions with GGAM. We were asked to review the allocations and assumptions underlying these models and provide the Owners with our comments and concerns regarding the projections. In our initial discussions with Spectrum regarding the reasonableness of their models, Spectrum informed us that they were not permitted to discuss the mass market segment with us, which further underscored the Owners' existing confidence in that market segment and that they were seeking our assistance primarily to drive the VIP business. In any event, Spectrum's conclusions were consistent with what Mr. Razon expressed to us during our initial meeting with him: The local mass market would be the primary revenue driver for the resort and

Subject to Arbitration Confidentiality Orders

BLOOM_0099015

could be attained relatively easily by outperforming Resorts World. Spectrum's initial assumptions regarding the Facilities' projected revenue mix projected approximately 70% of total GGR coming from the mass side and about 30% from the VIP side.

34. Based on our initial due diligence of the Project and our further investigation of the Philippine gaming market and the Facilities' projections, we concurred with Mr. Razon that the project would likely be profitable in the short and long term. We believe from our success in planning and execution to open and operate the property, and the added benefit of the Phase 1A expansion, Solaire should continue to be a profitable resort. Of course, its potential would have been greater had GGAM not been ousted after only three and half months of operations, and the resulting disruption.

### Recruitment of the Solaire Management Team

35. It was also apparent to us during our initial due diligence of the project and our initial visits to the property, that the Owners were critically behind in recruiting and staffing key individuals for the Facilities. Based on our observations and discussions with the Owners' representatives, it was clear that they had no direction on how to even identify suitable candidates. Given their limited experience in the integrated resort industry, it seemed as if the Owners underestimated the complexity involved in building an operation like Solaire from scratch. Ultimately, Solaire would have to become a mini-city of over 4,000 people, but by May 2011, certain critical elements that should have been solidified, had yet to be even conceptualized. To ensure that the Project remained on a proper trajectory, we began recruiting efforts in Asia and the United States months before we executed the MSA. The Owners' representatives eagerly began pursuing and accepting our recommended candidates, even though the MSA was not yet in place. As early as May 2011, we began talks with Dennis Andreaci and Joe Valdes to join the Project, both of whom were prior LVS alumni successfully working at other properties in Macau at the time, to head up our gaming operations and our development efforts, respectively. By June 2011, we had identified Michael French, with whom I had worked for several years in opening the City of Dreams property in Macau and at ITT Caesars, as a strong candidate for Chief Operating Officer. Although Mr. French would not officially begin his employment until January 2012, due to existing contractual restrictions, we incorporated Michael's current knowledge of the Macanese landscape (as well as Mr. Andreaci and Mr. Valdes) and began to identify and evaluate a number of other quality candidates for Solaire.

36. For example, around July 2011, after Mr. Andreaci had committed to come to Solaire, he recommended that we interview Ms. Lorraine Koo for a VIP services and marketing position, as

Subject to Arbitration Confidentiality Orders BLOOM_0099016