---

IN THE MATTER OF AN ARBITRATION UNDER
THE RULES OF THE UNITED NATIONS COMMISSION
ON INTERNATIONAL TRADE LAW (2010)

---

B E T W E E N

GLOBAL GAMING PHILIPPINES LLC and
GGAM NETHERLANDS B.V.
                                            Claimants

- and -

BLOOMBERRY RESORTS AND HOTELS INC. and
SURESTE PROPERTIES, INC.
                                            Respondents

---

- Before -

DR ANDRES RIGO SUREDA (Chairman)
MR MICHAEL HWANG, SC
MR R DOAK BISHOP, ESQ

Heard on:

Friday, 23 October 2015

---

Mr Charles Patricia and Mr Joseph Profaizer
(Paul Hastings LLP)
Mr Daniel Weiner
(Hughes Hubbard & Reed LLP)
Appeared on behalf of the Claimants

Mr Michael D Nolan, Mr David S Cohen, Ms Elitza Popova-Talty and
Ms Erin Culbertson
(Milbank Tweed Hadley & McCloy LLP)
Appeared on behalf of the Respondents

DTI Corporation Pte Ltd. (Reg. no. 201321519K)
1 Raffles Place, #50-00 | One Raffles Place Tower 1 | Singapore 048616
Phone: +65 6653 1688 | Fax: +65 6653 1699 | Email: singapore@dtiglobal.com



GGAM-SDNY-0359054

---

09.34
1  Q.  GGAM was terminated before that could occur, is that
2      fair to say?
3  A.  They were terminated around the three-month point, I
4      believe.
5  Q.  So they never had a chance to revise anything; is
6      that correct?
7  A.  I don't know what the review points were, if any
8      were set, and I offer no opinion in that regard.
9  Q.  And there was no opportunity, in fact, for them to
10     change the business plan because they were never
11     notified of that; is that correct?
12 A.  I don't have any opinion on that either, I'm afraid.
13 Q.  Thank you very much.  Pass the witness, I'm done
14     with my cross-examination.
15 CHAIRMAN:  Thank you.  Mr Lomibao?
16 MR LOMIBAO:  Thank you.
17              Re-examination by MR LOMIBAO
18 MR LOMIBAO:  Mr Profaizer asked you yesterday about
19     junkets, do you remember that discussion?
20 A.  Yes, he referred to me on the junket issue, correct.
21 Q.  And do you recall that Mr Bishop asked Mr Kleisner
22     about how junkets operated and the difference
23     between junkets and the cross-border trading
24     platform idea that Mr Weidner testified about?
25 A.  Yes, that's correct.

Page 5
A Court Reporting Transcript by DTI

GGAM-SDNY-0359059

---

1  09.35 Q.  And what is the difference between Mr Weidner's
2      cross-border trading platform and the junkets?
3  MR PROFAIZER:  I'm going to object at this stage.  This
4      is well beyond the scope of my cross-examination.
5  MR LOMIBAO:  The witness was asked yesterday about the
6      junkets and there was also a question posed by
7      Mr Bishop to Mr Kleisner, and as the witness said
8      yesterday, he was reading the transcripts and we are
9      asking the witness to discuss and elucidate on the
10     difference between Mr Weidner's cross-border trading
11     platform and the junkets.
12 MR PROFAIZER:  The cross-border trading platform is a red
13     herring they are trying to wave about was never
14     discussed in my cross-examination, even remotely.
15 MS POPOVA-TALTY:  If I may, during the discussion
16     yesterday, I believe that Mr Kleisner specifically
17     referred to Mr Lee as the right to be person to be
18     asked this question, so we think it's appropriate
19     that he be given the opportunity.
20 CHAIRMAN:  I think the objection is sustained.  It has
21     not been part of his cross.
22 MR LOMIBAO:  Can you tell the tribunal how do junkets
23     facilitate gambling by Chinese players outside
24     China?
25 A.  Outside China, in the most basic manner, what they

Page 6
A Court Reporting Transcript by DTI

GGAM-SDNY-0359060

---

1  09.36  do is they operate what we call parallel pools of
2      capital, or in layman's term, left pocket/right
3      pocket.  They would have a pool of funds in China
4      and a pool of funds in, say, Macau or Manila.
5          So a player who wants -- who would, say, want
6      to go to Macau to play, he would give the junket
7      operator an amount of cash in China, and the junket
8      operator would extend credit to the player in Macau
9      and the player would play, gamble, win, lose,
10     whatever; settlement would occur back in China.
11         There is no physical movement of currency at
12     that point in time.
13 Q.  And how does that differ with the -- would currency
14     controls in China be relevant to this set-up?
15 MR PROFAIZER:  I'm going to object to this line of
16     questioning.  It is well beyond the scope of the
17     cross-examination.
18 CHAIRMAN:  I think if you could limit yourself to the
19     cross, not what was discussed with other experts.
20 MR LOMIBAO:  Now, you said that strategy and the
21     execution do not appear in the business plan.
22 A.  That is correct.
23 Q.  Mr Profaizer yesterday asked you that you do not
24     address in your report what was done, and you
25     agreed?

Page 7
A Court Reporting Transcript by DTI

GGAM-SDNY-0359061