Perry Decl.
Ex. 52



U.S. Department of Justice

Criminal Division

January 17, 2017

Laurence Urgenson, Esq.
Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006

Re:  Las Vegas Sands Corp.

Dear Mr. Urgenson:

The United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), and Las Vegas Sands Corp. ("Sands" or the "Company"), a corporation organized under the laws of Nevada and headquartered in Nevada, pursuant to authority granted by Sands' Board of Directors, enter into this Non-Prosecution Agreement ("Agreement").

The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

(a)  the Company did not receive voluntary disclosure credit because it did not voluntarily and timely disclose to the Fraud Section the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts");

(b)  the Company received full credit for its cooperation with the Fraud Section's investigation, including conducting a thorough internal investigation, sharing in real-time facts discovered during the internal investigation and sharing information that would not have been otherwise available to the Fraud Section, making regular factual presentations to the Fraud Section, facilitating interviews of certain foreign witnesses, and voluntarily collecting, analyzing, and organizing voluminous evidence and information to the Fraud Section in response to requests, including translating key documents;

(c)  the Company provided to the Fraud Section all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed to the Fraud Section prior to the Agreement;

(d)  the Company no longer employs or is affiliated with any of the individuals implicated in the conduct at issue in the case; engaged in extensive remedial measures, including revamping and expanding its compliance and audit functions and programs and making significant personnel changes, including the retention of new leaders of its legal, compliance, internal audit, and financial gatekeeper functions; established a new Board of Directors Compliance Committee,

GGAM-SDNY-0122436

ATTACHMENT A

STATEMENT OF FACTS

1.  The following Statement of Facts is incorporated by reference as part of the non-prosecution agreement (the "Agreement") between the United States Department of Justice Criminal Division, Fraud Section and Las Vegas Sands Corp. ("Sands" or the "Company"). Sands hereby agrees and stipulates that the following information is true and accurate. Sands admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below:

**Relevant Entities and Individuals**

2.  Sands was, at all times relevant to the conduct described herein, a Nevada-based casino and resort company, which operated through a network of subsidiaries casinos and gaming facilities in the United States, Macao, and Singapore. Sands' shares were publicly traded on the New York Stock Exchange, and the Company therefore was an "issuer" within the meaning of the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78m.

3.  Venetian Macao Limited ("VML") was a wholly owned subsidiary of Sands until 2009, when it became a subsidiary of Sands China Limited ("SCL"), of whose shares Sands owns 70.1%. VML carried out casino operations for Sands in the Macao Special Administrative Region of the People's Republic of China ("Macao"). VML was an "agent" of Sands within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

4.  Sands' Wholly Foreign-Owned Enterprises ("WFOEs") were, at all times relevant to the conduct described herein, investment entities based in the People's Republic of China ("PRC") and owned and incorporated by Sands. The WFOEs were "agents" of Sands within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(a).

A-1

GGAM-SDNY-0122443

5. Sands Executive 1 was a senior executive of LVSC and led Sands' "China strategy," which included promotion of Sands' gaming operations in Macao and Sands' brands in the PRC. Sands Executive 1 left Sands in 2009.

6. Sands Executive 2 was a senior finance executive of Sands starting in 2006. Sands Executive 2 reported to Sands Executive 1 until Sands Executive 2 left Sands in mid-2008.

7. VML Executive was a manager of VML and was responsible for Sands' Asian business development. VML Executive 1 also managed and served as the legal representative for several of Sands' WFOEs. VML Executive left Sands in 2009.

8. Sands Finance Employee was sent by Sands Executive 2 to Macao to assist with Sands' Macao and PRC transactions. Sands put Sands Finance Employee on leave in 2008 and terminated Sands Finance Employee in 2009.

9. Consultant was a PRC-based business consultant who was paid—through numerous companies he owned or controlled—by various LVSC entities for work in Macao and the PRC. Consultant represented to LVSC that he was a former PRC government official, and advertised his political connections with PRC government officials as a primary qualification to provide assistance.

**Summary of Conduct**

10. Between in or around 2006 and 2009, Sands, through its Macao- and PRC-based subsidiaries, transferred approximately $60 million to Consultant for the purpose of promoting Sands' business and brands.

11. Several of Sands' contracts with and payments to Consultant had no discernible legitimate business purpose, Sands senior executives were repeatedly warned about the Consultant's dubious business practices and the high risk of Sands' transactions with Consultant,

A-2

GGAM-SDNY-0122444

and by at least early 2008, certain senior Sands executives knew that over $700,000 paid to Consultant by Sands subsidiaries had simply disappeared.

12. Nevertheless, Sands continued to engage Consultant for work on behalf of Sands, with knowledge of the same Sands senior executives, and did not take steps to provide reasonable assurances about the Company's use and disbursement of funds and assets. In particular, Sands failed to carry out enhanced due diligence on all of Consultant's myriad companies, and did not insist on the appropriate documentation, approvals, or justifications for the payments to Consultant, even after Sands had become aware of Consultant's failure to account for sums of over $700,000 paid by Sands and Consultant's business practices.

### Payments for Sponsorship of Chinese Basketball Team

13. Consultant was first retained by Sands in the fall of 2006, having been introduced to Sands through a high-level person with the PRC's China Liaison Office in Macao. VML Executive strongly advocated that Sands retain Consultant, asserting that Consultant's connections in the PRC would be very useful in Sands' efforts to expand its business into the PRC.

14. In or around early 2007, Sands sought to acquire a professional basketball team in the Chinese Basketball Association ("CBA") to increase interest in Sands' existing casino operations in Macao. When Sands learned that, as a gaming company, it could not own a CBA team under the league rules, Sands arranged for Sands to fund Consultant's purchase of the team, and for Sands to simply appear as the team "sponsor."

15. To that end, in or around 2007 a Sands WFOE paid approximately $7.5 million to companies controlled by Consultant to acquire the CBA team and two junior teams. In so doing, the Sands WFOE violated Sands policies and procedures, including because the contractual

A-3

GGAM-SDNY-0122445

documentation underlying the wire transfers between the Sands WFOE and the Consultant entity did not accurately reflect the identities of the parties to the transactions.

16. Following these payments, Sands Finance Employee began to raise concerns about the lack of transparency of, and failure to follow, proper accounting procedures and company policies in the transactions between Sands and Consultant entities, and also about the actions taken by VML Executive that appeared to show a disregard for internal controls. For example, on or about September 15, 2007, Sands Finance Employee sent an email to Sands Executive 2, expressing Sands Finance Employee's concerns over Sands' repeated payments to the Consultant without an articulable rationale, and explaining that "[Consultant] used [previously transferred] money to buy the junior teams. How come he wants to buy the teams again?...[T]he reason I am asking so many questions on this [$1.46 million] is because I heard another story about it in Beijing. Since I'm not sure whether the story is true, I don't want to put it in this email. At least, it's very alarming and we should be causious [sic] about it. As we advance more and more money, we should quickly set up the right structure and ask these questions early before it gets too complicated."

17. On or about September 15, 2007, Sands Executive 2 encouraged Sands Finance Employee via email to attend an FCPA training, writing "[i]t will be invaluable for you as you try to navigate the Asian business development waters and try to keep [VML Executive] under control." After Sands Finance Employee confirmed Sands Finance Employee's attendance, Sands Executive 2 replied "[g]reat - this will give you opportunity to control the wild animals!!!" Sands Finance Employee responded, "[y]eah, I need some big weapons for these wild animals!" Sands Executive 2 then replied, "[y]eah – but my money is on you!!!!!"

GGAM-SDNY-0122446

18. Sands Executive 2 also instructed Sands Finance Employee to carry out further financial due diligence on the basketball team Sands would be sponsoring. Attempting to do so, Sands Finance Employee faced significant pushback that prevented Sands Finance Employee from carrying out the task. For example, on or about October 1, 2007, Sands Finance Employee emailed VML Executive that "[Sands' outside counsel] and I have repeatedly asked [Consultant] and [Consultant associate] to provide these [payment] documents, but they kept telling us that they couldn't find their accountants. We can't just accept that excuse…[ Sands Executive 2] mentioned US GAAP and Sarbannes-Oxley [sic], they are both serious matters. As an US public [sic] traded company, we must follow these rules, which are non-negotiable."

19. Sands Executive 2 raised concerns to other Sands employees about the payments to Consultant. For example, on or about October 1, 2007, Sands Executive 2 emailed VML Executive and Sands Finance Employee, copying Sands Executive 1, in order to complain that the factual "mess" underlying the basketball transaction meant that Sands Executive 2 had "no idea how to account for the above quagmire. From where I sit right now, it is very hard for me to see how we can point to something that demonstrates that we have value that can be hung up on the balance sheet…My second concern is how to deal with this from a Sarbanes-Oxley perspective. The manner in which this has transpired is not indicative of a sound control environment."

20. Despite all of the foregoing, and without Consultant ever providing the requested documents to Sands Finance Employee or outside counsel, on or about October 12, 2007, a Sands WFOE, with the approval of Sands Executive 1, wired approximately $1.86 million more to one of Consultant's entities, purportedly in connection with the basketball team.

21. Increasingly concerned about the state of Sands' internal controls and ability to obtain proper documentation for the transactions involving Consultant, Sands Executive 2

A-5

GGAM-SDNY-0122447

advocated for the retention of a forensic accounting firm ("accounting firm") to review payments involving Consultant in connection with the basketball team. Accordingly, in or around late 2007, Sands engaged the accounting firm to review the basketball-related transactions. However, Consultant and VML Executive were able to significantly impede the accounting firm's efforts, for example by preventing the accounting firm from gaining access to key bank account information that would have allowed for a more complete investigation. As such, by the time the accounting firm was instructed to conclude its investigation in or around February 2008, over $700,000 of funds paid to Consultant's entities remained unaccounted for.

22. The accounting firm never presented its findings to Sands' Board of Directors. Instead, Sands Executive 1 gave Sands' Board of Directors a presentation of what Sands Executive 1 claimed were the accounting firm's conclusions, namely, that no illegal payments had occurred. In so doing, Sands Executive 1 omitted nearly all context for these purported findings, including the limitations that had been put on the accounting firm's efforts by Consultant and his associates.

### Acquisition of the "Beijing Building" and Basement

23. Sands promotional strategy in the PRC also included pursuing a joint venture to develop a resort facility with a Chinese state-owned travel agency ("Chinese SOE"). As part of its collaboration, Sands agreed in December 2006 to acquire from the Chinese SOE several floors of a large building in Beijing.

24. Between in or around July 2007 and February 2008, Sands, through its WFOEs, acquired a controlling interest in a company that Consultant had set up to purchase the Beijing building floors. The transactions, amounting to approximately $42 million, were between Sands' WFOEs and the Consultant entities, and none of the payments was approved by a Sands employee with sufficient authorization to approve the amounts paid.

GGAM-SDNY-0122448

25. Separate and apart from the core Beijing building transaction, in or around mid-2007, Consultant demanded that Sands pay Consultant a large up-front amount, purportedly so that Consultant could secure Sands' title to the building's unfinished basement.

26. On or about August 6, 2007, VML Executive sent an email to Sands Executive 1 suggesting that Consultant could use Consultant's connections in Beijing to secure the title, and that Consultant had asked for an upfront payment of approximately $1.4 million to obtain title to the basement. In response, Sands Executive 1 instructed Sands Executive 2 and VML Executive to ensure that Sands' outside counsel was consulted.

27. On or about August 19, 2007, Sands' outside counsel sent an email to, among others, VML Executive, Sands Executive 1, and Sands Executive 2, raising the specter of potential FCPA issues with the proposed payment and questioning the legality of how Consultant would obtain the basement permit.

28. Around the same time and over the following months, Sands Finance Employee sent multiple emails to Sands Executive 2 expressing similar concerns about giving Consultant an advance payment for the basement.

29. Despite all of the foregoing, and notwithstanding the fact that, among other things, Consultant had never provided documentation showing Consultant had even purchased the basement from the Chinese SOE, much less legally obtained title, on or about April 9, 2008, a Sands WFOE wired approximately $3.6 million to one of Consultant's companies, as a pre-payment for a five-year lease of the basement.

**Subsequent Payments to Consultant**

30. By early 2008, Sands Executive 1, Sands Executive 2, and VML Executive had been made aware of significant risks and concerns regarding Sands' relationship with Consultant,

A-7

GGAM-SDNY-0122449

and knew that Sands had not received documentation establishing what all the funds paid to Consultant were being used for. Yet, with the approval of those same senior managers, Sands, through its subsidiaries, continued to engage in business with Consultant, including by paying Consultant more than $5 million without a discernible legitimate business purpose, even after (A) the accounting firm had identified over $700,000 in missing funds, and (B) Sands Finance Employee and Sands' outside counsel, a major United States law firm with expertise in the FCPA, repeatedly raised concerns about Consultant. Confronted with these and other red flags, Sands willfully failed to implement controls to mitigate the risks, such as: (1) enhanced due diligence on Consultant's entities; (2) heightened approvals for payments to Consultant's entities; (3) more closely monitored supporting documentation for payments to Consultant's entities; (4) thorough review of Consultant's bank records; or (5) additional audits of Consultant's entities and transactions.

31. In addition, rather than being investigated, removed, or otherwise punished for entanglements with Consultant, VML Executive received support in VML Executive's efforts to suppress Sands Finance Employee's ability to scrutinize transactions with Consultant.

32. On or about January 20, 2008, VML Executive wrote an email to a Sands manager with responsibility over Macao, stating that VML Executive had "great worries" about Sands Finance Employee and outside counsel "knowing too much even now."

33. On or about February 23, 2008, VML Executive emailed Sands Executive 1 (and subsequently forwarded the email to Sands Executive 2) stating, "[Sands Finance Employee] is still making trouble for us during our foreign currency exchange in Zhuhai recently. We must think about what to do with her quickly." The email also noted that "[outside counsel] is ganging up with [a seller's rep] to hinder [Consultant] getting the Xian team transfer done."

A-8

GGAM-SDNY-0122450

34. Ultimately, VML Executive succeeded in having Sands Finance Employee and outside counsel removed from their respective roles and replaced by individuals who had less relevant experience and were not armed with an understanding of the risks that had previously been identified.

35. Moreover, Sands' WFOEs continued to make payments to Consultant's entities that illustrated the failure of effective internal accounting controls in the Company's PRC operations and were ultimately misrepresented in Sands' books and records. For example,

   a. On or about April 8, 2008, a Sands WFOE paid approximately $1.4 million to an entity affiliated with Consultant for "arts and craft procurement," purportedly pursuant to an artwork procurement contract that had been signed by VML Executive. The backup documentation for the payment consisted of formal receipts from the Consultant entity referring to "arts and crafts." In or around early 2009, Sands' outside auditors raised questions about this payment, and in an email written on or about February 2, 2009 to a Sands WFOE accountant, VML Executive admitted that the payment was not used for "arts and craft," but was instead used for a contemplated resort island development project.

   b. On or about September 3, 2008, another Sands WFOE transferred approximately $1.4 million to a Consultant entity, purportedly as an "advertisement" payment made pursuant to an undated advertisement agreement. VML Executive authorized the payment. There is no evidence that Consultant provided any advertising, consulting, or investment services in

GGAM-SDNY-0122451