```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - - - -x
 3                                      :
     GLOBAL GAMING PHILIPPINES, LLC,     :
 4                                      :
              Plaintiff,                :
 5                                      :
         v.                             :  Case No.
 6                                      :  21-CV-2655
     ENRIQUE K. RAZON, JR.;              :  (LGS)(SN)
 7   BLOOMBERRY RESORTS AND HOTELS INC.; :
     SURESTE PROPERTIES INC.;            :
 8                                      :
              Defendants.               :
 9                                      :
     - - - - - - - - - - - - - - - - - -x
10
              REMOTE VIDEOTAPED DEPOSITION OF
11
                   WILLIAM P. WEIDNER
12
         **** Confidential - Attorneys' Eyes Only ****
13
                      April 20, 2022
14
15       REMOTE VIDEOTAPED DEPOSITION OF WILLIAM P.
     WEIDNER, produced as a witness at the instance of
16   the Plaintiff, and duly sworn remotely, was taken in
     the above-styled and numbered cause on April 20,
17   2022, from 9:04 a.m. (PST) to 4:35 p.m. (PST),
     remotely before Dawn K. Larson, RDR, CRR, reported
18   by machine shorthand, pursuant to the Rule 30 of the
     Federal Rules of Civil Procedure and the provisions
19   stated on the record.
20
21
22
23
24
25
```

---

**[Perry Decl. Ex. 62]**

```
 1   exhibit, but why don't you take your time to review.
 2        A.    Okay.
 3              (Pause.)
 4        A.    Okay.
 5        Q.    So before you, Mr. Weidner, is an email
 6   chain.  It's been labeled Exhibit 2001.  The front
 7   page bears the Bates label BLOOM_148254.  Just
 8   drawing your attention to the first email in the
 9   chain, you'll see the subject is:  "Meeting last
10   Saturday."
11              The email address weidnerb@gmail.com, I
12   take it that's your email?
13        A.    Yes.
14        Q.    And you write:  "Ricky, enjoyed our talk
15   on your visit to Las Vegas.  Look forward to your
16   thoughts on how we may cooperate."  It goes on.
17              Is this -- is the reference to "meeting
18   last Saturday" -- is that the meeting at the
19   cocktail bar that we just discussed?
20        A.    Yes.
21        Q.    Okay.  And you see there is further
22   exchange of pleasantries.
23              And further, Mr. Razon, on March 17,
24   writes to you:  "Bill, some preliminary points on
25   principle that I think we should get out of the way.
```

---

```
 1   I'm envisioning an arrangement that is as close to
 2   full-time management as possible.  I realize that is
 3   not possible where you are concerned; however, we
 4   will need you as the main driver and as much of your
 5   time as we can get."
 6              Do you see that?
 7        A.    Yes.
 8        Q.    Do you recall at the cocktail lounge there
 9   was some discussion about how much time GGAM could
10   give to management of the organization in the
11   Philippines?
12        A.    Yes.
13        Q.    Did Mr. Razon tell you he was looking for
14   full-time management?
15        A.    It says what it says.
16        Q.    I'm just -- putting aside what it says, do
17   you recall that being a subject of discussion at the
18   cocktail lounge?
19        A.    Yes.  We talked about the three of us --
20   myself, Garry Saunders, and Brad Stone -- the
21   three of us tag-teaming as we have throughout our
22   careers.  So between the three of us and whomever we
23   would put on the ground full-time, there would be
24   someone there full-time, that we felt it was the
25   kind of coverage that he wanted.
```

---

```
 1        Q.    Okay.  And -- but you were careful to
 2   explain to him that you would not be able to be
 3   there full-time on the ground in Manila; correct?
 4        A.    What he acknowledged is what I said.
 5        Q.    Yeah.  And he writes:  "I'm not keen on a
 6   management contract but on an arrangement that
 7   aligns our interests, which, in effect, means you
 8   would come in as an investor with a real stake in
 9   our success."
10              Is that a reference to the "skin in the
11   game" discussion that we were just discussing?
12        A.    Yes.
13              MR. PASCUCCI:  Objection.  Calls for
14   speculation.
15              BY MR. PERRY:
16        Q.    And you would agree with me that, at least
17   at this point in time, Mr. Razon is imagining that
18   you, Mr. Weidner, would come in as an investor with
19   a real stake in the organization's success; right?
20              MR. PASCUCCI:  Objection.  Calls for
21   speculation.
22        A.    No.
23              BY MR. PERRY:
24        Q.    So did you -- well, when you received this
25   email stating "which, in effect, means you would
```

CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner          Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

1  come in with an investor with a real stake in our
2  success," what did you understand that to mean?
3      A.  "You" is the entity we discussed, and the
4  full-time wouldn't be possible for a company.  The
5  idea of the company was for us to have several
6  different management arrangements and potential
7  investors.  So the point is he's talking about
8  talking to GGAM because that's what we were
9  presented.
10     Q.  So just on the investment portion, the
11 concept was an investment by GGAM?
12         MR. PASCUCCI:  Objection.  Ambiguous.
13     A.  That's my understanding.
14         BY MR. PERRY:
15     Q.  To be fair, he says:  "We can come up with
16 a formula to accommodate this, which, as an example,
17 would be that I would make up to 10 percent of the
18 company available for you and your group with a
19 buy-in formula."
20         Do you see that?
21     A.  Yes.
22     Q.  And that -- to the best of your
23 recollection, does that generally summarize the
24 conversations that you had had Saturday at the
25 cocktail lounge?

CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner          Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

1      A.  Yes.
2      Q.  And you respond above:  "Ricky, Garry and
3  I are working on a simple outline of a proposal for
4  you."
5          Do you see that?
6      A.  Yes.
7      Q.  And do you recall preparing such a
8  proposal?
9      A.  Yes.
10     Q.  And how was it prepared?
11     A.  I don't recall.  Just discussions among
12 Brad, Garry, myself and the people at Cantor about
13 what we were pursuing.
14     Q.  Okay.  And who prepared -- well --
15         (Defendants' Exhibit 2002 was marked.)
16     Q.  Before you is Deposition Exhibit 2002.
17 It's an email chain starting on March 2, 2011.  It's
18 Bates-labeled BLOOM_76859, and I just direct your
19 attention to your email at the bottom.
20         Let me know when you're done with this
21 review, sir.
22     A.  Of this very first document?
23     Q.  Yes.
24     A.  Yes.  Okay.
25     Q.  Just directing your attention to the email

CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner          Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

1  between GGAM and Bloomberry; correct?
2      A.  Yes.
3      Q.  And just directing your attention to the
4  second bullet, it says:  "GGAM will be responsible
5  for the following activities of Solaire Manila."
6          Do you see that?
7      A.  Hang on a second.  No.  Where are you now?
8      Q.  The second bolded bullet.  It says:  "GGAM
9  will be responsible for the following activities of
10 Solaire Manila."
11         Do you see that?  Right there.
12     A.  Oh.  Yes.
13     Q.  There's a reference to a proprietary
14 Cantor gaming technology.
15         What was that?
16     A.  That was an entity that Cantor -- I don't
17 know how to describe it, if it was a subsidiary or
18 whatever it was.  It was a technology gaming
19 company.  It was early in the sports wagering,
20 opening the sports wagering market, and it was
21 utilizing their proprietary trading algorithms and
22 capabilities to sports wagering.
23     Q.  And that Cantor Gaming was a Nevada-based
24 entity?  Do I have that right?
25     A.  I believe so.

CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner          Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

1      Q.  And Solaire -- did Solaire ever use the
2  proprietary Cantor Gaming technology referenced
3  here?
4      A.  No.
5      Q.  Okay.  Just, if you go down to the bullet
6  entitled "GGAM Management Staffing," there's a
7  reference to "participation on an as-needed basis of
8  all GAM principals and staff."
9          Is that a reference -- is the use of the
10 word "GAM," do you know one way or another,
11 intentional there rather than a typo?
12         MR. PASCUCCI:  Objection.  Calls for
13 speculation.
14     A.  I don't know.
15         BY MR. PERRY:
16     Q.  Same question on the last bullet, "GAM
17 development and management fees," do you know
18 whether that's a typo or purposeful reference to the
19 GAM organization?
20         MR. PASCUCCI:  Calls for speculation.
21     A.  I don't know.
22         MR. PERRY:  Why don't we take a break?
23         EVEREST TECHNICIAN:  We are going off the
24 record.  The time is approximately 10:09 a.m.
25         (Brief recess.)

CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

**Page 50**

1  Q. Okay. So sometime after this initial
2  stage of the process, there was an in-person meeting
3  in Manila; right?
4  A. Yes.
5  Q. And do you recall who attended the
6  in-person meeting in Manila?
7  A. I believe it was Brad Stone and Garry
8  Saunders. I think it was the two of them, but I
9  don't remember.
10  Q. You didn't attend personally; correct?
11  A. I don't believe so, no.
12  Q. And do you -- are you aware of any
13  in-person negotiations in the United States for the
14  MSA?
15  A. I don't recall.
16  Q. Are you aware of any instances where BRHI
17  or -- strike that.
18      Are you aware of any instances where
19  Bloomberry personnel were in the United States while
20  negotiations were occurring?
21      MR. PASCUCCI: Objection. Calls for
22  speculation.
23  A. I don't recall.
24      BY MR. PERRY:
25  Q. And is it -- where was the MSA signed?

**Page 51**

1  A. I don't recall.
2  Q. Was there a signing ceremony in Manila
3  that you attended?
4  A. There was a ceremony in Manila.
5  Q. And do you recall --
6  A. Yeah, but I don't -- I don't remember what
7  that ceremony was. I don't remember if it was a
8  signing ceremony.
9  Q. Okay.
10  A. But I do remember a ceremony in Manila.
11  Q. And do you -- were you at that ceremony?
12  A. I was.
13  Q. Who else on the GGAM side was at that
14  ceremony?
15  A. I don't recall.
16  Q. And you're not aware of any signing
17  ceremony in the United States; right?
18  A. No.
19  Q. Switching gears a little bit, who
20  negotiated the Equity Option Agreement from the GGAM
21  side?
22      MR. PASCUCCI: Objection.
23  A. I don't recall. I don't recall.
24      BY MR. PERRY:
25  Q. Do you recall there being any negotiation

**Page 54**

1      BY MR. PERRY:
2  Q. Is that your signature on the second page
3  of the document, sir?
4  A. Yes.
5  Q. Okay. Can you identify this document?
6  A. It says it's a Notice of Exercise.
7  Q. And do you believe this to be the Notice
8  of Exercise of the equity option granted in the
9  Equity Option Agreement between Prime Metroline,
10  Bloomberry, and Global Gaming Philippines?
11  A. I believe so.
12  Q. And just drawing your attention to the
13  second page, there's a reference to a counsel John
14  Maynard Autotubo.
15      Who is that?
16  A. I don't know.
17  Q. There's a fax line, if you look at the top
18  that says "Weidner," and it has a phone number
19  there.
20      Is that a residence of yours?
21      Can you tell?
22  A. No.
23  Q. It's a Montana -- I believe it to be a
24  Montana phone number. Did you have a residence in
25  Montana in December of 2012?

**Page 55**

1  A. Yes.
2  Q. And do you believe, based on the fax line
3  and your signature, that you would have faxed your
4  Notice of Exercise from your residence in Montana in
5  December of 2012?
6      MR. PASCUCCI: Objection.
7  A. 406 is the area code there. I did not
8  recognize it when I read it. So it appears to be,
9  yes.
10      BY MR. PERRY:
11  Q. Who currently owns the shares granted
12  under the Equity Option Agreement?
13      MR. PASCUCCI: Objection.
14  A. I don't know.
15      BY MR. PERRY:
16  Q. The Equity Option Agreement was exercised
17  by Global Gaming Philippines.
18      Do you have any reason to believe that the
19  ownership of the Shares has been subsequently
20  transferred to some entity other than Global Gaming
21  Philippines?
22  A. No.
23  Q. And I believe I asked this question before
24  and I got a direction on the answer, but it's in my
25  outline and I'll ask it again. If there's a similar

1   A.   Yes.
2   Q.   And disputes would be arbitrated in
3   Singapore; right?
4   A.   Yes.
5        (Defendants' Exhibit 2008 was marked.)
6   Q.   Before you is Deposition Exhibit 2008.  It
7   is email chain from -- the top email -- the top
8   substantive email is Benny Tan to Kevin Russell at
9   Cantor.  And I'd just note you're copied on the
10  email.  The email is quite lengthy.
11       My first question is:  Who is Kevin
12  Russell?
13  A.   I don't know.
14  Q.   And it says -- it starts:  "Kevin, I've
15  discussed your draft with the Bloomberry team.  It's
16  our conclusion that your draft Management Services
17  Agreement, marked as GGAM draft June 2011, is
18  materially different from the Draft Agreement that
19  we had agreed to in Manila."
20       Do you see that?
21  A.   Yes.
22  Q.   And did -- I think you had testified
23  earlier that there was an initial stage of
24  negotiations where it was -- it was primarily you,
25  Mr. Saunders, Mr. Stone, and an attorney from

1   Las Vegas with expertise in hotel management
2   agreements, and then that evolved later to include
3   Cantor personnel.
4        Did that happen around this time after the
5   initial meeting in Manila?
6   A.   I'm only prompted by the dates here.  I
7   wouldn't independently recall that.
8   Q.   Okay.  It says -- if you go a little bit
9   further down -- "we were assured by Brad, Garry, and
10  Jon that we had agreement on the business terms."
11       Do you see that?
12  A.   Yes.
13  Q.   Was Mr. Rein in Manila for the negotiation
14  session that you had talked about earlier?
15  A.   I don't recall.
16  Q.   Do you recall there being a draft
17  agreement served up in the process that -- that
18  raised many more issues subsequent to the Manila
19  meeting and caused some consternation on the
20  Bloomberry side?
21       MR. PASCUCCI:  Objection.
22  A.   Yes.
23       BY MR. PERRY:
24  Q.   If you go down to 17 -- Point 17 in
25  Mr. Tan's lengthy email.  He writes:  "Cantor

1   Fitzgerald has been given personality in this
2   agreement by being identified as a party entitled to
3   any communications that will be sent to GGAM, but we
4   are supposed to contract only with GGAM."
5        Do you see that?
6   A.   Yes.
7   Q.   And do you recall that issue coming up
8   during the negotiation of the Agreement?
9   A.   No.
10  Q.   And do you know, one way or another,
11  whether Cantor is entitled to communications under
12  the Agreement?
13  A.   No.
14  Q.   Do you -- are you aware of anybody
15  responding to Mr. Tan's email to suggest that the
16  contractual relationship would be with someone other
17  than GGAM?
18  A.   No.
19  Q.   Anybody object to his Point 17 here, that
20  you're aware of?
21  A.   I don't understand it.
22  Q.   Okay.
23  A.   So...
24  Q.   If you go to Paragraph 22, it
25  says:  "You've changed the governing law to

1   Philippine law to New York law.  This does not make
2   sense because this contract has no connection with
3   New York at all.  I'm not even sure if gambling is
4   legal under New York law, but the point is, all
5   material links relating to this agreement are in the
6   Philippines; e.g., this is a Philippine operation of
7   a Philippine corporation subject to strict
8   regulation by a Philippine regulator, PAGCOR."
9        Do you see that?
10  A.   Yes.
11  Q.   Did you disagree with Mr. Tan's statement
12  at the time that this contract has no connection
13  with New York at all?
14  A.   Repeat that again.
15  Q.   Did you agree or disagree with Mr. Tan's
16  statement that this contract has no connection with
17  New York at all at the time?
18  A.   I don't recall.
19  Q.   Okay.  Are you aware of anyone responding
20  to Mr. Tan with respect to Point 22 and explaining
21  to him the connection between New York and the MSA?
22  A.   I'm not aware.
23  Q.   And did you become involved at some point
24  after this communication to try and bridge the gap
25  on the remaining open points in the MSA?

1  provides to GGAM in order to memorialize what's due
2  on the 37.43 million that it provided?
3      A.  Cantor performs the accounting services.
4  So the accounting services of GAM overall, a
5  statement comes that, among those accounting
6  processes, there is a -- part of that relates to the
7  37 million advanced as relates to GGAM.
8      Q.  Okay.  And do you know -- does the
9  37.43 million -- well, strike that.
10         Was the 37.43 million contributed as a
11 loan or a contribution of capital by the Cantor
12 partner in GGAM?
13     A.  I don't know.
14     Q.  Okay.  And I think I asked you this, and
15 I'm sorry if I did.
16         Are you aware of any writing that sets
17 forth the terms of the 37.43 million, either loan or
18 contribution of capital?
19         MR. PASCUCCI:  Objection.
20     A.  I don't recall.
21         BY MR. PERRY:
22     Q.  And just as a practical matter, if
23 tomorrow GGAM was paid $190 million in consideration
24 for the Equity Option Shares, do you have any
25 understanding of how that would be distributed as

---

1  between -- as between GAM and Cantor?
2      MR. PASCUCCI:  I'm going to object and
3  instruct not to answer.  I think this is the matter
4  that is subject to the protective order motion that
5  was just granted and is beyond the permissible scope
6  of discovery.
7      MR. PERRY:  Well, what I'm trying to
8  figure out is if -- can we excuse the witness?
9      MR. PASCUCCI:  Excuse the witness?
10     (Overlapping speakers.)
11     MR. PERRY:  Let's go off the record.
12     (Comments off the record.)
13     EVEREST TECHNICIAN:  We are going off the
14 record.  The time is approximately 12:07 p.m.
15     (Brief recess.)
16     EVEREST TECHNICIAN:  The time is
17 approximately 12:12 p.m.
18     We are back on the record.
19     BY MR. PERRY:
20     Q.  So I just want to be clear for the record.
21 I'm not asking about the GGAM Netherlands entity.
22 I'm not asking about how the flow of funds will be
23 structured for tax purposes.
24     All I want to know is -- this is my
25 question to you, sir -- is if there were a payment

---

1  tomorrow to GGP on account of the Option Shares, how
2  would that be split between the GAM entity and the
3  Cantor entity?  That's my question.
4      MR. PASCUCCI:  So I'll voice the same
5  objection.  Counsel and I have had a discussion off
6  the record, and you can answer the question to the
7  extent of your knowledge of it.  But I do object
8  that, to the extent this is calling for distribution
9  of funds, it is getting into the tax issue that is
10 not appropriately part of the scope of discovery in
11 this case.  I'm not instructing you not to answer.
12     A.  The Cantor advances, whatever to the
13 extent that they are, depending on what is net of
14 the award or the collection or whatever would come
15 out first, and then whatever is left is shared
16 50/50.
17     BY MR. PERRY:
18     Q.  Okay.  Yeah.  Does interest accrue on the
19 Cantor piece that comes out first?
20     MR. PASCUCCI:  Same objection.
21     You can answer, if you know.
22     A.  At a certain period, yes.  From a certain
23 period, yes.
24     BY MR. PERRY:
25     Q.  And what's the period?

---

1      A.  I don't recall.
2      Q.  Is interest currently accruing, or has it
3  stopped now?
4      A.  It continues to accrue.
5      Q.  I see.  And I guess I'm -- why did it
6  begin to accrue at a certain period?
7      A.  When the period of time became so long
8  here, it was only fair that there be an interest
9  related.  It was a contribution, but we had a
10 conversation, and we agreed that -- I mean, they are
11 advancing for the litigation.  So a cost of money,
12 interest rate would accrue.
13     Q.  I see.  Okay.  And just as to the equity
14 contribution, do you know -- do you know when that
15 agreement was struck?
16     A.  I don't know.
17     Q.  And I think you had just said in your
18 answer it was a contribution.
19     Do you -- and I had asked before whether
20 the $37 million capital infusion was structured as a
21 contribution of equity or capital or a loan.  I
22 think you said you didn't know.
23     Is it your belief that it -- was it a
24 contribution of capital by the Cantor entity?
25     A.  I don't know how it's characterized, and

Case 1:21-cv-02655-LGS-SN  Document 387-62  Filed 03/10/23  Page 6 of 6

CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner  Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1  so I'm reluctant to testify to something I just
 2  don't know.
 3       Q.   Okay.
 4            MR. PERRY:  So I'm going to pass the
 5  witness to Ms. Fissell.
 6            (Comments off the record.)
 7                      EXAMINATION
 8            BY MS. FISSELL:
 9       Q.   Good afternoon, Mr. Weidner.
10       A.   Good afternoon.
11       Q.   Could you go over your work history, where
12  your career began and all the various positions
13  you've held?
14       A.   I finished graduate school.  I taught
15  for 2.5 years at a place called Paul Smith's
16  College.  I was recruited from there by Marriott
17  Hotels.  I spent seven years at Marriott Hotels.  I
18  was recruited as from being the General Manager of
19  the Houston Marriott to come to Atlantic City to go
20  to work for Caesars.  That's 1979.
21            I worked for Caesars for a little over
22  two years, and then I went to Pratt Hotel
23  Corporation that had the Sands in Atlantic City.  I
24  went -- I became President of Pratt, developed
25  hotels in the Caribbean and other places and
```

CONFIDENTIAL - Attorney's Eyes Only
Deposition of William P. Weidner  Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

```
 1                  REPORTER'S CERTIFICATE
 2
 3            I, Dawn K. Larson, Registered Diplomate
 4  Reporter, Certified Realtime Reporter, Certified
 5  Realtime Captioner, and Notary Public, do hereby
 6  certify that previous to the commencement of the
 7  examination, the deponent was duly sworn by me to
 8  testify to the truth.
 9            I further certify this deposition was
10  taken in shorthand by me at the time and place
11  herein set forth and thereafter reduced to
12  typewritten form, that the foregoing constitutes a
13  true and correct transcript.
14            I further certify that I am not related
15  to, employed by, nor of counsel for any of the
16  parties or attorneys herein, nor otherwise
17  interested in the result of the within action.
18
19                    _____
20
21                    Dawn K. Larson, MBA, RDR, CRR, CRC
                      Notary Public
22
23
24
25
```