```
 1    UNITED STATES DISTRICT COURT
 2    SOUTHERN DISTRICT OF NEW YORK
 3    - - - - - - - - - - - - - - - - - -x
                                         :
 4    GLOBAL GAMING PHILIPPINES, LLC,    :
                                         :
 5         Plaintiff,                    :
                                         :
 6         v.                            : Case No.
                                         : 21 Cv. 2655
 7    ENRIQUE K. RAZON, JR.;             : (LGS)(SN)
      BLOOMBERRY RESORTS AND HOTELS INC.;:
 8    SURESTE PROPERTIES INC.;           :
                                         :
 9         Defendants.                   :
                                         :
10    - - - - - - - - - - - - - - - - - -x
11              REMOTE VIDEOTAPED DEPOSITION OF
                       GARRY W. SAUNDERS
12                      April 22, 2022
13         REMOTE VIDEOTAPED DEPOSITION OF GARRY W.
      SAUNDERS, produced as a witness at the instance of
14    the Defendants, and duly sworn remotely, was taken
      in the above-styled and numbered cause on April 22,
15    2022, from 9:05 a.m., (PST) to 12:58 p.m., (PST),
      remotely before Dawn K. Larson, RDR, CRR, reported
16    by machine shorthand, pursuant to the Rule 30 of the
      Federal Rules of Civil Procedure and the provisions
17    stated on the record.
```

---

**Page 44**

1  A.  I knew she worked in the financial area of
2  ICTSI, the port company.
3  Q.  And did you have any understanding of
4  Mr. Alarilla or Mr. Almeda's role?
5  A.  I don't recall knowing much specifically
6  other than the fact that he would have had them to
7  participate.
8  Q.  And what were the -- after you left Manila
9  and came back, what were the next steps in the
10 negotiation?
11 A.  The next meeting that was held after that,
12 I burst an eardrum on the plane flight back.  So on
13 the follow-up trip, I still couldn't travel.  So the
14 next time there was a trip, it was between -- it was
15 with Brad and John.
16 Q.  And you recall when in time that was,
17 relative to the first trip?
18 A.  No, I don't.
19 Q.  So two meetings in Manila to negotiate.
20      Any additional in-person, face-to-face
21 negotiations that you recall before the MSA was
22 signed?
23 A.  I can't recall.  There could have been a
24 third meeting, but I can't recall.
25 Q.  Okay.  You recall any meetings in the

*Perry Decl. Ex. 63*

---

**Page 45**

1  United States between GGAM personnel and the Solaire
2  side to negotiate the MSA?
3  A.  There were -- over the course of time,
4  there were phone calls, and I can't remember how
5  many, but there was a -- it was a reasonably long
6  period, I think, to finalize the contract.
7  Q.  Right.
8  A.  And so there was a lot of ongoing activity
9  with John and Brad probably taking the stronger lead
10 on our side.
11 Q.  Okay.  So on your side, the primary
12 negotiators were John -- and he was based in New
13 York; right?
14 A.  Correct.
15 Q.  And Mr. Stone.  He was based in Las Vegas;
16 right?
17 A.  Yes.
18 Q.  Okay.  And who were the primary
19 negotiators on the other side in this, the
20 subsequent negotiations, to your recollection?
21      MR. PASCUCCI:  Objection.  Asked and
22 answered.
23 A.  I would say that the people that were more
24 visible were Estella and Benny, Benny Tan.

---

**Page 46**

1       BY MR. PERRY:
2  Q.  There was a -- you recall that there was a
3  signing ceremony in Manila?
4  A.  Yes.
5  Q.  Did you attend the signing ceremony?
6  A.  Yes.
7  Q.  Was it at the Shangri-La Hotel?
8  A.  I don't recall which hotel.
9  Q.  Who else, on the GGAM side, to your
10 recollection, attended the signing ceremony?
11 A.  I think Brad did, but I can't say that for
12 sure.  And Bill.  I'm pretty sure Bill was there.
13 Q.  Was Mr. Rein there?
14 A.  I can't recall.
15 Q.  Do you recall during the negotiations the
16 issue of whether GGAM could assign the option to
17 purchase an interest in Solaire to Cantor coming up
18 or being negotiated?
19      MR. PASCUCCI:  Object to the form.
20 A.  I'm sorry.  Could you repeat that?
21      BY MR. PERRY:
22 Q.  Do you recall -- during the negotiations,
23 do you recall the issue of whether GGAM could assign
24 the option to purchase a 10 percent interest in
25 Solaire to Cantor coming up or being negotiated?

**Page 56**

1  BY MR. PERRY:
2  Q. And you and Mr. Stone and Mr. Weidner
3  provided management services from Nevada as well;
4  right?
5  A. Yes.
6  Q. And at times you provided management
7  services abroad, for example, in Asia; right?
8  A. Yes.
9  Q. And did you -- did there come a time where
10 you had your assistant Ms. Parker attempt to create
11 a calendar that detailed the management services
12 provided?
13 A. A calendar to show when things took place?
14   (Overlapping speakers.)
15 Q. Yeah. It'll be easier. Let me just get
16 the document rather than asking questions.
17 A. Okay.
18   (Comments off microphone.)
19   (Defendants' Exhibit 2025 was marked.)
20 Q. Before you is Deposition Exhibit 25. It's
21 a color copy of a calendar that was presented in the
22 arbitration. There's a reference at the top, says:
23 "The calendar was prepared by Claimants' counsel
24 based on a review of, one, the travel dates of GGAM
25 principals and other GGAM personnel, as recorded and

**Page 57**

1  documented by GGAM's administrative assistant, Kathy
2  Parker."
3   Do you recall Ms. Parker undertaking that,
4  that project?
5  A. Yes. Yes, I do.
6  Q. And if you could take a moment to review
7  the document, my question to you is, does this
8  represent GGAM's best effort to memorialize its
9  physical presence in Manila and its work for Solaire
10 on behalf of BRC outside of Manila and Las Vegas?
11   MR. PASCUCCI: Object to the form.
12 A. Yes. I think the intention was to show
13 specific days that we were there, physically, and
14 then also to show days where there is the
15 communications and activities taking place that
16 could be related to their -- to GGAM and Solaire
17 business.
18   BY MR. PERRY:
19 Q. Do you believe GGAM performed a
20 substantial portion of its services under the MSA in
21 the Philippines?
22 A. What do you mean by "substantial"?
23 Q. More than 15 percent.
24 A. Probably that the 15 to 20 percent would
25 have been the amount of time we would have spent on

**Page 58**

1  the ground in the Philippines.
2  Q. And when you say "on the ground," you mean
3  you, Mr. Stone, Mr. Weidner, Mr. Rein? You --
4  strike that.
5   You mean -- for on the ground, you mean
6  you, Mr. Stone, and Mr. Weidner?
7  A. Generally. Generally, yes.
8  Q. Okay. And then, Mr. French, as I
9  understand it, was the COO of the property?
10 A. Yes.
11 Q. And Mr. French is somebody that GGAM
12 hired?
13 A. We had nominated him for the position.
14 Mr. Razon liked him and agreed, and he was part of
15 the -- he's on the payroll of the property.
16 Q. Okay. But he is somebody that you would
17 communicate with regularly about what was going on
18 at Solaire?
19 A. Yes.
20 Q. And about how frequently would you talk to
21 Mr. French when he was in his role as COO?
22 A. Talked specifically, quite often, quite
23 often, and also email traffic, texts, Skype.
24 Q. Okay. Is it fair to say Mr. French was
25 GGAM's eyes and ears on the site on a daily basis?

**Page 59**

1  A. He was the --
2   MR. PASCUCCI: Object to the form.
3  A. He was the primary person, the most senior
4  person that we had nominated for the Property.
5   BY MR. PERRY:
6  Q. Would you characterize him as GGAM's eyes
7  and ears?
8   MR. PASCUCCI: Object to the form.
9  A. I would characterize him as GGAM's in
10 Mr. Razon's eyes and ears.
11   (Comments off microphone.)
12   BY MR. PERRY:
13 Q. Why don't you go back to your declaration,
14 Paragraph 48. In the second sentence, you
15 write: "We were to perform all of our services
16 under the MSA through the Management Team and
17 through the COO. It was effectively our eyes and
18 ears on-site on a daily basis."
19   Was that true and correct testimony when
20 you provided it?
21 A. Yes.
22 Q. And just going to Paragraph 73 of the
23 document. Last sentence, you write: "To the extent
24 we were not physically in Manila" --
25 A. I'm sorry. Which paragraph here?

1  Q. Paragraph 73, last sentence.
2  A. Okay. Thank you.
3  Q. "To the extent we were not physically in
4  Manila, we communicated on a daily or near-daily
5  basis with the executives on the Management Team,
6  primarily through Mr. French, regarding the most
7  pressing issues requiring our input or resolution."
8      Is that true and correct testimony when
9  you gave it?
10 A. Yes.
11 Q. And to be clear, Mr. French was living and
12 working in Manila; right?
13 A. Yes.
14 Q. And Mr. French was someone that GGAM --
15 the GGAM principals had confidence in; right?
16 A. Correct.
17 Q. Mr. French was somebody that the GGAM
18 principals supported throughout the Management
19 Services Agreement period with Bloomberry; right?
20     MR. PASCUCCI: Object to the form.
21 A. Yes.
22     BY MR. PERRY:
23 Q. If you -- I'm going to put before you
24 Exhibit 2007, which is a copy of the Management
25 Services Agreement.

1  A. I don't think it was required by the MSA,
2  but I'd have to read what you're going to show me.
3      BY MR. PERRY:
4  Q. Why don't you go back to your Declaration,
5  Paragraph 106.
6  A. Okay. It's even me saying it.
7  Q. So Paragraph 106 reads: "This total
8  amount, 242,474, reflect expenses we incurred
9  performing work related to the MSA services, and
10 45,557 reflect expenses we incurred performing work
11 on behalf of Bloomberry Resorts Corp. but outside
12 the scope of the MSA, e.g., attending investors
13 conference in November and December -- November 2012
14 and December 2012 and traveling to Buenos Aires,
15 Argentina, to investigate and evaluate Mr. Razon's
16 potential business opportunity in February of 2013."
17     Was that true and correct testimony when
18 you gave it?
19 A. I believe so.
20 Q. Okay. There's a reference to some travel
21 to Buenos Aires.
22     What do you recall about that project?
23 A. Mr. Razon has a port operation in
24 Argentina. It is one. So it's a place where he
25 already was doing business, and he had a particular

1       REPORTER'S CERTIFICATE
2
3       I, Dawn K. Larson, Registered Diplomate
4  Reporter, Certified Realtime Reporter, Certified
5  Realtime Captioner, and Notary Public, do hereby
6  certify that previous to the commencement of the
7  examination, the deponent was duly sworn by me to
8  testify to the truth.
9       I further certify this deposition was
10 taken in shorthand by me at the time and place
11 herein set forth and thereafter reduced to
12 typewritten form, that the foregoing constitutes a
13 true and correct transcript.
14      I further certify that I am not related
15 to, employed by, nor of counsel for any of the
16 parties or attorneys herein, nor otherwise
17 interested in the result of the within action.
18
19                    _____
20                    Dawn K. Larson, MBA, RDR, CRR, CRC
                      Notary Public
21
22
23
24
25