```
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4   --------------------------------X
                                      *
 5   GLOBAL GAMING PHILIPPINES, LLC,  *
                                      *
 6              PLAINTIFF,            *
                                      *
 7        vs                          *   INDEX NO:
                                      *   21-cv-2655
 8   ENRIQUE K RAZON, JR.; BLOOMBERRY *      (LGS)
     RESORTS AND HOTELS, INC, SURESTE *
 9   PROPERTIES, INC; COLLINGWOOD     *
     INVESTMENT COMPANY LIMITED;      *
10   COLLINGWOOD OIL & GAS HOLDINGS,  *
     LLC; COLLINGWOOD USA, INC;       *
11   COLLINGWOOD BROOKSHIRE USA, INC; *
     COLLINGWOOD APPALACHIAN MINERALS,*
12   LLC; ASIA ARROW LIMITED; RIZOLINA*
     LLC; ENSARA LLC; NOZAR LLC; BOWERY*
13   BAY LLD; CAMPANILLA LLC; FESARA  *
     LLC; and 11 ESSEX STREET REALTY  *
14   LLC,                             *
                                      *
15              DEFENDANTS.           *
     --------------------------------X  *
16
17            *** HIGHLY CONFIDENTIAL ***
18                VIDEOTAPED DEPOSITION
19                         of
20                   JONATHAN REIN
21                 New York, New York
22                Tuesday, May 17, 2022
23
24   Mary Agnes Drury, RPR
25
```

Perry Decl. Ex. 65

---

```
 1        JONATHAN REIN - HIGHLY CONFIDENTIAL
 2   in the MSA negotiations?
 3        A.   To the best of my recollection, it
 4   was the GGAM entities, so that would be Global
 5   Gaming Asset Management and its subsidiary such
 6   as Global Gaming Philippines.
 7        Q.   It wasn't representing Cantor,
 8   right?
 9        A.   To the best of my recollection the
10   clients were Global Gaming clients.
11        Q.   When you say "Global Gaming
12   clients," is that GGAM and GGP?
13        A.   Correct.  It would include GGAM and
14   GGP.  I don't recall when GGP was formed, but
15   the -- my recollection and understanding as I
16   sit here today is that Paul Hastings was
17   representing GGAM Global Gaming Philippines,
18   and possibly other GGAM entities in the chain.
19        Q.   Who were the primary negotiators
20   from your perspective on the BRHI and SPI side?
21        A.   From a counsel standpoint, it was a
22   gentleman named Benny Tan.  I'm not sure if
23   Benny is his formal first name, but he is known
24   as Benny Tan, T-a-n.
25             And then from a business layperson
```

---

```
 1        JONATHAN REIN - HIGHLY CONFIDENTIAL
 2   -- that the MSA obligations had been assigned.
 3             There may have been discussion of
 4   EOA as well, but I don't specifically recall
 5   that.
 6        Q.   You recall that the EOA had a
 7   provision in it that forbade assignment to
 8   Cantor, among others?
 9        A.   I -- it's been a long time, I don't
10   recall what's in the EOA.  If you'd like to
11   show me some language, I can tell you what it
12   says.
13        Q.   Do you recall any instance where
14   GGAM personnel met with BRHI or SPI personnel
15   in the United States for purposes of
16   negotiating the MSA?
17        A.   I can only testify to what I know,
18   and I did not meet with BRHI -- or at least I
19   do not recall meeting with BRHI or SPI
20   personnel in person in the United States for
21   the purpose of negotiating the MSA.
22        Q.   Did you meet with Ms. Occena or
23   Mr. Almeda in Las Vegas in October 2011?
24        A.   I can't be certain of the date, but
25   I did meet with Ms. Occena and possibly
```

---

```
 1        JONATHAN REIN - HIGHLY CONFIDENTIAL
 2        44-Pages was marked for identification.)
 3   BY MR. PERRY:
 4        Q.   Before you, Mr. Rein, is a document
 5   that's been marked as Exhibit 2038.  It's an
 6   Amended and Restated Limited Partnership
 7   Agreement between Global Gaming Asset
 8   Management dated as of July 27, 2011.
 9             Are you familiar with this document,
10   sir?
11        A.   When you say "familiar with it,"
12   what do you mean?
13        Q.   Is it a document you've reviewed
14   before?
15        A.   I have seen this document in the
16   past.
17        Q.   Did you ever have occasion when you
18   were employed by Cantor to review the terms of
19   this agreement?
20        A.   I don't specifically recall, but
21   perhaps.
22        Q.   If you flip to Section 4.04, there
23   is a section entitled "Financial Advisor."
24   "Cantor Fitzgerald & Co or its affiliates shall
25   be the exclusive financial adviser to the
```

**Page 39**

JONATHAN REIN - HIGHLY CONFIDENTIAL

partnership," and then it goes on to describe some of the financial advisory services.

　　Was one of your roles and responsibilities to provide the financial advisory services set forth in Section 4.04 to GGAM?

　　A.　I believe it's true that I would have been a person providing these sorts of services on behalf of Cantor Fitzgerald to GGAM.

　　Q.　By the way, were you a Cantor Fitzgerald & Co employee?

　　A.　You know, I don't know which entity I was an employee of. I don't think the distinction was important to me. I was a Cantor Fitzgerald employee, whether that's CF & Co or one of the other entities, I don't know.

　　Q.　Just directing your attention to 4.06?

　　A.　I'm there.

　　Q.　That's entitled, "Support Services Agreement." Do you know whether in fact a Support Services Agreement was ultimately executed between Cantor and GGAM?

**Page 55**

JONATHAN REIN - HIGHLY CONFIDENTIAL

　　MR. AINSWORTH:　Objection. Calls for a legal conclusion.

　　THE WITNESS:　So I've read paragraph 34, and I understand I believe what I mean in paragraph 34. You made a difference assertion though that the EOA has a prohibition.

　　I don't think this addresses the EOA prohibition, this addresses an event that -- or a set of conditions that were being asserted by your client and your colleagues did not, in fact, occur.

BY MR. PERRY:

　　Q.　And would you agree that GGAM, not Cantor exercised the option and paid for the shares?

　　A.　Yes.

　　Q.　And that was a payment of roughly $37 million?

　　A.　That is my recollection.

　　Q.　And that $37 million ultimately came from an investment of funds by Cantor into the GGAM entity, right?

　　A.　When you say "ultimately came from,"

**Page 56**

JONATHAN REIN - HIGHLY CONFIDENTIAL

I'm not sure what you mean.

　　Q.　How did GGAM get the 37 million bucks to exercise the option?

　　A.　GGAM's capital came from GGAM's joint venture partners and the bulk of the capital came from, you know, a Cantor entity acting on behalf of the Cantor JV partner.

　　Q.　Did any of the capital come from any entity other than the Cantor JV partner?

　　　MR. AINSWORTH:　Objection.

　　　THE WITNESS:　I don't recall.

　　And to the degree that money is fungible, I just don't know.

　　Q.　Well, I guess what I'm driving at is did Mr. Weidner, Mr. Stone, Mr. Saunders make a contribution alongside the Cantor JV partner, either individually or through their entity GAM that you recall?

　　A.　They may have contributed capital at other points in time, but I don't know specifically when Cantor made a $37 million investment as you said they did, whether there was a contemporaneous investment by any of them.

**Page 57**

JONATHAN REIN - HIGHLY CONFIDENTIAL

　　Q.　And do you know whether the Cantor piece of the investment was a loan or a contribution of capital?

　　A.　I believe it was a contribution of capital, but I couldn't swear that that's definitely the case.

　　Q.　Do you know whether Cantor has prepared a writing that it submitted to GGAM detailing what GGAM owes to Cantor in connection with the $37 million contribution?

　　A.　I don't recall.

　　Q.　Do you know whether Cantor's contribution of funds to GGAM bears interest?

　　A.　I don't recall.

　　Q.　And as of the time that you left Cantor in, I believe it was 2018, do you know who owned the shares granted by the Equity Option Agreement?

　　A.　Well, my understanding is that the shares are supposed to be owned by a GGAM affiliate, I believe, by Global Gaming Philippines. Whether we actually -- whether GGP or any of the other GGAM affiliates actually have the benefits of ownership I think

JONATHAN REIN - HIGHLY CONFIDENTIAL
previously marked for identification.)
BY MR. PERRY:
Q. This is a document that was previously marked as 2008, it's dated June 9, 2011, bears the Bates stamp BRHI 0012522.
And if you look at comment 17 Mr. Tan writes, "Cantor Fitzgerald has been given personality in this agreement by being identified as a party entitled to any communications that will be sent to GGAM, but we are supposed to contract only with GGAM."
Do you see that?
A. I do.
Q. Do you recall Mr. Tan objecting to Cantor being a notice party in the MSA?
A. Not specifically no, I don't recall.
Q. And do you -- did there come a time when you were asked not to participate in the roadshow on behalf of GGAM?
A. On behalf of GGAM, yes, I do generally recall that I was asked not to participate in roadshow meetings specifically, roadshow meetings.
Q. And who asked -- what is your

JONATHAN REIN - HIGHLY CONFIDENTIAL
general recollection of that subject?
A. My general recollection is that Brad Stone and Garry Saunders -- or at least Mr. Stone, but I believe both of them, conveyed to me that they had asked that I be allowed to attend roadshow meetings, and that the reaction from Bloomberry was that they did not want me attending roadshow meetings.
Q. And what were you told by Mr. Stone and Mr. Saunders about why Bloomberry did not want you attending roadshow meetings?
A. I don't recall.
MR. PERRY: I think this is a good stopping point.
VIDEOGRAPHER: Time right now is 1:12 p.m., we're off the record.
(Whereupon, proceedings recessed for a lunch break and once again resumed.)
VIDEOGRAPHER: Time right now is 2:10 p.m. we're back on the record.
EXAMINATION BY
MS. FISSELL:
Q. Good afternoon, Mr. Rein.
A. Good afternoon.

C E R T I F I C A T E

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF ONONDAGA   )

I, Mary Agnes Drury, a Notary Public within and for the State of New York, do hereby certify:
That JONATHAN REIN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.
I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.
IN WITNESS WHEREOF, I have hereunto set my hand this 30th day of May, 2022.

_____
Mary Agnes Drury