## Page 1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - - - - -x
 3                                      :
     GLOBAL GAMING PHILIPPINES, LLC,    :
 4                                      :
              Plaintiff,                :
 5                                      :
          v.                            : Case No.
 6                                      : 21 Cv. 2655
     ENRIQUE K. RAZON, JR.;             : (LGS)(SN)
 7   BLOOMBERRY RESORTS AND HOTELS INC.;:
     SURESTE PROPERTIES INC.;           :
 8                                      :
              Defendants.               :
 9                                      :
     - - - - - - - - - - - - - - - - - -x
10            REMOTE VIDEOTAPED DEPOSITION OF
11                 BENNY TAN, VOLUME I
                      June 2, 2022
12
          REMOTE VIDEOTAPED DEPOSITION OF BENNY TAN,
13   produced as a witness at the instance of the
     Plaintiff, and duly sworn remotely, was taken in the
14   above-styled and numbered cause on June 2, 2022,
     from 8:58 a.m., (KST) to 3:18 p.m., (KST), remotely
15   before Dawn K. Larson, RDR, CRR, reported by machine
     shorthand, pursuant to the Federal Rules of Civil
16   Procedure and the provisions stated on the record.
```

**Perry Decl. Ex. 68**

## Page 44

```
 1   compliance officer.
 2        So in the context of being a corporate
 3   secretary, I have not been in a situation where my
 4   being corporate secretary in one of the companies
 5   where Mr. Razon has shareholdings or is a director
 6   or an officer of conflicts with another corporation
 7   that I am a corporate secretary of.
 8   Q.   I'm going to change the topic.
 9        In 2011, you were involved in
10   communicating with GAM regarding negotiation of a
11   Management Services Agreement for BRHI and Sureste;
12   correct?
13   A.   2011?  Yes.  As a lawyer, I rendered the
14   service of part of the team which negotiated the
15   terms of the Management Service Agreement with GGAM.
16   Q.   And with whom did you communicate on
17   GGAM's side?
18   A.   I communicated with their lawyers.  I
19   cannot recall the name, but it should be in the
20   email link.
21   Q.   Did you communicate with anyone at Cantor
22   Fitzgerald in 2011 regarding the negotiation of the
23   MSA?
24   A.   Cantor Fitzgerald, I challenged their
25   participation in the negotiation because we are
```

## Page 45

```
 1   dealing with GGAM, not with Cantor Fitzgerald, and
 2   they came back to explain that they were acting as
 3   service provider for GGAM.
 4        Yeah, so some people in Cantor
 5   communicated with me; I communicated with them in
 6   their capacity as service provider for GGAM.
 7   Q.   Do you recall who at Cantor you spoke
 8   with, communicated with?
 9   A.   I cannot recall, but, again, it should be
10   in the email links, trails.
11   Q.   Did you have telephonic communications
12   with anybody at GGAM in 2011?
13   A.   That's possible, but I cannot recall any
14   particular telephone communication with them.
15   Q.   Did you meet in person with anyone at GGAM
16   in 2011 before executing the MSA?
17   A.   Yes.  There were a couple of
18   person-to-person meetings with GGAM.
19   Q.   And where was that?
20   A.   I think in some hotel function rooms, or
21   some offices.  I cannot recall the location.
22   Q.   In which country?
23   A.   Here in the Philippines.
24   Q.   Did you come to the United States at all
25   in connection with negotiating the MSA?
```

## Page 46

```
 1   A.   No, I did not.
 2   Q.   Did you come to the United States in 2011?
 3   A.   No, I did not.
 4   Q.   Did you have any telephonic communications
 5   with anyone at Cantor leading up to the execution of
 6   the MSA?
 7   A.   I don't recall any.
 8   Q.   Did you meet in person with anyone at
 9   Cantor leading up to the execution of the MSA?
10   A.   If they were part of the GGAM delegation,
11   that's a possibility, but I cannot recall.
12   Q.   You were involved in negotiating the
13   Equity Option Agreement; correct?
14   A.   That's correct.  I am one of the lawyers
15   involved there.
16   Q.   And you communicated with a Mr. Ben Kaplan
17   at Cantor regarding the negotiation of that?
18   A.   I cannot recall.
19   Q.   Did you communicate with anyone at Cantor
20   regarding negotiating the Equity Option Agreement?
21   A.   I was negotiating with GGAM, so if Cantor
22   was involved, it was in their capacity as service
23   provider for GGAM.
24   Q.   Did you communicate with anyone at Cantor
25   in regarding the negotiating the Equity Option
```

## Page 51

1    A.   I am not aware that Prime received
2 compensation from BRC in connection with the -- its
3 transfer of shares to GGAM.
4    Q.   Do you know whether BRHI is subject to
5 personal jurisdiction anywhere in the United States?
6    A.   Do I know if BRHI is subject to
7 jurisdiction in the U.S.?
8      MR. PERRY: I'm going to object to -- hold
9 on, Benny.
10      I'm going to object to the question. And I
11 think, given that it's -- that it's a legal question,
12 I'm going to object. I'll allow the witness to answer
13 this question to the extent he knows, but we're not
14 going to have lawyer testimony on things like
15 jurisdiction and claims and the like.
16      I'll allow him to answer this, although I
17 don't know what the basis is for the answer, but we're
18 not going to go into extensive questioning that calls
19 for him to render legal opinions, Kevin.
20    A.   BRHI has no business in the United States,
21 so it is my opinion that U.S. courts do not have
22 jurisdiction over BRHI.
23      BY MR. AINSWORTH:
24    Q.   Is your answer the same with regard to
25 Sureste?

## Page 52

1    A.   The same thing: Sureste does not have
2 business in the U.S., so U.S. courts should have no
3 jurisdiction over Sureste.
4    Q.   Did you participate in any of the
5 roadshows regarding BRC's shares?
6    A.   I did not.
7    Q.   Do you know Mr. Hans Sicat?
8    A.   I have heard of him, but I do not know him
9 personally.
10    Q.   Have you ever met him?
11    A.   No, I have never met Hans Sicat.
12    Q.   Have you spoken with him?
13    A.   No, I have never spoken to him.
14    Q.   Did you have email correspondence with
15 him?
16    A.   I've seen emails where I am -- addressed
17 to me where his name appears. But at the moment
18 those emails were created, I was not conscious of
19 it. I was reviewing documents. I replied to emails
20 and saw -- I replied to emails sent to me, and it
21 happens that he is part of that email.
22    Q.   You're aware now that Mr. Sicat was the
23 President of the Philippine Stock Exchange in 2014;
24 correct?
25    A.   Yes, that is correct.

## Page 146

1           REPORTER'S CERTIFICATE
2
3      I, Dawn K. Larson, Registered Diplomate
4 Reporter, Certified Realtime Reporter, Certified
5 Realtime Captioner, and Notary Public, do hereby
6 certify that, previous to the commencement of the
7 examination, the deponent was remotely duly sworn by
8 me to testify to the truth.
9      I further certify this deposition was
10 taken remotely in shorthand by me and thereafter
11 reduced to typewritten form, that the foregoing
12 constitutes a true and correct transcript.
13      I further certify that I am not related
14 to, employed by, nor of counsel for any of the
15 parties or attorneys herein, nor otherwise
16 interested in the result of the within action.
17      In witness whereof, I have hereunto
18 affixed my hand and seal. My commission expires:
19 January 31, 2023.
20
21
22
23      Dawn K. Larson, MBA, RDR, CRR, CRC
       Notary Public
24
25