# Exhibit 5

# (Previously Filed under Seal at Dkt. 281-1)

# Exhibit D

| | |
|---|---|
| **From:** | Benny J. Tan <sjtan@picazolaw.com> |
| **Sent:** | Thursday, June 9, 2011 10:32 AM |
| **To:** | Razon, Enrique K. <ERazon@ICTSI.com> |
| **Cc:** | Chito Alarilla <jejalarilla@hotmail.com>; Occena, Estela T. <EOccena@ICTSI.com>; Donato Almeda <dalmehda@aol.com>; Benny J. Tan <sjtan@picazolaw.com> |
| **Subject:** | [Fwd: Re: Project Berry Draft MSA] |

I have sent this email to Kevin Russel with copy to Weidner, Garry, Brad, Jon, Tony Cabot, and their Paul Hastings lawyers.

-------- Original Message --------
    **Subject:** Re: Project Berry Draft MSA
       **Date:** Thu, 09 Jun 2011 22:27:00 +0800
      **From:** Benny J. Tan <sjtan@picazolaw.com>
         **To:** Russell, Kevin <KRussell@cantor.com>
         **CC:** eoccena@ictsi.com, weidnerb@gmail.com, gwsvegas@cox.net, brad.h.stone@gmail.com, "Rein, Jon" <JRein@cantor.com>, Acabot@lrlaw.com, rickkirkbride@paulhastings.com, QSingleton@LRLaw.com, jeffreymyers@paulhastings.com
**References:** <44397D24F0C50F439CE2BB582C14E6F107F9A51E@LAXEXCH8.phjw.paulhastings.net>
            <0824099B1CF6F0449BDAD79A8BE0B1FF01742FB3@TBPINFV0296.na.ad.espeed.com>

Kevin,

I have discussed your draft with the Bloomberry team. It is our conclusion that your draft Management Services Agreement (marked as "GGAM Draft June 2011") is materially different from the draft Agreement that we had agreed to in Manila. We do not want to negotiate terms and conditions which the parties have previously negotiated and agreed to. We were assured by Brad, Gary and Jon that we had an agreement on the business terms. We were told that your lawyers will only put in the definitions and other details which will not deviate from what has been agreed.

But this is not to be so. The draft that you sent has changed the following basic concepts which we have previously agreed on:

1. You have inserted back the "exclusive right, authority, and discretion" of GGAM which we have argued long and hard to remove. We have always insisted that the management rights of GGAM is <u>not exclusive</u> because the CEO has the right to change or revoke GGAM's decisions and acts. Mr. Weidner had even characterized the authority of the CEO here as "absolute control" in one of his emails on this matter.

2. We have emphasized that the CEO has the power to intervene and give direction to GGAM and the COO at anytime (although he will probably not exercise that if everything is well and good). So we had a simple provision saying that: "GGAM and the COO shall comply with the instructions and directions in relation to the Services and/or this Agreement issued by the CEO or his representatives." But in your new draft you have changed this provision to read:
"<u>To the extent such rights and responsibilities of the CEO are expressly set forth in this Agreement</u>, Global Gaming and the COO shall in all material respects comply with the instructions and directions in relation to the Services and/or this Agreement issued to them by the CEO or his authorized representative in connection therewith so long as the same would not cause Global Gaming and/or the COO to breach or default under the Standard of Care . . ."
This means that CEO cannot give instructions to GGAM and the COO unless it refers to "rights and responsibilities of the CEO expressly set forth in this Agreement." And since there is no enumeration of the rights and responsibilities of the CEO, ergo the this provision completely nullifies the previous agreement that

CONFIDENTIAL

BRHI_0012522
GGAM-SDNY-0046583

the CEO can give instructions to GGAM and the COO at any time.

3. In our draft we have carefully stated that "GGAM must act through the Management Team." GGAM is not suppose to be a separate organization within our Facilities. This concept has been swept aside in the many provisions inserted by GGAM which gives it authority over the Facilities without reference to the Management Team. (See 2nd paragraph of Clause 2.9; Clause 2.10, 2nd paragraph of Clause 5.1).

4. In our draft, the PAGCOR License, the BDO Loan, PAGCOR Lease (collectively the "Project Agreements") must be complied with by GGAM acting through the Management Team. In your draft you added a provision that we cannot agree to any changes to those Project Agreements that "conflict with this Agreement or adversely affect Global Gaming's rights under this Agreement or their ability to provide the Services". It makes this Agreement superior to the PAGCOR License, the BDO Loan and the PAGCOR Lease (the "Project Agreements"), which is opposite to what we intended.

5. In our previously circulated draft we had a specific Conflict of Interest Provision that: "GGAM shall not engage in any activity, which might conflict with the interest of the Owners under the Project Agreements." In your new draft you deleted this provision and added one requiring us to obtain a Non-Disturbance Agreement from our creditor banks such that they promise not to disturb GGAM's position in the Facilities when they foreclose on the loan. This will prevent us from obtaining additional financing!

6. The provision on financial and performance reports that will be submitted to the Owners has been qualified with "as determined by Global Gaming in its sole discretion".

7. You have added a list of items where GGAM shall have the right to incur cost and expenses without the Owner's prior written approval, even outside the budget.

8. In the payment of fees provision, you deleted the requirement that the payment of fees is made "after a verification is made of such invoice and its supporting papers".

9. Our agreement was clear that: "Taxes accruing on fees payable to GGAM shall be for the account of GGAM." But in your new draft you added a new provision requiring the payment of fees to GGAM to be "free and clear of any tax, exchange, VAT, transfer, withholding, deduction or similar charges" and you further provided that the responsibility to pay thoses taxes is solely that of the Owners. This is the exact opposite of what was agreed!

10. On the Bank Accounts, we have carefully provided that: "The bank requirement for Revenue Accounts to be subject to security arrangements under the BDO Loan shall be respected." In your new draft, you have added the qualification: "so long as Global Gaming is otherwise able to act in accordance with the Standard of Care." But as we previously explained we have really no choice here, the security of BDO is a given and we cannot qualify it for the benefit of GGAM.

11. We had previously agreed that in marketing, the patron or casino data base of GGAM shall remain to be its property. But the patron or casino <u>database generated from the operation of the Facilities</u> shall be the property of the Owner. In this new draft of yours, you added a new provision stating that: "any Guest Data developed for foreign and junket VIP play shall remain the sole property of Global Gaming." And then you limited the data that the Owner will own to "Guest Data generated from residents of the Philippines visiting the Facilities. This is a distortion of what was agreed.

12. In our draft, the Representations, Warranties and Covenants of the Owners were practically the same as those of GGAM. They were reciprocal. But now in your new draft, you have expanded the representations and warranties of the Owners to three (3) full pages long, while you did not change those of GGAM which remained 1/3 of a page long. You have for example, added representations like: "Owners have fully disclosed to Global Gaming all persons and entities with any form of interest, whether held directly or indirectly, in the Facilities and PAGCOR License;" and "Owners have not engaged or authorized any broker, investment banker,

CONFIDENTIAL

BRHI_0012523
GGAM-SDNY-0046584

or third party to act on behalf of Owners (either directly or indirectly) as a broker, finder, or advisor in connection with the transaction contemplated in this Agreement;" and the Owner has listed down in an Annex to the Agreement the the "Sources and Uses" of funds relating to this Project; and that Owners have complied with Money Laundering Law, the U.S Sanctions Laws administered by OFAC, and Anti-Corruption Laws. But all these additional repesentations and warranties are not made to apply to GGAM. Why?

13. We had provisions on the obligation of a party to respond to any request for information in connection with the preservation of gaming license and compliance with gaming regulations. That provision was reciprocal. Now you have added provisions designed solely to protect the gaming license of GGAM or its Affiliates. And the Owners and their Affiliates are now required to take or refrain from taking any action necessary to prevent a gaming license of GGAM or its Affiliates to terminate or not renewed. And this include allowing foreign gaming regulators of GGAM or its Affiliates to allow inspection of Owners and its Affiliates, and to provide information about their ownership, corporate structure, officers, directors, stocholders, partners, financing, transfer of interest, etc.

14. We had a long discussion on Indemnity: that as a general rule, Owners will indemnify GGAM, except in 3 instances: (a) gross negligence or willfull misconduct, (b) acts or omissions of GGAM or an Affiliate of GGAM in a transaction with an Affiliate of GGAM, and (c) actions by GGAM or its Affiliate that are outside the scope of their authority. You have tried to delete items (b) and (c) from the exclusion until I showed to you that these exclusions (b) and (c) were copied from your Tony Cabot's original draft Agreement that was sent to us. After that, we had an email indicating that you accepted our position. You even proposed the language. Now in your new draft, the exclusions (b) and (c) were inexplicably deleted, again. This covers two provisions, Clause 12.1 (indemnity by GGAM) and 12.2 (indemnity by the Owners).

15. You have added a provision requiring GGAM's prior written consent (which GGAM may grant or withhold in its sole and absolute discretion) before Owner can assign any rights or benefits under this Agreement. The provision for GGAM's assignment requires consent of the Owner too but without the qualification "at its sole and absolute discretion".

16. We had provided that GGAM may assign this Agreement to another Affiliate where Bill Weidner is the CEO. Now your provision states where he is a "senior officer". And you have added Brad Stone and Garry Saunders so that even if Bill is not there, the assignment will still be okay if Brad and Garry are there.

17. Cantor Fitzgerald has been given personality in this Agreement by being identified as a party entitled to any communications that will be sent to GGAM. But we are suppose to contract only with GGAM!

18. We have provided for the exercise price of the 10% equity Option and that it will expire if not exercised on Start Date. In your draft you have deleted these two important details. Instead you have provided for a draft Option Agreement as an attachment. Since we have not agreed on the draft option agreement, this will delay the signing of this Management Services Agreement.

19. You have added a new provision granting GGAM a right of first refusal if the Facilities will be sold or transferred.

20. You have added a new provision granting GGAM the first right to negotiate with the Owner if the Owner will establish or manage a new casino and/or hotel project.

21. Our provision on Non-Compete covers "GGAM or any of its directors, partners, officers or affiliates." In your new draft, the Non-Compete covers only: Global Gaming, and any of its Affiliates directly controlled by William Weidner."

22. You have changed the governing law from "Philippine law" to "New York law". This does not make sense because this contract has no connection with New York at all. I am not even sure if gambling is legal under New York law. But the point is all material links relating to this Agreement are in the Philippines, e.g. this is a

Philippine operation of a Philippine corporation subject to strict regulation by a Philippine Regulator (PAGCOR).

23. We had suggested a neutral venue for dispute resolution like Singapore. In your draft you have New York courts.

24. Estela is questioning how you define EBITDA and other financial concepts.

25. You have changed the Performance Standards.

This list is by no means exhaustive, but it clearly shows that the new GGAM draft Agreement that you sent is very different from the one that we have agreed in principle in Manila.

I am authorized to say that we decline to negotiate the whole agreement again. Our draft reflected that agreement that we have reached in the exchange of communications and emails and various meetings between Mr. Razon and Mr. Weidner, and between your team and ours. We have no inclination or patience to negotiate again based on your new draft.

We therefore urge you to go back to our draft.

Regards

Benny Tan

THIS IS A CONFIDENTIAL LAWYER-CLIENT COMMUN ICATION/ADVICE.


Russell, Kevin wrote:

> Estela/Benny, please find attached a revised draft of the Master Services Agreement. Please note that this draft remains subject to further internal review, including, but not limited to, our diligence review and tax analysis. I would appreciate it if you could forward this draft to other members of your team.
>
> Please let us know if you have any questions or comments. We look forward to working with you on this project.
>
> Regards,
>
> Kevin

```
CONFIDENTIAL: This e-mail, including its contents and attachments,
if any, are confidential. If you are not the named recipient
please notify the sender and immediately delete it. You may not
disseminate, distribute, or forward this e-mail message or
disclose its contents to anybody else. Copyright and any other
intellectual property rights in its contents are the sole property
of Cantor Fitzgerald.
     E-mail transmission cannot be guaranteed to be secure or
error-free. The sender therefore does not accept liability for any
errors or omissions in the contents of this message which arise as
a result of e-mail transmission. If verification is required
please request a hard-copy version.
     Although we routinely screen for viruses, addressees should
```

CONFIDENTIAL

check this e-mail and any attachments for viruses. We make no
representation or warranty as to the absence of viruses in this e-
mail or any attachments. Please note that to ensure regulatory
compliance and for the protection of our customers and business,
we may monitor and read e-mails sent to and from our server(s).

For further important information, please see
http://www.cantor.com/legal/statement

CONFIDENTIAL

BRHI_0012526
GGAM-SDNY-0046587