Exhibit 6

(Previously Filed under Seal at Dkt. 281-4)

# Exhibit H

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE UNITED
NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010) BETWEEN:

### GLOBAL GAMING PHILIPPINES, LLC

and

### GGAM NETHERLANDS B.V.

*(CLAIMANTS)*

- versus -

### BLOOMBERRY RESORTS AND HOTELS INC.

and

### SURESTE PROPERTIES, INC.

*(RESPONDENTS)*

---

## SUPPLEMENTAL DECLARATION OF JONATHAN D. REIN
## IN RESPONSE TO RESPONDENTS' REJOINDER

---

Subject to Arbitration Confidentiality Orders

I, Jonathan D. Rein, of 400 Chambers St., New York, NY 10282, United States of America, declare as follows:

1.  I make this Supplemental Declaration in response to new evidence Bloomberry presented with its Rejoinder Memorial of September 4, 2015.

2.  My Supplemental Declaration is given voluntarily.  The contents of this Supplemental Declaration are true and correct and based upon my personal knowledge.  The source of the statements made herein is my personal knowledge, except where stated or cited otherwise.

3.  I am a U.S. citizen over the age of 18.  I am competent to give this Supplemental Declaration.  I affirm the truth of this Supplemental Declaration, and if called as a witness in this matter, I could and would competently testify to the matters set forth in this Supplemental Declaration. My Supplemental Declaration was originally prepared in English, and if called as a witness, I would give testimony in English.

4.  I have previously submitted a declaration (the "Initial Declaration") in support of GGAM's Reply Memorial, executed on June 13, 2015.  I hereby reaffirm the truth and correctness of that Initial Declaration, and incorporate it by reference in this Supplemental Declaration.  My current and prior employment, experience and relationship with GGAM remain the same as stated in my Initial Declaration.

5.  I have reviewed Respondents' Rejoinder Memorial, and the Declarations and Expert Reports submitted in support of it.  To the extent this Supplemental Declaration does not respond to everything in those materials such silence should not be viewed as my agreement with anything those materials state.

### Disclosure of Cantor Fitzgerald's Involvement

6.  Mr. Razon's supplemental declaration, Mr. Kleisner's expert report, and the Rejoinder state that GGAM failed to inform Bloomberry of Cantor's role in GGAM.[1]  This is not true.  Both before and after the execution of the management services agreement ("MSA"), GGAM was upfront with Bloomberry about Cantor's role as one of the two joint venture partners that formed Global Gaming Asset Management, L.P., the upstream owner of Global Gaming Philippines, LLC and upstream indirect owner of GGAM Netherlands B.V., as well as about Cantor's role as advisor and service provider.

---

[1] Supplemental Declaration of Enrique K. Razon (September 4, 2015) ("Razon Supp. Decl.") at paras. 12-14; Expert Report of Fred J. Kleisner ("Kleisner Report") at paras. 11-13, 41, 45-46; Respondents' Rejoinder Memorial ("Rejoinder") at Section VII.

BLOOM_0103129

7.      First, working on behalf of GGAM under support arrangements, Cantor personnel engaged directly with Bloomberry personnel in negotiating the MSA.  I was present, both in Manila and telephonically, during the negotiations throughout the spring and summer of 2011 leading up to the MSA's execution.  I identified myself clearly to the Bloomberry negotiating team members as a Cantor investment banker, which was my role at that time, providing advisory services to GGAM in respect of both the MSA and GGAM's potential investment in the Solaire project.[2]  Cantor's equity stake in the venture was explicitly discussed and acknowledged by the Bloomberry representatives many times, including in communications with me.  Lawyers from Cantor's in-house legal team appeared on emails and telephone calls with Bloomberry representatives and attorneys throughout this period. There was no confusion as to Cantor's role vis-à-vis the joint venture, in negotiating the MSA, or with respect to diligence and documentation of the equity option agreement ("EOA") and GGAM's related investment.

8.      Second, Cantor is identified in and carved out of certain provisions of the MSA, such as the non-compete clause and the conflict of interest clause. Bloomberry representatives discussed, debated and negotiated these provisions with GGAM and its advisors, including me, before the parties enshrined them in the executed MSA. Inclusion of those provisions regarding Cantor is further proof that Bloomberry understood and had diligenced Cantor's role.

9.      Third, on multiple occasions before execution of the MSA, Cantor's presence and role were discussed with Bloomberry representatives, including Mr. Razon, Ms. Occena, Mr. Almeda, Mr. Tan and others.  While this discussion often occurred orally, the following documents, among others, show the ongoing, multiple disclosures of Cantor's role as JV partner, financial backer and service provider to GGAM:

- The initial GGAM overview presentation, dated January 2011, which I understand was delivered to Bloomberry and specifically to Mr. Razon via their headhunter, states, on its first page, "[p]artnership with Cantor Fitzgerald provides superior access to capital . . . ."[3]  The title of the seventh slide is, in all capitals:  "CANTOR FITZGERALD BACKING CONFERS STABILITY AND WHEREWITHAL TO THE GGAM JOINT VENTURE."  The first bullet point on that same page reads, with reference

---

[2] Bloomberry knew of my role from the outset.  S.O.C. Exhibit 126, Email from E. Occena to E. Razon (May 4, 2011) ("I researched the backgrounds of the 3 guys who are coming tomorrow.  Jonathan Rein is Managing Director at Cantor Fitzgerald. Brad and Gary works [sic] with Bill.")

[3] RE-39, Email from F. Gaspar to E. Razon (January 21, 2011) (attaching "Global Gaming Asset Management Presentation" provided to Mr. Gaspar by headhunters for Mr. Razon's consideration) at 2.

Subject to Arbitration Confidentiality Orders

to Cantor's involvement:  "Significant capital commitment to GGAM's investment, acquisition and management activities."

- There were also email exchanges identifying Cantor's role in providing certain services, including legal services, to GGAM, such as the exchange among Cantor in-house lawyer Kevin Russell, Bloomberry representative (and later CFO) Estela Occena and Bloomberry Secretary and outside counsel Benny Tan dated May 17-25, 2011.[4]

- I also emailed Ms. Occena at least once noting that both Bill Weidner and Howard Lutnick (CEO of Cantor) would need to sign off on the MSA.  This communication was on July 1, 2011, well before the MSA was executed. [5]

- Ms. Occena and I also verbally discussed the nature of the deal between Cantor and Mr. Weidner, which conversation she acknowledges in an email to Mr. Alarilla when she suggests poaching two of GGAM's principals.[6]

10.     The foregoing, in addition to myriad other conversations and communications, fully disclosed Cantor's role, even before the disclosure in the "GGAM Disclosure Letter" that accompanied and formed part of the executed MSA.  At the very least, GGAM presented enough information about Cantor that, had Bloomberry wanted to consider walking away from or altering the MSA because of Cantor's involvement as an equity investor, strategic advisor, service provider or otherwise, it had plenty of information, time and opportunity to do so.  Cantor's interactions with Bloomberry and GGAM's disclosures during the MSA negotiations and before its execution, in the executed MSA itself, during the EOA negotiations, in investor

---

[4] RE-235, Email Exchange Regarding Cantor/Bloomberry NDA (May 17-25, 2011) (Ms. Occena noting "GGAM is looking at the Project to invest," and including Cantor lawyer Kevin Russell's statements that "Cantor provides services to Global Gaming, including but not limited to legal and financial advisory services (as a Representative of the NDA)" and "Cantor provides admin services to Global Gaming (and several other businesses.)").

[5] S.O.C. Exhibit 142, Email from J. Rein to E. Occena (July 1, 2011) (explaining that "we realize and acknowledge that both you and we must consult with our principals prior to executing the MSA, and *in our case neither Bill nor Howard* have had a chance to review or opine on this list in its entirety.  We would therefore suggest that we have our call on your Wednesday morning, and that this working group then ought to try to advance and resolve as many of these outstanding issues as possible, and *refer the balance to the principals.*") (emphasis added).

[6] RE-118, Email from E. Occena to J. Alarilla (July 7, 2011) ("At the end of the day, If Cantor stick (sic) to their guns, we can directly hire these guys and offer Brad (or Garry) a compensation package he cannot refuse.  Jon Rein told me months ago that Cantor's agreement is with Bill Weidner.").

BLOOM_0103131

presentations during the IPO roadshow, and in the road show presentation and Offering Circular, all demonstrate that Cantor's role was evident to and acknowledged explicitly by Bloomberry.

**The Support Services Agreement**

11.    The Kleisner Report and the Rejoinder both assert that GGAM assigned its duties under the MSA to Cantor, under the rubric of a support services agreement ("SSA").[7]  This is not correct.

12.    Cantor and GGAM executed the SSA as contemplated in GGAM's organizational documents.  The SSA relates to back-office administrative functions, such as GGAM's accounting, tax, legal, HR/payroll administration and similar functions. As already noted above, I and others specifically informed Bloomberry during the MSA negotiations that Cantor provided GGAM such services.  But Cantor did not perform work in fulfillment of GGAM's obligations under the MSA, whether under the SSA or otherwise.

13.    Contrary to Bloomberry's assertion,[8] the SSA does not have provisions enabling Cantor to perform the following functions, nor has Cantor ever performed the following functions, for Solaire:  recommend the selection of or order furniture, fixtures, equipment, data processing equipment, software, surveillance, and securities systems for Solaire; recruit, select or hire employees for Solaire or implement procedures, techniques  or training programs to obtain and evaluate qualified applicants; review or consult on Bloomberry's risk management program; or appoint Solaire's counsel.  First, these items are not contained in the provisions of the SSA.  Second, the SSA states that Cantor may provide the SSA services to *GGAM*, not to Solaire.[9]

---

[7] Kleisner Report at paras. 45-46; Rejoinder at paras. 165-68.  Neither Mr. Kleisner nor Bloomberry's Rejoinder acknowledges that the MSA specifically contemplates that Cantor could provide Services under the MSA.  CE-1, MSA § 18.8 (carving out Cantor entities from the non-compete clause "unless they are rendering the Services under this Agreement.").  That is a point that Mr. Razon's lawyer also recognized. *See* RE-117, Email from B. Tan to J. Myers (August 15, 2011) ("You excluded Cantor Fitzgerald and its affiliates (except GGAM) from the coverage of the Non-Compete Restrictions . . . Instead of saying that Cantor and its affiliates are not deemed an Involved Affiliate under this Non-Compete Clause, we added the qualification 'unless they are rendering the Services under this Agreement.' This means that not every Cantor affiliate is excluded.  A Cantor affiliate which is involved in rendering the Services as defined under the MSA will be covered by the Non-Compete clause.").  In any event, as I explain below, Cantor did not render Services to Solaire under the Agreement.

[8] Rejoinder at para. 166.

[9] *See, e.g.*, RE-187, Support Services Agreement, at sections 2(e) ("Human Resources. CFS may provide the Receiving Parties with human resources services, which shall

BLOOM_0103132

And while the Rejoinder asserts that under the SSA Cantor "will provide the following services,"[10] the SSA says only that GGAM *may* in its discretion request and Cantor *may* in its discretion provide the SSA services.[11]

14.    In my experience, support services agreements are commonplace in joint ventures and among private equity portfolio companies. Both casino owner-operator Las Vegas Sands and private equity companies like Blackstone employ similar arrangements.[12] As we explained to Bloomberry while negotiating the MSA, Cantor provides the same or similar services to other companies in which it is a joint venture partner: "Cantor provides admin services to Global Gaming (and several other businesses)."[13] The Cantor-GGAM SSA is a similar, commonplace arrangement between one JV partner and the JV itself, to provide back-office support more efficiently than if the JV had to procure such services on its own, and nothing more.

### Solaire as an Investment, The Exit Discussion and "Grabbing" the Option "Windfall"

15.    The Rejoinder argues that "... Cantor and GGAM viewed Solaire as an investment, *and not as a property to be managed*," and cites an internal draft presentation to bolster that claim.[14] Mr. Kleisner makes similar claims,

---

include assistance in hiring and terminating employees and administering employee benefits, as may be requested *in relation to the operation of the Receiving Parties*.") (emphasis added); 2(d) ("Members of [Cantor's] internal legal department may provide [GGAM] with such legal counsel as may be requested from time to time.").
[10] Rejoinder at para. 165.
[11] *See* RE-187, Support Services Agreement, at section 2 ("During the term hereof and upon the terms and conditions set forth herein, each of the Receiving Parties may from time to time request, and upon such a request, CFS may provide, or may cause to be provided through an affiliate of CFS or otherwise, at the Company's expense as provided herein, the following services. . .").
[12] Exhibit 1, Las Vegas Sands Form Def-14A, filed April 30, 2009, at 46 (there is "an administrative services agreement among [LVS] ... and an entity that is controlled by Mr. Adelson, our principal stockholder ... [to provide] shared services, including legal services, accounting services, insurance administration, benefits administration, travel services and such other services..."); Exhibit 2, https://www.blackstone.com/business/aam/private-equity/portfolio-operations-group (explaining a group purchasing program that is used by 95% of its portfolio companies "in more than 70 categories, including such essential products and services as IT hardware and software, office supplies, overnight small parcel, hotels, insurance, energy and telecommunications.").
[13] RE-235, Email Exchange Regarding Cantor/Bloomberry NDA (May 17-25, 2011).
[14] Rejoinder at para. 169 (emphasis supplied).

Subject to Arbitration Confidentiality Orders

BLOOM_0103133

appearing to cite the same presentation.[15]  This claim is wrong, as the very presentation they cite demonstrates.

16.     The draft presentation addresses both (a) GGAM's management of Solaire (*i.e.*, the provision of management services for a fee) and (b) GGAM's investment, as distinct, in multiple places, and the discussion materials include details and discussion of both elements.[16]  The presentation made clear that, contrary to Mr. Kleisner's assertion that Solaire was merely an investment for GGAM, that the "GGAM Strategy" was for GGAM to add value to Solaire through its long-term management of that property.  For instance, "[t]hrough its focus on high-end play, GGAM will have the ability to elevate Project Berry to a higher level of clientele and revenue recognition than Bloomberry could on its own" and "GGAM professionals with extensive project management experience will provide expertise and oversight to complete Project Berry – Brad Stone *et al.* have already begun dialogue on a good-faith basis regarding construction oversight."[17]

17.     I agree that one of the primary uses of this document was to look at the economic opportunity of the MSA (and related fees) and the equity investment, which are evaluated, and valued, separately.  It is the ordinary course in business to evaluate the economic consequences of a business decision.  It should not be surprising that a business would try to assess the potential risks and rewards of a venture in monetary terms before entering into that venture.

18.     Both the Rejoinder and Mr. Kleisner's expert opinion try to cast our evaluation of potential "exit" opportunities in a negative light.[18]  That is bizarre.  In my almost twenty years in various finance roles during which I have valued and evaluated numerous companies, projects and investments, I have never seen one evaluated that does not contemplate potential "exits."[19]

---

[15] Kleisner Report at paras. 41-42.

[16] RE-129, Global Gaming Asset Management Presentation (June 2011), *e.g.*, at 6, 37-39.

[17] *See id.* at 16, 18.

[18] Rejoinder at para. 169; Kleisner Report at paras. 42-44.

[19] See, for instance: Exhibit 3, *The Cornell University School of Hotel Administration on Hospitality: Cutting Edge Thinking and Practice*, edited by Michael C. Sturman, Jack B. Corgel, Rohit Verma (Cornell University Press 2011), at 273 ("Believe it or not, you need an exit strategy from your real estate before you ever get in."); Exhibit 4, "Structuring Hotel Deals to Achieve Strategic Goals: An Owner's Perspective" by Geoff Davis and Jan A. deRoos, Cornell University School of Hotel Administration ("One must thoroughly understand the potential exit or exits as part of the purchase decision."), Exhibit 5, *The SAGE Handbook of Hospitality Management*, by Roy C. Wood and Bob Botherton ("The hotel investor ... never enters an investment without having identified an exit strategy.").

BLOOM_0103134

Generally, businesses do not invest capital without considering returns, and returns are comprised of two pieces, broadly speaking: a return _on_ capital (such as a dividend or an interest payment, or appreciation), and a return _of_ capital (getting your principal back). Moreover, a business must consider the potential returns relative to the risks taken on. One risk of making an investment in an illiquid company (as Bloomberry was at that time) is an inability to monetize the investment as and when the business may choose. The document cited by Respondents performs this fundamental risk/reward business analysis exercise.

19. It is not possible to effectively evaluate the return on an investment (excepting a perpetuity) without picking some end point and valuing it as of that date.[20] Unless the terms of the investment dictate a specific end date (such as a debt instrument with a finite life), picking such an end date – commonly referred to as an "exit" or "terminal" date in financial analysis – is somewhat arbitrary. In my experience, I have generally seen five-year "exit" dates as the convention for looking at and comparing returns and values, but one can look at one-, two-, three- or ten-year returns (or three months, or eight days). We vary the underlying assumptions – cash flow projections, exit multiple, time to exit, _etc_. – and look at the impact on internal rate of return ("IRR") in sensitivity tables, and then compare this quantitative return profile against the risks we take on. In Bloomberry's case, our preliminary analysis of the equity investment opportunity showed IRRs in each year of projections that were attractive. The fact that a quirk of "finance math" shows theoretical IRRs that are higher in year one than in later years does not mean that nominal dollar returns decline over time, or that we would be in a rush to monetize our investment. In this case, it is a "time value of money" implication; we showed that, while the IRR might decrease over time, the value of the investment would _increase_ over time.[21] This quirk of "finance math" ought not be read as indicative of a plot to sell a company we did not own, or to take it public against its owner's will, in its first year.

20. Consideration of what IRR actually means to, and how it is used by, a business contemplating entry into a project, shows that, while it was helpful in evaluating whether it made financial sense for GGAM to enter into the relationship with Bloomberry, it was not driving GGAM to an early exit. If an investment theoretically increases in value, say, 80% over the course of a single year, the one-year IRR would be 80%. If the same investment increases in value 80% in the first year and 50% in the second year, then the

---

[20] See, for instance: Exhibit 6, _Investment Banking: Valuation, Leveraged Buyouts and Mergers and Acquisitions_ by Joshua Pearl and Joshua Rosenbaum ("…IRR [internal rate of return] and cash return are calculated on the basis of … the assumed equity proceeds at exit (inflow).").

[21] RE-129 at 37 (showing IRR declining from Year 1 to Year 5, but the value of the investment increasing over that time).

BLOOM_0103135

two-year IRR would be 64.3%. Even though the two-year IRR is lower than the one-year IRR, the *value* of the investment is higher at the conclusion of year 2 (because it has still increased 50% over the prior year). This phenomenon is common when building a new casino project – the new casino increases in value as it is built and then opens; it continues to increase in value each year as its performance ramps up, but often at a slowing rate.

21. Bloomberry's expert now characterizes GGAM's equity investment as a "windfall."[22] To the extent that Mr. Kleisner suggests that GGAM's unrealized return on its investment is unwarranted or unjustified, that is inaccurate.

22. First, the option was not something GGAM received for free. GGAM gave substantial value to Bloomberry in exchange for that option: its partnership and its team's reputation, as well as its stewardship of the relationship beyond the day-to-day services of the MSA. GGAM bore the risk that the option might expire worthless (or, not substantially in-the-money), while GGAM contributed its reputation and its goodwill (with investors, industry participants, *etc.*) – contributions that GGAM began making well before receiving the option under the EOA.

23. Second, the risk that the option might prove worthless was especially acute at the time GGAM and Bloomberry reached consensus on its basic economic terms. While the option itself was not granted until execution of the EOA in early 2012, the economic terms of the formula underpinning the buy-in price for GGAM's equity investment (although not the price itself) were negotiated by Mr. Weidner and Mr. Razon in spring 2011, at a time when we did not know when, if at all, Bloomberry would become publicly listed. The negotiation included Mr. Weidner's initial proposal, Mr. Razon's rejection of that proposal and his initial counter-proposal through his attorney, the acceptance of that counter proposal, and the formula's eventual manifestation as a part of the condition subsequent in the MSA (a condition ultimately satisfied by the EOA).[23] These were two sophisticated businessmen coming to a negotiated value for equity in an illiquid, under-construction project in a new market. At this juncture in spring 2011, the IPO process had not commenced, the IPO itself was over a year in the future, and the property would not be open for almost two years.

24. Of course, when we exercised our option later in December 2012, the GGAM-led IPO by then had occurred, and the option was in-the-money, *i.e.*, worth more than the strike price. As any student of finance can explain, one would generally only exercise an option if it were in-the-money; otherwise, one

---

[22] Kleisner Report paras. 6(f), 12.
[23] RE-188, GGAM Draft Term Sheet (March 20, 2011); RE-2, Email from A. Cabot to E. Occena and B. Tan (April 6, 2011) (attaching a "Preliminary Agreement"); S.O.C. Exhibit 146, Email from B. Tan to A. Cabot (April 7, 2011).

BLOOM_0103136

would let the option expire and simply buy the stock.[24] By Respondents' reasoning, any exercise of an option, which would rationally only be done if it is in-the-money, constitutes a "windfall." But it is wrong to characterize our option based on its value on its *exercise* date, or even as of its grant date under the EOA, when the formula underpinning the buy-in price for GGAM's equity investment was actually agreed to in spring 2011, almost two years *before* exercise, by sophisticated businessmen negotiating the terms of an investment in an illiquid, high-risk project.

25. Respondents accuse GGAM, and its constituent JV partner Cantor specifically, of "excitement for the cash grab this option represents."[25] While we were excited about the MSA and the investment opportunity – we did pursue them, after all, with enthusiasm – this mischaracterization is directly contradicted by our behavior. Had we wanted to "grab cash," we would have sold our equity as soon as we could – when the investment bank-imposed lockup provision on our shares expired at Solaire's opening. We did not, nor did we try to sell a single share until after Bloomberry terminated us. Tellingly, not only did Ms. Occena admit to investors that we could sell whenever we wanted, but she also privately offered to introduce us to Templeton, a mutual fund manager that was interested in acquiring more stock.[26] We did not take her up on the offer.

### Cantor's Power To Approve Projects As A Joint Venture Partner

26. In the Rejoinder, Bloomberry correctly notes that Cantor had approval power over GGAM's acceptance of the Solaire project. Bloomberry then mistakenly asserts that this approval power indicates that, as a matter of fact, Cantor controlled GGAM's performance under the MSA, instead of "merely provided

---

[24] *See* Exhibit 7, The Options Industry Council, *available at* http://www.optionseducation.org/content/oic/en/getting_started/options_overvie w/what_is_an_option.html (noting that "a call option is in-the-money if the current market value of the underlying stock is above the exercise price of the option. The call option is out-of-the-money if the stock is below the exercise price. . . . If an option is not in-the-money at expiration, the option is assumed worthless.").

[25] Kleisner Report at para. 43(e).

[26] *See* CE-170, Email from E. Occena to B. Stone and G. Saunders (January 9, 2013) (noting that Templeton wanted to know if GGAM was going to sell the Shares after the lock-up period, and if GGAM was, to let her know to arrange for Templeton to talk to GGAM directly); S.O.C. Exhibit 127, Transcript of Investor Conference at 42-43 (November 16, 2012) (noting E. Occena's response to the question of whether "the ultimate thing when the whole thing is up and running you should expect them to sell the 10 percent," was that "GGAM? I cannot really say what they intend to do because after they exercise their option . . . only until opening of the property. But I would envisage that they would not. But whether or not they will of course that's their option because after they exercise it's really up to them.").

BLOOM_0103137

'administrative services' and 'capital' to GGAM."[27]  But Cantor did not control GGAM's performance under the MSA.

27.     There is nothing improper or surprising about a joint venture partner having the power to approve the joint venture's projects and investments, and as discussed above, Cantor's role was fully disclosed.[28]  But Cantor's approval of a project occurs *before* GGAM enters that venture.[29]  It has nothing to do with how GGAM operates a venture after entering into the project.  The timing here is essential – Cantor's decision to approve GGAM's entry into the MSA happened *before* the parties executed the MSA.  It did not affect performance under the MSA after the MSA was executed.

28.     Respondents' broader argument that Cantor's approval of the MSA somehow shows that Cantor controlled GGAM's performance under the MSA is unfounded.  Bloomerry points to no evidence that Cantor "controlled" GGAM's performance under the MSA, and I know of none.

29.     Additionally, Bloomberry asserts that Cantor's approval of the MSA, and a related provision in the GGAM Limited Partnership Agreement permitting Cantor to invest in other casino activities outside of GGAM, are inconsistent with the MSA's non-compete and conflict of interest clauses.[30]  This does not make sense.  While the executed MSA has provisions that prohibit GGAM from managing other casinos in the Philippines, those same provisions expressly state that the non-compete and conflict of interest clauses do not bind Cantor.[31]  The provisions in the two contracts are fully consistent.

**Cantor's Capital Contribution For GGAM's Exercise of the Equity Option**

30.     In the Rejoinder, Respondents observe that Mr. Weidner told Mr. Razon that GGAM's investment in Solaire would ensure that GGAM would take risks alongside Mr. Razon, to align their interests.  Respondents then argue that, because Cantor provided a capital contribution to GGAM that GGAM used to pay the strike price of the equity option, Mr. Weidner's statement was false.[32]  That is nonsense.

31.     First, Mr. Razon was not contracting with Mr. Weidner – but with GGAM.  GGAM did, in fact, invest its own funds in Solaire.  The fact that one of its joint venture parents contributed that money as a capital contribution does not mean that the money did not come from GGAM.

---

[27] Rejoinder at paras. 163-164.
[28] *See* note 5, above, and accompanying text.
[29] RE-180, Limited Partnership Agreement, § 5.05(a).
[30] Rejoinder at para. 164.
[31] CE-1, MSA §§ 2.7, 18.8.
[32] Rejoinder at para. 170.

Subject to Arbitration Confidentiality Orders

BLOOM_0103138

32. To this precise point, Bloomberry explicitly acknowledged Cantor's role as a source of GGAM's capital, including with reference to paying the exercise price. On the IPO road show, Ms. Occena stated: "[t]hey [Messrs. Weidner, Stone, and Saunders] have a partnership with Cantor Fitzgerald. . . . They bring in the talent, they bring in the gaming expertise and they wanted a bank account so they partners [sic] with Cantor Fitzgerald. Cantor owns 50 percent. **So the money will come from Cantor.** The talent, the know-how, these three guys, they're industrial partners, that's what they put in."[33]

33. Second, one of the points of GGAM's investment was for GGAM to have its own "skin in the game," to align the interests of the parties with respect to Bloomberry's long-term value. Those interests were in fact aligned. It is not just the risk that GGAM would lose the $37 million it invested, but also that owning a portion of Bloomberry would give GGAM additional incentive to improve the value of that property and thereby its stock price, to the direct benefit of GGAM, Bloomberry and its shareholders.

34. Bloomberry also argues that GGAM violated the EOA by designating Cantor as the Investor to exercise the option without Cantor guaranteeing GGAM's performance of its obligations under the MSA.[34] As one of the EOA's main negotiators, I can say with certainty that Bloomberry's assertion does not match my understanding of the EOA or that document's language. First, GGAM did not designate Cantor to exercise the option in the first place – *GGAM*, not Cantor, exercised the option and paid for the shares. Second, Bloomberry misstates what an "Investor" is under the EOA, instead using the common definition of "an investor" as opposed to that agreement's defined term. Under Section 1.1 of the EOA, the term "Investor" is limited to either a Netherlands entity controlled by GGAM or another entity controlled by GGAM, neither of which could possibly have been Cantor. GGAM could not, and did not, designate Cantor as the Investor.

## **GGAM's Focus on Investments, not Management**

35. As noted in paragraph 14 above, Respondents and their experts now allege that GGAM was focused only on finding and making investments (at Cantor's behest), and not actually on managing.[35] This allegation is untrue.

36. As an initial matter, this is inconsistent with GGAM's foundational business purpose: to manage large-scale integrated casino resorts, and where possible and sensible, to invest in those properties we manage. As I discussed

---

[33] CE-127, Transcript of Investor Conference at 43 (November 16, 2012) (emphasis added).
[34] Rejoinder at para. 170 (citing EOA § 8.03(a)).
[35] Expert Report of Alan Woinski ("Woinski Report") at 7; Rejoinder at paras. 63, 65-72; Kleisner Report at para. 12; Razon Supp. Decl. at paras. 16-17.

BLOOM_0103139

in my Initial Declaration,[36] GGAM will manage properties without investing in them, but GGAM will not hold investments in properties it does not manage or otherwise control.

37.   Mr. Woinski observes that GGAM's first signed deal after Solaire was with Baha Mar,[37] a large integrated resort that is near construction completion on Cable Beach in Nassau, the Bahamas.  This arrangement is for a standalone management contract, without any GGAM investment.  That is, GGAM's contract is purely to manage the casino and casino-hotel, after opening.  There was no GGAM equity investment or option.  It is inconsistent with Mr. Woinski's and Bloomberry's theory that GGAM was solely focused on investing equity, and not on managing properties, when GGAM's very next deal after Solaire was for a management contract without an investment.

38.   Respondents and Mr. Woinski likewise now allege that GGAM's management principals were too busy chasing deal opportunities – again, at the behest of Cantor – to pay attention to Solaire.[38]  I personally know this to be untrue.  After spending an increasing amount of my time focusing on sourcing and evaluating opportunities for GGAM as an investment banker at Cantor throughout 2011, in the spring of 2012 I became the Head of Business Development and Corporate Finance for GGAM, effectively seconded from Cantor, along with one of my Cantor colleagues who supported me in that role.  My primary duty was (and is) to identify, evaluate, diligence and, if merited, negotiate investment and management opportunities for GGAM.  In this function, I maintain the primary communication channel between GGAM and various sources of deal flow, including industry coverage bankers, consultants and the like.  Occasionally, Messrs. Weidner, Stone or Saunders may have referred an opportunity, but these were quickly turned over to me to triage and process.  Most of the time, I operated on my own looking at these potential deals.  If I found a potential transaction to be sufficiently interesting, I would discuss and debate it with Messrs. Weidner, Saunders and Stone, and we would all "workshop" my team's analysis of that opportunity.  This job function was principally mine, not theirs.  In the two years from Fall 2011 to Fall 2013, Messrs. Weidner, Stone or Saunders attended "prospecting" meetings with me on only a handful of occasions – for instance, once in Philadelphia; twice in the Bahamas; and once in Vladivostok.  (By contrast, I was in Vladivostok four times working on the same opportunity.)  From the time of MSA execution until GGAM's termination, I estimate that I saw Mr. Weidner once every other month, and Messrs. Stone and Saunders less frequently than that, with respect to developing new GGAM business.  (In addition, Mr. Stone and I spent four to

---

[36] Declaration of Jonathan D. Rein (June 13, 2015) at para. 18.
[37] Woinski Report at 4.
[38] Woinski Report at 7; Rejoinder at paras. 71-72; Razon Supp. Decl. at paras. 12, 15-17.

BLOOM_0103140

five days together in New York negotiating a management services
agreement for the Baha Mar project, and Messrs. Saunders and Stone toured
Solaire pre-opening with two executives from Baha Mar.)

39. Mr. Woinski also alleges that GGAM has not been able to get much traction
for other projects in other jurisdictions.[39] I made a similar point in my Initial
Declaration.[40] What we do is hard. It is challenging to find attractive
opportunities, by which I mean large, move-the-needle projects and
properties where GGAM's particular expertise and focus can be brought to
bear to drive favorable results. We are not interested in the smaller
opportunities in which US-based management firms typically engage. These
larger opportunities are few and far between, and the combined pressures of
politics, regulatory landscapes, business/market dynamics and competition
make them difficult to actualize.

40. Mr. Woinski embellishes these supposed "failings" as somehow unique to
GGAM, or even to management companies. During the period from 2010
until now, it was hardly just GGAM that tried to open new jurisdictions or
compete for gaming licenses, and it was hardly just GGAM that was unable to
do so. A non-exhaustive list of such other "failings" would include:

- Florida, where LVS, MGM Resorts and Genting all failed to convince the
State Legislature to enact enabling legislation, Genting having spent over
$200 million on a potential casino site;[41]

- Japan, where virtually every operator would be interested in a license,
including LVS, MGM Resorts, Caesars, Wynn and Genting, did not approve
gaming legislation;[42]

---

[39] Woinski Report at 4-5.
[40] *See* Declaration of Jonathan D. Rein, June 13, 2015, para 15.
[41] Exhibit 8, Gaming Industry Weekly Report for 10/15/2012; Exhibit 9, Las Vegas
Sands quits Florida, turns attention toward Georgia, by Howard Stutz, Las Vegas
Review-Journal (September 28, 2015), *available at*
http://www.reviewjournal.com/business/casinos-gaming/las-vegas-sands-quits-
florida-turns-attention-toward-georgia.
[42] Exhibit 10, Gaming Industry Weekly Report for 7/30/2012, Exhibit 11, Japan to
Set Casino Vote as Wynn, MGM Consider Spending Billions, Bloomberg Business
(September 19, 2013), *available at*
http://www.bloomberg.com/news/articles/2013-09-18/abe-ally-to-submit-casino-
bill-as-wynn-mgm-plan-investments-draft; Exhibit 12, Cash-rich Genting Singapore
hopeful of Japan foray, Reuters (December 7, 2012), *available at*
http://www.reuters.com/article/2012/12/07/genting-japan-
idUSL4N09H1EC20121207.

BLOOM_0103141

- Toronto, where the gaming authority simply aborted the process, even though LVS, MGM Resorts, Caesars and Tropicana executives, backed by Canadian private equity firm Onex, all spent considerable time pursuing a monopoly casino license;[43] and

- Spain, where LVS abandoned a $30 billion proposal for development when the government was unwilling to give certain tax concessions and exemptions.[44]

GGAM also considered some of the foregoing jurisdictions and opportunities.

41. Mr. Woinski specifically cites a few specific cases where he believes GGAM came up short,[45] and where I believe he is misinformed:

- Taiwan. Mr. Weidner has been pursuing an opportunity since before the creation of GGAM, and now in conjunction with GGAM. While Mr. Weidner's extraordinary efforts were able to yield a referendum vote in favor of the proposed casino-resort on Matsu Island, the Taiwanese legislature has not enacted requisite legislation, despite lobbying efforts. GGAM's efforts on Matsu Island are ongoing. Other casino companies interested in Taiwan include LVS, MGM Resorts, Caesars and Bloomberry itself.[46]

---

[43] Exhibit 13, Gaming Industry Daily Report for 4/17/2012 (noting MGM's interest, as well as others, in investing in Toronto); Exhibit 14, Onex chief game to invest in proposed Toronto casino scheme, by Boyd Erman, Elizabeth Church, and Kelly Grant, The Globe and Mail (June 18, 2012), *available at* http://www.theglobeandmail.com/news/toronto/onex-chief-game-to-invest-in-proposed-toronto-casino-scheme/article4170446/; Exhibit 15, Caesars unveils vision for a downtown Toronto casino, by Natalie Alcoba, National Post (November 2, 2012), *available at* http://news.nationalpost.com/posted-toronto/caesars-unveils-vision-for-a-downtown-toronto-casino; Exhibit 16, Las Vegas Sands supports a casino at convention centre, by Elizabeth Church, The Globe and Mail (January 28, 2013), *available at* http://www.theglobeandmail.com/news/toronto/las-vegas-sands-supports-a-casino-at-convention-centre/article7921018/.
[44] Exhibit 17, Gaming Industry Daily Report for 4/26/12;Exhibit 18, Billionaire Drops Plan for Casino in Spain, by Raphael Minder and Landon Thomas Jr., The New York Times (December 13, 2013), *available at* http://www.nytimes.com/2013/12/14/business/international/las-vegas-sands-drops-giant-spanish-casino-project.html.
[45] Woinski Report at 4-5.
[46] Exhibit 19, Taiwan island votes yes for first casino resort, Reuters (July 8, 2012), *available at* http://www.reuters.com/article/2012/07/09/us-taiwan-casino-idUSBRE86800420120709; Exhibit 20, Taiwan's Kinmen island considered for

BLOOM_0103142

- Australia. GGAM's local partner was rebuffed in terms of its desired location for a resort, when the new Queensland government reversed the prior administration's indication of that parcel's acceptability. GGAM's local partner has worked with the new government to identify an acceptable new location. This project is still ongoing. Meanwhile, Australian gaming juggernaut Crown Resorts lost out to rival Echo Entertainment for a license in Brisbane,[47] while Echo lost its exclusivity to Crown in Sydney.[48]

- Vladivostok, Russia. GGAM won the competitive RFP process to build an integrated gaming resort near the northeastern border of China. GGAM ultimately abandoned its efforts there in part due to the geopolitical climate, after Russia's annexation of Crimea and invasion of Ukraine made American dealings in Russia increasingly precarious. One of our competitors, Lawrence Ho (CEO of Melco Crown), will be opening a casino there shortly, and he successfully took that project public on the Hong Kong stock exchange.

- Baha Mar, Bahamas. GGAM entered a management-only contract with Baha Mar. Under that contract, GGAM was not responsible for construction and did not invest any capital, but instead only agreed to manage the property post-opening. The issues arising from the financing and construction side of the project that have driven Baha Mar to reorganize its balance sheet have nothing to do with that part of the project that GGAM is responsible for – it hasn't even opened. After Baha Mar exits bankruptcy proceedings and the property opens, GGAM expects to continue in its role as manager of the casino.[49]

---

Casino, by Chong Hui-ling and Staff Reporter, Want China Times (June 6, 2012), *available at* http://www.wantchinatimes.com/news-subclass-cnt.aspx?id=20110612000004&cid=1502; Exhibit 21, Bloomberry on expansion mode for casino business, by Richmond S. Mercurio, The Philippine Star (June 11, 2015), *available at* http://www.philstar.com/business/2015/06/11/1464392/bloomberry-expansion-mode-casino-business.

[47] Exhibit 22, Hard work begins for Echo after beating Crown Resorts in Brisbane, by Michael Smith, Australia Financial Review (July 21, 2015), *available at* http://www.afr.com/brand/chanticleer/hard-work-begins-for-echo-after-beating-crown-resorts-in-brisbane-20150721-gigwlu.

[48] Exhibit 23, Packer's Crown Beats Echo Over $1.2 Billion Sydney Casino, Bloomberg (July 4, 2013), *available at* http://www.bloomberg.com/news/articles/2013-07-04/packer-s-crown-beats-echo-over-912-million-sydney-casino-tower.

[49] GGAM was asked repeatedly to invest in Baha Mar's equity, but declined. Today, still before opening, Baha Mar is unable to support its debt load and is being

BLOOM_0103143

My takeaway from the foregoing is that, contrary to Mr. Woinski's suggestion, the ups-and-downs in winning gaming opportunities are not unique to GGAM or management companies, and that disappointments are widespread and shared among industry participants.

### The "Norms" of Management Contract Economics

42.    Mr. Kleisner asserts, without citation to documents, data or other support, that the terms of GGAM's management fees in the MSA are far above the norms he describes in the gaming and hospitality industries.[50]  This assertion is demonstrably incorrect, based on publicly available information, including the management fees earned by Mr. Kleisner's own companies.

43.    I regularly review management services contracts in the ordinary course of assessing opportunities for GGAM, just as I did previously in my role as an investment banker focused on the gaming industry.  In doing so, I have reviewed publicly-available commercial gaming management contracts.  The typical casino management fees in these contracts are generally 2% of revenues plus 5% of EBITDA (a "2-and-5" formula).  Notable exceptions are in Asia, where new-build casino properties tend to command *higher* management fees.  My survey of publicly-available casino management contracts also shows management terms of 8 to 100 years (or indefinite tenor), with either no performance test at all, or performance tests commencing two to six years after operations begin.  My own knowledge of additional, non-public commercial casino management contracts bolsters these findings and indicates that the GGAM/Solaire fee economics and other terms were well within common practice in the industry.

44.    In the hotel industry, the base fees in management contracts are typically 2-4% of revenues, and incentive fees are typically 8-10% of operating profit (in addition to the base fee).[51]

45.    It is important to note that the base fees of these typical contracts are derived from *revenue*, while GGAM's fees in managing the Solaire project were derived from *EBITDA*, that is, profit after operating expenses.  Revenue is the top-line money coming into a business, without any deductions.  EBITDA –

---

reorganized.  This is *precisely* why GGAM (like all other competently run businesses) looks at "exits" when evaluating opportunities.

[50] Kleisner Report at paras. 20-21.

[51] See, for example: Exhibit 24, "Hotel Management Agreements: Incentive Fee – the Stuff of Negotiation," by Albert J. Pucciarelli, Esq. (Cayuga Hospitality Consultants); Exhibit 25, "Hotel Management Contracts: Historical Trends," by Hans Detlefsen and Matt Glodz (HVS International), 4Hoteliers (March 7, 2013); and Exhibit 26, "Hotel Management Contracts in Europe," by Amir Lababedi and Elana E Bader, HVS (March 20, 2007).

BLOOM_0103144

Earnings Before Interest, Taxes, Depreciation, and Amortization – represents the operating profit of an enterprise, because it subtracts operating costs and expenses from revenue. (A casino could have a lot of revenue but not a lot of operating profit because of high operating expenses.) If fees are based on revenue, there is less risk to the managers, because they make money regardless of how profitable the enterprise actually is. That means while in most contracts, managers would receive base fees regardless of whether the owner made any profit, GGAM could only earn money under the Solaire contract if, over the course of a year, the Solaire were profitable. GGAM did not receive _any_ percentage of revenues as a fee; _all_ of its fee stream was dependent not just on revenue generation, but also on achieving a solid profitability margin. This is a very atypical and risky arrangement for a manager. Although Mr. Kleisner correctly notes that the fees to which GGAM and Bloomberry agreed were the product of a negotiation,[52] for purely comparative purposes one can calculate "like-to-like" fees to assess his mistaken claim of "richness" of the GGAM fees. If one compares the fees calculated by our experts under the MSA formula, and the fees as would be calculated using the typical "2-and-5" formula, that comparison would not justify any claim of extraordinary in their "richness."

46. Second, Mr. Kleisner's characterization of the MSA fees as "rich beyond any comparable in my experience"[53] appears inconsistent with public reports of Mr. Kleisner's own experience. For example, the disclosed management agreements from Mr. Kleisner's tenure at Morgans Hotel Group, of which he was CEO from 2007-2011, show terms for Morgans' agreements that are much richer than those in the MSA. Morgans' contracts are for 4.0-4.5% of _revenues_, plus a chain services reimbursement (_i.e._, centralized cost coverage) of about 2.5% of _revenues_.[54] They generally last for 10 to 30 years, often with 10-year extension options at the sole discretion of Morgans, the manager.[55] Furthermore, Morgans has noted that, with respect to its management contracts, they are generally subject to performance tests (as was the Solaire MSA). In the case of Morgans: "...once the performance test period begins, which is generally multiple years after a hotel opens, each of these performance test must fail for two or more consecutive years and [the Company] has the right to cure any performance failures..."[56]

---

[52] Kleisner Report at para. 21.
[53] Kleisner Report at para. 6.
[54] Exhibit 27, Morgans Hotel Group 2005 S-1, page 43.
[55] Exhibit 28, Morgans Hotel Group 2005 10-K, page 61 (Initial 10-year management contract derived from date of Morgans' management of property and expiration date.); Exhibit 29, Morgans Hotel Group 2014 10-K, page 6; Exhibit 30, Morgans Hotel Group 2007 10-K, page 56; Exhibit 31, Morgans Hotel Group 2010 10-K, pages 9, 61.
[56] Exhibit 32, Morgans Hotel Group 2014 10-K, page 37.

BLOOM_0103145

47.     During Mr. Kleisner's tenure as its CEO, Morgans also managed the Hard
        Rock Hotel and Casino in Las Vegas.  This was Morgans' sole casino-resort
        management contract.  For management of the Hard Rock, Morgans received
        4% of non-gaming *revenue* (including casino rent), an EBITDA incentive fee
        of 10% above a hurdle level, and a chain services fee of 1.5% of non-gaming
        *revenue*, in addition to almost $1 million per year as a gaming support
        services fee.[57]  Morgans' revenue-heavy fee assured significant income to
        Morgans for managing the Hard Rock despite Morgans' inability to generate
        any meaningful operating profit at the casino resort, ultimately wiping out
        $500 million in invested equity.[58]

48.     One can also look at the typical management contracts of Wyndham, a large
        public hospitality company that Mr. Kleisner ran from 1999 until 2005.
        Wyndham reported in 2004, the last full year that Mr. Kleisner was CEO, that
        "we managed 42 hotels for third party owners...  Management fees generally
        range up to approximately 5% of total *revenue* per managed hotel.  The terms
        of the management agreements vary from hotel to hotel, but range from five
        to 20 years."[59]  Once again, Mr. Kleisner's contracts' fees and terms were on
        par with or exceeded those in the MSA.

49.     Mr. Kleisner also believes that the MSA's Pre-Opening and Development Fees
        were "exceedingly rich" and "have no comparable" and are "unheard" of.[60]
        Again, he is mistaken.  There are few publicly available examples of
        commercial casino development and pre-opening fees, as these fees are, in
        my experience, often negotiated in separate agreements that are not publicly
        disclosed.  But, based on my own experience and knowledge, 1-3% of total
        construction budget is a typical development fee range.  One public example
        of a commercial casino development fee is between MGM and MGM China,
        whereby MGM provides development services to MGM China for "a
        development fee which is . . . calculated at 2.625% of project development

---

[57] Exhibit 33, Hard Rock Hotel Holdings, LLC 2008 10-K, page 71; Exhibit 34,
Morgans Hotel Group 2009 10-K, page 85.
[58] Exhibit 35, Morgans Hotel Group Q1 2009 Earnings Conference Call, page 6;
Exhibit 36, Hard Exit For Hotel Owners, by Alexandra Berzon and Eliot Brown, The
Wall Street Journal (February 24, 2011), *available at*
http://www.wsj.com/articles/SB100014240527487039054045761651315985854
82 ("The investment in Hard Rock has been painful for Credit Suisse, which has
invested $424 million in the hotel's equity since 2007, according to financial
statements.  Credit Suisse owns about 87% of the casino and Morgans the rest.
Morgans has put $75 million into the Hard Rock.  It also received tens of millions of
dollars to operate the resort and casino."); Exhibit 37, Hard Rock ownership transfer
finalized, Las Vegas Review-Journal (March 2, 2011), *available at*
http://www.reviewjournal.com/business/hard-rock-ownership-transfer-finalized.
[59] Exhibit 38, Wyndham International 2004 10-K, at page 16 (emphasis added).
[60] Kleisner Report at para. 6.

Subject to Arbitration Confidentiality Orders

costs."[61]  Given the lack of public commercial casino development comparables, one can also look to Native American casino deals, which are generally poor comparables for commercial casino management fees,[62] but which do offer some indicia as to development fees.  One relevant recent example is Station Casinos' development of the Graton casino near San Francisco.  For this $850 million development, Station Casinos received an $8.2 million development fee.[63]  Additionally, a Mohegan Sun venture entered into a development arrangement for a fee equal to 3% of the approximately $510 million Cowlitz Indian Tribe development, and Caesars entered into an agreement to develop and manage the Fresno-area Big Sandy resort for a $7 million fee on this approximately $250 million project (2.8% of project costs).[64]  Based on a $750 million Phase 1 budget for Solaire, GGAM's approximately $3.5 million in fees are hardly excessive.

50.  Finally, Mr. Kleisner states that the term "through the Management Team," which appears throughout the MSA, "is a stated or implied provision of any management contract."[65]  Yet, in my review of other casino management services contracts, I have never seen provisions requiring management to perform its duties "through the management team," and Mr. Kleisner does not cite any example of a contract to support his assertion.  If this were a common term of contracts, I would have seen it in the ordinary course of my reviews.  And if  performing duties "through the management team" were implied in every other management services contract, it would not need to be repeated in multiple places in the MSA.  It is my understanding that operating "through the management team" was Mr. Razon's unique approach

---

[61] Exhibit 39, MGM National Harbor, LLC Operation License Applicant Commission Presentation (October 2013), *available at* http://gaming.mdlottery.com/wp-content/uploads/2013/10/Executive-Summary-MGM-National-Harbor-LLC-FINAL.10-10-2013.pdf.

[62] U.S. Bureau of Indian Affairs/National Indian Gaming Commission regulations dictate the economics and terms of management agreements, putting restrictions on potential management fees.

[63] Exhibit 40, Station Casinos 2013 10-K, pages 40 & 46.

[64] Exhibit 41, Mohegan Tribal Gaming Authority Presentation (February 26, 2014) at 16, *available at* http://gaming.ny.gov/pdf/Redacted%20RFA%20Applications/Mohegan/Revised%20Redacted%20102014/37-2%20Exhibit%20VIII%20A%2015%20a%20(2).pdf; Exhibit 42, *Caesars Entertainment, Inc. Signs Development and Management Agreements for $250 million Hotel and Casino on Tribal Land Near Fresno, California*, Hotel Online (September 16, 2004), *available at* http://www.hotel-online.com/News/PR2004_3rd/Sept04_CaesarsFresno.html; Exhibit 43, Cowlitz Tribe continues to push for casino near La Center, by Dean Baker, The Oregonian (July 17, 2013), *available at* http://www.oregonlive.com/clark-county/index.ssf/2013/07/cowlitz_tribe_continues_push_f.html.

[65] Kleisner Report at para. 5(c).

BLOOM_0103147

established to ensure that GGAM transferred its experience and knowledge to Solaire's local team, so that Bloomberry could eventually operate Solaire without GGAM.[66]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  October 5, 2015

JONATHAN D. REIN
New York, New York

_____

[66] Razon Supp. Decl. at paras 18-20.

Subject to Arbitration Confidentiality Orders

BLOOM_0103148