# Exhibit 7

# (Previously Filed under Seal at Dkt. 281-5)

# Exhibit I

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010) BETWEEN:

GLOBAL GAMING PHILIPPINES LLC

and

GGAM NETHERLANDS B.V.

*(CLAIMANTS)*

- versus -

BLOOMBERRY RESORTS AND HOTELS INC.

and

SURESTE PROPERTIES, INC.

*(RESPONDENTS)*

---

DECLARATION OF WILLIAM P. WEIDNER IN SUPPORT OF CLAIMANTS' REPLY MEMORIAL

---

## DECLARATION OF WILLIAM P. WEIDNER

I, William P. Weidner, of 9711 Orient Express Court, Las Vegas, Nevada 89145, United States of America, declare as follows:

1. I submit this declaration ("Declaration") in the above-captioned Arbitration (the "Arbitration") between Claimants Global Gaming Philippines LLC and GGAM Netherlands B.V. (together, "GGAM"), on the one hand, and Bloomberry Resorts and Hotel, Inc. ("Bloomberry Hotels") and Sureste Properties, Inc. ("Sureste") (collectively, "Respondents" or the "Owners" or "Bloomberry"), on the other. I make this declaration in support of GGAM's Reply Memorial in Support of Claimants' Statement of Claim ("Reply Memorial").

2. I confirm that I make this declaration voluntarily, and if called to testify could provide the information herein of my own knowledge. This declaration is true and correct to the best of my knowledge, information and belief.

3. I incorporate by reference into this Declaration (1) my Declaration in Support of GGAM's Request for Interim Measures dated April 13, 2014, and (2) my Supplemental Declaration in support of GGAM's Reply in Support of Claimants' Request for Interim Measures of Protection dated July 29, 2014. I again confirm that these prior declarations are true and correct.

### Formation of GGAM and the Company's Business Objectives

4. As I have previously explained in this Arbitration, in 2010, following my departure as President of Las Vegas Sands Corp. ("LVS"), I approached my former colleagues, Brad Stone and Garry Saunders, with the prospect of establishing a new business to take advantage our collective experience and successful track record of developing, positioning, and operating integrated resort properties. Our goal was to position our start-up business, which would eventually become the GGAM family of companies, to manage, invest in, and potentially acquire hospitality and gaming assets around the world. At that time, given the state of the global economy and the gaming industry generally, we were particularly focused on seeking fledgling opportunities and working with certain distressed properties, with a primary focus in Asia.

5. Given our history of working together, and the small size of our core team, Mr. Stone, Mr. Saunders and I delineated our roles within GGAM. We knew from our experience there would be significant overlap between functions, but we also understood that each of us possessed unique experience, expertise, and skill sets that would enable us to achieve our common business objectives.

1

As the CEO of GGAM, I would be responsible for identifying, seeking and obtaining business opportunities, being the face of the company in negotiations with prospective business partners and government regulators, and using my preexisting relationships, particularly in Asia, for the benefit of the properties that we would manage and/or own. Messrs. Stone and Saunders would be primarily responsible for the day-to-day development and management activities that GGAM would conduct. This approach allowed us to divide responsibilities for particular projects at any given time, assuring that the most appropriate experience and expertise would be brought to bear on a particular project. Our plan was that Messrs. Saunders and Stone would maintain more of a physical presence at our managed properties and communicate directly with those properties' on-the-ground management teams, while keeping me informed of critical operational matters as they arose. Given our considerable previous experience in senior management at LVS and Melco Crown, we would not expect to spend full time at any single property, but to be onsite as necessary, and to provide oversight and guidance as otherwise needed.

6. From our years of successfully developing and operating gaming properties in Asia, the GGAM principals have developed and cultivated professional relationships with a number of key casino marketing executives and casino junket operatives in the region. I, in particular, have developed and maintained long-standing relationships with high-ranking Chinese officials responsible for economic and gaming matters affecting the People's Republic of China and Macao, as well as a number of influential Chinese businessmen. In forming GGAM, we believed then (and continue to believe now) that we could leverage these existing relationships, which are generally difficult to establish, to help generate and market business opportunities in the region.

7. Because so much of the Asian business culture, in our experience, is predicated on social interactions, developing and maintaining trust within these networks, and necessarily requires speaking the language, I recruited another former LVS colleague of mine, Eric Chiu, to assist our Asian business development efforts by maintaining and expanding upon these critical social and business networks. Mr. Chiu, a Chinese national, resident of Macao, and a Cantonese and Mandarin speaker, was well suited for this role. Prior to joining us, Mr. Chiu served as President of Asian Development for Venetian Macao Limited under the LVS umbrella from December 2002 until May 2009. While at LVS, Mr. Chiu was responsible for corporate business development and relationship development with Macanese and Chinese government authorities. During this time, Mr. Chiu developed relationships with certain prominent government officials and businessmen within the Asian casino industry. We contemplated that Mr. Chiu would supplement my efforts in liaising with

2

our existing Asian contacts and establishing new relationships, which would be a key component of GGAM's overall business model. With respect to Solaire, Mr. Chiu would be instrumental in executing GGAM's specific strategies, to develop a sophisticated and unique government-led, top-down junket approach and direct VIP play, by helping to establish a cross-border trading platform to promote business and gaming visitation between China and the Philippines.

8.      Given that GGAM was a start-up company, we partnered with an affiliate of Cantor Fitzgerald L.P. to form a 50/50 joint venture to provide additional infrastructure, bolster our business model, generate additional credibility in the financial markets, and better position ourselves to attract potential opportunities. Within the overall GGAM framework, Cantor Fitzgerald would provide the joint venture with a source of capital and various support services, including financial, advisory, legal, tax, and administrative support.

### Initial Meeting with Mr. Razon and Genesis of the Parties' Relationship

9.      I first met Mr. Razon in person to discuss GGAM's potential involvement in the Solaire Project in March 2011 at a bar located on the casino floor in the Encore hotel in Las Vegas. This initial "meet and greet" was facilitated by a headhunter who had contacted Mr. Saunders regarding a management position at Mr. Razon's property. I was not fully familiar with the Solaire development and had not met Mr. Razon before this meeting.

10.     During this discussion, Mr. Saunders and I provided Mr. Razon with a background of GGAM's business model and objectives, the roles of its constituent parts, including the principals and Cantor Fitzgerald, and the services and value GGAM could provide to him and his property. Mr. Razon, in turn, explained to us his vision for the Solaire and what he was seeking in terms of a manager and a business partner to achieve that vision.

11.     During this first meeting with Mr. Razon, I emphasized our successes at LVS and our collective experience in the industry, including our unprecedented experience in entering into the Macao gaming market. I was, and remain, proud to have been the President of LVS during those exciting and historic years. Mr. Razon is correct that Mr. Saunders and I told him that we believed that GGAM, despite its infancy, was uniquely suited to generate results for his property in the Philippines due to our substantial start up and gaming experience in Asia. It was clear that Mr. Razon had read about our personal backgrounds and was familiar with the properties we had developed while at LVS and Melco Crown, as well as our departures from those companies. We explained that we formed GGAM not because we needed another source of income, but because we wanted to pursue

Subject to Arbitration Confidentiality Orders                                                                                                    BLOOM_0100637

our own investment and management opportunities in jurisdictions around the world (hence our name: Global Gaming Asset Management). Although we told Mr. Razon that we did not yet have any existing projects to our name, Mr. Razon seemed enthusiastic at the prospect of being able to utilize our collective experience and know-how without the brand name and other strings that would come along with partnering with an established casino operator, such as MGM or LVS. *See* Razon Decl. at para. 10.

14. Mr. Razon explained to us that he envisioned his property—which would be the first property to come online in the newly-established Entertainment City zone of Metro Manila—as a world-class destination-attraction with the same appeal as a major Las Vegas-style resort. To accomplish this objective, he had engaged Paul Steelman, a reputable architect, to assure the implementation of a high-end, luxury design for the resort. Mr. Razon conveyed his excitement about the growth potential within the local Philippine market and his confidence that his property would be able to easily take advantage of this client base.

13. Mr. Razon admitted his lack of experience in dealing with the VIP casino market, particularly the VIP market outside of the Philippines. We explained that, if engaged, GGAM would focus its efforts on establishing a framework for and generating this aspect of the casino's revenue mix. We were comfortable with that proposal, as our recent experiences and successes in Asia and our existing contacts in the region positioned us well to deliver those results. We also explained that GGAM would be able to contribute value in other aspects of the property's development and operations, including to construction, staffing, marketing, and implementing policies, procedures, and programs.

14. Given Mr. Razon's false and misleading statements in his declaration filed in this Arbitration regarding GGAM's purported representations and his resulting "expectations," they should be corrected. I want to reiterate that at no time, either during our initial meeting in Las Vegas or in any subsequent discussion with Mr. Razon, did I or any other GGAM principal promise Mr. Razon that GGAM had a "database" of existing customer information or a set of preexisting policies and procedures from our previous LVS projects that we would use for the benefit of Solaire. None of the GGAM principals had proprietary rights to any of the customer information or procedures of LVS, and we could not (and did not) represent that we did. It would have been foolish for Mr. Razon to believe otherwise. A successful businessman like Mr. Razon would certainly be aware of the legal restrictions and ramifications that would prevent us from stealing and giving to Solaire (and Solaire

4

  BLOOM_0100638

from using) a proprietary database or preexisting policies and procedures, even if we had that proprietary information readily available to us.

15. Despite Mr. Razon's unsupported assertions to the contrary, for example, that we "sold ourselves" as being willing to deliver a confidential customer database, *see* Razon Decl. at para. 44, the reality of what we actually promised Mr. Razon and what he expected from us is reflected in the heavily-negotiated MSA, as well as all other relevant documents discussing the operations of Solaire, including the Offering Circular, the roadshow management presentation, and the Business Plan. Of course, had Mr. Razon truly expected that our provision of a foreign VIP customer database and preexisting written policies and procedures were critical elements of our performance under the MSA, I would think that Mr. Razon or any of his many representatives would have assured that those "expectations" were set forth as representations and warranties in the MSA and notified us of these expectations, or our alleged shortcomings relative to them, at some point before July 2013.

16. I also understand that Respondents are now trying to justify their wrongful actions against GGAM by claiming that they were somehow misled as to scope and purpose of Cantor Fitzgerald's involvement within the GGAM organization. It is ridiculous to even consider this claim. From the beginning, we were candid with Mr. Razon regarding the roles and responsibilities of the GGAM principals and of Cantor Fitzgerald. Indeed, the GGAM "pitch" materials, which Mr. Razon apparently read and claims he relied upon in deciding to engage us, unequivocally explain Cantor's role within the joint venture.[1] The very first page of this presentation highlights that GGAM's "[p]artnership with Cantor Fitzgerald provides superior access to capital and proprietary technologies and infrastructure." The presentation later provides a detailed description of and underscores how "Cantor Fitzgerald Backing Confers Stability and Wherewithal to the GGAM Joint Venture," including, for example by providing "capital commitment to GGAM's investment, acquisition, and management activities." Respondents' make-believe complaints about Cantor Fitzgerald, like their laundry list of allegations in their July 2013 Letter and September 2013 Chart, are newly minted for the purpose of terminating the MSA, and do not reflect the true arrangements between the Parties or in any way impact GGAM's performance at Solaire.

---

[1] *See* RE-39, Email from F. Gaspar to E. Razon (January 21, 2011) (attaching presentation titled "Global Gaming Asset Management").

5

Subject to Arbitration Confidentiality Orders

BLOOM_0100639

### The Negotiations Regarding the Structure of the Parties' Relationship

17. During our initial one-hour conversation with Mr. Razon in Las Vegas, Mr. Razon emphasized to Mr. Saunders and me that he did not favor a pure management relationship with GGAM, but rather a structure in which GGAM would be an investor with its own money at risk, *i.e.*, that GGAM would have "skin in the game." Mr. Razon claimed that his goal was to ensure that our interests would be aligned with his.

18. During the ensuing weeks, the Parties turned their attention to negotiating GGAM's compensation structure, which was atypical according to industry standards. What I mean by this is that typically a management company is paid primarily based on a property's gross revenues, with an additional incentive fee based on earnings. Here, however, GGAM undertook significant risk by tying its entire fee stream to an incentive-based scheme based solely on Solaire's profitability, and largely for delivering incremental profit beyond Bloomberry's original forecasts, which had been prepared by a reputable gaming consultancy firm, Spectrum Gaming. Moreover, in recognition of the value GGAM acknowledged it could provide with respect to the foreign VIP segment, the Parties heavily weighted GGAM's total Fees to the incremental earnings generated from that segment, while agreeing that GGAM would only receive small monthly fixed fees during the pre-operating period. As a result, the preponderance of GGAM's compensation would be delayed until well after it had expended the substantial time and effort on the front end of the Project advising and assisting in the construction, development, and positioning of the property, as well as substantial, additional VIP marketing efforts after the property opened, in accordance with the property's designated ramp-up period. The results of those pre-Opening and ramp-up efforts would then be in place for the continuous benefit of Solaire and the Owners, and GGAM's Fees would be commensurate with both the short and long-term value that GGAM would provide to the Project.

19. In early April 2011, after several exchanges with Mr. Razon and with the general framework of our relationship understood between us, I explicitly informed Mr. Razon that I would instruct my representatives to draft agreements for his review: (1) management agreements and (2) an option/equity purchase agreement. I did this because we distinguished the management services GGAM would perform for Solaire separately from the equity interest that GGAM would have the option to acquire.[2]

---

[2] *See* Exhibit A, Email from B. Weidner to E. Razon (April 2, 2011).

6

20.     It is hard for me to understand how a sophisticated businessman like Mr. Razon can reasonably state that he believed that the very first draft agreement that my attorney sent over to his side, which he even recognizes was titled a "Preliminary Agreement," and that itself explicitly contemplated that the parties would negotiate and enter into a further definitive agreement, would be the "governing document of our partnership." *See* Razon Decl. at para. 13. I certainly expected that, in a significant long-term relationship such as the one that the Parties were preparing to enter into, there would be multiple rounds of revisions, discussions, and negotiations between the Parties before any of the agreements would be finalized.

21.     Despite Mr. Razon's desire for GGAM to provide guidance and oversight with respect to Facilities' operations, Mr. Razon and his representatives negotiated aggressively to ensure that the Owners would maintain ultimate authority over the day-to-day operations of the property. For example, over the course of several exchanges with one of Mr. Razon's attorneys, Mr. Benny Tan, I expressed my disagreement with Mr. Razon's proposal as being highly unusual in the gaming industry. In my experience, it is beneficial for an owner to delegate day-to-day managerial responsibilities to the operator so that the operator can effectively and efficiently execute their business and marketing plans. This is especially true for an owner as inexperienced in the gaming industry as Mr. Razon. I was concerned that by ceding the typical control elements contained in a management agreement, GGAM would be hamstrung in its ability to effectively position and operate the Solaire, in accordance with its business and marketing plans, to be flexible to adapt to evolving events on the ground, and achieve its profit milestones. Despite my voiced concerns, the Owners refused to surrender the level of control typical in a management contract, and instead insisted that Mr. Razon retain an effective veto right over operations.

22.     In our initial discussion with Mr. Razon, and as contract negotiations progressed, I assured him that GGAM would be dedicated to his Project. However, I never represented that Mr. Stone, Mr. Saunders and I would be exclusively committed to Solaire, because that would be inherently inconsistent with our stated business objective of developing a diverse portfolio of global gaming opportunities to which we would add value. From the beginning of our relationship, Mr. Razon was fully aware of the other ventures GGAM was pursuing or intended to pursue. Mr. Razon did not negotiate for, nor could he have ever expected to be hiring three full-time employees that would set up a physical office on Solaire's premises. It is no accident that the MSA does not specifically require GGAM principals, including myself, to be on Solaire's premises for a specific amount of time each week or month. Indeed, the entire structure and language of the MSA, in which

7

GGAM provided services through the Management Team but the GGAM principals themselves were not members of the Management Team, underscores that the Owners and Mr. Razon were well aware that GGAM would not be on Solaire's premises full time. Mr. Razon also made it a point to reinforce that he was the only CEO of the Project and that GGAM should not be perceived as a separate organization within Solaire.

23. Rather, consistent with each of our roles within GGAM, Messrs. Stone and Saunders would take the lead on the day-to-day development and operational matters, whereas I would focus my efforts on augmenting the activities of the other GGAM principals and the Management Team—by leveraging the stature I had achieved by previously establishing the LVS brand name in the Macao market, and my existing relationships with junket operatives, businessmen, and government officials in the region—to develop a high-end marketing network for Solaire. In one of my first communications to Mr. Razon in March 2011, I stated that I would personally oversee the on-the-ground activities and that I would initially spend time in Manila until our full time people were fully up to speed. By the time the MSA was signed in September 2011, however, Messrs. Stone and Saunders were already spending significant time on the ground in Manila, and elsewhere in Asia and in the United States, recruiting, assisting in construction efforts, and taking preliminary steps to position the property. At that point, it was clear that my physical presence in Manila was not the best use of my time or Solaire's resources, as I subsequently explained to Mr. Razon on more than one occasion. I personally oversaw the activities on the ground by communicating regularly with Messrs. Stone, Saunders about important on-site developments and critical issues affecting the property. These included, for example, construction progress, recruiting efforts, implementation of policies and procedures, employee training, design and layout decisions, and marketing strategies. As was the case in my role as President of LVS, I was kept apprised on a near-daily basis. I was particularly involved in the high-level strategic decisions regarding our tactical approach for recruiting and engaging junket operators, which included decisions regarding which operators we would contact and on what timeline, as well as the specific deal terms we would seek to implement.

24. Throughout the negotiations of our relationship, Mr. Razon led me to believe that he, like I, envisioned a long-term and fruitful partnership, both with respect to the Solaire property as well as other potential business ventures around the world. Accordingly, during the course of our relationship, I presented Mr. Razon with several business proposals, including a casino project in Macao and an asphalt deal in mainland China.

8

Subject to Arbitration Confidentiality Orders

BLOOM_0100642

25. I did not expect Mr. Razon to exploit GGAM's time, effort, experience, and expertise in assisting in the construction management process, participating in the roadshow, hiring staff, establishing procedures, and preparing the approved Business plan, marketing plans, and budgets, just to terminate GGAM mere months into the ten-year term of the MSA, as soon as it became expedient for him to do so. In addition to the direct financial harm Mr. Razon's wrongful termination and publicly disparaging statements have caused GGAM, it has particularly frustrating for me that Mr. Razon has thus far succeeded in rendering meaningless all of the contractual protections that GGAM carefully and diligently negotiated for and to which Mr. Razon had agreed. In the meantime, Solaire continues to be profitable, and Mr. Razon's wealth continues to grow, at our expense and due to our work.

### GGAM's "Hands-on" Efforts to Deliver VIP Customers

26. It is entirely misleading for Mr. Razon to claim that GGAM did not follow through on its representations to deliver foreign VIP business for Solaire. From the very beginning of GGAM's engagement, we did in fact leverage our existing relationships in the region to uniquely benefit Solaire, Mr. Razon, and GGAM (as the MSA's compensation structure incentivized us to do). Because it is illegal to advertise or market casinos or gaming directly to Chinese mainlanders, to tap this much-coveted gaming demographic, it is necessary to rely on reputation, influence, and relationships in the region. Positive word-of-mouth communications between and among junkets and players are critical. The reality of the state of affairs in the Asian junket market is that the largest and most influential junkets are reluctant to sign formal agreements or bring players to a property until these junkets have sufficient confidence that it makes financial sense to do so and that their players' experience will be positive from an atmospheric and personal services perspective. These principles were even more applicable to Solaire, as it was a brand new property, in an untested market, and in a jurisdiction with historical tensions with the People's Republic of China.

27. For these reasons, as part of an orchestrated strategy, in mid-October 2011, I arranged for a group of high-level Chinese government officials from the China Liaison Office ("CLO") to Macao to attend the MSA's signing ceremony in Manila.[3] As part of their official duties, these CLO officials were responsible for overseeing and advising on all Macanese economic issues affecting the People's Republic of China. The most senior of these officials was the head of the Economic

---

[3] *See* Exhibit B, Emails between E. Chiu and D. Almeda (October 12, 2011 – October 13, 2011) (GGAM0014247 – GGAM0014248).

9

Subject to Arbitration Confidentiality Orders

BLOOM_0100643

Division of the CLO, an individual whom I had first met, approximately ten years prior, in my role as President of LVS (during its entry as the first foreign-owned entity in the Macao market) when he was first assigned to the office. Because the Macanese economy is almost exclusively comprised of the gaming industry, these men thus possessed significant and unique visibility and influence over each and every aspect of Macanese junket activity, both within Macao and throughout the region. Therefore, to create a favorable perception of the Solaire to the Asian gambling community and to promote the nascent Philippine market as an attractive destination for Chinese gambling in particular, we arranged for the CLO officials to be seated at the signing table with Mr. Razon and me and be publicly photographed with us during the ceremony. The expectation was that the presence of Macao's most senior Chinese economic liaison representatives at the Solaire signing ceremony would provide major Macanese junket operators with confidence that it was politically and socially acceptable for them to bring significant numbers of Chinese gamblers to Manila. Organizing and achieving such an event (and understanding the cultural impact underpinning it) is just one example of how GGAM leveraged my unique knowledge, experience, and relationships to deliver value to Solaire that the Owners would have been utterly incapable of attaining on their own.

28. This strategy was also consciously designed as a marketing tool to pave the way for future Chinese-Philippine business cooperation platform—with the Solaire as a catalyst for such bilateral trade opportunities—as means to generate high-margin, self-marketed business directly from prominent, high net worth Chinese businessmen who would now have business motivations to visit the Philippines.

29. Later on in Solaire's pre-Opening development and positioning, and once GGAM had established a general framework for Solaire's junket operations in terms of table and floor layout, commission structures, and deal terms, I began focusing my time and effort on negotiating and executing specific deals with the largest junket operators in the region headquartered in Macao. A core element of GGAM's strategy was to go after the largest and most influential junkets first, and, more specifically, by negotiating directly with the top executives within those organizations. It is an important tenet in Macao junket circles that if you can successfully network to the top leaders of these most influential junkets and achieve their personal endorsement of the relationship, it will motivate other desirable junkets will follow suit. Another important tenet is that if a prominent junket develops a negative impression of a property either by having a disappointing first-hand experience or by learning of an unfavorable experience through another operator, it would detrimentally affect that property's ability to generate consistent business in the future. Signing a junket like SunCity—the

10

largest junket in all of Macao—would be so important for establishing a successful roadmap for future operations that it would be better to forestall SunCity coming at any time before the casino's experience fully met their and their players' expectations.

      30.     These principles were intrinsic to the deliberate ramp-up strategy GGAM advocated to the Owners from the beginning of the Parties' negotiations, throughout Solaire's development and strategizing phase, and publicly repeated to the investment community. Mr. Almeda's accusation that GGAM failed to reach out to junkets even though it had a year and half prior to Opening to do so is completely erroneous and only underscores Bloomberry's detachment from the realities of the junket industry, and thus should be rejected. See Almeda Decl. at para. 23.

      31.     Mr. Razon states in his declaration that during a road show presentation at the St. Regis Hotel in New York, I answered a question as to how I would get junket operators to come to the Solaire by making "7 phone calls." See Razon Declaration at 45. I do recall making such a remark regarding being able to position Solaire effectively within the junket community by making only seven phone calls. That Mr. Razon would react to that comment literally reflects his ignorance of the concentration of power within the hands of a few mega junkets (approximately seven of Macao's over 200 junkets represent close to two-thirds of the total junket revenue) and GGAM's coordinated, strategic approach to acquiring these junkets for Solaire, once the property was fully ready to receive these junkets.[4] I did not intend, and Mr. Razon should not have honestly believed, that I would only make seven phone calls to help Solaire successfully market to key junket operators. Rather, my statement was intended to communicate to an investor audience GGAM's capability of leveraging its existing relationships in Asia and elsewhere, and developing new relationship, for Solaire's benefit, specifically by focusing its efforts on these top-tier junkets in the industry. It is a reality that those "seven phone calls" represented junkets that had gross revenue of over US$20 billion in Macau.

      32.     In effectuating our strategy for delivering foreign VIP customers in accordance with our ramp-up strategy, I communicated with Mr. Chiu via phone or email nearly every day, as he actively sought to continue to broaden our networks within the core Macao junket circle on behalf of Solaire. Our relationships with CLO officials opened doors for Mr. Chiu to speak with, liaise, and negotiate directly with the head executives at several of the top Macanese junkets. For example, with CLO support, in early April 2013, Mr. Chiu attended an event hosted by the top representatives of SunCity (Alvin Chau) and Macao Golden Group (Sister Mei), two of the most powerful junkets in

---

[4]     See, e.g., Exhibit C, Email from E. Chiu to B. Weidner (July 1, 2013) (GGAM0017566 – GGAM0017568).

11

Subject to Arbitration Confidentiality Orders                BLOOM_0100645

Macao. Both junkets expressed interest in doing business with Solaire, but as was expected, both were hesitant to jump in too quickly after Solaire's Opening. However, over the course of the next several weeks, Mr. Chiu and I, in close coordination with Mr. Andreaci and Mr. Saunders, continued to engage these junket contacts in the pursuit of business on behalf of Solaire. In late May 2013, Mr. Chiu and I personally attended a "hotpot" dinner in Macao with top SunCity representatives to endorse the Solaire and further cultivate their trust in doing business with Solaire.

33. Mr. Razon was informed about our efforts to market junkets during this time. For example, in June 2013 GGAM arranged for SunCity representatives to visit Solaire and bring select premium players with them to experience the property.[5] During one of these visits, Mr. Chiu directly introduced Mr. Razon and Mr. Almeda to a group SunCity executives.

34. In the end, GGAM successfully negotiated a favorable casual junket arrangement directly with the headquarters of SunCity.[6] GGAM presented this agreement to the Solaire Management Team around early July 2013.[7] To the extent the Owners failed to pursue this agreement, that is their failure. As far as we knew, there was nothing deficient in the arrangement or the signed agreement GGAM delivered, which was executed pursuant to the standard Solaire junket agreement forms. Even following our formal termination from Solaire, SunCity representatives informed GGAM that they did not wish to terminate their junket agreement with Solaire.[8]

35. Following our success with SunCity and in accordance with our predetermined junket strategy, we turned our attention to other reputable major Macanese junket operators, the Neptune Group and Macao Golden Group. Over the prior months, Mr. Chiu had previously visited with representatives of Neptune and Macao Golden Group, but, for reasons I have already mentioned, both junkets were unwilling to formally sign agreements or bring players until once it was clear that the property had achieved some level of operating success. Unfortunately, GGAM was never able to capitalize on these efforts, because several weeks later we received Mr. Razon's letter informing us of his intent to terminate the MSA.

---

[5] *See* Exhibit D, Emails between E. Chiu and M. French (June 8, 2013 – June 10, 2013) (GGAM0013325 – GGAM0013326).

[6] *See* Exhibit E, Email from W. Weidner to E. Chiu (June 21, 2013) (GGAM0017462).

[7] *See* Exhibit F, Email from E. Chiu to M. French (July 5, 2013) (GGAM0013354 – GGAM0013372) (attaching SunCity Junket Agreement); *see also* Exhibit G, Email from E. Chiu to M. French (July 8, 2013) (GGAM0013341).

[8] *See* Exhibit H, Email from Chiu to Weidner (September 16, 2013) (GGAM0017571).

Subject to Arbitration Confidentiality Orders

BLOOM_0100646

36.     I want to be clear that my efforts to promote the Solaire and generate foreign VIP business were not limited solely to securing junket opportunities. For example, in a March 3, 2013 letter, I carefully explained to Mr. Razon how my other efforts in China and Taiwan would directly benefit Solaire.[9] Specifically, I described how my business pursuits in China and the relationships derived therefrom would (1) be a springboard for bringing specific high rollers to Solaire, and (2) market the property more generally to high-value Chinese businessmen by creating a cross-border trading platform, thereby facilitating outreach to the otherwise "un-marketable" mainland Chinese clientele. That is, since one cannot market gaming directly to the Chinese, the creation of a non-gaming business rationale for going to and transacting in Manila provided precisely the "excuse" to this demographic that Solaire needed and otherwise would likely have difficulty reaching and penetrating. I also explained how I intended to utilize my Matsu Island project in Taiwan as a mechanism for cross-marketing the Solaire to the lucrative Taiwanese demographic. I would also use my office in Taipei as a Solaire satellite office to augment travel opportunities to Manila and casino marketing/player development efforts throughout Taiwan.

37.     In addition, for Solaire's Opening, I specifically arranged for several Chinese and Taiwanese travel agencies to attend the Opening and tour the Facilities to generate potential cooperation opportunities. I also organized a group of Taiwanese media representatives to attend the Opening. Some of the Taiwanese media coverage of Solaire made front pages news in Taipei.[10] This was excellent publicity that neither Mr. Razon nor Solaire could have generated on their own.

38.     Generally, I did not make it a point to check in with Mr. Razon or his representatives on a regular basis to inform them of the items that I was working on at any particular moment, nor did I instruct Messrs. Saunders or Stone to do so with respect to my efforts either. If Mr. Razon had concerns about my physical presence in Manila or whether I was sufficiently focused on Solaire, he did not make those concerns known to me personally until after he had already decided to wrongfully terminate our contractual relationship.

39.     In any event, for me to accomplish what Mr. Razon wanted me to accomplish—namely driving incremental value in the VIP segment by marketing to high net worth Asian clientele and junkets outside of the Philippines—the best use of my time was not sitting in an office in Manila, but in Hong Kong, Macao, China, and Taiwan directly developing and utilizing our Asian

---

[9]     *See* Exhibit I, Letter from B. Weidner to E. Razon (March 3, 2013) (GGAM0017681).
[10]    *See* Exhibit J, Taiwanese Press Articles (certified translation attached).

13

Subject to Arbitration Confidentiality Orders                                                                           BLOOM_0100647

relationships. I explained this to Mr. Razon on at least two occasions, and he did not dispute this. It is ironic for Mr. Razon to now use my lack of physical presence at the Solaire as a justification for terminating the MSA and freezing GGAM's Shares.

### GGAM's Ability to Mitigate Its Damages

40. Consistent with GGAM's business model, I have continued to seek business opportunities internationally, including in Asia, but our opportunities in Asia are limited as a result of Bloomberry's actions. First, Respondents' wrongful termination of GGAM and their malicious, false, public statements about GGAM have interfered with GGAM's ability to develop a portfolio and to market itself for new management and investment opportunities. Second, Bloomberry's continued interference with GGAM's ability to sell its Shares has made it significantly more difficult for me to pursue lucrative partnership opportunities. For example, we have been unable to repay our initial investor, Cantor Fitzgerald, and we do not otherwise have the ability to use proceeds from this investment to pursue other ventures.

41. Even setting aside the non-compete restriction imposed on GGAM under the MSA, there are likely no other management opportunities for GGAM in the Philippines. PAGCOR only issued four Entertainment City licenses, and the other three licenses are owned by established owner-operator entities that would not require an outside management services provider or would not be a realistic partner.

### GGAM's Expectations Regarding the MSA's Ten-Year Term

42. We shared Mr. Razon's expectations regarding the short-term and long-term profitability of the Solaire, and we each thought that our partnership would be mutually beneficial and lucrative. However, experience in the industry has taught us that even the best properties need time to ramp up operations and optimize performance. Therefore, we specifically negotiated for the five-Initial Term of the MSA to be extendable to ten years at GGAM's option so as to maximize the value of GGAM's time and efforts during pre-Opening and Development and during the ramp-up, as well as the value of our separate US$37 million equity investment, which we believed would continue to increase, over the long run, as long as we managed the property

43. Even during the first few months of Solaire's operations, we fully expected that GGAM would exercise its option at the end of the MSA's five-year Initial Term and manage the Facilities for the full ten years. Only the occurrence of some unexpected negative external event that

14

made our management of Solaire no longer tenable would have caused GGAM not to extend the MSA for the second five year period. For example, if the Philippine government became hostile to the Solaire or to gaming in general or if the gaming tax rate increased substantially, then the Project may no longer make sense for us. Otherwise, GGAM fully expected to maintain the MSA for the full ten years we had negotiated.

### The Owners' Defamatory Statements Have Harmed and Continue to Harm GGAM

44. Respondents' public, false statements about GGAM have been more detrimental than simply stating that Respondents terminated the MSA and that the Arbitration between the Parties is ongoing. Instead, Respondents, and Mr. Razon in particular, have made and continue to make affirmative statements that GGAM made serious mistakes and acted incompetently and inefficiently in performing their obligations under the MSA, perhaps even willfully so.

45. Mr. Razon's and his representatives' statements about GGAM create a negative business perception that possible partners may want to avoid. Although it is impossible to know precisely which opportunities GGAM has lost (and continues to lose) because an owner or potential partners heard Bloomberry's statements and decided not to reach out to or work with us, the reputational damage to GGAM in the gaming industry has likely been substantial and enduring. Mr. Razon is also exploiting our reputation and know-how to damage our future business by passing himself off as the prodigious casino operator responsible for Solaire's operational success.

### GGAM's Ownership of Its Shares, But for Respondents' Wrongful Termination

46. Before the Owners wrongfully terminated the MSA, GGAM had no plans to sell a significant portion of our Shares in BRC in a single block transaction, such that it would have required GGAM to suffer a substantial discount to the then-market price of the Shares. As I explained earlier, GGAM's business model is to both manage integrated casinos resorts and to hold equity positions in those properties it manages. GGAM's ultimate goal is to derive value from its active management in the form of (1) a stream of management fees, and (2) a multiplier to maximize return on our initial investment. Thus, GGAM has a strong bias against holding ownership interests in businesses that it does not manage directly.

47. We likely would have maintained an ownership interest in Solaire for as long as we managed the property, while potentially selling some portion of the Shares in small quantities for tax purposes, to generate liquidity to fund other projects, or, alternatively, potentially collateralizing the

15

Shares to support GGAM's global business. In fact, immediately prior to Opening, Respondents presented us with an opportunity to sell a portion of our Shares to a third party buyer, and we were not interested.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: June 14, 2015

_____
William P. Weidner

16

Subject to Arbitration Confidentiality Orders

BLOOM_0100650