# Exhibit 8

# (Previously Filed under Seal at Dkt. 281-6)

# Exhibit J

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010) BETWEEN:

GLOBAL GAMING PHILIPPINES LLC

and

GGAM NETHERLANDS B.V.

*(CLAIMANTS)*

- versus -

BLOOMBERRY RESORTS AND HOTELS INC.

and

SURESTE PROPERTIES, INC.

*(RESPONDENTS)*

---

SUPPLEMENTAL DECLARATION OF WILLIAM P. WEIDNER IN RESPONSE TO RESPONDENTS' REJOINDER

---

# DECLARATION OF WILLIAM P. WEIDNER

I, William P. Weidner, of 9711 Orient Express Court, Las Vegas, NV 89145, United States of America, declare as follows:

1. I submit this supplemental declaration (my "Supplemental Declaration") in the above-captioned Arbitration between Claimants Global Gaming Philippines LLC and GGAM Netherlands B.V. (together, "GGAM"), on the one hand, and Bloomberry Resorts and Hotels, Inc. ("Bloomberry Hotels") and Sureste Properties, Inc. ("Sureste") (collectively, "Respondents" or the "Owners"), on the other. I make this Supplemental Declaration in response to new evidence that Respondents presented in conjunction with their Rejoinder Memorial, dated September 4, 2015.

2. My Supplemental Declaration is given voluntarily. The contents of this Supplemental Declaration are true and correct and based on my personal knowledge. I incorporate by reference into this Supplemental Declaration, my Declaration in Support of GGAM's Reply Memorial, dated June 14, 2015, as well as my Declarations in support of Claimants' Request for Interim Measures dated April 13, 2014 and July 29, 2014, including statements regarding my background and relationship to the parties, which have not changed.

3. I am a U.S. citizen over the age of 18. I am competent to give this Supplemental Declaration. I have personal knowledge of the transactions and events that are the subject of GGAM's Statement of Claim filed on September 8, 2014 and GGAM's Reply Memorial. This Supplemental Declaration was prepared in English, and I will testify in English.

4. I affirm the truth of this Supplemental Declaration, and if called as a witness in this matter, I could and would competently testify to the matters set forth in this Supplemental Declaration.

5. I have reviewed Respondents' Rejoinder Memorial, and the Declarations and Expert Reports submitted in support of it. The Declarations, Expert Reports and the arguments in the Rejoinder mischaracterize, misstate, and omit key documents and facts.

6. Mr. Razon's description in his Supplemental Declaration of his "evolving vision"[1] of the GGAM-Bloomberry relationship contradicts his own purported expectations of GGAM being

---
[1] Supplemental Declaration of Enrique Razon ("E. Razon Suppl. Decl.") at para. 3.

1

Subject to Arbitration Confidentiality Orders

BLOOM_0104873

Solaire's "management company"[2] and are revisionist history that misrepresent the exchanges between Mr. Razon and me. His statements fail to put individual phrases into the full context of the contemporaneous exchanges and are misleading. They are also belied by our negotiations leading to the MSA and the terms of the MSA itself.

7. Following Garry Saunders' and my initial meeting with Mr. Razon in Las Vegas on March 12, 2011, I sent Mr. Razon an initial draft document styled as a "Preliminary Agreement" that was expressly premised on further negotiation of a "definitive" agreement. Anthony Cabot, one of our attorneys, prepared and sent the draft to Mr. Razon and his attorney Benny Tan. That draft emphasized our proposal that GGAM would be the "Manager" of Solaire with full authority.[3] Mr. Razon and his negotiating team—through an email from Mr. Tan—specifically rejected our proposal that GGAM be the "Manager" of the Facilities. Instead, they insisted that GGAM would simply "reinforce and assist" the Owners, and that all management would occur only through "the Management Team," all of whom would be the Owner's employees reporting to Mr. Razon. GGAM could give recommendations and advice, but not make final decisions.[4]

8. Mr. Cabot responded to Mr. Tan, noting that Mr. Razon's proposed allocation of authority and responsibility was not typical in the gaming industry and raised substantial concerns.[5] I personally responded to Mr. Razon on April 11, 2011, raising similar concerns,[6] and subsequently reiterated these concerns to Mr. Razon.[7]

9. The negotiations between the Parties resulted in the MSA, under which GGAM was retained to provide management and technical services as defined, and was required to act "through the Management Team," all of whom would be Bloomberry employees. As reflected in the contemporaneous exchanges and in the MSA itself, it was our understanding that:

---

[2]    E. Razon Suppl. Decl. at para. 33; Declaration of Enrique Razon ("E. Razon Initial Decl.") at paras. 31, 42; *see also* Rejoinder at paras. 12, 41.

[3]    RE-2, Email from Cabot to Bloomberry (April 6, 2011) (attaching Managed Facilities Services Preliminary Agreement).

[4]    CE-146, Email from Tan to Cabot (April 7, 2011).

[5]    *Id.*

[6]    RE-3, Email from Weidner to Razon (April 11, 2011).

[7]    *See* CE-143, Letter from Weidner to Razon (April 18, 2011); CE-144, Letter from Weidner to Razon (May 1, 2011).

2

(a) There would be a Solaire Management Team that GGAM would recruit and nominate, subject to the Owners' approval. The GGAM principals would advise, oversee, and supervise the activities of that on-site team. Had Mr. Razon adopted our original proposal, that team would have been made up of key employees reporting directly to me and the other GGAM principals. In that context, we would have had direct authority over Solaire's management and our actions and activities would have been ascribed to GGAM, rather than characterized as actions and activities performed by Bloomberry.

(b) In contrast, under the MSA, the members of that Management Team that GGAM would recruit, including the Chief Operating Officer (who would be a Bloomberry employee but would act as GGAM's on-site representative), would specifically be Bloomberry's employees. GGAM had a "dotted line" relationship to the Management Team; it could advise, assist and recommend, but Mr. Razon retained ultimate control over Solaire and its operations.

10. Regardless of who employed the Management Team and the nature of the reporting relationship, GGAM in fact performed its obligations under the MSA; it cannot properly be denied credit for the Management Team's implementation of activities under GGAM's supervision and oversight. Mr. Stone spent significant time and effort in overseeing and improving construction activities, undertaking those efforts even before GGAM was under contract. Mr. Saunders and Mr. Stone spent significant time and effort identifying hiring needs for Solaire, recruiting key personnel to come to Solaire, negotiating salaries, and developing staffing plans. Mr. Saunders, Mr. Stone and I personally spent significant time discussing oversight activities, developing and reviewing business and marketing plans, considering strategy, advising on hiring, training, policies and procedures and other matters. We conducted these efforts whether we were in Manila or elsewhere, and were consistent with typical management activities within our industry and our experience in senior management positions at other companies. Finally, Mr. Stone spent significant time as the lead presenter during Bloomberry Resorts Corp.'s road show, and I personally joined the road show meetings in New York.

11. It was not GGAM's obligation to have its principals act as personal scriveners of the Business Plan, marketing plans, or specific policies and procedures. But we did direct and oversee their preparation and had significant and material input into each to assure their content, quality, and completion. It is important to distinguish between the activities of the property team —in this instance, the Management Team as defined by the MSA—and our activities as corporate supervisory

3

management. GGAM was not retained to be Solaire's on-site operating staff. That was expressly the province of the Manila Management Team GGAM recruited.

12. Mr. Razon now asserts that he anticipated full-time management from GGAM's principals, and from me in particular, including my physical presence in Manila.[8] But the contemporaneous emails and the MSA itself show that is not what we proposed, and not what was memorialized into the MSA. Rather, GGAM's principals would devote the time appropriate to the needs of Solaire, and use our years of industry experience to provide the Services specified in the MSA. GGAM did not represent that its principals would be at Solaire full-time; many of the Services required under the MSA, such as recruiting and marketing efforts, would necessarily be performed outside of Manila. Nor did GGAM represent that its principals would devote all of their time to management of Solaire, at a level to be subjectively assessed by Mr. Razon based on his sole judgment.

13. In Mr. Razon's first communication to me following our Las Vegas meeting, he acknowledged that it was not possible for me to provide full-time management of Solaire. Rather, he recognized that there would be a team of senior executives (not GGAM principals) who would be recruited by GGAM and assigned full time to Manila to carry out Solaire's day-to-day activities.[9] (Mr. Razon envisioned two phases: Phase one being construction and start-up, and Phase two being management, operations, and marketing). My proposal that followed explained that GGAM would identify and put a team of full-time people (not GGAM principals) on the ground in Manila that would perform these "functions required to maximize income from day to day operations and have them in place well before opening."[10] It was within that context that I assured Mr. Razon that I would personally oversee GGAM's "initial on the ground supervisory presence until our full time people are fully up to speed." And although the MSA would not be signed for another five months, I did just that. By the time that contract was officially announced in mid-October 2011, the three GGAM principals, including myself, had spent a total of over 80 days in Manila and in Macao solely performing pre-opening activities and recruiting for Solaire. The GGAM principals, under my direct supervision, had already identified most of those key, full-time, on-the-ground executives, and many had mobilized or were in the process of mobilizing to relocate to Manila for Solaire. Like our work

---

| | |
|---|---|
| 8 | E. Razon Suppl. Decl. at paras. 6, 15, 17; *see also* E. Razon Initial Decl. at paras. 29, 37. |
| 9 | RE-1, Email from Razon to Weidner (March 17, 2011). |
| 10 | CE-33, Email from Weidner to Razon (March 21, 2011). |

4

Subject to Arbitration Confidentiality Orders

BLOOM_0104876

with respect to development and design of Phase 1A of Solaire, we did not seek compensation for any of our pre-MSA time and effort, in recognition of the long-term partnership that we thought we were establishing with the Owners. From my perspective, this represented the significant initial commitment and personal oversight necessary to ensure that experienced, on-the-ground people were fully up to speed and integrated into the Project well before its opening.

14.   To further clarify GGAM's proposal regarding management and staffing, I attached to my March 21, 2011 email a Draft Term Sheet, which outlined the following principles:

- Participation on an as-needed basis of all GAM Principals and staff
- Hiring and supervision of the property management team, including the property president and COO, CFO, CMO and other key department heads
- Identify and appoint on-the-ground interim positions for the construction and pre-opening phase.[11]

15.   GGAM actively recruited, oversaw, and supervised the actions of the Management Team in performing the Services in accordance with the MSA. It is hypocritical, but more importantly a breach of their obligations, for Respondents to base their termination of the MSA on the ground that GGAM did not provide full-time, "on-site 24/7 leadership,"[12] when that requirement was never proposed by Respondents, never accepted by GGAM, and was not incorporated into the MSA.

16.   The time and effort we devoted to recruiting, supervising, advising, and overseeing the on-site Management Team shows that Respondents' new argument that GGAM lacked an "infrastructure" is a red herring.[13] If, as we proposed initially, Mr. Razon had retained GGAM as the operator of Solaire, the team we recruited would constitute the operating infrastructure onsite, with much the same positions as the Solaire Management Team. Messrs. Stone, Saunders and I would have supervised that team—as GGAM employees—in much the same way that we supervised what became the Solaire Management Team, all of whom, under Mr. Razon's construct, were Bloomberry employees. (We now know that, over two months before the parties signed the MSA, without

---

[11]   RE-188, Draft Term Sheet (March 20, 2011).
[12]   Expert Report of Fred Kleisner ("Kleisner Report") at para. 19(d).
[13]   Kleisner Report at paras. 9-10.

5

Subject to Arbitration Confidentiality Orders                                                                                                                              BLOOM_0104877

assurance that it would be signed, and over seven months before GGAM received its first MSA payment, Bloomberry considered hiring GGAM's recruits directly—after GGAM had introduced these individuals to Bloomberry in good faith—as a means of cutting GGAM out of the management deal.[14]) For the Services that it was contracted to provide, GGAM would not be expected to have in-house back-office support, such as a team of accountants, interior designers or other overhead. Our expertise and experience allow us to identify the right people to address those issues in support of the on-site team, while focusing our efforts on oversight, strategy and assuring that tasks are identified and completed.

17. Contrary to Mr. Razon's assertions in his Supplemental Declaration,[15] GGAM actively supervised and advised the Management Team. The effectiveness of our efforts is demonstrated by the fact that Solaire opened in the first quarter of 2013, as scheduled, with a full complement of trained employees, with policies and procedures in place, and with a marketing plan successfully implemented so that some 40,000 people were attracted to the property in its first two days of operation. It is impossible to view that as anything other than a success, and a demonstration that, acting "through the Management Team," GGAM provided the Services it contracted to provide. Mr. Razon confirmed this success publicly and to his shareholders.

18. Having at the outset in April 2011 rejected my proposal that GGAM employees be the on-site team, Respondents now engage in a sleight of hand, under which any success is ascribed to the on-site Management Team as "Bloomberry" employees, and GGAM is denied any credit for having recruited and assembled that team or for having supervised, overseen and directed their actions. For example, Respondents ascribe to Mr. Andreaci (again misleadingly as a "Bloomberry employee") the successful effort to attract SunCity, the largest junket operator in the world.[16] Of course, Mr. Andreaci had contacts within the SunCity organization as well as other Asian junkets; that is one of the reasons why we targeted, recruited, and convinced Mr. Andreaci, an LVS alumnus, to come to Solaire even before the MSA was signed. And of course we oversaw and encouraged

---

14  See, *e.g.*, RE-118, Emails between Alarilla, Razon, Almeda (July 7, 2011) (noting Bloomberry's excitement in meeting with GGAM's on-site executive candidates and suggesting that they could offer them positions directly); CE-154, Email from D. Almeda to E, Occeña (July 20, 2011) (recognizing that Mr. Razon wanted to use GGAM's connections for Management Team candidates "in parallel" with negotiating the MSA).

15  E. Razon Suppl. Decl. at para. 33.

16  Rejoinder at para. 95.

6

Mr. Andreaci to use those contacts. But the very email from Mr. Andreaci that Respondents cite establishes that Mr. Andreaci had been unsuccessful in using his contacts, and that it was only my personal efforts, working through my established, high-level connections in China and Macau, that resulted in the SunCity Chairman eventually agreeing to do business with Solaire.[17] Respondents ignore the inconvenient truth of GGAM's role in that success.

19. Mr. Razon and his expert Mr. Kleisner denigrate my travel and time spent in Macau and China cultivating these relationships as not benefitting Solaire[18] and "hav[ing] nothing to do with the attention, hands-on management presence required under the MSA."[19] But, as illustrated by our successful engagement of SunCity, the relationships that I developed and maintained from my years of doing business in Asia are important resources that I intended to (and did) leverage for Solaire.

20. The very week the MSA was signed, I began arranging for a delegation of officials from the Chinese Liaison Office to Macao to attend the ceremonial signing in Manila. These same connections, which I continued to cultivate over the next two years, paved the way for SunCity to agree to a junket arrangement with Solaire in June 2013. Before GGAM received Mr. Razon's July 12 2013, notice of intended termination, we had also begun talks with the Neptune Group and the Macao Golden Group, two of the other largest junkets in Macao, as part of a concerted strategy to attract and obtain business from the most prominent and profitable junkets. Understanding almost nothing about the Chinese junket industry, Mr. Razon and Mr. Kleisner fail to grasp the critical importance of the frequent, face-to-face interaction required to engender trust and build those business relationships. They also fail to appreciate that a deliberate, tempered approach to pursuing these junkets is not only prudent but necessary to sustaining long-term success. Had Mr. Razon not impatiently and unilaterally terminated the MSA four months into our ten-year agreement, our efforts to position Solaire on this strategic trajectory to attract and obtain the upper echelon of Chinese junkets would have reaped financial and reputational rewards for years to come.

21. Respondents, and Mr. Razon specifically, also assert that Mr. Razon "repeatedly expressed [] dissatisfaction with GGAM generally and with [me] in particular."[20] Yet, Mr. Razon's

---

[17]   RE-74, Email from Andreaci to Saunders and French (April 23, 2013).
[18]   E. Razon Suppl. Decl. at para. 17.
[19]   Kleisner Report at para. 19(c).
[20]   E. Razon Suppl. Decl. at para. 17; *see also id.* at para. 34.

7

declaration does not identify any specific communication, either verbally or in writing, that would support this unsubstantiated claim. Nor did he ever inform me, as he claims now, that he thought the best use of my time was being physically present in Manila.[21] I received fewer than five emails in total from Mr. Razon since the beginning of 2012, which includes his July 12, 2013 letter proposing to terminate GGAM and the September 3, 2013 chart of allegations. I do not recall receiving any communication, in which Mr. Razon expressed his dissatisfaction with GGAM's performance of the MSA, or with me personally. To the contrary, I was copied on and discussed with the GGAM team multiple complimentary communications from the Owners' representatives, who expressed their satisfaction with our efforts on the IPO roadshow, our success in correcting the Facilities' construction woes and revising the Phase IA construction process to save the Owners millions of dollars, and our successful efforts to recruit, train, and oversee Solaire staff. Even after the Opening, I did not receive a single complaint from Mr. Razon regarding GGAM's performance of the MSA, until shortly before we received his July 12, 2013 notice of intended termination.

22. Mr. Razon's summary decision to terminate the MSA without providing GGAM an opportunity to cure any alleged deficiencies demonstrates that he did not want an "amicable parting of ways," as he now claims.[22] Following our receipt of the July 12 Letter, I attempted for weeks to reach out to Mr. Razon, requesting an in-person meeting or a telephone conversation to propose a possible solution to our differences. Mr. Razon claims that the MSA was a deal he made with me,[23] but he did not respond to my requests to meet or to discuss methods to address GGAM's purported deficiencies. Rather, he acted to retain the fruits of GGAM's substantial efforts—a successful capital raise through the public offering, correction of the construction problems and completion of an integrated casino-resort facility that opened on time, fully staffed and with revenues and profitability on track to ramp up as mass marketing programs were adjusted and as Junket and VIP efforts matured over time—while denying us the fees and other economic returns we had contracted for.

23. The Rejoinder and Respondents' accompanying declarations make a number of allegations that Cantor Fitzgerald—which holds a 50% interest in the upstream holding company that owns GGAM Philippines—improperly controlled GGAM and prevented GGAM's principals

---

[21] E. Razon Suppl. Decl. at para. 17.
[22] E. Razon Suppl. Decl. at para. 35.
[23] E. Razon Suppl. Decl. at para. 8.

8

Subject to Arbitration Confidentiality Orders
BLOOM_0104880

from performing their obligations under the MSA.[24] That is not so. First, we fully disclosed Cantor Fitzgerald's upstream ownership interest from the inception of our discussions with Mr. Razon. It was on our website, which Mr. Razon told us in the first meeting he had reviewed. Second, the Bloomberry negotiating team could not have been surprised about Cantor's role, as they dealt directly with several Cantor attorneys who acted as our counsel in the negotiations, and with Mr. Rein who was a Cantor employee working for and eventually seconded to GGAM. Third, the Cantor ownership interest was specifically disclosed in an exhibit to the MSA, as required by Section 10.2(e). That Mr. Razon now says the disclosure letter required by Section 10.2 was somehow a last-minute disclosure that he failed to read[25] further establishes how disconnected his "expectations" are from the actual requirements of the MSA. The MSA disclosure provision was negotiated by his team, specifically required by them, and specifically fulfilled by GGAM. Mr. Razon must have recognized this requirement, because he sent me a letter identifying his company's ownership interests the day before I sent our disclosure letter to him.[26]

24. Respondents' and their expert's assertion that the Support Services Agreement ("SSA") was an "assignment" of GGAM's MSA obligations is also wrong.[27] The SSA was contemplated in our original partnership arrangement with Cantor Fitzgerald; such arrangements are a typical part of joint ventures and similar agreements. Financially, it makes no sense for a start-up organization to bear the costs of fully staffing back-office functions, especially where those services can be obtained from one of the co-owners at fair cost, and will usually assure that the services are provided by people with significant experience and expertise. At the time the MSA was signed, Cantor Fitzgerald had already been providing support services to GGAM. As I noted above, attorneys delegated from Cantor Fitzgerald to represent GGAM were involved in negotiating the MSA. The SSA was not created for any purpose related to the MSA, and in no way was an "assignment." Under the SSA, Cantor personnel provided services for activities internal to the relationship with GGAM only, and GGAM paid for those services. There is nothing in the SSA under which GGAM disclaims or transfers its obligations or its rights under the MSA.

---

[24] *See, generally,* Rejoinder at Part VII; Kleisner Report at Part G; E. Razon Suppl. Decl. at paras. 12-14.
[25] E. Razon Suppl. Decl. at para. 13; *see also* Rejoinder at para. 156.
[26] *See* Interim Measures CE-50, Letter from Razon to Weidner (September 7, 2011).
[27] Rejoinder at paras. 165-168; *see also* Kleisner Report at para. 45.

9

Subject to Arbitration Confidentiality Orders

BLOOM_0104881

25. Finally, Respondents argue that Entry 721 on Claimants' privilege log, a draft agreement among the upstream owners of GGAM Philippines regarding the GGAM Shares in Bloomberry Resorts Corporation, is somehow evidence of Cantor' domination of GGAM.[28] That argument, too, is off-base. The document is only a draft—it was never executed, never came into force, and has no effect whatsoever. It should also be no surprise that the owners of GGAM Philippines discussed among ourselves the economic benefits of shares granted to GGAM under the Equity Option Agreement. As experienced businessmen, it would be unreasonable for us not to consider the mechanisms by which the strike price would be funded, or for us not to assure the timing and mode of repaying the advance of those funds. Similarly, while our intent was to increase the value of our shareholdings—that alignment of interests between GGAM and the Owners was a fundamental economic incentive—it made perfect sense to consider how to take advantage of that economic benefit for our long-run business purposes.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: October 5, 2015

*/s/ William P. Weidner*

William P. Weidner
Las Vegas, NV

---

[28] Rejoinder at para. 170; *see also* Razon Suppl. Decl. at para. 12.

Subject to Arbitration Confidentiality Orders    BLOOM_0104882