behalf of GGAM.[37]  As Weidner and Chiu have a history of making payments to intermediaries in China without any supporting and/or misrepresented documentation (see **Appendix A**), and no other reasons for the payments have been put forth by GGAM, the circumstantial evidence indicates that the payments were used for illicit purposes.

## IV.    SPECTRUM'S OPINION ON GGAM'S "CROSS-BORDER TRADING PLATFORM" STRATEGY

36.     According to Weidner's sworn testimony in the Arbitration, Weidner proposed implementing a two-step technique he termed a "Cross-Border Trading Platform" as a specific strategy to "… direct VIP play, by helping establish a cross-border trading platform to promote business and gaming visitation between China and the Philippines" in order to facilitate Chinese VIP play at Solaire.[38]  The "Cross-Border Trading Platform" strategy proposed by Weidner consisted of two separate and distinct steps.  First, GGAM proposed to reach out to Mainland Chinese clientele by creating a pretext of a non-gaming business purpose when the actual purpose of the outreach was to promote illegal gaming visits to Solaire in the Philippines. Second, GGAM proposed the creation of a financial mechanism and structure by which funds intended for use in gaming could be secretly and illegally moved out of Mainland China and into the Philippines disguised as legal "business" transactions by misrepresenting them or bundling them with other legitimate transfers.  Once on deposit at a bank in the Philippines, the funds (or excess funds) could then be forwarded to player-owned casino accounts at Solaire for their actual intended purpose—gambling.

---

[37] Dr. Chen left his position with the CLO in Macao in 2016, and Spectrum has not been able to locate any reasons for his departure or his current position.  Given that his actions appear to be at variance with stated Chinese law and policy, however, he very well could have left for reasons related to the crackdown on corruption.  It should be noted that Li Gang, the head of the CLO in Macao from 2013-2016 was removed and subsequently punished for "serious disciplinary violations", the common term used in China for corruption.  *See* Racquel Cavalho, *Macau liaison office director Li Gang moved out, to be replaced by Wang Zhiming*, South China Morning Post (July 1, 2016),  https://www.scmp.com/news/hong-kong/politics/article/1984053/macau-liaison-office-director-li-gang-moved-out-be-replaced.

[38] Oct. 19, 2015 Hr'g Tr. at 148:12-15 (BLOOM_0119059, at -9315).

37.     Specifically, and according to his testimony in the Arbitration, Weidner and

GGAM were proposing to:

a. Travel to China under false pretenses by pretending to be there to market legal
business travel to the Philippines when the actual purpose was to promote illegal
travel to the Philippines for gaming;[39]

b. Secretly market Solaire's gaming services to potential Chinese VIP customers
while within China's national borders;[40]

c. Use business cards and documentation that intentionally avoided any references to
gaming to avoid detection by Chinese authorities;[41] and

d. Assist Chinese VIP customers in illegally moving funds out of China in large
amounts that GGAM knew violated China's currency control laws, so they could
be used for illegal gambling, all while knowing that doing so was in violation of
China's anti-gambling laws.[42]

38.     In short, the "Cross-Border Trading Platform" Weidner described as one of his

two key strategies for Solaire had a clear purpose: the placement of funds from China into the

Philippines' financial systems through secretive means intended to disguise its true character,

the layering of those transactions through foreign entities and accounts to further obscure their

original source, and the subsequent integration of those funds into accounts at Solaire where

the Chinese originator of the transactions could then personally enjoy and use the funds for

gaming in violation of China's laws.

39.     The "Cross-Border Trading Platform", if implemented, would have

circumvented China's criminal laws and facilitated illegal international monetary transfers by

potential Chinese VIP players.[43]  Such a mechanism is, on its face, one that is all too familiar

---

[39] *Id.* at 209:3-17.

[40] *Id.* at 206:13-17.

[41] *Id.* at 208:7-11.

[42] *Id.* at 210:14-25.

[43] As noted above, gambling is illegal in mainland China and the promotion of gambling to its citizens in mainland China is a clear violation of Chinese criminal law. *See supra* note 22. Furthermore, China's currency control laws strictly limit outbound cross-border fund transfers by individual Chinese citizens to US$50,000 per calendar year. Reuters Staff, *China's new rules on yuan transfers are not capital controls: Xinhua*, Reuters (Jan. 3, 2017), https://www.reuters.com/article/us-china-yuan-idUSKBN14M032.

15

to governments and financial investigators around the world: the creation and use of controlled foreign entities and false transactions to obfuscate funds by creating the false appearance of legitimacy. The use of foreign entities and false transactions as devices for money laundering,[44] tax evasion, and other financial crimes is a well-known and common component of many such schemes. One of the more common examples of such a money laundering scheme involves the use of phony business transactions to surreptitiously transfer money, including personal funds, across national borders through false invoicing, inflated pricing structures, and phony investments. This is often accomplished by establishing foreign business entities in offshore financial centers that can issue phony invoices for fabricated goods and services, or by inflating or deflating the true cost of legitimate goods and services. Sometimes referred to as "trade-based money laundering," it is commonly practiced by tax evaders and money launderers throughout the world.

40. And it is clear that Weidner was planning to engage in trade-based money laundering. In his sworn testimony, Weidner describes the cross-border trading platform as being "simply a technique … I don't want to use the term 'front,' but as the way of reaching out to Chinese without being a gambling person."[45] He further stated: "I wanted legitimate business. I didn't want to just do beards."[46] Notwithstanding Weidner's reluctance to use the

---

[44] Money Laundering involves the conversion or transfer of property, knowing that the property is the proceeds of crime, for the purposes of concealing or disguising the illicit origin of the property. *See About APG*, The Asia/Pacific Group on Money Laundering, , http://www.apgml.org/about-us/page.aspx?p=91ce25ec-db8a-424c-9018-8bd1f6869162 (last visited Sept. 14, 2022). The definition is incorporated directly from Article 6 of the United Nations Convention Against Transnational Organized Crime defines Money Laundering. While Spectrum has no information regarding the original source of the funds that would have been transferred, and does not allege they are derived from the proceeds of criminal activities, it does note that the sole and clearly stated purpose of the "Cross-Border Trading Platform" was to facilitate and enable Mainland Chinese nationals to illegally circumvent Chinese currency control laws so as to engage in gaming, an activity that ***by definition*** amounted to illegal activities on their part. Therefore, while the original source of the funds transferred may not have involved criminal proceeds, the subsequent use of illegal devices and subterfuge to transfer the funds out of the country would have clearly cast a taint of illegality over the funds.

[45] *Id.* at 216:19-24.

[46] *Id.* at 292:4-6. Notably, the SEC Cease-and-Desist Order Related to LVSC Operations in Macao and China also referred to LVSC, during Weidner's tenure, as using "an intermediary or 'beard' to obscure LVSC's role in certain transactions." *See* SEC Order, at ¶ 15 (GGAM-SDNY-0122376).

word "front"  nor his stated desire to not "just do beards," those are precisely the nature of the

platform that he was proposing to establish with the involvement of many of the same Chinese

businessman and state-owned entities that were involved in the FCPA investigations involving

Weidner and Chiu's conduct at LVSC—namely, the CLO in Macau, China International Travel

Service,[47] and Chu Kong Shipping.[48]

> 41.    In fact, Weidner acknowledges as much in his testimony wherein he states:

> "Understand, I can't – you can't promote gaming in China, so if you're going to directly promote people, you will promote business, not gamble, and both business (*sic*) give them a portal to be able to legally transfer RMB for their business activities and gives them a reason that they can get their visa and go to the Philippines.  So they will gamble and I will find people that will gamble, and they can use the excuse of doing business in the Philippines.[49]

> . . .

> . . . And I was setting up with them banking relationships so that when the trade guys -- when these guys went to be at Solaire in Manila and they needed money to be able to conduct their trading exercises, they generally over-send money for trading exercises so they have liquidity to gamble with.

> So they were the other piece of, call it the sophistication of a process, of building a way for Chinese businessmen to be able to come and gamble and have money to gamble with.

> But by the way, to the Chinese, gambling and business is just the way they breathe. ***So there is nothing wrong with it*** but it was the idea of setting a platform up to be able to do business and to be able to enjoy themselves and gamble."[50]

---

[47] China International Travel Service was the company that owned the building in Beijing that LVSC paid tens of millions of dollars to purchase for no apparent reason, and whose chairman had political connections on Hengqin Island, the location where Weidner wanted to develop a multi-billion-dollar resort but needed government approvals. *See* Appendix A.

[48] Chu Kong Shipping was indirectly owned by the Consultant and the chairman of China International Travel Service.  *See* Appendix A.

[49] Oct. 19, 2015 Hr'g Tr. at 206:15-24 (BLOOM_0119059, at -9330).

[50] *See* Oct. 19, 2015 Hr'g Tr. at 213:22-214:11 (BLOOM_0119059, at -9332).  Notably, Weidner testified that "Brother 8" and other members of the Ma family, a prominent Chinese family with significant political and business connections, were going to play a critical role in his "Cross-Border Trading Platform" strategy.  *See* Weidner Hr. Tr. at 210:14-211:3 ("So I was involved in Macau with the Ma family, one cousin, one brother, a very famous Chinese family.  Relatives had . . . set up Citic and Poly Group.  So Citic and Poly Group, through Brother 8 . . . were going to help me figure out how to be able to transfer money for trading purposes.  So it was my Macau contacts, my CLO contacts, my Beijing contacts that all came into play for what I would say [is] a

. . .

> As long as he registered a business there and was in trading you can't – it's hard to trace did he lose in the transaction, make money in a transaction, or whatever? That's why the trading platform – as long as he was making widgets, you can count widgets and send them. If you're trading commodities, which were the metals or whatever you were trading, oil, price goes up and down every day, so it's just a more, call it fluid way of being able to transact cash."[51]

42.    Significantly, Weidner acknowledges in his testimony that manipulation of trade transactions was a key component of his proposal, as the registered business used to move money out of China could not be one that involved fixed goods that could be counted (e.g., "widgets"), but rather should be one where prices were "fluid" (e.g., metals, oils, etc.) and therefore harder to trace.[52] Thus, in effect, the "Cross-Border Trading Platform" described by Weidner was a classic example of a trade-based money-laundering scheme whereby money, including personal funds, is transferred across national borders through the overpricing and/or under-invoicing of goods and services. The essential component of such schemes is the intentional misrepresentation of the value of trade-based goods and services in order to transfer value or settle accounts between trading parties. In the case of Weidner's "Cross-Border Trading Platform," further obfuscation would have been added by limiting the trading activities

---

unique and sophisticated way of reaching directly into individual Chinese high-end business people who were most of the very high-end gamblers there.") (BLOOM_0119059, at -9331); *id.* at 213:20-214:6 ("[B]rother 8 is in Macau. And brother 8's family relate[s] to Citic and Poly Group and I was setting up with them banking relationships so that when the trade guys . . . went to be at Solaire in Manila and they needed money to be able to conduct their trading exercises, they generally over-send money for trading exercises so they have liquidity to gamble with. So they were the other piece of, call it the sophistication of a process, of building a way for Chinese businessmen to be able to come and gamble and have money to gamble with.") (BLOOM_0119059, at -9332). Weidner expressed no concern whatsoever that "Brother 8" played a "crucial role" in the Macao underworld, as he was acquainted with many triad (organized crime) bosses and served as a "referee" for their disputes. *See* Sonny Lo Shiu-hing, *The Politics of Cross-border Crime in Greater China: Case Studies of Mainland China, Hong Kong, and Macao*, Routledge, p. 139.

[51] Oct. 19, 2015 Hr'g Tr. at 291:17-292:2 (BLOOM_0119059, at -9351); *see also* Oct. 19, 2015 Hr'g Tr. at 209:3-17 (BLOOM_0119059, at -9331) ("Well, you can't draw money in China and say 'I'm going to the Philippines to gamble.' It's illegal. When you're talking to a Chinese businessman, you're talking to him about business, you're talking to him about perhaps coming to a leisure thing. . . . so you can't promote gambling in China, particularly when you're dealing with high level government officials. I am Weidner Lou Trading or Weidner Resorts when I'm in China.").

[52] *Id.*

to commodities transactions, which can dramatically fluctuate in price in the short term thereby making it difficult, if not impossible, to determine actual gains and losses.[53]  As such, the "Cross-Border Trading Platform" bears a striking resemblance to many of the abusive schemes and techniques developed by money launderers, offshore bankers, financial service providers and others in assisting customers to circumvent national tax and anti-money laundering laws that have been the subject of significant media coverage around the world.[54]

43.     In his testimony, Weidner euphemistically referred multiple times to terms such as "sophisticated," "excuses," "techniques," "legal," and "fronts," but the clear inference of his statements is that he intended to put in place a structure that was designed to appear legitimate when in actuality he was illegally promoting gambling to Chinese nationals and assisting them in illegally getting funds out of China.  His unwillingness to put any information about his "Cross-Border Trading Platform" or his "Government-led Top-Down Junket Approach" in writing further underscores that he knew what he was doing was wrong.[55]  And we understand that, once again, GGAM did not produce any documents in the Arbitration concerning this strategy, leading us to the inescapable conclusion that GGAM and Weidner were likely fully aware that both aspects of what he was proposing were illegal.

---

[53] Jean B. Weld, *Current International Money-Laundering Trends and Anti-Money Laundering Co-Operation Measures*, UN Asia and Far East Institute for the Prevention of Crime and the Treatment of Offenders (July 2010), https://www.unafei.or.jp/publications/pdf/RS_No83/No83_08VE_Weld3.pdf ("Red flag indicators of trade-based money laundering include: . . . false invoicing and customs documents: such as commodity misclassification or commodity over-valuation or under-valuation[.]").

[54] Examples include U.S. Dep't of Justice, *HSBC Holdings Plc. and HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement* (Dec. 11, 2012), https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations; U.S. Dep't of Justice, *UBS Enters into Deferred Prosecution Agreement* (Feb. 18, 2009), https://www.justice.gov/opa/pr/ubs-enters-deferred-prosecution-agreement; U.S. Dep't of Justice, *United States Asks Court to Enforce Summons for UBS Swiss Bank Account Records* (Feb. 19, 2009), https://www.justice.gov/opa/pr/united-states-asks-court-enforce-summons-ubs-swiss-bank-account-records.

[55] *See* Oct. 19, 2015 Hr'g Tr. at 215:15-216:19 (BLOOM_0119059, at -9332).

V.      **GGAM'S REFUSAL TO PRODUCE CRITICAL DOCUMENTS IN THE ARBITRATION THAT WOULD HAVE CORROBORATED THE EXISTING CIRCUMSTANTIAL EVIDENCE OF ILLEGAL AND UNETHICAL CONDUCT**

44.     We note that that there was a suspicious lack of documentation produced in the Arbitration related to GGAM's relationship with Dr. Chen, as well as other Chinese government officials and businessmen.  We were informed by counsel that GGAM had been ordered by the Arbitration tribunal to produce Chiu's files, who was GGAM's President of Asia, "instrumental" and "key" to GGAM's strategies, and acted as a liaison between Weidner and Dr. Chen.  Such files seemingly would have included direct communications with government officials and junket operators, such as emails or text messages (a more common form of immediate communication in Asia).[56]  We also note that GGAM's former attorney, Charles A. Patrizia of Paul Hastings LLP, admitted that Paul Hastings did not search or review Chiu's personal email files, claiming, among other things, that "it would have been disproportionately time-consuming and expensive to obtain, search and review any separate personal files that Mr. Chiu might have possessed."[57]  ***Such secrecy is damning***.  If GGAM's utilization of these strategies, and Chinese government officials and businessmen to advance such strategies, was above-board and central to any legitimate strategies for Solaire, then there would be no reason to hide it.

45.     We also understand that GGAM did not produce any documents related to Weidner Resorts, Weidner Lou Trading, or any other Weidner businesses, on the basis that these entities were not "parties" to the Arbitration.[58]  Yet Weidner later testified that he used

---

[56] We are instructed that the only documents that GGAM produced in the Arbitration that were sent to or received by Eric Chiu were those documents that were also sent to or received by other custodians, such as Weidner.

[57] *See* Affidavit of Charles A. Patrizia, March 13, 2018, ¶ 36 (GGAM-SDNY-0152569).

[58] *See* Claimants' Objections and Responses to Respondents' Requests to Produce Documents, January 14, 2015 (GGAM-SDNY-0264742), at request no. 45 ("Claimants additionally object to this request on the ground that it seeks the disclosure of a *non- party's* confidential, commercial, technical, sensitive, privileged, and/or proprietary information.") (emphasis added); *see also* Decision of the Tribunal on Respondents' Requests for Documents, February 16, 2015 (GGAM-SDNY-0378511), at request no. 45 ("Objection upheld. Weidner Resorts is a third

20

these businesses as "fronts" to conduct GGAM or casino-related business while visiting the Chinese mainland, where it is illegal to gamble and to market for a casino.[59]  And, as noted above, it was later revealed that Chiu, GGAM's President for Asia, was not on GGAM's payroll, but rather was on the payroll of Weidner Resorts and Weidner Holdings.[60]  Therefore, it is possible that Chiu's emails also would have been in the possession, custody, and/or control of Weidner Resorts and Weidner Holdings, but were not produced in the Arbitration.

## VI.    CONCLUSION

46.    Weidner and Chiu have a long history of disregarding compliance measures and of engaging in unethical and illegal activities in China and Macao during Weidner's time as President of LVSC and as the leader of LVSC's "China strategy." (See **Appendix A** for details). They appeared to be consistently willing and ready to engage in casino marketing activities that were specifically designed to circumvent national and international laws, currency controls, and money laundering regulations and guidelines when those laws interfere or impede his financial interests.

47.    GGAM's proposed "Government-Led, Top-Down Junket Approach," which amounted to utilization of Chinese government officials to secure benefits from junket operators, appears to have involved corruption, including the implicit *quid pro quo* dynamic typically occasioned by such relationships.

48.    GGAM's proposed "Cross-Border Trading Platform" strategy for moving money illegally out of China to the Philippines for the purpose of engaging in illegal overseas gambling amounted to utilization of a common and well-known form of illegal money laundering known as "Trade Based Money Laundering."

---

party to these proceedings.").

[59] *See, e.g.*, Oct. 19, 2015 Hr'g Tr. at 208:7-11 ("But I was using – I travel with business cards that don't have 'gambling' on them. I don't travel with GGAM business in China, I travel with Weidner Resorts and another one called Weidner Lou Trading.") (BLOOM_0119059, at -9330).

[60] *See supra* ¶ 33.

49.    The secrecy employed by GGAM with respect to their "strategies" and relationships with Dr. Chen and other Chinese officials and businessmen, the lack of formal documentation and correspondence, Weidner's apparent lack of any moral or ethical qualms about the nature of these relationships, and Weidner's and Chiu's prior and similar misconduct at LSVC all further underscore these conclusions.

23

Executed this 16th day of September 2022

_____

Fredric Gushin

_____

Daniel Reeves