# Exhibit 2

than mere majority or complete stock control or ownership but rather such "absolute control" and domination of finances and practices that the corporation effectively has no existence separate from its principal. The second element is that the control has to have been used by the defendant to *commit a fraud or other wrong*. The third element is that the aforementioned domination and wrong have to have *proximately caused injury* to the plaintiff.

19. Based on my reading of the materials made available to me by Mr. Razon's counsel and my research into, experience with, and understanding of Philippine law, it is my opinion that a Philippine court would not deem this test satisfied here.

20. Addressing Plaintiff's theories as to why complete domination is satisfied:

    a. Plaintiff points out that Mr. Razon is the controlling shareholder of BRC, which owns the Bloomberry Defendants and Prime, which has majority control over BRC. But under Philippine law, merely holding a controlling position in a corporation and/or in its parent does not transform one into an alter ego of the corporation.

    b. Plaintiff also notes that Mr. Razon had ultimate management authority at Bloomberry by virtue of serving as Chairman and CEO of BRC and as Chairman of the Bloomberry Defendants. Even assuming that Mr. Razon did have ultimate management authority, Philippine law is clear that it is not sufficient to confer "absolute control" and transform someone into an alter ego of the corporation.

    c. Plaintiff additionally alleges that Mr. Razon has appointed, or caused to be appointed, loyal personnel as officers and directors of BRC, BRHI, and/or SPI. Assuming that is true, the appointment of personnel loyal to the Chairman and CEO does not transform the

10

>corporation into an alter ego. Plaintiff also alleges the existence of common directors and officers between and among the Bloomberry entities and other enterprises affiliated with Mr. Razon. However, it is not unusual in the Philippines to see interlocking directors and officers across companies under common ownership, and under Philippine law this does not evince the type of complete domination necessary for a finding of alter ego.

21.    Further, as discussed further below, the Bloomberry entities observed corporate formalities and preserved functional separateness.

22.    That the Bloomberry Defendants are owned by a publicly listed company ("PLC") in good standing makes it that much less likely that a Philippine court would find the element of complete domination satisfied. PLCs are the subject of extensive regulatory requirements intended to protect shareholders and deter fraud, including that their boards include a certain percentage of independent directors, that they have an audit committee that includes independent directors, that the companies regularly file public reports with the SEC, and that the companies comply with certain standards of quality and operations. As far as I am aware, no Philippine court has ever pierced the veil of a PLC or held that a PLC is an "alter ego" of its controlling shareholder. It is hard to imagine that a PLC in good standing and compliant with the required minimum public float could be deemed a mere conduit of a stockholder so as to justify disregarding the corporate form.

23.    In sum, the Philippine courts would be unlikely to deem the first element for alter ego satisfied here.

24. The Philippine courts also are likely to deem the second element for alter ego – that the alleged complete domination has been used to commit a fraud or other wrong – unsatisfied. Addressing Plaintiff's primary allegedly "wrongful acts":

   a. **Termination of the MSA** – Bloomberry's termination of the MSA, even if later found by the tribunal not to have been warranted by the terms of the MSA, was at most a contractual breach within the business judgment of Bloomberry, not the kind of illegal or fraudulent act recognized by the courts as a basis for alter ego or veil piercing.

   b. **Failure to comply with arbitral rulings** – Compliance with arbitral rulings is a *contractual* obligation, and again, a purely contractual breach does not rise to the level of wrongfulness required for veil-piercing. A company may make a business and lawful judgment to resist an arbitral award without being transformed into an alter ego.

   c. **Legal challenges to the Award in Singapore** – Again, pursuing a legally afforded remedy is not a wrongful act. The Philippine Supreme Court has expressly recognized the right to litigate even erroneous claims. Philippine law seeks to avoid imposing a penalty on the right to litigate.

   d. **The Bloomberry Defendants' ratification of Mr. Razon's use of corporate resources** – Ratification is entirely permissible under Philippine law and within the Boards' respective business judgments. Thus, Mr. Razon's (what I understand to be) *de minimis* use of Bloomberry resources, with proper Board consent, does not constitute a wrongful act sufficient to pierce the veil.

12

e. **The Bloomberry Defendants' decision to indemnify Mr. Razon**. The Board's decision to indemnify Mr. Razon (up to the limit of the law which would preclude indemnification for fraud or other such wrongful conduct by Mr. Razon) is consistent with standard Philippine practice and thus cannot form the basis for a wrongful act sufficient to pierce the corporate veil.

f. **The brief trading suspension** – BRC's application for a trading suspension of its shares is legally allowed under the PSE Rules Governing Trading Rights and Trading Participants.[3] The PSE may suspend the trading of shares in order to maintain a fair and orderly market for the protection of the investing public.[4] The filing of the petition for voluntary suspension of trading of BRC shares is not a wrongful act.

g. **Obtaining and maintenance of the Writs** – These are by definition legally afforded remedies in the Philippines, which have been upheld by the Philippine courts. Legally afforded remedies are not wrongful acts.

25. The third element for alter ego – that the complete domination and wrong have caused injury or harm to plaintiff – also is likely to be deemed unsatisfied by the Philippine courts. As an initial matter, it is my opinion that GGAM has not shown the requisite domination or any wrong (the first and second elements), and so necessarily the third element fails too. Even assuming GGAM had satisfied the first two elements,

---

[3] PSE Rules Governing Trading Rights and Trading Participants, Mem. Circ. No. 2009-0316, Art. IV, Sec. 3.

[4] PSE Revised Trading Rules, Art. 7, Sec. 4.

13

however, under Philippine law GGAM could not show harm. Addressing the most salient of Plaintiff's list of "wrongful acts":

    a.    As to the Bloomberry Defendants' failure to comply with the Award: (1) there is no indication that the Bloomberry Defendants lack sufficient assets against which GGAM may enforce the Award, and (2) GGAM has not sought to enforce the Award against those entities' assets.

    b.    As to the issuance of the Writs, GGAM has a damages remedy against the bond if it can show that the preliminary injunction was wrongfully issued. And if the bond is not sufficient to cover GGAM's damages, GGAM can proceed directly against the companies that obtained the bond. This, of course, assumes that GGAM eventually demonstrates that the injunction ought not to have been granted or to have been continued. To date, the Philippine courts have rejected that position.

    c.    As to Bloomberry's indemnification of Mr. Razon and approval of Mr. Razon's use of corporate resources, these are not the kind of purported injuries for which the case law contemplates an alter ego remedy. Rather, these are at best *generalized* "injuries" to the corporation, experienced pro rata by all stockholders by virtue of their status as such. Accordingly, the proper remedy for these "injuries," if they are injuries at all, is a derivative lawsuit brought by a stockholder in the name of the corporation. I understand that, to date, GGAM, despite being a shareholder of BRC, has commenced no such action.

Philippine Supreme Court ultimately found that the doctrine of piercing the corporate veil found no application to the case, as "there is no showing that the incorporation, and the separate and distinct personality, of KIC was used to defeat Morales' right to recover from Kukan, Inc. Judging from the records, *no serious attempt was made to levy on the properties of Kukan, Inc.*"[55]

63. In conclusion, GGAM's theory of veil-piercing liability pertains to the third theory for piercing the corporate veil, i.e., an alter ego case. And, even if it did not, the Philippine courts still would likely insist on satisfaction of the conjunctive three-part test that applies to alter ego claims (discussed in Section G. below). GGAM's inability to satisfy that test tends to suggest that the Philippine courts would *also* deem the other two theories, even if not expressly couched as conjunctive, unsatisfied here.

**F. Veil-piercing on the basis of an alter ego theory requires application of a conjunctive three-pronged test**

64. For alter ego cases, jurisprudence requires the concurrence of **<u>ALL</u>** of the following elements:

    a. **Control**, not mere majority or complete stock control, but **complete domination**, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own;

    b. **Such control must have been used by the defendant to commit fraud or wrong**, to perpetuate the violation of a statutory or other

---

[55] *Ibid.*

> positive legal duty, or dishonest and unjust act in contravention of the plaintiff's legal rights; **AND**
>
> c. The aforesaid **control and breach of duty must proximately cause the injury** or unjust loss complained of.[56]

65. Indeed, as recently as 2018, the Philippine Supreme Court reiterated:

> "Piercing the corporate veil based on the alter ego theory requires the **concurrence of three elements**: control of the corporation by the stockholder or parent corporation, fraud or fundamental unfairness imposed on the plaintiff, and harm or damage caused to the plaintiff by the fraudulent or unfair act of the corporation. **The absence of any of these elements prevents piercing the corporate veil**. Again, all these three elements must concur before the corporate veil may be pierced under the alter ego theory."[57]

### G. Jurisprudential guidelines dictate that the three-pronged test in alter ego cases is not satisfied in the case at bar

#### 1. The control, or instrumentality, test is not met here

66. The first test to be established in alter ego cases is the "instrumentality" or "control" test.[58] The control test: (a) requires complete control and domination of the

---

[56] Yamamoto v. Nishino Leather Industries, Inc., G.R. No. 150283, 16 April 2008, 551 SCRA 447, *accessible* through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/45043, last accessed 2 August 2022; Philippine National Bank v. Hydro Resources Contractors Corporation, G.R. No. 167530, 13 March 2013, 693 SCRA 294; Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022..

[57] Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

[58] Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022; *Pantranco Employees Association v. National Labor Relations Commission*, G.R. No. 170689, 17 March 2009, 581 SCRA 598, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/48981, last accessed 2 August 2022

79. In the case at bar, GGAM asserts that Mr. Razon alone acts and decides for the Bloomberry Defendants. As discussed in more detail below, I have been informed and accept as true that each of the Bloomberry Defendants and BRC has a Board, holds annual elections of directors, elects officers at organizational meetings of the Board, hires employees, transacts with third parties through agents duly authorized by the Board, enters into contracts, owns assets and properties, all in each of their respective names.[77] It is my opinion that, given these facts (which I assume are true for purposes of this report), it is unlikely that a Philippine court would find that the control test is met here.

2. **The fraud, or totality of circumstances, test is not met here**

80. The second element, which is that the alleged control is used to commit fraud or wrong, is also known as the "fraud" test. It requires that the parent corporation's (or controlling shareholder's) control of the subsidiary corporation has been used by the defendant to commit an unjust, fraudulent, or otherwise wrongful act toward the plaintiff.[78] A showing of "injustice or fundamental unfairness" must exist.[79] In other words, the mere presence of complete domination and control is not enough to pierce the corporate veil if it is not accompanied by fraud or illegality.[80]

81. Fraud is defined in Philippine jurisprudence as the voluntary execution of a wrongful act or a willful omission, while knowing and intending the effects that

---

[77]   See infra Section VI.

[78]   Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

[79]   *Ibid.*

[80]   *Ibid.*

39

allegations will not suffice to sustain the existence of fraud. The burden of evidence rests on the part of the plaintiff or the party alleging fraud. The quantum of evidence is such that fraud must be clearly and convincingly shown."[108]

112. *Second*. A party may not resort to veil-piercing if it was in estoppel. Under the equitable doctrine of estoppel, "an admission or representation is rendered conclusive upon the person making it and cannot be denied or disproved as against the person relying thereon. A party may not go back on his own acts and representations to the prejudice of the other party who relied upon them."[109] Accordingly, if a party conducted due diligence before binding itself to the terms and conditions of its contract with another corporation, said party should have been put on notice regarding the corporation's financial capability, creditworthiness, and corporate governance. The party should not be allowed to claim from the corporation's parent (or anyone else) on the sole basis that the corporation cannot make good on its obligations.

113. *Third*. The fact that the Bloomberry Defendants are associated with BRC, a PLC in good standing, should also be considered. PLCs are subject of heavy regulatory requirements (see below Section VI.C.). If a PLC has never been delisted from the PSE, has no outstanding penalties, and has maintained a good share value, it is unlikely that the PLC would be deemed a mere "instrumentality, agency, conduit, or adjunct"[110] of a subsidiary or stockholder so as to justify disregarding the corporate form. In fact, it would be difficult to conclude that a PLC is an "alter ego" of its controlling shareholder because a PLC is mandated to maintain a "minimum public float" of at least 15% to 20%.

---

[108] Tankeh v. Development Bank of the Philippines, G.R. No. 171428, 11 November 2013.

[109] Caltex (Philippines), Inc. v. Court of Appeals, G.R. No. 97753, August 10, 1992, 212 SCRA 448; Philippine National Bank v. Court of Appeals, G.R. No. L-30831, 21 November 1979, 94 SCRA 368.

[110] Maricalum Mining Corporation v. Florentino, G.R. No. 221813, 23 July 2018, 872 SCRA 572, accessible through https://elibrary.judiciary.gov.ph/thebookshelf/showdocs/1/64333, last accessed 2 August 2022.

51