# **<u>Exhibit 3</u>**

Deposition of Troy Dahlberg                                    Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 28

T. Dahlberg

A.  That was the ultimate impact.  I would say the focus of the work was the actions of individuals involved with the backdating.  Because ultimately, what happens here is that -- it's not enough just to identify the accounting issue.  You have to identify the core business issue, the business practices, the conduct of individuals.  And then, you know, a remediation plan has to be put into place.

And it is not uncommon that the remediation plan involves the removal of people that are viewed to be culpable.

Q.  And have you ever published any peer-reviewed articles on corporate governance practices?

A.  Specifically just on corporate governance practices?  I have not done something just specifically on corporate governance practices.

Q.  And -- sorry -- you mentioned United Health and then a number of audit committees that you've been hired to do work for.

A.  Right.

Q.  What -- what have you done for the audit committees?

A.  Usually, they were an investigation of

Page 29

T. Dahlberg

some type of conduct that potentially involved the financials.  Like, there was a bribery issue that came up for one company in its operations internationally, and so we had to do an investigation of the underlying individual and the specific allegations related to them and then report back to the board as to what the findings were.

Q.  And when -- when did you work with United Health?

A.  2000 -- I'm going to say, generally, it's like, 2004, 2005, 2006 time period.  I'm not exactly 100 percent sure on the exact dates.

Q.  And what about the audit committee consulting that you recall doing?  When was that?

A.  It's been at various times in my career where there's some type of investigation that comes up, and you're brought in to assist the audit committee.  Sometimes you're just hired by a corporate officer.  It kind of depends on the level of what the concern is.

If it's more on a lower level of the operations, then you get brought in by maybe the general counsel's office, maybe the CFO controller.  If it involves higher-up individuals, like officers

Page 30

T. Dahlberg

or even board members, then you might be brought in by outside counsel that would be deemed to be independent, working on behalf of the board, or working at the direction of the audit committee.

Q.  Okay.  You know, I'm just going to ask that you try to just answer the question I ask.  We are -- like you said, you have 180 pages of opinion.

A.  Right.

Q.  And so -- and, you know, your counsel hasn't agreed that we can go over seven hours, so I just want to make sure we stick to the questions asked.

So I asked when you recalled working for the audit committee, and I think your answer is you just don't recall.  It's been over the course of your career?

MR. AINSWORTH:  Objection.

A.  No.  I recall doing it.  I just don't have specifics.

BY MS. FISSELL:

Q.  My question was when.

A.  Right.

MR. AINSWORTH:  Please.

A.  When?  I don't remember exact dates.

Page 31

T. Dahlberg

MR. AINSWORTH:  Counsel.  Hold on.  Hold on.

Counsel, you've interrupted his answer several times, including right there.

Have patience.  Let him finish his answer.

BY MS. FISSELL:

Q.  Okay.  Have you ever participated in a board meeting for a public corporation?

MR. AINSWORTH:  Objection.

A.  Yes.

BY MS. FISSELL:

Q.  When?

A.  I cannot recall the exact dates of when.

Q.  How often have you done that?

A.  I can't recall the number of times I've actually done it.

Q.  Can you recall the corporation?

A.  Well, United Health was one of them.  But I've done a lot of forensic investigations, so I can't remember every time it went to the board level exactly or who I was exactly dealing with -- if it was outside counsel.

I remember making reports, PowerPoints, for the board to be presented on, but I don't

Page 32

T. Dahlberg

remember the names of the exact situations when that
was done.

Q.   And you presented to the boards?

A.   Yes.  Now, it could be a subcomponent of
the board, like the audit committee, but that's the
board.  They're just in charge of representing the
board for that issue.

Q.   And have you ever drafted board minutes
for a board meeting?

A.   I have not.

Q.   Outside of serving as an expert witness,
how many times have you reviewed board minutes for a
board meeting?

A.   So it is a -- well, many.  I'll try to
limit my answer, but many.

Q.   Have you ever served as a director of a
corporation?

A.   So I was appointed as an interim director,
or head, of an audit committee for a city.

Q.   What city?

A.   San Diego.

Q.   When was this?

A.   Again, roughly, time periods, starting
maybe 2004 through roughly, maybe, 2006, early --

Page 33

T. Dahlberg

yeah, 2006 probably.

Q.   How long did you do it for?

A.   The course of that particular matter was,
I think, like two years sort of, approximately.

Q.   And have you ever participated in the
board meeting of a Philippine corporation -- a
corporation incorporated in the Philippines?

A.   No.

Q.   And you've never served as a director of a
corporation based in the Philippines?

A.   That is correct.

Q.   And you're familiar with the concept of
"independent directors"?

A.   Yes.

Q.   What does that mean to you?

A.   It means a whole lot of things to me, in
fairness, okay?

So the term "independence" is sometimes
defined, especially by regulatory entities.  And I
think Ms. Herbosa, as an example, gave the
definition of what she thought, under Filipino
regulations -- SEC regulations, "independence"
meant, okay?  The SEC has an idea of -- in the
United States -- about what "independence" means.

Page 34

T. Dahlberg

I believe that the concept of independence
was dealt with in BRC's corporate governance manual,
okay?  Needless to say, it wasn't the same as what
Ms. Herbosa defined the -- the Filipino definition
of "independence" was.

So it is a word that can be, with a
capital-I in a given situation, a defined term that
means something, or there can be a general concept
of what "independence" means in a situation.

Independence is a huge issue, as you may
be very well-aware, for public accounting firms.
And during my whole career in public accounting,
including being a partner at Price -- I mean, at
KPMG and E&Y, independence is critical to the whole
existence of the audit profession.

So it's -- it's a big word that has a lot
of different definitions.

Q.   Do you have any basis to disagree with
Ms. Herbosa's definition of "independence" under
Philippine law?

A.   No.  Because they can define it any way
they want.  And I'm not a legal expert, and -- and
I'm not a Filipino regulatory expert.  So I -- no
disagreement with her on any of that.

Page 35

T. Dahlberg

Q.   And you understand that boards both in the
U.S. and in the Philippines are required to have
some number of, capital-I, "independent directors"?

A.   Right.  Based on whatever that definition
is, whether it's a regulatory definition, it could
be a statutory definition, you know, whatever it is.
But then there also is a component of that -- well,
you didn't ask about the little-I, so we won't get
into that, I guess.

Q.   Are you an expert in fiduciary duties of
board members?

A.   I don't know how -- you have to define the
term "expert" for me.  I'm certainly very
knowledgeable about it.

Q.   Well, do you have certification or degree
in board member fiduciary duties?

A.   I do not.

Q.   Have you ever published a paper about
fiduciary obligations of corporate directors?

A.   I have not.

Q.   And have you ever been qualified to
testify as an expert on fiduciary duties?

A.   As a component of a testimony, yes.

Q.   What do you mean by "as a component of a

Page 168

T. Dahlberg

1  from -- I'll come back to that.
2  
3      Are you aware -- so if you go to page 430,
4  line 2.
5      A.  (Witness complies.)
6      Q.  The fourth bullet states that "'A related
7  party shall abstain from attending and participating
8  in deliberations that affect matters in which he or
9  she has a personal interest.'
10     "In your experience, or as you sit here
11 today, do you believe that you have abstained from
12 participating in all deliberations that affect
13 matters in which you have a personal interest?
14     "Answer:  Yes."
15     So as to related-party transactions, you
16 are not crediting this testimony that Mr. Razon has
17 given here, correct?
18     MR. AINSWORTH:  Objection.
19     A.  I didn't do a thorough analysis of this
20 topic.  In other words, every time he had a related
21 party -- or, if there was a related-party
22 transaction, whether he abstained or removed himself
23 or not.  I didn't form a separate opinion about
24 this.
25

Page 169

T. Dahlberg

1  
2  BY MS. FISSELL:
3      Q.  You're aware that Razon was inhibited from
4  attending the meeting that ratified his personal use
5  of corporate resources and aircraft and the decision
6  to indemnify him in this matter?
7      A.  You used the word "inhibited."
8      Q.  It was a Philippine word.
9      A.  Oh, is it?  Okay.
10     Q.  Recused --
11     A.  Himself.
12     Q.  Recused himself from attending the meeting
13 that ratified his personal use of corporate
14 resources and the indemnification decision?
15     A.  Yes.
16     Q.  And that doesn't change your opinion in
17 any way that he was able to control the
18 decision-making processes regarding his own
19 related-party transactions with BRHI and SPI?
20     MR. AINSWORTH:  Objection.
21     A.  It doesn't.
22 BY MS. FISSELL:
23     Q.  You don't give any weight to that fact?
24     A.  Oh, no.  I give some weight to it.  It's
25 definitely worth considering.

Page 170

T. Dahlberg

1  
2      Q.  And you're aware that he was asked:
3      "Are you not involved in any way in the
4  related-party transaction process?" and he answered
5  "No, I'm not a member of the committee"?
6      "Question:  You're not a member of the
7  committee but do you have any purview of
8  related-party transactions?
9      "No.  Only the audit committee does and
10 the board."
11     Did you -- do you recall reviewing that
12 testimony he gave?
13     MR. AINSWORTH:  Where are you reading
14 from?
15     MS. FISSELL:  I'm reading from a different
16 transcript, not the one in front of Mr. --
17     THE WITNESS:  Is it for this matter, the
18 transcript?
19     MS. FISSELL:  Yes.  It's volume I of the
20 transcript.
21     THE WITNESS:  Oh, okay.
22     A.  I don't recall reading that.
23 BY MS. FISSELL:
24     Q.  Okay.  Can we go to paragraph 170 of your
25 report?

Page 171

T. Dahlberg

1  
2      A.  (Witness complies.)
3      Q.  In paragraph 170, you state:  "The web of
4  relationships between and among Razon's family,
5  close friends, and golfing partners indicates a lack
6  of independent directors on the BRC board and a
7  total disregard for BRC's own Manual of Corporate
8  Governance."
9      Do you see that?
10     A.  Yes.
11     Q.  Okay.  So when you use -- we talked this
12 morning about independent directors, like capital-I
13 independent directors and independent.
14     I think when you were referring to
15 lowercase independent, you meant independent minded;
16 is that fair?
17     A.  Well, all of the components of what could
18 be interpreted to mean "independence," right?  I
19 don't think there's one set definition, but there is
20 a more general sense of independence, without a
21 doubt.
22     Q.  And you're familiar with the term -- the
23 "independent director" term of art?
24     A.  Right.  Where there's more specific
25 issues -- things that you can't do because these

Page 172

T. Dahlberg

would deem you to be not independent.

Q.   Right.

And you're not, in paragraph 170 or elsewhere, opining that BRC lacked the requisite number of independent directors as defined by Philippine rules and regulations?

A.   Yeah, that's not the opinion I'm offering in 170 here.

Q.   And you're not offering it period, that there wasn't sufficient number of independent directors, as defined by the Philippine rules for independence?

A.   I was confused by Herbosa's definition and then how she applied that because -- well, you know, it seemed like you couldn't have certain relationships under the Philippine rule that she cited, and it seemed like some of the people did have other relationships and other situations.

And I think there were two different definitions.  There was one about how many boards or something you served on, but then there was also one about kind of business relationships or something like that that came in.  And I'd have to go back into my report to figure out where they are.

Page 173

T. Dahlberg

But one of them was very general.  One of them was a lot more about, you know, like the concept of being involved in other business activities or whatever, and then one of them was more direct about exactly being on boards or something like that.

Q.   So you are aware, from reading Ms. Herbosa's rebuttal report, that the BRC has certified to the Philippine Stock Exchange every year that they have two independent directors, and they've certified as to that those directors met the qualifications for independence under the Philippine rules?

A.   I think that's true, yes.

Q.   You're not offering an opinion in this case that those independent directors did not qualify as independent under the Philippine rules?

A.   That's correct.

Q.   And that's not what you're talking about in paragraph 170?

A.   That is true, yes.

Q.   So although you use the term of art "independent directors," what you're referring to here as -- what you mean by "independent directors"

Page 174

T. Dahlberg

here is -- you mean not loyal to Mr. Razon?

MR. AINSWORTH:  Objection.

A.   I think what I'm getting to here is this kind of concept of a small "I," in other words, the idea of independence in general and that if there's too many intervening relationships or whatever, there's a higher risk that a person is not going to be independent.  But it's not a bright-line standard.

It's more of measuring the totality of the relationships they have with the chairperson or the majority-share person or whatever.  And then, does it look like they've got a lot of overlapping or intermingled relationships so it could begin to be perceived that they basically are lacking independence.

BY MS. FISSELL:

Q.   Okay.  And you cite to Mr. Alarilla's testimony, where he cites -- where he states that he's not considered an independent director.

Do you understand Mr. Alarilla to be talking about the big-I independent director there, as opposed to whether he's, under the totality of relationships, sufficiently independent from

Page 175

T. Dahlberg

Mr. Razon?

A.   I believe he is speaking about the regulatory version of independence.

Q.   So his testimony that you quote here isn't supporting the lack of -- his lack of little-I independence?

A.   Well, there is a relationship, right?  I mean, in other words, the kind of regulatory big-I independence certainly is tied into the concept of being independent period; it just potentially has got different threshold markings on it or something like that.  But there's certainly an interrelationship.

So when he comes out and basically says, under his answer here, "No, I understand that you have to be an independent director, and I am not considered an independent director," I do believe, as we've just discussed, he's probably thinking about the regulatory version of this, but I also think that he's not really thinking about other versions of independence either.

Like, he probably doesn't really have a definition of independence he's working with, which is troubling because he -- you know, he is highly

Deposition of Troy Dahlberg                                       Global Gaming Philippines, LLC v. Enrique K. Razon, Jr., et al

Page 176

T. Dahlberg

tied into multiple organizations. He is director on
multiple deals, and there is overlapping stuff, and
it does look like it's different than what an
independent director under the BRC's corporate
manual is, which is someone who's free of any
business or other relationship.

That is clearly a measurement of
independence, and he clearly is not meeting that,
even though that does talk about applying it in the
capital-I situation of being designated as the
independent director.

Q. When you say that does talk about applying
it in the capitalized situation, are you referring
to the BRC Manual of Corporate Governance?

A. Right. I think what they're talking about
here is this direction, the identified independent
directors, that you're talking about that they put
forth as being independent -- I think this piece of
an -- they're talking about that in the BRC manual,
but that ties into the regulatory version of
independence.

Q. Right.

And is there anything in the BRC Manual of
Corporate Governance, other than in the definition

Page 177

T. Dahlberg

section, about independent directors?

A. Well, there's something about directors,
about what -- how a director should act. And I can
probably go find it in here someplace. I think I
quoted it. And it does talk about things that it
defines as being a good director and sort of they
lean towards -- I don't know if they actually use
the term -- well, I can go look it up here, if you
want me to.

Are you aware of what I'm talking about?

Q. We'll get back to that.

A. Okay.

Q. In paragraph 70 [sic], you're referring to
Razon's family, close friends, and golfing partners.

So who's the family you're referring to
here?

A. All right. We're talking 170, just for a
second?

Q. Yes.

A. Yeah, you said 70.

Q. I'm sorry. Yep, 170.

A. That's okay.

So I believe -- let me go back into the
report here for a second.

Page 178

T. Dahlberg

Q. It's on page 91.

A. Okay. Thank you.

In the chart on 91, Christian Gonzalez is
a family member, Razon's nephew. And so he is a
director, as you can see on this chart, in numerous
entities, not only in the Bloomberry world, but also
in the Prime world as well.

Q. So the -- so "family" is Christian
Gonzalez in paragraph 170?

A. Right.

Q. Close friends and golfing partners, who
are you referring to there?

A. I think it's -- well, I think he plays
golf with -- it's either Alarilla or Almeda. I can
look it up. One of the two he met playing golf, and
he may play golf with both. I don't remember. But
one of them, I think, he actually says he met him
playing golf, or their relationship developed
through their mutual interest in playing golf.

Q. And so if they play golf together, then
they're close friends or is "close friend" a
separate category from "golfing partner"?

MR. AINSWORTH: Objection.

A. I think there can be overlapping there, a

Page 179

T. Dahlberg

golfing buddy and a good friend or someone you just
enjoy playing golf with. I think he, in his
deposition testimony, seemed to act like they had a
relationship.

BY MS. FISSELL:

Q. Whose deposition testimony?

A. I'll go back and look. It's either Almeda
or Alarilla.

Q. So one or both of them is a friend and one
or both of them is a golfing partner?

MR. AINSWORTH: Objection.

A. If you give me a moment, I'll go back into
my report and see where I talked about exactly what
they were.

BY MS. FISSELL:

Q. We can skip that question and move on,
Mr. Dahlberg, because I don't want to waste time
debating on who's the golfing partner and who's the
friend. So we'll just --

A. I have the answer.

Q. Okay. Great.

A. I'm sorry. It took me a moment. José
Alarilla was asked by Razon to become a board
director after -- at his company -- at his