**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GLOBAL GAMING PHILIPPINES, LLC,

     *Plaintiff,*

          vs.

ENRIQUE K. RAZON, JR.; et al.,

     *Defendants.*

No. 21 Cv. 2655 (LGS)

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**PLAINTIFF'S MOTION TO ENFORCE THE ARBITRAL AWARD AND**
**IN OPPOSITION TO THE CROSS-MOTION OF**
**DEFENDANTS BLOOMBERRY RESORTS AND HOTELS INC.**
**AND SURESTE PROPERTIES, INC.'S FOR SUMMARY JUDGMENT**

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
AND POPEO, P.C.

Robert I. Bodian
Kevin N. Ainsworth
Barry Bohrer
Kaitlyn A. Crowe
Daniel T. Pascucci (admitted *pro hac vice*)
Joseph R. Dunn (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
T: (212) 935-3000
F: (212) 983-3115
rbodian@mintz.com
kainsworth@mintz.com
bbohrer@mintz.com
kacrowe@mintz.com
dtpascucci@mintz.com
jrdunn@mintz.com

*Attorneys for Plaintiff*
*Global Gaming Philippines, LLC*

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................2

I.     THE FAA REQUIRES RECOGNITION AND ENFORCEMENT OF THE
AWARD ...........................................................................................................2

    A.     The Court Must Reject Defendants' Invitation to Expand the New
York Convention's Enumerated Defenses and to Apply the Wrong
Standard ................................................................................................4

    B.     Defendants' Allegations at Most Describe a Resolved Discovery
Dispute, Not a Cognizable Defense Under Article V(1)(b) or
V(1)(d) ..................................................................................................6

         1.     Defendants Have Failed to Prove that the Arbitral Procedure Was
Not in Accordance with the Parties' Agreement .........................................7

         2.     Defendants Have Failed to Prove They Were Unable to Present
Their Case ................................................................................8

    C.     The Judgments of the Singapore Courts Should Be Given
Preclusive Effect ...................................................................................9

    D.     There Was No Fraud or Corruption ....................................................11

II.    THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS..........12

    A.     Defendants Expressly Consented to Jurisdiction................................12

    B.     Specific Personal Jurisdiction Exists Under CPLR 302(a)(1)
Because Defendants Transacted Business in New York .....................14

         1.     The Legal Standard ....................................................................14

         2.     Defendants Had Numerous Contacts with New York, Each Having
an Articulable Nexus to Plaintiff's Claim and Injury ...............................15

         3.     The Defendants Also Had Purposeful Contacts with New York
During Negotiation of the MSA and in the Execution of the MSA..........19

         4.     There Is a Substantial Relationship Between Defendants Contacts
with New York and the Enforcement of the Arbitral Award....................22

         5.     Exercising Jurisdiction Over Defendants Comports with Due
Process ...................................................................................22

    C.     The Court Also Has Jurisdiction over Defendants (1) Because
They Are Alter Egos of Defendant Razon, and (2) Because
Jurisdiction Exists Under Federal Rule of Civil Procedure 4(k)(2)......................23

III.    GGAM IS NOT SEEKING TO MODIFY THE AWARD ................................................25

i

## TABLE OF AUTHORITIES1

**Page(s)**

**Federal Cases**

*BMW of N. Am. LLC v. M/V Courage,*
254 F. Supp. 3d 591 (S.D.N.Y. 2017)..............................................................24, 25

*Bonar v. Dean Witter Reynolds, Inc.,*
835 F.2d 1378 (11th Cir. 1988) ...........................................................................5

*Boston & Maine Corp. v. Ill. C. R. Co.,*
274 F. Supp. 257 (S.D.N.Y. 1967) ......................................................................16

*BSH Hausergäte GMbH v. Kamhi,*
291 F. Supp. 3d 437 (S.D.N.Y. 2018)...................................................................7

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.,*
850 F.3d 58 (2d Cir. 2017)..................................................................................2

*China Shipping Container Lines Co. v. Big Port Serv. DMCC,*
803 F. App'x 481 (2d Cir. 2020) ...............................................................9, 10, 11

*Commercial Union Ins. Co. v. Lines,*
378 F.3d 204 (2d Cir. 2004)................................................................................5

*Commodities & Minerals Enter., Ltd. v. CVG Ferrominera Orinoco, C.A.,*
49 F.4th 802 (2d Cir. 2022) ...................................................................... *passim*

*Cont'l Transfert Technique Ltd. v. Nigeria,*
932 F. Supp. 2d 153 (D.D.C. 2013) ....................................................................27

*Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex–*
*Exploración Y Producción,*
832 F.3d 92 (2d Cir. 2016)..........................................................................25, 26

*Cunard S.S. Co. v. Salen Reefer Servs. AB,*
773 F.2d 452 (2d Cir. 1985)...............................................................................10

*Eades v. Kennedy, PC Law Offices,*
799 F.3d 161 (2d Cir. 2015)...............................................................................21

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.,*
403 F.3d 85 (2d Cir. 2005).............................................................................4, 8

*Enron Nigeria Power Holding, Ltd. v. Nigeria,*
844 F.3d 281 (D.C. Cir. 2016) ............................................................................6

*France v. Bernstein,*
　43 F.4th 367 (3d Cir. 2022) ...................................................................................5

*Fujifilm Mfg. U.S.A., Inc. v. Goldman Sachs & Co. (In Re Aluminum*
　*Warehousing Antitrust Litig),*
　No. 15-cv-8307 (PAE), 2020 WL 2036716 (S.D.N.Y. Apr. 28, 2020) ......................23, 24, 25

*Gordian Grp., LLC v. Syringa Expl., Inc.,*
　168 F. Supp. 3d 575 (S.D.N.Y. 2016).....................................................................13

*Great Earth Int'l Franchising Corp. v. Milks Dev.,*
　311 F. Supp. 2d 419 (S.D.N.Y. Mar. 3, 2004).........................................................13

*Hardy Exploration and Production (India), Inc. v. India,*
　314 F. Supp. 3d 95 (D.C. 2018)..............................................................................6

*Huzhou Chuangtai Rongyuan Inv. Mgmt. P'ship v. Qin,*
　No. 21 Civ. 9221 (KPF), 2022 WL 4485277 (S.D.N.Y. Sept. 26, 2022) ..................3

*ICC Chem. Corp. v. TCL Indus. (Malaysia) SDN,*
　206 F. App'x 68 (2d Cir. 2006) ..............................................................................9

*Jolen, Inc. v. Kundan Rice Mills, Ltd.,*
　No. 19-cv-1296 (PKC), 2019 WL 1559173 (S.D.N.Y. Apr. 9, 2019)......................26

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,*
　500 F.3d 111 (2d Cir. 2007)...................................................................................26

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.,*
　729 F.3d 99 (2d. Cir. 2013)....................................................................................8

*Kondot S.A. v. Duron LLC,*
　586 F. Supp. 3d 246 (S.D.N.Y. 2022).....................................................................9

*Licci v. Lebanese Canadian Bank,*
　732 F.3d 161 (2d Cir. 2013)...................................................................................14

*Marine Midland Bank, N.A. v. Miller,*
　664 F.2d 899 (2d Cir. 1981)...................................................................................23

*Microsoft Corp. v. Does,*
　No. 20-CV-1217 (LDH) (RER), 2021 WL 4755518 (E.D.N.Y. May 28, 2021)....................27

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*
　473 U.S. 614 (1985)...............................................................................................3

*Morse/Diesel, Inc. v. Fidelity & Deposit Co.,*
　763 F. Supp. 28 (S.D.N.Y. 1991) ...........................................................................17

*Pagaduan v. Carnival Corp.*,
    830 F. App'x 61 (2d Cir. 2020) ........................................................................3

*Qing Yang Seafood Imp. (Shanghai) Co. v. JZ Swimming Pigs, Inc.*,
    No. 21-CV-3587 (RPK) (TAM), 2022 WL 2467540 (E.D.N.Y. Apr. 15, 2022) ...................27

*Reed & Martin, Inc. v. Westinghouse Elec. Corp.*,
    439 F.2d 1268 (2d Cir. 1971) ...................................................................13, 14

*Sanko S.S. Co. v. Cook Indus. Inc.*,
    495 F.2d 1260 (2d Cir. 1973) .........................................................................5

*Sole Resort S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
    450 F.3d 100 (2d Cir. 2006) ......................................................................14, 15

*Sompo Japan Ins. Co. of Am v. Norfolk S. Ry. Co.*,
    762 F.3d 165 (2d Cir. 2014) .........................................................................6

*Sonera Holding B.V. v. Cukurova Holding A.S.*,
    750 F.3d 221 (2d Cir. 2014) ........................................................................13

*Sunward Elecs., Inc. v. McDonald*,
    362 F.3d 17 (2d Cir. 2004) .......................................................................15, 21

*Thomas Kinkade Co. v. Hazlewood*,
    No. C 06 7034 MHP, 2007 WL 217384 (N.D. Cal. Jan. 25, 2007) ................................5

*Transfield ER Cape Ltd. v. Indus. Carriers, Inc.*,
    571 F.3d 221 (2d Cir. 2009) ........................................................................23

*United States v Int'l Bhd. of Teamsters*,
    266 F3d 45 (2d Cir. 2001) ..........................................................................27

**State Cases**

*D & R Glob. Selections, S.L. v Bodega Olegario Falcon Pineiro*,
    29 N.Y.3d 292 (2017) ...............................................................................14

*New York v. Vayu, Inc.*,
    No. 2, 2023 WL 1973001 (N.Y. Feb. 14, 2023) .............................................14, 15, 21

**Federal Statutes**

9 U.S.C. § 207 ......................................................................................2, 5, 24

28 U.S.C. § 1651(a) ....................................................................................27

45 U.S.C. § 153 .........................................................................................5

**Rules**

Federal Rule of Civil Procedure 4(k)(2) ..................................................................23, 24

Federal Rule of Civil Procedure Rule 56.1 ...................................................................20

N.Y. C.P.L.R. § 302 ............................................................................................. *passim*

## INTRODUCTION

To resolve these motions, the Court need only address two questions: ***First,*** whether enforcing an award for money damages and injunctive relief enforcing GGAM's rights in publicly-traded stock would violate an identifiable public policy of the United States. It would not.  And ***second***, whether Defendants' myriad contacts with New York relate to Plaintiff's enforcement claim and injury, such that jurisdiction exists under New York CPLR 302(a)(1) for purposes of enforcing the Award. They do.

In September 2013, shortly after Solaire opened for business, Razon improperly terminated the MSA. The Tribunal rejected all of Defendants' grounds for termination, which included an allegation that "GGAM has failed to bring in any foreign VIP or junket operator four months going into the operation of the Facilities."[1] Supplemental Declaration of Kevin N. Ainsworth, executed 3/22/2023, ("Ainsworth Supp. Decl.") Ex. 21 at 6; *see also* Partial Award on Liability, ECF No. 218-2 (hereinafter, "Liability Award") ¶¶80-82. The Tribunal found that Defendants terminated the MSA before Solaire was ready to engage VIPs and junket operators. Liability Award ¶¶131, 208, 209, 242. Now, Defendants seek to undermine the Award by speculating that, if they had not wrongfully terminated, GGAM's planned, but never-implemented, strategies to bring in such VIPs and junket operators would have been corrupt. Their speculation is baseless, was rejected by the Tribunal and the courts of Singapore sitting in primary jurisdiction, and is irrelevant here.

Defendants made and lost all of their defense arguments—including their allegations of procedural fraud and Article V defenses—before the Tribunal and in petitions to vacate the

---

[1]    The Tribunal held "that the Respondents bear the burden of persuasion to establish the various breaches that the Respondents allege the Claimants to have committed." Partial Award on Liability, ECF No. 218-2 (hereinafter, "Liability Award") ¶155. They failed to meet their burden. *Id.* ¶272. Under Philippine law, which governs the MSA, Defendants were unable to defend the termination of the MSA on grounds that they had not asserted in their notice of termination. *See Belen Dela Torre v. Bicol University*, G.R. No. 148632 (Aug. 31, 2005) (Phil.); Liability Award ¶245.

Liability and Final Awards in the Courts of Singapore. They cannot relitigate them in this action and cannot meet their burden to prove a defense under the New York Convention.

In addition, there is overwhelming evidence supporting the exercise of personal jurisdiction over Defendants. They focus their arguments on activities that did not happen in New York, while overlooking their abundance of purposeful contacts with New York. It is settled that New York's long-arm statute supports personal jurisdiction based on a single contact—even as to parties who never enter the state. Here, ample undisputed evidence shows that Defendants purposefully negotiated with Cantor in New York, as GGAM's joint venture partner, directed numerous emails to New York when negotiating and executing the MSA, engaged in negotiations from New York, and participated in an investor Roadshow and two investor presentations in New York that directly relate to (and were litigated in) the arbitration that resulted in the Award.

## ARGUMENT

## I.   THE FAA REQUIRES RECOGNITION AND ENFORCEMENT OF THE AWARD

Sitting in its secondary jurisdiction, the Court must recognize and enforce the Award, except that it "may" refuse enforcement if Defendants prove one of the limited grounds specified in Article V of the New York Convention ("Convention"). *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 71, 75-76 (2d Cir. 2017); *see* 9 U.S.C. § 207. The defenses enumerated in Article V "must be 'construed very narrowly.'" *See Commodities & Minerals Enter., Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 818 (2d Cir. 2022) (citation omitted).

Defendants have a very heavy burden to prove that "enforcement itself, 'within the parameters of the arbitrator's interpretation of the facts,' violates public policy." *Id.* at 819 (citation omitted). Such a defense "encompass[es] only those circumstances 'where enforcement would violate our most basic notions of justice and morality.'" *Id.* at 818 (quoting *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 411 (2d. Cir. 2009)). The policy at stake "must be

'well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *Huzhou Chuangtai Rongyuan Inv. Mgmt. P'ship v. Qin*, No. 21 Civ. 9221 (KPF), 2022 WL 4485277, at *10 (S.D.N.Y. Sept. 26, 2022) (citation omitted).

The Second Circuit takes this approach because of "the New York Convention's preference for enforcement and concerns that foreign courts will routinely refuse to confirm American arbitral awards on policy grounds." *Id.* at *10 (citing *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 973-74 (2d Cir. 1974)). "[A] court may not 'revisit or question the fact-finding or the reasoning which produced the award.'" *Commodities & Minerals*, 49 F.4th at 818 (quoting *IBEW, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 716 (2d Cir. 1998)). The Court's role in assessing the public policy defense "is limited to determining whether the award itself, as contrasted with the reasoning that underlies the award, 'create[s] [an] explicit conflict with other laws and legal precedents' and thus clearly violates an identifiable public policy.'" *Id.* (quoting *IBEW*, 143 F.3d at 716). The only question the Court here must address is whether enforcing an award for money damages and injunctive relief against commercial entities creates such an explicit conflict. It does not.

To expand Article V(2)(b), or allow relitigation of issues decided by the arbitrators, would undermine the "emphatic federal policy" favoring arbitration in international commercial disputes. *See id.* at 819; *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, 473 U.S. 614, 631 (1985); *Pagaduan v. Carnival Corp.*, 830 F. App'x 61, 63 (2d Cir. 2020) ("'[I]mproper collateral litigation' may itself 'seriously . . . undermine' national policy." (citation omitted)).

Defendants cannot meet their heavy burden, and their submission fails for at least four independent reasons. ***First***, Defendants are not advancing a cognizable Article V "public policy"

3

defense and improperly invite the Court to expand Article V's enumerated defenses to adopt an improper standard—tactics the Second Circuit has expressly rejected. ***Second***, Defendants' claims of procedural fraud are an overspun account of a discovery dispute that the Tribunal fully resolved. ***Third,*** the Singapore Court judgments rejected their defenses and should be given preclusive effect. ***Fourth***, Defendants' theories are factually baseless and premised on speculation about inchoate strategies that never were implemented.

### A.   The Court Must Reject Defendants' Invitation to Expand the New York Convention's Enumerated Defenses and to Apply the Wrong Standard

Defendants ask the Court to expand the narrow Article V defenses and apply the standard in §10 of the Federal Arbitration Act ("FAA") for vacating an arbitral award, which applies only in a court having *primary* jurisdiction (*i.e.*, reviewing domestic awards). The Second Circuit has "explicitly declined to read into the New York Convention additional FAA defenses" to enforcement, including §10 defenses. *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 92 (2d Cir. 2005) (reversing denial of confirmation of foreign award on §10 grounds); *see also Commodities & Minerals*, 49 F.4th at 819 ("Article V(2)(b) must be 'construed very narrowly'" (citing *Telenor Mobile*, 584 F.3d at 411).

Singapore, as the country of primary jurisdiction, has a law analogous to FAA §10, and Defendants invoked that Singapore law when they applied to the Singapore Courts to vacate the Awards. *See* Singapore High Ct. Judgment (Jan. 3, 2020), ECF No. 13-1 ¶4 (citing Singapore Int'l Arb. Act Section 24). They raised their procedural fraud argument there, and lost.

The Court's role here is to enforce the Award unless Defendants meet their heavy burden to prove that "enforcement itself" would violate United States public policy. *Commodities & Minerals*, 49 F.4th at 819. They fail to show how enforcing an award for money damages and injunctive relief regarding ownership of publicly traded stock would come anywhere close to

violating a well-defined and dominant policy.

In arguing procedural fraud, Defendants invoke numerous non-precedential cases that apply the irrelevant standard of FAA §10 for vacating domestic arbitral awards. *See* Defs.' Mem., ECF No. 365 at 30-32 (citing *Commercial Union Ins. Co. v. Lines*, 378 F.3d 204, 208-09 (2d Cir. 2004) (FAA §10)[2]; *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988) (same); *France v. Bernstein*, 43 F.4th 367, 378 (3d Cir. 2022) (same)[3]; *Sanko S.S. Co. v. Cook Indus. Inc.*, 495 F.2d 1260 (2d Cir. 1973) (same); *Thomas Kinkade Co. v. Hazlewood*, No. C 06 7034 MHP, 2007 WL 217384, at *4 (N.D. Cal. Jan. 25, 2007) (same)). They cite other cases that do not involve enforcement of foreign awards under the New York Convention or FAA §207. ECF No. 365 at 30 n.86 (citing *Kinross v. Utah Ry. Co.*, No. 2:01-CV-0010BSJ, 2006 WL 1233027, at *10 (D. Utah Apr. 6, 2006) (decided under 45 U.S.C. §153); *Profilati Italia SrL v. PaineWebber Inc.*, [2001] 1 Lloyd's Report 715 (no mention of the New York Convention or Article V)).

Defendants fail to distinguish their arguments from the argument rejected by the Second Circuit in *Commodities & Minerals*. The Court of Appeals held that a public policy defense cannot be based on an argument that the parties' contract "was procured through corruption," and the party opposing enforcement must prove that "enforcement itself, 'within the parameters of the arbitrator's interpretation of the facts,' violates public policy." *Commodities & Minerals*, 49 F.4th at 819. The Court held that the corruption argument "falls outside the narrow public policy exception codified by Article V(2)(b)" and added: "In reviewing an arbitral award for violations

---

[2]   The Court in *Commercial Union* was weighing whether United States public policy favoring arbitration should be outweighed by "judicial policy." 378 F.3d at 208. Section 207 and the FAA does not mention "judicial policy" and allows a defense based only on "public policy" of the United States. The court in *Commercial Union* even acknowledged that the case before it was "unusual" and "not the typical 'public policy exception' case" because "the arbitration panel has already found fraud." *Id.* at 209 n.7.

[3] Defendants purport to quote from *France* (*see* Defs.' Mem., ECF No. 365 at 30), but they omitted words saying the reasoning applies to FAA §10.

of public policy, a court may not 'revisit or question the fact-finding or the reasoning which produced the award.'" *Id.* at 818 (citation omitted). Despite this clear guidance, Defendants do not address the issue of *enforcement* but instead ground their public policy defense in an argument that "GGAM engaged in illegal and corrupt conduct while performing services pursuant to the MSA." ECF No. 365 at 2.[4] Their argument is beyond the limited review at issue in this case, and must be rejected. *See, e.g.*, *Enron Nigeria Power Holding, Ltd. v. Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016) (finding that arbitrators already addressed, thus court could not reconsider, allegations that parties' agreement was induced by fraud that justified award-debtor's breach).

Defendants also fail to establish a "well defined and dominant" *United States* public policy against *enforcing* the Award. They cite to *Hardy Exploration and Production (India), Inc. v. India*, 314 F. Supp. 3d 95, 113-14 (D.C. 2018) (ECF No. 365 at 27 n.72), but that decision supports enforcing the Award because enforcement here would *not* interfere with the sovereignty of another nation, as was the case in *Hardy Exploration*. Defendants' contention about the views of "[c]ourts and scholars around the world interpreting Article V(2)(b)" fails to meet their burden to prove U.S. public policy. *See* ECF No. 365 at 27. Their reliance on *Belokon v. Krygystan*, (Cass. Civ. 1ère, 23 March 2022, No. 17-17.981), similarly is baseless. That decision by a French court is wholly inapplicable to the Court's inquiry whether enforcement of the Award would violate *U.S.* public policy. Finally, for the reasons provided in GGAM's pending motion to exclude the testimony of Catherine Rogers (*see* ECF No. 351), the Court should disregard her testimony here.

## B.    Defendants' Allegations at Most Describe a Resolved Discovery Dispute, Not a Cognizable Defense Under Article V(1)(b) or V(1)(d)

Defendants try to elevate and spin a discovery dispute into something salacious. As noted,

---

[4] Defendants waived a defense of alleged corruption in performance of the MSA by failing to plead it in their answer. *Sompo Japan Ins. Co. of Am v. Norfolk S. Ry. Co.,* 762 F.3d 165, 176 (2d Cir. 2014) ("[f]ailure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case" (citation omitted)).

they terminated the MSA on grounds that GGAM had failed to perform, not that GGAM had corruptly performed. Now they liberally inject the word corruption in their arguments, but their real complaint is GGAM failed to produce irrelevant emails of Eric Chiu. The tribunal and the Singapore Courts expressly rejected Defendants' allegations and found that any failure to produce such emails was immaterial[5]—that Defendants had failed to show the evidence would have had any impact on the arbitration. Final Award, ECF No. 218-1 (hereinafter "Final Award") ¶282 ("even if there had been any concealment, there would have been no prejudice suffered by the Respondents."); ECF No. 13-1 ¶112 ("the procedural fraud allegation is short on the materiality requirement ie, it is not so material that it would have substantially affected the [Liability] Award.") Defendants are long on rhetoric, but they fail to satisfy the high bar for a defense under Article V(1)(d) and V(1)(b). ECF No. 365 at 34-35.

1.  Defendants Have Failed to Prove that the Arbitral Procedure Was Not in Accordance with the Parties' Agreement

Defendants' Article V(1)(d) defense fails because "there is more than 'a barely colorable justification' to support finding" that the arbitrators conducted the arbitration in accordance with the parties' agreed-upon procedure. *See BSH Hausergäte GMbH v. Kamhi,* 291 F. Supp. 3d 437, 443-44 (S.D.N.Y. 2018) (rejecting Article V(1)(d) defense). Defendants do not dispute that the Tribunal applied the agreed UNCITRAL Rules and IBA Rules on the Taking of Evidence in International Arbitration. As in *BSH Hausergäte*, that fact dooms a defense under Article V(1)(d).

Defendants attempt to circumvent the test by asserting that *GGAM* breached the IBA Rules by concealing evidence. ECF No. 365 at 35. But that is not the standard, and in any event, they raised this discovery dispute with the Tribunal pursuant to the IBA Rules. The Tribunal applied

---

[5]   While Eric Chiu's emails are also irrelevant in this action, GGAM fully complied with Magistrate Judge Netburn's rulings defining the scope of production of them.

the IBA Rules and, in the exercise of its discretion as allowed by the IBA Rules, ruled against Defendants. The Tribunal's decision was in accordance with the parties' agreement.[6]

The only authority cited by Defendants in support of their proposition, *Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, is distinguishable. In that case, the court found that the *arbitrators* had ignored the parties' explicit arbitration agreement on how to appoint a third arbitrator in the event a dispute arose between the two originally-appointed arbitrators. 403 F.3d at 90-91. The *arbitrators'* conduct therefore "irremediably spoiled the arbitration process." *Id.* at 91 (citation omitted). Here, by contrast, the Tribunal applied the agreed Rules and made a discretionary decision about a discovery dispute.

> 2.  <u>Defendants Have Failed to Prove They Were Unable to Present Their Case</u>

Defendants' Article V(1)(b) defense—that they were unable to present their case—fails because there was no "denial of 'fundamental fairness.'" *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d. Cir. 2013) (citation omitted). In an arbitration that spanned six years and involved hearings on liability and remedies, as well as extensive briefing about their discovery disputes, Defendants had ample opportunity to present their case.

In both phases of the arbitration, Defendants raised the same arguments they now assert concerning procedural fairness and that they were unable to present their case. Liability Award at 124 (¶8); Final Award ¶408(b). In the Liability Award, the Tribunal addressed Defendants' concerns, noting "the IBA Rules 2010 obliges the Tribunal to consider procedural economy in dealing with requests for document production and related evidentiary matters." Liability Award at 125-126 (¶13). The Tribunal concluded, "[it] is satisfied that … the Parties were afforded a fair

---

[6]   Defendants raised the same argument that the Tribunal's decision was not in accordance with the parties' agreement before the Singapore Courts, which rejected the argument in full. Singapore High Court Judgment (May 29, 2020), ECF No. 13-2 ¶82.

and reasonable opportunity to present their respective cases …." *Id.* at 129 (¶26).

In the Remedies Phase, Defendants raised their Article V(1)(b) defense that they "were denied an adequate opportunity to present their case, as a result of GGAM's … failing to search the files of Eric Chiu." Final Award ¶408(b); *see also id.* ¶¶282, 338, 489. The Tribunal rejected that argument, holding that "even if there had been any concealment, there would have been no prejudice suffered by the Respondents."[7] *Id.* ¶282.

Thus there is no evidence whatsoever that Defendants were denied fundamental fairness by the Tribunal. Since they "had ample opportunity to be heard regarding all the issues in the arbitration" and "took full advantage of that opportunity," their defense is unfounded. *See Kondot S.A. v. Duron LLC*, 586 F. Supp. 3d 246, 258-59 (S.D.N.Y. 2022).

### C.   The Judgments of the Singapore Courts Should Be Given Preclusive Effect

The final judgments of the Courts of Singapore, which rejected the same arguments that Defendants again advance in this action, should be given preclusive effect. *See China Shipping Container Lines Co. v. Big Port Serv. DMCC*, 803 F. App'x 481, 484-85 (2d Cir. 2020) (affirming order giving preclusive effect to decision of a Singapore court); *ICC Chem. Corp. v. TCL Indus. (Malaysia) SDN*, 206 F. App'x 68, 70 (2d Cir. 2006) (affirming order finding decision of Singapore court was entitled to comity). The Singapore Courts' decisions should be recognized under the principle of comity. The Second Circuit has explained:

> Comity will be granted to the decision or judgment of a foreign court
> if it is shown that the foreign court is a court of competent jurisdiction,
> and that the laws and public policy of the forum state and the rights of
> its residents will not be violated. . . . The rationale underlying the
> granting of comity to a final foreign judgement is that litigation should
> end after the parties have had an opportunity to present their cases
> fully and fairly to a court of competent jurisdiction.

---

[7]   Defendants raised the same argument that they were unable to present their case before the Singapore Courts, which rejected the argument in full. ECF No. 13-1 ¶229.

*Cunard S.S. Co. v. Salen Reefer Servs. AB*, 773 F.2d 452, 457 (2d Cir. 1985).

Collateral estoppel applies when (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits. *China Shipping*, 803 F. App'x at 484 (quoting *Ecuador v. Chevron Corp.*, 638 F.3d 384, 400 (2d Cir. 2011)). Those factors are met here.

In the Courts of Singapore, Defendants filed petitions to set aside both the Liability and Final Awards and raised and litigated the identical arguments they raise here. Specifically, Defendants argued that "the [Liability Award] was induced or affected by fraud … [because] [GGAM] had concealed documentary evidence or committed perjury with the dishonest intention to deliberately mislead the Tribunal and/or [Defendants]" (ECF No. 13-1 ¶¶4(a), 5, 91); that GGAM engaged in actual fraud and thus the Liability "Award was 'tainted by the fraudulent and/or corrupt nature of Mr. Weidner's strategies … in performance of the MSA" (*id.* ¶91); that Defendants were unable to present their case because the "deceit and fraud of the [GGAM or its arbitration attorneys]—in concealing evidence—constitutes a breach of the rule that each party must be given a fair hearing and a fair opportunity to present its case" (*id.* ¶224); and that "the Tribunal's failure to address concealments in document production concomitantly resulted in an arbitral procedure that deviated from the arbitration agreement" (ECF No. 13-2 ¶81). Defendants relied on the same factual allegations of corruption, illegal conduct and concealment that they now raise. ECF No. 13-1 ¶¶70-89, 91-93

In confirming the Liability Award, the High Court concluded: "The plaintiffs' accusations are without basis. There is no concealment of information by either Paul Hastings or GGAM aimed at deceiving the plaintiffs or the Tribunal. . . . There are also no material deficiencies in the GGAM

and/or Paul Hastings' document production in the Arbitration." ECF No. 13-1 ¶144. The High Court determined that Defendants failed to prove they were not able to present their case. *Id.* ¶229.

When Defendants later challenged the Final Award, the High Court again rejected Defendants' arguments, stating "the Final Award cannot be set aside or, in the alternative, refused enforcement on the grounds that there was a breach of natural justice, that Bloomberry was unable to present its case or that the arbitral procedure was not in accordance with the agreement of the parties." ECF No. 13-2 ¶82. The judgments of the High Court were affirmed. Singapore Court of Appeal Judgment (Feb. 16, 2021), ECF No. 304-6 ¶¶2 (noting that Defendants present the same arguments they did before the High Court), 53 ("We find no reasoned basis on which we can disagree with the findings of the Judge in relation to the lack of evidence of fraud."), 72 (finding "no fraud has been established in relation to PH LLP's document collection or production for the arbitration."); Singapore Court of Appeal Judgment (Oct. 4, 2021), ECF No. 304-7 ¶168.

Defendants had a full and fair opportunity to litigate the issues they assert in this action. *See China Shipping*, 803 F. App'x at 483-85. The resolution of those issues was necessary to the Singapore Court judgments denying Defendants' petitions to set aside the Awards. Because Defendants filed their petitions in Singapore Courts, Defendants have acknowledged that they were courts of competent jurisdiction. Accordingly, the judgments of the Singapore Courts should be given preclusive effect.

### D. There Was No Fraud or Corruption

Even if the Court were to expand the scope of the Article V defenses or lower their standards, Defendants would still lose because their allegations are factually baseless. First, regarding their money laundering allegations, Defendants' own experts admit that GGAM's assailed strategies were yet-to-be implemented when Razon terminated the MSA. ECF No. 359-69 ¶39. Thus their charges amount to mere speculation that the trading platform *could have* been

used illegally. But even this speculation rings false because their own expert testified in the arbitration that GGAM's strategy was not money laundering or illegal. Ainsworth Supp. Decl. Ex. 3 at 192-94. Second, Defendants' allegations of bribery in GGAM's efforts to bring in VIPs and junket operators, are similarly based on conjecture about GGAM's planned strategies, which were never implemented. Defendants make abysmal inferential leaps to support their argument, all based on their allegations that GGAM intentionally concealed Mr. Chiu's emails—actions that the Tribunal and Singapore Courts found to be immaterial. Final Award ¶¶273-75, 282.

When the Court considers the arbitral record and the totality of Defendants' arguments in support of their defenses, the only conclusion to draw is that Defendants aim to relitigate and unnecessarily delay enforcement of the Award. They have failed to meet their burden to show that *enforcement* of the Award, which provides monetary damages and injunctive relief concerning the shares owned by GGAM, would "violate our most basic notions of justice and morality." The FAA therefore requires that the Court recognize and enforce the Award.

## II.     THE COURT HAS PERSONAL JURISDICTION OVER THE DEFENDANTS

Defendants do not and cannot rebut Plaintiff's showing that the Court has personal jurisdiction over them. Because the Court has jurisdiction (on any of four independent grounds), their motion for summary judgment must be denied, and GGAM's motion for recognition and enforcement must be granted.

### A.     Defendants Expressly Consented to Jurisdiction

It is undisputed that Defendants expressly consented to enforcement "in all jurisdictions." MSA, ECF No. 218-4 ¶19.2(b); Defs'. Resp. to Fact No. 17 (ECF No. 386). The clear, objective meaning of that language is that Defendants consented to jurisdiction in this Court.[8] The exercise

---

[8]    The Tribunal determined that under Philippine law "'i]f the terms of a contract are clear and leave no doubt upon the intention of the contracting parties, the literal meaning of its stipulation shall control.'" Liability Award ¶70 (citing

of jurisdiction is mandated by *Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1276 (2d Cir. 1971), which affirmed personal jurisdiction based on a clause that stated: "judgment upon an [arbitration] award may be entered in any court of competent jurisdiction."

Defendants have not addressed *Reed* or the other cases cited by GGAM. Instead, they ask the Court to disregard their express consent in the unambiguous jurisdiction clause that they inserted into the heavily-negotiated contract. *See* Fact No. 121.[9] Their description of it as a "boilerplate 'entry of judgment' clause" is unavailing.[10] The remainder of their argument is unsupported. Their primary case, *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 226 (2d Cir. 2014), interpreted *different* language, which limited enforcement to "any court having jurisdiction over the award or over the person or assets." *Id.* at 226.[11] By contrast, the MSA language does not limit enforcement to courts "having jurisdiction" but instead provides that the award shall be "*enforceable in all jurisdictions*." This is exactly the type of language the Second Circuit found enforceable in *Reed.*

In a footnote, Defendants cite to *Gordian Grp., LLC v. Syringa Expl., Inc.*, 168 F. Supp. 3d 575 (S.D.N.Y. 2016), which (unlike the Second Circuit's decision in *Reed*) did not involve a proceeding to enforce an arbitral award and did not address language added by the party challenging its application. That case is clearly inapposite and does not, in any way, undermine

---

Article 1371 of the Civil Code of the Philippines). The Tribunal also found that the MSA was a "heavily-negotiated contract, entered into with the benefit of legal counsel on both sides." *Id.* ¶192.

[9]   "Fact No." citations refer to the numbered facts included in Plaintiff's Response to Defendants Bloomberry Resorts and Hotels Inc.'s and Sureste Properties, Inc.'s Statement of Undisputed Material Facts and Further Statement of Undisputed Material Facts, attached hereto.

[10]   *See, e.g.*, *Great Earth Int'l Franchising Corp. v. Milks Dev.*, 311 F. Supp. 2d 419, 433 (S.D.N.Y. Mar. 3, 2004) ("[Defendants] also argue that this clause is boilerplate, but when a contract has been carefully negotiated between two sophisticated parties with the assistance of counsel, such an argument is unavailing.").

[11]   The contract in *Sonera* stated: "Any award of the arbitral tribunal *may be enforced* by judgment or otherwise *in any court having jurisdiction over the award or over the person* or the assets of the owing Party or Parties." *Sonera Holding.*, 750 F.3d at 226 (emphasis added). The Second Circuit described that language as "technically unnecessary." *Id.* at 227 n.3.

the binding and on-point decision in *Reed*.

**B.**   **Specific Personal Jurisdiction Exists Under CPLR 302(a)(1) Because Defendants Transacted Business in New York**

1.   The Legal Standard

Defendants do not meaningfully dispute the legal standard for exercising jurisdiction under CPLR 302(a)(1). The New York Court of Appeals recently re-emphasized that a *single* purposeful transaction is sufficient to exercise personal jurisdiction under Section 302(a)(1). *New York v. Vayu, Inc.*, No. 2, 2023 WL 1973001, at *3 (N.Y. Feb. 14, 2023) (reversing a dismissal of claims). The test is "primarily a fact-based inquiry that requires an assessment of whether the non-domiciliary's activities in the state were purposeful." *Id.* at *1. Purposeful transactions are "volitional acts by which the non-domiciliary 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (citation omitted). That court emphasized that "[l]ong-arm jurisdiction is appropriately exercised over commercial actors who have … 'us[ed] electronic and telephonic means to project themselves into New York to conduct business transactions.'" *Id.* at *2 (citation omitted).[12]

Jurisdiction exists under New York's long-arm where "the parties' activities in New York and the asserted claim are substantially related." *Sole Resort S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 105 (2d Cir. 2006). The nexus requirement "does not require a causal link between the defendant's New York business activity and a plaintiff's injury. Instead, it requires 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former ….'" *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 168-69 (2d Cir. 2013); *see also Vayu*, 2023 WL 1973001, at *4; *D & R Glob. Selections, S.L. v Bodega Olegario*

---

[12]   Defendants fail to address relevant, controlling New York cases when they argue that "'conducting contractual negotiations by phone, fax or mail with a party' … 'in New York does not constitute the transaction of business within the state.'" ECF No. 365 at 11.

*Falcon Pineiro*, 29 N.Y.3d 292, 298-99 (2017) (requiring "articulable nexus or substantial relationship"). As the Second Circuit stated in *Sole Resort*, "New York contacts underlying a contract that provides for arbitration have the requisite relationship under section 302(a)(1) to a claim challenging the results of that arbitration." 450 F. 3d at 104.

Defendants improperly focus their argument on what they describe as four "*Sunward*" factors. Notably, the New York Court of Appeals decision in *Vayu, Inc.*, did not mention the *Sunward* factors. Further, as the Second Circuit explained, those factors are non-exclusive and "no one factor is dispositive and other factors may be considered. … 'The ultimate determination is *based on the totality of the circumstances*.'" *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) (emphasis added).

Here, the claim at issue is GGAM's claim to enforce the Award. The injury is Defendants' failure to pay the Award as agreed. Defendants had extensive contacts with New York that substantially relate to the enforcement claim, GGAM's injury, and the negotiation and performance of the MSA.[13]

> 2.  Defendants Had Numerous Contacts with New York, Each Having an Articulable Nexus to Plaintiff's Claim and Injury

> a.  *The Roadshow in New York*

Defendants visited New York at least three times during the term of the MSA, and met with GGAM twice in New York regarding their relationship. Defendants admit in their Answer that in May 2012 they traveled to New York with GGAM for a Roadshow to raise funds for Solaire. Fact Nos. 134-35. Razon, on behalf of Defendants, and William Weidner of GGAM (among

---

[13]   The arbitration was conducted pursuant to the MSA's arbitration clause, which applied to disputes that "relate[] to the interpretation, carrying out of obligations, breach, termination or enforcement of this Agreement or in any way arises out of or is related to this Agreement." MSA, ECF No. 218-4 ¶19.1. Thus, all issues submitted to and determined by the Tribunal were substantially related to the MSA.

others) presented to prospective investors *at the St. Regis Hotel in New York*. Fact Nos. 150, 152.

That meeting at the St. Regis Hotel has an articulable nexus to the parties' relationship and the Award GGAM seeks to enforce. Indeed, Defendants argued at arbitration that GGAM had committed "causal fraud" by misrepresenting—during the Roadshow in New York—its ability to bring in junket operators. Fact Nos. 151-52.[14] Razon submitted a declaration alleging that Weidner misrepresented—at the New York St. Regis—his ability to bring in junket operators with "7 phone calls." Fact No. 152. By arguing this issue in the arbitration, Defendants admitted it was within the scope of the arbitration clause of the MSA and related to the MSA.[15] The Tribunal recognized that this issue related to the MSA by directly addressing it in the Liability Award, holding: "the Claimants' principals made statements about junket operators *during the IPO road show*." Fact No. 154 (emphasis added). Defendants' argument was adjudicated,[16] and the Tribunal rejected their defenses and counterclaims on their merits. Fact No. 155.

Moreover, Defendants' Roadshow itself (aside from the dispute about the "7 phone calls" statement) had an articulable nexus to the parties' relationship, their dispute, and the Award. Defendants came to New York to raise funds for Solaire.[17] They insisted that GGAM travel with them to New York to meet with potential investors and solicit investment for Solaire. Fact Nos. 34, 147-48; ECF No. 386 at 35-37.[18] Defendants argued in the arbitration that GGAM's

---

[14]   In their defense and counterclaims in the arbitration, Defendants argued that the Tribunal should rescind the Equity Option Agreement because of alleged causal fraud by GGAM. Fact No. 151.

[15]   *See, e.g.*, *Boston & Maine Corp. v. Ill. C. R. Co.*, 274 F. Supp. 257, 260 (S.D.N.Y. 1967) ("Submission to the arbitration ratifies the power of the arbitrators to deal with matters submitted.").

[16]   During the hearing in the Liability Phase, the phrase "7 phone calls" and the "St. Regis Hotel" were expressly mentioned underline fourteen times, including in Defendants' closing argument. Fact No. 153.

[17]   They admit this purpose of the Roadshow in their response to GGAM's Fact No. 32. *See* ECF No. 386 at 35.

[18]   Defendants entered into the MSA with GGAM for "the provision of management and other advisory services in relation to the design, construction and operations of Solaire Manila." Fact No. 138. In the arbitration, Defendants argued: "it is axiomatic that managers of an enterprise would be fundamental, active participants in the road show leading up to the backdoor listing and the top-up offering." Fact No. 147. They further argued: "GGAM's assistance with the construction of the Solaire, its participation in the top-up offering 'road show,' and its negotiations of

16

participation in the Roadshow fell "within GGAM's general and specific obligations under the MSA." Fact Nos. 147-48. Also, the Offering Circular for the New York fundraising touted Plaintiff's role at Solaire, stating for example: "The Company[19] has entered into a Management Services Agreement with GGAM for the provision of management and other advisory services in relation to the design, construction and operations of Solaire Manila." Fact No. 138.[20]

Defendants now argue, however, that only BRC, and not Defendants, came to New York for the Roadshow. That argument (a) contradicts their admission in their Amended Answer,[21] and (b) ignores the overlapping roles of Defendants' officers who came to New York. Moreover, Defendants admitted in the arbitration that they controlled BRC and Prime. Fact Nos. 173-78.[22] Since the purpose of the Roadshow was to raise funds for Defendants' resort/casino, Solaire, Fact Nos. 134, 137, Defendants' officers who traveled to New York did so as agents of Defendants.

Defendants' argument that the Roadshow was "outside the scope of the MSA" (ECF No. 365 at 12) is both irrelevant and unsupported. The test is not whether the Roadshow was "outside the scope of the MSA." The test is whether *Defendants'* contacts with New York had an articulable nexus or substantial relationship to Plaintiff's enforcement claim or injury. There is no genuine

---

agreements for the Solaire are not charitable acts. These acts fall within GGAM's general and specific obligations under the MSA." Fact No. 148.

[19]   The "Company" is defined to mean Defendants together with their nominal parent company, Bloomberry Resorts Corp. ("BRC"). Fact No. 136.

[20]   The Offering Circular mentions "GGAM" 169 times, and mentions the "MSA" or "Management Services Agreement" more than 50 times. Fact No. 141. It has five pages dedicated to describing the MSA. *Id.*

[21]   ECF No. 273 ¶82. They cannot create a genuine issue of fact by contradicting that judicial admission. *See Morse/Diesel, Inc. v. Fidelity & Deposit Co.*, 763 F. Supp. 28, 32 (S.D.N.Y. 1991) ("It is axiomatic that 'a party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.'") (quoting *Bellefonte Re Ins. Co. v. Argonaut Ins. Co*., 757 F.2 523, 528 (2d Cir. 1985)).

[22]   The Offering Circular groups Defendants together with BRC under the definition of "the Company" and says, for example, "in accordance with the MSA, the Company will rely on GGAM to provide necessary advisory services for Solaire Manila." Fact No. 139. It also says: "Under the MSA and the Equity Option Agreement, GGAM was also granted the option, to purchase up to 92l,184,056 Shares … of the Company … from Prime Metroline." Fact No. 138. Sureste's control over BRC was expressly stated on page BLOOM_0077439. Fact No. 140.

dispute that Defendants purposefully came to New York and insisted that GGAM come with them to raise funds for Solaire, and that events in New York were disputed in arbitration and addressed by the Tribunal. Defendants also fail to cite relevant evidence to show that GGAM's participation in the Roadshow was "outside the scope of the MSA." They cite to GGAM's concession in arbitration that certain "Additional Expenses" amounting to US$45,557 were outside the scope of the MSA; but those "Additional Expenses" were incurred *after* June 2012—*i.e.*, *after* the May 2012 Roadshow. Resp. to Fact Nos. 78-79; *see also* Fact Nos. 156-57.

At least one of Defendants' executives, Occeña, also traveled to New York for investor presentations in September and November 2012. Fact Nos. 158-63. Their volitional presence in New York for those conferences was to promote the value of the Solaire property and BRC's shares, which at that time GGAM had an option to purchase. *See* Fact No. 133.[23] Their presence, along with GGAM at the November conference, had an articulable nexus to the MSA and to the arbitral Award. GGAM's relationship with Defendants sprung entirely from the MSA. And after GGAM exercised its option to acquire BRC shares (with funds from New York-based Cantor), Defendants asserted counterclaims in arbitration "for (1) monetary damages equivalent to the value of the Shares, (2) rescission of the equity option grant and restitution of the Shares …; (3) annulment of the MSA on the basis of causal fraud and restitution of the Shares; and (4) equitable relief from GGAM's unjust enrichment." Fact No. 164. The Tribunal ruled against Defendants, and GGAM's right to retain and to sell its Shares is the subject of a significant portion of the Award that GGAM seeks to enforce. Each of those investor presentations in New York, therefore, had an articulable nexus not only to Plaintiff's enforcement claim, but directly to the MSA as well.

---

[23]   Occeña wrote to Stone, of GGAM, in October 2012 saying: "Our stock is doing so well. … you are such an impressive presenter that investors just keep buying the stock." Fact No. 159.

       b.  *Defendants Had Purposeful Contacts with New York Through Their Negotiation, Execution, and Performance of the EOA*

The MSA obligated Defendants to provide an equity option to GGAM, and after executing the MSA, Defendants began negotiating the equity option agreement ("EOA"). There is no genuine dispute that negotiation and performance of the EOA were purposeful acts in fulfillment of Defendants' obligations under the MSA. *See* Defs.' Resp. to Fact Nos. 20, 21. While Defendants now dispute that the EOA was "compensation,"[24] there is no genuine dispute that the EOA was granted pursuant to the MSA or that Prime acted as Defendants' agent in negotiating and signing the EOA. *See, e.g.*, Fact Nos. 126-28, 173-178.

Defendants' negotiation of the EOA included many purposeful communications between them (or Prime, as their agent) and Cantor in New York. Fact Nos. 22, 129-30; *see also* Defs.' Resp. to Fact No. 22. Defendants admit negotiating directly with GGAM's representatives at Cantor in New York to reach an agreement on the EOA. *Id*. Defendants also knew Cantor would be the source of funds for the exercise of the equity option. Fact No. 131. There is no genuine dispute that Cantor wired the funds for the exercise of that option; Defendants admitted in arbitration that "Cantor fully funded the US$37 million strike price for the exercise of the equity option," arguing "the equity stake effectively belonged to Cantor." Fact No. 132.[25]

    3.  <u>The Defendants Also Had Purposeful Contacts with New York During Negotiation of the MSA and in the Execution of the MSA</u>

Defendants had numerous purposeful contacts with New York during the negotiation of the MSA. In April 2011, Razon—as Chairman, CEO and President of BRHI and SPI—

---

[24]  In the arbitration, Defendants argued there is "overwhelming evidence that the option grant at issue was always intended to be compensation for management services pursuant to the MSA" and dedicated at least 13 pages of briefing to show the relationship between the MSA and the EOA. Fact No. 128.

[25]  Again contradicting themselves, Defendants now argue that "Cantor [did not] pay for the purchase of such shares." ECF No. 365 at 9.

purposefully traveled to New York where he conducted the Defendants' business, including directing the negotiations of the MSA. Fact Nos. 110, 117; *see also* Defs.' Resp. to Fact No. 10. In their Amended Answer, Defendants admit that Razon "had email and/or telephonic communication with Weidner, Occeña, Alarilla, and Tan … relating to negotiating the GGP relationship during one or more trips that Mr. Razon made to New York in the April-June 2011 time frame (during which he would have stayed at the Plaza residence in Manhattan)." Fact No. 117. Although Defendants argue that Razon did not travel to New York for the purpose of negotiating the MSA, they cannot deny that he was purposefully in New York and conducting their business, including the negotiation of the MSA.

Moreover, while negotiations of the MSA were ongoing and when the MSA was executed, Defendants knew Cantor—in New York—was GGAM's joint-venture partner, and purposefully had many contacts with Cantor regarding the MSA. *See, e.g.*, Fact Nos. 111-15. Defendants admit they "sent responses to document requests and diligence checklists by email to Cantor employees." Fact No. 119. Defendants admit negotiating the MSA with "Cantor and its army of lawyers" and admit they were told "that some Cantor employees provided 'admin' services to GGAM." Fact No. 115; *see also* ECF No. 365 at 10 (admitting "BRHI/SPI negotiated the MSA, in part, by email and phone with GGAM's advisors located around the world—including in New York.").[26]

Between March 2011 and the execution of the MSA (September 9, 2011), Defendants sent at *least 90 emails* directly to Cantor personnel in New York, and they sent at least another 108 emails directly to Cantor after executing the MSA. Fact No. 120. In September 2011, Defendants emailed the executed MSA to Cantor in New York. Fact No. 16; ECF No. 386 at 16.

---

[26]   Razon, in support of his motion for summary judgment, attributes to GGAM knowledge acquired by Cantor in its due diligence. ECF No. 345 (Rule 56.1 Statement) ¶¶10, 11, 13 (citing Fissell Decl. Ex. 5).

Defendants' extensive, volitional contacts are more than sufficient for jurisdiction. They are vastly more extensive than those in *Vayu, Inc.*, where the New York Court of Appeals found jurisdiction arose out of that defendant's phone calls and emails to New York, the sending of an invoice to New York and acceptance of a wire that originated from New York, followed by one in-person meeting in New York. *Vayu, Inc.*, 2023 WL 1973001, at *4.

Defendants' contacts also vastly exceed those in *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015), in which the Second Circuit held that although Defendant had not physically entered New York, personal jurisdiction arose from the defendant's three purposeful contacts with New York: "mailing one debt collection notice to Eades [in New York], engaging in one debt collection phone call with Eades, and mailing a summons and complaint [for an action pending in Pennsylvania] to both Plaintiffs."[27]

Defendants' contacts with Cantor in New York have an undeniable nexus to enforcement of the Award and to the MSA. They knew Cantor's approval would be needed for GGAM to enter into the MSA. Fact No. 123. Moreover, as they admit, Cantor's role "was litigated extensively" in the arbitration. ECF No. 365 at 7-8. Indeed, it was *Defendants* who placed Cantor's role at issue by arguing GGAM had "effectively assigned its rights and obligations under the MSA to Cantor." Fact No. 165. Their briefing in the arbitration mentions "Cantor" 133 times and mentions Cantor personnel numerous additional times. Fact No. 166. In the liability phase hearing, "Cantor" was mentioned more than 380 times. Fact No. 167. The Liability Award mentions Cantor 55 times, and the Final Award mentions Cantor 42 times. Fact No. 168. The Tribunal rejected Defendants' arguments and found that Cantor's involvement was not in breach of the MSA. Fact No. 170.

---

[27] The Second Circuit did not cite *Sunward* or apply, what Defendants deem, the "*Sunward*" factors.

4.   There Is a Substantial Relationship Between Defendants Contacts with New York and the Enforcement of the Arbitral Award

There is an undeniable, articulable nexus between Defendants' purposeful contacts with New York and the arbitration and Award that GGAM now seeks to enforce. The MSA, which is at the heart of the arbitration, was negotiated through Defendants' purposeful contacts with New York. The MSA was performed in New York through (a) Defendants' negotiation of the EOA with Cantor personnel in New York, (b) Defendants and GGAM's participation in the Roadshow in New York, and (c) Cantor's payment of the funds for the exercise of the equity option. GGAM's ownership rights to the "Option Shares," which Defendants granted to GGAM pursuant to the MSA, were disputed in the arbitration; Defendants asked the Tribunal to order GGAM to deliver those Shares to them. Fact No. 169. They argued, among other things, that GGAM had made misrepresentations during the Roadshow in New York and that GGAM had improperly assigned the MSA to Cantor in New York. *See, e.g.*, Fact Nos. 151, 164-65. The Tribunal rejected their claims and defenses, awarded damages to Defendants for their breach of the MSA and for their interference with GGAM's ownership of the Shares,[28] and ordered Defendants to take affirmative steps to enable GGAM to sell those Shares. Fact Nos. 170-71. GGAM now seeks to enforce the Award issued by the Tribunal in that arbitration.

5.   Exercising Jurisdiction Over Defendants Comports with Due Process

The exercise of jurisdiction over Defendants comports with Due Process. Defendants have not disputed that the "exercise of jurisdiction under CPLR 302(a)(1) satisfies the minimum requirements of the Due Process Clause." ECF No. 331 at 19 (citing *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006) ("[T]he constitutional requirements of personal

---

[28]   Defendants' interference with the sale of the Option Shares accounts for roughly 2/3 of the total Award Plaintiff seeks to enforce in this action.

jurisdiction are satisfied because application of N.Y. C.P.L.R. § 302(a) meets due process requirements."); *Energy Brands Inc. v. Spiritual Brands, Inc*., 571 F. Supp. 2d 458, 469 (S.D.N.Y. 2008) ("[T]he Due Process Clause permits the exercise of jurisdiction in a broader range of circumstances than N.Y. C.P.L.R. § 302, and a foreign defendant meeting the standards of § 302 will satisfy the due process standard.")). Instead, they simply dispute that their conduct falls within the scope of CPLR 302(a)(1). Since the undisputed facts support the exercise of jurisdiction under CPLR 302(a)(1), and for the reasons set forth in Plaintiff's opening memorandum (ECF No. 331), the Due Process requirements are satisfied.

### C.   The Court Also Has Jurisdiction over Defendants (1) Because They Are Alter Egos of Defendant Razon, and (2) Because Jurisdiction Exists Under Federal Rule of Civil Procedure 4(k)(2)

The Court has jurisdiction over Defendants as alter egos of Razon. As a matter of law, "alter egos are treated as one entity" for jurisdictional purposes. *See Transfield ER Cape Ltd. v. Indus*. *Carriers, Inc*., 571 F.3d 221, 224 (2d Cir. 2009) (citation omitted); ECF No. 216 at 9. GGAM has moved for summary judgment against Razon, proving that Defendants are his alter egos. ECF Nos. 360, 366. GGAM's evidence in support of that motion is sufficient to overcome Defendants' motion regarding jurisdiction over them. Moreover, the required showing of alter ego relationship for personal jurisdiction is lower than the showing required to prove liability, and there is ample undisputed evidence of Razon's control over Defendants. *See Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981); *see also* ECF No. 216 at 8. Accordingly, the Court can and should find that it has jurisdiction over Defendants as Razon's alter egos but, at a minimum, should deny Defendants' motion on this ground.

Finally, the Court must deny Defendants' motion for summary judgment on the issue of whether jurisdiction may be exercised under Rule 4(k)(2). That rule is the basis for federal long-arm jurisdiction and permits federal courts to exercise jurisdiction over foreign defendants with

"sufficient contacts with the United States generally, but insufficient contacts with any one state in particular." *Fujifilm Mfg. U.S.A., Inc. v. Goldman Sachs & Co. (In Re Aluminum Warehousing Antitrust Litig)*, No. 15-cv-8307 (PAE), 2020 WL 2036716, at *10 (S.D.N.Y. Apr. 28, 2020) (citation omitted); *see also BMW of N. Am. LLC v. M/V Courage*, 254 F. Supp. 3d 591, 599 (S.D.N.Y. 2017). Rule 4(k)(2) permits a district court to aggregate a foreign defendant's nationwide contacts to exercise jurisdiction where the defendant's contacts with any individual state are insufficient. *See* Fed. R. Civ. P. 4(k)(2); *see also Fujifilm,* 2020 WL 2036716, at * 9-10.

To establish jurisdiction under Rule 4(k)(2), a plaintiff must show: (1) the plaintiff's cause of action arises under federal law; (2) the defendant is not subject to the jurisdiction of a court of general jurisdiction of any one state; and (3) the "defendant's total contacts with the United States as a whole are sufficient to confer the court with personal jurisdiction without offending due process." *Fujifilm*, 2020 WL 2036716, at *9 (internal citation omitted).

This proceeding satisfies the first element because it arises under the FAA. 9 U.S.C. §207.

As to the second element, Defendants' factual assertions support the exercise of jurisdiction under Rule 4(k)(2); they assert that "Defendants BRHI and SPI are Philippine corporations …. BRHI and SPI have no assets in the United States and conduct no business in the United States." *See* Defs.' R. 56.1 Statement, ECF No. 367, Defs.' Fact No. 40; Defs.' Am. Answer, ECF No. 225 ¶¶13, 14. If the Court finds that Defendants are not subject to jurisdiction in New York on any other basis, then to Plaintiff's knowledge, Defendants are not subject to jurisdiction in the courts of general jurisdiction in any other state. Ainsworth Supp. Decl. ¶ 3.

The third element is met because Defendants' contacts with the United States as a whole are sufficient to confer the court with personal jurisdiction without offending Due Process. *See Fujifilm*, 2020 WL 2036716, at*15 (denying defendants' motion to dismiss for lack of personal

jurisdiction). Defendants knowingly traveled to Nevada to seek out GGAM, which is incorporated in Delaware and based in Nevada, and contracted with GGAM. Defs.' Fact Nos. 43, 50; MSA, ECF No. 218-4; *see also* Fact Nos. 5, 125, 175. Defendants had numerous purposeful contacts with several states relating to the negotiation, execution, and performance of the MSA and the arbitration Award, including (a) New York (as identified above and in GGAM's R. 56.1 Statement); (b) meeting twice with GGAM, in Nevada in March and October 2011 (*see, e.g.*, Fact Nos. 5, 130; Defs.' Fact No. 50), (c) contracting with GGAM, which is based in Nevada (Defs.' Fact No. 43; MSA, ECF No. 218-4; *see also* Fact Nos. 125, 175); (d) promoting investment in Solaire via their Roadshow in 2012, with stops in California, Massachusetts, Missouri, Colorado, and Washington, D.C. (Fact No. 145); (d) meeting with investors in California in November 2012 (Fact Nos. 160-61); (e) a meeting with GGAM in California in 2015 concerning their dispute (Fact No. 172); and (f) participating in arbitration hearings in Washington, D.C., in 2014 and 2018 (Defs.' Fact Nos. 102, 104). Accordingly, the evidence shows that the exercise of jurisdiction over Defendants is consistent with the United States Constitution and laws. *See Fujifilm*, 2020 WL 2036716, at *12-15 (finding defendants' had sufficient minimum contacts with the United States); *BMW of N. Am. LLC*, 254 F. Supp. 3d at 599-601 (same).

## III.   GGAM IS NOT SEEKING TO MODIFY THE AWARD

GGAM asks that the Court enforce the Award as crafted by the Tribunal, and does not seek to modify it. Because of Defendants' failure to comply with any aspect of the Award, the Court is tasked with interpreting the Award. Such interpretation is proper. *See Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex–Exploración Y Producción*, 832 F.3d 92, 112 (2d Cir. 2016) ("Although the confirmation role is limited, we have still allowed district courts to interpret the contents of applicable awards.").

Paragraph 507 (a), (b), (c), (f), and (g) of the Final Award set forth five components that

add up to the damages stated in GGAM's motion.

The Award also directed Defendants to take certain steps, including: (1) withdrawing and causing their agents to withdraw their petition for writs ("Writs") from the Philippine Regional Trial Court ("RTC") (Final Award ¶507 (d)(1)); (2) issuing a joint press release clarifying GGAM's ownership (*id.* ¶507(d)(2)); (3) instructing "the Philippine Depository & Trust Corporation, the Philippine Stock Exchange, Deutsche and the market" of GGAM's rights and instructing "Deutsche Bank to transfer the Shares to an unrestricted trading account" (*id.* ¶507(d)(3)); and (4) facilitating release of the dividends on the Shares to GGAM within 21 days of the Award (*id.* ¶507(e)).[29] GGAM requests a judgment that includes the complete monetary relief and non-monetary relief awarded by the Tribunal.

Contrary to Defendants' assertion, GGAM is not asking the Court to order a Philippine Court to take any action. The FAA requires the Court to enforce the Award as intended by the Tribunal. *See Corporación Mexicana*, 832 F.3d at 112 (affirming district court's interpretation of award to include $106 million as compensation for value of performance bonds defendant collected in violation of Tribunal's award). The Award required *Defendants* to "take all steps necessary" to ensure GGAM has the right to sell the Shares and directed *Defendants, including their agent and controlling shareholder, Prime,* to withdraw their petition in the RTC for the Writs. Final Award ¶507(d).

The Court has authority to order Defendants and Prime, Defendants' agent and controlling shareholder, to take the action directed in the Award.[30] *See, e.g.*, *Jolen, Inc. v. Kundan Rice Mills,*

---

[29]   The Singapore Courts rejected Defendants' arguments that the "Constructive Remedy" was outside the scope of the Tribunal's authority. ECF No. 13-2 ¶70.

[30]   Defendants' cited cases do not limit the Court's authority. *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 124 (2d Cir. 2007) ("federal courts *do* have inherent power to protect their own judgments from being undermined or vitiated by vexatious litigation in other jurisdictions").

*Ltd.*, No. 19-cv-1296 (PKC), 2019 WL 1559173, at *6 (S.D.N.Y. Apr. 9, 2019) (ordering defendant to "withdraw any action pending in the Courts of India" and "refrain from instituting or participating in any proceedings" that seek to interfere with the enforceability of award); *see also* 28 U.S.C. § 1651(a) (the "All Writs Act"); *United States v Int'l Bhd. of Teamsters,* 266 F3d 45, 50 (2d Cir. 2001) (citing *In re Baldwin-United Corp.*, 770 F.2d 328, 338 (2d Cir. 1985) ("An important feature of the All Writs Act is its grant of authority to enjoin and bind non-parties to an action when needed to preserve the court's ability to reach or enforce its decision in a case over which it has proper jurisdiction."); *Microsoft Corp. v. Does*, No. 20-CV-1217 (LDH) (RER), 2021 WL 4755518, at *11 (E.D.N.Y. May 28, 2021) (directing third party to transfer "ownership, certain domains" in order to "effectuate and prevent frustration of the injunctive relief" ordered).

Moreover, the Court has discretion to and should apply the December 9, 2014 exchange rate to the value of the Shares. *See Qing Yang Seafood Imp. (Shanghai) Co. v. JZ Swimming Pigs, Inc.*, No. 21-CV-3587 (RPK) (TAM), 2022 WL 2467540, at *4 (E.D.N.Y. Apr. 15, 2022) (when converting foreign awards, "courts in this circuit take different approaches to determine the date on which to calculate the exchange rate"). In granting the "Constructive Remedy," the Tribunal determined GGAM's damages as of December 9, 2014,[31] the date of its Interim Measures Order ("IMO") that Defendants have disregarded. The Court may consider equitable reasons for choosing that same date because "the conversion from foreign currency to dollars is to be made at such rate as to make the creditor whole and to avoid rewarding a debtor who has delayed in carrying out the obligation." *See Cont'l Transfert Technique Ltd. v. Nigeria*, 932 F. Supp. 2d 153, 158, 159-60 (D.D.C. 2013) (quoting Restatement on Foreign Relations Law §823(2). Using the exchange rate as of December 9, 2014 effectuates the Tribunal's intention of awarding GGAM the value of the

---

[31] The proposed conversion rate applies only to the amount awarded in ¶507(c) of the Final Award.

Shares as of that date and results in a judgment that reflects the true value in dollars of the IMO, as incorporated into the Final Award. *See Cont'l Transfer*, 932 F. Supp. 2d at 161-62 (equitable reasons supported exchange rate as of award date where Tribunal did not specify valuation date).

To effectuate the awarded relief, the judgment should include the following provisions[32] (*see* Final Award ¶507 (a), (b), (c), (f), (g)):

1. An award of money damages against Defendants in the amount of **$401,339,240** through March 22, 2023, plus pre-judgment interest accruing from March 22, 2023, at a daily rate of at least **$64,427.32** (Ainsworth Decl. ¶9);

2. An order that Defendants take all steps specified in ¶507(d) and (e) of the Final Award; and

3. An order that, (a) to the extent GGAM sells any of the Shares, the net proceeds of any such sale shall be credited toward satisfaction of the outstanding judgment amount; and (b) if GGAM holds any of the Shares when the judgment is fully satisfied, GGAM shall within 30 days after such satisfaction either (i) authorize the custodian of the Shares to transfer them to Defendants, or (ii) sell the Shares and remit the net proceeds of the sale to Defendants.

---

[32] Once the Court enters an order granting the motion to recognize and enforce the award, GGAM will submit a proposed form of judgment.

Dated: March 22, 2023
       New York, New York

                              MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND
                              POPEO, P.C.

                              Respectfully submitted,

                              By: _Kevin N. Ainsworth_____
                                  Robert I. Bodian
                                  Kevin N. Ainsworth
                                  Barry Bohrer
                                  Kaitlyn A. Crowe
                                  Daniel T. Pascucci (admitted *pro hac vice*)
                                  Joseph R. Dunn (admitted *pro hac vice*)
                                  919 Third Avenue
                                  New York, NY 10022
                                  T: (212) 935-3000
                                  F: (212) 983-3115
                                  rbodian@mintz.com
                                  kainsworth@mintz.com
                                  bbohrer@mintz.com
                                  kacrowe@mintz.com
                                  dtpascucci@mintz.com
                                  jrdunn@mintz.com

                                  *Attorneys for Plaintiff*
                                  *Global Gaming Philippines, LLC*