**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

GLOBAL GAMING PHILIPPINES, LLC,

　　　　　　　*Plaintiff*,

　　v.

ENRIQUE K. RAZON, JR.;
BLOOMBERRY RESORTS AND HOTELS
INC.; AND SURESTE PROPERTIES, INC.,

　　　　　　　*Defendants*.

No. 21-CV-2655 (LGS) (SN)

---

**PLAINTIFF GLOBAL GAMING PHILIPPINES LLC'S (1) RESPONSE TO**
**DEFENDANTS BLOOMBERRY RESORTS AND HOTELS INC.'S AND SURESTE**
**PROPERTIES, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND (2)**
**FURTHER STATEMENT OF UNDISPUTED MATERIAL FACTS**

　　　　Plaintiff Global Gaming Philippines, LLC ("GGAM" or "Plaintiff"), pursuant to Local

Civil Rule 56.1(b), submits this Response to Bloomberry Resorts and Hotels Inc.'s ("BRHI") and

Sureste Properties, Inc.'s ("SPI", and together with BRHI, "Defendants") "FURTHER

STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF BRHI'S AND SPI'S

CROSS-MOTION FOR SUMMARY JUDGMENT FOR LACK OF PERSONAL JURISDICION

[sic] AND OPPOSITION TO PLAINTIFF'S MOTION TO ENFORCE ARBITRAL AWARD"

("Defs.' 56.1 Fact Statement") (ECF No. 386). In addition to responding to Defendants' purported

fact Nos. 40-109 below, GGAM responds that Fact Nos. 1-39 in GGAM's Rule 56.1 Statement

(ECF No. 333) and Fact Nos. 110-178 below are additional material facts as to which there is no

genuine issue of fact and which support the Court's exercise of personal jurisdiction over

Defendants.

1

### GGAM'S RESPONSE TO DEFENDANTS' PURPORTED FACT NOS. 40-109

40.     Defendants BRHI and SPI are Philippine corporations, and together they own and operate the Solaire Resort & Casino located in Metro Manila, Philippines. *See* SAC (Dkt. 218) ¶¶ 13-14; Defs.' Am. Answer (Dkt. 273) ¶¶ 13-14. BRHI and SPI have no assets in the United States and conduct no business in the United States. *See* Perry Decl., Ex. 67 at 356:5-8; *id.* Ex. 68 at 51:20-52:3.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that Defendants are Philippine corporations that own and operate the Solaire Resort and Casino ("Solaire") in the Philippines. GGAM disputes the assertions that Defendants have no assets in the United States and conduct no business in the United States. In fact, on the date this action commenced, BRHI had an aircraft in the United States. Defendants' Amended Answer ("Defs.' Am. Answer") (ECF No. 273) ¶ 141; Declaration of Kevin N. Ainsworth dated February 22, 2023 ("Feb. Ainsworth Decl.") Ex. 41 (ECF No. 384-39) at 2-3. Moreover, defendant Enrique K. Razon, Jr. ("Razon"), Defendants' Chairman and CEO, traveled to the United States in March 2011 and met with two of GGAM's principals to discuss entering into a business deal with them. Defs.' Am. Answer (ECF No. 273) ¶ 50; Feb. Ainsworth Decl. Exs. 22-23 (ECF Nos. 384-20, 384-21) at Response Nos. 2-3 (Razon is "Chief Executive Officer and Chairman of the Board of Directors of [Defendants]"); *see also* Defendants' Fact No. 50. Thereafter, Razon conducted business on behalf of Defendants from his residence in New York in 2011, which included directing the negotiation of Defendants' contract with GGAM. Defs.' Am. Answer (ECF No. 273) ¶ 54; *see also* Fact No. 13 (ECF No. 333). After the MSA was executed, Defendants met with GGAM and Cantor in Nevada in October 2011 to discuss the EOA. Supplemental Declaration of Kevin N. Ainsworth ("Ainsworth Supp. Decl.") Ex. 1. Defendants have admitted that "executives of Debtor Defendants," including Razon and Estella Tuason-Occeña ("Occeña"), conducted a Roadshow in the United States, with stops in

New York, California, Massachusetts, Missouri, Colorado, and Washington, D.C., in April and May 2012 to raise funds for Solaire. Defs.' Am. Answer (ECF No. 273) ¶¶ 82, 84. Defendants also participated in investor conferences in September and November 2012 in New York, California, and Massachusetts. Ainsworth Supp. Decl. Exs. 4-5; Defendants' Response to Fact No. 36 (ECF No. 386); Defs.' Am. Answer (ECF No. 273) ¶¶ 87. They also came into the United States in 2015 to meet with GGAM, and in 2014 and 2018 to participate in arbitration hearings in Washington, D.C. Defs.' Am. Answer (ECF No. 273) ¶ 129; Interim Measures Order (ECF No. 218-3) ¶ 23; Final Award (ECF No. 218-1) ¶ 122.

41.     BRHI is 100% directly owned by SPI, and SPI is 100% directly and indirectly owned by BRC, which is a Philippine corporation that is publicly traded on the Philippine Stock Exchange. *See* Final Award (Dkt. 218-1) at 9; SAC (Dkt. 218) ¶ 76; Defs.' Am. Answer (Dkt. 273) ¶ 76. Razon is the Chairman and CEO of BRC and the Chairman of BRHI and SPI. *See* SAC ¶ 72; Defs.' Am. Answer ¶ 72. Razon directly and indirectly controls a majority of BRC's common stock. *See* SAC ¶ 135; Defs.' Am. Answer ¶ 135.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that BRHI is 100% directly owned by SPI. The cited evidence, however, indicates that SPI is owned by BRHI (9.34%) and Bloomberry Resorts Corporation ("BRC") (90.66%). Defs.' Am. Answer (ECF No. 273) ¶ 14. GGAM disputes the suggestion that Razon is not the CEO of Defendants. The evidence shows that he has been the CEO of Defendants since 2011. *See* Fact No. 110*, infra*; *see also* GGAM's Alter Ego Liability R. 56.1 Statement (ECF No. 382) ¶ 16. GGAM does not dispute that Razon controls the majority of BRC's common stock, and in fact the evidence shows that he controls 65.52% of BRC's common stock. GGAM's Alter Ego Liability R. 56.1 Statement (ECF No. 382) ¶ 7.

Moreover, the current ownership structure is not the only relevant ownership structure, as BRC was not an affiliate of any of the relevant companies at the time the MSA was signed on September 9, 2011. Defs.' Am. Answer (ECF No. 273) ¶¶ 67, 73, 76.

42. Razon has ownership interests in and executive positions with other companies in the Philippines, including ICTSI, which is a global port management company that is headquartered in Manila and publicly traded on the Philippine Stock Exchange. Perry Decl., Ex. 36 at ¶ 2.

43. Plaintiff Global Gaming Philippines LLC ("GGAM") is a Delaware company that is based in Las Vegas, NV. *See* MSA (Dkt. 218-4) at 1. GGAM has never been registered to do business in New York. *See* Perry Decl. ¶ 2.

**GGAM'S RESPONSE:** Disputed in part. The assertion that GGAM is "based in Las Vegas, NV" is incomplete. Beginning no later than spring 2012, Cantor employees in New York, including Jon Rein and Christine Levett, were seconded to GGAM and worked out of Cantor's New York office. Declaration of Daniel Perry ("Perry Decl.") Ex. 37 (ECF No. 387-37) at 2; *id.* Ex. 40 (ECF No. 387-40) ¶ 10; Declaration of Jonathan Rein dated October 5, 2015 (ECF No. 388-6) ¶ 38.

44. GGAM has a direct subsidiary, Global Gaming Netherlands B.V. ("GGAM Netherlands"), which is incorporated in the Netherlands. *See* Final Award (218-1) ¶¶ 350-52; *cf.* MSA (Dkt. 218-4) § 16.2. GGAM Netherlands is not registered to do business in New York. *See* Perry Decl. ¶ 2.

45. GGAM is 100% owned by Global Gaming Asset Management L.P. ("GGAM L.P."), which is a Delaware limited partnership based in Las Vegas, NV. *See* MSA (Dkt. 218-4) at 1; Perry Decl. ¶ 3. GGAM L.P. is not registered to do business in New York. *See* Perry Decl. ¶

2. The managing partner of GGAM L.P. is Global Gaming Asset Management Holdings, LLC, *see* Ainsworth Decl. Ex. 2 (MSA), Ex. A, which is also a Delaware company, Perry Decl. ¶ 3, and is also not registered to do business in New York. *Id.* ¶ 3.

46.     GGAM's management principals are William P. Weidner, Bradley H. Stone, and Garry W. Saunders. *See* SAC ¶ 48. Between January 2011 and September 2013, Weidner, Stone, and Saunders were all based in Las Vegas, Nevada. *See e.g.*, MSA (Dkt. 218-4) at 1; Perry Decl., Ex. 63 at 56:2-5; *id.* Ex. 17 at 1.

47.     GGAM's direct parent company, GGAM L.P., is owned 50% by Gaming Asset Management, LLC ("GAM")/Gaming Equity Group Series LLC, and 50% by Cantor GGAM, L.P. ("Cantor GGAM"). *See* Ainsworth Decl. Ex. 2 (MSA), Ex. A. GAM is a Nevada company, Perry Decl. ¶ 4, and is not registered to do business in New York. *Id.* ¶ 2. Cantor GGAM is a Delaware limited partnership, *id.* ¶ 3, and is also not registered to do business in New York. *Id.* ¶ 2.

48.     Cantor GGAM is directly and indirectly owned 100% by Cantor Fitzgerald L.P., *see* Ainsworth Decl. Ex. 2 (MSA), Ex. A, which is a Delaware limited partnership, Perry Decl. ¶ 3, that is registered to do business in New York. *Id.* ¶ 2. Cantor Fitzgerald L.P. has numerous affiliates in which it holds a majority or 100% ownership interest (such affiliates, together with Cantor Fitzgerald L.P., "Cantor").

49.     Pursuant to a Support Services Agreement that commenced as of January 27, 2011 (the "SSA"), Cantor provided legal, financial advisory, and "back office" services to GGAM, *see* Perry Decl., Ex. 23 at GGAM-SDNY-0279150-52; *id.* Ex. 9 at BLOOM_0001273, and GGAM paid for those services. *See* Dkt. 281-6 ¶ 24.

50.     In late 2010 and early 2011, Razon was looking for a President or Chief Operating Officer to run the day-to-day operations of Solaire, which was then under construction. Perry

Decl., Ex. 41 ¶ 13. In January 2011, a headhunter recommended that Razon meet with Saunders. Ainsworth Decl., Ex. 7. In early March 2011, Razon flew to Las Vegas, Nevada for a global management meeting related to ICTSI. Perry Decl., Ex. 47 at 30:14-22. While in Las Vegas, Razon met with Weidner and Saunders for an introductory meeting that lasted approximately one hour and during which they discussed the possibility of working together. *See, e.g.*, Ainsworth Decl., Ex. 30 (Saunders Dep. Tr. Excerpts) at 22:16-27:20.

51.     Following the parties' one-hour meeting in Las Vegas, on or about March 16, 2011, the parties began negotiations. *See* Liability Award (Dkt. 218-2) ¶ 46. Weidner sent Razon an email stating, *inter alia*, that he "[e]njoyed our talk on your visit to Las Vegas" and "[l]ook[ed] forward to [Razon's] thoughts on how we may cooperate." Perry Decl., Ex. 2 at BLOOM_0148255. On or about that same day, Razon replied to say he would "come up with some ideas by the end of the week and get back to you [Weidner]," and that he was "confident we can work something out." *Id.* at BLOOM_0148254. Weidner responded that he was "[l]ooking forward to seeing your proposal and you again soon." *Id.* On or about March 17, 2011, Razon followed up with "[s]ome preliminary points on principle that [he thought] we should get out of the way," including, *inter alia*, that he was "envisioning an arrangement that is as close to full time management as possible." *Id.* Razon told Weidner that he envisioned "hav[ing] two phases," one for "construction and start up," and the other for "management, operations and marketing," and said he "[w]ould like to get your [Weidner's] ideas on how the two phases will be handled and the senior executives who will be assigned full time to carry about both." *Id.* Razon also told Weidner that he is "not keen on a management contract but on an arrangement that aligns our interests. Which in effect you would come in as an investor with a real stake in our success. We can come up with a formula to accommodate this, which as an example would be that I would make up to

ten percent of the company available for you and your group with a buy in formula." *Id.* On or about March 19, 2011, Weidner told Razon that "Garry [Saunders] and I are working on a simple outline of a proposal for you." *Id.*

**GGAM'S RESPONSE:** Disputed in part. GGAM's in-person meeting with Razon, Defendants' Chairman and CEO, in Las Vegas on March 12, 2011 was the start of negotiations. Perry Decl. Ex. 2 (ECF No. 387-2) at 2. GGAM does not dispute that the referenced emails were exchanged as indicated. GGAM disputes Defendants' characterization of the emails which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to the document for its content.

52.     On or about March 21, 2011, Weidner sent an email to Razon to "share [GGAM's] thoughts on principles of alignment" including, *inter alia*: (i) GGAM's "add[ition] [of] significant value in every phase of constructing, staffing, operating and marketing Solaire;" (ii) GGAM's "dedicat[ion] [of] a significant part of [its] time [to] supervising construction (putting a trusted, tested person we have experience with full time on the ground in Manila) and pre-opening activities (again with a hand selected person on the ground in Manila);" and (iii) GGAM's ability to offer, "[u]nlike traditional management companies . . . unique experience in Asia, [and] a 'hands on approach to management.'" Perry Decl., Ex. 3 at BLOOM_0076859. Weidner proposed that Saunders and Stone would "'tag team' [GGAM's] initial on the ground supervisory presence until our full time people are fully up to speed," and that Weidner would "personally oversee these activities, initially spending significant time in Manila with the team, then traveling about once a month to both be in Manila and in the region to set up a high end marketing network for Solaire Manila." *Id.*

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the referenced email was exchanged as indicated. GGAM disputes Defendants' characterization of the email which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to the document for its content.

53.   Following a further exchange of emails between Weidner and Razon, on or about April 6, 2011, Anthony Cabot, a partner in the Las Vegas office of the law firm of Lewis & Roca who introduced himself as "the attorney for Bill Weidner and his company in relationship to the proposed management agreement, emailed Estella Tuason-Occeña and Silverio "Benny" Tan, copying Weidner and Razon, and attached a document entitled "Preliminary Agreement." Perry Decl., Ex. 4 at GGAM-SDNY-0441023. At the time, Occeña led BRHI's and SPI's finance team, Tan led BRHI's and SPI's legal team, and both were heavily involved in the negotiations with GGAM. *See, e.g.*, Ainsworth Decl., Ex. 26 ¶ 15.

**GGAM'S RESPONSE:** Disputed in part to the extent Defendants suggest Razon himself was not involved in the negotiations with GGAM. The cited paragraph from Razon's December 7, 2014 declaration states:

> After numerous exchange of emails with the GGAM principals to reach agreement on the basic concepts and terms of the agreement, I turned over negotiation of the management services agreement to our finance team under Estella Occeña and our legal team under Benny Tan. But they reported to me regularly and final decision was always mine." We had several meetings with Gary and Brad, and we thought that we had the management services agreement ready to sign. But then Cantor Fitzgerald came in and raised new issues which pushed the signing of the agreement back.

Declaration of Kevin N. Ainsworth dated January 25, 2023 ("Jan. Ainsworth Decl.") Ex. 26 (ECF No. 329-26) ¶ 15.

54.   Over the course of the next few weeks, the parties exchanged multiple written communications in connection with negotiating the terms of a potential agreement. *See, e.g.*, Perry

Decl., Ex. 5 at GGAM-SDNY-0441081-82. On or about April 28, 2011, Tan emailed Weidner and Cabot a draft of the MSA. *Id.* Ex. 6 at GGAM-SDNY-0058537. Tan and Cabot continued to negotiate this draft of the MSA through the end of May 2011. *See id.* Ex. 8 at BLOOM_0079623.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the referenced emails were exchanged as indicated. GGAM disputes Defendants' characterization of the emails which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to the documents for their content. GGAM objects to the use of parol evidence for purposes of interpreting the MSA as executed on September 9, 2011.

55.     While these negotiations between Tan and Cabot were ongoing, in early May 2011, Stone and Saunders traveled to Manila to, among other things, meet in person with BRHI/SPI personnel "to start talking in general terms about the contract" (*i.e.*, negotiate the MSA), and to conduct due diligence. Ainsworth Decl., Ex. 30 at 41:5-42:3; Perry Decl., Ex. 7; *id.* Ex. 41 ¶¶ 30-34.

**GGAM'S RESPONSE:** Disputed in part. The cited evidence does not support the assertion that the trip to Manila was "to conduct due diligence." GGAM respectfully refers the Court to the documents and testimony for their content.

56.     Jon Rein, an investment banker at Cantor, accompanied Stone and Saunders on this trip to Manila. *See* Ainsworth Decl., Ex. 30 (Saunders Dep. Tr. Excerpts) at 41:11-17; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 28:2-13; Ainsworth Decl., Ex. 9 at BLOOM_0012841. At this point in time, Rein provided advisory services to GGAM, Dkt. 281-4 ¶¶ 7-9; Perry Decl., Ex. 65 at 38:22-39:11; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 71:24-74:24, and Cantor was paid by GGAM for those services pursuant to the SSA. Dkt. 281-6 ¶ 24. In that capacity, Rein assisted GGAM in conducting due diligence and negotiating the MSA. Perry Decl.,

Ex. 40 ¶¶ 12-13; Dkt. 281-4 ¶¶ 7, 38; Ainsworth Decl., Ex. 30 (Saunders Dep. Tr. Excerpts) at 41:11-42:3; Ainsworth Decl., Ex. 33 (Rein Dep. Tr. Excerpts) at 71:24-74:24.

 **GGAM'S RESPONSE:** Disputed in part. GGAM disputes Defendants' characterization of the services Rein provided to GGAM which presents an incomplete and inaccurate picture. In Rein's cited declaration, he stated:

> First, working on behalf of GGAM under support arrangements, Cantor personnel engaged directly with Bloomberry personnel in negotiating the MSA. I was present, both in Manila and telephonically, during the negotiations throughout the spring and summer of 2011 leading up to the MSA's execution. I identified myself clearly to the Bloomberry negotiating team members as a Cantor investment banker, which was my role at that time, providing advisory services to GGAM in respect of both the MSA and GGAM's potential investment in the Solaire project. Cantor's equity stake in the venture was explicitly discussed and acknowledged by the Bloomberry representatives many times, including in communications with me. Lawyers from Cantor's in-house legal team appeared on emails and telephone calls with Bloomberry representatives and attorneys throughout this period. There was no confusion as to Cantor's role vis-à-vis the joint venture, in negotiating the MSA, or with respect to diligence and documentation of the equity option agreement ("EOA") and GGAM's related investment.

Declaration of Jonathan Rein dated October 5, 2015 (ECF No. 388-6) ¶ 7. GGAM respectfully refers the Court to the documents and testimony for the remainder of their content. GGAM further disputes that the Support Services Agreement was in place at this time. The Support Services Agreement was signed on August 28, 2012, and was dated effective as of January 27, 2011. Perry Decl. Ex. 3 (ECF No. 387-23).

 57. After returning from this trip to Manila, on or about May 17, 2011, Rein sent an email to Occeña that attached a mark-up of a "Confidentiality Agreement" between GGAM L.P. and BRHI and SPI, which was to govern documents provided by BRHI/SPI to GGAM in connection with GGAM conducting due diligence for the MSA. *See* Perry Decl., Ex. 10. Rein's

email copied Kevin Russell, who Rein described as "the key point-person in Cantor's legal department." *Id.*

      **GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that Rein sent an email to Occeña on May 17, 2011, as indicated. GGAM disputes Defendants' characterization of the email and mark-up of an attached non-disclosure agreement, which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to those documents for their content.

      58.    Between May 24-25, 2011 (on or about), Tan and Russell exchanged comments on various terms of the Confidentiality Agreement. *See* Ainsworth Decl., Ex. 11 at BLOOM_0001271, -1276-1277; Perry Decl., Ex. 9 at BLOOM_0001272-75. Among other things, Tan and Russell exchanged comments about (i) the period during which the agreement would apply, including whether it would be superseded by the MSA should the MSA be executed, Perry Decl., Ex. 9 at 0001274; (ii) the extent to which (and circumstances under which) confidential information could be shared with "potential investors," *id.* at 0001274-1275; Ainsworth Decl., Ex. 11 at 0001276; and (iii) the extent to which Cantor's "provi[sion] [of] admin services to Global Gaming" impacted certain "regulatory language" in the draft. Perry Decl., Ex. 9 at 0001272. Specifically, with respect to issue (i) above (duration of agreement), Tan and Russell exchanged the following statements, among others:

> Tan Comments: "**This Confidentiality Agreement will apply only during this period when GGAM is evaluating whether it will sign up with Bloomberry or not. If GGAM signs the Management Services Agreement with Bloomberry, the confidentiality clause in that Agreement will supersede and replace this one**. . . . Please note that if GGAM does not sign up with Bloomberry, GGAM would have no legitimate interest in all the confidential, proprietary and non-public information that Bloomberry will provide to GGAM. On the other hand, **if GGAM signs up with Bloomberry, then this provision will be replaced by the confidentiality clause in that Agreement**." Perry Decl., Ex. 9 at BLOOM_0001274 (emphasis added).

> Russell Response: "Ok." *Id.* at BLOOM_0001273.

With respect to issue (ii) above (disclosure of information to potential investors), Tan and Russell

exchanged the following statements, among others:

> Tan Comments: "**Our confidential information is intended only for GGAM not for GGAM's potential investors**," Ainsworth Decl., Ex. 11 at 0001276; "[t]his Confidentiality Agreement is for the sole purpose of allowing GGAM access to our confidential information to allow GGAM to evaluate whether it wants to sign up with Bloomberry or not. **Bloomberry is not asking GGAM to raise capital for the Project**. If GGAM signs up with Bloomberry, another Agreement with a separate confidentiality clause will apply. GGAM is therefore not allowed to disclose the information it obtained under this ad hoc Confidentiality Agreement to 'potential investors'." Perry Decl., Ex. 9 at 0001275 (emphasis added).

> Russell Response: "It is important that we have the ability to discuss this project with potential LPs and investors. Thus we have kept the reference to 'potential investors,' however, we have added language stating that (a) we'll notify Bloomberry if we disclose info to potential LPs and (b) such partners will agree to the confidentiality agreement's terms." Perry Decl., Ex. 9 at 0001272.

With respect to issue (iii) above (Cantor's "admin services"), Tan and Russell exchanged the

following statements, among others, with respect to proposed provisions that would give GGAM

"the ability to disclose [BRHI/SPI's] confidential information to 'any governmental, regulatory or

self regulatory agency or authority having or asserting jurisdiction over' [GGAM], without notice

to or consent from [BRHI/SPI]." Ainsworth Decl., Ex. 11 at 0001276-1277:

> Russell Comments: "We are subject to many regulatory regimes, both in the gaming and financial services sectors. We need the ability to disclose confidential information to our regulators and are required to do so upon their request." Perry Decl., Ex. 9 at 0001275.

> Tan Response: "**We are dealing with GGAM, not Cantor. Why are we being subjected to the regulations applicable to Cantor?** If laws and regulations applicable to GGAM will require disclosure of our confidential information obtained here (for GGAM's evaluation of whether it wants to sign up with Bloomberry or not), then GGAM needs to inform us as soon as possible and it should allow and assist us in obtaining a court order to contest or limit such disclosure of our confidential information." *Id.* at 0001275.

Russell Reply: "You are not being subjected to regulations that impact [C]antor, however, **Cantor provides services to Global Gaming, including but not limited to legal and financial advisory services (as a Representative of the NDA)**." *Id.* at 0001273. "With respect to the regulatory language, **Cantor provides admin services to Global Gaming (and several other businesses)**. **Some of your confidential information will hit Cantor's servers in connection with Global Gaming's evaluation of this opportunity.** In the ordinary course of our business, various regulatory agencies review our tape. They do not tell us what they are reviewing and unfortunately we can't control them. We have never had an issue on this point and we are hopeful that you can get comfortable with it as well." *Id.* at 0001272.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the referenced emails were exchanged as indicated. GGAM disputes Defendants' characterization of the emails which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to the documents for their contents. GGAM objects to the use of parol evidence for purposes of interpreting the MSA as executed on September 9, 2011.

59.    Following this exchange, GGAM L.P. and BRHI and SPI executed the Confidentiality Agreement, which was backdated to March 1, 2011. *See* Ainsworth Decl., Ex. 8 (excerpts of agreement); Dkt. 119-1 (full). Neither Cantor Fitzgerald L.P. nor any of its affiliates (other than GGAM L.P.) is a signatory to the Confidentiality Agreement. *Id.*

60.    On or around May 23, 2011, Stone and Saunders again traveled to Manila to meet with BRHI and SPI personnel to conduct due diligence and negotiate the MSA. Perry Decl., Ex. 7.

61.    On or about May 26, 2011, Tan emailed Cabot and stated that "[t]he GGAM and Bloomberry teams have reached agreement on the incentive fee of GGAM for foreign high rollers and junket," and attached "the latest draft of the Agreement." Perry Decl., Ex. 11 at GGAM-SDNY-0063569. The draft MSA attached to this email provided that (i) the MSA is "made under and shall be governed by and construed in accordance with the laws of the Republic of the

Philippines," (§ 19.3) and (ii) disputes are to "be settled by arbitration in Singapore" (§ 19.2). *Id.* at GGAM-SDNY-0063592.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the referenced email was sent, as indicated, and that it included a draft MSA. GGAM disputes Defendants' characterization of the documents which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to those documents for their content. GGAM objects to the use of parol evidence for purposes of interpreting the MSA as executed on September 9, 2011.

62.     On or about May 26, 2011, Cabot responded to Tan's email by stating that he "just spoke with Jon [Rein] and [Jon] had a few items that needed adjustment based on the business meetings and discussions with their outside counsel." Perry Decl., Ex. 12 at GGAM-SDNY-0100729. Cabot's reference to "their outside counsel" was a reference to GGAM's outside counsel at the law firm of Paul Hastings, which functioned as counsel to GGAM in connection with negotiating the MSA. Fissell Decl., Ex. 34 (Kaplan Dep. Tr. Excerpts) at 17:4-13.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the referenced email was sent, as indicated. GGAM disputes Defendants' characterization of the document which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to the document for its content.

63.     On or about June 9, 2011, Russell sent Tan an email attaching a revised draft of the MSA. Perry Decl., Ex. 13 at GGAM-SDNY-0058560. This email copied, among others, Rick Kirkbride, an attorney in the Los Angeles office of Paul Hastings. *Id.*; *see* Perry Decl., Ex. 19 (EOA) at BLOOM_0082050 (listing Kirkbride's Paul Hastings address). The draft of the MSA attached to Russell's email (i) required that **Cantor** receive a copy of all notices sent to GGAM, Perry Decl., Ex. 13 at 0058592 (§ 18.2), (ii) provided that the MSA is "governed by and construed

in accordance with the Laws of the **State of New York**," *id.* at 0058601 (§ 19) (emphasis added), and (iii) provided that the parties would "unconditionally and irrevocably consent to the non-exclusive jurisdiction of the state or federal courts sitting in Manhattan, New York, United States (the 'Specified Court') in any action, suit, or proceeding" related to "enforcement of [the MSA], and the non-exclusive jurisdiction of the Specified Court with respect to the enforcement of any award." *Id.*

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the referenced email was sent, as indicated, and that it included a draft MSA. GGAM disputes Defendants' characterization of the documents which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to those documents for their content. GGAM objects to the use of parol evidence for purposes of interpreting the MSA as executed on September 9, 2011.

64.    On or about June 9, 2011, Tan responded to Russell's June 9, 2011 email:

> I have discussed your draft with the Bloomberry team. It is our conclusion that your draft Management Services Agreement (marked as "GGAM Draft June 2011") is materially different from the draft Agreement that we had agreed to in Manila. We do not want to negotiate terms and conditions which the parties have previously negotiated and agreed to. We were assured by Brad, Gary and Jon that we had an agreement on the business terms. We were told that your lawyers will only put in the definitions and other details which will not deviate from what has been agreed. But this is not to be so.
>
> The draft that you sent has changed the following basic concepts which we have previously agreed on: . . .
>
> 17. **Cantor Fitzgerald has been given personality in this Agreement by being identified as a party entitled to any communications that will be sent to GGAM. But we are suppose to contract only with GGAM!**
>
> . . .
>
> 22. **You have changed the governing law from "Philippine law" to "New York law". This does not make sense because this**

**contract has no connection with New York at all. I am not even sure if gambling is legal under New York law. But the point is all material links relating to this Agreement are in the Philippines, e.g. this is a Philippine operation of a Philippine corporation subject to strict regulation by a Philippine Regulator (PAGCOR).**

23. **We had suggested a neutral venue for dispute resolution like Singapore. In your draft you have New York courts.**

. . .

This list is by no means exhaustive, but it clearly shows that the new GGAM draft Agreement that you sent is very different from the one that we have agreed in principle in Manila.

I am authorized to say that we decline to negotiate the whole agreement again. Our draft reflected that agreement that we have reached in the exchange of communications and emails and various meetings between Mr. Razon and Mr. Weidner, and between your team and ours. We have no inclination or patience to negotiate again based on your new draft.

We therefore urge you to go back to our draft.

Dkt. 281-1 at GGAM-SDNY-0046583, -6585-86 (emphasis added). Occeña similarly expressed in an email to Saunders dated June 10, 2011 that she was "shocked when [she] saw" the revised draft because it was "as if our negotiations and face-to-face meetings in Manila never took place." Perry Decl., Ex. 14 at GGAM-SDNY-0096130.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the referenced emails were sent, as indicated. GGAM disputes Defendants' characterization of the documents which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to those documents for their content. GGAM objects to the use of parol evidence for purposes of interpreting the MSA as executed on September 9, 2011.

65.     GGAM and/or its advisors never expressed to BRHI and SPI in writing or otherwise that they disagreed with Tan's statements about the MSA having "no connection with New York

at all" or about BRHI and SPI contracting "only with GGAM" and not Cantor. *See, e.g.*, Perry Decl., Ex. 64 at 23:11-25; Ainsworth Decl., Ex. 31 (Stone Dep. Tr. Excerpts) at 24:1-26:13; Perry Decl., Ex. 62 at 83:5-86:33; *id.* Ex. 14 at GGAM-SDNY-0096130.

      **GGAM'S RESPONSE:** Disputed. The asserted fact is not supported by the cited evidence. Moreover, GGAM notes that Tan's statements about the MSA having "no connection with New York at all" and Defendants contracting "only with GGAM" were made on June 9, 2011, and the MSA was signed three months later after much additional negotiation including between Defendants and Cantor personnel in New York. *See* Defs.' Am. Answer (ECF No. 273) ¶ 55 (admitting that Defendants and "certain Cantor employees acting on behalf of GGAM, communicated about the terms of the MSA between June 2011 and September 2011). In all, Defendants sent at least 90 emails directly to Cantor in New York between March 12 and September 9, 2011. *See* Ainsworth Supp. Decl. Ex. 2. For example, on June 22, 2011, Occeña wrote to Cantor and said "EKR (Mr. Razon) said his schedule in New York is still fluid at this time. He will be going in and out of NY so he will revert when he has free time to meet with Howard Lutnick [of Cantor]. He is willing to do counter-party signing of the MSA in case we finish before he returns to Manila." Jan. Ainsworth Decl. Ex. 13 (ECF No. 329-13). Moreover, on July 1, 2011, Jon Rein emailed and said Howard Lutnick's approval was required prior to executing the MSA. Ainsworth Supp. Decl. Ex. 7 ("we realize and acknowledge that both you and we must consult with our principals prior to executing the MSA, and in our case neither Bill nor Howard have had a chance to review or opine on this list in its entirety"). Before Defendants executed the MSA, they received an organization chart showing Cantor's relationship with and ownership of GGAM. *See* Fact Nos. 9, 18 (ECF No. 333); Perry Decl. Ex. 43 (ECF No. 387-43) ¶

13; *see also* MSA (ECF No. 218-4) Exhibit A. Defendants then accepted the MSA by sending their executed copy to Cantor in New York. Defendants' Response to Fact No. 16 (ECF No. 386).

GGAM objects, on relevance grounds, to the assertion that GGAM did not respond to Tan's negotiation posture in June 2011. The asserted fact, even if true, is irrelevant to the determination of whether the Court has jurisdiction over Defendants related to the enforcement of a foreign arbitral award arising out of (a) the parties' relationship under the MSA, which was executed in September 2011, (b) GGAM's damages for wrongful termination of the Award in September 2013 and for interfering with GGAM's ownership rights in the Shares beginning in 2014.

66.     In the executed MSA, (i) Cantor was __*not*__ entitled to receive a copy of all notices sent to GGAM, *see* MSA § 18.2 (Dkt. 218-4), (ii) the MSA was __*not*__ governed by the laws of New York (rather, it was governed by the laws of the Republic of the Philippines), *id.* § 19.3, and (iii) disputes were to be resolved through arbitration in Singapore, and BRHI and SPI did __*not*__ "consent to the non-exclusive jurisdiction of the state or federal courts sitting in Manhattan, New York, United States (the 'Specified Court') in any action suit, or proceeding with respect to the enforcement of this Agreement, and the non-exclusive jurisdiction of the Specified Court with respect to the enforcement of any award[.]" *Id.* § 19.2.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the parties entered into the MSA. GGAM disputes Defendants' characterization of the document, which presents an incomplete and inaccurate picture. GGAM objects that the quoted language, which appeared in a draft of the MSA (*See* Defendants' Fact No. 63; Perry Decl. Ex. 13 (ECF No. 387-13)), is inadmissible parol evidence. GGAM further notes that the quoted language, which appeared in a draft of the MSA that did not include an arbitration clause, was substituted with the MSA's arbitration clause. GGAM respectfully refers the Court to the MSA for its contents, in which

Defendants agreed, *inter alia*, that "if one Party initiates arbitration, the other Party shall be bound to participate, and the decision of the arbitration panel shall be binding upon both Parties and enforceable in all jurisdictions." MSA (ECF No. 218-4) § 19.2(b).

67.     During the MSA negotiations, BRHI and SPI were represented by Tan, a partner at the Philippine law firm of Picazo Buyco Tan Fider & Santos. *See* Perry Decl., Ex. 68 at 44:9-46:11.

68.     During the MSA negotiations, GGAM was represented by the Philippine law firm of Puno & Puno. *See, e.g.*, Fissell Decl., Ex. 34 (Kaplan Dep. Tr. Excerpts) at 17:9-15. As noted above, GGAM was also represented by attorneys from the Las Vegas office of Lewis & Roca, attorneys from the Los Angeles office of Paul Hastings, and attorneys from Cantor. *See supra* ¶ 63; BRHI/SPI's Response to GGAM's Fact No. 12.

69.     Following further negotiations, on or about September 9, 2011, the parties executed the MSA, with Razon signing on behalf of BRHI and SPI in the Philippines, Weidner signing on behalf of GGAM, and the parties exchanging the signed executed version via email. *See* Perry Decl., Ex. 16; *id.* Ex. 15 ("Benny has sent the MSA execution soft copy for Bill's signature. We look forward to receive [sic] the executed MSA **so we can have EKR sign it before he leaves the country again**.") (emphasis added); MSA (signature page) (Dkt 218-4). Cantor is not a party to the MSA. *See* MSA at 1 (Dkt 218-4). Cantor is not a signatory to any agreement with BRHI and SPI. *See* Perry Decl., Ex. 66 at 211:4-6.

**GGAM'S RESPONSE:** Disputed in part. The cited evidence shows that Kevin Russell, at Cantor in New York, emailed "our executed signature page to the MSA" to Occeña, and that Occeña provided the "complete MSA execution copy" to Kevin Russell after obtaining Razon's

signature. Perry Decl. Ex. 16 (ECF No. 387-16); *see also* Defendants' Response to Fact No. 16 (ECF No. 386).

70.    After the parties exchanged the executed MSA via email, Weidner and other GGAM personnel traveled to Manila to attend a formal signing ceremony for the MSA, which was held on or about October 17, 2011. *See* Perry Decl., Ex. 63 at 46:2-14.

**GGAM'S RESPONSE:** Disputed in part. The cited evidence shows that Kevin Russell, at Cantor in New York, provided "our executed signature page to the MSA" to Occeña, and that Occeña provided the "complete MSA execution copy" to Kevin Russell after obtaining Razon's signature. Perry Decl. Ex. 16 (ECF No. 387-16); *see also* Defendants' Response to Fact No. 16 (ECF No. 386).

71.    BRHI/SPI's personnel and/or advisors never traveled to New York or anywhere else in the United States to meet with GGAM's personnel and/or advisors to negotiate the MSA, and BRHI/SPI's personnel and/or advisors never attended any meetings in New York or anywhere else in the United States in connection with the negotiation of the MSA. *See, e.g.*, Perry Decl., Ex. 62 at 50:12-51:18; *id.* Ex. 64 at 20:18-22:8; *id.* Ex. 65 at 31:13-21; *id.* Ex. 66 at 134:1-136:19, 165:18-24; Ainsworth Decl., Ex. 35 (Razon Dep. Tr. (vol. 1) at 223:14-224:21; Perry Decl., Ex. 68 at 45:24-46:1.

**GGAM'S RESPONSE:** Disputed. Razon met with two of GGAM's principals in Las Vegas in March 2011 to discuss the possibility of working together. Defendants' Fact No. 50; Defs.' Am. Answer (ECF No. 273) ¶ 50. Moreover, Defendants have admitted that "Razon had email and/or telephonic communication with Weidner, Occeña, Alarilla, and Tan (none of which are based in New York) relating to negotiating the GGP relationship during one or more trips that Mr. Razon made to New York in the April-June 2011 time frame (during which he would have

stayed at the Plaza residence in Manhattan)." Defs.' Am. Answer (ECF No. 273) ¶ 54; *see also* Razon's Amended Answer ("Razon's Am. Answer") (ECF No. 253) ¶ 54.

72.    To the extent that any BRHI and SPI personnel and/or advisors (*e.g.*, Razon) were in New York, the surrounding states (*e.g.*, New Jersey, Pennsylvania or Massachusetts), or anywhere else in the United States during the time period that the MSA was being negotiated, his/her/their presence there was unrelated to the negotiations of the MSA. Ainsworth Decl., Ex. 35 (Razon Dep. Tr. (vol. 1) Excerpts) at 222:17-225:23, 228:1-241:4.

**GGAM'S RESPONSE:** Disputed. Razon met with two of GGAM's principals in Las Vegas in March 2011 to discuss the possibility of working together. Defendants' Fact No. 50; Defs.' Am. Answer (ECF No. 273) ¶ 50. Moreover, Defendants have admitted that "Razon had email and/or telephonic communication with Weidner, Occeña, Alarilla, and Tan (none of which are based in New York) relating to negotiating the GGP relationship during one or more trips that Mr. Razon made to New York in the April-June 2011 time frame (during which he would have stayed at the Plaza residence in Manhattan)." Defs.' Am. Answer (ECF No. 273) ¶ 54; *see also* Razon's Am. Answer (ECF No. 253) ¶ 54. Furthermore, in the midst of negotiations, Occeña wrote to Jon Rein and said: "EKR (Mr. Razon) said his schedule in New York is still fluid at this time. He will be going in and out of NY so he will revert when he has free time to meet with Howard Lutnick. He is willing to do counter-party signing of the MSA in case we finish before he returns to Manila." Razon was "in and out of NY." Jan. Ainsworth Decl. Ex. 13 (ECF No. 329-13).

73.    The MSA is governed by Philippine law, does not require that notices be sent to New York (rather, notices were to be sent to GGAM in Nevada), and does not provide for payments into New York. MSA (Dkt. 218-4) §§ 4.6 (payments), 18.2 (notices), 19.3 (applicable

law). The MSA also contemplates that GGAM would maintain a branch office in the Philippines. Ainsworth Decl. Ex. 2, Ex. A.

     **GGAM'S RESPONSE:** Disputed in part. GGAM disputes that "[t]he MSA … contemplates that GGAM would maintain a branch office in the Philippines." This alleged fact is immaterial. Moreover, the MSA provided that notices were to be sent to GGAM in care of its parent, Global Gaming Asset Management, L.P., which had an address in Nevada. MSA (ECF No. 218-4) § 18.2.

     74.    The MSA required GGAM to perform significant services on the ground in Manila in relation to the development, pre-opening, and operation of Solaire. *See* MSA (Dkt. 218-4) at Annex A (listing GGAM's Pre- and Post-Opening Services). As discussed *infra* in Section V.A., GGAM performed its services under the MSA "through the Management Team," which consisted of individuals located on the ground at Solaire in Manila, including Michael French, who GGAM hand-picked to be the Chief Operating Officer of Solaire.

     **GGAM'S RESPONSE:** Disputed in part. GGAM disputes Defendants' characterization of the MSA, which presents an incomplete and inaccurate picture. In particular, GGAM disputes Defendants' assertion that the MSA required GGAM to perform services "on the ground in Manila." This issue was litigated during the underlying arbitration, and the arbitral tribunal found: "There is no obligation in the MSA that would have required the principals of GGAM to be physically present in Manila." Liability Award (ECF No. 218-2) ¶ 255. GGAM respectfully refers the Court to the MSA for its content.

     75.    On or about March 8, 2013, GGAM assigned the MSA to GGAM Netherlands, a Netherlands entity. *See* Final Award (218-1) ¶¶ 350-52; *cf*. MSA (Dkt. 218-4) § 16.2. Thus, after the opening of Solaire, it was a Netherlands entity that was to provide services and receive

compensation and notices under the MSA. *See id.*; *see also* Perry Decl., Ex. 24 at 1 ("[GGAM] hereby assigns, transfers and conveys to [GGAM Netherlands] the MSA and all of its rights, title and interest in, to and under the MSA, solely with respect to the Post-Opening Services. . . . [GGAM Netherlands] agrees that it will observe and perform all of the duties, obligations, terms, provisions and covenants relating to the MSA, and will become liable for all liabilities related thereto . . . .").

76.     Solaire's grand opening occurred on or about March 16, 2013. *See* Liability Award ¶ 55 (Dkt. 218-2).

77.     In April and May 2012 (which was after the parties executed the MSA but before Solaire opened), GGAM's principals and BRC representatives participated in a "roadshow" in advance of a "top-up" equity offering of shares of BRC to the public (the "Roadshow"). *See* Ainsworth Decl., Ex. 6 at 1 (Venezuela Decl.). The Roadshow was led by the investment banks CLSA and UBS, and involved meetings with potential investors around the world, including in Asia, North America and Europe. *See, e.g.*, Perry Decl., Ex. 35 ¶¶ 8-10.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that in April and May 2012, the Roadshow occurred. Defendants dispute the suggestion that Defendants did not participate in the Roadshow; in their Answer and Amended Answer, Defendants admitted that the Roadshow was attended by "principals of GGAM" and "*executives of Debtor Defendants*," including Razon, Occeña, and others. Defs.' Am. Answer (ECF No. 273) ¶¶ 82, 84 (emphasis added). Moreover, Defendants controlled BRC and Prime. Ainsworth Supp. Decl. Ex. 8 ¶¶ 154-155, 158; *see also* Fact Nos. 173-78, *infra*. Because the purpose of the Roadshow was to raise funds for Defendants' resort/casino, Solaire, Defendants' officers who travelled to New York for the Roadshow did so as agents of Defendants. Ainsworth Supp. Decl. Ex. 6 at BLOOM_0077429.

GGAM disputes Defendants' characterization of the roadshow to the extent it suggests that the roadshow did not involve meetings in the United States and in New York. *See* Defs.' Am. Answer (ECF No. 273) ¶¶ 82, 84.

78.       In the Arbitration, GGAM requested that the Tribunal order BRHI/SPI to reimburse GGAM for certain travel expenses, including US$45,557 in travel expenses "related to the GGAM principals' **efforts with respect to the BRC roadshow**, representing **BRC** at investor conferences, and investigating and evaluating a potential business opportunity for **BRC** in Argentina." Perry Decl., Ex. 53 ¶¶ 133-37 (emphasis added). GGAM represented that it incurred the $45,557 amount "**outside the scope of the MSA**." *Id.* ¶ 136 ("While GGAM incurred these expenses outside the scope of the MSA, GGAM is entitled to reimbursement of these expenses as well."); *see also* Ainsworth Decl., Ex. 27 (Saunders Decl., June 14, 2015, Excerpts) ¶ 106 (explaining that of the US$288,031 in expenses for which it sought reimbursement, "US$242,474 **reflect expenses we incurred performing work related to the MSA Services,** and US$45,557 **reflect expenses we incurred performing work on behalf of Bloomberry Resorts Corp., but outside the scope of the MSA**, *e.g.*, attending investor conference in November 2012 and December 2012 and traveling to Buenos Aires, Argentina" in 2013 to investigate/evaluate the potential business opportunity) (emphasis added); Final Award (Dkt. 218-1) ¶¶ 366-367, 372.

**GGAM'S RESPONSE:** Disputed. The evidence shows that in the arbitration, GGAM asserted that Defendants had "not reimbursed GGAM for any submitted expenses incurred *after June 2012*," and sought $45,557, which the Final Award labeled "Additional Expenses." Perry Decl. Ex. 53 (ECF No. 287-53) ¶¶ 135-37; Ainsworth Supp. Decl. Ex. 9 ¶¶ 103-04; *id*. Ex. 10 ¶ 183; Final Award (ECF No. 218-1) at p. 5. Defendants reimbursed GGAM for its expenses incurred related to its participation in the roadshow. Ainsworth Supp. Decl. Ex. 9 ¶¶ 103-04; *id*.

Ex. 10 ¶ 183. GGAM's description of the $45,557 "Additional Expenses" therefore is irrelevant to whether Defendants' participation in the Roadshow in New York on May 1, 2012, has an articulable nexus to the parties' dispute.

79.     The Tribunal declined to order BRHI/SPI to reimburse GGAM for the $45,557 in expenses related to the Roadshow and other BRC investment-related activities because such expenses were incurred "outside the scope of the MSA." Final Award ¶ 372 ("As the Claimants themselves recognize, [such expenses] were incurred outside the scope of the MSA. For that reason, the Tribunal will not order that Respondents pay them.").

**GGAM'S RESPONSE:** Disputed. GGAM disputes that the "Additional Expenses" in the amount of $45,557 were related to the Roadshow. GGAM does not dispute that the Tribunal declined to award the "Additional Expenses" in the amount of $45,557, but the evidence shows that those "Additional Expenses" were incurred *after* June 2012—which was after the roadshow closed on May 1, 2012. Perry Decl. Ex. 53 (ECF No. 287-53) ¶¶ 135-37; *id*. Ex. 9 ¶¶ 103-04; *id*. Ex. 10 ¶ 183; Final Award (ECF No. 218-1) ¶ 372. Defendants reimbursed GGAM for its expenses incurred related to its participation in the roadshow. Ainsworth Supp. Decl. Ex. 9 ¶¶ 103-04; *id*. Ex. 10 ¶ 183.

80.     GGAM's participation in the Roadshow and in subsequent meetings with potential BRC investors did not constitute the performance of services under the MSA, as such participation was "outside the scope" of GGAM's obligations under the MSA. Final Award (Dkt. 218-1) ¶¶ 366-367, 372; *see also* Ainsworth Decl., Ex. 27 (Saunders Decl., June 14, 2015, Excerpts) ¶ 106.

**GGAM'S RESPONSE:** Disputed. Razon considered "GGAM's participation in the road show as managers of the Solaire" to be a "basic, anticipated component" and a "fundamental part of the top-up offering story." Jan. Ainsworth Decl. Ex. 26 (ECF No. 329-26) ¶ 18. Razon "expected

GGAM to participate on the road show because they were the management services provider for Solaire, and it was important to present to investors that Solaire had a credible and experienced management company." *Id.* Ex. 38 (ECF No. 329-38) ¶ 28. In the arbitration, Defendants argued that GGAM's participation in the Roadshow "fall[s] within GGAM's general and specific obligations under the MSA," and that "GGAM figured predominantly into the preparations for the top-up offering 'road show,' as it is axiomatic that managers of an enterprise would be fundamental, active participants in the road show leading up to the backdoor listing and the top-up offering." Ainsworth Supp. Decl. Ex. 8 ¶¶ 43, 51.

During the Roadshow meetings, including at the St. Regis Hotel in New York, GGAM's performance of its services under the MSA was discussed. *See* Jan. Ainsworth Decl. Ex. 26 (ECF No. 329-26) ¶ 45. In the arbitration, Defendants argued that during the Roadshow meeting at the St. Regis Hotel in New York, GGAM misrepresented its ability to bring in junket operators. *Id.*; Ainsworth Supp. Decl. Ex. 8 ¶¶ 111-13 & n. 320. By arguing this issue in the arbitration, Defendants admitted that it was within the scope of the arbitration clause of the MSA and related to the MSA. In addition to the Roadshow, in November 2012, Brad Stone and Occeña attended investor conferences in New York together, where GGAM's performance of the MSA was discussed. Defs.' Am. Answer (ECF No. 273) ¶ 87; Ainsworth Supp. Decl. Exs. 5, 11.

GGAM objects that the phrase "'outside the scope' of GGAM's obligations under the MSA" is not the relevant standard for assessing personal jurisdiction; GGAM's relationship with Defendants sprung entirely from the MSA.

81.     Rein attempted to involve Cantor in BRC's equity offering and the Roadshow, including by requesting to communicate with CLSA and attend the "kick-off" meeting for the Roadshow. *See* Perry Decl., Ex. 18 at GGAM-SDNY-0078938. These attempts were rejected. *See*

*generally* Perry Decl., Ex. 65 at 85:18-86:13. On or about January 26, 2012, Occeña emailed Rein

and stated, "[w]e would prefer that only Brad [Stone] and Garry [Saunders] attend the kick-off

meeting on the 8th. I spoke with Brad about this. Please talk to him. Thanks." Perry Decl., Ex. 18

at GGAM-SDNY-0078937. Occeña then forwarded this email to Razon and stated:

> Brad called me about the business plan this morning so I took the
> opportunity to speak to him about Jon Rein of Cantor. He wanted to
> communicate directly with CLSA and attend the kick-off on the 8th.
> I declined both his request. **I told Brad that I do not have to ask**
> **you to know whether you are fine with Cantor taking an active**
> **role in the equity placement because I know you will say no as**
> **well. I reiterated to Brad that you want to deal with him, Bill**
> **and Garry and we are just tolerating Cantor because they are**
> **their partners**. Brad fully understands and supports our position.
> My email below to Jon for your reference.

*Id.* (emphasis added). Razon responded "**No Cantor**. They only participate thru GGAM." *Id.*

(emphasis added). Occeña then forwarded Razon's email to Stone, who did not respond. *Id.*

      **GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the referenced

emails were exchanged as indicated. GGAM does dispute the inferences drawn by Defendants and

disputes their mischaracterization of the correspondence. GGAM respectfully refers the Court to

the document and testimony for their content. GGAM further notes that Defendants included Rein

in their celebratory closing dinner in New York at the conclusion of the roadshow. Defs.' Am.

Answer (ECF No. 273) ¶¶ 82, 84; Ainsworth Supp. Decl. Ex. 12.

      82.    On April 16, 2012, GGAM entered into the EOA with BRC and Prime, pursuant to

which GGAM was granted the option to purchase some or all of 921,184,056 shares of BRC from

Prime at a strike price calculated based on a formula. Fissell Decl., Ex. 7 (EOA) at

BLOOM_0082035 ("'Option Shares' means 921,184,056 shares of BRC"); *id.* § 3.2

(BLOOM_0082039) (strike price formula).

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that the EOA was executed on April 16, 2012, and that the parties named in the EOA were GGAM, Prime, and BRC. GGAM also does not dispute the terms of the EOA. However, GGAM does dispute Defendants' inference that BRHI and SPI were not parties to the EOA. Defendants used Prime as their agent to grant the equity option, in satisfaction of Defendants' obligation under section 18.3 of the MSA. MSA (ECF No. 218-4) § 18.3; Ainsworth Supp. Decl. Ex. 13 § 2.1 (referring to section 18.3 of the MSA); *id*. Ex. 8 ¶ 156 ("As the Grantor [of the shares], Prime Metroline acted on behalf of, and as agent for, Bloomberry and Sureste to comply with their enforceable obligation under the MSA to grant GGAM the right to purchase up to 10% ownership rights in the Solaire."); Final Award (ECF No. 218-1) ¶¶ 428-29, 433 (quoting paragraph 156 of Defendants' Statement of Defense and Amended Counterclaims (Ainsworth Supp. Decl. Ex. 8)).

83.     "[A]ll parties understood the MSA and EOA to be distinct arrangements." Perry Decl., Ex. 41 ¶ 26; *see also* Dkt. 281-5 ¶ 19.

**GGAM'S RESPONSE:** Disputed. GGAM also objects that the phrase "distinct arrangements" is vague and ambiguous regarding the issues this action. There is no genuine dispute that Defendants caused Prime to enter into the MSA on their behalf to satisfy their obligation under the MSA. MSA (ECF No. 218-4) § 18.3; Ainsworth Supp. Decl. Ex. 13 § 2.1 (referring to section 18.3 of the MSA); *id*. Ex. 8 ¶ 156 ("As the Grantor [of the shares], Prime Metroline acted on behalf of, and as agent for, Bloomberry and Sureste to comply with their enforceable obligation under the MSA to grant GGAM the right to purchase up to 10% ownership rights in the Solaire."); Final Award (ECF No. 218-1) ¶¶ 428-29, 433 (quoting paragraph 156 of Defendants' Statement of Defense and Amended Counterclaims (Ainsworth Supp. Decl. Ex. 8)). In this regard, Section 2.1 of the EOA states:

> Grant of Option. As *contemplated by Section 18.3 of the MSA*, for
> valuable consideration, the receipt and sufficiency of which is
> hereby acknowledged by the parties, Grantor hereby grants to
> Grantee an option (the "Option") to purchase some or all of the
> Option Shares from Grantor, subject to and upon the terms and
> conditions set forth in this Agreement.

Ainsworth Supp. Decl. Ex. 13 § 2.1 (emphasis added). The EOA has additional references to the

MSA. *See, e.g.*, Declaration of Rachel Penski Fissell Ex. 7 (ECF No. 340-7) at pp. 1 (recitals), 3,

and § 2.6.

Moreover, the evidence cited by Defendants does not support this assertion. Weidner's

declaration stated:

> In early April 2011, after several exchanges with Mr. Razon and
> with the general framework of our relationship understood between
> us, I explicitly informed Mr. Razon that I would instruct my
> representatives to draft agreements for his review: (1) management
> agreements and (2) an option/equity purchase agreement. I did this
> because we distinguished the management services GGAM would
> perform for Solaire separately from the equity interest that GGAM
> would have the option to acquire.

Declaration of William Weidner dated June 14, 2015 (ECF No. 388-7) ¶ 19. Defendants have

asserted as a fact an incomplete quote taken out of context, and they seek to draw unreasonable

inferences from it. GGAM does not dispute that Garry Saunders submitted a declaration in the

arbitration in response to Defendants' arguments, stating (in part):

> Mr. Razon continues to make accusations that we somehow
> "blackmailed" him into signing the EOA. These accusations are
> false, and simply fail to account for the realities at the time. First, by
> April 2012, we had been negotiating the EOA for many months—
> the concept and parameters of which had been discussed prior to the
> MSA negotiations in the spring of 2011. However, the Parties had
> not reached an agreement despite an understanding of the
> fundamental business terms such as the buy-in formula and certain
> ancillary shareholder rights, because Mr. Razon sought to change
> the legal parameters of the agreement in a way that was
> disadvantageous to us. Most notably, Mr. Razon insisted that the
> Philippines be the venue for arbitration in the EOA, even though the
> Parties had agreed that Singapore would be the venue for resolution

of disputes under the MSA, and there was no reason to change to a different venue for the EOA. The fact that Mr. Razon and his advisors were still trying to change key terms in the EOA so late in the process shows that all parties understood the MSA and EOA to be distinct arrangements.

Perry Decl. Ex. 41 (ECF No. 387-41) ¶ 26.

84.     The EOA is governed by Philippine law. *See* Perry Decl., Ex. 19 (EOA) § 11.8 (at BLOOM_0082051).

**GGAM'S RESPONSE:** Undisputed.

85.     The EOA provides for the resolution of disputes by arbitration in Singapore, *id.* § 11.9(b) (at BLOOM_0082051), and further provides that arbitrations under the EOA may not to be merged with arbitrations under the MSA or any other agreement. *Id.* § 11.9(b)(iii) (at BLOOM_0082052).

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that section 11.9 of the EOA provides for arbitration in Singapore. However, Defendants have mischaracterized the terms of section 11.9 of the EOA, and GGAM respectfully refers the Court to the document for its content. The asserted fact is not material to the issue of personal jurisdiction over Defendants.

86.     Cantor is not a party to the EOA. *See* Fissell Decl., Ex. 7 (EOA) at BLOOM_0082033.

87.     On or about December 20, 2012, while in Montana, Weidner faxed to Prime a copy of a letter from GGAM that provided notice of GGAM's exercise of its option to purchase 921,184,046 shares of BRC (the "Option Shares") pursuant to Section 2.3 the EOA. *See* Ainsworth Decl. Ex. 24 at BLOOM_0002282-83. This letter also noted that GGAM's Philippine counsel would be in touch with Tan and Occeña to discuss logistics for the closing of GGAM's exercise of this option. *Id.*

**GGAM'S RESPONSE:** Disputed in part. The cited evidence shows that, in addition to Weidner's fax to Prime, John Jones from Cantor emailed the notice of exercise of option to Occeña and Tan. GGAM respectfully refers the Court to the document for its content.

88.     GGAM, not Cantor, purchased the Option Shares. *See* Dkt. 281-4 ¶¶ 31, 34; Perry Decl., Ex. 65 at 55:15-18.

**GGAM'S RESPONSE:** Disputed in part. Defendants have admitted that Cantor provided the funds for the purchase of the Option Shares. Ainsworth Supp. Decl. Ex. 10 ¶¶ 33, 170; *see also* Fact Nos. 28, 30 (ECF No. 333).

89.     Cantor directly and/or indirectly made capital contributions and/or loans to GGAM that provided GGAM with some or all of the cash it used to purchase the Option Shares. *See* Dkt. 281-4 ¶ 31; Perry Decl., Ex. 62 at 93:8-97:2; *id.* Ex. 65 at 55:15-57:15.

90.     GGAM is required to repay Cantor, with interest, for the capital contributions and/or loans it made to GGAM that GGAM used to purchase the Option Shares. *See* Dkt. 281-5 ¶ 40; Dkt. 281-6 ¶ 25; Perry Decl., Ex. 46 at 250:9-17; *see also id.* Ex. 62 at 93:8-97:2.

91.     GGAM performed its services under the MSA through the individuals on the ground at Solaire in Manila who comprised the Management Team, including Michael French, who GGAM hand-picked to be the Chief Operating Officer of Solaire. *See* Perry Decl., Ex. 63 at 57:19-60:16. GGAM did this by either being on-site with the Management Team at Solaire or communicating with the Management Team via email, telephone or Skype. *Id.* at 58:16-23, 60:3-10.

**GGAM'S RESPONSE:** Disputed in part. GGAM disputes Defendants' characterization of the referenced testimony which presents an incomplete and inaccurate picture. During the arbitration, the arbitral tribunal found that "[t]he expression '*through the Management Team*' was

added to the draft contract by Mr. Razon to avoid having a company – GGAM – within a company and so that Mr. Razon could retain ultimate control of the management of the company." Liability Award (ECF No. 218-2) ¶ 190 (emphasis in original). GGAM's role under the MSA "was to nominate and build most of the Management Team and to be involved thereafter as needed, but once the Management Team was in place and the COO had been appointed, it was the Management Team who was responsible for the day-to-day operation of the Solaire." *Id*. ¶ 191. Services GGAM provided under the MSA, including Solaire's marketing plan and business plan, were "prepared by the Solaire's Management Team working in conjunction with GGAM." *Id*. ¶ 206. GGAM respectfully refers the Court to the cited testimony for its content.

92.     The MSA says nothing about GGAM supervising or performing its services in the United States, much less in New York. *See generally* MSA (Dkt. 218-4). The MSA does not contain the words "New York." *See id.*

93.     While GGAM "spent extensive time in Manila" to perform its services under the MSA, Perry Decl., Ex. 33 ¶ 34, there is no evidence that GGAM performed any services under the MSA in New York.

**GGAM'S RESPONSE:** Disputed in part. GGAM does not dispute that it spent extensive time in Manila performing services under the MSA. However, there is ample evidence that GGAM performed services under the MSA in New York. *See, e.g.* Fact Nos. ¶¶ 19, 21-22, 33-34 (ECF No. 333); Fact Nos. 135, 150-55, *infra*.

94.     "Cantor did not perform work in fulfillment of GGAM's obligations under the MSA, whether under the SSA or otherwise." Dkt. 281-4 ¶ 12; *see also* Perry Decl., Ex. 45 at 252:18-22; *id.* Ex. 44 at 128:17-129:4; Dkt. 281-6 ¶ 24.

**GGAM'S RESPONSE:** Disputed in part. The cited evidence does not support the fact asserted. In the arbitration, Defendants argued that GGAM had improperly assigned to Cantor its obligations under the MSA. Ainsworth Supp. Decl. Ex. 10 ¶¶ 167-68; Liability Award (ECF No. 218-2) ¶¶ 257, 261. In response to this argument, GGAM provided the declarations Defendants now cite, wherein Rein and Weidner described Cantor's role in detail and explained that while Cantor provided back-office support to GGAM, Cantor itself did not fulfill GGAM's obligations under the MSA. *See* Declaration of Jonathan Rein dated October 5, 2015 (ECF No. 388-6) ¶¶ 6-14; Declaration of William Weidner dated October 5, 2015 (ECF No. 388-8) ¶ 24.

95.     Cantor also did not perform any services for GGAM that supported GGAM's performance of services under the MSA. Although GGAM paid Cantor for the legal, financial advisory and administrative (or "back office") services that it performed for GGAM under the SSA, Dkt. 281-6 ¶ 24, GGAM did not pay any third parties (including Cantor) for any services rendered in connection with GGAM's performance of services under the MSA. *See* Final Award (Dkt. 218-1) ¶¶ 223, 262, 313-14; *see also* Perry Decl., Ex. 54 ¶¶ 46-47; Dkt. 281-6 ¶ 16 ("**For the Services that it was contracted to provide, GGAM would <u>not</u> be expected to have in-house back-office support, such as a team of accountants, interior designers or other overhead**.") (emphasis added).

**GGAM'S RESPONSE:** Disputed. GGAM disputes Defendants' characterization of the documents which presents an incomplete and inaccurate picture. The cited evidence does not support the asserted fact that "Cantor also did not perform any services for GGAM that *supported* GGAM's performance of services under the MSA." Defendants' Fact No. 95 (emphasis added). Indeed, Defendants' asserted fact concedes, and it is undisputed, that Cantor provided "legal, financial advisory and administrative (or 'back office') services" for GGAM, which "were

necessary to keep GGAM running as a company." Defendants' Fact No. 95; Final Award (ECF No. 218-1) ¶ 262. The cited evidence also does not support the asserted fact that "GGAM did not pay any third parties (including Cantor) for any services rendered in connection with GGAM's performance of services under the MSA." The full text of paragraph 16 of the Weidner Declaration, which contains the cited quote, was prefaced with "*If*, as we proposed initially, Mr. Razon had retained GGAM as the operator of Solaire . . . GGAM would not be expected to have . . . ." Declaration of William Weidner dated October 5, 2015 (ECF No. 388-8) ¶ 16 (emphasis added). Moreover, the Tribunal denied Defendants' request to reduce GGAM's damages by the costs GGAM would have incurred but for Defendants' breach of the MSA, because Defendants presented no evidence of such costs. Final Award (ECF No. 218-1) ¶¶ 313-14.

96.    Additionally, although GGAM has entered into at least one agreement with third parties that (i) stated that GGAM's power to enter into the agreement was "subject to the execution" of the agreement by GGAM's two direct parent companies, Cantor GGAM and GAM, Perry Decl., Ex. 29 at GGAM-SDNY-0463314, and (ii) was "[a]cknowledged" and signed by Cantor GGAM (with Howard Lutnick signing in his capacity as Chairman, President and CEO), *id.* at GGAM-SDNY-0463310, and GAM (with Mr. Weidner signing in his capacity as Manager), *id.* at GGAM-SDNY-0463309, the MSA contains no such terms, acknowledgements or signatures. Rather, the MSA expressly states that GGAM has "the requisite rights, power and authority" to enter into the MSA, without any qualification that Cantor GGAM or any other affiliate of Cantor execute the MSA. MSA § 10.2(b) (Dkt. 218-4).

**GGAM'S RESPONSE:** Disputed. GGAM disputes the suggested inference that Cantor's approval of the MSA was not required; Defendants knew that Cantor's (Howard Lutnick's) approval was required before GGAM could *execute* the MSA. Ainsworth Supp. Decl. Ex. 7.

GGAM objects that the "at least one agreement with third parties" (i.e., a 2014 agreement between GGAM and placing agents for a sale of the Shares) is irrelevant. GGAM objects to Defendants' effort to use parol evidence to interpret the MSA. GGAM disputes Defendants' characterization of the MSA which presents an incomplete and inaccurate picture. GGAM respectfully refers the Court to the MSA for its content.

97.    There is no evidence in the record that after the MSA was executed any BRHI/SPI representatives ever traveled to New York in connection with GGAM's performance of services under the MSA or to otherwise meet about the MSA.

**GGAM'S RESPONSE:** Disputed. Defendants admitted in their Answer and Amended Answer that on May 1, 2012, "principals of GGAM" and "executives of Debtor Defendants," including Razon and Occeña, "attended road show meetings with potential investors in New York City." Defs.' Am. Answer (ECF No. 273) ¶¶ 82, 84. Razon considered "GGAM's participation in the road show as managers of the Solaire" to be a "basic, anticipated component" and a "fundamental part of the top-up offering story." Jan. Ainsworth Decl. Ex. 26 (ECF No. 329-26) ¶ 18. Razon "expected GGAM to participate on the road show because they were the management services provider for Solaire, and it was important to present to investors that Solaire had a credible and experienced management company." *Id*. Ex. 38 (ECF No. 329-38) ¶ 28. During the roadshow meetings, including at the St. Regis Hotel in New York, GGAM's performance of its services under the MSA was discussed. *See id*. Ex. 26 (ECF No. 329-26) ¶ 45. In the arbitration, Defendants argued that during the Roadshow meeting at the St. Regis Hotel in New York, GGAM misrepresented its ability to bring in junket operators. *Id*; Ainsworth Supp. Decl. Ex. 8 ¶¶ 111-14 & n. 320. Moreover, in November 2012, Brad Stone and Occeña attended investor conferences in

New York together, where GGAM's performance of the MSA was discussed. Defs.' Am. Answer (ECF No. 273) ¶ 87; Ainsworth Supp. Decl. Exs. 5, 11.

98.     On or about September 12, 2013, BRHI and SPI terminated the MSA. *See* Liability Award ¶ 58 (Dkt. 218-2). On or about that same date, GGAM and GGAM Netherlands initiated the Arbitration. *Id.* ¶ 59.

99.     Pursuant to the terms of the MSA, the seat of the Arbitration was Singapore. *See* SAC (Dkt. 218) ¶ 196; Defs.' Am. Answer (Dkt. 273) ¶ 192.

**GGAM'S RESPONSE:** Undisputed.

100.     During the Arbitration, GGAM and GGAM Netherlands were represented by the international law firms of Paul Hastings (out of its Washington, D.C. office) and Hughes Hubbard (out of its New York office). BRHI and SPI were represented by the international law firm of Milbank LLP (out of the Washington, D.C. office) and the Philippine law firm of Picazo Buyco Tan Fider & Santos. *See, e.g.*, Liability Award (Dkt. 218-2) ¶¶ 1-4; Final Award (Dkt. 218-1) ¶¶ 1-4.


101.     The Tribunal issued confidentiality orders that prohibited nearly all Cantor personnel—including Cantor's CEO (Howard Lutnick), Chief Litigation Counsel (Michael Lampert), and VP and Assistant General Counsel (Binyomin Kaplan)—from receiving confidential information exchanged in connection with the Arbitration (e.g., arbitral filings) and from attending arbitral hearings. *See* Perry Decl., Ex. 37 at BLOOM_0073714, 3718; *id.* Ex. 31 at BLOOM_0073755, 3757-58. These confidentiality orders did not apply to Rein, who had been seconded from Cantor to GGAM and who was designated by GGAM as its "party representative" in the Arbitration. Perry Decl., Ex. 37 at BLOOM_0073718; *id.* Ex. 31 at BLOOM_0073757-58.

**GGAM'S RESPONSE:** Disputed in part. The arbitral tribunal expressly permitted the following persons at Cantor to receive Defendants' confidential information: Michael Lehrman, Jon Rein, Christine Levett, and Eric Su. Perry Decl. Ex. 31 (ECF No. 387-31) at BLOOM_0073757; Perry Decl. Ex. 37 (ECF No. 387-37) at BLOOM_0073718.

102.    A three-day interim measures hearing was initially scheduled to take place in Singapore; however, it was ultimately held in Washington, D.C. on or around October 20-22, 2014 because BRHI/SPI's lead counsel had an unexpected surgery that prevented him from flying to Singapore. Interim Measures Award ¶¶ 21-23 (Dkt. 218-3). The Tribunal ordered that Cantor's chief litigation counsel be ***removed*** from this hearing when he arrived in person notwithstanding the Tribunal's order that prohibited Cantor personnel from attending arbitral hearings. Perry Decl., Ex. 34 at 23:17-25.

103.    A two-week merits hearing was held in Singapore on or around October 15-24, 2015. *See* Liability Award ¶ 14 (Dkt. 218-2).

**GGAM'S RESPONSE:** Undisputed.

104.    A one-week remedies hearing was scheduled to take place in Singapore; however, it was ultimately held in Washington, D.C. on or around May 28-June 1, 2018 due to health reasons of a member of the Tribunal. *See* Final Award (Dkt. 218-1) ¶¶ 68, 87, 122.

105.    No arbitration proceedings took place in New York.

106.    During the Arbitration, GGAM sought to minimize its relationship with Cantor, including an effort to "minimize Cantor's role in the management of the properties." *See* Perry Decl., Ex. 64 at 28:18-22.

**GGAM'S RESPONSE:** Disputed. GGAM disputes Defendants' characterization of the referenced testimony which presents an incomplete and inaccurate picture. The cited evidence,

which is a "yes" answer to a vague question that drew an objection, does not support the asserted fact. GGAM respectfully refers the Court to the testimony for its content. The Liability Award has an entire section discussing "Cantor's Role." Liability Award (ECF No. 218-2) at Section VI.C.(v) (p. 47).

107.    During the liability phase of the Arbitration, in response to BRHI/SPI's argument that GGAM had failed to perform under the MSA because of pressure from Cantor to pursue other business, GGAM took the position that although Cantor performed certain advisory and administrative services for GGAM for which GGAM paid Cantor pursuant to a Support Services Agreement, **Cantor did _not_ perform any services under the MSA**. *See* Dkt. 281-6 ¶¶ 16, 24; Dkt. 281-4 ¶ 12; *see also* BRHI/SPI SOF ¶ 96 *supra*; BRHI/SPI's Response to GGAM's Fact No. 19 *supra*.

**GGAM'S RESPONSE:** Disputed. The cited evidence does not support the asserted fact that Defendants argued "that GGAM had failed to perform under the MSA *because of pressure from Cantor to pursue other business*." (Emphasis added.) While it is undisputed that Cantor provided "legal, financial advisory and administrative (or 'back office') services" for GGAM, *see* Defendants' Fact No. 95, Defendants argued in the arbitration that GGAM had improperly assigned to Cantor its obligations under the MSA. Ainsworth Supp. Decl. Ex. 10 ¶¶ 9, 165, 167-68; Liability Award (ECF No. 218-2) ¶¶ 257, 261. In response to this argument, GGAM provided declarations wherein Rein and Weidner described Cantor's role in detail and explained that while Cantor provided back-office support to GGAM, Cantor itself did not fulfill GGAM's obligations under the MSA. *See* Declaration of Jonathan Rein dated October 5, 2015 (ECF No. 388-6) ¶¶ 6-14; Declaration of William Weidner dated October 5, 2015 (ECF No. 388-8) ¶ 24. The Liability Award states the parties' positions and the Tribunal's analysis regarding "Cantor's Role." *See*

Liability Award (ECF No. 218-2) ¶¶ 72(e), 97-101, 119-121, 140-48. The Tribunal found: "Bloomberry was aware since the very beginning of its relationship with GGAM that Cantor provided financial support and certain other services to GGAM." *Id.* ¶ 144.

108.    During the damages phase of the Arbitration, BRHI/SPI sought to reduce GGAM's damages by arguing that because the MSA was terminated early, GGAM potentially saved (avoided) costs that it would have otherwise paid to Cantor as part of the SSA for back-office services (*e.g.*, accounting, finance, and legal). *See* Final Award (Dkt. 218-1) ¶¶ 262-63; *see also* BRHI/SPI's Response to GGAM's Fact No. 19 *supra*. GGAM argued that it did not avoid any such costs because Cantor did not perform services under the MSA, and therefore, its damages should not be reduced. *See id.* ¶¶ 261-62. The Tribunal adopted GGAM's position when it ruled that GGAM would not have avoided any costs (*e.g.*, payments to Cantor for services in connection with the performance of the MSA) as a result of the termination of the MSA, and therefore GGAM's damages for lost management fees would not be reduced to account for such avoidance of costs. *See* Final Award (Dkt 218-1) ¶¶ 313-14.

**GGAM'S RESPONSE:** Disputed. The cited evidence does not support the fact asserted. The arbitral tribunal denied Defendants' request to reduce GGAM's damages because Defendants presented no evidence of costs GGAM would have incurred but for Defendants' breach of the MSA. Final Award (ECF No. 218-1) ¶¶ 313-14. In the Tribunal's words, "The Tribunal has no evidence of any specific costs (which the Claimants would have expended and which would not have come within the reimbursement clause in the MSA) that could have been avoided or the basis on which an amount could be calculated. The Tribunal also notes that the Respondents' own expert, Mr. Searby, proceeded with the calculations in his Searby Report on the understanding that

'*it is not disputed that . . . the Claimants have avoided no cost by not performing the MSA.*'" *Id.* ¶ 313 (emphasis in original).

109.    On or about December 9, 2014, the Tribunal issued its Interim Measures Award. *See* Interim Measures Award (Dkt. 218-3). On or about September 20, 2016, the Tribunal issued its Liability Award. *See* Liability Award (Dkt. 218-2). On or about September 27, 2019, the Tribunal issued its Final Award. *See* Final Award (Dkt. 218-1). Across the 353 pages of arbitral rulings, "New York" appears exactly twice: (1) in the address of GGAM's arbitration counsel, and (2) in a quotation from BRHI/SPI's submissions reiterating that they did not contract with a New York-based financial institution. *See* Liability Award (Dkt. 218-2) ¶ 98 (stating that GGAM is "an investment vehicle for a New York-based financial institution [i.e. Cantor]", which was "***not*** what Bloomberry was seeking—and ***not*** what GGAM represented itself to be—when it entered into its agreement") (emphasis added).

## GGAM's FURTHER STATEMENT OF MATERIAL FACTS

GGAM submits that the following additional facts are relevant to the Court's determination of personal jurisdiction and, together with GGAM's Statement of Undisputed Fact Nos. 1-39 (ECF No. 333), require the Court to deny Defendant's motion for summary judgment.

**Defendants' Contacts With New York During Negotiation And Execution of the MSA**

110.    During the negotiation, execution, and term of the MSA, Razon was the Chairman, CEO, and controlling shareholder of Defendants. Feb. Ainsworth Decl. Exs. 22-23 (ECF Nos. 384-20, 384-21) at Response Nos. 2-3; *id*. Ex. 24 (ECF No. 384-22); *id*. Ex. 1 (ECF No. 384-1) at 146:22 – 147:1; *id*. Ex. 6 (ECF No. 384-6) at 93:20 – 94:25.

111.    Before Razon ever met with anyone from GGAM, he received an email with an attached PowerPoint presentation that "explains that the partnership of GGAM and Cantor 'provides superior access to capital and proprietary technology and infrastructure.'" Liability Award (ECF No. 218-2) ¶ 140.

112.    In March 2011, during Razon's first in-person meeting with GGAM's principals, they explained to Razon GGAM's "joint venture relationship" with Cantor, which "provided 'backing' and a 'significant capital commitment' to GGAM's activities." *See* GGAM's 56.1 Statement (ECF No. 333) ¶ 6; Liability Award (ECF No. 218-2) ¶ 97(a) (citing Defendants' Rejoinder Memorial (Ainsworth Supp. Decl. Ex. 10) ¶ 13).

113.    During negotiation of the MSA, Defendants knew that Cantor—in New York—was GGAM's joint venture partner, and Defendants purposely had numerous contacts with Cantor. Ainsworth Supp. Decl. Ex. 10 ¶¶ 13, 156; *see also* GGAM's 56.1 Statement (ECF No. 333) ¶¶ 6-10, 12, 13-16.

114.    In May 2011, Kevin Russell, a Vice-President and Assistant General Counsel of Cantor, explained in an email to Defendants "that Cantor provided services to GGAM 'including but not limited to legal and financial advisory services.'"  Liability Award (ECF No. 218-2) ¶ 141.

115.    Defendants admitted to negotiating the MSA with "Cantor and its army of lawyers," and they admitted they were told "that some Cantor employees provided 'admin' services to GGAM.  Ainsworth Supp. Decl. Ex. 10 ¶¶ 31-32, 196.  Defendants told the Tribunal, "That was to be expected of a new start-up company that needed administrative support, and was consistent with Mr. Weidner's explanation to Mr. Razon in their first meeting that Cantor provided 'backing.'"  *Id*. 32.  They further admitted, "Certain Cantor employees, such as Jon Rein and Michael Lehrman, provided support to GGAM . . . ."  *Id*. 74.

116.    [intentionally omitted]

117.    Defendants have admitted that "Razon had email and/or telephonic communication with Weidner, Occeña, Alarilla, and Tan (none of which are based in New York) relating to negotiating the GGP relationship during one or more trips that Mr. Razon made to New York in the April-June 2011 time frame (during which he would have stayed at the Plaza residence in Manhattan). Defs.' Am. Answer (ECF No. 273) ¶ 54; *see also* Razon's Am. Answer (ECF No. 253) ¶ 54.

118.    Razon owns the penthouse at the Plaza Hotel in New York, and Between March 2011 and September 2013 (when Defendants terminated the MSA), Razon's plane flew into Teterboro, New Jersey airport 25 times.  Defs.' Am. Answer (ECF No. 273) ¶¶ 54, 85; Razon's Am. Answer (ECF No. 253) ¶¶ 54, 85.

119.    Defendants admit that they "sent responses to document requests and diligence checklists by email to Cantor employees."  Defs.' Am. Answer (ECF No. 273) ¶ 54.

120.    Between the initial meeting in March 2011 and execution of the MSA on September 9, 2011, Defendants sent at least 90 emails that were directly addressed to Cantor personnel in New York. Ainsworth Supp. Decl. Ex. 2. Between September 10, 2011 and the MSA's termination in September 2013, Defendants sent at least 108 emails that were directly addressed to Cantor personnel in New York. *Id.*

121.    On April 27, 2011, Defendants sent GGAM a draft of the MSA.  *See id*. Exs. 14-15. In that draft, Defendants inserted the following language to the agreement's arbitration provision: "The Parties agree in advance that if one Party initiates arbitration, the other Party shall be bound to participate, and the decision of the arbitration panel shall be binding upon both Parties and enforceable in all jurisdictions." *Id*. Ex. 15.

122.    On June 22, 2011, Defendants emailed Cantor and discussed setting up a meeting in New York with Howard Lutnick, Cantor's Chairman and CEO, and suggested signing the MSA in New York, saying that Razon "will be going in and out of NY so he will revert when he has free time to meet with Howard Lutnick.  He is willing to do counter-signing party of the MSA in case we finish before he returns to Manila."  Jan. Ainsworth Decl. Ex. 13 (ECF No. 329-13).

123.    On July 1, 2011, Cantor's Jon Rein stated in an email to Defendants, "we realize and acknowledge that both you and we must consult with our principals prior to executing the MSA, and in our case neither Bill [Weidner] nor Howard [Lutnick] have had a chance to review or opine on this list in its entirety." Liability Award (ECF No. 218-2) ¶ 141.

124.    Before they executed the MSA, Defendants received a chart showing Cantor's ownership role with respect to GGAM.  Perry Decl. Ex. 43 (ECF No. 387-43) ¶ 13; MSA (ECF No. 218-4) Exhibit A; GGAM's 56.1 Statement (ECF No. 333) ¶¶ 9, 18.

**Defendants' Contacts with New York In Connection with the Performance of the MSA**

*Negotiation, Execution, and Performance of the EOA*

125.    The MSA required Defendants to grant an equity option to GGAM, and in satisfaction of that contractual promise, Defendants caused their agents Prime and BRC to negotiate with GGAM and to enter into the EOA with GGAM, along with a Participation Agreement that was annexed to the EOA. Defs. Am' Answer (ECF No. 273) ¶¶ 58, 81; *see also* Fact Nos. 173-178, *infra*.

126.    In the arbitration, Razon submitted a declaration stating, "I needed GGAM to begin providing its management services for the Solaire, so we agreed to execute the MSA. The MSA explicitly granted the equity option to GGAM, however we left the specific terms relating to the exercise of the equity option in a separate agreement." Jan. Ainsworth Decl. Ex. 26 (ECF No. 329-26) ¶ 16.

127.    The terms of the EOA expressly refer to the MSA and state the relationship between the EOA and the MSA. *See, e.g.*, Ainsworth Supp. Decl. Ex. 13 § 2.1.

128.    In the arbitration, Defendants argued there is "overwhelming evidence that the option grant at issue was always intended to be compensation for management services pursuant to the MSA." *Id*. Ex. 10 ¶ 187.  They dedicated at least 13 pages of briefing to show the relationship between the MSA and EOA.  *Id*. at pp. iii-iv (depicting sections IX.A & IX.B).

129.    During negotiations of the EOA, Cantor's Jon Rein told Occeña that a scheduled call needed to be postponed and "apologize[d] profusely on behalf of GGAM, Cantor and our counsel." *Id*. Ex. 16.

130.    Occeña met in person with GGAM's Brad Stone and Cantor's Jon Rein in Las Vegas to negotiate the EOA in October 2011.  *Id*. Ex. 1.

131.    Defendants knew Cantor would be the source of funds for the exercise of the equity option.  Jan. Ainsworth Decl. Ex. 5 (ECF No. 329-5) ("So the money will come from Cantor"); Liability Award (ECF No. 218-2) ¶¶ 143-44.

132.    In the arbitration, Defendants admitted, "Cantor fully funded the US$37 million strike price for the exercise of the equity option" and "the equity stake effectively belonged to Cantor." Ainsworth Supp. Decl. Ex. 10 ¶¶ 33, 170; Fact Nos. 28, 30 (ECF No. 333).

133.    GGAM exercised its option on December 20, 2012. Defs.' Am. Answer (ECF No. 273) ¶ 90.

### The Road Show

134.    In 2012, Defendants participated in a Roadshow in the United States, including in New York, so that Prime, acting as their agent, could sell shares of BRC to raise money to "fund Phase 1 of Solaire Manila, including construction, FF&E, and other various day-to-day expenses, such as pre-opening costs and working capital, as well as for general corporate purposes." Defs.' Am. Answer (ECF No. 273) ¶ 82; *see also id.* ¶ 84; Ainsworth Supp. Decl. Ex. 6 at BLOOM_0077389, BLOOM_0077429.

135.    Defendants admit that "(i) certain principals of GGAM participated in a 'road show' in April and May 2012 to meet with potential investors in advance of a 'top-up' equity offering, (ii) the road show . . . included presentations in New York . . . and (iii) the road show presentations were attended by Razon, Occeña, *other executives of Debtor Defendants*, and/or certain principals of GGAM." Defs.' Am. Answer (ECF No. 273) ¶ 82; *see also id.* ¶ 84 (admitting that "(i) on May 1, 2012, Razon, Occeña, Weidner and Saunders attended road show meetings with potential investors in New York City, and (ii) a dinner was held in Manhattan on May 1, 2012").

136.    The Offering Circular for the 2012 offering of BRC shares stated, "[r]eferences to the Company include references to [BRC's] direct and indirect subsidiaries, Sureste and BRHI, respectively, unless otherwise specified."  Ainsworth Supp. Decl. Ex. 6 at BLOOM_0077389.

137.    The purpose for the share offering was "to use the proceeds of the Subscription to fund Phase 1 of Solaire Manila, including construction, FF&E, and other various day-to-day expenses, such as pre-opening costs and working capital, as well as for general corporate purposes."  *Id*. at BLOOM_0077429.

138.    The Offering Circular provided that, "The Company has entered into a Management Services Agreement with GGAM for the provision of management and other advisory services in relation to the design, construction and operations of Solaire Manila." *Id*. at BLOOM_0077456. It also provided that, "Under the MSA and the Equity Option Agreement, GGAM was also granted the option, to purchase up to 921,184,056 Shares . . . of the Company . . . from Prime Metroline. *Id*.

139.    The Offering Circular provided that, "in accordance with the MSA, the Company will rely on GGAM to provide necessary advisory services for Solaire Manila."  *Id*. at BLOOM_0077411.

140.    The Offering Circular expressly mentions Sureste's control over BRC. *Id*. at BLOOM_0077439.

141.    The Offering Circular mentions "GGAM" 169 times and mentions the "MSA" or "Management Services Agreement" more than 50 times.  Ainsworth Supp. Declaration ¶ 4.  It has five pages dedicated to describing the MSA. *See id*. Ex. 6 at BLOOM_0077388, BLOOM_0077485.

142.     Defendants argued in the arbitration that BRC's position in their ownership structure did not constitute a "Change of Control" of Defendants "where Enrique K. Razon Jr. continues to own or control, directly or indirectly, [Defendants] following such IPO or back-door listing."  Ainsworth Supp. Decl. Ex. 8 ¶ 149 & n. 449.

143.     Razon personally viewed the substance of the EOA as being between GGAM and him, not his companies BRC and Prime, and stated in the underlying arbitration that he offered the equity option to GGAM, he gave GGAM the Shares, and "the vehicles by which the deal would be brought about weren't important from a business perspective and shouldn't be given some exaggerated importance in the arbitration.  Jan. Ainsworth Decl. Ex. 38 (ECF No. 329-38) ¶ 11.

144.     Defendants invited Cantor's Jon Rein to the celebratory road show closing dinner in Manhattan on May 1, 2012.  Defs.' Am. Answer (ECF No. 273) ¶ 84; Ainsworth Supp. Decl. Ex. 12.

145.     During the roadshow, GGAM and Defendants also made stops in California, Massachusetts, Missouri, Colorado, and Washington, D.C.  Defs.' Am. Answer (ECF No. 273) ¶ 82.

146.     As a result of the offering, which was described in the Offering Circular that expressly mentioned GGAM's role, New York investors invested millions in BRC.  *See* Fact No. 35 (ECF No. 333).

147.     In the arbitration, Defendants argued that GGAM's participation in the roadshow "fall[s] within GGAM's general and specific obligations under the MSA." Ainsworth Supp. Decl. Ex. 8 ¶ 51, and that "GGAM figured predominantly into the preparations for the top-up offering 'road show,' as it is axiomatic that managers of an enterprise would be fundamental, active participants in the road show leading up to the backdoor listing and the top-up offering." *Id*. ¶ 43.

148.     In the arbitration, Defendants further argued, "GGAM's assistance with the construction of the Solaire, its participation in the top-up offering 'road show,' and its negotiations of agreements for the Solaire are not charitable acts.  These acts fall within GGAM's general and specific obligations under the MSA."  *Id.* ¶ 51.

149.     In the arbitration, Defendants argued that, "Clause 2.5 of the MSA required GGAM to take such actions as manager of Solaire that would maximize value for Bloomberry's shareholders.  It is fundamental that managers participate in road shows, including present to and interacting with potential investors."  *Id.* Ex. 10 ¶ 182.

### *The New York Roadshow—St. Regis Hotel*

150.     In the arbitration, Defendants placed at issue an event that happened during their Roadshow presentation at the St. Regis Hotel in New York. Jan. Ainsworth Decl. Ex. 26 (ECF No. 329-26) ¶ 45; *see also* Ainsworth Supp. Decl. Ex. 8 ¶¶ 111-14 & n. 320 (citing Razon's declaration); *id.* Ex. 10 ¶ 89 & n. 228.

151.     Defendants argued in the arbitration that GGAM misrepresented its ability to bring in junket operators and committed "causal fraud," and argued that the Tribunal should rescind the EOA. Ainsworth Supp. Decl. Ex. 8 ¶¶ 111-14, 180; Liability Award (ECF No. 218-2) ¶¶ 79, 129.

152.     Razon submitted a declaration stating:

> I recall that during a road show presentation *at the St. Regis Hotel in New York*, one of the institutional investors that we were presenting to asked Mr. Weidner how he would get junket operators to come to the Solaire.  Mr. Weidner gave a short and matter of fact response: "7 phone calls."

Jan. Ainsworth Decl. Ex. 26 (ECF No. 329-26) ¶ 45 (emphasis added); *see also* Ainsworth Supp. Decl. Ex. 8 ¶¶ 111-14 & n. 320 (citing Razon's declaration); *id.* Ex. 10 ¶ 89 & n. 228.

153.   During the hearing for the liability phase of the arbitration, the phrase "seven phone calls" and "St. Regis Hotel" were expressly mentioned fourteen times, including in Defendants' closing argument. Ainsworth Supp. Decl. ¶ 5.

154.   The Liability Award references the meeting at the St. Regis Hotel in New York and Mr. Weidner's statement. *See* Liability Award (ECF No. 282-2) ¶ 131 ("the Tribunal observes that the Claimants' principals made statements about junket operators during the IPO road show").

155.   The Tribunal rejected Defendants' defenses and counterclaims because at the time the alleged statement was made, the MSA and the EOA had already been signed and "those statements could not have induced the [Defendants] to sign the MSA on false pretenses." *Id*.; *see also id.* at p. 120.

156.   In the arbitration, GGAM submitted a request for reimbursement of US$45,557 of "Additional Expenses" that were incurred *after* June 2012.  Perry Decl. Ex. 53 (ECF No. 387-53) ¶¶ 134-35; Ainsworth Supp. Decl. Ex. 9 ¶¶ 103-04; Final Award (ECF No. 218-1) at p. 5.

157.   In the arbitration, Defendants admit that they paid "All of GGAM's travel and out-of-pocket expenses incurred with respect to the road show."  Ainsworth Supp. Decl. Ex. 10 ¶ 183.

### *Investor Presentations*

158.   In September 2012, Defendants, including Occeña, traveled to the United States, including New York and Massachusetts, to give investor presentations concerning the BRC shares. *Id*. Ex. 4; Defendants' Response to Fact No. 36.

159.   On October 11, 2012, Occeña told GGAM's Bradley Stone, "Our stock is doing so well . . . you are such an impressive presenter that investors just keep buying the stock."  Ainsworth Supp. Decl. Ex. 17.

160.    In November 2012, Defendants came to the United States, including New York and California, to give investor presentations concerning the BRC shares, and GGAM participated in the investor presentations in New York and California. Defs.' Am. Answer (ECF No. 273) ¶ 87.

161.    Razon requested that GGAM attend the UBS Global Emerging Markets Conference on behalf of BRC in San Francisco and New York in November 2012.  Ainsworth Supp. Decl. Ex. 18; Defs.' Am. Answer (ECF No. 273) ¶ 87.

162.    On November 28, 2012, Occeña met with Jon Rein and Bradley Stone in New York for a dinner meeting. Ainsworth Supp. Decl. Ex. 19.

163.    GGAM attended those investor conferences to "solidify existing investor relationships and cultivate new relationships by serving as the face of Solaire at various conferences around the world."  *Id*. Ex. 20 ¶ 39.

### *Defendants Arguments in the Arbitration*

164.    In the arbitration, Defendants asserted counterclaims against GGAM for "(1) monetary damages equivalent to the value of the Shares, (2) rescission of the equity option grant and restitution of the Shares . . .; (3) annulment of the MSA on the basis of causal fraud and restitution of the Shares . . .; and (4) equitable relief from GGAM's unjust enrichment."  *Id*. Ex. 8 ¶ 143.

165.    In the arbitration, Defendants argued that GGAM had improperly "effectively assigned its rights and obligations under the MSA to Cantor." *Id*. Ex. 10 ¶¶ 9, 165, 168; Liability Award (ECF No. 218-2) ¶ 257.

166.    Defendants' briefing in the arbitration mentions "Cantor" 133 times and mentions Cantor personnel by name numerous additional times. Ainsworth Supp. Decl. ¶ 6.

167.    During the arbitration's liability hearing, "Cantor" was mentioned more than 380 times.  *Id*. ¶ 10.

168.    The Liability Award mentions "Cantor" 55 times and the Final Award mentions "Cantor" 42 times.  *Id*. ¶¶ 6, 7.

169.    In the arbitration, Defendants requested that the Tribunal order GGAM to deliver the Shares (which it had acquired in exercising the EOA) to Defendants.  Liability Award (ECF No. 218-2) ¶¶ 307-11.

170.    The Tribunal rejected Defendants' arguments, claims and defenses, and found that Cantor's involvement was not in breach of the MSA.  *Id*. ¶¶ 140-48, 265, 272, 278, and p. 120.

171.    The Tribunal awarded damages to GGAM for Defendants' breach of the MSA and interference with GGAM's ownership of the Shares, and ordered Defendants to cease their efforts at blocking GGAM's sale of those shares and to take affirmative steps to enable GGAM to sell those Shares.  *Id*. ¶ 507.

172.    On September 28, 2015 Defendants and GGAM met in San Francisco, and on and May 11, 2017 they met in Cantor's New York office, to discuss their dispute.  Defs.' Am. Answer (ECF No. 273) ¶ 129.

**BRC and Prime Acted as Agents of Defendants**

173.    In the arbitration, Defendants argued that, "The Parties understood that, notwithstanding the new corporate structure, the equity option had been granted by Bloomberry and Sureste to GGAM as the management services provider under the MSA," and that "Bloomberry and Sureste caused Prime Metroline to be the grantor under the EOA because, Prime Metroline, as the majority shareholder of BRC, was the appropriate entity in Bloomberry's

corporate structure to enter into the EOA and sell the Shares to GGAM."  Ainsworth Supp. Decl. Ex. 8 ¶¶ 153, 155.

174.    In the arbitration, Defendants argued that, "The Parties contemporaneous negotiations confirm that the identity of the 'Grantor' that would be a party to the EOA was a mere formality and did not alter the Parties' relationship or their overall deal."  *Id*. ¶ 155.

175.    In the arbitration, Defendants admitted that, "Here, Bloomberry, Sureste, BRC, Prime Metroline and GGAM all were aware of the three contracts (the MSA, the EOA and the Participation Agreement) and executed them as part of a single transaction to accomplish an agreed purpose—that is, to effect GGAM's agreement to provide management services for the Solaire, in which GGAM would be permitted to purchase ownership interests."  *Id*. ¶ 158.

176.    In the arbitration, Defendants argued, "Prime Metroline and GGAM agreed that the purpose of the Equity Option Agreement was to document the equity option granted in the MSA," *Id*. Ex. 10 ¶ 208, and that, "It is clear that Prime Metroline was acting as . . . [Defendants'] agent with respect to the execution of the EOA."  *Id*. ¶ 213.

177.    Defendants "offered to GGAM listed shares in BRC, in place of the illiquid, unlisted shares in Bloomberry and Sureste."  *Id*. Ex. 8 ¶ 154.

178.    In the arbitration, Defendants argued that, "As the Grantor [of the Shares], Prime Metroline acted on behalf of, and as agent for, Bloomberry and Sureste to comply with their enforceable obligation under the MSA to grant GGAM the right to purchase up to 10% ownership rights in the Solaire."  Final Award (ECF No. 218-1) ¶¶ 428-29, 433 (quoting Defendants' Statement of Defense and Amended Counterclaims; (Ainsworth Supp. Decl. Ex. 8) ¶ 156).

Dated: March 22, 2023
New York, New York

MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND
POPEO, P.C.

Respectfully submitted,

By: *s/* Kevin N. Ainsworth          
    Robert I. Bodian
    Kevin N. Ainsworth
    Barry Bohrer
    Kaitlyn A. Crowe
    Daniel T. Pascucci (admitted *pro hac vice*)
    Joseph R. Dunn (admitted *pro hac vice*)
    919 Third Avenue
    New York, NY 10022
    T: (212) 935-3000
    F: (212) 983-3115
    rbodian@mintz.com
    kainsworth@mintz.com
    bbohrer@mintz.com
    kacrowe@mintz.com
    dtpascucci@mintz.com
    jrdunn@mintz.com

    *Attorneys for Plaintiff*
    *Global Gaming Philippines, LLC*