# TABLE OF CONTENTS

| | Page |
|---|---|
| Glossary of Terms | 1 |
| Summary | 6 |
| Summary of the Offer | 13 |
| Summary Consolidated Financial Information | 17 |
| Risk Factors | 20 |
| Use of Proceeds | 41 |
| Dividend Policy | 42 |
| Exchange Rates | 43 |
| Market Price Information | 44 |
| Capitalization | 45 |
| Dilution | 46 |
| Selected Consolidated Financial Information | 47 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 50 |
| Business | 61 |
| The Provisional License | 87 |
| Industry | 89 |
| Regulatory | 92 |
| Material Contracts | 97 |
| Board of Directors and Senior Management | 102 |
| Related Party Transactions | 107 |
| GGAM Principals | 108 |
| Principal Shareholders and Selling Shareholder | 110 |
| Description of Share Capital | 111 |
| The Philippine Stock Market | 117 |
| Philippine Foreign Exchange and Foreign Ownership Controls | 121 |
| Taxation | 123 |
| Plan of Distribution | 131 |
| Transfer Restrictions | 137 |
| Sale and Subscription of Shares by the Selling Shareholder | 140 |
| Legal Matters | 141 |
| Independent Auditors | 142 |
| Consolidated Financial Statements and Independent Auditors' Report | F-1 |
| The Philippine Gaming Industry | A-1 |

# Glossary of Terms

In this Offering Circular, unless the context otherwise requires, the following terms shall have the meanings set out below.

| | |
|---|---|
| "AAI" | Active Alliance, Incorporated |
| "articles of incorporation" | the amended articles of incorporation of the Company, approved by the Philippine SEC on February 27, 2012 |
| "BDO" | Banco de Oro Unibank, Inc. |
| "BDO Loan Facilities" | an aggregate of ₱14.6 billion in loan facilities from BDO specifically to fund construction of Solaire Manila, comprised of two facilities entered into with Sureste and BRHI, respectively, as set out in two Omnibus Loan and Security Agreements each originally dated January 24, 2011. The BDO Omnibus Loan and Security Agreement with Sureste was amended by an Amendment to Omnibus Agreement dated April 4, 2012 |
| "Board of Directors" or "Board" | the board of Directors of the Company |
| "BRHI" | Bloomberry Resorts and Hotels, Inc. |
| "BSP" | *Bangko Sentral ng Pilipinas*, the central bank of the Philippines |
| "Business Day" | any day (other than a Saturday or Sunday or public holiday) on which banks in Makati City, Philippines are generally open for normal banking business |
| "cage" | a secure room within a casino with a facility that allows clients to exchange cash for chips used in the casino's gaming activities, or to exchange redeemable chips for cash |
| "CAGR" | compound annual growth rate |
| "casino revenue" | the gross gaming revenue from casino gaming activities, namely table games and slots, which is the difference between gaming wins and losses to the casino operator. For table games, gross win equals the drop plus credit slips (receipts for chips returned from a gaming table chip tray to the cage), indicating income to the table, less fills to the table. For slot machines, gross win equals the drop, less fills to the slot machine and jackpot payouts |
| "chip(s)" | a token, usually in the form of a plastic disc(s) issued by a casino to clients in exchange for cash or credit, which must be used (in lieu of cash) to place bets on gaming tables |
| "Closing Date" | the day on which the Offer Shares are expected to be ready for delivery in book entry form through the PDTC against payment, which is expected to be on or around May 7, 2012 |
| "Company" or "Bloomberry" | Bloomberry Resorts Corporation (formerly known as Active Alliance, Incorporated). References to the Company include references to its direct and indirect subsidiaries, Sureste and BRHI, respectively, unless otherwise specified |
| "Congress" | the Congress of the Philippines, which includes the House of Representatives and the Senate |
| "Corporation Code" | *Batas Pambansa Blg. 68*, also known as the Corporation Code of the Philippines |

Subject to Arbitration Confidentiality Orders

BLOOM_0077389

There can be no assurance that necessary financing will be available in amounts or on terms acceptable to the Company, or at all. If the Company fails to raise additional funds in such amounts and at such times as it may need, the Company may be forced to reduce its expenditures and growth to a level that can be supported by its cash flow and delay the development of Solaire Manila and the commencement of its operations, which may result in the Company's inability to meet drawing conditions under its loan facilities or default and exercise of remedies by the lenders under its loan facilities. In that event, the Company would be unable to complete Phase 1 of Solaire Manila or future phases of Solaire Manila and could suffer a partial or complete loss of its investments in Solaire Manila.

**Construction at Solaire Manila is subject to hazards that may cause personal injury or loss of life, thereby subjecting the Company to liabilities and possible losses, which may not be covered by insurance.**

The construction of large scale properties such as Solaire Manila can be dangerous. Construction workers at Solaire Manila are subject to hazards that may cause personal injury or loss of life, thereby subjecting the contractor and the Company to liabilities, possible losses, delays in completion of the projects and negative publicity. The Company believes that it and its contractor take adequate safety precautions that are consistent with industry practice, but these safety precautions may not be sufficient to prevent serious personal injuries or further loss of life, damage to property or delays. If accidents occur during the construction of Solaire Manila, the Company and Solaire Manila may be subject to delays, including delays imposed by regulators, liabilities and possible losses, which may not be covered by insurance, and the Company's business, prospects and reputation may be materially and adversely affected.

**Solaire Manila may not be financially successful.**

Even if Solaire Manila is completed and opened as planned, it still may not be a financially successful venture or generate the cash flows that the Company anticipates. The Company may also not attract the level of patronage that it is seeking. If Solaire Manila does not attract sufficient business, this will limit the Company's cash flow and would adversely affect its operations, future plans, its ability to service payments under its loan facilities and its results of operations.

RISKS RELATING TO THE OPERATION OF SOLAIRE MANILA

**The loss of members of the Company's management team, including any GGAM Management Nominees, or termination of the MSA, may adversely affect the Company's operations, particularly given the Company's lack of experience in planning and operating an integrated tourism resort such as Solaire Manila.**

The Company's ability to develop successful operations is dependent to a large degree on the efforts, skills and continued service of key management and operating personnel, particularly the members of its management team, including the GGAM Management Nominees. See "Business—Corporate Organization and Management Service Provider—GGAM Management." The loss of any of the Company's management team, including the GGAM Management Nominees, may have a material adverse effect on the Company's business.

In addition, in accordance with the MSA, the Company will rely on GGAM to provide necessary advisory services for Solaire Manila. Under the terms of the MSA, GGAM is entitled to terminate the MSA upon the occurrence of various events, such as non-compliance by the Company with its material obligations under the Provisional License and the MSA, including the development, construction and completion of Solaire Manila, securing of all relevant government permits and non-compliance by the Company with its obligations under the BDO Loan Facilities. In the event that GGAM terminates the MSA, there can be no assurance that the Company will be able to enter into an agreement with another management service provider with similar expertise as GGAM, and on substantially similar terms as the MSA. The GGAM Management Nominees have long relationships with the GGAM principals, with some lasting as long as 13 years. As a result, if the MSA is terminated, the GGAM Management Nominees may choose to relinquish their positions within the Company despite their being employees of the Company and having notice periods under their employment contracts ranging from 45 to 180 days.

The Company has not historically managed hotel and gaming operations and by itself has no track record in the integrated tourism resort. The Company will depend on the experience of its management team, including the

Subject to Arbitration Confidentiality Orders

BLOOM_0077411

# Use of Proceeds

Based on an Offer Price of ₱7.50 and an Offer of 1,179,963,700 Offer Shares, the Company estimates that the Selling Shareholder will receive gross proceeds from the Offer of approximately ₱8,849.7 million (approximately U.S.$206.5 million) (excluding any proceeds from the exercise of the Over-Allotment Option). The Offer Price was determined through a book building process and discussions between the Company, the Selling Shareholder and the Joint Lead Managers. With the proceeds of the Offer, the Selling Shareholder has, subject to completion of and availability of the cash proceeds from the Offer, agreed to subscribe for, and the Company has, subject to completion of the Offer, agreed to issue, new Shares in an amount equal to the aggregate number of Offer Shares to be sold by the Selling Shareholder in the Offer at a price equivalent to the Offer Price.

The estimated net proceeds to be received by the Company from the Subscription (assuming no exercise of the Over-Allotment Option), has been calculated by multiplying the number of Offer Shares by the Offer Price of ₱7.50, and subtracting an estimated amount of placing commissions, market charges, fees and other expenses related to the Offer and Subscription of ₱430.7 million (approximately U.S.$10.0 million). Based on these arrangements (assuming no exercise of the Over-Allotment Option), the Company expects to raise net proceeds from the Subscription of approximately ₱8,419.0 million (approximately U.S.$196.5 million).

The actual placing commission, market charges, fees and other expenses related to the Offer and Subscription may vary from the estimated amounts.

The Company intends to use the proceeds of the Subscription to fund Phase 1 of Solaire Manila, including construction, FF&E and other various day-to-day expenses, such as pre-opening costs and working capital, as well as for general corporate purposes.

The Company's proposed use of the proceeds of the Subscription as described above is based on its current plans and estimates and other factors as of the date of this Offering Circular. However, the actual allocation of the proceeds by the Company will depend on various factors, including the amount of cash generated by the Company's operations, the rate of progress in the Company's development of Solaire Manila, the market conditions, the availability of suitable opportunities, the timing of regulatory approvals and other factors, and may differ from the uses described above as the Company's management finds necessary or advisable. To the extent the Company does not use the proceeds of the Subscription for the purposes described above, the Company intends to use the proceeds for general corporate purposes.

Subject to Arbitration Confidentiality Orders

BLOOM_0077429

also provide management and other related services for Solaire Manila upon commencement of its commercial operations. Steelman is an architecture, planning and design firm with vast experience in designing gaming resort projects throughout the world. GGAM is an investor, developer and manager of casino resort properties globally. GGAM is based in Las Vegas, Nevada, USA whose three principals each have decades of integrated tourism resort and gaming industry experience, a substantial portion of which was in senior management positions with Las Vegas Sands, Inc. in the United States and Macau. GGAM has strong relationships with independent gaming promoters who the Company believes will be a key component in attracting VIP customers to the Philippines, and Solaire Manila, in particular. The Company has also engaged DCI and DMCI, two of the Philippines' most experienced companies with established track records in large-scale project management and construction, respectively, to oversee and conduct the development and construction of Solaire Manila. See "Business—Consultants-Project Design, Management and Construction."

## PRESENTATION OF FINANCIAL INFORMATION

On February 6, 2012, the Company completed the legal acquisition of Sureste. Sureste, a wholly-owned subsidiary of Prime Metroline, was deemed to be the accounting acquirer for accounting purposes under the principles of PFRS 3, *Business Combinations* ("PFRS 3"). The acquisition was accounted for similar to a reverse acquisition following the guidance provided by the standard. In accordance with the guidance of PFRS 3, in a reverse acquisition, the legal parent is identified as the acquiree for accounting purposes because based on the substance of the transaction, the legal subsidiary is determined to be the entity that gained control over the legal parent. Accordingly, the consolidated financial statements of the Company as of and for the two months ended February 29, 2012 have been prepared as a continuation of the consolidated financial statements of Sureste. Sureste has accounted for the acquisition of the Company from January 26, 2012 which was the date when Prime Metroline acquired the Company. The comparative financial statements as of and for the year ended December 31, 2011 and as of and for the two months ended February 28, 2011 is that of Sureste and its consolidated subsidiary, BRHI.

## LIQUIDITY AND CAPITAL RESOURCES

### Sources and uses

*Solaire Manila*

The Company is presently developing Solaire Manila, which has not yet commenced operations. Sureste and BRHI have entered into the BDO Loan Facilities for an aggregate of ₱14.6 billion (approximately U.S.$340.6 million) (See "—Indebtedness—Aggregate ₱12.35 Billion (approximately U.S.$288.1 million) BDO Loan Facility with Sureste" and "—Indebtedness—Aggregate ₱2.25 Billion (approximately U.S.$52.5 million) BDO Loan Facility with BRHI"), which is being utilized to help fund the construction of Phase 1 of Solaire Manila, which is planned to begin commercial operations during the first quarter of 2013.

The Company plans to fund additional expansions of Solaire Manila in part with revenues generated from Solaire Manila.

Subject to Arbitration Confidentiality Orders

BLOOM_0077439

An organizational chart of the Company's management team as of the date of this Offering Circular is set out below.



★ Owner nominated positions
● GGAM nominated positions

**GGAM**

The Company has entered into a Management Services Agreement with GGAM for the provision of management and other advisory services in relation to the design, construction and operations of Solaire Manila. GGAM's principals, William Weidner, Garry Saunders and Bradley Stone, have extensive experience in developing and operating some of the world's largest gaming resorts. GGAM's U.S. parent entity, Global Gaming Asset Management, LP, is 50% owned by its three principals and 50% owned by Cantor Fitzgerald LP, a leading global financial services firm. The three principals of GGAM focus on both the broad parameters and detailed execution of design, efficient and cost-effective construction, top-tier staffing, budgeting, strategic direction and monitoring and oversight of all aspects of Solaire Manila's operations and results.

GGAM's principals have been involved in the development and opening of over 20 gaming and resort properties in various locations around the world. In their last five years with Las Vegas Sands Inc., the GGAM principals were actively involved in the design and development of, among others, the Sands Macao, the Palazzo in Las Vegas, the Marina Bay Sands in Singapore and The Venetian Macao. In the course of assisting with the development, opening and operation of these casino properties, GGAM's principals believe that more than 30,000 gaming industry professionals have worked under them. As a result, the GGAM team has an extensive relationship network encompassing leading professionals in the industry, and GGAM believes it has established strong working relationships and a strong reputation within the gaming industry.

*Management Services Agreement*

On September 9, 2011, BRHI, Sureste and GGAM entered into an MSA for an initial term commencing on the signing of the MSA up to five years from the date that commercial operations of Solaire Manila commence, expected to be in the first quarter of 2013. GGAM was granted an option to extend the MSA for an additional five years. Under the MSA, GGAM is required to carry out various services in relation to the pre-opening of Solaire Manila, for which GGAM will be entitled to the payment of various fixed fees, as well as incentive fees to be based upon the actual earnings generated by Solaire Manila upon commencement of operations.

Under the MSA and the Equity Option Agreement, GGAM was also granted the option, to purchase up to 921,184,056 Shares, equivalent to 9.91% of the outstanding Shares of the Company (prior to any issuance of Shares pursuant to the Subscription), from Prime Metroline at a purchase price equivalent to ₱1.00 per Share plus U.S.$15 million assuming full exercise of the option or failing which, adjusted pro rata. This option is exercisable until Solaire Manila commences commercial operations.

Subject to Arbitration Confidentiality Orders

BLOOM_0077456

# Material Contracts

## CONTRACT FOR CONSTRUCTION OF SOLAIRE MANILA

On January 18, 2011, DMCI entered into a contract with Sureste for the building architectural and general construction works in relation to Solaire Manila. Pursuant to the provisions of the contract, DMCI is responsible for establishing the overall organization of the Solaire Manila design and construction team, procuring the requisite equipment and materials, and implementing Solaire Manila's overall construction methodology. DMCI is also responsible for subcontracting certain aspects of the construction to an agreed set of third parties. Sureste and DMCI have agreed on a guaranteed maximum price of ₱8.594 billion, payable at set increments.

As required under the contract, DMCI has obtained a performance bond providing assurance of construction progress as well as a guarantee bond providing assurance of quality of materials and workmanship. DMCI is also required to maintain certain insurance policies, including a contractor's all risk policy covering any loss or damage to buildings or machinery, as well as any loss or damage resulting from prolonged work stoppages. DMCI is also required to maintain a third party liability policy, our automobile liability policy, workman compensation and personal accident policies.

The contract may be terminated upon the occurrence of certain events. For example, Sureste may choose to terminate the contract under certain circumstances, including upon DMCI's suspension of work on the project, failure to make regular progress, abandonment of the project, subcontracting any part of the project to any third party without prior agreement, or in instances where there is a material change in the ownership or control of DMCI, of which DMCI did not notify Sureste or to which Sureste did not give consent. DMCI may choose to terminate the contract if Sureste fails to make payment without just or reasonable cause, if Sureste interferes with or obstructs DMCI's ability to perform under the contract, or upon the occurrence of certain events, including force majeure, riots and acts of terrorism.

Under the contract, DMCI is responsible for the cost of materials, equipment and other related expenses, except for a list of owner-supplied materials, which are purchased and paid for by Sureste. The contract includes a schedule specifying the prices of the materials and equipment to be used in undertaking the construction of Solaire Manila. The parties have agreed that the consideration payable by Sureste to DMCI will not be adjusted regardless of any changes in the cost of materials, plant, equipment, shipping, insurances or changes in exchange rates.

## MANAGEMENT SERVICES AGREEMENT WITH GGAM

On September 9, 2011, BRHI, Sureste (together with BRHI, the "Owners") and GGAM entered into an MSA for an initial term commencing on the signing of the MSA up to five years from the date that commercial operations of Solaire Manila commence. The term of the MSA may be extended by the parties under the same terms and conditions for another five-year term at the option of GGAM, with further extensions or renewal only upon mutual agreement of the parties.

Under the MSA, GGAM is required to carry out various services in relation to the pre-opening of Solaire Manila, including but not limited to:

- providing technical assistance on all aspects of planning, design, layout and construction of Solaire Manila, as well as recommendation of and approval of all consultants for Solaire Manila;

- preparation of a pre-opening plan and budget in consultation with the Owners and Solaire Manila's construction contractor;

- establishment, implementation and monitoring of the pre-operating accounting, internal controls, security, marketing and other aspects of pre-opening;

- advising contractors and consultants in the selection, purchase, design, layout and installation of all equipment and facilities for pre-opening;

- reviewing and monitoring construction expenditures and construction progress;

Subject to Arbitration Confidentiality Orders

BLOOM_0077485