to the party rendering the Management Services under the MSA."[74] Bloomberry granted the equity option to GGAM in the MSA, an agreement to which Cantor Fitzgerald was not a party.

41. Claimants and its lawyers understood that this was Bloomberry's position, and they included it in a chart of the open points of negotiation. The entry reads:

> Effectiveness of MSA does not dictate GGAM's rights as a shareholder in Bloomberry. Absolutely not acceptable to us. EKR granted the option to GGAM as an incentive to the management team and not because of the capital investment of Cantor (which is a big discount to the current and future market price). **The price of the Option was determined as part of GGAM's compensation as manager, not as an investor.** Since the Option was granted because of the MSA, GGAM cannot treat the Option as a stand-alone transaction. [75]

42. In response to Bloomberry's position (as understood and commented upon by Paul Hastings), GGAM did not say that it disagreed with the statement that "the price of the Option was determined as part of GGAM's compensation as manager, not as an investor." Rather, GGAM's position was presented neutrally, as follows:

> GGAM is flexible on its position; however, GGAM needs to see the revised Equity Option Agreement and Participation Agreement in order to move the document into a position that both Owner and GGAM can mutually agree upon.[76]

43. The EOA was being negotiated during a critical and busy time for Bloomberry, which was undertaking the backdoor listing and the top-up offering.[77] GGAM figured

---

74 *See* Email from E. Occeña to G. Saunders, B. Stone, and J. Rein, October 24, 2011 (RE-5) ("The option to purchase 10% interest in the Project under the MSA was granted to "GGAM" only."). In the executed version of the EOA, Bloomberry required a guarantee from GGAM that if GGAM assigned the equity option to another investor (such as GGAM Netherlands B.V., a special-purpose vehicle), the investor must provide a guarantee to Bloomberry that guaranteed GGAM's performance of its obligations under the MSA. *See* EOA, § 8.3 (Claimants' Ex. 3) ("In the event [Global Gaming Philippines LLC] designates Investor to exercise the Option, Investor has submitted to [Bloomberry] a guarantee agreement in form and substance acceptable to Grantor under which Investor guarantees the performance by Grantee of its obligations under the MSA[.]") (emphasis added).

75 Email from G. Saunders to E. Occeña, April 5, 2012 (attaching chart prepared by J. Myers (Paul Hastings) (RE-7) (emphasis added).

76 Email from G. Saunders to E. Occeña, April 5, 2012 (attaching chart prepared by J. Myers (Paul Hastings) (RE-7).

77 *See* G. Festin Decl. ¶¶ 7-10. Mr. Razon granted GGAM the option to purchase up to 10% of his shareholdings in Bloomberry. At the time the Parties signed the MSA, Bloomberry's unlisted shares were all wholly owned by Mr. Razon and members of his family through corporate facilities. In order to facilitate the public listing

predominately into the preparations for the top-up offering "road show," as it is axiomatic that managers of an enterprise would be fundamental, active participants in the road show leading up to the backdoor listing and the top-up offering.[78] For example, Messrs. Weidner and Stone both participated in the Las Vegas Sands' road show in their capacity as managers.[79]

44. Fully aware of its leverage, on the eve of the Solaire road show, when the Parties were still negotiating numerous substantive open points in the EOA, GGAM blackmailed Bloomberry by refusing to participate in the upcoming top-up offering road show unless Bloomberry signed the agreement. On April 12, 2012, four days before the road show, Mr. Saunders wrote to Ms. Occeña, "we are unable to participate in meetings with potential investors and represent GGAM ***as your manager*** until we have concluded these agreements."[80] Mr. Razon "concede[d] the major point to get the deal done," but GGAM's handling of the EOA caused Mr. Razon to question GGAM's dedication to the Solaire:

> Your timing on this ultimatum is obviously blackmail. To preserve my reputation in the financial and business community we can concede major points to get the deal done which I have relayed to Estella. But if this is the way you want to deal we

---

of Bloomberry's shares, Mr. Razon acquired a publicly listed company that was renamed Bloomberry Resorts Corporation. *See* G. Festin Decl. ¶¶ 6-9; *see also* April 5, 2012 CLSA Report (RE-43). Thus, although the corporate structure of Respondents changed in the interim period of the execution of the MSA and the EOA, the deal itself remained the same—GGAM still had the option to purchase approximately 10% of ***Mr. Razon's*** shareholdings. *See* G. Festin Decl. ¶¶ 6-9; Hr'g Tr. 390:10-19 (Festin).

78 *See* Craig F. Arcella, Cravath, Swaine & Moore LLP, The Nuts and Bolts of Road Shows, Practical Law Company (2010) (RE-36) ("Road shows are presentations that are made by an issuer's senior management"; "Road shows are designed to provide prospective investors with . . . a more personal opportunity to evaluate the issue, its management team . . ."; "By allowing investors to interact with management in a live setting, . . . investors can personally assess the character and commitment of management.").

79 *See* Rod Smith, "Inside Gaming Column - Sands Execs Revved Up For IPO -The Tour," Gaming Wire, November 29, 2004 (RE-32).

80 Email from G. Saunders to O. Occeña, April 12, 2012 (RE-8) (emphasis added); Email from E. Razon to G. Saunders, B. Stone, and B. Weidner, April 12, 2012 (RE-8). After threatening to withhold their participation "as your manager" from Bloomberry's road show in order to finalize quickly the EOA—on GGAM's terms—GGAM now recasts its role as that of an "investor" or as an "asset manager." *Compare* www.ggam.com ("[W]e believe GGAM is uniquely situated to be the premiere developer and operator of such properties worldwide") *with* Hr'g Tr. at 200:21-24 (Weidner) ("Global Gaming Asset Management is an asset manager that seeks to both manage actively casinos and the gaming space and to position assets to have them have a high multiple."); *see also* Hr'g Tr. at 78:20-24 (Profaizer) ("[Respondents] needed to represent to the world that someone with credibility, with 100 years of experience on a team that had that kind of deep investment and commitment in an equity as an investor in the Project."); Hr'g Tr. at 93:6-10 (Profaizer) ("And the answer is, what Mr. Weidner does is, he obtains investments; right? Just like we've all seen in other contexts. That's what Mr. Weidner and GGAM do. They obtain investments from investors.").

solution.[98] And those very same "lawyers' letters" are quoted wholesale in the Statement of Claim,[99] illustrating that GGAM immediately adopted a litigious position rather than a cooperative position that could have led to an amicable parting of the ways.

## III. GGAM'S OBLIGATIONS UNDER THE MSA INCLUDED, AMONG OTHER THINGS, ASSISTANCE WITH THE SOLAIRE'S DEVELOPMENT AND CONSTRUCTION, AND GGAM WAS COMPENSATED FOR THIS ASSISTANCE.

50. As GGAM admits, "Under the MSA, GGAM undertook to provide specific services relating to the development, construction and operation of the Solaire."[100] The MSA generally provides that GGAM "has the right, authority, obligation, and discretion, and is instructed to take all such pre-opening (and post-opening) actions for and on behalf of the Owners to operate all aspects of the Facilities."[101] The MSA then provides a ***non-exhaustive list*** of what these actions include.[102]

51. Nonetheless, GGAM takes a narrow and restrictive view of its obligations as the management services provider. GGAM asserts that its efforts to assist with the construction of the Solaire, as well as its participation in Bloomberry's capital-raising efforts, were offered in

---

[98] *See, e.g.*, Letter from B. Weidner to E. Razon, August 19, 2013 (Claimants' Ex. 85) ("Of course, not every operational or management issue at Solaire constitutes a breach of the MSA, and not every breach of a contract constitutes a material breach (which is required under the MSA for there to be breach of that Agreement).").

[99] *See, e.g.*, Claimants' S.O.C. ¶¶ 144-150.

[100] *See* Claimants' S.O.C. ¶1; *see also id.* ¶ 39 ("GGAM would provide specific management, operational, and technical Services in the development, construction and operations of Solaire"). Notably, this is in contrast to Claimants' Request for Interim Measures of Protection, where Claimants attempted to present GGAM's construction-related services as services rendered as an "investor," and not as a manager under the terms of the MSA. *See, e.g.*, Claimants' Request ¶ 190 ("***As an equity investor***, GGAM possessed a direct interest in the timely opening and reputation of the Project. Undeniably, GGAM's efforts contributed, and continue to contribute, both quantifiable and unquantifiable value to Solaire, which included s***uccessful restoration of the Project schedule and timely completion of the Facilities' construction***. For example, in mid-2012, when the contractors notified the Owners that the Project would likely miss the planned completion date by six months, ***Bloomberry looked to GGAM, as its active partner***, to leverage substantial new resources ***to restore the construction schedule*** and thereby ensure the First Quarter 2013 opening.") (emphasis added).

[101] *See* MSA, Annex A (Claimants' Ex. 1).

[102] *Id.* In light of GGAM's responsibilities and obligations as the management services provider of the Solaire, GGAM's facile argument that it provided "important oversight and advisory services" with respect to "Phase 1-A of the Facilities" (which, according to GGAM, was "[b]eyond the scope of its Pre-Opening and Post-Opening Services"), but did not "demand independent payment from the Owners for these efforts" should be disregarded. *See* Claimants' S.O.C. ¶ 84.

addition to its obligations under the MSA.[103] GGAM also takes credit for "negotiating agreements on behalf of the facilities" even though the MSA did not expressly require them to negotiate those specific agreements.[104] GGAM appears to misunderstand the nature of their general and specific obligations under the MSA. GGAM's assistance with the construction of the Solaire, its participation in the top-up offering "road show," and its negotiations of agreements for the Solaire are not charitable acts. These acts fall within GGAM's general and specific obligations under the MSA.[105]

### A. GGAM Was Obligated to Provide Services Related to the Construction of the Solaire.

52. Under the MSA, GGAM was obligated to provide technical assistance and management services with respect to the construction of the Solaire.[106] This assistance included:

- Provide technical assistance on all aspects of planning, design, layout, and construction of the hotel, casino, food & beverage facilities, convention services, entertainment programs (where applicable), and other facilities and amenities;[107]
- Advise on design and layout of the casino to include operational and functional criteria, layout of the casino floor, selection and ordering of gaming equipment, in conjunction with key employees hired during pre-opening;[108]
- Advise contractors and consultants in the selection, purchase, design, layout, and installation of all equipment and facilities necessary or desirable for the efficient and economical operation of the Facilities;[109] and

---

103 *See* Claimants' S.O.C. ¶¶ 60, 92.

104 Claimants' S.O.C. ¶¶ 70, 84.

105 *See* MSA, Annex A, Number 5 ("Advise contractors and consultants in the selection, purchase design, layout and installation of all equipment…"), Number 7 ("Recommend the selection and order FF&E [defined as "furniture, furnishings, fixtures and equipment (including Gaming Equipment), interior and exterior signs, as well as other non-real property improvements and personal property used to operate the Facilities"] in accordance with the pre-opening plan and budget."); *see also* Clause 2.5(c) ("[GGAM] will at all times act in the best interests of the shareholders of the Casino Owner and the Hotel Owner, and to maximize such shareholders value in the performance of its obligation under this Agreement and in all dealings carried out by it in its capacity under this Agreement.").

106 MSA, Annex A.

107 *See id.*, Annex A, Pre-Opening Services – Item 1 (Claimants' Ex. 1).

108 *See id.* at Annex A, Pre-Opening Services – Item 2.

109 *See id.* at Annex A, Pre-Opening Services – Item 5.

110. As GGAM acknowledges,[317] the sentence "The Guest Data of GGAM ***shall remain***[318] to be its property," indicates that GGAM's Guest Data was already in existence. In contrast, the proceeding sentence provides that additional Guest Data would be generated in the future from the operation of the Solaire. That Guest Data would become the property of Bloomberry, and was separate from the pre-existing Guest Data of GGAM.

111. In the development and pre-opening phase of the Solaire, GGAM continued to represent that it had direct access to high rollers.[319] For example, during the top-up offering "road show," when asked how they planned to bring in VIP players to the Philippines, Mr. Weidner said that it would only take "7 phone calls."[320] Indeed, the Statement of Claim posits that "GGAM was uniquely positioned to establish a pipeline of foreign VIP patrons by leveraging its experience and contacts from years of doing business in Asia."[321]

112. Notwithstanding these representations, GGAM did not utilize its purported connections or Guest Data to bring in VIP players. During GGAM's tenure at the Solaire, none of GGAM's purported contacts with junket operators brought their business to the Solaire.[322] GGAM was not directly responsible for successfully bringing in individual VIP players[323] or

---

317 *See* Claimants' S.O.C. ¶ 185 ("At most, MSA Clause 6 recognizes that any Guest Data possessed by GGAM would remain GGAM's property, and any Guest Data generated through Solaire's operation would remain the Owners' property.")

318 For example, "remain" is defined as "to stay in the same place or with the same person or group." *See* "Remain," MerriamWebster.com, accessed on December 4, 2014 (RE-66).

319 The pre-top-up offering materials, for example, discussed "GGAM's direct customer relationship, as well as existing relationship with regional junket operators."). *See* April 5, 2012 CLSA Report at 12 (RE-43).

320 *See* E. Razon Decl. ¶ 45.

321 *See* Claimants' S.O.C ¶ 80.

322 *See* D. Almeda Decl. ¶ 23.

323 *See* A. Toh Decl. ¶ 15

putting in place large junket operators.[324] Bloomberry's management team and employees were never privy to a "list" of customer contacts that could be used.[325]

113. The Business Plan relied heavily on Bloomberry employees to recruit VIP players, making no mention of GGAM's purported contacts.[326] Several Bloomberry employees—including Don Almeda and Lorraine Koo—utilized their pre-existing contacts, connections, and customer information to recruit VIP players and some of the top junket operators in Macau, including XTD (XinTianDi), International Club, MF (MingFa), Tak Chun, and EEG (Empire Entertainment Group).[327] More than just a phone call (or 7 phone calls) are required to attract these highly-sought after players. Frequent travel, to places such as Macau, Singapore and Hong Kong, is required to meet with, make presentations to, and recruit VIP players and junket operators.[328] To Bloomberry's knowledge, GGAM's principals did not undertake such efforts on the Solaire's behalf.[329]

114. Bloomberry could only conclude that GGAM had misrepresented it had its own Guest Data. After Bloomberry had threatened to terminate the MSA, GGAM admitted that it did not have any pre-existing "Guest Data" from which they could connect VIP players or junket operators with the Solaire.[330] Despite this admission, GGAM continues to represent to other clients that they have the direct personal connections to bring in the high rollers: when asked

---

324 *Compare* L. Koo Decl. ¶¶ 8-9 *with* B. Stone Supp. Decl. ¶ 27 ("[W]e also assisted in engaging several large reputable junket operators, including the largest junket operator in Macau."). GGAM signed one junket operator, Sun City, but the contact soon thereafter had to be terminated. *See* L. Koo Decl. ¶ 8; *compare* MSA, Annex A, Post Opening Services - Item 4 (Claimants' Ex. 1) ("Make all decisions regarding junkets, granting of complimentaries and extensions of credit and collections . . .").

325 *See* L. Koo Decl. ¶ 9.

326 *See* Solaire Business Plan, January 29, 2013 at 117 (Claimants' Ex. 119) ("All Player Development Team and Operations Team to remain in contact with Players thru phone calls and visitation so as to maintain the positive relationship and players do not feel as if they were forgotten.").

327 *See* D. Almeda Decl. ¶ 22; *see also* L. Koo Decl. ¶¶ 7-8; A. Toh Decl. ¶ 13.

328 *See, e.g.*, B. Lee Op. § 2.3.2 (discussing the importance of awareness campaigns to attract VIP gamblers and recognizing "[t]he key element to success in this field is to establish a good working relationship with these junket operators.").

329 *See supra* note 86.

330 *See* Letter from B. Weidner to E. Razon, August 19, 2013 (Claimants' Ex. 95) ("***[T]here was no GGAM Guest Data at the opening of Solaire***—nor does the MSA require that there be.").

about bringing Chinese customers to the Baha Mar, another property managed by GGAM, Mr. Weidner said that he "***plans to reach out to high-rollers directly***."[331]

115. Moreover, GGAM did not guide or oversee the development of the Solaire's "robust" customer database.[332] Customer databases, such as Bloomberry's current database, typically are created from the personal lists of various managers. For example, the role of a Director of International VIP Marketing is to convince individual VIP players and junket operator managers to come to the Solaire by leveraging existing personal connections with those players, operators, and/or other casino managers.[333] Once the Director is successful in bringing in VIP players and junket operators, the Solaire then collects and tracks the players' and operators' information.[334]

116. GGAM defends its inability to attract VIP players by saying that the plan was to "ramp up" the VIP business.[335] Nonetheless, there must be a foundation from which one can "ramp up." The Business Plan provided that agreements would be signed with all junket operators by January 2013.[336] GGAM had one and a half years prior to Opening Day on March 16, 2013 to reach out to their contacts and establish a foundation for VIP gaming. This did not happen.[337] It appears that GGAM's sole basis for attempting to take credit for the Solaire's VIP and junket players is GGAM's hiring of certain individuals, who then created the databases.[338]

---

331 *See* K. O'Keefe, "Ex-Sands Executives to Help Manage Bahamas Casino," Wall Street Journal, May 22, 2013 (RE-67) (emphasis added). (also stating that "he plans to engage junket operators—the middlemen who extend credit to high-stakes players that account for around 70% of Macau's gambling revenue—to bring Chinese customers to Baha Mar.").

332 *Compare* Claimants' S.O.C. ¶ 82 *with* L. Koo Decl. ¶ 9.

333 *See, e.g.*, B. Lee Op. § 2.3.2 ("One of the most noticeable features about the junket operators is that the business is done based on trust, and any outsider particularly one with a short term business outlook is highly unlikely to earn that trust and have a real relationship with these tightly bound groups.").

334 In contrast, the Business Plan proposed collecting "name cards" from players in order to form a core database. *See* Solaire Business Plan, January 29, 2013 at 118 (Claimants' Ex. 119).

335 *See, e.g.*, Claimants' S.O.C. ¶¶ 86-87.

336 *See* Solaire Business Plan, January 29, 2013 at 119 (Claimants' Ex. 119). The Business Plan neglected to provide detail as to what junkets were being targeted and whether progress had been made. *See id.*

337 D. Almeda Decl. ¶ 23; A. Toh Decl. ¶¶ 12-13.

338 *Compare* Claimants' S.O.C. ¶ 81 ("GGAM commenced these efforts shortly after the MSA was executed in September 2011 by identifying and recruiting certain key management personnel based on their knowledge and existing relationships with premium direct customers and junket operators in the region.") *with* L. Koo Decl. ¶¶ 7-9.

143. Accordingly, Bloomberry now asserts amended counterclaims for (1) monetary damages equivalent to the value of the Shares, (2) rescission of the equity option grant and restitution of the Shares on behalf of its agent, Prime Metroline; (3) annulment of the MSA on the basis of causal fraud and restitution of the Shares on behalf of its agent, Prime Metroline; and (4) equitable relief from GGAM's unjust enrichment.

#### 1. The Management Services Agreement and the Equity Option Agreement Are Two Components of the Same Deal.

144. During the Parties' negotiations, Mr. Razon made clear that he expected "as close to full-time management" as possible,[419] and Mr. Weidner assured him that he, along with Messrs. Stone and Saunders, would provide "hands-on approach to management" of the Solaire.[420] Moreover, Mr. Weidner assured Mr. Razon that he would "personally oversee" the management activities at the Solaire by spending "significant time in Manila with the team."[421] Mr. Weidner expressed his interest in managing the Solaire Resort & Casino and assisting Bloomberry to create a new "Solaire" brand in the Philippines and elsewhere.[422]

145. Based on these representations, the Parties' relationship was memorialized on September 9, 2011 in the MSA. The MSA was an atypical management agreement, pursuant to which GGAM was to be compensated handsomely by substantial fees generated from foreign VIP performance and a nearly 10% equity stake in the Solaire at a substantial discount.[423] The Parties intended for the equity option to be a component of one overall deal.[424] Because Bloomberry needed to have a management team in place for the Solaire, the Parties agreed to execute the MSA and continue negotiating the mechanics of exercising the option in a separate

---

419 *See* Email from E. Razon to B. Weidner, March 17, 2011 (RE-1) (requesting "as much of your time as we can get").

420 *See* Email from B.. Weidner to E. Razon, March 21, 2011 (Claimants' Ex. 104).

421 *See id.*; *see also* E. Razon Decl. at ¶ 8.

422 *See, e.g.*, Email from W. Weidner to E. Razon, March 16, 2011 (JCB-1) ("I just wanted to express my interest and excitement to be involved in realizing your vision.").

423 *See, e.g.*, MSA, Clauses 4.1-4.5 and Clause 18.3 ("GGAM is hereby granted the right to purchase up to ten percent (10%) ownership in the Facilities and the gaming license by purchasing 10% of the shareholdings of Owners.") (Claimants' Ex. 1).

424 *See supra* ¶¶ 27-35.

### 2. Changes in Bloomberry's Corporate Structure Did Not Alter the Overall Deal.

148. At the time Bloomberry and Sureste, the owners of the Solaire, granted GGAM the option to purchase up to 10% of the ownership interests in the Solaire, these ownership interests were unlisted and wholly owned by Mr. Razon and members of his family.[439] Prior to signing the MSA, GGAM was notified that Bloomberry's and Sureste's equity funds, which were identified as "deposits for future subscription," were being converted into shares of stock.[440] Bloomberry and Sureste then embarked on a process called a "backdoor listing" in order to facilitate a public listing of the equity in the Solaire while providing immediate access to the Philippine equity markets.[441] To initiate the backdoor listing, Mr. Razon transferred his shareholdings in Bloomberry and Sureste to a holding company, Prime Metroline, on September 30, 2011.[442]

149. On November 22, 2011, Prime Metroline, which now owned the equity interests of Bloomberry and Sureste, signed a definitive agreement with the controlling stockholders of Active Alliance Incorporated ("Active Alliance"), a publicly-listed company, pursuant to which Prime Metroline agreed to acquire approximately 75% of the total outstanding shares of Active Alliance from the controlling stockholders.[443] Prime Metroline formally acquired control of

---

[439] *See* Respondents' Closing Presentation, Interim Measures Hearing, October 22, 2014 at Slide 60 (organizational chart of BRHI and SPI at the time the MSA was signed); *see also* Hr'g Tr. at 390:7-19 (Festin) (explaining corporate structure of BRHI and SPI at the time the MSA was signed); *see also* G. Festin Decl. at ¶ 6 ("When the Management Services Agreement (MSA) was executed on September 9, 2011, Solaire was owned by Sureste and Bloomberry. Mr. Razon owned Sureste, which, in turn, owned Bloomberry, and it was effectively Mr. Razon, through Sureste and Bloom berry, who granted GGAM the equity option.").

[440] *See, e.g.*, Email from B. Tan to B. Stone, G. Saunders, B. Weidner, *et al.*, August 3, 2011, attaching Disclosure Letter (RE-70) ("The capitalization of Bloomberry and Sureste are still in the process of being formalized to convert the equity funds currently identified in their books as "Deposit for Future Subscription" into shares of stock."). Initially, Bloomberry and Sureste's capitalization was insufficient to support the expenses being incurred during the construction of the Solaire. An application for an increase in the entities' authorized capital stock was pending, but in the interim, Mr. Razon made advances to Bloomberry and Sureste, and the advances were recorded in their books as "deposits for future subscription."

[441] *See* Festin Decl. at ¶ 7.

[442] *See* Festin Decl. at ¶ 6. GGAM had been notified prior to entering into the MSA that Mr. Razon was contemplating such a transfer. *See supra* note 440 (RE-70).

[443] *See, e.g.*, Festin Decl. at ¶ 8 ("After our due diligence Mr. Razon approved the acquisition of Active Alliance, Incorporated. Mr. Razon's Prime Metroline acquired approximately 75% of the total outstanding shares of Active Alliance . . .").

Active Alliance on January 26, 2012.[444] Shortly thereafter, on February 6, 2012, Active Alliance's articles of incorporation were amended to, *inter alia*, change its name to Bloomberry Resorts Corporation ("BRC") and its primary purpose to that of a holding company for a hotel, gaming, and entertainment business—namely, the Solaire.[445] On the same day, the newly renamed BRC acquired all the Sureste shares from Prime Metroline,[446] and thus, Sureste and Bloomberry became wholly-owned direct and indirect subsidiaries of BRC, for which Prime Metroline remained the controlling stockholder.[447] As a result of this backdoor listing, the ownership interests of Bloomberry and Sureste were now publicly listed.[448] A provision in the MSA, however, clarified that a "back-door" listing of Bloomberry, Sureste, or Prime Metroline would not constitute a "Change of Control" of Bloomberry and Sureste.[449]

150. The Parties were still negotiating the terms of the EOA during the back-door listing process, and GGAM was well aware that the corporate structure of BRHI and SPI was evolving.[450] As Respondents' expert Professor Davidoff Solomon explained, a "single, complex business transaction" might be documented in multiple agreements for several reasons:

> The parties may desire that a specific part of the transaction be capable of later assignment to another party or an affiliate of one of the initial parties . . . Additionally, it may be contemplated that

---

444 In accordance with the rules of the SEC and PSE, before formally acquiring Active Alliance, Prime Metroline first had to conduct a mandatory tender offer, which was completed in January 2012. *See* Section 19 of Republic Act No. 8799 (the "Securities Regulation Code"); *see also* Amended Implementing Rules and Regulations of the Securities Regulation Code, ¶ 2.

445 *See, e.g.*, Festin Decl. at ¶ 8 ("Mr. Razon's Prime Metroline acquired approximately 75% of the total outstanding shares of Active Alliance and then changed its name to Bloomberry Resorts Corporation and increased its authorized capital stock to accommodate the infusion of the new investment. Its primary purpose was amended to that of a holding company for the hotel gaming and entertainment businesses."). These changes were approved by the SEC on February 27, 2012. *See, e.g.*, Amended Articles of Incorporation of BRC (RE-71).

446 *See* Festin Decl. at ¶ 9.

447 *See id.*

448 The new BRC shares were listed on the PSE on March 9, 2012. *See* Festin Decl. at ¶ 9. The transfer and ownership of publicly traded shares had many benefits to privately held shares. *See, e.g.*, Email from B. Tan to Paul Hastings, *et. al*, February 15, 2012 (CE-107) (explaining, *inter alia*, the ease and speed in which the title for publicly listed shares can be transferred).

449 *See* MSA, Clause 16.1(c) ("An initial public offering (IPO) or a back-door listing of the Owners or of the holding companies which owns or controls the Owners in the Philippine Stock Exchange or in other stock exchanges shall not constitute a trigger of a Chang of Control of Owners where Enrique K. Razon Jr. continues to own or control, directly or indirectly, the Owners following such IPO or back-door listing.").

450 *See, e.g.*, *supra* notes 440, 442.

> additional persons would become a party to a specific part of the transaction, but not another part of the transaction, necessitating a different agreement.[451]

151. On February 14, 2012, GGAM's lawyers at Paul Hastings sent Bloomberry and Sureste a list of open issues regarding the EOA, including a section focused on the back-door listing and the "structure of documents."[452] GGAM's position was described as follows:

> GGAM and Sureste to discuss ensuring that the agreements provide for what will happen if the back-door listing is not successful or completed as intended by Mr. Razon. The Equity Option and Purchase Agreement must still provide for GGAM's ***right to acquire 10% of the project*** and the Shareholder Agreement must address certain rights ***in the event that the ultimate company is not a public company***.[453]

152. Similarly, on March 20, 2012, GGAM's lawyers at Paul Hastings circulated another chart of issues for GGAM, Bloomberry, and Sureste to discuss regarding the EOA.[454] In this chart, Sureste stated that GGAM could rely on the representations and warranties in the MSA, rather than requiring new representations and warranties in the EOA.[455]

153. The Parties understood that, notwithstanding the new corporate structure, the equity option had been granted by Bloomberry and Sureste to GGAM as the management services provider under the MSA. For example, Bloomberry continued to emphasize in contemporaneous documents that the equity option had been granted as an incentive to the management team, the price of the option was determined "as part of GGAM's compensation as manager, not as investor," and that "[s]ince the Option was granted because of the MSA, GGAM

---

451 *See* Davidoff Solomon Op. at ¶ 31.

452 *See* Email from J. Myers (Paul Hastings) to B. Tan, *et al.*, February 14, 2012 (RE-72) (attaching charts of open issues).

453 *See id.* (emphasis added).

454 *See* Email from J. Myers (Paul Hastings) to E. Occeña and B. Tan , March 20, 2012 (RE-73) (attaching chart of open issues).

455 *See id.*

cannot treat the Option as a stand-alone transaction."[456] Neither GGAM nor its lawyers disagreed with those statements.[457]

### 3. Prime Metroline, Acting as Bloomberry's Agent, Entered into the Equity Option Agreement on April 16, 2012.

154. Bloomberry and Sureste committed under Clause 18.3 of the MSA to grant GGAM the right to purchase "10% of the shareholdings of the Owners"—that is, 10% ownership in the Solaire project and the PAGCOR license. As noted above, the successful backdoor listing resulted in Bloomberry and Sureste being owned by a listed company, BRC. Thus, Bloomberry and Sureste offered to GGAM listed shares in BRC, in place of the illiquid, unlisted shares in Bloomberry and Sureste, and GGAM gladly accepted the offer.

155. Bloomberry and Sureste caused Prime Metroline to be the grantor under the EOA because, Prime Metroline, as the majority shareholder of BRC, was the appropriate entity in Bloomberry's corporate structure to enter into the EOA and sell the Shares to GGAM (if and when GGAM chose to exercise the equity option).[458] The Parties' contemporaneous negotiations confirm that the identity of the "Grantor" that would be a party to the EOA was a mere formality and did not alter the Parties' relationship or their overall deal.[459] The EOA and the Participation Agreement repeatedly reference and build from the MSA,[460] making it clear that the EOA was

---

[456] Email from G. Saunders to E. Occeña, April 5, 2012 (attaching chart prepared by J. Myers (Paul Hastings)) (RE-7); *see supra* S.O.D. ¶¶ 40-42.

[457] *See id.*

[458] *See* EOA, §§ 5.5-5.10 (explaining the corporate structure and resulting ownership of the Facilities and the PAGCOR License: Prime Metroline is the majority Shareholder of Bloomberry Resorts Corporation, which indirectly owns the Facilities and the PAGCOR License through its ownership and control of Sureste, which owns and controls Bloomberry).

[459] *See, e.g.*, Email from J. Myers (Paul Hastings) to E. Occeña and B. Tan , March 20, 2012 (RE-73) (attaching chart of open issues) (describing Sureste as the "shareholder of the option shares").

[460] *See, e.g.*, EOA, *id. at* §1.1 (certain defined terms, such as "Facilities," "Phase I Facilities," and "Start Date," all refer to the MSA); *id.* at §2.1 ("As contemplated by Section 18.3 of the MSA, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Grantor hereby grants to Grantee an option to purchase some or all of the Option Shares from Grantor."); *id.* at § 2.6 ("as contemplated by Section 18.8 of the MSA" preface, refers to defined terms within the MSA, and grants GGAM the right to enter into Competing Project Opportunities only "during the validity of the MSA."); *id.* at § 5.9 (" . . . Bloomberry's other assets and properties and to conduct the businesses in which it is now engaged including, without limitation, the ownership of the Casino (as defined in the MSA)."); *id.* at § 8.3 ("In the event [Global Gaming Philippines LLC] designates Investor to exercise the Option, Investor has submitted to [Bloomberry] a guarantee agreement in form and substance acceptable to Grantor under which Investor guarantees the performance by Grantee of its obligations under the MSA. . . .").

entered into purely to effectuate rights granted to GGAM by Bloomberry and Sureste in the MSA:

> Whereas, Sureste and Bloomberry, as Owners, have agreed under the Management Services Agreement, dated September 9, 2011 and entered into by and among the S***ureste, Bloomberry and [Global Gaming Philippines LLC] to grant or cause to be granted to [Global Gaming Philippines LLC] an option to purchase the Option Shares***, which option shall be exercisable solely in accordance with and pursuant to the terms and conditions set forth herein.[461]

156. As the Grantor, Prime Metroline acted on behalf of, and as agent for, Bloomberry and Sureste to comply with their enforceable obligation under the MSA to grant GGAM the right to purchase up to 10% ownership rights in the Solaire. Under Philippine law, agency may be implied from the words and conduct of the parties, as well as the circumstances of a particular case.[462] Although there was not a separate written agreement between Bloomberry, Sureste and Prime Metroline,[463] the Parties' actions make clear that Prime Metroline was acting as the agent of Bloomberry and Sureste. The EOA plainly states that it was entered into because of Clause 18.3 of the MSA (even though Prime Metroline was not a party to the MSA).[464] The EOA then goes on to imply that the agreement was being entered to satisfy the obligations of Bloomberry and Sureste, which had granted the equity option in the MSA and were causing Prime Metroline

---

[461] *See* EOA, Recitals (Claimants' Ex. 3).

[462] Philippine Civil Code, art. 1869 ("Agency may be express, or implied from the acts of the principal, from his silence or lack of action, or his failure to repudiate the agency, knowing that another person is acting on his behalf without authority."); *see also Equitable PCI-Bank v. Ku* (G.R. No. 142950), March 26, 2001 (RL-51) (explaining that agency may be implied from the acts of the principal, and "acceptance by the agent may be implied from his acts which carry out the agency"); *see also Johnlo Trading Co. v. Flores* (G.R. No. L-3987) May 18, 1951 (RL-45) (communications between agent and plaintiff during the parties' negotiations led plaintiff to believe that the agent acted as the representative of the defendant company.)

[463] The quasi-principal and agent relationship between Bloomberry, Sureste, and Prime Metroline is most accurately described as an innominate contract closely akin to an agency relationship. *See, e.g.*, Philippine Civil Code, art. 1307 ("Innominate contracts shall be regulated by the stipulations of the parties, by the provisions of Titles I and II of this Book, by the rules governing the most analogous nominate contracts, and by the customs of the place."). The fact that it is not a strict agency relationship does not detract from its validity under Philippine law. *See, e.g.*, Philippine Civil Code, art. 1306 ("The contracting parties may establish such stipulations, clauses, terms and conditions as they may deem convenient, provided they are not contrary to law, morals, good customs, public order, or public policy.").

[464] *See, e.g.*, EOA, §§ 2.1 ("As contemplated by Section 18.3 of the MSA, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Grantor hereby grants to Grantee an option to purchase some or all of the Option Shares from Grantor . . ."), 2.6 ("[A]s contemplated by Section 18.8 of the MSA . . .").

to act as their agent in the equity transaction.[465] GGAM was well aware of the relationship between Bloomberry, Sureste, and Prime Metroline. For example, even when GGAM chose to exercise the equity option, it could not effectively close the transaction until the boards of directors for Bloomberry and Sureste had approved the sale.[466]

157. The common ownership and interrelatedness of corporations may "give rise to a valid inference as to the broad scope of agency." [467] In the corporate context, it is not unusual to see situations where an affiliate will facilitate performance of another affiliate's obligation, particularly when the affiliates are owned and controlled by the same corporate parent. Courts recognize the possibility that a parent corporation may act as the agent of its subsidiary.[468] For example, when a parent company acts as an agent for its subsidiary for a particular purpose, the parent has necessarily acquiesced to the subsidiary's control, albeit only for the particular purpose.[469]

158. The MSA, the EOA, and the Participation Agreement should be regarded as components of one overall deal.[470] Here, Bloomberry, Sureste, BRC, Prime Metroline and

---

[465] *See* EOA, Recitals (Claimants' Ex. 3) ("Whereas, Sureste and Bloomberry, as Owners, have agreed under the Management Services Agreement, dated September 9, 2011 and entered into by and among the Sureste, Bloomberry and [Global Gaming Philippines LLC] to grant or ***cause to be granted to [Global Gaming Philippines LLC] an option to purchase the Option Shares***, which option shall be exercisable solely in accordance with and pursuant to the terms and conditions set forth herein") (emphasis added).

[466] EOA, § 4.2(c) ("At the Closing, Grantor shall deliver (iii) a certificate executed by the corporate secretary of Sureste confirming the adoption of a resolution by the board of directors of Sureste; and (iv) a certificate executed by the corporate secretary of Bloomberry confirming the adoption of a resolution by the board of directors of Bloomberry, in each case authorizing the Transactions and the due execution, delivery and performance of the Closing documents contemplated hereby by the applicable signatories.").

[467] *See, e.g.*, *Palmieri v. Estefan*, 793 F. Supp. 1182, 1193 (S.D.N.Y. 1992) (discussing agency principles in the context of jurisdiction) (RL-48).

[468] *See, e.g.*, *United States v. Watchmakers of Switz. Inform. Ctr, Inc.*, 133 F. Supp. 40, reh'g denied, 134 F. Supp. 710 (S.D.N.Y. 1955) (agency in the context of jurisdiction) (RL-46), *see also Industria Siciliana Asfalti, Bitumi, S.p.A. v. Exxon Research & Engineering Co.*, *et al.*, 1977 U.S. Dist. LEXIS 17851 (S.D.N.Y. 1977) ("Though hardly commonplace, it would appear that a parent corporation has the capacity to act as an agent for its subsidiary, and likewise, an agency relationship can develop between affiliated companies.") (RL-47).

[469] *See, e.g.*, P. Chestek, "Control of Trademarks by the Intellectual Property Holding Company, " 41 J.L. & TECH. 1 (2001), *available at* http://ipmall.info/hosted_resources/IDEA/1.Chestek01.pdf ("In limited situations, courts recognized that a subsidiary can control the behavior of its parent for a specific purpose. One occasion is based on the subsidiary's leverage over a parent, while a second is where the parent is the acknowledged agent of the subsidiary."); *see also id.* ("a parent voluntarily acquiesces to restrictions set by the subsidiary, to the benefit of the corporate entity as a whole.").

[470] *See, e.g.*, *Countryside Orthopaedics, P.C. v. Peyton*, 261 Va. 142 (2001) (finding that four agreements, executed between different parties, were "part of a single transaction to accomplish an agreed purpose"—that is, to

GGAM all were aware of the three contracts (the MSA, the EOA and the Participation Agreement) and executed them as part of a single transaction to accomplish an agreed purpose—that is, to effect GGAM's agreement to provide management services for the Solaire, in which GGAM would be permitted to purchase ownership interests. Bloomberry and Sureste would have been in breach of their obligations under Clause 18.3 of the MSA if their agent, Prime Metroline, failed to comply with its obligations under the EOA. Similarly, GGAM cannot deny that it deemed Bloomberry's and Sureste's obligation under Clause 18.3 of the MSA as having been fulfilled by the execution of the EOA. GGAM was not prejudiced in any way by the fact that Prime Metroline, and not Bloomberry or Sureste, was the entity in the Bloomberry corporate family that signed the EOA: GGAM was entitled to purchase the Shares and did, in fact, purchase the Shares. The Parties' actions are indicative of an agency relationship between Prime Metroline, as agent, and Bloomberry and Sureste, as principals—a relationship which has been recognized by all parties to the controversy, including GGAM.

159. GGAM should not now be permitted to obscure the substance and economics of the Parties' deal through formalism. The EOA, and subsequent sale of the Shares to GGAM, was, "as a matter of obvious reality" directed and controlled by Bloomberry and Sureste.[471] For example, a prerequisite to the option closing was delivery of certificates executed by both Sureste and Bloomberry confirming that their respective boards of directors had authorized GGAM's execution of the option.[472] Thus, a stark, binary approach to the MSA and the EOA has no basis in the contracts and their negotiation history. The Shares ultimately sold to GGAM by Prime Metroline should be understood for what they represent—substantial ownership

---

effect one party's (Dr. Peyton's) purchase of stock in another party (Countryside) and to structure the employment relationship between the three parties.) (RL-50).

[471] *See, e.g., Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342 (Del. Ch. 2004) (deciding to treat the assets of an indirect, wholly-owned subsidiary as the assets of the parent company) (RL-53). In *Hollinger*, for example, the parent company entered into an agreement to sell the assets of its indirect, wholly-owned subsidiary. The court decided to treat the subsidiary's assets as the assets of the parent company, because "as a matter of obvious reality," the sale process was directed and controlled by the parent company. In reaching this conclusion, the court noted that the subsidiary did not engage independent financial or legal advisors, and all of the directors of the subsidiary were officers of the parent company. In addition, the terms of the relevant contract evidenced the fact that the parent company directed the sale process. The parent company's legal advisors negotiated the terms of the contract, pursuant to which the parent company agreed to cause the subsidiary to perform its obligations under the contract. Based on these facts, the court reasoned that, although the law recognizes the separate existence of corporate entities, it does not necessarily mean that the law should recognize their separate existence for all purposes.

[472] *See supra* note 466.

180. Here, GGAM's misrepresentations, such as its misrepresentation that it would provide "hands-on" management and that its principals had the contact information for foreign VIP "high rollers" and junket operators, induced Bloomberry to enter into the contract. As noted above, Bloomberry later learned that GGAM had fundamentally misrepresented its capabilities as a management company, concealed its true purpose as an investment vehicle, and misled Bloomberry in order to gain a monetary advantage.[528] GGAM's misrepresentations, indicative of causal fraud, make the MSA, including the grant of the equity option, annullable and/or voidable. Under Article 1398 of the Philippine Civil Code

> An obligation having been annulled, the contracting parties shall restore to each other the things which have been the subject matter of the contract, with their fruits, and the price with its interest, except in cases provided by law.[529]

181. The effect of annulment of the contract is to wipe it out of existence, and to restore the parties, in so far as legally and equitably possible, to their original situation before the contract was entered into.[530] Consequently, the Shares must be returned or the value of the Shares should be paid over to Bloomberry and Sureste. As discussed above,[531] there is nothing under Philippine law that prevents the Shares from being returned directly to Bloomberry and Sureste.

### 4. Unjust Enrichment and Restitution of the Value of the Shares

182. Pursuant to Philippine law and principles of equity therein, GGAM is not entitled to retain the value of the Shares. Unjust enrichment exists "when a person unjustly retains a benefit to the loss of another, or when a person retains money or property of another against the fundamental principles of justice, equity and good conscience."[532] The principle of unjust

---

[528] Had Bloomberry known that GGAM would be unable to deliver on its promises, Bloomberry would not have engaged GGAM as the management services provider of the Solaire. *See* January 17, 2014 Philippine Court Petition at 13 (RE-10).

[529] Philippine Civil Code, art. 1398 (RL-1); *see also* J. Vitug. Op. ¶ 59.

[530] *See id.*

[531] *See supra* ¶ 177.

[532] Philippine Civil Code, art. 22 (RL-1); *see also* J. Vitug Op. ¶¶ 63-64; *see also Republic v. Court of Appeals*, G.R. No. 160379, 14 August 2009, 596 SCRA 57 (RL-22) (citing *Benguet Corporation v. Department of Environment and Natural Resources-Mines Adjudication Board*, G.R. No. 163101, February 13, 2008, 545 SCRA