VI.  GGAM'S "DEFENSE" OF ITS PERFORMANCE AND JUSTIFICATION OF ITS SHORTCOMINGS ARE LITIGATION-DRIVEN ARGUMENTS. ........................ 67

    A.  GGAM Attempts to Wield the Phrase "through the Management Team" as Both a Sword and a Shield. .................................................................................. 67

        1.  The "Through the Management Team" Concept in No Way Excused GGAM From Its Management Obligations. ............................................. 70

        2.  GGAM Tries to Miscast Bloomberry's Attempts To Work Together "Through the Management Team" As "Interference." .............................. 71

        3.  GGAM's Adversarial Approach to the Parties' Relationship Doomed Any Attempts at Reaching an Amicable Resolution. ................................ 74

VII. DOCUMENTS PRODUCED IN THIS ARBITRATION CONFIRM THAT GGAM WAS NOT A MANAGEMENT COMPANY AT ALL—AND NEVER HAD ANY INTENTION OF BECOMING ONE; INSTEAD, GGAM IS AN INVESTMENT VEHICLE FOR CANTOR. ................................................................................................. 75

    A.  Documents Produced in this Arbitration Confirm that Bloomberry Properly Terminated the MSA Due to GGAM's Material and Substantial Breaches of the Parties' Agreement ...................................................................................... 79

VIII. GGAM HAS ASSERTED AN EXTRAORDINARY CLAIM FOR DAMAGES, LARGELY JUSTIFIED BY TWO DISTINCT "CONTRIBUTIONS." .......................... 84

    A.  GGAM's Contributions to the Construction of the Solaire, Which Must Be Viewed in the Context of the Project as a Whole, Were Required Under the MSA, and GGAM Was Compensated Handsomely. .................................................... 84

    B.  GGAM's Participation on the Road Show, Which Was Motivated by GGAM's Self-Interest, Was Required under the MSA and Compensated by Bloomberry. .................................................................................................................. 89

IX.  COUNTERCLAIMS ................................................................................................. 91

    A.  The Parties' Contemporaneous Communications Make Clear that the Equity Option was Intended to be Compensation for Management Services Pursuant to the MSA. .................................................................................................. 91

    B.  The Parties Always Understood that the Grant of the Equity Option May Be Performed by a Corporate Entity other than Bloomberry ...................................... 96

        C.      Bloomberry Is Entitled to Equitable and Contractual Remedies as a Result of GGAM's Substantial Breaches of the MSA and Its Misrepresentations of Its Abilities as a Management Company. [[HOLD]] ............................................... 105

X.     REQUEST FOR RELIEF ....................................................................................... 109

8.      Here, the time and attention GGAM dedicated to Solaire was not enough. It was not enough to fulfill Mr. Weidner's promises of hands-on management and personal attention. It was not enough to fulfill GGAM's representations under the MSA that it had the management and technical expertise to provide the services required under the MSA. And it was not enough to make Solaire a success under GGAM's watch.

9.      In this Arbitration, Bloomberry has started to see why GGAM failed to be the management company it represented itself to be. GGAM and Cantor Fitzgerald ("Cantor"), which has been described for the first time in this Arbitration as GGAM's "parent," viewed Solaire from the outset as an investment opportunity. Once GGAM was able to extract the equity option, which was—and always had been intended to be—compensation for management services, GGAM's substandard performance came to a virtual halt. Specifically, Mr. Weidner and GGAM moved on to find the next investment opportunity. Unbeknownst to Bloomberry, GGAM then effectively assigned its rights and obligations under the MSA to Cantor, including the equity option. The fundamental agreement between the Parties was breached, and, in reality, their interests were never aligned.

II.     **In the Parties' Initial, Senior-Level Negotiations, GGAM Was Presented as a Start-Up Management Company Eager to Enter a Long-Term Partnership with Bloomberry.**

A.      **Mr. Razon Thought He Was Entering Into an Agreement with Mr. Weidner, Who Was Seeking His First Management Opportunity Outside of the Las Vegas Sands Enterprise.**

10.     Solaire is a cutting-edge and world-class integrated casino resort, the first of its kind in the Philippines. The unique opportunity to build, develop, and operate Solaire hinged upon the personal commitment and substantial financial contribution of Mr. Razon, one of the leading industrialists in the Philippines.[1] Mr. Razon had a vision of making Solaire a unique and

---

[1]     *See* S.O.D. at ¶ 4. More information about the PAGCOR license can be found in the Offering Circular. *See* Offering Circular at 6, 87-88 (CE-8). Bloomberry owns the casino component of the integrated resort, and Sureste owns the hotel component. *See also* April 5, 2012 CLSA Report at 3 (RE-43).

GGAM-SDNY-0337672

"main driver" of that management.[8] Contrary to Mr. Weidner's positions in this Arbitration, Mr. Weidner assured Mr. Razon that he would provide a "hands-on approach to management," a feature that he said distinguished GGAM from other management companies.[9] Moreover, Mr. Weidner assured Mr. Razon that he would "personally oversee" the management activities, spending "significant time in Manila with the team."[10]

13.     Although GGAM was comprised at that moment only of Mr. Weidner, and his two associates Brad Stone and Garry Saunders, Mr. Weidner said he was confident in his ability to build the GGAM team. In part, Mr. Weidner would leverage his industry contacts and former colleagues at the Las Vegas Sands to develop GGAM into a company that was capable of managing not only Solaire on a day-to-day basis, but also multiple properties at the same time.[11] Mr. Weidner explained that Cantor Fitzgerald ("Cantor") provided "backing" and a "significant capital commitment" to GGAM's activities.[12] In a presentation about GGAM provided to Mr. Razon before this meeting, no reference at all was made to Cantor, or to any of Cantor's employees, officers, or directors, having any management role in GGAM.

14.     Mr. Razon was intrigued by Mr. Weidner's history with the Las Vegas Sands, one of the leading global developers of destination casino and resort properties, which had been emphasized in a presentation given to Mr. Razon prior to this meeting.[13] The presentation equated GGAM with the Las Vegas Sands and explained that GGAM was a company with "unparalleled expertise in integrated resort development," and a "track record of generating

---

[8]     *See* Email from E. Razon to B. Weidner, March 17, 2011 (RE-1) ("I am envisioning an arrangement that is as close to full time management as possible, I realize that this is not possible where you are concerned, however, we will need you as the main driver and as much of your time as we can get.").

[9]     *See* Email from B. Weidner to E. Razon, March 21, 2011 (CE-33).

[10]    *See* E. Razon Supp. Decl. ¶ 6; *see* Email from B. Weidner to E. Razon, March 21, 2011 (CE-33); *see also* E. Razon Decl. 8.

[11]    *See* E. Razon Supp. Decl. ¶ 6; *see also* "The Team and the History," GGAM Website from June 28, 2012 (RE-195) ("This team of elite executives has formed partnerships with financial powerhouses, leading edge gaming innovators and exclusive luxury developers further solidifying their reputations as leaders in integrated resort development. They have assembled a dream team of financiers, architects, designers, high-tech gaming facilitators and experienced operators who turn visionary projects into a reality.").

[12]    *See* Email from F. Gaspar to E. Razon, January 21, 2011, attaching presentation at 7-8 (RE-39).

[13]    *See* Email from F. Gaspar to E. Razon, January 21, 2011, attaching presentation at 4, 13-15 (RE-39); *compare with* "All Properties," Sands.com, accessed on November 24, 2014 (RE-64).

agreement outlined the "material understanding" between Bloomberry and GGAM with respect to Solaire, which was "to be managed by GGAM":[50]

> Owner desires to engage Manager to plan, develop, construct, manage, and operate the Managed Facilities, and Manager desires to plan, develop, construct, manage, and operate the Managed Facilities.[51]

30.     The draft agreement verified that the Parties would be entering into an agreement similar to customary "hotel and casino management agreements, entertainment venue management agreements, and management agreements for those other amenities and facilities contemplated therein," as these ventures were similar to Solaire, which was defined as the "Managed Facilities."[52]

### A.     To Bloomberry's Surprise, After the Parties Reached an Agreement on the Business Terms of the Deal, Cantor and Its Army of Lawyers Became Heavily Involved in the Negotiations.

31.     Over the course of the next month, the Parties continued their negotiations and reached an agreement on the business terms of the deal by the end of May 2011, around the time of an in-person meeting among principals to finalize the agreement.[53] Shortly after this meeting, however, lawyers from Cantor and Paul Hastings (GGAM's arbitration counsel) became involved in the negotiations.[54] The version of the MSA sent to Bloomberry on June 9, 2011 by

---

[50]     Email from A. Cabot to B. Tan, E. Occeña, April 6, 2011, attaching a third version of "Preliminary Agreement—Bloomberry Solera Project 4-6-11" (RE-2).

[51]     Email from A. Cabot to B. Tan, E. Occeña, April 6, 2011, attaching a third version of "Preliminary Agreement—Bloomberry Solera Project 4-6-11" at Recitals (RE-2).

[52]     Email from A. Cabot to B. Tan, E. Occeña, April 6, 2011, attaching a third version of "Preliminary Agreement—Bloomberry Solera Project 4-6-11" at ¶ 2.3 (RE-2).

[53]     *See* Email from B. Tan to A. Cabot, May 25, 2011 (RE-80) ("There is a GGAM team headed by Garry Saunders here in Manila meeting with the Bloomberry/Sureste team concerning this project.").

[54]     According to Paul Hastings, it began representing the "GGAM family of companies" in connection with the Solaire project on or around May 18, 2011. *See* Letter from J. Profaizer, July 6, 2015; Letter from J. Profaizer, July 22, 2015 ("*[E]ngagement letters exist* between certain of the law firms identified on Claimants' privilege log and predecessor or related corporate entities . . . .") (emphasis added). ; *see* also Email from T. Cabot to B. Tan, May 26, 2011 (RE-183) ("I just spoke with ***Jon [Rein]*** and he had a few items that needed adjustment based on the business meetings and discussions with ***their outside counsel***."); Email from J. Rein (Cantor) to R. Kirkbride (Paul Hastings), May-25, 2011 (RE-184) (after Benny Tan send a draft MSA to Tony Cabot, the only attorney with whom Tan had communicated regarding GGAM and the MSA, Rein forwarded the draft to an attorney at Paul Hastings). aul Hastings began communicating with Bloomberry about the MSA at the same time that GGAM requested, and

Kevin Russell from Cantor was, in Bloomberry's mind, a distortion of the Parties' agreement, and Bloomberry raised its concern immediately in a June 10, 2011 email from Ms. Occeña to Mr. Saunders:

> I was shocked when I saw your draft because I relied on your assurances that you will just tweak certain provisions for sake of clarify. Instead, we saw a new draft as if our negotiations and face-to-face meetings in Manila never took place. It is very sad and disappointing.[55]

32. With the introduction of an army of new lawyers, existing terms of the MSA were altered or new terms were introduced.[56] For example, in the June 9 draft, Cantor was given "personality" by being identified as a party entitled to any communications that would be sent to GGAM, notwithstanding the fact that Bloomberry was only entering into a contract with GGAM.[57] When Bloomberry questioned Cantor's role in the negotiations, Bloomberry was informed that some Cantor employees provided "admin" services to GGAM.[58] That was to be expected of a new start-up company that needed administrative support, and was consistent with Mr. Weidner's explanation to Mr. Razon in their first meeting that Cantor provided "backing."[59]

33. For this reason, Bloomberry was unconcerned when GGAM negotiated strongly to exclude Cantor and its affiliates from the coverage of both the Conflict of Interest[60] and Non-

---

presumably received, approval from Cantor to provide with due diligence and negotiations on the MSA. *See* Cantor Presentation for Project Berry, June 2011 at Slide 4 (RE-129) ("Global Gaming . . . *requests approval* to conclude diligence, negotiations and documentation concerning the Management Services Agreement and the equity Option and continue exploring a Direct Equity Investment ."). 

[55] *See* Email from E. Occeña to G. Saunders, *et al.*, June 10, 2011 (RE-22); *see also* Email from B. Tan to K. Russell (Cantor), June 9, 2011 (RE-21) (including a non-exhaustive list of 25 ways the agreement had been altered and noting that "Our draft reflected that agreement we have reached in the exchange of communications and emails and various meetings between Mr. Razon and Mr. Weidner, and between your team and ours.").

[56] *See* S.O.D. ¶ 35.

[57] *See* Email from B. Tan to K. Russell (Cantor), June 9, 2011 (RE-21); *see also* Email from J. Rein to B. Weidner, et. al., August 18, 2011 (RE-234).

[58] Emails between B. Tan and K. Russell, May 24-25, 2011 (RE-235).

[59] *See supra* [ ]; *see* Email from F. Gaspar to E. Razon, January 21, 2011, attaching presentation (RE-39)..

[60] *See* Email from B. Tan to J. Myers, Aug. 15, 2011 (RE-117) ("Your exclusion of Cantor Fitzgerald, L.P. and its Affiliates (except for GGAM) from the coverage of the Conflict of Interest restriction. Since "GGAM" here is the new shell company, we included Global Gaming Management L.P. (the original GGAM which is owned 50% by Bill Weidner) in the exclusion. This means that both GGAM and Global Gaming Management L.P. (the original GGAM) will be covered by the Conflict of Interest restriction. ***But Cantor is free, as you wanted.***").

GGAM-SDNY-0337682

Case 1:21-cv-02655-LGS-SN   Document 408-10   Filed 03/27/23   Page 7 of 19

CONFIDENTIAL

Compete restrictions.[61] These revisions ultimately did not alter the substance of the deal, but the process of finalizing the deal—which had been nearly final in May 2011—stretched inexplicably over the course of months due to a seemingly endless pattern of position-taking, over-reaching, and a churning of issues by lawyers on GGAM's side.[62] When it appeared that GGAM's "backer," Cantor, was solely focused on finalizing the terms of the equity option grant to the detriment of the overarching management agreement, Mr. Razon contemplated eliminating the equity option altogether.[63]

34. These negotiations were occurring at a critical time for Solaire's development. Construction was already well underway,[64] and Bloomberry needed a management team on board.[65] Bloomberry had delayed making important decisions with the belief that the deal would soon be signed with GGAM.[66] Bloomberry was eager to bring the deal to a close.

35. To facilitate GGAM's commencement of its management responsibilities, Bloomberry agreed to include a "placeholder" provision in the MSA regarding the executory

---

[61] *See* Email from B. Tan to J. Myers, Aug. 15, 2011 (RE-117) ("You excluded Cantor Fitzgerald and its affiliates (except GGAM) from the coverage of the Non-Compete Restrictions . . . Instead of saying that Cantor and its affiliates are not deemed an Involved Affiliated under this Non-Compete Clause, we added the qualification 'unless they are rendering the Services under this Agreement.' This means that not every Cantor affiliate is excluded. A Cantor affiliate which is involved in rendering the Services as defined under the MSA will be covered by the Non-Compete clause.").

[62] *See, e.g.*, Email from E. Razon to E. Occeña, August 18, 2011 (RE-226) ("Here we go again") (upon receiving an email from Mr. Weidner regarding 17 "contentious" issues identified in Paul Hastings' last draft of the MSA).

[63] *See* Email from E. Razon to E. Occeña, July 7, 2011 (RE-94) ("If the issues surround the equity portion, you can tell them that we can drop the equity part all together."); *see also* Email from E. Razon to J. Alarilla, July 7, 2011 (RE-118) ("What is the issue with Cantor? If it's the equity we can drop that no problem.").

[64] *See* J. Salvacion Decl. ¶ 7; Offering Circular, May 1, 2012 at 69, F-43 (CE-8).

[65] *See, e.g.*, Email from E. Occeña to J. Alarilla, July 7, 2011 (RE-118) ("It is good we are meeting GGAM's COO candidate, Chief IT candidate and Head of Gaming in Macau. At the end of the day, if Cantor stick to their guns, we can directly hire these guys and offer Brad (or Garry) a compensation package he cannot refuse. Jon Rein told me months ago that Cantor's agreement is with Bill Weidner.").

[66] *See* D. Almeda Decl. ¶ 17; Email from J. Alarilla to B. Stone, June 3, 2011 (CE-12); Hr'g Tr. at 247:16-25 (Alarilla) ("We have brought the Project to a certain level where we thought we--we had gotten the expertise in different areas. But an operator, maybe an experienced one, would have their way of doing things in terms of payout in the sizes of offerings. And we thought that, if we were to work with GGAM, they might as well put in their input early enough so that we can consider it in our construction. That's the context of why I mentioned that we should have engaged them much earlier."); id. at 248:5-12 (Alarilla) ("As I said, we needed their inputs because they are going to be the operators, and operators would have their way of doing things and defining the layouts and the structure of the gaming floor. That's why, before getting more advanced to the construction and for them to change it later, they might as well be there at the time when we can take into consideration the inputs that they will give us.").

- 14 -

GGAM-SDNY-0337683

### 2.  GGAM Delegated Its Responsibility for Identifying and Signing VIP Players and Junket Operators to the Management Team.

89. One of GGAM's main selling points, and a key motivation for Bloomberry in entering into the deal with Bloomberry was their personal relationships with VIP players and junket operators, an elusive market that Mr. Razon knew was critical for Solaire's success.[226] Under the MSA, GGAM was required, prior to Solaire's opening, to "develop marketing and operational plans, including junket and similar arrangements."[227] When asked by investors how he would get junket operators to come to Solaire, Mr. Weidner stated "7 phone calls."[228] Similarly, Mr. Stone informed investors that he would use the Philippines as a marketing tool and call customers to encourage them to visit:

> I know this one customer who lives in Hong Kong and he travels with his family. And I'll call him up and say, "Hey, come over here. Spend three days gaming. We'll put you up nice and then we'll send you over to Boracay or send to Aman and take your family there and spend four days there on us." And that will be a marketing tool to get this several million dollar customer in.[229]

90. GGAM, however, defaulted to its *modus operandi* of acting as an executive search firm, hiring people who then hired people who actually had the relationships with junket operators, and then taking credit for those contributions.[230] As GGAM's own expert

---

[226] *See* E. Razon Decl. ¶ 44 ("During my initial meeting with GGAM's principals, they represented to me that they had personal relationships with junket operators and access to VIP players."); *see also id.* at ¶ 45 ("In addition to their claims about connections to foreign VIP players, Messrs. Weidner, Stone and Saunders also indicated they had direct contacts with junket operators in Asia, particularly in Macau. They claimed that they were in frequent contact with these junket operators and could easily get them to the Solaire."); *see also* Saunders Decl. ¶ 15 (acknowledging that one of GGAM's selling points was Mr. Weidner's role as CEO and his responsibility for "leveraging his network of contacts, especially in Asia, to generate patronage of high net worth individuals.").

[227] *See* MSA, Annex A, Pre-Opening Services, No. 12 (CE-1).

[228] *See* E. Razon Decl. ¶ 45. Mr. Weidner does not and cannot deny that he made this remark. *See* Weidner Third Decl. ¶ 31 ("I do recall making such a remark regarding being able to position Solaire effectively within the junket community by making only seven phone calls."). Mr. Weidner now tries, in a convoluted way, to say that by "7 phone calls" he tried to convey to Mr. Razon and to an investor audience "GGAM's capability of leveraging its existing relationships in Asia and elsewhere, and developing new relationships, for Solaire's benefit, specifically by focusing its efforts" on the seven of Macao's junkets that represent close to two-thirds of the total junket revenue). *See id.* That was not communicated to the investors or to Mr. Razon at the time, and Mr. Weidner seems to have repeated his promises of phone calls to get VIP players. *See* K. O' Keefe, "Ex-Sands Executives to Help Manage Bahamas Casino," THE WALL STREET JOURNAL, May 22, 2013 (RE-67) (in an article regarding the Baha Mar, Mr. Weidner planned to "reach out to high-rollers directly.").

[229] Transcript of Investor Presentation, November 14, 2012 at 46:19-48-1 (RE-111).

[230] *See* Stone Third Decl. ¶ 51 ("We chose to recruit and hire certain Management Team members precisely because we knew what resources they could bring to the table . . ."); *Cf.* Stone Third Decl. ¶ 51 ("At the time, there

156. Subsequently, GGAM attempted to involve high-level executives and in-house counsel from Cantor in the Arbitration.[427] GGAM began describing Cantor as GGAM's "parent," which was quite different from the joint-venture relationship explained to Mr. Razon during his initial meeting with Mr. Weidner.[428] In this Arbitration, Claimants repeatedly point to a letter from Mr. Weidner to Mr. Razon at the eleventh hour the day before the Parties signed the MSA as "proof" that Bloomberry was informed of Cantor's role as GGAM's "parent."[429] Mr. Weidner attached to this letter a chart of the corporate structure of Global Gaming Philippines, LLC, purportedly in compliance with Section 10.2(g) of the MSA, even though the MSA had no such requirement.[430] The organizational chart itself is not effective disclosure of the true nature of the relationships between GGAM and Cantor.[431] It's simply a piece of paper with a diagram indicating that GGAM is a 50-50 joint venture between GGAM entities and Cantor GGAM, L.P., a Cantor subsidiary.[432] It appears to have been "disclosed" to Mr. Razon at the eleventh hour because Claimants knew that their relationship with Cantor had not been accurately disclosed during the Parties' negotiations.[433]

157. In this Arbitration, Claimants also have described Howard Lutnick, the CEO of Cantor, as the "Co-Chairman" of Claimant Global Gaming Philippines,[434] and argued that he needs access to Confidential Information to fulfill his responsibilities at the "apex of GGAM Philippines' management team."[435] No reference was made to Howard Lutnick as the "Co-Chair" of Global Gaming Philippines, LLC, however, in Mr. Weidner's eleventh-hour letter in

---

[427] See Email from J. Profaizer to M. Nolan, October 28, 2014 (RE-212).

[428] Claimants' Letter to Tribunal, November 21, 2014 at 13 (RE-213).

[429] Claimants' Letter to the Tribunal, December 22, 2014 (RE-83).

[430] Letter from B. Weidner to E. Razon, September 8, 2011 (RE-192); MSA, Clause 10.2(G) (CE-1) ("GGAM represents and warrants as of the Effective Date that . . . there is no litigation or proceedings pending or threatened against GGAM that could adversely affect the validity of this Agreement or the performance of GGAM of its obligations under this Agreement.").

[431] E. Razon Supp. Decl. ¶ 13 ("I don't remember receiving this document, and I still don't really know what it is supposed to show aside from the fact that Bill, like myself, owned various, separate entities that were arranged in such a way to make the most business sense.")

[432] Letter from B. W. to E. Razon, September 8, 2011 (RE-192).

[433] E. Razon Supp. Decl. ¶ 14 ("I had no desire to get involved with a New York investment bank. If it had been explained during our first meeting that GGAM was influenced by Cantor's pursuit of gaming investments.")

[434] Compare Claimants' Letter to Tribunal, November 21, 2014 at 13 (RE-213) with Letter from B. Weidner to E. Razon, September 8, 2011 (RE-192).

[435] See Claimants' Letter to Tribunal, November 21, 2014 at 13 (RE-213).

GGAM-SDNY-0337746

165. **Second**, GGAM effectively and improperly assigned its rights and obligations under the MSA to Cantor under the Support Services Agreement or "SSA." The SSA, entered into on Aug. 28, 2012 and then backdated to Jan. 27, 2011, states that Cantor will provide the following services to GGAM (for cost plus 10%):[450] (1) Payroll services; (2) Financial, risk management and operations services (including providing technical advice as requested on commercial contracts); (3) Accounting and treasury services (including "such other accounting and treasury services as may be requested for time to time"); (4) Legal services; (5) Human Resources; (6) IT Services and Communication Facilities; (7) Promotional Sales and Marketing; (8) Investor Relations; and (9) Miscellaneous—***Cantor shall provide such other miscellaneous services to the Receiving Parties as the parties may reasonably agree***.

166. These obligations mirrored many of GGAM's obligations to Bloomberry under the MSA: (1) recommend the selection and order FF&E in accordance with the pre-opening plan and budget;[451] (2) recommend the selection and order the gaming facilities' data processing equipment and software, surveillance, and security systems;[452] (3) recruit, select, and hire employees for the Facilities and implement necessary procedures, techniques and training programs to obtain and evaluate qualified applicants;[453] (4) review and consult on Owners' risk management program;[454] and (5) appoint counsel.[455] To accomplish these obligations, a management company would have a complete support staff, organized department by department, broad in function and deep in personnel, and replete with systems, manuals, policies, procedures, audit, marketing, sales, and performance benchmarks.[456]

167. GGAM's reliance on Cantor, an investment bank, to run its management company and provide numerous services to GGAM, which GGAM then owed to Bloomberry, is

---

[450]   GGAM and Cantor Support Services Agreement, August 28, 2012, § 2 (RE-187).

[451]   MSA, Annex A, Pre-Opening Services, No. 7 (CE-1).

[452]   MSA, Annex A, Pre-Opening Services, No. 8 (CE-1).

[453]   MSA, Annex A, Pre-Opening Services, No. 9 (CE-1); *see also* MSA, Annex A, Post-Opening Services, No. 6 (human resources systems and policies); No. 7 (compensation and benefit plans); No. 8 (payroll systems).

[454]   MSA, Annex A, Pre-Opening Services, No. 14 (CE-1).

[455]   MSA, Annex A, Pre-Opening Services, No. 21 (CE-1).

[456]   *See generally* Kleisner Report.

GGAM-SDNY-0337750

an admission that GGAM was incapable of fulfilling its obligations under the MSA and that it misrepresented its abilities to Bloomberry when it promised that

> GGAM has the management and technical expertise, track record, experience, adequate capitalization and financial resources to comply with its obligations under this Agreement.[457]

168.    The SSA is an effective assignment of the MSA, in violation of the MSA's assignment clause, which requires Bloomberry's written consent before GGAM assigns either its obligations or benefits arising under the MSA.[458] Bloomberry was not aware of the existence of the SSA until December 2014 and never received written notice of this assignment.[459] Not one of the entities purportedly providing management services to Bloomberry—not GGAM, not Cantor, not GGAM Netherlands B.V.—was a management company capable of fulfilling GGAM's obligations under the MSA, thereby breaching Clause 10.2(J) of the MSA.[460]

169.    ***Third***, contrary to GGAM's representations to Bloomberry, Cantor and GGAM viewed Solaire as an investment, not as a property to be managed. An internal Cantor presentation describes Solaire (nicknamed "Project Berry") as a "unique opportunity for Cantor and GGAM to participate in an early stage investment in the rapidly growing Asian gaming market."[461] The presentation goes on to explore this "economic opportunity" by providing "investment highlights" an examining "investment risks."[462] This presentation thoroughly examined the equity option Mr. Razon had offered to GGAM at founder's cost if GGAM acted as the management services provider for Solaire. Cantor recognized that the equity option

---

[457]    MSA, Clause 10.2(J) (CE-1).

[458]    *See* MSA, Clause 16.2 (CE-1).

[459]    Bloomberry previously received notice of GGAM's attempted assignment of the MSA to Claimant GGAM Netherlands B.V., which was also an improper assignment. Under Clause 16.2 of the MSA, GGAM was permitted to assign the MSA to a Dutch special purpose vehicle ***provided that*** the new entity must at all times by the same constituent owners and controlled by the same individuals as GGAM. *See* MSA, Clause 16.2. GGAM Netherlands B.V. is not controlled by Messrs. Weidner, Stone, and Saunders. Instead, it is controlled by Mr. Weidner and a Cantor representative. *See* GGAM Netherlands B.V. Articles of Incorporation, December 17, 2012 (RE-225). There is no indication that GGAM Netherlands, B.V. performed any better at providing management services to Solaire than Global Gaming Philippines did.

[460]    *See supra*. Regardless, "[a]ny assignment to an Affiliate and/or any sub-contracting shall not in any way relieve GGAM from any liability or obligation under or in connection with this Agreement," and therefore GGAM still had the obligation to perform its promised services under the MSA. *See* MSA, Clause 16.3 (CE-1).

[461]    *See* Cantor Presentation for Project Berry, June 2011 at Slide 6 (RE-129).

[462]    *See id.*

represented an enormous windfall, predicating an internal rate of return of **462.8%** in the first year of the "investment."[463] Finally, in yet another violation of the implied covenant of good faith and fair dealing, GGAM, with Cantor's assistance, evaluated "possible exits from the property," including a strategic sale of Solaire, antithetical to Mr. Razon's interests and vision of building a Solaire brand of Asian luxury integrated resorts.[464]

170. **Fourth**, contrary to Mr. Weidner's representations to Mr. Razon that undertaking the attendant risk of the equity option represented GGAM's "extraordinary commitment" to Bloomberry,[465] Mr. Weidner, in fact, undertook no risk at all. Bloomberry now knows that Cantor fully funded the US$ 37 million strike price for the exercise of the equity option.[466] Cantor did not loan the money to GGAM; rather, it was a "capital contribution" to the entity, giving Cantor priority in payment from any dividends or sale of the Shares.[467] Moreover, Cantor negotiated a right to demand a sale of the a substantial portion of the block of Shares *for Cantor's benefit*.[468] GGAM's actions were in violation of Section 8.3 of the EOA, which required that in the event GGAM designated an investor to exercise the Option, the investor had to guarantee GGAM's performance of its obligations under the MSA.[469] Cantor never provided this guarantee, because it could not—GGAM was incapable of performing its obligations of the MSA, as it was not the management company it had represented itself to be. More important, GGAM's actions demonstrate that the 10% equity stake offered to Claimants in their role as management services providers for Solaire was never going to be sufficient to align the Parties' interests—because the equity stake effectively belonged to Cantor, not to Claimants.

---

[463] *See id.* at 37.

[464] *See id.* at 34.

[465] Email from B. Weidner to E. Razon, March 21, 2011 (CE-33).

[466] GGAM Funding Application to Cantor Fitzgerald, December 21, 2012 (RE-189).

[467] *See* Version 3 of Draft Letter Agreement between S. Merkel, on behalf of Cantor GGAM, and B. Weidner, on behalf of GGAM, December 19, 2012 (RE-197).

[468] *See* Version 3 of Draft letter Agreement between S. Merkel, on behalf of Cantor GGAM, and B. Weidner, on behalf of GGAM, December 19, 2012 (RE-197).

[469] *See,* EOA §8.3(a) (CE-10).

GGAM-SDNY-0337752

### B. GGAM's Participation on the Road Show, Which Was Motivated by GGAM's Self-Interest, Was Required under the MSA and Compensated by Bloomberry.

182. GGAM continues to try, unsuccessfully, to separate its participation on the top-up offering road show from its obligations as Solaire's management services provider. Clause 2.5 of the MSA required GGAM to take such actions as manager of Solaire that would maximize value for Bloomberry's shareholders.[503] It is fundamental that managers participate in road shows, including present to and interacting with potential investors.[504] As Bloomberry's management expert, Mr. Kleisner explains, "[Road show participation] is a typical obligation of a management company when invited or requested to do so by a non-managing owner, when this may well facilitate the financing of current or future projects."[505]

183. GGAM's emphasis on the road show is an attempt to distract from their failure to manage the operations of Solaire as it was obligated to do. Participation on a 2-week road show does not equate to actual hands-on management.[506] Moreover, GGAM again claims—falsely— that it was not compensated for its participation on the road show.[507] At the time of the road show in April-May 2012, GGAM was receiving a monthly development fee of US$ 100,000

---

[503] MSA, Clause 2.5 (CE-1) ("[GGAM] will at all times act in the best interest of the shareholders of the Casino Owner and the Hotel Owner, and to maximize such shareholders value in the performance of its obligations under this Agreement and in all dealings carried out by it in its capacity under this Agreement.").

[504] See Craig F. Arcella, Cravath, Swaine & Moor LLP, *The Nuts and Bolts of Road Shows*, Practical Law Company (2010) (RE-36) ("Road shows are presentations that are made by an issuer's senior management (often accompanied by representatives of the lead underwriters) to market an upcoming securities offering to prospective investors . . . By allowing investors to interact with management in a live setting, and by allowing question and answer sessions . . . investors can personally assess the character and commitment of management.").

[505] Kleisner Report ¶ 19(a).

[506] *Id.*

[507] *See* Claimants' Reply at ¶ 67 ("Because GGAM successfully performed [on the road show], it is entitled to be paid, irrespective of whether [other management companies] might have also done so had Respondents hired them instead."); *see also* B. Stone Supp. Decl. at ¶ 21 ("When GGAM went out on the Roadshow (which we were not compensated for under the MSA) . . .").

under the MSA.[508] All of GGAM's travel and out-of-pocket expenses incurred with respect to the road show were also paid by Bloomberry.[509]

184. GGAM continues its pattern of ignoring any one of a multitude of factors that contributed to the success of the top-up offering, insisting that its "central role" resulted in the success of the offering.[510] As Bloomberry explained in its Statement of Defense, Solaire offered a unique opportunity for investors to participate in Asia's booming gaming market.[511] Moreover, investors in Mr. Razon's company, ICTSI, were willing to purchase more than 165% of the shares that were available under Bloomberry's top-up offering, making it more than 1.6 times oversubscribed.[512]

185. GGAM now alleges that "many of these" investors, were also long-time investors in the Las Vegas Sands.[513] That very well may be true, insomuch as these investors recognized the lucrative nature of Asian casinos. It is less difficult to believe, however, that these investors purchased Bloomberry's stock because of their "prior relationships" with GGAM's principals.[514] GGAM's CEO, Mr. Weidner, had a very public falling-out with the visionary behind Las Vegas

---

[508] MSA, Clause 4.1 (CE-1); *see also* Saunders Decl. at ¶¶ 98-101 (acknowledging receipt of development fees).

[509] MSA, Clause 4.7 (CE-1); *see also* Saunders Decl. at ¶¶ 102-103 (acknowledging receipt of reimbursable expenses).

[510] *See Compare* Claimants' Reply ¶ 67 *with* Cantor Internal Presentation, GGAM Case Study: Bloomberry Resorts IPO, July 2012 (RE-123).

[511] *See* S.O.D. ¶¶ 64-65; *see also* April 5, 2012 CLSA Report (RE-43) ("Of all the players in the Philippines gaming space, Bloomberry Resorts is set to be the only pure play gaming company in the Philippines. This allows investors a direct way to participate in what we believe will be one of the strongest growth sectors in the Philippines market over the next three to four years."). Claimants cite no contemporaneous documents to support their claim that Belle Corporation was unsuccessful in raising capital for its casino venture in the Philippines because it did not have "an experienced management entity associated with its project, and later had to partner with Melco Crown." Reply ¶ 69. On the contrary, contemporaneous documents demonstrate that Belle Corporation successfully raised capital well before partnering with Melco Crown in 2012. *See* Belle Corporation 2010 Annual Report at p. 2 (RE-228) (secured financing for first phase of Belle Grande Manila Bay project); Belle Corporation's 2011 Annual Report at p. 38 (RE-229) (describing Belle's successful stock rights offering, the net proceeds of which would be used to partially finance construction of entertainment and resorts facilities).

[512] *See* S.O.D. ¶¶ 66-67.

[513] *See* Claimants' Reply ¶ 68.

[514] *See* Claimants' Reply ¶ 68; *see also* Stone Third Decl. ¶ 35.

GGAM-SDNY-0337759

Sands, Sheldon Adelson, and Las Vegas Sands' stock soared after Mr. Weidner's voluntary departure from the company.[515]

186. Ultimately, GGAM's participation on the road show was motivated by self-interest. GGAM was a new start-up management company, eager to find new projects and possibly investors. The road show provided them with a unique opportunity to "sell" themselves and GGAM to investors interested in gaming. Bloomberry's participants on the road show noted that Mr. Stone appeared to be using the road show as an opportunity to promote GGAM,[516] and as Mr. Saunders wrote to Mr. Weidner:

> I think that a big side-benefit is the parallel GGAM story that [Brad] is telling, which is of equal interest to most of the target audience. Given the hideous number of face-to-face meetings, this is outstanding PR for GGAM that should pay off in other ways.[517]

## IX. COUNTERCLAIMS

187. GGAM devotes a scant eight pages of its response to Bloomberry's counterclaims concerning the equity option. Significantly, those eight pages entirely ignore the overwhelming evidence that the option grant at issue was always intended to be compensation for management services pursuant to the MSA. Because GGAM did not earn that compensation, it must be returned.

### A. The Parties' Contemporaneous Communications Make Clear that the Equity Option was Intended to be Compensation for Management Services Pursuant to the MSA.

188. From the very first meeting between Mr. Razon and Mr. Weidner in March 2011, Mr. Razon suggested as a form of compensation, granting GGAM an option to purchase up to

---

[515] *See* Woinski Report at 4.

[516] *See* E. Razon Decl. ¶ 25; D. Almeda Decl. ¶ 21.

[517] *See* Email from G. Saunders to W. Weidner, April 26, 2012 (RE-125); *see also* Email from J. Rein to H. Lutnick, April 26, 2012 (RE-124) ("Indications are that Brad Stone, who is leading the presentations, is doing a fantastic job, and that a number of the investors are indicating appetite not just for the Bloomberry IP but also for GGAM's future activities.").

compensation for services rendered pursuant to the MSA. In addition, the proposed language in Clause 18.3 set a formula by which the strike price would be calculated and established an expiration date for the option; and (2) an Option Agreement setting forth the ministerial terms and conditions of exercising the option would be executed within a set period of time after the MSA was signed.[529]

196. GGAM and Cantor again stalled the MSA negotiations by raising a host of issues regarding the equity option.[530] Because of the delay caused by finalizing the terms of the equity option grant, Mr. Razon contemplated departing from his "points of principle," and dropping his suggestion that that Parties enter into an unusual management services arrangement whereby the manager would be granted an equity option as compensation.[531] By this point, however, the equity component of its compensation package was what Mr. Weidner considered the "main attraction."

197. In suggesting that the Parties sign the MSA and then finalize the equity option agreement, Mr. Razon reaffirmed to Mr. Weidner that the equity option was **not** distinct from GGAM's performance and obligations under the MSA and described this arrangement to Mr. Weidner as a "two-part agreement."[532]

198. Mr. Razon emphasized that they "could not negotiate every possible contingency and there is no perfect agreement."[533] Mr. Weidner agreed, "as a show of good faith" to suspend

---

[529] *See* Email from B. Tan to J. Rein, June 21, 2011 (attaching draft MSA) (RE-121).

[530] *See* Email from E. Occeña to J. Rein (Cantor), June 22, 2011 (RE-82) ("I propose to sign the MSA to get it out of the way and fulfill your DD (due diligence) requirements while negotiating the Option Agreement."); *see also* Email from E. Occeña to E. Razon, July 7, 2011 (RE-94) ("Benny and I are about to start discussing how to trim down the many many issues raised by Cantor in the MSA. You might be overwhelmed if I send it to you now.").

[531] *See* Email from E. Razon to E. Occeña, July 7, 2011 (RE-94) ("What are the open issues on the MSA? Is it just the equity investment? What's Cantor's problem? . . . If the issues surround the equity portion you can tell them that we can drop the equity part all together."); *see also* Email from E. Razon to J. Alarilla, July 7, 2011 (RE-118) ("What is the issue with Cantor? If it's the equity we can drop that no problem.").

[532] Email from E. Razon to B. Weidner, August 20, 2011 ("The structure as it stands is a two-part agreement and we are still working on the first part.") (RE-4); *see generally* Expert Opinion of Steven Davidoff Solomon ("Davidoff Solomon Op.") ¶ 31 (explaining that a "single, complex business transaction" might be documented in multiple agreements for several reasons: "The parties may desire that a specific part of the transaction be capable of later assignment to another party or an affiliate of one of the initial parties . . . Additionally, it may be contemplated that additional persons would become a party to a specific part of the transaction, but not another part of the transaction, necessitating a different agreement."

[533] Email from E. Razon to B. Weidner, August 20, 2011 (RE-4) ("The structure as it stands is a two-part agreement and we are still working on the first part.").

GGAM-SDNY-0337764

- As far as our ongoing relationship, ***there's two components to how we get compensated... Probably the most important for you is that we are buying 10 percent of Mr. Razon's shares under an option agreement***, which we will exercise prior to the opening."[547]

- ***Our main compensation, other than the equity piece,*** is based upon bringing VIP business to the Philippines.[548]

- "***So we buy an option for roughly 10 percent of [Mr. Razon's] shares. These are new—not new shares or public shares***, these are shares that he has for $36 million, and we own 9.8 something percent of the company. ***So, the management company is highly incentivized, because we are the second largest shareholders in Bloomberry***."[549]

207.  Although GGAM may now wish it had bargained for a right to buy deeply discounted equity – separate and apart from its obligations to meet the performance requirements of the MSA – it did not do so. All of the evidence disproves GGAM's theory and none supports it. At no point—until this Arbitration—did GGAM claim that this change in corporate structure was anything other than a permitted change of control under the MSA to enable GGAM to purchase ownership interests in Solaire, the integrated casino resort GGAM had been hired to manage.[550]

208.  Prime Metroline and GGAM agreed that the purpose of the Equity Option Agreement was to document the equity option granted in the MSA:

> Whereas, Sureste and Bloomberry, as Owners, have agreed under the Management Services Agreement dated September 9, 2011 and entered into by and among Sureste, Bloomberry, and Grantee (the "MSA"), to grant or ***cause to be granted*** to [GGAM], an option to purchase the Option Shares (as defined below), which option shall

---

[547] Transcript of Investor Presentation, November 15, 2012 at 50:11-17) (RE-113).

[548] Transcript of Investor Presentation, November 14, 2012 at 13:15:17 (RE-112).

[549] *See* Investor Presentation Transcript, November 14, 2012 at 50:17-51:11 (RE-111); *see also id.* Investor Presentation Transcript, November 14, 2012 at 38:9-39:5 (RE-110) ("I think the important thing for you guys to know is my company, GGAM, will be the second—we have the option to buy 10 percent of—roughly 10 percent of Mr. Razon's shares, so when we talk about the option to buy shares, it's not public shares, there's no additional shares issued, it's buying part of his—he gets—he sells 10 percent of his shares to us and my company, GGAM, becomes the second biggest shareholders in the company. So, we talk about aligned interest with the investors, you know, the management company is the second biggest investor after Mr. Razon.").

[550] *See* Solomon Third Op. at ¶ 24.

be exercisable solely in accordance with and pursuant to the terms and conditions set forth herein.[551]

209.  Moreover, Prime Metroline and GGAM acknowledged that the consideration for the Equity Option Agreement was GGAM's promised performance of its obligations under the MSA:

> ***As contemplated by Section 18.3 of the MSA, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties,*** Grantor hereby grants to Grantee an option (the "Option") to purchase some or all of the Option Shares from Grantor, subject to and upon the terms and conditions set forth in this Agreement.[552]

210.  Claimants now pretend that the MSA and the EOA are not related contracts because both have integration clauses and neither has a cross-default clause.[553] The presence of an integration clause in no way forestalls this Tribunal's consideration of the Parties' negotiations, contemporaneous communications, and even drafts of the MSA and EOA,[554] all of which demonstrate that Bloomberry and GGAM understood the equity option and management services were part of a unified arrangement.

211.  GGAM inaccurately asserts that neither the MSA nor the EOA contains any "mechanism tying the Shares to GGAM's performance under the MSA."[555] The plain language of the EOA repeatedly cross-references the MSA,[556] and the agreement includes an express

---

[551] *See* EOA, Recitals (CE-10); *see also* MSA, Clause 18.3 (CE-1) ("The Parties shall execute a mutually acceptable Option Agreement to embody the share purchase option under this Clause. . .").

[552] *See* EOA, Section 2.1. In transactional situations involving corporate families, the consideration for a parent to participate in a transaction on behalf of its subsidiary is often the benefit being provided to the subsidiary. *See* Solomon Third Op. ¶ 36.

[553] *See* Claimants' Reply ¶ 111 ("the MSA and EOA are separate agreements with separate integration clauses"); *see also id.* ("Neither the MSA nor the EOA contains any provision for cross-default or any other mechanism tying the Shares to GGAM's performance under the MSA.").

[554] *See* Supplemental Expert Opinion of Steven Davidoff Solomon ("Solomon Davidoff Supp. Op.") ¶¶ 14-15 (citing WILLISTON ON CONTRACTS § 33.23 (4th ed.)) (explaining that "even in order to consider whether an integration clause bars consideration of terms outside the contract, a court can consider outside evidence."). Importantly, "a merger or integration clause is, with certain limitations, ineffectual to exclude evidence of prior or contemporaneous extrinsic representations for the purpose of showing fraud or other invalidating cause by way of defense or in an action for rescission." *See id.*

[555] *See* Claimants' Reply ¶ 111.

[556] *See* EOA, Recitals (CE-10) ("Whereas, Sureste and Bloomberry, as Owners, have agreed under the Management Services Agreement, dated September 9, 2011 and entered into by and among the Sureste, Bloomberry

supporting documentation, that the equity option was granted to GGAM *independent* of its role as management services provider under the MSA.[561]

213. It is clear that Prime Metroline was acting as Bloomberry's agent with respect to the execution of the EOA.[562] Claimants feign credulity at the idea that a parent company would act as the agent for its subsidiary, describing the very notion as "topsy-turvy." Prime Metroline's performance of Bloomberry's obligation to GGAM under the MSA to effectuate the equity option grant is typical in complex corporate transactions.[563] Both Parties' Philippine legal experts agree that Bloomberry and Sureste had a binding obligation to provide GGAM with 10% ownership interests in Solaire if GGAM chose to exercise the equity option.[564] Prime Metroline owned publicly traded interests in Solaire, and Prime Metroline agreed to reserve up to 10% of those interests to satisfy Bloomberry and Sureste's obligations to GGAM. Ultimately, when Prime Metroline entered into the EOA on behalf of Bloomberry, it was acting as Bloomberry's agent.[565]

214. GGAM makes the bold assertion that "[t]here is no support for the novel proposition that a parent can act as its subsidiary's agent."[566] GGAM is wrong—it is routine and happens every day in the corporate world. The fact that there is nothing unusual about a parent acting as the agent of its subsidiary may explain why Claimants offer no support for their position that a parent *cannot* act as a subsidiary's agent. As Bloomberry's Philippine and U.S.

---

unconvincing. *Compare* Claimants' Request ¶ 151 *with* Claimants' Reply ¶ 28 (describing the consideration for the equity option as "GGAM's agreement to enter into a partnership with Mr. Razon's business, both in the Solaire Project and elsewhere").

[561] *Cf.* Claimants' Reply ¶ 119 (repeating previous attempts to distinguish the MSA from GGAM's "partnership" with Mr. Razon and asserting, unconvincingly, that the "consideration" was GGAM's "willingness to enter into a partnership with Mr. Razon's business.").

[562] *See* Solomon Third Op. at ¶ 33; *see also* Second Supplemental Opinion of Justice Jose C. Vitug ("Vitug Third Op.") ¶ 25.

[563] *See* Solomon Third Op. at ¶ 34; *see also id.* at ¶ 30 (explaining that "assets and rights are often dispersed within these groups and the corporate entities exercise such rights in order to effectuate common goals.")

[564] *See* Hr'g Tr. at 513:4-24 (Justice Feliciano and Justice Vitug agree that, absent the EOA, the Parties were bound by the MSA).

[565] *See* Solomon Third Op. at ¶ 30 ("When an action on behalf of another corporate group member occurs, the basis for such an act is within principal-agent law. A parent or subsidiary will act to perpetuate the interests of another group member, acting through principal-agent authority.").

[566] *See* Claimants' Reply ¶ 114.