investors on behalf of the Company. In addition, I educated the underwriters and analysts on the details of the Project and was heavily involved in drafting the portions of the Offering Circular that described the Project's business and marketing strategies. In our preliminary discussions with the Owners, the Owners referenced an earlier Philippine casino venture that had failed to achieve an equity raise, because that project did not have a reputable, experienced operator that it could market to potential investors.

19. During the Roadshow presentations, Bloomberry representatives and I showcased GGAM's reputation and experience in the global gaming industry. Bloomberry was eager to highlight GGAM's option to invest in Bloomberry, because they, like us, understood that potential investors would feel more confident about the viability of the enterprise if they saw evidence of GGAM's own financial commitment to the business.

20. Respondents repeatedly agreed that GGAM's participation in the Roadshow was integral to the IPO's success. In fact, until as late as July 2013, Mr. Razon continued to "piggyback" off of GGAM's name and reputation by requesting that GGAM serve as the face of Solaire vis-à-vis the international financial community.

21. Bloomberry's current position—that GGAM's ownership of its Shares was always contingent on GGAM's full future performance over the entire term of the MSA—was not the arrangement at the time that GGAM agreed to be partners with Mr. Razon. If that were the case, we would not have undertaken the efforts that we did on behalf of Solaire, beyond the scope of our Services under the MSA, including representing to investors our long-term commitment to the enterprise. When GGAM went out on the Roadshow (which we were not compensated for under the MSA), GGAM sought to increase the value of the enterprise, not just for Mr. Razon but for ourselves, because we felt confident that GGAM's future investment would be secure.

Subject to Arbitration Confidentiality Orders

BLOOM_0100954