UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                :

GLOBAL GAMING PHILIPPINES, LLC,     :
                      Plaintiff,    :       21 Civ. 2655 (LGS)
                                  :

          -against-        :       <u>OPINION & ORDER</u>
                                  :

ENRIQUE K. RAZON, JR., et al.,      :
                    Defendants.  :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

      Plaintiff Global Gaming Philippines, LLC ("GGAM") brings this civil action against Defendants Bloomberry Resorts and Hotels, Inc. ("BRHI"), Sureste Properties, Inc. ("Sureste") (together, the "Debtor Defendants") and Enrique K. Razon, Jr. ("Razon").  Plaintiff seeks to confirm a foreign arbitral award rendered against the Debtor Defendants and enforce the award against Razon, arguing that the Debtor Defendants are his alter egos.  Plaintiff also asserts a claim of trespass to chattels against Razon.  Following the completion of fact and expert discovery, the parties cross-move for summary judgment.  In connection with each cross-motion, the movants seek to exclude opposing expert testimony.  For the reasons below, the motions are denied, except Razon's motion for summary judgment is granted in part.

I.     **BACKGROUND**

      Familiarity with the factual and procedural history of this action is presumed.  *See Global Gaming Phil. v. Razon*, No. 21 Civ. 2655, 2023 WL 159785 (S.D.N.Y. Jan. 11, 2023); *Global Gaming Phil. v. Razon*, No. 21 Civ. 2655, 2022 WL 836716 (S.D.N.Y. Mar. 21, 2022).  The following facts are drawn from the parties' evidentiary submissions in connection with the cross-motions and are undisputed.  *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. C & S Wholesale Grocers, Inc.*, 24 F.4th 163, 170 (2d Cir. 2022).

Plaintiff is a Delaware company, which operates out of Nevada.  Plaintiff is wholly owned by Global Gaming Asset Management L.P., which in turn is 50% owned by Cantor GGAM L.P., a subsidiary of Cantor Fitzgerald L.P., a Delaware limited partnership registered to do business in New York.  On September 9, 2011, Plaintiff and the Debtor Defendants entered into the Management Services Agreement (the "MSA"), pursuant to which Plaintiff provided services related to the development, construction and operation of Solaire, a casino and resort in Manila.  Defendant Sureste owns and operates the real property, hotel and restaurant operations at Solaire, while Defendant BRHI owns and operates the casino at Solaire.

Sureste wholly owns BRHI.  Bloomberry Resorts Company ("BRC") owns 90.66% of Sureste, and BRHI owns the remaining 9.34% of Sureste.  BRC is a Philippine corporation traded on the Philippine stock exchange.  As of December 31, 2021, Prime Strategic Holdings, Inc. ("Prime") directly owns a majority of BRC's shares.  Razon is the beneficial owner of Prime.  Razon owns 65.52% of the outstanding shares of BRC as of December 31, 2021, and has at all times controlled at least 63% of BRC.  Razon is the Chairman and CEO of the Debtor Defendants and BRC, and executed the MSA on behalf of the Debtor Defendants.

The MSA contains a clause granting GGAM an option to purchase an equity interest in the Debtor Defendants, namely the right to purchase up to ten percent of their shares.  On April 16, 2012, GGAM, Prime and BRC entered into the Equity Option Agreement ("EOA") as contemplated by this clause.  The EOA grants Plaintiff the right to purchase around 921 million shares in BRC, which Plaintiff exercised on December 20, 2012.

On September 12, 2013, the Debtor Defendants terminated the MSA, prompting Plaintiff to file a notice of arbitration.  On February 25, 2014, a Regional Trial Court in the Philippines granted a request from the Debtor Defendants and Prime for writs of attachment.  As a result,

Deutsche Bank, the custodian of Plaintiff's BRC shares, placed them in a non-trading account, preventing Plaintiff from selling the shares. On September 20, 2016, the arbitral panel issued the Liability Award, finding that the Debtor Defendants had breached the MSA by terminating it without sufficient basis. On September 27, 2019, the panel issued its final decision, awarding damages to Plaintiff (the "Final Award"). The Debtor Defendants unsuccessfully challenged the Liability Award and the Final Award in the High Court of Singapore. The Singapore Court of Appeal, the highest court of Singapore, affirmed the Liability Award and the Final Award. On March 29, 2021, Plaintiff filed this action, seeking to confirm the Final Award and enforce it against Razon.

## II.     STANDARD

Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for a nonmoving party." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017). In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Torcivia v. Suffolk Cty.*, 17 F.4th 342, 354 (2d Cir. 2021). On cross-motions for summary judgment, "the court evaluates each party's motion on its own merits and all reasonable

inferences are drawn against the party whose motion is under consideration." *Roberts v. Genting N.Y. LLC*, 68 F.4th 81, 88 (2d Cir. 2023).

## III.   THE DEBTOR DEFENDANTS

Plaintiff seeks to confirm the Final Award against the Debtor Defendants.  Antecedent to this motion is the issue of whether the Court has personal jurisdiction over the Debtor Defendants.  Plaintiff and the Debtor Defendants cross-move for summary judgment on this issue.  Because genuine disputes of material fact exist regarding the basis for personal jurisdiction over the Debtor Defendants, the cross-motions for summary judgment on that issue are denied.  Plaintiff's motion to confirm the arbitral award against the Debtor Defendants is denied without prejudice to renewal if and when it is determined that the Court has personal jurisdiction over them with respect to the Final Award.

"The plaintiff bears the burden of establishing the court's personal jurisdiction over the defendant." *Yak v. BiggerPockets, L.L.C.*, No. 20-3498, 2022 WL 67740, at *1 (2d Cir. Jan. 7, 2022).  Plaintiff seeks to enforce the Final Award against the Debtor Defendants under the Convention on the Recognition and Enforcement of Foreign Awards (the "New York Convention"), to which the United States is a signatory.  The New York Convention is codified in the Federal Arbitration Act.  *See* 9 U.S.C. §§ 201, *et seq.*  A federal court applies the forum state's personal jurisdiction rules when subject matter jurisdiction is based on federal law and the applicable federal statute does not provide for national service of process.  *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 22 (2d Cir. 2004); *accord CesFin Ventures LLC v. Al Ghaith Holding Co. PJSC*, No. 21 Civ. 1395, 2022 WL 18859076, at *3 n.5 (S.D.N.Y. Dec. 10, 2022). The Federal Arbitration Act does not provide for nationwide service of process.  *See* 9 U.S.C. § 9; *Wash. Nat'l Ins. Co. v. OBEX Grp. LLC*, 958 F.3d 126, 140 (2d Cir. 2020).

4

Plaintiff offers four bases for personal jurisdiction over the Debtor Defendants: (1) as entities transacting business in New York under the state's long-arm statute; (2) as alter egos of Razon, who is indisputably subject to personal jurisdiction in New York; (3) due to the Debtor Defendants' consent given in the MSA and (4) pursuant to Federal Rule of Civil Procedure 4(k)(2). Plaintiff's motion for summary judgment is denied because the transacting business and alter ego theories are subject to genuine disputes of material fact, and the consent theory and likely the Rule 4(k)(2) theory fail as a matter of law. The Debtor Defendants' motion for summary judgment based on lack of personal jurisdiction is denied because genuine disputes of material fact exist as to Plaintiff's transacting business and alter ego theories of jurisdiction.

### A.     "Transacting Business" Under New York's Long-Arm Statute

Under New York law, "[a]s to a cause of action arising from any of the [following] acts . . . , a court may exercise personal jurisdiction over any non-domiciliary . . . , who in person or through an agent[] transacts any business within the state." CPLR § 302(a)(1). To determine whether there is personal jurisdiction under this clause, "courts must ask whether what the defendant did in New York constitutes a sufficient transaction to satisfy the statute." *State v. Vayu, Inc.*, 206 N.E.3d 1236, 1238 (N.Y. 2023). "[This] is primarily a fact-based inquiry that requires an assessment of whether the non-domiciliary's activities in the state were purposeful . . . [meaning] [they] are volitional acts by which the non-domiciliary avails itself of the privilege of conducting activities within the forum State." *Id.* By its terms, the statute requires that the cause of action arise out of the contacts with the state. CPLR 302(a) ("As to a cause of action arising from any of the acts enumerated in this section, . . . .").

Plaintiff asserts that the following contacts of the Debtor Defendants with New York relating to the MSA constitute transacting business under the New York long-arm statute:

Razon's negotiation of the MSA on behalf of the Debtor Defendants, performed in part while he was physically in New York; the Debtor Defendants' contacts with New York-based company Cantor Fitzgerald L.P. and its affiliates ("Cantor Fitzgerald") during the MSA negotiations; the Debtor Defendants' contacts with New York during performance of the MSA, including the negotiation, execution and performance of the EOA; and the Debtor Defendants' participation in a roadshow event in New York to raise funds for Solaire.

### 1. Preclusive Effect of the Arbitral Findings

The Debtor Defendants argue that the doctrines of issue preclusion and judicial estoppel bar Plaintiff from relying on the New York contacts related to Cantor Fitzgerald, the EOA and the roadshow event in New York. These arguments are unpersuasive.

"Issue preclusion . . . bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008); *accord Cayuga Nation v. Tanner*, 6 F.4th 361, 374 (2d Cir. 2021). Plaintiff's claim to enforce the Final Award arises out of federal law, meaning that the preclusive effect of the arbitral tribunal's decisions is governed by federal law. *See Wyly v. Weiss*, 697 F.3d 131, 140 (2d Cir. 2012); *accord CBF Indústria De Gusa S/A v. AMCI Holdings, Inc.*, No. 13 Civ. 2581, 2023 WL 185493, at *8 (S.D.N.Y. Jan. 13, 2023). Under Second Circuit precedent, "[a]n arbitration decision may effect issue preclusion in a later litigation only if the proponent can show with clarity and certainty that the same issues were resolved." *CBF Indústria De Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017). Issue preclusion applies when:

> (1) [T]he identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; (4) the resolution of the issue was necessary to support a valid and final judgment on the merits; and (5) application of the doctrine is fair.

*Id.*

Judicial estoppel is an equitable doctrine that bars a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding. *Clark v. All Acquisition, LLC*, 886 F.3d 261, 264 (2d Cir. 2018). For the doctrine to apply, a proponent must first show that the adverse party "took a prior inconsistent position and . . . convinced an earlier tribunal to adopt that position." *Id.* at 266. The court must then determine "whether the particular factual circumstances of a case tip the balance of equities in favor" of estoppel. *Id.* at 266-67.

As relevant to Plaintiff's and the Debtor Defendants' cross motions, neither doctrine applies. The Debtor Defendants argue that (1) Plaintiff argued Cantor Fitzgerald played no role in the performance of the MSA and that (2) the arbitral panel adopted this position, thereby precluding and/or estopping Plaintiff from arguing that Cantor Fitzgerald's involvement in performance of the MSA provides a jurisdictional connection to New York. The Declaration of William Weidner filed in the arbitral proceeding states that Cantor Fitzgerald "provided services for activities internal to the relationship with [Plaintiff] only." The Declaration of Jonathan Rein filed in the arbitration states, "Cantor did not perform work in fulfillment of [Plaintiff's] obligations under the MSA." Issue preclusion does not apply because Plaintiff's argument here is not the same issue raised and decided in the arbitral proceeding. Plaintiff offered the quoted testimony to argue that any avoided costs that Plaintiff would have paid to Cantor Fitzgerald for services Cantor Fitzgerald allegedly provided should not be deducted from its damages. The

tribunal declined to deduct these costs because it lacked "evidence of any specific costs . . . that could have been avoided or the basis on which an amount could be calculated." This finding is distinct from whether Cantor Fitzgerald performed services under the MSA, meaning the issue was not actually litigated for purposes of preclusion. Nor is there evidence that Plaintiff convinced the arbitral panel to adopt its alleged position regarding Cantor Fitzgerald performing services under the MSA, meaning judicial estoppel does not apply.

The Debtor Defendants also argue that Plaintiff is judicially estopped from arguing that the negotiation and execution of the EOA were a part of Plaintiff's compensation under the MSA. Plaintiff is not estopped because the Debtor Defendants have not established that Plaintiff convinced the arbitral panel to adopt this position. Debtor Defendants cite two paragraphs of an order adjudicating Plaintiff's motion for interim relief. Both paragraphs state the preliminary conclusion that the Debtor Defendants likely will not be able to establish a proprietary interest in the shares that are subject to attachment in the Philippines. However, the order does not address whether Plaintiff acquired the shares as compensation under the MSA. This tribunal's conclusion was also explicitly preliminary in addressing only the probability of success on the merits, and subject to a later statement that "[t]he Tribunal emphasises that it makes **no declaration** as to the ownership of the Shares, and has not pre-judged any aspect" of the case. (Emphasis and British spelling in the original). This is an insufficient basis for judicial estoppel.

The Debtor Defendants finally argue that the tribunal found that Plaintiff's attendance at the roadshow event was "outside the scope of the MSA" and done as a co-investor in BRC, precluding Plaintiff from arguing here that roadshow events in New York were related to the MSA. The parties had disputed whether Plaintiff should be reimbursed $46,000 in expenses "related to work on behalf of [the Debtor Defendants] and BRC, including a roadshow." The

panel found that because, "as [Plaintiff] . . . recognize[d], [the expenses] were incurred outside the scope of the MSA," they would not be reimbursed. The question of Plaintiff's entitlement to reimbursement of these expenses under the MSA is distinct from questions about the roadshow's connection to the MSA, the parties' business relationship and the claims arising out of the arbitration for purposes of personal jurisdiction. Issue preclusion does not apply.

### 2. Disputes of Fact as to Transacting Business

Neither the Debtor Defendants nor Plaintiff is entitled to summary judgment on the issue of whether the Debtor Defendants had sufficient relevant contacts with the State of New York to constitute "transacting business" for the purpose of the New York long-arm statute.

The alleged facts relevant to Plaintiff's asserted New York contacts are rife with factual disputes that preclude summary judgment:

- **Razon's Presence in New York During Contract Negotiations** – It is undisputed that Razon communicated with Plaintiff and Occeña, Alarilla and Tan, executives of the Debtor Defendants, by telephone and email regarding the MSA negotiations, at least on occasion, in the April to June 2011 timeframe while Razon was physically in New York. Plaintiff offers evidence that Razon directed the negotiations from his residence in Manhattan. The Debtor Defendants offer evidence that Razon did not negotiate the MSA personally and merely gave the Debtor Defendants general parameters for the deal early in the process.

- **Negotiations with Cantor Fitzgerald** – The parties dispute the import of the Debtor Defendants dealings with Cantor Fitzgerald, which acted as an advisor to Plaintiff on the deal. During negotiation of the MSA, the Debtor Defendants communicated with Cantor Fitzgerald, headquartered in New York, via email and phone. The Debtor Defendants offer evidence that they communicated with Cantor Fitzgerald only in its capacity as Plaintiff's legal and financial advisor, rather than as a counterparty. Although Razon understood Cantor Fitzgerald would "provide some funding and administrative services" to Plaintiff, he was unaware of its ownership stake in Plaintiff, and he "had no desire to get involved with a New York investment bank." In communications during negotiations, Tan resisted efforts to incorporate Cantor Fitzgerald into the MSA, stating in a May 24, 2011, email, "We are dealing with GGAM, not Cantor," and in a June 9, 2011, email, "Cantor Fitzgerald has been given personality in this Agreement . . . [b]ut we are suppose[d] to contract only with GGAM." Plaintiff offers evidence that Plaintiff operated out of New York during the negotiations of the MSA and that the Debtor Defendants were aware of Cantor Fitzgerald's ownership stake and affiliation with

Plaintiff.  During initial discussions regarding the MSA, Plaintiff emphasized its affiliation with Cantor Fitzgerald as a selling point.  Negotiations were repeatedly delayed to address Cantor Fitzgerald's concerns.

- **Exchange of Execution Copies of the MSA** – When the MSA was signed, a Cantor Fitzgerald employee with a New York address listed in his email signature emailed the MSA signature page with Plaintiff's signature to the Debtor Defendants.  Occeña responded with the complete agreement executed by the Debtor Defendants.

- **Choice of Law in a Related Agreement** – The MSA contains a provision identifying Philippine law as the controlling law.  In a June 9, 2011, email, Tan also rejected a change to a choice of law clause in the MSA that would set the governing law to New York law, stating, "[T]his contract has no connection with New York at all."  The Debtor Defendants entered into a confidentiality agreement with Global Gaming Asset Management L.P., Plaintiff's parent company, regarding their negotiations of the MSA.  This agreement contains a New York choice of law clause.

- **Performance of the MSA –** Plaintiff introduces evidence that the parties to the MSA understood that Cantor Fitzgerald would perform various services under the MSA out of New York and that it did so.  The Debtor Defendants introduce evidence that Cantor Fitzgerald did not play any role in the management of Solaire or perform work in fulfillment of any of Plaintiff's obligations under the MSA.

- **Negotiation of the EOA with Cantor Fitzgerald –** Clause 18.3 of the MSA states that "[t]he parties shall execute a mutually acceptable Option Agreement."  After the MSA was signed, Plaintiff, Prime and BRC negotiated the EOA, again communicating with Cantor Fitzgerald.  The Debtor Defendants characterize Cantor Fitzgerald as acting as a legal and financial advisor to Plaintiff and Plaintiff characterize them as a negotiating party, offering evidence that Cantor Fitzgerald wired the funds for the option shares under the EOA to a bank account in the Philippines.  The Debtor Defendants note that they are not parties to the EOA, while Plaintiff offers evidence that Razon, on behalf of the Debtor Defendants, entered into the EOA in satisfaction of Debtor Defendants' obligations under the MSA.

- **The Roadshow** – In Spring 2012, Plaintiff and staff from the Debtor Defendants participated in a road show including meetings in New York to attract investors to invest in the Debtor Defendants' parent BRC, to raise funds for the construction of Solaire.  Those efforts resulted in a capital raise of $228.9 million, some of which came from investors based in New York.  The Debtor Defendants offer evidence that although the personnel at the Debtor Defendants and BRC overlap, the relevant staff attended the roadshow meetings behalf of BRC, not the Debtor Defendants.

"To determine whether a party has 'transacted business' in New York, courts must look at the totality of circumstances concerning the party's interactions with, and activities within, the state." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 787 (2d Cir. 1999); *accord Dixon v. Stedman*, No. 22 Civ. 3581, 2023 WL 2710405, at *2 (E.D.N.Y. Mar. 30, 2023). The ultimate inquiry is whether the Debtor Defendants "purposefully availed [themselves] of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws." *D & R Glob. Selections, Inc. v. Bodega Olario Falcon Pineiro*, 78 N.E.3d 1172, 1175-76 (N.Y. 2017) (finding contacts that "resulted in the purposeful creation of a continuing relationship with a New York corporation" sufficient).

Construed in favor of the Debtor Defendants as the non-moving party with respect to Plaintiff's motion for summary judgment, these contacts are insufficient to create personal jurisdiction. Although the Debtor Defendants admit that "Razon had email and/or telephonic communication . . . relating to negotiating the [MSA] during one or more trips that Mr. Razon made to New York," they introduce evidence that his physical presence in New York was fortuitous and incidental to these communications -- or, as he testified at his deposition when asked about specific messages, he could have been in New Jersey, Massachusetts, Pennsylvania or New York, when sending them. *See Barrett v. Tema Dev. (1988), Inc.*, 251 F. App'x 698 (2d Cir. 2007) (summary order) (affirming dismissal for lack of personal jurisdiction where, notwithstanding in-person negotiation, there was no allegation that the purpose of the defendant's representative's presence in New York was to meet with the plaintiff). The MSA, which gives rise to Plaintiff's claims, contains a choice of law clause pointing to the Philippines. The Debtor Defendants' evidence, if credited, indicates that they tried *not* to avail themselves of the privilege of conducting activities in New York or with a New York corporation, resisting a

11

New York choice of law provision.  The Debtor Defendants also rejected attempts to give the New York entity Cantor Fitzgerald "personality" in the contract, such as by giving it notice rights.  Although the MSA disclosed Cantor Fitzgerald's ownership stake in Plaintiff -- and the Debtor Defendants, as sophisticated parties can be presumed to be aware of the contents of agreements in which they enter, *see Simmons v. Reich*, No. 20-4114, 2021 WL 5023354, at *2 (2d Cir. 2021) -- a reasonable fact finder could credit the evidence that the Debtor Defendants understood Cantor Fitzgerald to be only an advisor and provider of services and funding to Plaintiff and had no interest in entering an agreement with Cantor Fitzgerald.  If accepted, this evidence undercuts the idea that the Debtor Defendants purposefully sought out a relationship with a New York entity.  *See D & R Glob.*, 78 N.E.3d at 1176 ("[P]urposeful availment occurs when the non-domiciliary seeks out and initiates contact with New York, solicits business in New York, and establishes a continuing relationship.").  Taken as a whole, the record so construed on Plaintiff's motion for summary judgment is insufficient to create jurisdiction over the Debtor Defendants on the basis of CPLR § 302(a)(1).

Construed in favor of Plaintiff as the non-moving party with respect to the Debtor Defendants' motion for summary judgment, these contacts are sufficient to qualify as transacting business to support the exercise of personal jurisdiction.  The evidence could support a finding that the Debtor Defendants voluntarily engaged in negotiations of the MSA fully aware of Cantor Fitzgerald's involvement with the Solaire project.  A reasonable fact finder also could find that Razon was physically present in New York for part of the negotiation of the MSA and to meet with Howard Lutnick, the CEO of Cantor Fitzgerald.  The parties' confidentiality agreement accompanying their negotiation of the MSA contained a New York choice of law provision, "a significant factor . . . because the parties, by so choosing, invoke the benefits and

protections of New York law." *Sunward Elecs, Inc.*, 362 F.3d at 23.  After entering the MSA, representatives of the Debtor Defendants travelled to New York as part of a roadshow to raise money from New York investors who would invest in BRC to help fund Solaire.  Such contacts qualify as transacting business under the long-arm statute.  *See Vayu, Inc.*, 206 N.E.3d at 1240 ("Long-arm jurisdiction is appropriately exercised over commercial actors who . . . used electronic and telephonic means to project themselves into New York to conduct business transactions.  [A]lthough being physically present in New York is not required, . . . travel[] to New York . . . , is significant.").  Further, Plaintiff's cause of action would arise out of these contacts, as they concern the negotiation of the contract whose breach forms the basis of the parties' dispute, satisfying the long-arm statute.  *See D&R Glob.*, 78 N.E.3d at 1177 (finding the "arising out of" requirement satisfied when there was "an articulable nexus or substantial relationship between defendant's New York activities and the parties' contract, defendant's alleged breach thereof, and potential damages").  Finally, the exercise of jurisdiction under the long-arm statute would comport with due process.  *See Vayu, Inc.*, 206 N.E.3d at 1242 (finding due process satisfied when the defendant contracted with a New York entity, conducted business via email and telephone with that entity and visited New York in connection with that relationship).

These disputes of fact preclude summary judgment in favor of either Plaintiff or the Debtor Defendants on the issue of personal jurisdiction under New York's long-arm statute.

### B.    Alter Egos of Razon

Plaintiff argues that personal jurisdiction exists over the Debtor Defendants because they are alter egos of Razon, over whom there is "tag" personal jurisdiction.  "The alter-ego theory provides for personal jurisdiction if the parent company exerts so much control over the

subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 274 (2d Cir. 2023). Plaintiff and Razon's cross-motions for summary judgment on the question of whether the Debtor Defendants are alter egos of Razon are addressed below.  In brief, genuine disputes of material fact preclude resolving the alter ego issue on summary judgment.

### C.    Contractual Consent to Personal Jurisdiction

Plaintiff argues that the Debtor Defendants consented to personal jurisdiction.  The MSA states "the decision of the arbitral panel shall be binding upon both Parties and enforceable in all jurisdictions."  Plaintiff primarily relies on *Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1276-77 (2d Cir. 1971), which held that a contractual provision stating that "judgment upon an award may be entered in any court of competent jurisdiction," constituted a waiver of personal jurisdiction in New York.  However, in that case, the underlying arbitration took place in New York, and the contract included an explicit consent to the American Arbitration Association's Rules, which in turn include an explicit consent to service of process. *Id.* at 1276 & n.3.  The Second Circuit dealt with an argument regarding personal jurisdiction in the courts of the state where the arbitration took place, pursuant to a contract that granted the American Arbitration Association the right to set the time and place of arbitration, *id.* at 1271 n.1.  Here, Plaintiff argues the MSA constitutes consent to personal jurisdiction in all jurisdictions, including New York where the arbitration did not take place.  This case is thus more akin to *Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221 (2d Cir. 2014), in which the Second Circuit declined to read as a waiver of all objections to personal jurisdiction "a standard entry-of-judgment clause," which stated "[a]ny award of the arbitral tribunal may be enforced by judgment . . . in any court having jurisdiction over the award or over the person or

the assets of the owing Party or Parties." *Id.* at 226-27.  The court reasoned that the contractual

language "does not speak to personal jurisdiction," notwithstanding the reference to jurisdiction

"over the person or the assets" of the parties.  *Id.* at 227.  *Sonera* is persuasive here.  The entry of

judgment clause in the MSA cannot fairly be read to consent to personal jurisdiction in all

courts.  Plaintiff's argument regarding jurisdiction based on consent fails as a matter of law.

> **D.**      **Rule 4(k)(2)**

Finally, Plaintiff "reserves its right to present evidence" in support of jurisdiction over

the Debtor Defendants under Federal Rule of Civil Procedure 4(k)(2).  That rule states that, for

claims arising under federal law, "serving a summons . . . establishes personal jurisdiction over a

defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general

jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and

laws."  Fed. R. Civ. P. 4(k)(2); *see also Porina v. Marward Shipping Co.*, 521 F.3d 122, 126-28

(2d Cir. 2008) (describing the three requirements for jurisdiction under Rule 4(k)(2); *accord*

*George Moundreas & Co SA v. Jinhai Intelligent Mfg. Co Ltd*, No. 20 Civ. 2626, 2021 WL

168930, at *11 (S.D.N.Y. Jan. 18, 2021).  It is unlikely that the Debtor Defendants' conduct

would not be tantamount to "transacting business" and yet would be sufficient to satisfy the

minimum contacts requirement of the Constitution.  Typically, contacts that are sufficient to

satisfy the Due Process Clause of the U.S. Constitution, also satisfy the "transacting business"

provision of the New York long-arm statute.  *See Licci ex rel. Licci v. Lebanese Canadian Bank,*

*SAL*, 673 F.3d 50, 61 n.11 (2d Cir. 2012) ("[T]he jurisdictional analysis under the New York

long-arm statute may closely resemble the analysis under the Due Process Clause of the

Fourteenth Amendment.  This similarity of state-law and constitutional standards appears

particularly evident with respect to N.Y. C.P.L.R. § 302(a)(1)."); *Deutsche Bank Sec., Inc. v.*

*Mont. Bd. of Invs.*, 850 N.E.2d 1140, 1143 (N.Y. 2006) ("In short, when the requirements of due process are met, as they are here, . . . [the conduct] is within the embrace of the New York long-arm statute.").

*   *   *

Plaintiff and the Debtor Defendants' cross-motions regarding personal jurisdiction are denied due to genuine disputes of material fact as to the basis for jurisdiction.  Because there is a genuine dispute whether the Court has personal jurisdiction over the Debtor Defendants, Plaintiff's motion to confirm the award against them is denied without prejudice to renewal.  *See Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 810 (2d Cir. 2022) (describing the question of personal jurisdiction as "antecedent" to defenses to confirmation under the New York convention), *cert. denied*, 143 S. Ct. 786 (2023).  Plaintiff's motion to preclude the testimony of Catherine Rogers, Fredric Gushin and Daniel Reeves is also denied without prejudice to renewal, because their testimony relates only to Plaintiff's motion to confirm the arbitral award.

## IV.   RAZON

Plaintiff also brings claims against Razon, seeking to enforce the Final Award against him as the alter ego of the Debtor Defendants and alleging trespass to chattels regarding his interference with Plaintiff's ownership interest in the shares of BRC stock.  Even though Plaintiff's motion to confirm the Final Award against the Debtor Defendants is denied without prejudice, Plaintiff may still seek to enforce the award against Razon.  *See CBF Indústria de Gusa S/A*, 850 F.3d at 74 (allowing an award creditor to seek to enforce an arbitral award against alleged alter egos of the award debtor prior to confirmation of the award).  Plaintiff and Razon cross-move for summary judgment on the issue of Razon's alter ego status.  Razon further

16

moves for summary judgment on the trespass claim.  Genuine disputes of material fact preclude

summary judgment on the alter ego question, but summary judgment is granted to Razon on the

trespass claim.

> **A.      Alter Ego Liability**

>> **1.       Applicable Law**

Federal common law on veil piercing applies.  "[T]he question of whether a third party

not named in an arbitral award may have that award enforced against it under a theory of alter-

ego liability . . . is one left to the law of the enforcing jurisdiction, here the Southern District of

New York, under the terms of Article III of the New York Convention."  *Id.* at 75.  The law of the

Southern District of New York on veil piercing is federal common law.

Federal common law provides a disjunctive, equitable test for alter ego liability.  This

conclusion is based on federal common law in analogous contexts.  The parties do not identify,

and the Court has not found, Second Circuit decisions articulating the federal common law

standard for alter ego status in this precise circumstance -- i.e., enforcing an arbitral award under

the New York Convention against an entity not alleged to be the alter ego of a foreign sovereign.

The Second Circuit has addressed enforcement of an arbitration agreement against an

alter ego, holding that "veil-piercing/alter ego" is a doctrine "aris[ing] out of common law

principles of contract and agency law" "under which nonsignatories may be bound to the

arbitration agreements of others."  *Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d

Cir. 1995).  "[T]he courts will pierce the corporate veil in two broad situations: to prevent fraud

or other wrong, or where a parent dominates and controls a subsidiary."  *Id.* at 777.  A similar,

disjunctive standard applies when determining whether an entity is the alter ego of a foreign

government for purposes of personal jurisdiction to enforce an arbitral award.  *See Esso Expl. &*

*Prod'n Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 40 F.4th 56, 69 (2d Cir. 2022) ("An alter ego relationship is not easy to establish . . . . [existing] only where the instrumentality is so extensively controlled . . . that a relationship of principal and agent is created or where affording the entity separate juridical status would work fraud or injustice."); *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021) (same).  Cases under federal maritime law also use the disjunctive test.  *See, e.g., Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008) ("The prerequisites for piercing a corporate veil are . . . : [t]he individual must have used the corporate entity to perpetrate a fraud or have so dominated and disregarded the corporate entity's corporate form that the corporate entity primarily transacted the individual's personal business rather than its own corporate business."); *Dow Chem. Pac. Ltd. v. Rescator Mar. S.A.*, 782 F.2d 329, 342 (2d Cir. 1986) (same).  *But see Fisser v. Int'l Bank*, 282 F.2d 231, 238 (2d Cir. 1960) (applying a three-part conjunctive test borrowed from New York law).

As the references to "prevent[ing] wrong," *Thomson-CSF, S.A.*, 64 F.3d at 776, or "work[ing] . . . injustice," *Esso Expl.*, 40 F.4th at 69, suggest, the standard for alter ego liability is equitable.  *See Williamson*, 542 F. 3d at 53 (maritime law) ("Instead of a firm rule, the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result.").  This inquiry is fact-bound.  *See Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l*, 198 F.3d 88, 97 (2d Cir. 1999) (discussing "all the circumstances here [that] justify piercing the corporate veil," including identity of interests, use of the same mailing address and references by the party opposing veil piercing to the entities "as though they were interchangeable" in litigation), *abrogated on other grounds by Loc. Union 97, Int. Bhd. Of Elec. Workers, AFL-CIO v. Niagara*

*Mohawk Power Corp.*, 67 F.4th 107 (2d Cir. 2023); *Thomas-CSF, S.A.*, 64 F.3d at 777 ("Veil piercing determinations are fact specific and differ with the circumstances of each case.").

Razon cites various cases decided under Philippine and New York law to argue that a stricter, conjunctive standard applies.  He also argues, applying this case law, that Plaintiff must show Razon rendered the Debtor Defendants judgment proof and that Plaintiff's ability to conduct due diligence before entering the MSA precludes a finding of alter ego status.  Because federal law applies, these cases are inapposite.  To the extent Razon cites non-binding cases that state that federal law mirrors the New York standard, *see, e.g.*, *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 260 (S.D.N.Y. 2014) (stating in dicta that "the federal and New York standards appear to be one and the same"), the Court respectfully disagrees.  *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987) (differentiating the inquiry under federal common law from "the strict *alter ego* doctrine of state law"); *accord Garcia v. Vill. Red Rest. Corp.*, No. 15 Civ. 6292, 2017 WL 1906861, at *6 (S.D.N.Y. May 8, 2017).  Whether Razon rendered the Debtor Defendants judgment proof or Plaintiff knew of their corporate structure before entering the MSA may be relevant to the alter ego determination, but Razon has not shown that federal common law requires consideration of those particular facts.

Razon also argues that Plaintiff must introduce evidence relating to alter ego status for each corporate entity between Razon and the Debtor Defendants.  This argument is unpersuasive as a rigid rule because it stands in tension with the equitable nature of the inquiry under federal law.  *See Williamson*, 542 F.3d at 53.  Of the cases on which Razon relies, a majority are non-binding and all of them apply the law of other jurisdictions.  *See In re Tronox Inc.*, 855 F.3d 84, 106 n.27 (2d Cir. 2017) (Delaware and Pennsylvania law); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 453 F. Supp. 2d 644, 689 (S.D.N.Y. 2006) (English law); *Capmark Fin.*

*Grp., Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349 (S.D.N.Y. 2013) (New York, Delaware and Nova Scotia law); *Noto v. Cia Secula di Armanento*, 319 F. Supp. 639, 647 (S.D.N.Y. 1970) (Iranian, Dutch and Italian law).

### 2.    Application

Plaintiff and Razon's motions for summary judgment on the issue of alter ego liability are denied because they each offer evidence that, if credited, is sufficient to allow finding in their favor on the alter ego issue.

Razon provides evidence that precludes a finding that the Debtor Defendants are his alter egos.  Specifically, he offers expert testimony that the Debtor Defendants adhere to corporate formalities under Philippine law.  This includes quorum requirements, holding regular meetings and preparing minutes of the meetings.  In Razon's telling, the Debtor Defendants, for each entity, held meetings that complied with Philippine law throughout the term of the MSA, the arbitration and this litigation.  Razon's evidence further shows: that the Debtor Defendants are solvent and have assets sufficient to satisfy the Final Award; that they have never transferred money to Razon personally and have made only de minimis payments to entities beneficially owned by him, beyond dividend payments distributed to all shareholders; that Razon has never guaranteed a loan on behalf of the Debtor Defendants; and that the Debtor Defendants have never relied on Razon's assets when seeking loans.

Razon also offers evidence that Plaintiff was fully aware of the relationship between Razon and the Debtor Defendants, counseling against equitable relief.  According to Razon, Plaintiff, with Cantor Fitzgerald, "reviewed a variety of diligence documents with [the Debtor Defendants'] management" and undertook "a process of in depth due diligence" prior to entering the MSA, including into the financial condition of the Debtor Defendants.  When Plaintiff

entered into the MSA, it did so fully aware of the Debtor Defendants' corporate structure, Razon's personal wealth and influence in the Philippines and the limited recourse Philippine courts could offer in the event of corruption.  At the time of entering the MSA and the EOA, Plaintiff did not believe that Razon offered a personal guarantee for any liabilities incurred by the Debtor Defendants.  The circular published by BRC in connection with the public offering of its stock, which Plaintiff's representative reviewed in draft, makes clear that Razon exerted substantial control over BRC and that investors would have difficulty enforcing judgments outside the United States.

On the other hand, Plaintiff offers evidence that Razon exercised domination and control over the Debtor Defendants to such an extent that veil piercing would be equitable.  Specifically, it is undisputed that Razon votes all but four of the 64.7 million shares of Sureste and all but four of the approximately 4.84 billion shares of BRHI, and serves as the Chairman and CEO of both entities (and BRC).  Plaintiff also offers evidence that board approval of Razon's appointments to his positions with the Debtor Defendants was obtained only as a formality and that Razon exercises complete control over the selection of all directors.  All board decisions by BRC and the Debtor Defendants have been unanimous.  Representatives of the Debtor Defendants understood Razon to be "the ultimate decision maker" with respect to the negotiations of the MSA and stated that "it was effectively Mr. Razon . . . who granted [Plaintiff] the equity option" under the EOA.  Occeña told investors in November 2012, regarding the grant of shares under the EOA, that Razon "doesn't want to relinquish control" of BRC.  For his part, in a Declaration filed in the arbitration, Razon referred to the corporate structures of BRC, Prime and the Debtor Defendants as "the vehicles by which the deal would be brought about," and stated they "weren't important . . . and shouldn't be given some exaggerated importance."  He also stated he

did not want to release the BRC shares because doing so could "undermine [his] control over the company" and "impact voting and other corporate governance decisions," which "would be especially problematic for me."  Plaintiff also offers evidence that Razon used his control over the Debtor Defendants to stop trading of BRC shares temporarily, long enough to seek writs of attachment barring Plaintiff from disposing of the shares.  Plaintiff offers evidence from which it is reasonable to infer that this conduct is not intended to protect the interests of the Debtor Defendants, as Razon argues, but instead for Razon's personal interest in maintaining control over BRC and the Debtor Defendants.

In the fact-bound and equitable context of veil piercing under federal common law, both Razon and Plaintiff have introduced sufficient evidence to allow a reasonable fact finder to find in their favor.  Accordingly, their cross-motions for summary judgment on Razon's alter ego liability are denied.  Because the testimony of Plaintiff's expert Troy Dahlberg is unnecessary to deny Razon's motion for summary judgment, Razon's motion to exclude Dahlberg's testimony is denied without prejudice to renewal.

### B.    Trespass Claim

Razon moves for summary judgment on Plaintiff's trespass to chattels claim.  "A trespass to chattel may be committed by intentionally . . . using or intermeddling with a chattel in the possession of another."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *accord Iacovacci v. Brevet Holdings, LLC*, No. 18 Civ. 8048, 2023 WL 2631966, at *9 (S.D.N.Y. Mar. 24, 2023).  An opinion dated January 11, 2023, found that Plaintiff had sufficiently pleaded a claim for trespass to chattels by alleging the following acts of interference by Razon: (1) halting trading of all shares of BRC stock on the Philippine Stock Exchange, (2) misusing Philippine court proceedings to enjoin the sale of the shares, (3) causing the Debtor Defendants

to deny permission to Deutsche Bank to release the shares, (4) making public statements regarding the shares that had the effect of interfering with Plaintiff's ownership rights and (5) causing the Debtor Defendants to renew the bonds on the writs of attachment.  Summary judgment is granted to Razon because Plaintiff does not proffer sufficient evidence of Razon's interference with Plaintiff's BRC shares.

On March 21, 2022, Plaintiff's conversion claim was dismissed as time-barred under New York's three-year statute of limitations, which the parties did not dispute governed the claim.  Plaintiff repleaded the claim as one alleging trespass to chattels, which survived a motion to dismiss in the January 11, 2023, opinion.  The same three-year statute of limitations applies to the trespass claim, limiting damages to those acts of interference that took place after March 29, 2018, three years prior to the filing of this lawsuit.  *See Sporn v. MCA Recs.*, 448 N.E.2d 1324, 1327 (N.Y. 1983) ("Trespasses of a continuing character may be considered a continuing trespass which would give rise to successive causes of action each time there is an interference with a person's property so that relief would not be barred by the Statute of Limitations for interferences occurring within three years of the commencement of the action."); *accord Rachunow v. Jamieson*, No. 20 Civ. 5627, 2021 WL 1894206, at *3 (S.D.N.Y. May 11, 2021).  The first two acts of interference pre-date March 29, 2018, and cannot constitute trespass.

The public statements consist of BRC's disclosures in its annual reports that the Debtor Defendants "were advised by Philippine counsel that an [arbitral award] can only be enforced in the Philippines through an order of a Philippine court of proper jurisdiction after appropriate proceedings," with exact phrasing varying across disclosures.  This is a characterization of legal advice and does not constitute "intermeddling" with Plaintiff's ownership interest, as Plaintiff

does not introduce evidence as to what effect, if any, these disclosures had on Plaintiff's ability to dispose of the shares.

Razon offers uncontested evidence from Deutsche Bank that it is a neutral third-party custodian of the shares and that it is merely complying with Philippine court orders, in particular the writs of attachment. Plaintiff does not offer any evidence that Razon pressured or otherwise caused Deutsche Bank not to release the BRC shares by any means besides seeking and renewing the writs. While under the standard applicable to summary judgment, all reasonable inferences must be drawn in Plaintiff's favor, Plaintiff provides no additional evidence of alleged interference with the shares beyond the writs.

The renewal of the writs of attachment, standing alone, cannot support a claim for trespass to chattels. On February 25, 2014, a Philippine trial court issued writs of attachment preventing Plaintiff from "disposing of . . . the Shares during the pendency of the arbitration proceedings in Singapore." On November 23, 2017, the Philippine Regional Trial Court upheld the validity of the writs. And on November 8, 2018, the Philippine Court of Appeals held it did not have jurisdiction to hear Plaintiff's appeal of that determination. In other words, there is no evidence in the record that the writs or Razon's continuing renewal of the necessary bonds are invalid under Philippine law. Without such evidence, the issuance of the writs by the Philippine courts is a judicial decision entitled to deference under principles of comity. *See Next Invs., LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021). Particularly in light of the lack of other evidence of interference with Plaintiff's property interest in the BRC shares, the renewal of the writs cannot support a claim for trespass to chattels.

\*     \*     \*

For the reasons above, Plaintiff's motion for summary judgment is **DENIED** and Defendants motions for summary judgment are **GRANTED IN PART** and **DENIED IN PART** as follows:

- Debtor Defendants and Plaintiff's cross-motions for summary judgment on the issue of personal jurisdiction over the Debtor Defendants are denied.

- Plaintiff and Razon's cross-motions for summary judgment on enforcement of the arbitral award against Razon as the alter ego of the Debtor Defendants is denied.

- Razon's motion for summary judgment on the trespass claim is granted.

- Plaintiff's motion to confirm the Final Award is denied without prejudice.

- Plaintiff's motion to exclude expert testimony offered by the Debtor Defendants and Razon's motion to exclude expert testimony offered by Plaintiff are denied without prejudice.

The parties' joint request for oral argument is **DENIED** as moot.  By **September 26, 2023,** the parties shall (1) meet and confer in an effort to agree on next steps in the litigation and (2) file a joint status letter with their joint proposal, and to the extent they do not agree, with their individual proposals.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 327, 335, 350, 353, 357 and 360.

Dated: September 12, 2023
      New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**