# Exhibit F

IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF THE UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW (2010) BETWEEN:

GLOBAL GAMING PHILIPPINES LLC

and

GGAM NETHERLANDS B.V.

*(CLAIMANTS)*

- versus -

BLOOMBERRY RESORTS AND HOTELS INC.

and

SURESTE PROPERTIES, INC.

*(RESPONDENTS)*

---

DECLARATION OF MICHAEL D. FRENCH IN SUPPORT OF
CLAIMANTS' REPLY MEMORIAL

---

GGAM-SDNY-0322140

## DECLARATION OF MICHAEL D. FRENCH

I, Michael Douglas French, of 137 Juniper Spring Road, Nogal, New Mexico 88341, United States of America, declare as follows:

1.      I submit this Declaration ("Declaration") in the above-captioned Arbitration (the "Arbitration") between Claimants Global Gaming Philippines LLC and GGAM Netherlands B.V. (together, "GGAM"), on the one hand, and Bloomberry Resorts and Hotel, Inc. ("Bloomberry Hotels") and Sureste Properties, Inc. ("Sureste") (collectively, "Bloomberry" or the "Owners"), on the other.

2.      My declaration is given voluntarily.  The contents of this Declaration are true and correct and based on my personal knowledge.

3.      I am a U.S. Citizen over the age of 18.  I am competent to give this Declaration.  I affirm the truth of this Declaration, and if called as a witness in this matter, I could and would competently testify to the matters set forth in this Declaration.

4.      I have personal knowledge of events discussed in this Declaration and that are the subject of this Arbitration.

5.      Capitalized terms not defined in this Declaration shall have the meaning given to those terms in the Management Services Agreement (the "MSA") or the Equity Option Agreement (the "EOA").

### Professional Background

6.      I am currently a Senior Vice President for GGAM LLC responsible for directing and coordinating company activities at managed properties.  From January 2012 until September 2013, I was employed as the Chief Operating Officer ("COO") of the Solaire Manila Resort and Casino ("Solaire").  As COO, I was responsible for nearly all aspects of performance of the property including gaming, non-gaming, marketing,

2

GGAM-SDNY-0322141

human resources, security, IT, and surveillance).[1] In accordance with the MSA, I was "nominated" by GGAM, and although at all times, I was an employee of Bloomberry, I also served as the lead member of the Management Team through which GGAM was required to perform its contractual obligations.

7.     I have more than 30 years' experience in hotel and casino management, more than 18 of which includes senior management positions with integrated casino-resorts, and six years as a General Manager or COO of internationally-recognized casino resort properties.  Immediately prior to joining Solaire, I was Senior Vice President/General Manager for Altira Macau, a Forbes 5-Star Rated Melco-Crown Entertainment casino resort.  For a portion of my employment with Melco-Crown, I was also the Senior Vice President of City of Dreams, where I worked for Garry Saunders while he was serving as the COO of Melco Crown Entertainment.

8.     From 1998 until 2002, I worked as the Senior Vice President of Operations at the Venetian Resort Hotel Casino in Las Vegas, Nevada, the first major integrated resort developed by the Las Vegas Sands Corporation ("LVS").  In this role I was responsible for gaming, hotel, food & beverage, engineering and security, and in part, hotel sales, Asian and domestic casino marketing and database marketing.  During my tenure at LVS, my superiors were Bradley Stone, who served as Executive Vice President, and William Weidner, who served as President and Chief Operating Officer.

9.     My complete résumé is included as Appendix A to this Declaration.

### Responsibilities as Chief Operating Officer of Solaire

10.     In June of 2011, Garry Saunders contacted me about an opportunity at a large scale integrated casino-resort project then under development in Entertainment City in Manila, Philippines. Although I had a good position in Macau, the opportunity

---

[1] Under the reporting structure set forth in the MSA, the finance function also reported to me as COO. However, Bloomberry unilaterally changed that structure in 2012, undermining my ability to coordinate the finance function with other functions and departments, and hindering overall management.

3

GGAM-SDNY-0322142

was interesting, and so I discussed the opportunity and the potential terms with GGAM and the controlling shareholder, Mr. Razon, over the next several months. When I was offered a position as the COO of Solaire in November 2011, I understood that in addition to my responsibilities as COO within Bloomberry itself, I would also be acting as Solaire's Management Team leader, meaning I would be responsible for representing GGAM in performing management services at Solaire. As a result, I would be reporting to both Enrique Razon, Jr., the Chief Executive Officer ("Mr. Razon") of Solaire and to GGAM. Being hand-selected by Mr. Saunders, Mr. Stone and Mr. Weidner was an honor as I have a great deal of respect for their individual contributions to the casino industry. I had positive experiences working for them each previously, and based on their experience and reputations I felt confident that they could successfully lead the operations and management of a large-scale integrated resort in Asia, even with an inexperienced owner newly embarking on a casino venture.

11.    At the outset, my responsibilities included implementing the plans to achieve expected results for the entire property including gaming and hotel operations and all support functions such as IT, Human Resources, Finance, Engineering, Surveillance, Sales and Marketing. Even before I fully came on board as COO of Solaire, I began assisting GGAM in identifying potential candidates to join Solaire's management team, including beginning the search for an F&B Vice President, interviewing an HR candidate, and meeting with some potential candidates selected by Dennis Andreaci. Additionally, as early as December 2011 Ed Chen (then Solaire's CFO) and I met in Macau with a purchasing company to begin the process of specifying and ordering operating supplies and equipment ("OS&E"). GGAM and I truly had to hit the ground running on this project in order to reach the Owner's goal of opening in less than two years from the time GGAM was first enlisted.

12.    The opening of an integrated resort requires significant elements to be developed and in place before the first customer enters. Thus, in the period after I

4

accepted the position in November 2011 until opening in March 2013, there were significant efforts by GGAM and by the management team, as individuals were added. Key staff, including the rest of the management team had to be recruited.  Policies and procedures had to be developed. Operating staff needed to coordinate with the construction team as elements were turned over to assure that the construction met standards and all punch list items were completed.   IT had to be selected, purchased and configured.  OS&E needed to be specified, ordered and received.  Staff needed to be trained.  All of those efforts must be completed before opening.  The work is thus substantially "front loaded."  Moreover, the schedule was aggressive – at the time I was recruited, opening was less than 2 years away.

13.     In my prior experience both acting as a COO (or general manager) and in other management positions, it has always been my experience that a COO is the "first in command" at the property level and is responsible for overseeing all aspects of the ongoing operations for the facility.  The COO reports to the CEO, and all other property level executive positions report directly to the COO.  This was initially the case when I was hired, but on May 14, 2012, Ms. Estela Occeña, at the direction of Mr. Razon, notified me and GGAM that Mr. Razon had unilaterally changed the reporting structure so that the Chief Financial Officer would report directly to the CEO, thus removing my direct access to, and responsibility for, the performance of Solaire's Finance Department, which was ostensibly overseen by Ms. Occeña from that point on.[2]

14.     In performing my duties as COO, I regularly communicated with both Mr. Razon and GGAM regarding operational developments and milestones.  Prior to the Solaire's Opening, Mr. Razon and I had a standing weekly lunch meeting so that I could discuss issues, make recommendations, discuss operational decisions and proposals, and obtain approvals directly from the CEO.  I was transparent with Mr. Razon

---

[2] *See* Exhibit A, E-mail from E. Occeña to G. Saunders (May 14, 2012).

5

GGAM-SDNY-0322144

regarding issues and concerns and I assumed he would be similarly open with me. Mr. Razon never indicated to me that he was dissatisfied with my pre-opening performance as COO.

15.    Similarly, I had open and frequent communications with GGAM. I spoke with Garry Saunders nearly every day (sometimes multiple times a day), via telephone, skype, or, when Mr. Saunders was on-site, in person. Additionally, each time Mr. Saunders and Mr. Stone visited the Facilities, we would conduct multiple meetings among ourselves and with the Management Team to discuss operational matters.

16.    As COO, I never had any concerns with the level of GGAM's involvement overseeing and guiding the operations both leading up to and following the opening of Solaire. Mr. Saunders and Mr. Stone were heavily involved in on-the-ground efforts ranging from handling construction issues, developing the Business Plan and marketing plans, developing financial projections, and addressing operational and staffing concerns on an as-needed basis. While I did not work closely with Bill Weidner, I would not have expected to, as I had the full support and supervision of Mr. Saunders and Mr. Stone and was aware that Mr. Weidner was primarily focused on maintaining and developing VIP contacts for Solaire in other Asian countries. My level of interaction with the GGAM principals was consistent with what I would have expected as COO of any large-scale integrated resort (such as a Melco Crown or LVS property), and in many ways they had more of a presence in the day-to-day operations of Solaire than I would have expected at another property.

17.    Although I acted as a primary, or day-to-day, liaison between Mr. Razon and GGAM, Mr. Razon typically met with GGAM as well when any of the principals were visiting the Facilities. Prior to opening, Mr. Razon would meet in person with Mr. Saunders, Mr. Stone, and on occasion, Mr. Weidner primarily to provide progress updates (general catch-up meetings), but they also discussed significant presentations on branding, design, and other operational developments. From my perspective there

6

GGAM-SDNY-0322145

never appeared to be an issue with Mr. Razon having sufficient "access" to GGAM to raise concerns or ask questions about operations at any time during my tenure as COO. In fact, when situations did arise that required direct involvement by anyone at GGAM, they were always extremely responsive and committed to finding the appropriate solution.

18.     For example, following the opening of Solaire on March 16, 2013, GGAM worked quickly and diligently with the Management Team to retarget marketing efforts in order to better reach the local mass market.  In connection with these efforts, GGAM worked with me and the management team to conduct a detailed analysis of Solaire's competitor Resorts World's own mass marketing programs as part of the process of identifying what types of programs were successful with the local Filipino customer.[3]  I discuss GGAM's post-opening marketing efforts in more detail below.

### Relationship with CEO and EXCOM

19.     From my initial introduction to Mr. Razon until I resigned, I had always had a positive working relationship with Mr. Razon.  I cannot recall any time Mr. Razon voiced specific concerns he had with GGAM's performance.  Thus, I was surprised in July 2013 when Mr. Razon informed me that he was planning to terminate GGAM.  At that time, Mr. Razon made no indication that he was unsatisfied with my performance, and in fact, when I asked him if I should start looking for another job he told me not to do anything "rash."  When I followed up with members of the Management Team to see if Mr. Razon had raised concerns directly with individual executives regarding their performance, I consistently heard that Mr. Razon was happy with their job performance.  In fact, Adrian Ort, the VP of Hotel Operations (who was responsible for overseeing a number of the "issues" Mr. Razon ultimately raised with GGAM in his

---

[3] *See* Exhibit B, E-mail from G. Saunders to N. Mirasol (April 17, 2013) (GGAM0013307-11).

7

GGAM-SDNY-0322146

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 12, 2015

_____
Michael D. French

37

GGAM-SDNY-0322176

# Michael D. French
307 Scenic Drive ♦ P.O. Box 1587
Ruidoso, New Mexico 88355
michaeldfrench@aol.com

APPENDIX A

## *Qualifications*

- Over 40 years of Gaming and Resort experience which reflect a history of setting industry standards for excellence in customer satisfaction, employee satisfaction and profitability.
- Experienced with diverse markets, hotels and destination resorts including Las Vegas "megaresorts", Macau China integrated resort, Philippines gaming resort, Forbes Five Star rated experience, Native American gaming casinos, large upscale convention hotels, city center hotels, and a destination resort with skiing, golf and big game hunting.
- Participated in or led the opening of eleven properties including hotels, casinos, resorts, conference centers and integrated resorts.
- Led staffs ranging from as few as 150 to as many as 6,000 employees.
- Well known as a highly effective communicator who can lead and motivate a team to perform at the highest level.
- Proven effective in operations with union contracts as well as non-union properties.

## *Professional History*

## Global Gaming Asset Management (GGAM)          Jan 2012 to Present

**Senior Vice President**                                    **October 2013 to present**
Member of the senior team of Global Gaming Asset Management.  Responsible for directing and coordinating company activities at managed properties. Participate in evaluations of potential developments.

**Chief Operating Officer**                                   **Jan 2012 to Sept 2013**

**Solaire Manila Resort and Casino**
185,000 square feet of casino space including Mass Market and VIP private gaming rooms, 300 table games (200 mass and 100 VIP), 1,276 slot machines, 500 rooms, 11 food and beverage outlets, 20,000 square feet of convention / meeting space, full service spa and outdoor pool complex. Approx. 4,500 employees.   First property in the Entertainment City area of Manila.  Property opened in March 2013.

Overall responsibility for all aspects of performance of the property (gaming, non-gaming, marketing, HR, security, finance, IT, Surveillance). Responsible for the development and implementation of business plans and strategies, marketing plans, service strategies, human resources policies and guidelines, financial  projections, equipment and IT specifications, and other actions to open and operate the property in a manner to achieve goals for service quality and employee engagement as well as budgeted financial results. Total of 12 Direct and Indirect reports. Participate in the development of corporate strategies to include future phases of the property. Member of the team that successfully completed Bloomberry's first public equity offering.

## Melco-Crown Entertainment                           2007 to 2012

**Senior Vice President / General Manager**           **Sept 2010 to Jan 2012**
**Altira Macau (Casino Resort Hotel)  (Forbes 5 Star Rated)**
170,000 square feet of casino space including VIP private gaming rooms, 210 table games, 216 guest rooms (Forbes 5 Star Rating), 10 food and beverage outlets including 1 Star Michelin Rated Italian Restaurant.  Luxury spa (Forbes 5 Star rating) including a full fitness center and one of the world's top 10 indoor pools. Altira is one of two 5 Star rated properties in Macau.  Approx. 3,000 employees.

Overall responsibility for all aspects of service and performance of the property. In conjunction with

1

GGAM-SDNY-0322177